# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

| | |
|---|---|
| **Devin G. Nunes,** | **Case No. 5:19-cv-04064-CJW-MAR** |
| Plaintiff, | **Defendants' Brief in Support of Their** |
| v. | **Motion to Dismiss, to Strike the Amended** |
| | **Complaint Pursuant to Cal. Civ. Proc.** |
| **Ryan Lizza** and **Hearst Magazine Media, Inc.,** | **Code § 425.16, and to Strike Pursuant to** |
| | **Fed. R. Civ. P. 12(f)** |
| Defendants. | **(Oral Argument Requested)** |

Defendants Ryan Lizza and Hearst Magazine Media, Inc. ("Defendants") respectfully submit this brief in support of their motion (the "Motion") to dismiss the Amended Complaint filed in this case by Plaintiff Devin Nunes, *see* ECF No. 23 (the "Amended Complaint"), pursuant to Fed. R. Civ. P. 12(b)(6), to strike the Amended Complaint pursuant to California's anti-SLAPP law, Cal. Civ. Proc. Code § 425.16, and to strike under Fed. R. Civ. P. 12(f).

# Table of Contents

Introduction.................................................................................................................1

Factual Allegations ....................................................................................................5

    A.    Devin Nunes Is a United States Congressman from California.............................5

    B.    *Esquire* Magazine Publishes the Article ..................................................5

    C.    Congressman Nunes Files this Lawsuit .....................................................8

Argument ....................................................................................................................8

    I.    Congressman Nunes's Amended Complaint Should Be Dismissed
        Pursuant to Rule 12(b)(6) ....................................................................8

        A.    Only False, Defamatory, Factual Statements that Are "Of and
            Concerning" Congressman Nunes Are Actionable Under
            Both California and Iowa Law ..................................................10

        B.    None of the 11 Challenged Explicit Statements in the Article Are
            Actionable, as a Matter of Law ................................................13

        C.    Congressman Nunes Has Failed to State a Claim for Defamation by
            Implication ................................................................................20

        D.    Congressman Nunes Has Failed to Plead Facts Sufficient to Make
            His Allegation of Actual Malice "Plausible."............................27

        E.    Congressman Nunes Has Failed to Plead an Underlying Cause of
            Action to Sustain a Civil Conspiracy Claim .............................29

    II.    Congressman Nunes's Amended Complaint Should Be Stricken
        Pursuant to California's Anti-SLAPP Law.........................................29

        A.    California Law Supplies the Rule of Decision .........................29

        B.    The California Anti-SLAPP Law's Motion-to-Strike Provision Is a
            Substantive Immunity from Suit that Applies in Federal Court ...............31

        C.    The Amended Complaint Should Be Stricken Pursuant to the
            Anti-SLAPP Statute ...............................................................32

III.    This Court Should Strike All or Part of the Amended Complaint
Because Its Words, Tone, and Averments Well Exceed the
Bounds of Permissible Pleading and Prejudice the Defendants
by Including Redundant, Immaterial, Impertinent, or
Scandalous Matter ................................................................................... 32

Conclusion ....................................................................................................................... 35

# Table of Authorities

**Page(s)**

**Cases**

Abadian v. Lee,
117 F. Supp. 2d 481 (D. Md. 2000) ..................................................................22, 23

Abbas v. Foreign Policy Grp., LLC,
783 F.3d 1328 (D.C. Cir. 2015) ..............................................................................19

Aguilar v. Universal City Studios, Inc.,
174 Cal. App. 3d 384 (1985) ....................................................................................11

Ashcroft v. Iqbal,
556 U.S. 662 (2009) ...............................................................................................4, 9

Bailey v. Fairfax Cty., Va.,
No. 1:10-cv-1031, 2010 WL 5300874 (E.D. Va. Dec. 21, 2010) .........................33

Baker v. L.A. Herald Exam'r,
42 Cal. 3d 254 (1986) ..............................................................................................13

Balon v. Enhanced Recovery Co.,
316 F.R.D. 96 (M.D. Pa. 2016) ...............................................................................33

Balzaga v. Fox News Network, LLC,
173 Cal. App. 4th 1325 (2009) ................................................................................10

Bandstra v. Covenant Reformed Church,
913 N.W.2d 19 (Iowa 2018) ....................................................................................12

Barr v. Matteo,
360 U.S. 564 (1959) ...................................................................................................1

Barreca v. Nickolas,
683 N.W.2d 111 (Iowa 2004) ..................................................................................28

Bartholomew v. YouTube, LLC,
17 Cal. App. 5th 1217 (2017) ..................................................................................11

Batzel v. Smith,
333 F.3d 1018 (9th Cir. 2003) .................................................................................31

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) ...............................................................................................4, 9

*Bertrand v. Mullin*,
  846 N.W.2d 884 (Iowa 2014) ...............................................................................1, 24, 28

*Bertroche v. Mercy Physician Assocs., Inc.*,
  No. 18-CV-59-CJW-KEM, 2019 WL 4307127 (N.D. Iowa Sept. 11, 2019) .........................33

*Bierman v. Weier*,
  826 N.W.2d 436 (Iowa 2013) ...............................................................................11

*Biro v. Conde Nast*,
  807 F.3d 541 (2d Cir. 2015).................................................................................10

*Biro v. Conde Nast*,
  883 F. Supp. 2d 441 (S.D.N.Y. 2012).......................................................................23

*Blatty v. N.Y. Times Co.*,
  728 P.2d 1177 (Cal. 1986) ...................................................................................11

*Blumenthal v. Drudge*,
  No. Civ. A. 97-1968(PLF), 2001 WL 587860 (D.D.C. Feb. 13, 2001)................................31

*Brummett v. Taylor*,
  569 F.3d 890 (8th Cir. 2009) ...............................................................................11

*Butowsky v. Folkenflik*,
  No. 4:18CV442, 2019 WL 2518833 (E.D. Tex. Apr. 17, 2019) .....................................23

*Cameron v. Hardisty*,
  407 N.W.2d 595 (Iowa 1987) ...............................................................................30

*Chapin v. Knight-Ridder, Inc.*,
  993 F.2d 1087 (4th Cir. 1993) ........................................................................4, 19, 23, 24

*Cochran v. NYP Holdings, Inc.*,
  58 F. Supp. 2d 1113 (C.D. Cal. 1998) .....................................................................16

*Compuware Corp. v. Moody's Inv'rs Servs., Inc.*,
  499 F.3d 520 (6th Cir. 2007) ...............................................................................23

*Condit v. Dunne*,
  317 F. Supp. 2d 344 (S.D.N.Y. 2004).....................................................................31

*Craig v. City of Cedar Rapids, Iowa*,
  826 N.W.2d 516 (Iowa Ct. App. 2012).....................................................................13

*Dallas Morning News, Inc. v. Tatum*,
  554 S.W.3d 614 (Tex. 2018)......................................................................... *passim*

*Deripaska v. Associated Press*,
    282 F. Supp. 3d 133 (D.D.C. 2017) ....................................................................24

*Dodds. Johnson v. Columbia Broad. Sys., Inc.*,
    10 F. Supp. 2d 1071 (D. Minn. 1998) ................................................................24

*Dodds v. American Broadcasting Co.*,
    145 F.3d 1053 (9th Cir. 1998) ...........................................................3, 23, 24, 25

*In re Fannie Mae 2008 Sec. Litig.*,
    891 F. Supp. 2d 458 (S.D.N.Y. 2012)................................................................33

*Forsher v. Bugliosi*,
    608 P.2d 716 (Cal. 1980) ..............................................................................22, 25

*Foster v. Pfizer Inc.*,
    No. 00-1287-JTM, 2000 WL 33170897 (D. Kan. Dec. 12, 2000).......................35

*Franklin v. Dynamic Details, Inc.*,
    116 Cal. App. 4th 375 (2004) .......................................................................13, 17

*Fuqua Homes, Inc. v. Beattie*,
    388 F.3d 618 (8th Cir. 2004) ..............................................................................30

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)............................................................................................27

*Gomez v. J. Jacobo Farm Labor Contractor, Inc.*,
    188 F. Supp. 3d 986 (E.D. Cal. 2016).................................................................33

*Good Gov't Grp. of Seal Beach, Inc. v. Superior Court*,
    586 P.2d 572 (Cal. 1978) .....................................................................................9

*Greenbelt Coop. Publ'g Ass'n v. Bresler*,
    398 U.S. 6 (1970)................................................................................................14

*Gregory v. McDonnell Douglas Corp.*,
    552 P.2d 425 (Cal. 1976) ..............................................................................15, 16

*Hammond v. Arch Ins. Sols.*,
    No. 3:17-cv-00019, 2017 WL 11297279 (S.D. Iowa Sept. 6, 2017)..........33, 34, 35

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989)...........................................................................................29

*Hogan v. Winder*,
    No. 2:12-CV-123 TS, 2012 WL 4356326 (D. Utah Sept. 24, 2012).....................23

*Horsley v. Feldt*,
304 F.3d 1125 (11th Cir. 2002) ...............................................................14, 16

*Hovey v. Iowa State Daily Publ'n Bd., Inc.*,
372 N.W.2d 253 (Iowa 1985) .........................................................................11

*Howard v. Antilla*,
191 F.R.D. 39 (D.N.H. 1999) ..........................................................................23

*Janklow v. Newsweek, Inc.*,
759 F.2d 644 (8th Cir. 1985) ..................................................................3, 22, 23

*Johnson v. Nickerson*,
542 N.W.2d 506 (Iowa 1996) .........................................................................11

*Jones v. Palmer Commc'ns, Inc.*,
440 N.W.2d 884 (Iowa 1989) ...........................................................................9

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941).........................................................................................30

*Lauderback v. Am. Broad. Cos.*,
741 F.2d 193 (8th Cir. 1984) ..........................................................................15

*Lee v. Lincoln Nat'l Life Ins. Co.*,
No. 18-CV-2063-CJW, 2018 WL 5660553 (N.D. Iowa Oct. 31, 2018)................18

*Lundell Mfg. Co. v. Am. Broad. Cos.*,
98 F.3d 351 (8th Cir. 1996) ............................................................................10

*Lunsford v. United States*,
570 F.2d 221 (8th Cir. 1977) ..........................................................................33

*Lyons v. Midwest Glazing*,
265 F. Supp. 2d 1061 (N.D. Iowa 2003).........................................................29

*Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*,
674 F.3d 369 (4th Cir. 2012) ..........................................................................10

*Mechdyne Corp. v. Garwood*,
707 F. Supp. 2d 864 (S.D. Iowa 2009) ...........................................................11

*Michel v. NYP Holdings, Inc.*,
816 F.3d 686 (11th Cir. 2016) ........................................................................10

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990)......................................................................................12, 26

*Miller v. Redwood Toxicology Lab., Inc.*,
688 F.3d 928 (8th Cir. 2012) .................................................................18

