IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| **Devin G. Nunes,** | Case No. 5:19-cv-04064-CJW-MAR |
| Plaintiff, | |
| v. | **Defendants' Reply Brief in Further Support of Their Motion to Dismiss, to Strike the Amended Complaint Pursuant to Cal. Civ. Proc. Code § 425.16, and to Strike Pursuant to Fed. R. Civ. P. 12(f)** |
| **Ryan Lizza** and **Hearst Magazine Media, Inc.,** | |
| Defendants. | **(Oral Argument Scheduled for April 24, 2020, at 2:30 p.m.)** |

Defendants Ryan Lizza and Hearst Magazine Media, Inc. respectfully submit this reply brief in further support of their pre-answer motion to dismiss or strike the Amended Complaint filed in this case by Plaintiff Devin Nunes, *see* ECF No. 23, and in reply to Congressman Nunes's Resistance and Memorandum in Opposition to the Motion, *see* ECF No. 38 (the "Resistance" or "Res.").*

---

\*      Except where defined herein, all capitalized terms in this reply brief have the same definition as in Defendants' opening brief, *see* ECF No. 37 ("Opening Brief" or "Opening Br.").

# Table of Contents

Argument ...........................................................................................................................1

    I.      Congressman Nunes's Amended Complaint Should Be Dismissed ........................1

          A.      The Resistance Largely Ignores the Allegedly Defamatory Explicit Statements ...................................................................................................1

          B.      Congressman Nunes Has Failed to State a Claim for Defamation by Implication ................................................................................................4

          C.      The Resistance Fails to Explain How Congressman Nunes's Allegation of Actual Malice Is "Plausible." ................................................6

          D.      Congressman Nunes Has Failed to Plead a Civil Conspiracy Claim ...........7

    II.     Congressman Nunes's Amended Complaint Should Be Stricken Pursuant to California's Anti-SLAPP Law ...................................................................................8

          A.      California Law Supplies the Rule of Decision ............................................8

          B.      The California Anti-SLAPP Law Applies in Federal Court ........................9

    III.    This Court Should Strike the Amended Complaint Pursuant to Rule 12(f) ..........10

Conclusion .......................................................................................................................10

Page(s)

**Cases**

*Batzel v. Smith*,
  333 F.3d 1018 (9th Cir. 2003) ....................................................................................................9

*Bierman v. Weier*,
  826 N.W. 2d 436 (Iowa 2013) ....................................................................................................1

*Bridges v. California*,
  314 U.S. 252 (1941)....................................................................................................................3

*Condit v. Dunne*,
  317 F. Supp. 2d 344 (S.D.N.Y. 2004).........................................................................................8

*Edwards v. Nat'l Audubon Soc'y, Inc.*,
  556 F.2d 113 (2d Cir. 1977)........................................................................................................7

*Eramo v. Rolling Stone*,
  209 F. Supp. 3d 862 (W.D. Va. 2016) ........................................................................................7

*Forsher v. Bugliosi*,
  608 P.2d 716 (Cal. 1980) ............................................................................................................6

*Franklin v. Dynamic Details, Inc.*,
  116 Cal. App. 4th 375 (2004) .....................................................................................................4

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)................................................................................................................3, 6

*Janklow v. Newsweek, Inc.*,
  759 F.2d 644 (8th Cir. 1985) ..................................................................................................4, 5

*Keeton v. Hustler Magazine, Inc.*,
  465 U.S. 770 (1984)................................................................................................................8, 9

*Keeton v. Hustler Magazine, Inc.*,
  549 A.2d 1187 (N.H. 1988) ........................................................................................................9

*Lamb Eng'g & Constr. Co. v. Neb. Pub. Power Dist.*,
  103 F.3d 1422 (8th Cir. 1997) ..................................................................................................10

*Lampo Grp., LLC v. Paffrath*,
  No. 3:18-CV-01402, 2019 WL 3305143 (M.D. Tenn. July 23, 2019) .......................................9

*Metabolic Research, Inc. v. Ferrell*,
    693 F.3d 795 (9th Cir. 2012) ...........................................................................................9

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..................................................................................................3, 7

