IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
Western Division

DEVIN G. NUNES                    )
                                  )
        Plaintiff,                )
                                  )
v.                                )         <u>Case No. C19-4064-CJW-MAR</u>
                                  )
                                  )         **TRIAL BY JURY**
RYAN LIZZA                        )         **IS DEMANDED**
                                  )
-and-                             )
                                  )
HEARST MAGAZINE MEDIA, INC.       )
                                  )
        Defendants.               )
_____    )

# <u>THIRD AMENDED COMPLAINT</u>

Plaintiff, Devin G. Nunes ("Plaintiff"), by counsel, pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure (the "Rules"), files the following Third Amended Complaint against defendants, Ryan Lizza ("Lizza") and Hearst Magazine Media, Inc., the publisher of *Esquire* magazine ("Hearst" or "*Esquire*"), jointly and severally.

Plaintiff seeks (a) compensatory damages and punitive damages in the sum of **$77,500,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from the date of the commencement of this action until the date of Judgment pursuant to Iowa Code § 668.13, and (c) costs incurred – arising out of the Defendants' defamation by implication.

In support of his claims, Plaintiff states the following facts:

1

# I. <u>INTRODUCTION</u>

1. Lizza is a high-profile, left-wing political journalist, well-known for his extreme bias towards Plaintiff and his long history of publishing libelous statements about Plaintiff.  In June 2018, Hearst announced that it had hired Lizza as the magazine's chief political correspondent.  Lizza only lasted a short time at in the position.  During his brief tenure, however, he physically traveled to Sibley, Iowa, and concocted a fictitious conspiracy theory about Plaintiff, Plaintiff's family and former Iowa Representative Steve King that Hearst published ahead of the November 2018 Congressional Election.

2. On September 30, 2018, Lizza and Hearst published an article online and in *Esquire* magazine that fraudulently implied that Plaintiff conspired with his family and Rep. King to conceal a "Politically Explosive Secret": that Plaintiff's family's dairy in Sibley, Iowa, knowingly employed illegal workers.  Lizza and Hearst manufactured the false narrative out of whole cloth.  They knowingly fabricated and falsified facts.  They falsely attributed statements to sources that the sources never made.  They destroyed evidence to cover-up and hide knowledge of their wrongdoing.  Directly and by implication, Lizza and Hearst accused Plaintiff's family of criminal conduct, conspiracy, deception, deceit, lack of integrity, and dishonest and shoddy business practices.  Lizza and Hearst accused Plaintiff, a sitting United States Congressman, of conspiring to cover up the dairy's crimes.  Lizza and Hearst published the fabricated story to millions.  On November 20, 2019, at a time when Lizza and Hearst knew the statements were fabricated and long after Plaintiff notified Lizza and Hearst that he, in fact, denied the article's central implication of a conspiracy, Lizza maliciously republished the false and

2

defamatory Article via social media.  In doing so, Lizza and Hearst engaged in the purposeful avoidance of the truth.

3. In this case, Plaintiff seeks actual damages for the insult, pain, embarrassment, humiliation, mental suffering and distress, anguish, and injury to his good name and reputation in Iowa and elsewhere, caused by Defendants' defamation by implication.

## II.  PARTIES

4. Plaintiff is a citizen of California.  Born October 1, 1973, Plaintiff served in the United States House of Representatives from 2003 until December 2021. Plaintiff's parents, brother and sister-in-law live in Sibley, Iowa, and work at NuStar Farms ("NuStar"), a local dairy.  They have operated a dairy farm in Sibley for more than a decade.  At the time Defendants republished the false statements at issue in this action, Plaintiff served as Ranking Member of the House Permanent Select Committee on Intelligence (the "House Intelligence Committee"), having been appointed to the Committee in the 112th Congress and having served as Committee Chairman during the 114th and 115th Congresses.  Plaintiff worked in Washington, D.C.  As a member of the House Intelligence Committee, he participated in oversight of the U.S. national security apparatus, including the intelligence-related activities of seventeen agencies, departments, and other elements of the United States Government.  Plaintiff is a Medal of Freedom recipient.  He retired from Congress at the end of December 2021. [https://nunes.house.gov/about/; https://www.devinnunes.com/bio].  Plaintiff's career as a United States Congressman is distinguished by his honor, dedication and service to his constituents and his country, his honesty, integrity, ethics, and reputation for truthfulness

and veracity. The qualities disparaged by Defendants – Plaintiff's reputation for truthfulness, honesty, veracity, integrity, ethics, judgment and performance as United States Congressman – are particularly valuable to Plaintiff and are absolutely necessary in the conduct of public office, including Plaintiff's then-role as Chairman of the House Intelligence Committee, and in business.

