IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
Western Division

| | | |
|---|---|---|
| DEVIN G. NUNES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case 5:19-cv-4064-CJW-MAR |
| | ) | |
| | ) | |
| RYAN LIZZA | ) | |
| *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————— | ) | |
| | ) | |
| NUSTAR FARMS, LLC | ) | |
| *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case 5:20-cv-04003-CJW-MAR |
| | ) | |
| | ) | |
| RYAN LIZZA | ) | |
| *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————— | ) | |

# PLAINTIFFS' BRIEF IN SUPPORT
# OF RESISTED MOTION TO COMPEL DISCOVERY

Plaintiffs, Devin G. Nunes, NuStar Farms, LLC, Anthony Nunes, Jr. and Anthony

Nunes, III ("Plaintiffs"), by counsel, pursuant to Local Civil Rule ("LR") 7, respectfully

submit this Brief in Support of their motion to compel discovery from Defendants, Ryan

Lizza and Hearst Magazine Media, Inc. ("Defendants"), and to award Plaintiffs their

reasonable expenses incurred in making this motion, including attorney's fees.

1

## DISCUSSION

1.      The Federal Rules authorize broad discovery.  Rule 26(b) states that parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."  Rule 33(a)(2) states that an interrogatory may relate to any matter that may be inquired into under Rule 26(b).  Further, an interrogatory is not objectionable merely because it asks for an opinion or contention that relates to "fact or the application of law to fact".  Rule 34 provides that a party "may serve on any other party a request [for the production of documents] within the scope of Rule 26(b)".

2.      For purposes of pretrial discovery, relevancy "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Daniels v. City of Sioux City*, 294 F.R.D. 509, 512 (N.D. Iowa 2013) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).  In *St. Paul Reinsurance Co., Ltd. v. Commercial Financial Corp.*, Chief Judge (Retired) Mark Bennett held that "[i]n order to fulfill discovery's purposes of providing both parties with 'information essential to the proper litigation of all relevant facts, to eliminate surprise, and to promote settlement,' the discovery rules mandate a liberality in the scope of discoverable material … Thus, as long as the parties request information or documents relevant to the claims at issue in the case, and such requests are tendered in good faith and are not unduly burdensome, discovery shall proceed … The party resisting production bears the burden of establishing lack of relevancy or undue burden"). 198 F.R.D. 508, 511 (N.D. Iowa 2000) (quotations and citations omitted).

3.      With these salutary principles in mind, Plaintiffs seek an Order compelling discovery.

2

## A.     Viewership and Circulation of the Article

4.     The Article at issue in this case – hyped and promoted by Hearst as a "politically-explosive" "BOMBSHELL" story – was broadly circulated to millions upon millions of Hearst and Lizza loyalists, advertisers, paid subscribers, viewers and, of course, Twitter followers, on September 30, 2018, and was maliciously republished on November 20, 2019, after Lizza and Hearst were notified that Plaintiffs contended that statements in the Article were false and defamatory ***and*** after this lawsuit was filed.

5.     In NuStar's third request for production of documents, *Exhibit "A"* to Plaintiff's motion to compel, Plaintiffs sought the production of

> "6.     Documents sufficient to identify the readership, circulation, number of subscribers, page views, and the daily, monthly and/or unique visitors to the website, www.esquire.com."

> "7.     Documents sufficient to identify the number of times the Article has been viewed online."

> "8.     Documents sufficient to identify the readership, circulation, and number of subscribers to *Esquire* magazine, and the total number of copies of the magazine that contained the Article that were printed and/or sold anywhere in the World."

These documents are clearly relevant to the issues of publication and damages. *See, e.g., Gibson Bros., Inc. v. Oberlin College*, 2022 WL 970347 (Ohio App. 2022) ($33.2 million in compensatory and punitive damages award upheld, where statements in flyer passed out during protests and student senate resolution widely circulated to college students and others alleged that bakery had a history of racial profiling and discriminatory treatment); *Wynn v. Francis*, 2014 WL 2811692, at * 1 (Cal.App. 2014) ($17 million presumed damages award upheld, where defendant widely circulated the defamatory statements, including to the viewers of *Good Morning America*); *Cantu v. Flanigan*, 705 F.Supp.2d 220, 227-228 (E.D.N.Y. 2010) (affirming $150 million compensatory damages award,

