# Exhibit B

| | | |
|---|---|---|
| DEVIN G. NUNES | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case 5:19-cv-4064-CJW-MAR |
| | ) | |
| | ) | |
| RYAN LIZZA | ) | |
| *et al* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| NUSTAR FARMS, LLC | ) | |
| *et al* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case 5:20-cv-04003-CJW-MAR |
| | ) | |
| | ) | |
| RYAN LIZZA | ) | |
| *et al* | ) | |
| | ) | |
| Defendants. | ) | |

# <u>PLAINTIFFS' AMENDED AND SUPPLEMENTAL RULE 26(a)(1) DISCLOSURES</u>

Plaintiffs, Devin G. Nunes ("Devin Nunes"), NuStar Farms, LLC ("NuStar"), Anthony Nunes, Jr. ("Anthony") and Anthony Nunes, III ("Anthony III") (collectively, the "Plaintiffs"), by counsel, pursuant to Rule 26(a)(1)(i), (iii) and Rule 26(e) Fed. R. Civ. Pro. ("FRCP"), provide the following Amended and Supplemental Disclosures:

1

1.    _Individuals Likely to Have Discoverable Information_.    The following persons are likely to have discoverable information that Plaintiffs may use to support the allegations and claims in the Devin Nunes's Third Amended Complaint [_ECF No. 104_] and NuStar, Anthony and Anthony III's (collectively, the "NuStar Plaintiffs") Third Amended Complaint [_ECF No. 189_]:

a.    Devin G. Nunes, c/o Steven S. Biss, Esquire.    Plaintiff has knowledge and information relevant to all facts, allegations and claims stated in his Third Amended Complaint, including, without limitation, Defendants' publication of false statements and defamatory implications, the republication of those statements and implications on November 20, 2019, Defendants' actual malice, and the presumed damages and actual injuries, including insult, pain, embarrassment, humiliation, mental anguish (past and future), and injury to reputation (past and future), caused by the Defendants' defamation by implication.

b.    The NuStar Plaintiffs, c/o Steven S. Biss, Esquire.    The NuStar Plaintiffs have knowledge of the allegations in their Third Amended Complaint, including the falsity of Defendants' statements and implications in the Lizza Hit Piece and the reputational risk and injury to Plaintiffs' reputations caused by the Defendants' malicious and defamatory statements and implications.[1]

c.    Toni Dian Nunes, c/o Steven S. Biss, Esquire.    Toni Dian has knowledge of the facts stated in her victim impact statement and the facts she testified to at her deposition, including injury to Plaintiffs' reputations.

---

[1]    Plaintiffs restate and incorporate herein by reference the NuStar Plaintiffs' amended and supplemental initial disclosures.

d.  Lori Nunes, c/o Steven S. Biss, Esquire. Lori Nunes has knowledge of the adverse impact of false statements and defamatory implications of the Lizza Hit Piece on the Plaintiffs, and Plaintiffs' actual injuries.

e.  Gerald Nunes, 674 E. Oakdale Avenue, Tulare, CA 93274. Mr. Nunes has knowledge of the reputational risk and injury to Plaintiffs' reputation caused by the Defendants' malicious and defamatory statements and implications. Mr. Nunes has knowledge of his deposition testimony, which is incorporated herein by reference

f.  Ryan Lizza and Hearst Magazine Media, c/o Counsel of Record. Lizza and Esquire (Hearst) have knowledge and information relevant to all facts, allegations and claims stated in Plaintiffs' Third Amended Complaints, including, without limitation, the publication and republication of the Lizza Hit Piece, including tweets and retweets of the republished Hit Piece, the defamatory implication of the Hit Piece, Defendants' actual malice, and the injuries to Plaintiffs' reputations caused by publication and republication of the Hit Piece. Lizza and Esquire (Hearst) also have knowledge of their respective audiences, the reach and the breadth of the publications and republications at issue in this case, both online and via Twitter.

g.  Twitter, Inc. (Twitter). Twitter has knowledge of the number of followers of @RyanLizza on November 20, 2019 and the number of times Lizza's November republication was tweeted, retweeted, quoted, replied to and liked.

h.  Jay Fielden, https://twitter.com/jayfielden?lang=en. Fielden has knowledge of the editing and publication of the Lizza Hit Piece.

