## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

|  |  |
|---|---|
| **Devin G. Nunes,** | **Case No. 5:19-cv-04064-CJW-MAR** |
| Plaintiff, | |
| v. | |
| **Ryan Lizza, Hearst Magazines, Inc.,** and **Hearst Magazine Media, Inc.,** | |
| Defendants. | |
| **NuStar Farms, LLC, Anthony Nunes, Jr., and Anthony Nunes, III,** | **Case No. 5:20-cv-04003-CJW-MAR** |
| Plaintiffs, | **Defendants' Rule 56.1 Statement of Undisputed Material Facts in Support of Their Resisted Motion for Summary Judgment Against Plaintiffs Devin G. Nunes, NuStar Farms, LLC, Anthony Nunes, Jr., and Anthony Nunes, III** |
| v. | |
| **Ryan Lizza** and **Hearst Magazine Media, Inc.,** | **(Oral Argument Requested)** |
| Defendants. | **\*Filed Under Seal\*** |

Defendants Ryan Lizza ("Lizza") and Hearst Magazine Media, Inc. ("Hearst") (collectively "Defendants") respectfully submit this Local Rule 56.1 Statement of Undisputed Material Facts in support of their Resisted Motion for Summary Judgment against Plaintiffs NuStar Farms, LLC ("NuStar"), Anthony Nunes, Jr. ("Anthony Jr."), Anthony Nunes, III ("Anthony III") (collectively, the "NuStar Plaintiffs"), and Devin G. Nunes (the "Congressman" or "Congressman Nunes," together with the NuStar Plaintiffs, "Plaintiffs"), seeking dismissal of Plaintiffs' claims in their entirety.

**Table of Contents**

UNDISPUTED FACTS ............................................................................................. 1

I.     Congressman Nunes, Like His Family, Has Deep Experience in Dairy Farming. ............. 1

II.    Defendants Carefully Reported a Story on the Congressman's Family's Dairy, NuStar Farms, and the Use of Undocumented Workers on Dairy Farms. ........................................ 6

III.   The Congressman Did Not Publicize His Family's Move to Iowa. ............................... 26

IV.    ███████████████████████████████████ ..................... 29

       A.   ███████████████████████████████ ........................... 29

       B.   █████████████████████████████████████
            ..................................................................................... 35

       C.   █████████████████████████████████████
            ...................................................................................... 41

       D.   ████████████████████████████████
            ......................................................................... 49

V.     The Congressman Knows His Family Has Routinely Hired Without Verification, in an Industry Rife with Unauthorized Workers ............................................................ 57

       A.   The Congressman Knows His Family Has Regularly Hired Workers Without Verifying Documents. .......................................................................... 57

       B.   The Congressman Communicates with His Family Constantly. ........................ 59

       C.   The Congressman Co-Sponsored Eight Bills Addressing the Issues of Undocumented Dairy Workers, Including Verification Requirements. .............. 62

VI.    █████████████████████████████████████
       .......................................................................................... 71

VII.   █████████████████████ the NuStar Plaintiffs Sued for Defamation, Following the Congressman's Lead. ........................................................... 74

VIII.  Plaintiffs Have Not Been Damaged. .................................................................. 76

       A.   The NuStar Plaintiffs Can Show No Harm from the Article. ............................ 76

       B.   The Congressman Has Not Been Harmed by Lizza's November 2019 Link to the Article. .......................................................................................... 79

i

**UNDISPUTED FACTS**

**I.  Congressman Nunes, Like His Family, Has Deep Experience in Dairy Farming.**

1.  For over a century, members of the Nunes family have owned and operated a

dairy at 690 Oakdale Avenue in Tulare, California.  App. 723 (Ex. S, Devin Tr. II,[1] 282:19–

283:23); App. 1584 (Ex. WWWW ¶ 5); App. 691-92 (Ex. R, Gerald Tr. 13:24-14:1).

2.  ███████████████████████████████████████████.  App. 231

(Ex. E, Anthony Jr. Tr. 15:9–16:19).

---

[1]      References to "Callahan Tr." are to the transcript of the April 27, 2021 deposition of
Father James Callahan (App. 1-29, Ex. A); references to "Source 1 Tr." are to the transcript of
the May 10, 2021 deposition of Source 1 (App. 30-100, Ex. B); references to "████ Tr." are to
the transcript of the May 12, 2021 deposition of ████ (App. 101-122, Ex. C); references to
"Anthony III Tr." are to the transcript of the July 13, 2021 deposition of Anthony III, in his
individual capacity and as a corporate representative of NuStar pursuant to Rule 30(b)(6) (App.
123-226, Ex. D); references to "Anthony Jr. Tr." are to the transcript of the July 15, 2021
deposition of Anthony Jr. (App. 227-88, Ex. E); references to "Lori Tr." are to the transcript of
the July 16, 2021 deposition of Lori Nunes (App. 289-359, Ex. F); references to "Dian Tr." are to
the transcript of the July 19, 2021 deposition of Toni Dian Nunes (App. 360-98, Ex. G);
references to "Lizza I Tr." are to the transcript of the July 23, 2021 deposition of Lizza (App.
399-472, Ex. H); references to "Kenney Tr." are to the transcript of the August 2, 2021
deposition of Hearst by John Kenney, its corporate representative, pursuant to Rule 30(b)(6)
(App. 3335-70, Ex. YYYYYYY); references to "Devin I Tr." are to the transcript of the August
10, 2021 deposition of the Congressman (App. 473-527, Ex. I); references to "████ Tr." are to
the transcript of the August 12, 2021 deposition of ████ (App. 528-33, Ex. J); references to
"████ Tr." are to the transcript of the August 12, 2021 deposition of ████. (App. 534-38,
Ex. K); references to "████ Tr." are to the transcript of the August 12, 2021 continued
deposition of ████ (App. 539-43, Ex. L); references to "████ Tr." are to the transcript of the
August 12, 2021 deposition of ████ (App. 544-49, Ex. M); references to "████ Tr." are to the
transcript of the August 12, 2021 deposition of ████ (App. 550-55, Ex. N); references to
"████ Tr." are to the transcript of the August 12, 2021 deposition of ████ (App. 556-62,
Ex. O); references to "Samson Tr." are to the transcript of the September 8, 2021 deposition of
Clete Samson (App. 563-643, Ex. P); references to "Bahena Tr." are to the transcript of the
February 22, 2022 deposition of Amanda Bahena (App. 644-87, Ex. Q); references to "Gerald
Tr." are to the transcript of the August 17, 2022 deposition of Gerald Nunes (App. 688-705,
Ex. R); references to "Devin II Tr." are to the transcript of the September 9, 2022 continued
deposition of Congressman Nunes (App. 706-44, Ex. S); references to "Lizza II Tr." are to the
transcript of the September 14, 2021 continued deposition of Lizza (App. 775-830 Ex. T).
"Lizza Decl." refers to the October 24, 2022 Declaration of Ryan Lizza (App. 3457-640,
Ex. HHHHHHHH).  "Kenney Decl." refers to the October 21, 2022 Declaration of John Kenney
(App. 3444-56, Ex. GGGGGGGG).  ).  "McDonnell Decl." refers to the October 24, 2022
Declaration of Kevin McDonnell (App. 3437-43, Ex. HHHHHHHH).  All other capitalized terms
not defined in this Rule 56.1 statement have the same definition as in Defendants' Brief in
support of their motion for summary judgment.

1

3.      The Congressman—Anthony Jr.'s son—grew up working alongside his father on the farm in Tulare, starting when he was "a small boy" in the 1970s.  App. 723 (Ex. S, Devin Tr. II, 282:19–283:23); App. 1585 (Ex. WWWW ¶ 5).

4.      ██████████████████████████████████████

██████████████████████████████████████

App. 372, App. 374 (Ex. G, Dian Tr. 48:4–49.1, 56:8-13).

5.      ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

App. 366-68 (Ex. G, Dian Tr. 23:3-23, 25:12–27:4, 31:15–32:2).

6.      ██████████████████████████████████████

████  App. 375 (Ex. G, Dian Tr. 59:24–60:10).

7.      As Congressman Nunes testified:

> [M]y brother and I were partners, but it all worked—we were all together.  The family kind of operated all together . . . .  [W]e worked with the farm here [in California].  . . . [T]here's four or five different operations, including my own, that we all, like, shared and worked with . . . .

App. 724 (Ex. S, Devin II Tr. 284:5-22).

8.      Farming was the Congressman's "educational focus from boyhood through completion of a university master's degree program, and much of his working history from age 14 to the present."  App. 1590 (Ex. XXXX, at 2); *see also* App. 476 (Ex. I, Devin I Tr. 13:3-6 (the Congressman "grew up working" on family farm)).

2

9.      At age fourteen, in the late 1980s, the Congressman first purchased, raised, and sold dairy cows himself.  App. 1584 (Ex. WWWW ¶ 6).

10.      As a teenager, the Congressman started a custom farming business with Anthony III, which continued until he went to Congress.  App. 723 (Ex. S, Devin II Tr. 283:17–284:4).

11.      The Congressman "began managing [his] family's dairy farm" in Tulare in 1996, after getting his Masters' in Agricultural Science from California Polytechnic University.  The Congressman has a Bachelor of Science in Agribusiness from California Polytechnic University, too.  App. 1584-85 (Ex. WWWW ¶¶ 8-9).

12.      When he was working on the family's dairy farm after college, the Congressman was working on the farm seven days a week, doing everything from milking cows to feeding cows.  App. 700 (Ex. R, Gerald Tr. 49:6-13).  Gerald Nunes is the Congressman's uncle and became a half owner of the family's Tulare farm in 1994. App. 723 (Ex. S, Devin I Tr. 282:19-25); App. 1282 (Ex. JJJJ, at 2).

13.      As of 1994, the family's dairy farm in Tulare had a dairy herd of 900 cows, and its gross income was $1.4 million.  App. 1282 (Ex. JJJJ, at 2).

14.      Consistent with his history of "shar[ing] and work[ing]" with his family as "partners," the Congressman bought another farm in the 1990s, but "can't remember" if he bought it alone or with Anthony III.  App. 723-24, 728 (Ex. S, Devin II Tr. 283:24–284:22, 301:1-12).

15.      In 2000, the Congressman completed the California Agricultural Leadership Program, which "takes farmers off the farm and introduces them to both domestic and international agriculture policy."  App. 1584-85 (Ex. WWWW ¶ 8).

3

16.     The Congressman continued working at the Tulare dairy farm until he was appointed by then-President George W. Bush in 2001 as the U.S. Department of Agriculture California State Director of Rural Development.  App. 1585 (Ex. WWWW ¶ 9).

17.     In 2003, the Congressman was elected to Congress, where he "stay[ed] on top of the issues" facing the dairy farms he represented.  App. 477 (Ex. I, Devin I Tr. 16:20–23).  He represented California's 21st Congressional District from January 2003 until 2012, and he represented its 22nd Congressional District from 2012 until January 2022.  App. 716 (Ex. S, Devin II Tr. 254:22–255:17).

18.     The Congressman's "life, education, work, public honors, and public offices all have been focused on farming and agriculture."  App. 1590 (Ex. XXXX, at 2).

19.     The Congressman is a California resident.  *See Nunes v. Lizza*, No. 19-cv-4064-CJW-MAR ("*Nunes*"), [ECF. No. 104 (the Third Amended Complaint, or "TAC")] ¶ 4; App. 769 (Ex. S, Devin II Tr. 465:3–466:3 (the Congressman is a California resident, has a California license, and pays taxes in California, other than spending "ten days to three weeks . . . sometimes" at his Florida residence, for his new job)); App. 1654 (Ex. BBBBB, Interrogatory Response by the Congressman, stating that home address can be "ascertained" by examining tax returns).  The Congressman has "visited with his family" in Iowa only "on a few occasions" since January 1, 2006.  App. 1655 (Ex. BBBBB).

20.     ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████.  App. 368 (Ex. G, Dian Tr. 30:10–31:4).

21.     ███████████████████████████████████████████████
App. 132 (Ex. D, Anthony III Tr. 34:2–16).

22.      

App. 235 (Ex. E, Anthony Jr. Tr. 30:25-31:15).

23.      Anthony Jr. and Anthony III asked the Congressman to visit Sibley to give his opinion on the farm before completing the purchase. App. 494-95 (Ex. I, Devin I Tr. 84:15–86:9); App. 729 (Ex. S, Devin II Tr. 306:4-6).

24.      The Congressman spent two nights there, "looked at the farm" and "gave . . . [his] advice" after "evaluating the facilities [and] the animals." App. 494-95 (Ex. I, Devin I Tr. 84:15–86:9).

25.      The Congressman claims that over those two days, he never once discussed the work force in Sibley with his father or brother—when asked if he had, his response was, No, . . . nice try on the labor." App. 495 (Ex. I, Devin I Tr. 86:10–87:3).

26.      ███████████████████████████████, App. 1157-72, 1171 (Ex. LLLL), ████████████████████████████ App. 368, 369 (Ex. G, Dian Tr. 30:7–31:13, 34:7–12).

27.      ████████████████████████████████████ ███. App. 265 (Ex. E, Anthony Jr. Tr. 152:5–153:8); App. 370 (Ex. G, Dian Tr. 34:1-20).

28.      ████████████████████████████████ ████████████████████████████████████

██████████████████████ App. 137 (Ex. D, Anthony III Tr. 54:21–56:12); App. 265 (Ex. E, Anthony Jr. Tr. 152:5–153:23).

## II. Defendants Carefully Reported a Story on the Congressman's Family's Dairy, NuStar Farms, and the Use of Undocumented Workers on Dairy Farms.

29.  Hearst publishes *Esquire* as a magazine and at *Esquire*.com. *Nunes*, [ECF No. 107], at 6 ¶ 20; *see also* App. 3448, 3452 (Ex. GGGGGGGG, Kenney Decl. ¶¶ 17, 31).

30.  The subject matter that *Esquire* publishes in print and online is varied and wide ranging. It includes the following categories: news & politics, culture, lifestyle, men's fashion, sports, criminal justice, science, products, medicine, investigations, government, international affairs, food & drink, cars, travel, entertainment, the arts, and literature, among many others. App. 3448-49 (Ex. GGGGGGGG, Kenney Decl. ¶ 17).

31.  As a print publication, *Esquire* currently publishes six times a year. As an electronic publishing publication, *Esquire* publishes new content on a daily basis. *Esquire* has a regular political columnist (Charles P. Pierce, who has written for *Esquire* for over a decade) and publishes political content electronically at minimum several times a week. App. 3448-49 (Ex. GGGGGGGG, Kenney Decl. ¶ 17).

32.  *Esquire* articles often are written in the style of "New Journalism," combining journalistic research with prose techniques in reporting on public-interest events, frequently with first-person observations. App. 3446-49 (Ex. GGGGGGGG, Kenney Decl.¶¶ 10-18).

33.  *Esquire* content is created, edited, and written by a group of senior editors, with extensive experience in journalism and publishing, and with full understanding of the standards, practices, and ethics involved in good journalism. *Esquire* requires its employees and freelance staff to adhere to journalistic standards and practices, the most fundamental of which is to report stories as completely, accurately, fairly, and transparently as possible. App. 3449-50

6

(Ex. GGGGGGGG, Kenney Decl. ¶¶ 19-21); *see also* App. 3341-41 (Ex. YYYYYYY, Kenney Tr. 18:5-15, 20:1-10, 23:10–24:21, 25:1-13).

34.     *Esquire* stories are subject to an editorial process that includes writer selection, fact-checking, art design, editing, copy editing, ensuring that all of the facts in the published article are accurate and that there are no material omissions.  App. 3450-52 (Ex. GGGGGGGG, Kenney Decl. ¶¶ 23-30); *see also* App. 3339 (Ex. YYYYYYY, Kenney Tr.12:14–13:10).

35.     Ryan Lizza is and was an experienced freelance political reporter who, between June 1, 2018, and June 1, 2019, was engaged by *Esquire* pursuant to an independent contractor agreement with Hearst.  App. 403-404 (Ex. H, Lizza I Tr. 11:1-10, 15:18-21); App. 3458-60, 3504-07 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 3-16, Ex. L1); App. 3453 (Ex. GGGGGGGG, Kenney Decl. ¶¶ 38-41).

36.     Lizza has published hundreds of times in publications like *The New Republic*, *GQ*, *The Atlantic*, *The New York Times*, and *The New Yorker*.  App. 403 (Ex. H, Lizza I Tr. 10:3–12:1); App. 3458-60 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 3-15).

37.     Since 2019, Lizza has been employed by Politico as Chief Washington Correspondent.  He is currently Politico's Chief Washington Correspondent, co-author of Politico Playbook, and host of Politico's flagship podcast Playbook Deep Dive.  He is a political journalist with 25 years of professional experience.  App. 3458 (Ex. HHHHHHHH, Lizza Decl. ¶ 3).

38.     Prior to joining *Esquire*, Lizza had reported and written hundreds of articles that were published in numerous publications such as *The New York Times*, *The Atlantic*, *The New Republic*, and *The New Yorker*.  He had made hundreds of television appearances—such as on

CNN's domestic and international programs—discussing politics.  App. 3458

(Ex. HHHHHHHH, Lizza Decl. ¶ 3).

39.     Lizza covered Bill Clinton's impeachment, the 2000 Florida recount, the United

Nations Security Council debate over the Iraq War, the 2005 Federal elections in Germany, the

Arab Spring, and the presidencies of Bill Clinton, George W. Bush, Barack Obama, and Donald

Trump.  Lizza has covered the White House regularly since 1998, when he became one of the

youngest White House reporters on the beat.  Lizza has covered every presidential campaign

since 2000 and has reported on politics and national affairs from some 40 American states.

Lizza has also reported from Israel, China, Germany, France, Tunisia, and Egypt.  Lizza has

been a guest lecturer on politics, government, and journalism at Harvard University, Princeton

University, Stanford University, Georgetown University, the University of Oxford, and other

renowned academic institutions.  App. 3458-59 (Ex. HHHHHHHH, Lizza Decl. ¶ 4).

40.     While working for the Center for Investigative Reporting in San Francisco, Lizza

worked on the Emmy Award-winning FRONTLINE documentary *Hot Guns*.  App. 3459

(Ex. HHHHHHHH, Lizza Decl. ¶ 5).

