```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  NORTHERN DISTRICT OF IOWA
 3                     WESTERN DIVISION
 4
 5
 6     _____
                                   )
 7     NUSTAR FARMS, LLC,          )
       ANTHONY NUNES, JR., AND     )
 8     ANTHONY NUNES, III,         )
                                   )
 9            Plaintiffs,          ) Case No.
                                   ) 5:20-cv-04003-CJW-
10        vs.                      ) MAR
                                   )
11     RYAN LIZZA, HEARST          )
       MAGAZINE MEDIA, INC.,       )
12                                 )
              Defendants.          )
13     _____)
14
15
16
17          ZOOM VIDEOTAPED DEPOSITION OF DEVIN NUNES
18                    Tulare, California
19                 Tuesday, August 10, 2021
20                        Volume I
21
22     Reported by:
23     LORI M. BARKLEY CSR No. 6426
24     Job No. 4751278
25
```

Case 5:19-cv-04064-CJW-MAR   Document 141-12   Filed 11/01/22   Page 1 of 55

EXHIBIT 12

App. 473

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF IOWA
 3                 WESTERN DIVISION
 4
 5
   _____
 6                    )
   NUSTAR FARMS, LLC,  )
 7  ANTHONY NUNES, JR., AND )
   ANTHONY NUNES, III, )
 8                    )
                      ) Case No.
 9     Plaintiff,     ) 5:20-cv-04003-CJW-
                      ) MAR
10     vs.            )
                      )
11  RYAN LIZZA, HEARST )
   MAGAZINE MEDIA, INC.  )
12                    )
       Defendants.   )
13  _____)
14
15       Zoom Videotaped deposition of Devin Nunes,
16  Volume I, taken on behalf of Plaintiffs, at Tulare,
17  California, beginning at 10:12 a.m., and ending at
18  4:48 p.m., on Tuesday, August 10, 2021, before LORI M.
19  BARKLEY, Certified Shorthand Reporter No. 6426.
20
21
22
23
24
25
```

```
 1  APPEARANCES:
 2
 3  THE HEARST CORPORATION
 4  OFFICE OF GENERAL COUNSEL
 5  Jonathan R. Donnellan, Esq.
 6    - and -
 7  Nathaniel Boyer, Esq.
 8  300 West 57th Street, 40th Floor
 9  New York, NY 10019
10  (212) 649-2051
11  jdonnellan@hearst.com
12  nathaniel.boyer@hearst.com
13
14  STEVEN S. BISS LAW OFFICES
15  Steven S. Biss, Esq.
16  300 West Main Street, Suite 102
17  Charlottesville, VA 22903
18  (804) 501-8272
19  stevenbiss@earthlink.net
20
21  Videographer:
22     Jon Manuel
23
24
25
```

```
 1                  INDEX
 2  WITNESS              EXAMINATION
 3  DEVIN NUNES
 4  Volume I
 5       BY MR. DONNELLAN          6
 6       BY MR. BISS            195
 7
 8
 9              EXHIBITS
10  NUMBER      DESCRIPTION       PAGE
11  Exhibit 47 Article from The Federalist   164
12       authored by Molly Hemingway.
13  Exhibit 74 One-page summary of the Farm    17
14       Workforce Modernization Act.
15  Exhibit 75 Information on Farm Workforce    17
16       Modernization Act from
17       congressional website.
18  Exhibit 76 Document subpoena.         175
19  Exhibit 77 Subpoena to the Devin Nunes    189
20       campaign committee.
21
22       INSTRUCTION NOT TO ANSWER
23          Page     Line
24          141       9
25
```

```
 1       Tulare, California; Tuesday, August 10, 2021
 2            10:12 a.m.
 3
 4       VIDEO OPERATOR:  Good morning.  We are now going
 5  on the record at 10:12 a.m. on August 10th, 2021.  This
 6  is the media unit number one of the video recorded
 7  deposition of Devin Nunes, in the matter of NuStar Farms
 8  LLC, et al. versus Ryan Lizza, et al., filed in the
 9  United States District Court for the Northern District
10  of Iowa, Western Division.  This is case number
11  5:20-cv-04003-CJW-MAR.
12       This deposition is being held via Zoom
13  technology.  My name is Jonathan Manuel from the firm
14  Veritext Legal Solutions, and I am the videographer.
15  The court reporter is Lori Barkley from the firm
16  Veritext Legal Solutions.
17       Counsel and all present in the room and everyone
18  attending remotely will now state their appearances and
19  affiliations for the record.  If there are any
20  objections to the proceeding, please state them at the
21  time of your appearance, beginning with the noticing
22  attorney.
23       MR. DONNELLAN:  This is Jonathan Donnellan on
24  behalf of defendants and I'm joined by my colleague,
25  Nathaniel Boyer.
```

1     MR. BISS: I'm Steve Biss. I represent the
2  plaintiffs.
3     THE VIDEOGRAPHER: Will the court reporter
4  please swear in the witness.
5     (Witness sworn.)
6     THE REPORTER: Please proceed.
7
8          DEVIN NUNES,
9  having been administered an oath, was examined and
10 testified as follows:
11          EXAMINATION
12 BY MR. DONNELLAN:
13    Q. Good morning, Congressman Nunes. How are you
14 today?
15    A. I'm doing well, thank you.
16    Q. Have you testified before?
17    A. Testified where?
18    Q. In a deposition.
19    A. Yes, I have.
20    Q. All right. Well, then you'll be familiar with
21 some of the instructions that I'll be giving
22 preliminarily and you'll take no offense to some of the
23 questions --
24    A. I can't see any of you. I'm not sure if I'm
25 supposed to see you or not.

1     (Technology discussion.)
2  BY MR. DONNELLAN:
3     Q. Do you have any medical condition that impairs
4  your memory, Congressman?
5     A. No, I do not.
6     Q. Any medical condition that would impair your
7  ability to tell the truth?
8     A. Nope.
9     Q. And are you taking any medication that impairs
10 your memory or ability to tell the truth?
11    A. No.
12    Q. And have you taken any alcohol or any other drug
13 that might impair your memory or your ability to tell
14 the truth?
15    A. No.
16    Q. All right. Is there any reason why you could
17 not testify truthfully here today?
18    A. No, there's not.
19    Q. All right. And I'll ask, just as we go along,
20 that we try not to speak over each other so the court
21 reporter can get a clean record and get everything down.
22 I will certainly do my best to let you finish your
23 answers and I'll ask you to do the same with respect to
24 my questions.
25       Is that acceptable?

1     A. Yes, it is.
2     Q. And if you don't understand a question, please
3  let me know. And if you answer a question, I'll assume
4  that you understood it. Is that acceptable?
5     A. Okay.
6     Q. If you need a break at any time, please let me
7  know. All that I'll ask is that you answer whatever
8  question is pending before we break. All right?
9     A. Okay.
10    Q. And you understand that you're under oath here
11 today as if you were testifying in a court before a
12 judge or a jury; is that right?
13    A. Yes.
14    Q. And will your answers be truthful and complete
15 today?
16    A. Yes.
17    Q. Maybe the most single important thing today,
18 which is to just tell the truth. That's all you have to
19 do. Do you promise to do that?
20    A. Yes.
21    Q. Tell me what you did to prepare for today's
22 deposition, please.
23    A. Just set up this iPad to try to make sure it
24 worked and maybe a different link, got that done. And
25 other than that, just printed off the article that I've

1  got in front of me, the original first article, it's
2  right here. And then I printed off a picture of, couple
3  pictures of Lizza, the reporter, if you want to see
4  those, got those there. And then I've got about 15, 10
5  to 15 articles here that I reviewed before this.
6     Q. Do you have any other documents in front of you
7  right now?
8     A. No, I do not.
9     Q. Do you have the articles there with you?
10    A. I have the Hearst article, yes, this one.
11    Q. You said that you printed out 10 or 15 other
12 articles.
13    A. Oh, yeah.
14    Q. Do you have copies of those as well?
15    A. Yeah, I've got -- they're right there.
16    Q. And what do those articles relate to?
17    A. They relate to your reporter Lizza's ████
18 ████████████.
19    Q. Do they relate to anything else?
20    A. No. I mean, I've read some of them. I haven't
21 read all of them in detail, but I've read four or five
22 of them.
23    Q. And why would you bring those to your deposition
24 today?
25    A. Preparing. You asked me how I prepared, and I

3 (Pages 6 - 9)

1  told you.
2      Q.  What leads you to believe those would be
3  necessary in order to prepare to testify today about
4  your knowledge of the case?
5      A.  Well, because in my case, I think it's quite
6  relevant that I filed against you, this pending in the
7  Eighth Circuit.
8      Q.  Okay, do you think it's relevant to your
9  parents' case?
10     A.  I don't know what questions you're going to ask
11 me, so I don't know.  But you asked me how I prepared;
12 this is how I prepared.
13     Q.  Do you have any personal knowledge about those
14 ▒▒▒▒▒▒▒▒▒ Mr. Lizza?
15     A.  Only what I know from what I've read, what I
16 read at the time, and how -- and his conduct and his
17 behavior when he was in Iowa harassing my family.
18     Q.  Aside from setting up the link today for the
19 deposition, reviewing the Esquire article, printing out
20 the two pictures of Ryan Lizza that you showed me, and
21 10 to 15 articles about ▒▒▒▒▒▒▒▒ him, is
22 there anything else that you've reviewed in preparation
23 for today's deposition, or anything else that you've
24 done?
25     A.  Not that I recall.

1      Q.  Did you speak with anyone before appearing here
2  today for your deposition?
3      A.  I spoke to Steve Biss about an hour ago.
4      Q.  And for how long did you speak?
5      A.  I don't know, 20, 30 minutes about this.
6      Q.  Have you spoken with Mr. Biss at all prior to
7  that about your deposition?
8      A.  No.  About other cases, but not deposition.
9      Q.  Have you spoken with anybody else in preparing
10 for your deposition today?
11     A.  In preparation, no.
12     Q.  Did you talk with your father about your
13 deposition today?
14     A.  No, I did not.
15     Q.  Did you speak with your brother about your
16 deposition?
17     A.  No, I did not.
18     Q.  Did you speak with your mother about your
19 deposition?
20     A.  No, I did not.
21     Q.  Did you speak with your sister-in-law Lori?
22     A.  No, I did not.
23     Q.  Have you reviewed any deposition transcripts
24 from the NuStar case before today?
25     A.  No, I have not.

1      Q.  Have you reviewed any documents from the NuStar
2  case before today?
3      A.  Other than -- NuStar case, no.  I mean, I'm
4  familiar with what's in the Eighth Circuit right now.
5      Q.  So, you haven't reviewed any documents that were
6  produced by the parties in the NuStar case?
7      A.  No.
8      Q.  Have you reviewed any of the court orders in the
9  NuStar case?
10     A.  No, I have not seen any.  I was told you were
11 going to send them to, whatever documents you want me to
12 look at, that you would send them to Mr. Biss, and
13 that's what we discussed here about an hour ago.
14     Q.  Okay.  And did you bring any other documents
15 with you to your deposition today other than the ones
16 we've just talked about that you've shown me?
17     A.  Documents, no.
18     Q.  Have you brought anything else with you to aid
19 your memory or to assist you in testifying today?
20     A.  I have a notepad, I have a pen, and I have an
21 iPad here so I can review documents.
22     Q.  Okay.  Do you have anything written on the
23 notepad?
24     A.  No, I do not.
25     Q.  Do you have any notes on the iPad available for

1  you to review during the deposition?
2      A.  No.
3      Q.  Congressman, let's talk first about your
4  background, if we may.  You grew up working on a farm;
5  is that correct?
6      A.  That's correct.
7      Q.  And I understand that your family has --
8  includes three generations of farmers, including your
9  grandparents, your parents, and you and your brother; is
10 that right?
11     A.  Many other family members, but yes.
12     Q.  And I have seen that you wrote in the Wall
13 Street Journal some years ago, that you bought seven
14 head of cattle when you were 14 years old; is that
15 right?
16     A.  That's correct.
17     Q.  And were they on your family's farm at that
18 time?
19     A.  They were on a pasture that I got from my
20 grandfather.
21     Q.  What kind of farm did your family run when you
22 were growing up, was it a dairy farm?
23     A.  All sorts of farming, so cotton, corn, wheat,
24 grapes, dairy, some beef cattle.
25     Q.  And how old were you when you started working?

Veritext Legal Solutions

800-567-8658                                                           973-410-4098

1    A.   We farmed, I don't know, probably in my
2    lifetime, 10 or 15 different crops.
3    Q.   And how old were you when you started working on
4    the family farm?
5    A.   Four to five years old.
6    Q.   And you worked all throughout your youth on the
7    farm?
8    A.   Yeah, all the way through until I was elected to
9    Congress, and then I still farm now.
10   Q.   And I understand that you went to college at
11   Cal Poly in San Luis Obispo; is that correct?
12   A.   That is correct.
13   Q.   And you received a B.A. in agricultural business
14   in 1995; is that correct?
15   A.   That's correct.
16   Q.   And a master's degree in agriculture in 1996; is
17   that right?
18   A.   That's correct.
19   Q.   And then afterwards, you went back to work in
20   your family's farm business?
21   A.   That is correct.
22   Q.   And did president George W. Bush appoint you to
23   serve as the California state director for the U.S.
24   Department of Agriculture's rural development section?
25   A.   That is correct.

1    Q.   That was in 2001, I believe; is that right?
2    A.   Yep.
3    Q.   And you were elected to Congress in 2002, and
4    have served in the House of Representatives ever since;
5    is that right?
6    A.   Yes.
7    Q.   Have you had any other jobs besides agriculture
8    and politics in your career?
9    A.   Nope, that's it.
10   Q.   So, it's fair to say you know a lot about
11   agriculture and farming, then?
12   A.   I would say so, but, you know, there's always a
13   lot of people that know more than me.
14   Q.   Right, I would agree with that.  That's true for
15   all of us.
16        And dairy farming has been a part of your
17   family's farming operation throughout the time period
18   that we've been talking about throughout your life; is
19   that right?
20   A.   That's correct.
21   Q.   And dairy farming is year-round farming; is that
22   right?
23   A.   All farming pretty much is year-round farming,
24   especially in California.
25   Q.   I guess the distinction I was making is between

1    seasonal crop farming and those farming operations which
2    go the entire year; dairy farming is not seasonal,
3    right?
4    A.   Well, I don't think you came here for a lesson
5    in agriculture, so I won't bore you with it, but in
6    California it's -- we grow crops 12 months out of the
7    year.  It's different than what you'd find in the
8    midwest or in other parts of the world.
9    Q.   Fair enough.
10        And are there a lot of farmers in your district,
11   your congressional district?
12   A.   Yes, the San Joaquin Valley is the largest
13   agricultural region in the world.
14   Q.   Are there a lot of dairy farmers in that
15   district?
16   A.   There's all kinds of farmers, over 300 different
17   crops are grown.
18   Q.   Are there dairy farmers in your district?
19   A.   Yes, there are.
20   Q.   And do you believe you're familiar with the
21   issues that are facing America's dairy farmers today?
22   A.   As much as one could be.  You try to stay on top
23   of the issues as much as you can.
24   Q.   You were a co-sponsor of the Farm Workforce
25   Modernization Act of 2019; is that right?

1    A.   What's the name of it?
2    Q.   The Farm Workforce Modernization Act of 2019.
3    A.   I don't know, you have to -- you'd have to send
4    me the -- I don't even know, what's the bill number?
5        MR. DONNELLAN:  All right, I could send you the
6    bill itself, but maybe what I will do is, I will send
7    you a one-pager that was issued and see if that
8    refreshes your recollection.
9        Congressman, we're going to send you two
10   exhibits which are going to be marked Defendants'
11   Exhibits 74 and Defendants' Exhibit 75.  The first one
12   is a one-pager on the Farm Workforce Modernization Act,
13   and the second exhibit, Exhibit No. 75, is from the
14   congressional website showing the bill number and the
15   sponsors and co-sponsors.
16        (Exhibit 74 was marked for identification by the
17   court reporter and is attached hereto.)
18        (Exhibit 75 was marked for identification by the
19   court reporter and is attached hereto.)
20        MR. DONNELLAN:  Let me know when you receive
21   those.
22        MR. BISS:  Jon, you're sending those to me,
23   correct?
24        MR. DONNELLAN:  That's right.  Did you receive
25   the exhibit, Steve?

5 (Pages 14 - 17)

1    MR. BISS: I received 74.
2        Jon, just for information, is this a duplicate
3    of 11, or is it a different exhibit?
4        MR. DONNELLAN: Different exhibit.
5        MR. BISS: Okay, thank you.
6        MR. DONNELLAN: Sure.
7        THE WITNESS: So, I've got 74. I don't know, I
8    have no idea what 74 is. I don't know the source. I
9    don't know where it came from. It's not a document that
10   I'm familiar with.
11       MR. DONNELLAN:
12   Q.   Why don't we start with Defendants' Exhibit 75
13   when you receive that.
14   A.   Okay, I've got 75. I'm not familiar with this.
15   I know the website.
16   Q.   All right, if I could direct your attention to
17   the second page. On the second line, you see that it
18   notes your name there as a co-sponsor, do you see that?
19   A.   Yes.
20   Q.   And this exhibit was taken from the congress.gov
21   website.
22       Does this refresh your recollection as to your
23   sponsorship of this particular bill --
24   A.   No, it does not.
25   Q.   And if you take a look at Defendants' Exhibit

1    74, the one-page summary of the Farm Workforce
2    Modernization Act, I will represent to you that this was
3    obtained from the website of the sponsor of that bill,
4    representative Zoe Lofgren.
5        Does this refresh your recollection at all as to
6    the bill?
7    A.   No, it does not. But I wouldn't have any idea,
8    I think I've seen Zoe Lofgren once in the last two
9    years, and this was -- I don't even know what date this
10   is from. I don't have the date --
11   Q.   The date is --
12   A.   It's hard for me to comment on something another
13   member of Congress put out.
14   Q.   Let me ask you this question based on your
15   answers. I think I may know how you're going to answer
16   this question, but I'm going to ask it anyway.
17       Do you remember voting in favor of the Farm
18   Workforce Modernization Act of 2019?
19   A.   2019? No.
20   Q.   Would it surprise you if you voted in favor of
21   it?
22   A.   You could go through my congressional records,
23   we're voting on dozens of bills a week, hundreds, if not
24   over a thousand a year.
25   Q.   I understand that. You have an obligation to be

1    familiar with all the bills that you vote in favor of or
2    against; is that right?
3    A.   Well, yeah, you have to do research, but you're
4    asking me in a deposition here to -- you know, something
5    like this, I'd have to take and look at and analyze and
6    go back and you have to recreate all the steps that it
7    would take to how you get involved in a piece of
8    legislation.
9    Q.   All right, just to go back to my question, would
10   it surprise you to learn that you voted in favor of
11   this?
12   A.   I have no opinion on that. I mean, because
13   there's going to be -- you could bring up bills for the
14   last 20 years that I either voted for or against, so how
15   do you expect me to comment on something that I don't --
16   that was two years ago.
17   Q.   How many bills a year do you sponsor,
18   Congressman?
19   A.   Just depends, you know, every year's different.
20   I couldn't even tell you right now how many I've
21   co-sponsored this year.
22   Q.   Do you have a tendency to forget bills that you
23   have co-sponsored?
24   A.   No, you would just have to go back and rebuild
25   the legislative process as to why you -- why you

1    co-sponsored a bill or didn't co-sponsor a bill or vote
2    for a bill. Different members have different processes
3    that they go through to do that.
4    Q.   Yeah, I understand that, but I'm asking you
5    about a bill that you co-sponsored two years ago, and
6    you're saying that you forget this bill that you
7    co-sponsored.
8    A.   No, you said that I forgot it. I just said that
9    I don't have a recollection of this.
10   Q.   What's the distinction between forgetting and
11   having no recollection?
12   A.   I'm just -- I just want to make sure you're not
13   putting words in my mouth.
14   Q.   Is there a distinction between the two?
15   A.   Well, I think the issue here is that if you're
16   going to ask me about legislation, you can't -- you put
17   something in front of me that I didn't write and you ask
18   me to comment on it, that was the original question, and
19   you're asking me about bills that were voted on two
20   years ago, which there were hundreds of bills since
21   then.
22       So, I mean, you can go back to hundreds,
23   thousands of bills, and my answer's going to likely be
24   the same. Unless it was something that I was really
25   intimately involved with and if it was recent, then I

6 (Pages 18 - 21)

1  could probably have some concept of it, of what you're
2  asking.
3      Q.  Let me ask you about something that you voted
4  for more recently.  Do you recall the Farm Workforce
5  Modernization Act of 2021?
6      A.  No.
7      Q.  Do you recall voting for that bill?
8      A.  I -- I don't know.  I'd have to look up the
9  record.
10     Q.  I have to confess, I wasn't -- I wasn't -- I
11 wasn't anticipating that you wouldn't recall this bill
12 that you just voted for this year.
13         MR. BISS:  Is that a question, Jon?
14         MR. DONNELLAN:  No, it's not a question, but now
15 I'm thinking about whether or not I want to go through
16 the legislation and spend time on that.
17     Q.  Let me ask you this, Congressman:
18         Do you -- do you only vote for bills that you
19 support?
20     A.  Well, you have to vote one way or another.  The
21 legislative process is always complex because you're
22 often left with some of what you like, some of what you
23 don't like, and so you -- so you have to -- there's some
24 things you support, sometimes you vote for it, sometimes
25 you don't.  Sometimes you have to vote against things

1  that you may support some parts of legislation and
2  there's other parts that you may not support, but you
3  may vote for it anyway.
4         So, I guess the answer is, it's the legislative
5  process and it depends.  Sometimes you're voting for
6  things, you may not support the underlying language, but
7  you're supporting moving the process forward.
8      Q.  So, you might not approve of the underlying
9  language, but you'd approve of the policies that it
10 advances, is that right, if you voted in support of it?
11     A.  No, the legislative process.  So, for -- I mean,
12 look, I know I know this, I don't know if you want to
13 go through this, but how a bill becomes law, but you
14 have to move things through in the process even if you
15 -- maybe you fully support it, maybe you don't support
16 it at all.  You might be voting to move it through the
17 process so that you can engage with the Senate, or to
18 come up with a final piece of legislation that then
19 would be signed into law.
20         Because at the end of the day, the legislative
21 process is moving things forward and very seldom do
22 things actually get both House and Senate approval in a
23 compromise and then get signed into law by the
24 president.  It takes -- it's a long process and it takes
25 a lot of time.

1      Q.  All right, what about when you decide to
2  co-sponsor a bill, presumably you support bills that you
3  co-sponsor?
4      A.  No, not always.
5      Q.  Why would you co-sponsor a bill that you --
6      A.  Well, you may support it in -- it's what I just
7  referred -- was trying to explain.  If you -- you may
8  co-sponsor bills to move the process forward, to show
9  support for the process.  But I'd have to go -- you
10 know, it would have to be specific legislation that I
11 would have to go back and review and, you know, it
12 depends on how long ago it was.  It could be -- we may
13 not even have a history of it --
14     Q.  I --
15     A.  I was --
16     Q.  I was talking about a bill from 2021, so it's
17 not from that long ago.
18     A.  Well, 2021, with COVID, there hasn't been --
19 this has been a completely broken Congress and it's been
20 a disaster, and so most bills haven't even had hearings.
21 So, a lot of times these bills are being brought to the
22 floor, and so I wouldn't use this year as the shining
23 example.  It's probably the worst time ever in Congress.
24 Part of that is COVID related, but part of it is also
25 the politics of the country right now.

1          MR. DONNELLAN:  I'm going to suggest that we
2  take a five-minute break right now so that I can be
3  efficient with your time, and see if I can streamline
4  some questions for you.  Okay?
5          THE WITNESS:  Okay.
6          VIDEO OPERATOR:  We are now going off the
7  record.  The time is 10:45 a.m.
8          (Recess taken.)
9          VIDEO OPERATOR:  We're now back on the record.
10 The time is 10:51 a.m.
11 BY MR. DONNELLAN:
12     Q.  Congressman, I certainly don't want to ask you,
13 you know, questions about bills that you currently don't
14 have any recollection of, so why don't we talk about
15 some of the issues instead.
16         Is it your view that there are significant labor
17 problems in agricultural -- in agriculture today that
18 require legislative solutions?
19     A.  There are -- as it relates to immigration, is
20 that your question?
21     Q.  Yes, sir.
22     A.  Well, there are -- we have an immigration crisis
23 right now.  We've got -- I've been down to the border
24 twice in the last couple months and we've got people
25 flowing over the border, many with COVID, claiming

7 (Pages 22 - 25)

1　refugee asylum and all sorts of other things.
2　　　　So, as it relates to -- I don't differentiate
3　agriculture from any other employer in the country. I
4　think it's all the same. I mean, we've got, what, ten,
5　roughly eight, nine, ten million people that are
6　unemployed; we've got ten million job openings, is what
7　I think I saw yesterday.
8　　　　So, clearly, there's a -- we have a labor crisis
9　in this country. I don't know if it's due to
10　immigration or not, but it's -- I think it has to do
11　probably more with giving -- paying people not to work,
12　because we have an unprecedented level of people that
13　are claiming unemployment benefits. So...
14　　　Q. Focusing on agriculture specifically for a
15　moment, if we could. Would you agree that there's not
16　enough workers who are legal United States citizens who
17　are interested in working on farms, that this has
18　created a labor shortage that's been filled by workers
19　from other countries?
20　　　A. Well, as I just said, maybe I'll be clear,
21　there's a labor -- there's a labor shortage across the
22　entire United States in every sector, so everywhere I've
23　been over the last -- over the last six months,
24　there's -- there's not one place, not one business I go
25　into, not one -- not one employer that hasn't complained

1　about not having enough labor. I mean, you can see it
2　at every restaurant, hotel. I mean, almost every single
3　business, I think that I have seen, is actually hiring
4　in the entire United States. I'm sure there's -- I'm
5　sure there's some that aren't, but all the ones that
6　I've seen.
7　　　　So, I'm not sure I would differentiate
8　agriculture from the rest of the -- from the rest of the
9　economy.
10　　　Q. Okay, I appreciate that. Perhaps maybe to get a
11　little bit more focused on agriculture, which is where I
12　would like to focus our discussion right now, put aside
13　this moment in time as influenced by COVID and the
14　immigration crisis and let's think over the last decade
15　or longer.
16　　　　Would you agree that there has been a labor
17　shortage of qualified U.S. workers for farms in this
18　country?
19　　　A. Specifically, like I said, there's been a -- I
20　don't think it's just COVID related. I think it's been
21　amplified. But I don't think you should really
22　highlight agriculture over other sectors of the economy.
23　I think there's labor shortages across the economy in
24　multiple sectors.
25　　　　And in fact, you know, probably one of the

1　largest areas that we hear a lot of complaints are
2　people that have skills, technological skills, and
3　that's been a real need, too, people that can work in
4　the technology sector. So, I wouldn't say that
5　agriculture's any different than any other industry.
6　They need skilled people that understand technology and
7　that's across multiple sectors of the economy.
8　　　Q. Okay, I understand your point, but again,
9　focusing on agriculture, if you will, would you agree
10　with me that there has been a shortage of labor on farms
11　in this country for well over a decade for qualified
12　U.S. workers, which has left farmers to employ illegal
13　immigrants from other countries?
14　　　A. Oh, that's where you're going. So, you're
15　accusing people in agriculture of hiring illegals.
16　　　Q. I'm asking you a question. Can you answer the
17　question, please?
18　　　A. What's your question?
19　　　　MR. DONNELLAN: Court reporter, can you please
20　read back the question.
21
22　　　　(Whereupon the record was read by the
23　　　　reporter as follows:
24　　　　"Q. Okay, I understand your point,
25　　　　but again, focusing on agriculture, if

1　　　　you will, would you agree with me that
2　　　　there has been a shortage of labor on
3　　　　farms in this country for well over a
4　　　　decade for qualified U.S. workers,
5　　　　which has left farmers to employ
6　　　　illegal immigrants from other
7　　　　countries?"
