1        IN THE UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF IOWA

3             WESTERN DIVISION

4             ——————————————

5

    Devin G. Nunes,         )VOLUME II, Page 215

6                     )

          Plaintiff,     )

7                     )

        vs.             )Case No.

8                     )5:19-cv-04064-CJW-MAR

    Ryan Lizza and Hearst  )

9    Magazine Media, Inc.,  )

                     )

10        Defendants.    )

                     )

11                     )

    NuStar Farms, LLC,    )

12    Anthony Nunes, Jr., and )

    Anthony Nunes, III,   )

13                     )

          Plaintiffs,    )

14                     )

        vs.             )Case No.

15                     )5:20-cv-04003-CJW-MAR

    Ryan Lizza and Hearst  )

16    Magazine Media, Inc.,  )

                     )

17        Defendants.    )

                     )

18

19          DEPOSITION OF DEVIN NUNES

20         Friday, September 9, 2022

21           Visalia, California

22

23

24  Reported by:  Susan R. Wood, CSR No. 6829

25

EXHIBIT S

Case 5:19-cv-04064-CJW-MAR   Document 121-22   Filed 11/01/22   Page 1 of 69  App. 706

1        APPEARANCES
2
For Plaintiff:    Law Offices of Steven S. Biss
3  (Appearing Remotely) By MR. STEVEN S. BISS, ESQ.
               300 West Main Street
4              Suite 102
               Charlottesville, Virginia 22903
5             (804) 501-8272
               stevenbiss@earthlink.net
6
For Defendants:    The Hearst Corporation
7           By MR. RAVI R. SITWALA, ESQ.
             MR. NATHANIEL S. BOYER, ESQ.
8           300 West 57th Street
           40th Floor
9           New York, New York 10019
           (212) 649-2006
10          rsitwala@hearst.com
          nathaniel.boyer@hearst.com
11
The Videographer:   Terri Perkins
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

1       I N D E X
2
3  EXAMINATION BY          PAGE
4
5  MR. SITWALA          219
6
7  MR. BISS         476
8
9  MR. SITWALA (Further)    478
10
11      EXHIBIT INDEX
12  Defendants' Exhibits
13  Exhibit DX141 - Executive Employment Agreement  268
14  Exhibit DX142 - Plaintiffs' Supplement To Rule
15       26(a)(1)(i) Disclosures    384
16  Exhibit DX143 - Complaint    402
17  Exhibit DX144 - Plaintiffs' Amended and
18       Supplemental Rule 26(a)(1)
19       Disclosures    433
20
21
22
23
24
25

---

1     Visalia, California
2    Friday, September 9, 2022; 9:05 a.m.
3    Law Offices of Sherwood & Marvin
4
5     THE VIDEOGRAPHER:  Good morning.  We are on
6  the record.  The time is 9:05 on Friday,
7  September 9th, 2022.  Please note that the
8  microphones are sensitive and may pick up whispering
9  and private conversations.  Please mute your phones
10  at this time.  Audio and video recording will
11  continue to take place unless all parties agree to go
12  off the record.
13     This is Media Unit Number 1 of the video
14  recorded deposition of Devin Nunes taken by counsel
15  for defendant in the matter of NuStar Farms, LLC, et
16  al., versus Ryan Lizza and Hearst Magazine Media,
17  Inc., filed in the United States District Court,
18  Northern District of Iowa, Western Division, Case
19  Number 5:20-cv-04003-CJW-MAR.  The location of the
20  deposition is 225 West Oak Avenue, Visalia,
21  California, 93291.
22     My name is Terri Perkins, representing
23  Veritext Legal Solutions, and I'm the videographer.
24  The court reporter is Susan Wood, from the firm
25  Veritext Legal Solutions.  I am not related to any

---

1  party in this action nor am I financial interested in
2  the outcome.  If there are any objections to
3  proceeding, please state them at the time of your
4  appearance.
5     Counsel and all present, including remotely,
6  will now state their appearances and affiliations for
7  the record, beginning with the noticing attorney.
8     MR. SITWALA:  Ravi Sitwala with Nathaniel
9  Boyer for the defendants.
10     MR. BISS:  Steve Biss.  I represent the
11  plaintiffs.
12     THE VIDEOGRAPHER:  Court reporter, can you
13  swear in the witness.
14     DEVIN NUNES,
15  the Plaintiff, recalled as a witness by counsel for
16  Defendants, being first duly resworn, testified
17  further as follows:
18     EXAMINATION
19  BY MR. SITWALA:
20    Q.  Good morning, Congressman.  How are you
21  doing this morning?
22    A.  Good.  Good morning.
23    Q.  Do you --
24    A.  Before we get started, though, I'm a -- two
25  questions.  One, so who's -- you're the lawyer here?

Case 5:19-cv-04064-CJW-MAR   Document 121-22   Filed 11/01/22   Page 2 of 69

App. 0707

1    Q.  Yes.
2    A.  And your name is?
3    Q.  Ravi, R-a-v-i.
4    A.  Ravi.
5    Q.  Yes.
6    A.  Okay.  And then who's this?
7    Q.  This is Nate Boyer.  He's also a lawyer for
8  defendants.
9    A.  Okay.
10   Q.  And we represent both Hearst as well as Ryan
11  Lizza, in case that was your second question.
12   A.  Okay.  And you work for who?
13   Q.  For Hearst.
14   A.  So you guys are Hearst -- you're Hearst
15  employees?
16   Q.  Correct.
17   A.  Okay.
18       THE WITNESS:  And you guys work with another
19  firm?
20       THE REPORTER:  Yes.
21       THE WITNESS:  Okay.  And then the other
22  question I have is in your opening you said that this
23  is NuStar Farms.  Well, I'm not NuStar Farms.
24       MR. SITWALA:  Congressman, your case was
25  consolidated with your family's in their businesses'

1  case, so the caption -- and Steve can -- Mr. Biss can
2  jump in if I'm misstating anything.  So the caption
3  is -- the et al. is everybody else, including
4  yourself.
5       Does that make sense?
6       THE WITNESS:  Okay.  I just want to confirm.
7  Steve, are you okay with that?
8       MR. BISS:  I am.  The cases were
9  consolidated.  The style of the case has no
10  reflection on -- is not evidence in any way, shape,
11  or form that you have any involvement in NuStar
12  Farms.
13       THE WITNESS:  Okay.
14       MR. BISS:  That's right; isn't it, Ravi?
15       MR. SITWALA:  It -- certainly that in and of
16  itself would not suggest that, that's correct.
17       THE WITNESS:  Right.  But didn't you --
18  didn't you guys go into court to -- in favor of
19  consolidating the case?
20       MR. SITWALA:  We did?  Anyway, I don't --
21  there's -- I don't think there's any need to discuss
22  this.
23       THE WITNESS:  Well, I just want to make sure
24  that, you know, it's under the right pretense here of
25  why I'm here.  I'm here on my own, not NuStar Farms.

1       MR. SITWALA:  That's correct.
2       THE WITNESS:  Okay.
3       MR. SITWALA:  And if you look at the notice
4  of deposition, it's a notice of deposition to you and
5  nobody else.
6       THE WITNESS:  Okay.
7       MR. SITWALA:  All right.  Are you ready to
8  proceed?
9       THE WITNESS:  Yeah.
10       MR. SITWALA:  Great.
11  BY MR. SITWALA:
12   Q.  Do you have any medical condition that would
13  impair your memory or your ability to tell the truth
14  today?
15   A.  No.
16   Q.  Are you taking any medication that would
17  impair your memory or your ability to tell the truth?
18   A.  No.
19   Q.  Let me just go over a few rules.  I think
20  you're already familiar with these from the previous
21  deposition in this case, and I believe you've been
22  deposed before that as well.
23   A.  Were you in the last deposition --
24   Q.  I was not.
25   A.  -- where you deposed me?

1    Q.  I was not.
2    A.  You were not.
3       Were you?
4       MR. BOYER:  Irrelevant.  Please continue.
5  BY MR. SITWALA:
6    Q.  So neither of us took the last deposition,
7  to answer your question.
8    A.  Okay.
9    Q.  Let's try not to speak over each other today
10  so that the court reporter can take everything down.
11  I'm going to try to speak more slowly than I have
12  been so far, and I would ask you to try to speak in
13  a -- slow enough that she can take down both of our
14  words.  I'll do my best to let you finish your
15  answers, and I would ask you to do the same for me
16  with my questions.
17       Does that make sense?
18    A.  Yeah.
19    Q.  If you don't understand my question, please
20  let me know.  And if you do answer the question, I'm
21  going to assume that you understood it; is that fair?
22    A.  Yep.
23    Q.  If you need a break at any time, just let me
24  know.  The only thing I would ask is that you answer
25  any pending question, and then we'll take a break

3 (Pages 220 - 223)

1 whenever you like.
2     Is that okay with you?
3     A.  Yes.
4     Q.  Great.
5         And you understand you're under oath today
6 just as if you were testifying in court before a
7 judge or a jury?
8     A.  Yes.
9     Q.  And your answers will be truthful and
10 complete; correct?
11     A.  Yes.
12     Q.  Okay.  What did you do to prepare for
13 today's deposition?
14     A.  Just printed out the hit piece that Lizza
15 did, spoke to my lawyer this morning.  Then obviously
16 I wasn't sure if the deposition was on because there
17 was no -- 'cause my lawyer wasn't going to be able to
18 be present via video, and that was it.
19     Q.  How long did you speak with your lawyer?
20     A.  Is it relevant for you to know how long I
21 spoke with my lawyer?
22     Q.  Your lawyer can make objections with respect
23 to relevance, but in a deposition you have to answer
24 the question unless he instructs you not to.
25     A.  I don't have privilege with my lawyer in how

1 often I talk to my lawyer?
2     Q.  No.
3     A.  Okay.  Well, let's see.  I guess I can tell
4 you.  Let's see here.  So roughly at 7:00 a.m. this
5 morning I got notified by my lawyer that -- Mr. Biss,
6 that there was a --
7         MR. BISS:  Well, hold on, hold on.
8 BY MR. SITWALA:
9     Q.  Please don't -- yeah, don't tell me the
10 contents of your conversation.  I was just asking how
11 long.
12     A.  Okay.  Looks like roughly 30 minutes.
13     Q.  Okay.  And had you spoken with your lawyer
14 before today in preparation for this deposition?
15     A.  Yeah.
16     Q.  And how many times?
17     A.  I don't know.  I don't remember.
18     Q.  More than five?
19     A.  Probably.
20     Q.  Okay.
21     A.  I don't know about preposition -- or not for
22 this deposition, but I've spoke to him more than five
23 times.
24     Q.  Sorry.
25         So in preparation for this deposition in

1 particular, I'm asking how many times you can recall
2 you spoke with your lawyer.
3     A.  I don't know.  Handful of times.  He
4 notified me about it and then we discussed it,
5 what -- you know, where it was going to be, I
6 remember that, and you guys were trying to have me go
7 to Los Angeles and then San Francisco.
8     Q.  Again, I don't need to know what you talked
9 about.
10     A.  Oh, okay.
11     Q.  I'm just asking when and how many times.
12     A.  Okay.
13     Q.  Would you say that you spoke in the last
14 week about this deposition?
15     A.  This morning, I just told you.
16     Q.  Sure.  Other than that.
17     A.  Yeah, I think so.
18     Q.  Okay.  Did you speak --
19     A.  Few days ago.
20     Q.  Did you speak with anybody else about this
21 deposition?
22     A.  Yeah, yeah.
23     Q.  And who would that be?
24     A.  I spoke to Matt Butler.
25     Q.  And who is that?

1     A.  He was -- as I was preparing, I was just
2 kind of jotting down all my notes about who was --
3 who was with me at the time that the hit piece came
4 out, and he was the one that was with me.
5     Q.  And what was his role?
6     A.  He was one of my campaign consultants in
7 2018.
8     Q.  And you're still in touch with him.
9     A.  Um-hmm.  Well, I had to -- I called him so
10 that I could -- 'cause I just remembered that he was
11 there so I wanted to make sure that that was the
12 case.
13     Q.  And what did you speak with him about?
14     A.  Just to confirm that he was there.
15     Q.  Did you talk --
16     A.  I knew he was there, but I just wanted to
17 make sure that my memory was correct.  It's been, you
18 know, a few years ago.
19     Q.  Sure.
20         And do you recall speaking to him about
21 anything else?
22     A.  Well, just about the hit piece coming out.
23     Q.  Okay.  And what do you recall of that
24 conversation?
25     A.  My conversation with him, just to confirm

4 (Pages 224 - 227)

1 that it came through and it was pushed out all over
2 on social media multiple times and he was there the
3 whole time.
4    Q. Okay. And just so I'm clear, the
5 conversation I'm asking about is the one you just had
6 with him. That's what you talked to him about.
7    A. Yeah, I just called to confirm that he was
8 there.
9    Q. Did you speak to him about anything else?
10    A. No. It was a two-minute conversation.
11    Q. Okay. And when you say "there," what do you
12 mean by "there"?
13    A. There when the hit piece came out, there
14 with me.
15    Q. Physically?
16    A. Physically.
17    Q. Okay. And where were you?
18    A. I was at my home.
19    Q. And where is that?
20    A. Tulare, California.
21    Q. And he was there with you?
22    A. Correct.
23    Q. Was there anybody else there with you?
24    A. No, just, I mean, probably my family, but I
25 don't remember. I just remember specifically being

1 outside when it happened, we were on the patio, and
2 then after that my phone went off for -- you know, we
3 spent the next five hours, I think it was probably --
4 probably till about 1:00 in the morning, so five,
5 six, seven hours dealing with it.
6    Q. You and Mr. Butler?
7    A. Um-hmm.
8    Q. Did you speak with anybody else about this
9 deposition or in preparation for it?
10    A. I spoke to my father; I spoke to my former
11 communications director. That's all I can remember.
12    Q. Okay.
13    A. Sure there were more, but that's what I
14 remember.
15    Q. And can you tell me, when did you speak with
16 your father?
17    A. Two or three days ago --
18    Q. And was that --
19    A. -- roughly.
20    Q. I'm sorry.
21       Was that over the phone?
22    A. Over the phone.
23    Q. And what was the -- what do you recall of
24 that conversation?
25    A. He reiterated to me that you guys tampered

1 with evidence.
2    Q. Can you tell me -- did he explain any more
3 about what that meant?
4    A. He said that when he was in his deposition
5 that they -- that there were some verbiage that was
6 taken out of context, and he said that he brought it
7 up to you. I don't know if you were in the
8 deposition so -- I don't know. But that he brought
9 it up that they doctored evidence -- that you guys
10 doctored evidence.
11    Q. Anything else?
12    A. No.
13    Q. And did you --
14    A. I'm sure there was more, but that was the
15 gist of it, that -- that you guys have doctored
16 evidence and so major problem.
17    Q. And did you reach out to him or did he reach
18 out to you to tell you that?
19    A. I think I was probably just talking to him
20 and then it came up in just in the matter of
21 conversation.
22    Q. Okay. And who is your former communications
23 director?
24    A. Jack Langer.
25    Q. L-a-n-g-e-r?

1    A. L-a-n-g-e-r, yeah.
2    Q. And do you know what he's doing today?
3    A. He is a communications director for -- in
4 the United States House of Representatives.
5    Q. For a particular representative or more
6 generally?
7    A. For Connie Conway.
8    Q. And what district does Representative
9 Conway --
10    A. She represents my old district.
11    Q. Got it.
12       And what was the substance of your
13 conversation with Mr. Langer?
14    A. Just that -- it was just kind of
15 remembering, going back, I was trying to recollect
16 that -- the night in 2018 and kind of how that all
17 went down because we were noticing on social media
18 and then Apple News specifically, which was very
19 unusual, did a nationwide push notification.
20       So I'm not sure how you guys arranged that,
21 but it was quite convenient for you to maximize the
22 damage.
23    Q. And is there anything else you recall about
24 your conversation with Mr. Langer?
25    A. Yeah. So he was also present when -- and

5 (Pages 228 - 231)

1 we're skipping a lot here, but we could spend the
2 whole time on this. I don't know how deep you want
3 to get into it, but when it was republished on
4 Twitter by Mr. Lizza, but then at the height of the
5 impeachment hearings that would have been -- he would
6 remember that.
7    (Garbled audio.)
8    THE WITNESS: Steve?
9    MR. SITWALA: Steve, are you objecting? I
10 think maybe --
11   MR. BISS: No.
12   MR. SITWALA: Okay.
13   THE WITNESS: Oh, Steve, we couldn't -- your
14 screen is gone and it sounded like you were objecting
15 or something.
16   MR. BISS: No, not objecting.
17   THE WITNESS: Okay.
18 BY MR. SITWALA:
19   Q. Please continue. So you were talking
20 about --
21   A. So at the height of the impeachment, so, you
22 know, we sued you, I sued you and my family sued you,
23 and then -- and then you guys decided to put it out
24 on Twitter that then caused a whole 'nother round of
25 damages.

1    Q. And that's --
2    A. So he was -- you know, he was in charge of
3 my communications at the time, so he knew that that
4 came up, and then of course it led to, you know, kind
5 of the same thing that happened in 2018 I had to
6 relive in 2019 of your ridiculous accusations.
7    Q. Did you have any -- in 2019 did you have any
8 communications with Mr. Langer, like e-mails or texts
9 or anything like that --
10   A. No.
11   Q. -- about this?
12   A. No.
13   Q. You would have just talked to him either --
14   A. We've provided you everything. He's
15 provided you everything that he has.
16   Q. "He" meaning Mr. Langer?
17   A. Um-hmm.
18   Q. Anything else?
19   A. We searched through everything that would
20 have had that, but I don't do e-mails, so there would
21 be no e-mails.
22   Q. Sure.
23      And do you recall anything else from your
24 recent conversation with Mr. Langer before this
25 deposition?

1    A. Yeah, just -- it was just -- it was just,
2 you know, half hour ago.
3    Q. Okay.
4    A. Yeah.
5    Q. So what else do you remember?
6    A. Just that -- you know, just confirming that
7 he was there just so I could make sure that I knew
8 what happened, you know, in both -- both times.
9    Q. Anything else?
10   A. Of the publication.
11   Q. Okay. Anything else?
12   A. That I talked to him about this morning?
13   Q. Yes.
14   A. No.
15   Q. Now, I believe you said you couldn't recall,
16 but let me just ask to make sure, is there anybody
17 else you recall talking to in preparation or
18 anticipation of this deposition?
19   A. I talked to Langer, Butler, my father,
20 Steve. I mean, not -- I mean, I told, like, my staff
21 that I was going to be, you know, out of pocket
22 today.
23   Q. Your staff in your current employment?
24   A. Correct.
25   Q. Okay. And how many people are on your

1 staff?
2    A. Well, I'm not going to -- I'm not going to
3 disclose that here.
4    Q. You're refusing to answer the question?
5    A. Because you guys leak, I don't need my
6 current employees being harassed by you and your
7 thugs.
8    Q. And knowing how many of them would --
9    A. Absolutely, because you'll release this out,
10 and that's important public information that you and
11 your people would go after and target these people.
12   Q. So just to be clear, you're refusing to
13 answer the question; correct?
14   A. I did answer the question. I'm not
15 refusing.
16   Q. You're refusing to disclose the number of
17 members --
18   A. Because you send thugs and harass them.
19   Q. I'm not asking why. I'm just confirming.
20 You're not going to answer; right?
21   A. I answered it.
22   Q. You're not going to tell me the number;
23 right?
24   A. I'm not going to tell you the number because
25 of your harassment.

1    Q. Did you speak with your brother about the
2 deposition?
3    A. Not that I can remember, no.
4    Q. And any other family members?
5    A. I told my wife that I had a deposition
6 today.
7    Q. Okay. Any other family members?
8    A. I told my daughter 'cause I just talked to
9 her when I walked out the door and she was on her way
10 to school.
11    Q. And is it fair to say you didn't speak about
12 anything of substance with either your wife or your
13 daughter?
14    A. No. No, I did not speak anything of
15 substance.
16    Q. Okay. Thank you.
17       Okay. So I think we just started to get
18 into this. So who is your employer today?
19    A. Truth Social, Trump Media Technology Group.
20    Q. Okay. And are you full time employed by
21 that entity?
22    A. Yes.
23    Q. Okay. Do you report to anybody there?
24    A. Sure. I report to the board.
25    Q. To the board.

1    A. No.
2    Q. I believe you mentioned you reviewed some
3 documents in preparation for the deposition,
4 including the article at issue; is that correct?
5    A. Correct.
6    Q. Is there any -- are there any other
7 documents you reviewed?
8    A. I reviewed probably a month ago, month and a
9 half ago, you had an expert witness that I read
10 something that -- I don't remember the expert
11 witness' name.
12    Q. Mr. Hosfield. I don't know if that would
13 refresh your recollection.
14       Was the subject of the expert witness report
15 damages?
16    A. Yes.
17    Q. And with respect to your case -- or your
18 claim.
19    A. Yes.
20    Q. Okay. Anything else?
21    A. Documents?
22    Q. Yes.
23    A. I mean, not in the last -- what's the time
24 frame?
25    Q. Let's say the last two weeks.

1    A. Yeah.
2    Q. And what is your position?
3    A. I'm the CEO. I mean, you're asking me these
4 questions you already know.
5    Q. For the record.
6    A. Okay. All right. You're just doing it for
7 the record.
8    Q. Yeah. I mean, they're not trick questions.
9    A. Okay. I didn't know where you were going
10 with this.
11    Q. So you said you report to the board. How
12 large is the board?
13    A. It's five.
14    Q. And who is on the board?
15    A. Myself, President Trump, Donald Trump, Jr.,
16 Kash Patel, Wes Moss.
17    Q. What was the last name?
18    A. Wes Moss.
19    Q. Can you spell it?
20    A. I think it's Moss. W-e-s.
21    Q. Okay. But the last name.
22    A. I think it's M-o-s-s.
23    Q. Oh, okay. Got it.
24       And did you tell the board that you had a
25 deposition today?

1    A. No.
2    Q. Okay.
3    A. Not that I remember. I mean, there could
4 have been one but not that I remember.
5    Q. And that includes documents that are part of
6 the court file or anything else; correct?
7    A. I have not read -- I read that expert
8 witness report. I mean, I remember reading the
9 circuit opinion, but I don't think that was in the
10 last two weeks.
11    Q. Are you done with your answer? Are you done
12 with your answer?
13    A. Those are the things I remember.
14    Q. Okay. And I see you brought something with
15 you today. And what did you bring with you today?
16    A. I mean, just papers --
17    Q. And what are they?
18    A. -- on my own.
19    Q. Well, can you please tell me what's in that
20 folder?
21    A. Why?
22    Q. Because you brought them to the deposition.
23    A. And you have the right to go through my
24 documents?
25    Q. The documents that you brought to the

Veritext Legal Solutions

800-567-8658                                   973-410-4098

1 deposition and have in front of you, yes.
2    A. That seems a little odd that I would have to
3 show you my documents.
4    Q. Well, I'm asking you to do so.
5    A. Aren't they my documents? I have to provide
6 my documents to you?
7    Q. I'm asking you what they are.
8    A. Do I have to provide you my car keys?
9    Q. Are you not going to answer the question?
10    A. Well, you're demanding to see documents that
11 are in my possession.
12    Q. Well, let's back up for a second, then. Can
13 you please tell me, describe the documents that
14 are --
15    A. Yeah, it's the defamatory hit piece.
16    Q. Anything else?
17    A. No.
18    Q. And did you have -- do you have notes on
19 that or no?
20    A. I don't think I have to disclose if I have
21 notes or not.
22    Q. Are you not going to answer the question?
23    A. I did answer the question. I mean, do you
24 have a right to look through my notes?
25    Q. I have a right to ask you questions, you're

1 under oath. Your attorney can object or instruct you
2 not to answer.
3       THE WITNESS: Steve, do I have to show them
4 my documents?
5       MR. BISS: No.
6       MR. SITWALA: Are you instructing him not to
7 answer the question, Steve?
8       MR. BISS: No.
9       MR. SITWALA: No, you're not instructing
10 him?
11       MR. BISS: No.
12       MR. SITWALA: I'm going to ask the question.
13 You can state your objection if you want.
14 BY MR. SITWALA:
15    Q. Do you have notes written on the article
16 that is inside --
17    A. I mean, look, if you insist, if you want to
18 see it, it seems ridiculous that you're trying to go
19 through my documents. I've never heard of that.
20 I've been in -- conducted many depositions and I
21 never go to the attorney or the witness and say let
22 me see what's in front of you. I mean, it sounds --
23 it seems ridiculous.
24    Q. I'm asking the question. You can answer it
25 or I guess you can choose not to.

1    A. Well, I just think it's absurd.
2    Q. That's fine. But are you going to answer
3 the question?
4    A. I've never seen that before.
5    Q. I'm not trying to have extended arguments
6 today. I just want --
7    A. I'm not either. You called me for a
8 deposition, let's just remember that, you're the one
9 that called me.
10    Q. You understand why we called you for a
11 deposition; right?
12    A. No, I do not.
13    Q. Okay.
14    A. Because -- I don't find it funny.
15    Q. Okay.
16    A. You weren't in the last deposition, I don't
17 know if your other lawyer was, but you -- you,
18 Hearst -- I'm not picking on you because I guess you
19 weren't there -- you deposed me before for seven
20 hours.
21    Q. I understand that.
22    A. And you stopped the deposition. You
23 stopped -- you stopped the deposition and you hid
24 evidence from me.
25    Q. I'm not trying to get into an argument with

1 you. Can you please answer my question.
2    A. Well, I just want you -- I just want to make
3 sure that you know that you ended the deposition with
4 me early, you hid evidence from me, and then now you
5 called me back for another deposition and now you
6 want to go through my notes.
7    Q. Do you understand that the court basically,
8 when presented with the question of whether you
9 should have been provided that evidence in the
10 deposition, found that you should not?
11    A. Yeah, I know you guys went to the judge and
12 whined and cried, and then the judge ruled in your
13 favor to hide evidence from me.
14    Q. So it's your view --
15    A. So you deposed me for seven hours, you hid
16 evidence, so -- and then now you call me back for a
17 deposition and you're asking me, you know, questions
18 that you already know the answer to, and you want to
19 look through my notes, which I've never even heard of
20 that before.
21    Q. Is it your testimony that the judge is
22 complicit in hiding evidence from you?
23    A. You went to the judge and asked the judge to
24 enable you to hide evidence.
25    Q. Does -- do the documents inside that folder

8 (Pages 240 - 243)

1 have your notes on them?
2  A. Look, I mean, if you just want to get going
3 with it I'll just show you what they are. I mean, if
4 you want to see them, right there, it's all over
5 the -- all over the Internet.
6  Q. Okay. Thank you.
7  If either -- you can show me that they don't
8 have notes or you can tell me they don't and then we
9 can move on.
10  A. I don't think there's any notes on them, but
11 I'll go through it page by page.
12  Q. Thank you.
13  A. They have nice little cartoons, though, you
14 did.
15  I don't see anything other than just the hit
16 piece.
17  Q. Okay. Thank you.
18  Did you have any role in responding to the
19 third-party subpoena that was issued to TMTG? And
20 you know --
21  A. What do you mean "role"? I mean, I was
22 notified of it.
23  Q. Okay. Was that the extent of your
24 involvement?
25  A. Yeah. I mean, and we complied, the company

1 complied.
2  Q. Okay. And TMTG --
3  A. And you ran to the media and you leaked the
4 story.
5  Q. You understand --
6  A. And you har-- -- yeah, you caused more
7 harassment for something that was already publicly
8 available.
9  Q. And you understand when I refer to TMTG I'm
10 talking about Trump Media Technology Group; correct?
11  A. Yeah, I'm well aware.
12  Q. Okay.
13  A. And you should be too because you leaked it.
14  Q. Have you reviewed at any point any
15 deposition transcripts in this case?
16  A. No.
17  Q. What about your previous deposition
18 transcript?
19  A. No.
20  Q. How about any court orders?
21  I'm sorry. You did mention the Eighth
22 Circuit earlier so I understand you reviewed that.
23  Other than the Eighth Circuit --
24  A. I'm aware of the shenanigans you pulled in
25 Florida.

1  Q. Okay.
2  A. I didn't read anything but other than when
3 it leaked out. And, of course, it was a fun little
4 hit piece for you guys for about a week. And that
5 expert testimony I read I reviewed.
6  Q. Okay. And what about documents that were
7 produced by any of the parties, including your case
8 and in your family's case?
9  A. Not that I know of.
10  Q. Okay. Have you spoken with anybody in your
11 family about their lawsuit since your last
12 deposition?
13  A. I mean, only the -- I mean, yeah, I think --
14 I mean, I'm sure that I have, you know. I mean, it's
15 been -- I don't know. What has it been since you
16 since this was -- I forget, the Eighth Circuit ruling
17 was, what, about a year ago, and you guys deposed me
18 a year ago until you ended the deposition.
19  Q. So the answer is yes.
20  I know you did mention that your father
21 spoke about, you know, his deposition. So other than
22 that, can you recall any specific conversations with
23 your family about --
24  A. Yeah, because he -- I remember -- I don't
25 remember all the specifics, but I do remember from a

1 year ago, rough time frame, that my dad said that you
2 accused him of multiple additional federal crimes in
3 addition to doctoring the evidence that you were --
4 when you presented it to him in the deposition.
5  Q. Okay. Anything else?
6  A. Not that I know of. I mean, I know that --
7 I think you harassed my mother, you harassed -- oh,
8 you harassed my uncle recently. No, you harassed two
9 of my uncles, that's right.
10  Q. And how did we harass your -- your -- I
11 understand you're referring to the deposition of your
12 Uncle Gerald. What about your other uncle?
13  A. You were trying to get him to testify, and
14 then you called off the deposition for some reason.
15 But why you would -- why you would interview those
16 people I have no idea, other than just to harass.
17  Q. So it's your view that, for example, your
18 Uncle Gerald doesn't have any knowledge relevant to
19 this case?
20  A. Well, you're the one that called him, but
21 he's not -- you know, he has nothing to do with me.
22  Q. I --
23  A. But he has -- I mean, he definitely has
24 information about 'cause it's a bad situation because
25 of what you guys have done.