*Mills v. State*,
924 F. Supp. 2d 1016 (S.D. Iowa 2013) ...................................................13

*Moore v. Sun Publ'g Corp.*,
881 P.2d 735 (N.M. Ct. App. 1994)..........................................................23

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964)............................................................................ *passim*

*Nationwide Ins. Co. v. Cent. Mo. Elec. Coop., Inc.*,
278 F.3d 742 (8th Cir. 2001) .................................................................33

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*,
No. CV 17-5577, 2018 WL 4353690 (D. Minn. Sept. 12, 2018) .........10

*United States ex rel. Newsham v. Lockheed Missiles & Space Co.*,
190 F.3d 963 (9th Cir. 1999) .................................................................31

*Newton v. Nat'l Broad. Co.*,
930 F.2d 662 (9th Cir. 1990) ............................................................23, 24

*Philadelphia Newspapers, Inc. v. Hepps*,
475 U.S. 767 (1986)...............................................................................11

*Pippen v. NBCUniversal Media, LLC*,
734 F.3d 610 (7th Cir. 2013) .................................................................10

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
890 F.3d 828 (9th Cir. 2018) .................................................................32

*Polygram Records, Inc. v. Superior Court*,
170 Cal. App. 3d 543 (1985) .................................................................11

*Ramsey v. Fox News Network, L.L.C.*,
351 F. Supp. 2d 1145 (D. Colo. 2005)..................................................9, 30

*Ratner v. Kohler*,
No. CV 17-00542 HG-KSC, 2018 WL 1055528 (D. Haw. Feb. 26, 2018)...........30

*Reader's Digest Ass'n v. Superior Court*,
690 P.2d 610 (Cal. 1984) ...................................................................27, 28

*Reeder v. Carroll*,
759 F. Supp. 2d 1064 (N.D. Iowa 2010)................................................11

*Resolution Tr. Corp. v. Fiala*,
    870 F. Supp. 962 (E.D. Mo. 1994)........................................................................34

*Sanchez v. City of Fresno*,
    914 F. Supp. 2d 1079 (E.D. Cal. 2012)..............................................................34

*Sassone v. Elder*,
    626 So. 2d 345 (La. 1993) ....................................................................................23

*Saunders v. Superior Court*,
    27 Cal. App. 4th 832 (1994) ................................................................................29

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012)..................................................................................10

*Schmidt v. Wash. Newspaper Publ'g Co.*,
    No. CV N19C-03-262 CLS, 2019 WL 4785560 (Del. Super. Ct. Sept. 30,
    2019) ......................................................................................................................30

*Schuster v. U. S. News & World Report, Inc.*,
    602 F.2d 850 (8th Cir. 1979) ..................................................................................9

*Sliger v. Prospect Mortg., LLC*,
    789 F. Supp. 2d 1212 (E.D. Cal. 2011)..............................................................33

*Smith v. Maldonado*,
    72 Cal. App. 4th 637 (1999) ................................................................................12

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)..............................................................................................27

*Stepanov v. Dow Jones & Co.*,
    987 N.Y.S.2d 37 (2014)........................................................................................22

*Stevens v. Iowa Newspapers, Inc.*,
    728 N.W.2d 823 (Iowa 2007)..............................................................................22

*Stewart v. Rolling Stone LLC*,
    181 Cal. App. 4th 664 (2010) ..............................................................................32

*Taggart v. Drake Univ.*,
    549 N.W.2d 796 (Iowa 1996) ..............................................................................11

*Thomas v. L.A. Times Commc'ns, LLC*,
    189 F. Supp. 2d 1005 (C.D. Cal. 2002) ..............................................................27

*Tilton v. Capital Cities/ABC, Inc.*,
    905 F. Supp. 1514 (N.D. Okla. 1995) ................................................................23

*Time, Inc. v. Hill*,
  385 U.S. 374 (1967)..................................................................................................9

*Tobinick v. Novella*,
  108 F. Supp. 3d 1299 (S.D. Fla. 2015) ...............................................................31

*Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*,
  85 F.3d 383 (8th Cir. 1996) ..................................................................................24

*Totah v. Bies*,
  No. C 10-05956 CW, 2012 WL 762004 (N.D. Cal. Mar. 8, 2012) .......................11

*Veasley v. CRST Int'l, Inc.*,
  553 N.W.2d 896 (Iowa 1996) ................................................................................30

*White v. Fraternal Order of Police*,
  909 F.2d 512 (D.C. Cir. 1990) .................................................................3, 22, 23

*Whitney v. Guys, Inc.*,
  700 F.3d 1118 (8th Cir. 2012) ................................................................................9

*Wilson v. IBP, Inc.*,
  558 N.W.2d 132 (Iowa 1996) ................................................................................12

*Woods v. Evansville Press Co.*,
  791 F.2d 480 (7th Cir. 1986) .........................................................................21, 22

*Wright v. Brooke Grp. Ltd.*,
  652 N.W.2d 159 (Iowa 2002) ................................................................................29

*Wynn v. Chanos*,
  75 F. Supp. 3d 1228 (N.D. Cal. 2014) ..................................................................13

*Wyo. Corp. Servs. v. CNBC, LLC*,
  32 F. Supp. 3d 1177 (D. Wyo. 2014).............................................................14, 15

*Yates v. Iowa W. Racing Ass'n*,
  721 N.W.2d 762 (Iowa 2006) ....................................................................10, 11, 13

**Statutes**

Cal. Civ. Proc. Code § 425.16 .........................................................................5, 32, 37

**Other Authorities**

4 Annals of Congress 934 (1794) ...............................................................................1

4 Jonathan Elliot, *Debates on the Federal Constitution* 569-70 (1876)..........................1

Fed. R. Civ. P. 8 ................................................................................................... 33, 34

Fed. R. Civ. P. 12(b)(6) ....................................................................................... *passim*

Fed. R. Civ. P. 12(f) ............................................................................................ *passim*

Restatement (Second) of Conflict of Laws § 145 .................................................... 30

Restatement (Second) of Conflict of Laws § 150(2) ................................................. 30

## Introduction

The Constitution has little tolerance for thin-skinned public servants. Ours is a government where "[t]he people, not the government, possess the absolute sovereignty." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 274 (1964) (quoting James Madison's Report on the Virginia Resolutions, *reported at* 4 Jonathan Elliot, *Debates on the Federal Constitution* 569-70 (1876)). It rejects the British form "under which the Crown was sovereign and the people were subjects," *Sullivan*, 376 U.S. at 274-75, and places "the censorial power . . . in the people over the Government, and not in the Government over the people," *id.* at 275 (quoting James Madison during debate in House of Representatives, *reported at* 4 Annals of Congress 934 (1794)). To secure our democratic self-governance, "the citizen-critic of government" requires a level protection from damage suits that is analogous to the broad protections afforded to the officials themselves. *Sullivan*, 376 U.S. at 282 (citing *Barr v. Matteo*, 360 U.S. 564, 575 (1959)).

These concerns animate the Supreme Court's landmark opinion in *New York Times v. Sullivan*. To maintain an action for defamation, a public official must prove, by clear and convincing evidence, that the defendant made the challenged statements with knowledge of their falsity or reckless disregard of falsity. This is an exceedingly high bar. It furthers our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270. Elected representatives are expected to withstand the most searching public scrutiny, and may only avail themselves of the tort of defamation under extraordinary circumstances. As the Iowa Supreme Court has recognized, "[a]mong public figures and officials, an added layer of toughness is expected." *Bertrand v. Mullin*, 846 N.W.2d 884, 901 (Iowa 2014).

This appears to be lost on Devin Nunes. The plaintiff in this case is one of the most

prominent members of Congress. His actions (or inactions) in Congress have been some of the most consequential in recent years. Here, he takes issue with an article in *Esquire* Magazine entitled "*Devin Nunes's Family Farm Is Hiding a Politically Explosive Secret*" (the "Article"). As it relates to Congressman Nunes—who famously touts his work in agriculture as part of his political persona—the "secret" is that "the Nunes family dairy [farm] of political lore . . . isn't in California," as many believe. Rather, "[i]t's in Iowa," with his family having moved the operation to Iowa over a decade ago. To be clear: This fact is undisputed. But Congressman Nunes filed this lawsuit anyway, just as he has filed other meritless suits in the recent past.[1]

In his original complaint, Congressman Nunes alleged that 15 statements in the Article were false and defamatory. When the named defendants moved to dismiss on numerous grounds, Congressman Nunes responded by filing the Amended Complaint. He now takes issue with 11 explicit statements in the Article.

None of the 11 explicit statements that Congressman Nunes challenges are actionable, each for one or more reasons. Many are not statements "of and concerning" Congressman Nunes. Many are not defamatory; that is, they would not tend to injure Congressman Nunes's reputation. Many are admitted to be actually or substantially true in the Amended Complaint. And the remainder are nonactionable opinions, as evidenced by the literary journalism format of the Article and the overall context, and moreover such opinions are predicated on facts disclosed in the Article and fair comment protected by the First Amendment. *See infra* Point I.B.

But the most significant—and troubling—change from his original complaint is that Congressman Nunes now challenges words that appear nowhere in the Article at all. That is, Congressman Nunes alleges that the Article falsely *implies* that he "conspired or colluded" with

---

[1]    *See, e.g.*, *Nunes v. Fusion GPS*, Case No. 1:19-cv-01148 (E.D. Va. Sept. 4, 2019); *Nunes v. McClatchy Co.*, Case No. CL19000629-00 (Va. Cir. Ct., Albemarle Cty. Apr. 8, 2019).

others "to hide or cover-up" the fact that the Nunes family farm "employs undocumented labor." Am. Compl. ¶ 13. Defamation claims by public officials are already Constitutionally suspect— but where, as here, that public official alleges that what the speaker *does not say* but supposedly *implies* is also defamatory, the Constitutional concerns are doubly acute.

To address these concerns, a plaintiff may only maintain a claim for defamation by implication if "the article in question can[] be read to imply that [the defendant] espoused the validity of the" the alleged implication. *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 648-49 (8th Cir. 1985), *affirming summ. j. in full on reh'g en banc*, 788 F.2d 1300 (8th Cir. 1986). The Eighth Circuit Court of Appeals's holding in *Janklow* is the wellspring for the seminal opinion in *White v. Fraternal Order of Police*: To be an actionable implication, "the communication, by the particular manner or language in which the true facts are conveyed, [must] suppl[y] *additional, affirmative evidence* suggesting that the defendant *intends or endorses* the defamatory inference." 909 F.2d 512, 520 (D.C. Cir. 1990) (emphasis added).