*Perez v. CRST International, Inc.*,
    355 F. Supp. 3d 765 (N.D. Iowa 2018) ............................................................................8

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
    890 F.3d 828 (9th Cir. 2018) ...........................................................................................9

*Stevens v. Iowa Newspapers, Inc.*,
    728 N.W.2d 823 (Iowa 2007) ..........................................................................................6

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
    No. 02 CV 2258 JM (AJB), 2007 WL 935703 (S.D. Cal. Mar. 7, 2007) ..................................7

*Vangheluwe v. Got News, LLC*,
    365 F. Supp. 3d 836 (E.D. Mich. 2019) ......................................................................9, 10

*White v. Fraternal Order of Police*,
    909 F.2d 512 (D.C. Cir. 1990) .................................................................................4, 5, 6

## Other Authorities

Restatement (Second) of Conflict of Laws § 145 ...........................................................................8

Restatement (Second) of Conflict of Laws § 150(2) ......................................................................8

The Resistance leaves key dispositive arguments unchallenged. It mainly presents string cites[1]—which get the law wrong in several regards[2]—with little attempt to tether the principles from those authorities to the statements at issue here.[3] The Resistance does not save Congressman Nunes's claims, and the Motion should be granted.

## Argument

**I.     Congressman Nunes's Amended Complaint Should Be Dismissed.**

**A. The Resistance Largely Ignores the Allegedly Defamatory Explicit Statements.**

1.   *Congressman Nunes ignores at least six of the allegedly defamatory statements.*

Congressman Nunes lists 11 allegedly defamatory statements in his Amended Complaint. Am. Compl. ¶ 18. Defendants moved to dismiss his defamation claim as it concerns all of them. Opening Br. 13-20. The Resistance addresses only five statements, ignoring the rest.[4] He has

---

[1]     Congressman Nunes argues that Iowa law supplies the rule of decision. Res. 8-10. This is not correct, *see* Opening Br. 29-31, and the application of California law results in the application of the state's anti-SLAPP statute, *id.* at 31-32. However, Congressman Nunes does not dispute that, in considering the elements of his claims, there is "no true conflict because the law of defamation in both California and Iowa, infused with the First Amendment's requirements, are congruent." *Id.* at 10.

[2]     For example, Congressman Nunes spends two pages describing libel *per se* under Iowa law, Res. 11-12, but, as here, when the "defendant is a media defendant, . . . presumptions of fault, falsity, and damages are not permissible, and thus the common law doctrine of libel *per se* cannot apply." *See Bierman v. Weier*, 826 N.W. 2d 436, 443 (Iowa 2013).

[3]     For example, Congressman Nunes argues that the challenged statements are "of and concerning" him because his "name and references . . . are all over the" Article. Res. 18. He cites nothing for this proposition. The fact that some statements in the Article might be "of and concerning" him does not mean that all statements in the Article are "of and concerning" him.

[4]     The allegedly defamatory statements that the Resistance fails to address are as follows: (1) "Devin; his brother, Anthony III; and his parents, Anthony Jr. and Toni Dian, sold their California farmland in 2006. Anthony Jr. and Toni Dian, who has also been the treasurer of every one of Devin's campaigns since 2001, used their cash from the sale to buy a dairy eighteen hundred miles away in Sibley, a small town in northwest Iowa where they—as well as Anthony III, Devin's only sibling, and his wife, Lori—have lived since 2007," Am. Compl. ¶ 18(d); (2) "I laid out the facts I had uncovered in Sibley, including the intimidation of sources and the Devin Nunes angle, and asked him for advice. 'I'd tell that story,' he said. He paused and added, 'We're a sanctuary church, if you need a place to stay. You're safe here!'," *id.* ¶ 18(j); (3) "Is it possible the Nuneses have nothing to be seriously concerned about? Of course, but I never got the chance to ask because Anthony Jr. and Representative Nunes did not respond to numerous requests for interviews," *id.* ¶ 18(k); (4) "'They are immigrants and Devin is a strong supporter

therefore conceded that the unaddressed statements are not actionable.