5.     Defendant, Lizza, was a senior correspondent for Hearst. He now works for Politico. Acting in a managerial capacity within the scope of his employment, Lizza wrote the article at issue in this action for Hearst for publication in *Esquire* magazine. Lizza is not an "opinion" writer. He is a political news correspondent and self-acclaimed "political analyst" for Cable News Network, Inc. ("CNN"). The article at issue in this case did not appear in any "op-ed" column.

6.     Defendant, Hearst, is a Delaware corporation. Its headquarters and principal place of business is New York. Hearst publishes *Esquire* magazine. Hearst is a unit of Hearst Corporation, a global media, information and services company. Hearst's print and digital assets reach 155 million readers and site visitors each month – two-thirds of all millennials, and over 80% of Gen Z and millennial women in the country. *Esquire* magazine has a total print circulation of 759,922, 97% of which are subscriptions. [http://www.esquiremediakit.com/r5/home.asp]. Hearst has hundreds of thousands of print and digital subscribers and viewers who live and work in Iowa, and has sold millions of copies of *Esquire* to Iowans. Hearst encouraged, authorized and ratified publication of the article at issue in this action, and actively participated in its multiple republications online and via social media.

## III.  JURISDICTION AND VENUE

7.      The United States District Court for the Northern District of Iowa has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The parties are citizens of different States, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

8.      The Defendants are subject to specific personal jurisdiction in Iowa.  They transact substantial business in Iowa and committed multiple acts of defamation in whole or in part in Iowa.  They have minimum contacts with Iowa such that the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice and is consistent with the Due Process clause of the United States Constitution.  Defendants purposefully availed themselves of the privilege of doing business in Iowa.  Defendants' defamation was purposefully directed at Iowa.  Plaintiff's claims arise directly from and specifically relate to Defendants' publication and republication of false and defamatory statements in Iowa. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984).

9.      Venue is proper in the Western Division of the United States District Court for the Northern District of Iowa.  A substantial part of the events giving rise to the claims stated in this action, including injury to Plaintiff's name and reputation, occurred in Osceola County within the Western Division of the United States District Court for the Northern District of Iowa.

## IV.  STATEMENT OF THE FACTS

10.     NuStar operates a dairy farm in Sibley, Iowa.  Anthony Nunes, Jr. ("Anthony Jr.") and Anthony Nunes III ("Anthony III") (collectively "the Nuneses")

manage NuStar.  The business of NuStar is managed professionally.  NuStar documents all labor and employment decisions.  Those records, including documents establishing both employment authorization and identity as well as Forms 1-9 – Employment Eligibility Verifications, are kept and maintained by NuStar in the ordinary course of its business in accordance with Federal law.  NuStar has never employed an alien knowing that such person is an unauthorized alien.

11.　Plaintiff is Anthony, Jr.'s son and Anthony III's brother.

12.　The Nunes family has long owned and managed a dairy farm located in Tulare, California.  The farm in California is closely associated with Plaintiff's political profile.  The Nunes family dairy farm of political lore – the farm that has been central to Plaintiff's identity and a feature of every major political profile written about him – is located in Tulare, California.  It has always been in Tulare, California.  It has never moved.  The Nunes family never sold the family farm.  As of November 20, 2019, Plaintiff's uncle, Gerald Nunes, continued to manage the Nunes family farm in California, a fact that was well-known to Lizza and Hearst.  Gerald's life was substantially impacted by Defendants' publication and republication of the Article.

13.　In 2006, Anthony Jr., Anthony Jr.'s wife Toni Dian ("Dian"), Anthony III and his family moved to Iowa, formed NuStar, and started a new dairy farm.  Plaintiff has never had any ownership, managerial or financial interest whatsoever in NuStar or any involvement of any kind in its operations, including, without limitation, any of NuStar's labor and employment, hiring or business/immigration compliance practices.

A. **_Knowledge of Falsity_**

14. In late August 2018, Lizza traveled to Sibley, Iowa, to find sources to support a fake narrative about Plaintiff and his family. He found none.