where (a) plaintiff had a positive reputation throughout the industry and his reputation for honesty and fair business practice was recognized throughout the world by his peers, (b) defendant's statements were indeed inflammatory, (c) the statements at issue were circulated throughout the world, (d) the remarks certainly tended to damage plaintiff's reputation and cause mental suffering, and (e) defendant's conduct was more than merely reckless); *Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 300-302 (Iowa App. 1985) ("Kelly did present evidence that he had a good reputation as an administrator before defendant's writings were published. He presented evidence that the writings would adversely affect his reputation. He also submitted evidence of the extent of the publication. In addition, he presented evidence of special damages: emotional distress and lost speaking fees … Some of [plaintiff's] witnesses indicated they had become upset and had doubts about Kelly when they first read the libelous writings. The jury could conclude from their testimony that the reason their opinions of Kelly ultimately remained unchanged was that they were exposed to the truth through their personal acquaintanceship with Kelly. The jury could also conclude that people who were not acquainted with Kelly would not have any basis for disbelieving the libel … As everybody knows, there is no market price for reputation, no historical cost which can be depreciated, and no replacement cost to be calculated. The worth of reputation is a subjective matter, varying from person to person. One person's estimate of the value of reputation, moreover, may vary depending upon attendant circumstances. For example, the person may value reputation less if living in a large impersonal metropolis than the person would if living in a county seat in rural Iowa" – reinstating $75,000 compensatory damages and $100,000 punitive damages awards); *compare Hoffmann v. Clark*, 975

N.W.2d 656, 668 (Iowa 2022) ("In considering whether an award of presumed damages for libel per se is within the range of reasonableness as a natural and probable (although not necessarily proven) consequence of the defendant's conduct in this case, several questions help to focus our inquiry: (1) What was the prior reputation of the plaintiff? (2) Did the plaintiff suffer emotional distress? (3) What type of defamatory statements were made? (4) How many defamatory statements were made? (5) How widely were they disseminated? (6) Over what period of time were they made and disseminated? (7) Were they ever retracted? (8) Was there evidence of bad faith? The answers to these questions support the very substantial damages that the jury awarded to Hoffmann personally. Hoffmann proved that he had built up his reputation in the car tuning industry over many years. He proved that he suffered emotional harm. He proved that there had been repeated statements to the effect that Hoffmann was a fraudster and a thief disseminated over various media and under various personae over a period of years. Clark never showed contrition for his intentional, bad-faith, abusive conduct. To the contrary, he called in more fire.").[1]

6.     Defendants leveled a host of boilerplate objections to NuStar's third request for production of documents nos. 6, 7 and 8. *See St. Paul*, 198 F.R.D. at 511 ("each objection asserted by the [Defendants] is boilerplate, obstructionist, frivolous,

---

[1]     As in *Hoffmann*, Defendants' November 20, 2019 republication can only be viewed as an effort to call in "more fire". *See Hoffmann*, 975 N.W.2d at 667-668 ("This case involves defamation over a period of years. Scott Clark used five different Facebook accounts, two under aliases. Clark disseminated his false statements over social media and podcasts to tens of thousands of people. He said that Hoffmann was dishonest and engaged in bribery. He falsely reported that Hoffmann knowingly sold dangerous products out of greed … Hoffmann also had to watch his reputation be 'torn apart online' … Hoffmann took years to develop his reputation. As a result of what Clark put him through, Hoffmann was 'stressed to the max.' He had trouble sleeping. This was 'overwhelming' and 'consuming.'").

overbroad, and, significantly, contrary to well-established and long standing federal law"). Defendants refused to search for <u>AND</u> withheld from production any responsive documents.

7.      Defendants' contempt for the discovery process should not be tolerated by this Court. Hearst and its in-house lawyers have materially interfered with and impeded what is normal and routine discovery in every defamation case. This, together with the intentional fabrications and misrepresentations in the Article and spoliation of evidence, is intolerable. Plaintiffs are entitled to discover the extent of Defendants' publication. It would be manifest and appealable error to deprive Plaintiffs of this discovery.

**B.      <u>Tax Returns and Net Worth</u>**

8.      In Anthony Nunes, Jr.'s fourth request for production of documents, *Exhibit "B"* to Plaintiffs' motion, Plaintiffs sought the production of

> "1.      Lizza's most recent financial statement, income and expense statement, statements of assets and liabilities, balance sheet, and/or statement of net worth."