i.      Olivia Nuzzi, Washington, D.C.

https://twitter.com/Olivianuzzi?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor.    Nuzzi has knowledge of Lizza's false statements and defamatory implications, his republication of the Hit Piece, his actual malice, and her evasion of lawful document subpoenas.

j.      Cable News Network, Inc. (CNN), c/o Dana Nolan, Dana.Nolan@turner.com.  CNN has knowledge of the publication and republication of Lizza's false and defamatory statements and implications.  CNN also has knowledge of Lizza's employment as an "analyst" and of communications with Lizza about Plaintiffs and the Lizza Hit Piece.

k.      Representative (former) Steve King (address unknown).    Rep. King has knowledge of the falsity of Defendants' defamatory implication.

3.      *Computation of Damages*.    Plaintiffs allege and seek to recover the following four (4) categories of damages in this action: actual injuries, punitive damages, prejudgment interest, and court costs.    Plaintiffs restate and incorporate herein by reference the facts stated in their respective Third Amended Complaints.    Plaintiffs, respectively, compute their damages as follows:

- **Actual Injuries/Damages – $75,000,000.00/$20,000,000.00.**

Authorities agree that:

"[t]he law of defamation embodies the public policy that individuals should be free to enjoy their reputation unimpaired by false and defamatory attacks.  An action for defamation or slander is based upon a violation of this right.

The gravamen or gist of an action for defamation is damage to the plaintiff's reputation. It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation.

4

> Defamation is an impairment of a relational interest; it denigrates the opinion which others in the community have of the plaintiff and invades the plaintiff's interest in the reputation and good name. A cause of action for defamation is based on the transmission of derogatory statements, not on any physical or emotional distress to plaintiff which may result. Defamation law protects interests of personality, not of property."

*Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998) (quoting 50 Am.Jur.2d *Libel and Slander* § 2, at 338-330 (1995)).

Here, Devin Nunes cultivated a stellar reputation over almost twenty (20) years of public service. At the time Defendants published the Hit Piece in September 2018, Devin was Chairman of the House Permanent Select Committee on Intelligence ("HPSCI"). At the time Defendants' republished the Hit Piece in November 2019, he was Ranking Member of HPSCI. [https://nunes.house.gov/about/; https://www.devinnunes.com/bio]. NuStar, by comparison, is a family-owned diary that has been in business in the quiet town of Sibley, Iowa, since 2006. The NuStar Plaintiffs are private individuals. Prior to September 2018, they had excellent reputations. The NuStar Plaintiffs work 24/7. They earn a modest income, and are upstanding members of the local community. The egregious defamatory statements and implications in this case were published and republished to millions. Defendants refused to retract. Rather, they doubled-down on the defamation in November 2019, and republished the false facts via social media[2] in a brazen effort to harm Devin Nunes's reputation and increase Plaintiffs' damages. *Compare Hoffmann v. Clark*, 975 N.W.2d 656, 668 (Iowa 2022) ("In considering

---

[2] "Given the ease of defaming another person through the social media, it is arguable that a remedy for defamation through presumed damages is more necessary now than ever, even if plaintiffs are not able to provide evidence of actual harm to reputation in a given case." Mike Steenson, *Presumed Damages in Defamation Law*, 40 Wm. Mitchell L. Rev. 1492, 1540 (2014) (quoted with approval in *Hoffmann v. Clark*, 975 N.W.2d 656, 667 (Iowa 2022)).

5

whether an award of presumed damages for libel per se is within the range of reasonableness as a natural and probable (although not necessarily proven) consequence of the defendant's conduct in this case, several questions help to focus our inquiry: (1) What was the prior reputation of the plaintiff? (2) Did the plaintiff suffer emotional distress? (3) What type of defamatory statements were made? (4) How many defamatory statements were made? (5) How widely were they disseminated? (6) Over what period of time were they made and disseminated? (7) Were they ever retracted? (8) Was there evidence of bad faith? The answers to these questions support the very substantial damages that the jury awarded to Hoffmann personally. Hoffmann proved that he had built up his reputation in the car tuning industry over many years. He proved that he suffered emotional harm. He proved that there had been repeated statements to the effect that Hoffmann was a fraudster and a thief disseminated over various media and under various personae over a period of years. Clark never showed contrition for his intentional, bad-faith, abusive conduct. To the contrary, he called in more fire.").[3] Defendants' publication and republication of false and defamatory statements and implications, including that Plaintiffs' conspired to conceal the commission of federal crimes, caused Plaintiffs to suffer – and continuously suffer for four (4) long years – public shame, ridicule, insult, humiliation, embarrassment, emotional distress and mental