41.     Lizza worked for *The New Republic* (as a reporter-researcher, associate editor,

senior editor, and White House correspondent); was a contributing editor for *New York*

magazine, where he wrote about national politics; and he served as a correspondent for *GQ*, a

competitor to *Esquire*.  He has periodically contributed to *The New York Times*.  App. 3459

(Ex. HHHHHHHH, Lizza Decl. ¶ 6).

42.     In 2004, when covering politics for *The Atlantic*, Lizza wrote one of the first

national magazine profiles of Barack Obama, who was then a relatively unknown state senator.

App. 3459 (Ex. HHHHHHHH, Lizza Decl. ¶ 7).

43.     In 2007, Lizza became the Washington correspondent for *The New Yorker*
magazine, where he covered the White House and presidential politics and wrote the magazine's
"Letter from Washington" column.  At *The New Yorker*, Lizza covered the 2008, 2012, and 2016
U.S. presidential elections; and wrote a widely acclaimed 2008 profile of Barack Obama's career
in Illinois politics (which was nominated for a National Magazine Award, the highest journalistic
prize in magazine journalism, which "honors the enterprise, exclusive reporting, and intelligent
analysis that a magazine exhibits in covering an event, a situation, or a problem of contemporary
interest and significance").  App. 3459 (Ex. HHHHHHHH, Lizza Decl. ¶ 8).

44.     In June 2009, The Washingtonian magazine included Lizza on its list of
Washington's "50 Top Journalists" and described him as a writer who "change[s] the way
readers see the world."  App. 3459 (Ex. HHHHHHHH, Lizza Decl. ¶ 9).

45.     In 2011, Lizza received an Everett McKinley Dirksen Award for Distinguished
Reporting on Congress Honorable Mention, and a Toner Prize for Excellence in Political
Reporting Honorable Mention for his reporting on Congress's failed attempt to pass climate
legislation.  App. 3459-60 (Ex. HHHHHHHH, Lizza Decl. ¶ 10).

46.     In 2012, Lizza won the Edwin M. Hood Award for Diplomatic Correspondence
for his "coverage of the U.S. foreign policy battles during the 'Arab Spring.'"  App. 3460
(Ex. HHHHHHHH, Lizza Decl. ¶ 11).

47.     In 2012, Lizza became a political analyst for CNN and has appeared across the
network's domestic and international programs for nearly a decade.  App. 3460
(Ex. HHHHHHHH, Lizza Decl. ¶ 12).

48.     On April 27, 2013, the White House Correspondents' Association presented Lizza
with the Aldo Beckman Memorial Award for journalistic excellence for his "remarkable efforts

to provide an independent perspective on President Barack Obama's presidency and re-election." App. 3460 (Ex. HHHHHHHH, Lizza Decl. ¶ 13).

49.     In 2015, Lizza was a finalist for the Newhouse School Mirror Award competition honoring excellence in media industry reporting (Best Single Article, Digital Media).  App. 3460 (Ex. HHHHHHHH, Lizza Decl. ¶ 14).

50.     Lizza's writing was included in the 2003, 2004, 2006, 2007, 2008, and 2009 editions of The Best American Political Writing.  App. 3460 (Ex. HHHHHHHH, Lizza Decl. ¶ 15).

51.     In his 25-year career, Lizza, to his knowledge, has never been accused of defamation or of reporting falsehoods (other than in this action) and has never been found liable for defamation or reporting falsehoods.  App. 3458 (Ex. HHHHHHHH, Lizza Decl. ¶ 3).

52.     *Esquire's* Managing Editor believed Lizza was the "right choice" for an "important" investigative political story.  App. 3452-53 (Ex. GGGGGGGG, Kenney Decl. ¶¶ 32, 40).

53.     In the summer of 2018, Lizza's editors at *Esquire* assigned him "to investigate and report on the dairy farm associated with the family of United States Republican Congressman Devin Nunes, one of the most powerful and high-profile members of Congress at the time."  App. 3460-61 (Ex. HHHHHHHH, Lizza Decl. ¶ 17); *see also* App. 405 (Ex. H, Lizza I Tr. 19:22–20:12).

54.     Lizza and his editors had reason to believe the Congressman's family's farm moved over a decade before from California to Iowa, where Lizza and his editors understood that Midwestern dairies, as a matter of economic necessity, often rely on undocumented labor. App. 3460-61 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 17-18).

55. The resulting Article was published on *Esquire*.com on September 30, 2018, and reprinted in the November 2018 edition of *Esquire* magazine. App. 1309-28 (Ex. LLLL, the Article); App. 3461-62, 3509-17 (Ex. HHHHHHHH, Lizza Decl. ¶ 19, Ex. L2); App. 3452 (Ex. GGGGGGGG, Kenney Decl. ¶ 31).

56. Lizza tweeted a link to the Article on Esquire.com through his personal Twitter account on September 30, 2018. App. 3466 (Ex. HHHHHHHH, Lizza Decl. ¶ 39); App. 2941 (Ex. XXXXXX, https://twitter.com/ryanlizza/status/1046543162964156416?lang=en).

57. "The article begins with the words: 'Devin Nunes has a secret,'" "namely, that '[t]he Nunes family dairy of political lore . . . isn't in California. It's in Iowa.'" *Nunes v. Lizza*, 12 F.4th 890, 896 (8th Cir. 2021); App. 3462 (Ex. HHHHHHHH, Lizza Decl. ¶ 21); App. 1309, 1312 (Ex. LLLL).

58. The Article observes, "[a]s far as [Lizza] could tell . . . neither [Devin] Nunes nor the local California press that covers him had ever publicly mentioned that his family dairy is no longer in Tulare." App. 3462 (Ex. HHHHHHHH, Lizza Decl. ¶ 21); App. 1313 (Ex. LLLL, the Article). The Article describes specific instances, based on Lizza's reporting, where Lizza would have expected the Congressman to mention his family's move to Iowa and NuStar, but did not do so. App. 3462 (Ex. HHHHHHHH, Lizza Decl. ¶ 22); App. 1312-14 (Ex. LLLL, the Article). It also describes an article about the farm in which the family and NuStar were featured, but in which there is no mention of the Congressman. App. 3462-63 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 20-26); App. 1312-14 (Ex. LLLL, the Article).

59. Lizza "went to Sibley" to "report on, among other things, the local labor market, the farm associated with the Congressman's family members, and the apparent tension between the realities of the agriculture labor market, on the one hand, and positions taken by the political

party that is supported by many western Iowa farmers, on the other hand." App. 3461-65, 3469

(Ex. HHHHHHHH, Lizza Decl. ¶¶ 18, 20-26, 27, 30, 35, 48).

60.     Much of the Article concerns Lizza's experience reporting in Sibley, an Iowa

community that overwhelmingly supported Donald Trump in 2016 and was represented by

Representative Steven King, "the most anti-immigrant member of Congress." App. 3461-62,

3463-64, 3474-88 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 27-28, 53-55); *see also* App. 1314-28

(Ex. LLLL, the Article).

61.     Lizza worked on the Article for over two months. App. 3469 (Ex. HHHHHHHH,

Lizza Decl. ¶ 50). His reporting for the Article included (1) research on the use of immigrant

labor on dairy farms in the Iowa and Minnesota region by studying topical articles, studies, films,

the Congressional record, and dairy industry statements, and (2) spending three full days (August

27, 2018–August 30, 2018) in Sibley, IA, and Worthington, MN, investigating the story and

conducting interviews with 24 different sources, including sources who had firsthand knowledge

of NuStar. App. 3469-70, 3474-89, 3551-37 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 51, 54-57, Exs.

L10-L33); App. 1337 (Ex. RRRR); App. 1335 (Ex. PPPP); App. 1336 (Ex. QQQQ); App. 1329

(Ex. MMMM); App. 1330 (Ex. NNNN). In investigating the story, Lizza recorded over five

hours of interviews with sources; took over 60 pages of written notes and recorded additional

audio notes to himself; shot over 1 hour of video footage; and conducted extensive research for

the Article resulting in a file of over 1,120 pages. App. 3469-89 (Ex. HHHHHHHH, Lizza Decl.

¶¶ 50-56).

62.     Several residents that Lizza interviewed, including Sibley's mayor, were vocal

supporters of Trump but were uneasy about his hardline positions on immigration. *See, e.g.*,

App. 3463-64, 3477, 3481, 3484, 3596 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 27-30, 54(h), 54(m),

54(p), Exs. L15, L19-20, L13 (Lizza's reporting notes)); *see also* App. 1316, 1320-21, 1325 (Ex. LLLL, the Article).

63.     Lizza learned from his reporting why that may be: "Midwestern dairies tend to run on undocumented labor."  App. 1317 (Ex. LLLL, the Article); *see also* App. 3463-97, 3520-29, 3551-57, 3559-68 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 29, 49-55, 59-81, Exs. L4-L8, L10-L16, L18-L27); App. 1337 (Ex. RRRR); App. 1335 (Ex. PPPP); App. 1115 (Ex. EEE); App. 1336 (Ex. QQQQ); App. 1329 (Ex. MMMM); App. 1330 (Ex. NNNN); *see generally* App. 3574-3637 (Lizza Decl. Ex. L3 (Lizza's reporting notes)).

64.     Interviews revealed that the use of undocumented labor on Midwestern dairy farms was "well-known and acknowledged by everyone with whom [Lizza] spoke":

> But it's an open secret that the system is built on easily obtained fraudulent documents.  "I just look at the document—Hey, this looks like a good driver's license, permanent resident card, whatever the case is—and that's what you go with," the farmer said.  A second northwest-Iowa dairy farmer who knows the Nunes family told me, "They show you a Social Security card, we take out Social Security taxes.  Where'd they get the card?  I have no idea."

App. 1319 (Ex. LLLL article); App. 3481, 3559, 3612 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 54(l), Exs. L18 at 10:00-11:03, L33 (Lizza's reporting notes)); *see also* App. 3463-97, 3520-29, 3551-57, 3559-68 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 29, 49-55, 59-81, Exs. L4-L8, L10-L16, L18-L27); App. 1317 (Ex. LLLL, the Article); App. 1337 (Ex. RRRR); App. 1335 (Ex. PPPP); App. 1115 (Ex. EEE); App. 1336 (Ex. QQQQ); App. 1329 (Ex. MMMM); App. 1330 (Ex. NNNN); *see generally* App. 3574-37 (Lizza Decl. Ex. L33 (Lizza's reporting notes)).

65.     Lizza's research, including court files from the prosecution of an Iowa cattle farmer for knowingly hiring unauthorized workers, a Western Iowa Dairy Alliance ("WIDA") Position Statement on Labor and Immigration, and an October 2017 letter to former Chairman of

the Judiciary Committee Bob Goodlatte signed by various dairy coalitions and farms also supported the "open secret." App. 3470-73, 3520-29 (Ex. HHHHHHHH, Lizza Decl. ¶ 52, Exs. L4-L8).

66.     Lizza noted in the Article the "political hypocrisy" in Midwestern dairy farmers relying on undocumented labor: "Trump's and King's rural-farm supporters embrace anti-immigrant politicians while employing undocumented immigrants."  App. 1325 (Ex. LLLL, the Article); App. 3463-65, 3469 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 27-36, 48).  The Article reports that the Congressman "has long supported moderate immigration reform . . . including amnesty for many undocumented people."  App. 1325 (Ex. LLLL, the Article).

67.     In this context, Lizza reports the following in the Article's 54th paragraph:

> According to two sources with firsthand knowledge, NuStar did indeed rely, at least in part, on undocumented labor.  One source, who was deeply connected in the local Hispanic community, had personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs.  "I've been there and bring illegal people," the source said, asserting that the farm was aware of their status.  "People come here and ask for work, so I send them over there."  When I asked how many people working at dairies in the area are documented citizens, the source laughed.  "To be honest?  None.  One percent, maybe."

App. 3464 (Ex. HHHHHHHH, Lizza Decl.  ¶ 31); App. 1325 (Ex. LLLL, the Article); App. 1335 (Ex. PPPP) at 4:51-5:20.  The source who is quoted in this paragraph, Source 1, would later confirm under oath that the Source was "being truthful with [Lizza]," and was "always truthful with [Lizza]" throughout Lizza's interviews of the Source.  App. 85 (Ex. B, Source 1 Tr. 217:4-21).

68.     During Lizza's first interview with Source 1, Source 1 informed Lizza that earlier in their interview the source received a call from a worker at NuStar who told the source to "be careful" with what the source told Lizza.  App. 1335 (Ex. PPPP) at 00:49-01:37, 08:08-11:30;

App. 1336 (Ex. QQQQ) at 14:35-16:08, 25:18-26:06; *see also* App. 3478-80, 3483 3492-93, 3606, 3617, 3622, 3630 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 54(j), 54(n), 65, 67, Ex. L33 (Lizza's reporting notes)). In a subsequent conversation Lizza had with Source 1, Source 1 informed Lizza that this worker was "Flavio," whom NuStar had sent to talk to her and to ask her if she had spoken with Lizza. App. 1336 (Ex. QQQQ) at 14:35-16:08, 25:18-26:06; *see also* App. 3478-80, 3483 3492-93, 3606, 3617, 3622, 3630 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 54(j), 54(n), 65, 67, Ex. L33 (Lizza's reporting notes)). As Lizza reported in the Article, "[s]omehow Flavio knew exactly where I was and whom I was talking to . . . Not only was I being followed, but I was also being watched, and my sources were being contacted by NuStar." App. 1325 (Ex. LLLL, the Article); *see also* App. 1335 (Ex. PPPP) at 00:49-01:37, 08:08-11:30; App. 1336 (Ex. QQQQ) at 14:35-16:08, 25:18-26:06; App. 3478-80, 3483 3492-93, 3606, 3617, 3622, 3630 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 54(j), 54(n), 65, 67, Ex. L33 (Lizza's reporting notes)).

69.     During that first interview Lizza had with Source 1, after Flavio's call, Source 1 told Lizza that he would have "better luck" in speaking to dairy workers at a dairy 25 minutes away, saying "I think you can get better help there." App. 1335 (Ex. PPPP) at 00:49-01:37, 08:08-11:30; *see also* App. 3478-80, 3483 3492-93, 3606, 3617, 3622, 3630 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 54(j), 54(n), 65, 67, Ex. L33 (Lizza's reporting notes)); App. 1336 (Ex. QQQQ) at 14:35-16:08, 25:18-26:06. Source 1 told Lizza that a NuStar worker (later disclosed as "Flavio," *see supra* ¶ 68) informed her that Lizza had visited NuStar, and Source 1told Lizza that he would not get "help there [NuStar]" because they are "scared" that Lizza "may be looking for something else." App. 1335 (Ex. PPPP) at 8:08-11:00; *see also* App. 3478-80, 3483 3492-93, 3606, 3617, 3622, 3630 (Ex HHHHHHHH, Lizza Decl. ¶¶ 54(j); 54(n); 65, 67, Ex. L33;

App. 1336 (Ex. QQQQ) at 14:35-16:08, 25:18–26:06.  Lizza told Source 1 about how "paranoid"

NuStar has been and Source 1 said "yeah, they so scared."  *Id.*

70.     Source 1 was deposed in this case.  Source 1 confirmed that the "Flavio" the

Source mentioned during the Source's interviews with Lizza worked at NuStar.  App. 83-84

(Ex. B, Source 1 Tr. 209:12–210:14); *see also* App. 3493, 3606, 3617, 3622, 3630

(Ex. HHHHHHHH, Lizza Decl. ¶ 70, Ex. L33 (Lizza's reporting notes)).

71.     The Article quotes a second source ("Source 2"), who used to work at NuStar and

admitted to Lizza he is "illegal."  App. 3484-85, 3495-96 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 33;

54(r), 77-78); App. 1330 (Ex. NNNN) at 00:48-01:53, 03:13-3:57; App. 1325 (Ex. LLLL, the

Article); App. 89-90 (Ex. B, Source 1 Tr. 233:15–235:12 (Source 1 confirming that she asked

Source 2 if he was "here illegally," and Source 2 answering yes); *see also* App. 435 (Ex. H,

Lizza I Tr. 139:7–141:4).

72.     ███████████████████████████████████████████████

████████████████████ App. 68 (Ex. B, Source 1 Tr. 148:1-13); App. 1331-34 (Ex. OOOO,

██████████ App. 1103 (Ex. AAA).

73.     A third source said nearly all employees on area dairy farms, such as NuStar, are

undocumented.  App. 3465, 3482-83 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 34, 54(n)); App. 1336

(Ex. QQQQ) at 05:26-05:59; App. 1325-26 (Ex. LLLL, the Article).

74.     The Article reports that two area dairy farmers explain why it is nearly impossible

for a dairy in the area or the size of NuStar to not use undocumented labor.  App. 1319

(Ex. LLLL, the Article); App. 3465, 3474, 3481, 3551, 3559 (Ex. HHHHHHHH, Lizza Decl.

¶¶ 34, 54(a), 54(l), Exs. L10 at 14:35-14:51, L18 at 10:00-11:03, 14:30-15:22).

75.        One of these sources ████████████████████████████████████

████████████████.  App. 3473-74, 3528 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 52(c)(i),

54(a), Ex. L8).  Lizza reviewed and considered ████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████.  App. 3473 (Ex. HHHHHHHH,

Lizza Decl. ¶ 52(c)(i)).

76.        As the Article reported, the source who said they "sent" people "over there"

asked:

> If people have papers, they are going to go to a good company where
> you can get benefits, you can get Social Security, you can get all the
> stuff.  Who is going to go [work in the dairy] to make fourteen
> dollars an hour doing that thing without vacation time, without
> 401(k), without everything?

App. 1325 (Ex. LLLL, the Article); App. 3464-65, 3483, 3490-91 (Ex. HHHHHHHH, Lizza

Decl. ¶¶ 32, 54(n), 61); App. 1336 (Ex. QQQQ) at 16:38–17:35.

77.        The Article states : "Is it possible the Nuneses have nothing to be seriously

concerned about?  Of course . . . ."  App. 1327 (Ex. LLLL, the Article); App. 3466, 3490

(Ex. HHHHHHHH, Lizza Decl. ¶¶ 37, 58).

78.        Lizza did not intend to convey that the Congressman, his family and Steve King

"conspired in the sense of a formal agreement" to hide the family's move to Iowa (the "secret")

or that the "secret" was anything other than the family's move to Iowa.  App. 3466, 3490

(Ex. HHHHHHHH, Lizza Decl. ¶¶ 20-26, 45-46).