8
9　　　　THE WITNESS: Yeah, so the answer is, employing
10　people that are illegal is completely inappropriate
11　because nobody knows who's legal or illegal in this
12　country. So, accusations about agriculture specifically
13　hiring people that are illegal, that's a very racist
14　statement.
15　BY MR. DONNELLAN:
16　　　Q. Can you answer the question, please?
17　　　A. That's my answer.
18　　　Q. It's a yes or no question, Congressman, can you
19　answer the question? That's your comment on the
20　question. Can you answer my question yes or no, please?
21　　　A. The answer is -- the answer is what I just gave
22　you, there is no -- you know, you're accusing people of
23　hiring illegals, I know, because you guys have done it
24　repeatedly, which is -- which is unfortunate, but nobody
25　knows who's illegal or legal in this country, and asking

8 (Pages 26 - 29)

1  me a question specifically about agriculture, I don't
2  know anyone in agriculture who is employing illegals.
3    Q.  Well, if there was a way to find out whether
4  somebody's here illegally or not, would you expect
5  employers to use that?
6    A.  That would be -- that would be discriminatory
7  and illegal.
8    Q.  What would be discriminatory and illegal, to try
9  to verify somebody's legal status?
10    A.  You can't racially profile people in this
11  country based on their -- their color or whether or not
12  they speak English or not.  That is -- that is illegal
13  on both federal law, especially in the state of
14  California.
15    Q.  I said nothing about racially profiling.  I
16  asked whether or not, if there was a way to verify the
17  citizenship of workers, would you expect employers to
18  use that?
19    A.  Employers can't use that.  Even if the tool
20  existed, they can't use it.
21    Q.  You're saying that employers cannot use means to
22  verify the citizenship of employees?
23    A.  To target them, absolutely not.
24    Q.  I'm not talking about targeting them, I'm
25  saying --

1    A.  I --
2    (Speaking simultaneously).
3    THE WITNESS:  Anybody that walks in the door,
4  you cannot -- you cannot say, let me see if you're a
5  legal citizen or not.
6  BY MR. DONNELLAN:
7    Q.  Why not?
8    A.  Because it is discriminatory.
9    Q.  If I walked in the door and my employer asked me
10  to verify my citizenship, that would be discriminatory
11  against me?
12    A.  The way that I understand the law -- now, it's
13  been a while since I've actually looked at documents or
14  taken documents but, you know, I hire people all the
15  time, whether it's in my office or in the Congress, and
16  we cannot ask them if they're U.S. citizens or not.
17  You'd have to accept their documentation as real,
18  whatever they provide to you.
19    Q.  Well, by asking for documentation, aren't you
20  asking them about their citizenship or about their legal
21  status in the country?
22    A.  Well, sure, you ask for documents, but those are
23  the documents you require, but you cannot ask them if
24  they're illegal or not.  You're making statements about
25  agriculture and illegals and I answered the question to

1  say that I think it's racial profiling, just to say that
2  just because people are a different color and don't
3  speak English very well, that they're illegal.
4    Because the truth is, there are so many people
5  in this country now who we don't -- we don't know their
6  status.  I mean, I've never met an illegal in my life,
7  somebody that's come up to me and said they're --
8    MR. DONNELLAN:  The Congressman has frozen on my
9  screen.
10    THE REPORTER:  Mine, too.
11    (Technology discussion.)
12    MR. BISS:  Let's go off the record.  If we can't
13  resolve this, we may need to adjourn and reschedule in
14  person.
15    VIDEO OPERATOR:  We are now going off the
16  record.  The time is 11:02 a.m.
17    (Whereupon a discussion was held off
18  the record.)
19    VIDEO OPERATOR:  We are now back on the record.
20  The time is 11:04 a.m.
21  BY MR. DONNELLAN:
22    Q.  I would just like to go back to your last
23  answer, Representative Nunes, where you were suggesting
24  that trying to verify that somebody had work
25  authorization would be illegal because it would require

1  racial profiling.  Did I understand you, that's
2  what you were saying?
3    A.  If you were to use a tool to -- you asked
4  originally, I think, from a few questions ago, you asked
5  if there were tools available to see if someone's a U.S.
6  citizen.  That would be illegal.  At least it would be
7  in the state of California.  I don't know about the rest
8  of the country.
9    Q.  And if you -- how about if you used a tool to
10  see if somebody had appropriate work authorization in
11  this country?
12    A.  That would be illegal in California, the way I
13  understand the law.
14    Q.  And that would be illegal as applied to anybody?
15    A.  It's not -- it's any industry, anyone that comes
16  in, you cannot use -- you cannot target someone in the
17  state of California just because you think that they may
18  be legal or illegal.  You get fined for that.
19    Q.  Well, what about if the requirement was, you do
20  it to everybody, not whether you think they're legal or
21  illegal; is there still a legal problem with that, in
22  your view?
23    A.  I'm only asking [sic] your direct question.  I'm
24  not going to speculate on -- I'm just telling you what
25  the law, as I understand the law is now as it relates in

9 (Pages 30 - 33)

1  California. You cannot target people based on racial
2  profiling and whether or not you think they're a citizen
3  or not a citizen.
4      In fact, you don't even have to be a citizen to
5  work in the United States. There's a lot of different
6  ways that you can be here and -- and work.
7      Q. Well, I'm just trying to explore this with you,
8  okay. So, it's your position that you cannot make
9  any -- put aside targeting, I'm not talking about
10  targeting, you're the one who keeps on talking about
11  targeting. I'm not talking about targeting at all.
12      Are you saying that in your view, that it is not
13  lawful in order to make inquiries or use tools to
14  determine whether or not somebody is in the country
15  legally when they have applied for employment?
16      A. In the state of California, that is the way that
17  I -- that I read the law. You have to accept their
18  documentation as real and you have to -- and then -- and
19  you can't -- just because they don't speak English, you
20  can't -- you can't say, well, I'm going to go see if
21  these people are legal or not. That is highly illegal
22  and discriminatory.
23      Q. If they do speak English, can you go do it?
24      A. No.
25      Q. If they're white, can you do it?

1      A. English, white, brown, green, you cannot go and
2  challenge somebody's work verification documents that
3  they provide you.
4      Q. And where did you gain this understanding of the
5  law?
6      A. Well, we have to -- we have to exercise that in
7  my own office. I don't -- I don't do the paperwork, but
8  we don't challenge people's documents.
9      Q. Where did you gain that understanding of the
10  law, Congressman?
11      A. I'm talking about the -- I'm talking about the
12  procedures that I follow in my office as an employer.
13      Q. Okay, I understand your answer, but that's not
14  responsive to my question. Where did you gain your
15  understanding of the law that you've just expressed to
16  me?
17      A. Well, that would be -- we go through training in
18  the House of Representatives on hiring practices.
19      Q. And the training at the House of
20  Representatives, they tell you that you cannot take
21  steps to verify somebody's --
22      A. Well, I'm not going to get into -- into -- those
23  would all be privileged conversations, but I'm just
24  telling how we enact our procedures in my office. We do
25  not discriminate, you know, we accept documentation that

1  people provide. We do not --
2      Q. I think you may be mistaken about the privilege.
3  What's the basis for saying that it's privileged to tell
4  me about the training you've received in terms of
5  verifying employment?
6      A. I mean, well, hypothetically, I don't have to
7  answer any questions you ask about my dealings with the
8  House of Representatives. I'm willing to because I want
9  to be cooperative.
10      Q. And that's your understanding of the
11  congressional privilege?
12      A. Yeah, for sure, and definitely that would relate
13  to hiring practices.
14      Q. Are you --
15      A. And personnel and the information that I would
16  get from the House legal counsel on hiring practices.
17      Q. Are you familiar with E-Verify?
18      A. Conceptually, yes.
19      Q. And do you understand that that is a tool that's
20  made available to verify the legal status of workers by
21  the United States government?
22      A. That's not how I understand how it works, but
23  that may be your reading of it.
24      Q. What's your understanding?
25      A. Well, number one, it's a failed program, hardly

1  anyone in the country uses it. And as I told you, at
2  least -- I don't know the rest of the country, I'm not
3  sure how the federal laws would apply to E-Verify, I'm
4  sure there's a lot of case law but I haven't looked at
5  it recently, but I know in the state of California, if
6  you use E-Verify to target someone, you get fined.
7      So, most people in California don't use it. I
8  don't know anyone in California that uses it. Maybe
9  there is, but the state legislature has made it almost
10  unusable --
11      Q. None of my questions have had anything to do
12  with targeting, that's a concept that you keep on
13  bringing up, but it's not part of any of my questioning.
14      Can you tell me what your understanding is of
15  E-Verify?
16      A. Basically, it is a -- it is a program, it's been
17  a test pilot program for, oh, I don't know over a decade
18  maybe, and that it's -- as I told you, not very many
19  people use it; in California, nobody uses it, that I
20  know of. I'm sure maybe there are, but -- because the
21  state legislature has made it -- well, they've made
22  accusations that it was used for targeting. And so, you
23  know, we definitely do not use it here.
24      Q. How does it work?
25      A. I'm sorry, how does what work?

App. 482

1     Q. How does E-verify work, to the extent that you
2 know?
3     A. That's -- I just told you everything I know.
4 It's been a -- it's been a --
5     Q. You told me that it's a failed program and it's
6 not used by many, but you haven't told me anything about
7 how it works. How does it work, so far as you know?
8     A. I've told you that it's a program that was -- it
9 was a trial program. It's an optional program. And I'm
10 only telling you that it doesn't work based on my
11 constituents who tell me that it doesn't work because of
12 the discrimination issues surrounding it.
13     Q. So, you've told me it's a trial program, it's an
14 optional program, it's a failed program, that nobody
15 uses it, and there's concerns about discrimination, but
16 you haven't told me what it is.
17     What is your understanding of what E-Verify is
18 and what it does?
19     A. It -- I've never used it, so it would be
20 impossible for me really to get into the details of how
21 you would deploy an E-Verify system, because I've never
22 -- I've never done it. I only know the basics of
23 roughly when it started, and that now it's -- it's --
24 described by me, I can tell you, described by me from my
25 constituents and employers in my district that have

1 called it a failed program that doesn't work, and it's
2 because of the discriminatory nature of it used to
3 target people based on race and ethnicity.
4     Q. Do you have any understanding of what the
5 purpose of E-Verify is?
6     A. Well, in a general sense, the idea is that if
7 you were to get a comprehensive immigration system in
8 place in the United States of America, which I'm sure
9 you have all this information, or at least your reporter
10 must have had it from whoever gave it to him, but nobody
11 seems to know where he got the story from, but a
12 comprehensive fix for immigration, and this is my
13 definition, not anybody else's, but what I convey to my
14 constituents is that we need border security, including
15 a wall across most of the southern border, we need to
16 have -- then we have to deal with creating systems by
17 which both employers and employees --
18     Q. Congressman Nunes, with all due respect, I'm
19 going to stop you and ask you again, I'm just --
20     A. But you didn't allow me to answer --
21     Q. You're right, because my question was not about
22 comprehensive reform. My question was, do you know what
23 the purpose of E-Verify is?
24     A. And I was answering your question. It's a -- it
25 was a testing -- it's been tested as part of a tool that

1 would accompany comprehensive immigration reform. And
2 then I was defining the comprehensive immigration reform
3 before you cut me off, so I guess you don't want to
4 know -- I won't --
5     (Speaking simultaneously).
6     THE WITNESS: -- position on comprehensive
7 immigration.
8 BY MR. DONNELLAN:
9     Q. Yeah, I'm not asking you for your position on
10 comprehensive immigration reform right now, I'm asking
11 what your understanding is of E-Verify and if -- and
12 correct me if I'm wrong, but your answer is that it is a
13 -- potentially a piece of comprehensive immigration
14 reform; is that right?
15     A. It was a -- it's a test pilot, is what it is.
16     Q. Do you know any --
17     A. That's failed. And, you know,
18 perhaps it could be part of a -- you know, part of --
19 perhaps it could work better with different systems in
20 place, but you'd have to have comprehensive immigration
21 reform in order to have a program like that to be
22 viable. It's not a viable program in the United States
23 of America today.
24     Q. Have you now told me everything that you know
25 about E-Verify specifically or is there anything more

1 that you know about that program?
2     A. As of now, that's what I recall.
3     Q. Would it be news to you to learn that E-Verify
4 may be used to verify the legal status of -- of
5 individuals who are applying for work?
6     A. Well, that's what I just told you. And --
7     Q. You --
8     A. It cannot be used for that. You would be -- you
9 would be -- if you used it for that -- like I said, I
10 don't know about the rest of the United States, I'm sure
11 there's a lot of states that are similar to California,
12 but you will be fined, and you will be charged, because
13 there are criminal and civil charges for that.
14     Q. So, your position is that E-Verify is unlawful?
15     A. If you use it -- if you use it to target the --
16 whether or not somebody's a citizen or not, absolutely
17 it is in California.
18     Q. Again, you're -- Representative, you are
19 mischaracterizing my question. I'm not asking about
20 targeting or employing this tool in a discriminatory way
21 at all. I am asking about employers using it in an
22 evenhanded way to cull applicants for jobs. Is it your
23 position that that would be unlawful?
24     A. It's a failed -- it's a failed program that's
25 not working, that will not work unless it's retooled and

11 (Pages 38 - 41)

1 fixed and you have a comprehensive solution to

2 immigration.

3    Q. That's different from whether or not it's lawful

4 or not. Is it your position that an evenhanded

5 application of E-Verify is unlawful?

6      MR. BISS: Are you asking him for a legal

7 opinion?

8      MR. DONNELLAN: Well, he's already expressed it

9 several times that he believes it's unlawful, and I'm

10 trying to get some clarity on that, so that's -- that is

11 the question. He is a lawmaker. I think that he can

12 opine on this.

13      MR. BISS: He's not a lawyer.

14      MR. DONNELLAN: He's a lawmaker who's expressed

15 an opinion on the law, so I'd like to hear his opinion.

16      THE WITNESS: Okay, I think you have my opinion.

17 BY MR. DONNELLAN:

18    Q. Okay.

19    A. That it is unlawful to use E-Verify to target

20 people to see if they're U.S. citizens or not.

21    Q. All right.

22    A. I'm not sure what the U.S. citizenship issue has

23 to do with anything anyway, because you don't have to be

24 a U.S. citizen in this country to lawfully work. You

25 have to have documentation.

1    Q. Yeah, and again, that wasn't my question. My

2 question was not about citizenship. My question was

3 whether or not you could use it in an evenhanded way to

4 determine whether or not somebody was in the country

5 lawfully when they are seeking employment.

6    A. I do not think that's the reason for E-Verify.

7 I mean, well, and I know for, at least from the meetings

8 that I've been in in California, that that was the

9 purpose, that the legislature moved to put in additional

10 laws to go with E-Verify because it was being used for

11 what would be deemed unlawful purposes in the state of

12 California. That's why they put such heavy penalties

13 and fines with it as it relates to hiring practices in

14 the state of California.

15    Q. All right. And it's your position that it would

16 be unlawful to use E-Verify?

17    A. That's not what I said. I said that it would

18 be -- it would be -- because of the discriminatory

19 nature of the technology, it's really the test pilot

20 technology, if you use it to see if people are U.S.

21 citizens or not, that is -- that is, as I understand the

22 law, illegal in California, and you can be fined,

23 subject to fine.

24    Q. So, how is it that E-Verify can be used

25 lawfully?

1    A. Lawfully, or in the state of California?

2    Q. Lawfully --

3    A. You can use it in the state of California, but

4 you can't use it to verify citizenship.

5    Q. So, what can you use it to do?

6    A. I don't know anybody that's using it, so I

7 couldn't -- I couldn't tell you.

8    Q. Would you be surprised to learn that the United

9 States government uses E-Verify?

10    A. I'm not going to -- I have no idea where you got

11 your information.

12    Q. Would it be your view that it would be unlawful

13 if the United States government were using E-Verify?

14    A. You're just -- you're speculating, trying to put

15 the words in my mouth --

16    Q. I'm not speculating --

17      (Speaking simultaneously)

18      THE WITNESS: -- California.

19 BY MR. DONNELLAN:

20    Q. I'm asking you a question as a United States

21 representative, not as -- not about practices in

22 California. I'm asking you if it's your view that the

23 United States government could not use E-Verify

24 lawfully.

25    A. I would have to -- I'd have to research the law

1 and review it before I could answer a question like

2 that.

3    Q. Would it surprise you to learn that the United

4 States government uses it?

5    A. That's your opinion. I'm not going to go off of

6 whatever -- whatever your opinion is, you're stating as

7 fact, but --

8    Q. I'm not stating any opinion --

9    A. I'm not --

10      (Speaking simultaneously).

11 BY MR. DONNELLAN:

12    Q. I'm not stating any opinion, Your Honor, I'm

13 asking you a question.

14    A. And I answered it. I don't know where you got

15 your information from.

16    Q. Okay.

17    A. And if you want me to go back, if I'm going to,

18 you know, go back and look at E-Verify and how it's

19 used, I just told you everything that I know about it.

20 I know it's not used here in California.

21    Q. Do you know if --

22    A. By very many people.

23    Q. Does the U.S. Congress use E-Verify?

24    A. Not that I know of, but no idea.

25    Q. Would it be unlawful if it did?

12 (Pages 42 - 45)

1   A.   If it was used to target in the state of
2   California, it would be.
3   Q.   If it was used not to target but to verify legal
4   status of all applicants for employment in the United
5   States Congress, would it be illegal?
6   A.   Not if it's being used, it wouldn't be.
7   Q.   Okay.
8   A.   But if it's used to target people based on their
9   race and ethnicity, or if you thought somebody was
10  illegal, it would definitely be illegal in California.
11  I'm not sure that I could be fined, but that would be
12  the question for the lawyers.
13  Q.   Have you ever sponsored a bill that mandated the
14  use of E-Verify?
15  A.   I have no idea.
16  Q.   Is that a bill that you would -- that you
17  would -- that you would sponsor?
18  A.   You cut me off when I was going to answer the
19  question about comprehensive immigration reform, so you
20  lost your opportunity.  You didn't want the answer.  So,
21  I tried to answer the question, you cut me off.
22  Q.   Well, I'm asking you now, would you sponsor a
23  bill that requires the use of E-Verify?
24  A.   You already had your opportunity to get a
25  comprehensive immigration reform opinion out of me, or

1   my positions, and you cut me off.
2   Q.   Your Honor, that was the -- this question
3   here doesn't call for a comprehensive explanation of
4   immigration reform, it's a yes or no question.  And
5   you're here under subpoena and I would request that you
6   answer it so that we don't have to ask a court for an
7   order that you answer it.
8   A.   Well, you can go ahead and ask the court all you
9   want, but you cut me off.  I was giving you the answer
10  and you cut me off.  It would have -- my answer would
11  have answered your question.
12  Q.   So, you're refusing now to answer my question,
13  which is a different question --
14  A.   I didn't refuse.  You cut me off earlier.
15  Q.   No, Your Honor, I asked you a different
16  question, which you also were not answering, which is
17  what the purpose of E-Verify was.  And now I'm asking --
18       (Speaking simultaneously.)
19  BY MR. DONNELLAN:
20  Q.   Now, I'm asking you a different question, which
21  is whether or not you would sponsor a bill that required
22  it.  So, I -- I apologize for cutting you off earlier,
23  but we are under a time limitation in the time that we
24  have for depositions and I would like answers to my
25  questions.

1   And you were not answering my question before
2   and I wanted to make sure that you were focused on the
3   specific question, and now I'm asking you to focus on
4   the specific question I'm asking again.
5   A.   Okay, so since you apologized to me for cutting
6   me off, I'll tell you my position, it's widely known, on
7   immigration reform.
8        There needs to be a comprehensive solution to
9   immigration reform.  So -- and that involves border
10  security, the wall, having a permit system that works
11  for all employees and employers, so that -- so that
12  there's a process that everybody can follow and
13  everybody knows how it works, where -- where you can
14  ensure that employers and employees are matched up.
15       And that's the goal of immigration -- of
16  comprehensive immigration reform, that people would be
17  in the country, either as U.S. citizens or residents or
18  under some type of permit system, in order to ensure
19  that everybody in this country who was working is doing
20  so in an appropriate manner.
21       MR. BISS:  Jon, when you get to a convenient
22  stopping point, I need to take a five-minute break.
23       MR. DONNELLAN:  All right, that's fine, let me
24  just follow up on this so we don't lose the thread.
25  Q.   Thank you, Congressman, for your position for --

1   on a comprehensive solution to immigration reform.
2        Do you believe that E-Verify is an appropriate
3   part of a comprehensive solution to immigration?
4   A.   E-Verify, I do not believe, will work in its
5   present testing form.  So, you'd have to do a lot of
6   research, you'd have to have a lot of -- work done as
7   it relates to border security, everything else, before
8   you could use E-Verify.
9        So, in its current form, it's not going to work.
10  Part of some type of comprehensive solution, it may be a
11  piece of a very large and complex puzzle that can't be
12  just boned down to a yes or no question.
13  Q.   Okay, if it was, assuming that it was part of a
14  comprehensive solution and that it was mandatory so that
15  it could not be used in a discriminatory or targeted
16  way, would that be a solution that you would support?
17  A.   Look, I'd have to -- that's -- you're asking me
18  to speculate.  I mean, legislation is complex.  You have
19  to -- it takes a long time to draft it, especially
20  immigration legislation.  You know, it's been a while
21  since I drafted, myself, immigration legislation.
22       But, you know, you'd have to get -- and then
23  you'd have to pass something out of the pertinent
24  committees, relevant committees and the House.  You'd
25  have to pass it out to the Senate.  You'd have to then

13 (Pages 46 - 49)

1  negotiate it all out and ensure that you come up with a
2  product that actually will work. And that's been the --
3  that's been elusive since, I think 1986, which was
4  before I was in Congress.
5      Q. The reason I'm asking, Your Honor, is because
6  the two bills that I was asking you about earlier, the
7  bipartisan Farm Workforce Modernization Act of 2019 and
8  2021, has a provision in there that requires the use of
9  E-Verify as mandatory for employers.
10     So -- and you did, as we saw, sponsor at least
11  the earlier version of that bill, presumably based on
12  that it is something that you would support if it's in
13  the context of a comprehensive solution; is that
14  correct?
15     A. No, I don't think you can -- a comprehensive
16  solution -- I have not seen a comprehensive solution
17  that I've voted on in a long, long time. I think it
18  would have to be the mid 2000s, when there was an
19  attempt made, but a lot has changed since then.
20     So, like I said, I've co-sponsored, God knows
21  how many bills, voted on a lot of different immigration
22  issues over the years, but until you see the final
23  product, you cannot make any -- you can't make any rash
24  decisions or pronouncements as it relates to anything on
25  immigration, because it's very -- it's -- as -- it's

1  very, very complex and it impacts a lot of people in
2  different ways, including when you match that up with
3  different state laws.
4      MR. DONNELLAN: All right, I think your counsel
5  asked for a break, so why don't we take a break now.
6      VIDEO OPERATOR: We're now going off the record.
7  The time is 11:31 a.m.
8      (Recess taken.)
9      VIDEO OPERATOR: We are now back on the record.
10  The time is 11:39 a.m.
11  BY MR. DONNELLAN:
12     Q. Congressman Nunes, when you speak with your
13  constituents, do you ever speak with the farmers in your
14  district about their labor problems?
15     A. I speak with all -- all constituents, including
16  farmers.
17     Q. Focusing just on those constituents in your
18  district who are farmers, what are the problems that
19  they've raised to you in terms of the labor situation in
20  agriculture?
21     A. I think I've already answered that question,
22  that it wouldn't be any different than labor all across
23  the -- in every sector. I wouldn't say that my
24  conversations with farmers are different than
25  conversations that I have with nearly every industry in

1  my district.
2      And I'd also say, in my travels across the
3  country, you hear exactly the same complaints across
4  all -- all sectors.
5      Q. And that is that there's a labor shortage in
6  every sector of every industry?
7      A. Just about. I don't know of one that doesn't
8  have a labor shortage.
9      Q. Focusing on agriculture specifically, are
10  there -- are there different solutions that you might
11  propose for the agriculture industry than you would for
12  other industries which rely on different workers with
13  different types of skills?
14     A. Sounds like a hypothetical question, but the --
15  there's a lot of different ways to craft legislation,
16  but I think it goes back to how I answered it before,
17  before the break, and that is that you can probably
18  design the legislation and it would cover all the
19  sectors, you could differentiate, it would just -- it
20  would just depend.
21     There's a hundred -- there's 435 members of the
22  House and a hundred in the Senate, and probably every
23  single member has a different opinion on how to craft
24  legislation to solve the larger immigration crisis that
25  we have.

1      Q. And in your view, is the labor shortage
2  connected to the immigration crisis?
3      A. Well, they're all -- they're all intertwined.
4      Q. And have you crafted or introduced any bills
5  with respect to the labor shortage in agriculture
6  specifically?
7      A. I don't know if -- I know I worked on
8  legislation specifically, but it would have been over --
9  probably over a decade ago.
10     Q. Can you tell me which laws that you remember?
11     A. Well, I --
12     Q. I'm sorry --
13     A. That's the problem.
14     Q. I'm sorry, I will withdraw that question and
15  I'll ask you a different one.
16     Can you recall what bills that you have worked
17  on to address the labor shortage in agriculture?
18     A. No. I just know that I can recall, about a
19  decade ago, being -- my office was involved in helping
20  to draft some legislation. I'm talking about actual
21  drafting legislation. And like I said, I'm not sure
22  that ever got introduced or not.
23     Q. Aside from that instance about a decade ago,
24  have you or your office been involved in drafting any
25  other legislation that addresses the labor shortage in

14 (Pages 50 - 53)

1  agriculture?
2    A.  Not that -- in terms of drafting, not that I'm
3  aware of.
4    Q.  In your time in Congress, have -- do you recall
5  whether or not you have been a sponsor of any
6  legislation which addresses the labor shortage in
7  agriculture?
8    A.  I don't know specifically on co-sponsors.  I
9  don't believe that any of the legislation that I
10  drafted, like I said, this was probably a decade ago, I
11  don't think that ever made it into actual legislation
12  that was introduced.  So, largely the way this would
13  work, is that you would go to the committees of
14  jurisdiction, and in this case on the immigration issue
15  it's both judiciary and Homeland Security, of which I
16  don't sit on those committees, so a lot of the work that
17  we would do would be based on a product that comes out
18  of those committees, or is put there.
19        And then, like any other member of Congress,
20  constituents contact you and -- in support or oppose of
21  it.  Then, of course, we try -- you know, specifically,
22  I know there were some funding issues for the border
23  wall that were in the appropriations process, I believe,
24  but that's -- that's been a couple years ago.
25        And like I told you, I opened up with, I've been

1  down to the border twice this year in the last few
2  months, looking at the wall where it needs to be
3  completed, looking at the immigration center, in both
4  California and Texas.
5    Q.  Can you tell me everything that you can recall
6  about the draft legislation that your office prepared
7  approximately a decade ago that was directed at the
8  labor shortage in agriculture?
9    A.  Well, I'm not sure that it was directed at a
10  labor shortage.  I think it was part of a larger, as I
11  recall, it was part of some larger group that -- that I
12  would have been just participating in, in a few
13  meetings.  But like I said, I normally wouldn't be in
14  the process of drafting because I don't sit on those
15  relevant committees.
16        I mean, it doesn't prevent you from, you can
17  draft legislation and introduce it, but I'm not -- I
18  don't remember, like I said, whether or not language got
19  introduced or not.
20    Q.  Okay, maybe I misheard you earlier.  I thought
21  you said earlier that your office had drafted some
22  language and -- are you now saying that your office
23  didn't draft some language?