9 (Pages 244 - 247)

Case 5:19-cv-04064-CJW-MAR   Document 121-22   Filed 11/01/22   Page 9 of 69

App. 714

1 Q. You said --
2 A. It's a really bad situation.
3 Q. You said that your --
4 A. Well, you're ignoring -- you're ignoring
5 what I just said. I mean, you have a -- you're
6 harassing my family mem- -- extended family members
7 and don't -- and also, you sent thugs around all over
8 this county, interviewing anybody and everybody that
9 had ever had any involvement with my family, people
10 that were -- had -- definitely would have zero
11 information about this, about this case.
12      So I've been hearing -- you know, of course
13 over the last year I guess you asked if I had
14 additional information. I mean, I remember -- you
15 know, I've had, you know, people come up to me and
16 say, yeah, somebody knocked on so-and-so's door, you
17 know, they were -- they were -- they had badges in
18 hand, which was -- which was ridiculous because
19 they're not federal agents, they were like retired
20 federal agents or something.
21 Q. Okay.
22      A. I don't know the name of them, but I'd like
23 to put that in the record of whoever those people
24 were that were, you know, here in -- here in Tulare
25 County running around harassing people that would

1 have no information whatsoever about this -- about
2 this case. So --
3 Q. So --
4      A. So why did you -- you know, so why was that
5 done? The only purpose was to inflict more damage.
6 So the damages are not just what happened at the time
7 but also the damages that have occurred during the
8 course of this case. I've never seen anything quite
9 like it. It's just -- it's just pure harassment,
10 it's very unprofessional.
11 Q. Okay. So going back to your -- you
12 mentioned that your father had told you that he was
13 accused of additional federal crimes in his
14 deposition.
15      Do you recall any details about what the
16 nature of those crimes were?
17      A. I mean, it was just like this hit piece, it
18 was something to do -- something ridiculous, like
19 that he was evading -- something about evading taxes
20 or something.
21 Q. Okay. Anything else?
22      A. All pretty serious. I mean --
23 Q. Sure. I'm saying --
24      A. Yeah, I mean, you guys made it up. I don't
25 know. Just like this story was made up out of thin

1 air, you made that story up too. So, yeah, I think
2 it upset him.
3 Q. Other than evading taxes, do you recall any
4 other details as to why --
5      A. I mean, I just remember that it was
6 harassment and it was -- and it was, you know,
7 multiple conspiracy theories about that you guys
8 brought up to -- that upset him.
9 Q. Okay. You don't remember anything other
10 than that?
11      A. I mean, I'd have to go -- I mean, I guess --
12 I don't even know. Can I look at his deposition?
13 Q. I'm not asking you to.
14      THE WITNESS: Can I -- Steve, can I review
15 my father's deposition? I don't --
16      MR. BISS: I think you're entitled to unless
17 it's been designated as highly confidential or
18 counsel's eyes only so -- which I don't remember if
19 it has been so designated but, you know, we can talk
20 about that.
21      THE WITNESS: Well, and -- so for the sake
22 of time here, I mean, I'd like to get more specifics
23 as to the additional accusations that Hearst has
24 leveled against my family. It would be good if I
25 could review that and then submit for the record, you

1 know, after I review the deposition.
2 BY MR. SITWALA:
3 Q. Just to be clear, I'm just asking your
4 recollection of the conversation. I'm not asking
5 you --
6      (Overlapping speakers.)
7      THE WITNESS: Well, I know, that's -- in
8 order to recollect and to answer the question fully,
9 I would need to review the deposition. I'm saying
10 that I would supplement this deposition once I review
11 my father's transcripts.
12 BY MR. SITWALA:
13 Q. You're certainly allowed to make corrections
14 and supplement the transcript, you know --
15      A. Well, do you -- but you asked --
16 Q. I'm just asking --
17      (Overlapping speakers.)
18      THE WITNESS: You asked me a question.
19 BY MR. SITWALA:
20 Q. -- sitting here today.
21      A. You asked me a question. That's what I
22 recollect. I would like to be more thorough in my
23 answer, but I would have to review the deposition of
24 where you harassed my father, and then I could go
25 through in detail, you know, the crazy conspiracies

10 (Pages 248 - 251)

1 that you came up with.
2    Q. I understand you're saying that. I'm not
3 asking you to do that, but I understand what you're
4 saying.
5    A. Are you objecting that -- for me to -- are
6 you objecting for me to review the deposition?
7    Q. I'm not asking you to do it now. If you
8 want to review it afterwards and submit something,
9 that's entirely up to you.
10    A. Okay. So I can review my father's
11 deposition.
12    Q. My colleague has reminded me, there's
13 information that's in that deposition that I believe
14 has been designated counsel's eyes only to your
15 family; so I think you would need to work out with
16 them and your joint counsel that. It's not our
17 objection, just to be clear. I just want to make
18 sure you understand that. There's a protective order
19 in this action. All the parties can designate things
20 confidential or even a higher level of
21 confidentiality, and then, you know, it must be
22 treated that way.
23       And so because your family would have
24 designated information in that deposition as
25 counsel's eyes only to them, I don't want to suggest

1 that I could tell you as a separate party you could
2 see it.
3       Does that make sense?
4    A. So you're not the ones that would stop me
5 from seeing --
6    Q. No, no, we're not. But I just --
7    A. But then why did you in the deposition last
8 time --
9    Q. Those are different materials.
10    A. -- with me and you refused to provide the
11 evidence?
12    Q. That was our counsel's-eyes-only material.
13 What I'm saying it's in your father's deposition,
14 that material is different material, that is your
15 family's confidential information. But let's please
16 move on.
17       I want to talk about your long career in
18 Congress. And none of this should be a surprise, but
19 I just want to get it on the record and hopefully --
20    A. Yeah, I mean, I think you already asked me
21 about that last time. Well, I know you didn't
22 because you weren't there. But when you ended the
23 deposition last time, you already -- you asked me all
24 these questions before.
25    Q. I'm going to do my best not to go over

1 things that were gone over last time.
2    A. Okay. All right.
3    Q. I'll try to be efficient, you know, and it
4 is what it is.
5    A. Okay.
6    Q. Your were elected ten times; correct?
7    A. I was elected 12 times.
8    Q. 12 times. Okay.
9       And I have from 2002 to 2020 you served; is
10 that correct?
11    A. I was elected ten times to the United States
12 Congress and I was elected twice to the Community
13 College Board here in this county.
14    Q. I see. Okay.
15       And the Community College Board, when were
16 you elected to that?
17    A. 1996.
18    Q. And what was your role on that board?
19    A. I was a trustee, one of five board members.
20    Q. And is that a government role?
21    A. Yes.
22    Q. Okay. For the US House of Representatives,
23 you served from 2002 to 2020; is that correct?
24    A. That's correct.
25    Q. And as you just said, you were elected ten

1 times.
2       Your most recent election was in 2020;
3 correct?
4    A. Yeah.
5    Q. Can you tell me what district you
6 represented.
7    A. 22.
8    Q. District 22.
9    A. You already know these answers but ...
10    Q. And you represented the same district for
11 all your terms; correct?
12    A. It was -- no, it was previously the 21st.
13    Q. Okay. Thank you.
14       When did that change --
15    A. But you already know this. You already know
16 these answers. I mean, we can go through this. I
17 mean, you already asked before. It changed in 2012.
18    Q. Okay. Thank you.
19       You never lost a Congressional election;
20 correct?
21    A. No.
22    Q. Not correct?
23    A. No, I didn't lose a Congressional election.
24    Q. Okay.
25    A. I mean --

Veritext Legal Solutions

800-567-8658                                    973-410-4098

1    Q. Thank you.
2    A. Yeah.
3    Q. In 2018 do you recall that you received over
4  115,000 votes?
5    A. What I recall is that roughly a month before
6  the election you guys did a ridiculous hit piece of a
7  preposterous story that I then spent the next month
8  having to defend against, which is why you guys did
9  it, in coordination with others. Yeah, so it was a
10  very, very ugly time.
11    Q. When you say --
12    A. It did tremendous damage because it lowered
13  my reelection number, which was your objective, to
14  the lowest it ever -- it ever was.
15    Q. How much --
16    A. Because typically I would win pretty
17  comfortably, and instead I had to spend millions and
18  millions of dollars because of your defamation and
19  your well-timed hit piece a month before the
20  election. And then, of course, I had to relive it
21  again during the impeachment hearings because you
22  guys decided to republish it again.
23    Q. You just said coordinated with others about
24  the piece. Could you tell me who those others are
25  that you believe that the defendants coordinated with

1  in publishing the piece.
2    A. They got the story from somewhere.
3    Q. So you don't know who the other people are?
4    A. I mean, how would -- you guys are the ones
5  that know and you haven't disclosed it.
6    Q. Okay. In 2020 you received even more votes
7  than you received in 2018; correct?
8    A. What happened in 2020 is I got a few votes
9  more than the previous time because of the
10  damage that you did to my reputation.
11    Q. In fact, it was the most votes you'd ever
12  received.
13    A. That is a basis of turnout, not anything
14  else.
15    Q. But it's true; right?
16    A. I'm not going to -- that's a ridiculous
17  statement. You guys hammered me, on purpose, 30 days
18  before the election and you republished it and every
19  single day it's out there, everywhere. So the whole
20  idea that you would think you haven't done damage to
21  me is preposterous. And playing numbers games is the
22  numbers don't work in your favor because I typically
23  would win by double digits, most of the time more
24  than 20 points, and in '18, as you well know, I won
25  by, I don't know, four or five, and then I think I

1  won by, I don't know, five or six in 2020. That's a
2  far cry from where I was before before you guys
3  purposefully destroyed my reputation and harassed my
4  family, and you continue to harass my family today.
5    Q. Would you agree that, just to make this
6  quicker, that the vote counts are a matter of public
7  record for the elections?
8    A. Yes.
9    Q. And we can look at the Board of Elections
10  vote counts and rely on those counts; correct?
11    A. Sure.
12    Q. Okay. In 2016 you served as a member of
13  President Trump's transition team; correct?
14    A. Yes.
15    Q. How did you get selected for that role?
16    A. I don't remember.
17    Q. Do you recall if you volunteered for it, or
18  did someone come ask you to do it?
19    A. I assume somebody asked me.
20    Q. And what --
21    A. I wouldn't remember that.
22    Q. Okay. Do you recall --
23    A. But I know I didn't lobby for it, I didn't
24  try to do it.
25    Q. Okay. Do you recall what your

1  responsibilities were as part of that team?
2    A. Defense and intelligence issues and a little
3  bit on water issues.
4    Q. Okay.
5    A. Resource issues but mainly water issues.
6    Q. Which is right in your wheelhouse coming
7  from the valley; correct?
8    A. (Witness nods head.)
9    Q. That's a yes? I saw you nodding, but I just
10  want to get it in the record.
11    A. Yes.
12    Q. And for defense and intelligence, that was
13  part of your expertise having served for many years
14  on committees relating to that; correct?
15    A. Correct.
16    Q. Okay. And you've had a number of committee
17  assignments during your tenure in Congress; correct?
18    A. Yes.
19    Q. Okay. And in the 2015 to '16 term you
20  chaired the Select Committee on Intelligence;
21  correct?
22    A. I chaired the committee from '15 to '19.
23    Q. Correct.
24    And from '15 to '16 you were also on the
25  Ways and Means Committee; correct?

12 (Pages 256 - 259)

1    A. Correct.

2    Q. And those are two very important committees;

3 right?

4    A. They are -- every committee in Congress is

5 important.

6    Q. Fair enough.

7     Those are particularly prestigious

8 assignments; no?

9    A. Yeah.

10    Q. Okay. And you were -- in 2017 to '18 you

11 were the chairman of the Permanent Select Committee

12 on Intelligence; correct?

13    A. I just answered that.

14    Q. And the answer is yes?

15    A. Um-hmm.

16    Q. And then --

17    A. Where are you going with this? I mean,

18 we're going to go through all this?

19    Q. We're almost done.

20    A. The questions you already know the answers

21 to?

22    Q. Well, we're almost done, and then we can go

23 to things that perhaps you don't think we know the

24 answers to.

25     In '19 to '20 you were on the committee on

1 taxation and then you remained in Ways and Means and

2 Intelligence; correct?

3    A. I was the -- what's called the ranking

4 Republican on Intelligence and I was the ranking

5 Republican on the Health Committee.

6    Q. Okay. And, finally, for '21 to '22 you had

7 the same assignments, in addition to trade; is that

8 correct?

9    A. Correct.

10    Q. Okay. In the two years ending in

11 December -- the end of December 2016 your campaign

12 raised approximately two and a half million dollars.

13     Does that sound correct to you?

14    A. I would have no idea.

15    Q. Okay. But you -- this is a matter of public

16 record; correct?

17    A. I don't trust any numbers that you have.

18    Q. Would you trust the numbers that the FEC

19 has?

20    A. Not if you're providing them.

21    Q. Okay. But if somebody went to the FEC and

22 got the numbers, would you trust those numbers if it

23 wasn't me?

24    A. Well, I would trust the reports that I filed

25 but ...

1    Q. Okay.

2    A. But, yeah, any document that you guys are

3 bringing up in there would be taken as very

4 suspicious being that your habit of -- of doctoring

5 evidence.

6    Q. On January in 2021 you were awarded the

7 Presidential Medal of Freedom; correct?

8    A. Correct.

9    Q. And can you tell me what that meant to you.

10    A. Yeah, it's a -- one of the highest civilian

11 honor in the country.

12    Q. And do you recall what the President said in

13 terms of why you had earned that honor?

14    A. I mean, I can paraphrase it, but it was

15 primarily for -- it wasn't just uncovering the Russia

16 hoax that Hearst and others were involved with that

17 you -- that is actually mentioned in this article

18 because you guys were trying to hide the fact that

19 you knew it was a hoax. And so I was awarded it not

20 just because we got to the bottom of the hoax but

21 also because of the attacks like Lizza and Hearst did

22 on myself, my family, my staff, and that's -- in

23 simple form, that's what this award was for.

24    Q. Okay. Would you describe your tenure in

25 Congress as a successful one?

1    A. Yeah. I mean, look, there's a lot left to

2 do.

3    Q. Okay. And you left Congress at the end of

4 2021; correct?

5    A. I left in the first of this year.

6    Q. That's right. You announced that you were

7 going to leave in December of 2021 but you actually

8 left in January of 2022?

9    A. Yeah.

10    Q. Why did you leave?

11    A. Because of people like you.

12    Q. Can you please elaborate on that.

13    A. The defamations piled up so much, and then

14 you coordinate with big tech and you've

15 successfully -- you push the fake news and destroy

16 people's minds, you push it through technology

17 through social media and other ways, just like you

18 pushed the story through Apple News the night that it

19 came out in '18 and the American people lost their

20 voice.

21     And so when the President called me and

22 asked me to take this -- take the job, I thought that

23 it was -- it was so important that I left just to do

24 this so I could give the American people their voice

25 back.

13 (Pages 260 - 263)

1    Q.   Okay.
2    A.   And that's what we're doing every day.  So I
3  didn't leave because I needed a job, I left because
4  of people like you and scumbags like Lizza.
5    Q.   And when did you first hear from the
6  President regarding this opportunity?
7    A.   I don't know.  It was just right around the
8  time of the -- when he called me.  When it was
9  announced, whatever that was.
10    Q.   Okay.  So around December?
11    A.   Yeah, somewhere in there.
12    Q.   Did you know about -- if I say Truth Social,
13  you know what I'm talking about, obviously.
14    A.   Um-hmm.
15    Q.   Did you know about Truth Social and its
16  development at some point prior to hearing from the
17  President, or is that when you first learned --
18    A.   I had no idea that the company was being
19  created until it came out publicly, whenever that
20  was.
21    Q.   And, I'm sorry, did it come out publicly
22  prior to the President reaching out to you or --
23    A.   Yeah, yeah.  It was announced, I don't know,
24  maybe -- well, I'm not going to speculate, but it was
25  announced before that.

1    Q.   Okay.  So sometime --
2    A.   And that's how I found out about it.  I
3  didn't -- that's how I knew that it was created,
4  which I was happy about, obviously, because of you
5  and all of the people that you work with shutting
6  down people's voices --
7    Q.   Okay.
8    A.   -- and destroying character.
9    Q.   So then you heard from him sometime in
10  December and he asked you to take on the role that
11  you took on; is that fair?
12    A.   That is, yep.
13    Q.   Do you remember anything else of that
14  conversation?
15    A.   That was the gist of the conversation.
16    Q.   Did you ultimately have to apply for the
17  job?
18    A.   No.
19    Q.   Do you know whether anybody else was asked
20  to take the role?
21    A.   No.
22    Q.   You don't know or you know nobody was?
23    A.   I wouldn't know.  I would have no idea.
24    Q.   Did you submit a resume or anything like
25  that?

1    A.   No.
2    Q.   And when you announced -- I'm sorry.  Strike
3  that.
4         When it was announced that you were going to
5  lead this company, you pointed out that part of the
6  mission was to end censorship; correct?
7    A.   Yeah.
8    Q.   And to allow for the free flow of ideas and
9  expression; correct?
10    A.   Yeah.
11    Q.   And one of the things that you wanted to do
12  was provide a platform that encouraged global
13  conversation without any discrimination; correct?
14    A.   Yeah.
15    Q.   Do you recall --
16    A.   I don't know if those were my words, but I
17  know that that's -- you know, I mean, I could go on
18  and on about that but -- so I'm not -- if you're
19  ascribing those words to me, I don't know.  I mean,
20  if those were in -- were those my words?
21    Q.   More or less.  But if you agree with the
22  gist, that's all I was asking.
23    A.   Okay.
24    Q.   I'm not asking you to recall --
25    A.   Well, I'm just concerned that you're trying

1  to get me to agree to things that I didn't say but, I
2  mean, generally I agree with those statements.
3    Q.   Okay.  Yeah, I'm not --
4    A.   But they're your statements, not mine.
5    Q.   Fair enough.
6         Do you recall that a couple days before you
7  were announced as CEO that the company had announced
8  a pipe investment of about a billion dollars?
9    A.   No.  I mean, I know about the pipe
10  investment but ...
11    Q.   Did you have any role in actually generating
12  that investment?
13    A.   No, I did not, and this is -- and here you
14  go again with your conspiracy theories.
15    Q.   Simple question.
16    A.   No, I don't think it's a -- I think it's a
17  ridiculous question, and now I know what my dad was
18  talking about.
19    Q.   Okay.
20    A.   Yeah, you're ginning up conspiracy theories.
21    Q.   How was your compensation determined when
22  you joined the company?
23    A.   I just -- my lawyer talked to their lawyer
24  and that was it.  That's all I -- you know, I never
25  even -- I never even negotiated on it.  My lawyer

14 (Pages 264 - 267)

1 said, hey, here's what the deal is and that was --
2 and I was like, okay --
3    Q. Got it.
4    A. -- and they worked out the details. But you
5 already know that.
6    Q. No, I did not.
7    A. Okay.
8    Q. In any event, you -- you'd produced a couple
9 contracts, either you or the company, and were you
10 involved in any way in the negotiations over the
11 contracts?
12    A. I don't know what contracts you're referring
13 to. I'd have to see them.
14    Q. Okay.
15       MR. SITWALA: I'm going to mark what will be
16 exhibit -- Defendants' Exhibit 141.
17       (Defendants' Exhibit Number DX141
18    marked for identification.)
19       MR. SITWALA: And Steve, Nate will e-mail
20 you a copy.
21       MR. BISS: I was just about to ask. Thank
22 you.
23 BY MR. SITWALA:
24    Q. I'm handing you --
25    A. I'm not accepting one document from you

1 guys.
2    Q. You're not going to look at it.
3    A. Hell, no. You tamper with -- you tampered
4 with evidence and you -- and you also tampered with
5 witnesses, so I am not taking some document. You had
6 plenty of time to send me whatever the hell you
7 wanted me to look at. You had -- you've had, what,
8 two months to prepare for this deposition, and now
9 you're asking me to look at documents after you
10 already know that you've tampered with evidence,
11 you've tampered with witnesses, and you've tampered
12 with -- and you've harassed my family.
13       MR. SITWALA: So just for the record, I will
14 note that the witness is not accepting the exhibit.
15       Mr. Biss, I don't know if you want to have a
16 conversation with your client, or we will have to
17 just take this one up later with the court.
18       MR. BISS: No, I agree with him
19 wholeheartedly. I -- my trust level is lower than
20 his.
21       MR. SITWALA: All right. Well, we'll take
22 this up --
23       MR. BISS: I -- I agree -- I don't
24 understand why you think it's okay to sandbag him at
25 the deposition with these documents. You could have

1 shown him these documents a week ago and then he
2 would have been able to compare documents to the real
3 documents and to see if there were any discrepancies,
4 but I fundamentally disagree with this approach.
5       And -- and I recall in the year 1868 in
6 Virginia they abolished spring guns, you know, you
7 couldn't set up a shotgun inside the door of your
8 house, somebody opened the door and they would get
9 blown away by the shotgun. And the Virginia General
10 Assembly abolished it because it was fundamentally
11 unfair to do that to people.
12       And, you know, it's kind of like that right
13 here, it's kind of like a spring gun. So, you know,
14 I think you just proceed with your questions. If you
15 think you -- you have something that you need to take
16 up with the judge, you can -- you can do that.
17       MR. SITWALA: Well, we clearly do. Well,
18 why don't we continue up till the next break and then
19 we'll reach out to the court during that break.
20       I will note just for the record the exhibit
21 was marked Defendants' Exhibit 141, which is a
22 contract, an employment agreement draft that was
23 produced by TMTG in this action, but I will get back
24 to it later.
25 ///

1 BY MR. SITWALA:
2    Q. You understand that you're entitled to
3 145,000 restricted share units for TMTG as part of
4 your --
5    A. I don't know.
6    Q. Do you know what restricted share units are?
7    A. No.
8    Q. And do you understand that TMTG is at least
9 at the moment a privately held company?
10    A. That I know, yeah.
11    Q. Do you know how many shares of TMTG are
12 outstanding currently, approximately?
13    A. No.
14    Q. Do you know who owns a percentage -- the
15 majority of the company, if anybody?
16    A. Look, I'm not going to get into -- this has
17 no relevance over this -- over this case. And like I
18 started from the outset, because of your past
19 behavior I only take these -- any questions like this
20 as something that you're going to leak out to harass
21 my current employer and our team at Truth Social, and
22 I'm not going to subject them to the same harassment
23 that you've levied against people of this county and
24 my -- and my family.
25    Q. Are you seeking lost earnings in this case?

15 (Pages 268 - 271)

1    A.  I'm not sure of the term lost -- I don't
2  know what the term "lost earnings" means.
3    Q.  Are you seeking money damages in this case
4  for lost business opportunities either in the past or
5  going forward?
6    A.  Yeah, I mean, absolutely.
7    Q.  Okay.  And are you going to tell me what you
8  know about the value of the shares that you own in
9  TMTG?
10    A.  That's all speculative.  I'm not going to
11  speculate because there's -- it takes the approval of
12  the Securities Exchange Commission, so this is all
13  public information.
14    Q.  And when you refer to the approval, you're
15  referring to the merger that's been -- being
16  discussed for some time now?
17    A.  Yeah, we're a privately held company and --
18  and, you know, I just -- you know, we put out
19  official statements on this so -- about the merger.
20    Q.  Do you know --
21    A.  I'd just refer you to those -- those
22  official statements if you -- and you can go find
23  them or we can provide them to you.
24    Q.  And do you know what you would be receiving
25  in value for your shares if the merger went forward?

1    A.  I'm not going to discuss -- I'm not going to
2  discuss under -- I would have to check with counsel
3  from Truth Social any discussion about anything to do
4  with the SEC.
5    Q.  So at least sitting here right now you're
6  not willing to discuss that; right?
7    A.  I mean, I don't know what I can disclose or
8  not disclose.
9    Q.  You just -- you can't answer the question
10  sitting here today; correct?
11    A.  I'm answering the question in that I would
12  have to get approval from counsel as to what could be
13  disclosed, especially being since this is an SEC
14  issue.  I don't control the public company.
15    MR. SITWALA:  Why don't we take a short
16  break now since we've been going for about an hour,
17  and then we can talk about reaching out to the court
18  and then we will resume in -- is -- let's say ten
19  minutes unless, of course, we get on with the court.
20    Is that okay with you?
21    THE WITNESS:  So you want me to talk to the
22  judge?
23    MR. SITWALA:  No, I don't want you to talk
24  to the judge.  We will talk to your counsel.  You
25  don't need to be -- you don't need to worry about

1  that.
2    THE WITNESS:  Okay.  Is the clock still
3  running?  I mean, I've got --
4    MR. SITWALA:  No.  When we're on the record,
5  that's when the clock is running.  When we take
6  breaks and we're off the record, the clock stops
7  running.
8    THE WITNESS:  Okay.  So you're deciding to
9  stop this right now.
10    MR. SITWALA:  Yes, I'd like to go off the
11  record now so that we can resolve this issue with the
12  exhibits.
13    THE WITNESS:  But you want me to leave the
14  room?
15    MR. SITWALA:  We can leave the room.  You
16  can stay here.
17    THE WITNESS:  I'll leave the room but -- but
18  you have --
19    MR. SITWALA:  Can we go off --
20    THE WITNESS:  -- to talk to my lawyer or you
21  have to talk to yourselves?
22    MR. SITWALA:  No, no, no, to your lawyer.
23    Mr. Biss, can we go off the record so that
24  we can talk about this?
25    MR. BISS:  Sure.

1    MR. SITWALA:  Thank you.
2    THE VIDEOGRAPHER:  This is the end of Media
3  Number 1.  We are off the record at 10:02 a.m.
4    (Recess taken.)
5    THE VIDEOGRAPHER:  This is the beginning of
6  Media Number 2.  We are on the record at 10:23 a.m.
7    MR. SITWALA:  So for the record, I
8  understand that going forward in this deposition
9  should I mark and offer exhibits the witness will at
10  least accept those exhibits; is that a -- is that
11  fair?
12    MR. BISS:  That's fair, but there's no need
13  to put it on the record.  Just go ahead and let's
14  start the deposition.  Let's go.
15    THE WITNESS:  And also, is there -- just to
16  confirm, the only people that are in this deposition
17  right now are the ones that are in this room or you,
18  Steve?
19    MR. BISS:  Yeah.
20    THE WITNESS:  Or are there other people that
21  are listening in or --
22    MR. SITWALA:  There's nobody else listening
23  in, as far as I'm aware.  There may be transcript --
24  I don't know, but there may be other people connected
25  to the RealTime, but they would be counsel of record

16 (Pages 272 - 275)

1 in the case, to the extent that there are.
2     THE WITNESS: What does that mean? I mean,
3 I just noticed there's a phone -- I'm not sure, is
4 that a speaker or is that a phone?
5     MR. SITWALA: This is a microphone.
6     THE WITNESS: Yeah, I know, but is it to a
7 telephone or is it --
8     (Overlapping speakers.)
9     THE VIDEOGRAPHER: That's so my camera can
10 hear your attorney. That's it.
11     THE WITNESS: Okay. I'm just trying to --
12     MR. SITWALA: There's no separate recording.
13     THE WITNESS: You have no other attorneys
14 that are on this call?
15     MR. SITWALA: That are on the call, no.
16     THE WITNESS: Okay.
17 BY MR. SITWALA:
18     Q. Okay. Why did you choose to sue over this
19 article?
20     A. Because defamation and slander is illegal in
21 this country and it shouldn't be done.
22     Q. Okay.
23     A. It's because you guys did this to inflict
24 tremendous damage on me and my family, my staff, and
25 you've continued to do it, and I'll just remind you

1 that I actually asked you first to retract and you
2 didn't do it. And then this continued and then you
3 continued the hit pieces and then you republished the
4 hit piece again in 2019.
5     Q. Do you recall when you were first asked for
6 the article to be retracted?
7     A. I mean, it would have been 2019.
8     Q. And why did you wait till 2019 to ask for a
9 retraction?
10     A. Because I was -- I didn't know what to do.
11 At that point I was trying to figure out what to do
12 with -- with the mess that you created for me and my
13 family. I didn't know what my -- what avenues I had.
14 I had to explore, I had to review, and once I
15 completed that review, then I asked you, as I recall,
16 to retract, and this went on and on. You guys have
17 fought it every single point of this case, and now it
18 will be up to a jury to decide the fate.
19     Q. And when you say you were reviewing, you
20 know, what to do before you sent the letter -- and
21 I'm not asking if you had discussions with counsel
22 what they were, but were you reviewing with counsel
23 or was that something you were reviewing on your own?
24     A. I had -- I mean, look, it was so bad I
25 didn't know what else to do, so I just -- I had to

1 research on my own and eventually, you know, I knew I
2 had some legal recourse, I wasn't sure what that was,
3 and it just took me time to do the research and find
4 a lawyer, and then as soon as that was done then we
5 proceeded.
6     Q. And was this the only article that you were
7 thinking about at the time that was causing you
8 damage that you were considering suing over?
9     A. At that time, I mean, there were -- this was
10 the -- this was the -- you know, one of the most --
11 one of the worst. There's other articles, but this
12 one surely -- clearly is really bad.
13     Q. But there were others.
14     A. Anytime someone defames me or slanders me, I
15 am going to -- I'm trying to -- I'm doing everything
16 I can to get my reputation back and cleaned up. So
17 if you defame me again, I'll sue you again.
18     Q. And if somebody else defames you, you'll sue
19 them.
20     A. If I'm defamed or slandered, absolutely.
21     Q. And did you discuss the possibility of suing
22 with anybody other than your counsel in this case?
23     A. I don't know. That was a long time ago.
24     Q. So you don't remember.
25     A. I wouldn't remember.

1     Q. Do you recall discussing it with anybody who
2 served in Congress with you?
3     A. About suing someone?
4     Q. Yeah.
5     A. About suing you guys?
6     Q. Correct.
7     A. I'm sure I did. I'm sure I -- I mean, are
8 you talking about specifically suing you?
9     Q. Yeah. We'll get into it more generally.
10     A. Are you talking about the defamation, the
11 slander, and the damages?
12     Q. Yeah, put that aside. We'll talk about that
13 later. I'm asking about actually deciding --
14     A. Not that -- I mean, not that I remember, I
15 mean.
16     Q. Okay. And what are you hoping to accomplish
17 through this lawsuit?
18     A. I want to get my reputation back, I want the
19 harassment of my family to stop, I want the story
20 taken down, and I want -- and I want damages because
21 you guys need to pay for your criminality.
22     Q. What's the criminality?
23     A. Witness tampering, extortion, that would be
24 one of them, but defamation --
25     Q. So --

17 (Pages 276 - 279)

Veritext Legal Solutions

1  A. -- also.
2  Q. Well, describe the witness tampering you're
3  talking about.
4  A. That will be up to -- it's not for me to
5  decide if Department of Justice or the prosecutor
6  wants to -- wants to investigate it or not.
7  Q. I'm sorry. What witnesses do you believe
8  that we've tampered with?
9  A. You've tampered with -- well, you've
10 harassed a lot of people, but clearly you tampered
11 with Chris Buskirk.
12 Q. Anyone else?
13 A. You know, I'd have to go through and get all
14 the names. It would take me some time, but
15 there's -- there's others in terms of how you sent
16 your thugs out to go to their homes at night, asking
17 them questions, throwing up phony badges. I think
18 you even sent them to places in Iowa, I think. I
19 don't recall.
20 Q. And the extortion, what do you mean by that?
21 A. I'm not going to get into that with you.
22 You guys know what you did.
23 Q. Do you know and you're not telling me, or
24 you don't know?
25 A. I don't know all the -- I don't know all the

1  particulars but -- but -- but from my perspective
2  you've engaged in criminal behavior.
3  Q. What do you know about this extortion?
4  A. I know that you tampered with Mr. Buskirk.
5  Q. Anything else?
6  A. I told you I can get you -- you know, I
7  remember there were people around in this region that
8  you sent your thugs to.
9  Q. Can you just tell me in your own words what
10 the nature of your defamation claim is.
11 A. The nature of my claim?
12 Q. Yes. So let me break that down. That's
13 maybe a bad question.
14    What do you believe is defamatory about the
15 article?
16 A. You know from the multiple times we've been
17 in court. I'll just rely on those -- those records.
18 Q. Sitting here today, in your own words, can
19 you please tell me --
20 A. Well, I would want to look through the -- I
21 would want to look at the pleadings, but, you know, I
22 know at the time when we filed that, and I can't
23 remember 'cause it's been through -- there's been so
24 many iterations of it, but I would first rely on
25 those -- those pleadings.

1     But, I mean, simply put, you attacked me to
2  damage my reputation; in order to do that, you went
3  out and you harassed my family, who had nothing to do
4  with this; you created what -- you know, it's one of
5  the biggest sins in the decay of American civics that
6  you guys participated in, and you tied me to
7  conspiracy, federal crimes, and in order to do that
8  you used my family as pawns, and not just my family
9  in Iowa, you're continuing to do it by harassing my
10 uncles and my grandmother.
11 Q. And what are these federal crimes?
12 A. They're in the story, they're in the Eighth
13 Circuit opinion. I mean, you wrote a story, a hit
14 piece on me that talked about illegal activity,
15 undocumented workers, and God only knows what else,
16 me hiding, having secrets, that I was conspiring to
17 keep secrets. You know what it is, you've read the
18 pleadings.
19 Q. Okay. Now, your family has long owned and
20 operated a dairy farm in Tulare; correct?
21 A. Correct.
22 Q. And that farm is operated by your Uncle
23 Gerald?
24 A. Well, it's now -- I mean, it's now his farm,
25 I mean, you guys know that.

1  Q. And whose farm was it before?
2  A. Well, I mean, it dates back. I mean, that
3  farm's been there for long time, started by my
4  great-grandparents.
5  Q. Were you ever an owner of the farm?
6  A. Of what farm?
7  Q. I'm sorry. The farm in Tulare that your
8  Uncle Gerald currently owns.
9  A. I was never an owner of that farm, no. I
10 grew up there and I worked there and I worked there
11 after college.
12 Q. And that farm is closely associated with
13 your political profile; right?
14 A. Well, it's with my upbringing and it's
15 where -- it's one of the places that I worked
16 before -- you know, when I was out of college.
17 Q. And you'd say it was central to your
18 identity.
19 A. Well, yeah, but it's also -- I mean, I
20 farmed on my own, I started my own business when I
21 was a teenager, and, you know, basically kept that
22 going, ultimately moved that into the wineries that I
23 know you're familiar with, yeah.
24 Q. What is the business that you started as a
25 teenager?

Veritext Legal Solutions

800-567-8658                                                          973-410-4098

1    A. Started custom harvest -- custom, basically,
2 operations of farm equipment and started farming on
3 my own, and I continued to do that until I got to
4 Congress.
5    Q. And did you do that with anybody else?
6    A. Yeah, my brother and I were partners, but it
7 all worked -- we were all together. The family kind
8 of operated all together, everybody had different
9 responsibilities.
10    Q. And do you have more than one brother?
11    A. No, but we worked with, like, my -- I mean,
12 it's been a long time ago, but we worked with the
13 farm here. I had another uncle, he passed away, but
14 we would do work with him; so, I don't know, there's
15 four or five different operations, including my own,
16 that we all, like, shared and worked with and
17 everybody had different responsibilities. I mean, I
18 left and -- when I went to work for the Bush
19 Administration and I kept farming on my own, just me,
20 until I went to Congress, and then shortly thereafter
21 I started farming with -- I started -- I invested as
22 a limited partner into a winery.
23    Q. Okay. I think you said custom operations.
24 Can you just tell me a little bit if I got that right
25 and what that means.