The *Janklow/White* rule has been adopted by many courts, *see infra* Point I.C, including courts applying California law, which supplies the rule of decision in this case, *see infra* Point II.A, *Dodds v. American Broadcasting Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998). And subsequent cases have articulated at length the need for the *Janklow/White* rule. For example, in a thorough and thoughtful opinion adopting the rule, the Texas Supreme Court recently explained that "[t]he potential chilling effect [on speech rights] is especially strong in defamation-by-implication cases" because, "[u]nlike explicit statements, publishers cannot be expected to foresee every implication that may reasonably arise from a certain publication." *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 632-33 (Tex. 2018). To guard against that risk, the "'plaintiff must make an especially rigorous showing' of the publication's

defamatory meaning"; that determination must be made by the "judge rather than the jury to prevent the chilling effect"; and "the judge's review must be 'especially rigorous.'" *Id.* at 633 (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993)).

Applying this rule, Congressman Nunes's defamation by implication claim cannot survive. The Article discloses that Congressman Nunes has no financial or operational involvement with the family farm, and it expressly states that it is "possible" that Congressman Nunes has "nothing to be seriously concerned about." *See* Feb. 18, 2020 Decl. of Ravi V. Sitwala ("Sitwala Decl."), Exs. A (the Article as published on Esquire.com), B (the Article as it appeared in the November 2018 print edition of *Esquire*). There is a physical barrier between the section of the Article that concerns the Congressman's "secret" and the balance of the Article concerning the author's reporting experience in northwest Iowa. No reasonable reader could take from the Article, read in its entirety, the defamatory implication that Congressman Nunes is assigning to it. The Article does not support a conclusion, required by the First Amendment, that Defendants intended to convey or endorsed the defamatory implication that Congressman Nunes advances. And even if the Article and the Constitution could sustain such a reading, this alleged implication would still be a nonactionable statement of opinion. *See infra* Point I.C.

Further, Congressman Nunes has not pleaded facts that would make his otherwise-conclusory allegation of "actual malice" plausible, as he must under *Twombly* and *Iqbal* (and prove under *Sullivan* and its progeny). Even after Defendants pointed out that the original complaint improperly attempted to substitute allegations of common law malice for the required actual malice, the Amended Complaint does nothing to cure this deficiency. *See infra* Point I.D. And with no viable underlying claim, his claim for "civil conspiracy" cannot survive on its own. *See infra* Point I.E.

For these reasons, the Court should dismiss Congressman Nunes's Amended Complaint pursuant to Rule 12(b)(6). *See infra* Point I. In addition, the Court should strike Congressman Nunes's Amended Complaint pursuant to California's anti-SLAPP statute ("SLAPP" stands for "Strategic Lawsuit Against Public Participation"), and grant Defendants their attorneys' fees incurred in responding to this suit. *See* <u>Cal. Civ. Proc. Code § 425.16</u>; *infra* Point II. Lastly, Defendants have included a Rule 12(f) motion to strike; if any aspect of this case were to survive their pre-answer dispositive motions then the Court should strike various scandalous and immaterial allegations in his Amended Complaint, and direct Congressman Nunes and his counsel to refrain from including any such content in future pleadings. *See infra* Point III.

## Factual Allegations

### A. Devin Nunes Is a United States Congressman from California.

Devin Nunes is a "citizen of California" who has served in the United States Congress since 2003, and currently represents California's 22nd Congressional District. Am. Compl. ¶ 4. He is the ranking Republican member on the House Permanent Select Committee on Intelligence (the "House Intelligence Committee") and, at the time of the Article's publication, served as the House Intelligence Committee's Chairman. *Id.* Before serving in Congress, Congressman Nunes spent many years farming in California. "From childhood," he worked on his family's farm in Tulare County, California. *Id.* He "raised cattle as a teenager," later began his own "harvesting business," and then "bought his own farmland with his brother." *Id.*

### B. *Esquire* Magazine Publishes the Article.

*Esquire* Magazine is a publication of Hearst Magazine Media, Inc. ("HMMI"). Am. Compl. ¶ 7. *Esquire*'s content is also published on Esquire.com. *Id. Esquire*'s articles tend to be written in the style of literary journalism, which combines journalistic research with the techniques of prose writing in the reporting of stories about real-life, public-interest events, often

through the perspective of the author's first-person observations.

The Article is a good example of this style. Authored by Lizza, HMMI's predecessor-in-interest published the Article on Esquire.com on September 30, 2018, and reprinted it in the November 2018 edition of *Esquire* magazine. *See* Sitwala Decl., Exs. A, B. The cover of the print edition includes this headline: "One Powerful Congressman, 2,000 Cows, and a Small Town's Big Secret | A Very Weird Political Thriller | By Ryan Lizza." *Id.*, Ex. B. Consistent with the literary journalism style, on the page preceding any text in the print edition (and near the top of the online edition) appears a full-page illustration depicting Lizza sweating while driving past dairy farms in Sibley, with endless lines of cows staring at him on both sides of the road and a white SUV appearing in his rear-view mirror, the driver focused on Lizza. *Id.*, Exs. A, B.

These elements reflect the tone of Lizza's first-person reporting, as he takes the reader into his investigation into the Nunes family farm. *Id.*, Exs. A, B. As the Article explains, Congressman "Nunes grew up in a family of dairy farmers in Tulare, California, and as long as he has been in politics, his family dairy has been central to his identity and a feature of every major political profile written about him." *Id.* The Article points to several instances of prior reporting on Congressman Nunes in which his family farm was featured. *Id.*

The Article then reveals that "[t]he Nunes family dairy of political lore—the one where his brother and parents work—isn't in California. It's in Iowa." *Id.* The family moved their farming operations to Sibley, Iowa, more than a decade ago. *Id.* The Article explains that Congressman Nunes appears to have kept this fact a "secret," and that he "tried to conceal" it. *Id.* The Article notes that "until late August, neither Nunes nor the local California press that covers him had ever publicly mentioned that his family dairy is no longer in Tulare[, California,]" according to the author's research. *Id.* The Article then describes several instances

where Lizza would have expected to find reference to the family farm having moved to Iowa—for example, in a press release for a campaign rally for Congressman Steve King in his Iowa district, which Congressman Nunes attended—but Lizza found no such disclosure.  *Id.*  The Article then asks, "[w]hy would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa?"  *Id.*

The foregoing appears within the first 14 paragraphs of the 68-paragraph Article.  *See id.*, Ex. A.[2]  Immediately thereafter, a horizontal line appears in the Article; a black line in the online version, *id.*, Ex. A, and a red line in the print version, *id.*, Ex. B.  The first word in the following paragraph is a large, dropped capital letter, referred to as a "drop cap."  *Id.*, Exs. A, B.  Together, the line and the drop cap signal to the reader that the Article is transitioning to the next topic or chapter of Lizza's reporting, and that this new topic is distinct from what preceded it.

The rest of the Article concerns Lizza's experience reporting on this story in and around Sibley, a small town in a region of Iowa that overwhelming supported Donald Trump in 2016, and is represented by Steve King, "the most anti-immigrant member of Congress."  *Id.*, Exs. A, B.  While reporting, Lizza learned that, despite the political preferences of many area residents, "Midwestern dairies tend to run on undocumented labor."  *Id.*, Exs. A, B.  The Nunes family farm, NuStar Farms, LLC ("NuStar"), is no exception:  In the Article's 54th paragraph, Lizza reports that "NuStar did indeed rely, at least in part, on undocumented labor."  *Id.*  Lizza sees this as a "massive political hypocrisy"; "Trump's and King's rural-farm supporters embrace anti-immigrant politicians while employing undocumented immigrants."  *Id.*  "The greatest threat to Iowa dairy farmers, of course, is not the press.  It's Donald Trump."  *Id.*

---

[2]      This count includes the summary paragraph that appears at the top of the Article.  In the print edition, the 12th and 13th paragraphs are combined for formatting reasons; thus, the foregoing appears within the first 13 paragraphs of the 67-paragraph Article as it appears in print. *Id.*, Ex. B.

The Article makes clear, however, that Congressman Nunes does not have any ties to NuStar, other than being related to its owners. The Article states that Congressman Nunes "ha[s] no financial interest in his parents' Iowa dairy operation." *Id.*, Exs. A, B. And the Article does not otherwise state or suggest that Congressman Nunes is involved in the operation of the farm. *See id.* Nonetheless, Lizza reached out to Congressman Nunes for comment, but the Congressman "did not respond to numerous requests for interviews," as the Article reports. *Id.*

### C. Congressman Nunes Files this Lawsuit.

Congressman Nunes initiated this action by filing his original complaint with this Court on September 30, 2019. ECF No. 1. The original complaint named Lizza and "Hearst Magazines, Inc." as defendants, and they moved to dismiss on January 21, 2020. ECF No. 15. In response, Congressman Nunes filed the Amended Complaint on February 3, 2020, swapping in HMMI for "Hearst Magazines, Inc.," which had been incorrectly named as a defendant. *See* ECF No. 23. The Amended Complaint asserts one count of defamation based on 11 *explicit* statements in the Article, and one allegedly *implied* statement; all of these are recounted and addressed below. The Amended Complaint also asserts one count of civil conspiracy.

However, the Amended Complaint is more notable for what it fails to allege. It does not plead facts establishing falsity, much less Defendants' knowledge or reckless disregard of falsity, both of which are Congressman Nunes's burden as a matter of well-established federal and state constitutional law. Because of these and other fatal legal defects discussed below, the Amended Complaint fails to state a claim and is subject to dismissal under California's anti-SLAPP law.

## Argument

### I. Congressman Nunes's Amended Complaint Should Be Dismissed Pursuant to Rule 12(b)(6).

"To survive a motion to dismiss" pursuant to Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128 (8th Cir. 2012) (citation omitted). "'[L]abels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citation omitted).

Importantly, the Court must be mindful of the chilling effect that costly and protracted litigation can have on speech concerning a public official, and thus the need to dispose of meritless claims swiftly, before the burdens of discovery are suffered. It would be antithetical to the First Amendment for a court to entertain a dubious lawsuit by a public official when the effect, if not intent, of the litigation is to cause the media to think twice before reporting on the official. *See Ramsey v. Fox News Network, L.L.C.*, 351 F. Supp. 2d 1145, 1153 (D. Colo. 2005).[3]

Against those weighty concerns, the *Twombly/Iqbal* standard takes on heightened importance. Under *Sullivan*, to maintain an action for defamation, a public official such as Congressman Nunes must plead (and ultimately prove) "actual malice" on the part of Defendants; that is, he must plead and prove, by "clear and convincing" evidence, that the defendant(s) made the challenged statements with knowledge of their falsity or reckless disregard of falsity, *see Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 890 (Iowa 1989)

---

[3]    *See also Schuster v. U. S. News & World Report, Inc.*, 602 F.2d 850, 855 (8th Cir. 1979) (in granting summary judgment motion, "The Supreme Court has recognized that the cost of defending a protracted lawsuit can chill first amendment rights.") (citing *Time, Inc. v. Hill*, 385 U.S. 374, 389 (1967) ("Fear of large verdicts in damage suits . . . , even fear of the expense involved in their defense, must inevitably cause publishers to 'steer wider of the unlawful zone.'")); *Good Gov't Grp. of Seal Beach, Inc. v. Superior Court*, 586 P.2d 572, 578 (Cal. 1978) ("[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable.").