> 2. *Statements concerning Congressman Nunes's actions as Chairman of the House Intelligence Committee are protected opinion.*

Congressman Nunes challenges the following statements in the Article: (1) He "used the Intelligence Committee to spin a baroque theory about alleged surveillance of the Trump campaign that began with a made-up Trump tweet about how 'Obama had my 'wires tapped' in Trump Tower'," Am. Compl. ¶ 18(c); and (2) he used his position as Chairman of the House Intelligence Committee as a "battering ram to discredit the Russia investigation and protect Donald Trump at all costs, even if it means shredding his own reputation and the independence of the historically nonpartisan committee in the process." Am. Compl. ¶ 18(b). In a single sentence, Congressman Nunes argues these statements are not protected opinion because they "accuse [him] of abusing his position as Chairman of the House Intelligence Committee, obstruction of the Russia investigation, prejudice, impartiality and unethical behavior." Res. 17. These phrases and accusations are also subjective statements that are not capable of being objectively proven true or false. Even adopting Congressman Nunes's (mis)characterization of Defendants' statement, he merely swaps one set of opinions for another.

---

of Mr. Trump, and Mr. Trump wants to shut down all of the immigration, and here is his family benefiting from immigrant labor', documented or not," *id.* ¶ 18(g); (5) "Other dairy farmers in the area helped me understand why the Nunes family might be so secretive about the farm: Midwestern d[ai]ries tend to run on undocumented labor," *id.* ¶ 18(f); (6) "There was no doubt about why I was being followed. According to two sources with firsthand knowledge, NuStar did indeed rely, at least in part, on undocumented labor. One source, who was deeply connected in the local Hispanic community, had personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs … asserting that the farm was aware of their status," *Id.* ¶ 18(i) (Congressman Nunes claims that he "ha[s] no knowledge of who the dairy farm hired," Res. 17). In addition, Congressman Nunes fails to address all but the italicized portion of the following statement: "Devin Nunes was the public figure at the heart of this, and he had no financial interest in his parents' Iowa dairy operation. *On the other hand, he and his parents seemed to have concealed basic facts about the family's move to Iowa. It was suspicious.* And his mom, who co-owns the Sibley dairy, is also the treasurer of his campaign." Am. Compl. ¶ 18(h).

But Congressman Nunes misses the point. That these opinions are critical of him does not transform them into facts. A reasonable reader would understand that Congressman Nunes does not literally use a "battering ram." Whether he has "sp[u]n a baroque theory" or "shredd[ed] his own reputation and the independence of the historically nonpartisan committee" are not provably true or false. For these and other reasons, which Congressman Nunes also fails to address, the statements are protected opinion. *See* Opening Br. 17-18.[5]

### 3. *Statements that Congressman Nunes kept secret the family farm's move to Iowa are nondefamatory statements of opinion.*

Congressman Nunes alleges the following statements are defamatory, at least insofar as they are "of and concerning" him: (1) "Devin Nunes has a secret," Am. Compl. ¶ 18(a); (2) "Why would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa?," *id.* ¶ 18(e); and (3) "On the other hand, he and his parents seemed to have concealed basic facts about the family's move to Iowa," *id.* ¶ 18(h). But Congressman Nunes fails to explain why these facts are defamatory at all. "Because there is nothing illegal, shameful, or wrong about the fact that Congressman Nunes's relatives moved the family farm to Iowa, as a matter of law, it is not defamatory to state

---

[5] That Congressman Nunes would argue that these statements are defamatory and actionable speaks to how far he has strayed from foundational precedent securing First Amendment freedoms. He cites *Gertz v. Robert Welch, Inc.* for the proposition that "there is 'no constitutional value in false statements of fact,'" Res. 16, but ignores the Supreme Court's explanation, three sentences later in *Gertz*, as to why many false statements still should not be punished by libel laws: "Although the erroneous statement of fact is not worthy of constitutional protection, it is nevertheless inevitable in free debate. . . . And punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press." 418 U.S. 323, 340 (1974). And he revealingly cites to English common law for the proposition that "libel of a public official [is] deemed an offense most dangerous to the people, and deserving of punishment." Res. 1 (citation omitted). But that is not the Constitutional tradition or law of this country or the individual states. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Bridges v. California*, 314 U.S. 252, 264 (1941) (in reversing contempt conviction for newspaper reporting on ongoing litigation: "[T]o assume that English common law in this field became ours is to deny the generally accepted historical belief that one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.") (citation omitted).