15. Lizza interviewed a Hispanic woman named ███████████████. Lizza ██████ the interview. ██████ told Lizza that she ████████████████ ██████ in Sibley. Lizza avoided asking ████████████████. If he had asked, Lizza would have discovered that ████████████████████ ████████████████████████. The ██████ reveals that Lizza peppered ██████ with leading questions that suggested the answers Lizza wanted. Lizza asked ████████████████ ██████?" ██████ clearly stated to Lizza, "████████████████ ██". ██████ never told Lizza that NuStar was aware of the immigration status of any workers that ██████ sent. Indeed, ██████ has never met and never spoken with Anthony Nunes, Jr., Anthony Nunes, III, or anyone else from NuStar Farms.

16. Lizza also interviewed an anonymous source identified only as "██ ██". Lizza ██████ the telephone interview. ██████ told Lizza that ████████ ████████████████. ██████ did not claim to be undocumented. Rather, the ██████ reveals that in response to Lizza's question, "█ ████████████████", ██████ said "██". Lizza did nothing to corroborate whether ██████ was authorized to work in the United States. In truth, ██████ was fully documented. ██████ told Lizza that he ████████████████.



17.     Other than ████ and "████", Lizza never spoke with anyone in connection with his reporting who had any knowledge of the employment and hiring practices at NuStar.

18.     While he was in Sibley, Iowa, Lizza took notes and communicated with sources via text message and email.  Sometime prior to the filing of this action, Lizza destroyed his notes and the original texts and emails.

19.     Hearst fact-checker, Kevin McDonnell, also ████████ ████ of Lizza's interviews.

**B**.     ***Publication and Republication***

20.     On September 30, 2018, Hearst published in its *Esquire* magazine an article written by Lizza about Plaintiff, the Nuneses and NuStar ("the Article").  The online version of the Article was headlined "***Devin Nunes's Family Farm is Hiding a Politically Explosive Secret***".  The print version of the Article published in the magazine was entitled "***Milking the System***".

21.     Lizza and Hearst intentionally timed the original publication of the Article to occur within close proximity to the November 6, 2018 Congressional Election.  It was Defendants' intent to hurt Plaintiff politically with false statements of fact and false implications ahead of the Election.

22.     In November 2019, during the impeachment inquiry before the House Intelligence Committee and at a time when Plaintiff was "in the news", Defendants republished the Article:





**Ryan Lizza** ✔
@RyanLizza

I noticed that Devin Nunes is in the news. If you're interested in a strange tale about Nunes, small-town Iowa, the complexities of immigration policy, a few car chases, and lots of cows, I've got a story for you...

Devin Nunes's Family Farm Is Hiding a Politically Explosive Secret
Why did Devin Nunes's parents and brother cover their tracks after quietly moving their family farm to Iowa? Ryan Lizza went to Iowa in search of the trut...
🔗 esquire.com

8:13 PM · Nov 20, 2019 · Twitter for iPhone

[https://twitter.com/RyanLizza/status/1197322014572371969].  At the time he published the November 20, 2019 tweet, Lizza had over 232,000 followers on Twitter.  His tweet was retweeted 3,481 times, quoted 381 times, and it received 7,361 likes.  As Defendants' intended, the November 20, 2019 tweet was published millions of times on Twitter.  Republication of the Article created fresh reputational risk for Plaintiff, for Plaintiff's family, and for anyone doing business with Plaintiff.

9

23.     By November 20, 2019, Defendants knew that *both* Plaintiff *and* the Nuneses had denied that NuStar knowingly employed undocumented labor and further expressly denied that there was any conspiracy to hide it.  On September 25, 2019, Plaintiff delivered notice and demand for retraction to Lizza and Hearst, putting them on notice that Plaintiff contended the statements in the Article to be false and defamatory. Similarly, on November 14, 2019, Anthony, Jr. and NuStar delivered notice and demand for retraction to Hearst that put Hearst on notice of the false and defamatory statements in the Article.  The Defendants disregarded both letters.  The November 2019 tweet was a slap in the face, published with actual malice and reckless disregard for truth and consequences to Plaintiff and his family.