> "2.      Hearst's most recent financial statement, income and expense statement, statements of assets and liabilities, balance sheet, and/or statement of net worth."

> "3.      Lizza's 2018 Federal income tax returns, together with all accompanying schedules and statements, showing income received from all sources."

These documents are relevant to a host of issues, including who commissioned Lizza to write the hit piece, Lizza's bias, and actual malice. *See Dershowitz v. CNN*, 2022 WL 2662352, at * 1-2 (S.D. Fla. 2022) (employment agreements could shed light on reporters' sources of income, bias and actual malice). Tax returns and financial statements are also relevant to show a defendant's ability to pay punitive damages. *McClure v. Walgreen Co.*, 613 N.W.2d 225, 233 (Iowa 2000) ("In Iowa, '[e]vidence of a defendant's financial worth is one relevant factor for the jury to consider when setting a

punitive damage award.'") (quotation omitted); *Hoekstra v. Farm Bureau Mut. Ins. Co.*, 382 N.W.2d 100, 109-110 (Iowa 1986) ("[e]vidence of net worth is admissible on the issue of punitive damages."); *id. Jackson v. Union Pacific Railroad Company*, 2020 WL 11025591, at * 5 (S.D. Iowa 2020) (overruling objections to interrogatory because financial condition is relevant to punitive damages); *Equal Employment Opportunity Commission v. Heart of CarDon, LLC*, 339 F.R.D. 602, 605 (S.D. Ind. 2021) (discovery request that sought tax returns was within the defendant's control, relevant to the issue of punitive damages, and proportional to the needs of the case).

9.     There is no good faith basis for Hearst and Lizza's refusal to comply with their discovery obligations.  It is common knowledge, especially in Iowa Courts, that tax returns and financial net worth are relevant and discoverable.

10.     In this case, it is almost certain that the jury will return a massive punitive damage award.  Hearst and Lizza fabricated facts and falsely attributed them to sources who had no firsthand knowledge and never professed to have any firsthand knowledge. They published a scandalous story 36 days ahead of a Congressional Election about a grand criminal conspiracy involving a sitting United States Congressman, Chairman of the House Intelligence Committee (Devin Nunes), his family, and Rep. King that was so inherently improbable that only a reckless person would have put the statements in circulation.  After publication, Hearst and Lizza destroyed evidence.  In November 2019, Lizza republished the hit piece after Plaintiffs sent Lizza and Hearst notice and two demands to retract ***and*** after Devin Nunes filed a lawsuit that expressly denied the defamatory implication.  Finally, Hearst intentionally abandoned all journalistic standards and integrity in publishing and republishing the false statements and defamatory

implications. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 161 (1967) ("Where a publisher's departure from standards of press responsibility is severe enough to strip from him the constitutional protection our decision acknowledges, we think it entirely proper for the State to act not only for the protection of the individual injured but to safeguard all those similarly situated against like abuse");[2] *Burger v. McGilley Memorial Chapels, Inc.*, 856 F.2d 1046, 1050 (8th Cir. 1988) (punitive damage award supported by the fact that defendants "concocted" the story).

### C.      The Defamatory Implication and Evidence of a Conspiracy

11.      The Eighth Circuit Court of Appeals squarely held that the "alleged defamatory implication is that the article implies falsely that Representative Nunes 'conspired or colluded with his family and with others to hide or cover-up' that the farm 'employs undocumented labor.'"  The Eighth Circuit further found that "[a] reasonable reader could conclude, from reading the Article as a whole, that the identified 'secret' is 'politically explosive' because Nunes knew about his family's employment of undocumented labor.  The Eighth Circuit also ruled that "[w]hether Nunes knew about the farm's hiring practices, including the potential use of undocumented labor, and whether he agreed with others to keep that information secret, are issues of verifiable fact."  Finally, the Eighth Circuit ruled that "Nunes has plausibly alleged that Lizza and

---

[2]      In *Butts*, as in this case, "prior to publication the Saturday Evening Post had been notified both by Butts and his daughter that the material about to be printed was false.  Despite these warnings, and the fact that no member of the staff had ever even seen Burnett's crucial notes, no further efforts at investigation were undertaken prior to publication.  It might indeed be argued that this conduct would have sufficed, under proper instructions, to satisfy even the 'actual malice' standard of New York Times, the notice to the Saturday Evening Post being considered as furnishing the necessary 'mental element.'" 388 U.S. at 161 fn. 23.