---

[3] As in *Hoffmann*, Defendants' November 20, 2019 republication can only be viewed as an effort to call in "more fire". *See Hoffmann*, 975 N.W.2d at 667-668 ("This case involves defamation over a period of years. Scott Clark used five different Facebook accounts, two under aliases. Clark disseminated his false statements over social media and podcasts to tens of thousands of people. He said that Hoffmann was dishonest and engaged in bribery. He falsely reported that Hoffmann knowingly sold dangerous products out of greed … Hoffmann also had to watch his reputation be 'torn apart online' … Hoffmann took years to develop his reputation. As a result of what Clark put him through, Hoffmann was 'stressed to the max.' He had trouble sleeping. This was 'overwhelming' and 'consuming.'").

6

anguish, anxiety, insecurity, fear for safety and the safety of family members, fear that the defaming remarks and implications reached family, friends, constituents, colleagues in Congress and other members of the public beyond those who are identified in the Third Amended Complaints, fear that the false facts agitated bad actors and caused such persons to defame Plaintiffs, permanent loss of standing and credibility in the community, fear that they will never be able to clear their name, and injury to reputation. In support of their claims of actual injuries, Plaintiffs intend to introduce the following evidence at trial:

● The September 30, 2019 online article, entitled "**Devin Nunes's Family Farm Is Hiding a Politically Explosive Secret**", published on September 30, 2018 [https://www.esquire.com/news-politics/a23471864/devin-nunes-family-farm-iowa-california/[, and the print version of the Hit Piece;

● Lizza's November 20, 2019 republication of the Hit Piece ("Republication"). [https://twitter.com/RyanLizza/status/1197322014572371969];

● Retweets, quotes, replies and likes of the Republication by Twitter users. [https://twitter.com/search?q=https%3A%2F%2Ftwitter.com%2FRyanLizza%2Fstatus%2F1197322014572371969&src=typed_query];

● Recordings of threatening phone calls received by the NuStar Plaintiffs as a result of the original publication of the Hit Piece and the Republication (all recordings have been produced);

● Testimony of Devin Nunes as to the impact of the defamation on the 2018 Congressional Election and on his career as a Congressman and his earnings capacity;

●     Testimony of the NuStar Plaintiffs, Toni Dian Nunes, and Lori Nunes as to the impact of the defamation on Plaintiffs' reputations;

●     Testimony of Gerald Nunes as to the impact of the defamation on Plaintiffs' reputations; and

●     Testimony of disclosed third parties concerning the injury to the NuStar Plaintiffs' reputations caused by the Hit Piece.

The Iowa Supreme Court adopted the definition of "actual injury" set forth in *Gertz v. Robert Welch, Inc.*. In *Gertz*, "actual injury" was defined this way:

> "[A]ctual injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering."

418 U.S. 323, 350 (1974) (adopted in *Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884, 900 fn. 5 (Iowa 1989) ("*Gertz* articulated an expansive definition of actual damages. Even though *Gertz* did not direct the states to adopt this definition, we are nonetheless persuaded to accept *Gertz* as the appropriate definition for actual damages in a defamation action.")). In *Schlegel*, the newspaper defendant falsely reported that plaintiff, a lawyer, had declared bankruptcy. 585 N.W.2d at 220. Unlike this case, the record in *Schlegel* was rife with evidence of hurt feelings and depression, but did not demonstrate that anyone thought less of the attorney. The Iowa Supreme Court held that in order to recover "parasitic" damages, such as emotional distress and humiliation, a plaintiff must prove reputational harm. *Id.* at 224. The *Schlegel* Court held as follows:

> "Our task then is to determine if the record supports the district court's finding that Schlegel suffered no harm to his reputation. As the district court stated, there is no evidence that the false report caused Richard a loss of business. In fact, before trial, Richard dismissed claims regarding loss of business suffered by his wife and him. Although we have every reason to assume Richard is well regarded in his community and had a good reputation before the false report, he presented no evidence of that good reputation. The only evidence on this point is Richard's deposition testimony referred to in trial that he was well known, 'good or bad.' The Schlegels presented a number of witnesses, most of whom were friends, who saw the false report. None testified that Richard had any particular reputation before the false report or that they thought ill of him because of it."