79.        The Article expressly states that the Congressman "has no financial interest in his

parents' Iowa dairy operation," and does not report any facts to suggest that the Congressman is

17

involved in the farm's operations or knows how his family hires workers.  App. 3467
(Ex. HHHHHHHH, Lizza Decl. ¶ 43); App. 1324 (Ex. LLLL, the Article).

80.        The article identifies the "secret" at issue as follows:  "So here's the secret: The
Nunes family dairy of political lore—the one where his brother and parents work—isn't in
California."  App. 1312 (Ex. LLLL, the Article); *see also* App. 3462-63 (Ex. HHHHHHHH,
Lizza Decl. ¶¶ 20-25).  Lizza intended that line to convey exactly what it said—that the secret
concerned the farm's location, not whether it hired undocumented workers.  App. 1312
(Ex. LLLL, the Article); *see also* App. 3467-69 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 42-46).

81.        When Lizza asked, "Why would the Nuneses, Steve King, and an obscure dairy
publication all conspire to hide the fact that the congressman's family sold its farm and moved to
Iowa?," he did not mean a legal conspiracy or formal agreement; he meant it in a vernacular
sense, consistent with its dictionary meaning to "act in harmony."  App. 3462-63, 3468-69
(Ex. HHHHHHHH, Lizza Decl. ¶¶ 26, 45-46); *see also* App. 466 (Ex. H, Lizza I Tr. 263;17–
264:4).  The precise facts showing what he meant by this "conspiracy"—including Plaintiffs'
attempts to suppress information connecting the Congressman to NuStar—are expressly laid out
in the Article.  App. 3468-69 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 20-26, 46); App. 1309-14
(Ex. LLLL, the Article).  But for the allegations in the Congressman's more-recent complaints, it
did not occur to Lizza that the Article could be read to convey an "agreement" among the
Nuneses, Rep. King, and the *Dairy Star*.  App. 3468-69 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 46,
47).

82.        Lizza made several attempts to interview the Congressman and the NuStar
Plaintiffs.  App. 3489-90 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 57-58).

83.     Anthony Jr. "did not respond to numerous requests for interviews," Lizza was rebuffed at Anthony Jr.'s house.  Calls to NuStar went unreturned.  App. 3489-90 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 57-58).

84.     The Congressman did not respond to requests for comment and told his father not to speak to Lizza.  App. 3489-90 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 57-58).; *infra* ¶¶ 269, 270-72.

85.     *Esquire* staff assigned to the Article engaged in the editorial process described *supra* ¶ 34, to confirm the accuracy of all the factual statements in the Article and to ensure that the narrative was clear, and they consulted with Lizza regarding the same.  App. 3450-53 (Ex. GGGGGGGG, Kenney Decl. ¶¶ 23-30, 33-38); App. 3439-42 (Ex. FFFFFFFF, McDonnell Decl. ¶¶ 10-29); App. 3466 (Ex. HHHHHHHH, Lizza Decl. ¶ 38).  Specifically, drafts of the Article went through a thorough fact-checking process; several rounds of editorial review with multiple senior editors at *Esquire*, including the story editor for the Article, the Executive Director of Editorial for *Esquire* magazine, and the Editor-in-Chief for *Esquire* magazine; a copy-editing process with the Assistant Copy Editor; and contributions from the Art Department.  *Id.*  Ultimately, the Editor-in-Chief signed off on the Article.  App. 3454 (Ex. GGGGGGGG, Kenney Decl. ¶ 42); *see also* App. 3346-47, 3364-66 (Ex. YYYYYYY, Kenney Tr. 40:8–41:20, 42:5-:16, 112:8-18, 117:10-23, 118:5-20).

86.     At the time of the Link (defined *infra* ¶ 100) and the publication of the Article (and to this day) Lizza had no doubt that the NuStar Plaintiffs knew that they employed undocumented workers.  App. 3469-97, 3502 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 49-81, 98).

87.     Lizza believed, and continues to believe, that dairy farms widely use undocumented labor.  App. 1317 (Ex. LLLL, the Article); *see also* App. 3463-3497, 3520-3529,

3551-3557, 3559-3568 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 29, 49-55, 59-81, Exs. L4-L8, L10-L16, L18-L27); App. 1337 (Ex. RRRR); App. 1335 (Ex. PPPP); App. 1115 (Ex. EEE); App. 1336 (Ex. QQQQ); App. 1329 (Ex. MMMM); App. 1330 (Ex. NNNN); *see generally* App. 3574-3637 (Lizza Decl. Ex. L3 (Lizza's reporting notes)). The prevalence of undocumented labor led him to believe the NuStar Plaintiffs understood the nature of their own workforce. App. 3496 (Ex. HHHHHHHH, Lizza Decl. ¶ 80). To Lizza, it seemed unlikely the owners of a dairy could remain ignorant of their workers' status, and he believed the NuStar Plaintiffs knowingly hired undocumented workers. *Id.*

88.     Among other facts, Lizza's research uncovered a prosecution of an Iowa dairy farmer for violations in hiring unauthorized workers, statements from dairy industry groups, and other documents showing it is widely known dairies commonly employ undocumented workers but have little alternative given the nature of the market. App. 3470-74, 3496-97, 3520-29 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 52, 81, Exs. L4-L8); *see also* App. 1317, 1323, 1328 (Ex. LLLL, the Article). In addition, while Lizza was visiting Sibley, the Congressman's family followed Lizza and had his key sources contacted. *See, e.g., supra* ¶¶ 68-69; App. 3495, 3499-500 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 79, 92. According to Lizza, members of the Nunes family appeared to be concerned by his presence in Sibley. *Id.* One source informed Lizza that Anthony Jr. called him and was "afraid this [Lizza's article] will put a great big target on their dairy. And as soon as it comes out, that they will be raided by ICE and it will not go well." App. 3485-86, 3495, 3499-3500, 3563 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 54(s), 79, 92, Ex. L22 at 01:14-01:26. That source stated: "He [Anthony Jr.] talks about you destroying their lifestyle and then you think through the process: destroy it how? By getting an ICE raid in, well why would that be a problem? Well because you got illegal immigrants?" App. 3485-86, 3495, 3499-

500, 3563 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 54(s), 79, 92, Ex. L22 at 9:04-9:16).  As reported in the Article, in this conversation, the source said that Anthony Jr. "said that he was hiring a lawyer and that he was convinced that his dairy would soon be raided by ICE." App. 1327 (Ex. LLLL, the Article); App. 3485-86, 3495, 3499-3500, 3563 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 54(s), 79, 92, Ex. L22 at 19:45–20:10 ("[T]hey are just sure ICE is going to come after this thing runs."); When Lizza asked the source if Anthony Jr. opened up to him about the bind he is in "having to rely on this labor [undocumented labor]," the source said, "it's all subtext, we kind of know we have no choice here because we can't get Caucasian people to do these jobs." App. 3485-86, 3495, 3499-500, 3563 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 54(s), 79, 92, Ex. L22 at 12:46–13:20).

89.     At the time he shared a link to the Article through a November 2019 tweet, Lizza strongly believed that the Congressman was aware that NuStar hires unauthorized workers, and that is at least one likely reason he has been publicly reticent about his family's move to Iowa and NuStar—a reticence mirrored by the NuStar Plaintiffs, as reported in the Article.  *Supra* ¶¶ 57-58; App. 3497-500 (Ex HHHHHHHH, Lizza Decl. ¶¶ 82-92); *see also* App. 1312-14, 1327 (Ex. LLLL, the Article).

90.     Lizza was also familiar with the Congressman's extensive personal farming background, family history of farming, educational and work experiences relating to the agriculture and farming industry, and close relationship with the NuStar Plaintiffs.  App. 3473-74, 3497-98, 3530, 3533-39, 3544, 3546 (Ex HHHHHHHH, Lizza Decl. ¶¶ 52(d), 84, Ex. L9); *see also* App. 1312 (Ex. LLLL, the Article).  These facts led Lizza to believe that the Congressman is keenly aware the dairy farms—including NuStar Farms—rely on undocumented labor.  *Id.* Further, having reported on the Congressman for years and being aware of his record

of sponsoring bills addressing the concerns of unauthorized dairy workers, Lizza believed, and continues to believe, the Congressman knows his family hires undocumented workers. App. 3497-500 (Ex HHHHHHHH, Lizza Decl. ¶¶ 84-87). Lizza believed that this seemed another possible explanation why the Congressman did not speak publicly about NuStar, given the Republican Party's approach to immigration. App. 3499 (Ex HHHHHHHH, Lizza Decl. ¶ 89). As Lizza wrote in the Article, he understood from prior reporting that the Nuneses speak frequently with one another about the farm, and that the Congressman has even, along with his wife, used the NuStar dairy's Iowa post-office-box address on a filing with the SEC. App. 3498-99 (Ex HHHHHHHH, Lizza Decl. ¶ 88); App. 2357 (Ex. WWWWW). He expected that they would have discussed immigration and the dairy labor pool. App. 3498-999 (Ex HHHHHHHH, Lizza Decl. ¶ 88).

91.     *Esquire* and Lizza did not receive any complaints or requests for correction or retraction until nearly one year after the Article was published. App. 3454 (Ex. GGGGGGGG, Kenney Decl. ¶ 44); App. 3500 (Ex. HHHHHHHH, Lizza Decl. ¶ 93). Lizza was aware of a rebuttal to the Article, authored by Mollie Hemingway and published in *The Federalist* in October 2018. App. 3500-01 (Ex. HHHHHHHH, Lizza Decl. ¶ 94); App. 2949-59 (BBBBBBB). Lizza observed that this article in the *Federalist* did not refute the Article's reporting on the use of undocumented workers. *Id.*

92.     On September 25, 2019, the Congressman sent a letter to Ryan Lizza and Hearst Magazine, Inc., demanding they retract certain statements in the Article. App. 3500 (Ex. HHHHHHHH, Lizza Decl. ¶ 93); App. 2932-40 (Ex. WWWWWW).

93.     On September 30, 2019, the Congressman initiated this suit by filing an original

complaint with the Clerk of the Court.  App. 3500 (Ex. HHHHHHHH, Lizza Decl. ¶ 93); *Nunes*,

[ECF No. 1].

94.     Lizza read both the retraction demand and the original complaint at or around the

time they were delivered to him in September 2019.  App. 3500 (Ex. HHHHHHHH, Lizza Decl.

¶ 94).  He understood both to complain about a list of approximately eight to nine statements in

the Article that they challenged as being false.  App. 3501 (Ex. HHHHHHHH, Lizza Decl. ¶ 95);

*Nunes*, [ECF No. 1] at ¶ 23; App. 2937-38 (Ex. WWWWWW).  As Lizza understood them, the

lists of challenged statements did not include the implication that the Congressman knew about

NuStar's undocumented workforce, and nothing else in the complaint and retraction demand

letter mentioned or denied such an implication.  App. 3501 (Ex. HHHHHHHH, Lizza Decl.

¶ 95); *Nunes*, [ECF No. 1]; App. 2932-40 (Ex. WWWWWW).

95.     Further, Lizza did not understand either the complaint or retraction demand to

challenge the reporting that NuStar used undocumented workers.  App. 3501 (Ex. HHHHHHHH,

Lizza Decl. ¶ 95); *see also Nunes*, [ECF No. 1]; App. 2932-40 (Ex. WWWWWW).  Lizza

observed that the only mention in the original complaint of "undocumented" workers appears in

quotes of third-party tweets, which are pasted into a paragraph as examples of how the article

was "republished" via social media.  App. 3501 (Ex. HHHHHHHH, Lizza Decl. ¶ 95); *see also*

*Nunes*, [ECF No. 1] at ¶ 25; App. 2932-40 (Ex. WWWWWW).

96.     Lizza was struck by the Congressman's failure to challenge the reporting about

the use of undocumented labor.  App. 3501 (Ex. HHHHHHHH, Lizza Decl. ¶ 95); *see also*

*Nunes*, [ECF No. 1].  On November 21, 2019 (one day after he shared the Link, defined *infra*

¶ 100), Lizza tweeted that the Congressman issued a "rebuttal" to the Article but "didn't dispute

the core finding that his family's dairy used undocumented immigrants." *Id.*; App. 2943
(Ex. ZZZZZZ); *see also* App. 828 (Ex. T, Lizza II Tr. 207:1-11 (the "rebuttal" referenced in
November 21, 2019 tweet refers to "the retraction letter and" Congressman Nunes's "original
complaint"), 208:4-11 (Congressman Nunes "did not say" in his original complaint that it was
"untrue" that "his family's dairy used undocumented immigrants")).

97.     Both the retraction demand and complaint allege the "strong defamatory gist and
false implication" was an awareness of or conspiracy to conceal "criminal wrongdoing."
App. 3501-02 (Ex. HHHHHHHH, Lizza Decl. ¶ 96); *see also Nunes*, [ECF No. 1] at ¶ 24;
App. 2939 (Ex. WWWWWW).  But neither the retraction demand nor the complaint identifies
what the "criminal wrongdoing" was.  *Id.*  Rather, the complaint describes the "conspiracy," in
paragraph 21, as follows: "The false claim [is] that Plaintiff 'conspired' with his own family,
Congressman King, and an Iowa dairy publication to 'hide' his family's 'secret' move to Iowa."
*Nunes*, [ECF No. 1] at ¶ 21; App. 3501-02 (Ex. HHHHHHHH, Lizza Decl. ¶ 96).  This alleged
"conspiracy" makes no mention of the Congressman's knowledge that NuStar hires
undocumented workers, as Lizza understood it.  *Id.*  Rather, Lizza understood the "criminal
wrongdoing" to relate to the statements concerning the Congressman's use of his position as
Chairman of the House Permanent Select Committee on Intelligence, which are among the
expressly challenged statements in the paragraph preceding the "criminal wrongdoing" reference
in the complaint.  App. 3501-02 (Ex. HHHHHHHH, Lizza Decl. ¶ 96); *Nunes*, [ECF No. 1] at
¶ 23(b)-(c).

98.     Even if the retraction demand and original complaint had denied that the
Congressman knew about NuStar's workforce, Lizza still believed that the Congressman does,
indeed, know that NuStar hires undocumented workers.  App. 3501-02 (Ex. HHHHHHHH, Lizza

Decl. ¶ 96). The Congressman's complaint did not mention any specific facts that caused Lizza to doubt his sources. *Id.*

99.     Moreover, the original complaint contained numerous statements Lizza knew to be false, coloring his view of the complaint's credibility. *See* App. 3502 (Ex. HHHHHHHH, Lizza Decl. ¶ 97). For example, the complaint accused Lizza of coordinating with his now fiancée (also a political reporter), Olivia Nuzzi, on a "smear campaign" of tweeting about the Article, *Nunes*, [ECF No. 1] ¶ 15, of preparing the piece "to retaliate against Plaintiff for exposing corruption, including the DNC/Clinton campaign's role in funding the salacious 'Steele dossier,'" *Nunes*, [ECF No. 1] ¶ 19, and of a "joint scheme" among Lizza, his Editor-in-Chief, Nuzzi, and CNN to publish the article, *Nunes*, [ECF No. 1] ¶¶ 36-40. *Id.* Lizza knew these allegations to be false, and they struck Lizza as political theater. *Id.* This was especially so when considered with the hyperbole and *ad hominem* attacks in the original complaint. *Id.*; *see generally Nunes*, [ECF No. 1]. If anything, the complaint confirmed for Lizza that the Article is accurate, which he never doubted. *Id.*

100.    On November 20, 2019, Lizza tweeted a link to the Article through his Twitter account ("Link"). App. 3466 (Ex. HHHHHHHH, Lizza Decl. ¶ 40); App. 2942 (Ex. YYYYYY, November 20, 2019, 8:13 pm tweet by Ryan Lizza, *available at* https://twitter.com/ryanlizza /status/1197322014572371969?lang=en, last visited Oct. 11, 2022). At the time he shared the Link, Lizza did not doubt the accuracy of any statements in the Article, and he believed that the Congressman knew about NuStar's workforce and that NuStar knowingly hires undocumented workers. App. 3467, 3490, 3497, 3500, 3502 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 41, 59, 83, 94, 97-98). Hearst did not direct Mr. Lizza to share the Link, and Hearst would not have had any reason to do so because Lizza left months prior. App. 3453 (Ex. GGGGGGGG, Kenney Decl.

¶ 38); *see also* App. 3460, 3466, 3504-07 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 16, 40, Ex. L1); App. 825 (Ex. T, Lizza II Tr. 196:3–197:7 (Lizza "made the decision to write this tweet" with the Link "on his own" and did not share the Link at the direction of Hearst counsel).

## III. The Congressman Did Not Publicize His Family's Move to Iowa.

101.    The Congressman never made any documented statements about NuStar or his family's move to, or residence in, Iowa. *See* App. 1635 (Ex. AAAAA, Document Request Responses Nos. 25, 26), App. 1656 (Ex. BBBBB, Interrogatory Response No. 5).

102.    When asked, in this case, to produce documents relating to any statements by the Congressman relating to family's move or residence in Iowa, or relating to or mentioning NuStar, the Congressman responded that there were "[n]one."  App. 1635 (Ex. AAAAA, Document Request Responses Nos. 25, 26).

103.    In response to an interrogatory asking for the Congressman to identify "every statement or communication by You, through any media, relating to NuStar, Your family members' move to or residence in Iowa, Your family's purchase or ownership of NuStar, or Your family's role in managing or operating NuStar," the Congressman responded, "I don't recall any such statements or communications."  App. 1656 (Ex. BBBBB, Interrogatory Response No. 5).

104.    In response to an interrogatory asking for the Congressman to identify "each and every occasion You have spent time in the state of Iowa since January 1, 2006," the Congressman responded, in part, "in 2010, I attended a townhall Le Mars, Iowa.  I met some staffers and constituents of Rep. Steve King."  App. 1655 (Ex. BBBBB, Interrogatory Response No. 3).  The press release for this event stated, "Congressman Nunes' family has operated a dairy farm in Tulare County, California for three generations," but it did not mention his family's nearby farm in Sibley, Iowa.  App. 3463, 3499, 3518-19 (Ex. HHHHHHHH, Lizza Decl. ¶¶ 23,

89-90, Ex. L3, Press Release); *see also* App. 1314 (Ex. LLLL, the Article). The Congressman testified that, at this event, he talked about his family being "there" (in Iowa) "publicly" and said he had a family member recently born in Iowa, App. 766-67 (Ex. S, Devin II Tr. 455:21-23, 457:7–23), but he produced no documentary evidence supporting that he made these statements at this event, App. 1656 (Ex. BBBBB, Interrogatory Response No. 5).