24    A.  No, I told you, just to be precise here, that I
25  remember drafting language or working -- or looking at

1  drafted language about a decade ago, but that's all I
2  remember.  And I don't remember if it was -- it
3  became -- if it was put into an actual bill or not.
4    Q.  Okay --
5    A.  There's a difference between -- there's a
6  difference between a draft -- a draft is just a draft.
7  But I don't -- but I don't have any recollection of what
8  the specifics were on it, or even the issues surrounding
9  it.  I think it was part of some type of working group
10  of some kind, but, you know, we have lots of those.
11    Q.  Do you recall anything at all about the
12  substance of the language that your office drafted?
13    A.  Just -- well, it's not -- once again, I want to
14  make sure you're not putting words in my mouth --
15    Q.  I'm certainly not, I'm just asking questions.
16  The words are all yours.
17    A.  It's not language that my office drafted and put
18  into a piece of legislation.  We would have been
19  reviewing, as part of a working group, we would have
20  been reviewing legislation, legislative ideas.  I don't
21  remember if we would have went and got anything actually
22  drafted into legislative text or not.  It was
23  conceptual.
24        But I would say that it would be consistent with
25  my position that I've had for -- for nearly two decades,

1  which is what I already told you before on comprehensive
2  immigration solution.
3    Q.  Okay.  All right, and do you recall, I've --
4  just to be fair, you know, I've asked you if you recall
5  any specific bills that you were involved in drafting
6  and any bills you've sponsored.
7        Are there any bills that you can recall as you
8  sit here today that you co-sponsored that relate to
9  labor in the agriculture industry?
10    A.  No.
11    Q.  Are there any bills that you voted for or
12  against that you can recall as you sit here today
13  related to labor in the agriculture industry?
14    A.  Not that I can recall and speak factually on
15  without doing the research.
16    Q.  Okay, is there any other work that you have done
17  while a member in Congress with respect to labor in the
18  agricultural industry that you can recall as you sit
19  here today?
20    A.  Not from what I've told you, just it's -- like I
21  said, I think there was a working group at one point,
22  which was, I think, informal.  And there's pieces of
23  legislation that get introduced all the time and, you
24  know, people lobby you on those pieces of legislation,
25  pieces of -- you know, language comes to the floor in

15 (Pages 54 - 57)

Veritext Legal Solutions

1  various manners.
2      And like I said, it's been 1986 since we've had
3  any comprehensive reform, and that's what I support.
4      Q.  But you don't recall specifics of any of those
5  bills or any of that work as you sit here today?
6      A.  No.
7      Q.  If I can just go back for a moment to your
8  articulation of what you think would be a comprehensive
9  solution for labor and immigration.  You spoke very
10  specifically about border security and the need for a
11  wall.
12      I also heard you say that there would be a
13  process that everybody would follow to ensure that
14  employers and employees are matched up.  Is that -- is
15  that -- am I fairly summarizing that?  I'm reading off
16  of my notes.
17      A.  Yeah, I think that's -- generically speaking,
18  that's a -- that's what needs to be done.  But like I
19  said, there's a lot of different ways to accomplish
20  that, which have remained elusive to the United States
21  Congress and the White House that predates me.
22      Q.  And I believe you also said that there would be
23  some part of the solution that would ensure that
24  everybody is in the country appropriately.
25      A.  That's right.  But you can't take one step.  It

1  has to be comprehensive.  If not, you end up with what
2  we have -- what we have now, which is -- which is, you
3  know, completely chaotic.
4      Q.  And within that framework, would you -- do you
5  support an opportunity for agricultural workers who may
6  be here illegally to earn citizenship or to earn legal
7  status, I should -- would be a better phrasing.
8      A.  Yeah, I mean, the term illegally is one that
9  people throw around and I don't think people really have
10  a clue who's in this country legally or not, including
11  our own government.
12      Q.  Do you believe that part of a comprehensive
13  solution, though, would be to provide a pathway for
14  those who may not have legal authority to be in the
15  country to gain that?
16      A.  Just depends on what you come up with.  I mean,
17  a lot of it's based on what you can get past.
18      Q.  Okay, so it sounds as though you're open to that
19  as part of a comprehensive solution.  Is that fair to
20  say?
21      A.  I am open to whatever can get done, which we're
22  on no track to get anything done on it right now.  Right
23  now we have total chaos and complete catastrophe.  So,
24  you know, you're asking me hypotheticals, which I'm
25  engaging in these, which I probably don't need to, or

1  have to, but like I said, I'm not sure where you're
2  going with the questions, but you can keep asking them.
3      Q.  Do you think the labor system in this country is
4  broken for agricultural labor?
5      A.  I've already -- I can answer it again for you,
6  for the, I guess this would be the fourth or fifth time,
7  but I don't view any industry under a microscope
8  differently than any other industry.  There are labor
9  shortages all across the country, and have been
10  specifically with a skilled workforce.
11      Q.  I understand that, Congressman, but you do
12  represent a district with a lot of farmers and a lot of
13  agriculture, right?
14      A.  Yes, I do.
15      Q.  And I would expect that you take a specific
16  interest in their interests, don't you?
17      A.  I take an interest in all my constituents'
18  interests, whether I agree or disagree.  But you have to
19  listen to them and you try to get a response out to them
20  and answer their questions and then you try to reflect
21  their views in the U.S. Congress.
22      Q.  Would you agree that there's not a one size fits
23  all solution to labor shortages for all industries, but
24  should be a solution that focuses on the problems of
25  different industries?

1      A.  No, I don't think I can make those blanket
2  statements.  I mean, a lot of people have different
3  ideas.  I mean, there's so many concepts out there that
4  you can't just look through -- like I said, you can't
5  look at it through a microscope.
6      I mean, basically, it's around skilled labor,
7  and then what's the definition of skilled labor.  But
8  that's what I would -- you know, in terms of a
9  comprehensive fix, I would really support.  I'd like to
10  see some type of program where we have people -- where
11  we need skills that we don't have in this country, that
12  we could have an efficient, fair way to, number one, be
13  able to meet that -- that need, whether it's through
14  bringing in guest workers or training our citizens in
15  those skill sets.
16      Q.  Would you favor legislation that addresses only
17  the labor problems in agriculture if it doesn't address
18  other industries?
19      A.  No.  I favor -- I only favor a comprehensive
20  solution with security first.
21      Q.  Are you familiar with the lawsuit that this
22  deposition relates to, Congressman?
23      A.  You're talking about my family suing Hearst
24  company?
25      Q.  That's right.

16 (Pages 58 - 61)

1    A.   Yes.
2    Q.   And that was -- that relates to the -- to an
3  article in Esquire magazine; is that right?
4    A.   Yes.
5    Q.   When did you first read that article?
6    A.   Probably the night that it came out.
7    Q.   And what was your reaction?
8    A.   I'm pretty sure you know my reaction because I
9  filed it -- I filed a lawsuit against you.
10   Q.   Well, you --
11   A.   So, everything I have to say is in that -- is in
12 that lawsuit.  I can tell you more if you'd like.
13   Q.   Well, you -- sure, yeah, please tell me more.
14   A.   I think that you should be ashamed of yourself
15 and your company.  And that what you continue to do to
16 my family, and not just -- and all of my relatives is
17 despicable.
18       The fact that, you know, I spent the first, what
19 are we on now, we're two hours, roughly a little short
20 of two hours, you know, talking about agriculture
21 workers, I find quite -- quite hypocritical.  Being that
22 you seem to know so much about my area, you probably
23 should know, in California, the Hearst company is one of
24 the largest landholders in my area of central
25 California, they're in agriculture, and the accusations

1  that -- or the implication of agriculture specifically,
2  citing it now, is somehow there's illegals there,
3  implicates your own company and your winery.  I'm not
4  sure what is the difference between Hearst Corporation
5  and -- and the family, what family holdings they have,
6  but, you know, I know I'm familiar with several of the
7  Hearst operations that are not far from here that are in
8  the same business that my family and a lot of people
9  here in the same part of central California are in.
10       So, you can imagine, when Hearst produces --
11 number one, sends somebody out under the pretenses of
12 doing an article on illegal immigration in the dairy
13 industry, and they just happen to show up in northwest
14 Iowa a month before the election, I think it's quite
15 preposterous, and I think a jury would find that, too.
16   Q.   You said before that the company should be
17 ashamed of what it continues to do to your family.  What
18 is it that -- what are you talking about?  What is it
19 that you believe the company is continuing to do to your
20 family?
21   A.   If you go up onto a website, if you go to your
22 website right now, you have a fake news story that's
23 defamatory and slanderous that targeted my family, my
24 relatives, many of my relatives and me, and it's still
25 up there.  And every single day I have to deal with

1  threats that come in that, many of which relate directly
2  to that article, including having to have the sheriff
3  protect me and my family and my relatives that live
4  nearby me.  That's almost on a weekly basis.  And then,
5  of course, my family that's in Iowa, having to work with
6  the sheriff there for protection.
7        So, yeah, it's a problem, and I think
8  hypocritical, like I said, that -- you know, you could
9  have just sent Lizza out to -- why didn't you send him
10 out to the Hearst winery if you're so interested in ag
11 workers?  You didn't need to go out to Iowa, you could
12 have went to your own company, your own family.  But you
13 didn't bother doing that.
14       So, yeah, I have a problem with it.  You ought
15 to take the damn story down, and you won't do it.  And
16 that's all I ever asked you to do.
17   Q.   Tell me about the threats that you've received
18 related to the article.
19   A.   Well, I'm not going to get into specific
20 threats, but I can just tell you that there's -- we get
21 threats almost every single day.
22       So, you know, recently, you know, there was a
23 threat that was very specific in the last, I can't
24 remember, in the last 30 days or so, with somebody
25 saying that they knew where my family lived.  So, yeah,

1  that's a problem.  Actually, I think specifically it
2  said my dad.  So, the threats are real, the threats are
3  active, and they don't stop.
4        The other one that I'm sure I think you're
5  familiar with, or you should be, is, you know, we had
6  people claiming to be Antifa that showed up at my
7  family's farm, which I'm not sure if you've been out
8  there or not, to that area, but it's a very rural part,
9  very rural part of the United States of America, and you
10 had activists that came down from, I believe Minnesota,
11 that represented to be part of Antifa that came onto the
12 farm.
13       Later we learned that one of those activists was
14 -- or terrorists, maybe you could say, criminal, was
15 from my area.  So, obviously it's a threat not only to
16 me, but then the threat moves, and ends up moving from
17 California, in a matter of just a few weeks, to Iowa in
18 order to trespass on their farm.
19       So, it's -- yeah, it's a big problem.  So, you
20 guys -- it's actually embarrassing for you and your
21 company, and the Hearst family, especially being the
22 size of the accusations of the article.  He could have
23 wrote the whole article about the Hearst family, maybe
24 you should have went and interviewed their gardeners
25 maybe, I don't know.

17 (Pages 62 - 65)

1  But instead you send -- you send a guy, maybe
2  it's the people that work at their winery, maybe
3  anybody -- maybe you do like Lizza did, racial
4  profiling, sneaking around, sneaking around in a rural
5  area targeting -- racial profiling and targeting
6  Hispanics, anybody who doesn't speak English, including
7  young Guatemalan boys who claim they're legal. It's
8  pretty sick stuff.
9  Q.  When you reference threats, are these all
10  threats to your father and brother and your family in
11  Iowa, or are you talking about threats to yourself and
12  your immediate family, your -- I don't know if you
13  have -- if you're married or have children. Who are the
14  threats to that you're talking about?
15  A.  They're threats to my entire family, whether
16  it's -- and anybody that's related to me.
17  Q.  And they come in -- and how do you --
18  A.  And not all the threats are the same, but some
19  are specific to that story. I mean, look, if you want,
20  I could probably -- if you got onto Twitter right now,
21  or Facebook, it wouldn't take you long to pull up people
22  that are talking about your story.
23  Q.  Where do you receive these threats?
24  A.  They can come in the form of trespassing, people
25  showing up at farms. They can show up in terms of

1  e-mails, phone calls.
2  Q.  Not in terms of how they can come up, but tell
3  me specifically about the threats that you have received
4  related to the article, please.
5  A.  Well, like I told you, the most recent one was
6  the one where it was said that the guy was threatening
7  to kill me and my father.
8  Q.  And did that threat come in by telephone or
9  e-mail, or how did that come in?
10  A.  I believe it was telephone. I think that one
11  was telephone. And then I know there was a more recent
12  one which was both telephone and e-mail. I can't
13  remember, though, if that had to do with it -- that one
14  mentioned my family or not.
15  Q.  Did you report it to the authorities?
16  A.  Yes, we report all of them to the authorities.
17  Q.  Do any of those who make threats leave names or
18  identifying information, have there been any arrests
19  that have been related to any of these threats?
20  A.  I'm not going to get into specific security
21  issues surrounding my security. It's a matter that we
22  deal with FBI and the Capital Hill Police, and usually
23  local sheriff and police department.
24  Q.  Can you tell me any other threats that you can
25  recall aside from the one you just identified?

1  A.  Look, there's threats that are ongoing, you
2  know, virtually daily. Some are -- some are better than
3  -- some are more threatening than others, but they're
4  very, very damaging.
5  Q.  I realize it may be difficult or uncomfortable
6  to talk about, Congressman, but it is relevant to the
7  case. You have been listed as a witness for major areas
8  of your family's case, and so it is relevant. If you
9  could please recount for me the threats that you can
10  recall, I'd appreciate it.
11  A.  I'm going to get into -- I've told you the
12  threats that were most recent and those are the ones
13  that I recall the best. The other ones are -- you know,
14  it's been going back a month or two or three months,
15  it's hard for me to recall all the specifics about it,
16  but, you know, what I'm telling you is, is that they are
17  constant and they are active and they are a major
18  problem that you caused.
19  Q.  And if we could just go back to the most recent
20  one because that's the one you mentioned first and seem
21  to have the best recollection of, what was it in the
22  threat that leads you to believe that it was related to
23  the Esquire article from three years ago?
24  A.  Because they said they knew where my family farm
25  was. I mean, that's -- I mean, look, you only have to

1  get on -- I know you don't want to do this, but, I mean
2  you probably have done it, but you can just go and read
3  the quotes and comments that are under your own story
4  that you refuse to take down. You want to know the
5  threats? Go look at that.
6  Or you can go to Twitter. You know, the fact
7  that people are advertising that I've got relatives that
8  have farms somewhere is frightening. I mean, that does
9  not happen to most public officials. But because of
10  what you guys decided to do, and because you wanted to
11  get me and you hired, you know, some guy that shouldn't
12  have even probably had a job at the time, but you hired
13  him, and then you hired him to go target my family, and
14  yet you can't even tell me who fed the story. Who fed
15  the story to Lizza? Who fed the story to Hearst?
16  So (speaking simultaneously) --
17  Q.  So --
18  A.  -- should have said, wow, maybe we should go
19  target the Hearst winery and the Hearst ranches.
20  Q.  So, the fact that the person who made the threat
21  knew where your parents' farm leads you to believe
22  that it's related to the Esquire article?
23  A.  Every single day you have hundreds of thousands
24  of people, most likely, that are reading nonsense about
25  how I have some secret farm that's in Iowa. That's

18 (Pages 66 - 69)

1  every single day. Every time that that's out there it
2  results in lunatics, like the ones that I described to
3  you, because it was a concern, because you had people
4  going from California that were trespassing on my
5  family's farm. So -- claiming to be part of Antifa.
6      So -- and these are the ones that we know about,
7  but the longer that that's out there and the American
8  public thinks that I had some type of secret farm, it's
9  going to result in people being spun out, especially
10  with the politics of today, and targeting my family.
11      And then let's not forget my family that gets
12  targeted that lives by me here. They have -- they
13  constantly get targeted too. And, in fact, if you want
14  a specific, you coordinated, Lizza coordinated with CNN,
15  who was the employer at the time when this story came
16  out, and had CNN reporters go out to my 98-year-old
17  grandmother's home. And they also went out to Iowa.
18      Now, why would you do that if it wasn't because
19  you were trying to get at me, and therefore get at them?
20  You're targeting, you're sending people out. My
21  grandmother never ran for office, my family never ran
22  for office, they're not public officials, but your
23  reporter decided -- who has a checkered past, I will
24  say, decided to go do that.
25      And like I said, you're so -- you seem so

1  interested on this call, you're really interested about
2  agriculture in California in my district, you ought to
3  look in the damn mirror and go look at the Hearst
4  winery, and go look at the Hearst ranches. If you're so
5  interested, maybe ask them, I don't know, are they
6  verifying? Those are questions you could have asked
7  them.
8      You didn't need to go out to Iowa, you didn't
9  need to go to my 98-year-old grandmother's house and
10  scare the hell out of her, but you did it. You did it.
11  Matter of fact, she's dead now, by the way, and she
12  never really recovered from that. So, you know --
13  anyway, I'll just stop there.
14  Q. All right. I'm going to let you go on with your
15  comments because I don't want to cut you off or
16  interrupt you again, but you did not answer my question,
17  so I'm going to ask the court reporter to read it back.
18  And I just will say, if we need to continue the
19  deposition or ask the court for more time because we
20  don't finish today, you know, that's your choice.
21      MR. BISS: You can do whatever you want, just
22  get on with the deposition, stop wasting time.
23      MR. DONNELLAN: I am certainly trying to, Steve.
24      Court reporter, could you please read back the
25  question that I asked.

1
2      (Whereupon the record was read by the
3      reporter as follows:
4      "Q. And if we could just go back
5      to the most recent one, because that's
6      the one you mentioned first and seem to
7      have the best recollection of, what was
8      it in the threat that leads you to
9      believe that it was related to the
10      Esquire article from three years ago?")
11
12      THE WITNESS: Pretty sure I answered the
13  question. When you have people saying that they know
14  where my family's farm is, and they're on the internet
15  all day long and you can see -- and these people, you're
16  poisoning the minds of the American people with this
17  nonsense, that -- I don't know what more evidence you
18  need, than just go out and look on social media right
19  now. It's all over the place. Every day, practically,
20  if not multiple times a day, I'm getting accused of
21  having some big grand secret in Iowa. Every day that
22  happens it makes my family a target.
23      As we have found out with the most recent call,
24  where they specifically said where my family lives, and
25  it caused us to have to get the sheriff involved in

1  Iowa. And then also the one that I told you about
2  because it's -- it's very concerning because it has to
3  do with a terrorist group called Antifa. I'm not sure
4  if you've heard of them or not, but they're the ones
5  that went burning down buildings all over this country
6  last year. And then they showed up, somebody was from
7  my area that actually went back there to target my
8  family.
9      So, if it wasn't for your article, how the hell
10  would he know it, and you know the answer to your own
11  question.
12  BY MR. DONNELLAN:
13  Q. Well, I had thought that the location of your
14  family's farm was not a secret. Isn't that your
15  position?
16  A. Are you trying to be cute? It's not a secret
17  because -- you guys said that it was a big secret and
18  you gave the implication that it had something to do
19  with me. And it's not just the Iowa farm. It's also
20  the farms in -- that are nearby me here, where every one
21  of my family members have been targeted. And it's also
22  any business that I'm involved with, including wineries
23  that I'm involved with that have been targeted. So --
24  Q. Congressman, I'm not trying to be cute, but I am
25  trying to be responsive to your answers and trying to

1 get answers to my questions. And my question is, going
2 back again to the threat that you had talked about, you
3 said that you -- when I asked you why you thought that
4 that threat was connected to the Esquire article, you
5 said because they referenced the location of your
6 family's farm in Iowa.
7      And now I'm asking you, is there anything else
8 in that threat that was referenced that would connect it
9 to the Esquire article?
10     A. Well, there's that one, was the most recent,
11 that I can recall as it related to the farm, and like I
12 said, it was in the last few months. But then there was
13 one that was, I don't know what it was, six or -- seven
14 months ago, where you had somebody who left this area
15 and showed up out there on my family's farm there in
16 Iowa.
17     Not to mention all the lunatics that go around
18 my house and my farms here. And it's the total phony
19 story that you wrote and the implication that you --
20 that you used to give your readers some type of idea
21 that I may or may not have something to do with Iowa.
22     And, you know, it's right here, it's in the
23 article that's still up online. You can probably look
24 at it, but you -- and every day you leave it up, and
25 every day you don't apologize, is another day that my

1 family has to live in fear. Not only the family in
2 Iowa, but my family that's here in California, including
3 my wife and children who often have to have protection.
4     So, it's garbage like this that's destroying
5 America. And like I said, I find it very hypocritical
6 that you've gone down this line of questioning, knowing
7 that the Hearst family is involved in agriculture. You
8 could have picked any dairy farm in America, or winery,
9 to do your fake story, but you didn't. You targeted my
10 family because you have a lunatic, an unhinged lunatic
11 that's the reporter, who has serious problems. He's a
12 political operative, didn't have a job until you guys
13 hired him to be an assassin to go out to my family.
14     In fact, I didn't even know that he was working,
15 I didn't know he had a job, 'cause I didn't think
16 anybody would be crazy enough to hire this guy with all
17 of the ████████████████████████████
    ██ ██
19     And then, not to point out, then you have this
20 sick guy that goes and parks by my parents' home, and he
21 parks in a, basically at a dead end of the road that
22 nobody even goes down where he can peer into their
23 backyard. And so, it's a road that there's never even
24 been a car on in my whole time, the times that I've been
25 out there, and my dad and mom said there's never been a

1 car parked there. So, yeah, it kind of scares the hell
2 out of people.
3     And then, furthermore, then the guy goes and
4 he's parked, taking pictures of my brother's home. You
5 know, this is sick stuff. Like I never even heard of a
6 reporter that supposedly, as you guys represented to the
7 court, you lied to the court, but you told the court in
8 my case that you were doing an origin story on -- on me.
9     Well, your reporter, and I provided this, I
10 provided these e-mails to you, your reporter represented
11 that, oh, he just happened to be in Iowa doing a story
12 on immigration and the dairy industry. Now, that's not
13 what you told the federal court. So, your story doesn't
14 jive there.
15     And then like I said, you know, you could have
16 just targeted the Hearst family if you wanted to do
17 some -- you know, if you really have an interest in
18 immigration. So, the fact that you would send this guy
19 with these ████████ to my mom's house, hanging out,
20 to my young nieces', you sent him there, he's parked two
21 houses down taking pictures while my nieces are outside,
22 that's pretty sick stuff.
23     And then you're playing dumb like, oh, what --
24 let me ask you a question about how people would know
25 what it -- how people would link this up. I get threats

1 nearly every day and you could find them all if you just
2 went to your own website, if you cared.
3     Q. Are all the threats that you receive related to
4 the Esquire article?
5     A. It's one of the big ones, but no, that's not all
6 the threats.
7     Q. How do you distinguish between those that are
8 related to the Esquire article and those that are not?
9     A. The ones that mention that I have some secret
10 illegal activities that I'm concocting in Iowa. Any
11 time you see those online, that poisons people, and then
12 it gets people to leave from here and go out there, and
13 it gets people to drive by their farms, drive by their
14 homes. And it's totally inappropriate. Public
15 officials' families, especially, especially distant
16 family, should be -- should be off limits.
17     Q. And with respect to the threats that you've been
18 talking about, if we put aside threats on Twitter or
19 that are posted online for public consumption, how many
20 threats have you received personally through e-mail,
21 telephone, letter, or some other direct means of
22 communication to you?
23     A. Look, I'm not going to get into specifics of
24 that, but it's more than I can -- more than I can count.
25 And I don't know the whole number, but I'm under

20 (Pages 74 - 77)

1  constant -- I'm constantly having to make sure that my
2  family is secure, both here in California, my staff is
3  secure in Washington, and my staff here. And oftentimes
4  it is directly related to your article, your hit piece.
5      Q.  So, we started this line of discussion when I
6  asked you if you read the article and what your reaction
7  was to it. If I could focus you, to the extent to which
8  you can remember, you said that you read it the night it
9  came out. Do you recall what your reaction, your
10  immediate reaction was to it that evening; was it the
11  same as what you've described or was it any different?
12     A.  Specifically that night? I mean, it's hard --
13  you know, I don't know if that night or within the few
14  days after, but I mean clearly you're accusing me and my
15  family of federal crimes 30 days before an election, so
16  pretty serious stuff.
17     Oh, then it was used by all of my political
18  opponents, conveniently, too. That's -- not that you
19  guys would have had any coordination on that. Just like
20  I'm sure you didn't coordinate, Lizza didn't coordinate
21  with CNN to have a camera crew show up on the very next
22  day, I believe it was the next morning, at my
23  grandmother's house. Which, by the way, would be a four
24  or five-hour drive for a CNN crew to get to her home.
25     And the same goes for -- that showed up out at

1  my brother's place out in Iowa, I'm sure that was just
2  coincidence.
3      Q.  When did you first consider suing?
4      A.  Probably -- probably early 2000 -- I guess it
5  would be 2019.
6      Q.  Why did -- why was it not until 2019?
7      A.  Well, it wasn't -- I mean, I wanted to do it --
8  I had to figure out how I could actually bring lawsuits.
9  I didn't know the law well enough, so I had to study it.
10  And then -- and now my policy is, and I have a new
11  policy, that if you defame or slander me, I take you to
12  court.
13     Q.  When did you implement that policy?
14     A.  In 2019.
15     Q.  Was this article what motivated you to implement
16  that policy?
17     A.  This is one of the big ones.
18     Q.  You understand that the only remaining issue in
19  your family's case, the NuStar case, relates to the
20  reporting that your father or your family's farm relies
21  on undocumented workers, right?
22     A.  I don't know what's remaining in that case.
23     Q.  Okay.
24     A.  All I know is you asked me to appear on a
25  deposition, I gave you a date, and then you moved the

1  date.
2      Q.  Have you ever visited Sibley, Iowa?
3      A.  Yes.
4      Q.  And you visited the farm, presumably, your
5  family's farm?
6      A.  Yes.
7      Q.  How often have you been there?
8      A.  Maybe, I don't know, maybe once, maybe two
9  nights, maybe, last year. I'm usually out there about
10  every other year for a birthday or baptism, something
11  like that, usually for just a couple nights. We went,
12  one time we went, I took my kids for, I believe it was
13  Fourth of July, maybe about, I don't know, seven, eight
14  years ago.
15     And then there was one time that my grandmother,
16  when she was still alive, that I -- just what I
17  remember, we took her out there one time, I think either
18  me or my aunt traveled with her, met her out there. So,
19  been there a couple times for more than a few days, and
20  then the rest of the time it's usually just been a night
21  or two if I was swinging through.
22     Q.  How many times have you been there since the
23  Esquire article appeared?
24     A.  I don't even know if I have been. I know I -- I
25  know I made it up there -- I'd have to look at my

1  calendar, but I think I was there last year, it was
2  around September. I think it was -- it was last fall.
3  And I was there -- I think I was in Omaha, and I drove
4  up, as I recall. But I don't know if I was actually --
5  are you saying on the farm, or just visiting my family?
6      Q.  That's a fair distinction. Visiting your family
7  or the farm, shall we say.
8      A.  On the farm, I don't know. I can't -- I don't
9  recall. I know I visited my family last year.
10     Q.  So, the fall of 2020, was the last --
11     A.  I think it was -- I think it was one night,
12  might have been two nights.
13     Q.  And that was the last time you were there?
14     A.  That was the last time that I was there. But
15  that was visiting my family, I was not on the farm.
16     Q.  And had you visited your family or the farm any
17  other time in 2020?
18     A.  Not that I recall.
19     Q.  How about in 2019?
20     A.  I think it was just -- I think it was just 2020,
21  that I recall.
22     Q.  Do you recall any visits to your family or the
23  farm in 2018?
24     A.  No.
25     Q.  Do you communicate with your family much by

21 (Pages 78 - 81)

1 other means, by telephone or e-mail or otherwise?
2 A. Just -- I mean, my family, before COVID, my --
3 you know, my parents spend -- used to spend quite a bit
4 of time out here in California, so either in person or
5 on the phone.