1    A. Yeah, so just equipment; so I purchased
2 equipment in -- I don't know, I don't remember the
3 year, but I was in high school.
4    Q. What sort of equipment?
5    A. When I leased -- I leased the equipment and
6 then just -- just farm machinery.
7    Q. And then you would lease that out to others
8 or you would operate it --
9    A. No, then I would go and operate it myself.
10    MR. SITWALA: I'm sorry.
11    THE REPORTER: I'm sorry. Just one at a
12 time, please. If you could let him get his question
13 out.
14    MR. SITWALA: Okay.
15    THE REPORTER: Thank you.
16    MR. SITWALA: Thank you.
17 BY MR. SITWALA:
18    Q. And the farm that your Uncle Gerald
19 currently owns, that is a farm that is a feature of
20 all the major political profiles that have been
21 written about you; correct?
22    A. No, that's you speculating.
23    Q. Okay.
24    A. I mean, I would say that's not even -- I
25 mean, I don't know what you're referring to. What's

1 been written?
2    Q. Political profiles.
3    A. Like which ones?
4    Q. I guess -- I'm just asking --
5    A. I mean, there's hundreds of them, which most
6 of them are fake news, so I wouldn't rely on any of
7 those.
8    Q. Okay. Have you invited the press to come to
9 your uncle's farm to take photographs of you?
10    A. Yeah, I mean, I -- not anymore.
11    Q. And do your parents or your brother have any
12 connection to your Uncle Gerald's farm?
13    A. No.
14    Q. Okay. Have you ever had management
15 responsibilities on your Uncle Gerald's farm?
16    A. On my Uncle Gerald's farm?
17    Q. Correct.
18    A. No.
19    Q. Now, in 2006 your father, your mother, and
20 your brother and your sister-in-law moved to Iowa;
21 correct?
22    A. Somewhere in the -- somewhere in that
23 vicinity.
24    Q. Time and vicinity, you mean.
25    A. Somewhere in the -- in that time -- in that

1 time frame.
2    Q. Okay. Thank you.
3    A. I mean, you already know the answers to
4 these questions but ...
5    Q. And they formed NuStar and started a new
6 dairy farm in Iowa; correct?
7    A. We've already went over these questions the
8 last time that we -- I mean, that we did the
9 deposition.
10    Q. So is that a yes or a no?
11    A. It's in -- I just refer to my last
12 deposition. I think it's in there.
13    Q. Your family manages NuStar; correct?
14    A. I have no idea what they do.
15    Q. Okay.
16    A. You're the ones that drew up conspiracy
17 theories about them.
18    Q. Do you know why they moved?
19    A. I mean, you've asked them. Why don't you
20 just rely on their answers?
21    Q. Do you know yourself?
22    A. I mean, what I've said publicly is is
23 because my brother wanted to get to a place where
24 there was -- where agriculture had water and things
25 of that nature, which here there's -- there's a big

Veritext Legal Solutions

App. 724

1 water problem.
2     Q. And what you said publicly is true; correct?
3     A. I mean, that's -- those are the things that
4 I've said publicly.
5     Q. Do you have any -- do you know anything else
6 as to any other reason they might have moved?
7     A. Well, they went -- my brother went there
8 specifically to farm on his own and my dad went
9 there, you know, and he would come back and forth.
10     Q. Okay.
11     A. And he's there, but my father -- I don't
12 know all the intricacies of it, so I don't think I
13 could speak because I don't know who owns what, I
14 don't know the ownership, but I know my brother's --
15 you know, my brother is the guy that's been kind of
16 in charge there and my father was -- you know, has
17 been the one that has been, you know, helping him.
18     Q. Okay. But other than the water issues that
19 they were experiencing in this area, is there any
20 other reasons you know of why they would have moved
21 from California to Iowa?
22     A. Well, it was -- it was to start -- my
23 brother wanted to be in the dairy business, as I
24 recall, I mean, you'd have to ask him, but that's
25 been a long time ago, but he wanted to go where there

1 was farming and it was -- and, you know, live in an
2 area that was safe and not be harassed, and that all
3 ended in 2018. And now because of Lizza and you, now
4 they get harassed incessantly.
5     Q. And would you say your family manages the
6 NuStar business professionally?
7     A. I'm not going to speak to their business.
8 I'm not involved in their business.
9     Q. Okay. And would you say that they document
10 all their labor and employment decisions?
11     A. We've already talked -- we've already went
12 through all of this stuff.
13     THE REPORTER: I'm sorry. Stop. Excuse me.
14     Counsel, your objection?
15     MR. BISS: Asked and answered.
16     THE REPORTER: Thank you.
17 BY MR. SITWALA:
18     Q. Would you say they maintain records
19 establishing --
20     A. I'm not going -- I'm telling you, I'm not
21 going to -- you've already -- you spent -- you ended
22 a deposition, you spent the whole time, as I recall,
23 on your crazy conspiracy theories on a farm that you
24 knew I didn't own, and you wrote a story, a hit
25 piece, where you -- on me and you used my family as

1 pawns for your conspiracy theories to destroy my
2 reputation and theirs, and then you did it to my
3 family here also.
4     Q. Just to try to cut through this quickly,
5 then, are you saying you don't know what they do in
6 operating their farm, you don't know the answers to
7 these questions I'm asking?
8     A. I mean, I would just go back to the
9 deposition that I gave before, I mean, I know they're
10 good, law-abiding citizens that just want to farm and
11 be on their own, and you screwed up their life.
12     Q. Do you know anything about the employment
13 practice on the farm? If the answer is no, we can
14 move on.
15     A. I mean, no, I wouldn't know anything.
16     Other than -- just to be clear, other than I
17 know in my last deposition we spent -- until you
18 ended it; so I would refer back to my last deposition
19 because I know we spent the whole time on your
20 conspiracy theories on immigration.
21     Q. Do you see any difference between the claim
22 you're bringing against Hearst versus the claim
23 against Ryan Lizza?
24     A. What do you mean by "difference"?
25     Q. Do you see those claims as being different

1 in any way, or is it the same claim but just
2 different defendants?
3     A. I mean, look, I think you're one in the
4 same, I would guess. I mean, you're the one that
5 hired ███████████
6 ████████████, and then you sent him -- you sent
7 him out to Iowa to a farm that you knew I didn't own,
8 he ran around, talked to -- I don't know how many
9 people he talked to, asking questions about me, and
10 then he shows up stalking my family, he stalks my
11 nieces.
12     Q. I'm just going to move to strike --
13     A. And you guys are the ones that --
14     Q. -- that last answer.
15     A. You guys are the ones that hired him.
16     Q. Okay.
17     A. What do you mean you're going to strike the
18 last answer? What does that mean?
19     Q. It's just for the record.
20     A. Wait, wait, wait. That's my testimony.
21     MR. BISS: Hold on. They're just words,
22 Devin. He can't strike any portion of your
23 testimony; so it's part of the record.
24     MR. SITWALA: Thank you, Steve.
25 ///

1 BY MR. SITWALA:
2   Q. Do you have any opinion as to Ryan Lizza as
3 a journalist prior to the publication of this
4 article?
5   A. I only knew him as a guy who does hit pieces
6 on people. I know he did -- he had a few conspiracy
7 theories that I recall██████████████████████████
8 █████████████
9   MR. SITWALA: Going to move to strike that
10 last --
11   THE WITNESS: And then you guys hired him
12 after that so he could go out, and it appears like
13 the only story I've seen him do -- so he could go out
14 and harass my family, you sent that something to
15 Sibley, Iowa, where my family was just minding their
16 own business to a business you knew I didn't have,
17 and you developed a conspiracy theory about me and
18 secrets and secret farms and you ran it a month
19 before the election, and now every day that goes by
20 they're harassed.
21   So what are the -- you know, the difference
22 between you and Lizza, I mean, as far as I know you
23 guys██████████████████████████████████████████
24 ████████████████, but I do know that you're the
25 only -- you're the only ones that I know, the Hearst

1 company, specifically Steve Hearst, Ben Higgins,
2 Hearst Winery, that have admitted to committing
3 criminal acts.
4 BY MR. SITWALA:
5   Q. Can you please elaborate on that.
6   A. Yeah. You've admitted they -- I'm assuming
7 that they hire -- they hire -- they don't document
8 their employees.
9   Q. And why are you assuming that?
10   A. Because at one point, I mean, I think we
11 discussed this in the last deposition, as I recall,
12 it's been a long time ago, but what I recall is you
13 had some -- some expert witness of some kind that
14 made wild accusations about agriculture and accused
15 people in agriculture of hiring undocumenteds, which
16 is totally untrue and it's an attack on the people
17 that live in this area, the people I represented,
18 except for Hearst, because you guys have admitted
19 that you do engage in those practices.
20   Q. And where have you seen these admissions?
21   A. I just remember seeing it. There were
22 some -- I don't know if that same expert report. It
23 wasn't in that last one that I read, but I remember
24 you submitted something or I heard something about --
25 or maybe it was just -- I heard something about your

1 expert. I don't know who it is.
2   Q. Do you recall who would have told you about
3 that?
4   A. No, but I just know that it was -- I know
5 that it was something to do with -- with you guys
6 were saying that everybody has -- that everybody in
7 agriculture is not documenting employees, which I
8 thought was ridiculous.
9   Q. So is it your understanding that there are
10 literally no undocumented workers working in the
11 agriculture industry?
12   A. Nobody that I know of hires undocumenteds.
13 Everybody that I've ever worked with in agriculture,
14 but also -- it's not agriculture, it's right here,
15 it's this business across the street, it's everywhere
16 downtown, it's, you know, probably the hotel you
17 stayed at last night, none of those businesses are
18 hiring undocumented labor. You guys made that up.
19 And Steve Hearst and Ben Higgins and Hearst Winery
20 are the only ones that I know that do it.
21   Q. So just to break that down a little, when
22 you say hiring undocumented workers, if somebody were
23 to present papers that were not valid and then they
24 were hired, are you saying that's not hiring an
25 undocumented --

1   A. We already went through this in the last
2 deposition, but you know damn well that you have to
3 document everyone that works for you.
4   Q. Okay.
5   A. And every business I know does that except
6 for you.
7   Q. Okay. So you are saying not that there are
8 not people who are not legally working here in the
9 industry. What you're saying is that the employers
10 all document their workers as far as you know; is
11 that fair?
12   A. No, you're -- you're speculating. There is
13 no way to -- all an employer can do is -- is -- they
14 have to ensure that they get documentation and not
15 discriminate against people. Except for you guys,
16 because you guys seem to not document your workers.
17   Q. So let's talk about this from a policy
18 level. You're a policy -- you were a policy maker --
19   A. We already discussed --
20   Q. -- with decades of experience both as a
21 Congressman and also as a farmer in the agriculture
22 industry; correct?
23   A. We went over this in my last deposition. I
24 don't know if you read the last deposition.
25   Q. Correct?

21 (Pages 292 - 295)

1    A. To which part?
2    Q. That you have decades of experience both as
3 a lawmaker and as an actual farmer in the agriculture
4 industry.
5    A. I already answered those questions earlier
6 in this deposition.
7    Q. And the answer was yes.
8    A. (Witness nods head.)
9    Q. And with that experience sitting here today
10 you're saying that you have no idea whether any of
11 the workers in the industry are not, in fact,
12 authorized to work in the United States, regardless
13 of what papers they may have submitted?
14    A. You have -- I mean, I think here -- I mean,
15 now in Cali- -- I mean, now basically everybody here
16 is -- is documented and, you know, legal depending on
17 what law you believe. I mean, the President of the
18 United States and the Congress, I mean, they're all
19 saying that -- I mean, there's billions of people
20 going through the border right now from 80 different
21 countries. I was down there.
22    Q. And they are here legally under federal law?
23    A. It depends. Well, I mean, it depends on who
24 you believe, but I mean here in the State of
25 California they've essentially granted -- I mean,

1 they give people documentation.
2    Q. But if you go to ICE, for example, would ICE
3 take the position that all of those people --
4    A. I don't know. I've never spoke to ICE.
5    Q. So you don't know the answer to that
6 question?
7    A. I've never spoke to ICE on -- on which
8 question?
9    Q. As a matter of federal law, are you saying
10 that people who cross the border without -- without
11 authorization from the federal government are here
12 illegally?
13    A. Well, it's a matter of -- it's a matter of
14 big political disagreement in this country, you're
15 well aware. Different states are different. I would
16 assume that the -- there are sanctuary states,
17 there's sanctuary counties. That is still being
18 adjudicated in the courts. I know that when I was
19 down at the border twice last year that all the
20 people that were coming through there, they were
21 claiming different forms of asylum and not -- and I
22 had no idea; so all those people are now out in the
23 workforce.
24    Q. And on that point, so if you were to come
25 here claiming asylum or sanctuary or anything like

1 that, would that give you a legal right under federal
2 law to work?
3    A. I'm not going to get into -- without going
4 through and reading the specific federal laws, I'm
5 not going to get -- I'm not going to go through that
6 but -- 'cause -- and like I said, every single state
7 is different.
8    All the employer can do is get the
9 documentation, and they cannot -- they cannot
10 discriminate based on one's color or the way they
11 speak and they're required to get those
12 documentation, and every -- I've never run across a
13 business that I know that is not documenting their
14 employees and getting documents from their employees.
15    And I'm talking about in my, you know, my
16 old constituency where I live, except for -- except
17 for Hearst Corporation. You guys don't seem to
18 document your employees, or at least that's what
19 you've alluded to, and you have yet to, as far as I
20 know, produce in discovery your documents to show
21 that you have documented your employees. I don't
22 even know if you guys are documented.
23    Q. You can't ask; right?
24    A. Can't ask.
25    Q. So beyond your testimony, can you point me

1 to any evidence that would show that you lack
2 knowledge of the hiring practices under your family's
3 Iowa farm?
4    A. I would have no idea about the hiring
5 practices there. You guys made that conspiracy up.
6    Q. Okay. I'm just asking you beyond your
7 testimony, is there anything else you could point me
8 to that would reflect that?
9    A. That would reflect what?
10    Q. Your lack of knowledge.
11    A. Why would I have any knowledge of something
12 that I don't own or anywhere else? I only know that
13 the people that I represented, the people that I
14 worked with, you know, what was relayed to me in
15 meetings when people would come in and talk about,
16 you know, these -- these immigration issues.
17    Q. Did you know about the hiring practices of
18 the farm when it was in California, that is, the farm
19 that your uncle and your brother owned?
20    A. I'm confused again as to what farm you're
21 talking about and when. You have to be more
22 descriptive.
23    Q. Okay. Let me break it down better.
24    So it's my understanding that -- well, help
25 me out here. So we've identified one farm, which is

22 (Pages 296 - 299)

1 the farm that's currently owned by your Uncle Gerald
2 and that has been in your family for generations.
3    A. Um-hmm.
4    Q. Then we've identified, I believe, another
5 farm that your uncle and your brother and others
6 owned in California that they sold and then opened
7 the farm in Iowa; is that not correct?
8    A. No, no, it's not. No, that's not correct,
9 as I recall. It's been a long time ago.
10    Q. Okay. So can you help me out in
11 understanding --
12    A. I mean, not if you're going to go harass
13 more people, I mean, but I don't know the relevance
14 of this, but there was -- I have a huge family.
15 They're all in agriculture --
16    Q. Okay.
17    A. -- different businesses.
18        And so, I mean, I think you were asking me
19 in relationship to when I started my business.
20    Q. So you started your business -- maybe I got
21 this -- misunderstood, that was with equipment where
22 you would farm other people's farms.
23    A. I would do custom work for other people --
24    Q. Okay.
25    A. -- for other farms.

1    Q. And did you yourself own any farm at that
2 point in time?
3    A. Not when I first started, but then I
4 bought -- I bought my first farm in -- I don't
5 remember what year. It was somewhere in the '90s,
6 mid to late '90s.
7    Q. And did you -- were you the sole owner of
8 that farm, or did you buy that with other family
9 members?
10    A. As I -- I can't remember if my brother and I
11 bought it together or if I bought it separately. I
12 just don't remember.
13    Q. Did he at some point come to own some
14 portion of it whether or not he bought it --
15    A. I don't remember if he owned -- if we owned
16 it together or if it was separate. I just don't
17 recall.
18    Q. Okay. And when that farm was sold, is that
19 when some of your family went to Iowa or are those
20 two completely unrelated events?
21    A. No, those are -- no, those are not related.
22    Q. Okay. So now we've established --
23    A. No farm was sold, as I recall, to any move
24 to Iowa.
25    Q. Okay. I see.

1        So was everybody at that point working with
2 your uncle on that farm and then decided to strike
3 out on their own with their own?
4    A. No.
5    Q. Is that it?
6    A. No, no. My dad was on his own many, many
7 years, for many years. I mean, he still had an
8 ownership at some point in the original farm, and I
9 don't remember how that all went down, but, I mean,
10 there was some -- at some point my grandmother -- my
11 grandmother split things up, and I don't remember
12 when that was.
13    Q. Okay. But from your recollection at least
14 sitting here today is that when your brother and
15 father and others moved to Iowa it was not part of a
16 sale of one farm and purchase of another, they just
17 went out and bought a farm to run on their own?
18    A. Yeah, they didn't sell -- I mean, 'cause
19 they still had -- they still -- I mean, you'd have to
20 ask them.
21    Q. Sure.
22    A. So I don't know why -- what you're getting
23 at here, but I know that when my -- I know that they
24 had sold some property because I remember I had sold
25 property that I owned and I invested in the winery,

1 and that was all that I did 'cause I just wanted
2 to -- because I had too much going on and so that was
3 a project that I had spent a lot of time on that I
4 enjoyed. And then -- and then they sold -- there was
5 surrounding in that -- in the south county, they had
6 that, my dad had sold some land but he still owned
7 some around here, and I don't remember that time -- I
8 don't remember if that was, you know, three years or
9 five years. I don't remember the years.
10    Q. Okay. Let me get back to the point.
11    A. I don't understand your --
12    Q. So let me try to help you.
13    A. Okay.
14    Q. So what I was trying to understand is with
15 respect to any of the farms in California, were you
16 ever involved in the hiring of the farm workers?
17    A. Well, when I was -- when I was -- obviously
18 when I had my own business, you know, I had a few
19 people that worked with me way back in the day; so I
20 would have been -- at that time I did, and then --
21 and then when I worked with my grandmother she did --
22 she did all of that.
23    Q. Okay. And were you ever knowledgeable about
24 the hiring practices of your family, that is your
25 brother and your father, when they were operating

23 (Pages 300 - 303)

1 farms in California?
2    A.  I mean, loosely.
3    Q.  Okay.
4    A.  I mean, I remember -- you know, I mean, I
5 remember back -- long time ago that I would get
6 documents from people, file them, you know, for my
7 own business.  I mean, you're talking -- you're
8 talking late '80s, early '90s.
9    Q.  And loosely you understood that they did
10 basically the same thing; is that what you're saying?
11    A.  Not only them, but I think every -- I mean,
12 every business that I've ever been around, you know,
13 documents employees.
14    Q.  Okay.
15    A.  Except -- except for you guys.
16    Q.  And so just to hopefully close this out,
17 it's my understanding you're saying that you are
18 not -- you don't have knowledge about their hiring
19 practices for NuStar in the Iowa farm; and all I'm
20 asking is beyond what you're telling me now, is there
21 anything else that you would point to to show that
22 you lacked that knowledge?
23    A.  Well, I mean, your guys are the ones that
24 made up the conspiracy, not me.
25    Q.  If the answer is no, that's fine.

1    A.  You know, I don't know what you -- I don't
2 understand the question.  I don't know what you're
3 trying to get at.  I mean --
4    Q.  I'm just trying to --
5    A.  -- you're the one that -- you're the one
6 that said there was a secret.  You're the one that
7 said there was a secret move.  You're the one that
8 said that I was conspiring with other Congressmen and
9 my dad and -- I mean, it's preposterous.
10    Q.  So the answer --
11    A.  For a farm that I've never even hardly even
12 been to other than a few times.
13    Q.  Okay.  So if the answer is no, I'm happy to
14 move on.  I just want to make sure it's clear that
15 there's not something else you're later going to
16 point to.  I'm just trying to have --
17    A.  Later -- point to in terms of what, that my
18 family follows --
19    Q.  Your lack of --
20    A.  -- that my family follows the law?
21    Q.  No, no, no.  That you don't know what they
22 do on that farm for labor practices.
23    A.  Well, I wouldn't know, but I would say that
24 they definitely followed the law, but I don't know
25 any intricacies of it.  I don't know.  But I assume

1 they wouldn't have changed from the way that my
2 grandmother did it and the way that we did it in the
3 past.
4    Q.  Okay.
5    A.  So I have every belief that everybody that
6 they've ever hired would have been -- would have been
7 documented to the best of my belief, but I don't
8 have -- you know, you can't -- you can't fault me or
9 even question me.  I've never hardly been there to
10 that -- to the farm, I mean, a handful of -- you
11 know, once a year for a couple nights.
12    Q.  Okay.  So --
13    A.  The only time I remember, which I know I
14 testified to last time, I remember my dad asked me to
15 go out there and look at some animals.  That was
16 before they even bought it.
17    Q.  So -- so there's your testimony and then
18 there's the fact that you've almost never been there.
19 Is there anything else that you would point to to
20 show that you lack knowledge about the employment
21 practices on the farm?
22    A.  I mean, I don't have any -- I've never been
23 involved in it.  How would I have any knowledge of
24 something that I haven't been involved in other than
25 I know that the practices from when -- you know, when

1 we all were -- you know, operated together.
2    Q.  Okay.  And that's -- that's the basis;
3 right?
4    A.  I can't imagine that they changed their --
5 they changed their policies, but, you know, let it --
6 I know you don't -- you want me to remind you again?
7 You're the ones that came up with the story.  You or
8 Lizza, somebody concocted a story that I was
9 conspiring to have a secret farm, a secret move, hire
10 people illegally and undocumented.  You guys made
11 that up, not me.
12    Q.  All right.  I'm going to --
13    A.  Or Lizza.  I don't know who -- you know,
14 Lizza, you, I don't know who.
15    Q.  I think I'm going to -- so I'll give you --
16 let me rephrase it.  I'll give you an opportunity.
17      If there is anything else that you would
18 like to point to that would support the fact that you
19 lack knowledge of the hiring practices on the farm, I
20 will give you the opportunity to do that.  If not --
21    A.  Well, I would ask that, I mean, I could
22 supplement later.  I mean, I don't know --
23    Q.  Now is the time.  I mean, if you know, if
24 there's any other evidence, please tell me what it
25 is.

24 (Pages 304 - 307)

Veritext Legal Solutions

800-567-8658                                      973-410-4098

1     A. Evidence that -- that I don't know their
2 hiring practices?
3     Q. Correct.
4     A. For a farm that I don't own and have never
5 managed, never been involved in?
6     Q. Exactly.
7     A. Well, why would I -- why would I have any
8 firsthand knowledge of that?
9     Q. Sure. And that's a fine answer. I just
10 want to get the answer.
11     A. Well, I'm just -- but, I mean, I do have
12 obviously firsthand knowledge, as I just went
13 through, about when I did it way back in the day, the
14 way that we did it. I was trained by my mother and
15 my grandmother on what to do. I mean, that's --
16 that's -- and I can't imagine that they changed when
17 they went there.
18     Q. Okay.
19     A. And you would have all the evidence because
20 I know they provided you documents for everyone.
21     Q. Okay. How do you know that?
22     A. I think they said that.
23     Q. They said that --
24     A. That's probably when I talked to my dad that
25 they provided documents that went back for the whole

1 time. They had documented -- they had documented --
2 everybody was documented, as I would expect, that
3 this business, all these businesses here. But if you
4 go 30 miles that way, you'll find a business that
5 doesn't document their people.
6     Q. So when would he have told you that he
7 had -- that they had provided us all the documents?
8 Is this earlier in the case, when they filed the
9 case? Do you know when --
10     A. I -- I don't remember.
11     Q. You mentioned a little while back some
12 meetings you had -- and let me look at the
13 transcript. I don't want to put words in your mouth
14 that are not correct.
15       So you had said that you only know that the
16 people that you represented, the people that you
17 worked with, what was relayed to you in meetings when
18 people would come talk to you about these immigration
19 issues. Can you -- can you tell me more about those
20 meetings, please?
21     A. I mean -- just, I mean, there would always
22 be meetings on, you know, ways to fix -- ways to fix
23 the immigration process to make it better, to make it
24 work. I mean, that's -- I mean, countless meetings,
25 I mean, there would be meetings all the time.

1     Q. And what is wrong with the process that
2 needs to be fixed?
3     A. We went over this last time in the
4 deposition, I mean, it's just completely -- I mean,
5 the whole system's collapsed now. I mean, it was
6 kept -- it was getting worse and worse and worse, and
7 now we've got -- I don't know, how many people are
8 going to come across the border this year, two, three
9 million, four million?
10     Q. And that's what you would talk to your
11 constituents about?
12     A. Well, that was in the last few years, but, I
13 mean, it was always bad, but, you know, basically how
14 are you going to have a -- you know, you've got 50
15 different states, 50 different laws, all kinds of
16 lawsuits going on. I mean, if you go to Sacramento
17 and you talk to people in this state, then the people
18 who run this state, they'll say that everyone in the
19 state is documented, which, I mean, I'm guessing that
20 they are because they've been given documents.
21     Q. And the people you meet with -- so, for
22 example, those would be constituents who ran farms?
23     A. Constituents, the different organizations
24 all through -- not just farms. I mean, you guys are
25 the ones fixated on farms, I mean, as if there's a

1 difference between a farm and any other business;
2 there is no difference.
3     Q. So --
4     A. There is no difference in terms of the way
5 that they hire people.
6     Q. So then why are there bills, for example,
7 proposed to have like visas, H visas, for farm -- for
8 agriculture in particular? Why would you do that if
9 it's not different?
10     A. I mean, generally speaking, it's because
11 they -- it's because I think there's a belief that --
12 well, you've got the disagreement that you have
13 people here that are all now legal, you know, that
14 everybody here in the whole country is legal now. I
15 mean, that's -- I'm not saying that that's my
16 position. I'm just saying that that's the position
17 of many politicians and governments and even courts.
18     Q. Okay.
19     A. And so, you know, I think we talked about
20 this last time. I don't know why you want to go back
21 through this again, but we talked about, you know,
22 like what do you do with the -- and this was years
23 ago, but you had kids that were brought here, where
24 do they land? That's the whole Dreamer issue. I'm
25 not a lawyer, I can't go through all the specifics of

25 (Pages 308 - 311)

1 it, so how are they treated?  Are they -- they're --
2 as far as I know, those are now all documented and
3 are legal.
4      And like I said, in this state that I'm --
5 where I represented, everybody here now is
6 documented.  Not that it's the right -- you know,
7 it's not the right policy, it's total chaos, but
8 they're all -- but that's what it is, except for you
9 guys who seem to not document your workers.
10     Q. So going back to constituent meetings, can
11 you -- so if you were meeting with a constituent that
12 had in this case, let's say, an agricultural
13 operation, what is the sort of immigration reform
14 that they would be asking you to -- to work toward?
15     A. Well, I mean, it changed over 20 years.  I
16 mean, there's all kinds of different stuff.
17     Q. And would the Farm Workers Modernization Act
18 be an example of that?
19     A. I don't know that.  I think you guys asked
20 me about that last time.
21     Q. You still don't have any recollection of it?
22     A. There's -- well, why do you ask me if you
23 already know?  I just started out with it.  If you're
24 going to go down this line of questioning, go back to
25 the deposition --

1      Q. Well, I thought maybe you --
2      A. -- from the last time.  Why are you --
3      Q. -- you may have studied it.
4      A. Well, you're playing a game.  You're playing
5 a game.
6      Q. Apparently not.
7      A. So -- but I will say that on immigration, on
8 those -- so the main reason as -- and I'm not saying
9 all; okay?  So I'm not speaking in an absolute, but I
10 think the concern that would be relayed is that there
11 are certain times when you reach full employment
12 that -- when you reach full employment, can there
13 be -- in the country, in the United States of
14 America, is there a -- you know, do you need a
15 process for some industries, and the answer is -- and
16 the answer, you know, obviously has been yes because
17 over the years there are different programs that
18 exist.  I mean, I know there's, like, programs for
19 highly educated people, tech world, agriculture.  I
20 can't even think of the names of those, but they have
21 certain visa programs.  And so I think the concept
22 was is -- are you guys listening, or am I just --
23     Q. I'm listening.  I am listening.
24     A. Well, you asked me this question last time
25 in the deposition and now I'm explaining it to you.