(citing and discussing *Sullivan*).  This is described in greater detail *infra* Point I.D.[4]

**A. Only False, Defamatory, Factual Statements that Are "Of and Concerning" Congressman Nunes Are Actionable Under Both California and Iowa Law.**

The Amended Complaint sets forth 11 allegedly defamatory statements that are reported in the Article.  *See* Am. Compl. ¶ 18.  The Amended Complaint also attempts to allege one false and defamatory "implication" that is not stated in the Article at all.  *See id.* ¶ 13.  Although the latter warrants heightened Constitutional scrutiny as described *infra* Point I.C, basic tenets of defamation law apply to all statements and inferences.  And although California law should supply the rule of decision in this case—a fact dictating that California's anti-SLAPP law applies (*see infra* Point II)—there is no true conflict because the law of defamation in both California and Iowa, infused with the First Amendment's requirements, are congruent, as follows:

*First*, both states require that the article in question be read as whole, and any allegedly defamatory statements must be considered in their context.  *See Lundell Mfg. Co. v. Am. Broad. Cos.*, 98 F.3d 351, 359 (8th Cir. 1996); *Balzaga v. Fox News Network, LLC*, 173 Cal. App. 4th 1325, 1338 (2009).  And any allegedly defamatory statements must be judged objectively from the perspective of an objective reasonable reader; a defamation plaintiff may not maintain a claim premised on her own subjective interpretation of the article.  *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 771 (Iowa 2006); *Balzaga*, 173 Cal. App. 4th at 1339.

*Second*, both states require that the statements in question give rise to a defamatory

---

[4]    Although not yet addressed by the Eighth Circuit Court of Appeals, all Courts of Appeals that have considered this question have held that a complaint should be dismissed if a public official or public figure plaintiff fails to plead factual matter sufficient to make her allegation of actual malice "plausible."  *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 701-02 (11th Cir. 2016); *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015); *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012); *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012); *see Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, No. CV 17-5577 (DWF/LIB), 2018 WL 4353690, at *4 (D. Minn. Sept. 12, 2018) (same), *appeal docketed*, No. 18-3254 (8th Cir. Oct. 13, 2018) (appeal argued Oct. 18, 2019).

meaning. *Yates*, 721 N.W.2d at 771-72; *Bartholomew v. YouTube, LLC*, 17 Cal. App. 5th 1217, 1226 (2017). This is a question of law for the Court to decide. *Yates*, 721 N.W.2d at 772; *Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 551 (1985). "In carrying out this task, a court should not . . . 'indulge far-fetched interpretations of the challenged publication.'" *Mechdyne Corp. v. Garwood*, 707 F. Supp. 2d 864, 875 (S.D. Iowa 2009) (quoting *Yates*, 721 N.W.2d at 771-72).

Third, and as the Constitution mandates, both states require that the allegedly defamatory statement be "of and concerning" the plaintiff. *See, e.g.*, *Sullivan*, 376 U.S. at 287; *Brummett v. Taylor*, 569 F.3d 890, 892 (8th Cir. 2009); *Bierman v. Weier*, 826 N.W.2d 436, 464-65 (Iowa 2013); *Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996); *Blatty v. N.Y. Times Co.*, 728 P.2d 1177, 1182 (Cal. 1986). The Court can decide this issue as a matter of law where there is no possibility that a reasonable reader could understand the statement as referring to the plaintiff. *See Reeder v. Carroll*, 759 F. Supp. 2d 1064, 1083 (N.D. Iowa 2010); *Aguilar v. Universal City Studios, Inc.*, 174 Cal. App. 3d 384, 388 (1985).

Fourth, the plaintiff bears the burden of proving falsity, *Johnson v. Nickerson*, 542 N.W.2d 506, 511 n.3 (Iowa 1996)—also a Constitutional requirement, *see Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986)—and the truth of a statement defeats a defamation claim, *Totah v. Bies*, No. C 10-05956 CW, 2012 WL 762004, at *3 (N.D. Cal. Mar. 8, 2012); *Hovey v. Iowa State Daily Publ'n Bd., Inc.*, 372 N.W.2d 253, 256 (Iowa 1985). And a plaintiff's burden to prove falsity cannot be met by relying only on minor inaccuracies; the plaintiff must prove the challenged statement is materially false, meaning it must be substantially untrue. *See Yates*, 721 N.W.2d at 769-70 ("Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance." (citation omitted)). In deciding whether a

statement is substantially true, courts look not at the literal truth or falsity of words, phrases, or passages, but at whether the "gist" or "sting" of the article is substantially true. If it is, there can be no recovery. *See, e.g.*, *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 140-41 (Iowa 1996). Where a complaint admits to the truth of the statement, then this issue may be decided as a matter of law. *See Smith v. Maldonado*, 72 Cal. App. 4th 637, 652 (1999), *as modified* (June 23, 1999).

*Fifth*, the Constitution protects pure opinion, "rhetorical hyperbole," and any other statements that are not "sufficiently factual to be susceptible of being proved true or false." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 21 (1990). Beyond those baseline Constitutional safeguards for opinion, the common law of both Iowa and California recognize broader protections, examining various factors to consider whether, in context, the statements would be understood by the reader as statements of opinion. For example, Iowa courts "utilize a four-part test to determine whether a statement is factual or a protected opinion": (1) "whether the alleged defamatory statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous"; (2) "the degree to which the [alleged defamatory] statements are objectively capable of proof or disproof"; (3) "the context in which the alleged defamatory statement occurs"; and (4) "the broader social context into which [the alleged defamatory] statement fits." *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 47 (Iowa 2018) (alterations in original) (quotation marks and citations omitted). Similarly, "California courts have developed a 'totality of the circumstances' test to determine whether an alleged defamatory statement is one of fact or of opinion," which examines (1) "the language of the statement" and (2) "the context in which the statement was made," and "demands that the courts look at the nature and full content of the communication and to the knowledge and understanding of the audience to whom the publication was directed."

*Baker v. L.A. Herald Exam'r*, <u>42 Cal. 3d 254, 260-61</u> (1986).

Both states also consider whether the author has disclosed the facts on which the statement is based. *See Franklin v. Dynamic Details, Inc.*, <u>116 Cal. App. 4th 375, 387</u> (2004) ("A statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning," because "[w]hen the facts supporting an opinion are disclosed, readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts." (quotation marks and citations omitted)); *see also Wynn v. Chanos*, <u>75 F. Supp. 3d 1228, 1233-34</u> (N.D. Cal. 2014) (same); *Mills v. State*, <u>924 F. Supp. 2d 1016, 1034</u> (S.D. Iowa 2013) (author's "subjective impression[]" of a situation is not actionable if it does not imply the speaker possesses additional, undisclosed facts informing that impression); *Yates*, <u>721 N.W.2d at 771</u> ("[S]tatements of opinion can be actionable if they imply a provable false fact, or rely upon stated facts that are provably false." (citation omitted)). Whether a statement is one of opinion is a question of law for the Court to decide. *See Baker*, <u>42 Cal. 3d at 260</u>; *Craig v. City of Cedar Rapids, Iowa*, <u>826 N.W.2d 516</u> (Iowa Ct. App. 2012).

## B. None of the 11 Challenged Explicit Statements in the Article Are Actionable, as a Matter of Law.

1. *Statements to the effect that Congressman Nunes concealed, kept secret, and/or conspired to keep secret the fact that the family farm moved to Iowa.*

Congressman Nunes alleges that the following explicit statements are defamatory:

- "Devin Nunes has a secret," Am. Compl. ¶ 18(a);

- "Why would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa?," *id.* ¶ 18(e); and

- "On the other hand, he and his parents seemed to have concealed basic facts about the family's move to Iowa," *id.* ¶ 18(h).

None of these statements are actionable. *First*, insofar as they concern Congressman

Nunes's brother, his parents, or Congressman Steve King, they are not "of and concerning" Congressman Nunes. Statements concerning the "congressman's family," Congressman Nunes's "parents and brother," Congressman King, or the status of the "family dairy of political lore" or "family farm" in which, as the Congressman admits and the Article discloses, he "does not own an interest" and "is not involved in any way in its operations," *id.* ¶ 15, have no bearing on the reputation of Congressman Nunes. Moreover, the fact that the family moved its farming operations to Iowa is (i) admittedly true, *id.* ¶ 4, and (ii) not defamatory, as the Article itself recognizes in noting that there is nothing strange about that. *See* Sitwala Decl., Exs. A, B ("There's nothing particularly strange about a congressman's family moving.").

*Second*, statements to the effect that Congressman Nunes "concealed" or kept "secret" the fact of the farm's move are not defamatory. Because there is nothing illegal, shameful, or wrong about the fact that Congressman Nunes's relatives moved the family farm to Iowa, as a matter of law, it is not defamatory to state that Congressman Nunes chose to keep that fact a secret. *See Wyo. Corp. Servs. v. CNBC, LLC*, 32 F. Supp. 3d 1177, 1187 (D. Wyo. 2014) (because "there is nothing illegal or shameful about hiding a person's ownership in a company," it was therefore not defamatory for defendant to state or imply that the plaintiff's "purpose" in creating a corporation was "to conceal ownership"). For the same reason, it is not defamatory for Defendants to report that Congressman Nunes "conspired" to keep that fact "secret," an obvious rhetorical hyperbole in any event. *See Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (use of word "blackmail" to describe actions of public official not actionable "as a matter of law"); *Horsley v. Feldt*, 304 F.3d 1125, 1133 (11th Cir. 2002) (allegation in heated debate that the plaintiff had "conspired with others" to commit criminal acts nonactionable hyperbole; "a reasonable listener would not have taken the statement as a literal

assertion that [the plaintiff] had actually conspired in the technical legal sense"); *Lauderback v. Am. Broad. Cos.*, 741 F.2d 193, 197 (8th Cir. 1984) (allegation that the plaintiff "was dealing unscrupulously with senior citizens, is more analogous to a broad, unfocused, wholly subjective comment than it is to specific accusations of felonious conduct") (citation omitted).

*Third*, these statements are clearly nonactionable opinion.  To start, they are obvious hyperbole, as noted above.  Further, the statements that Congressman Nunes kept the farm's move a "secret," or that he "concealed" it, are not readily capable of being proven true or false, and those words do not have an easily defined meaning (consider: to whom, to how many people, and in what contexts would Congressman Nunes need to disclose the fact of the farm's move before it could be said that he was no longer keeping that fact a "secret" or "concealing" it?).  *See Wyo. Corp. Servs.*, 32 F. Supp. 3d at 1187 (statement that purpose of creating legal entity was to "conceal ownership" was "opinion"; "it cannot be proven true or false," and "[t]he statement does not imply 'the allegation of undisclosed defamatory facts'" (citation omitted)).