3

that Congressman Nunes chose to keep that fact a secret." Opening Br. 14 (citing cases).

The only argument that Congressman Nunes makes concerning these statements is that they cannot be protected opinion because the facts on which the opinion is based are "provably false." Res. at 17. Not so. The disclosed facts are: (i) The Nunes family moved its farming operation to Iowa over a decade ago, and (ii) this (a) has attained little-to-no press attention, (b) was absent from a press release issued by Steve King's office in connection with Congressman Nunes's visit to the area, and (iii) was intentionally omitted from a regional dairy industry publication's story about the Nunes family farm, at the family's request. Opening Br. 16-17. Congressman Nunes does not dispute these facts.[6] And Congressman Nunes does not address the several other reasons the Article's reporting that he has a "secret" is protected opinion.[7]

### B. Congressman Nunes Has Failed to State a Claim for Defamation by Implication.

The First Amendment requires that, to be an actionable implication, "the communication, by the particular manner or language in which the true facts are conveyed, [must] suppl[y] *additional*, *affirmative evidence* suggesting that the defendant *intends or endorses* the defamatory inference." *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) (emphasis added) (citing *Janklow v. Newsweek, Inc.*, 759 F.2d 644, 648-49 (8th Cir. 1985) (claim for defamation by implication may only be maintained if "article in question can[] be read to imply that [the defendant] espoused the validity of the" the alleged implication), *affirming*

---

[6] Even if the constituent facts that supported this opinion were untrue, it would not matter; under the governing California law, the disclosed facts must be both "false *and defamatory*" to make the statement actionable. *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 387 (2004) (emphasis added). There is nothing defamatory about these disclosed facts.

[7] As explained in the Opening Brief, such statements are not capable of being proven true or false and lack an easily defined meaning. The tone of the Article as a whole, a work of literary journalism, is unlike a traditional news report; it is laden with adjectives and introspective questions intended to reveal Lizza's mental impressions. And Congressman Nunes embraces the characterization of Lizza as a "a high-profile, left-wing political journalist, well-known for his extreme bias towards" Congressman Nunes, Am. Compl. ¶ 1, from whom readers would anticipate works of persuasion rather than straight news reporting. Opening Br. 14-15.

*summ. j. in full on reh'g en banc*, 788 F.2d 1300 (8th Cir. 1986)).  *See* Opening Br. 21-24.

Congressman Nunes does not dispute that the *Janklow/White* rule applies to this case.  He declines to address it, or even cite *Janklow*, *White*, or their progeny.  He does not point to any allegation or evidence of intent in the publication itself that could satisfy his high burden.  Yet again, Congressman Nunes has conceded the point through silence.

Even assuming the *Janklow/White* rule would not apply, no reasonable reading of the Article supports Congressman Nunes's allegedly defamatory implication.  Congressman Nunes proffers *ipse dixit* that the Article implies that he "conspired or colluded with his family and others to hide or cover-up a 'Politically Explosive Secret': that [his] 'family farm' employs undocumented labor."  Res. 15.  But he ignores the fact that the Article, reviewed in its entirety, includes several statements refuting that inference.  The Article reports that Congressman Nunes "ha[s] no financial interest in his parents' Iowa dairy operation"; the Article neither states nor suggests that Congressman Nunes is involved in the operation of the farm; and any defamatory implication is undermined by the following disclaimer: "Is it possible the Nuneses have nothing to be seriously concerned about?  *Of course* . . . ."  Sitwala Decl., Exs. A, B (emphasis added).[8]

Congressman Nunes also fails to address the fact that—as explained in the Opening Brief—a horizontal line appears in the Article between Congressman Nunes's "secret" (addressed in the first 14 paragraphs) from what Lizza learns during his investigation, including NuStar's hiring of undocumented laborers reported in the 54th paragraph.  *Id.*  These signal to readers that Congressman Nunes's "secret," described in the beginning, is separate from the