**C.**     ***The False Statements And Why They Are False***

24.     The Article makes the following express statements of fact:

a.     "**There was no doubt about why I was being followed. According to two sources with firsthand knowledge, NuStar did indeed rely, at least in part, on undocumented labor.  One source, who was deeply connected in the local Hispanic community, had personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs … asserting that the farm was aware of their status … A second source, who claimed to be an undocumented immigrant, also claimed to have worked at NuStar for several years, only recently leaving the dairy … This source was nervous to talk to me and did not want to speculate about the immigration status of fellow employees**".

b.     These statements are false because (a) contrary to Defendants' central allegation, neither of the two sources had firsthand knowledge that NuStar relied

on undocumented labor, (b) the first source (███████) never "personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs" – indeed, ████████████████

████████████████████████████████████████████, (c) the first source (████████) did not assert that "the farm was aware of their status" – in fact, she had never met or spoken with the Nuneses or anyone at NuStar, (d) the second source (███████) did not "claim[] to be an undocumented immigrant", (e) the second source (███████) was ███████████ by NuStar, (f) the second source (████████) did not "recently" leave the dairy, (g) far from not wanting to "speculate", the second source (███████) unequivocally stated that ████████████████████████████, (h) NuStar did not hire undocumented labor as its business records attest; (i) NuStar was not "aware of their status" and did not violate Federal law (Title 8 U.S.C. § 1324a) by knowingly hiring an unauthorized alien. NuStar fully documented all hiring decisions in accordance with Federal law. Indeed, there were never any reported cases of NuStar's use of undocumented or unauthorized workers.

**D.**   ***Defamation by Implication***

25.    The Article juxtaposes a series of facts so as to imply a defamatory connection between them. The Article also creates a defamatory implication by omitting facts, such that Defendants may be held responsible for the defamatory implication.

26.    The Article is premised on false suggestions, impressions and implications arising from a series of factual statements. The Article maintains that Plaintiff and his family hid the fact that the family farm is now in Iowa. The Article states that Plaintiff (1) "has a secret" and (2) that "he and his parents seemed to have concealed basic facts about the family's move to Iowa." The Article describes how Plaintiff's parents,

"Anthony Jr. and Toni Dian … used their cash from the sale to buy a dairy eighteen hundred miles away in Sibley," and declares it "strange … that the family has apparently tried to conceal the move from the public—for more than a decade."  The Article ponders: "Why would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa?"  The Article later asserts that the farm uses undocumented labor: "According to two sources with firsthand knowledge, NuStar did indeed rely, at least in part, on undocumented labor.  One source … had personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs" and "assert[ed] that the farm was aware of their status."  Two statements insinuate that the farm's use of undocumented labor is the reason that Plaintiff and his family were hiding the family's move and their operation of an Iowa dairy farm.  Lizza writes that "[o]ther dairy farmers in the area helped me understand why the Nunes family might be so secretive about the farm: Midwestern dairies tend to run on undocumented labor."  The Article also includes a quote from Lizza's interview with a local newspaper reporter, who said that the farm's workers "'are immigrants and Devin is a very strong supporter of Mr. Trump, and Mr. Trump wants to shut down all of the immigration, and here is his family benefiting from immigrant labor,' documented or not."

27.     The defamatory gist and implication of the Article is that Plaintiff conspired or colluded with his family, Rep. King and with others to hide or cover-up that NuStar employs undocumented labor.

28.     Based on the Article's presentation of facts, an objectively reasonable reader could draw the false implication from the Article as a whole.

29.     The implication is false because Plaintiff was not involved in NuStar's operations, had no knowledge of who the dairy farm hired, and, therefore, did not, indeed could not have conspired with his family.  Further, Plaintiff never conspired, colluded, combined, associated, plotted, schemed or agreed with Rep. King to do anything.  At the time Defendants both published and republished the false and defamatory implication, they knew they did not have a scintilla of supporting evidence.  Publication and republication, therefore, were both made with actual malice. *Blessum v. Howard County Bd. of Sup'rs*, 295 N.W.2d 836, 845 (Iowa 1980).

30.     The defamatory implication is verifiable.  The Defendants' false facts can be confirmed and refuted.   A conspiracy is an agreement that requires knowledge—here, knowledge that the farm employed undocumented labor and a knowing agreement to cover up that politically embarrassing fact.  Whether Plaintiff or Rep. King knew about NuStar's hiring practices, including the potential use of undocumented labor, and whether they agreed with NuStar or Plaintiff's family to keep that information secret, are issues of verifiable fact.