Hearst intended or endorsed the implication that Nunes conspired to cover up the farm's use of undocumented labor." *Nunes v. Lizza*, 12 4th 890, 896-899 (8th Cir. 2021).

12.    In *Blessum v. Howard County Bd. of Sup'rs*, the Iowa Supreme Court upheld a jury verdict for compensatory and punitive damage in a defamation case. Plaintiff's position was that at the time the statements were made, the defendant knew the statements were false or acted in reckless disregard for its truth. To satisfy the test, plaintiff produced defendant's own testimony from his deposition "in which he admitted that … he did not have knowledge of any facts which would lead him to believe that Blessum was a crook, nor did he have knowledge of any information which would lead him to believe that Blessum had done anything crooked." Plaintiff argued that "this evidence was sufficient to submit the actual malice charge of slander to the jury." The Iowa Supreme Court agreed. 295 N.W.2d 836, 843 (Iowa 1980).

13.    Based upon the Eighth Circuit's decision in *Nunes v. Lizza*, which is the law of the case, and the Iowa Supreme Court's opinion in *Blessum*, Devin Nunes served the following interrogatories, *Exhibit "C"* to Plaintiffs' motion:

> "10.    If you deny or dispute that the defamatory implication of the Article is that [Devin Nunes] conspired or colluded with his family and with others to hide or cover-up that NuStar Farms employs undocumented labor, describe in detail and identify ALL facts and evidence that support your denial and/or that establish that no reasonable reader could draw that implication from the Article."

> "11.    If you deny or dispute [that a reasonable reader could conclude, from reading the Article as a whole, that the identified 'secret' is 'politically explosive' because Nunes knew about his family's employment of undocumented labor], describe in detail and identify ALL facts and evidence that support your contention, including any facts or evidence that proves, demonstrates or shows that [Devin Nunes] knew about his family's employment of undocumented labor."

"12. Describe in detail and identify any and ALL facts and evidence that prove, demonstrate or show that [Devin Nunes] knew about NuStar Farm's hiring practices, including the potential use of undocumented labor, and that he agreed with others to keep that information secret."

"13. If you deny or dispute [that Lizza and Hearst intended or endorsed the implication that Nunes conspired to cover up the farm's use of undocumented labor], describe in detail and identify ALL facts and evidence that support your contention, including any facts or evidence that proves, demonstrates or shows that Lizza and Hearst did not intend or endorse the implication that Plaintiff conspired to cover up NuStar Farm's use of undocumented labor."

"14. Describe in detail and identify any and ALL facts and evidence that proves, demonstrates or shows that on either September 30, 2018 or November 20, 2019 Lizza and Hearst had knowledge of facts which would lead them to believe that Plaintiff conspired to cover up NuStar Farm's use of undocumented labor."

"15. Describe in detail and identify any and ALL facts and evidence that proves, demonstrates or shows that on either September 30, 2018 or November 20, 2019 Lizza and Hearst had knowledge of facts which would lead them to believe that Plaintiff had engaged in a conspiracy with anyone."

These interrogatories clearly seek information that is relevant to Plaintiffs' claim of defamation by implication that was expressly recognized by the Eighth Circuit Court of Appeals. Under *Blessum*, interrogatory nos. 14 and 15 are also relevant to the issue of actual malice.

14. Defendants offered a slew of boilerplate objections to each interrogatory, including that the interrogatories were "premature", "irrelevant", they called for a "legal conclusions", the information sought "could be obtained through more practical methods", and "Defendants" have already sought and obtained potentially responsive information through more appropriate methods including Defendants' prior depositions in this action and Defendants' document productions." In response to interrogatory no. 12, Hearst and Lizza hid behind vague generalities. Hearst and Lizza objected "***to the extent***" that the interrogatory "calls for Defendants to identify information from public

records; deposition transcripts; documents produced by the plaintiffs in this consolidated case; documents that are outside of Defendants' possession, custody, or control; expert reports; and documents that Defendants are not permitted to view or access as a result of the protective orders in this consolidated case." **What public records? What deposition transcripts? What documents produced in discovery by Plaintiffs? What documents outside Defendants' possession? What parts of what expert reports?** This is total obfuscation.