585 N.W.2d at 225. In *Bierman v. Weier*, 826 N.W.2d 436 (2013), the Iowa Supreme Court held that the plaintiff's case suffered from the "same gap in proof" as the plaintiff in *Schlegel*:

> "While the summary judgment record contains evidence of the good reputations of both Beth and Gail before the publication of the book, it is devoid of evidence that anyone changed his or her opinion of the two after reading the book. The affidavits of friends revealed either that they had not read the book, or that if they had read portions of it, they did not accept the allegations it contained about Beth and Gail. Beth's work supervisor averred that Beth has suffered mental anguish and was less outgoing at work than before the book was published—i.e., the same kind of proof we found insufficient in <u>Schlegel</u>—but he did not assert that anyone at work thought less of her because of the statements in the book. Beth testified that she did not know who might think less of her because of the publication of the book … Gail testified that he suffered stress because of the publication of Scott's book, mainly because he had to endure a deposition. He did not identify anyone who believed the allegations about him published in the book and consequently thought less of him."

The plaintiff in *Bierman* also presented testimony from the defendant's parents:

> "Beth and Gail urge us to consider the testimony of Scott's parents who testified that they thought less of Beth and Gail because of the allegations of sexual abuse and mental illness. However, the record is clear that Scott's parents formed their opinions about the abuse and the mental illness long before Scott wrote or published his book. They testified that they came to believe the abuse had occurred and that Beth suffered from some sort of personality disorder while Scott and Beth were still married, at least six years before the book was published. Accordingly, the testimony of Scott's parents is not evidence tending to prove the publication of the statements in the book caused Beth and Gail reputational harm."

9

826 N.W.2d at 463.[4]  In *Cockram v. Genesco, Inc.*, 680 F.3d 1046 (8th Cir. 2012), the Eighth Circuit Court of Appeals ruled that the evidence was sufficient to allow a reasonable jury to find actual reputational harm flowing from the defendant's statements. The plaintiff argued that there were multiple pieces of evidence indicating that her reputation was harmed by the defendant's statements.  "She stated that '[p]eople posting comments to media stories carrying Genesco's statement would call me racist.'  For example, one person writing a comment in response to an online article containing Genesco's first statement said that a 'racist teenager entered the words on their [sic] own' and was 'rightfully fired.'  Cockram also received numerous messages containing threats and accusations of racism after Genesco released the first statement.  Cockram claims that these 'accusations and threats made [her] afraid and [she] moved out of [her] apartment and placed [her] child with [her] parents temporarily.'  Cockram's father confirmed that Cockram was so concerned about the threats that she asked him to allow her daughter to live with him for a period.  Furthermore, Cockram's father stated that his family's friends and acquaintances contacted him and questioned whether Cockram was racist after the stories with Genesco's statements appeared.  Thus, we cannot say as a matter of law that Cockram cannot show actual reputational harm".  680 F.3d at 1054. Likewise, in *Lundell Mfg. Co. v. American Broadcasting Companies, Inc.*, 98 F.3d 351 (8th Cir. 1996), the Eighth Circuit Court of Appeals found that there was sufficient proof of actual damages:

---

[4]       In this case, by comparison, publication and republication of the defamatory statements and implications caused the reputational harm.

> "Vernon Lundell testified that Lundell began operating in 1945 and had always had an excellent reputation in the industry and in Iowa. Another witness testified that just before the broadcast, Lundell was the industry leader for this type of equipment. Several witnesses testified that after the broadcast, interest in the machine vanished … This evidence is more than sufficient to sustain the jury's finding that Lundell was damaged by the story."

98 F.3d at 364-365. In *Kiesau v. Bantz*, 686 N.W.2d 164 (Iowa 2004), a female former deputy sheriff brought claims against another officer for defamation, alleging that officer showed and sent to others a doctored photograph showing the deputy in front of her squad car with her breasts exposed. The Iowa Supreme Court held that in addition to damages to plaintiff's reputation, "she is also entitled to damages for the actual injury inflicted by the libelous statement including personal humiliation, mental anguish and suffering, and the out-of-pocket costs for treating those conditions.