105.    For the Congressman's political career, he has held out the Nunes family dairy farm in Tulare, California—not NuStar—as the farm that is "central to [his] identity." App. 723 (Ex. S, Devin II Tr. 283:7-23).

106.    The Congressman has, in the past, taken guests to "the original farm" in Tulare and gave tours to "ambassadors, diplomats, government officials, [and] people in the media." App. 763 (Ex. S, Devin II Tr. 442:13-443:3).

107.    In August 2018, a Petition was filed in the Superior Court for the State of California, Sacramento County, claiming the Congressman was "misleading" by calling himself a "Farmer" on the ballot for the November 2018 election because he had not farmed since at least 2007. App. 1604 (Ex. YYYY ¶ 14); *see also* App. 1613-23 (Ex. ZZZZ, Memo of Law). His campaign, for which his mother Dian was treasurer, filed suit against the Petitioners in the Tulare County Superior Court, alleging that the "fake farmer" claims "bashed Nunes" and were spread on social media including through Twitter, damaging his campaign. App. 3271-72 (Ex. TTTTTTT).

108.    The Congressman responded to the Petition by detailing his extensive connections to farming, including through family. His responses did not mention NuStar. His response did not mention that his immediate family members were operating a farm in Iowa. *See* App. 1583-600 (Exs. XXXX, WWWW).

109.     In discovery in this case, the NuStar Plaintiffs produced no documentary evidence of any public statement by them about the Congressman.  App. 1665 (Ex. CCCCC, Document Request Response No. 8); App. 1672 (Ex. DDDDD, Interrogatory Response No. 4).

110.     When asked in discovery for documents "relating to any public statement or communication by You relating to" the Congressman, the NuStar Plaintiffs responded, "None." App. 1665 (Ex. CCCCC, Document Request Response No. 8).

111.     In response to an interrogatory asking for the NuStar Plaintiffs to identify "every public statement or communication by You relating to Devin," the NuStar Plaintiffs refused to answer the interrogatory.  App. 1672 (Ex. DDDDD, Interrogatory Response No. 4).  This issue was raised with the Court, App. 1786-87 (Ex. OOOOO, Tr. of Hearing on Aug. 16, 2022, pp. 32–33), and the NuStar Plaintiffs never supplemented their response with an answer or otherwise identified responsive statements during discovery.

112.     In 2009, the *Dairy Star*, a regional industry publication, wrote an article about the NuStar Plaintiffs.  ████████████████████████████████████████████ ████████████████████████████████. ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ ███████████████████████████████████ ████████████████████. ███████████████████████████ ████████████████████████████████████████████ App. 129-30 (Ex. D, Anthony III Tr. 25:20–29:8); App. 884-885 (Ex. Y). ██████████████████████████████████████████████



. App. 129-131 (Ex. D, Anthony III Tr. 25:20-31:19).

113. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." App. 225 (Ex. E, Anthony III Tr. 406:23–407:21).

**IV.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

114.     The Form I-9 is the form used to verify the identity and employment authorization of individuals hired for employment in the United States. Form I-9s must be reviewed and completed by the employer. App. 1202-04 (Ex. QQQ, sample form I-9).

115.     In Section 2 of the Form I-9, the employer is required to sign and date the following certification:

> I attest, under penalty of perjury, that (1) I have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of my knowledge the employee is authorized to work in the United States.

App. 1203 (Ex. QQQ, sample form I-9).

**A.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



116. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. App. 1357 (Ex. SSSS, Arnold Rep. at 17), App. 614-15 (Ex. P, Samson Tr. 202:24–206:20). Clete Samson, NuStar's proffered immigration expert, and Defendants' expert Claude Arnold, former Special Agent in Charge with ICE, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ App. 1357-58 (Ex. SSSS, Arnold Rep. at 17-18); App. 614-15 (Ex. P, Samson Tr. 202:24–206:20).

117. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. App. 1236 (Ex. VVV,

███████████████.”); App. 661 (Ex. Q, Bahena Tr. 71:8-14 ██████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████).

118.    ████████████████████████████████████████

████████████████████████████████████████████████.

App. 1357 (Ex. SSSS, Arnold Rep. at 17).

119.    ████████████████████████████████████████

████████████████████████████ App. 1357 (Ex. SSSS, Arnold Rep. at

17); *see, e.g.*, App. 1036 (Ex. LL); App. 1043 (Ex. NN); App. 1046 (Ex. OO); App. 1056

(Ex. RR); App. 1059 (Ex. SS); App. 1063 (Ex. TT); App. 1067 (Ex. UU); App. 1071 (Ex. VV);

App. 1123–24 (Ex. HHH); App. 1273–80 (Exs. HHHH, IIII).

120.    NuStar's expert Samson testified that ████████████████████

████████████████████████████████████████ App. 614-

15 (Ex. P, Samson Tr. 205:21–206:20); *see, e.g.*, App. 1036 (Ex. LL); App. 1043 (Ex. NN);

App. 1046 (Ex. OO); App. 1056 (Ex. RR); App. 1059 (Ex. SS); App. 1063 (Ex. TT); App. 1067

(Ex. UU); App. 1071 (Ex. VV); App. 1123–24 (Ex. HHH); App. 1273–80 (Exs. HHHH, IIII).

121.    ████████████████████████████████████████

████████████████████████████████████████████████

████████    App. 1367 (Ex. SSSS, Arnold Rep. at 27).

122. ███████████████████████████████████

App. 620 (Ex. P, Samson Tr. 229:13-18 ██████████████████████████

████████████████████████████ )).

123. ███████████████████████████████

██████████████████████████████████████████

███████████████████████████. App. 293 (Ex. F, Lori Tr. 16:25–17:17);

App. 367, 369, 372, 377, 378 (Ex. G, Dian Tr. 26:55–27:21, 37:7-14, 49:10-14, 68:23–69:15,

71:21-25).

124. ███████████████████████████████

██████████████████████████████████████████

████████████████████████████." App. 163 (Ex. D, Anthony III Tr. 160:3–

161:24).

125. ███████████████████████████████

██████████████████████████████████████████

██████████████████████████████████

█████████████ App. 270-71 (Ex. E, Anthony Jr. Tr. 171:5–177:17); *see also*

App. 271 (Ex. E., Anthony Jr. Tr. 176:14–177:7) (Anthony Jr. testifying ████████████

████████████████████████████ ).

---

[2]    Throughout this 56.1 Statement, Defendants refer to current and former NuStar employees by initials, and refer to Lizza's unnamed sources for the Article as "Source 1," "Source 2," etc.  Defendants have anonymized these individuals to protect their identities when this document is available on the public docket, and consistent with this Court's practice.  *See NuStar Farms, LLC et a. v. Lizza et al.*, 5:20-cv-04003-CJW-MAR ("*NuStar*") [ECF. No. 119], at 2-7 (referring to NuStar employee "F.S.D.").

126. ███████████████████████████████████████

████████████████████████████████████████

███████████████ App. 163 (Ex. D, Anthony III Tr. 160:7–161:24).

127. ██████████████████████████████████████

████████████████████████████████████████████ App. 367,

377 (Ex. G, Dian Tr. 27:5-21; 69:6–11).

128. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ App. 235 (Anthony Jr. Tr. 30:25–31:15 █████████████

████████████████████████████).

129. ██████████████████████████████████████

██████████████████ App. 374 (Ex. G, Dian Tr. 57:21-25).

130. ██████████████████████████████████████

████████████████████████████████████████████

██████████ App. 266 (Ex. E, Anthony Jr. Tr. 154:9–155:17).

131. █████████████████████████████████████

███████████████████████████████████ App. 138 (Ex. D, Anthony III Tr.

60:11–61:19).

132. █████████████████████████████████████

█████ App. 138 (Ex. D, Anthony III Tr. 60:11–61:19).

133. ██████████████████████████████████████

█████ App. 293 (Ex. F, Lori Tr. 16:25–17:17).

134. ████████████████████████████████████████████████.

App. 301-02 (Ex. F, Lori Tr. 47:19–51:4) ("████████████████████████

████████████████████████████████████████████████████

██████).

135. ████████████████████████████████████████████████

████████████████████████ App. 300 (Ex. F, Lori Tr. 45:5-8) ("Q. ████

████████████████████████████████████████████

████████████████

136. ████████████████████████████████████████████████

████████████████████████ App. 324 (Ex. F, Lori Tr. 138:8–

141:8).

137. ████████████████████████████████████████████

████████████████████████████████████████ App. 293, 300-01

(Ex. F, Lori Tr. 16:25–17:17, 45:5-8, 46:7–47:4).

138. ████████████████████████████████████████████

████████████████████████ App. 293 (Ex. F, Lori Tr. 16:25–17:17); App. 369,

App. 378 (Ex. G, Dian Tr. 37:7-14; 71:21-25).

139. ████████████████████████████████████████ App. 293

(Ex. F, Lori Tr. 16:25–17:17); App. 372 (Ex. G, Dian Tr. 49:10-14).

140. ████████████████████████████████████████████████

████████████████████████ App. 307 (Ex. F, Lori Tr. 72:15–73:2).

141. ████████████████████████████████████████████

████████ App. 367, 375, 376 (Ex. G, Dian Tr. 28:14-20; 61:8-10; 64:18–65:7).

142. ███████████████████████████████████████████████
████ App. 375, 379 (Ex. G, Dian Tr. 58:19–59:21; 76:1-13).

143. █████████████████████████████████████ App. 379 (Ex. G,
Dian Tr. 76:25–77:18).

144. ████████████████████████████████████████
███████████████
████████████████████████████████
██████████████
███████████
█████████████████████████
████████████████████
██████████████████
█████████████
█████████████
███████████████████████████
███████████████████

145. As NuStar's expert Samson testified, ███████████████████████
██████████████████████ App. 581 (Ex. P, Samson Tr. 73:12-19);
*see also* App. 1220 (Ex. SSS).

146. Arnold concludes in his report ███████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████ App. 1344-45 (Ex. SSSS, Arnold Rep. at 4-5). Plaintiffs' expert,

Clete Samson, ███████████████████████████████████████████████
████████████████████████████. App. 634-35 (Ex. P, Samson Tr. 285:8–289:3).

      **B.** ████████████████████████████████████████████.

147.      In response to an interrogatory, on April 1, 2021 NuStar produced a verified roster of NuStar's employees and former employees. The roster included the employees' names, their proffered SSNs, their dates of employment, and their proffered dates of birth. App. 847-83 (Ex. X).

148.      In this case, the Court ordered that the SSA "shall verify the validity of the SSNs of employees disclosed by NuStar to Defendants during discovery in this case." It was to do so by populating a chart containing all of NuStar current and former employees' names, proffered dates of birth, and social security numbers "by, in the 'Match?' column" of the chart, "populating the cells with 'Yes' if the name and SSN in that row matches the SSA's records, or 'No' if the name and SSN in that row do not match the SSA's records. *NuStar*, [ECF No. 80, as modified by ECF No. 89] (together, the "SSA Orders"). The SSA complied with the Court's SSA Orders and, on April 16, 2021, produced to the parties a fully populated chart (the "Completed Chart"). App. 1098-106 (Ex. AAA).

149.      The Completed Chart indicates that 243 of 319, or 76 percent, of the employees identified on NuStar's verified interrogatory answer who were employed by the dairy on or before September 30, 2018, did not have names, dates of birth, and SSNs that matched the SSA's records. App. 1098-106 (Ex. AAA); App. 1370 (Ex. SSSS, Arnold Rep. at 30); *see also* App. 847-83 (Ex. X (verified interrogatory response, listing employment date ranges for all current and former NuStar employees as of April 1, 2021)).

150.    According to NuStar's expert Samson, ███████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████. App. 607 (Ex. P,
Samson Tr. 175:1–176:14).

151.    In October 2019, NuStar received correspondence from the SSA indicating that,
for the W-2s that NuStar submitted to the Internal Revenue Service (the "IRS") for tax year
2018, NuStar reported SSNs for 20 of 27 employees (74%) that did not match the SSA's records.
App. 1082-89 (Ex. YY (the "2018 No-Match Letter")); App. 249 (Ex. E, Anthony Jr. Tr. 86:7–
87:25); App. 195-96 (Ex. D, Anthony III Tr. 288:17–293:19); App. 331-32 (Ex. F, Lori Tr.
169:23–171:7).

152.    ████████████████████████████████████████████
███████████████████████████████████████ App. 332-34 (Ex. F,
Lori Tr. 170:8-15; 173:24–174:2; 180:11–181:5 ███████████████████████████
██████████████████████████████████████████████
████████████████████████████████

153.    In December 2020, NuStar received correspondence from the SSA indicating that,
for the W-2s that NuStar submitted to the IRS for tax year 2019, NuStar reported SSNs for 14 of
19 employees (74%) that did not match the SSA's records.   App 1090-97 (Ex. ZZ (the "Tax
Year 2019 No-Match Letter")); App. 249 (Ex. E, Anthony Jr. Tr. 86:20–88:22); App. 197
(Ex. D, Anthony III Tr. 296:9–297:17); App. 335 (Ex. F, Lori Tr. 183:17–184:13).

154.    ████████████████████████████████████████████
████████ App. 335 (Ex. F, Lori Tr. 183:17–184:13).

155. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

App. 1082-89 (Ex. YY); App. 1090-97 (Ex. ZZ); App. 589 (Ex. P, Samson Tr. 104:13-18);

App. 1132 (Ex. JJJ).

156. ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████ App. 1082-89 (Ex. YY); App. 1090-97 (Ex. ZZ); *see also* App. 1131-35 (Ex. JJJ);

App. 1136-56 (Ex. KKK).

157. █████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████ App. 1082

(Ex. YY); App. 1090 (Ex. ZZ).

158. ██████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

App. 1082 (Ex. YY); App. 1090 (Ex. ZZ).

159.　███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████ App. 332 (Ex. F, Lori Tr. 171:13–173:10).

160.　███████████████████████████████

███████████████████████████████████

████████████. App. 249 (Ex. E, Anthony Jr. Tr. 87:6–88:6); App. 196 (Ex. D, Anthony

III Tr. 293:17-25); App. 332-33, 337 (Ex. F, Lori Tr. 173:16–174:10, 193:7-16).

161.　　The SSA website offers information about what employers can do in response to

receiving EDCOR letters if the employer has questions. App. 1138-43 (Ex. KKK).

162.　　On its website, the SSA states that "[t]he employer is ultimately responsible for

investigating the SSN and name mismatch error . . . ." App. 1138 (Ex. KKK).

163.　███████████████████████████████████

███████████████████████████████

App. 249 (Ex. E, Anthony Jr. Tr. 87:6–88:6); App. 196 (Ex. D, Anthony III Tr. 293:17-21);

App. 331-34 (Ex. F, Lori Tr. 169:23–174:6, 178:1-12).

164.　███████████████████████████████████

███████████████████████████████

App. 249 (Ex. E, Anthony Jr. Tr. 87:6-88:6); App. 196 (Ex. D, Anthony III Tr. 293:17-21);

App. 334 (Ex. F, Lori Tr. 178:1-12).

165.　███████████████████████████████████

██████████████████████ App. 249 (Ex. E, Anthony Jr. Tr. 87:6–88:6); App. 196,

198 (Ex. D, Anthony III Tr. 293:17-21, 298:23–299:4); App. 333 (Ex. F, Lori Tr. 174:7-10).

166. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████ App. 197-99 (Ex. D, Anthony III Tr. 296:5–302:18); App. 249-50

(Ex. E, Anthony Jr. Tr. 88:12–92:17); App. 335 (Ex. F, Lori Tr. 183:17–184:13).

167. ████████████████████████████████████████████████

████████████████████████████████████████████████

App. 197-99 (Ex. D, Anthony III Tr. 296:5–302:18); App. 249-50 (Ex. E, Anthony Jr. Tr. 88:12–

92:17); App. 335 (Ex. F, Lori Tr. 183:17–184:13).

168. ████████████████████████████████████████████████

████████████████████████████████████████████████████

App. 197-99 (Ex. D, Anthony III Tr. 296:5–302:18); App. 249-50 (Ex. E, Anthony Jr. Tr. 88:12–

92:17); App. 335 (Ex. F, Lori Tr. 183:17–184:13).

169. █████████████████████████████████████████████████████

██████████████████████████████ App. 250 (Ex. E, Anthony Jr. Tr. 91:23–92:17); App. 198

(Ex. D, Anthony III Tr. 298:23–299:7); App. 335 (Ex. F, Lori Tr. 183:17–184:13).

170. █████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ Arnold concluded.  App. 1361-62 (Ex. SSSS, Arnold Rep. at

21-22).  NuStar's expert Samson █████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████ App. 1194 (Ex. PPP, Samson Rep. at 10); App. 610, 612-13,

618, 624, 631 (Ex. P, Samson Tr. at 187:8-25 (███████████████████████████),

197:22–198:4, 219:18–220:9, 243:6-10, 270:8-23).

171.     At the time that Arnold produced his report on July 30, 2021, ████████

████████████████████████████████████████████████████████████████████

██████████████████████████ App. 1361-64 (Ex. EEEE, Arnold Rep. at 21-24);

App. 847-83 (Ex. X).

172.     NuStar's expert Samson ███████████████████████████████████████

███████████████████████████████████ App. 618, 631, 633-34 (Ex. P,

Samson Tr. 218:12–219:8, 219:18–221:19, 270:5-25, 281:18–284:14).

173.     Agricultural workers in the U.S. are primarily foreign-born and of Hispanic

origin,█████████████████ as explained by Defendants' expert witness Philip Martin,

Professor Emeritus of Agricultural and Resource Economics at the University of California,

Davis.  App. 1402-03 (Ex. TTTT, Martin Rep. at 4-5).

174.     Among foreign-born farm workers, studies show around 70% are unauthorized,

Martin reports.  App. 1403 (Ex. TTTT, Martin Rep. at 5).  NuStar's expert Samson ███████

█████████████████████. 611 (Ex. P, Samson Tr. at 190:14–191:11) ████████████████

███████████████████████████████████████████.

175.     ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████ App. 235, 278 (Ex. E, Anthony Jr. Tr. 30:7-13,

202:21–204:14). ████████████████████████████████████████████████



App. 278 (Ex. E, Anthony Jr. Tr. 202:21–203:22).

**C.** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

176. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ App. 1718-21 (Ex. FFFFF). ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ App. 1100 (Ex. AAA, at 3, line 82).

177. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ App. 852 (Ex. X). ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ App. 1078-81 (Ex. XX);

App. 852 (Ex. X); App. 1375 (Ex. SSSS, Arnold Rep. at 35); App. 1171 (Ex. LLL). ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ App. 1099 (Ex. AAA, at 2, line

43).

178. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ App. 1049-51 (Ex. PP); App. 852

(Ex. X); App. 1375 (Ex. SSSS, Arnold Rep. at 35). ▮▮▮▮

▮▮▮▮▮▮▮▮ App. 1099 (Ex. AAA, at 2, line 42).

179. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

App. 1052-55 (Ex. QQ); *see also* App. 1383 (Ex. SSSS, Arnold Rep. at A-5). ▮▮▮▮

41

███████████████████████████████████ App. 1052 (Ex. QQ). ████████

█████████████████████████████████ App. 1100 (Ex. AAA, at 3, line 103).

180. ████████████████████████████████████████

██████████████████████████████████████████████

█████████████████ App. 1722-24 (Ex. GGGGG). ███████████████████████

█████████████████████████ *Id.*

181. NuStar's expert Samson ████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ App. 630-31 (Ex. P, Samson Tr. 269:7–270:4; 271:6-12 (████████████████████████████, App. 1049-51 (Ex. PP))).

182. Samson ██████████████████████████████████

████████. He also testified ███████████████████████████████

█████████████████████████████████. App. 598, 630 (Ex. P., Samson Tr. 140:8–141:4, 267:3-23); *see also* App. 601 (*id.*, 150:11-16 ██████████████████████

████████████████████████████████ App. 1212-13 (Ex. RRR (████

████████████████████████████████████████).

183. ████████████████████████████████████████

████ App. 326 (Ex. F, Lori Tr. 147:19–24 ("████████████████████████

████████████████████████████████ *see also* App 325-26 (Ex. F, Lori Tr. 145:23–146:24).

███████████████████████████████████ App. 160 (Ex. D, Anthony III Tr. 149:18-23).

184. ███████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ App. 326 (Ex. F,

Lori Tr. 146:11-24, 147:12-15).

185. ████████████████████████████████████

████████████████████████████████████████████

████████████ App. 1262-67 (Ex. MM).

186. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████ App. 1262-67 (Exs. DDDD, EEEE).

187. ████████████████████████████████████

██████████████ App. 672-73 (Ex. Q, Bahena Tr. 113:25–118:9); *see also* App. 1039-42

(Ex. MM), App. 1262-67 (Exs. DDDD, EEEE); *see also* App. 1213–14 (Ex. RRR, ██

████████████████████████████████████████ ).

188. NuStar's expert, Samson, ████████████████████████

████████████████████████████████████████████

███████████████████ App. 1374-75, 1380 (Ex. SSSS, Arnold Rep. (

██████ ); App. 630-31 (Ex. P, Samson Tr. 269:7–270: 22 ████████████████

████████████████████████████████████████

██████ , App. 629-30 (Ex. P., Samson Tr. 264:11–266:24 ████████████████

██████████████████████████████ App. 1078-81 (Ex. XX);

App. 1049-51 (Ex. PP).

189. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

190. █████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████

191.     Defendants had issued a subpoena for ████████ deposition.  In May 2021,
Defendants were informed by NuStar's litigation counsel that ███████ was no longer working for
NuStar, and that NuStar could not produce ███████ for a deposition.  App. 1733-34, 1736
(Ex. JJJJJ).

192. ██████████████████████████ App. 1725 (Ex. HHHHH).  ██████████
████████████████████████████████████████████████████
████████████████████████████████████████████
█████████████████ App. 1725-28 (Ex. HHHHH).  ██████████████████████
████████████████████ App. 1725-28 (Ex. HHHHH).

193. █████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

194. ███████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████App. 607 (Ex. P, Samson Tr. 175:1–176:14);
*see also* App. 1102 (Ex. AAA, Completed Chart).

195.    Instructions that appear on the Form I-9 state that, when a social security card

bears the notation "VALID FOR WORK ONLY WITH [DHS OR INS] AUTHORIZATION,"

that card is not valid for establishing employment authorization.  App. 1204 (Ex. QQQ); █████████

███████████████████████████; App. 1215 (Ex. RRR).

196.    ████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████ App. 1371-72 (Ex. SSSS, Arnold

Rep. at 31-32); App. 1063-66 (Ex. TT); App. 1248-51 (Ex. ZZZ). ███████████████

████████████████████████████████████████████

App. . 1099 (Ex. AAA, at 2, line 67). App. 1248-51 (Ex. ZZZ).

197.    ████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████ App. 344-45 (Ex. F, Lori Tr. 221:6–222:2);

App. 1065 (Ex. TT). ████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████ App. 345 (Ex. F,

Lori Tr. 222:2-10, 224:6-11).

198.    ██████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████ App. 674 (Ex. Q, Bahena Tr. 122:24–123:19); *see also* App. 1268-

72 (Exs. FFFF, GGGG).

    199. ████████████████████████████████████████

App. 1740-44 (Ex. KKKKK). ████████████████████████ *Id.* ████████████

████████████████████████████████████████████████████████████

App. 1388 (Ex. SSSS, Arnold Rep., at A-10); App. 1740-41 (Ex. KKKKK). ████████████

███████████████ App. 1741 (Ex. KKKKK). █████████████████████████

████████████████ App. 1740 (Ex. KKKKK). ███████████████████████

██████████████████████ App. 1742 (Ex. KKKKK).

    200. ██████████████████████████████████████

███████████████████ App. 1114 (Ex. DDD). █████████████████████████

███████████████████████ App. 1112 (Ex. DDD). ██████████████████████

██████████████ App. 1111 (Ex. DDD). ██████████████████████████

███████████████████████████████████████ App. 872

(Ex. X), App. 1112 (Ex. DDD). ███████████████████████████████

████████████████████████████████████████ App. 1103

(Ex. AAA, at 6, line 236); *see also* App. 1109-10 (Ex. CCC).

    201. ███████████████████████████████████████

App. 1268-72 (Ex. FFFF). ███████████████████████████████████

App. 1268 (Ex. FFFF); App. 1272 (Ex. GGGG). ██████████████████████████

██████████████████████████ App. 878 (Ex. X); App. 1269-70 (Ex. FFFF);

App. 1392 (Ex. SSSS, Arnold Rep., at A-14). ███████████████████████████



App. 1105 (Ex. AAA, at 8, line 293).

202. ███████████████████████████ App. 879 (Ex. X). ████████████

███████████████████████████ App. 1745-48 (Ex. LLLLL). ████████████

███████████████████████████████████ App. 1747-48

(Ex. LLLLL). ██████████████████████████████████

██████████████████████████████████ App. 1105

(Ex. AAA, at 8, line 307).

203. ████████████████████████████████████████

█████████████████████████████████████████████

████████████████ App. 879 (Ex. X); App. 1749-51 (Ex. MMMMM). ██

████████████████████████████████████████████

██████████████ App. 1105 (Ex. AAA, at 8, line 316).

204. ██████████████████████████████████████

█████████████████████ App. 1372-73 (Ex. SSSS, Arnold Rep. at 32-
33); App. 1752-54 (Ex. NNNNN); App. 848 (Ex. X) (listing as ████); *see also* App. 1098

(Ex. AAA, at 1, line 9).

205. ██████████████████████████████████████

██████████████████ App. 1373 (Ex. SSSS, Arnold Rep. at 33); App. 1074-77

(Ex. WW); *see also* App. 1101 (Ex. AAA, at 4, line 141).

206. ████████████████████████████████████

███████████████████ App. 1373-74 (Ex. SSSS, Arnold
Rep. at 33-34); App. 1078-81 (Ex. XX).  NuStar's expert Samson ████████████



███████████████████████████████████████████

███████████████████████████████████ App. 629 (Ex. P, Samson

Tr. 264:11–265:10).  Samson ███████████████████████████████

████████████████████████████████████ App. 630 (Ex. R,

Samson Tr. 267:25–269:5).

     207.    ██████████████████████████████

██████████████████████████ App. 1374 (Ex. SSSS, Arnold

Rep. at 34); App. 1238-41 (Ex. WWW).

     208.    ████████████████████████████████████

███████████████████████████████████████████

████████████ App. 664 (Ex. Q, Bahena Tr. 81:21-83:13).

     209.    █████████████████ App. 1242-45 (Ex. XXX). █████████

███████████████████████████████████████████

███████████████████████████████████ App. 1242-

45 (Ex. XXX).

     210.    ████████████████████████████████

███████████████████████████████████████

███████████████ App. 665 (Ex. Q, Bahena Tr. 85:10–87:24); App. 1242-

45 (Ex. XXX); App. 1246-47 (Ex. YYY).

     211.    ██████████████████████████████████

████████████████████████████████████████

App. 1374 (Ex. SSSS, Arnold Rep. at 34); App. 1036-38 (Ex. LL); *see also* App. 1099

(Ex. AAA, at 2, line 37).

212. ██████████████████████████████████████████████████

██████████████████████████████████████ App. 677 (Ex. Q,

Bahena Tr. 134:19-135:6). ████████████████████████████████████

████████████████████████████████████████████████████████

████████ App. 677 (Ex. Q, Bahena Tr. 134:19–135:11, 135:22–136:17); App. 1036-38

(Ex. LL).

**D.** ██████████████████████████████████████.

213.     Defendants effected service of deposition subpoenas on six of NuStar's current

long-time employees (all having worked at NuStar for anywhere from five to fourteen years), all

hired before the Article was published, calling for production of their original ID and

authorization documents. App. 831-33, 1799-813 (Exs. U, PPPPP, QQQQQ, RRRRR, SSSSS,

TTTTT); App. 847-83 (Ex. X); *NuStar* [ECF No. 104] (Tr. of May 13, 2021 Status Conference,

at 24:21-22) (NuStar's counsel claiming these are all "long-term, loyal employees").

214. ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

215.     Source 1 testified that ██████ served in a supervisory role at NuStar. App. 69

(Ex. B, Source 1 Tr. 152:14-17) (████████████████████████████████████████

████████████████████); App. 128 (████████████████████████████████

████████████████████████████████

216. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████ App. 119-20 (Ex. C, F.S.D. I Tr. at 71:2–77:10; *see also NuStar* [ECF No. 119], at

2.

217. ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████ ██████ App. 119-20

(Ex. C, F.S.D. I Tr. 71:2–77:10); *see also NuStar* [ECF No. 119], at 2. ██████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████ App. 120 (Ex. C, F.S.D. I Tr. 74:7-15); *see also NuStar* [ECF No. 104] (Tr. of May 13,

2021 Status Conference, 22:18–23:3, NuStar counsel: ███████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

218.     The Court subsequently appointed new counsel for the employees. *See NuStar*

[ECF No. 122], at 2.

219. ██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████████

██████████████



f.

220.

221.

222.

223. 

224.

225.

226.

227.

228.

229.

App. 1357

(Ex. SSSS, Arnold Rep. at 17); App. 834-37 (Ex. V); App. 979-81(Ex. DD); App. 983-86 (Exs. FF, GG); App. 1027-29 (Ex. II); App. 1030-32 (Ex. JJ); App. 1222-25 (Ex. TTT).

230. ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

231.    Arnold would testify, and NuStar's expert Samson ██████████████

███████████████████████████████████████

██████████. App. 1362-64 (Ex. SSSS, Arnold Rep. at 22-24 (███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████ App. 617-28 (Ex. P, Samson Tr. 214:2–261:5); App. 834-37 (Ex. V); App. 979–81(Ex. DD); App. 983-86 (Exs. FF); App. 1027-29 (Ex. II); App. 1030-32 (Ex. JJ); App. 1222-25 (Ex. TTT).

232. ███████████████████████████████████████

██████████ App. 983-86 (Exs. FF, GG); *see also* App. 669 (Ex. Q, Bahena Tr. 104:6–20) (███████

██████████████████████████████████████); App. 1372 (Ex. SSSS, Arnold Rep.)

(same).

233.    ████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████. App. 661, 680 (Ex. Q, Bahena Tr. 71:8-14, 146:2–147:20). ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████App. 670 (Ex. Q, Bahena Tr. 106:4–108:15; App. 1252-59 (Exs.

AAAA, BBBB); App. 868 (Ex. X (████████████████████████████████████

██████).

234.    ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████. 187-88 (Ex. D, Anthony III Tr. 257:12–

259:25); App. 1046-48 (Ex. OO).

235.    According to its own expert, Samson, ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████ App. 623-25 (Ex. P, Samson Tr. 240:15–247:3).



236. ███████████████████████████████████████████

███████████████████████████████████ App. 1389 (Ex. SSSS, Arnold
Rep. at A-11), App. 1396 (Arnold Rep. ███████████████████████████
███████, App. 1814-20 (Ex. UUUUU, ███████████).

237. ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████ 1366-67 (Ex. SSSS, Arnold Rep. 26-27); App. 979-81 (Ex. DD); App. 171–
72 (Ex. D, Anthony III Tr. 192:7–197:5). █████████████████████████████
App. 151 (Ex. D, Anthony III Tr. 112:3–113:20); App. 1353 (Ex. SSSS, Arnold Rep. at 13).

238. Samson ████████████████████████████████
███████████████████████████████ App. 622 (Ex. P, Samson Tr.
235:16–24); App. 979-81 (Ex. DD).

239. Samson ████████████████████████████████
████████████████████████████ App. 620, 625-26,
627-28, 629 (Ex. P, Samson Tr. 247:6-13; 252:4-23 ███████████████████
███████████████████████████████ *id.* at
229:15-18 (████████████████████████████████
█████ *id.* at 257:22–258:16 ████████████████████████
██████████

240. ███████████████████ ██████████████████
███████████████████████████████████████████





App. 1675-717, at 1681 ████

████████████████████████████████████ (Ex. EEEEE).

241. ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████ App. 1675-717, at 1681 ████

████████████████████████████████ (Ex. EEEEE).

242. ██████████████████████████████████

████████████████████████████ App. 1353 (Ex. SSSS, Arnold Rep., at 13);

263-64 (Ex. E, Anthony Jr. Tr. 145:2–146:23 (████████████████████████

████████████████; App. 128-29, 150-51, 171-72 (Ex. D, Anthony III Tr.

18:21–23:4 (███████████████████████████████

████████████████████████████████████ 109:18–113:15

(███████████████████████████████ 192:7–197:5);

App. 1027 (Ex. II ████████████████████████

243. ██████████████████████████████████

████████████████████████████████ App. 1353

(Ex. SSSS, Arnold Rep. at 13).

244. ██████████████████████████████████

████████████ ████████████████████████████

████████████████████████████████████

████████████████████████████████

App. 1351-53 (Ex. SSSS, Arnold Rep. at 11-13); ██████████████████

████████████████████████████████

## V. The Congressman Knows His Family Has Routinely Hired Without Verification, in an Industry Rife with Unauthorized Workers.

### A. The Congressman Knows His Family Has Regularly Hired Workers Without Verifying Documents.

245.    When asked at his deposition what evidence he has to show he lacks knowledge of the NuStar Plaintiffs' hiring practices, the Congressman testified:

> [B]ut, I mean, I do have obviously firsthand knowledge, as I just went through, about when I did it way back in the day, the way that we did it.  I was trained by my mother and my grandmother [Anthony Jr.'s mother] on what to do. . . . I can't imagine that they changed when they went there.

App. 729-30 (Ex. S, Devin II Tr. 307:17–308:17).

246.    When asked at his deposition if he was aware of and familiar with the processes that Anthony III, Anthony Jr., and NuStar followed to ensure that they don't hire unauthorized workers, the Congressman testified:

> I told you, I am familiar with the process that—because, of course, I used to work with my family many years ago, so I'm quite sure that it wouldn't have changed, I'm sure they're following the same—the same rules and regulations that they've always followed.

App. 512 (Ex. I, Devin I Tr. 154:2-12).

247.    The Congressman testified that NuStar's hiring practices "wouldn't have changed from the way that my grandmother did it and the way that we did it in the past."  App. 729 (Ex. S., Devin II Tr. 305:21–306:3).

248.    When asked if there was anything else that he wanted to point to in order to show that he lacked knowledge about the employment practices on his family's farm, the Congressman testified that his knowledge comes from "the practices from when—you know, when we all were—you know, operated together," and he "can't imagine that they changed their . . . policies[.]").  App. 729 (Ex. S, Devin II Tr. 306:17–307:5).

249. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

App. 370, 375, 377 (Ex. G, Dian Tr. 39:6-3, 58:12-59:1, 59:24–60:10 ████████████

███████████████████████████████████████ 61:16-22, 66:6-67:1).

250.     The Congressman was "trained by [Dian]" how to hire people.  App. 729-30

(Devin II Tr. 307:24–308:17).

251.     When the Congressman worked with his family on farm businesses in California,

the process was for the employee to fill out a Form I-9, and the Congressman would "get, usually

a social security . . . card, and a form or two of photo I.D."  App. 512 (Devin I Tr. 154:24–-

155:12).

252.     When asked, "Would you review the cards to see whether or not they were

genuine?", the Congressman testified:

> Yeah, I mean you had to—well, not if they're genuine, you have to
> accept them. I mean, I guess if you looked at a card and it had a
> picture of Ryan Lizza on it, and it wasn't of whoever's applying for
> the job, then—then, you know, you could challenge it at that point.
>
> But I don't know, I don't ever remember that happening.  Somebody
> gives you a card, and it's their picture, you have to accept that as—
> as real, 'cause it's what they're giving you.  And it would be illegal
> otherwise, discriminate against those people.  Anybody that you're
> hiring, you can't challenge their—their identification that they give
> you.

App. 512 (Ex. I, Devin I Tr. 156:23–157:12).

253.     The Congressman testified that, even if the employer wanted to verify documents,

it would be "impossible" because "you cannot ask," so "nobody knows who's in this country

illegally or not, and . . . you have no way to find out."  App. 513 (Ex. I, Devin I Tr. 158:24–

159:8); *see also* App. 512 (Ex. I, Devin I Tr. 154:24–155:25 ("It's practically impossible that you could ever even hire somebody illegal because you would never know.")).

254.     The Congressman testified, "I hire people all the time . . . .  You'd have to accept their documentation as real, whatever they provide to you."  App. 481 (Ex. I, Devin I Tr. 31:9-18).