6 Q. And how about your brother and his family?
7 A. My niece came out for my grandmother's funeral,
8 two of my nieces did, and they stayed with me, which was
9 about, about a month ago.
10 Q. Do you talk with your parents about the -- about
11 the business?
12 A. No.
13 Q. Do you talk with your father at all about the
14 farm's operations?
15 A. No, I do not.
16 Q. Never?
17 A. Probably just random stuff, but, you know, like
18 how's the -- what's the corn crop look like and things
19 of that nature.
20 Q. Do you talk with your brother at all about --
21 A. About the specifics of -- of -- I have enough
22 issues to deal with on my own. But as it relates to
23 issues on either my brother's farm there or my family's
24 operations here in California, other than just small
25 talk, I don't know anything really about the operations.

1 Q. So, you don't --
2 A. It's been a long time since I've been involved
3 in those -- in my family's operations.
4 Q. So, you don't speak with your brother about the
5 farm business or operations at all either?
6 A. Not really, no. Small talk. But about specific
7 operations about that, about that farm, no, I do not.
8 Q. Like, for example, do you know how many cows
9 they have there?
10 A. Today, no. I know roughly it's in the -- it was
11 around 17 or 1800, but I think they have more now, but I
12 don't know.
13 Q. Do you know roughly how many workers they have?
14 A. I have no idea.
15 Q. Do you know anything at all about the
16 composition of their workforce?
17 A. No, I do not.
18 Q. Do you know who any of the workers are?
19 A. No, I do not.
20 Q. Have you ever met any of the workers at the
21 farm?
22 A. I'm sure I have, just walking through. But, you
23 know, when I've been there in the past, that I can
24 recall, it's just walking in, walking out and saying
25 hello.

1 Q. Have you ever spoken with any of the workers
2 there besides hello?
3 A. Not that I can recall. Waving, hello, what's
4 going on. I remember one time I was out there, I think
5 my uncle was out there and we did -- they were
6 harvesting corn, I can't remember this was -- this was
7 probably ten years ago, I'm not sure if it was the same
8 trip, but I was in there for a couple nights and my
9 uncle was out there and I remember we were, I think they
10 had some new piece of equipment and I talked to several
11 of the people that were there working at that time.
12 That's probably the last time I can remember
13 actually talking to anyone on the -- that worked on the
14 farm.
15 Q. Have you ever discussed labor issues with your
16 father or your brother at all?
17 A. No, I have not.
18 Q. Have you had those sort of conversations at any
19 time over the last 20 years?
20 A. As it relates to what?
21 Q. As it relates to agriculture and farming.
22 A. We've had lots of conversations about farming in
23 general, but in terms of the operation on that, on that
24 farm, other than going to -- when my brother decided
25 that he was going to move out there, I remember stopping

1 out there. I can't remember what year it was, it would
2 have been probably 2005 or '06, and he wanted me to look
3 at the farm. And it was before he owned it. And then I
4 went out there and --
5 Q. Did you go --
6 A. I went out there and I looked at the farm and,
7 you know, gave him my advice, which I'm not sure if he
8 took any of it or not.
9 Q. I'm sure with your, not just with your
10 experience but with your academic degrees in
11 agriculture, your family has called upon you for your
12 views and your advice in the past such as that, yeah?
13 A. Like I said, that was the one time I -- the only
14 time -- issue I can remember, was when they first bought
15 the farm, they were getting ready to put it into escrow,
16 I stopped out there -- or I think maybe -- maybe two
17 nights, and just to give them my -- they asked for my
18 thoughts on it.
19 Q. And what -- and what were your thoughts on it,
20 what were the views that you shared with them about the
21 farm?
22 A. Well, I didn't really want them to leave. I
23 didn't want my brother to leave, but I understood why he
24 was leaving, so...
25 Q. What were the views you shared with him about

22 (Pages 82 - 85)

1 the farm, which is what presumably was asked for, right?
2 A. Oh, yeah, it would have just been, you know, my
3 evaluation. I mean, at that time I was not as far
4 removed from farming as I am now, specifically on dairy,
5 because I used to run my grandmother's farm. So, at
6 that time, you know, it was evaluating the facilities,
7 the animals. I think we went and looked at some young
8 stock that they had, and that's the state of my
9 evaluation.
10 Q. Presumably you evaluated the labor forces as
11 part of that, yes?
12 A. No, I did not.
13 Q. Wouldn't that be one of the largest cost centers
14 in running a farm?
15 A. No, not -- nice try on the labor, there you go
16 again on the labor thing. Why would I go out to a farm
17 my family doesn't have, doesn't own, and evaluate labor?
18 Q. Because you said that you were evaluating the
19 farm operations and --
20 A. They weren't buying -- they weren't buying
21 labor.
22 Q. Before going out --
23 A. They were buying facility -- they were buying
24 facility and -- facility and the land and the animals.
25 That's what I was evaluating. And that's the last time

1 that I can remember of actually doing something that
2 was -- you know, where I got called in where they asked
3 me to give them an evaluation.
4 Q. When did you first learn that Ryan Lizza had
5 gone to Sibley, Iowa?
6 A. When my dad called me and he -- and he said --
7 'cause I had talked to him the day before, and I
8 remember he said that there had been some car that had
9 been trespassing on the farm, or driving around real
10 slow, which was kind of odd.
11 And then he called me, matter of fact, I think
12 he called me, maybe a couple times, and I was -- I
13 think -- because I was in Washington, as I recall. And
14 I knew something was wrong because he normally wouldn't
15 call like that. And then he said, hey, you remember the
16 car that I told you was driving around slow on the farm,
17 and I said yeah. And he said, it's parked outside my
18 house.
19 And I'm like where, and I told you this earlier,
20 it was parked in a place where nobody ever parks because
21 it's on a dead end on an untraveled road that actually
22 looks -- the only thing you can see is a corn field or
23 into the backyard of my family, to my parents' home.
24 It's a small town there.
25 And so, that's when I said, did you -- I said,

1 what are you doing? He says, well, I confronted the
2 guy. And -- and I went out there to see what was going
3 on because clearly he had been trespassing on the farm
4 the day before, and here he was parked in a place, that
5 the only thing you would do is eavesdrop on somebody,
6 which I don't know why any reporter would think that he
7 can sneak around a small town like that and not get
8 spotted and not look like, you know, you're casing out
9 the place, which ends up that's exactly what he was
10 doing.
11 And then my dad told me that it was Lizza. And
12 I told him I was kind of surprised, because I said
13 that -- I said it was very dangerous, because Lizza
14 doesn't even have a job. 'Cause I didn't think that he
15 had a job. And I told him, I said be careful, because I
16 knew the guy's background as being a left wing assassin.
17 And then I said something about, represented to
18 my dad -- my dad said something like, oh, no, he says he
19 works for CNN, or something along those lines. And I
20 said, well, look, I said, I don't know what he's doing
21 there, but be careful because this guy's got a really
22 checkered past, and he's got, you know, serious █████
23 ████████████.
24 And then it was at that point -- that's what I
25 basically remember, when that all happened. And then

1 like I said, then probably, I don't know, a month later,
2 I get these frantic e-mails and messages, you know, to
3 my office from your reporter, Lizza, claiming that he
4 was just doing a story on immigration in the dairy
5 industry. But couldn't really figure out, though, why
6 he would be talking to -- racial profiling, talking to
7 every Hispanic he could find in Sibley, Iowa, which is
8 what my family had told me, and running around asking
9 about me, claiming that I was using different names and
10 all kinds of other conspiracy theories, that I was, you
11 know, hiding something there.
12 So, like I said, you have a problem that --
13 Hearst has a problem, not just for being hypocrites and
14 not, you know, investigating, you know, your supposed
15 concerns of agriculture because you could just look at
16 your own landholdings and winery, but also because you
17 have a situation where you were, you know, targeting --
18 you send a ██████ guy out there, and then you
19 wonder why your parents had to call the sheriff.
20 The guy was driving around slow, taking
21 pictures, scaring the hell out of my nieces. And then,
22 you know, like I said, I didn't believe that he had a
23 job because of all the stories that I knew at the time.
24 'Cause, matter of fact, I remember right after I got off
25 the phone with my dad that first morning, I called to

23 (Pages 86 - 89)

1  see -- I called -- or I started to search, and I said I
2  don't think this guy has a job. And then I called my
3  dad back and said, I don't think he has a job, because
4  of all these stories. I mean, they were in all the, you
5  know, all the fake news stories here about the ███
6  ███████ you got New York Times, Politico, which
7  ironically ended up hiring the guy after you guys fired
8  him. The AP. Chicago Tribune. U.S. News. I mean,
9  nearly every single outlet in the country covered that
10 this guy had been fired███████████████.
11      So, the fact that this guy would misrepresent
12 himself out there, run around saying that he's doing a
13 story supposedly on immigration and the dairy industry,
14 why he would choose there is weird; why wouldn't he go
15 ask him some questions.
16      And in fact, Hearst, you guys lied to the
17 federal court in my case, claiming that this was somehow
18 an origin story. You know it's a lie. Lizza knows it's
19 a lie. And his e-mails also show that it's a lie. So,
20 that's what I -- that's what I remember when I first
21 talked about my dad when you sent a ███████ out to
22 stalk him and my mom and my nieces.
23      Q. Okay, so I've heard you make reference to, at
24 least two communications you had with your father while
25 Ryan Lizza was in Sibley, one when he called and said

1  there's a guy trespassing, and then he called you back
2  and said, hey, the guy's name is Lizza, I confronted
3  him.
4      Were there more than two communications that you
5  had with your father while Mr. Lizza was in Sibley?
6      A. Like I said, I think that -- I told you about
7  the articles that I then looked up, because I didn't
8  believe that he had a job --
9      Q. That's not my question. And, again, I don't
10 mean to be rude or disrespectful at all, but I'm just
11 asking about the number of communications that you had
12 with your father while Ryan Lizza was in Sibley, Iowa.
13     A. Oh, I wouldn't remember that. I just remember
14 the first -- I remember -- the first conversation I had,
15 I was actually just talking to him in generalities, I
16 think I was checking in. That was the -- that was when
17 he was first trespassing, but nobody knew what it was.
18 It was just in passing that my dad said that there was a
19 car driving around, he said he kept seeing it, and it
20 was trespassing.
21     And then, like I said, it was the next morning
22 that he called me with that, and then that's when I
23 looked up all the stories. And I think I must have
24 called him back that day, I don't remember, but --
25 'cause I said this guy doesn't even have a job, because

1  I didn't know he had a job.
2      Q. Okay.
3      A. So, at that point we're assuming, I'm under the
4  assumption, and the reason I think that my dad went to
5  the sheriff, is because I'm under the assumption that he
6  is hired by the same dirty groups that had been
7  targeting me and the rest of my family.
8      But that was the first time that anybody had
9  actually shown up in Iowa. We had had numerous similar
10 problems of, you know, goons like the ones you hired
11 just to run around Sibley and target people just a month
12 or so ago, I heard about. You know, there were goons
13 hired around here to target my family here.
14     Q. Representative Nunes, just again, in an effort
15 for us to be able to move through the questions that we
16 have and to be efficient with our time, I just want to
17 try to focus on the number of communications that you
18 had with your father while Ryan Lizza was in Sibley, and
19 also the substance of those and --
20     A. I told you --
21     Q. If I could -- if I may, please, Your Honor.
22     A. Okay.
23     Q. You had said initially that your father had
24 called and said that some car was trespassing on his
25 farm, and then you had a later conversation that, you

1  know, he said that the car was outside his house then.
2  And then you just said, just before, that you thought
3  the first call was that you were checking in with your
4  father, which suggests that you may have been calling
5  him and that you were talking about generalities.
6      So, I just want to make sure I have the sequence
7  right and the number of conversations --
8      A. Okay, I can clarify this for you, because I
9  remember this part pretty distinctively.
10     Q. Thank you.
11     A. So, it was the day before, when I was just -- I
12 happened to be talking to my father, just a check in
13 call, you know, like once a week or whatever, and he was
14 out, he was out on the farm, and I think they were
15 chopping corn at the time, harvesting, and then we were
16 just chatting and then he says something about a car,
17 and then he said that there's this car that keeps
18 driving around. And I said, oh, that's weird, you know,
19 didn't think anything of it.
20     And then the next morning was when he caught
21 Lizza, you know, peeping around in his backyard. And
22 that's when he went out, you know, like any normal
23 person would do, and confronted him, you know,
24 especially since my mom was in there, and confronted him
25 to see -- he didn't know what the hell the guy was doing

24 (Pages 90 - 93)

1 because he had been casing out the dairy the day before,
2 now he's three miles away casing out their house in
3 Sibley. That's when he called me frantically, after
4 that.
5     And then like I said, I remember at the time,
6 that's why I wanted to get my recollections back,
7 because I remember searching, 'cause I said that Lizza
8 didn't have a job, and I was just assuming that he was
9 out there targeting me. Which he was, ends up he was,
10 but those are kind of the three conversations that I
11 remember having with my dad at that time, and that was
12 in that two-day period.
13     Q. So, just going back to the first conversation
14 where, you know, you said initially that Lizza was
15 trespassing on the farm, and you said just now that he
16 was driving around. Did he actually go on the farm
17 property or not?
18     A. From what I remember, he was actually driving --
19 you know, whether it's trespassing or not, you know, I
20 don't know. My dad just said that he was driving around
21 slowly around the farm. Legal definition of
22 trespassing, I don't know, I didn't see, I don't have --
23 I can only tell you what my dad was telling me, that the
24 guy, for several hours, you know, had been driving back
25 and forth and around the farm.

1     So, if you're going around the farm that's -- if
2 it's not trespassing, it's awfully damn close, but it's
3 definitely stalking. So -- and then, you know, for sure
4 when you show up at -- at my mom's and dad's house
5 that's three miles away, I already explained that to
6 you, that's really stalking and weird.
7     And then I know after the fact, I can't remember
8 when I found out about it, but when the neighbors saw
9 him a couple houses down from my nieces' home, when they
10 were out in the front yard and they thought he was some
11 perv, that's a big problem.
12     Q. But just going back to the second conversation
13 again, when Lizza went to your parents' home, you had
14 said the first time that he was parked outside the
15 house, then you made a comment that suggested that he
16 might have been on their property looking in their
17 windows, and now you're -- that's something I have not
18 heard anywhere before.
19     Is that what you're saying, or are you saying
20 that you heard that he was parked outside?
21     A. He was parked outside. So, the two -- so,
22 initially, he was parked where nobody should be parked,
23 in a spot that would only be there to monitor what's
24 happening in that house. There's no other homes there.
25 There would be no reason to be where he was parked, from

1 what my dad -- from the location that he was in.
2     Q. He was parked in the street, correct?
3     A. No, he was -- well, he was parked on a dead-end
4 street that's really not -- it's not a through street.
5 It's a street that's along a little -- between -- by a
6 field and a wooded area that's part of my parents'
7 property, with a direct view into their backyard, their
8 garage. I mean, very bizarre.
9     And then later, I remember that one of the
10 neighbors there saw him a couple houses down from my
11 parents' home taking pictures of the -- of the house.
12 And then, of course, there's later that I found out that
13 he was at my brother's house, which is -- which is, you
14 know, a few blocks away, and he was stopped out there
15 stalking my brother's home taking pictures while my
16 nieces were in the front yard.
17     Q. So, just going back again to the chronology and
18 what your father said to you and you said to him, you
19 had said earlier that after the second call with your
20 father, that you went and you looked up information
21 about Ryan Lizza, correct, is that right?
22     A. Remember, the first call had nothing to do with
23 Ryan Lizza. We didn't know who -- we didn't know -- it
24 was just in passing that he said some car had been
25 driving around the farm.

1     Q. Got it.
2     A. I thought that was obviously a little weird
3 because of all the, you know, all of the other issues
4 that I was having at that time with security. So, it
5 was a little odd that, you know, just -- you know, he
6 raised that. Because we had lots of other people
7 driving -- you know, stalking me and the farm and my
8 family's farms and all of that in California.
9     So, then the first call where I find out about
10 Lizza was right after he had caught Lizza on the side of
11 his house on a road that's a dead end. And then I think
12 -- and then when he told me that, I said be careful
13 because he doesn't have a job. And so, that's when I --
14 and then I think I looked up to see if he had a job, and
15 I think I told my dad -- I think I called him back, and
16 I can't remember if it was an hour or five hours, but
17 called him back and said, hey, the guy doesn't have a
18 job, so whatever he's doing out there, you know, it's
19 obviously targeting me.
20     Little did my dad know that it was targeting him
21 because he was going around the town racial profiling
22 and finding anybody who didn't speak English to try to,
23 you know, make up a story, which is what he did, about
24 me and my family.
25     Q. Now, when you -- so, the second and the third

1  calls, you know, the second call, when you called your
2  father and he noted the car outside, at that point he
3  told you it was Ryan Lizza. I'm assuming at that point
4  that your father had gone outside and spoken with Lizza;
5  is that right?
6      A. Yeah, actually, I think he actually pronounced
7  the name wrong, as I recall. And I'm like who, and then
8  I said, no, it can't be that guy, because he doesn't
9  have a job. And then he said, yeah, he said he's from,
10 you know, wherever he said he was from. And I just
11 said, wow, I don't think it's the same guy, he doesn't
12 have a job.
13      And then that's when I went and searched, and
14 then I called him back at some point, and I didn't think
15 it was the same guy, but then my dad said, no, that it
16 was the same guy. Because I think he must have looked
17 up and found a picture of him, probably a picture on the
18 ██████████████ job stories.
19      Q. Did you tell your father at any point that he
20 shouldn't speak to Lizza?
21      A. I told him, I said watch out, stay away. I
22 don't know if this guy's -- I mean, and obviously that
23 was the right advice. I wasn't sure if he was there to
24 harm him or to, you know, just filming and taking
25 pictures. I didn't know what the hell was doing. Of

1  course, after the fact, you know, when the story comes
2  out, you know, it ends up being totally, just fabricated
3  nonsense.
4      Q. Did you speak with anybody else in your family
5  while Ryan Lizza was in Sibley?
6      A. Not that I recall, but that's been a long time
7  ago.
8      Q. Did you speak with anybody outside your family
9  about Ryan Lizza's presence in Sibley during that time?
10     A. I'm sure that I would have mentioned it to --
11 'cause at that point we were dealing with all sorts of
12 security issues, so I probably -- I'm sure I would have
13 mentioned it to my people on my campaign and office, but
14 I don't -- I don't know.
15     And I know for sure after the fact when the
16 story came out, you know, that was obviously pretty bad,
17 because, you know, it went out to tens of millions of
18 Americans. And then from that day forward, all the
19 accusations have been flying against me and my family.
20     Q. And you testified a little while earlier that
21 about a month after Mr. Lizza's visit to Sibley, that he
22 had sent e-mails to your office; is that right?
23     A. Yeah, we provided those to you as part of --
24 when you subpoenaed me for them.
25     Q. And did he provide -- did he send you direct

1  mail messages also?
2      A. He sent me a direct -- I think he actually
3  called me, texted me, which I don't even know how he got
4  my phone number. And then I know he direct messaged me
5  on Twitter, because I have that -- I provided that to --
6  to your subpoena request.
7      Q. Were there any other communications that
8  Mr. Lizza made to you or your office?
9      A. Yeah, I think it was around the same -- I don't
10 remember if he e-mailed -- I think he might have
11 e-mailed my staff also.
12     Q. And did you --
13     A. But if we had that, we would have provided it to
14 you.
15     Q. And did you respond to any of Mr. Lizza's
16 communications?
17     A. Absolutely not.
18     Q. Did your staff respond?
19     A. Absolutely not. We don't respond to fake news,
20 especially a guy like Lizza.
21     Q. This is --
22     A. You have a guy running around -- you have a guy
23 running around, we don't even think has a job, has all
24 sorts of ██████████████ issues, he's not exactly the
25 guy, despite the fake news aspect of it, Lizza's not a

1  guy that I would respond to anyway, other than you guys
2  thought he was a great guy to hire.
3      Q. So, you wouldn't have responded to him under any
4  circumstances?
5      A. Not with his ██████████ problems, no.
6      Q. You weren't interested in learning what he was
7  reporting on or what he was seeking comment on?
8      A. Well, it was -- it was -- I know what he did
9  because he represented it in his message to me, which
10 was he was doing it on dairy -- on the dairy industry
11 and immigration. Which is kind of weird, he doesn't
12 seem to me to be like an ag reporter of any kind. Of
13 course, by the time we got that e-mail I already knew
14 that he had been stalking my family for the better part
15 of a week, or a few days. And I think it had been about
16 four weeks ago, or four weeks before, when I got the
17 e-mail, maybe more.
18     And then the story runs, and of course it was
19 exactly what we thought, he was just there making up
20 stories. And then of course, you know, the issue that
21 you have, that I decided not yet to raise it to the
22 court, but, you know, you lied directly to the federal
23 court, you Hearst.
24     Q. I'll take issue with that, but we'll leave that
25 for another day.

26 (Pages 98 - 101)

1    Congressman, you testified earlier that in one
2  of the calls with your father, that while Lizza was
3  reporting in Sibley, that he said that Lizza was talking
4  to every Hispanic he could find there.  What was -- tell
5  me more specifically what your father relayed to you
6  about that.
7      A.   My father never told me about that he was
8  talking to every Hispanic there.  I got it from your
9  story.  I got it from Lizza's -- I got it from Lizza's
10  story.  It looks like he -- it looks like he just went
11  around and found -- I mean, give me a break, some
12  Guatemalan boy, I think he was having a beer or
13  something weird like that; and he's going around talking
14  to some priest smoking cigarettes and -- and, you know,
15  talking about Hispanics.  And then supposedly he has
16  sources that he supposedly had.
17      So, that's my interpretation of his story, that
18  he went prowling around Sibley.  And I know that, you
19  know, just in passing conversations with -- with, you
20  know, surrounding this court case, that's the best that
21  we can -- that's the best that we can tell, that he just
22  went to Sibley to find any brown Spanish-speaking person
23  he could, and he just went up to all of them saying, you
24  know, do you know Devin Nunes, and do you know the Nunes
25  family.

1      I mean, he was -- just like I said, he was
2  telling people that I had -- that I was using a
3  different name or something crazy like that, that I was
4  somehow secretly using a different name.  I mean, it's
5  really psychotic stuff.
6      Q.   Well, Congressman, I just want to make sure that
7  we have an accurate record of what it is that you know
8  and what your discussions were, so I'm just going to ask
9  you, in the future and in responding to my questions, to
10  separate, when I ask a question about what you
11  discussed, you know, to focus on that as opposed to what
12  you may assume based on your reading of the article.
13      Or if you want to discuss -- if you want to
14  testify as to both, that's fine, but let's just be clear
15  about each of them.  So, if I could just go back again
16  to your conversations with your father, is there
17  anything else that you discussed in that first
18  discussion, aside from the fact that there was a car
19  driving slowly around the farm, that you haven't told
20  me?
21      A.   I don't think so.  I just want to make sure you
22  understand it correctly so we can get the record
23  straight.
24      Q.   That's exactly what I want, too, so we're
25  totally on the same page.

1      A.   So, he -- when I was talking to him the night
2  before, that Lizza went to my mom and dad's home, so
3  which I think was, I want to say it was like in the
4  morning, as I recall, so the first phone call was just
5  me, just a usual check in and my dad said that there was
6  some guy that was diving around the farm.  So, I took
7  that as trespassing.
8      Then I didn't think anything of it until I got
9  that frantic phone call the next day, which I think I've
10  already explained that to you, that he said there was
11  some guy, I think he pronounced it wrong, and then -- I
12  think he might have said Liza or something like that.
13  And then I said Lizza, I said, no, that's impossible, he
14  doesn't have a job.
15      And then I, like I said, I think I did some
16  searches and found all the stories about him.  And then
17  I'm pretty sure I must have called my dad back, or he
18  called me back, and I said, hey, this guy doesn't have a
19  job.  And my dad said, no, no, that's the same -- that's
20  the same guy, 'cause he saw the picture of him.
21      THE REPORTER:  Counsel, when it's a convenient
22  time, I need to take a break.
23      MR. DONNELLAN:  Absolutely.  Why don't we
24  take -- we can take a break now.
25      And Congressman, I don't know if you'd like to

1  take a lunch break at some time, but, you know, we're --
2  as I said earlier, whenever you'd like to take a break,
3  you just let just know.
4      THE WITNESS:  I'm fine with a -- I just want to
5  know, are we holding it to a five-minute break?
6      THE REPORTER:  Can we go off the record?
7      VIDEO OPERATOR:  We are now going off the
8  record.  The time is 1:05 p.m.
9
10      (Whereupon at the hour of 12:05 P.M.,
11      a luncheon recess was taken.  The
12      deposition was resumed at 1:35 P.M.,
13      the same persons being present.)
14
15      VIDEO OPERATOR:  We're now back on the record.
16  The time is 1:42 p.m.
17  BY MR. DONNELLAN:
18      Q.   Congressman, did you consult with your counsel
19  during the break?
20      A.   With my spouse?
21      Q.   With your counsel.
22      A.   No, I did not.
23      Q.   Did you review any records, electronic documents
24  or otherwise?
25      A.   No, I did not.  Other than I just called him to

27 (Pages 102 - 105)

1　see what was taking so long. Does that count?
2　　Q. So, at some point, did there come a time when
3　you discussed with your family, your father and your
4　brother, the possibility of them filing a defamation
5　lawsuit?
6　　A. At some point.
7　　Q. Do you recall when that was?
8　　A. No. I mean, I think they knew that I was filing
9　lawsuits, so -- and then as I recall, I think -- I think
10　my dad sent you guys a note or a letter or something
11　that asked you to just take the story down, and you
12　refused to do it, just like you still do now.
13　　Q. Did you have any discussions with your family
14　about filing your lawsuit before you did so?
15　　A. No.
16　　Q. So, did they learn about it the first time by
17　reading about it in the press, or how did they find out
18　about it?
19　　A. I don't know. I don't remember. I have no
20　idea. Been, what, almost two years now.
21　　Q. Did you have any discussions with them about the
22　article before either you or your father or brother
23　filed lawsuits?
24　　A. I mean, I know we talked about the article on,
25　you know, several occasions after it came out and all of

1　that, but I can't tell you, you know, how often or when
2　or what it was or anything like that.
3　　Q. Well, you can only do the best you can. If you
4　could, could you tell me what conversations you recall
5　having with them?
6　　A. I mean, look, it's -- I can tell you again, if
7　you'd like, but I think I already made the point that
8　this is an ongoing problem for them, for their security,
9　for the safety of their -- of my nieces, my mom. I
10　mean, they're constantly harassed, so, yeah, I mean.
11　And before this article, nobody ever harassed them.
12　　Q. Tell me about the first conversation you recall
13　having with your family about the article.
14　　A. I wouldn't remember that. I just -- I told you
15　I know that when -- when --
16　　Q. Just listen to my question. I know you said
17　that you can't remember when the first one was, but I'm
18　asking about the first one that you can recall.
19　　A. So, the first one that I can -- that I don't
20　recall specifically what it was about, but I'm pretty
21　sure it would have been about CNN showing up the next
22　morning, almost simultaneously on my family's farm in
23　California, and then the farm in Iowa. But I can't tell
24　you if that was my grandmother calling me or my uncle or
25　my dad, or who, but they were -- they were there on both

1　properties, and then running around to every dairy farm
2　and farm in Tulare County that has the last name Nunes,
3　that your reporter choreographed, coordinated it.
4　　So, I know that a conversation must have taken
5　place within, you know, that next day, but when all that
6　was happening --
7　　Q. Do you recall anything -- I'm sorry to
8　interrupt you.
9　　A. I said that's what I -- I just recall that would
10　had to have been the first that I had a conversation,
11　but I don't know who that would have been with, like I
12　told you. It could have been my grandmother. It could
13　have --
14　　Q. Okay, so you don't recall who it was with or
15　what the substance of it was, right?
16　　MR. DONNELLAN: I think you're frozen.
17　　(Technology discussion.)