1      Q. Please go ahead.
2      A. So -- but it's -- I think the concept is is
3 when you reach full employment and you have sectors
4 of the economy, you want to have an organized process
5 to bring people in to work.
6      Q. And have we reached full employment over the
7 years in the past?
8      A. I think you could argue a few years ago we
9 were at full employment.
10     Q. Okay.  Are you familiar with a program now
11 from many years ago called the Bracero Program?
12     A. Only by name.
13     Q. Do you have any recollection as to what it
14 was?
15     A. I mean, I only remember because when I was a
16 kid there were -- the people -- you know, there were
17 people that I worked with or knew or kids I went to
18 school with that were here on that program.
19     Q. And is it your understanding that was
20 essentially a work permit program for people in
21 Mexico to come to the United States primarily for
22 agricultural work?
23     A. I don't know that it's a -- I don't think it
24 was only Mexico, but maybe it was.
25     Q. So it was at least people from outside the

1 United States?
2      A. Yeah, but then that program got converted to
3 a new program, which I can't think of the name of it,
4 but I just remember that name.
5      Q. Okay.  And is it your understanding --
6      A. And I'm sure at one point I read about it
7 and I researched but, I mean, you know, I had plenty
8 of other issues that were -- that I, you know, have
9 more granular recollection on, but immigration is not
10 really one of them because it -- you know, it really
11 was not a -- because the State of California, I mean,
12 we were just -- everybody was -- everybody was
13 documented.  And now in the last couple of years
14 everybody -- it's a free flow of people from
15 everywhere.
16     Q. And you had mentioned earlier that it's some
17 people's position that everybody here is now
18 documented but that's not necessarily your position.
19 What is your position?
20     A. I mean, I'm not going to get -- speculate on
21 my position.  I mean, I think I have a clear record
22 of what my record in Congress is.  But, I mean, I
23 know that last year, I mean, I was at the border, and
24 towards the end of the tour, you know, because we had
25 been briefed on, you know, terrorists coming across

26 (Pages 312 - 315)

1 the border, things of that nature, and came upon some
2 people there that were dressed as nice as you are
3 with very expensive bags, and I went up to them and
4 they were -- they were saying they were claiming
5 asylum. I don't know. It was probably ten of them.
6       And then I spoke my crappy Spanish to them
7 and then quickly realized they don't speak Spanish
8 and they were Romanian gypsies that had left Romania
9 two days before, flew somewhere to Mexico, and the
10 drug cartel came and dropped them off, and then they
11 were claiming political asylum to me, and I was just
12 there for a tour, and they were turning themselves
13 into the Border Patrol.
14       So what the hell do you do? I have no idea.
15 Did those people get documents? I don't know. But I
16 assume if you claim asylum and it was successful, you
17 get documents. I mean, they seemed to be -- they
18 seemed to be pretty sure. I mean, they were dressed,
19 you know, to the -- you know, very, very nicely; so
20 I'm guessing those people are now in this -- in here.
21 I mean, they weren't like -- it wasn't like some of
22 the videos you see of people coming all up the border
23 and all through Central America and South America. I
24 mean, we had 80 different countries, I think, at
25 least, the last time that I was -- that I was briefed

1 on this, and they were coming from all over the
2 globe, and they're all claiming asylum, and the Biden
3 Administration's all letting them in.
4       So, I mean, going back to how do we start on
5 this, you know, the whole issue of undocumenteds, and
6 nobody -- nobody undocument -- nobody's not
7 documenting their employees except for you, and then,
8 oh, and then your conspiracy theories that you accuse
9 other people of doing, including me.
10    Q. Let's -- well, I was going to change
11 subjects, but if you -- it's up -- if you'd like to
12 take a break, this would be a reasonable time.
13    A. I mean, look, I don't have anything more to
14 tell you guys, but I prefer just to get this done.
15    Q. Okay. Let's keep on moving.
16       Can you please tell me how you believe the
17 article has harmed you?
18    A. I mean, we already went through that, but we
19 can go through it again. So when the story came out,
20 I started to tell you earlier, you guys coordinated
21 with big tech and other fake news organizations for
22 the defamation and slander which was a designed
23 attack to destroy my reputation in this community.
24 With your conspiracy that I was doing illegal
25 activities on a secret farm in Iowa, that came out

1 roughly a month before the election, came out -- I
2 remember it was -- it posted like at 9:00 p.m.
3 Eastern Time, approximately, because, as I told you
4 earlier, I spent the next -- you know, spent the next
5 six hours on the phone talking to all kinds of
6 people, my communications director, and then, you
7 know, after that, of course, I started taking calls
8 and incoming -- I mean, I think even my ethics lawyer
9 at the time that, you know, was I involved in some
10 illegal activity, you know, of a farm in Iowa. And
11 so that's how that started.
12       Then the next morning you sent -- you
13 coordinated with -- well, Lizza, the guy that you
14 hired,                              I knew
15 he had showed up the month earlier on the farm,
16 having no idea what he was doing, but he went and
17 harassed all kinds of people, as I recall, at the
18 time.
19       And the story came out, it was preposterous
20 because it tied me to something that I had nothing to
21 do with. And then the next day, the next morning,
22 news crews showed up out at my grandmother's house
23 and they showed up out in Sibley, Iowa. And then my
24 grandmother panicked -- she was 98 years old at the
25 time -- called -- as I recall, somehow my uncle calls

1 me and says you better get over here, you better call
2 the Sheriff. And I went over there quickly and Matt
3 Butler was with me, my grandmother was in the house,
4 she was panicked, she didn't know what was going on,
5 and her mind was still really good then, and so I had
6 to calm her down.
7       And then, you know, I remember my uncle
8 coming in there and -- into the office there where
9 she worked and where he worked and, you know, he
10 wasn't happy and said, you know, you better get the
11 Sheriff, I think was his terms, and this is bullshit
12 and things of that nature.
13       And my grandmother was -- I mean, she was
14 outside, she was sweating because she was outside
15 working in her yard and, yeah, it's pretty -- pretty
16 bad. That was just that day. And then it goes on
17 for the rest of the -- the -- you know, all the way
18 through the election I'm getting pounded on it,
19 television, radio, everywhere I go, all your fake
20 news buddies are asking about it. I know I took a
21 lot of calls because of the potential ethics
22 violations, that obviously it would be unethical,
23 number one, for me to have a secret farm that I
24 didn't report, so that would be criminal. And then
25 it would be obviously criminal if I was conspiring

27 (Pages 316 - 319)

1 to, you know, have a -- run an operation secretly
2 that was -- that was not documenting its employees.
3        So I just remember having to deal with all
4 that and there was the fallout, and then when I got
5 back from -- after the election, then I had to deal
6 with it there because it was -- you know, so I had to
7 brief all of my colleagues that I served with on --
8 you know, on this issue because there was, you know,
9 obviously a good chance that I'd be removed as
10 chairman of the Intelligence Committee because of
11 your story, your hit piece.
12        So then, as I testified to earlier, then
13 went about, you know, trying to figure out what I
14 could do to clear my name, try to get my name
15 cleared, you guys refused to do it, and then you
16 continued to harass. And then right -- right at the
17 time, you know, at least when I filed the lawsuit I
18 was contending that, hey, this is not true, it needs
19 to be erased from my record, and it's not. And then
20 ████████████████████ that you hired decided to
21 send it out again at the height of the impeachment,
22 that then started it all over again.
23        And then, I mean, and now it lives out there
24 every single day, I mean, you can go to -- I mean,
25 probably the number one, I think the number one

1 website in the world is Wikipedia. Are you familiar
2 with Wikipedia, just for the record?
3    Q. Yes.
4    A. Okay. I think it's number 1, 2, or 3. You
5 could pull it up on your phone or your computer right
6 now, and guess what you're going to find there?
7    Q. Please tell me.
8    A. You're going to find your hit piece, your
9 bullshit, and it's there for everybody to see, every
10 day, and people put it on social media; it never
11 ends. So -- and I can go on and on about that, but
12 we can stop there on that issue. But, you know, it's
13 on any search engine you find it, any -- there's
14 plenty of videos, other people picked it up, there's
15 videos out there on YouTube that have hundreds of
16 thousands of views.
17    Q. What's in those videos?
18    A. Your hit piece.
19    Q. They're reading it or there's -- they're
20 recant- -- they're recounting --
21    A. They're recounting the story, just like it
22 is on Wikipedia. Then -- I mean, obviously there was
23 the damage that was done to my grandmother. There's
24 the damage that was done to, you know, my --
25 basically at that point my uncle said no more, and --

1 and, yeah, it's bad stuff. And then now everywhere I
2 go, almost everywhere I go, anytime I make a public
3 appearance I even get introduced as somebody who has
4 a farm in Iowa, so -- which is pretty damn
5 embarrassing because if you go and search it, which
6 many people do, they find out that I have a farm in
7 Iowa that has a bunch of illegal activity because you
8 guys made up the story.
9        And now my family in Iowa, because you used
10 them as pawns, now they get attacked all the time,
11 just like Lizza attacked them and stalked them, and
12 now it happens by other people, including -- I know
13 you're aware of this, but including we had some
14 jackass lunatic from here, from my area, that decided
15 to drive from here, he was somehow affiliated with
16 antifa, and went out and attacked their farm. That
17 was just a couple years ago, less than a couple of
18 years ago.
19        So -- so, you know, so, yeah, that -- that
20 is the damage that continues to build up, not to
21 mention all the other damage that we can go through
22 if you would like at the -- at the time, at the time
23 and still today from, you know, people that I worked
24 with and -- and my family.
25        Do you want me to go on, or I assume you

1 don't care about this.
2    Q. No, I certainly want to hear what you have
3 to say. I will ask some questions about some of the
4 specific people that you disclosed recently, but if I
5 can go back and just ask a couple follow-up questions
6 on some of the things you said and then perhaps you
7 can continue and explain.
8        So you mentioned that you received a lot of
9 calls when the article was initially published in
10 2018, and if you could just first let me know, how
11 did you respond to those calls? What did you tell
12 people who were calling you and asking you about this
13 article?
14    A. I mean, as it related to the ser- -- I mean,
15 at first, I mean, it was the seriousness of it;
16 right? So, you know, it's the -- I mean, the main
17 thing -- the first thing I had to do was to explain
18 that, no, I didn't have a secret farm and that I had
19 no ownership of any farm other than the ones that I
20 had -- you know, other than the winery that I
21 reported on the -- on my disclosures. You know, so
22 that was, I think, the biggest -- most important
23 thing, I think, that the Republican leaders were
24 worried about at that time because of the accusations
25 that I would have -- 'cause it's not legal for me to

28 (Pages 320 - 323)

Veritext Legal Solutions

Case 5:19-cv-04064-CJW-MAR   Document 121-22   Filed 11/01/22   Page 29 of 69

App. 733

1  lie on my forms --
2     Q.  Okay.
3     A.  -- about ownership.  And so that was
4  probably the biggest problem was convincing people of
5  that because that would have been -- first and
6  foremost, I mean, I would have been -- had I lied on
7  those forms, I would have been removed.
8     Q.  Okay.
9     A.  Probably expelled.
10    Q.  And did you talk to them about any of the
11 other allegations in the article?
12    A.  I mean, that was the -- that was the one
13 that most -- was most concerning because that's the
14 one that I could be immediately expelled for --
15    Q.  Okay.
16    A.  -- right, from -- removed from my committee
17 and then probably expelled from Congress if I had
18 lied continuously and had a conspiracy going to run
19 whatever the hell you guys trumped up.  And then, you
20 know, I had to get through that, I mean, and then it
21 kept going and then it never ended.  And now you
22 have -- you know, people still think that I have some
23 farm because it lives out there because your story is
24 still up.
25    Q.  And you didn't actually get expelled; right?

1  We know that's true.
2     A.  You know that's true.  Why are you asking me
3  the question?
4     Q.  For the record, you know that's true;
5  correct?
6     A.  You know the answer.  It's a dumb question.
7     Q.  You're not going to answer the question?
8     A.  You know the answer.  Why are you asking me
9  the question if you know that -- you already know the
10 answer to?  You already asked me that I retired from
11 Congress earlier this year.
12    Q.  Okay.
13    A.  Why are you asking if I got expelled?  If I
14 got expelled, I wouldn't have had to retire.
15    Q.  Did they ask you questions about your
16 family's farm or were they only asking you questions
17 about whether you --
18    A.  As I recall at that time, the number one
19 issue, I'm sure there was more to do more, but it
20 was -- the number one thing would be -- it had
21 nothing really to do -- my family were pawns in this,
22 as you well know.  It was what's my ownership, what
23 do I have there.  It was exactly what is in your
24 little hit piece right here.  I mean, I think I could
25 go through it if you want me to read it, but it's

1  pretty -- you know, he speculates we don't know what
2  he has, I mean, just paraphrasing, but, I mean, we
3  could go through it.
4        Do you want me to sit here and read it to
5  you?
6     Q.  I do not.
7     A.  You don't want to hear about it.
8     Q.  So was there -- did you talk to your
9  colleagues or anybody else who called you about
10 whether your family's farm actually did or did not
11 have undocumented labor or --
12    A.  Yeah, of course they didn't have -- I mean,
13 you already know the answer to that question.  They
14 documented -- you know they documented everybody.
15    Q.  And you explained that to the people who
16 were --
17    A.  I wouldn't have known, you know, but it's
18 preposterous that my family was running some --
19 remember, the accusation that you made was that I was
20 conspiring, it was me conspiring to do this to keep a
21 secret, keep it hidden in order to exploit and run
22 some operation that doesn't document their employees,
23 which is ridiculous.
24        So the bigger concern at the time was --
25 'cause the thing that was right in front of them

1  would be whether or not I had a secret and whether or
2  not that secret was -- was real or not.  Because if
3  that was kept secret and I had something to do with
4  this and I was conspiring to do this, I had big
5  problems.
6     Q.  I understand that.
7     A.  And there's, you know, countless people that
8  still believe today that I do have something to do
9  with that.
10    Q.  And my question is when you were speaking
11 with your colleagues, did you talk to them about the
12 question of whether or not the farm actually did --
13    A.  I doubt it.  I mean, I think it was ...
14    Q.  Okay.  So back to --
15    A.  And then I had to get -- you know, then I
16 had my ethics attorney that I had to make sure that
17 everything was good and, you know, it just lived on
18 and on and on, and then it happened again in '19
19 because you guys decided to republish it and put it
20 out for the whole world to know, and you still
21 haven't taken it down.  I mean, if you -- the -- any
22 device that's here connected to Wi-Fi right now, you
23 can pick up and you can find your story and it's the
24 number one thing.  It's on Wikipedia, it's on every
25 search engine, it's on YouTube, it's on your website;

29 (Pages 324 - 327)

1 so it lives continually every day.
2     Q. So would you say it is -- would you say that
3 the harm that's caused by the publication, the
4 initial publication of the article, has lessened over
5 time or not?
6     A. Screw you. Come on. I just walked you
7 through -- I just spent ten minutes telling you you
8 have the story still up on your website, you, Hearst.
9     Q. So the answer is --
10     A. You wrote it, Lizza wrote it, it's on your
11 website.
12     Q. So the answer is no.
13     A. It's on Wikipedia. No, the damages increase
14 every single day.
15     Q. Okay.
16     A. And I'm offended that you continue to ask me
17 these questions that somehow something has subsided
18 when I just spent, you know, 10, 15 minutes, which
19 you were just ignoring me, you weren't evening
20 listening, and then you come out and you ask a
21 question like, oh, so it doesn't matter.
22     Q. So is there anything else you want to talk
23 about generally in terms of the harm that they
24 caused --
25     A. I can go on and on but --

1     Q. Please do.
2     A. If you want to keep going.
3     Q. I do.
4     A. You want to keep -- you want more?
5     Q. I want to know what you know.
6     A. Okay. So you've got the problem of -- I
7 mean, the big issue, the antifa issue, now lunatics
8 know where my family lives and they -- so, you know,
9 both my -- both farms that are in this story, neither
10 of which, you know, that I own, continually get
11 harassed. My uncle gets harassed. It pisses him
12 off. And then you guys went and harassed my other
13 uncle, who had nothing to do with this, just because
14 you wanted to harass him.
15     And then -- and then those two farms now,
16 there's always people that are driving by there, and
17 my family has to fret for their safety and, you know,
18 there's always some shenanigans that are going on in
19 terms of phone calls, hate calls, social media posts.
20 I mean, I can probably pull up for you right now -- I
21 bet that you'll find social media posts that were
22 posted in the last 24 hours, and you know what
23 they'll have? They'll have these pictures right
24 here. This is like -- this thing's been published --
25 I guarantee you we can find this picture, all your

1 little cartoons.
2     So it wasn't just Lizza. You then hired
3 somebody to write -- to draw ridiculous cartoons, and
4 you must have bought these pictures too from
5 somebody. I mean, look, you've got pictures of ICE,
6 alluding that ICE -- I'm involved with -- that ICE
7 is -- and I'm in big trouble. I mean, that's what
8 this article shows. It's all about me.
9     Q. Okay.
10     A. So you've got those that live and they're
11 out there on social media every single day right now.
12 You have continued, you know, harassment and
13 potential harassment. I mean, I know my family out
14 in Iowa, they've got -- it just doesn't -- it doesn't
15 end for them.
16     And then everywhere I go, like I said,
17 around the country I have to answer these questions
18 to people. I still have former colleagues that
19 believe that I still had something to do with a farm
20 in Iowa. Why? Because it's still up and you guys
21 have republished it over and over and over again. I
22 guarantee you even the stupid little video on your
23 website probably gets viewed every single day.
24     Q. Okay. Anything else?
25     A. There's more, but I'll -- it'll have to come

1 to me, but I'll supplement.
2     Q. Okay. But sitting here for now that's what
3 you remember.
4     A. I think I remember other things, but I'll
5 supplement more later.
6     Q. Well, if you remember it now, please tell
7 me. Otherwise, obviously you can tell me later.
8     A. I mean, I want to -- I gave you kind of a
9 lot right there that you didn't really listen to, so
10 let's just -- why don't you get on with your
11 questions and then we can come back to it.
12     Q. Do you remember anything more right now?
13     A. In terms of what?
14     Q. The harm.
15     A. The harm?
16     Q. Yeah.
17     A. I mean, yeah. You've got -- you know, I
18 mean, you guys -- I said that, you know, I was harmed
19 with my colleagues at the time. I submitted that a
20 few weeks ago. Then you guys came back and, you
21 know, I guess asked for names, so I gave you names.
22 But there's a lot more than that, lot more names than
23 that that I could go through if you want more names.
24     Q. Okay. Anything else?
25     A. Well, you just asked me so --

Veritext Legal Solutions

1    Q.  If you want to go through, what are the
2  other names, then?
3    A.  I mean, I could go on.  I mean, probably --
4  in terms of names of my former colleagues that would
5  have information on this, on the damages?
6    Q.  Yeah.
7    A.  The list could grow and grow and grow, but
8  off the top of my head, ones I didn't put on the list
9  because, I mean, they have information but it's
10  not -- I don't think it's -- not as much as like the
11  ones that are on the list that know, I think -- they
12  know directly, they have direct information.  So
13  these would be people that, you know, that would have
14  information but, you know, I'm not sure, you know,
15  where they fall at -- in on it but they would for
16  sure have information.
17    Q.  So who are they?
18    A.  I would start with Tom Latham.  His health
19  is pretty poor right now.  He was a good friend of
20  mine.  He would know that -- he was a Congressman
21  from Iowa, but he's in bad health.
22       John Boehner --
23    Q.  And I'm sorry to interrupt you.  Can you
24  tell me what they would know, kind of why you're
25  doing it so we don't have to go back and -- it would

1  probably be quicker if you want to tell me --
2    A.  They would have relevant information as to
3  my damages.
4    Q.  Such as what?
5    A.  Well, in knowing that this story was really
6  harmful.  So Latham would be relevant because he's
7  from Iowa.  He knew that there was no secret.  I'd
8  been out to Iowa to do events for many people in Iowa
9  over the years, and he would always joke about, you
10  know, that I should move to Iowa, you know, make
11  jokes like that, you know, that -- 'cause, you know,
12  he would announce at his events that my family was in
13  Iowa and, you know, make little jokes like that, so
14  he clearly knew there was no secret.  He and his
15  family would have to know the damage that it took
16  because a lot of people in Iowa knew that I was
17  friends with him, he was a good friend of mine and my
18  family.
19    Q.  Did you discuss with him the damages or he
20  would just -- he would know them because --
21    A.  Well, he would know them.  I mean, you know,
22  I can't remember 'cause he got ill, so I know that he
23  came -- after he got ill he came and we had dinner,
24  we had dinner, but his -- he had a stroke so -- but I
25  know that we talked about it at that time.  But he

1  would have information that would go back all the way
2  to 2003.
3    Q.  What kind of information?
4    A.  Just that there was no -- there was no --
5  nobody was sneaking around, there were no secrets.
6  He knew everything about my farming.  He knew
7  everything I had done.  We were good friends.  He
8  knew that whatever time frame was that when -- right
9  when my family moved because I remember talking to
10  him about it because when they were -- when my
11  brother wanted to look out there, I remember asking
12  him about -- and his wife, you know, hey, do you know
13  the area, because I think his son now lives in that
14  area, and he used to sell seed out there so he knew
15  the area; so I remember talking to him before --
16  before they went out there.  And then we would always
17  talk about just the -- so there were no secrets.  And
18  then, of course, obviously, he was out of Congress
19  when you guys did the hit piece, but, you know,
20  everybody knew I was close with him.
21       So that's John Boehner, obviously, too.  He
22  would have relevant information because he would know
23  Tom Latham and he would know we were always -- we
24  spent a lot of time together.  He knows those years
25  because I was -- you know, they were close friends of

1  mine.
2    Q.  When you say he'd know those years, what do
3  you mean by that?
4    A.  Well, he would know that your story was very
5  damaging to me and they would know that it was
6  preposterous because they would know that -- I mean,
7  he was the Speaker of the House, he would obviously
8  know -- not at the time when the story was written,
9  but he was Speaker of the House before that and he
10  would know whether or not there was any big secret
11  that I was running some secret farm, conspiring with
12  other people to commit illegal activ- -- to conduct
13  illegal activity; so he would have direct knowledge
14  of that.
15       Senator Grassley would definitely have
16  knowledge, would have knowledge of this.
17    Q.  What knowledge would Senator Grassley have?
18    A.  He's from -- he's from Iowa, he's a
19  long-term senator from Iowa.  Him and I worked
20  closely on the Russia hoax, the other conspiracy that
21  you guys came up with, and he played an integral role
22  in that in the Senate.  He knew for years that my
23  family was -- was -- you know, that I had a
24  brother -- or, you know, he knew there was a family
25  member, I don't think he knew exactly who, but I

31 (Pages 332 - 335)

1  think -- over the years I think my mom or other
2  people would go to -- he would do little county
3  meetings, and I know my mom went to a few of those
4  meetings. I think maybe even my brother did. I
5  don't know. But I remember Senator Grassley talking
6  to me about that.
7        And then during this pertinent time, you
8  know, he definitely -- you know, during that time he
9  would know the attacks that I was taking because of
10 when we were unraveling with your conspiracy that you
11 guys came up with to frame the Republican party with,
12 that we were all somehow tied to Russians and secret
13 Russian agents. Just like it says right here,
14 Trump's biggest defender, House Intelligence
15 Committee biggest defender, and then he goes on and
16 on about, you know, battering ram, battering ram to
17 discredit the Russia investigation, one that you made
18 up, you and your people made it up.
19    Q. What did we make up?
20    A. You made up the Russia hoax. You guys
21 had -- you knew it was nonsense and you framed -- you
22 framed a presidential candidate, a party. Many
23 people went to jail over it, and you all -- you
24 played along with it. So Senator Grassley and I
25 worked together on essentially getting the facts that

1  that was a complete hoax. So he -- and he would know
2  that my fam- -- there was no big secret that was in
3  Iowa.
4    Q. And you were -- so you were under attack
5  generally because of your work to discredit this
6  Russia hoax; right?
7    A. Your guy writes about it. Your guy attacked
8  me precisely because of it. You attacked me in this
9  article because of it. You said -- that's why you
10 wrote it, you wrote it to damage me before the
11 election.
12    Q. All right. So other than Senator Grassley,
13 is there anybody else you want to -- who you can
14 identify?
15    A. I mean, I can go on and on. I mean, do you
16 want me to give you more? I mean, we'll sit here all
17 day.
18    Q. I guess we are, then. Go ahead.
19    A. Okay. I mean, just in that region you
20 have -- Kristi Noem would have information, the
21 governor of South Dakota.
22    Q. Okay. What information would she have?
23    A. She would know also that my family was out
24 there because they would -- 'cause sometimes I
25 would -- when I would visit I would fly through Sioux

1  Falls, fly into Sioux Falls.
2    Q. And --
3    A. Senator John Thune --
4    Q. I'm sorry.
5    A. -- would know.
6    Q. Just to back up to the governor. When you
7  flew through Sioux Falls, did you meet with her? Is
8  that what you're saying?
9    A. Oh, well, she was my colleague, so she was
10 there at the time when this hit piece came out.
11    Q. Okay.
12    A. But over the years she was there, there
13 would -- you know, I know that we -- either I told
14 her or I can't -- you know, I know I told her that I
15 was in Sioux Falls. I remember seeing Senator Thune
16 one time, you know, and he well -- you know, he knew
17 for many years that my family was in -- you know,
18 that I had family in Iowa. So there was no secret.
19 There was no conspiracy.
20        You've got -- trying to think of the North
21 Dakota -- the North Dakota former governor now in the
22 Senate, Senator Hoeven, he used to come out here
23 to -- he used to come out here to this area and he
24 would put on symposium for -- at the big agricultural
25 expo here when he was governor, he would come out

1  here to recruit farms, and I know there was a time
2  where I think he met my -- maybe he was in the Senate
3  then or he was running for the Senate, but he met
4  my -- I think my father was out here and they talked
5  about, you know, that he was in -- you know, that he
6  had purchased the farm in Iowa.
7    Q. Were you present for that conversation or
8  you just knew --
9    A. I remember -- I remember -- I think he was
10 running for the Senate. I remember him telling me
11 about that. And we've had numerous conversations
12 about his time. He came out here several times; so
13 he knew there was no -- I was not conspiring on any
14 secret to commit illegal activities.
15        You've got senator -- now Senator Cramer, I
16 think he was in the House at the time, and he's from
17 that region, he knew and he knows the damage.
18        Sean Duffy would know the damage too.
19    Q. How would he know that?
20    A. He was from Wisconsin and he's from a big
21 dairy area, so we would work a lot on -- because this
22 is one of the largest -- or it is the largest dairy
23 area in the world and, of course, he has a large
24 dairy area, so he knew. I think I had done events
25 for him in Wisconsin and I remember, you know, him

32 (Pages 336 - 339)

1 bringing it up at an event.
2　Q. He knew what?
3　A. He knew about your hit piece.
4　Q. And he knew that your family had a farm.
5　A. Well, he knew before, of course, 'cause it
6 was -- you're the ones that said it was a secret.
7　Q. I'm just trying to understand --
8　A. But I'm telling you nobody -- every --
9 everybody -- major figures all through the area,
10 representatives, knew there was no secret. But
11 clearly then they had to then come and look to see
12 if, you know, had I been lying, was I -- you know,
13 did I have some ethical -- had I been ethically
14 compromised.
15　Q. Okay. Anybody else?
16　A. Yeah. How many do you want?
17　Q. As many as you have.
18　A. I would say -- oh, well, I've obviously got
19 my colleagues in California, but obviously Ken
20 Calvert, who's the dean of our delegation, chairman
21 of our delegation.
22　Q. What would he know?
23　A. Oh, he would know -- he would know all about
24 it. I mean, he knows it was -- he knew that my
25 family had an operation in Iowa, he knew I didn't

1 have anything to do with it, and he knew that I was
2 damaged tremendously.
3　Q. And how did he know you were damaged
4 tremendously?
5　A. Because everybody was talking about it.
6 It's still up. I'm still being damaged every single
7 day. This went like wildfire all the way through and
8 then I got pounded on it for 30 days, 40 days during
9 an election that I had a secret farm that was
10 employing illegal workers or something, some crap.
11 It was all over.
12　　And then it goes on to -- then it goes on to
13 and then, of course, it got reignited again by Lizza
14 when he decided to republish it.
15　　Oh, Mac Thornberry would definitely know; so
16 he definitely would be somebody that would know about
17 this.
18　Q. And all of these people reached out to you
19 or you spoke with after the publication in 2018 or
20 they just would know these things?
21　A. They would know -- well, for sure like
22 Calvert I would have spoke to, Duffy I would have
23 spoke to about the. The -- you know, Grassley I
24 know at one point I think brought it up. So they all
25 have some -- they all know about it, they all know

1 about the article, the damage, they know that there
2 was no secret, and they know the seriousness of the
3 chairman of the Intelligence Committee being accused
4 of keeping a secret in order to conduct illegal
5 activity and one that would immediately be
6 investigated by -- you know, by the Republican
7 leadership.
8　Q. And it was investigated?
9　A. Yeah, absolutely.
10　Q. Was there a formal investigation?
11　A. No, but it was -- they had to come and ask
12 me about it.
13　Q. Okay. Anybody else?
14　A. Mac Thornberry.
15　Q. Okay. And what would he know?
16　A. He would know -- I mean, I worked with him
17 very, very closely. He was the chairman of the Armed
18 Services Committee. We served together for many
19 years on intelligence. But my brother sent his --
20 he's in the cattle business, he grew up in the cattle
21 business, and my brother sent his cattle to his
22 district; so we would oftentimes talk about the --
23 about that and about how they raised -- you know, the
24 West Texas cattle operations, and so he knew that my
25 brother had an operation there.

1　Q. So where was his district?
2　A. In northwest Texas.
3　Q. So your brother would send their Iowa cattle
4 down to northwest Texas?
5　THE WITNESS: Uh-oh. I think we lost --
6　MR. SITWALA: Steve, are you there?
7　THE REPORTER: Off the record?
8　MR. SITWALA: Do we need to take a break to
9 try to get Steve back?
10　THE VIDEOGRAPHER: I need to change my
11 video.
12　MR. SITWALA: Let's go off the record, then.
13　THE VIDEOGRAPHER: This is the end of Media
14 Number 2. We are off the record at 11:44 a.m.
15　(Recess taken.)
16　THE VIDEOGRAPHER: This is the beginning of
17 Media Number 3. We are back on the record at
18 p.m.
19 BY MR. SITWALA:
20　Q. Congressman, we were going through people
21 who you recalled who may have some knowledge about
22 the damages that you suffered in this case, and I
23 believe the last person I had written was
24 Representative Thornberry.
25　　Is there -- and we can go through the list

Veritext Legal Solutions

1 of people you did provide, but before we do that I
2 want to make sure if there are others you can think
3 of or have thought of, I just want to go through them
4 first.
5     A. Okay. So you want me to keep going through
6 them?
7     Q. I do.
8     A. Are you sure?
9     Q. I guess I don't -- I wouldn't say I want you
10 to, but that is what we're here to do, so let's do
11 it.
12     A. Okay. I mean, 'cause I -- you know, I don't
13 know to what -- I can keep going on and on and on,
14 but I'm just trying to give you the -- when you asked
15 me who was relevant -- or, I mean, I said, look,
16 these are people that know about my reputational
17 damage, we've provided that. You guys came back and
18 said you wanted the names, so I kind of went through
19 and got the ones that would be most -- you know, that
20 knew the most.
21     Q. I --
22     A. And it doesn't mean that these others -- I
23 mean, these others would know, like Mac Thornberry
24 clearly would know a lot about this, Ken Calvert
25 would know a lot about this, but we're going to be

1 Thornberry, Ken Calvert are, you know, obviously
2 important witnesses if they -- you know, since you're
3 asking.
4     Q. So anybody that you think you might call or
5 rely on I'd like to know about.
6     A. Well, Mac Thornberry, and we talked about --
7 I mean, you're asking me -- you know, my brother
8 has -- you know, his cattle are there in that area.
9     Q. Oh, yes. That's right. We were talking
10 about -- and my question was I just didn't
11 understand -- so why would you move them from Iowa to
12 Texas, is that for a different purpose or what's
13 the --
14     A. Well, I can tell you it's not to keep it a
15 secret and to conspire to commit illegal activities,
16 I can tell you that.
17     Q. Okay.
18     A. I can tell you what it's not for. I think
19 because -- I mean, you'd have to ask my brother, but
20 it's -- I think they just -- I think it's economical
21 to do it there, they have facilities that do it
22 professionally.
23     Q. Like slaughtering, or what are we talking
24 about?
25     A. No, no, no, to raise animals.

1 here a long time if you want me to go through all of
2 them.
3     Q. Let me ask you a different question, then,
4 which is is the list of people you provided the list
5 of people who you would intend to actually rely upon
6 versus the other people who you wouldn't?
7     A. No. No, I could rely on -- I mean, rely for
8 what? Rely for when we go to a jury trial?
9     Q. Correct.
10     A. No. I mean, we could -- I mean, every name
11 that I just named, I mean, other than Tom Latham
12 probably would not be able to because of his health,
13 but, I mean, I would have no problem -- you know,
14 I've never -- I don't know when we get to trial how
15 many of these we want to call. I don't know. I
16 mean, that would be up to Steve, I guess, or you
17 guys, if you guys want to call them.
18     Q. So I --
19     A. But, I mean, I have a lot. I just kind of
20 highlighted the ones that I thought would have the
21 most -- like the most information because they would
22 have been in all the meetings.
23     Q. So anybody --
24     A. 'Cause there's -- remember, there's a lot of
25 meetings. We can go through it, but like Mac

1     Q. So they're born --
2     A. They're born in Iowa, right, or born
3 wherever and then they -- people move them to Texas
4 and they raise them for an amount of time, usually --
5 I don't know, probably I'm guessing like a year and a
6 half, and then they send them back. Like, I know
7 farms from here that send them there.
8     Q. Oh, okay. Thank you.
9     A. It's been a while since I've been in the
10 industry, but that's as I recall it. So I know my
11 brother has been now for several years sending his
12 animals to Thornberry's district; so we had numerous
13 conversations about that so he would know there was
14 no secret. And obviously because we worked closely
15 together, he's a guy that would have -- you know, I
16 mean, he would know how I was damaged.
17     Q. Okay.
18     A. I mean, because he was -- he was one of
19 my -- you know, he was my counterpart. Him and I
20 worked -- 'cause he was Chairman of Armed Services, I
21 was Chairman of Intelligence, so we spent a lot of
22 time together.
23     Q. Okay. That makes sense. All right. Well,
24 let's keep going, then.
25     A. Let's see. I mean, look, you could go to --

34 (Pages 344 - 347)

1  well, another -- Ken March- -- Kenny Marchant, he's
2  also from Texas, he raises cattle himself, he served
3  with me on the Ways and Means Committee, and he was
4  also at the time the chairman of the Ethics
5  Committee, and he knew my family wasn't hiding a
6  secret.  And then he would have been the one that
7  would have had to -- you know, I don't know the
8  process because I never served on the Ethics
9  Committee, but he would have been the one that this
10  would have come to to -- you know, that the
11  leadership would have talked to him about
12  adjudicating whether or not I was committing --
13  whether or not I was committing crimes.
14      Q.  I see.
15      A.  So he would definitely know that damage, the
16  reputational damage.
17      Q.  Did you speak with him about that, or do you
18  just understand that based on his position?
19      A.  Yeah, I'm sure that I -- yeah, I know I
20  would have because he's -- because he raises cattle.
21  I mean, yeah, he would know about that.  He would
22  know all about it.
23      Q.  I'm sorry.
24      A.  I haven't talked to him in many -- in a few
25  years but ...

1      Q.  I meant did you speak with him about his
2  investigation into these allegations against you, or
3  are you saying that would have been his
4  responsibility so he --
5      A.  Yeah, I would have had -- I mean, as a -- I
6  don't remember him specifically asking me about it,
7  you know, but I know that we talked about it, but I
8  don't remember if that was in terms of what he -- I
9  don't know if he was tasked by the leadership to look
10  into it or not.
11      Q.  Okay.
12      A.  But I know that I had to answer questions
13  to, you know, like some of the people on the list.
14      Q.  I see.
15      A.  And then but Marchant clearly would have
16  important information.
17      Q.  And would you speak to him about -- I'm
18  sorry.
19          Did he also raise cattle for your brother
20  or --
21      A.  No, no.  He just was in the business so he
22  would know that -- you know, he knew that there was
23  no big secret.  I mean, he knew for years that my
24  family, you know, had a farm in Iowa.
25      Q.  Okay.