Moreover, the Article's tone and setting as a work of literary journalism written in the first-person perspective of the author establish that the challenged statements constitute nonactionable opinion.  Sitwala Decl., Exs. A, B.  The tone of the Article, which must be "taken as a whole," *Gregory v. McDonnell Douglas Corp.*, 552 P.2d 425, 428 (Cal. 1976), is filled with adjectives and introspective questions intended to reveal Lizza's mental impressions as he conducted reporting for the Article.  A cartoon-style illustration appears at the top of the Article, Sitwala Decl., Exs. A, B., which the hard copy edition previews as being not a traditional news report but rather "A Very Weird Political Thriller," *id.*, Ex. B.  These elements align with the author's literary voice.  Together, these cues signal to readers that words like "secret," "conceal," or "conspire" are, in the context of the Article, not being offered as objective facts but rather the

opinion of Lizza as he investigates the piece. *See Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1121 (C.D. Cal. 1998), *aff'd*, 210 F.3d 1036 (9th Cir. 2000) (statements were opinion considering "the general tenor of the entire work," including dramatic lead paragraph, and sarcasm and figurative language throughout).

Relatedly—according to Congressman Nunes—Lizza is "a high-profile, left-wing political journalist, well-known for his extreme bias towards" Congressman Nunes. *See* Am. Compl. ¶ 1. If that's true—which the Court should assume for purposes of deciding this Motion—then readers would anticipate Defendants' statements about Nunes to be framed as an attempt to persuade as opposed to straight news reporting, and readers would weigh such statements accordingly. *See Gregory*, 552 P.2d at 428 ("[W]here potentially defamatory statements are published in a . . . setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion."); *see also Horsley*, 304 F.3d at 1133.

Further, the Article discloses the constituent facts that led to the author's opinion that Congressman Nunes kept the move a "secret," and that he "conspired" with his family and Congressman King to do so. The author states that, "[a]s far as I could tell, until late August, neither Nunes nor the local California press that covers him had ever publicly mentioned that his family dairy is no longer in Tulare." Sitwala Decl., Exs. A, B. In announcing that Congressman Nunes would be visiting his district, Congressman Steve King's office issued a press release stating that "Congressman Nunes's family has operated a dairy farm in Tulare County, California for three generations", but "[t]here was no mention that the Nunes family actually lived up the road in Sibley, where they operated a dairy." *Id.* The Article even reports on efforts to keep

Devin Nunes's name out of a regional dairy industry publication's news story on the Nunes family farm in Iowa. *Id.* In sum, "the facts supporting [the] opinion[s] are disclosed," and so "readers are free to accept or reject the author's opinion based on their own independent evaluation of the facts." *See Franklin*, <u>116 Cal. App. 4th at 387</u>.

2.    *Congressman Nunes used his position as Chairman of the House Intelligence Committee as a "battering ram to discredit the Russia investigation and protect Donald Trump at all costs, even if it means shredding his own reputation and the independence of the historically nonpartisan committee in the process."* Am. Compl. ¶ 18(b).

This statement is clearly protected opinion. The reference to a "battering ram" is rhetorical hyperbole, and not subject to being objectively proven true or false. The same applies to the statement that Congressman Nunes may have "shredd[ed] his own reputation and the independence of the historically nonpartisan committee." And as for whether Nunes has sought to "discredit the Russia investigation and protect Donald Trump at all costs"—it is not clear whether Congressman Nunes is alleging that this is false (and on what basis), but in any event this is also a statement of opinion, for the reasons stated above.

3.    *Congressman Nunes "used the Intelligence Committee to spin a baroque theory about alleged surveillance of the Trump campaign that began with a made-up Trump tweet about how 'Obama had my 'wires tapped' in Trump Tower'"* Am. Compl. ¶ 18(c).

To the extent Congressman Nunes challenges this statement based on its characterization that he used the Intelligence Committee "to spin a baroque theory," it is nonactionable opinion, as that phrasing conveys no objectively provable statement of fact, much less a false one, and none is alleged. To the extent the statement's factual content is challenged, it is substantially true. Congressman Nunes cannot dispute that, in his capacity as Chairman of the House Intelligence Committee, he took steps to develop evidence that President Donald Trump's 2016 Presidential campaign was the subject of surveillance by federal authorities. For example,

Congressman Nunes does not dispute that, as reported in the Article, he "famously" released a memorandum that "accuse[d] the FBI of bias in its effort to obtain a warrant to monitor the communications of Carter Page, a Trump foreign-policy advisor."[5]  And Congressman Nunes cannot dispute that his actions to develop this theory began after President Trump published a "made-up . . . tweet about how 'Obama had my 'wires tapped' in Trump Tower.'"

Instead, Congressman Nunes merely points out that he does not believe that the phones in Trump Tower were tapped.  But that is not what the Article says—it only states that President Trump "made up" the allegation.  It does not state or suggest that Congressman Nunes agrees with the allegation.  But even if it did, the statement would still be substantially true, as the undisputed "sting" and "gist" of the statement remains the same—specifically, that Congressman Nunes, through his position on the House Intelligence Committee, "sp[u]n a baroque theory about alleged surveillance of the Trump campaign . . . ."  Am. Compl. ¶ 18(c).  Whether Congressman Nunes believed Donald Trump's wiretap allegations that kick-started Congressman Nunes's efforts does not alter the effect that the statement would have on the reader.

4.    *"Devin; his brother, Anthony III; and his parents, Anthony Jr. and Toni Dian, sold their California farmland in 2006. Anthony Jr. and Toni Dian, who has also been the treasurer of every one of Devin's campaigns since 2001, used their cash from the sale to buy a dairy eighteen hundred miles away in Sibley, a small town*

---

[5]    *See, e.g.*, Sitwala Decl., Ex. C (Memorandum, HPSCI Majority Staff, "Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation," Jan. 18, 2018 (declassified by order of the President on Feb. 2, 2018), *available at* https://docs.house.gov/meetings/IG/IG00/20180129/106822/HMTG-115-IG00-20180129-SD001.pdf (the "Nunes Memo")).  The Nunes Memo alleges that, during the early phases of the FBI's investigation into Russian interference in the 2016 United States elections, the FBI relied on politically motivated or questionable sources to obtain a FISA warrant (and subsequent renewals of the warrant) to conduct surveillance on a Trump campaign adviser, Carter Page.  This matter of public record, which is expressly disclosed in the Article, may be considered by the Court on this Rule 12(b)(6) motion to dismiss.  *See Lee v. Lincoln Nat'l Life Ins. Co.*, No. 18-CV-2063-CJW, 2018 WL 5660553, at *2 (N.D. Iowa Oct. 31, 2018) (Williams, J.) ("In ruling on a Rule 12(b)(6) motion to dismiss, the Court may consider . . . 'matters of public record'" (quoting *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012)).

> *in northwest Iowa where they—as well as Anthony III, Devin's only sibling, and his wife, Lori—have lived since 2007."* Am. Compl. ¶ 18(d).

Congressman Nunes admits that these facts are true. Am. Compl. ¶ 4. And the statements are neither defamatory nor "of and concerning" Congressman Nunes.

5.  *"Devin Nunes was the public figure at the heart of this, and he had no financial interest in his parents' Iowa dairy operation. . . . And his mom, who co-owns the Sibley dairy, is also the treasurer of his campaign."* Am. Compl. ¶ 18(h).[6]

To the extent this statement refers to persons other than Congressman Nunes, it is not "of and concerning" him. And, in any event, it is not defamatory to say that Congressman Nunes "ha[s] no financial interest in his parents' Iowa dairy operation." Furthermore, this fact is true, and it is admitted in the Amended Complaint. Am. Compl. ¶ 15.

6.  *"I laid out the facts I had uncovered in Sibley, including the intimidation of sources and the Devin Nunes angle, and asked him for advice. 'I'd tell that story,' he said. He paused and added, 'We're a sanctuary church, if you need a place to stay. You're safe here!'"* Am. Compl. ¶ 18(j).

This statement is not defamatory, and it is not "of and concerning" Congressman Nunes.

7.  *"Is it possible the Nuneses have nothing to be seriously concerned about? Of course, but I never got the chance to ask because Anthony Jr. and Representative Nunes did not respond to numerous requests for interviews."* Am. Compl. ¶ 18(k).

To the extent this statement concerns persons other than Congressman Nunes, it is not "of and concerning" him. Also, it is not an actionable statement of fact; it is a nonactionable question. *See Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1338 (D.C. Cir. 2015) (Kavanaugh, J.) ("[I]t is generally settled as a matter of defamation law . . . that a question, 'however embarrassing or unpleasant to its subject, is not accusation.'" (quoting *Chapin*, 993 F.2d at 1094)). As it relates to Congressman Nunes, it is neither false nor defamatory to report

---

[6]    The omitted portion of this quotation concerns Congressman Nunes's allegation that it is defamatory to report that he "concealed basic facts about the family's move to Iowa," which is addressed above.

that he did not respond to a request to be interviewed.

> 8.      *"'They are immigrants and Devin is a strong supporter of Mr. Trump, and Mr. Trump wants to shut down all of the immigration, and here is his family benefiting from immigrant labor', documented or not."* Am Compl. ¶ 18(g).

This statement is a quote from a reporter for a dairy industry publication whom Lizza interviewed for the Article. In this quote, the reporter explains to Lizza why, in his view, Lizza's "encounter with Anthony Jr.," described seven paragraphs above, was "hostil[e]." Sitwala Decl., Exs. A, B. The "family benefiting from immigrant labor" refers to Congressman Nunes's relatives, including Anthony Jr., who operate NuStar; thus, this statement is not "of and concerning" Congressman Nunes. The only aspect of this statement that concerns Congressman Nunes is the statement that he is a "strong supporter of Mr. Trump." To the extent Congressman Nunes contends this is false, it is non-defamatory and a statement of opinion.

> 9.      *Statements to the effect that NuStar relies on undocumented laborers.*

Congressman Nunes alleges that the following statements are defamatory:

- "Other dairy farmers in the area helped me understand why the Nunes family might be so secretive about the farm: Midwestern d[ai]ries tend to run on undocumented labor," Am. Compl. ¶ 18(f); and

- "There was no doubt about why I was being followed. According to two sources with firsthand knowledge, NuStar did indeed rely, at least in part, on undocumented labor. One source, who was deeply connected in the local Hispanic community, had personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs … asserting that the farm was aware of their status." *Id.* ¶ 18(i).