---

[8]   Congressman Nunes accuses Defendants of "divid[ing] the [A]rticle into parts and analyz[ing] each of the parts independently."  Res. 16.  Yet it is Congressman Nunes who is ignoring the Article as a whole, its tone, and the overall context.  And although he "disputes th[e] characterization" of the Article as a work of literary journalism, Res. 4 n.3, he does not explain why that characterization is inaccurate.

farm's hiring practices, described near the end of the Article. These cues distinguish the Article from the cases relied upon by Plaintiff,[9] and Congressman Nunes cannot make a claim from his "extra sensitive perception." *Forsher v. Bugliosi*, 608 P.2d 716, 723 (Cal. 1980).[10]

Lastly, Congressman Nunes does not directly address Defendants' argument that—even assuming the Article could support the alleged defamatory implication—that implication would be nonactionable opinion. Opening Br. 26-27. The closest Congressman Nunes comes to addressing this point is a conclusory argument that "whether Plaintiff knew that his family's farm employed 'undocumented labor'" and/or "conspired with anyone in a 'secret' effort to" cover it up is a "provably false assertion[] of fact." Res. 17. This ignores the context of the Article as a whole, its broader social context, its tone and setting, and the undisputed disclosed facts on which the alleged implication is premised. Opening Br. 26-27.

### C. The Resistance Fails to Explain How Congressman Nunes's Allegation of Actual Malice Is "Plausible."

Congressman Nunes argues that actual malice "cannot be resolved on a motion to dismiss under Rule 12(b)(6)," Res. 19, but does not dispute that, under *Twombly* and *Iqbal*, the Court must consider whether he has alleged facts sufficient to make it plausible that Defendants acted with "actual malice," that is, that they knew that any of the challenged statements were false, or that they were published with reckless disregard for whether they were false or not, meaning subjective awareness of probable falsity, Opening Br. 9-10, 27-28, *see Gertz*, 418 U.S. at 35 n.6.

---

[9] For example, in *Stevens*, the Iowa Supreme Court held that a claim for defamation by implication was actionable where the defendant had omitted a key fact, which would leave the readers with the false and defamatory impression that the plaintiff had fabricated prior sports opinion columns. *Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 831 (Iowa 2007). Congressman Nunes has not identified any omitted facts that, had they been included, would have refuted the allegedly defamatory implication.

[10] These design elements, together with the above-referenced statements in the Article refuting the alleged implication, undermine any suggestion that the "manner or language" of the Article conveys that Defendants "intend[ed] or endors[ed] the defamatory inference." *White*, 909 F.2d at 520.

Congressman Nunes never proffers plausible facts that support the inference that Defendants published any of the challenged statements with actual malice. For example, the Amended Complaint alleges that Defendants did not adhere to "journalistic standards in writing, editing and publishing" or "standards of ethics," Am. Compl. ¶ 35(a)—but Congressman Nunes never specifies how such "standards" were violated, and how that violation manifested itself in any allegedly defamatory statements. He parrots a statement in *Eramo v. Rolling Stone, LLC* that evidence that the defendant "conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice," 209 F. Supp. 3d 862, 872 (W.D. Va. 2016)—but proffers no facts to support this conclusory allegation here. He accuses Defendants of "manufactur[ing] the false statements"—but he (i) never identifies *which* statements were supposedly fabricated, or (ii) provides any factual basis for that conclusory allegation. Congressman Nunes makes much of his assertion that Defendants have "republished" the article by tweeting about it recently[11]—but that cannot support an inference of actual malice here; that Congressman Nunes filed a lawsuit alleging that the Article is inaccurate has not caused Defendants to harbor any doubts about its accuracy.[12]

**D. Congressman Nunes Has Failed to Plead a Civil Conspiracy Claim.**

Congressman Nunes concedes that a claim for civil conspiracy is not itself actionable; it will only live if an underlying tort claim survives. Res. 22. The claim should be dismissed.

---

[11] Tweeting a link to the Article does not constitute "republication" of the Article, as a matter of law. *See Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02 CV 2258 JM (AJB), 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007) ("[T]he court finds that such linking is more reasonably akin to the publication of additional copies of the same edition of a book, which is a situation that does not trigger the republication rule.").