31.     The Defendants intended or endorsed the defamatory implication that Plaintiff conspired with his family and Rep. King to cover up NuStar's use of undocumented labor.  The Article's click-bait headline that "Devin Nunes's family farm" is hiding a "politically explosive secret," its discussion of Plaintiff and his family's efforts to conceal the farm's move to Iowa, its claim that NuStar employs undocumented labor, and the manner in which the Article presents the discussion of NuStar's use of undocumented labor, including the use of a menacing cartoon and stock photographs of

13

ICE agents, permits a plausible inference that Lizza and Hearst intended or endorsed the implication.

**E.**  *__Readers Understood The Article to Convey a Defamatory Meaning__*

32.  Viewing the false statements and defamatory implications in the republished Article as a whole and in the context of the surrounding circumstances, third persons immediately understood that Defendants were accusing Plaintiff of conspiring with his family, Rep. King and others to hide "politically explosive secret" crimes.  A few examples suffice:

https://twitter.com/dregg_r/status/1046609910098608128
("I'd like to report an ongoing criminal conspiracy to unlawfully employ aliens in violation of US Code-Title 8-Ch12-SubchII-Part VIII-§1324a @ICEgov by Nustar farms and its proprietors the Nunes family from Sibley Iowa");

https://twitter.com/showusyourwork/status/1046835542170701833
("Today's required reading is about Devin Nunes' family farm and the shadowy conspiracy surrounding it");

https://twitter.com/MatkovichTony/status/1108543305791475712
("Devin... have you talked to your family @NuStar Farms about hiring undocumented labor?  Has ICE visited your farm up in Sibley, Iowa to make sure it is on the up and up?");

https://twitter.com/hoopsnut/status/1046576975094181888
("Really a heckuva read[.]  Nunes and family hide their Iowa farm because his and King's kissing up to DT and anti-immigration policy runs against Iowa farm economy built on undocumented labor");

https://twitter.com/MsToucanSami/status/1177420842910830593
("Nunes part of a thoroughly corrupt family unit.  Read this appalling Esquire story about his family, moving their farm to Iowa to hide hiring undocumented workers while Nunes supports Trump's immigration policy.  Threatening reporters, too");

https://twitter.com/brainsdavis1/status/1047155521516527617
("So a new conspiracy theory has come to light, does Senator Nunes have something to hide by concealing his family dairy farm has moved from California to Iowa?");

14

https://twitter.com/garyjholliday3/status/1201973090441256960
("Republicans [sic] Nunes get ready to do farm work at Lompoc Fedaral [sic] prison.  Hard work.  You are involved in this conspiracy.  Get your prison jumpsuits ready");

https://twitter.com/universeiscool5/status/1071416859302551552
("Make that MAJOR BIG TIME OBSTRUCTION and LYING and involved in CONSPIRACY!!!  I can't stand the sight of that man. Family farm in Iowa— illegals supposedly working there.  Read that in article.  Hypocrite!!);

https://twitter.com/budniks_mullet/status/1197564936710447106
("Share this far and wide … the Nunes family is literally committing felonies in Iowa in trump county, while #dillholedevin reaps the benefits").

Plaintiff's reputation was adversely affected by the Article in many ways.  As a direct result of the publication and republication of the Article, people on Twitter believed that Plaintiff was involved in unlawful schemes with his family in Iowa, when, in truth, Plaintiff was never involved in the affairs of NuStar and only came to Iowa on a handful of occasions.  Additionally, multiple anonymous third parties, who had read the Article, left threatening messages in which they clearly expressed that they thought ill of Plaintiff and his family because of the Article.

**F.** *The False And Defamatory Statements Are Of Or Concerning Plaintiff*

34.     The Article expressly identifies Plaintiff by name and contains matters of description or other references, including images, video, extraneous facts and circumstances, which clearly show that Plaintiff was intended to be the object of the Defendants' libel, and that it was so understood by others.

35.     Plaintiff's name and references to Plaintiff are all over the Article.  The publication refers explicitly to Plaintiff and identifies him by name.  The millions of recipients of the Article understood that it was referring to Plaintiff explicitly in a defamatory way.