15. Defendants' sole "response" to interrogatory no. 10 was that they "did not read the Article to convey the alleged implication." This is completely non-responsive and evasive. The Eighth Circuit has ruled that the Article is capable of the defamatory implication alleged by Plaintiffs. If Hearst and Lizza deny or dispute the implication, they must produce whatever evidence shows the basis for the denial or dispute. Hearst and Lizza do not get a free pass. They do not get to sand-bag Plaintiffs at trial. If they fail to explain the basis of their denial, the Court, as a sanction, should enter summary judgment and find that the defamatory implication of a "conspiracy" is false, *i.e.*, there was no conspiracy.

16. Defendants absolutely refused to answer interrogatory nos. 11, 12, 13, 14 and 15. It would be plain error to let the Defendants get away with such an obvious abuse of the discovery Rules.

**D.     Evidence of Devin Nunes's Involvement With NuStar Workers**

17. Based upon the Eighth Circuit's decision in *Nunes v. Lizza*, Devin Nunes served a request for production of documents, *Exhibit "F"* to Plaintiffs' motion to compel, in which he sought the following documents

"1.     evidences, proves, shows or reflects that Plaintiff played any role or had any involvement in (a) the hiring or firing of such NuStar Employee or NuStar Worker, (b) the review of any job application or any pre-hiring interview of such NuStar Employee or NuStar Worker, (c) the preparation or completion or amendment of any USCIS Form I-9 for any NuStar Employee of NuStar Worker, (d) the inspection of any passport, green card, driver's license and/or identification card for any NuStar Employee or NuStar Worker, and/or (e) the verification of any NuStar Employee's or any NuStar Worker's authorization to work in the United States."

"2.     Any document that evidences any communication between [Devin Nunes] and NuStar about any NuStar Employee or NuStar Worker."
"3.     Any document that evidences any communication between [Devin Nunes] and Anthony Nunes, Jr. about any NuStar Employee or NuStar Worker."

"4.     Any document that evidences any communication between Plaintiff and Anthony Nunes, III about any NuStar Employee or NuStar Worker."

"5.     Any document that evidences any communication between Plaintiff and (former) Representative Steve King about any NuStar Employee or NuStar Worker."

The requests are relevant to Plaintiffs' claim of defamation by implication, and, specifically, to show the non-existence or absence of any "conspiracy".

18.     Subject to boilerplate objections, Hearst and Lizza represented as follows:

"Defendants respond that they have already produced in this consolidated action the nonprivileged documents in their possession, custody, or control that are responsive to this Request."

**To date, Defendants have not produced a single document in this consolidated action that is responsive to requests 1-5 above**.

E.     **Documentary Evidence of the Putative "Conspiracy**

19.     Based upon the Eighth Circuit's decision in *Nunes v. Lizza*, NuStar served a request for production of documents, _Exhibit "D"_ to Plaintiffs' motion, in which NuStar sought documents that evidenced the putative "conspiracy" to hide the use of undocumented labor at the farm.  NuStar sought production of the following documents

12

"1. ALL documents that prove, evidence, demonstrate or show that NuStar conspired to hide NuStar's use of undocumented labor."

"2. All documents that prove, evidence, demonstrate or show that NuStar agreed with others to hide NuStar's use of undocumented labor."

"3. ALL documents that prove, evidence, demonstrate or show that NuStar entered into a knowing agreement with anyone to cover up the politically embarrassing fact that NuStar employed undocumented labor."

"4. ALL documents that prove, evidence, demonstrate or show that either NuStar or Anthony Nunes, Jr. or Anthony Nunes, III hid the family farm's move to Iowa."

"5. ALL documents that prove, evidence, demonstrate or show that NuStar's use of undocumented labor is the reason that Devin Nunes and his family were hiding the family's move and their operation of an Iowa dairy farm."

"6. ALL documents that prove, evidence, demonstrate or show that King knew about NuStar's employment of undocumented labor."

"7. ALL documents that prove, evidence, demonstrate or show that King knew about NuStar's hiring practices, including the potential use of undocumented labor, and agreed with others to keep that information secret."

"10. ALL documents that prove, evidence, demonstrate or show that the Nuneses, King, and an obscure dairy publication conspired to hide the fact that Devin Nunes's family sold its farm and moved to Iowa."