> "The jury awarded Kiesau $96,000 in compensatory damages for emotional distress, past mental pain and suffering, future mental pain and suffering, past medical expenses, and future medical expenses. The medical testimony at trial indicated Kiesau experienced personal humiliation together with mental anguish and suffering. Her psychologist diagnosed her as having an adjustment disorder with mixed anxiety and depressed mood caused by the publication of the altered photograph. The medical testimony also substantiates the necessity for treatment of these conditions in the future. There was substantial evidence in the record to support the jury's verdict for compensatory damages."

686 N.W.2d at 178.

In determining the actual injuries claimed in this action, Plaintiffs have taken into consideration all of the circumstances surrounding the Defendants' statements and actions, including, but not limited to (a) the occasion on which the false statements were made and republished, (b) the means and methods of publication and republication (online, in print and via social media), (c) the extent and sheer volume of the publications and republications (millions of views, tweets, retweets, quotes, replies and likes), (d) the nature and character of the insult, (e) the probable effect on those who read and heard the

statements (measured by comments on Twitter and threatening phone calls), and (f) the probable and natural effect upon the Plaintiffs' personal feelings and upon their standing in the community and in business. *See, e.g., Cantu v. Flanigan*, 705 F.Supp.2d 220, 227-228 (E.D.N.Y. 2010) ("In calculating non-economic damages in a defamation case, including humiliation, mental suffering and damage to plaintiff's reputation, a jury may properly consider a number of factors. In this case, the jury was instructed to consider: '[1] the plaintiff's standing in the community, [2] the nature of defendant's statements made about the plaintiff, [3] the extent to which the statements were circulated, [4] the tendency of the statement to injure a person such as the plaintiff, and [5] all of the other facts and circumstances in the case.'"). In *Lawnwood Medical Center, Inc. v. Sadow*, the Florida Court of Appeals held that personal reputation is "highly valued by civilized people." It is "value as old as the Pentateuch and the Book of Exodus, and its command as clear as the Decalogue: 'Thou shall not bear false witness against thy neighbor.' The personal interest in one's own good name and reputation surpasses economics, business practices or money. It is a fundamental part of personhood, of individual standing and one's sense of worth." 43 So.2d 710, 729-732 (Fla. 4th DCA 2010) (upholding $5,000,000 punitive damage award – "The jury obviously found Lawnwood's offense despicable. To repeat, the trial judge described the evidence as essentially showing that Lawnwood set out to destroy Dr. Sadow's career in the community. The jury's finding of a specific intent to harm Dr. Sadow, together with its finding of actual harm, is the very incarnation of both express and actual malice. It was a purposeful act of malevolent destruction of the reputation of one of its surgeons, done repeatedly as a matter of policy. A reasonable jury could conclude that repeatedly defaming the skill and proficiency of a

practicing surgeon was likely to have significant and long-lasting public and professional consequences. It could rationally have equated the slanders to feathers loosed into the wind, with no one ever knowing where they all landed or whom they touched. The effects could be seen as insidious and unknowable.").

Here, Plaintiffs will ask the Jury to determine an amount that will fully and fairly compensate Plaintiffs for the actual injuries suffered as a result of Defendants' publication and Republication to millions of advertisers, subscribers, viewers and followers. Although there is no mathematical formula for computing the quantum of actual injuries in a defamation case, Plaintiffs will ask the jury to award $100 for each viewer, advertiser, follower and subscriber to whom the false facts were transmitted, published and republished as a sufficient sum to redress the damage caused by the defamation and defamation by implication. *See Alito v. Cowles Communications, Inc.*, 430 F.Supp. 1363, 1372 (N.D. Cal. 1977) (the court awarded $350,000.00 to the plaintiff for a slanderous article impugning the plaintiff's fitness for public office. Recognizing that there is no mathematical formula for the award of general damages, the court considered "'the wide publicity given to the libel, the plaintiff's prominence in the community where he lives, his professional standing, his good name and reputation, his injured feelings and his mental suffering.'") (citation omitted), *aff'd*, 623 F.2d 616 (9th Cir. 1980), *cert. denied*, 449 U.S. 1102 (1981); *see also Cantu*, 705 F.Supp.2d at 228-229 (affirming $150 million compensatory damages award – "Upon examination of the substantial evidence in front of the jury with respect to each of these factors, it cannot be said that the jury's award is excessive under New York law. With respect to the first factor, plaintiff's standing in the community, the uncontradicted evidence at trial