255.     The Congressman testified:

> Q. So, if somebody who is in the country without authorization obtains counterfeit documents, how is one to enforce the immigration laws if they can't be questioned about it?
>
> A. Well, they can't be questioned by the employer, that's for sure.
>
> Q. So, employers are obligated to accept whatever documents are put in front of them?
>
> A. That's the way that I—that's the way that I have been—that's the way that I've always operated.

App. 513 (Ex. I, Devin I Tr. 158:5–14).

**B.      The Congressman Communicates with His Family Constantly.**

256.     Prior to his election to the House of Representatives in 2002, the Congressman worked closely with his family on farm ventures they "all . . . shared."  App. 723-24 (Ex. S, Devin II Tr. 283:17–284:22).

257.     ███████████████████████████████████████████████████
███████████████████████████████████████████████
App. 363 (Ex. G, Dian Tr. 10:3-15).

258.     ███████████████████████████████████████████████
███████████████████████████████████████████  App. 363 (Ex. G, Dian Tr. 10:3–12:23).

259.        ████████████████████████████████████████ App. 363

(Ex. G, Dian Tr. 12:24–13:17).

260.        ████████████████████████████████████████

████ App. 261, 279 (Ex. E, Anthony Jr. Tr. 135:19–136:17, 206:8–208:22); App. 491

(Ex. I, Devin I Tr. 73:13-23).

261.        Phone records produced by Plaintiffs show over 860 calls over an 18-month

period between the Congressman and either his father or brother, not counting calls with his

mother or other family members.  App. 1855-2355 (Ex. VVVVV, ████████████████

█████████████████████████████████████████████████████████

███████████████████████████); App. 765-66 (Ex. S, Devin II Tr.

449:6–454:9) (the Congressman discussed with his family the production of their phone records

in this case).  This averages out to multiple calls per day.  *Id.*

262.        Among the calls with his father and brother, the Congressman had "lots of

conversations about farming" ██████████████████ " at NuStar.  App. 494 (Ex. I, Devin I

Tr. 84:15–23); App. 766 (Ex. S, Devin II Tr. 454:10-20); App. 141 (Ex. D, Anthony III Tr. 70:5-

71:4).

263.        The Congressman has listed NuStar's post office box address in Iowa as his home

address in a filing with the U.S. Securities and Exchange Commission.  App. 2357

(Ex. WWWWW, Form D).

264.        The Congressman has arranged visits for his family at the White House, including

for his father to meet then President George W. Bush.  App. 516-17 (Ex. I, Devin I Tr. 173:19–

175:1).

265.     Through the Congressman, Anthony Jr. were introduced to John Hoeven, the former Governor and current senior United States Senator for the State of North Dakota. Anthony Jr. spoke with then-Governor Hoeven about NuStar Farms in Iowa.  App. 737 (Ex. S, Devin II Tr. 338:6-14).  Through the Congressman, Anthony Jr. and Anthony III have known (since before the Article was published) and have met with United States Representative Billy Long (R-MO), with whom they have spoken about farming.  App. 741 (Ex. S, Devin II Tr. 352:21–354:17).  Through the Congressman, Anthony Jr. and Anthony III have known (since before the Article was published) and have met now-former Representative George Holding (R-NC).  App. 744, 745 (Ex. S, Devin II Tr. 370:5-13, 375:14-20).

266.     Asked what he knows about NuStar employees, the Congressman testified that he has known of some former NuStar employees, including one "related somehow to [his] sister-in-law," Lori.  App. 511 (Ex. I, Devin I Tr. 151:3–152:10).

267.     The Congressman has discussed NuStar's employment records with Anthony Jr.:

> [Y]ou would have all the evidence because I know [the NuStar Plaintiffs] provided you documents for everyone.  . . .  That's probably when I talked to my dad that they provided documents that went back for the whole time.  They had documented . . . everybody was documented, as I would expect  . . . .

App. 730 (Ex. S, Devin II Tr. 308:9–309:5).

268.     In his Second Amended Complaint, Congressman Nunes alleges that NuStar "records" show how NuStar documented workers.  *Nunes*, [ECF No. 92] ¶ 31.

269.     In his Third Amended Complaint, the Congressman alleges that "documents establishing both employment authorization and ID as well as Forms I-9–Employment Eligibility Verifications, are kept and maintained by NuStar in the ordinary course of its business."  *Nunes*, TAC [ECF No. 104] ¶ 10.

270.     When Lizza first appeared at NuStar for his reporting—but before the Nuneses knew it was Lizza—Anthony Jr. called the Congressman multiple times to tell him he had seen a car driving around.  App. 495, 497 (Ex. I, Devin I Tr. 87:4–88:11, 96:17-25).

271.     The Congressman had at least three conversations over two days with this father, Anthony Jr., after Anthony Jr. first became aware Lizza was in Sibley, and had more conversations thereafter.  App. 496-97 (Ex. I, Devin I Tr. 93:6–94:12).

272.     According to the Congressman, a "few days" after he learned from his father that Lizza was in Sibley, Lizza sent messages to the Congressman explaining he was writing an article "on the dairy industry and immigration."  App. 498 (Ex. I, Devin I Tr. 101:6-17).

273.     The Congressman never responded to Lizza's messages.  The Congressman told his father not to do so either: "I told him, I said watch out, stay away . . . and obviously that was the right advice."  App. 498 (Ex. I, Devin I Tr. 98:19-23, 100:15-19).

274.     The Congressman testified that when the Article ran, "of course, it was exactly what we thought . . . ."  App. 498 (Devin I Tr. 101:6-20).

### C.     The Congressman Co-Sponsored Eight Bills Addressing the Issues of Undocumented Dairy Workers, Including Verification Requirements.

275.     The Congressman testified that if there was a way for employers to "find out whether somebody's here illegally," it "would be discriminatory and illegal."  App. 481 (Ex. I, Devin I Tr. 30:3-7), App. 481 (Ex. I, Devin I Tr. 30:8–31:5) ("Even if the [verification] tool existed, [employers] can't use it.").

276.     The U.S. government offers to employers a free "web-based system . . . that allows enrolled employers . . . to confirm the eligibility of their employees to work in the United States" called E-Verify.  App. 1349-50 (Ex. SSSS, Arnold Rep. at 9-10); App. 2366-68 (Ex. XXXXX, www.e-verify.gov).

277.    "E-Verify employers verify the identity and employment eligibility of newly hired employees by electronically matching information provided by employees on the Form I-9, Employment Eligibility Verification, against records available to the Social Security Administration (SSA) and the Department of Homeland Security (DHS)."  App. 1349-50 (Ex. SSSS, Arnold Rep. at 9-10); App. 2366-2368 (Ex. XXXXX, www.e-verify.gov); ████████ ████████████████████

278.    According to a government website, E-Verify is used by over a million employers in the United States.  App. 2366 (Ex. XXXXX, www.e-verify.gov).

279.    The E-Verify tool has been available to employers since 1997.  App. 1349 (Ex. SSSS, Arnold Rep. at 9 n.5).

280.    When asked about E-Verify and whether it may be used lawfully, the Congressman repeatedly failed to give a direct answer, but said "it is unlawful to use E-Verify to target people," calling it a "failed program," claiming "it doesn't work," and citing its "discriminatory nature."  App. 482-85 (Ex. I, Devin I Tr. 36:17–45:7, 46:3-6) ("Q. Would it surprise you to learn that the United States government uses it?  A. That's your opinion.").  He claimed in California, "nobody uses it, that I know of."  App. 482 (Ex. I, Devin I Tr. 37:18-20).

281.    ████████████████████████████████████ App. 195 (Ex. D, Anthony III Tr. 286:11-16; 288:5-9); App. 305 (Ex. F, Lori Tr. 62:8-15; 63:10-21); App. 238-39 (Ex. E, Anthony Jr. Tr. 45:25–47:2).

282.    "[W]hen an Employer confirms the identity and employment eligibility of a newly hired employee using E-Verify procedures, the Employer establishes a rebuttable presumption that it has not knowingly hired an unauthorized worker."  Thus, "E-Verify provides

employers with a significant legal protection and a definitive answer concerning the work authorization of a hired employee."  App. 1350 (Ex. SSSS, Arnold Rep. at 10.)

283. ███████████████████████████████████████████

██████████████████████████████████ App. 195 (Ex. D, Anthony III Tr. 286:11-288:9); App. 238-239 (Ex. E, Anthony Jr. Tr. 45:25–47:2); App. 305-306 (Ex. F, Lori Tr. 62:8-15, 64:2-11, 66:15-24, 67:2-11); *see also* App. 1404, 1433 (Ex. TTTT, Martin Rep. at 6, 32 ███████████████████████████████████████████████

████████████████████████████████

284.     The Congressman testified "there is no way" for "people to know" someone's work authorization status.  App. 511 (Ex. I, Devin I Tr. 152:24–153:18).

285.     The Congressman testified that he has never known an "illegal" worker because although he has "worked with people in agriculture . . . [his] whole life[,] [n]ot one person ever came up to [him] and said, oh, I'm illegal.  Not one."  App. 512 (Ex. I, Devin I Tr. 154:24–155:25).

286.     The Congressman testified that "nobody's hiring unauthorized workers," and it is "practically impossible" to do so.  App. 511, 512 (Ex. I, Devin I Tr. 152:24-153:18, 154:24–155:25).

287.     On June 23, 2019, Devin Nunes was interviewed by Maria Bartiromo on Fox News's *Sunday Morning Futures*.  When asked about issues concerning illegal immigration, he responded:

> So, the easiest way, in my opinion, to fix all of this is that you put in a permit system.  So you put in a system where, if somebody is employing you, you have to—you have to actually file with the government what's called E-Verify.
>
> It's a voluntary program now.  It's worked really, really well.  And that means, if everybody was certified by the government that

everybody working for you is, in fact, here on a legal permit, that in the long run is great.

Now, you can't is have [*sic*] that without a permit system, because everyone knows that, in this country, we have got millions of people that are here on either expired permits, or they never had a permit in the first place. . . .

we have already proven that this E-Verify system works with people who have voluntarily been taking part in it.

App. 2979-89 (Ex. DDDDDD, transcript of interview from foxnews.com).

288.     In 2003, 2005, 2007, and 2009, according to records available on the U.S. House of Representatives official government website, the Congressman co-sponsored four versions of the Agricultural Job Opportunity, Benefits, and Security Act ("AgJOBS"). App. 2369-70 (Ex. YYYYY); App. 2376-77 (Ex. ZZZZZ); App. 2381-82 (Ex. AAAAAA); App. 2385-86 (Ex. BBBBBB).

289.     The 2003, 2005, 2007, and 2009 AgJOBS bills would have extended the then-existing H-2A program to agricultural workers, with a path to permanent residence, and:

- allowed corrections to SS records and voided penalties for using counterfeit numbers;

- required employers to provide free housing and transportation; and

- required employers to ensure anyone driving workers has a valid license.

App. 2389-24 (Ex. CCCCCC, text of 2003 AgJOBS bill); App. 2425-30, 2436, 2441-43 (Ex. DDDDDD, text of 2005 AgJOBS bill); App. 2461-67, 2472, 2476-79, 2483-86 (Ex. EEEEEE, text of 2007 AgJOBS bill); App. 2496-01, 2507-08, 2512-14 (Ex. FFFFFF, text of 2009 AgJOBS bill). The H-2A program allows employers to use immigrant workers only upon certifying "there are not sufficient workers who are able, willing, and qualified" in the United States. 8 U.S.C. § 1188(a)(1).

290. ████████████████████████████████████

████████████████████████████████ App. 1379-94 (Ex. SSSS,

Arnold Rep. App'x A) ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████

291.     The 2007 and 2009 AgJOBS bills also included a provision specifically for dairy

workers, granting legal residence status for up to three years, with a path toward permanent

residence. App. 2487 (Ex. EEEEE, text of 2007 AgJOBS bill); App. 2522-23 (Ex. FFFFFF,

text of 2009 AgJOBS bill).

292.     According to Congressional records, the Congressman co-sponsored versions of

the Dairy and Sheep H-2A Visa Enhancement Act in 2008 and 2009.  App. 2531-32

(Ex. GGGGGG); App. 2960-61 (Ex. CCCCCCC).

293.     The Dairy and Sheep H-2A bills included provisions to provide dairy workers

legal resident status for three years with extensions and provisions on housing.  App. 2534-35

(Ex. HHHHHH); App. 2536 (Ex. IIIIII).

294.     In opening remarks on the 2008 Dairy and Sheep H-2A Visa Enhancement Act

bill, Representative John McHugh stated it was "to ensure that American dairy farmers . . . can

legally hire the employees they need," since "[i]ncreasingly, the U.S. dairy workforce is relying

upon those born outside of the United States, with some estimates indicating that at least 50

percent of all current labor is now foreign-born."  App. 2536 (Ex. IIIIII).

295.     Martin's unrebutted conclusion is that over half of dairy workers are foreign-born. App. 1417-21 (Martin Rep. at 19-20 (Texas A&M survey finding 51% immigrant workers on US dairies in 2013), 23 (similar finding in 2018 by Journal of Dairy Science).

296.     In a 2016 interview for KFSN-TV in Tulare, KSFN-TV reported that the Congressman was asked, "Can you do a wall and . . . a Bracero program." App. 2537-38 (Ex. JJJJJJ).  KSFN-TV reported that the Congressman answered the question, "Yeah.  I mean, it's always been the solution.  It's security along with a permit system of some kind, and then a verification system."  App. 2538 (Ex. JJJJJJ).

297.     According to the Library of Congress, the "Bracero program," terminated in 1964, allowed millions of Mexican nationals to work legally in the United States on short-term contracts, often in agriculture.  App. 2539 (Ex. KKKKKK).

298.     In July 2018, the Congressman co-sponsored the Agricultural Guestworker and Legal Workforce Act ("AG Act").  App. 2543 (Ex. LLLLLL).

299.     The AG Act would create a new H-2C visa for agricultural workers.  App. 2543-80 (Ex. LLLLLL).

300.     As proposed in the AG Act, the H-2C would require the employer to attest they were "unsuccessful in locating sufficient members of willing and qualified United States workers for the job."  App. 2546 (Ex. LLLLLL).

301.     The Act would also create a mandatory "electronic employment-eligibility verification system" modeled after E-Verify.  App. 2546, 2571-2580 (Ex. LLLLLL).

302.     The AG Act included provisions to:

- verify SSNs suspected of being used for fraud;
- allow for the provision of free housing to H-2C workers.

App. 2549, 2571-2580 (Ex. LLLLLL).

303.     In 2019, the Congressman was one of the original co-sponsors of the Farm

Workforce Modernization Act ("FWMA") of 2019.  App. 1179-80 (Ex. OOO).

304.     The FWMA of 2019 provided for a "certified agricultural worker status" with a

path to permanent residence for workers already in the United States who are "inadmissible or

deportable from the United States," *i.e.*, unauthorized.  App. 2584-92 (Ex. MMMMMM).

305.     The FWMA of 2019 included provisions that:

- eliminated penalties for workers who used a fake SSN;

- verified SSNs suspected of fraudulent use;

- expanded the H-2A, reserving 50% of visas for dairy or agriculture workers;

- amended housing laws and appropriated funds for farmworker housing;

- created a mandatory electronic verification system modeled after E-Verify; and

- required employers to provide free transportation between jobs.

App. 2618-21, 2649-53, 2713-30, 2750-800 (Ex. MMMMMM).

306.     At a meeting of the House Judiciary Committee on November 20, 2019, the then-

Ranking Member of the Judiciary Committee, Mr. Collins, remarked about the FWMA of 2019,

"if you are here from dairy and you have lobbied for the help of dairy, congratulations, you all

have done a great job."  App. 2809, 2812 (Ex. NNNNNN).

307.     According to records from the Clerk of United States House of Representatives,

on March 18, 2021, the Congressman voted to pass the FWMA of 2021.  App. 2817, 2829

(Ex. OOOOOO).

308.     The FWMA of 2021 contained provisions similar to those in the FWMA of 2019.

*Compare*, App. 2581-2808 (Ex. MMMMMM); *with,* App. 2835-910 (Ex. PPPPPP).

309.     At his deposition, the Congressman did not to recall any of the aforementioned

bills he co-sponsored or voted for:

> Q. . . . Are there any bills that you can recall as you sit here today
> that you co-sponsored that relate to labor in the agriculture industry?
>
> A. No.
>
> Q. Are there any bills that you voted for or against that you can recall
> as you sit here today related to labor in the agriculture industry?
>
> A. Not that I can recall and speak factually on without doing the
> research.

App. 487 (Ex. I, Devin I Tr. 57:7-15); *see also* App. 486 (Ex. I, Devin I Tr. 53:16-18 ("Q.

Can you recall what bills that you have worked on to address the labor shortage in

agriculture? A. No.")).

310.     At his deposition in August 2021, the Congressman testified that he did not recall

the FWMA of 2021 and did not know if he voted in favor of it.  App. 479 (Ex. I, Devin I Tr.

22:3-9).

311.     When presented with an exhibit describing the FWMA of 2019, the Congressman

testified, "I have no idea what [it] is."  App. 478 (Ex. I, Devin I Tr. 18:7-10); App. 1177-78

(Ex. NNN); *see also* App. 477-78 (Ex. I, Devin I Tr. 16:24–19:19) (reviewing an additional

document showing his co-sponsorship, the Congressman's recollection was not refreshed

regarding the FWMA of 2019); App. 1179-81 (Ex. OOO).

312.     When asked if he supported the verification system in the FWMA, the

Congressman did not indicate whether he did or did not support it, testifying, "I've co-sponsored,

God knows how many bills, voted on a lot of different immigration issues over the years," and

immigration is "very, very complex . . . ."  App. 486 (Devin I Tr. 50:5-51:3).

313.     When asked if the labor shortage led to the hiring of unauthorized workers, the

Congressman testified, "nobody knows who's illegal or legal in this country, and . . . I don't

know anyone in agriculture who is employing illegals."  App. 480 (Devin I Tr. 28:24–30:7).

314. Blue Diamond Growers has donated $41,000 to the Devin Nunes Campaign Committee, according to Federal Election Commission records. App. 2911-13 (Ex. QQQQQQ). Blue Diamond Growers has spent over $1 million on lobbying, including for the bills sponsored by the Congressman (*supra* ¶¶ 288-305), according to lobbying contribution reports made available to the public by the Secretary of the United States Senate. App. 3371-77 (Ex. ZZZZZZZ).