18　　VIDEO OPERATOR: Shall I take us off again?
19　　MR. BISS: Yeah.
20　　VIDEO OPERATOR: I'll just take us off the
21　record now.
22　　We're now going off the record. The time is
23　1:48 p.m.
24　　(Whereupon a discussion was held off
25　　the record.)

1　　VIDEO OPERATOR: We are now back on the record.
2　The time is 1:51 p.m.
3　BY MR. DONNELLAN:
4　　Q. So, Congressman, you had just recounted for me
5　that you recall the conversation with a family member
6　when CNN showed up after publication of the article, but
7　that you didn't recall who specifically in your family
8　you spoke with or what the substance of that
9　conversation was; is that right?
10　　A. Well, I mean, I know that it was about my
11　grandmother was scared to death, and that she was having
12　all sorts of, you know, anxiety issues since they were
13　right outside her house. So, it could have been my
14　grandmother. It could have been one of my uncles.
15　Could have been a cousin. Could have been my dad. I
16　just don't remember.
17　　But I know there was a lot of conversations that
18　took place that day. Because you had them sitting
19　outside the farm in Sibley, Iowa, and sitting outside
20　the farm in Tulare, along with going around to, like I
21　said, every farm with the last name of Nunes.
22　　Q. So, there were a lot of conversations that day,
23　you're saying?
24　　A. I just remember that, you know. And probably at
25　the time, there probably -- it probably would have

28 (Pages 106 - 109)

Veritext Legal Solutions

1 been -- you know, at that point our security protocol
2 would have taken off and we were probably making sure
3 that we're ensuring the safety of my family.
4   Q. Were there any discussions about responding to
5 the article through the media at all?
6   A. No, I don't talk to fake news.
7   Q. What about talking to whatever you would
8 consider real news?
9   A. No, I don't -- no, I don't think -- I don't
10 believe we did any interviews that day.
11   Q. Was there discussion about responding in the
12 media of your choice?
13   A. No, we don't search out -- we don't seek out
14 media.
15   Q. Did there eventually come a time where you did
16 give interviews or did make public statements about the
17 article?
18   A. I mean, not that I can recall. But, I mean, you
19 know, at that time it's -- it's election season, I'm
20 going around, and I'm sure everybody's asking me about
21 it, so I can't remember if -- I'm sure local radio asked
22 me about it. I don't know, I think local television
23 came out, but we didn't talk to them.
24     And then, of course, all the harassment that
25 started from that day forward, and continues to today.

1   Q. Did your family ask you what you were going to
2 do about it, after the article came out?
3   A. No, I don't recall any conversations I had. At
4 that time, there was a lot going on, and, you know, I
5 wouldn't even recall. Like I said, I just told you I
6 know what happened the next day because I remember CNN
7 coming around to all the farms, like I just explained to
8 you.
9   Q. Do you remember any other conversations that you
10 had with your family members that related to the article
11 before you filed your lawsuit?
12   A. Not that I recall.
13   Q. Do you recall whether or not you had such
14 conversations?
15   A. I'm sure that I did, but I don't remember what
16 conversations I had. It would have been with my dad, I
17 know that he wanted to get it retracted, and you guys
18 refused to do it. And that's all -- that's what I
19 remember about that.
20   Q. Did he seek your advice about how to go about
21 getting it retracted?
22   A. No, he got a lawyer.
23   Q. And by that lawyer, are you referring to
24 Mr. Biss?
25   A. Yes.

1   Q. Did you suggest that they engage Mr. Biss?
2   A. No, not that I remember.
3   Q. Did they -- did you refer them to Mr. Biss?
4   A. I wouldn't think so, because I think they
5 already knew who my lawyer was, so it wouldn't have been
6 hard for them to reach out to him.
7   Q. Did they have a pre-existing relationship with
8 him, so far as you knew?
9   A. With Mr. Biss?
10   Q. Yes.
11   A. I don't think so. You ask him that.
12   Q. So, they didn't ask you for any recommendations
13 of a lawyer?
14   A. Not that I remember. But, I mean, there's -- I
15 think it would have been self-explanatory, if I'm hiring
16 a lawyer, that that would probably be who my family
17 would go to first to see if they were interested in it,
18 but I'm just speculating.
19   Q. Did they ask you for Mr. Biss' contact
20 information?
21   A. I don't remember.
22   Q. Do you know how they first learned to get in
23 touch with him?
24   A. No, I do not. I'm not sure why that's relevant,
25 but you can keep asking the questions.

1   Q. Did they ask you about your experience with
2 Mr. Biss?
3   A. Not that I remember.
4   Q. Given the fact that you had been using him as a
5 lawyer, did they ask you what you thought of his legal
6 expertise?
7   A. I don't remember any conversations like that;
8 nor do I know why it's even relevant. But I know that
9 you and Hearst and others have been smearing Mr. Biss,
10 lots of fake news stories on Mr. Biss. The guy was
11 living a nice life until he -- until I became his
12 client, and then the guy's been smeared.
13     And I'm sure you guys have coordinated with it
14 because I've read your little quotes to the fake news
15 that you guys give out.
16   Q. So, I'm not sure whether or not you responded to
17 my question or not, so I'm just going to ask it again.
18     Did your family members ask you about your --
19 about your experience with Mr. Biss and about his
20 experience representing you?
21   A. I just answered the question.
22   Q. I just heard you talk about smears and all that.
23 What was your answer to that question, what's the answer
24 to that question?
25   A. Not that I -- not that I would recall.

29 (Pages 110 - 113)

1  Q.  Okay.
2  A.  And I really don't know why this is even
3  relevant.  Why are you asking questions about a lawyer?
4  Q.  Well, unfortunately, the process is,
5  Congressman, that I ask the questions during this
6  deposition.  You've been named as a fact witness on a
7  number of areas in this case, and it does relate to the
8  case.
9  A.  Well, I've done lots of depositions myself, and
10  I've never once targeted the witness' lawyer.
11  Q.  With all due respect, Congressman, as you noted
12  earlier, you have not reviewed all the filings and the
13  orders and are not familiar with the proceedings in the
14  case, so I think you'll just have to leave it to us that
15  we are pursuing a line of questioning that is
16  appropriate.  Your lawyer's here and he can object when
17  and if he thinks that it is appropriate to do so and to
18  take issues up before the court.
19  A.  Well, I can object myself, and I'm telling you
20  that I'm objecting to asking questions about my lawyer
21  or what I think of my lawyer.  That's a bizarre line of
22  questioning and it's totally inappropriate.
23  Q.  I understand your opinion, and I understand your
24  position.
25  A.  No, I think it's fact, and I think if you're

1  going to continue this, you know, then you probably
2  ought to call up the judge.  Asking me questions about
3  the qualifications of what people think of a lawyer?
4  That's insanity.
5  Q.  So, do you know why your family retained
6  Mr. Biss?
7  A.  To sue you, which they did, and that's why I'm
8  here.  They first wanted the story retracted, which I
9  already explained to you, and you refused to do it.  And
10  now you have me before this deposition, to where
11  you're -- you participated in the smearing of Mr. Biss,
12  both in public and in the courts and with the judges,
13  you and all your cohorts.
14  So, it's a totally inappropriate question to ask
15  about my legal counsel, or my family's legal counsel,
16  and you know it's totally privileged.  And like I
17  said, I've participated in dozens and dozens of
18  depositions, and never once have I ever targeted the
19  witnesses' lawyers.
20  Q.  Congressman, I'm not targeting your lawyer.  You
21  are mischaracterizing the nature of my questions.
22  They're very straightforward questions and appropriate
23  questions.
24  A.  No, they're not appropriate --
25  Q.  I'm not going to argue with you.  I am not going

1  to argue with you --
2  A.  I'm not arguing --
3  Q.  I'm going to ask my questions.
4  A.  I'm not arguing, but if you want to ask
5  questions about my legal counsel and my feelings about
6  legal counsel and how somebody got a lawyer, how
7  somebody didn't get a lawyer, then you can go to the
8  judge.  Because I've seen what you've been doing to
9  Mr. Biss, I've seen it in the public.
10  So, you want to call the judge?  Go ahead, I'll
11  take a break if I'm around.
12  Q.  We've already been to the judge, Congressman.
13  So, I'm going to -- I'm going to ask you -- I'm going to
14  continue with my questions.
15  Do you know why your family chose Mr. Biss as
16  opposed to any other lawyer to represent them in this
17  case?
18  A.  I can sit here, if you would like, or I can
19  pontificate with you, but you say you didn't want to
20  argue, but this is a totally inappropriate line of
21  questioning.  And if you want, I'm willing to wait, if
22  you want to call the judge, and if the judge orders me
23  to answer questions that are insane like this about
24  continuing to smear my lawyer and my family's lawyer,
25  I'm just not going to participate in your conspiracy

1  theories.
2  Q.  I'm not going to call the court, and I'm not
3  trying to smear your lawyer.  I'm asking you a simple
4  question:
5  Do you know why your family chose Mr. Biss as
6  opposed to any other lawyer to represent them in this
7  case?
8  A.  No, I do not.
9  Q.  How did you meet Mr. Biss?
10  A.  I don't remember.
11  Q.  Does Mr. Biss represent you in all of your
12  defamation cases?
13  MR. BISS:  What does that matter, Jon?
14  THE WITNESS:  Who cares?
15  BY MR. DONNELLAN:
16  Q.  You can answer the question, Congressman.
17  A.  Look, I'm objecting to this line of questioning.
18  You, for one, I mean, you're playing stupid.  You know
19  he represents me in all this, and I know you're not a
20  dumb guy.  So, you know that he represents me in all my
21  cases, so why are you asking me a question that you
22  already know the answer to, that I've already explained
23  to you is totally inappropriate, very unusual, very
24  bizarre.
25  And you just said you're not going to go to the

30 (Pages 114 - 117)

1 judge, so stop asking me about my lawyer and stop
2 smearing Mr. Biss, which maybe you haven't, but your
3 minions have smeared Mr. Biss. I've read the stories,
4 plenty of them.
5     Q. Thank you for answering my question that he
6 represents you in all your libel cases; I appreciate
7 that.
8        Do you know who is paying him to represent your
9 father, your mother, and their farm in this case?
10     A. No.
11     Q. Do you know if he's being compensated for his
12 work in this case?
13     A. Look, you're going -- you can go right to the
14 judge. I'm done. I'm done with it. I've heard enough.
15 This is totally inappropriate. You know it's
16 inappropriate. And obviously you've been out on the
17 Twitter sewer and reading all the articles, because you
18 can read on Twitter all the time, who's funding the
19 lawsuits, who's funding the lawsuits. There's all sorts
20 of stories about it.
21       So, you know, you're a lawyer, this is
22 inappropriate questioning, so this will be -- look, I
23 want to get to other lines of questioning so I can get
24 this over with today, but if you continue, I am going to
25 hang up.

1     Q. Well, I can't stop you from hanging up.
2     A. Yeah, and you're going to go to the judge,
3 because your questions are totally inappropriate, and
4 you know they're inappropriate. And you know that the
5 smearing that your people have been doing talking to
6 your other buddies in the media, smearing my lawyer, is
7 also totally inappropriate.
8       So, you know, whatever your conspiracy theory
9 is, are you the one that's on Twitter putting all that
10 out there, or are they giving you the questions to ask
11 who's paying for my family's lawsuits? Which I'm pretty
12 sure the judge already told you that you can't ask those
13 questions.
14     Q. That's incorrect. And if you'll note, your
15 lawyer has not raised a single objection because this is
16 a totally appropriate line of questioning that has been
17 addressed with the court. So, you can say --
18     MR. BISS: I haven't --
19     MR. DONNELLAN: -- everything that you wish --
20 (Speaking simultaneously)
21     MR. BISS: I haven't objected yet, but I'm just
22 telling you that you can ask whatever questions you
23 want, but I think he's made his position clear, he's not
24 going to be answering them. If you want go to the judge
25 on these, you can go to the judge again. We already

1 went once.
2     MR. DONNELLAN: Well, I will answer [sic] my
3 question, and if he does not want to answer the
4 questions, he can refuse to answer them, you can direct
5 him not to answer, and then we will go to the judge and
6 we will take them up, but I'm going to make my record
7 with the questions, and you and your client can take
8 whatever positions you wish on the record.
9       But I'm being very clear that this is not an
10 inappropriate line of questioning for this case and it
11 has been a matter that has been taken up with the court
12 previously, and if we need to take it up with the court
13 again, we will.
14     MR. BISS: Right, and let me just make my
15 position crystal clear. This is nothing but harassment.
16 There is no issue in this case that it can possibly be
17 relevant to. There's no claim for attorney fees,
18 there's no issue whatsoever, and you've never
19 articulated any reason.
20       We have gone to the judge already, and using his
21 crystal ball, he told you it's not relevant, so
22 that's --
23     MR. DONNELLAN: No, no, no, no, Steve, we --
24 look, let's not get into an argument on the record here,
25 but the judge specifically said this was an appropriate

1 line of questioning for the Congressman, and that's why
2 we're pursuing it and that's why we have waited until
3 this late date in the discovery process to have this
4 opportunity, and we're going to pursue this line of
5 questioning.
6       And if you want to object, or if you want to
7 direct him not to answer, you can do so, and then we
8 will go back to the court again. So, that's fine with
9 me.
10     MR. BISS: (Speaking simultaneously.)
11     MR. DONNELLAN: You want to do it the long way
12 or the short way, it really doesn't matter to me, it's
13 your choice.
14     MR. BISS: We're probably going to stop at some
15 point in time. You can ask him questions about whether
16 he knows anything about how the plaintiffs are paying
17 for the lawsuit, which he's already answered, he said he
18 didn't know, but when you start asking him questions
19 about the funding of other lawsuits, there's no question
20 that that's pure harassment, and we're just not going to
21 entertain it. We're not going to -- this is just
22 another Hearst media stunt and we're not going to -- not
23 even going to entertain it for a second.
24       So, just to be crystal clear, you can go as
25 slowly, or you can go as quickly as you want, get to

Veritext Legal Solutions

1 something that's important in the case. It's up to you.
2 MR. DONNELLAN: Well, it's already been deemed
3 by the court an appropriate line of questioning. And as
4 you well know from our other appearances before Judge
5 Roberts, and from the local law, that relevance and
6 harassment are not grounds to instruct the witness not
7 to answer a question or to refuse to answer a question.
8 If you want to --
9 MR. BISS: I'm not --
10 MR. DONNELLAN: -- (speaking simultaneously)
11 that's fine.
12 MR. BISS: I'm not, for a moment, going to put
13 myself in jeopardy with the magistrate judge or the
14 district court, so the witness is not going to hear me
15 instruct him not to answer, but he's intelligent enough
16 to know the issues. He's already told you he doesn't
17 think it's relevant, so he can make up his own mind, I'm
18 not going to tell him what to do.
19 MR. DONNELLAN: Well, he doesn't know enough
20 about the case to make a determination as to relevance.
21 He is not the judge in the case, and I am not going to
22 explain to him how I am -- you know, what the purpose is
23 for asking specific questions. That's inappropriate, to
24 expect me to do that.
25 So, I'm going to ask my questions, and respond

1 as you wish, you can make the instructions or objections
2 that you wish, we'll make the record, and if we need to
3 go back to the court with this, we'll go back to the
4 court. These are very straightforward issues which we
5 have already been around the horn on.
6 MR. BISS: The truth is, you can't explain to
7 the witness why it's relevant. That's the truth.
8 Because you know it's not relevant. You know it.
9 That's why you can't explain it. If you could explain
10 it, you would, you would be fair with him, you'd be up
11 front with him and you'd be forthcoming, you would
12 explain to him, here's why it's relevant, and you would
13 give him a fair opportunity. But you're not going to do
14 that because you know it's not relevant.
15 (Speaking simultaneously).
16 MR. DONNELLAN: Nice try baiting me, Steve, to
17 disclose my legal strategy in the case, but I'm not
18 going to do it.
19 MR. BISS: Well, again, I'll just follow up on
20 that. I don't think you have a legal strategy here. At
21 all. We know your other strategy, but I don't think you
22 have a legal strategy here. I think you're just trying
23 to -- to get some kind of sound bite to satisfy the
24 trolls. That's what you're doing.
25 But I'll tell you what, if that happens, it'll

1 shock me. I'll probably age a whole year on the video.
2 So, go ahead, ask your questions.
3 BY MR. DONNELLAN:
4 Q. Congressman, do you know if Mr. Biss is being
5 compensated for his work on this case for your family?
6 A. I don't know -- I already answered the question
7 and I already told you that I don't know anything about
8 that case as it relates to Mr. Biss, how they got him,
9 the funding, anything.
10 And so -- but like what I do know, and I'll
11 follow up on this, and hopefully the court can review
12 this, because you have been engaged in participating in
13 a complete smear operation of my lawyer and my legal
14 strategy and who's paying the lawsuits. So -- so, you
15 know, I'm not going to play into that. That's why
16 you're fake news, that's why I'm not going to answer the
17 question, because I've never even heard of such a thing
18 and I don't know how any of that could even be relevant.
19 Q. Do you know if Mr. Biss is representing your
20 family on a pro bono basis?
21 MR. BISS: Asked and answered.
22 THE WITNESS: I have no --
23 BY MR. DONNELLAN:
24 Q. Do you know if Mr. Biss' representation of your
25 family is covered by a retainer agreement?

1 A. I've already answered the question.
2 Q. I asked you different questions. I didn't ask
3 you that question.
4 MR. BISS: You already asked how. He said he
5 didn't know. That's the same question.
6 MR. DONNELLAN: I asked if. It's different.
7 Q. Do you know whether or not there is an
8 engagement letter between your family and Mr. Biss?
9 A. Like I told you, I'm not playing into your sick
10 world and your sick line of questioning meant to -- line
11 of questions with the fake news stories that you put
12 out.
13 So, you can keep asking the questions, I've
14 already told you, I've already answered all this. I
15 don't know anything about it, nor would I. Just like I
16 didn't know anything about the farm in Iowa and had no
17 management piece of, and hadn't been on a -- run a farm
18 in 20 years and been involved with my family.
19 But you guys proceeded to write a fake news
20 story about it, which you refuse to take down. And now
21 you're playing into your other fake news fantasies and
22 conspiracy theories that you -- the same people that are
23 targeting my family, that harassed my family and why
24 they have to have security, and why my family here has
25 to have security, are the same people you're feeding

1    with your nonsense about who's paying for lawsuits.
2        So, just keep asking, keep asking your
3    questions, but it's -- this is totally inappropriate.
4    Q.  So, just to be clear, you don't know?
5    A.  I do not.
6    Q.  You're not aware of any -- you do not, okay.
7        Have you had any communications with your family
8    at all about their retaining Mr. Biss to represent them
9    in the lawsuit?
10   A.  Not that I recall.
11   Q.  Do you know why there is a reluctance to
12   disclose the terms of the engagement of Mr. Biss in this
13   lawsuit?
14       MR. BISS:  Object to the form.
15   BY MR. DONNELLAN:
16   Q.  What's your answer, Congressman?
17   A.  I've already answered the question.
18   Q.  No, you didn't answer that question.  I asked
19   you if you know why there's a reluctance to disclose the
20   terms of your family's engagement of Mr. Biss in this
21   lawsuit.  You haven't answered that question.
22   A.  How would I know?  It's not my case.
23   Q.  So, you don't know.
24   A.  I said it's not my case.  How would I know?
25   Q.  That's different from not knowing.  Do you know

1    or not?
2    A.  I'm not going to play word games with you.  I
3    don't know.
4    Q.  I'm trying to take evidence for a case,
5    Mr. Congressman.  You have a job to do.  I have a job to
6    do --
7        MR. BISS:  Don't argue with him, don't argue
8    with him, just get on with --
9        MR. DONNELLAN:  I'm not arguing with him.  I'm
10   explaining --
11       MR. BISS:  Yes, you are.
12       MR. DONNELLAN:  I'm not.
13       MR. BISS:  You're giving him a speech.
14       THE WITNESS:  And I've already explained to you
15   the reason why that this line of questioning is totally
16   inappropriate, because it plays into the smearing that
17   you're continuing to do of me, and you're participating
18   in it by asking questions about who's funding lawsuits.
19       And don't play stupid, because you know that you
20   and your team and all your minions are all writing about
21   this and you're all secretly talking to the media, and
22   that's why this is all out there, this whole fake news
23   story about who's paying for lawsuits, when you know
24   damn well that as a U.S. citizen, that everybody has the
25   right to retain counsel, and that's all privileged.

1    So, like I said, you're getting to the end of
2    the rope here on this because it's offensive and -- and
3    it's -- and you're just -- we're going to have to go to
4    the judge.
5    BY MR. DONNELLAN:
6    Q.  Mr. Nunes, tell me everything you know, every
7    fact that you know about the defendants in this case
8    smearing you after publication of the article.
9    A.  How about when your -- when your ████████,
10   Lizza, goes out and Tweets about it every time I'm in
11   the news and he re-ups the article?  How about -- why
12   don't we just start there.  How about Hearst putting it
13   back up?  How about Hearst not taking it down?
14       How about the fact of you smearing me on this --
15   during this interview by, you know, going after
16   agriculture and farming with all your conspiracy
17   theories, when you and your owners and your family
18   probably have -- if you follow your logic, there must be
19   illegals running around all over the place, right near
20   by here.  You want me to go find out?
21       Because if I take your logic and I go to ICE to
22   have them look at your employees that you guys are
23   employing -- because if I track your logic, you know,
24   supposedly everybody in agriculture, I guess, is hiring
25   illegals.  That's what you continue to say.  But if you

1    would like, you know, maybe you guys should -- maybe you
2    should implement E-Verify at the Hearst ranch and
3    winery, since you seem so concerned about it.
4    Q.  Mr. Nunes, you have made repeated references now
5    during the course of this deposition to how Hearst
6    ranching operations in California should be
7    investigated.  Do you have any knowledge of any facts
8    that would suggest that there is any employment of
9    undocumented laborers at any Hearst operations?
10   A.  What I told you -- I did not say that.  That's
11   not what I said.  But what I'm referring to is, that you
12   know, with the line of questioning that you're asking,
13   you're accusing farmers, agriculture, you must have
14   asked it 25 different ways, that somehow there's
15   illegals running around everywhere.
16       And all I'm doing is applying your logic to your
17   own company and your family members, who are some of the
18   wealthiest people, biggest land owners in California,
19   that are from my area.  So, if you're so sure of it, all
20   I said is, why didn't you send Lizza there.  I'm not
21   accusing them of anything, like you do, like Lizza did,
22   like Hearst did, and refuse to take it down.
23       So, there's no accusations going on, all I'm
24   saying is, is that you wrote what was supposedly a
25   factual story, and it's all a bunch of nonsense, and you

1 know it. And all you've done -- and now you're going on
2 this weird line of questioning about who's paying for
3 lawsuits.
4 Q. So, you have no facts about any undocumented
5 workers working for Hearst; is that right?
6 A. Only the facts that you -- only the facts that
7 you've tried to state with your broad brush statement.
8 So, if I apply what you've said and your logic to it,
9 then you should have just interviewed the Hearst family.
10 Q. Okay. Did you encourage your family to file
11 this suit?
12 A. You already asked the questions.
13 Q. The answer is you don't recall or no?
14 A. No.
15 Q. Did you suggest it to them?
16 A. No. Look, you're doing this again.
17 Q. It's what lawyers do, Mr. Nunes, they ask
18 questions.
19    Last year there was an ethics complaint filed
20 against you concerning the funding of lawsuits; is that
21 right?
22 A. I get ethics complaints filed against me all the
23 time by the same people you coordinate with.
24 Q. And last year there was one filed against you
25 for failure to disclose your funding of your defamation

1 lawsuits, correct?
2 A. I have no idea. There's so many, I can't keep
3 track.
4 Q. Oh, is that a fact? Okay.
5 A. Yeah.
6 Q. So, you're not familiar with that ethics
7 complaint?
8 A. They're all frivolous complaints, every single
9 one of them. They're all frivolous. So, I can make up
10 anything, just like you made up about me and my family,
11 and I can take it and file it with the ethics. So, if
12 you think that I'm going to give you anything on this
13 when you're filing -- when you're asking me about
14 frivolous lawsuits that you could get anybody in your
15 company just to go make them up -- you guys have
16 done with some of your partners that have actually filed
17 a lot of these, a lot of these frivolous ethics
18 complaints.
19 Q. Congressman, it's not about giving me anything,
20 it's just about your obligation to tell us what you
21 know, which you are sworn to do --
22 A. You're asking me now -- no, no, no, I'm sworn to
23 ask [sic] questions about this case, and if it's
24 relevant to this case. You're now starting to ask me
25 questions about -- that goes directly to me. So, if

1 you'd like to go to the Eighth Circuit and apologize,
2 apologize to the federal judge for the lies that you
3 said when you said you were just doing a little origin
4 story on me, but yet that's not what the e-mails show
5 and the contacts show from your own reporter, if you'd
6 like to go apologize, we'll go back to court and you can
7 depose me all day long, multiple times, whatever you
8 want to do.
9    But if you're going to start to get into bogus
10 ethics complaints, personal attacks on me, who's paying
11 for things, nice try, but I know what you're planning on
12 doing is leaking this out to your buddies.
13 Q. I just -- I just want to know whether you're
14 familiar with the ethics complaints I referenced or not.
15 A. I don't keep track of frivolous ethics
16 complaints.
17 Q. Is that --
18 A. I ignore them, you guys write fake stories on
19 them, then ultimately they end up where you ask me in a
20 deposition, of which I'm not even a party to, about --
21 but it sounds like -- if you want to be, I told you,
22 we'll -- you can go apologize to the federal court for
23 lying.
24 Q. So, you are not familiar with an ethics
25 complaint filed last year that you failed to disclose

1 payments for legal services?
2 A. I already told you the answer.
3 Q. No, you didn't?
4 A. Bring up all the frivolous ethics complaints you
5 want, but if you continue to go down this line of
6 questioning, I'm just -- it's going to end.
7 Q. With all due respect, Congressman, you're under
8 an obligation to provide answers to factual questions to
9 the best of your knowledge. And I'm asking you, once
10 again --
11 A. I am not under obligation --
12    (Speaking simultaneously)
13    THE WITNESS: I'm under no obligation to answer
14 questions that are not relevant to this case.
15 BY MR. DONNELLAN:
16 Q. These are relevant to this case.
17    (Speaking simultaneously)
18    MR. BISS: No, it's not, Jon. Jon, let's move
19 on, he's not going to answer the question. Move on to
20 the next question.
21    (Speaking simultaneously)
22    MR. BISS: We're going to go to the judge. Make
23 your record, let's go, come on, make your record.
24    MR. DONNELLAN: That's fine.
25 Q. Are you refusing to answer that question?

Veritext Legal Solutions

**App. 506**

1  A. I've already answered the question.
2  Q. You said you don't keep track of them. I'm
3  asking you if you have knowledge about --
4  A. I don't keep track of them, which would mean I
5  don't have knowledge of them. I'd have to go and review
6  them all 'cause there's so many.
7  Q. Okay, so you don't have knowledge. Thank you
8  for that answer. Thank you for that answer, that
9  responds to my question, I appreciate that.
10     Did you review drafts of your family's complaint
11 before they filed it?
12 A. No.
13 Q. Have you ever reviewed the complaints in their
14 lawsuit?
15 A. Not that I -- the only thing that I can recall
16 is reading the decision by the judge, I think I read
17 that.
18 Q. Have you read any other -- any other pleadings
19 or documents relating to the case at all that you can
20 recall now?
21 A. Not that -- not that I recall. I only recall
22 reading the decision by the judge on this case to move
23 forward.
24 Q. There's been a number of decisions. Do you
25 recall which decision --

1  A. The initial decision when my case got moved and
2  I had to appeal it to the Eighth Circuit, and I read
3  the, I think at the same time, roughly the same day,
4  that other decision came out where this one went past
5  and into this discovery phase.
6  Q. That was the decision denying the motion to
7  dismiss?