1      A.  And he knew that I didn't have anything to
2  do with it.
3      Q.  Got it.
4      A.  But obviously when you guys made the
5  accusation it becomes much more serious.
6      Q.  Understood.
7          Anybody else?
8      A.  I mean, there's more, I mean, there's a lot
9  more.  I'm just trying to think of ones that would be
10  most relevant.  I mean, Tom Cole from Oklahoma.
11      Q.  What would he know?
12      A.  I mean, he would know the hit piece, he knew
13  about the hit piece, I mean, he knew the accusations
14  that I was under, very -- you know, very serious guy
15  that's well respected.
16      Q.  And how would he have learned about those
17  accusations?
18      A.  Well, everybody knew about the accusation.
19      Q.  Just like --
20      A.  Everybody knows right now.  Most people
21  believe the accusations.
22      Q.  And can you tell me somebody --
23      A.  We already went through all this.  I mean,
24  you think like this.  It gets worse and worse every
25  day.

1      Q.  Can you tell me somebody who believes them
2  as we sit here today?
3      A.  I don't know where these people live, but
4  they probably believe it.  I mean, anybody that looks
5  up -- those people sitting across the street, if you
6  Google it, if you look on YouTube, if you go to my
7  Wikipedia site, it's there.
8      Q.  Okay.  But that wasn't my question.
9          Can you identify any individuals who believe
10  it today?
11      A.  I would guess there are some -- if you go to
12  social media, there's going to be -- there's going to
13  be thousands and thousands and thousands of them.
14  But, I mean, I have to go and do research and bring
15  it to you, but I know we've supplied a lot of that to
16  you in discovery.
17      Q.  Okay.  So let's go back to -- you said Tom
18  Cole.  So what would he know?
19      A.  I mean, he would know about the damage, he
20  knows the seriousness of the accusations, he would
21  know that it was a really bad time, and then he would
22  also understand why they did it because he's, you
23  know, been in politics for -- and he's got a
24  doctorate in government and he's been elected for
25  20 years, and before that he was the executive

1 director of the RNC, so he would -- I mean, he would
2 have to remember it at the time, he would know about
3 it, he would know the damage that it did to me.
4    Q. Okay.
5    A. And I've not talked to him about it
6 recently, but he clearly knows all the -- you know,
7 all the damage that I incurred.
8    Q. When would you say the last time you would
9 have spoken to him about it would be?
10    A. About -- about what, specifically this or in
11 general?
12    Q. No, no. This.
13    MR. BISS: Can you repeat that name.
14    MR. SITWALA: Tom Cole.
15    THE WITNESS: Tom Cole.
16    MR. BISS: Okay. Thank you.
17    THE WITNESS: I don't know. I'm going to
18 have -- well, talked to him -- we didn't talk about
19 this. I don't know. A couple years, roughly, maybe.
20 BY MR. SITWALA:
21    Q. Okay. Anybody else?
22    A. Just trying to think. Billy Long would
23 know.
24    Q. What would Billy Long know?
25    A. He would know about your hit piece and he

1 would know about the damages.
2    Q. And what would he know about the damages?
3    A. He would talk to people, he knows people, he
4 was also -- he was in the auction business so he
5 would know that I was in -- you know, he knew that
6 there was no secret, he knows my brother.
7    Q. How does he know your brother?
8    A. He's met him before. I don't know. He
9 knows my -- he knows my father -- he knows my father
10 too.
11    Q. And, I'm sorry, what is his district?
12    A. It's Missouri, so just south of -- kind of
13 the next district down. I think he's a little lower
14 but ...
15    Q. And he would have known your father and
16 brother prior to the publication of the article?
17    A. Correct.
18    Q. And through you or through --
19    A. Yeah, through me. But he's a cattle -- you
20 know, he was an auctioneer, so he had an interest in
21 this -- in these issues. And he for sure 'cause he
22 always makes fun of people, so he definitely knew
23 about it.
24    Q. He made fun of you about it?
25    A. Well, I mean, yeah, I mean, he knows that

1 I -- he's one of these guys that makes fun of people.
2 He's an auctioneer. He would know the seriousness of
3 it.
4    Q. And did your family go to his auctions?
5    A. No, no. I don't think he -- I think he just
6 auctions for -- for charity now.
7    Q. I see. He's the guy who actually stands
8 there.
9    A. But he used to have like a -- that was his
10 business.
11    Q. I see.
12    A. But then -- but he's been in Congress now
13 for a long time, but he would be -- but he for
14 sure -- because he had an interest so he would
15 always -- you know, there's people that you know that
16 you would talk to about -- you know, about farming
17 and agriculture, things of that nature.
18    Q. Okay. I'm sorry.
19    A. Yeah, I mean, Don Bacon would be another
20 one, retired general.
21    Q. General --
22    A. Air Force general.
23    Q. Oh, okay. And how do you know him?
24    A. Because I would -- I did a bunch of events
25 for him over the years, and he's right in that area.

1 So I would always go -- when I would go there -- he's
2 in Omaha, and so when I would go there I would
3 usually pop in and have dinner with my family or
4 something. I think even my family -- I think my
5 brother and sister-in-law came down one time when I
6 was in Omaha.
7    Q. And, I'm sorry, is he in Congress or he's --
8    A. He's in Congress, yeah.
9    Q. Got it.
10       So he was at one point an Air Force --
11    A. He was an Air Force general, went to
12 Congress, but he would definitely know because I
13 was -- you know, I think he even talked about it
14 as -- because I want to say that I was through there
15 and he -- you know, he brought it up, said they were
16 all lies. But, you know, a lot of people when I --
17 when you go to -- when I go to do events they Google
18 you, they go to Wikipedia, and then they -- then you
19 go to these events and they come up to you and they
20 ask you about whether or not you have a -- you know,
21 they'll say, oh, you have a farm in Iowa.
22    Q. Okay.
23    A. And then the only story that's up there
24 about a farm in Iowa is your hit piece and other
25 psychopath stories that were built off of your hit

36 (Pages 352 - 355)

1 piece.
2    Q. And I take it you couldn't identify any of
3 those people, it's just people who would have come up
4 to you at --
5    A. Yeah, for sure at his events that that
6 happened. It even happened -- I mean, we can get to
7 that too, put the name on the list because --
8 definitely because it was somebody that actually
9 believed it still to just recently.
10    Q. We'll get to the list, but let's keep going
11 with the other people.
12    A. Okay. So Don Bacon for sure; his
13 predecessor, Lee Terry.
14    Q. Okay. And what would Lee know?
15    A. He would know that -- he would know about
16 that I was -- I did events for him. He would know
17 that I was in the -- that I never was, like, hiding
18 anything, that there was no secret. He knows -- I
19 think he knows my brother. I think my brother maybe
20 came to one of his -- went to an event that I was
21 speaking at, so there was no -- nobody was hiding
22 anything. I mean, I think he introduced my brother
23 at the event, that my brother, you know, just lived
24 up the road.
25    Q. When would that have event -- I'm sorry.

1 When would that event have been?
2    A. Probably in 2000- -- I mean, I'm just
3 approximating, but probably 2010.
4    Q. Okay. Anybody else?
5    A. Yeah, I'm sure. How many do you want?
6    Q. As many as you've got.
7    A. I'm just trying to give you the ones that
8 would -- I know would for sure know and have
9 information that would be relevant.
10    Adrian Smith, he's a Congressman from
11 Nebraska.
12    Q. And what would Congressman Smith know?
13    A. He was on the Ways and Means Committee with
14 me. His district goes right to the corner, so my
15 family's only a short distance from him.
16    Q. Okay.
17    A. He would know that I'd have a -- you know,
18 have a -- that my family was there in that area
19 because I think I even saw him -- I think he even
20 attended some events that I was at with either Don
21 Bacon or Lee Terry, and then he would have been at
22 the -- you know, where I had to address my colleagues
23 on the committees because he was on the Ways and
24 Means Committee.
25    Q. Did you address your colleagues in a session

1 together?
2    A. I mean, I had to with at least the
3 Intelligence Committee and the Ways and Means
4 Committee.
5    Q. Okay. And I assume that's what we'll get to
6 when we get to the names.
7    A. But he would fit in with those. I mean, he
8 would have been in all those meetings, plus he would
9 know 'cause he lived there in the region.
10    Q. All right. Anybody else?
11    A. Yeah, there's a lot more. Tom Emmer would
12 be -- he represents just to the north. He would
13 know.
14    Q. He would know what?
15    A. He would know that -- he would know that my
16 family -- there was no secret. He would know that
17 there's -- that the hit -- that this was a hit piece,
18 you know, he would know it was timed, and he would
19 know it severely damaged my reputation.
20    Q. How would he know that?
21    A. Because he's an expert. He's in the -- how
22 would he know which part of that?
23    Q. The damages part.
24    A. The damages part? Because he's in -- he's
25 the chairman of the -- now he's chairman of the NRCC.

1 So he -- he would, you know, look at all of these
2 issues that would -- you know, races, how they would
3 be impacted, so I would have to report to him as to,
4 you know, your hit piece that not only was in '18 but
5 then again relevant all through '19 and '20 that was
6 used against me still in the next election. Because
7 he was -- he would be in charge of working with me to
8 make sure that I won reelection; so he's definitely
9 relevant.
10    Q. Okay.
11    A. You would have -- anyway, there's more, but
12 I think that's --
13    Q. If there's anybody else that you think you
14 would rely on, I need to know who they are.
15    A. That I might -- well, I would have to confer
16 with my lawyer to know. I mean, I don't know how
17 many we're going to decide to call, or maybe you're
18 going to call them.
19    Q. If you would even consider calling people, I
20 want to know who they are.
21    A. Well, but I don't want to be nailed down to
22 that in case I think of somebody later. I guess I'll
23 supplement to you.
24    Q. Well, anybody you can think of now --
25    A. I don't know that I would call any of those

37 (Pages 356 - 359)

1 people. I just know that -- because I'd leave it
2 up to counsel, but those are definitely people that
3 are very knowledgeable that would know the damage
4 that you've done and would know what happened.
5    Q. All right. I'm asking just for any others.
6    A. Steve Stivers would know. He was chairman
7 of the NRCC at the time --
8    Q. Okay.
9    A. -- from Ohio.
10   Q. And would he know essentially the same
11 things as Tom Emmer?
12   A. A little different 'cause he would have been
13 in charge at that time; so I think Emmer was like a
14 deputy.
15   Q. Okay. So what would he --
16   A. He would have been in charge in '18; so he
17 definitely would know.
18   Q. Would know what?
19   A. Would know the damage that was done to me.
20   Q. Okay. Did you speak with him about the
21 article?
22   A. I would have had to at the time, yeah.
23   Q. And what would you have told him?
24   A. I mean -- well, he would have called. He
25 was the guy, number one, that I would have to -- that

1 would have said, hey, what's this about because he's
2 seeing all the hit pieces that would be generated
3 from your article that would be attacking me; so
4 it would fall in his lap to basically call and say,
5 hey, man, you're getting damaged.
6    Q. Okay. And what would you say to him?
7    A. I would say, yeah, I know, but what am I
8 going to do?
9    Q. Did you talk about what you were going to
10 do?
11   A. I mean, later because I sued you.
12   Q. You talked to him about that.
13   A. I don't know if I talked to him specifically
14 about this -- about this lawsuit, but I know at the
15 time he would have been one that would have known how
16 bad this story was for me.
17   Q. And --
18   A. Because he was in charge of it at the time,
19 in charge of the races.
20   Q. Okay. Who else?
21   A. Well, I don't want to be -- I don't want to
22 be married to -- I mean, I may think of some later.
23   Q. I'm just asking --
24   A. So I don't want to get -- so I don't want to
25 forget somebody because I'm sure there's more that

1 will come to my mind since you asked.
2    Q. I'm just asking what you can think of now.
3 I understand you can think of something later. I
4 can't stop you from that.
5    A. Okay. Right now that's -- you know, I'd
6 have to put more thought in, but there's probably
7 dozens more but ...
8    Q. Okay. Well, let's go to the next --
9    A. But I'd have to re- -- you know, recollect.
10 Like, I just thought of Steve Stivers because I
11 remembered he was in charge and then I would have had
12 to been answering to him.
13   Q. Okay. So going to the list, I'm going to
14 start I think in the order they're already in, but I
15 honestly don't know.
16      Let's start with Randy Feenstra. So when
17 did you speak with Representative Feenstra?
18   A. Well, Feenstra I didn't know --
19   Q. Okay.
20   A. -- in 2018.
21   Q. Okay.
22   A. But then last year, you know, he knew -- he
23 knew all about it; so we had several conversations
24 about your hit piece and the damage that was done.
25   Q. Okay. Can you tell me what the substance of

1 those conversations was.
2    A. Well, he represents that area so he's the --
3 so he was in the state legislature at the time. I
4 didn't know him, but he knew -- he knew of me and he
5 knew that my family was in the area, and he would
6 know that -- that, you know, the beating and the
7 attack that my family took and the damage that was
8 done to their reputation and mine because he would
9 have been asked about it, you know, during that time
10 because he's a short distance from there.
11   Q. And what did you tell him about the article?
12 Well, let me back up for a second.
13      How did you come to be talking to him about
14 the article in the first place?
15   A. He would bring it up. I mean, it's --
16 everybody talks about the article. You're the only
17 ones that -- and they talk the article because
18 you kept it up.
19   Q. So --
20   A. He represents the area. He knows -- I mean,
21 he knew that my family -- I mean, I think he even had
22 reservations 'cause he didn't know what had happened.
23 And then I got to know him over the -- when he came
24 to Congress and -- and, yeah, I don't think there was
25 a time that goes by that -- matter of fact, I even

38 (Pages 360 - 363)

1 did an event out there I think for somebody else in
2 that region last year and, you know, I think he knows
3 probably better than anyone the damage that my family
4 incurred, and he didn't know what the truth was at
5 the time.
6    Q. So how did you meet him, because he came to
7 Congress or for some other reason?
8    A. Yeah, I would have met him when he came to
9 Congress in -- I think last year.
10    Q. Okay. While you were still in Congress or
11 no?
12    A. Yes.
13    Q. Okay. And so when you met him, did he then
14 bring up the article at that time?
15    A. Yeah, as I -- many times, yeah.
16    Q. And what is it that you talked about over
17 and over about this article?
18    A. Just he talked about my family, what they're
19 doing, how they're doing. I mean, he knew -- you
20 know, at the time he believed -- you know, he said
21 people believed the article. He didn't know what to
22 believe but, you know, over time, you know, I had to
23 tell him I don't own anything there, and, you know,
24 he didn't know 'cause the only record out there is
25 this story.

1    Q. And was he interested in understanding
2 whether what was said about your family was true or
3 not?
4    A. Well, he knew. I mean, I knew it was -- he
5 would know it was -- he assumed that it -- something
6 was true.
7    Q. And then did you --
8    A. I mean, everybody did except for you guys.
9    Q. And did you tell him it wasn't true?
10    A. Yeah, I mean, I told -- I can't remember all
11 the specifics, but I would have said this is not --
12 this is not true, I mean, I don't have any ownership
13 there, I never was involved in anything there.
14    Q. Did he speak with your family, though, about
15 the other part of the allegations?
16    A. You mean the lies that you said?
17    Q. Well, as to whether they --
18    A. You mean your lies? People don't go talk
19 about lies if you're lying. They just assume --
20 either they're not going to ask you about it, about
21 the lies that you guys put out there, or they're
22 going to, you know -- you know, I think over time I
23 think he's got to know them and knows that they're
24 not -- I mean, he knows I don't have any ownership so
25 he knows the whole thing is a lie now, but at the

1 time he sure as hell didn't.
2    Q. And when you talked to him, you told him you
3 had no ownership interest, did you tell him anything
4 about, you know, what you believed about the farm?
5    A. I mean, not that I would recall, I mean,
6 other than it was my brother and that my -- and that,
7 you know, you guys ran this hit piece and it was all
8 lies.
9    Q. Okay. Anything else you recall in terms of
10 talking to Randy Feenstra about the damages?
11    A. Not at this time.
12    Q. Okay. Trey Gowdy, can you tell me how you
13 came to -- first of all, how did you come to know
14 him?
15    A. He's in Congress with me and, you know, he
16 was one of my top lawyers on the Intelligence
17 Committee.
18    Q. Okay. So he served with you on the
19 Intelligence Committee.
20    A. Um-hmm. He was specifically put there
21 because of his legal background.
22    Q. Okay. Do you have a legal background?
23    A. No, I do not.
24    Q. When --
25    A. You already know that.

1    Q. When did you speak with Congressman Gowdy
2 about the article?
3    A. Well, at the time, I mean, he would have
4 been -- because he was also -- he was on the
5 Intelligence Committee and he was also on the Ethics
6 Committee; so he would have been one of the most, you
7 know, closest people to all of this because he had
8 to -- a lot of the leadership and members would come
9 to him after you made your accusations about me; so
10 he would have taken a lot of those questions from the
11 other members.
12    Q. And then brought them to you?
13    A. No, he wouldn't bring them to me. Well,
14 maybe he did, but he would have to internalize them
15 and then probably work with Kenny Marchant and the
16 leadership to figure out what to do about them.
17    Q. So did you have any direct conversations
18 with him about the article?
19    A. At the time, yeah. I mean, I don't remember
20 all the specifics, but basically saying, look, it's
21 not true.
22    Q. Okay.
23    A. So ...
24    Q. Can you remember anything else about those
25 conversations?

39 (Pages 364 - 367)

1    A.  No, just that it's not true and, you know,
2  he was -- you know, had to like ask the questions.  I
3  mean, it's very awkward, embarrassing.
4    Q.  Did he believe you?
5    A.  Yeah, I mean, I don't know.  You have to ask
6  him.  I guess we'll find out at trial.
7    Q.  Can you think of any other conversations
8  that you had with him regarding the article?
9    A.  I mean, look, it went on, I mean, then
10 during -- then it was republished.  But, I mean,
11 not -- I mean, I just remember that at the time and
12 then later having to go to the Intelligence Committee
13 members to discuss it.  I think he left, as I
14 recall -- I can't remember.  I think he left that
15 following year so -- but at the time he would have
16 been kind of the most important -- one of the most
17 important people I had to deal with because he was my
18 top lawyer.
19   Q.  Okay.  So just to be clear, you don't
20 remember specifically any other conversations that
21 you had with him about the article other than the
22 ones we just discussed?
23   A.  Other than -- other than I -- whenever I --
24 I mean, I talked to, I don't know, sometime in the
25 last year.

1    Q.  Did you -- just for -- going back to
2  Feenstra for a second, did you reach out to him to
3  say that you were going to be identifying him as a
4  witness for this case?
5    A.  Yes.  Well, I don't -- I think I sent it --
6  I think I sent that to -- I think maybe -- I don't
7  know if Steve sent it or -- I know that I notified
8  him -- I know that I notified him that it's potential
9  that he'll be on a list.
10   Q.  And when would you have done that?
11   A.  I mean, whenever you guys asked me about
12 this two weeks ago.
13   Q.  Okay.  But the conversations you had with
14 Randy Feenstra were back when the article was
15 actually published.
16   A.  Correct.  That's the time of the relevant
17 conversations.
18   Q.  Okay.  So now with Mr. Gowdy -- Congressman
19 Gowdy, have you also told him that you were planning
20 on listing him?
21   A.  I did -- I did talk to him, yes, briefly.
22   Q.  Okay.  And when --
23   A.  I think I sent him the -- the -- whatever
24 the disclosure was just as an FYI.
25   Q.  The actual document.

1    A.  Yeah, whatever we provided in discovery.
2    Q.  Okay.  And that would have been sometime in
3  the last two weeks?
4    A.  Yeah.
5    Q.  All right.  George Holding, can you please
6  tell me what information you believe he has.
7    A.  He would know -- he was one that I
8  distinctly remember talking to several times at the
9  time in both 2018 and 2019.  He knew -- he knew my --
10 he had met my father and my brother; so he knew that
11 there was no secret.  And then he would always call
12 me to ask if everything was going -- if I was going
13 to be okay, if everything was all right.
14   Q.  Okay.
15   A.  And I remember specifically him calling like
16 right in that time period after your hit piece came
17 out, I remember him specifically calling.  He might
18 have even called that night or the next night.
19   Q.  Because he was concerned because he didn't
20 believe what was actually said; right?
21   A.  No, he was concerned that I was going to be
22 expelled from Congress because you accused me of
23 federal crimes.
24   Q.  So --
25   A.  You're trying to put words in my mouth.

1    Q.  Okay.  So he believed it --
2    A.  And he was also on the Ethics Committee.
3    Q.  So he believed it when he read it and
4  reached out to you because he was concerned; is that
5  what you're saying?
6    A.  I don't think he -- I mean, you have to ask
7  him.  I mean, I don't know what he believed or didn't
8  believe, but he -- but he clearly was concerned about
9  the article and about my safety, my family's safety,
10 what was going on, what was -- you know, what was
11 true in the article.  I mean, we had probably
12 multiple conversations about it over the years.  And
13 then, of course, he was aware that then you guys went
14 and republished it again at the height of impeachment
15 that then started that all over again.
16   Q.  So --
17   A.  And he was on the Ways and Means Committee
18 with me; so, you know, it's important to remember
19 that I had to have -- I had to tell my colleagues in
20 private meetings that -- about what was going on
21 because you guys accused me of committing federal
22 crimes for something that I would have been in
23 serious trouble about.
24   Q.  Now --
25   A.  So my committee members, I was chair of one

1 committee and then I was one of the -- you know, I
2 think I was the second ranking top Republican, number
3 two Republican on the Ways and Means Committee; so I
4 had to address these accusations with them so ...
5       Because all of your counterparts, just like
6 CNN, when CNN went out and harassed my grandmother
7 and my family and went to every Nunes family in
8 Tulare County, just like they went to -- which you
9 guys coordinated with, you claimed you didn't, but
10 ████████ Ryan Lizza was working for CNN at
11 the time, so it's preposterous to think you pushed
12 that all over social media, Apple News pushed it out,
13 and then 12 hours later news vans are at my
14 98-year-old grandmother's house and my brother's
15 place, hanging out there with cameras, running
16 around everywhere that Lizza went.
17       So, you know, to believe that what your
18 guys' supposed story is, you don't know anything,
19 you've provided zero evidence, but to think that a
20 jury in Iowa's not going to believe that Lizza and
21 you didn't coordinate with CNN is going to be fun for
22 the jury, I think, to hear, and I look forward to
23 that one.
24    Q. Okay. So when George Holding initially
25 reached out to you I think you said maybe the day of

1 or the day after the publication in 2018, you then --
2 and tell me if this is wrong -- you then took it upon
3 yourself to explain to him why what was in the
4 article wasn't true; right?
5    A. When I -- I mean, it was so fast then, like
6 I said, I was on the phone for probably five or
7 six hours that night.
8    Q. Um-hmm.
9    A. Okay? Severe damage. And then I was under
10 attack for the next, you know, 30-plus days. I just
11 remember specifically him calling me, asking if I was
12 going to be okay.
13    Q. Okay. And then you said you had several
14 conversations with him about that --
15    A. I mean, and then over the years I've had --
16       THE REPORTER: Whoa, whoa, whoa. I'm sorry.
17 One at a time.
18       And then you said you had several
19 conversations with him --
20       MR. SITWALA: After that.
21 BY MR. SITWALA:
22    Q. Go ahead. I'm sorry.
23    A. Yeah.
24    Q. And in those conversations did you then
25 explain to him why what the article said was not

1 true?
2    A. I mean, over time, I mean, you know,
3 obviously I'd have to explain it, then it would get
4 regurgitated, people would ask then you'd have
5 to, you know, talk about it again and then of course
6 it was republished and, you know, because what
7 happens is just like you did with CNN, you put your
8 seeds of poison out and then all of your other little
9 fake news buddies come and -- come and ask the
10 questions to my colleagues. So that's what happens.
11 So like Gowdy, when Gowdy and these people are
12 dealing with this it is because you poisoned the
13 well, you send people out, say oh, did they see
14 Lizza's story, and then they ask and then they would
15 go to people like -- you know, 'cause they
16 probably -- a lot of them wouldn't come to me and
17 they would ask what's going on with Devin, this is
18 serious, what's going on, I mean, you know, that's --
19 that happened over and over again, especially the
20 guys that would be, you know, on my committees that
21 would get -- ask those questions the most and
22 obviously the guys that were on the Ethics Committee.
23    Q. So when George Holding -- George Holding
24 came to believe that the story was not true; correct?
25    A. I mean, you have to ask him that.

1    Q. You don't know that?
2    A. Well, obviously I wasn't -- I wasn't
3 expelled so the story wasn't correct, but the problem
4 is the story's still out there; so, you know, you
5 have to have conversation after conversation after
6 conversation and we'll get to it if you want to have
7 more fun, you know, so keep going down the list.
8    Q. Is there anything else you can recall
9 sitting here now about your discussions with George
10 Holding regarding the article?
11    A. Yeah, George would -- would -- like I said,
12 I don't think there's anything more other than he
13 knew all about it, he knew how bad it was for me.
14    Q. How did he know your father and brother?
15    A. Just 'cause he was a guy that I served with
16 a lot and I think they had met before.
17    Q. Through you.
18    A. Through me, yeah.
19    Q. And that was, again, before the article was
20 published?
21    A. Correct.
22    Q. All right. Let's talk about Jim Jordan.
23 Now, let me back up for a second. So we've been
24 talking about the Intelligence Committee and Ethics
25 Committee.

41 (Pages 372 - 375)

1     Are the people on the list that you
2 disclosed, are they all members of one or both of
3 those committees?
4     A. I'd have to review the list again. I just
5 went through the ones that I thought were most
6 relevant.
7     Q. Okay. So let me --
8     A. That's the one I gave you, but then I gave
9 you a bunch of other ones that -- that were -- you
10 know, that were obviously, you know, Republican
11 leaders.
12     Q. Okay. So let's just keep going. So Jim
13 Jordan, was he on either of those committees?
14     A. He was on the Intelligence Committee when
15 Lizza republished the hit piece in 2019.
16     Q. But he was not in 2018.
17     A. He was not in 2018. But he was on during
18 the impeachment --
19     Q. And what --
20     A. -- trial --
21     Q. I'm sorry.
22     A. -- or impeachment hearings.
23     Q. And you're referring to the first set;
24 correct?
25     A. I'm referring to whatever time frame that

1 was, November of '19.
2     Q. Okay. What were the conversations you
3 recall -- let me back up.
4     What knowledge do you believe that Jim
5 Jordan has regarding your damages?
6     A. He would just know -- at that time he would
7 know the story, he would know the hit pieces, he
8 would know -- you know, 'cause that was when he was
9 on the committee and this is the one that they, you
10 know, re- --- that you guys republished. That was the
11 one that I then -- everybody was asking questions
12 about again. 'Cause the story line would go that
13 you've got -- they're attacking, they're impeaching a
14 president, and then the story line would be how can
15 you have a criminal like Devin Nunes who committed
16 crimes with a secret farm in Iowa, those were the
17 questions that they then would talk about because of
18 your original hit piece and then the republication
19 and promotion of the hit piece, that's how that would
20 go down.
21     And then so, like I said, you'd put your
22 poisonous seeds out there and then the story line
23 would get written and you could see it on social
24 media, I know we provided some of this, but it would
25 be that, you know, how can this guy be leading this

1 committee, leading anything when he's guilty of all
2 these other crimes, why hasn't, you know, ICE raided
3 his home.
4     Q. But Jim Jordan wasn't saying that.
5     A. Yeah, but Jim Jordan was on the committee at
6 the time when all that happened, and he would have
7 relevant information about it.
8     Q. Okay. So he would know about what people
9 were saying based on the article.
10     A. He would know the damages, the reputational
11 damage, the harm, the injury he would definitely know
12 about.
13     Q. Okay. Did you have conversations with him
14 about it?
15     A. I'm sure -- I know at the time I did
16 because -- because I had to -- once again, I had to
17 sit the whole Republicans down because they're
18 getting the questions what's this illegal activity
19 you're involved in, what's this -- why is Ryan Lizza
20 pushing this out again, you know, why did you -- you
21 know, I remember the conversations of wait a second,
22 didn't you sue them and why is this coming back up
23 again.
24     Q. You mentioned this a couple times now. So
25 you had a group discussion with each of the

1 committees; is that true?
2     A. With -- multiple times. But for sure at
3 that time -- at that time for sure and, you know,
4 there had to be at least a dozen times, probably, but
5 specifically about your hit piece was for sure would
6 have been in that -- in that probably phone calls in
7 October and then I know I would have had to address
8 it in November and December of '18 and then I would
9 have had to address it again because you republished
10 it in '19 with the Intelligence Committee members,
11 and the same would be true for the Ways and Means
12 Republican members.
13     Q. Would there be any record of these
14 discussions?
15     A. No, there wouldn't be any -- nothing
16 transcribed.
17     Q. Okay.
18     A. It was just where I would have to meet with
19 them to tell them what happened.
20     Q. And to tell them what happened you told them
21 that these allegations were totally untrue; correct?
22     A. Yeah, that you psychopaths made it up.
23     Q. Okay.
24     A. That's probably my word exactly, and you've
25 kept it up.

1    Q. Any other conversations you can remember
2 with Jim Jordan about either the damages or the
3 article?
4    A. I mean, I had lots of conversations with Jim
5 Jordan over the years 'cause we've worked closely
6 together on the Russia hoax investigation along with
7 Chuck Grassley. He would know that I'm not -- that
8 I'm not -- that I'm not, you know, a criminal, but he
9 would know that -- the damage that was done.
10    Q. Did you tell him that you were going to list
11 him as a potential witness in this case?
12    A. Who, Jordan?
13    Q. Yes.
14    A. I don't think I've told him yet.
15    Q. Okay.
16    A. I can't remember.
17    Q. What about --
18    A. But I don't think I have. No, I have not.
19 Because I have not talked with him for a while.
20    Q. What about George Holding?
21    A. George Holding I notified.
22    Q. Within the last two weeks?
23    A. Yes.
24    Q. And how did you do that?
25    A. I think I just -- I had a brief conversation

1 with him.
2    Q. You called him on the phone?
3    A. I called him, yeah.
4    Q. And do you have the phone numbers of all of
5 these people?
6    A. Most of them I probably would, yeah.
7    Q. But you didn't provide them in the contact
8 information; correct?
9    MR. BISS: Yes, we did. Yes, we did.
10    THE WITNESS: Yeah, they were provided,
11 that's right.
12    MR. BISS: Don't say that, Ravi. We did.
13    THE WITNESS: Yeah, there you go. See?
14    MR. BISS: Sent you a link with all the
15 info.
16    THE WITNESS: You lied again. Jesus.
17    MR. SITWALA: We'll get to it later.
18 BY MR. SITWALA:
19    Q. All right. What about Darin LaHood?
20 What -- what knowledge do you think he has regarding
21 the damage?
22    A. He would know because I notified you of
23 the -- I notified him also because what I
24 remembered -- and he was relevant because he was the
25 one who, even though I served with him on -- well, he

1 wouldn't have been -- he was in Congress at the time.
2 He knows the damage that was done in '18. And then
3 he was on the -- joined the Ways and Means Committee
4 and then he joined the Intelligence Committee.
5    But probably one of the more embarrassing
6 episodes of all was he -- I went to his district and
7 he borders Iowa, and he gave a long introduction
8 about me and my -- that I had a farm in Iowa.
9    Q. When was that?
10    A. Last year sometime.
11    Q. And then did you correct him when you --
12    A. Yeah, I mean, I corrected 'cause he made
13 this in front of hundreds of people, and I said, you
14 know, no, that's -- I don't own any farm in Iowa and
15 please don't -- you know, I know it's on my
16 Wikipedia, I know it's there when you Google, but I
17 don't own anything there, there was no controversy
18 there, only the one that sick people like you guys
19 made up.
20    Q. And did you --
21    A. And that you -- and then I think I even
22 explained there that you guys went and -- you know,
23 you sent that sick bastard out to my family, you
24 ████████████████████████████████████ and
25 you did it to my grandmother, and I just remember

1 telling that story there.
2    And then afterwards, you know, he apologized
3 to me 'cause he didn't -- you know, he just thought
4 it was true. So he's -- so he's -- you know,
5 obviously knows the damages. And he's somebody who
6 wasn't on the committee at the time but then still --
7 but believed it, you know, years later.
8    Q. And did you tell the -- this was at an
9 event, I take it?
10    A. Um-hmm.
11    Q. Did you tell the people at the event that it
12 was your family that had the farm in Iowa as part of
13 explaining the --
14    A. As I -- yeah, I told them that it shouldn't
15 be believed and that it was all lies and that I -- I
16 think I might have even said that I was suing you
17 guys, you guys refused to own up to the story.
18    Q. Was your family at that event?
19    A. No.
20    Q. And you said that event was last year?
21    A. Last year at some point.
22    Q. Can you think of any other conversations
23 with Mr. LaHood that would be relevant to your --
24    A. No, only the -- before when you guys asked,
25 I called him and asked him about the -- just if -- if

1 I -- if my recollection of that story was correct,
2 and he said -- and he said yes.
3    Q.  And have you told him that you were going to
4 list him?
5    A.  Yeah.  Well, after I listed him, I tried to
6 contact as many as I could just to let them know
7 'cause I know how you send thugs after people, so I
8 didn't want them to be -- get a knock on their door
9 with one of your fake federal agents like you did
10 here in Tulare County.
11    MR. SITWALA:  I'm going to mark what would
12 be marked as Defendants' Exhibit 142.
13    Can you send it to Steve.
14    MR. BOYER:  Yep.
15    (Defendants' Exhibit Number DX142
16    marked for identification.)
17 BY MR. SITWALA:
18    Q.  Congressman, here is an exhibit that's
19 marked as Defendants' Exhibit 142.
20    Are you not going to take it?
21    A.  You can give it to me since we went through
22 this before.
23    Q.  Does this look familiar to you?
24    A.  I'm not going -- I don't trust anything you
25 guys put in front of me.  I'm not going to

1 authenticate a damn thing that you guys put in front
2 of me.
3    Q.  Can you please turn to the second page of
4 it.  Do you see at the bottom a list of individuals?
5    A.  Yep.
6    Q.  Are these the individuals that we've been
7 talking about who you listed as having information
8 relating to your damages?
9    A.  Yep.
10    Q.  And do you see their phone numbers listed
11 here?
12    A.  Yeah.
13    Q.  You do?
14    A.  Come on, dude.  Quit with your games.
15 You're a joke.
16    MR. BISS:  Yeah, Ravi, Ravi --
17    THE WITNESS:  You're a joke.
18    MR. BISS:  It's outrageous.
19    THE WITNESS:  You're a joke too.
20    MR. BISS:  It's really outrageous.
21    THE WITNESS:  That's outrageous.
22    MR. SITWALA:  What is outrageous?
23    THE WITNESS:  Another accusation.  Again,
24 the website's right there.  You go to the website and
25 the phone number's right there and you call.