These statements are not "of and concerning" Congressman Nunes because, as reported in the Article, Congressman Nunes "had no financial interest in his parents' Iowa dairy operation," let alone other "Midwestern dairies." *Id.*, Exs. A, B. And the Article does not state or suggest that Congressman Nunes is involved in the operation of his family's farm. *See id.*

## C. Congressman Nunes Has Failed to State a Claim for Defamation by Implication.

In addition to challenging what the Article *does* state, in the Amended Complaint,

Congressman Nunes now takes issue with what the Article *does not* state. According to Congressman Nunes, the Article falsely implies that he "conspired or colluded with his family and with others to hide or cover-up a 'Politically Explosive Secret': that Plaintiff's family's dairy farm, NuStar Farms, employs undocumented labor." Am. Compl. ¶ 13. Although not detailed in the Amended Complaint, Congressman Nunes appears to suggest the following: By reporting (i) the (nonactionable) statement that Congressman Nunes "conspired" with others to hide the fact that his family's dairy farm moved to Iowa, and (ii) news that NuStar hires undocumented laborers (which is not "of and concerning" Congressman Nunes), the Article leaves readers with the defamatory impression that Congressman Nunes "conspired" to hide the fact that NuStar employs undocumented laborers. For reasons described below, the Article does not and cannot support this implication, and even if it did, it would be a statement of protected opinion.

1. *The Article does not support the defamatory inference that Congressman Nunes "conspired or colluded" with others "to hide or cover-up" the fact that NuStar "employs undocumented labor."*

***The law of defamation "by implication."*** Claims of defamation "by implication" warrant close Constitutional scrutiny. The harm to the First Amendment animating the rule in *Sullivan* is that, if publishers must guarantee the truth of their statements concerning public officials before publishing them, that will result in "self-censorship" of the press and a "chilling effect" on public debate and the free exchange of ideas. 376 U.S. at 279, 300-01; *see also Woods v. Evansville Press Co.*, 791 F.2d 480, 487-88 (7th Cir. 1986). From this, it follows that "requiring a publisher to guarantee the truth of all the *inferences* a reader might reasonably draw from a publication would undermine the uninhibited, open discussion of matters of public concern." *Woods*, 791 F.2d at 487–88 (emphasis added). "A publisher reporting on matters of general or public interest cannot be charged with the intolerable burden of guessing what inferences a jury might draw from an article and ruling out all possible false and defamatory

innuendoes that could be drawn from the article." *Id.* at 487-88.

It is therefore not enough that "a defamatory inference can reasonably be drawn" from reported facts. *White*, 909 F.2d at 520.[7] Rather, to give rise to a claim of defamation by implication, "the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference." *Id.* The court in *White* relied on Eighth Circuit Court of Appeals's opinion in *Janklow*, which affirmed the dismissal of a libel by implication claim where "the article in question [could not] be read to imply that [the defendant] espoused the validity of the" alleged implication. 759 F.2d at 648-49 (recognizing the "strong underpinnings in the First Amendment" in considering libel by implication; "[w]hile newspapers have long been liable for that which they publish, they have never been liable solely for that which was omitted").

Importantly, this is a question of law for the Court to decide, and "the evidence of intent must arise from the publication itself." *Tatum*, 554 S.W.3d at 635; *Stepanov v. Dow Jones & Co.*, 987 N.Y.S.2d 37, 44 (2014). This inquiry concerns only whether the challenged article is capable of a defamatory meaning, an "entirely separate issue[]" from the evaluation of the speaker's state of mind required by *Sullivan*. *Stepanov*, 987 N.Y.S.2d at 44; *see also Abadian v. Lee*, 117 F. Supp. 2d 481, 488 (D. Md. 2000) ("[A] defendant's statements must include affirmative evidence supporting the defamatory inference"); *Butowsky v. Folkenflik*, No.

---

[7]     "Defamation by implication arises, not from what is stated, but from what is implied when a defendant '(1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts, [such that] he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.'" *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 827 (Iowa 2007). "[T]he fact that some person might, with extra sensitive perception, understand such a meaning cannot compel this court to establish liability at so low a threshold. Rather, the test as noted above is whether by reasonable implication a defamatory meaning may be found in the communication." *See Forsher v. Bugliosi*, 608 P.2d 716, 723 (Cal. 1980).

4:18CV442, 2019 WL 2518833, at *31 (E.D. Tex. Apr. 17, 2019), *report and recommendation adopted*, No. 4:18CV442, 2019 WL 3712026 (E.D. Tex. Aug. 7, 2019).

The majority of the courts that have considered whether to adopt the *Janklow/White* rule have decided to do so, finding its reasoning persuasive.[8] Moreover, the *Janklow/White* rule is Constitutionally required,[9] and it is critical in defamation cases brought by public officials; it protects our self-governed citizenry from public servants who seek to deter speech that could even *imply* a critical view. Thus, applying California law, the Ninth Circuit Court of Appeals held that a public official plaintiff challenging an "implication" must show that the article is (i) "reasonably capable of sustaining [the allegedly defamatory] meaning," *and*, (ii) that "a jury could reasonably find by *clear and convincing evidence* that [the defendant] *intended to convey* the defamatory impression." *Dodds*, 145 F.3d at 1063-64 (emphasis added) (citation and quotation marks omitted); *see also Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 681 (9th Cir. 1990) (to hold otherwise would "eviscerate[] the First Amendment protections established by

---

[8]        *See, e.g., Compuware Corp. v. Moody's Inv'rs Servs., Inc.*, 499 F.3d 520, 528 (6th Cir. 2007) (applying progeny of *Janklow* and *White*); *Tilton v. Capital Cities/ABC, Inc.*, 905 F. Supp. 1514, 1523 (N.D. Okla. 1995), *aff'd*, 95 F.3d 32 (10th Cir. 1996) (same); *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 465 (S.D.N.Y. 2012) (applying *White*, *Janklow*, and progeny); *Abadian*, 117 F. Supp. 2d at 488 (same); *Howard v. Antilla*, 191 F.R.D. 39, 45 (D.N.H. 1999) (applying *White* and progeny); *Moore v. Sun Publ'g Corp.*, 881 P.2d 735, 741 (N.M. Ct. App. 1994) (applying *White* and progeny).
[9]        *See, e.g., Tatum*, 554 S.W.3d at 635; *Chapin*, 993 F.2d at 1092-93 ("[B]ecause the constitution provides a sanctuary for truth, a libel-by-implication plaintiff must make an *especially rigorous showing* where the expressed facts are literally true. The language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference.") (emphasis added); *Hogan v. Winder*, No. 2:12-CV-123 TS, 2012 WL 4356326, at *9 (D. Utah Sept. 24, 2012) ("[T]he requirement that a plaintiff in a libel-by-implication case show that the defendant intended the implication is grounded in the First Amendment, and is therefore an issue of federal—not state—law," observing "the magnitude of the First Amendment liberties at stake" and the fact that "the theory of libel by implication would allow a jury to draw whatever inferences it wished from statements of fact'"); *Sassone v. Elder*, 626 So. 2d 345, 354 (La. 1993) (if libel by implication exists at all, "adequate protection of freedom of the press at least requires that the plaintiffs prove that the alleged implication is the principal inference a reasonable reader or viewer will draw from the publication as having been intended by the publisher").

*New York Times*" by "permit[ting] liability to be imposed not only for what was not said but also for what was not intended to be said").[10]

     ***Congressman Nunes's Amended Complaint fails both prongs.*** On the first prong*:* No reasonable reading of the Article supports Congressman Nunes's allegedly defamatory implication. Evaluating the Article in its entirety, the Article makes several explicit statements that refute the inference that Congressman Nunes seeks to draw. *First*, the Article reports that Congressman Nunes "ha[s] no financial interest in his parents' Iowa dairy operation." Sitwala Decl., Exs. A, B. *See Deripaska v. Associated Press*, <u>282 F. Supp. 3d 133, 148</u> (D.D.C. 2017) (no defamation by implication where the article "specifically includes facts that negate the implications that [the plaintiff] conjures up"). *Second*, the Article neither states nor suggests that Congressman Nunes is involved in the operation of the farm. Sitwala Decl., Exs. A, B. *Third*, any defamatory implication is undermined by the following disclaimer: "Is it possible the Nuneses have nothing to be seriously concerned about? *Of course* . . . ." *Id.* (emphasis added).

     *Fourth*—and of particular note here—the Article inserts a horizontal line between Congressman Nunes's "secret" (addressed in the first 14 paragraphs of the 68-paragraph Article) from what Lizza learns during his investigation (the balance of the Article), with the latter starting with a "drop cap." *Id.* And NuStar's hiring of undocumented laborers specifically is not reported until 40 paragraphs later, in the Article's 54th paragraph. *Id.* Collectively, these signal to the reader that Congressman Nunes's "secret," described in the beginning of the Article, is

---

[10]     In *Bertrand*, the Iowa Supreme Court canvassed these same cases and identified the same Constitutional concern, but ultimately declined to reach the question of whether the showing "contemplated by *Chapin* and *Newton* is a required one." <u>846 N.W.2d at 896</u> n.3. A district court in this Circuit has read subsequent Eighth Circuit precedent as adopting the holding in *Dodds*. *Johnson v. Columbia Broad. Sys., Inc.*, <u>10 F. Supp. 2d 1071, 1075</u> (D. Minn. 1998) (observing that, in *Toney v. WCCO Television, Midwest Cable & Satellite, Inc.*, <u>85 F.3d 383, 387</u> (8th Cir. 1996), the Eighth Circuit Court of Appeals held that a plaintiff must show that the defendant is "responsible" for the implication and finding it analogous to the rule in *Dodds*).

separate the from the farm's hiring practices, described near the end of the Article, and thus the Article does not "link the key statements together." *Tatum*, 554 S.W.3d at 635. Notably, Congressman Nunes was provided numerous opportunities to refute any defamatory inference himself, unlikely as that inference may be, but he declined to be interviewed. No reasonable reading of the Article supports the allegedly defamatory implication, and this cannot be overcome by Congressman Nunes's "extra sensitive perception." *Forsher*, 608 P.2d at 723.

On the second prong: There is nothing in the Article—let alone "clear and convincing evidence" from the face of the Article—suggesting that Defendants "intended" or "endorsed" the alleged implication. *Dodds*, 145 F.3d at 1063–64. The Article is a 68-paragraph first-person narrative that proceeds chronologically through Lizza's reporting experience. Congressman Nunes's role in the story ends after the 14th paragraph—before Lizza even arrives in Iowa. From that point on, the Article pivots to reporting on the facts that Lizza learned in Iowa, which include what he learned concerning the local economy's reliance on undocumented labor. The only times Congressman Nunes is mentioned again in the Article in any substantive manner are (i) to state that he "had no financial interest in his parents' Iowa dairy operation," and (ii) to report an undisputed and unrelated fact concerning the mailing address of a financial holding company the family co-owns. And, near the end of the article, Lizza reinforces that he is *not* implying that Congressman Nunes has any affiliation to the hiring of undocumented laborers, by stating: "Is it possible the Nuneses have nothing to be seriously concerned about? Of course, but I never got the chance to ask because . . . Representative Nunes did not respond to numerous requests for interviews." . Sitwala Decl., Exs. A, B.