[12] *See Edwards v. Nat'l Audubon Soc'y, Inc.*, 556 F.2d 113, 121 (2d Cir. 1977) ("Surely liability under the 'clear and convincing proof' standard of *New York Times v. Sullivan* cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.").

**II.     Congressman Nunes's Amended Complaint Should Be Stricken Pursuant to California's Anti-SLAPP Law**

   **A. California Law Supplies the Rule of Decision.**

Congressman Nunes agrees that, for tort claims, Iowa courts apply the "most significant relationship" test reflected in the Restatement (Second) of Conflicts.  Res. 8.  For claims of defamation arising from content that is published in multiple states (such as the Article), "the state of most significant relationship will usually be the state *where the person was domiciled at the time*."  Opening Br. 30 (quoting Restatement (Second) of Conflict of Laws (the "Restatement") § 150(2)).  In most instances that will be "the state where the plaintiff has suffered the greatest injury by reason of his loss of reputation."  *Id.* (citing cases).

Congressman Nunes ignores Section 150 of the Restatement entirely.  He also ignores the many defamation cases cited in the Opening Brief applying Section 150 that concluded that the law of the state of plaintiff's domicile supplies the rule of decision.[13]  Instead, Congressman Nunes quotes *Perez v. CRST International, Inc.*, which does not involve a defamation claim.  355 F. Supp. 3d 765 (N.D. Iowa 2018) (holding that California wage and hour laws apply).  *Perez* concerns the application of Section 145 of the Restatement—entitled "The General Principle"— the comments to which direct readers to Section 150 for multistate defamation claims, as it is a "particular tort[] as to which it is possible to state rules of greater precision."  Restatement (Second) of Conflict of Laws § 145, cmt. a.  Following the Restatement, the Court should hold that California law supplies the rule of decision in this case.[14]

---

[13]     For example, in a directly on-point application of this rule, a New York federal court applied California law to a defamation claim brought by a California congressman because, although "his reputation necessarily was a matter of national significance, . . . it mattered most in California where he had been elected to office, and where the people whom he represented resided."  *Id.* at 31 (citing *Condit v. Dunne*, 317 F. Supp. 2d 344 (S.D.N.Y. 2004)).

[14]     Plaintiff cites to *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984).  That case

## B. The California Anti-SLAPP Law Applies in Federal Court.

Plaintiff does not dispute that the circuit that embraces California has held that the California's anti-SLAPP statute is a "substantive immunity from suit." *See Batzel v. Smith*, 333 F.3d 1018, 1025-26 (9th Cir. 2003). Nor does he dispute that courts outside the Ninth Circuit Court of Appeals applying California law as the rule of decision have applied California's anti-SLAPP law to diversity actions. Opening Br. 31. Instead, Congressman Nunes points to the circuit split in the application of various anti-SLAPP laws in federal court generally. Res. 5-8.[15]

This misses the point; Defendants do not ask the Court to apply the anti-SLAPP statute in a manner that could even arguably cause a conflict with the Federal Rules. Rather, the motion challenges "alleged deficiencies in the plaintiff's complaint," and thus it "must be treated in the same manner as a motion under Rule 12(b)(6) except that the attorney's fee provision of § 425.16(c) applies." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1446 (2019). As a sister district court has observed, *Planned Parenthood*'s "manner of harmonizing the Federal Rules and California's anti-SLAPP statute is entirely sensible." *Vangheluwe v. Got News, LLC*, 365 F. Supp. 3d 836, 844 (E.D. Mich. 2019), *appeal docketed*, No. 19-1162 (6th Cir. Feb. 19, 2019) (applying California anti-SLAPP statute).[16] As applied, "California's anti-

---

concerned whether an out-of-state defamation defendant was subject to personal jurisdiction in New Hampshire. Defendants are not challenging personal jurisdiction. Notably, subsequent reported opinions in the *Keeton* case suggest that the district court applied out-of-state substantive law of defamation, notwithstanding the personal jurisdiction ruling. *See generally Keeton v. Hustler Magazine, Inc.*, 549 A.2d 1187 (N.H. 1988).