**G.** ***Actual Malice***

36. Lizza and Hearst republished the Article on November 20, 2019 with actual malice and reckless disregard for the truth:

      a. First, the ██████████ demonstrate that Defendants published false statements and defamatory implications in the Article (and republished those same statements on November 20, 2019) that they knew to be false. For instance, ██████ did not assert that "the farm was aware of their status". In fact, ██████ told Lizza that ██ ████████████████████████████████████████████████████████. ████████ did not claim to be an ████████████████████. The Defendants fabricated facts and falsely attributed them to sources who had no firsthand knowledge and never professed to have any firsthand knowledge. The Defendants concealed material facts and knowingly misled readers. They published and republished statements that were a product of their imagination. They made up facts out of whole cloth in order to impute intentional wrongdoing to Plaintiff and his family. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant [or] is the product of his imagination"). When they republished the Article on November 20, 2019, Lizza and Hearst acted with double actual malice.

      b. Second, given Plaintiff's stature and accomplishments as of November 20, 2019, Defendants' scandalous story about a grand criminal conspiracy involving Plaintiff, Plaintiff's family and Rep. King was so inherently improbable that only a reckless person would have put the statements in circulation. *St. Amant*, 390 U.S.

16

at 732 ("Professions of good faith will be unlikely to prove persuasive, for example, … when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation.").

  c. Third, "[r]epublication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard." Restatement (Second) of Torts § 580A cmt. d (Am. L. Inst. 1977). Here, Lizza republished the Article in November 2019 after Plaintiff sent Lizza and Hearst notice and a demand to retract ***and*** after Plaintiff filed a lawsuit that expressly denied the Article's defamatory implication. In November 2019, Lizza and Hearst engaged in purposeful avoidance of the truth, which constitutes actual malice.

  d. Fourth, at no time, either when they published the Article or when they republished the Article in November 2019, did Defendants ever have knowledge of any facts that would support a genuine belief that Plaintiff conspired with his family and/or Rep. King to conceal the fact that NuStar knowingly employed illegal workers.

  e. Fifth, the Defendants harbored an institutional hostility, hatred, extreme bias, spite and ill-will towards Plaintiff. They published false statements and defamatory implications for the sole purpose of inflicting harm on Plaintiff and his family ahead of the 2018 Congressional Election and then doubled-down and republished the same false statements and defamatory implications to undermine Plaintiff's credibility and influence the outcome of the 2019 impeachment inquiry. As evidenced by the words Defendants chose and the timing and tenor of both the Article and the November 2019 republication, Defendants intended to inflict harm through knowing or reckless

falsehoods. The Defendants' motive in publishing the false and defamatory statements supports an inference of actual malice.

f.      Sixth, the Defendants intentionally abandoned all journalistic standards and integrity in publishing and republishing the false statements and defamatory implications. They did not seek the truth or report it. They betrayed the truth for the sake of their institutional bias against Plaintiff and ratings. Rather than minimize harm, Defendants set out to inflict maximum pain and suffering on Plaintiff in order to harm Plaintiff's reputation. The Defendants published the false statements in the broadest manner possible for the sole purpose of injuring Plaintiff's reputation. The Defendants' intentional abandonment of their journalistic integrity further supports an inference of actual malice.

**H.      *Plaintiff Suffered Actual Injury And Damages***

37.      Prior to publication of the Article, Plaintiff enjoyed an untarnished reputation.

38.      The Defendants intentionally and excessively republished the Article to the broadest possible audience online and via social media. Defendants knew that by republishing the Article to Lizza's Twitter 232,000+ followers in was certain that the defamatory implication would be further broadcast to millions. The nature and character of the Defendants' insults had an immediate effect on those who read Defendants' November 20, 2019 republication. Plaintiff was universally condemned, ridiculed and exposed to contempt. The Article and its republication directly impacted Plaintiff's reputation and his standing in the community and in business.

39.     Defendants' publication and republication of the Article inflicted actual injury on Plaintiff, including impairment of personal and professional reputations and standing in the community, insult, humiliation, embarrassment, mental anguish and distress, pain and suffering.

40.     Prior to filing this action, Plaintiff gave notice to Defendants and made a demand for retraction of the defamatory statements at issue.  The Defendants failed and/or refuse to retract or withdraw the defamatory statements.