NuStar's requests production of any materials in Hearst and Lizza's possession and control that would evidence a "conspiracy". The requests are relevant, *inter alia*, to show the falsity of the defamatory implication.

20. After boilerplate objections, Hearst and Lizza represented as follows:

"Defendants respond that they have already produced in *NuStar Farms, LLC, et al. v. Ryan Lizza et al., Inc.* (Case No. 5:20-cv-04003) non-privileged documents in their possession, custody, or control that are responsive to this Request. Defendants will search for and produce any additional nonprivileged documents that may be responsive to this Request, as interpreted."

**To date, Defendants have not produced a single document in Case 4003 that is responsive to requests 1-7 and/or 10 above.**

21.     If they have produced documents, it should be easy to identify the specific documents by bates-stamp.   The Court should not allow Hearst and Lizza to hide responsive documents in a haystack of "already produced" materials.

**F.     Injury to Devin Nunes's Reputation**

22.     In interrogatory no. 18, part of _Exhibit "C"_ to Plaintiffs' motion to compel, Devin Nunes sought the following information

> "If you contend that Plaintiff did not suffer an injury to his reputation as a result of the Republication of the Article on November 20, 2019, describe in detail and identify ALL facts and evidence that support your contention."

This interrogatory seeks the disclosure of any facts and evidence that support Defendants' affirmative defense that Devin Nunes' did not suffer an injury to his reputation.

23.     In response to interrogatory no. 18, Defendants served more boilerplate objections, and then stated that they are "not aware of any facts or evidence indicating any injury to Plaintiff's reputation as a result of the Tweet."   This is non-responsive, evasive, and knowingly false.

24.     In-house counsel for Hearst is well aware that during the discovery process and in writing Plaintiffs disclosed at least seven (7) different pieces of evidence that demonstrate injury to Plaintiffs' reputations:

1.     Recordings of threatening phone calls received by the NuStar Plaintiffs _after_ publication and republication of the Article (**PX 180, 2729**);

2.     Millions of tweets, quote tweets, retweets, replies and likes of the Article and Republication (https://twitter.com/search?q=https%3A%2F%2Ftwitter.com%2FRyanLiz za%2Fstatus%2F1197322014572371969&src=typed_query);

3.     Victim impact statement and testimony of Toni Dian Nunes that the reputation of NuStar and the Nuneses suffered in the Sibley, Iowa, community as a result of the Article (**TONI DIAN 1-3**);[3]

4.     Photographs of trespassers and activists at NuStar Farms (**TONI DIAN 10-11**);

5.     Disclosure of Jesse Van De Stroet, who "has knowledge of the damage caused by the Defendants' false and defamatory statements, including the actual injury to Plaintiffs' reputation."

6.     Deposition testimony of Gerald Nunes, who has knowledge of the reputational risk created by the Article, the fact that the Article and continued publication gave the Nuneses a "bad name", and the fact that Gerald separated himself from Devin Nunes after the Article came out and did not want Devin at the family farm in California; and

7.     Deposition testimony of Devin Nunes, including the fact that he could no longer give tours of his family's farm in California to dignitaries and others as a result of the publication and republication of the Article and the disclosure of the names of colleagues in Congress with express knowledge of the injury to reputation caused by the Article and Republication.

Authorities agree that:

"The gravamen or gist of an action for defamation is damage to the plaintiff's reputation. It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation.

Defamation is an impairment of a relational interest; it denigrates the opinion which others in the community have of the plaintiff and invades the plaintiff's interest in the reputation and good name. A cause of action for defamation is based on the transmission of derogatory statements, not on any physical or emotional distress to plaintiff which may result. Defamation law protects interests of personality, not of property."

*Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998) (quoting 50 Am.Jur.2d

*Libel and Slander* § 2, at 338-340 (1995)). In *Schlegel*, the newspaper defendant falsely

reported that plaintiff, a lawyer, had declared bankruptcy. 585 N.W.2d at 220. The

---

[3]     A copy of the victim impact statement produced by Toni Dian Nunes in response to a subpoena served by Hearst is attached as *Exhibit "G"* to Plaintiffs' motion to compel discovery.

record in *Schlegel* was rife with evidence of hurt feelings and depression, but, unlike this case, did not demonstrate that anyone thought less of the attorney. The Iowa Supreme Court held that in order to recover "parasitic" damages, such as emotional distress and humiliation, a plaintiff must prove reputational harm. *Id.* at 224. The *Schlegel* Court held as follows:

> "Our task then is to determine if the record supports the district court's finding that Schlegel suffered no harm to his reputation. As the district court stated, there is no evidence that the false report caused Richard a loss of business. In fact, before trial, Richard dismissed claims regarding loss of business suffered by his wife and him. Although we have every reason to assume Richard is well regarded in his community and had a good reputation before the false report, he presented no evidence of that good reputation. The only evidence on this point is Richard's deposition testimony referred to in trial that he was well known, 'good or bad.' The Schlegels presented a number of witnesses, most of whom were friends, who saw the false report. None testified that Richard had any particular reputation before the false report or that they thought ill of him because of it."

585 N.W.2d at 225. In *Bierman v. Weier*, 826 N.W.2d 436 (2013), the plaintiff's case suffered from the "same gap in proof" as the plaintiff in *Schlegel*. The Court observed that "[w]hile the summary judgment record contains evidence of the good reputations of both Beth and Gail before the publication of the book, it is devoid of evidence that anyone changed his or her opinion of the two after reading the book." The plaintiff in *Bierman* also presented testimony from the defendant's parents:

> "Beth and Gail urge us to consider the testimony of Scott's parents who testified that they thought less of Beth and Gail because of the allegations of sexual abuse and mental illness. However, the record is clear that Scott's parents formed their opinions about the abuse and the mental illness long before Scott wrote or published his book. They testified that they came to believe the abuse had occurred and that Beth suffered from some sort of personality disorder while Scott and Beth were still married, at least six years before the book was published. Accordingly, the testimony of Scott's parents is not evidence tending to prove the publication of the statements in the book caused Beth and Gail reputational harm."

826 N.W.2d at 463.[4]  In *Cockram v. Genesco, Inc.*, 680 F.3d 1046 (8th Cir. 2012), the Eighth Circuit Court of Appeals ruled that the evidence was sufficient to allow a reasonable jury to find actual reputational harm flowing from the defendant's statements. The plaintiff argued that there were multiple pieces of evidence indicating that her reputation was harmed by the defendant's statements.  "She stated that '[p]eople posting comments to media stories carrying Genesco's statement would call me racist.'  For example, one person writing a comment in response to an online article containing Genesco's first statement said that a 'racist teenager entered the words on their [sic] own' and was 'rightfully fired.'  Cockram also received numerous messages containing threats and accusations of racism after Genesco released the first statement.  Cockram claims that these 'accusations and threats made [her] afraid and [she] moved out of [her] apartment and placed [her] child with [her] parents temporarily.'  Cockram's father confirmed that Cockram was so concerned about the threats that she asked him to allow her daughter to live with him for a period.  Furthermore, Cockram's father stated that his family's friends and acquaintances contacted him and questioned whether Cockram was racist after the stories with Genesco's statements appeared.  Thus, we cannot say as a matter of law that Cockram cannot show actual reputational harm".  680 F.3d at 1054. Likewise, in *Lundell Mfg. Co. v. American Broadcasting Companies, Inc.*, 98 F.3d 351 (8th Cir. 1996), the Eighth Circuit Court of Appeals found that there was sufficient proof of actual damages:

---

[4]        In this case, by comparison, publication and republication of the defamatory statements and implications caused the reputational harm.

Case 5:19-cv-04064-CJW-MAR   Document 112-8   Filed 10/07/22   Page 17 of 22

"Vernon Lundell testified that Lundell began operating in 1945 and had always had an excellent reputation in the industry and in Iowa. Another witness testified that just before the broadcast, Lundell was the industry leader for this type of equipment. Several witnesses testified that after the broadcast, interest in the machine vanished … This evidence is more than sufficient to sustain the jury's finding that Lundell was damaged by the story."