established that Cantu had a positive reputation throughout the petroleum industry and that his reputation for honesty and fair business practice was recognized throughout the world by his peers … With respect to the second factor, the nature of the defendant's statements made about the plaintiff, the defendant's statements were indeed inflammatory … With respect to the third factor, the extent to which the statements were circulated, the statements at issue here were circulated throughout the world … With respect to the fourth factor, the tendency of the statement to injure a person such as the plaintiff, these remarks certainly tended to damage Cantu's reputation and cause mental suffering … Finally, and perhaps most significantly, it must be noted that Flanigan's conduct was more than merely reckless. He engaged in a deliberate course of conduct that can only be described as attempted criminal extortion"); *Anagnost v. The Mortg. Specialists, Inc.*, 2017 WL 7690898 (N.H. Super. 2017) ($105 million compensatory damages award), *aff'd*, 2018 WL 4940950 (N.H. 2018); *Gibson Bros., Inc. v. Oberlin College*, 2022 WL 970347 (Ohio App. 2022) ($33.2 million in compensatory and punitive damages award upheld, where statements in flyer passed out during protests and student senate resolution widely circulated to college students and others alleged that bakery had a history of racial profiling and discriminatory treatment); *Wynn v. Francis*, 2014 WL 2811692, at * 1 (Cal.App. 2014) ($17 million presumed damages award upheld, where defendant widely circulated the defamatory statements, including to the viewers of *Good Morning America*); *Prozeralik v. Capital Cities Commc'ns, Inc.*, 222 A.D.2d 1020, 1021, 635 N.Y.S.2d 913 (1995) (upholding an award of $6,000,000 for injury to plaintiff's reputation and $3,500,000 for mental suffering—in addition to a separate award of $1,500,000 for direct financial loss); *Bentley v. Bunton*, 94 S.W.3d 561, 605-607 (Tex.

2002) ("The record leaves no doubt that Bentley suffered mental anguish as a result of Bunton's and Gates's statements. Bentley testified that the ordeal had cost him time, deprived him of sleep, caused him embarrassment in the community in which he had spent almost all of his life, disrupted his family, and distressed his children at school. The experience, he said, was the worst of his life. Friends testified that he had been depressed, that his honor and integrity had been impugned, that his family had suffered, too, adding to his own distress, and that he would never be the same. Much of Bentley's anxiety was caused by Bunton's relentlessness in accusing him of corruption. But all of this is no evidence that Bentley suffered mental anguish damages in the amount of $7 million, more than forty times the amount awarded him for damage to his reputation."); *see also Eshelman v. Puma Biotechnology, Inc.*, 2 F. 4th 276, 286 (4th Cir. 2021) ($22.35 million compensatory and punitive damage award reversed, where plaintiff did not identify "any lost business opportunities, damaged relationships, or foregone contracts resulting from the investor presentation" that contained the defamatory statements, plaintiff was "unable to name any person who refused to do business with him, or any person who had knowledge of damage to his reputation", plaintiff's reputation "remained both commendable and intact after the publication", and there was no evidence of widespread publication – the "website linking to the investor presentation at issue here was viewed only 198 times.").[5]

- <u>Punitive Damages</u> – **$2,500,000.00/$5,000,000.00**.

With regard to punitive damages the *Gertz* Court held that:

---

[5] By comparison, Defendants intentionally published and republished false and defamatory statements and implications to million-plus people.

"[Punitive damages] are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by New York Times may recover only such damages as are sufficient to compensate him for actual injury."