315. Western Growers has donated $30,000 to the Devin Nunes Campaign Committee, according to Federal Election Commission records. App. 2914-16 (Ex. RRRRRR). Western Growers has spent over $2 million on lobbying, including for the bills sponsored by the Congressman (*supra* ¶¶ 288-305), according to lobbying contribution reports made available to the public by the Secretary of the United States Senate. App. 3378-90 (Ex. AAAAAAAA).

316. Dairy Farmers of America, Inc. has donated $38,000 to the Devin Nunes Campaign Committee, according to Federal Election Commission records. App. 2917-19 (Ex. SSSSSS). Dairy Farmers of America, Inc. has spent over $6 million on lobbying, including for the bills sponsored by the Congressman (*supra* ¶¶ 288-305), according to lobbying contribution reports made available to the public by the Secretary of the United States Senate. App. 3391-408 (Ex. BBBBBBBB).

317. National Milk Producers Federation has donated $23,000 to the Devin Nunes Campaign Committee, according to Federal Election Commission records. App. 2920-23 (Ex. TTTTTT). National Milk Producers Federation has spent over $4.5 million on lobbying, including for the bills sponsored by the Congressman (*supra* ¶¶ 288-305), according to lobbying contribution reports made available to the public by the Secretary of the United States Senate. App. 3409-26 (Ex. CCCCCCCC).

318.     Land O'Lakes, Inc. has donated $54,000 to the Devin Nunes Campaign
Committee, according to Federal Election Commission records.  App. 2924-27 (Ex. UUUUUU).
Land O'Lakes, Inc. has spent $2 million on lobbying, including for the bills sponsored by the
Congressman (*supra* ¶¶ 288-305), according to lobbying contribution reports made available to
the public by the Secretary of the United States Senate.  App. 3427-39 (Ex. DDDDDDDD).

319.     Western United Dairymen has donated $34,500 to the Devin Nunes Campaign
Committee, according to Federal Election Commission records.  App. 2928-31 (Ex. VVVVVV).
Western United Dairymen has spent over $130,000 on lobbying, including for the bills
sponsored by the Congressman (*supra* ¶¶ 288-305), according to lobbying contribution reports
made available to the public by the Secretary of the United States Senate.  App. 3430-36
(Ex. EEEEEEEE).

320.     Texas A&M University conducted a survey for the National Milk Producers
Federation in 2014.  According to the survey, over 70 percent of dairy respondents had low or
medium confidence in worker documents, and 58 percent had high concern about immigration
enforcement.  App. 1403, 1417-20 (Ex. TTTT, Martin Rep. 5, 19-22).

**VI.**     ████████████████████████████████████

321.     The Congressman spoke to his family the day after the Article was published.
App. 500 (Ex. I, Devin I Tr. 107:12–108:13).

322.     The Congressman testified that "there [were] a lot of conversations" he had with
his family in Sibley, Iowa, the day after the Article was published, App. 500 (Ex. I, Devin I Tr.
109:4-21, 107:12–108:13), and that he continued to discuss the Article with his family in Sibley
"on several occasions" thereafter.  App. 500 (Ex. I, Devin I Tr. 106:2–107:2).

323. ████████████████████████████████████████████████

████████████████████████████████████ App. 283, 285 (Ex. E, Anthony Jr. Tr.

222:8–223:1, 224:16–225:4, 230:2–231:20):



App. 285 (Ex. E, Anthony Jr. Tr. 231:3-20); *see also id.* (231:21–232:5 ██████████

████████████████████████████████████████████

324.     The Congressman also had discussions—he did not say with whom—about the

identity of a potential "source" for the Article who spoke to Lizza:

> A. . . . I know the family, but I can't think of his name right now,
> but I think he was interviewed.  And I heard that from one of his
> family members or something.  . . .  But I don't know that that's
> really his source because I don't think the name, as I recall, is
> actually in the story.
>
> Q. And was this a family member of one of the workers or one of
> the farmers or somebody else?
>
> A. I just remember somebody that knew him said that Lizza had
> talked to him.  . . .
>
> Q. Okay, and you had a conversation with their family member
> directly?
>
> A. I don't remember who. *I just remember hearing it at the time, he
> was potentially a source.* . . .

App. 513-14 (Ex. I, Devin I Tr. 161:20–163:6).

325.     The Congressman testified: "I know that, you know, just in passing conversations

with—with, you know, surrounding this court case, that's the best that we can . . . tell, that

[Lizza] just went to Sibley to find any brown Spanish-speaking person . . . ." App. 499 (Ex. I, Devin I Tr. 102:1–102:25).

326. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████. 301, 303, 305-06, 337, 338-39 (Ex. F, Lori Tr. 48:8–49:24, 55:14-17, 56:11–14, 65:15–66:21, 191:9–192:1, 197:3–198:7); App. 1226 (Ex. UUU); App. 1236-37 (Ex. VVV, ███████████████████); *see also* App. 245-46 (Ex. E, Anthony Jr. Tr. 73:20–75:25); App. 159 (Ex. D, Anthony III Tr. 143:8–144:21); App. 646, 655-56 (Ex. Q, Bahena Tr. 11:22–12:11, 48:23–49:6).

327. ███████████████████████████████████████████████████████

███████App. 310-11, 315, 323-24, 328 (Ex. F, Lori Tr. 85:14–87:10, 102:4–103:25, 135:23–141:8, 150:5-15, 155:11-15); *see also* App. 681 (Ex. Q, Bahena Tr. 150:3-17) ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████; *see also* App. 611 (Ex. P, Samson Tr. 192:23–293:24).

328. █████████████████████████████████████████████████████

███████████████████████████████████App. 310-11, 323-24, 340 (Ex. F, Lori Tr. 85:14–87:10, 135:23–141:8, 150:5-15, 202:20–204:14); App. 1116 (Ex. FFF); App. 1119 (Ex. GGG); App. 1236-37 (Ex. VVV). ███████████ App. 614-15 (Ex. P, Samson Tr. 205:21–207:6; 208:14–209:4).

329. █████████████████████████████████████████████████

███████████████████████████████ App. 325-26, 327-28 (Ex. F, Lori Tr. 143:13–

147:24, 153:24–155:7, 155:11-15); App. 1039, 1041 (Ex. MM); App. 1052, 1054 (Ex. QQ); App. 672 (Ex. Q, Bahena Tr 113:25–116:7); App. 1262-64 (Ex. DDDD).

330.　████████████████████████████████████

████████████　App 1360, 1367-68 (Ex. SSSS, Arnold Rep. at 20, 27-28); *see also* App. 159, 169-70, 207 (Ex. D, Anthony III Tr. at 143:11-25, 184:3-17, 188:19–189:20, 336:16–337:10); App. 980 (Ex. DD); App. 324-325 (Ex. F, Lori Tr. 141:20-142:25).

331.　████████████████████████████████████

██████████████████████████████　App. 207-08 (Ex. D, Anthony III Tr. at 336:16–338:25); App. 315, 324-25 (Ex. F, Lori Tr. 103:16–104:18, 141:20–142:25); App 1360-61, 1367-68 (Ex. SSSS, Arnold Rep. at 20-21, 27-28). ████████████████████

████████████　App. 1360-61 (Ex. SSSS, Arnold Rep. 20-21).

## VII.　Despite Knowing Their Practices Broke the Law, the NuStar Plaintiffs Sued for Defamation, Following the Congressman's Lead.

332.　"At some point" after the Article was published on September 30, 2018, on *Esquire*.com, the Congressman spoke with his family, his father, Anthony Jr. and his brother, Anthony III, about the possibility of them filing a lawsuit. App. 500 (Ex. I, Devin I Tr. 106:2-6); App. 253, 255-56 (Ex. E, Anthony Jr. Tr. 104:17-24, 111:1–114:20).

333.　Congressman Nunes commenced suit against Lizza and Hearst on September 30, 2019, seeking $77.5 million in compensatory and punitive damages. *Nunes*, [ECF No. 1].

334.　The Congressman discussed with his father, Anthony Jr., that Anthony Jr. wanted to try to get the Article retracted. App. 501, 502 (Ex. I, Devin I Tr. 111:9-25, 115:5-9).

335.　████████████████████████████████████

████████████████████████████████████████　App. 255-56 (Ex. E,

Anthony Jr. Tr. 111:7–112:5, 113:8–114:13); *see also* App. 212 (Ex. D, Anthony III Tr. 357:1-18).

336.      After the Article was published, a counter-story was published by *The Federalist*, authored by Mollie Ziegler Hemingway, titled "Ryan Lizza's Hit Piece on Devin Nunes' Extended Family Is Deeply Flawed," and dated October 2, 2018.  App. 2949-59 (Ex. BBBBBBB); App. 1231-35 (Ex. UUU).  Lori is reported as a source in *The Federalist* article, ██████████████████████████████████████████████████████████ ███████████  App. 2954 (Ex. BBBBBBB); App. 347 (Ex. F, Lori Tr. 232:20–233:25); App. 1231 (Ex. UUU).

337.      The NuStar Plaintiffs sent a retraction demand to Hearst, but not to Lizza, that was dated November 14, 2019.  App. 2944-48 (Ex. AAAAAAA).

338.      The NuStar Plaintiffs filed their suit on January 16, 2020, seeking $25 million.  *NuStar*, [ECF. No. 1].

339.      ████████████████████████████████████████████ ██████████████████████████████████████████████████████App. 221 (Ex. D, Anthony III Tr. 391:18–393:9); App. 254-55 (Ex. E, Anthony Jr. Tr. 108:11–112:5 ██████████████████████████████████████████████████████████ ███████  113:8-18).

340.      The NuStar Plaintiffs are not seeking injunctive relief.  *NuStar*, [ECF No. 188], at 189, at 1, 30.

341.      The Congressman is not seeking injunctive relief.  *Nunes*, [ECF Nos. 103, 104], at 1, 21.

342. The Congressman filed his First Amended Complaint on February 3, 2020. *Nunes*, [ECF No. 23]. It added allegations about Lizza sharing the Link through the November, 20, 2019 tweet, and added allegations regarding other social media posts, too. *Compare Nunes*, [ECF No. 23], at 12-19; *with, Nunes*, [ECF No. 1].

343. The Congressman has had multiple conversations with his father to discuss the lawsuits since they were filed. App. 507 (Ex. I, Devin I Tr. 135:14-20, 136:2–137:3); *supra* ¶¶ 322, 324-25, 334.

344. The Congressman spoke to an expert witness, Chris Buskirk, about working on both his and his family's cases. App. 507-08 (Ex. I, Devin I Tr. 137:8–138:9).

345. Buskirk was engaged by all Plaintiffs. He withdrew as an expert after receiving discovery requests related to his role in heading an organization that funded or proposed to fund certain political causes associated with Republican politicians, including litigation against the media. App. 507-08 (Ex. I, Devin I Tr. 137:20–139:2); App. 3276, 3285-88 (Ex. UUUUUUU); App. 3302, 3311-14 (Ex. VVVVVVV); App. 3328 (Ex. WWWWWWW).

346. The Congressman testified that Defendants' denials in pleadings of his own conspiracy theories relating to this case have not caused him to doubt those theories, dismissing the denials as "lying." App. 757 (Ex. S, Devin II Tr. 417:4–418:2).

**VIII. Plaintiffs Have Not Been Damaged.**

    **A. The NuStar Plaintiffs Can Show No Harm from the Article.**

347. ██████████████████████████████████████████████
████████████████████████████████████ App. 242-44 (Ex. E, Anthony Jr. Tr. 58:19–63:6, 65:9–66:12); App. 214-16 (Ex. D, Anthony III Tr. 363:12–373:6).

348. ██████████████████████████████████████████████
████████████████████████████████. 242-44 (Ex. E, Anthony Jr. Tr. 58:19–63:6,

65:9–66:12, 69:25–71:3); App. 214-18 (Ex. D, Anthony III Tr. 363:12–373:16, 374:2-15, 376:10-23, 378:10-15).

349. ████████████████████████████████████████████████████████

███████████████████████████. 242-43, 284 (Ex. E, Anthony Jr. Tr. 58:23–61:13, 65:9-16, 227:22–228:23); App. 214-18 (Ex. D, Anthony III Tr. 363:12–373:16, 372:11-15, 374:2-15, 376:10-23, 378:10-15, 379:8-21).

350. Source 1 testified that meatpacking and agricultural employers often have a hard time hiring, because people who are authorized to work in the United States are unwilling to work in meatpacking plants or on farms. They are, therefore, left with no choice but to hire undocumented workers, who are the ones willing to perform the jobs. App. 81-82 (Ex. B, Source 1 Tr. 198:15–203:18).

351. One of Lizza's on the-record sources, Father James Callahan, called for deposition by Plaintiffs, testified that dairy farms would be "screwed" without immigrant labor, including undocumented workers, because those workers staff the local farms. App. 23 (Ex. A, Callahan Tr. 84:17–85:20); App. 1329 (Ex. MMMM, Audio recording of newsgathering interview of Callahan by Lizza).

352. Father Callahan does not think less of Plaintiffs because of the Article, because it is common knowledge that the local economy relies on unauthorized workers with fraudulent documentation. App. 22-23 (Ex. A, Callahan Tr. 79:18–82:5); *see generally* App. 20-23 (Ex. A, Callahan Tr. 71:8–82:5).

353. Source 1 testified at length that many aspects of the local economy (in and around Sibley) rely on undocumented labor, and that this is commonly known. App. 81-83 (Ex. B, Source 1 Tr. 198:15–203:18, 206:11–208:23).

354. ████████████████████████████████████ App. 218-19 (Ex. D,

Anthony III Tr. 379:8–384:2); App. 1488-93 (Ex. UUUU, Hosfield Rep. at 12-17).

355. ██████████████████████████████████████

App. 1491 (Ex. UUUU, Hosfield 2021 Rep. at 15); App. 888-971 (Ex. AA); App. 219 (Ex. D,

Anthony III Tr. 383:13–384:2).

356. ██████████████████████████████████████

████████ App. 218 (Ex. D, Anthony III Tr. 378:16–380:22); *see also* App. 1489-90

(Ex. UUUU, Hosfield 2021 Rep. at 13-14).

357. █████████████████████████████████

████████████████████████████████████████████

████████████████████████ App. 218 (Ex. D, Anthony III Tr. 379:16-24).

358. ██████████████████████████████████████

████████ App. 260-61 (Ex. E, Anthony Jr. Tr. 131:14–135:9); App. 218-19 (Ex. D, Anthony III

Tr. 379:8–384:2).

359. ████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

App. 218 (Ex. D, Anthony III Tr. 380:16–384:2); App. 1491 (Ex. UUUU, Hosfield 2021 Rep. at

15).

360. Defendants' expert, Mark J. Hosfield, ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ App. 1488 (Ex. UUUU, Hosfield Rep. at 12).

361. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  App. 221 (Ex. D, Anthony III Tr. 391:12–393:12) ("Q.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇

362. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇ App. 221 (Ex. D, Anthony III Tr. 393:10-12).

363. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

App. 260 (Ex. E, Anthony Jr. Tr. 131:14-23).

364. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇ App. 259 (Ex. E, Anthony Jr Tr. 129:3-22).

**B.    The Congressman Has Not Been Harmed by Lizza's November 2019 Link to the Article.**

365.    Congressman Nunes was re-elected to the United States House of Representatives in 2020.  App. 1550 (Ex. VVVV, Hosfield 2022 Rep. at 8); App. 716 (Ex. S, Devin II Tr. 254:5–255:5).

366.    Congressman Nunes has never lost any election. App. 1550 (Ex. VVVV, Hosfield 2022 Rep. at 8); App. 716 (Ex. S, Devin II Tr. 254:5–255:5).

367.    Congressman Nunes was elected to the United States Congress 10 times. App. 716 (Ex. S, Devin II Tr. 254:5–255:5).

368.    Congressman Nunes served on a number of Congressional committees during his tenure in Congress.  App. 717 (Ex. S, Devin II Tr. 259:16-18).

369.    Congressman Nunes chaired the House Permanent Select Committee on Intelligence (the "Intelligence Committee") from 2015 to January 2019, and remained its ranking

Republican member from 2019 until he resigned.  App. 717-18 (Ex. S, Devin II Tr. 259:16–261:9).

370.　　Congressman Nunes also served on the House Ways and Means Committee from 2015 until he resigned, and was the ranking Republican member of the Subcommittee on Health from 2019 until he resigned.  App. 717-18 (Ex. S, Devin II Tr. 259:16–261:9).

371.　　Congressman Nunes's positions on the House Intelligence Committee and the House Ways and Means Committee were "particularly prestigious" assignments.  App. 717-18 (Ex. S, Devin II Tr. 259:16–261:9).

372.　　Congressman Nunes's position on the House Intelligence Committee was one that showed that he had a "stellar" and "good" reputation and was "supported by his colleagues." App. 762 (Ex. S Devin II Tr. 436:20–437:25).

373.　　Congressman Nunes was not expelled from Congress following Lizza sharing the Link to the Article in November 2019.  App. 734 (Ex. S, Devin II Tr. 324:2–325:14).

374.　　Congressman Nunes did not lose any Congressional committee assignments since 2019 (or subsequent to the Link).  App. 717-18, 734 (Ex. S, Devin II Tr. 259:16–261:9, 324:2–325:14).

375.　　In January 2021, then-President Donald Trump awarded Congressman Nunes the Presidential Medal of Freedom.  App. 1549 (Ex. VVVV, Hosfield 2022 Rep. at 7); App. 718 (Ex. S, Devin II Tr. 262:6-22).

376.　　Congressman Nunes testified that the Presidential Medal of Freedom is "one of the highest civilian honor[s] in the country."  App. 718 (Ex. S, Devin II Tr. 262:6-11).

377.     Congressman Nunes testified that he was awarded the Presidential Medal of Freedom in part "because of the attacks like Lizza and Hearst did on [himself], [his] family . . . that's what this award was for." App. 718 (Ex. S, Devin II Tr. 262:6-23).

378.     Congressman Nunes ███████████████████████████████████████ ██████████████████████████████. App. 1550-51 (Ex. VVVV, Hosfield 2022 Rep. at 8-9).

379.     For the years 2018 to 2020, Congressman Nunes's ████████████████ ██████████ after Lizza shared the Link to the Article, ████████████████████ ██████ App. 1550-1551 (Ex. VVVV, Hosfield 2022 Rep. at 8-9).

380.     Congressman Nunes' Congressional salary ██████████████████████ ██████████████████. App. 1551 (Ex. VVVV, Hosfield 2022 Rep. at 9).

381.     The Congressman referred Defendants' counsel to his filings with the Federal Election Commission for information about his campaign's fundraising. App. 718 (Ex. S, Devin II Tr. 261:10–262:5).