8  A. I think that's what you would call it, yes.
9  Q. All right, have you told me about all of the
10 conversations with your family that you can recall
11 concerning this lawsuit that took place prior to its
12 filing?
13 A. Yes, that I can recall.
14 Q. Have you discussed the lawsuit with your family
15 at all since it was filed?
16 A. I'm sure that I have, but not to any great
17 extent.
18 Q. And who was it who you discussed it with, was it
19 your father --
20 A. I told you, my father, a few times.
21 Q. How about your brother?
22 A. No.
23 Q. And your mother?
24 A. No.
25 Q. Your sister? I'm sorry, your sister-in-law.

1  A. No.
2  Q. Tell me what conversations you've had with your
3  father regarding the lawsuit or the issues in this
4  lawsuit that you can recall, please, since it was filed.
5  A. You've already asked me those questions, and I
6  think I've already answered them.
7  Q. I don't believe that I asked you specifically
8  about it since it was filed. We were talking about
9  pre-filing.
10 A. I don't know. In general, that he wanted the
11 story taken down. And I remember him -- you know, I
12 remember when he said, I think he told me, I don't
13 remember the date or the time, but that he had sent you
14 guys a letter, and you didn't do anything about it, and
15 it left him no choice but to file this lawsuit because
16 of the constant harassment that he's under, and his
17 family, when my brother and his niece -- and his
18 granddaughter was out there.
19 Q. And that was a conversation that took place
20 after the filing?
21 A. I don't know about after the filing. I don't
22 know if it was before or after, during. I have no idea.
23 It's been two years ago.
24 Q. How often would you say that you discuss with
25 your father the lawsuit and the issues raised by the

1  lawsuit?
2  A. Not very often. I'm not sure why -- is this
3  relevant, as to why I talk to my father about a lawsuit?
4  Q. You can assume that all of my questions are
5  relevant.
6  A. Well, I know they're not relevant, but you can
7  continue to ask questions.
8  Q. Did you discuss with your father the retention
9  of experts in this case?
10 A. I don't know if I -- no, I don't think so. I
11 know that I -- I know that I talked to Mr. Buskirk in my
12 case, and I think he talked to -- and I think Mr. Biss
13 contacted Mr. Buskirk. And I believe, although I'm not
14 sure, but I think he had agreed to be an expert.
15 Q. So, you were not the one who connected your
16 family with Mr. Buskirk; is that right?
17 A. No, I did not ever have -- I don't think I ever
18 had a conversation at all about any experts or anything
19 with -- as it relates to this case.
20 Q. Just to be clear, you never called Mr. Buskirk
21 and asked him to serve as an expert for your family?
22 A. I talked to Mr. Buskirk about if he was
23 interested in my case specifically. And I can't
24 remember if it was about my family or not, but I'm sure
25 maybe it was both, in terms of the -- about being an

35 (Pages 134 - 137)

1  expert witness. But there would have been not for --
2  that was not -- that would be not my decision to make.
3  That would ultimately be them and Mr. Biss, as it
4  relates to their case.
5       But I do know for a fact that I talked to
6  Mr. Buskirk about being an expert witness potentially in
7  my case at one point, but that's been quite a long time
8  ago. And then I would have introduced Mr. Buskirk to
9  Mr. Biss.
10      Q.  What led you to reach out to Mr. Buskirk as an
11  expert witness?
12      A.  Because he's highly respected and I think he's
13  one of the best in the business, in the business of
14  journalism, journalism and editing.
15      Q.  Did you consider any other experts?
16      A.  No, I think I just had a conversation with him.
17  And then when he expressed an interest, that's when I
18  passed him off to Mr. Biss. Because I don't know
19  exactly what -- I don't -- I'm not steeped enough in
20  defamation law and experts, so I have no idea if this is
21  something that -- that -- where Mr. Buskirk would meet
22  the qualifications for an expert witness.
23      So, I wouldn't be the one that would even know
24  how to go about doing that, but I know that I trust him,
25  he's a good journalist and editor, and then that's why

1  he -- that's why I made the introduction, asked him if
2  he was interested and made the introduction to Mr. Biss.
3      Q.  And when you spoke with him, did you talk with
4  him about your case?
5      A.  Oh, he's well aware of the case. I mean,
6  everybody's familiar with the -- with the fake news hit
7  piece that you did, and how you went around and targeted
8  people.
9      Q.  Have you ever had any discussions with your
10  family relating to depositions of their employees?
11      A.  No.
12      Q.  Have you ever had discussions with your family
13  about the appointment of criminal counsel for those
14  employees by the court?
15      A.  No.
16      MR. BISS:  What did you call it?  Did you call
17  it criminal counsel?
18      MR. DONNELLAN:  Yeah.
19      MR. BISS:  That's not accurate.
20      MR. DONNELLAN:  He's a criminal lawyer.
21      MR. BISS:  You should retract that.  That's not
22  accurate at all.
23      MR. DONNELLAN:  It's under the criminal justice
24  act.
25      MR. BISS:  That's not what you said, though.

1  You said criminal lawyer.
2      MR. DONNELLAN:  Well, he is a criminal lawyer.
3      Want me to rephrase the question?
4      THE WITNESS:  No, I don't need you to rephrase
5  it, because I don't know what this is even about.
6  BY MR. DONNELLAN:
7      Q.  That's fine.
8      A.  But I know that -- I mean, it just sounds like
9  you said criminal lawyer, which I don't have any --
10  which I wouldn't know, because I don't know about
11  anything with the operations of -- of the farm.
12      Q.  That's fine.
13      Have you had any discussions with your family
14  relating to information obtained from the Social
15  Security Administration relating to NuStar employees?
16      A.  No.
17      Q.  I'm going to ask you about some conversations
18  that you may have had with Mr. Biss, but I want to be
19  clear, I'm not asking about any requests for legal
20  advice that you made or any legal advice that he
21  provided to you, only about discussions that you may
22  have had about factual matters.
23      MR. BISS:  Jon, I'm going to instruct him not to
24  answer --
25      THE WITNESS:  Wait, wait.

1      MR. BISS:  Hold on.
2      THE WITNESS:  You're going to ask me questions
3  about questions I had with my lawyer?
4      MR. DONNELLAN:  Yes.
5      MR. BISS:  I'm going to instruct him not to
6  answer any of these questions, so you can go ahead and
7  ask him for the record.
8      MR. DONNELLAN:  That's fine, I'll ask him.
9      Q.  Did Mr. Biss tell you that depositions of
10  NuStar's employees were going to take place?
11      A.  I'm not answering any questions about my
12  conversations with my lawyer, other than what I've
13  already told you, which is that I gave you a date for my
14  deposition, you didn't want to do it, you moved it to
15  now, and here we are.
16      Q.  Congressman, just so the record is clear, we
17  requested your deposition months ago. Mr. Biss told us
18  that the only date that you had available was the very
19  last day of discovery, which was a Sunday. And then
20  based on the fact that you were not available to appear
21  in Washington, D.C., where the deposition was noticed,
22  but only in the state of California, we agreed to move
23  it to a weekday for everybody's convenience. But the
24  date was --
25      A.  Actually, that's not how I recall it. I was

1   notified that you wanted me to give a deposition, to
2   which I said, sure, no problem, to. The problem was the
3   only time that I had was actually a Saturday, I believe
4   I gave you a Saturday and a Sunday, and I accommodated
5   you to do it on a Sunday.
6        And then when you said you didn't want to do it
7   that day, then I said that I could do it, and I gave you
8   the two dates that I gave you. And I'm sure the whole
9   issue with the Washington, D.C. thing was just a
10  miscommunication. So, I hope you're not trying to smear
11  me or my lawyer again.
12       Q.  I'm not trying to smear you, Congressman, or
13  Mr. Biss. All I'm saying is that we -- the deposition
14  dates were to accommodate your schedule, we waited
15  months. We would have done it much earlier on any day
16  and we repeatedly requested days in June and July.
17  So --
18       A.  Well, I gave you the date that I had, 'cause the
19  only dates that I did have in July, which I don't think
20  you would have wanted to do, but it would have been the
21  weekend of Fourth of July. And then I did not have
22  another date available until the Saturday and Sunday.
23       So, I just want to make sure that you're aware,
24  nobody's dodging you, nobody's afraid of you, nobody's
25  afraid of your silly conspiracy theory questions about

1   who's funding lawsuits or not. So, I just want to make
2   sure it's clear on the record that I wasn't trying to do
3   anything but cooperate with you to do a deposition.
4        And so, I just don't like the tone of how you
5   said you had to wait. It was all done in accordance
6   with what was available, the dates that were available.
7        Q.  Well, you're -- I thank you for that
8   clarification. I just wanted you to be clear that we
9   were not, you know, trying to delay or defer your
10  deposition, that we in fact, you know, were cooperating
11  with Mr. Biss. So, I think that we can agree that there
12  was good faith on both sides and here we are today.
13       A.  Okay.
14       Q.  All right, so again, to go back to -- and I'll
15  make the questions; if you want to refuse to answer,
16  that's fine, but I'm going to ask you the questions if
17  you had any factual discussions not relating to your
18  case against Hearst, and not relating to legal advice,
19  but whether or not you had any discussions with Mr. Biss
20  about the appointment of counsel for employees of
21  NuStar.
22       A.  I already answered that question. I didn't even
23  know anything about this. I don't know anything about
24  NuStar farm operations.
25       Q.  So, the answer is no.

1        And I asked you before if your family --
2        A.  But I'm not going to -- but I just want to make
3   sure, I'm not answering questions about conversations
4   that I'm having with Mr. Biss.
5        Q.  Well, Your Honor, you're certainly entitled to
6   refuse, you know, invoke the attorney/client privilege,
7   and so is your counsel, but to conversations
8   relating to legal advice, but not with respect to
9   factual matters, and that's all I'm asking about.
10       I'm not asking about his representation of you
11  with respect to your case against Hearst, or about the
12  provision of legal advice. I'm asking about
13  conversations or discussions you may have had on factual
14  matters relating to the NuStar case.
15       A.  Okay.
16       Q.  All right?
17       Did Mr. Biss ever tell you about information
18  obtained from the Social Security Administration
19  relating to NuStar and its employees?
20       MR. BISS:  Yeah, we're not answering any
21  questions relating to the communications between me and
22  my client. So, ask the questions, his answer's going to
23  be --
24       MR. DONNELLAN:  No, no, no.
25       MR. BISS:  His answer's going to be that he's

1   going to follow my advice. I'm instructing him not to
2   answer any questions that you pose to him that require
3   him to divulge our communications, whether it's related
4   to any case that he is directly or indirectly involved
5   in at all, or any other matter.
6        We're not going to give you any opportunity to
7   attempt to pierce the veil of the attorney/client
8   privilege, under no circumstances are we going to give
9   you any opportunity.
10       MR. DONNELLAN:  All right.
11       MR. BISS:  So, I do want to clear up your
12  record, but I want to make sure you're very clear, that
13  you can ask it as many times, but we are invoking the
14  attorney/client privilege.
15       MR. DONNELLAN:  Well, this is what I want, I
16  want a clear record, Steve.
17       So, just so we are clear, you are invoking the
18  attorney/client privilege with respect to conversations
19  you had with the Congressman concerning the NuStar case
20  and facts relating to that case?
21       MR. BISS:  Yes.
22       THE WITNESS:  I'm invoking the attorney/client
23  privilege on any -- any conversations that I had with my
24  lawyer. Because it's not that I want to be -- I want
25  the record to reflect, I want to answer your questions,

Veritext Legal Solutions

1 because there's no (indiscernible) there anyway. But
2 once -- I've been around long enough, I know -- you
3 know, you think that you and Hearst think, oh, they're
4 just a bunch of dumb farmers and, you know, people are
5 really stupid out here at the farm and they're running
6 around, you know, hiring illegals. I get that, so I
7 know your position.
8 But I'm not going to get in a position where all
9 of a sudden, then, you get to have all conversations
10 with any lawyer that I've ever had. So, it's a slippery
11 slope, you know it, and I'm not going to fall for your
12 game.
13 BY MR. DONNELLAN:
14 Q. Congressman Nunes, have there been any
15 conversations that you have engaged in, without telling
16 me anything about their substance, that included you,
17 your father or your brother, and Mr. Biss?
18 A. No.
19 Q. Just to clarify some of your testimony before,
20 so I know that you've testified that you don't know
21 about the operations of NuStar, and haven't had
22 discussions with your family about that. Does that
23 include the financial performance of NuStar?
24 A. I would not know anything about NuStar's
25 operations, financial, anything. Other than, like I

1 told you, I was out there when they first were looking
2 at purchasing it, and that's the only substantive
3 conversation that I've had that I could -- that I
4 recall.
5 Q. Have you had any conversations with your family
6 members about the damages that they've suffered, or
7 alleged to have suffered as a result of the Esquire
8 article?
9 A. Well, I don't know about conversations, but --
10 specifically as it relates to the case, but I can tell
11 you about -- I've already explained to you the damages
12 that are severe about the security of my family and the
13 safety of my family in Iowa and California because of
14 this article, and it continues to this day.
15 So, the damages are very, very high, from my
16 perspective. But, you know, I can only tell you that,
17 you know, just -- you know, of course I already
18 mentioned, but people showing up out there at the farm
19 trespassing, Antifa specifically, is really, really,
20 really, really bad. And it's -- and it's wrong, and
21 it's your fault, and there's a lot of damages.
22 I don't know how you calculate those damages,
23 but the damages continue to roll up every single day
24 that goes by. Because you can get online right now,
25 which I'm sure you're not going to do, and you will be

1 able to find lots of the text. Because all the -- all
2 the Tweets, all the comments, they're all still there,
3 and they live on. And then people will call the office,
4 people make death threats. So, the damages are -- are
5 very, very high.
6 Q. And is there -- you did describe earlier that
7 the threats that you just made reference to. Is there
8 anything else in terms of specificity that you can add
9 to that, other than what you've already testified to?
10 A. Well, I mean, I -- like I said, we're under
11 constant -- we have constant security protocol, we're
12 under constant -- we have constant problems. And that's
13 not -- that's also my family in Iowa, so we have to
14 notify them. I just told you the ones that I'm aware
15 of.
16 So, you know, between the direct -- those are
17 what I would call direct threats. Then you have ones
18 that, you know, they're -- that you maybe don't deem
19 they're harassment, but not -- not maybe life
20 threatening, not trespassing, not that kind of thing.
21 And then, of course, you have the constant online
22 harassment of my family online, making reference to me
23 and secret farms and all kind of crazy, you know, the
24 crazy story that -- that's right here, that I'm holding
25 up, the one that you still have online. You can just go

1 on there and read the comments, on your own story on
2 your own website.
3 Q. Any other information you have that relates to
4 damages that you wanted to state?
5 A. I mean, look, I think you've got a lot of --
6 there's a lot of damages to be incurred. And it's not
7 just -- it's me, it's my family, it's -- it's my staff,
8 it's my relatives that just live nearby here. And of
9 course, my nieces and my sister-in-law, my mom. So,
10 yeah, there's -- this has taken a big toll on all of my
11 family, specifically targeting businesses that I have
12 nothing to do with.
13 That's where the real damage comes in because,
14 you know, you can say what you want about elected
15 officials and whether or not they're fair game, I think
16 that's a debate that needs to be had, that we're having
17 right now, or I'm having with you in the Eighth Circuit.
18 And, of course, I'm having it with other fake news media
19 companies.
20 But taking private individuals, specifically
21 that I have nothing -- no involvement in, and putting
22 your reporters out there on their farms, coordinating
23 other reporters to go out there, is not only
24 unprecedented and unwarranted, but it's sick and
25 demented. And so, the damages are very, very high and

1 they continue to escalate by every Tweet, every mention,
2 every death threat.
3    And look, and I'm going to say this on the
4 record, there -- you know, at some point, you guys keep
5 doing this, somebody in my family or my staff is going
6 to get killed. I'll repeat it again: Somebody on -- in
7 my family, possibly me or my staff, are going to get
8 killed, or my supporters are going to get killed because
9 of what you are doing, you Hearst, by not taking this
10 down.
11    Q. Congressman, have you ever reviewed the -- and
12 I -- I believe that we can move through these questions
13 pretty quickly based on answers you've given before, but
14 I appreciate you answering them.
15    Have you ever reviewed the farm's I-9 records?
16    A. No.
17    Q. Have you ever reviewed the I.D. cards for
18 workers?
19    A. No. On what, as it relates to -- as it relates
20 to NuStar --
21    Q. Yes.
22    A. -- or I-9 records in the past --
23    Q. Yes, all of this relates to NuStar.
24    A. No, I have not.
25    Q. Okay. Have you ever reviewed workers' social

1 security cards at NuStar?
2    A. No.
3    Q. Do you know anything about any of the specific
4 employees who have worked at NuStar over the years?
5    A. The only ones that I know are the ones you sent
6 your goons out here, to Tulare, so people that used to
7 work for my family, and you sent goons out here to
8 harass them at their house. So, I know about some of
9 those. They're former employees that were harassed by
10 you.
11    I'm assuming that's because of this case and I
12 assume that's the reasoning you're using, but -- but
13 yeah. So, now you're actually harassing my constituents
14 here in my own district, because they used to work for
15 my family.
16    Q. Because they worked for your family at NuStar?
17    A. I don't know where -- I don't know when or where
18 they worked, I don't know.
19    Q. Okay.
20    A. I just know that I think I've had at least
21 two -- at least two or three that I know of were
22 contacted by your goons that you sent to harass, asking
23 questions about my family, that are here right in my
24 district.
25    Q. And so, who are the -- do you know the names of

1 the specific employees who used to work for NuStar that
2 you're referring to?
3    A. No, I don't know them. I just know they
4 contacted me through -- I don't know if it was through
5 my office or staff or what.
6    Q. Have --
7    A. Maybe I do know -- actually, I think I do know
8 one of them, because I think it was somehow related -- I
9 don't remember his name, but he was related somehow to
10 my sister-in-law.
11    Q. Okay, did you speak with any of them?
12    A. I did not. I just got -- it was related to me,
13 I'm guessing via my office somehow.
14    Q. And they reached out to your office?
15    A. Oh, yeah, they reached out to figure out why
16 goons pretending to be law enforcement were running
17 around Tulare County asking questions about me. So, I
18 think they were concerned for my safety. I don't
19 think they -- I'm guessing you were there because it had
20 something to do with my family, I don't know, but you
21 ought to stop it.
22    Q. Did you refer them to your family?
23    A. No, I did not.
24    Q. Are you aware of the processes that your
25 brother, your father, and NuStar followed to ensure that

1 they don't hire unauthorized workers?
2    A. Well, nobody, like I told you earlier, nobody's
3 hiring unauthorized workers. That's a total lie.
4 And -- and you know it's a lie. And you shouldn't
5 even -- you're making wild accusations about agriculture
6 and farming. We went through this already for two
7 hours. So, I can repeat it again if you would like, but
8 the bottom line is, that any accusations against
9 farmers, business people, anybody that's employing
10 anyone, that they're hiring illegals, is just flat out
11 wrong and nonsense.
12    Because you have to -- there is no way for
13 people to know, the way it works, you cannot
14 discriminate against people, whether it's my office or
15 any other business. So, the hiring practices that my
16 family at least had when I was involved with that
17 entity, was very sound and it matches every other
18 business operation in America that I'm familiar with.
19    Q. Congressman, just to be clear, the bill that I
20 referred to earlier today, which you co-sponsored,
21 rested on the premise that workers who were being
22 provided a pathway to being in the country illegally had
23 been in the country working unlawfully for years in
24 agriculture. And that was one of the policy issues that
25 I had hoped to speak with you about that you didn't seem

39 (Pages 150 - 153)

1  to have a recollection of.
2      But in any event, the question that I just asked
3  you did not suggest that your family hired undocumented
4  workers, it simply asked if you were aware of the
5  processes that your brother, father, and NuStar followed
6  to ensure that they don't hire unauthorized workers.
7  Are you familiar with the processes?
8      A.  I told you, I am familiar with the process that
9  -- because, of course, I used to work with my family
10  many years ago, so I'm quite sure that it wouldn't have
11  changed, I'm sure they're following the same -- the same
12  rules and regulations that they've always followed.
13      But it's you that made the insinuation in this
14  article that they were not following that process, that
15  they were -- that they were hiring people that were
16  undocumented, that they were doing something nefarious.
17  That's you that made those -- well, not you, but Lizza
18  made those.  And don't forget, even misrepresented the
19  whole story to everybody else that was -- that he spoke
20  to.
21      So, I only know what my family -- what processes
22  they followed.  My guess is that they probably do it,
23  even a lot better today than they ever have in the past.
24      Q.  So, what was the process that was followed on
25  your family farm that you're familiar with back when you

1  were still working there with your father and your
2  brother?
3      A.  Back when I was running the farm, this was --
4  I'm not specifically talking about -- this would be
5  my -- this would be my family's original farm, my
6  grandmother's farm, which I was managing for her, we had
7  to get, usually a social security form -- card, and a
8  form or two of photo I.D.
9      Q.  Okay.
10      A.  And then they have to fill out, I believe it was
11  called an I-9, I can't -- I don't want to give you the
12  wrong name.  And they would have to do that before they
13  could get paid, before they would start working or get
14  paid.  And that's how every single business does it,
15  probably exactly like the Hearst family and Hearst
16  winery and the Hearst ranches that are in my area too.
17  I would never run around accusing farmers of, or any
18  business for that matter, of hiring illegals like you
19  guys did.
20      It's practically impossible that you could ever
21  even hire somebody illegal because you would never know.
22  'Cause like I said, I don't know anybody who's illegal.
23  I've worked with people in agriculture, you know, before
24  I went to Congress, my whole life.  Not one person ever
25  came up to me and said, oh, I'm illegal.  Not one.

1      I don't know any friends, I don't know anybody,
2  other than the two that I told you that I remember
3  specifically because they involved the DACA situation.
4  And other than that, I have a constituent service that
5  we offer, that is obviously a privilege for obvious
6  reasons, but those are people who are dealing with visas
7  and things of that nature.
8      Q.  And when you were managing the farm and you
9  would do the -- and you would get the social security
10  card and the photo I.D., would you make photocopies of
11  those for your files?
12      A.  I don't remember.  I don't remember if we did or
13  not.  I don't remember that, but -- I think I had to
14  review it, I think I had to look at it and make sure it
15  was the right person, and get the social security
16  number, card, and then they had to fill out a form, and
17  then I would give it to my grandmother.
18      Q.  And would you fill out the I-9 form as the
19  manager?
20      A.  I don't remember.  That's been 20 years ago.  I
21  don't even remember if it was an I-9 form, to be honest
22  with you.
23      Q.  Would you review the cards to see whether or not
24  they were genuine?
25      A.  Yeah, I mean you had to -- well, not if they're

1  genuine, you have to accept them.  I mean, I guess if
2  you looked at a card and it had a picture of Ryan Lizza
3  on it, and it wasn't of whoever's applying for the job,
4  then -- then, you know, you could challenge it at that
5  point.
6      But I don't know, I don't ever remember that
7  happening.  Somebody gives you a card, and it's their
8  picture, you have to accept that as -- as real, 'cause
9  it's what they're giving you.  And it would be illegal
10  otherwise, discriminate against those people.  Anybody
11  that you're hiring, you can't challenge their -- their
12  identification that they give you.
13      Q.  And back when you were manager of the farm and
14  before you went to Congress, who was it who advised you
15  that you could not challenge somebody based on the
16  identification that they provided you?
17      A.  You know, I'm assuming that I learned that
18  through just going to seminars and things of that
19  nature, I would guess.  But you cannot -- but it's
20  been -- it's very, very clear that you cannot challenge
21  somebody based on, you know, their ethnicity or whether
22  or not they speak English.  That has always been made
23  perfectly clear to me.
24      We still, even in my office today, we don't
25  discriminate against people.  If somebody applies for a

40 (Pages 154 - 157)

1  job at my office, and if they happen to be from a
2  foreign country and they don't speak English, I don't --
3  I absolutely do not question them and say, are you a
4  legal citizen.
5      Q.  So, if somebody who is in the country without
6  authorization obtains counterfeit documents, how is one
7  to enforce the immigration laws if they can't be
8  questioned about it?
9      A.  Well, they can't be questioned by the employer,
10  that's for sure.
11     Q.  So, employers are obligated to accept whatever
12  documents are put in front of them?
13     A.  That's the way that I -- that's the way that I
14  have been -- that's the way that I've always operated.
15  I mean, I know how your reporter likes to racially
16  profile and target Hispanics.  So, maybe when you apply
17  for a job at Hearst, maybe you guys do that, but you
18  cannot discriminate against somebody because they're a
19  different color or because they don't speak English very
20  well.
21         Because like I said, you have no -- you have no
22  idea.  You know, your fabrications, your fabricated
23  story, running around accusing people of hiring
24  illegals -- like I told you, nobody knows who's in this
25  country illegally or not, and you can't even -- you have

1  no way to find out.  I mean, we have -- probably two
2  million of them are going to come across the border this
3  year.
4      Q.  Is it your position that all agricultural
5  workers are in this country legally and authorized to
6  work in this country?
7      A.  As far as I know that is the position, but you
8  cannot ask.
9      Q.  But as a matter of fact, is that what you
10  believe to be the case, that all of the workers are in
11  fact --
12     A.  Well, you're going after agriculture again,
13  which I -- which is totally unacceptable.  We already
14  went over this.  Every industry in this country is
15  hiring people exactly the same way.  So, if you want to
16  target agriculture, you can go ahead and indict your own
17  company, if you would like, but that line of questioning
18  indicts your own company.
19         So, I don't believe that, from what I know of,
20  other than what you're telling me, that the Hearst
21  family, by your questioning, must be hiring people that
22  are illegal because they have huge agricultural
23  holdings, so I guess I'll have to apply that to you
24  specifically.
25         But as I told you, I don't know anyone in this

1  country that is illegal, except for the two, but I
2  don't -- I lost track, (indiscernible) two, the cases
3  that I handled.
4      Q.  So, the only way to learn if somebody's illegal
5  is if they volunteer that information --
6      A.  That would be correct.
7      Q.  -- right?
8      A.  As far I know.  As it relates to an
9  employer/employee relationship, absolutely.
10         THE REPORTER:  I need to take a break.
11         MR. DONNELLAN:  Very good.
12         VIDEO OPERATOR:  We are now going off the
13  record.  The time is 3:07 p.m.
14         (Recess taken.)
15         VIDEO OPERATOR:  We're now back on the record.
16  The time is 3:19 p.m.
17  BY MR. DONNELLAN:
18     Q.  Congressman, do you have knowledge of Hearst or
19  Lizza republishing the article?
20     A.  Yeah, it's in my lawsuit.  You can read it right
21  there.
22     Q.  Well, can you tell us in your own words what
23  your personal knowledge is --
24     A.  Yeah, he re-Tweeted it a couple times, with a
25  link to the article.  I think Hearst actually put it

1  out, too.
2      Q.  Anything else?
3      A.  Well, I think that's bad enough.
4      Q.  Do you know any of Ryan Lizza's sources for the
5  article?
6      A.  I'm assuming he doesn't have any because it's
7  all a lie.
8      Q.  Do you know who the first source was who was
9  closely -- who was cited as being closely connected to
10  the Hispanic community?
11     A.  I don't know any of the sources; nor do I think
12  -- nor do I believe the sources.  And I think it's a
13  little freaky that he was going around talking to some
14  young Guatemalan boy in a bowling alley, whatever the
15  hell he wrote.
16         So, yeah, targeting, he was doing -- it looks
17  like all he was doing was targeting, finding anybody who
18  was brown in Sibley, and interviewing them and running
19  up to them and asking them if they know me.
20     Q.  Do you know the unnamed farmers cited in the
21  article with whom Lizza spoke?
22     A.  No, I do not.
23     Q.  Do you have any information about what any of
24  them said to Lizza?