1 BY MR. SITWALA:
2    Q.  So the phone numbers that you called to
3 reach these people are the phone numbers --
4    A.  I'm not telling you anything about any phone
5 numbers that I call because you guys are sick
6 individuals.
7    Q.  Let's talk about --
8    A.  So you can go, the phone numbers were
9 provided right there, you just type it into the
10 website and you can see it.
11    Q.  Let's talk about Kevin McCarthy.
12    A.  So stop with your accusations.
13    Q.  You're the one that made the accusations.
14    A.  No, no, you made the accusation.
15    Q.  All right.  Kevin McCarthy --
16    A.  'Cause you have no evidence, and a jury is
17 going to see all of this, and the jury needs to see
18 all of this because what you guys have done to my
19 family should never be done in this country again.
20    Q.  Let's talk about Kevin McCarthy.  Can you
21 tell me what he knows about your damages.
22    A.  Yeah, he knows all about it.
23    Q.  Can you give me some detail on that?
24    A.  It's the same answer.  Do you want me to go
25 through it again?

1    Q.  Yes, I do.  Since you listed him, I need
2 to --
3    A.  Are you going to accuse me of not providing
4 you information that I've provided you?
5    Q.  Are you going to answer the question?
6    A.  Not if you're going to accuse me of not
7 giving you information.
8    Q.  Please answer the question.
9    A.  So Kevin McCarthy has been in this area
10 for -- I've known him for 30 years.  He knows my
11 family, he knows all of them or most of them, and he
12 is -- you know, he knew that they moved to Iowa, he
13 knew that there was no secret, and he probably of all
14 people took, you know, a lot of the -- he was
15 Republican leader so he would have been the one that
16 had to, you know, verify that that information was
17 not true.
18    Q.  And did he do that by speaking with you?
19    A.  Yeah, I know he did at the time 'cause he
20 would constantly -- in '18 'cause he would constantly
21 be checking -- you know, checking on me.
22    Q.  Okay.
23    A.  And I think I remember him saying something
24 like, you know, well, you don't even own anything
25 there, do you, and I said no, I don't, and he's like,

44 (Pages 384 - 387)

App. 749

1 well, you better make sure because that's the
2 accusations that they made. And he must have had
3 people calling him at the time. I'm sure that his --
4 you know, his staff, 'cause he's the Republican
5 leader at the time, both in '18 and in -- you know,
6 to today.
7     Q. And did you reach out to him in the last
8 couple of weeks to give him a heads-up that you were
9 disclosing him?
10     A. No, I haven't talked to him.
11     Q. Okay. John Ratcliffe. First of all, can
12 you please tell me who that is.
13     A. John Ratcliffe was on the -- he was a
14 Congressman from Texas. He was a US Attorney. Are
15 you asking me because you already know the answer or
16 because you don't know who it is?
17     Q. Because I want to know who he is. You
18 listed him.
19     A. But do you know who it is or you don't know
20 who it is?
21     Q. I --
22     A. I mean, I don't want to -- do you want me to
23 give his whole history?
24     Q. No, you already answered my question. Thank
25 you.

1         What -- how do you know him?
2     A. I served with him, and then he was on the
3 Ethics Committee, he was on the Intelligence
4 Committee, then he became the Director of National
5 Intelligence and I worked with him in that capacity
6 as the top Republican on the Intelligence Committee
7 'cause that would be one of my main interactions in
8 the administration.
9     Q. And what does he know about your damages in
10 this case?
11     A. Oh, he would know a lot because he would
12 have been there through the whole thing.
13     Q. So, for example, can you please tell me --
14     A. I mean, look, you can ask him that. I'm not
15 going to get into his -- I mean, I know that he would
16 know all about it, you know, I told him about it, I
17 told him this was going to come up, we didn't get
18 into any details, and he said, you know -- he just
19 said yeah, I know about it.
20     Q. Okay.
21     A. I mean, you know, I don't sit here like with
22 you and go through 100 questions. I have work to do
23 and it's quick, like, hey, this is -- you know, this
24 is what you guys need to -- you know, just want to
25 let you know, this could -- you could get asked about

1 this, and most people just say, okay, no problem.
2     Q. And that now -- what you're talking about
3 now is recently when you reached out to them.
4     A. Yes.
5     Q. Okay. Let's back up to what is it, what
6 conversations did you have with him at the time that
7 are relevant to his knowledge?
8     A. Look, he was on -- he was on all the
9 relevant committees, so he would have been the one in
10 the middle of this, just like the -- that's why I
11 named those 11, because they have significant
12 information about it.
13     Q. And so their information is all --
14     A. And I haven't -- you know, I mean, unlike
15 you guys, I'm not like, you know, that -- go and
16 harass people, I'm not harassing them. I -- you
17 know, I know they know, and if we decide to call them
18 at trial, we'll call them at trial.
19     Q. And for those 11 you're saying they have
20 similar knowledge insofar as they were in the
21 committees when this was all going on?
22     A. Those -- I mean, I named you a lot of others
23 and there's probably more, but those that I put there
24 are the ones that -- I mean, there would have been
25 multiple conversations, multiple times that I had to

1 like, you know, go explain myself --
2     Q. Okay.
3     A. -- to them.
4     Q. And let me just ask, with John Ratcliffe,
5 was there anything else other than what we just
6 discussed, you know, that's different than the other
7 people that you would have talked to him about?
8     A. He would know the damage, he would know --
9 I'm sure every one of these individually if asked
10 would remember, you know, something about this in
11 their own different way.
12     Q. In terms of learning about the article --
13     A. I mean, just like -- I mean, the one I know
14 the most about is because -- is Feenstra because that
15 was somebody who I didn't know who then -- you know,
16 we had numerous conversations about it because he
17 probably gets asked about it all the time.
18     Q. Okay. What about Steve Scalise?
19     A. Scalise would be similar to McCarthy. I
20 was -- I served a long time as a Deputy Whip and I
21 had to tell him that, no, I haven't committed any
22 crimes.
23     Q. Okay. When did he reach out to you?
24     A. He would have reached out to me, as I
25 recall, in '18, you know, after the article came out.

45 (Pages 388 - 391)

1   Q. Did you reach out to him recently to give
2 him a heads-up?
3   A. No, I haven't.
4   Q. Okay. What about Congressman Stefanik,
5 Congresswoman Stefanik?
6   A. So same thing. She was on the Intelligence
7 Committee with me, she was on the -- during
8 impeachment. She knows that -- you know, about the
9 hit pieces. She also has an agricultural district,
10 so I've known her a long time and -- and she would
11 know about damages 'cause she's also in the
12 Republican leadership also.
13   Q. Would she have known -- did she know your
14 family?
15   A. I don't know. I think she -- I don't think
16 she -- I don't think my family had ever met her, that
17 I know of.
18   Q. Okay. Did she know about their farm, that
19 it was in Iowa?
20   A. I don't know if she knew at the time, but
21 yeah, I'm getting that she must have known something.
22   Q. And did she --
23   A. I mean, there was no -- other than you
24 freaks who made up a fake story, pretty much all of
25 my colleagues -- I don't know that there's any -- any

1 of them that knew me well knew that my brother had a
2 farm in Iowa.
3   Q. Okay. And --
4   A. I mean, so there was no secret. So I can't
5 say 100 percent certain, but I'm pretty sure she
6 would know that my brother was in Iowa because I know
7 we talked about dairy farming and agriculture. She
8 has an agricultural district.
9   Q. And if she had asked you, you would have
10 explained to her that the article was wrong?
11   A. Well, I know she would have been there
12 multiple times where I had to address these issues to
13 the Intelligence Committee members.
14   Q. Okay. What about Chris Stewart?
15   A. Chris Stewart is the same thing, you know,
16 he -- known him for many, many years, served with him
17 on Intelligence, he's a -- and he would know -- he
18 was in -- numerous conversations with him about this.
19   Q. And are those conversations of the same sort
20 that you described --
21   A. Same sort. He would know the damage, he
22 would know the -- what was -- what you guys did, and
23 he would know the pain and suffering and all the
24 damages that I would have incurred.
25   Q. When would you have spoken with him?

1   A. All through it. I mean, he's somebody I
2 worked with almost on a daily basis.
3   Q. And have you reached out to him recently --
4   A. I notified him, yeah. He was overseas, but
5 I said -- I told him that, hey, you might get this --
6 get a call, and he was, like, okay.
7   Q. And with -- I don't know if I asked you.
8 Did you reach out to Congresswoman Stefanik recently?
9   A. No, I have not.
10   Q. And last one, Brad Wenstrup, please tell me
11 about him.
12   A. Same -- well, he's on both Ways and Means --
13 he was on the Ways and Means Committee with me and
14 the Intelligence Committee with me. He knows the
15 whole story.
16   Q. And in 2018 he was on those committees with
17 you --
18   A. Yeah.
19   Q. -- already?
20   A. Yeah. So was Stewart.
21   Q. Is the knowledge he has similar to what we
22 discussed with respect to the other people?
23   A. He would know the damage, yeah.
24   Q. Is there anything --
25   A. I don't know specifically because I haven't

1 asked them about, like, you know, who but I'm sure
2 once we get to this point we'll -- they'll be able to
3 come and testify to -- before a jury about, you know,
4 who they -- you know, the damages that were done and,
5 you know, he would know that there was no secrets,
6 that nobody was hiding anything, and because there
7 was so much -- you know, I spent so much time with
8 both him and Wenstrup.
9   Q. Did any of these people when you talked to
10 them in 2018 suggest that you file a lawsuit to try
11 to deal with this?
12   A. Not that I know of.
13   Q. And when was the first time that you were
14 asked to come up with this list of individuals who
15 would have knowledge of these damages?
16   A. Well, it was -- actually it was me 'cause I
17 told you I read that -- I read your -- when I was
18 preparing for the deposition I read that -- your
19 supposed expert and I just started laughing, and then
20 I said, well, I mean, it would be important to
21 provide, you know, the people that would have the
22 most relevant information about this, and so I gave
23 it to you and then you guys wanted more and now you
24 want even more now.
25     MR. SITWALA: So if you -- I'm happy to

1 continue going and I know I feel like that's your --
2 you'd like to be done as quickly as possible as well.
3 If you want to take a break, I'm going to kind of
4 change topics somewhat, but otherwise I'll just press
5 on.
6      THE WITNESS: No, I'm fine.
7      MR. SITWALA: Everybody else is fine? Okay.
8 Thank you.
9      THE REPORTER: May I interject?
10     Please, one at a time. You're interrupting
11 his question, and it's making it really difficult.
12     THE WITNESS: Okay.
13     THE REPORTER: I'm sorry. Thank you.
14 Appreciate it.
15     THE WITNESS: I apologize. I'm not trying
16 to.
17     THE REPORTER: No, I understand. I totally
18 understand. Thank you. Appreciate your
19 consideration.
20 BY MR. SITWALA:
21     Q. So you understand that in your complaint,
22 your initial complaint in this action, that you're
23 seeking $75 million in compensatory damages and two
24 and a half million dollars in punitive damages; do
25 you understand that?

1      A. I'd have to review it.
2      Q. Do you know how you came up with -- or did
3 you come up with the numbers that are listed in your
4 complaint as what you're seeking?
5      A. Yeah, I mean, I think at the time -- as I
6 recall, it was basically kind of like how much
7 information's out there, look at all the posts, and I
8 think that's how we -- you know, I think that's how I
9 came up with it, as I recall, it was just the amount
10 of, you know, what's it worth, what's my reputation
11 worth, how do you -- you know, how do you come about
12 a way to get reimbursed for your damages, and so that
13 would be up to a jury, but that's just kind of the --
14 the round number that I thought was appropriate.
15     Q. Did you use any kind of formula to come up
16 with that number?
17     A. I think it's just the overwhelming number of
18 views on your videos that are all over the place,
19 hundreds of thousands, millions of views, and then
20 you've got the Twittersphere that's all over the
21 place, but now, you know, that number should be
22 actually higher based on those calculations.
23     Q. So initially when you made the complaint,
24 the complaint listed eight different statements, I
25 believe, along with an implication.

1      Does that roughly sound right to you?
2      A. I mean, roughly. I'm not going to -- I
3 mean, I'm not going to accept as what you're telling
4 me as true because of your actions, prior actions,
5 but I will -- but go ahead with what you're trying to
6 get at.
7      Q. The amount of damages you were seeking was
8 essentially the aggregate damages from all of those
9 different statements; correct?
10     A. Um-hmm.
11     Q. And how did you --
12     MR. BOYER: (Unintelligible.)
13 BY MR. SITWALA:
14     Q. Oh. Can you please answer with a yes or no
15 instead of an um-hmm.
16     A. Yes. At the time -- and remember, there
17 was -- there was -- there were social media posts,
18 there were views on videos, there were the number of
19 times -- you know, so I think we just kind of -- I
20 think I just added all that up and then I think we
21 figured it was like -- it had been like replicated
22 like -- you know, I think it was like seven -- I
23 can't even remember what the number was, but it was
24 10 or 15 or 20 million times and then just said,
25 well, what's that worth, you know, dollar, two

1 dollars, three dollars? I don't know.
2      Q. And so what did you ultimately decide?
3      A. I ultimately decided that -- I don't know.
4 I came up with the 75 million and -- which now under
5 those calculations should be -- should be higher.
6      Q. Okay. Now, you filed several other
7 defamation lawsuits against other entities; correct?
8      A. Are you representing the Washington Post and
9 your other allies, or are you here to talk about this
10 case?
11     Q. I'm asking you -- well, I'm asking you to
12 confirm that you filed numerous other cases --
13     A. I'm not going to get into my other cases
14 unless you're representing them.
15     Q. You're not going to talk about the other
16 cases?
17     A. No.
18     MR. SITWALA: Do we need to take a break?
19     Steve, Mr. Biss, do you want to talk to your
20 client about that, or are you going to basically
21 agree with that?
22     MR. BISS: I'm not going to answer your
23 questions.
24     MR. SITWALA: Will you instruct your client
25 to answer my questions?

47 (Pages 396 - 399)

1    MR. BISS: I'm not instructing him to answer
2 or not answer.
3    MR. SITWALA: Okay.
4    THE WITNESS: Go ahead. Just answer your
5 questions -- or ask your questions. If you -- it is
6 just totally ridiculous that you would be asking
7 about cases that you're not even the lawyer for, but
8 you are all buddies and friends so -- so it's not a
9 problem --
10 BY MR. SITWALA:
11    Q. In March 2000- --
12    A. -- since you all coordinate with your
13 defamation.
14    Q. In -- and what's your basis for believing
15 that?
16    A. We've already discussed it earlier
17 specifically in this case that it is not by
18 coincidence ████████ that you hired
19 also worked at CNN at the same time, nobody knows how
20 the story came up, you guys just pulled it out of
21 your ass, you went and harassed my family, and then
22 you sent CNN off to attack my family even more, which
23 I've already explained that to you.
24    Q. Is there any other coordination --
25    A. Oh, that's -- that's quite a bit, and then

1 we can go through every single time, leaks come out,
2 you selectively leak transcripts, you went after my
3 brother, you accused my dad of federal -- additional
4 federal crimes, you just did the stunt where you went
5 to court in Florida for something you already knew
6 about. I don't know, was that you? I mean, pretty
7 sick, pretty sick for information that was all made
8 public. So, yeah, so I would say that you guys do
9 coordinate with all your little buddies.
10    Q. Okay. In March 2019 you recall filing a
11 lawsuit against Twitter along with two Twitter
12 accounts and a person named Liz Mair?
13    A. I'm not going to -- unless you're
14 representing them, I don't -- I'm not here to -- that
15 case is now over with, so there's nothing more to
16 say.
17    Q. And that was a defamation case; right?
18    A. That's correct.
19    Q. And in your initial complaint you sought
20 $250 million in damages; is that correct?
21    A. I'm not going to authenticate anything that
22 you're saying.
23    Q. How did you calculate that number you were
24 seeking in that case?
25    A. I'm not going to authenticate anything. I'm

1 not sure what you're even asking.
2    Q. You don't understand --
3    A. I don't remember -- I don't remember what
4 the number was.
5    MR. SITWALA: Okay. I'm going to hand you
6 an exhibit. We can just mark this Exhibit 143,
7 DX143.
8    (Defendants' Exhibit Number DX143
9    marked for identification.)
10 BY MR. SITWALA:
11    Q. Let me just wait for a minute so that --
12    A. Are you going to accuse me of something
13 again? I'm not accepting this as being authentic.
14    MR. SITWALA: Steve, we just sent the
15 exhibit to you. Can you please just let me know when
16 you get it.
17    MR. BISS: Yes.
18    MR. SITWALA: Thank you.
19    Have you gotten it yet, Steve?
20    MR. BISS: No, I haven't got it yet.
21 BY MR. SITWALA:
22    Q. While we're waiting for that document, in
23 that case you were taking the position that Twitter
24 should be responsible for the defamatory tweets of
25 the users; correct?

1    A. I'm not going to speak to the specific
2 complaint.
3    Q. Because you don't know?
4    A. I just don't -- I don't remember.
5    Q. Okay.
6    A. But I think what is relevant to this case is
7 that it's highly likely that Liz Mair was being paid
8 by the same people that paid Lizza, other than you
9 and CNN.
10    Q. And who do you think those people are?
11    A. Some relationship to a guy named Dan Jones
12 and Fusion GPS.
13    Q. And what is your basis for believing that?
14    A. They admitted it, they wrote it in their own
15 book.
16    Q. They wrote what in their own book?
17    A. That they were supplying you guys with all
18 the hit pieces on me.
19    Q. When you say "you guys," do you mean Esquire
20 in particular or the --
21    A. I mean you guys meaning the fake news. So
22 the only big hit pieces that were -- and she helped
23 promote all these and replicate them all. Hell, I
24 don't know, maybe we should call her as a witness.
25 We probably should subpoena you guys to see what your

48 (Pages 400 - 403)

1 communication has been with her and Lizza's
2 communication.
3         MR. SITWALA: Steve, have you gotten the
4 exhibit?
5         MR. BISS: I have, but I'm just uploading it
6 now.
7         MR. SITWALA: Okay.
8         THE WITNESS: So I would say that she's
9 relevant and we might call her as a witness because
10 she was paid -- you know, paid to defame me, and she
11 bragged about it on Twitter and she pushed out -- as
12 I recall, I think maybe she even pushed out -- used
13 that as a vehicle.
14 BY MR. SITWALA:
15     Q. Used what as a vehicle?
16     A. Used -- I think she pushed out your hit
17 piece too, as I recall.
18     Q. So you seem to recall a fair amount about
19 the case. You don't --
20     A. No, no, I recall about her and what she did.
21 I know she was being paid by someone and they were
22 generating in the -- you know, and yours was the --
23 yours was the hallmark October surprise hit piece
24 that you know damn well that's the case.
25     Q. And why --

1     A. So her job was to maximize damage on me and
2 coordinate with scumbags like Lizza.
3     Q. And why did you --
4     A. And she was paid to do it.
5     Q. Why did you sue Twitter in that case?
6     A. I don't -- I'm not going to get into that.
7     Q. Because you don't know?
8     A. I don't remember. I don't remember the
9 specifics and so I'm not going to play your little
10 gotcha games like you did last time on the phone
11 numbers. So we're not going there 'cause that's
12 something that I haven't read and I don't know how to
13 authenticate and there's no reason. I told you what
14 was relevant here was that, Twitter would be relevant
15 for the -- all the tweets that went out that -- so
16 that we could count them all in terms of to get to
17 the damages 'cause I think that's one way. Number of
18 times something was sent out, replicated, that's how
19 you get to the damage number, in my mind.
20     Q. And is that --
21     A. But, you know, how do you know, I mean, this
22 number, you know, the 75 million number has now
23 ballooned beyond belief because of the damage you've
24 continued to -- to get to me and do to me 'cause your
25 story's still up. So, you know, and I don't know,

1 it's up to a jury to decide what the damage would be,
2 but you're the ones that had no basis for this, you
3 used my family as pawns in this game, you now --
4 they're now getting attacked, all the things that I
5 had previously told you about, and now you're sitting
6 here, your expert witness says that I wasn't damaged,
7 which is preposterous, and then you -- just like your
8 story, and now you come in here and now you're
9 throwing -- you know, you're throwing people that
10 were paid to attack me in front of me as if this was
11 some crime that I took them to court because she was
12 paid -- she admitted she was paid to attack me and to
13 defame me. So, I mean, she actually might be a great
14 witness. Maybe we should call her.
15         MR. SITWALA: Steve, do you have the
16 document open?
17         MR. BISS: I do.
18         MR. SITWALA: Thank you.
19 BY MR. SITWALA:
20     Q. So the only thing I wanted to point you to
21 on this document is you can see in bold on the front
22 page is the demand for not less than $250 million; do
23 you see that? You don't see --
24     A. Are you here to -- you talking to me?
25     Q. Yes, I'm talking to you.

1     A. I told you, I'm not reviewing this document.
2     Q. Okay.
3     A. I mean, you -- look, this is the problem and
4 you know it. You came in here playing your little
5 sandbag games. You've known about this deposition
6 for months so you could have just given it to me and
7 said, hey, we might go over this, and then I would
8 have gladly authenticated it for you and then I would
9 have answered the questions. But you brought up the
10 name Liz Mair, then that's -- and, I mean, she's
11 probably relevant because she probably worked with
12 your little scumbag.
13     Q. If I represent that this document was
14 produced by your lawyer in this action, will that
15 give you -- will you look at it then?
16     A. I don't know how you printed it off. I
17 mean, I don't -- I mean, you just played a game on
18 the last document you gave me.
19     Q. Are you --
20     A. And then you said that there were no
21 numbers, and it's like, okay, there's the website
22 there that takes you to the phone number.
23     Q. Are you not going to --
24     A. Maybe you want to e-mail instead of call. I
25 mean, who knows?

49 (Pages 404 - 407)

1  Q. Are you going to look at this document or
2  not?
3  A. I'm looking at it.
4  Q. Okay. Thank you.
5  A. There you go. I looked at it.
6  Q. Do you see that there's a demand for $250
7  million?
8  A. I'm not -- I don't know -- I'm not
9  authenticating any of this here.
10  Q. So you don't know whether you sought
11  $250 million in damages in the case --
12  A. I know that -- I know that you guys should
13  pay dearly for this, and it's not about me, it's
14  about your arrogance, your refusal to take this down
15  and so that the people of my area and the people in
16  this country and the people in Sibley, Iowa, are not
17  harassed by you people again. And so -- but it's
18  ultimately up to a jury on what they decide to do,
19  but there's -- there's probably a billion hits on
20  this thing by now.
21  Q. So --
22  A. Because anytime somebody goes to Google,
23  they see your story.
24  Q. I'll ask you --
25  A. I mean, it's on Wikipedia.

1  Q. I'll ask you once again. How did you
2  calculate the $250 million you were seeking in the
3  lawsuit against Twitter --
4  A. I'm not getting in -- I'm not going to --
5  unless you're represent- -- are you representing Liz
6  Mair or Twitter?
7  Q. I am not.
8  A. -- in here?
9     You're representing Hearst. You asked me
10  about how I calculated the 75 million, I told you,
11  and I told you that that is not enough, that -- that
12  the only way that you're going to learn a lesson in
13  this and the American people and this country is
14  going to get fixed is if something -- you don't care
15  because you're one of the largest property owners in
16  this state, billionaires, you don't give a shit.
17     And you can go around and you can attack
18  people, you can accuse people of things, and then
19  your own experts admit that Steve Hearst doesn't
20  document his employees, Hearst Winery, your refusal
21  to give those documents up even though my family
22  produced all the documents. I mean, you're guilty as
23  hell.
24  Q. Are you done --
25  A. I mean, you ought to be -- you ought to

1  be -- you ought to turn yourself into ICE.
2  Q. Are you done?
3  A. No. I can keep going.
4  Q. Well, please don't.
5     All right. So are you going to answer the
6  question about how you calculated the --
7  A. I already answered your question.
8  Q. Which is you're not going to answer it.
9  A. No, that's not. You just said that. I told
10  you as it's relevant to this case, it's relevant to
11  the damages that you created and you continue to
12  cause, and I don't -- and at the end of the day, this
13  is what's most important. It doesn't matter what
14  calculation I came up with at the time because I
15  don't remember all the specifics. What matters is
16  what the jury in Northwest Iowa believes is right.
17     And what I would tell -- you know, what I
18  would explain to the jury is that I think it's really
19  important that -- that Hearst and Lizza understand
20  that this type of behavior in this country is wrong,
21  whether it's your defamation, whether it's your
22  slander, whether it's your intimidation of witnesses,
23  whether it's your doctoring of evidence, and you
24  should be looked at criminally by the Department of
25  Justice, quite frankly, for that. Were you the one

1  that did the intimidation of witnesses.
2  Q. How did you calculate --
3  A. But that jury needs to hear all of that
4  evidence and they have to decide, and whatever they
5  decide I'll be fine with.
6  Q. How did you calculate the $250 million --
7  A. I already -- I just answered the question.
8  Q. Are you going to provide any further answer
9  to that question?
10  A. I answered it fully, more than fully.
11  Q. Do you recall in April 2019 you sued
12  McClatchy along with Liz Mair and Mair Strategies for
13  defamation?
14     THE REPORTER: I'm sorry. Can you repeat
15  again.
16     MR. SITWALA: Sure.
17  BY MR. SITWALA:
18  Q. You sued McClatchy, the parent company of
19  the Fresno Bee, Liz Mair and Mair Strategies in
20  Virginia; do you recall that?
21  A. Yep.
22  Q. And you asserted defamation claims in that
23  lawsuit; correct?
24  A. Yep.
25  Q. And in that case you were suing over a story

50 (Pages 408 - 411)

1 that I think, as you characterized, it reported that
2 you were an investor in a winery that had been sued
3 for some civil rights violations?
4    A.  No.  You know exactly what it was.  So there
5 you go again with your bullshit.
6    Q.  Please tell me in your words, what is
7 that --
8    A.  Oh, you don't know what the story's about?
9 Ask me the question.  What's the story about?  You
10 know what the story's about.  Why are you playing
11 games here?
12    Q.  What's the story about?
13    A.  You ask me.
14    Q.  I just asked you.
15    A.  No.  You said what the story was about, some
16 nonsense.  You know what the story was about and
17 you're playing a game here on the -- you know exactly
18 what the story was about.
19    Q.  Which is?
20    A.  Why don't you ask it.  It's embarrassing.
21 What's the title of the story?
22    Q.  I don't -- I honestly don't know.
23    A.  Oh, you don't know?  You want me --
24       MR. BISS:  Come on, Ravi.
25       THE WITNESS:  You know exactly what it is.

1 You know that story, and you came with some bullshit,
2 oh, this is -- what is this about, some civil rights
3 dispute.  You're so full of it.  I mean, come on.
4 Ask the question.  What's the title of the story?
5 You don't know the story title?
6 BY MR. SITWALA:
7    Q.  What's the title of the story?
8    A.  Yeah, what is it?
9    Q.  I'm asking you.  I don't know.
10    A.  Well, you're asking some bullshit I've never
11 even heard of what you just said, but I'm familiar
12 with the story, I know about the lawsuit, I'm here to
13 answer your ques- -- answer your questions, and you
14 won't even say the title of the story.  And you make
15 up something that -- you obscure what actually really
16 happened by the way you -- by the way you're asking
17 the question instead of just asking me the question,
18 which would be appropriate and upfront, which is why
19 I don't trust you.
20    Q.  Okay.  I have the title of the story.  Is
21 the title of the story that you sued over, quote, A
22 Yacht, Cocaine, Prostitutes: Winery Partly Owned By
23 Nunes Sued After Fundraiser Event?
24    A.  There you go.
25    Q.  That's correct?

1    A.  That is correct.
2    Q.  And you sued because you believed that that
3 story and potentially that headline was defamatory?
4    A.  It was defamatory.
5    Q.  Okay.
6    A.  It was very similar to your story.  The only
7 difference was is that one was designed to come out
8 before the primary election.  And you guys have
9 coordinated very closely with McClatchy.  McClatchy
10 has covered -- they've been on all the calls with all
11 the -- every time you guys go and whine to the judge
12 and cry about how mistreated you've been, how you've
13 been mistreated, you have 27 lawyers, you got a --
14 you're one of the largest landowners here in
15 California, you've admitted that you're hiring
16 undocumenteds, you go and whine to the judge every
17 single time, and guess who's on the line?  McClatchy,
18 who conveniently wrote the hit piece that came out
19 timed when?  One month before the primary in 2018.
20 And then they got Lizza to then do the same thing
21 that you guys condoned, to go out to Iowa and harass
22 my family and do a hit piece a month before the 2018
23 election.
24    Q.  So is it your view that this piece, the
25 Hearst piece, was part of a -- some coordinated

1 effort to attack your reputation by multiple
2 different entities?
3    A.  She ad- -- Liz Mair admitted it.  She was
4 paid to defame people.
5    Q.  And you are saying that the Esquire piece
6 is --
7    A.  And Fusion GPS admitted that they did it.
8    Q.  Are you saying --
9    A.  And you won't turn over the -- Lizza won't
10 turn over the tax returns.  You went to the judge,
11 whining to the judge, we can't give over the tax
12 returns.  Give up the damn tax returns.  I gave up
13 mine.  I mean, I gave you three and then I had to go
14 find eight years' worth.  So you got any conspiracies
15 about that?  Have I been evading taxes too like you
16 accused my father of?
17    Q.  Are you saying that the Esquire piece is
18 part of this coordinated effort between Fusion GPS
19 and Liz Mair --
20    A.  No, I'm speaking directly to -- this case is
21 directly what's in the pleadings, which each one has
22 to be separated on their own, and your piece was
23 designed a month before the election to do maximum
24 damage to me.  And you then took it out on my -- you
25 used my family and then now you do nothing but harass

51 (Pages 412 - 415)

1  my family for now four years, four years you've
2  harassed my family, who was not involved in this at
3  all. All they wanted was the story taken down, and
4  now you're in here and you won't even talk about
5  yacht, cocaine, and prostitutes, 'cause it's so
6  ridiculous, just like Devin Nunes' secret that he's
7  hiding in Iowa.
8      Q. You had alleged that that McClatchy story
9  accused you of crimes; correct?
10     A. Yeah.
11     Q. What were those crimes?
12     A. I mean, as I recall, I have to go re-read
13 the story again, but obviously prostitution and --
14 and drug use is illegal in this country.
15     Q. Okay. And you sought $150 million in
16 compensatory and punitive damages; correct?
17     A. I don't remember the number.
18     Q. Do you recall how you came up with the
19 number for damages in --
20     A. I told you how I came up with the number in
21 your defamation, and so I'm sure it would have been
22 similar.
23     Q. And that is to basically look at how many
24 times the piece may have been published or how many
25 people --

1      A. Times used, whatever, but I can't speak to
2  the number. I just know that -- what that story is
3  about.
4      Q. Okay.
5      A. And I know that you guys coordinate closely
6  with McClatchy during this case to leak out
7  anything -- any hit piece you want on me 'cause you
8  tried to maximize the damage, not only after 2018 and
9  2019, but then after I sued you, you guys
10 conveniently coordinate with McClatchy and McClatchy
11 just seems to have all the information and, oh, wait,
12 where are they at? They're right in my hometown. So
13 they continue to take your crap and put it out every
14 single time. And you're coordinating with them and
15 you pretend you're not, but the only place they could
16 have gotten this from is you, unless your little
17 scumbag Lizza is going around and leaking to them.
18     Q. You know we've denied any of that
19 coordination in this case; right?
20     A. And you're lying.
21     Q. So you don't believe --
22     A. Well, either you or Lizza are lying.
23     Q. So you continue to believe that there is
24 this coordination.
25     A. You think there's not coordination between

1  what McClatchy is doing and that they just so happen
2  to get all this information every single time.
3      Q. So in December --
4      A. So I don't -- ook, it doesn't -- I don't
5  know that it really matters for the case, but, you
6  know, a jury will determine whether or not you and
7  Lizza -- Hearst and Lizza did this, you know, on -- a
8  month before the election to maximize the damage on
9  me. You did it with actual malice and it was
10 reckless and it was false and you knew it was false,
11 and you've hidden documents from me, you just played
12 another game with me. Anyway ...
13     MR. BISS: Steve, were you trying to say
14 something?
15     THE WITNESS: Steve, are you still there?
16     MR. BISS: Yeah, I'm here.
17 BY MR. SITWALA:
18     Q. All right. In December --
19     THE WITNESS: There was a weird noise; so I
20 didn't know, were you trying to talk?
21     MR. BISS: No, no.
22 BY MR. SITWALA:
23     Q. In December 2019 you sued CNN regarding a
24 report that somehow involved you with a former
25 Ukrainian prosecutor; do you remember that?