Rather, what Lizza expressly conveys in this passage is the fact that he has *questions* that remain unanswered, *not* facts or conclusions to present to readers. The First Amendment

protects even the most skeptical of questions and critics, particularly as they relate to public officials. To be sure, as reflected in *Sullivan*, such speech lies at the core of the First Amendment. For these reasons, nothing in the Article itself reveals the requisite intent or endorsement to sustain a claim for defamation by implication.

>    2.    *Even if the alleged implication was supported by the Article, it would be nonactionable opinion.*

Assuming *arguendo* that the Article supports the defamatory implication that Congressman Nunes "conspired or colluded" with others "to hide or cover-up" the fact that NuStar "employs undocumented labor," Am. Compl. ¶ 13, such an "implied" statement would be nonactionable opinion, for the same reasons described *supra* pp. 15-17. Again, the allegation that Congressman Nunes "conspired" to keep a fact a "secret" is an obvious rhetorical hyperbole that is not capable of being proven true or false, and thus protected by the First Amendment. *Milkovich*, 497 U.S. at 20, 21; *see supra* pp. 15-16.

Moreover, under both California and Iowa law, all relevant factors make clear that—to the extent the Article could be deemed to imply that Congressman Nunes "conspired or colluded" with others "to hide or cover-up" the fact that NuStar "employs undocumented labor," Am. Compl. ¶ 13—that is the author's opinion, and is not being offered as a fact. This includes (i) the context of the Article as a whole, which is filled with introspective questions and thoughts and concludes with editorial commentary, (ii) the broader social context concerning Congressman Nunes, a controversial public official embroiled in American politics, (iii) the tone and setting of the Article, a work of literary journalism, (iv) the disclosed facts that Congressman Nunes appears to have kept the farm's move a secret, and NuStar hires undocumented laborers, and (v) the fact that—according to Congressman Nunes—Lizza is "a high-profile, left-wing political journalist, well-known for his extreme bias towards" Congressman Nunes, *see* Am.

Compl. ¶ 1, from whom readers would anticipate works of protected comment, opinion, or persuasion, anyway. *See supra* pp. 15-17; *see also Tatum*, <u>554 S.W.3d at 639</u> (reversing and reinstating dismissal on grounds of opinion: "This first-person, informal style indicates that the format is subjective rather than objective. Nor does the column imply any undisclosed facts."); *Thomas v. L.A. Times Commc'ns, LLC*, <u>189 F. Supp. 2d 1005, 1015</u> (C.D. Cal.) ("[E]ven if Defendants did intend to assert the allegedly defamatory implications, the article itself is constitutionally protected because it merely states 'opinion[s] on matters of public concern that do not constitute or imply a provable factual assertion'"), *aff'd*, <u>45 F. App'x 801</u> (9th Cir. 2002) (alteration in original) (citation omitted).

**D. Congressman Nunes Has Failed to Plead Facts Sufficient to Make His Allegation of Actual Malice "Plausible."**

The Amended Complaint fails to state a claim for defamation for an additional reason: It fails to allege facts sufficient to make it plausible that Defendants acted with "actual malice," that is, that they knew that any of the challenged statements were false, or that they recklessly disregarded the truth of the statements. A publisher acts with "reckless disregard" when it has a "high degree of awareness of . . . probable falsity." *Gertz v. Robert Welch, Inc.*, <u>418 U.S. 323, 332</u> (1974). "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing," but rather whether "the defendant in fact entertained serious doubts as to the truth of his publication." *Reader's Digest Ass'n v. Superior Court*, <u>690 P.2d 610, 617-18</u> (Cal. 1984) (quoting *St. Amant v. Thompson*, <u>390 U.S. 727, 731</u> (1968)). This establishes a "subjective test, under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue." *Id.*

Importantly, the definition of "actual malice" in the *constitutional* sense is "unlike the common law definition of actual malice"; it "focuses upon the attitudes of defendants vis-à-vis

the truth of their statements, as opposed to their attitudes towards plaintiffs." *Barreca v. Nickolas*, 683 N.W.2d 111, 120 (Iowa 2004). "[U]nder *New York Times*, a plaintiff cannot demonstrate actual malice 'merely through a showing of ill will or "malice" in the ordinary sense of the term.'" *Bertrand*, 846 N.W.2d at 899 (quotation marks and citations omitted). "Stated differently, actual antagonism or contempt has been held insufficient to show malice." *Id.* (citation omitted).

Here, Congressman Nunes fails to satisfy the *Twombly*/*Iqbal* standard of pleading sufficient factual matter to make his allegation of actual malice "plausible." Although the Amended Complaint is larded with conclusory allegations that Defendants had an agenda and harbored ill will and animus toward Congressman Nunes, *see, e.g.*, Am. Compl. ¶ 35(b), (c), (d), these sorts of allegations have no bearing on Defendants' attitude toward "the truth of their statements, as opposed to their attitudes towards plaintiffs." *Barreca*, 683 N.W.2d at 120.[11] Similarly, it does not matter if Defendants relied on sources who were biased against Nunes, another conclusory allegation. *See* Am. Compl. ¶ 35(c); *Reader's Digest Ass'n*, 690 P.2d at 619 (evidence of a "failure to investigate" or reliance on "unreliable" sources or sources "known to be biased" "is relevant only to the extent that it reflects on the subjective attitude of the publisher"; "[t]he failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy").

Also irrelevant is the allegation—again conclusory—that Defendants did not adhere to "standards of ethics" or "all journalistic standards in writing, editing and publishing." Am.

---

[11] For the same reason, the allegation that Defendants used "unnecessarily strong and violent language, disproportionate to the occasion" is (besides being demonstrably false from the face of the Article) irrelevant to the issue of actual malice, Am. Compl. ¶ 35(d)—and, assuming *arguendo* it is true, makes it clearer that many of the challenged statements are in fact opinions that cannot give rise to a defamation claim.

Compl. ¶ 35(a); *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989)

("Petitioner is plainly correct in recognizing that a public figure plaintiff must prove more than

an extreme departure from professional standards . . . ."). In sum: Even if the Article contained

any otherwise actionable defamatory statements (and it does not, for the reasons stated *supra*

Points I.B, and I.C), Congressman Nunes has not pleaded that any of the allegedly defamatory

statements were made with actual malice by Defendants. Given that Defendants raised these

very issues in connection with the original complaint, and Congressman Nunes did not add any

substantive allegations to cure these deficiencies in the Amended Complaint, the Amended

Complaint should be dismissed with prejudice.

### E. Congressman Nunes Has Failed to Plead an Underlying Cause of Action to Sustain a Civil Conspiracy Claim.

"Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken

in furtherance of the conspiracy [that] give rise to the action." *Wright v. Brooke Grp. Ltd.*, 652

N.W.2d 159, 172 (Iowa 2002) (alteration in original) (citation omitted); *see also Saunders v.*

*Superior Court*, 27 Cal. App. 4th 832, 845 (1994). "[C]onspiracy is merely an avenue for

imposing vicarious liability on a party for the wrongful conduct of another with whom the party

has acted in concert." *Wright*, 652 N.W.2d at 172 (citation omitted)). Here, Congressman

Nunes has failed to allege the underlying tort of defamation. Therefore, there is no basis to

sustain a separate claim for "civil conspiracy."

## II. Congressman Nunes's Amended Complaint Should Be Stricken Pursuant to California's Anti-SLAPP Law

### A. California Law Supplies the Rule of Decision.

"A federal court must apply the choice of law rules of the forum state in which it sits"—

in this case, Iowa. *Lyons v. Midwest Glazing*, 265 F. Supp. 2d 1061, 1072 (N.D. Iowa 2003)

(citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). For tort claims, Iowa

"follow[s] the Restatement's 'most significant relationship' methodology for choice of law issues." *Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 897 (Iowa 1996); *Cameron v. Hardisty*, 407 N.W.2d 595, 597 (Iowa 1987) (quoting Restatement (Second) of Conflict of Laws § 145: "The rights and liabilities . . . are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties."). For claims of defamation arising from content that is published in multiple states (such as the Article), "[w]hen a natural person claims that he has been defamed by an aggregate communication, the state of most significant relationship will usually be the state *where the person was domiciled at the time*, if the matter complained of was published in that state." Restatement (Second) of Conflict of Laws § 150(2) (emphasis added). As the Restatement explains:

> Rules of defamation are designed to protect a person's interest in his reputation. When there has been publication in two or more states . . . at least most issues involving the tort should be determined . . . by the local law of the state where the plaintiff has suffered the greatest injury by reason of his loss of reputation. This will usually be the state of the plaintiff's domicil if the matter complained of has there been published.

*Id.*[12]

Applying this standard, Iowa choice of law rules dictate that California law supplies the rule of decision in this case. Congressman Nunes pleads that he is "a citizen of California." Am. Compl. ¶ 4. Purported harm to his reputation would be most severely felt in the 22nd

---

[12] *See, e.g.*, *Ratner v. Kohler*, No. CV 17-00542 HG-KSC, 2018 WL 1055528, at *6 (D. Haw. Feb. 26, 2018) (applying California law because that is where the plaintiff "resides and conducts his business"); *Ramsey*, 351 F. Supp. 2d at 1149 (under Restatement, law of domicile of plaintiff family applied); *Schmidt v. Wash. Newspaper Publ'g Co.*, No. CV N19C-03-262 CLS, 2019 WL 4785560, at *4 (Del. Super. Ct. Sept. 30, 2019), *amended on reconsideration*, No. CV N19C-03-262 CLS, 2019 WL 7000039 (Dec. 20, 2019) (applying California law because the "[p]laintiff is a California resident" and "the injury" to his reputation "occurred in California"); *see also Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 622 (8th Cir. 2004) (applying the Restatement as adopted by the Missouri Supreme Court to hold that, "when defamatory material is published in two or more states," "the state where the defamed party has its principal place of business will usually be the state in which its reputation is most grievously affected").

Congressional District of California, where Congressman Nunes was, at the time of publication, running for re-election. *Condit v. Dunne*, <u>317 F. Supp. 2d 344, 354</u> (S.D.N.Y. 2004) (applying California law because, "[a]s [the defamation] plaintiff was a [California] Congressman [at the time of the allegedly defamatory statement], his reputation necessarily was a matter of national significance, but it mattered most in California where he had been elected to office, and where the people whom he represented resided"). In fact, Congressman Nunes expressly alleges that the Article was published for the purpose of "influenc[ing] the 2018 Congressional election." Am. Compl. ¶ 35(f). And the Amended Complaint rejects the notion that Congressman Nunes has any ties to Iowa, or to the family farm in Sibley. *Id.* ¶ 15 ("Plaintiff does not own an interest in his family's dairy farm in Iowa, never has, and is not involved in any way in its operations.").

### B. The California Anti-SLAPP Law's Motion-to-Strike Provision Is a Substantive Immunity from Suit that Applies in Federal Court.