[15] Congressman Nunes does not explain the relevance of decisions concerning other states' anti-SLAPP statutes. *See Metabolic Research, Inc. v. Ferrell*, 693 F.3d 795, 799 (9th Cir. 2012) ("[W]hile all of the [anti-SLAPP] statutes have common elements, there are significant differences as well, so that each state's statutory scheme must be evaluated separately.").

[16] *Vangheluwe* was not followed in *Lampo Grp., LLC v. Paffrath*, No. 3:18-CV-01402, 2019 WL 3305143, at *2 (M.D. Tenn. July 23, 2019), a case cited by Congressman Nunes amid a multi-page string cite. *See* Res. 7. But *Lampo* did not address *Planned Parenthood* and how it

9

Case 5:19-cv-04064-CJW-MAR   Document 40-1   Filed 03/10/20   Page 13 of 16

SLAPP statute just puts some extra skin in the game: if [Defendants] wins [their] motion, [they] gets fees; but if the motion is frivolous or solely to delay, [Congressman Nunes] gets fees." *Id.* at 844-45. This tracks the rule that fee-shifting provisions are, as a general matter, substantive laws that apply in diversity cases in federal court. *Lamb Eng'g & Constr. Co. v. Neb. Pub. Power Dist.*, 103 F.3d 1422, 1434 (8th Cir. 1997) ("In a diversity case 'where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed." (citation omitted)).

**III.     This Court Should Strike the Amended Complaint Pursuant to Rule 12(f).**

Congressman Nunes's only argument for the inclusion of scandalous, impertinent, and irrelevant allegations in his Amended Complaint is that they "explain why members of the Nunes family were fearful of Lizza." Res. 24. This is highly misleading; the scandalous allegations are proffered as statements of fact in the first paragraph of the Amended Complaint and original complaint, not as an explanation for third parties' reactions to Lizza's reporting. Opening Br. 34 n.14. In any event: Setting aside whether (i) the family members in fact harbored these supposed fears of Lizza, and (ii) such fears would be rational, Congressman Nunes makes no attempt to argue that his family members' alleged fears are relevant to his claims. They have nothing to do with Congressman Nunes, or the accuracy of the reporting concerning him in the Article.

## Conclusion

For the reasons stated above and the Opening Brief, the Motion should be granted in full.

---

harmonizes California's anti-SLAPP statute with the Federal Rules where, as here, the Court's review is identical to that upon a Rule 12(b)(6) motion.

10

Case 5:19-cv-04064-CJW-MAR   Document 40-1   Filed 03/10/20   Page 14 of 16

March 10, 2020

**Ryan Lizza and Hearst Magazine Media, Inc., Defendants**

By: /s/ Jonathan R. Donnellan
Jonathan R. Donnellan, *Lead Counsel*\*
 *jdonnellan@hearst.com*
Ravi V. Sitwala\*
 *rsitwala@hearst.com*
Nathaniel S. Boyer\*
 *nathaniel.boyer@hearst.com*
THE HEARST CORPORATION
Office of General Counsel
300 West 57th Street
New York, New York 10019
Telephone: (212) 841-7000
Facsimile: (212) 554-7000
*\*Admitted Pro Hac Vice*

Michael A. Giudicessi
 *michael.giudicessi@faegrebd.com*
Nicholas A. Klinefeldt
 *nick.klinefeldt@faegrebd.com*
Susan P. Elgin
 *susan.elgin@faegrebd.com*
FAEGRE BAKER DANIELS LLP
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309-8003
Telephone: (515) 248-9000
Facsimile: (515) 248-9010

*Attorneys for Defendants*

11

## Certificate of Service

The undersigned certifies that a true copy of **Defendants' Reply Brief in Further Support of Their Motion to Dismiss, to Strike the Amended Complaint Pursuant to Cal. Civ. Proc. Code § 425.16, and to Strike Pursuant to Fed. R. Civ. P. 12(f)** was served upon the following parties through the court's CM/ECF electronic filing system on March 10, 2020.

/s/ Jonathan R. Donnellan
Jonathan R. Donnellan

Copy to:

Joseph M. Feller
 jfeller@kkfellerlaw.com
Steven S. Biss
 stevenbiss@earthlink.net

*Attorneys for Plaintiff*