## COUNT I – <u>DEFAMATION BY IMPLICATION</u>

41.     Plaintiff restates paragraphs 1 through 40 of this Amended Complaint, and incorporate them herein by reference.

42.     The strong defamatory gist and false implication from the Article is that Plaintiff conspired with others (including his family and Rep. King) to hide and conceal a "politically explosive secret" – that NuStar knowingly employs undocumented labor on its dairy farm.  The Article implies that Plaintiff is dishonest, deceitful, unethical, that he aided, abetted and is an accessory to Federal crimes, and that he conspired with his family and another member of Congress to hide crimes.

43.     The Defendants carefully chose their words and purposefully misrepresented facts.  In the republished Article, they juxtaposed a series of facts so as to imply a defamatory connection between them.  The first fact is the direct reference to a "**politically explosive secret**".  There was no secret, however; in fact, "Devin Nunes's family farm" never moved to Iowa.  Further, Plaintiff's family never moved "the farm" or any farm to Iowa, and never concealed their move in 2007.  The entire thematic foundation of the Article is knowingly false.  The next fact is the "**conspiracy**" to hide

the secret. Here, Lizza deliberately employs a series of falsehoods – including accusations that Plaintiff and his family were "hiding something politically explosive", "covered their tracks", "concealed" their actions, intimidated "sources", were "so secretive", and that "Anthony Jr. was seemingly starting to panic" – to create the appearance that the Plaintiff acted intentionally and surreptitiously in furtherance of an agreed goal. The Article then rhetorically ponders: "Why would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa?" The answer is supplied by Defendants' third juxtaposed fact: The Defendants state that NuStar knowingly uses "**undocumented labor**".[1] In addition, Defendants also left out facts, including statements ██████ made to Lizza, in a way that intentionally conveyed a false meaning and that rendered the challenged statements in the republished Article defamatory.

44. The Defendants' statements and actions constitute defamation by implication.

45. As a direct result of Defendants' defamation by implication, Plaintiff suffered actual injury and damages, including, but not limited to, insult, public ridicule, humiliation, embarrassment, pain, mental anguish, damage and injury to personal and professional reputations, out-of-pocket expenses and costs, in the sum of $75,000,000.00 or such greater amount as is determined by the Jury.

---

[1] The Article begins by expressly declaring that NuStar is hiding a "**politically explosive**" secret. In the context of this story, the use of undocumented labor is what makes the secret "**politically explosive**".

Plaintiff alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession. Plaintiff believes that substantial additional evidentiary support, which is in the exclusive possession of Lizza, Nuzzi, Fielden, Hearst, CNN and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Plaintiff reserves his right to amend this Complaint upon discovery of additional instances of the Defendants' wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Plaintiff, Devin G. Nunes, respectfully requests the Court to enter Judgment against Lizza and Hearst, jointly and severally, as follows:

A.      Compensatory damages in the amount of $75,000,000.00 or such greater amount as is determined by the Jury;

B.      Punitive damages in the amount of $2,500,000.00 or the maximum amount allowed by Iowa law;

C.      Prejudgment interest from September 30, 2019 until the date Judgment is entered at the maximum rate allowed by law;

D.      Postjudgment interest at the maximum rate allowed by law;

E.      Costs and such other relief as is just and proper.

## TRIAL BY JURY IS DEMANDED

DATED:      August 6, 2022

DEVIN G. NUNES


By:  */s/ Steven S. Biss*
       Steven S. Biss (VSB # 32972)
       300 West Main Street, Suite 102
       Charlottesville, Virginia 22903
       Telephone:  (804) 501-8272
       Facsimile:  (202) 318-4098
       Email:  stevenbiss@earthlink.net
       (*Admitted Pro Hac Vice*)

       William F. McGinn #24477
       McGINN LAW FIRM
       20 North 16th Street
       Council Bluffs, Iowa 51501
       Telephone: (712) 328-1566
       Facsimile: (712) 328-3707
       Email: bmcginn@themcginnlawfirm.com

       *Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2022 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to counsel for the Defendants and all interested parties receiving notices via CM/ECF.

By: _/s/ Steven S. Biss_

Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone: (804) 501-8272
Facsimile: (202) 318-4098
Email: stevenbiss@earthlink.net
(*Admitted Pro Hac Vice*)

William F. McGinn #24477
McGINN LAW FIRM
20 North 16th Street
Council Bluffs, Iowa 51501
Telephone: (712) 328-1566
Facsimile: (712) 328-3707
Email: bmcginn@themcginnlawfirm.com

*Counsel for the Plaintiff*