98 F.3d at 364-365.

25. In determining the actual injuries claimed in this action, Plaintiffs have taken into consideration all of the circumstances surrounding Defendants' statements and actions, including, but not limited to (a) the occasions on which the false statements were made and republished, (b) the means and methods of publication and republication (online, in print and via social media), (c) the extent and sheer volume of the publications and republications (millions of views, tweets, retweets, quotes, replies and likes), (d) the nature and character of the insult, (e) the probable effect on those who read and heard the statements (measured by comments on Twitter and threatening phone calls), and (f) the probable and natural effect upon the Plaintiffs' personal feelings and upon their standing in the community and in business. Plaintiffs will ask the Jury to determine an amount that will fully and fairly compensate Plaintiffs for the actual injuries suffered as a result of Defendants' publication and republication to millions of advertisers, subscribers, viewers and followers. Although there is no mathematical formula for computing the quantum of actual injuries in a defamation case, Plaintiffs will ask the jury to award $100 for each advertiser, subscriber, viewer and follower of Hearst and Lizza to whom the false facts were transmitted, published and republished as a sufficient sum to redress the damage caused by the defamation and defamation by implication. Plaintiffs will ask for actual injuries in a sum not less than **$100,000,000.00**.

26.     Hearst and Lizza refuse to identify any facts or evidence in discovery to refute Plaintiffs' evidence of injury to reputation.  The answer to interrogatory no. 18 is woefully inadequate.  The Court should order Defendants to respond with complete answers and any supporting documents, or preclude Defendants from introducing any evidence at trial, including so-called "expert" testimony, in opposition to Plaintiffs' claims of injury to reputation.

### G.     Lizza's Twitter Followers and Direct Messages

27.     In *Exhibits "D" and "E"* to Plaintiffs' motion, NuStar sought production of the following documents

> "11.    Documents sufficient to identify the followers of Lizza's twitter account, **@RyanLizza**, between September 30, 2018 and November 20, 2019."

> "1.     Documents sufficient to identify the number of persons or accounts following Twitter account @RyanLizza (the "Lizza Account") on November 20, 2019."

> "2.     Documents sufficient to identify the names/handles of the followers of the Lizza Account on November 20, 2019."

> "3.     The entire Republication, including all retweets, quote tweets, replies and likes."

> "4.     All tweets, retweets, quote tweets, replies and likes of the Republication."

> "5.     All Twitter direct messages or private messages sent or received by Lizza (excluding only messages exchanged with legal counsel) between September 30, 2018 and the present that mention [Devin Nunes], any member of Devin Nunes's family, the Article, the Republication, or this action."

The documents are obviously relevant to the issues of publication, republication and actual malice.  The documents are not publicly available to Plaintiffs.

28. In spite of the fact that Lizza controls the Twitter account at issue and has direct access to the documents, or can request them from Twitter, Lizza and Hearst refuse to lift a finger to produce Lizza's social media account files.

29. Plaintiffs ask the Court to Order Lizza to produce the documents or to sign an appropriate consent to release of records, authorizing Twitter to release the documents to Plaintiffs' counsel.

## CONCLUSION AND REQUEST FOR RELIEF

For the reasons stated above, Plaintiffs respectfully request the Court to grant their Motion to Compel Discovery, order the Defendants to provide complete answers to interrogatories and all responsive documents or confirm that they have no documents, or, in the alternative, to enter summary judgment on the issue whether the defamatory implication of the Article is false, and award Plaintiffs their attorney's fees incurred in making this motion.


DATED:        October 7, 2022


Signature of Counsel on Next Page

DEVIN G. NUNES
NUSTAR FARMS, LLC
ANTHONY NUNES, JR.
ANTHONY NUNES, III


By:   */s/ Steven S. Biss*
      Steven S. Biss (VSB # 32972)
      300 West Main Street, Suite 102
      Charlottesville, Virginia 22903
      Telephone:  (804) 501-8272
      Facsimile:  (202) 318-4098
      Email:  stevenbiss@earthlink.net
      (*Admitted Pro Hac Vice*)

      William F. McGinn #24477
      McGINN LAW FIRM
      20 North 16th Street
      Council Bluffs, Iowa 51501
      Telephone: (712) 328-1566
      Facsimile: (712) 328-3707
      Email: bmcginn@themcginnlawfirm.com

      *Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2022 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to counsel for the Defendants and all interested parties receiving notices via CM/ECF.

By: */s/ Steven S. Biss*

Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone: (804) 501-8272
Facsimile: (202) 318-4098
Email: stevenbiss@earthlink.net
(*Admitted Pro Hac Vice*)

William F. McGinn #24477
McGINN LAW FIRM
20 North 16th Street
Council Bluffs, Iowa 51501
Telephone: (712) 328-1566
Facsimile: (712) 328-3707
Email: bmcginn@themcginnlawfirm.com

*Counsel for the Plaintiffs*