*Id.* at 350. Defendants published and republished the false statements and defamatory implications with knowledge that the facts were false and/or with reckless disregard for the truth. First, ███████████ demonstrate that Defendants published false statements and defamatory implications in the Hit Piece (and republished those same statements on November 20, 2019) that they knew to be false. For instance, ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ The Defendants fabricated facts and falsely attributed them to ███████████████████ ████████████████████████████. The Defendants concealed material facts and knowingly defrauded readers and Twitter followers. They published and republished statements that were a product of their imagination. They made up facts out of whole cloth in order to impute criminal wrongdoing and malfeasance to Plaintiffs. *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant [or] is the product of his imagination"). Second, considering Plaintiffs' stature and accomplishments as of November 20, 2019, Defendants' scandalous story about a grand criminal conspiracy involving Plaintiff, the NuStar Plaintiffs and Rep. King was so inherently improbable that only a reckless person would have put the statements in circulation. *St. Amant*, 390 U.S. at 732 ("Professions of good

16

faith will be unlikely to prove persuasive, for example, … when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation."). Third, "[r]epublication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard." Restatement (Second) of Torts § 580A cmt. d (Am. L. Inst. 1977). Here, Lizza republished the Hit Piece in November 2019 after Plaintiffs sent Lizza and Hearst notice and two demands to retract *and* after Devin Nunes filed a lawsuit that expressly denied the defamatory implication. In November 2019, Lizza and Hearst engaged in purposeful avoidance of the truth, which constitutes actual malice. Fourth, at no time, either when they published the Hit Piece or when they republished the Hit Piece in November 2019, did Defendants ever have knowledge of any facts that would support a genuine belief that Plaintiff conspired with his family and/or Rep. King to conceal the fact that NuStar knowingly employed illegal workers. *Blessum v. Howard County Bd. of Sup'rs*, 295 N.W.2d 836, 845 (Iowa 1980). Fifth, the Defendants harbored an institutional hostility, hatred, extreme bias, spite and ill-will towards Plaintiff. They published false statements and defamatory implications for the sole purpose of inflicting harm on Plaintiff and his family ahead of the 2018 Congressional Election and then doubled-down and republished the same false statements and defamatory implications to undermine Plaintiff's credibility and influence the outcome of the 2019 impeachment inquiry. As evidenced by the words Defendants chose and the timing and tenor of both the original Hit Piece and the November 2019 Republication, Defendants intended to inflict harm through publication and republication of knowing or reckless falsehoods. Defendants' motive in publishing the false and defamatory statements supports an

17

inference of actual malice. Finally, Defendants intentionally abandoned all journalistic standards and integrity in publishing and republishing the false statements and defamatory implications. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 161 (1967) ("Where a publisher's departure from standards of press responsibility is severe enough to strip from him the constitutional protection our decision acknowledges, we think it entirely proper for the State to act not only for the protection of the individual injured but to safeguard all those similarly situated against like abuse").[6] Defendants did not seek the truth or report it. They disregarded their own code of ethics and betrayed the truth for the sake of their institutional bias against Plaintiffs and desire to harm Plaintiffs. Rather than minimize harm, Defendants set out to inflict maximum pain and suffering on Plaintiffs in order to harm Plaintiffs' reputations. The Defendants published the false statements and implications in the broadest manner possible for the sole purpose of injuring Plaintiffs' reputations. Defendants' intentional abandonment of their journalistic integrity further supports an inference of actual malice. *See Wilson v. IBP, Inc.*, 558 N.W.2d 132, 143-144 (Iowa 1996) ("From the evidence in this record, a reasonable juror could have found the following: Diane Arndt lied to Dr. Hamsa to keep him from referring Wilson to a neurosurgeon, that IBP and Arndt would profit financially by getting workers back to work quickly (via IBP's safety award system), and that Arndt maliciously manipulated Wilson's medical treatment for personal profit, knowing that he had an unstable disc in

---

[6] In *Butts*, as in this case, "prior to publication the Saturday Evening Post had been notified both by Butts and his daughter that the material about to be printed was false. Despite these warnings, and the fact that no member of the staff had ever even seen Burnett's crucial notes, no further efforts at investigation were undertaken prior to publication. It might indeed be argued that this conduct would have sufficed, under proper instructions, to satisfy even the 'actual malice' standard of New York Times, the notice to the Saturday Evening Post being considered as furnishing the necessary 'mental element.'" 388 U.S. at 161 fn. 23.