382.     According to publicly available Federal Election Commission records, for the two years ending December 31, 2016, Congressman Nunes's campaign raised approximately $2.46 million. App. 3000-02 (Ex. EEEEEE, 2016 Devin Nunes Campaign Committee FEC Overview).

383.     According to publicly available Federal Election Commission records, for the two years ending December 31, 2018, Congressman Nunes's campaign raised approximately $12.69 million. App. 3003-05 (Ex. FFFFFF, 2018 Devin Nunes Campaign Committee FEC Overview).

384.     According to publicly available Federal Election Commission records, for the two years ending December 31, 2018, Congressman Nunes's campaign ranked among the top 5

Congressional campaigns for fundraising dollars. App. 3007 (Ex. GGGGGGG, 2018 Raising by the Numbers FEC House).

385.　　　According to publicly available Federal Election Commission records, for the two years ending December 31, 2020, Congressman Nunes's campaign raised approximately $26.8 million.  App. 3009-11 (Ex. HHHHHHH, 2020 Devin Nunes Campaign Committee FEC Overview).

386.　　　According to publicly available Federal Election Commission records, for the two years ending December 31, 2020, Congressman Nunes's campaign ranked among the top 4 Congressional campaigns for fundraising dollars.  App. 3013 (Ex. IIIIIII, 2020 Raising by the Numbers FEC House).

387.　　　In December 2021, Congressman Nunes announced that he was resigning from Congress.  App. 718 (Ex. S, Devin II Tr. 263:3-9).

388.　　　In December 2021, Congressman Nunes announced he would be leaving Congress to serve in the position of Chief Executive Officer of Trump Media & Technology Group, Inc. ("TMTG") by former President Donald J. Trump.  App. 718-19 (Ex. S, Devin II Tr. 263:3-9, 264:5-20, 265:9-12).

389.　　　The principal product of TMTG is the social media platform Truth Social. App. 3015 (Ex. JJJJJJJ).

390.　　　Congressman Nunes resigned from Congress effective Jan 1, 2022.  App. 718 (Ex. S, Devin II Tr. 263:3-9).

391.　　　Congressman Nunes did not have to apply for the position at TMTG.  He did not submit a resume to TMTG.  App. 719 (Ex. S, Devin II Tr. 265:9–266:1).

392.	Congressman Nunes was offered the position as CEO of TMTG by Chairman of the Board, former President Donald Trump, based on the strength of Congressman Nunes's reputation.  App. 719 (Ex. S, Devin II Tr. 264:5–266:1).

393.	Beginning January 1, 2022, ████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████ App. 1551 (Ex. VVVV, 2022 Hosfield Rep. at 9); App. 1293 (Ex. KKKK); App. 719-20 (Ex. S, Devin II Tr. 267:20–268:12).

394.	Congressman Nunes did not negotiate his salary at TMTG; it was just offered to him.  App. 719-20 (Ex. S Devin II Tr. 267:21–268:7).

395.	At TMTG, Congressman Nunes is entitled ███████████████████████ ████████████████████████████████████████████████████████ █████████ App. 1551 (Ex. VVVV, Hosfield 2022 Rep. at 9); App. 1293 (Ex. KKKK).

396.	At TMTG, Congressman Nunes ████████████████████████████████ ████████ App. 1295 (Ex. KKKK).

397.	The Congressman was offered and took the job at Truth Social to "give the American people their voice back" and fight "defamations" like he alleges here.  App. 718-19 (Ex. S, Devin II Tr. 263:6–264:4).

398.	Part of Congressman Nunes's mission at Truth Social is to "end censorship," "allow for the free flow of ideas and expression," and "provide a platform that encouraged global conversation without any discrimination."  App. 719 (Ex. S., Devin II Tr. 266:4-14); App. 3015 (Ex. JJJJJJJ, TMTG Press release).

399.	The Congressman "has not experienced any economic damages stemming from Defendants' actions," as Hosfield testifies.  App. 1551 (Ex. VVVV, Hosfield 2022 Rep. at 9).

400.     Congressman Nunes's original Complaint of September 30, 2019 claimed defamation from the Article, seeking $75 million compensatory and $2.5 million punitive damages. *Nunes*, [ECF No. 1], at 24.

401.     At the time he filed his initial complaint, the amount of damages the Congressman was seeking comprised the aggregate damages from all of the different statements listed in the initial Complaint, and it concerns the publication of the Article on September 30, 2018. App. 752 (Ex. S, Devin II Tr. 397:23–398:16); *see also Nunes*, [ECF No. 1].

402.     With regard to the Congressman's case, after the Eighth Circuit's ruling, the only alleged publication at issue is a single Link to the Article by Lizza on November 20, 2019, and the case concerns a single defamatory implication. *Nunes*, [ECF No. 90], at 8 ("Plaintiff's second amended complaint is limited to the November 20, 2019 tweet."), 9).

403.     The Congressman's operative pleading, the Third Amended Complaint, seeks $75 million compensatory and $2.5 million punitive damages, now attributed only to the Link. *Nunes*, [ECF No. 104], TAC, at 21.  This is the same amount in damages that Congressman sought in his original complaint (filed September 30, 2019), first amended complaint (filed February 3, 2020), and his second amended complaint (filed June 11, 2022). *Nunes*, [ECF No. 1], at 24-25; [ECF No. 23], at 28; [ECF No. 93], at 30.

404.     Congressman Nunes testified that his damages demand is based on "how much information's out there," after "look[ing] at all the posts" and the "overwhelming number of views," and arriving at a "round number that [he] thought was appropriate."  App. 752 (Ex. S, Devin II Tr. 396:21–397:22).

405.     Congressman Nunes testified that his damages from the Article "increase every single day" and have "ballooned beyond belief," but has offered no further evidence to support

this statement. App. 734, 754-55 (Ex. S, Devin II Tr. 328:2–328:14, 405:7-23); *see also* App. 755 (Ex. S, Devin II Tr. 408:6-20 ("There's probably a billion hits on this thing by now")).

406.     According to Congressman Nunes, to calculate his damages, he "added all [the social media posts and views] up," suggesting "it was 10 or 15 or 20 million times." He has produced no documentary evidence regarding those calculations. App. 752 (Ex. S, Devin II Tr. 398:11–399:5).

407.     The Congressman testified that, for his damages calculation, he considered "well, what's that [post or view] worth, you know, dollar, two dollars, three dollars? I don't know." App. 752 (Ex. S, Devin II Tr. 398:11–399:5); *see also* App. 755 (Devin II Tr. 410:8-15) ("[I]t doesn't matter what calculation I came up with at the time because I don't remember the specifics.").

408.     In March 2019, Congressman Nunes sued Elizabeth Mair, Twitter, and two Twitter aliases for defamation. App. 3135-74 (Ex. PPPPPPP); App. 753 (Devin II Tr. 401:10-18).

409.     In his March 2019 lawsuit against Elizabeth Mair, Twitter, and two Twitter aliases for defamation, the Congressman sought $250 million in compensatory damages. App. 3135, 3173 (Ex. PPPPPPP); App. 753-54 (Devin II Tr. 401:10–405:19).

410.     Congressman Nunes testified that to come up with damages in his lawsuit against Twitter, Mair, and the Twitter aliases, one way was to count "all the tweets that went out"; and that "he knows that" he sought $250 million in damages in that action. App. 754-55 (Ex. S, Devin II Tr. 405:5–408:12); *see also id.* at 755 (Devin II Tr. 409:1-10; 411:6-10).

411.     In March 2019, Fox News reported that Congressman Nunes's lawsuit against Mair and Twitter was the "first of many," quoting the Congressman as saying he would

"challenge every single one" of "all these fake news stories" that were written about "this [Russia hoax] investigation." App. 3016, 3018 (Ex. KKKKKKK).

412.　　　Congressman Nunes has a "policy" that he implemented in 2019 that "if you defame and slander [him], [he] take[s] you to court." App. 493 (Ex. I, Devin I Tr. 79:3-17); App. 722 (Ex. S., Devin II Tr. 278:6-20).

413.　　　He testified that the *Esquire* Article was "one of the big ones" that "motivated [him] to implement that policy." App. 493 (Ex. I, Devin I Tr. 79:3-17).

414.　　　Congressman Nunes sued McClatchy, the parent company of *The Fresno Bee*, Liz Mair and Mair Strategies in April 2019 in Virginia, for defamation, alleging that a story accused the Congressman of crimes, and imputed to him dishonesty, unethical behavior, that he was unfit for office or employment for profit, and was without integrity. App. 755-57 (Ex. S, Devin II Tr. 411:18-24, 413:20–414:1, 416:8-14); App. 3175-77, 3205 (Ex QQQQQQQ at ¶¶ 1, 2, 28).

415.　　　In his lawsuit against McClatchy, Mair and Mair Strategies, Congressman Nunes sought $150 million in damages for harm to his reputation, including insult, pain, embarrassment, humiliation, mental suffering. App. 3213 (Ex. QQQQQQQ at ¶¶ 32).

416.　　　The Congressman testified that he came up with the damages figure in the McClatchy lawsuit in a "similar" way to how he computed damages in this lawsuit, referring to how many times the article was published or number of "times used." App. 757 (Ex. S, Devin II Tr. 416:15–417:3).

417.　　　Congressman Nunes testified that the McClatchy article about which he sued is "very similar to" the Article accessible via the Link, and accused him of crimes. App. 756-58 (Ex. S, Devin II Tr. 413:20–414:23, 416:5-11; 420:14–421:1).

418.     The Congressman testified that both the original Article in this lawsuit and the McClatchy article over which he sued were published before elections.  App. 756 (Ex. S, Devin II Tr. 414:2-8).

419.     Congressman Nunes sued the *Washington Post* for defamation in March 2020, seeking $250 million in compensatory damages for insult, pain, embarrassment, humiliation, mental suffering, injury to reputation, and special damages arising from allegations that he had informed the President that there was an intelligence official who had been giving a briefing to Adam Schiff.  App. 3218-22, 3237, 3239 (Ex. RRRRRRR); App. 757-59 (Ex. S, Devin II Tr. 419:22-420:16).

420.     In the March 2020 lawsuit against the *Washington Post*, Congressman Nunes alleged that the gist of the article about which he was complaining was that he lied to the President of the United States, causing the President to become angry with the Acting Director of National Intelligence, and that the article imputed to Congressman Nunes "criminal conduct," "dishonesty," "deceit," "sharp and unethical practices," that he was unfit to perform duties of an office or employment for profit, from which he was harmed in his reputation.  App. 3221, 3232-33 (Ex. RRRRRRR ¶¶ 5, 6, 17, 18, 20); App. 757-59 (Ex. S, Devin II Tr. 419:22–420:16).

421.     The Congressman sued the *Washington Post* for defamation in November 2020, over statements in an article based on the "so-called midnight run."  App 758-59 (Ex. S, Devin II Tr. 421:16–422:25); App. 3061-80 (Ex. MMMMMMM).

422.     In this second lawsuit against the *Washington Post*, Congressman Nunes is demanding $125 million in compensatory damages and $50 million in presumed damages.  App. 3083-84 (Ex NNNNNNN).

423.     Congressman Nunes testified that he calculated his damages in his second lawsuit against the *Washington Post* by, in part, "looking at the number of republications, . . . how many times [the article] was replicated out into the wild." App. 758 (Ex. S, Devin II Tr. 422:15-25); App. 3083-84 (Ex. NNNNNNN).

424.     Congressman Nunes sued Cable News Network ("CNN") in December 2019 for defamation regarding a report that involved the Congressman and a former Ukrainian prosecutor. App. 757 (Ex. S Devin II Tr. 418:23–419:1); App. 3087-134 (Ex. OOOOOOO).

425.     From CNN, the Congressman was seeking $435 million in damages arising from statements that the Congressman alleges impute to him the "commission of felonies and crimes involving moral turpitude," "an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of duties of such office or employment, including dishonesty, lack of candor, fraud and concealment, lack of ethics, self-dealing and conflicts of interest." App. 3087, 3132 (Ex. OOOOOOO).

426.     At his deposition, the Congressman testified that he calculated his damages in the CNN lawsuit in "a similar way" to how he calculated them in this lawsuit. App. 757 (Ex. S Devin II Tr. 419:5-13).

427.     In August 2021, Congressman Nunes sued NBC Universal for defamation arising from a segment on Rachel Maddow's show on MSNBC, alleging that the published statements accuse Congressman Nunes of "criminal conduct (obstruction of justice and treason), serious breaches of the Code of Conduct and violations of protocols concerning the handling of information that comes to the House Intelligence Committee from foreign sources . . . , concealment, lack of integrity and ethical improprieties." App. 3241-43 (Ex. SSSSSSS).  In that lawsuit he is seeking at least $200 million in damages.  App. 3331-32 (Ex. XXXXXXX).

428.	In all of the lawsuits described *surpa* ¶¶ 408-27, the Congressman employed a similar method to calculate the specific amount he was allegedly damaged.  App. 757 (Ex. S, Devin II Tr. 419:5-21).

429.	Congressman Nunes has not "ever tried to distinguish between the damages that the different publications that are the subjects of [his] various lawsuits caused [him];" he has not "compared" them.  App. 758 (Ex. S, Devin II Tr. 420:17–421:4).

430.	The Congressman publicized his lawsuits against the media, including this lawsuit, on his website, devinnunes.com.  App. 3049-51 (Ex. LLLLLLL).

431.	On his website, Congressman Nunes described Defendant Hearst as a "target" of one of his lawsuits "for an *Esquire* article falsely claiming that [the Congressman] conspired to hide a business venture operated by his family members in Iowa."  App. 3050 (Ex. LLLLLLL).

432.	Congressman Nunes has been the subject of "a lot of different negative and false press."  App. 758 (Ex. S, Devin II Tr. 421:5-11); *see also* App. 3047-49 (Ex. LLLLLLL).

433.	"[L]eftists," who Congressman Nunes has not sued, have accused Congressman Nunes of being a "Putin stooge." App. Ex. S at 758-59 (Devin II Tr. 423:22–424:7); App. 3048 (Ex. LLLLLLL at 23).

434.	Congressman Nunes has been asked to his face whether he is a Russian agent. App. 759 (Ex. S, Devin II Tr. 424:8-10); *see also* App. 3048 (Ex. LLLLLLL at 23).

435.	The Congressman says McClatchy published a "whole spate of negative stories about various different ethical improprieties against" him.  App. 759 (Ex. S, Devin II Tr. 424:11-14); *see also* App. 3048 (Ex. LLLLLLL).

436.    "Big corporate owned [media] companies'" coverage of Congressman Nunes has been full of attacks on his reputation, according to the Congressman . App. 759 (Ex. S, Devin II Tr. 424:15–425:1).

437.    The Congressman testified that Democratic politicians have defamed him by "regurgitat[ing]" published news stories.  App. 759 (Ex. S, Devin II Tr. 425:2-10).

438.    The Congressman "has been subject to vehement attacks by the mainstream media, leftwing activist groups and opposition research operatives."  App. 3047 (Ex. LLLLLLL at 22); App. 759 (Ex. S, Devin II Tr. 424:15–425:1).

439.    Regarding emotional distress he has experienced, the Congressman testified about his reaction in the "initial hours" after the Article was published (in September 2018), over a year before the Link.  App. 764 (Ex. S, Devin II Tr. 444:2-14).

440.    Regarding humiliation he has experienced, the Congressman testified about his having to tell people he was being deposed in his own case.  App. 763 (Ex. S, Devin II Tr. 441:12-23).

441.    Regarding embarrassment he has experienced, the Congressman testified about his inability to give tours of his uncle's Tulare farm to dignitaries after the Article.  App. 763 (Ex. S, Devin II Tr. 442:3–443:18).

442.    Regarding "anxiety" he has experienced, the Congressman testified about his reactions when Lizza went to Sibley, Iowa, before the Article was published.  App. 765 (Ex. S, Devin II Tr. 448:2–449:5).

443.    The Congressman never sought treatment for any mental anguish or distress over the Article or Link.  App. 764 (Ex. S, Devin II Tr. 445:6–447:8).

444.     The Congressman does not have any medical conditions that were caused by the Article or Link.  App. 764 (Ex. S, Devin II Tr. 445:6–447:8).

*[signature block on next page]*

Dated: October 25, 2022.

**Ryan Lizza and Hearst Magazine Media, Inc., Defendants**

/s/ Jonathan R. Donnellan
Jonathan R. Donnellan, *Lead Counsel*\*
 jdonnellan@hearst.com
Ravi R. Sitwala\*
 rsitwala@hearst.com
Nathaniel S. Boyer\*
 nathaniel.boyer@hearst.com
Sarah S. Park\*
 sarah.park@hearst.com
Nina Shah\*
 nina.shah@hearst.com
Kristen Hauser\*
 khauser@hearst.com
The Hearst Corporation
Office of General Counsel
300 West 57th Street
New York, New York 10019
Telephone: (212) 841-7000
Facsimile: (212) 554-7000
*\*Admitted Pro Hac Vice*

Michael A. Giudicessi
 michael.giudicessi@faegredrinker.com
Nicholas A. Klinefeldt
 nick.klinefeldt@faegredrinker.com
Susan P. Elgin
 susan.elgin@faegredrinker.com
Faegre Drinker Biddle & Reath LLP
801 Grand Avenue, 33rd Floor
Des Moines, Iowa 50309-8003
Telephone: (515) 248-9000
Facsimile: (515) 248-9010

Scott W. Wright\*
 scott.wright@faegredrinker.com
Faegre Drinker Biddle & Reath LLP
2200 Wells Fargo Center/90 S. 7th Street
Minneapolis, Minnesota 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600
*\*Admitted Pro Hac Vice*

**Attorneys for Defendants**

**Certificate of Service**

The undersigned certifies that a true copy of **Defendants' Rule 56.1 Statement of Undisputed Material Facts in Support of Their Resisted Motion for Summary Judgment Against Plaintiffs Devin G. Nunes, NuStar Farms, LLC, Anthony Nunes, Jr., and Anthony Nunes, III** was served upon the following parties through the Court's CM/ECF electronic filing system on October 25, 2022.

/s/ Jonathan R. Donnellan

Copy to:                                          Jonathan R. Donnellan

Bill McGinn
  *bmcginn@mcginnlawfirm.com*
Steven S. Biss
  *stevenbiss@earthlink.net*

*Attorneys for Plaintiffs*

US.353266017.01