25     A.  No.  The only one that I know, but I don't

41 (Pages 158 - 161)

Veritext Legal Solutions

800-567-8658                                                              973-410-4098

1  know -- I just know -- I know the family, but I can't
2  think of his name right now, but I think he was
3  interviewed. And I heard that from one of his family
4  members or something.
5      Q. And are you speaking --
6      A. But I don't know that that's really his source
7  because I don't think the name, as I recall, is actually
8  in the story.
9      Q. And was this a family member of one of the
10  workers or one of the farmers or somebody else?
11      A. I just remember somebody that knew him said that
12  Lizza had talked to him. But I don't know -- I don't
13  know the guy. But I just know the guy lives somewhere
14  in Nebraska or Iowa somewhere.
15      Q. Okay, and you had a conversation with their
16  family member directly?
17      A. I don't remember who. I just remember hearing
18  it at the time, he was potentially a source.
19      Q. What else were you told during that
20  conversation?
21      A. Well, I don't know if I'm getting pieces of
22  conversations, but as we said at the beginning of this
23  interview, this is a large agricultural area, everybody
24  talks. So, this story goes round and round and round
25  and round, and then you start to hear, oh, yeah, that

1  was so-and-so's cousin that lives in Iowa or Nebraska,
2  something like that, that was one of the sources.
3      Q. You don't remember anything --
4      A. But I don't know who it was. I just know that I
5  remember hearing people state that it was some guy in
6  Iowa. I think it starts with a -- it's a Dutch name.
7      Q. Have you ever reviewed or seen edits of the
8  draft article before it was --
9      A. No, I have not.
10      Q. Have you ever seen any of Ryan Lizza's notes?
11      A. No, I have not.
12      Q. Have you ever --
13      A. If you have any, I'm looking forward to seeing
14  those after the Eighth Circuit rules.
15      Q. Have you listened to any of the audio recordings
16  of his interviews?
17      A. No, I have not.
18      Q. Have you ever spoken with Ryan Lizza about the
19  article?
20      A. No, I have not.
21      Q. Have you ever spoken with anyone at Hearst about
22  the article?
23      A. Not that I'm aware of. It's possible, because
24  you guys are a big company, but not that I would -- not
25  that I recall.

1      Q. Do you know anyone at Hearst?
2      A. Other than your family that's in California, I
3  don't think so. I mean, I'm sure -- I forget all the
4  companies that you own. I'm sure I must know reporters
5  or editors that work for you. But I think you have,
6  what, 20 or 30 different news sites?
7      I know I've met some of the Hearst family
8  members in this part of California, central California,
9  but that's been a long time, and I don't know exactly
10  which ones they are. I just know they're involved in
11  the farming and the ranching side of the business, but I
12  don't know if that's under Hearst Corporation or
13  separate.
14      (Exhibit 47 was marked for identification by the
15      court reporter and is attached hereto.)
16  BY MR. DONNELLAN:
17      Q. Congressman, have you received Exhibit 47? It's
18  an article from The Federalist, DX-47.
19      A. Yes, okay, yeah, I got it.
20      Q. If you take a look at the last page, you'll see
21  that the author is Molly Hemingway, a senior editor at
22  The Federalist.
23      A. Okay, I'm familiar with the story because we
24  used it in my lawsuit against them.
25      Q. Okay. And do you know Molly Hemingway?

1      A. I do, yes.
2      Q. And do you speak with her?
3      A. I mean, occasionally. I used to see her, back
4  before COVID I would see her, usually 'cause she does a
5  lot for Fox News, and I would see her in the green room.
6      Q. And does anybody on your staff speak with her
7  also?
8      A. I assume people on my staff would, but I don't
9  know.
10      Q. Did you speak with her about Ryan Lizza's
11  article?
12      A. No, I did not.
13      Q. Did you speak with her before this article was
14  published?
15      A. No, not before -- this article, the one that's
16  in front of me? No, I did not speak to her before. I'm
17  trying to think of the last time that I saw her, but
18  it's been a while, 'cause we haven't seen very many
19  people.
20      Q. Your family members are cited in the article on
21  page 4 -- actually, on page 5, it says, "Lori Nunes
22  confirms." That's in the, one, two, three, four, fifth
23  paragraph down.
24      On page 3, in the first paragraph, it says a
25  family member confirms, and references how they felt.

1    Did you suggest to her that she speak with your
2  family?
3    A.  I already told you I didn't talk to her.
4    Q.  Okay.
5    A.  That I recall.  I don't remember talking to her
6  when this article was written.
7    Q.  Have you at any time connected Molly Hemingway
8  with members of your family?
9    A.  Not that I know of.  But, you know, just for
10  your information, Molly Hemingway's a great journalist,
11  along with the work they do at The Federalist, unlike
12  what you guys participate in.  And they were -- many of
13  the real news that's out there, any time that you guys
14  would write fake news stories, including all the way up
15  to today -- when I say "you guys", meaning the fake news
16  conglomerate -- she would -- well, not just
17  The Federalist, Molly Hemingway specifically, but a lot
18  of other journalists would actually go in and fact
19  check.
20    So, this would not be unusual at all, for them
21  to fact check the fake news that was going around.
22  Especially back in that time, back in 2018, when I had
23  people like Lizza who were preying on my family and
24  putting -- showing up at their farm, and then writing
25  fake news stories about them.

1    So, it's not an unusual article, other than just
2  to -- it talks about how you guys wrote a ridiculous
3  fake news piece.
4    Q.  If you take a look at page 2, in the final two
5  paragraphs, which relate to statements from Steve King,
6  and in particular, the last paragraph which quotes
7  former Congressman King, he says there (as read):
8      "I've been to visit their dairy
9      farm.  They have been to political
10      events with me."
11    What do you know about his visit to the dairy
12  farm?
13    A.  I don't know anything about his visit to the
14  dairy farm, but I think I remember saying he ran --
15  every once in a while, he was my colleague for a long
16  time, and he would tell me when he would run into my
17  family somewhere.  I mean, it's a small -- so, any time
18  he came through the town, I'm sure he would see them.  I
19  don't know specifically about any visit to a farm.
20    Q.  Were you and Representative King ever at NuStar
21  at the same time?
22    A.  No, we were not.  But since you ask, we also
23  didn't conspire together with my family to hide some big
24  secret.  But you guys somehow made that up, fabricated
25  the story that somebody fed you.

1    Q.  Did you know that Representative King had been
2  to the farm?
3    A.  I don't -- I think so, probably.  I don't know
4  if it's the farm or if -- or in Sibley at a meeting or
5  something, but I know they would -- I know that he would
6  see them occasionally.
7    Q.  He's also quoted as saying that they have been
8  to political events with King.  What do you know about
9  that?
10    A.  Nothing, other than it wouldn't be unusual for
11  my parents to go, I'm guessing, to some -- I know when
12  local officials come through there, they go to the
13  events, like any good citizens would do.
14    Q.  Did you ever make arrangements for them to
15  attend political events with Representative King?
16    A.  No, I did not.
17    Q.  Did you attend such events with him?
18    A.  I never -- with my family?
19    Q.  Yes.
20    A.  No, I never went to -- not -- in Iowa?
21    Q.  Correct.
22    A.  No, I have never -- not that I can recall, did I
23  ever go to a political event with my family.  I went
24  with -- but I will say that I went with -- I went and
25  did an event for Steve King and toured his district

1  many, many years ago.  And it's a fake news story that
2  you brought up, that somehow that was a conspiracy
3  theory -- a conspiracy, that him and I were colluding
4  together to keep all the illegals and all the Mexicans
5  and brown people, people that didn't speak English and
6  Guatemalan boys that Lizza liked to see, that somehow we
7  conspired for years to keep that a secret, as Lizza said
8  in his story.
9    In fact, the opposite is the truth, when I went
10  out there, it was advertised, we had a big town hall
11  with him or you, know, some type of listening session
12  that we had.  Matter of fact, I was very proud of the
13  fact to say that I just had a family member who was just
14  born, because I was there for my niece's baptism.  So,
15  it must have been, gosh, 10, 11 years ago, something
16  like that, 12 years ago.
17    So, your whole story is fake and phoney and you
18  ought to pull it down, and you should know -- and you
19  should know that.  So, there was no hiding, no nothing,
20  you guys just made that up out of thin air with whoever
21  fed that story.  Because I don't even think you guys
22  made it up, I think somebody gave it to you, and -- you
23  know, and I'd like to know who's -- who paid Lizza.
24    Q.  Do you know what political events Representative
25  King is referencing here when he says that your family

43 (Pages 166 - 169)

Veritext Legal Solutions

1  had been to political events with him?
2     A.  No, I don't know what he's referencing there. I
3  just know the one -- the event that I did with him in
4  his district and I just gave you the information on
5  that.
6     Q.  Do you have -- do you know anybody at Breitbart?
7     A.  I mean, like best friends, no.  But I know, I
8  talk to -- I do interviews with them quite often.
9     Q.  Did you ever connect your family with anybody at
10  Breitbart at any time?
11     A.  No, not that I'm aware of.
12     Q.  Lori has testified that she spoke with somebody
13  at Breitbart after the article was published.  Do you
14  know who that was?
15     A.  I don't know who it was.  But like I said, with
16  this, on The Federalist article, and any other articles,
17  real news in this country, it was actually following and
18  trying to get to the facts.  Any time there were fake
19  news stories, whether it was about me or about the
20  Russia hoax that you guys were all involved in with the
21  democrats, they would focus hard on going after and
22  getting -- and doing fact checking.
23     So, the idea that -- I'm not sure, you sound
24  offended by the fact that people would do stories about,
25  you know, some ███████ that you guys hired, we

1  don't know who's paying, that would go in and prey on my
2  family.  So, I'm not sure what you're getting at here,
3  but you're welcome to continue asking questions about
4  it.
5     Q.  Did you suggest to anybody at Breitbart that
6  they speak with your family?
7     A.  No, I don't even know -- I'm not even familiar
8  right now with the story that you're referring to.
9     Q.  Do you have any idea how Lori Nunes wound up
10  speaking with somebody from Breitbart?
11     A.  I do not, but I assume somebody called her.  It
12  wouldn't be hard to -- it's not hard to find them,
13  because unlike what you guys wrote, nobody was -- nobody
14  was hiding.  Nobody was hiding from -- from your ███
15  ███████ reporter that you sent to stalk my family.
16  Nobody hid for decades.  Steve king and I weren't
17  conspiring to commit federal crimes.  That's all a
18  figment of your psychopathic imagination, of your
19  reporter Lizza and your editors and whoever wrote it.
20     And I'd really like to know who paid -- who paid
21  Lizza to do it, because I don't think the salary you
22  were paying him, and CNN -- I'm sure somebody else was
23  paying him, but I guess we'll never know that.
24     Q.  Who in the media have you spoken to about Ryan
25  Lizza's article?

1     A.  Of Ryan Lizza's what?
2     Q.  Ryan Lizza's article.
3     A.  I mean, gosh, back in the day I can't -- I mean,
4  I don't even remember.  I probably wouldn't have been
5  speaking too much about it because it was fake news.
6  Like I said, I'm sure I was asked about it on local
7  radio interviews that I was doing, but I just don't -- I
8  wouldn't recall.
9     Q.  Do you recall directing anyone in the media to
10  your family?
11     A.  No, I did not.
12     Q.  Did your family ever ask you to facilitate
13  access to the media on their behalf so that they could
14  discuss the story?
15     A.  Not that I recall.
16     Q.  Have you arranged for family members to visit
17  the White House?
18     A.  What kind of question is that?
19     Q.  A factual question.
20     A.  No, I -- no, you don't get to ask questions
21  about -- how is that relevant?  You go to the judge and
22  ask that, did I arrange for family members to go to the
23  White House; how is that relevant?
24     Q.  Are you refusing to answer the question?
25     A.  I don't see how it's -- first of all, I think

1  that would be privileged under the speech and debate
2  clause, but asking about my official capacities in
3  Congress and who -- I mean, what are you going to ask
4  next, did I ever -- did I ever, you know, get Vladmir
5  Putin entrance into the U.S. Congress secretly at
6  midnight?  I don't know.
7     So, I'm not going to -- it's a slippery slope,
8  you're asking me about somebody I got into the White
9  House.  I mean, we get people in the White House all day
10  long.  In fact, if you called my office and you said
11  your name, said who you're with, I'd probably arrange
12  one for you.  We do that all the time.  I mean, other
13  than COVID, of course it was closed, but as soon as they
14  open up.
15     Q.  Sir, are you invoking speech and debate clause
16  privilege?
17     A.  I just think it's ridiculous, I mean, what are
18  you asking the question for?
19     Q.  Congressman, you can answer it or you can choose
20  not to answer it, but I just want our record to be clear
21  and complete.
22     A.  Okay.  Well, I'm sure that over the years that
23  I've gotten my family a White House tour.  Matter of
24  fact, probably -- probably dozens and dozens and dozens
25  of family members, I got White House tours for.  And

44 (Pages 170 - 173)

1 constituents and people related to them. I mean, I
2 wouldn't even know the number. It would be -- over the
3 last 20 years it would probably be a thousand people,
4 maybe more --
5     Q. What --
6     A. (Speaking simultaneously.)
7     Q. Let's put aside White House tours. What about
8 events at the White House, did you ever arrange for
9 family members to attend an event at the White House?
10     A. The only event that I can remember family going
11 to would be my wife going to a couple of the White House
12 Christmas events. I think there might have been a White
13 House, a couple White House picnics, but that would have
14 been a long time ago, that would have been in the George
15 W. Bush timeframe. So, you're talking, you know, mid to
16 late 2000s.
17     Q. Do you recall arranging for your father to
18 visit -- to attend a White House event?
19     A. I don't know why this is relevant. I would -- I
20 would guess I did, since you're asking the question.
21 But I think I remember my -- I think I do remember,
22 because I think my -- the only reason 'cause my -- my
23 oldest niece has a picture with George W. Bush that I
24 think is in my office, so that must have been at some --
25 I don't know, it must have been some White House event

1 of some kind.
2     Q. And have you done that for other non-family
3 members, inviting them to White House events, as opposed
4 to tours?
5     A. I don't know. I can't -- I wouldn't remember.
6 I mean, I'm sure there's some example of somebody that I
7 invited, you know, staff or somebody, but, I mean, not
8 that I can recall, would there be anybody. Seems like
9 I -- I mean, I haven't been to a White House picnic in
10 -- probably since that one that I was at with my niece,
11 but I can't even remember who was with me.
12     MR. DONNELLAN: All right, Congressman, I'm
13 going refer you to Defendants' Exhibit 76, which you may
14 have received by now.
15     (Exhibit 76 was marked for identification by the
16 court reporter and is attached hereto.)
17 BY MR. DONNELLAN:
18     Q. Let me know if you've got that.
19     A. 76 and --
20     Q. Yeah, there should be two, 76 and 77. Let's
21 focus on 76 first, if you have that.
22     A. Okay, I have 76.
23     Q. All right. Do you -- have you seen this before,
24 this document?
25     A. Is this -- is this the subpoena?

1     Q. Yes, it is, it's a document subpoena.
2     A. Yeah, I don't remember it. I mean, I remember
3 getting it.
4     Q. Can you tell me what you did in response to the
5 subpoena?
6     A. Yeah, I fully complied. I got whatever -- I
7 think it was -- I don't know if it was from -- whatever it
8 asked for, I complied with at the time.
9     Q. Did you look for documents?
10     A. Yes, we did.
11     Q. And where did you look?
12     A. I had my Twitter account, that I think we talked
13 about. And I think there was -- I want to say there was
14 an e-mail to -- I don't know if it was from -- I think
15 it was Lizza, to my office, or phone call. I don't
16 remember. I think we provided those to you.
17     Q. And let's put aside what you provided. I just
18 want to know where you looked. Where did you look for
19 documents?
20     A. I looked -- I looked -- all my documents that I
21 would have.
22     Q. So, let's take that one by one. Do you have --
23 do you have multiple e-mail accounts?
24     A. I do not -- I do not e-mail.
25     Q. You don't do e-mail at all?

1     A. I do not. I do not e-mail.
2     Q. Do you have anybody who does e-mail on your
3 behalf?
4     A. Not directly for me. You will not find any
5 thoughts that I have on e-mail for over a decade, for
6 security reasons.
7     Q. Okay.
8     A. So, I am -- I have a receipt type of e-mail,
9 where I review -- where I can review a document. But I
10 would not have any -- I would not have any e-mails
11 from -- from anybody, nor would I send any e-mails that
12 would pertain to -- that would pertain to you. Or
13 anybody, for that matter.
14     Q. So, if somebody wants to send you an e-mail, is
15 there a place where you -- is that what you're talking
16 about, you have an account --
17     A. You can go to -- you can go to my official
18 website or my political website, and you can send an
19 e-mail through there, that then goes through a process.
20     Q. And that's handled by --
21     A. It gets triaged and then it would be -- you
22 know, go to the appropriate staff person for the
23 appropriate response if it's needed.
24     Q. And in terms of record keeping, how are records
25 kept of those e-mails?

45 (Pages 174 - 177)

1   A.  Well, that would all be -- that's all
2   privileged.
3   Q.  Are records kept of those e-mails?
4   A.  To be honest with you, I don't know, but it
5   would be privileged regardless.
6   Q.  Well, the reason I ask, Congressman, is I want
7   to ask you whether or not, assuming that there are
8   records kept of those e-mails, whether or not they were
9   searched for responsive documents.
10  A.  Yeah, I don't know.  I'm sure they were.  I
11  don't know what -- well, no, I would not have searched
12  through privileged stuff in my official capacities.
13  Q.  When you say privileged, what privilege are you
14  talking about?
15  A.  Speech and debate, you can't go through members
16  of Congress' e-mail.  But as I told you, I don't have --
17  I don't e-mail, so there's nothing there anyway.
18  Q.  I'm a little confused, so I'm going to ask a few
19  more questions.
20      When you have an e-mail account where you
21  receive e-mails, and the e-mails are handled by your
22  office and --
23  A.  So, if you want to send me an e-mail, then you
24  would go through my official site, you'd fill out a
25  form, and then it goes through and it gets triaged.

1   Most of those I respond to via -- well, sometimes
2   they'll get a phone call within 24 hours, or they'll
3   get -- and then oftentimes they'll get a written
4   response from me, if they want.  If not, it might be
5   a -- they might just be asking for some information
6   on -- on some issue, and we would respond that way.
7   Q.  If you got a media inquiry through your e-mail,
8   would that be triaged by your office?
9   A.  Yes.  Other than what I told you on the -- I
10  have the Twitter, the one Tweet from Lizza.
11  Q.  Okay.  And do -- do you get official
12  correspondence relating to your congressional duties
13  through your e-mail account also?
14  A.  Repeat the question.
15  Q.  Sure.
16      Do you get e-mails relating to your official
17  duties in Congress through that e-mail account?
18  A.  Yeah, pretty much everybody would communicate to
19  me -- that's the way you would communicate to me if you
20  wanted to send me an e-mail.
21  Q.  All right.  So, if there was a congressional
22  ethics violation, presumably, and they wanted to
23  communicate with you, presumably it would be through
24  that e-mail account?
25  A.  I don't know how they would do that.  They would

1   go through my lawyer.
2   Q.  Okay, but they might?
3   A.  If somebody -- I mean, look, anybody from the
4   public, you can do it right now.
5   Q.  Okay.
6   A.  Anybody can go on there and send me an e-mail
7   right now.
8   Q.  So, my question is, was any effort made to
9   search e-mails received through that account for
10  responsive documents?
11  A.  I don't know, to be honest with you.  Because I
12  don't think -- I think that's covered by speech and
13  debate.  I would have to check with the -- with the
14  general counsel of the House --
15  Q.  Well, who --
16  A.  -- to see if that's even a -- to see if that's
17  even a possibility.
18  Q.  All right.  Well, let's put that aside for the
19  moment, just talk about what's happened, again, facts,
20  in terms of what was actually done or not done.
21      When you say you would have to check, were you
22  the one who undertook the document review to comply with
23  the subpoena yourself, or did you delegate that to
24  others?
25  A.  I got every document that I had in my possession

1   and gave it to you.
2   Q.  Okay.  And then --
3   A.  And then I hired my -- my ethics lawyer, I
4   think, had to go through it, because I think you
5   subpoenaed, like my mom and the campaign and all kinds
6   of other crazy conspiracy theories you guys were on.
7   Q.  That's a different subpoena and that's the next
8   exhibit and I'll ask you about that, but just in terms
9   of this subpoena, did you check your e-mail account,
10  your congressional e-mail account for any documents
11  responsive to the subpoena?
12  A.  I did not, because I would not do that because I
13  don't control -- it's not my e-mail account, it belongs
14  to the House of Representatives and the official duties
15  of the House.
16  Q.  But you have access and control over it, yes?
17  A.  I assume so, but I don't -- I don't get in there
18  and look at them.  They're all triaged, but I don't know
19  what the protocol for that would even be.  But in terms
20  of you asking me for any communications I have, I gave
21  you everything.
22  Q.  Okay.
23  A.  You're asking about official me versus, you
24  know, what I would have personally.  All I have is what
25  -- is Lizza contacting me and whatever else I gave you.

Veritext Legal Solutions

1    I can't even remember.
2        Q.   So, where did you look?
3        A.   I would have looked only places that I would --
4    that I would be able to look.
5        Q.   Which are where?
6        A.   Which is the --
7        Q.   Specific.
8        A.   Which would be on Twitter and anything like
9    that.
10       Q.   When you say anything like that, what --
11       A.   Any type of social media, anything of that
12   nature.  If not, there would no other communication.
13       Q.   All right, so you checked your Twitter account.
14   And you have other social media accounts that you
15   checked as well?
16       A.   Parler.  I have Rumble.  Instagram.  Facebook,
17   but I don't really check that one.
18       Q.   Do you engage in -- do you text?
19       A.   I do text, yep.
20       Q.   Did you check texts?
21       A.   I did, but there would have been nothing,
22   because I think it deletes after 30 days.
23       Q.   Your texts delete after 30 days?
24       A.   I believe so.  But texting is very limited, I do
25   not put anything particular on texts for security

1    reasons.  So, the only thing you would find on there
2    would be things like, you know, see you at 7:00 o'clock.
3        Q.   Do you communicate with your family in Iowa by
4    text?
5        A.   No, other than maybe some pictures or something.
6        Q.   Did you review your texts to see if you had
7    anything responsive to the subpoena?
8        A.   Yes, I did.
9        Q.   What about paper files, did you check your paper
10   files?
11       A.   I don't have any real paper files.
12       Q.   You don't maintain paper files?
13       A.   As it would relate to this, no.
14       Q.   As it would relate to any of the topics and any
15   of the requests in the subpoena?
16       A.   No.
17       Q.   So, you have no paper files relating to the
18   ethics complaints and related investigation?
19       A.   Those would be with my ethics lawyer.  And
20   they're all frivolous, so I know you like to keep
21   bringing those up for your little game that you're
22   playing.
23       Q.   Those would be under your control --
24       A.   Frivolous ethics complaints would go to my
25   ethics lawyer.

1        Q.   Your lawyer informed us that you had no
2    responsive documents, even notwithstanding the
3    privilege, so that's why I'm trying to explore where you
4    looked and whether or not any documents exist.
5    Certainly if there are privileged documents, your lawyer
6    can prepare a privilege log and you can --
7        A.   So, there's no documents.  I mean, are we going
8    to sit here all afternoon?  I mean, I've got time, if
9    you want to keep going.  I gave you everything that I
10   had.
11       Q.   Well --
12       A.   Unlike you guys, who have lied to the federal
13   court and you refused to get into discovery with me.
14       Q.   Who is your ethics lawyer, who's your lawyer on
15   the ethics complaint?
16       A.   I don't know if I have to tell you that.
17       Q.   On what basis would you not tell me --
18       A.   I don't know, it's just continued asking
19   questions about my lawyers, so I don't want to go -- we
20   already had this discussion before.  But we can -- we
21   can have it again, but I'm not sure, without talking to
22   my ethics lawyer, whether I need to disclose the name of
23   my ethics lawyer to you.
24       Q.   Well, Congressman, you were issued a document
25   subpoena, you responded to it that you have no

1    documents, and --
2        A.   I don't think I did that.  I think I gave you
3    the -- I think I gave you what I had.
4        Q.   I'm entitled to ask these questions to ensure
5    that there is an adequate search for responsive
6    documents.  I know that you may believe that you have
7    produced what you need to produce, but that is an area
8    that we are entitled to ask questions about and may have
9    a different view on.  So, that's what these questions
10   relate to --
11       A.   Sounds like you're prepping for an Eighth
12   Circuit decision, sounds like you're interested in the
13   other case, not this case.
14       Q.   This subpoena was issued back in February.  You
15   had -- your lawyer had every opportunity to object and
16   to respond to it.  He said that a search was conducted,
17   that there's no responsive documents, and I'm now
18   exploring whether or not an adequate search was
19   conducted.  You have just testified under oath --
20       MR. BISS:  Hold on, hold on, that's not an
21   accurate statement.  Why don't you show the witness his
22   response.  Why are you playing games with him?  Show him
23   his response.  I'm looking at it right now.  It's on the
24   screen here.  Let's mark it as an exhibit.  He responded
25   to you.  Actually, it was a very lengthy letter, March 2

47 (Pages 182 - 185)

1  of 2021. He responded with objections and he responded
2  with reference to documents.
3      So, Jon, I don't think you're being fair with
4  the witness here --
5      THE WITNESS: I'm going to go farther than that.
6  I'm going to go further than that. You're putting
7  documents in front of me and now I'm not -- I don't know
8  any of these documents that you put in front of me,
9  whether or not they're authentic at this point.
10      If you're going to play that game with me, where
11  you're not even showing -- you know I responded to you.
12  Now I'm not going to talk about any documents because my
13  answers will be that your documents cannot be trusted,
14  just like you and your company cannot be trusted. So, I
15  can't comment on -- I have no opinion on anymore
16  documents that you're going to show me, 'cause I don't
17  know they're authentic and it sounds to me like you're
18  playing a game here 'cause none of this is even
19  relevant, and that's what I was getting to. So, no
20  more --
21  BY MR. DONNELLAN:
22      Q. That's not your decision. Relevance is not your
23  decision.
24      A. Throw more documents and I'll give you my --
25  throw more documents at me and I'll give you my answers.

1      Q. You're represented by your counsel here today.
2  Your counsel can represent to you that this is an
3  authentic subpoena. And your counsel is well aware that
4  he had conversations with counsel for defense,
5  Mr. Boyer, and represented that there were no responsive
6  documents to that category, and I am absolutely entitled
7  to inquire as to where you searched for documents. If
8  you --
9      A. I gave you --
10      (Speaking simultaneously.)
11      THE WITNESS: I already told you the answer, so
12  quit trying to put words in my mouth. I've answered
13  every one of your stupid questions and I was very clear
14  that I gave you everything that I could possibly have
15  had. There's nothing else that I could have possibly
16  have had.
17  BY MR. DONNELLAN:
18      Q. Let's --
19      A. So, that's -- and I don't appreciate you playing
20  some trick with me. You knew I responded to you. I
21  mean, I don't remember the exact documentation. This
22  was six months ago. And now I find out that you had the
23  whole letter and you're pretending like there's
24  something nefarious going on here. Nice try for your
25  fake news.

1      Q. There's no trick here, Congressman.
2      A. Yeah, right.
3      Q. So, let's catalog all of the places that you
4  searched for documents. You searched your Twitter
5  account, Parler, Instagram, Rumble, Facebook.
6      Did you look at --
7      A. Any other -- and any other paper documents that
8  I would have had.
9      Q. And where would you have looked for those? You
10  just testified before that you don't keep paper
11  documents.
12      A. I don't. Anything that I would have had that
13  would have been relevant, I'm sure I would have given to
14  you.
15      Q. How did you conduct the business --
16      A. (Speaking simultaneously.)
17      Q. -- of your office without paper documents?
18      A. Well, there are documents as it relates to my
19  official capacities, but as you know, those are
20  privileged.
21      Q. So, are you taking the position, in your
22  response to this subpoena, that you did not search any
23  documents that you consider to be privileged?