1      A. Yep.
2      Q. And you sought $435 million in damages in
3  that case; does that sound correct?
4      A. I don't remember the number.
5      Q. Do you recall how you calculated the amount
6  of damages you sought?
7      A. It would have been exactly some -- a similar
8  way. I don't know why you're so fixated on this.
9  I'm going to give you the same answer, and ultimately
10 it doesn't matter, you know, what -- ultimately the
11 only thing that matters here is what a jury is going
12 to decide, and then the jury will come up with that
13 calculation.
14     Q. So to hopefully speed things up, then, in
15 the cases you filed where you sought a certain amount
16 of damages, you used the same method of calculating
17 that in the complaint as you've talked about --
18     A. As I re- -- look, to the best of my memory,
19 that's basically -- you just look at all the -- but
20 that's why I want you to know that -- I mean, yours
21 now has far surpassed most of these.
22     Q. In March of 2020 you sued the Washington
23 Post about some statements that you were alleged to
24 have made to the President of the United States at
25 the time; do you recall that?

Page 420

1  A. Yes.
2  Q. And it had something to do with allegations
3 that you'd informed the President that there was an
4 intelligence official who had been giving a briefing
5 to Adam Schiff; does that sound right?
6  A. Vaguely.
7  Q. In that case you allege that the statements,
8 the defamatory statements, imputed criminal conduct,
9 dishonesty, deceit, and other acts to you.
10     What was the criminal conduct that you were
11 claiming was being attributed to you by those
12 defamatory statements?
13  A. That I was lying and would have caused the
14 same problems that your article caused, that I was
15 somehow unfit for the position that I held because,
16 once again, that was another lie, just like yours.
17  Q. Have you ever tried to distinguish between
18 the damages that the different publications that are
19 the subjects of your various lawsuits caused you?
20  A. I've never went and compared -- every
21 lawsuit is based on its own merits, they're all
22 separate, as you know, except for, you know, like you
23 brought up that Liz Mair might be a relevant witness.
24 But all these should be taken separately and
25 individually. But I think it's safe to say that

Page 421

1 there's not too many people that have had more fake
2 news like you guys participated in and slander and
3 defamatory -- you know, the only difference with you
4 is that you, like, personally went after my family.
5  Q. So you're saying that you've been the
6 subject of a lot of different negative and false
7 press.
8  A. Yeah, you didn't -- where's the one -- you
9 didn't bring up the -- you missed another lawsuit.
10 Are you going to keep going through them or are you
11 just --
12  Q. I wasn't, but I'm happy to talk about --
13  A. Oh, you just missed the one that we're in
14 discovery now with the Washington Post. I don't know
15 why you -- why you skipped over that one.
16  Q. Well, I was assuming you were going to tell
17 me that the damages you sought in that case you've
18 calculated in the same way.
19  A. I just thought you didn't want to talk about
20 it, because just like last time when you interrupted
21 the -- not you because you weren't the lawyer but --
22 until the Eighth Circuit brought you back to the
23 table. Because before you didn't want to -- you
24 wanted to hide evidence and then the Eighth Circuit
25 ruled but -- and then you conveniently didn't leave

Page 422

1 out the one where I'm in discovery with the
2 Washington Post, and I just want to make sure that --
3 you know.
4  Q. Let's talk about it. So that's the one
5 about the so-called midnight run; is that correct?
6  A. That's correct.
7  Q. And you filed that in November of 2020;
8 correct?
9  A. Yeah, 'cause much like you, it was
10 regurgitated. Much like what Lizza did, it was
11 regurgitated later, asked for a retraction, they did
12 a fake retraction, and, you know, that was -- you
13 know, obviously it's separate but also done to
14 maximize damage to me.
15  Q. And you have claimed in that case damages of
16 175 million plus 50 million in presumed damages.
17  A. I don't -- I don't know the number.
18  Q. How would you have calculated that number?
19  A. I mean, look, it's the number of -- it's
20 the -- the way that I view this is -- and I don't
21 even remember that in there so I'm not sure
22 that's correct, but it's basically looking at the
23 number of republications, the emotional harm, the
24 damage, the reputational harm, and how many times it
25 was replicated out into the wild.

Page 423

1     And then also with the fact that, you know,
2 you have in the -- in that case also, much like
3 yours, which is that this has gotten bigger and
4 bigger and bigger because of your actions after the
5 fact, which is the same thing with the Post, they
6 knew that story was bullshit and then they came back
7 and they re-ran the story and then when they were
8 told about it and then they corrected it to make it
9 even worse. Instead of just retracting the whole
10 story that they knew was nonsense, they just did
11 basically like you did. You didn't retract and you
12 had ███████ go out there and put it out
13 there again.
14  Q. You're familiar with the website
15 devinnunes.com; correct?
16  A. That's my long-time website that I have,
17 yeah.
18  Q. And do you have -- do you maintain that
19 website yourself?
20  A. I mean, I don't -- now it's in transition,
21 but I think it's just a placeholder right now.
22  Q. And you're familiar on that website you
23 identify statements that have -- negative statements
24 that have been made against you for the past six,
25 seven years?

53 (Pages 420 - 423)

Veritext Legal Solutions

800-567-8658                                    973-410-4098

Case 5:19-cv-04064-CJW-MAR   Document 121-22   Filed 11/01/22   Page 53 of 69

App. 758

1    A. I mean, seems like it, yes.
2    Q. For example, you note on the site that
3 leftists have accused you of being a Putin stooge; is
4 that right?
5    A. It's not true, but that has been done, yes.
6    Q. It's been alleged.
7    A. Yes, it's been alleged.
8    Q. And it's been alleged that you've been asked
9 to your face whether you are a Russian agent?
10    A. Many times, yeah, thanks to you.
11    Q. And McClatchy has published a whole spate of
12 stories about various different ethical improprieties
13 against you; correct?
14    A. Correct.
15    Q. And you would say that the attacks against
16 you have essentially pervaded the mainstream media;
17 right?
18    A. That they've -- what do you mean, that
19 they've --
20    Q. That there have been attacks on your
21 reputation, you know, in all manner and form in the
22 mainstream media.
23    A. Yeah, I mean, I don't know your definition
24 of mainstream media, but basically corporate, big
25 corporate owned companies like Hearst have definitely

1 participated in this.
2    Q. And would you agree that other politicians,
3 typically Democratic politicians, have made
4 statements about you that were bad for your
5 reputation?
6    A. Well, what happens is you guys write the
7 stories and then they regurgitate them. So it starts
8 with you, you put the poison out there, you plant the
9 seeds of the poison and then it lets others pick it
10 up.
11    MR. SITWALA: Okay. I think we have to take
12 a break in order to put a new tape in. So let's take
13 ten minutes, and then we'll start off again at 1:40.
14    THE VIDEOGRAPHER: This is the end of Media
15 Number 3. We are off the record at 1:31 p.m.
16    (Recess taken.)
17    THE VIDEOGRAPHER: This is the beginning of
18 Media Number 4. We are on the record the 1:46 p m.
19 BY MR. SITWALA:
20    Q. Thank you, Congressman.
21    So I am going to hopefully talk about the
22 last couple of lawsuits I want to talk about, other
23 lawsuits, two related ones which I will call, for
24 lack of a better term, the fake farmer lawsuits.
25    Do you recall that there was a lawsuit filed

1 in August 2018 against you that was challenging your
2 designation on the 2018 ballot?
3    A. I sure do.
4    Q. And you will recall that you or your
5 campaign filed essentially a countersuit based on
6 that effort.
7    A. I don't remember the particulars, but I
8 remember the -- I remember the accusations and the
9 attacks.
10    Q. And the attack was more or less that you
11 were misleading your constituents by calling yourself
12 a farmer when, in fact, you hadn't been a farmer
13 since 2007; is that a fair characterization?
14    A. No, it's not a -- those are accusations, but
15 this is why it was so ridiculous what you guys --
16 what Lizza did and what you guys did is you actually
17 built upon that narrative to then say that -- you
18 combined it to then say actually, he has a secret
19 farm and he's been secretly farming in Iowa this
20 whole time.
21    Q. Well, which in some ways would be
22 contradictory to what they were saying; right?
23    A. Yeah, well, that was an issue of somebody
24 was paying them, probably the same people that were
25 paying Lizza.

1    Q. And --
2    A. And Liz Mair.
3    Q. And would you say that these fake farmer
4 accusations that were being made by that lawsuit, by
5 the people bringing that lawsuit, were widespread?
6    A. I mean, not widespread like your
7 accusations.
8    Q. It was picked up by social media; right?
9    A. Yeah, but not like -- not like this.
10    Q. But your campaign did file a lawsuit in 2019
11 over the allegations; right?
12    A. I don't remember the year but -- as I told
13 you, if you conduct yourself dishonorably, you break
14 the law, defamation or slander, my only way to get my
15 reputation back is to file a lawsuit. There is no
16 way because, like you, it's still living here for,
17 you know, what is this, year five that this is in now
18 that you still have it up. People are viewing it
19 right now, they're clicking on the site, watching the
20 video.
21    Q. And would you say that this fake farmer
22 attack was a coordinated attack between social media
23 and media entities like the Fresno Bee?
24    A. I don't -- I don't remember -- I don't
25 remember specifically, no. I just remember it was

54 (Pages 424 - 427)

1 clearly you had dark money coming into this region
2 and -- and that was what -- I think that case is a
3 little different because it was trying to figure out
4 who was funding people like this that were doing --
5 involved in defamatory and seemed to have plenty of
6 money to splash around, kind of like you guys with
7 Lizza.
8     Q. And then in August of 2019 you filed a
9 report -- financial disclosure report which discloses
10 a farm in Tulare that's worth somewhere between 1,000
11 and 15,000 dollars; does that ring a bell?
12     A. I'd have to look at my disclosure report.
13     Q. Do you own a farm now in Tulare County?
14     A. Well, what I'm doing is I'm making my
15 own -- I'm experimenting with my own wine is what I'm
16 doing.
17     Q. So are you growing grapes?
18     A. I'm buying -- I'm sourcing grapes.
19     Q. And is that the farm that's disclosed in the
20 disclosure statement?
21     A. As far as I -- yeah, that would be what --
22 yeah, that would be what I would be doing.
23     Q. So you're sourcing the grapes, and then what
24 are you doing with them?
25     A. I'm experimenting with wine. I'm trying to

1 get my wine license. I'm in the process of that
2 right now.
3     Q. Okay. And so for the moment you're making
4 wine, essentially, for --
5     A. I'm having -- I'm going through the proper
6 channels, but I'm experimenting to try to -- with
7 some different varietals to try to make something
8 that I've been working on for a long time.
9     Q. What would you say your favorite varietal is
10 at the moment?
11     A. I'm not sure why that's relevant but --
12     Q. Probably isn't. I'll give you that one.
13 I'll let you go on that one.
14     Did you buy the farm in Tulare to fend off
15 of these allegations about the fake farmer or were
16 they unrelated?
17     A. No, I'm just -- I'm getting back into -- I
18 was actually going to get back, start doing this
19 project in 2017, and then I couldn't do it because of
20 all the attacks. And, of course, you guys added on
21 in '18 and so it postponed my ability to start
22 working on this project, and I finally started it
23 last year, whenever it was.
24     Q. Okay. Would you agree that currently the
25 political climate is very polarized?

1     A. I guess, generally speaking, maybe.
2     Q. And it was already this way in 2018?
3     A. Well, no. You guys have made it much worse.
4     Q. Would you say it was already bad then?
5     A. For me, I mean, in '16 it wasn't bad at all.
6     Q. Okay.
7     A. I mean, it was bad but not -- I mean, you
8 weren't accusing people of being Russian agents, you
9 weren't accusing people of having secret farms and
10 breaking laws in other states that you have nothing
11 to do with. So it's what you guys did working with
12 to replicate this stuff on social media that is
13 causing the damage. You make up fake stories, you
14 smear people, and in my case, in this particular
15 case, you use my family as a pawn, which, you know, I
16 won't say much good about the other cases, but at
17 least they didn't do what you and Lizza did and go
18 out and stalk my nieces ████████.
19     Q. So would you say that --
20     A. And my grandmother and my uncles and, you
21 know, every Nunes family in Tulare.
22     Q. Would you say that by 2018 that many people
23 were reflexively demonizing Republicans?
24     A. I don't know. I mean, people are always
25 doing that. When I was at the -- for me, I mean, it

1 happened -- you did it in '18 right before the
2 election.
3     Q. And did it happen -- did you feel like
4 people were demonizing you after you were seen as
5 someone who was an ally of Trump?
6     A. No, that's what your scumbag reporter said.
7     Q. Nobody had said it before that?
8     A. The reason that he was -- he was being paid,
9 as were you and you guys knew what -- you were fully
10 aware of what you were doing, you guys were fully
11 bought in to what is the biggest scandal in history,
12 that you labeled a presidential candidate, you caused
13 investigations to occur on dozens and dozens of
14 people, you broke people's lives, and I unearthed it,
15 which is why you and Lizza and your people wanted to
16 destroy me.
17     Q. And not just -- not just them but many
18 people.
19     A. Oh, I don't think there's too many people
20 that have faced more defamation and slander than
21 me --
22     (Overlapping speakers.)
23 BY MR. SITWALA:
24     Q. I'm sorry. That's not what I mean. I meant
25 there were many people out to destroy you.

1    A.  With you being at the centerpiece of it,
2 especially in '18 at the time of this story.
3    Q.  Would you say that many people recognize
4 that the media has a liberal bias?
5    A.  I don't think that's -- I mean, I think
6 that's just evident in the polling that I've seen.
7    Q.  People believe --
8    A.  But they also don't trust you guys and they
9 don't trust you because of the shit that you've
10 pulled for the last five years with this -- with this
11 hit piece.
12    Q.  They think we're fake news.
13    A.  No, they -- they know that it's poison and
14 it does damage to people; so some people know that
15 it's fake but -- but it doesn't matter.  You put it
16 out there and people believe it and then you have to
17 explain it.  Then, you know, initially what happens
18 is is these pieces come out, they're taken as real,
19 then you have to try to defend yourself, like in my
20 case I have to go to court to try to get you to pull
21 down the story, you won't pull it down, so then it
22 replicates out there.
23       So I've already given you example after
24 example of how this case has just lived in infamy, it
25 just keeps going and going and going, it doesn't

1 stop.  And it's because you guys are the way -- part
2 of the reason why is because you didn't take the
3 story down and you -- the way you've been litigating
4 this case, it's -- it's shameful.
5    Q.  You recently provided -- well, your counsel
6 recently provided a document that set forth your
7 damages calculation and explanation.  Are you
8 familiar with that document?
9    A.  Yeah, so I don't understand.  I thought that
10 had been done.  We spent an hour, 30, 40 minutes
11 going through this, you kept asking me about this,
12 and once again, you know, it's nice and sneaky, but
13 you knew that I had already provided that to you.  So
14 we provided to you in detail how these calculations
15 were made.  I don't have it in front of me.  I told
16 you that at the outset of this and walked -- I tried
17 to walk you best through it when you have the damn
18 document the whole time.  And you acted like -- now
19 you're -- and you act like you didn't even have the
20 document.
21    MR. SITWALA:  So I'm going to mark what will
22 be DX144.
23    (Defendants' Exhibit Number DX144
24 marked for identification.)
25    MR. SITWALA:  Here you go.

1    Steve, this is the Amended and Supplemental
2 Rule 26(a)(1) Disclosures dated August 25th, 2022.
3 And Nate can send you a copy, but you obviously have
4 one.
5       Now, are you all right with me -- do you
6 have it in front of you or do you want to wait until
7 you get the one we're sending you?
8    MR. BISS:  Go ahead.  I know the document.
9 BY MR. SITWALA:
10    Q.  I'll ask you to turn for me --
11    A.  I'm going to tell you, I don't know -- I
12 can't authenticate this document.
13    Q.  That's fine.  It's --
14    A.  I would have to read the whole document, and
15 if you're going to -- look, if you already had this
16 document for the last 45 minutes, we've been doing an
17 exercise in futility where you've been playing a game
18 again just like your phone numbers.  So you had this,
19 you asked me the questions how do you calculate it,
20 you already knew how I calculated it.  Why did you
21 waste an hour doing this?
22    Q.  So are you telling me what's in this
23 document is all of the information --
24    A.  I don't know.  I'd have to re-read the
25 document.  It's been a long time.  I know basically I

1 described to you, but what I don't like is that
2 you could have provided this document to me, you
3 could have asked about it, but then instead you're
4 springing it on me, but you spent an hour in a lead-up
5 as if you're, like, going to play Perry Mason or
6 something and say, oh, gotcha, when you had.  And I
7 told you at the outset, I said I think you have this,
8 and you didn't disclose to me an hour ago that you
9 had this.  And then you wonder why I won't
10 authenticate anything.  You don't remember -- I guess
11 we can go back in the transcript, but I'm pretty sure
12 I said I'm pretty sure we provided this to you.  And
13 you sat there, he's sitting on it, you know you have
14 it, you play a game for an hour, you take these
15 people's time -- I guess they get paid so they don't
16 care, but you waste all this time to then say, oh,
17 have you seen this document.  I said I just told you
18 about this document an hour ago --
19    Q.  I'm fine with you --
20    A.  -- and you didn't tell me -- you didn't tell
21 me you had it.
22    Q.  I'm fine with you being rude to me.  I'd ask
23 you not to be rude to the --
24    A.  I'm not being rude to them at all.  I feel
25 sorry for them to have to sit through this.

Veritext Legal Solutions

Case 5:19-cv-04064-CJW-MAR   Document 121-22   Filed 11/01/22   Page 56 of 69

App'x 761

1    Q.  I do too.
2    A.  I was actually apologizing to them for
3  your -- to -- you know, that we're even here.
4    Q.  So in this document you talk about
5  cultivating a stellar reputation over 20 years of
6  public service; does that sound right?
7    A.  Look, if you want me to take and review the
8  document, I'll take time to review the document, but
9  I'm not going to get into specifics on something I
10  haven't read that you could have given me an hour
11  ago.
12    Q.  Does that statement sound right to you?
13    A.  Repeat the statement.
14    Q.  Sure.
15        Devin Nunes cultivated a stellar reputation
16  over almost 20 years of public service.
17    A.  I would agree with that.
18    Q.  Okay.  And --
19    A.  I'm sure you don't, but that's okay.
20    Q.  As evidence of that, the next line notes
21  that at the time the defendants published the hit
22  piece in September 2018 you were chairman of the
23  House Permanent Select Committee on Intelligence.
24        Does that seem right to you?
25    A.  Are we going to go through this for the --

1  you've asked me this same question now three times
2  today.
3    Q.  What I'm asking is that you would agree that
4  is evidence of your stellar reputation; correct?
5    A.  I'm not going to speculate without reading
6  this document.
7    Q.  I'm not asking whether --
8    A.  I was the chairman of the House Intelligence
9  Committee, yes.
10    Q.  And that is evidence of you having a stellar
11  reputation; right?
12    A.  That you destroyed.
13    Q.  Having that -- having that post was evidence
14  of your stellar reputation; correct?
15    A.  You have to be supported by your colleagues
16  to be in that position, which you guys tried to get
17  me taken out of that position --
18    Q.  But that's a yes.
19    A.  -- by accusing me of federal crimes.
20    Q.  Is that a yes?
21    A.  On -- what, that it's in a position that is
22  a -- that you have to have a good reputation to hold?
23    Q.  Correct.
24    A.  Absolutely you have to have a good
25  reputation to hold.

1    Q.  Now, in this document you talked about
2  suffering public shame, ridicule, insult,
3  humiliation, embarrassment, emotional distress and
4  mental anguish, anxiety, insecurity, and then fear of
5  safety for your family members and that the remarks
6  reached many other people, and I just want to break
7  that down.  I know we've gone through a lot of this
8  and so I don't want to go through it again, and so
9  I'm just going to ask some -- just for each one.
10        In terms of the publish shame, is that
11  basically what we went through earlier?
12    A.  So there's -- there's different levels of
13  it.
14    Q.  Okay.
15    A.  So you have from the -- you have the people
16  in this area that had -- where the people that
17  believed this crap, you have people in -- around my
18  family in Iowa, and of course you have the people
19  that I worked with, and then you had on top of that,
20  then, this story in particular lives because people
21  see it all over the place and it's one of the first
22  things you see because it sits there on Wikipedia.
23        So I have to deal with this story, as I gave
24  you the example of getting introduced places where
25  people think that I have some farm in Iowa, and if

1  you look at it, it's controversial because you accuse
2  me of federal crimes.
3    Q.  So -- and I think we went through that
4  already.
5    A.  We did.
6    Q.  So I'm just asking --
7    A.  So I don't know why you're going through
8  this but ...
9    Q.  So that is -- what we talked about, that is
10  the public shame you're referring to in terms of your
11  damages; correct?
12    A.  That would be one example of it.  I'm sure
13  there's more.
14    Q.  Are there more we didn't talk about?
15    A.  I'm not going to speak in absolutes because
16  I may come up with something else.
17    Q.  Okay.  But sitting here --
18    A.  I mean, it's pretty shameful that I had to
19  deal with my grandmother and all of that mess that I
20  walked you through.  Do you want to hear that again?
21    Q.  No, I mean, you've already told me.
22        So I'm saying sitting here now, are there
23  things you haven't told me that you can recall?
24    A.  Let's just keep going and then we'll see if
25  we can -- and then I'll let you know.

Veritext Legal Solutions

Case 5:19-cv-04064-CJW-MAR   Document 121-22   Filed 11/01/22   Page 57 of 69

App. 762

1    Q. Okay. So what about ridicule? I assume
2 that -- and I don't want to assume. Is the ridicule
3 the same -- the same kinds of things we talked about?
4    A. Well, the ridicule would be the people -- I
5 think the best example of ridicule would be the
6 people that continue to this day to bring this up and
7 post the little cartoon pictures and all that that
8 they do all the time.
9    Q. Okay. Anything else?
10    A. I'm sure there is others, but that's the one
11 that comes to the top of my mind right now.
12    Q. Okay. And what about insult?
13    A. I mean, do you want me to go back through
14 this?
15    Q. Well, I mean, I guess it sounds -- I believe
16 we've already gone through it, and I just want to
17 make sure I'm not missing anything.
18    A. I think the record will show that I've been
19 insulted plenty, including by you by dropping these
20 documents on me.
21    Q. And the record you were talking about is the
22 record in this deposition where you walked through
23 all of the things you went through after these
24 publications.
25    A. Yeah. But I'm telling you that there's more

1 because I remember, you know, as I was preparing for
2 this deposition, you know, I had -- and I had totally
3 forgot about, you know, the time that you did the hit
4 piece and the timing and I was trying to remember who
5 had relevant information, and that's when I
6 remembered -- you know, I recalled what happened. So
7 I'm saying there could be more information that comes
8 up, which I'll supplement to you or I'll tell you
9 today if it comes to my mind.
10    Q. You can only tell me what you know now. I
11 understand that.
12    So is there anything else right now that you
13 want to add to it?
14    A. On the issue of which --
15    Q. Humiliation.
16    A. Of humiliation? I mean, look, it's -- it's
17 humiliating for my -- the thing we haven't talked
18 about is that my -- you know, that my family has to
19 deal with this, like my direct -- my -- you know,
20 like this morning I'm leaving, you know, and I've got
21 to tell my daughter that I'm going to a deposition,
22 which, you know, makes her -- makes it sound like her
23 father did something wrong.
24    Q. Okay.
25    A. So, I mean, it's -- it's pretty -- you know,

1 it's every level, like I explained to you. But
2 that's probably the, you know, some of the worst.
3    Q. And in terms of embarrassment, is there
4 anything different in addition to with respect to
5 what we already talked about?
6    A. I think that -- I don't know if you -- we
7 haven't glossed over -- I don't want to gloss over
8 that, you know, how embarrassing it is for my family
9 that when all those -- when you sent your buddies at
10 CNN around to every Nunes family in this county, so
11 that's pretty damn bad that was spurred by your
12 story.
13    Q. I think we've gone over that. Is there --
14    A. Well, I don't know that we have because I
15 think that continues to be -- I don't want to gloss
16 over that because it's significant that it continues
17 to like -- you know, I still have the issue where I
18 can't -- I mean, I'm out of office now, but I
19 don't -- I can't even go -- after your story, I can't
20 even go back to -- you know, I never -- you know, my
21 uncle doesn't want me around to -- you know, for
22 what -- historically I would go there, you know, I'd
23 go to the original farm and I would take, you know,
24 people and give them a tour of the farm, I'd take
25 ambassadors, diplomats, government officials, people

1 in the media, what have you, and numerous others, I
2 would take them there, and now that doesn't happen
3 anymore, which is -- which is pretty damn bad.
4    And then every time I see the other Nuneses
5 in the area they, you know, of course bring it up,
6 they bring it up to my uncle and pisses him off, as
7 it should. But, you know, I just had -- you know, I
8 still have people come to visit me and I'll have them
9 over to my house but -- you know, where I used to
10 take them out and -- you know, 'cause a lot of people
11 that come here, if they've never been around a farm
12 before, they'll want to go see it, well, kind of
13 sucks that I can't take anybody out there any longer.
14    Q. Okay. Anything else?
15    A. I'm sure there's more, but go ahead.
16    Q. There's nothing you can think of right now?
17    A. I mean, I don't like to speak in absolutes
18 here. You keep trying to draw me into that.
19    Q. I just --
20    A. I've given you a lot, but I'm sure I could
21 come up with more, just like I could probably think
22 through and come up with additional names.
23    Q. I guess I'll ask you right now, can you
24 think of anything or no?
25    A. You can go on to the next -- whatever your

Veritext Legal Solutions

App. 763

1 next adjective is there.
2    Q. Emotional distress and mental anguish, and
3 we -- I don't think we've talked about this quite as
4 much. If you could, just walk me through what the
5 emotional distress and anguish that the article has
6 caused you.
7    A. I think we have covered this, but I walked
8 you through at the beginning of this when that
9 happened, you had the initial hours and hours and
10 hours, and then you had -- that I had to respond to
11 this, completely derailed my campaign for reelection
12 where we spent all kinds of time on this issue
13 because I had everybody under the sun reaching out to
14 me. So, yeah, I would say that's emotional distress.
15    Q. Okay.
16    A. And then -- and then you have -- and then
17 you brought it back again in -- you know, during the
18 impeachment.
19    Q. Okay. Anything else?
20    A. You want me to go back through and --
21    Q. No, no, no, no --
22    A. -- again and tell you all the --
23    Q. -- I don't.
24    A. -- all the bullshit you guys have pulled
25 against my family in the course of this case, I will.

1    Q. I'm saying anything you haven't already gone
2 through today.
3    A. Okay.
4    Q. So not right now?
5    A. Not right now.
6    Q. Have you sought treatment for any kind of
7 mental anguish or distress over this article from a
8 medical provider of any kind?
9    A. No.
10    Q. Have you sought any kind of counseling --
11    A. No.
12    Q. -- or therapy?
13    A. No. Like official therapy, no.
14    Q. Okay. Have you visited a doctor at all in
15 the past four years?
16    A. I mean, just like a clinic to -- I mean, I
17 had COVID.
18    Q. I hope you are doing okay now.
19    A. Yeah, it was a couple years ago.
20    Q. Okay.
21    A. But I didn't visit a doctor, but I had a
22 prescription or something.
23    Q. Have you visited a doctor for like a sort of
24 a regular checkup at all over the last --
25    A. I mean, just the -- the -- the Navy doctors

1 that come through the Capitol was how we got our
2 health care.
3    Q. Okay. Have you sought treatment for any
4 particular condition other than, you know, the COVID
5 and your regular checkups in the last four years?
6    A. Well, I don't think I really had regular
7 checkups that I can be sure of, but just kind of like
8 if you've got a sore throat you go in, get a
9 prescription, you know, get strep throat or -- you
10 know, I don't know. I didn't have strep throat. I
11 had swine flu, like, 12 years ago.
12    Q. All right. Let's stick with the four years.
13    So have you sought treatment for anything
14 other than the COVID and sort of regular, you know,
15 sore throat kind of maladies over the last four
16 years?
17    A. The only thing I would have is that I have a
18 breathing -- 'cause at night sometimes I'll stop
19 breathing.
20    Q. Okay. Is that apnea or something?
21    A. Yeah.
22    Q. And is that just regular treatments you get
23 for that?
24    A. Yeah, just like a CPAP machine.
25    Q. Okay. And how long have you had that

1 condition?
2    A. Well, probably for a long time.
3    Q. Like dozens of years?
4    A. I don't -- I don't know. I mean, more
5 than --
6    Q. More than that --
7    A. Your story was bullshit, but it probably
8 didn't cause sleep apnea.
9    Q. Okay. Thank you.
10    Do you have a regular doctor you see?
11    A. No, not -- I mean, I used to just get the --
12 kind of the -- use the medical clinic in the Capitol.
13    Q. Okay.
14    A. And so -- you know, and I've got a doctor
15 here, but I haven't -- that I know that I haven't
16 been to him.
17    Q. Okay. Did you ask the Capitol for your
18 medical records?
19    A. I don't think I would have -- I don't
20 think they -- I don't even know what they would have
21 there.
22    Q. Okay. So you didn't ask, but you don't
23 think they would have any.
24    A. I can't imagine they would. I mean, you
25 have a sore throat -- well, I don't even think --

59 (Pages 444 - 447)

1 they didn't even prescribe the COVID stuff so ...
2    Q. Tell me about any anxiety that you've
3 experienced because of the article.
4    A. Well, I would say back -- it's what I
5 already explained to you --
6    Q. Okay.
7    A. -- about the -- specifically what -- I mean,
8 it's getting a call from your father that there's
9 somebody around them, which I think I said that in my
10 last deposition, didn't know who it was, and then
11 found out who it was, had no idea why he was there,
12 had no idea who was paying him because I figured that
13 nobody would hire a guy like that. But obviously,
14 you know, that was when it first happened, that was
15 before the story was even written, so from that point
16 now, I mean, you've got -- you've got the risk of
17 that you always have people now that are -- it's
18 pretty bad when you have antifa, I know you guys
19 probably support them, but they show up at -- they
20 show up at your -- at your family's farm. Some guy
21 leaves from here and drives all the way back there,
22 there's an arrest warrant out for him, and he shows
23 up, you know, harassing my family out on their farm,
24 and the only reason he would know about that is
25 because of you. So, yeah, I guess that would qualify

1 as anxiety from the starting point when you first
2 sent the scumbag out to harass my family to today.
3 And also the fact I'm sitting here answering
4 questions from -- that you already had a chance to
5 ask me where you cut the deposition short.
6    Q. You understand that there were some phone
7 records produced in this case, correct, recently? Or
8 maybe you don't.
9    A. I think we gave you everything there was.
10    Q. Okay. Did you do any kind of search in
11 terms of trying to obtain your own phone records?
12    A. What was I think decided was that the
13 records would be provided. You wanted conversations
14 on -- between my dad and I and, I don't know, Steve
15 King and, I don't know, what other conspiracy theory
16 you guys have.
17    Q. So did you then collect your records in
18 order to identify those conversations?
19    A. I mean -- well, what happened was is we -- I
20 think you received all the phone records from my dad
21 and my brother and the farm on the dairy.
22    Q. Okay.
23    A. Or the phone on the dairy.
24    Q. So we received their records which would
25 reflect their discussions with you because --

1    A. Well, I don't have any secret phone that I
2 would -- that I would have that wouldn't be -- that
3 wouldn't show up, that wouldn't show up on their
4 records.
5    Q. Sure.
6    So if you talked to them, their records
7 would show it.
8    A. Right.
9    Q. Okay. And we looked through the records and
10 we had records, I think, from January '21 through
11 June '22, and so it looks like over that 18-month
12 span there were about little over 850 phone calls
13 either with your father or brother.
14    Does that sound reasonable to you?
15    A. I wouldn't have a -- I wouldn't have a clue.
16    Q. You talked to them frequently; right?
17    A. I talked to my dad. I mean, I talk to my
18 brother now --
19    Q. Well, let's break it down.
20    A. -- not very often. I mean --
21    Q. Let's stick with your father. You speak
22 with him quite frequently, almost every day; right?
23    A. Yeah. Probably, yeah.
24    Q. Sometimes multiple times a day.
25    A. Well, a lot of times it's -- probably a lot

1 of those phone calls are where I would guess is
2 that -- 'cause this happens, he'll call me, I don't
3 answer or I'll say, look, I've got to call back or
4 I'll call him and he's doing something, or he's
5 trying to get ahold of my daughters or, you know, I
6 mean, that's -- 'cause if he's in -- well, even when
7 he's here, but when he's in Iowa he would be, you
8 know, checking in with the family, and then when he's
9 here he would be coordinating, you know -- I mean, my
10 grandmother did pass away so he was out here, so
11 there was probably a lot of calls then.
12    Q. Okay.
13    A. But, yeah, typically talk to him a few times
14 a week.
15    Q. And that's been true for many years;
16 correct?
17    A. I mean, I don't think -- probably sometimes
18 when I'm busy it's probably less, but if there's
19 family stuff going on or -- you know, he'll call
20 usually on the weekend to talk to the kids or my mom
21 will use his phone to talk to the kids on FaceTime
22 because we don't really use the home phone.
23    Q. Okay. And you just brought up FaceTime. Is
24 that something you use frequently with your family?
25    A. Yeah, I mean -- well, not with me. I use it

Veritext Legal Solutions

800-567-8658                   973-410-4098

1  with my daughters.
2  Q. But not with your father or your brother?
3  A. Well, my father uses it with my -- and my --
4  or my father and my mom use it with my daughter.
5  Q. Sure, sure.
6  And you're not part of those conversations?
7  A. I mean, I'm there when they --
8  Q. Sure.
9  A. -- they may call -- they may FaceTime my
10  phone and then they -- then I put them on the phone.
11  Q. Yeah, okay. I think we -- those of us who
12  have, you know, our kids and parents I think are
13  quite familiar with what you're describing.
14  A. Um-hmm.
15  Q. So would it be fair to say that at least
16  with your father going back let's just say 2016, you
17  talked to him frequently, often multiple times a
18  week?
19  A. I would -- I mean, I don't think it's
20  changed. I mean --
21  Q. Okay.
22  A. -- other than there's probably, you know, a
23  few additional calls with my grandmother, there's
24  probably a few additional calls with, you know, your
25  harassment, but I would say that -- I mean, I

1  remember the calls specifically, like I've testified
2  already to.
3  Q. Sure.
4  A. Because I remember distinctly he called and
5  said, hey, I've got this weird car driving around our
6  place, he's been driving around all day, he's been
7  going to other people's farms. Ended up the next day
8  he calls me and says you remember that car and the
9  guy came to my house, he was parked outside my house,
10  and then he was parked outside my niece's house, he
11  was stalking them and then he confronted them. And
12  then found out who he was, and that's when I said,
13  you know, like, my God, that guy's really bad news,
14  he got fired from everywhere, I don't think he has a
15  job. But --
16  Q. And you've already talked about that.
17  A. -- you guys thought he was great so you guys
18  hired him.
19  Q. Now, would you say that your -- you talk to
20  your father more than anybody outside of your
21  immediate family?
22  A. I talk to my mom. I don't know.
23  Q. Okay.
24  A. I mean, I talk to my brother occasionally.
25  Q. How often do you talk to your brother?