The California anti-SLAPP law's motion-to-strike protections apply in federal court. *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, <u>190 F.3d 963, 973</u> (9th Cir. 1999). These protections constitute "substantive immunity from suit"—and thus a federal court, "sitting in diversity" and applying California defamation law, should apply the anti-SLAPP protections. *See Batzel v. Smith*, <u>333 F.3d 1018, 1025-26</u> (9th Cir. 2003). Courts outside the Ninth Circuit Court of Appeals applying California law as the rule of decision have therefore applied California's anti-SLAPP law to diversity actions pending in those courts. *See, e.g.*, *Tobinick v. Novella*, <u>108 F. Supp. 3d 1299, 1305</u> (S.D. Fla. 2015) (applying California substantive law and thus California's anti-SLAPP statute because, "[a]lthough framed as a rule of state procedure, California's anti-SLAPP statute protects substantive rights and thus applies in federal court"); *Blumenthal v. Drudge*, No. Civ. A. 97-1968(PLF), <u>2001 WL 587860</u> (D.D.C. Feb. 13, 2001). This Court should do the same.

**C. The Amended Complaint Should Be Stricken Pursuant to the Anti-SLAPP Statute.**

Under the California anti-SLAPP statute, "a cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike . . . ." Cal. Civ. Proc. Code § 425.16(b)(1). Moreover, in ruling on an anti-SLAPP motion, "the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." *See* Cal. Civ. Proc. Code § 425.16(b)(2); *see also Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 679 (2010), *as modified on denial of reh'g* (Feb. 24, 2010) (noting that a court "do[es] not evaluate the first prong of the anti-SLAPP test solely through the lens of a plaintiff's cause of action").

Where, as here, a defendant files an anti-SLAPP motion to strike "based on alleged deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a motion under Rule 12(b)(6) except that the attorney's fee provision of § 425.16(c) applies." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1446 (2019) (citation omitted).

Here, for all of the reasons stated above, Congressman Nunes has failed to plead a viable claim. The Court should grant Defendants' motion to strike the Amended Complaint pursuant California's anti-SLAPP provision, and charge Defendants' attorneys' fees to Congressman Nunes pursuant to Cal. Civ. Proc. Code § 425.16(c).

**III. This Court Should Strike All or Part of the Amended Complaint Because Its Words, Tone, and Averments Well Exceed the Bounds of Permissible Pleading and Prejudice the Defendants by Including Redundant, Immaterial, Impertinent, or Scandalous Matter.**

Federal judges enjoy "liberal discretion under Rule 12(f)" to strike all or part of a party's pleading, including his complaint. *Nationwide Ins. Co. v. Cent. Mo. Elec. Coop., Inc.*, 278 F.3d

742, 748 (8th Cir. 2001); *Bertroche v. Mercy Physician Assocs., Inc.*, No. 18-CV-59-CJW-KEM, 2019 WL 4307127, at *4 (N.D. Iowa Sept. 11, 2019). While courts disfavor such motions, *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977), the express language of Fed. R. Civ. P. 8 on pleading standards for a complaint and of Fed. R. Civ. P. 12(f) relating to unacceptable content of a pleading join to make clear why this case merits an exercise of this Court's broad discretion to strike all or part of the Amended Complaint.

The text of Rule 12(f) starts with the concept a trial judge may strike any "redundant, immaterial, impertinent, or scandalous matter," and Rule 12(f) case law suggests courts should:

(a) Test whether the challenged language lacks any bearing on the issues in the case,

(b) Ask if evidence in support of the allegations would be admissible, and

(c) Measure how retention of the allegations would result in prejudice to the movant.

*See, e.g.*, *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012). Or, as Chief Judge Jarvey of the Southern District of Iowa observed, "[t]rial courts have traditionally granted such motions where 'the allegations have no possible relation to the controversy, may cause prejudice to one of the parties, or confuse[] the issues.'" *Hammond v. Arch Ins. Sols.*, No. 3:17-cv-00019, 2017 WL 11297279, at *4 (S.D. Iowa Sept. 6, 2017) (quoting *Balon v. Enhanced Recovery Co.*, 316 F.R.D. 96, 98 (M.D. Pa. 2016)); *Bailey v. Fairfax Cty., Va.*, No. 1:10-cv-1031, 2010 WL 5300874, at *4 (E.D. Va. Dec. 21, 2010) (same).

As to what stands as "redundant, immaterial, impertinent, or scandalous matter" under Rule 12(f), case law provides further definitions, making content:

- Redundant if it "constitute[s] needless repetition" or is "foreign to the issue." *Sliger v. Prospect Mortg., LLC*, 789 F. Supp. 2d 1212, 1216 (E.D. Cal. 2011) (citations omitted); *Gomez v. J. Jacobo Farm Labor Contractor, Inc.*, 188 F. Supp. 3d 986, 991 (E.D. Cal. 2016);

- Immaterial if it "has no essential or important relationship to the claim for relief

or the defenses being pleaded." *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1122 (E.D. Cal. 2012) (citation omitted); *see also Hammond*, 2017 WL 11297279, at *4; and

- Impertinent if it "consist[s] of statements that do not pertain to the issues in question." *Resolution Tr. Corp. v. Fiala*, 870 F. Supp. 962, 977 (E.D. Mo. 1994).

And, as to what is scandalous matter, the Amended Complaint speaks for itself and clearly satisfies any definitional test.

The content of the Amended Complaint's long and intricate averments lacks adherence to Rule 8 and clearly warrants the exercise of judicial discretion under Rule 12(f). *First*, rather than providing "a short and plain statement of the claim showing that the pleader is entitled to relief," and setting forth each allegation in a "simple, concise, and direct" manner, as Fed. R. Civ. P. 8 commands, the Amended Complaint stacks 44 numbered paragraphs, some extending up to or more than a page in length and some with dozens of sentences, that among other things, call Defendant Lizza a sexual predator and a member of the "Shitty Media Men," accuses Lizza of "lurking" around "grammar-school aged" children, and labels the Article the "Lizza Hit Piece."[13]

*Then*, as further detailed in Defendants' motion, Plaintiff uses the Amended Complaint—

---

[13] The scandalous, impertinent, and irrelevant statements that Defendants seek to have stricken are listed in the Motion, and are as follows: "Lizza was a fixture of the main stream media until December 2017, when his then-employer—The New Yorker magazine—summarily severed all ties and publicly terminated Lizza because of 'improper sexual conduct,'" Am. Compl. ¶ 1; "Lizza's name was also included in the 'Shitty Media Men' list that circulated in response to allegations published about Harvey Weinstein," *id.*; Lizza "physically traveled to Sibley, Iowa, where he lurked around Plaintiff's grammar-school aged nieces and stalked members of Plaintiff's family, reducing Plaintiff's sister-in-law to tears," *id.*; "The Lizza Hit Piece falsely portrays Lizza as a hard-working reporter earnestly investigating a real story on the ground in Iowa, being stalked and intimidated by Plaintiff's family. In truth, as was reported almost immediately after publication of the Lizza Hit Piece, while he was in Sibley, Lizza stalked Plaintiff's grammar-school aged nieces, caused Plaintiff's family to believe he was a sexual predator cruising the local neighborhood for victims, frightened a family member to tears, and enraged a grieving mother," *id.* ¶ 17; "It turns out that Nunes doesn't have a secret, that he's not a hypocrite on immigration policy, and that the Iowans Lizza met were wary of him slowly driving around town while children were at play because they discovered Lizza had recently been fired from his job for sexual misconduct . . . ," *id.* ¶ 29; and "Another resident told me that he encountered a Nunes family member crying because she'd discovered that the man who was surveilling her house had recently been fired for sexual misconduct," *id.*

under the guise of privileged court papers—to publish or republish inflammatory falsehoods and statements that themselves are defamatory against Defendants and to employ prejudicial *ad damnum* clauses, including one in bold face on page one that screams this lawsuit seeks "compensatory damages and punitive damages in the sum of **$77,500,000.00**."

The inclusion and retention of these portions of the Amended Complaint and all other similarly offending portions setting forth redundant, immaterial, impertinent, and scandalous matter prejudice Defendants, in part because the language and the prolix pleading (a) impede Defendants from expeditiously making full denials and (b) impose such burdens on Defendants that they cannot litigate this case and defend themselves in a just, speedy, and inexpensive manner. Defendants are harmed because "[p]rejudice occurs when the challenged pleading or allegation confuses the issues or is so lengthy and complex that it places an undue burden on the responding party." *Hammond*, 2017 WL 11297279, at *4 (quoting *Foster v. Pfizer Inc.*, No. 00-1287-JTM, 2000 WL 33170897, at *2 (D. Kan. Dec. 12, 2000)).

Defendants therefore ask that this Court strike the Amended Complaint in its entirety, or at least those portions of the Amended Complaint referenced or quoted in the accompanying Rule 12(f) motion to strike.

## Conclusion

For the reasons stated above and their related motion papers, Defendants respectfully request that the Court dismiss the Amended Complaint pursuant to Rule 12(b)(6), with prejudice; strike the Amended Complaint pursuant to California's anti-SLAPP statute; strike some or all of the Amended Complaint pursuant to Rule 12(f); and award Defendants their reasonable attorneys' fees incurred in responding to Congressman Nunes's Amended Complaint and original complaint.

February 18, 2020

**Ryan Lizza and Hearst Magazine Media, Inc., Defendants**

By: /s/ Jonathan R. Donnellan

Jonathan R. Donnellan, *Lead Counsel*\*
 *jdonnellan@hearst.com*
Ravi V. Sitwala\*
 *rsitwala@hearst.com*
Nathaniel S. Boyer\*
 *nathaniel.boyer@hearst.com*
THE HEARST CORPORATION
Office of General Counsel
300 West 57th Street
New York, New York 10019
Telephone: (212) 841-7000
Facsimile: (212) 554-7000
*\*Admitted Pro Hac Vice*

Michael A. Giudicessi
 *michael.giudicessi@faegrebd.com*
Nicholas A. Klinefeldt
 *nick.klinefeldt@faegrebd.com*
Susan P. Elgin
 *susan.elgin@faegrebd.com*
FAEGRE BAKER DANIELS LLP
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309-8003
Telephone: (515) 248-9000
Facsimile: (515) 248-9010

*Attorneys for Defendants*

**Certificate of Service**

The undersigned certifies that a true copy of **Defendants' Brief in Support of Their Motion to Dismiss, to Strike the Amended Complaint Pursuant to <u>Cal. Civ. Proc. Code § 425.16</u>, and to Strike Pursuant to <u>Fed. R. Civ. P. 12(f)</u>** was served upon the following parties through the court's CM/ECF electronic filing system on February 18, 2020.

/s/  Jonathan R. Donnellan
Jonathan R. Donnellan

Copy to:

Joseph M. Feller
 *jfeller@kkfellerlaw.com*
Steven S. Biss
 *stevenbiss@earthlink.net*

*Attorneys for Plaintiff*