his back.  A reasonable juror could conclude from this evidence that Arndt's conduct constituted a willful and wanton disregard of the rights and safety of Wilson" – reducing $15,000,000 punitive damage award to $2,000,000); *Burger v. McGilley Memorial Chapels, Inc.*, 856 F.2d 1046, 1050 (8th Cir. 1988) (punitive damage award supported by the fact that defendants "concocted" the story); *Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 300-302 (Iowa App. 1985) ("Kelly did present evidence that he had a good reputation as an administrator before defendant's writings were published.  He presented evidence that the writings would adversely affect his reputation.  He also submitted evidence of the extent of the publication.  In addition, he presented evidence of special damages: emotional distress and lost speaking fees … Some of [plaintiff's] witnesses indicated they had become upset and had doubts about Kelly when they first read the libelous writings.  The jury could conclude from their testimony that the reason their opinions of Kelly ultimately remained unchanged was that they were exposed to the truth through their personal acquaintanceship with Kelly.  The jury could also conclude that people who were not acquainted with Kelly would not have any basis for disbelieving the libel … As everybody knows, there is no market price for reputation, no historical cost which can be depreciated, and no replacement cost to be calculated.  The worth of reputation is a subjective matter, varying from person to person.  One person's estimate of the value of reputation, moreover, may vary depending upon attendant circumstances. For example, the person may value reputation less if living in a large impersonal metropolis than the person would if living in a county seat in rural Iowa" – reinstating $75,000 compensatory damages and $100,000 punitive damages awards); *but see Luster v. Retail Credit Co.*, 575 F.2d 609, 619 (8th Cir. 1978) ("Plaintiff concedes that there is no

19

proof in the record that defendant acted with actual ill will or evil intent. Furthermore, the uncontroverted evidence shows that as soon as the accuracy of the report was questioned, the defendant acted swiftly. In the afternoon of the same day on which plaintiff informed defendant that there were errors in the report the defendant's Memphis office called the supervisor of the Jonesboro office and requested an immediate reinvestigation" – reversing $100,000 punitive damages award).

Plaintiffs use a reasonable multiplier to compute their punitive damages claims. That multiplier comports with Due Process and Iowa law. *See State Farm Mutual Automobile Insurance Company v. Campbell*, 538 U.S. 408, 425 (2003) ("[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's deterrence and retribution goals, than are awards with 145–to–1 ratios, as in this case. Because there are no rigid benchmarks, ratios greater than those that this Court has previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages."); *White & Johnson, P.C. v. Bayne*, 670 M.W.2d 430 (Table), at * 6 (Iowa App. 2003) (upholding punitive damage awards of "twice the compensatory damages").

●　Prejudgment Interest – interest on the principal sum awarded by the Jury from September 30, 2019 until the date Judgment is entered against Defendants at the rate specified in and pursuant to Iowa Code § 668.13.

●　Court Costs – **$400**. Docket Entry ("DE") 1.

Plaintiffs reserve the right to amend and supplement these Rule 26(a)(1) Disclosures in accordance with the Rule 26 FRCP.

DATED:        August 25, 2022



                        DEVIN G. NUNES
                        NUSTAR FARMS, LLC
                        ANTHONY NUNES, JR.
                        ANTHONY NUNES, III



                By:     */s/ Steven S. Biss*
                        Steven S. Biss (VSB # 32972)
                        300 West Main Street, Suite 102
                        Charlottesville, Virginia 22903
                        Telephone:  (804) 501-8272
                        Facsimile:  (202) 318-4098
                        Email:  stevenbiss@earthlink.net
                        (*Admitted Pro Hac Vice*)

                        William F. McGinn #24477
                        McGINN LAW FIRM
                        20 North 16th Street
                        Council Bluffs, Iowa 51501
                        Telephone: (712) 328-1566
                        Facsimile: (712) 328-3707
                        Email: bmcginn@themcginnlawfirm.com

                        *Counsel for the Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2022 a copy of the foregoing was served electronically in PDF upon counsel for the Defendants.

By: ___*/s/ Steven S. Biss*___

Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone: (804) 501-8272
Facsimile: (202) 318-4098
Email: stevenbiss@earthlink.net
(*Admitted Pro Hac Vice*)

William F. McGinn #24477
McGINN LAW FIRM
20 North 16th Street
Council Bluffs, Iowa 51501
Telephone: (712) 328-1566
Facsimile: (712) 328-3707
Email: bmcginn@themcginnlawfirm.com

*Counsel for the Plaintiff*

22