24      A. Yeah, that's correct. Nor would anybody else.
25      Q. Okay, so any document --

1      A. But I'm telling you, I mean, look, you can go on
2  a conspiracy theory, you can leak out if you want, but
3  I'm telling you there wouldn't be anything that would be
4  relevant for this case.
5      Q. So, in terms of your search, then, you did not
6  review or search any of the --
7      A. That's privileged communications, but there
8  wouldn't be any that I'm aware of.
9      Q. And your view of privileged communications --
10  and you're speaking of the speech and debate clause
11  right now; is that right?
12      A. Anything that's -- anything that is in the --
13  all of that, absolutely.
14      Q. Okay. And your understanding of the scope of
15  that is, anything that touches your office; is that
16  correct?
17      A. That's correct.
18      MR. DONNELLAN: Okay. All right. So let's take
19  a look now at the next exhibit, number 77, which is a
20  subpoena to the Devin Nunes campaign committee.
21      (Exhibit 77 was marked for identification by the
22  court reporter and is attached hereto.)
23  BY MR. DONNELLAN:
24      Q. Have you seen this document before?
25      A. I'm sure I have, but it would have been turned

1 over to my lawyer.
2 Q. Do you have any recollection of seeing it today,
3 as you sit here today?
4 A. Look, I'm not -- like I told you, I'm not taking
5 anything that you put in front of me as authentic.
6 They're fabricated, as far as I'm concerned, fabricated
7 just like the rest of your story.
8 Q. Your counsel can attest to the fact that this is
9 an authentic copy of the subpoena and he's forwarded it
10 to you. I'm sure he wouldn't have done that if it was
11 not authentic.
12 Do you have any recollection, as you sit here
13 today, of having seen this document before?
14 A. I don't know that I have seen the document. I
15 do not know.
16 Q. What did your campaign committee do to comply
17 with this subpoena?
18 A. They would have fully complied, would have went
19 through the campaign lawyer and ethics lawyers and would
20 have complied.
21 Q. Did you undertake any steps personally to comply
22 with this subpoena?
23 A. I'm pretty sure I told my -- I want to make sure
24 that my lawyer did a thorough job to make sure we
25 provided you everything that we had.

1 Q. And who was that who you instructed?
2 A. I would have instructed my lawyer to do that.
3 Q. Which lawyer?
4 A. I don't -- I'm not -- because of what you guys
5 are doing here, I'm not going to start naming who my
6 lawyers are.
7 Q. So, you're not going to disclose who the lawyer
8 for the campaign committee is who was responsible for
9 responding --
10 A. I don't think I have any requirement to do that.
11 You've already been trashing my lawyer today, smearing
12 him, and you've been talking to your buddies in the
13 press, so I don't want to expose who my other lawyers
14 are because you'll probably smear them, too.
15 Q. Was it Elliott Burke?
16 A. I'm not going to respond to anything doing with
17 my -- it's privileged, as to who my lawyers are.
18 Q. The fact of who the lawyer is for the campaign
19 committee is privileged, is that your position?
20 A. As far as I'm concerned.
21 Q. Can you tell me, to the extent to which you
22 know, what steps were taken to comply with the subpoena
23 by the lawyer to whom you gave it?
24 A. It was all privileged.
25 Q. (Speaking simultaneously).

1 A. That I complied -- given instructions to comply
2 100 percent, as I've always -- as I've already told you,
3 and it was done.
4 Q. When you say it was all privileged, are you
5 saying that the steps --
6 A. I'm not going to get into conversations that I
7 had with my lawyer, who it is, who they talked to --
8 Q. I'm not asking you that. I'm not asking you
9 that. I'm asking you about the testimony you just gave
10 that it's all privileged. Is it your position that the
11 steps taken to comply with the subpoena were privileged?
12 A. Any conversations that I had with my lawyer or
13 any names of my lawyers are privileged.
14 Q. I understand. I'm not asking about your
15 conversations. I'm asking about, as a factual matter,
16 what steps were taken to comply.
17 A. That would be privileged. We complied. And I'm
18 not even sure -- furthermore, what's the relevance of --
19 of -- of going after -- subpoenaing me and my campaign?
20 I don't know, you subpoena anybody else?
21 Q. So, are you saying that the -- again, I just
22 want to be clear on this -- that the -- that any
23 responsive documents were privileged, or that the --
24 that the --
25 A. No, we responded.

1 (Speaking simultaneously)
2 THE WITNESS: The search is privileged, but we
3 responded in full and gave you everything that we had.
4 And I'm not even sure why you would even do that, to
5 subpoena that, because it's a little wild and a
6 conspiracy theory, but you guys are really good at
7 chasing down conspiracy theories and making stuff up.
8 BY MR. DONNELLAN:
9 Q. And just to be clear, the search -- the
10 privilege that you're invoking is, again, the speech and
11 debate clause?
12 A. It would be speech and debate and privilege
13 between who my lawyers are.
14 Q. Okay.
15 A. And my conversations with them.
16 Q. And what responsive documents were located as a
17 result of the search?
18 A. I don't have any idea. You would probably know.
19 I bet you're probably holding that document from me,
20 too, just like you tried a few minutes ago. It's
21 totally unacceptable.
22 Q. Without revealing the substance of any
23 communications between you and the campaign committee's
24 lawyer, did the campaign committee's lawyer ask you to
25 conduct any -- any search, or to look any place for

49 (Pages 190 - 193)

1  responsive documents?
2      A.  That would all be privileged.  But we fully
3  complied with your subpoena, gave you everything we had.
4      Q.  Did you discuss the campaign committee subpoena
5  with your mother?
6      A.  Not that I recall.
7      Q.  Did you discuss it with anybody else in your
8  family?
9      A.  No, I would not have.
10      Q.  Did you discuss the other subpoena to you
11  personally with anyone in your family?
12      A.  No.
13      Q.  Did you discuss it with anyone else other than
14  your lawyer?
15      A.  Not that I recall.
16      MR. DONNELLAN:  All right, why don't we take a
17  short break.
18      MR. BISS:  Is that the proverbial short break?
19      MR. DONNELLAN:  I'm not quite sure what you
20  mean, Steve.
21      MR. BISS:  Well, you know, the usual, I need ten
22  minutes to collect my thoughts and --
23      VIDEO OPERATOR:  Let me take us off.
24      We are now going off the record.  The time is
25  4:12 p.m.

1      (Recess taken.)
2      VIDEO OPERATOR:  We are now back on the record.
3  The time is 4:28 p.m.
4      MR. DONNELLAN:  Congressman, that's all the
5  questions that I have for you today.
6      I am going to leave the deposition open subject
7  to, you know, taking up with the court, some of the
8  questions that you have either declined to answer or
9  have not answered on the basis of privilege or
10  otherwise, but that's going to be all for today.
11      THE WITNESS:  Well, I've answered all your
12  questions, so I'm not sure what you would take up with
13  the court, but...
14      MR. DONNELLAN:  Thank you very much for your
15  time.
16      MR. BISS:  Okay, I've got just a couple of
17  questions to follow up on some of the things that were
18  asked during the deposition today, and let me see if I
19  can do this as smoothly as possible.
20
21          EXAMINATION
22  BY MR. BISS:
23      Q.  Counsel asked you during the deposition whether
24  you had ever listened to the audiotapes that Mr. Lizza
25  produced.  I think you said no.  I want to play two of

1  those audiotapes for you and get your response --
2      MR. DONNELLAN:  Hold on, Steve, I'll object to
3  that.  That goes beyond the scope of my examination.  I
4  did not ask the Congressman today about any matters that
5  were covered by the protective order in this case, and
6  he did not testify as to the substance of any matters
7  covered by the protective order in this case, and I want
8  it to stay that way.
9      So, that's beyond the scope of the examination,
10  so I object to any attempt to introduce to him or to
11  expose him to any of the evidence that's covered by the
12  protective order.
13      MR. BISS:  All right, that's -- that's -- I
14  fully understand why you're making that objection.  I
15  fully understand why you don't want to have him hear
16  these tapes.  I think it will -- it will upset him more
17  than your questions have upset him today.
18      But you've asked him multiple times today, you
19  asked him about the audiotapes.  You also asked him
20  about the sources.  And so, it's absolutely fair game
21  for me to ask him --
22      MR. DONNELLAN:  It is not fair game.  Steven,
23  it's not fair game.  And you can't unscramble the egg,
24  so I would say that we take this -- if you want to take
25  this up with the court, we take it up with the court,

1  but it's totally inappropriate.  We have not asked him
2  to sign a protective order.  He has not signed a
3  protective order.  And it is beyond the scope of the
4  testimony that I elicited and I asked for, and so I
5  object to this and I will -- I will take great exception
6  if you try to proceed.  I'm going to end the deposition.
7      MR. BISS:  Why don't you want him to hear what's
8  on the tapes?  What are you afraid of?
9      THE WITNESS:  Aren't I the one being deposed,
10  doesn't my lawyer have a right to ask me questions?  You
11  get to end it without my lawyer having time to ask me
12  questions, is that how this works?
13      MR. DONNELLAN:  It's beyond the scope of the
14  examination and it's evidence that you are not entitled
15  to hear, Congressman.
16      MR. BISS:  Why isn't he entitled to hear it?
17      MR. DONNELLAN:  It's governed by the protective
18  order.
19      MR. BISS:  He can sign the witness assurance
20  declaration, just like everyone else.
21      MR. DONNELLAN:  Well, this is our deposition, we
22  called the deposition, and we have not asked about any
23  evidence that is covered, and it's completely beyond the
24  scope of the direct examination, so it's inappropriate.
25  You should take it up with the court if you feel that

1 strongly about it, Steve.

2     MR. BISS: I just don't understand how you could

3 possibly think that's a valid objection, how you could

4 possibly think that you can stop a witness from

5 listening to an audiotape that you referred to expressly

6 on your direct examination. You examined this witness

7 and you referred to the audiotapes. You also --

8     MR. DONNELLAN: No, I didn't. All I did was ask

9 him if he had heard them, and he said no.

10     THE WITNESS: You also asked me about some

11 documents, and I said no, I'd like to see them. So, I

12 have that on my testimony to you, that I would like to

13 see them. If they exist, what you're asking me, I have

14 every right to see them. If not, there needs to be

15 transparency in this process. Because if you're hiding

16 something from me, like you hid my response of my

17 subpoena, that's completely outrageous. You can't do

18 that.

19     MR. DONNELLAN: Steven, if you look at --

20     THE WITNESS: You have to show me. You brought

21 it up. If they exist, I get to see them. You don't get

22 to ask me questions about things that you know and that

23 I don't. You did it once, you got caught, now you're

24 doing it again. So, now I find out there are audiotapes

25 and there's -- are there documents? What kind of

1 documents have I not seen for this -- for this --

2     MR. BISS: You chose to depose this witness.

3 You opened the door. You --

4     MR. DONNELLAN: No, I did not. No, I did not,

5 Steve --

6     MR. BISS: Absolutely, you did.

7     MR. DONNELLAN: No, I did not --

8     MR. BISS: Absolutely, you did.

9     (Speaking simultaneously)

10     MR. BISS: Now you want to make sure that he

11 doesn't get to see that the -- gets to hear what's on

12 those audiotapes. You've listened to the audiotapes.

13 You know what's on them.

14     MR. DONNELLAN: If you go to the protective

15 order, paragraph 8E, that during the deposition

16 witnesses in the action to whom disclosure is reasonably

17 necessary shall be given access to the materials. It's

18 not reasonably necessary. I asked him if he'd heard

19 them. He said no. That's the end of it.

20     MR. BISS: That's not reasonable --

21     MR. DONNELLAN: It's not reasonably necessary to

22 play them.

23     THE WITNESS: Wait, I object to that. I have a

24 right, this is my deposition, I totally object to that.

25 They definitely -- I do have a reason to know. You've

1 sat on this deposition going through conspiracy theory

2 after conspiracy theory after conspiracy theory, whether

3 it's who's paying lawsuits, or frivolous ethics

4 violations, and then you do that bogus little game on me

5 where you show me a subpoena and then play some game

6 like I haven't complied, and now I find out that you had

7 it sitting next to you there as one of the exhibits.

8     You asked me if I had seen some type of

9 documents. I said no, but I'd like to see them, if I

10 want to see Lizza's notes or something like that. If

11 there's notes you're damn right I want to see them. And

12 it's wrong, it's not transparent, it's totally corrupt,

13 and I'm going to go to the judge. I want to go to the

14 judge myself. And I'm not ending this deposition. I

15 want Steve to continue to ask me questions.

16     MR. BISS: You asked him a question --

17     (Speaking simultaneously)

18     THE WITNESS: Who do the hell do you think you

19 are?

20     MR. BISS: Jon, you asked him questions about

21 the article. You asked him questions about illegal

22 immigration. You spent hours --

23     (Speaking simultaneously)

24     MR. BISS: You talked about the audiotapes. You

25 used every single word to open the door here for me to

1 ask him questions about that. You asked him about his

2 family, about the operation of the farm.

3     And the fact that you don't want these

4 audiotapes made public is -- it's beyond alarming. This

5 is a matter of extreme public concern. The public --

6     MR. DONNELLAN: Steve, you are using this --

7 look, you are using this to try to -- to try to publicly

8 disclose these and to try to expose them to a witness.

9 It's not reasonably necessary, it's not appropriate

10 under the order. And to play them right now would be a

11 violation of the order and I would move for sanctions

12 and move to hold you in contempt.

13     MR. BISS: You're not going to scare me with

14 your threats.

15     MR. DONNELLAN: I don't care whether I'm scaring

16 you or not. I'm just putting you on notice.

17     (Speaking simultaneously)

18     MR. BISS: Go write an article about it, tell

19 the Fresno Bee, go write an article --

20     MR. DONNELLAN: We should take it up with the

21 judge because this is a very serious step that you're

22 proposing to take. It's a violation of the protective

23 order. It's beyond the scope of the examination. You

24 can make your choice, but I would end this deposition

25 right now because this is absolutely inappropriate.

1    MR. BISS:  You're trying to conceal material
2 information from the public.  That's what you're trying
3 to do.  You're trying to assure that the public knows
4 your half of the story.
5    MR. DONNELLAN:  If you would like to go to the
6 court and make a motion, you should do it.
7    MR. BISS:  (Speaking simultaneously).
8    MR. DONNELLAN:  Just the same way that I'm going
9 to go to the court and make a request with respect to
10 matters that the Congressman didn't want to answer
11 today, if you have issues that you would like to take up
12 with the court in connection with this deposition, you
13 should do that, too.  And then we'll come back and we
14 will ask questions, and if the court allows you, you can
15 ask questions and play the deposition -- play the tapes
16 for the deposition.  But --
17    MR. BISS:  He has a right to know what you did
18 to his family.
19    MR. DONNELLAN:  (Speaking simultaneously)
20    MR. BISS:  That, he has a right to know.
21    MR. DONNELLAN:  He has no right to know this
22 information because it's covered by a protective order
23 that you and I are subject to, and our clients are
24 subject to, and that this would be a violation of the
25 protective order.

1    THE WITNESS:  You asked me questions about
2 documents that I don't know about and now you're trying
3 to claim that now we don't have to do that --
4    MR. DONNELLAN:  With all due respect,
5 Congressman, I can't discuss this with you, this is
6 between me and your lawyer, and he and I need to work
7 this out.  Okay?  So, I'm not going to respond to
8 anything that you have to say.
9    THE WITNESS:  Well, I also have --
10    MR. DONNELLAN:  If you feel the need to make a
11 speech, you can make a speech.
12    THE WITNESS:  I'm not making a speech, but you
13 continue to say that I didn't answer your questions.  I
14 answered every single one of your questions, so I want
15 to make sure that that's on this deposition.  Hopefully,
16 the judge will read this deposition, 'cause there's
17 nothing that I didn't answer.  Matter of fact, I
18 answered all your psychobabble questions about things
19 that have nothing to do with, zero relevance whatsoever,
20 including about trips to the White House.  Like what --
21    MR. DONNELLAN:  Every single word that you've
22 said is reflected in the transcript and he'll have an
23 opportunity to read it, and your lawyer will have an
24 opportunity to point them out to him.
25    MR. BISS:  I'm concerned with what you're trying

1 to keep out of the transcript and --
2    MR. DONNELLAN:  Well, take it up with the court.
3 Take it up with the court, Steve, that's where it
4 belongs.
5    MR. BISS:  This witness has a right to know
6 what's on those audiotapes, just like the public does.
7    MR. DONNELLAN:  No, he does not.
8    MR. BISS:  The public has a right --
9    MR. DONNELLAN:  It is subject to a court
10 order --
11    (Speaking simultaneously)
12    MR. DONNELLAN:  It's subject to a court order
13 and it should be taken up with the court.
14    MR. BISS:  Jon, what I find most astounding is,
15 you represent a member of the press, and here we have a
16 classic example, maybe another classic example of the
17 press trying to keep the truth from the people, and
18 including this witness, trying to keep the truth from
19 this witness.  And he's entitled to know what's on the
20 audiotapes and to respond to what's on the audiotapes,
21 as part of his testimony in this case, including on the
22 question of damages, on the question of --
23    MR. DONNELLAN:  This witness is not even a party
24 to this case --
25    MR. BISS:  He's a witness.

1    MR. DONNELLAN:  -- Steve.
2    MR. BISS:  He's a witness.  He's a witness
3 and --
4    MR. DONNELLAN:  He has no entitlement under this
5 order to have access to these materials.  If you would
6 like to have a discussion offline about lifting the
7 protective order so that all materials subject to the
8 protective order are disclosed, let's have that
9 discussion.
10    But for right now, we have a protective order,
11 it's in place, it's signed by the judge, and if you were
12 to play this tape right now it would be a violation of
13 that order.
14    MR. BISS:  Well, I can tell you this, I am --
15 I'm shocked by this response.  I'm shocked by it, but
16 I'm not surprised.  And I'm not going to put myself or
17 my clients, or the witness, in the position of violating
18 a federal court order.  I'm not going to give you the
19 satisfaction of preparing a motion for sanctions, but I
20 will tell you this:
21    We are definitely, definitely going to the judge
22 on this, and we're going to seek attorney's fees and
23 costs for you tying up this deposition.  We have a few
24 more days left to finish up discovery.  How am I going
25 to get to examine this witness on these audiotapes

52 (Pages 202 - 205)

Veritext Legal Solutions

1 because of what you're doing? You're effectively
2 running out the clock, that's what you're doing here.
3 And unless you --
4     MR. DONNELLAN: If you have a valid claim, you
5 take it up with the court, and I'm sure the court will
6 give you relief to pursue that questioning if he deems
7 that it's appropriate, as he's done in other instances
8 where there's been an appropriate request to push out
9 the discovery schedule. So, that's certainly your right
10 and you can make that request. And if the court grants
11 it, we'll come back and we'll finish it.
12     MR. BISS: Just so I'm clear, so you're refusing
13 to go forward with the deposition, you're threatening
14 me, and perhaps the witness, you're threatening me with
15 sanctions and other types of remedies if I proceed with
16 the audiotapes, with showing him and asking him
17 questions about what's on those audiotapes.
18     MR. DONNELLAN: I'm not threatening you. I'm
19 telling you that it would be --
20     MR. BISS: Sounds like a threat to me.
21     MR. DONNELLAN: Don't mischaracterize it. I am
22 telling you that it would be a violation of the court
23 order and that I will seek relief from the court if you
24 proceed with that.
25     MR. BISS: And what other grounds, other than

1 what you've stated, what other grounds do you have that
2 it's a violation of the court order?
3     MR. DONNELLAN: As I've already told you,
4 it's -- you can go read the protective order yourself.
5 It's right in there --
6     MR. BISS: Well, are there any other grounds --
7     MR. DONNELLAN: And it's also beyond the scope
8 of the direct examination to begin with, so it's
9 completely inappropriate.
10     MR. BISS: Well, it's definitely not beyond the
11 scope, but any other grounds under the protective order
12 that you want to put on the record? This is your
13 opportunity.
14     MR. DONNELLAN: I would just direct you to the
15 protective order, Steve. You've got it. You can read
16 it. You are a party to it and you were part of putting
17 it forward to the court. So --
18     MR. BISS: I don't think it restricts me at all
19 in the examination of the witness. This witness can
20 sign a witness assurance declaration and he can receive
21 any counsel's eyes only information at all. He's a
22 witness to the deposition. You agree with that, right?
23     MR. DONNELLAN: No, absolutely not.
24     MR. BISS: You don't think -- because you called
25 this witness, I can't show him counsel's eyes only

1 information?
2     MR. DONNELLAN: Absolutely not. This is my
3 deposition. This is defendants' deposition. I called
4 it. I did not show him those materials and I did not
5 reveal any materials that are subject to the
6 confidentiality order, whether attorney's eyes only or
7 under any lesser standard. And so, there's no basis for
8 him to sign, it's not reasonably necessary to the
9 deposition, and it's beyond the scope of anything that
10 I've asked about.
11     THE WITNESS: So, just so I'm clear, so now,
12 Steve, you don't get to ask me any questions, and
13 anything that he asked of me, he gets to decide whether
14 or not it's relevant or not. So, I'm being treated
15 differently than all the other people that got deposed,
16 which is totally ridiculous and wrong.
17     And I don't know what the hell you guys at
18 Hearst are trying to cover up, but you asked me about
19 audiotapes, you asked me about notes, you asked me about
20 documents, so I get a right to see those documents and
21 hear those tapes, that I now know exist. And if not,
22 you're keeping them from me, a witness, who you've made
23 a witness. And you're the one that called me for a
24 deposition, not Steve.
25     You asked me 90 percent of questions that are

1 not relevant at all to this case, that are completely
2 just fishing, things that you want to try to push out to
3 all your fake news people. And now you're threatening
4 my lawyer with me on the line. You threatened me a
5 couple times with going to the judge. And then you said
6 that I didn't answer your questions and you're going to
7 the judge, so you're full of threats.
8     But I know this much, those tapes need to get
9 out. If you continue to hide them, I don't know what my
10 legal remedies are, but as far as I'm concerned, this
11 deposition is not complete because of your illegal cover
12 up and activity here, that continues to cover up your
13 lies for the ████████ that you sent out to harass my
14 family.
15     And now there's actual tapes that exist of this?
16 I've never heard of them. So, why do I not get to hear
17 them? I don't know what the court's going to say about
18 this, but this seems totally unfair, that my lawyer
19 doesn't get to ask me any questions. This is absurd.
20 And I don't know what game you think this is, but maybe
21 you should send ICE out to Hearst winery and Hearst
22 ranch or something. What a joke.
23     (Speaking simultaneously)
24     MR. DONNELLAN: I don't agree with your
25 ad hominem characterizations, Congressman, but I think

1  we can agree --
2        (Speaking simultaneously).
3        MR. BISS: Do you think that it's ethical for
4  you to stop a deposition based on the grounds that the
5  cross-examination exceeds the scope of your direct? Do
6  you think that's a legitimate response? I don't think
7  that's a legitimate response, and I don't think --
8        MR. DONNELLAN: I think it's a legitimate
9  response when you're about to violate a protective order
10  that's been put in place by the court.
11        MR. BISS: I'm not about to violate anything.
12  You know I'm not about to violate anything. You know
13  that the only reason you're doing this is to hide the
14  truth. That's it.
15        MR. DONNELLAN: I know, Steve, I know, Steve, I
16  understand all the points that you and your client want
17  to make right now and that's --
18        MR. BISS: So, why not let us make them? Why
19  not?
20        MR. DONNELLAN: No, no, no, no, if you can get
21  off your soapbox right now, I think we have said what we
22  have to say for the record, let's close the deposition,
23  we can take it up with the court, and anything that you
24  want to say to the court in terms of playing attorneys'
25  eyes only material that was not covered by this

1  them counsel's eyes only information. That's his point.
2        It doesn't -- it's hypocrisy. That's what he's
3  concerned about. That's what he's trying --
4        MR. DONNELLAN: This is not the right place for
5  speeches, okay, we're done. You can take it up with the
6  court.
7        MR. BISS: We will, we definitely will take it
8  up with the court, no question.
9        MR. DONNELLAN: The deposition is ended.
10        MR. BISS: Thanks for hiding the truth, Jon,
11  thanks for trying to hide it. We'll get it out, okay,
12  we'll get it out.
13        VIDEO OPERATOR: We are now going off the record
14  at 4:48 p.m. and this concludes today's testimony given
15  by Devin Nunes. The total number of media units used
16  was three and will be retained by Veritext Legal
17  Solutions. Thank you.
18
19        (TIME NOTED: 4:48 p.m.)
20
21
22
23
24
25

1  deposition, you can make those arguments to the court.
2        MR. BISS: Hey, Jon, so much for the First
3  Amendment.
4        THE WITNESS: Well, hold on a second. I have
5  another question for my lawyer, since we're still in the
6  deposition, but I guess you have the right to just shut
7  it off, you can just shut me off.
8        So, I want to know, I brought up the goons that
9  were out in my district that you sent to harass my
10  constituents. How did those people know of these people
11  that worked for my family years and years and years ago
12  unless it was something that my family had provided to
13  you --
14        MR. DONNELLAN: I'm going to stop you,
15  Congressman, and I'm going to --
16        (Speaking simultaneously)
17        MR. DONNELLAN: Mr. Biss, would you please
18  instruct your client to stop with the speeches? There's
19  no question pending. We're suspending this deposition
20  at this point.
21        MR. BISS: Well, the problem is, is that you're
22  the one who talks about counsel's eyes only and the
23  protective order, and what he's pointing out is the
24  hypocrisy of your statement. The fact is, that you sent
25  goons out to California and you gave them -- you gave

1      I declare under penalty of perjury
2  under the laws of the State of
3  California that the foregoing is true
4  and correct.
5      Executed on _____, 2021, at
6  _____, _____.
7
8
9
10
11     _____
11     SIGNATURE OF WITNESS
12
13
14
15
16
17
18
19
20
21
22
23
24  Job No. CS4751278
25

54 (Pages 210 - 213)

1   STATE OF CALIFORNIA       ) ss.
2   COUNTY OF LOS ANGELES    )
3
4        I, Lori M. Barkley, CSR No. 6426, do hereby
5   certify:
6        That the foregoing deposition testimony taken
7   before me at the time and place therein set forth and at
8   which time the witness was administered the oath;
9        That the testimony of the witness and all
10  objections made by counsel at the time of the
11  examination were recorded stenographically by me, and
12  were thereafter transcribed under my direction and
13  supervision, and that the foregoing pages contain a
14  full, true and accurate record of all proceedings and
15  testimony to the best of my skill and ability.
16       I further certify that I am neither counsel for
17  any party to said action, nor am I related to any party
18  to said action, nor am I in any way interested in the
19  outcome thereof.
20       IN WITNESS WHEREOF, I have subscribed my name
21  this 12th day of August 2021.
22
23
24       LORI M. BARKLEY, CSR No. 6426
25

---

1   Steven S. Biss, Esq.
2   stevenbiss@earthlink.net
3            August 12, 2021
4   RE: Nustar Farms v. Ryan Lizza, Hearst Magazine Media, Inc
5   8/10/2021, Devin Nunes (#4751278)
6   The above-referenced transcript is available for
7   review.
8        Within the applicable timeframe, the witness should
9   read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  Erratas-cs@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22       Yours,
23       Veritext Legal Solutions
24
25

---

1   Nustar Farms v. Ryan Lizza, Hearst Magazine Media, Inc
2   Devin Nunes (#4751278)
3          E R R A T A   S H E E T
4   PAGE_____ LINE_____ CHANGE_____
5   _____
6   REASON_____
7   PAGE_____ LINE_____ CHANGE_____
8   _____
9   REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____     _____
24  Devin Nunes                    Date
25

Veritext Legal Solutions