1  A. I don't know. Probably two or three times a
2  month.
3  Q. Okay. And that's been true going back to
4  2016?
5  A. Well, I think it would be true going back to
6  even --
7  Q. Sure.
8  A. -- even when they -- before they left
9  Iowa --
10  Q. And what do you --
11  A. -- when they were in California.
12  Q. And when you speak with your father, do you
13  talk about the business and farming?
14  A. We talk about -- I mean, over the years we
15  would talk about the -- you know, kind of -- as it
16  relates to, you know, my work and then what I was
17  doing, and specifically it would have been about -- I
18  mean, mostly about water issues, I would guess. If
19  you're asking me relative to farming, that was what
20  we'd talk about.
21  Q. Like different challenges or always water?
22  A. It would be mostly water, probably prices of
23  stuff because I would get that around here, you
24  know, 'cause the -- I would have a lot of meetings
25  around here with farmers so -- you know, as it

1  relates to farming or agriculture, that would be the
2  gist of what we would talk about.
3  Q. And would you -- you text with your family
4  too; right?
5  A. No.
6  Q. You don't?
7  A. I don't think so, not that I know of. I
8  mean, maybe a picture, I don't know, sending them a
9  picture, but I don't have any texts.
10  Q. Okay.
11  A. Maybe a phone number or something but, no, I
12  don't text with them. I mean, not on a -- not on
13  a -- like, we don't have, like, text chains or
14  anything like that.
15  Q. What do you have?
16  A. I mean, it would be like something like --
17  Q. A camera --
18  A. -- a picture.
19  Q. A picture of the kids.
20  A. Right.
21  Q. Okay. How long have you known Congressman
22  Steve King?
23  A. Since he came into Congress.
24  Q. And do you know approximately when that
25  might have been?

61 (Pages 452 - 455)

1   A. I think he came in the same year I did.
2   Q. 2010?
3   A. No, 2002 we were elected.
4   Q. Oh, sorry.  2002, okay.  So in and around
5 2002.
6       And you've known him since then?
7   A. Yeah.
8   Q. Have you served on the same committees with
9 him ever?
10   A. I can't remember if we served together on my
11 first term or not when I was on the Agriculture
12 Committee.
13   Q. Okay.  Did you leave the Agriculture
14 Committee after your first term?
15   A. Yeah.
16   Q. And that's when you joined some of these
17 other --
18   A. The Ways and Means Committee.
19   Q. Okay.  Have you ever worked with him, as you
20 recall, on any legislation?
21   A. No.  But it doesn't mean there's not, but
22 it's possible.
23   Q. Sure.
24   A. I have no idea 'cause there's thousands and
25 thousands of bills; so I don't want you to, like,

1 take -- oh, you had a bill in 2008 that said this and
2 you guys co-sponsored it, so I don't want you to take
3 that out of context.  It is possible that we were on
4 the same piece of legislation together, but I have
5 no -- I would not know what that is and I would not
6 remember it.
7   Q. And how often would you say you interacted
8 with him while the two of you were in office
9 together?
10   A. I mean, he knew that I was -- he knew my
11 family went to -- I think I -- I must have talked to
12 him before my family moved to Iowa.  I did a couple
13 events for him, they were public, where he talked
14 about -- matter of fact, I think my niece had just
15 been born at one or a baptism or something, and I was
16 able to -- then I did a town hall for him that was
17 widely publicized in that part of the world and
18 talked about my family being there publicly.  There
19 was -- in that Sibley -- south of that Sibley area.
20 And he announced to everybody that, hey, Devin Nunes'
21 niece was born here, and I think I made the joke that
22 this was the first -- she was the first Nunes born
23 outside of California.
24   Q. Wow.
25   A. So that was -- so that was, you know,

1 announced at his event, which is why it was so
2 preposterous, your story that you wrote, because
3 nobody was hiding anything, and that was back in, I
4 don't know, 2008 or something.
5   Q. And you said you must have talked to him
6 before your family moved to Iowa.  Why do you think
7 that?
8   A. Well, I did talk to him, but I'm pretty sure
9 I would have talked to him just like with Tom Latham,
10 I would have talked to him about -- about that area.
11 Well, I know I even talked to him before because I
12 had done events out there.
13   Q. Okay.  But you would have talked to him
14 about the area because you were interested in --
15   A. But I would have talked to him about the
16 area even before that because I had been out there.
17 So, I mean, typically, I mean, I could do this for
18 basically every state but -- or not every state but
19 most of the states where you go out, you speak at an
20 event, you do a town hall for people, you do -- you
21 talk to people.  And I know that in that part of Iowa
22 I had been several times before my -- before my
23 family even moved there.
24   Q. And did you -- did you ever talk to him on
25 the phone?

1   A. Not that I know of.  I mean, I think -- I
2 think maybe I might have talked to him when that
3 hit piece -- when your hit piece came out.
4   Q. Do you recall what he might have said then?
5   A. I mean, just that, I mean, he knew it was
6 nonsense.
7   Q. And do you still talk to him ever?
8   A. I mean, he left Congress so I haven't talked
9 to him since he left, but I talked to him up until he
10 left in 2020.
11   Q. And did you look at your own phone records
12 for any calls with him?
13   A. Yeah, I don't have any calls with him.
14   Q. Do you still use Twitter?
15   A. I just review it.  I don't -- I don't post.
16   Q. And why is that?
17   A. What's that?
18   Q. What's that?
19   A. Why don't I post?
20   Q. Yeah, yeah.
21   A. Because it's a sewer --
22   Q. Okay.
23   A. -- and I think it's a horrible company and I
24 think they're -- I think they've been very
25 destructive, they sensor, they shadowban and

62 (Pages 456 - 459)

1 everything else, but they love to promote your stuff,
2 so lots of replications of your stuff.
3     Q.  And --
4     A.  I can probably find one right now if you
5 wanted me to look.
6     Q.  Does --
7     A.  Probably in the last few days.
8     Q.  What about on Truth Social, is the story --
9 the Esquire story --
10    A.  I've seen the -- that's what reminded me of
11 this.  I've seen the little cartoons on Truth Social
12 somewhere.  I should have taken a screenshot of it.
13        So people that hate me love to go and post
14 stuff and they use -- I think they use -- I think
15 it's this picture, one of these pictures.  I think
16 it's that one right there.
17    Q.  Do you know anybody named John Reelhorn?
18    A.  John what?
19    Q.  Reelhorn, R-e-e-l-h-o-r-n.
20    A.  R-e-e-l-h-o-r-n?
21    Q.  That's correct.
22    A.  No.
23    Q.  Okay.
24    A.  Not that I know of.
25    Q.  Have you heard of a nursery called Belmont

1 Nursery in Fresno?
2     A.  I know where Belmont is.  I'm not sure that
3 I know of Belmont Nursery.  Is that a specific
4 company?
5     Q.  It is, yes.
6     A.  Okay.  Okay.  Yeah, yeah, I mean, I think I
7 know of it.
8     Q.  I will tell you that we saw that
9 Mr. Reelhorn who runs that nursery had donated to
10 your campaign.  I don't know if that -- I'm sure
11 many, many people donated to your campaign so I don't
12 know if that refreshes your recollection at all, does
13 it?
14    A.  No.
15    Q.  Okay.  Do you recall hearings on a 2012 farm
16 bill -- excuse me -- farm bill that took place in May
17 of 2010 in Fresno?
18    A.  No.
19    Q.  And the reason I thought you might remember,
20 I mean, how often are hearings held in Fresno, for
21 example?
22    A.  We would have usually a couple times a year.
23    Q.  Okay.
24    A.  I mean, not Fresno but somewhere in the
25 region.

1     Q.  And --
2     A.  Either field hearings or things of that
3 nature.  Okay.  And do you --
4     Q.  Okay.  And do you --
5     A.  But in 2010 we wouldn't -- I don't even
6 remember -- I don't remember that at all.  I don't
7 even think I would have been there.
8     Q.  Well, so that's the interesting thing.
9 Well, maybe it's not interesting but --
10    A.  No.
11    Q.  -- I will note that based on the record that
12 I can provide that if you want to look at it.
13    A.  Yeah, but you could have provided this
14 before if you wanted me to answer questions about a
15 2010 field hearing that was 12 years ago.
16    Q.  So you wouldn't have been on the ag
17 committee at that time; right?
18    A.  I was not on the ag committee at that time,
19 correct.
20    Q.  And yet you had attended this hearing of the
21 ag committee with the permission of the committee
22 because you were interested in what the committee was
23 doing; does that sound correct?
24    A.  Typically it is -- it is customary that if
25 there's a field hearing or a visit by a -- like a

1 cabinet level official or even any government agency,
2 typically it's -- I think the term is called
3 Congressional courtesy, you get invited to it.
4     Q.  And then did you always go?
5     A.  I don't know if I always went but, I mean,
6 you know -- I mean, I -- I mean, I know I missed a
7 lot of -- because I know a lot of times it was in
8 August and I spent the better part of a decade in
9 August overseas for my intelligence work.
10    Q.  Okay.  And when --
11    A.  So I missed a lot of those periods, which is
12 why I'm surprised I was even at one in 2010.  I don't
13 remember that at all.
14    Q.  When you were at the hearings, though, you
15 would have paid attention to what was going on;
16 right?
17    A.  I don't remember.  I mean, you know, I don't
18 know how long I was there.  If I don't remember
19 something from 2010 it's unlikely that I would --
20 that I would know -- you know, recall what was there
21 I mean, I probably popped in, said hello, made an
22 opening statement, walked out.  That's usually how
23 those go.
24    Q.  Okay.
25    A.  I doubt I was there the whole time.  I don't

Veritext Legal Solutions

App. 768

1  know.  But it sounds like -- I mean, you could have
2  provided the records so you're -- I mean, this is
3  once again, you know, kind of --
4     MR. BISS:  By the way, Ravi, have you
5  produced the records in discovery, these records that
6  you are alluding to --
7     MR. SITWALA:  These are records --
8     MR. BISS:  -- produced them in discovery?
9     MR. SITWALA:  -- we would have asked from
10 you and you would have told us were a matter of
11 public record and not produced.
12    MR. BISS:  Okay.  So the answer is no;
13 right?
14    MR. SITWALA:  I've also not introduced the
15 records, so in any event.
16    MR. BISS:  Okay.  Fair enough.  So you
17 didn't produce them in discovery and you're not going
18 to show them to the witness.
19    MR. SITWALA:  I'm not going to because I
20 don't want to ask any more questions about it and
21 waste his time.
22    MR. BISS:  Okay.  Fair enough.
23    MR. SITWALA:  I will provide him a copy if
24 he wants it.
25    MR. BISS:  That's actually a good thing.

1     A. -- but I'm spending, you know, ten days to
2  three weeks in Florida sometimes.
3     Q. Okay.  So --
4     A. Or in Washington or in other places around
5  the country.
6     Q. And so tell me, where have you traveled in
7  the last, let's say, four months?
8     A. Well, I was in London.
9     Q. Okay.  Where else?
10    A. Just would have been Sarasota.
11    Q. That's it?
12    A. In the four months?
13    Q. Let's say this year.
14    A. Four months?
15    Q. Let's just say 2022.
16    A. I mean, I'm traveling all the time.
17    Q. Okay.
18    A. I mean, I've been in Dallas, I've been in
19 Minnesota, I've been in Iowa.
20    Q. When was the last time you were in Iowa?
21    A. I don't know.  Like in the last, like, a
22 month ago.
23    Q. Oh, what were you doing there?
24    A. I was -- I had a meeting in Minne- -- or
25 outside of Minneapolis.

1     THE WITNESS:  Okay.
2  BY MR. SITWALA:
3     Q. So you would agree you have a rich history
4  in California; right?
5     A. I mean, my family's been here on the same
6  farm for over 100 years.
7     Q. So yes?
8     A. (Witness nods head.)
9        Yes.
10    Q. Thank you.
11    A. Yes.
12    Q. And you still live here in California today;
13 right?
14    A. Well, I'm in -- I live in -- I'm here and in
15 Sarasota, Florida.
16    Q. So you have homes in both areas?
17    A. Well --
18    Q. Residences in both areas?
19    A. Right, right.
20    Q. And how --
21    A. But I'm still a Californian.
22    Q. What do you mean by that?
23    A. I mean, my driver's license is here, I pay
24 taxes here --
25    Q. I see.

1     Q. Okay.
2     A. And then I drove down there and had -- I
3  drove south and had dinner and then flew out of Sioux
4  Falls.
5     Q. Dinner with your family.
6     A. Yes.
7     Q. Okay.  Your meeting was for your company?
8     A. Correct.
9     Q. Okay.  Have you been to DC this year?
10    A. I've been twice.
11    Q. And what about New York?
12    A. I've been to New York.
13    Q. Have you been to Miami?
14    A. Why?
15    Q. I'm just interested.  Miami?
16    A. This is weird questioning.  Are you trying
17 to track everywhere I've been?
18    Q. No, I'm not asking where you're going
19 because I figured you'd --
20    A. That sounds really --
21       (Overlapping speakers.)
22    THE WITNESS:  That sounds really creepy.  I
23 mean, do you have access to my phone?
24 BY MR. SITWALA:
25    Q. I do not.

1    A. Well, then, why are you asking me these
2 places I've been that you already clearly know that I
3 must have been?
4    Q. No, I didn't know. That's why I asked.
5    A. Are you going to play guessing games of all
6 the places I've been? Yes, I've been to Miami.
7    Q. Okay. What about --
8    A. Or I've been to just -- I am not sure it was
9 considered Miami but it was close.
10    Q. What about LA?
11    A. LA? I don't think I've been to LA --
12    Q. San Francisco?
13    A. -- in the last year.
14       I have not been to San Francisco. I'm
15 trying to think if I went through the -- the only way
16 I would have would have been through the airport.
17    Q. Okay.
18    A. Oh, wait. I've been -- well, not LA, but I
19 was in -- you're saying in the last year?
20    Q. Yeah.
21    A. I was in like the Riverside area last year
22 at some point. And probably through the -- I know I
23 flew out of Ontario airport.
24       MR. SITWALA: Okay. Why don't I take a
25 break so I can go over and see what else there is and

1 hopefully we can wrap this up relatively quickly.
2       Steve, is that okay with you?
3       MR. BISS: It sure is, Ravi. Thank you.
4       MR. SITWALA: Okay. Why don't I take
5 15 minutes. That way I can really try to just have
6 one more thing and be done with it.
7       THE WITNESS: Okay.
8       MR. BISS: Okay.
9       THE VIDEOGRAPHER: We are off the record.
10 The time is 2:31 p.m.
11       (Recess taken.)
12       THE VIDEOGRAPHER: We are back on the
13 record. The time is 2:51 p.m.
14 BY MR. SITWALA:
15    Q. Thank you, Congressman. I just have a few
16 more questions and then hopefully we can wrap this
17 up.
18       First of all, your contract -- your current
19 employment contract says that you're entitled to a
20 bonus. Did you receive a bonus in 2021?
21    A. I'm not even aware of a bonus.
22    Q. Okay. And you don't recall receiving --
23    A. I never even knew that was in my contract.
24    Q. So maybe we've done you a favor today.
25    A. Yeah.

1    Q. It looks like you should demand a bonus
2 after this deposition so ...
3       Okay. You had mentioned in the beginning of
4 the deposition, and I just want to get a little more
5 clarity on this, that your father had mentioned that
6 there was an exhibit shown to him, at least one
7 exhibit, that was tampered with by the defendants,
8 and I just wanted to know anything else you know
9 about that in terms of the nature of the exhibit or
10 anything -- anything you know about the specifics of
11 that 'cause this is a serious allegation and we want
12 to understand it.
13    A. Yeah, I mean, I'm pretty sure you guys are
14 well aware of it. I mean, I don't know all the
15 details because I wasn't in the -- I mean, I'd have
16 to go review the deposition.
17       And so didn't you say I can review the
18 deposition?
19    Q. Well, I'm just asking what your father told
20 you. I'm not asking for you to go figure it out for
21 yourself.
22    A. I just remember him saying that there was
23 either -- words were taken out of context or was
24 partial words or something like that, and I think
25 it's in the story --

1    Q. Okay.
2    A. -- about that he was threatening Lizza and
3 then you guys accused him of threatening, and I think
4 that's in the story.
5    Q. I see.
6    A. And then -- and then he said that in his
7 deposition that -- that -- I don't know if he tried
8 to explain that that wasn't what happened and that it
9 was only part of the story.
10    Q. Okay. And do you recall anything else of
11 that --
12    A. Well, I just know at the time, and I think I
13 testified to this in my last deposition, that when
14 Lizza was prowling around, I told you about the chaos
15 that ensued after that because he was running around
16 all over Northwest Iowa prowling on people and
17 stalking people.
18       So the day before I got a call from my dad
19 saying that, hey, there's a weird car driving around.
20    Q. Okay.
21    A. He called me from the farm.
22    Q. But --
23    A. Okay.
24    Q. -- I'm interested in the deposition, not --
25 and we've gone over that today and in your prior

65 (Pages 468 - 471)

1 depositions. I'm not -- all I'm asking about is any
2 details you have --
3     A. Well, yeah, but that's what I'm referring to
4 is that that's the -- and then at the time he said
5 that -- that -- then the next day he shows up, he
6 parks in a really creepy spot because it's a place
7 that nobody's parked in the history of mankind, it's
8 like on the side of his house and like back by a
9 field.
10     Q. But what does that have to do --
11     A. So did you ever -- have you ever been to
12 Sibley, Iowa?
13     Q. I have not, personally.
14     A. Okay. So -- so it was parked in a really
15 creepy place. And then my dad, as I recall the
16 story, he called me right after that and he said that
17 he was going to call the Sheriff because this -- he
18 said -- and then he tells me this name, I think he
19 used the wrong term, and I -- he called them
20 something different. And then I said what, you know,
21 and then he -- and then he -- and I said oh, my God,
22 it's that guy, he doesn't have a job.
23         And then he had been stalking -- then later
24 he had been stalking my nieces, but my dad said I
25 remember that guy, he says I went and confronted him

1 because I didn't know he had been driving around the
2 farm and all these places, and then he was parked in
3 a really creepy spot and then the jury -- I'm sure that
4 we'll have photos of it because nobody's ever parked
5 in the history of the time that that was built in
6 that spot; okay?
7         And so my dad calls me, I said that's weird,
8 I said -- and then I said what -- I said, well, stay
9 away, what did you do? Like, no, I didn't know who
10 he was, and then he told him that he was going to
11 call the Sheriff because he was trespassing yesterday
12 and now -- and now.
13         And then what was in the story was that my
14 dad threatened him, and then you guys made that
15 accusation, as I understand it, in the deposition.
16 So he said that you had taken his words out of
17 context or you had cut up his words.
18     Q. I see. Okay. Thank you.
19     MR. SITWALA: So just for the record before
20 I pass the witness, I'm going to move to strike any
21 impertinent and scandalous references to Mr. Lizza
22 that have been made in the deposition, but with that
23 I will pass the witness to you, Mr. Biss.
24     THE WITNESS: Well, I don't know that -- I
25 mean, before -- well, do I get to respond to that or

1 no?
2     MR. SITWALA: No.
3     MR. BISS: No, you don't need to respond
4 right now, but I'll respond.
5     Ravi, we are going to need to move in limine
6 before trial to get a ruling on this issue because we
7 are definitely going to be introducing evidence at
8 trial as to Ryan Lizza's actions while he was on the
9 ground in Sibley and the impression that that gave to
10 everybody. So put that on your list of motions in
11 limine because the -- you can move to strike it out
12 of this deposition, but we are definitely going to
13 be -- going to be seeking to introduce evidence.
14     How the judge will rule is -- is anybody's
15 issue, but we think it -- we think the -- what Ryan
16 Lizza -- what Ryan Lizza did and how he frightened
17 these people is very relevant to -- to his actual
18 knowledge and other issues, including punitive
19 damages.
20     So Ravi, are you finished with all your
21 questions?
22     MR. SITWALA: I am, and I note what you just
23 said.
24     MR. BISS: Okay.
25     THE WITNESS: Can I just -- I don't want to

1 belabor this, I don't want to belabor this, but I
2 don't know how they -- how you can strike from the
3 record when I gave verbatim, you know, or best to my
4 ability the conversations that I had at the time with
5 my father where I relayed that this guy -- you know,
6 so I'm not sure, what are you striking?
7     MR. SITWALA: I'm asking for it to be
8 stricken, I'm not asking you or Steve, so it's just
9 for the record. Nothing's being stricken based on me
10 having said it.
11     THE WITNESS: Okay. But I mean --
12     MR. SITWALA: I'm saying it shouldn't be
13 there, you're clearly saying it should. It's
14 something a judge could decide a later day. It's
15 not -- that's all it is.
16     THE WITNESS: Okay. So that would be --
17 'cause my recollection of how that -- the phone
18 calls, what occurred and -- during that time frame, I
19 just want to make sure that that's not -- you're not
20 striking that.
21     MR. SITWALA: I'm not going to go delete it.
22 I don't have the power to do that.
23     THE WITNESS: Okay. Okay. Okay. All
24 right.
25     Are we good, Steve, on that?

1    MR. BISS:  I've got one -- I've got one
2  follow-up question.
3      THE WITNESS:  Okay.
4        EXAMINATION
5  BY MR. BISS:
6    Q.  So earlier in Mr. Sitwala's examination he
7  asked you about somebody by the name of John
8  Reelhorn; do you remember that?
9    A.  Yes.
10   Q.  And he asked you or maybe he made the point
11 that Mr. Reelhorn donated to your campaign; do you
12 remember that?
13   A.  Yes.
14   Q.  Okay.  I have a broader question and that is
15 this:  Can you describe the impact that this article,
16 this hit piece had on your ability to raise money for
17 your campaign or -- or the impact that it had on your
18 campaign in general?
19   A.  Yes.  So I guess that gets to -- I probably
20 didn't mention this earlier to their -- to their
21 earlier questions on damages, humiliation, whatever
22 all those -- all the terms were, but there -- there
23 were many corporations -- I don't have the whole
24 number yet -- that after these accusations then
25 refused to -- they stopped contributing to me.  And I

1  don't know if I disclosed that in discovery or not,
2  but I need to do an accounting of that.  So is
3  this --
4    Q.  Do you remember the -- go ahead.
5    A.  I just don't remember.  I know there were --
6  there were probably dozens -- you know, probably two
7  or three dozen companies that I think would be
8  relevant, but I need to -- I need to comb through.
9  And these are people that stopped supporting me after
10 these accusations.
11   Q.  Do you remember the names of any of the
12 corporations sitting here today?
13   A.  I don't want to -- I think I have a good
14 idea, but I'd probably screw up and give you the
15 wrong -- you know, give one that's the wrong one.
16 But, I mean, they are many of the top corporation --
17 you know, many of the top companies in the United
18 States.
19   Q.  And what are -- and what are some of the
20 records that you would need to review to determine or
21 refresh your recollection as to some of the names?
22 What are some of the records you have to review?
23   A.  I'd probably have to look at the Federal
24 Election Commission records and then remember -- you
25 know, and then remember who -- who it is that I've --

1  you know, probably talk to some of my old people just
2  to -- 'cause I don't want to give a name that's not
3  accurate.
4    Q.  All right.
5    A.  But there definitely will be -- there would
6  be names.  I just don't have them off the top of my
7  head right now.
8      MR. BISS:  All right.  I don't have any
9  other questions.  Thank you.
10     MR. SITWALA:  Just a couple follow-ups on
11 that.
12        FURTHER EXAMINATION
13 BY MR. SITWALA:
14   Q.  So did you --
15   A.  Wait.  I thought you were already done.
16   Q.  Well, once he raises something new I get to
17 ask you a couple more questions.
18   A.  But why didn't he get to ask me questions?
19   Q.  He just did.
20   A.  That was -- that was it?  Does he get to ask
21 you -- or does he get to come back and ask me more
22 questions?
23   Q.  If he would like, yes.  But let's hope for
24 everybody's sake that we don't do that.
25      I just want to say, did you have

1  conversations with people, representatives of any of
2  these companies in connection with these lost
3  donations that you just mentioned?
4    A.  Yeah, I know that I have.
5    Q.  Do you have records of those?
6    A.  I don't.
7    Q.  Do you recall them?
8    A.  But I know they -- I know that there's -- I
9  just don't want to -- you know, like I thought long
10 and hard about the 11 names I disclosed of people
11 that definitely had information about -- you know,
12 about the damages at the time that I worked with.
13 But like, for example, I thought about the additional
14 names that I provided you today and I know that there
15 are -- and I don't want to make some -- put some poor
16 guy or gal on a list and then all of a sudden, you
17 know, you guys call him or her and then -- but I know
18 that it happened.  I just -- but it just is going to
19 take me some time to analyze and then disclose.
20   Q.  And do you recall the substance of the
21 conversations?
22   A.  It would be that my team would have reached
23 out like in terms of doing fundraisers and they
24 would have -- then they would have said no, sorry,
25 we're not -- we're no longer going to support the

Veritext Legal Solutions

800-567-8658                                              973-410-4098

Case 5:19-cv-04064-CJW-MAR   Document 121-22   Filed 11/01/22   Page 67 of 69

App. 772

1 Congressman.

2     MR. SITWALA: Okay. I don't have any other

3 questions.

4     MR. BISS: Okay. We'll read the transcript

5 if it's ordered.

6     MR. SITWALA: All right.

7     THE VIDEOGRAPHER: Are you ready for me to

8 conclude?

9     MR. SITWALA: I am.

10     THE VIDEOGRAPHER: This concludes today's

11 deposition of Devin Nunes. The number of media used

12 was four. We are off the record at 3:03 p.m.

13 (3:03 p.m.)

14         --oOo--

15

16

17

18

19

20

21

22

23

24

25

---

1 STATE OF CALIFORNIA )

             ) ss.

2 COUNTY OF KERN   )

3

4     I, DEVIN NUNES, do hereby certify:

5     That I have read the foregoing Volume II of my

6 deposition;

7     That I have made such changes in form and/or

8 substance to the within deposition as might be necessary

9 to render the same true and correct;

10     That having made such changes thereon, I hereby

11 subscribe my name to the deposition.

12     I declare, under penalty of perjury, that the

13 foregoing is true and correct.

14     Executed this _____ day of _____, 2022, at

15 _____, California.

16

17

18           _____

19

20

21

22

23

24

25

---

1 STATE OF CALIFORNIA )

             ) ss.

2 COUNTY OF KERN   )

3

4

5     I, Susan R. Wood, a Certified Shorthand Reporter

6 in the State of California, holding Certificate No. 6829,

7 do hereby certify that DEVIN NUNES, the witness named in

8 the foregoing deposition, was by me duly sworn; that said

9 deposition was taken Friday, September 9, 2022, at the

10 time and place set forth on the first page hereof.

11     That upon the taking of the deposition, the

12 words of the witness were written down by me in stenotypy

13 and thereafter transcribed by computer under my

14 supervision; that the foregoing is a true and correct

15 transcript of the testimony given by the witness.

16     I further certify that I am neither counsel for

17 nor in any way related to any party to said action, nor

18 in any way interested in the result or outcome thereof.

19     Dated this 12th day of September, 2022, at

Bakersfield, California.

20

21

22

    Susan R. Wood, CSR No. 6829

23

24

25

---

1 Steven S Biss, Esq

2 stevenbiss@earthlink net

3     September 12th, 2022

4 RE:Nustar Farms, LLC Et Al v Ryan Lizza, Hearst Magazine Media

5   9/9/2022, Devin Nunes, Volume II (#5380442)

6   The above-referenced transcript is available for

7 review

8   Within the applicable timeframe, the witness should

9 read the testimony to verify its accuracy If there are

10 any changes, the witness should note those with the

11 reason, on the attached Errata Sheet

12   The witness should sign the Acknowledgment of

13 Deponent and Errata and return to the deposing attorney

14 Copies should be sent to all counsel, and to Veritext at

15 (erratas-cs@veritext com)

16

17  Return completed errata within 30 days from

18 receipt of testimony

19   If the witness fails to do so within the time

20 allotted, the transcript may be used as if signed

21

22     Yours,

23     Veritext Legal Solutions

24

25

---

68 (Pages 480 - 483)

App. 773

1  Nustar Farms, LLC Et Al v. Ryan Lizza, Hearst Magazine Media
2  Devin Nunes, Volume II (#5380442)
3        E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10  PAGE_____ LINE_____ CHANGE_____
11  _____
12  REASON_____
13  PAGE_____ LINE_____ CHANGE_____
14  _____
15  REASON_____
16  PAGE_____ LINE_____ CHANGE_____
17  _____
18  REASON_____
19  PAGE_____ LINE_____ CHANGE_____
20  _____
21  REASON_____
22
23  _____   _____
24  Devin Nunes, Volume II              Date
25

Veritext Legal Solutions
800-567-8658                                    973-410-4098