# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

DEVIN G. NUNES,

        Plaintiff,

vs.

RYAN LIZZA, HEARST
MAGAZINES, INC., and HEARST
MAGAZINE MEDIA, INC.,

        Defendants.

_____

ANTHONY NUNES, JR., ANTHONY
NUNES, III and NUSTAR FARMS,
LLC,

        Plaintiffs,

vs.

RYAN LIZZA and HEARST
MAGAZINE MEDIA, INC.,

        Defendants.

No. 19-CV-4064 CJW-MAR

**MEMORANDUM OPINION AND
ORDER**

No. 20-CV-4003 CJW-MAR

_____

## TABLE OF CONTENTS

I.      BACKGROUND ............................................................................ 5

    A.    Procedural History ................................................................ 6

        1.    The Nunes Case, 19-CV-4064 ......................................... 6

        2.    The NuStar Case, 20-CV-4003 ......................................... 8

3.      Post-Consolidation.......................................................10

B.     Factual History: The Parties ............................................11

1.      The Nunes Family and NuStar Farms..................................11

2.      Esquire and Ryan Lizza ...............................................13

C.     Factual History: The Article .............................................14

1.      Content and Investigation..............................................14

2.      Editing Process.........................................................18

3.      Publication ............................................................20

4.      Retraction .............................................................22

5.      The Tweet..............................................................23

6.      Public Mention of the Sibley Farm ....................................23

7.      Allegations of Federal Immigration Violations ......................25

a.     NuStar Farms' Onboarding Process...........................26

b.     NuStar Farms' History of No-Match Issues ..................29

c.     NuStar Farms' Employees with Problematic Documents.......................................................31

d.     NuStar Farms Employees' Invocation of the Fifth Amendment.............................................................35

e.     Congressman Devin Nunes' Alleged Knowledge of NuStar Farms' Practices ......................................39

2

           f.      Congressman Devin Nunes' Family Relationships ..........40

           g.      Congressman Devin Nunes' Time in Congress, Sponsorship, and Donations ....................................42

     8.      The Nunes' Reaction Post-Publication ...............................47

     9.      Damages..................................................................49

II.    SUMMARY JUDGMENT STANDARD .............................................57

III.   DISCUSSION.............................................................................59

    A.    NuStar Plaintiffs' Claim of Defamation ......................................60

        1.      Applicable Law ..............................................................65

        2.      Elements.....................................................................70

           a.      Publication..................................................70

           b.      Defamatory Statement ........................................70

           c.      Of and Concerning Plaintiff ...................................70

           d.      Injury to Plaintiff ...........................................71

           e.      Falsity .....................................................73

           f.      Negligence..................................................77

    B.    Defamation by Implication .....................................................80

        1.      Applicable Law ..............................................................83

        2.      NuStar Plaintiffs' Claim ...................................................87

                a.      Juxtaposition of Facts.............................................87

                b.      Republication Under Iowa Law ................................87

                c.      Of and Concerning Plaintiff ....................................89

                d.      Injury ................................................................89

                e.      Falsity of the Implication.......................................89

                f.      Negligence .........................................................92

    C.  Nunes' Claim ........................................................................93

        1.      Juxtaposition of Facts ..........................................93

        2.      Republication Under California Law ..................................93

        3.      Of and Concerning Plaintiff.............................................94

        4.      Injury ..................................................................94

        5.      Falsity of the Implication................................................96

        6.      Defendants' Intent to Convey Defamatory Impression ..............98

        7.      Actual Malice...............................................................98

IV.     CONCLUSION .............................................................................. 101

4

This matter[1] is before the Court on defendants' motion for summary judgment[2] on plaintiffs Anthony Nunes, Jr., Anthony Nunes, III, and NuStar Farms, LLC's (collectively "NuStar plaintiffs") complaint[3] alleging defamation (Count I) and defamation by implication (Count II) and on plaintiff Devin Nunes' ("Nunes") complaint[4] alleging defamation by implication (Count I).  (Docs. 118; 121; 103; Case No. 20-CV-4003-CJW-MAR, Doc. 188).  Plaintiffs timely filed a resistance.  (Doc. 130). Defendants timely replied.  (Doc. 138).  For the following reasons, the Court **grants** the motion as to NuStar plaintiffs' claim for defamation (Count I), **grants** the motion as to NuStar plaintiffs' claim for defamation by implication (Count II), and **grants** the motion as to Nunes' claim for defamation by implication (Count I).

## I.    BACKGROUND

The following facts are undisputed unless otherwise noted.  The Court will consider additional facts as they become relevant to its analysis.

---

[1] All references to the docket are to Case No. 19-CV-4064-CJW-MAR, unless otherwise stated. On February 1, 2022, the Court consolidated plaintiffs' separate cases, Case No. 19-CV-4064-CJW-MAR and Case No. 20-CV-4003-CJW-MAR, making the former the lead case with further filings to be entered in the lead case.  (Doc. 83).

[2] Defendants also filed a redacted version of their motion for summary judgment, including all attachments (Doc. 121), and the resistance and reply were both filed in redacted forms (Docs. 139, 141).  The Court will refer to the original, sealed documents filed at Docs. 118, 130, and 138.

[3] NuStar plaintiffs filed a third amended complaint, which the Court references here.  (Case No. 20-CV-4003-CJW-MAR, Doc. 188).

[4] Nunes filed a third amended complaint, which the Court references here.  (Doc. 103).

## A.    Procedural History

The procedural life of this case is extensive, and as such, the Court discusses only that portion of which is relevant to the motion for summary judgment.

### 1.    The Nunes Case, 19-CV-4064

On September 30, 2019, Nunes filed a two-count complaint in this Court.  (Doc. 1).  Nunes brought Count I for defamation alleging defendants published an article ("the Article") in *Esquire* containing false statements of fact concerning Nunes, knowing the statements were defamatory and would be republished and acting with actual malice, harming Nunes.  (*Id.*, at 19-22).  Count II asserted common-law conspiracy, alleging defendants and others conspired through concerted action to publish a "hit piece"—that is, the Article—that would defame and thus harm Nunes through its lies.  (*Id.*, at 22-24). On January 21, 2020, defendants filed a motion to dismiss or strike portions of the complaint citing the California Code of Civil Procedure and also filed to stay discovery and for protective order.  (Docs. 15; 17).  Then, on February 3, 2020, Nunes filed an amended complaint again alleging defamation and common-law conspiracy.  (Doc. 23). That same day, the Court dismissed the January 21, 2020 motion as moot as a result of the amended complaint and allowed leave to refile.  (Doc. 24).  On February 4, 2020, the Court granted the motion to stay and granted defendants the ability to file a renewed motion to dismiss so long as it was filed by February 18, 2020.  (Doc. 26).  On February 18, 2020, defendants filed a motion to dismiss the amended complaint and to strike. (Doc. 34).  On March 31, 2020, the Court extended the stay of discovery by 30 days. (Doc. 45).  On August 5, 2020, the Court granted the motion to dismiss with prejudice and entered judgment in favor of defendants.  (Doc. 53).  Nunes maintained that there were 12 defamatory statements, including several related to his family's move to Iowa. (Docs. 38; 53, at 22-34).  Further, Nunes alleged the statements within the Article together created a false implication—that he, his family, and others including former

6

Representative Steve King, conspired to hide the family's move to Iowa because the farm employs undocumented laborers. (Docs. 38; 53, at 35). In Count II of his complaint, Nunes asserted Lizza and others conspired to defame him by promoting, publishing, and republishing the Article. (Docs. 38; 53, at 47). The Court addressed defendants' motion to dismiss as to the claims in Counts I and II of Nunes' complaint and granted defendants' motion to dismiss on Counts I and II. (Doc. 53). Nunes appealed the Court's August 5 order. (Doc. 55).

The Eighth Circuit Court of Appeals affirmed in part and reversed in part, remanding the case to this Court. (Docs. 60; 61). The Court of Appeals agreed Nunes' complaint failed to sufficiently allege express defamation. (Doc. 60, at 2). Adopting this Court's conclusions, the Court of Appeals held Nunes' complaint did not identify an allegedly defamatory statement, and he could not so raise a statement for the first time on appeal. (*Id.*, at 6). The Court of Appeals reversed and remanded, however, on the issue of defamation by implication, finding the complaint stated a claim based on an alleged republication of the Article through a November 20, 2019 tweet ("the Tweet") defendant Lizza published on his Twitter. (*Id.*, at 2, 14-15). It is plausible, the Court held, that the presentation of facts within the Article are juxtaposed in a way that the implication—that Nunes and his relatives had a politically explosive secret and thus conspired to hide the family's move to Iowa—could be conveyed to the reasonable reader. (*Id.*, at 7-8). What is more, the Court of Appeals found Nunes sufficiently, plausibly alleged each element of a defamation by implication claim under Iowa law[5] so as to survive a motion to dismiss. (*Id.*, at 7-15). The Court of Appeals later denied Nunes' motion for reconsideration and petition for rehearing en banc. (Docs. 67; 68).

---

[5] The Court analyzed the motion to dismiss using Iowa law, having found no conflict between California and Iowa law. The parties did not challenge this finding on appeal. (Doc. 60, at 4-5).

On January 18, 2022, defendants filed an answer to the amended complaint. (Doc. 73).

## 2. *The NuStar Case, 20-CV-4003*

On January 16, 2020, NuStar plaintiffs filed a complaint in this Court alleging defamation. (Case No. 20-CV-4003-CJW-MAR, Doc. 1). On March 23, 2020, defendants filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 12(e). (*Id.*, Doc. 15). NuStar plaintiffs timely resisted (*Id.*, Doc. 20), and defendants timely replied (*Id.*, Doc. 21). On May 12, 2020, this Court granted the Rule 12(b)(e) motion for a more definite statement and denied with leave to refile the Rule 12(b)(6) motion to dismiss for failure to state a claim. (*Id.*, Doc. 27). On May 24, 2020, plaintiffs filed an amended complaint alleging a single count of defamation with a more definite statement. (*Id.*, Doc. 28). Then, on June 22, 2020, defendants filed a motion to dismiss the amended complaint under Rule 12(b)(6). (*Id.*, Doc. 33). Plaintiffs timely resisted (*Id.*, Doc. 41), and defendants timely replied (*Id.*, Doc. 43). Defendants also moved to stay discovery and for a protective order. (*Id.*, Doc. 35). Again, plaintiffs timely resisted (*Id.*, Doc. 42), and defendants timely replied (*Id.*, Doc. 44). The Court granted the order to stay discovery pending the motion to dismiss. (*Id.*, Doc. 45). On September 11, 2020, this Court granted the motion to dismiss to the extent defendants sought dismissal of all defamation claims except as to a claim related to surveillance[6] of Lizza. (*Id.*, Doc.

---

[6] The claim related to the following statement:

> There was no doubt about why I was being followed. According to two sources with firsthand knowledge, NuStar did indeed rely, at least in part, on undocumented labor. One source, who was deeply connected in the local Hispanic community, had personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs . . . asserting that the farm was aware of their status . . . . A second source, who claimed to be an undocumented immigrant, also claimed to have worked at NuStar for several years, only recently leaving the dairy, which this source estimated employed about fifteen people.

50, at 24-26).  This Court directed plaintiffs to amend their complaint and limit the defamation claim to the claim regarding knowing employment of undocumented laborers. (*Id.*, Doc. 50).

On September 17, 2020, plaintiffs filed a second amended complaint.  (*Id.*, Doc. 51).  Defendants filed a timely answer.  (*Id.*, Doc. 52).  Then, on November 18, 2020, plaintiffs filed a motion to compel discovery (*Id.*, Doc. 53), which was denied as moot with leave to refile if needed (*Id.*, Doc. 62).  Defendants then filed a resisted motion to compel certain records from the Social Security Administration (*Id.*, Doc. 79), which on March 15, 2021, this Court granted, (*Id.*, Doc. 80).  Defendants later filed two motions to compel regarding NuStar employee depositions (*Id.*, Docs. 103; 106), and plaintiffs timely resisted both (*Id.*, Docs. 107; 108).  Defendants timely replied to both resistances. (*Id.*, Docs. 111; 112).  From these motions to compel, the Court granted witness compliance with document production and provision of materials to new counsel.  (*Id.*, Doc. 119).  The Court later ordered CJA appointment for the six employees who the parties sought to depose.  (*Id.*, Doc. 122).  On July 26, 2021, defendants filed a motion to compel testimony of a specific attorney and related documents.  (*Id.*, Doc. 126). Plaintiffs timely resisted (*Id.*, Doc. 133), and defendants timely replied (*Id.*, Doc. 140). On August 13, 2021, plaintiffs filed their own motion to compel discovery (*Id.*, Doc. 138).  Defendants filed a timely resistance (*Id.*, Doc. 143).  On August 23, 2021, defendants filed a motion to compel responses to third party litigation funding discovery requests (*Id.*, Doc. 147).  Plaintiffs timely resisted (*Id.*, Doc. 153), and defendants timely replied (*Id.*, Doc. 158).  On September 14, 2021, the Court denied plaintiffs' motion to compel filed at Doc. 138 (*Id.*, Doc. 161) and later granted defendants' motion to compel

---

(Case No. 20-CV-4003-CJW-MAR, Doc. 50, at 24).

9

specific attorney testimony and related documents, filed at Doc. 126,[7] (*Id.*, Doc. 177). On October 26, 2021, the Court granted defendants' motion to compel responses to third party litigation funding discovery requests, filed at Doc. 147. (*Id.*, Doc. 180).

On October 8, 2021, plaintiffs moved to amend their complaint a third time (*Id.*, Doc. 173). Defendants timely resisted, (*Id.*, Doc. 176), and plaintiffs timely replied. (*Id.*, Doc. 181). On December 16, 2021, the Court granted the motion as to adding actual malice and defamation by implication claims but denied the motion as to adding claims of false light invasion of privacy and common-law conspiracy. (*Id.*, Doc. 187). On January 4, 2022, plaintiffs filed their third amended complaint. (*Id.*, Doc. 188). Defendants filed a timely answer. (*Id.*, Doc. 193).

Then, on January 25, 2022, defendants moved to consolidate the NuStar case with the Nunes case (*Id.*, Doc. 195), which NuStar plaintiffs resisted (*Id.*, Doc. 196).

### 3. *Post-Consolidation*

As mentioned, on February 1, 2022, the Court consolidated Nunes' and NuStar plaintiffs' cases. (Doc. 83; Case No. 20-CV-4003-CJW-MAR, Doc. 197). After the Court consolidated plaintiffs' cases, Nunes moved for leave to file his second amended complaint (Doc. 86), which defendants timely resisted (Doc. 87). The Court granted Nunes' motion as to adding defamation by implication and common-law conspiracy claims but denied the motion as to adding a false light invasion of privacy claim. (Doc. 90). After Nunes filed his second amended complaint (Doc. 92), defendants moved to strike immaterial and impertinent matter from the complaint (Doc. 99). After plaintiffs' timely resistance (Doc. 100) and defendants' timely reply (Doc. 101), the Court granted the motion but denied any relief through sanctions (Doc. 102).

---

[7] On October 26, 2021, the Court terminated as duplicative the unsealed version of defendants' motion to compel. (*See* Case No. 20-CV-4003-CJW-MAR (terming Doc. 127)).

On August 6, 2022, Nunes filed his third amended complaint. (Doc. 104). On August 22, 2022, defendants filed a timely answer. (Doc. 107).

On October 7, 2022, plaintiffs filed a motion to compel discovery (Doc. 112), and defendants moved to preclude plaintiffs from relying on belatedly disclosed witnesses, (Doc. 113). Both parties filed respective resistances (Docs. 116; 117) and replies (Docs. 119; 120). On November 18, 2022, the Court granted defendants' motion to preclude reliance on belatedly disclosed witnesses both at trial and in their resistance to summary judgment. (Doc. 128). On December 2, 2022, the Court granted plaintiffs' motion to compel but denied a request therein for attorneys' fees. (Doc. 136).

On October 25, 2022, defendants moved for summary judgment against all plaintiffs. (Doc. 118). Having filed both sealed and redacted versions of the motion, defendants then moved to unseal certain documents filed in support of summary judgment. (Doc. 124). Plaintiffs resisted the motion to unseal (Doc. 129) and timely resisted defendants' motion for summary judgment (Doc. 130). Defendants timely replied to plaintiffs' resistance to the motion to unseal (Doc. 133) and the motion for summary judgment (Doc. 139). Defendants then filed a proposed less-redacted version of their reply statement of undisputed facts. (Doc. 142). On January 6, 2023, the Court heard argument on the motion for summary judgment and the motion to unseal. (Doc. 144).

**B. Factual History: The Parties**

**1. The Nunes Family and NuStar Farms**

Plaintiffs Anthony Nunes Jr., Anthony Nunes III, and Devin Nunes are, respectively, father and sons.[8] (Docs. 118-2, at 2; 130-1, at 4-5; 138-1, at 5-6). Anthony Jr.'s family has owned and operated a dairy farm in Tulare, California for more than a

---

[8] Given the number of plaintiffs bearing the last name "Nunes," for purposes of clarity, the Court will refer to each by their first name in the factual history.

century. (Docs. 118-2, at 3; 130-1, at 2; 138-1, at 4-5). All three men worked on the Tulare farm starting at a young age. (Docs. 118-2, at 3-4; 130-1, at 2-5; 138-1, at 4-5). Later, after purchasing and opening a different farm, Anthony Jr. and Anthony III worked closely together, and all family members, including Devin, performed various assigned tasks on the new California farm, though Devin ceased farming upon election to Congress. (Docs. 118-2, at 4; 130-1, at 5-6; 138-1, at 6-7). Devin, whose educational background is in farming, also operated his own farming business in addition to a farming operation with Anthony III until he was elected to Congress. (Docs. 118-2, at 4-5; 130-1, at 6-7; 138-1, at 7-9). In 1996, Devin began managing his family's Tulare dairy farm, as his family, including his uncle and part-owner of the Tulare dairy, Gerald Nunes, often worked and managed their farms together. (Docs. 118-2, at 5; 130-1, at 7-8; 138-1, at 8-10).

In 2001, after Devin's appointment to the position of California Director of Rural Development in the Department of Agriculture, he ceased work at the Tulare dairy. (Docs. 118-2, at 5-6; 130-1, at 8-9; 138-1, at 10-11). Thereafter, from 2003–2022, Devin represented various districts of California in Congress, attempting all the while to stay on top of issues facing dairy farmers despite his absence from the family's various farms. (Docs. 118-2, at 6; 130-1, at 9; 138-1, at 11). Devin has remained a California resident, even after his parents sold their California property and moved to Iowa along with Anthony III, who was interested in a farm in Sibley, Iowa, which would later become NuStar Farms. (Docs. 118-2, at 6; 130-1, at 10; 138-1, at 12-13). Devin's brother and father asked Devin to visit the Sibley farm before purchasing the farm, which Devin agreed to do, spending two nights there to evaluate the farm, facilities, and livestock. (Docs. 118-2, at 7; 130-1, at 10-11; 138-1, at 13-14). Devin claims that at no point did he discuss the labor used at the Sibley farm. (Docs. 118-2, at 7; 130-1, at 11; 138-1, at 14). Devin's parents, Dian and Anthony Jr., formed NuStar Farms in 2006 as co-owners,

though Anthony Jr. became 100 percent owner in 2011, then transferred five percent to Anthony III and 5 percent to Anthony III's wife, Lori, in 2019 or 2020 with the thought Anthony III—who previously agreed to be responsible for labor—and Lori would eventually become full owners of the dairy. (Docs. 118-2, at 7-8; 130-1, at 10, 11; 138-1, at 13, 14).

### 2.    *Esquire and Ryan Lizza*

Hearst Media and Hearst Magazines (collectively, "Hearst") publish a magazine called *Esquire* as well as an online version, *Esquire*.com. (Docs. 118-2, at 8; 130-1, at 12; 138-1, at 14-15). The online publication covers various news categories, publishing content daily, while the print version publishes six times annually. (Docs. 118-2, at 8; 130-1, at 12-13; 138-1, at 15-16). Written in the style of New Journalism, *Esquire* articles are often written using first-person observations. (Docs. 118-2, at 8; 130-1, at 13; 138-1, at 16). *Esquire* utilizes a group of senior editors to create, edit, and write articles and requires both employees and freelancers to adhere to ethical practices, including accuracy, fairness, transparency, and complete reporting. (Docs. 118-2, at 8; 130-1, at 13-14; 138-1, at 17-18). Each story is sent through an editorial process that includes writer selection, fact-checking, art design, copy editing, and a check on accuracy. (Docs. 118-2, at 9; 130-1, at 14-15; 138-1, at 18-19).

Ryan Lizza, an experienced political reporter who has published hundreds of times in respected publications over 25 years,[9] worked for *Esquire* under an independent contractor agreement from June 1, 2018-June 1, 2019. (Docs. 118-2, at 9; 130-1, at 15-17; 138-1, at 19-21). As a political journalist, Lizza has covered many political issues and scandals both on television and in print, such as President Bill Clinton's

---

[9] Plaintiffs claim Lizza harbors extreme bias toward Devin and published statements and stories in accord with that sentiment, in addition to claimed libelous stories before employment with Hearst, leading to the events of this case. (Docs. 118-2, at 9; 130-1, at 15-18).

impeachment, the 2000 United States election recount, presidential campaigns, and international politics, has lectured at respected universities on topics including politics and journalism, and has worked on award-winning reports, receiving recognition in 2009 as a Top 50 journalist by *The Washingtonian* and other awards since. (Docs. 118-2, at 9-12; 130-1, at 17-20; 138-1, at 21-24). Never before the instant case, defendants claim, has Lizza been accused of defamation or reporting falsehoods, or found liable for either. (Docs. 118-2, at 12; 130-1, at 21; 138-1, at 24-25).

### C. Factual History: The Article

In the summer of 2018, defendants claim, *Esquire* editors assigned Lizza to investigate and report on Devin Nunes' family's farm, NuStar Farms, as Devin was one of the most high-profile and powerful members of Congress at the time. (Docs. 118-2, at 12; 130-1, at 21-22; 138-1, at 25-26). Lizza and his editors claim that they believed Devin Nunes' relatives and family's dairy farm moved to Iowa over ten years earlier, where they believed dairies often use undocumented labor; plaintiffs disagree. (Docs. 118-2, at 12; 130-1, at 22-23; 138-1, at 26-28). On September 30, 2018, *Esquire*.com published the Article detailing Lizza's investigation and report on NuStar Farms, which was later printed in the November 2018 print copy of *Esquire*. (Docs. 118-2, at 13; 130-1, at 23-24; 138-1, at 28). Then, on September 30, 2018, and again on November 20, 2019, Lizza tweeted a link to the Article on his personal Twitter account. (Docs. 118-2, at 13; 130-1, at 24-25; 138-1, at 28-30).

### 1. Content and Investigation

The Article's headline reads, "Devin Nunes's Family Farm is Hiding a Politically Explosive Secret." (*See* Docs. 130-1, at 25; 130-1, at 30). The Article itself begins by stating "Devin Nunes has a secret." (*See* Docs. 118-2, at 13; 130-1, at 25; 130-1, at 30). The Article later states, "So here's the secret: The Nunes family dairy of political lore—the one where his brother and parents work—isn't in California." (*See* Docs. 118-

14

2, at 13; 130-1, at 25; 138-1, at 30). Further, the Article provides that, "[a]s far as [Lizza] could tell . . . neither [Devin] Nunes nor the local California press that covers him had ever publicly mentioned that his family dairy is no longer in Tulare." (Docs. 118-2, at 13; 130-1, at 25-27; 138-1, at 31-33). The content of the Article, defendants state, came from Lizza's investigation in Sibley, where he sought to learn about the local labor market, NuStar Farms, and the tension between agriculture and certain political views Lizza believed common among many Iowa farmers, as much of Sibley's population voted for President Donald Trump in 2016 and was represented by Representative Steve King, who is opposed to undocumented immigration. (Docs. 118-2, at 13-14; 130-1, at 27-28; 138-1, at 33-34).

Lizza worked on the Article for longer than two months, which included: (1) researching use of immigrant labor on dairy farms in Minnesota and Iowa from various sources, including Congressional records and studies; (2) spending three days in Sibley, Iowa, and Worthington, Minnesota, where he interviewed a total of 24 sources; (3) and taking over five hours of interview recordings, 60 pages of written notes and audio notes for himself, over an hour of video footage and research totaling over 1,120 pages. (Docs. 118-2, at 14; 130-1, at 28-32; 138-1, at 34-42). Defendants state that some people Lizza interviewed, despite supporting President Trump, were uneasy on Trump's immigration views, which Lizza suspected might be because of dairies' reliance on undocumented labor. (Docs. 118-2, at 14-15; 130-1, at 32; 138-1, at 42-43). In fact, according to defendants, several sources confirmed that undocumented labor use occurs on Midwestern dairy farms and that its prevalence is well-known, as did files from a Title 8, United States Code, Section 1324, Immigration Reform and Control Act ("IRCA") prosecution and a 2017 letter from dairy farmers to the Chairman of the Judiciary Committee. (Docs. 118-2, at 15-16; 130-1, at 33; 138-1, at 43-44). As a result of this labor use paired with the farmers' alleged political views, Lizza noted in the Article that

15

there is political hypocrisy when the dairy farmers employ undocumented laborers despite supporting Trump, King, and their views against undocumented immigration. (Docs. 118-2, at 16; 130-1, at 33; 138-1, at 44).

Further, the Article detailed interviews in which two sources having firsthand knowledge, which plaintiffs dispute, informed Lizza that NuStar Farms relies on undocumented labor and that one source had taken "illegal people" to NuStar Farms and "assert[ed] that the farm was aware of [each undocumented laborer's] status." (Docs. 118-2, at 16; 130-1, at 34; 138-1, at 44-45). According to defendants, Source 1 informed Lizza a NuStar Farms worker Flavio,[10] informed the source to be careful with what they told Lizza, leading Lizza to infer he was being followed because the worker knew not only who Lizza was interviewing but where those interviews would take place. (Docs. 118-2, at 16-17; 130-1, at 34-35; 138-1, at 46-48). Plaintiffs add "Source 1 then informed Lizza that she told Flavio that Lizza 'just wanted help. He just want [sic] to make an article, and that's it'"; plaintiffs also state that Lizza misrepresented being followed. (Docs. 130-1, at 34-35; 138-1, at 46-48). Source 1 also informed Lizza that he would have better luck speaking with workers at a dairy 25 minutes away because Flavio informed Source 1 that NuStar Farms' workers were scared to help Lizza in case he was "looking for something else," and that NuStar Farms was "so scared." (Docs. 118-2, at 17-18; 130-1, at 35-36; 138-1, at 48).

Lizza's second source, Source 2, who previously worked for NuStar Farms, informed Lizza he is "illegal," which plaintiffs deny. (Docs. 118-2, at 18; 130-1, at 36; 138-1, at 49). Defendants claim the Social Security Administration ("SSA") has no record of someone with Source 2's name and Social Security Number ("SSN"), which plaintiffs deny and dispute because Source 2 signed his Form I-9 and supplied his social

---

[10] Source 1 was deposed and confirmed Flavio worked at NuStar Farms. (Docs. 118-2, at 18; 130-1, at 36; 138-1, at 49).

security card, and NuStar Farms never received a no-match letter when it withheld taxes from Source 2's pay. (Docs. 118-2, at 18; 130-1, at 36; 138-1, at 49-50). Defendants state, and plaintiffs dispute, that a third source said nearly all employees on dairy farms in the area are undocumented laborers. (Docs. 118-2, at 18; 130-1, at 37; 138-1, at 50-51).

To explain why it is "nearly impossible for a dairy in the area or the size of NuStar [Farms] to not use undocumented labor," the Article featured two area dairy farmers commenting on the matter. (Docs. 118-2, at 18; 130-1, at 37; 138-1, at 51). One of these sources was featured in a January 2016 *Des Moines Register* article, which informed Lizza's view that Midwestern dairies rely on undocumented labor, though plaintiffs deny and dispute Lizza ever reviewed the article. (Docs. 118-2, at 19; 130-1, at 37, 37 n.13 (citing Lizza's affidavit); 138-1, at 51-52). One source, who stated that they "sent" people "over there" stated people with documentation are going to go to a good company with benefits, not work in a dairy making $14 an hour without vacation and benefits. (Docs. 118-2, at 19; 130-1, at 37-38; 138-1, at 52).

The Article goes on to state, "Is it possible the Nuneses have nothing to be seriously concerned about? Of course . . . ," and, defendants claim to plaintiffs' denial, Lizza did not intend to convey a formal conspiracy to hide the family's move to Iowa or that the secret involved anything other than the move. (Docs. 118-2, at 19; 130-1, at 38; 138-1, at 52-53). The Article states that Devin Nunes "has no financial interest in his parents' Iowa dairy operation," and defendants claim to plaintiffs' denial, that no facts within the Article allege that Devin is involved in the farm's operations or knows about hiring practices. (Docs. 118-2, at 19-20; 130-1, at 38; 138-1, at 53-54). Plaintiffs dispute that the Article details that Devin has no ownership or operational interest in the farm, to which defendants reply that the Article states Devin has no financial interest in the farm, which includes not having an operational interest, and that it is true Devin and

17

his wife filed a document with the Securities and Exchange Commission ("SEC") listing their address as the NuStar Farms post-office box because Lizza retrieved the document from the SEC website. (Docs. 118-2, at 19-20, 62; 130-1, at 39, 118; 138-1, at 53-54, 165).

The Article goes on to name the aforementioned secret, which plaintiffs state conveys a defamatory implication and not the farm's location as the secret. (Docs. 118-2, at 20; 130-1, at 39-40; 138-1, at 54-56). The Article then asks, "Why would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa?" (Docs. 118-2, at 20; 130-1, at 39-40; 138-1, at 54-56). Defendants claim, to plaintiffs' denial, "conspire" here means to act in harmony, not to commit a formal, actionable conspiracy. (Docs. 118-2, at 20; 130-1, at 39-40; 138-1, at 54-56).

Defendants state that while in Sibley, Lizza tried to interview Devin Nunes and the NuStar plaintiffs on multiple occasions. (Docs. 118-2, at 20; 130-1, at 40-41; 138-1, at 56-57). Defendants claim, and plaintiffs deny, that Lizza called NuStar Farms multiple times without response and that he was rebuffed and ignored when he attempted to interview Anthony Jr. (Docs. 118-2, at 21; 130-1, at 41; 138-1, at 57). Devin Nunes also did not respond to requests for comment and advised his father to not speak to Lizza. (Docs. 118-2, at 21; 130-1, at 41; 138-1, at 57-58).

### 2. *Editing Process*

According to defendants, a thorough editing process occurred to ensure the accuracy of the statements in the Article and the clarity of the narrative, all while consulting Lizza. (Docs. 118-2, at 21; 138-1, at 58-61). Defendants assert the Article was checked by multiple fact-checkers, but plaintiffs dispute this, adding their conclusion that defendants were negligent in not keeping Lizza's notes, tapes, and records despite suit being filed a year after the Article's creation and Hearst's policy of retaining such

materials for 60 days only.  (Docs. 118-2, at 9, 21; 130-1, at 14-15, 41-44; 138-1, at 18-19, 58-61).  Then, *Esquire* performed several rounds of editing using multiple senior editors, including the story editor, the Executive Director of Editorial, and the Editor-in-Chief, in addition to contributions from the Art Department and a copy-editing process performed by the Assistant Copy Editor, with the Article receiving final approval by the Editor-in-Chief; plaintiffs dispute these facts.  (Docs. 118-2, at 21; 130-1, at 41-44; 138-1, at 58-61).

Instead, plaintiffs state that though the Article went through multiple drafts, yet after listening to the tapes, Lizza knowingly included falsities in the Article.  (Docs. 130-1, at 41-44).  In support of this claimed fact, plaintiffs list three versions of a paragraph from the Article:

> (1)     There was no doubt about why I was being followed.  According to two sources with firsthand knowledge, NuStar did indeed rely on undocumented labor.  One source, who was deeply connected in the local Hispanic community, *told me that the source has personally sent undocumented workers to Anthony Nunes' farm for jobs*.  'I've been there and bring illegal people,' the source said.  "*And he knows that*."  The source added, "People come here and ask [sic] work so I send them over there."

> (2)     There was no doubt about why I was being followed.  According to two sources with firsthand knowledge, NuStar did indeed rely on undocumented labor.  One source, who was deeply connected in the local Hispanic community, *has personally sent undocumented workers to Anthony Nunes' farm for jobs*.  'I've been there and bring illegal people,' the source said.  "*And he knows that*."  The source added, "People come here and ask work so I send them over there."

> (3)     "There was no doubt about why I was being followed.  According to two sources with firsthand knowledge, NuStar did indeed rely, *as* [sic] *least in part*, on undocumented labor.  One source, who was deeply connected in the local Hispanic community, *had personally sent undocumented workers to Anthony Nunes, Jr.'s farm for jobs*.  'I've been there and bring illegal people,' the source said, *asserting*

> *that the farm was aware of their status*. "People come here and ask
> work so I send them over there."

(*Id.*) (emphasis added). Defendants acknowledge these changes were made but call them non-substantive and state the changes do not suggest carelessness or that defendants acknowledged the statements' falsity. (Doc. 138-1, at 60-61).

### 3.    Publication

Again, the Article was published on September 30, 2018, on *Esquire*.com and later printed in the November 2018 print copy of *Esquire*. (Docs. 118-2, at 13; 130-1, at 23-24; 138-1, at 28). On November 20, 2019, Lizza tweeted a link to the Article—the Tweet—on his personal Twitter. (Docs. 118-2, at 13; 130-1, at 24-25; 138-1, at 28-30). Defendants state Lizza believed when the Article was published and the Tweet was published, and still believes today, that NuStar plaintiffs knowingly employed undocumented workers, which plaintiffs state is false because they believe Lizza never spoke to one of their workers or anyone with firsthand knowledge, though defendants say this is not true. (Docs. 118-2, at 21; 130-1, at 44-45; 138-1, at 61-63). Also, defendants assert that Lizza believed at the time of the Article and Tweet publications, and still believes today, that dairy farms often use undocumented labor, which led him to believe NuStar Farms knowingly hired undocumented laborers, as he thought it unlikely NuStar plaintiffs could remain ignorant of their workers' statuses. (Docs. 118-2, at 21-22; 138-1, at 63-64). Plaintiffs deny this and call the Article a conjured "October Surprise" that intentionally ignored Lizza's tapes and notes and did not acknowledge that NuStar plaintiffs did not own the farm when Source 1 brought labor to the Sibley farm. (Doc. 130-1, at 45).

Defendants also state Lizza's research uncovered many facts showing reliance on undocumented labor is common and widely known, including the aforementioned IRCA prosecution and statements from dairy industry groups. (Docs. 118-2, at 22; 138-1, at

20

64-66).  According to defendants, one source informed Lizza that Anthony Jr. called the source expressing fear that the Article would put a target on the Nunes' Sibley dairy and lead to an ICE raid, which the source stated led the source to believe NuStar plaintiffs would only be in fear of an ICE raid if they have undocumented workers.  (Docs. 118-2, at 22-23; 138-1, at 64-66).  Plaintiffs state neither this phone call nor expression of fear that an ICE raid would occur ever happened.  (Doc. 130-1, at 45-46).

Also, defendants state that when Lizza published the Tweet, Lizza believed Devin Nunes was aware that NuStar Farms hires and uses undocumented labor, which he believed was one reason Devin had been "reticent" about his family's move.  (Doc. 118-2, at 23).  NuStar plaintiffs deny this, stating their family has never been reticent about their move to Iowa or the operation of NuStar Farm, the move has been a matter of public record since 2006, and there is no evidence showing Devin—who spoke publicly about NuStar Farms—was ever aware that NuStar hires unauthorized workers.  (Doc. 130-1, at 46-47).  Defendants reply to this proffer that plaintiffs cite to no evidence in support of their asserted facts.  (Doc. 138-1, at 66-67).  Further, defendants state Lizza was familiar with Devin's farming background, education, work experience, and family's farming history, which led Lizza to believe Devin would know dairy farms, including NuStar Farms, rely on undocumented labor.  (Docs. 118-2, at 23-24; 138-1, at 67-68).  Lizza believed this was another reason Devin was not open about the family's move, given his immigration stances and his purported conversations about the farm with his family, and that Devin would have talked about the dairy's labor pool because he used its address on an SEC filing.  (Docs. 118-2, at 23-24; 138-1, at 67-68).  Plaintiffs state Devin never discussed labor or farm operations as to the Sibley farm with his father, and Devin had no experience that would lead him to believe his family employed undocumented laborers there.  (Doc. 130-1, at 47-48).

### 4. *Retraction*

Defendants received no complaint or demand for correction or retraction until a year after the Article's publication, and Lizza did not find the Molly Hemingway article in *The Federalist* to have refuted[11] any of the Article's reporting on undocumented labor use. (Docs. 118-2, at 24; 130-1, at 48-49; 138-1, at 69-70). On September 25, 2019, however, Devin Nunes sent a retraction demand letter to defendants. (Docs. 118-2, at 24; 130-1, at 49-50; 138-1, at 70). Five days later, Devin Nunes filed this suit. (Docs. 118-2, at 25; 130-1, at 50; 138-1, at 70).

Lizza read the retraction demand and complaint around the time of delivery in September 2019. (Docs. 118-2, at 25; 130-1, at 50; 138-1, at 70-71). Lizza believed the complaint challenged eight or nine statements as false but did not read the complaint as challenging any implication that Nunes was aware of any undocumented workforce, though plaintiffs state they expressly asked for retraction of the implication. (Docs. 118-2, at 25; 130-1, at 50; 138-1, at 70-71). Also, Lizza did not take the retraction demand or complaint to challenge the statements that NuStar Farms uses undocumented labor—though plaintiffs state the retraction did challenge knowing use and employment of undocumented labor—which surprised him and led him to tweet that Devin rebutted the Article but not its core findings on undocumented labor. (Docs. 118-2, at 25-26; 130-1, at 51-52; 138-1, at 71-73). Further, defendants state that the retraction demand and complaint do not allege what "criminal wrongdoing" the Article, through its defamatory gist and false implication, purportedly alleged that Devin knew about or conspired to conceal, because the conspiracy makes no mention of Devin's knowledge of NuStar Farm's use of undocumented labor. (Docs. 118-2, at 26; 138-1, at 73-74). In

---

[11] Plaintiffs state the Hemingway article was not a rebuttal but an article pointing out falsehoods in the Article to show that the Sibley farm was mentioned at a town hall in 2010. (Docs. 118-2, at 24; 130-1, at 48-49; 138-1, at 69-70).

22

response, plaintiffs point to the Eighth Circuit Court of Appeals' finding that a reasonable reader could find the complaint plausibly alleges an implication that there was a conspiracy to hide NuStar plaintiffs' move, among other pieces of the implication. (Doc. 130-1, at 52-53). After receiving the complaint and retraction demand, Lizza still believed Devin knew NuStar Farms hires undocumented laborers, and no facts in the complaint changed Lizza's belief or caused him to doubt it, though plaintiffs maintain Lizza's belief is baseless. (Docs. 118-2, at 26-27; 130-1, at 53-54; 138-1, at 74-76).

Defendants assert, to plaintiffs' denial, that the original complaint contains numerous false statements, such as: (1) Lizza and his fiancée, Olivia Nuzzi, coordinated a smear campaign of tweeting the Article; (2) Lizza and Nuzzi had a joint scheme to retaliate against Devin for exposing corruption including the Hilary Clinton Steele dossier; and (3) a joint scheme among Lizza, the Editor-in-Chief of *Esquire*, Nuzzi, and CNN to publish the Article. (Docs. 118-2, at 27; 130-1, at 54-55; 138-1, at 76-78).

### 5. *The Tweet*

On November 20, 2019, Lizza tweeted a link to the Article via his personal Twitter account, having no doubt about the accuracy of the Article or that Devin Nunes was aware that NuStar Farms knowingly hires undocumented laborers; plaintiffs contest this fact, asserting Lizza knew the Article contained falsehoods on these topics. (Docs. 118-2, at 27; 130-1, at 55-56; 138-1, at 78-79). Defendants add no one at Hearst directed Lizza, who left their employment months before, to share the link; plaintiffs contest Hearst's liability nonetheless, arguing Hearst is liable because Lizza has apparent authority to publish the Article again through the Tweet. (Docs. 118-2, at 27-28; 130-1, at 55-56; 138-1, at 78-79).

### 6. *Public Mention of the Sibley Farm*

According to plaintiffs, Devin has mentioned his family's move to Iowa, in part because the Hemingway article documents King saying to people that Devin's family are

among his constituents; as defendants point out, however, Devin himself is not documented in the record discussing his family's move to Iowa. (Docs. 118-2, at 28; 130-1, at 56; 138-1, at 79-80). When asked to produce documents relating to any statement Devin made about his family's move to Iowa or mentioning NuStar Farms, Devin responded that there were none, though plaintiffs state that is because Devin was never involved in the business of NuStar Farms. (Docs. 118-2, at 28; 130-1, at 57; 138-1, at 80). In fact, Devin did not recall any statements or communications he made about NuStar Farms, his family's move to Iowa, the purchase of NuStar Farms, or the family's role in managing or operating NuStar Farms. (Docs. 118-2, at 28; 130-1, at 56-57; 138-1, at 80-81). Devin has been in Iowa since the Nunes' move, however, and states he made mention of his family being in Iowa at a 2010 townhall in Le Mars, Iowa, though the press release for the event did not mention his family's Sibley farm—King's office, not Nunes'—created the press release. (Docs. 118-2, at 28-29; 130-1, at 57-58; 138-1, at 81). Devin holds not the Iowa farm, but the Tulare, California farm as the family dairy that is central to his identity and has taken guests, ambassadors, diplomats, media members, and government officials to the Tulare farm for tours. (Docs. 118-2, at 29; 130-1, at 58; 138-1, at 82).

In August 2018, however, a petition was brought in California state court claiming it was misleading for Devin to be called "U.S. Representative/Farmer" on the November 2018 election ballot, given that he had not farmed in 11 years; it was later found that no error was made in accepting Nunes' ballot with that title. (Docs. 118-2, at 29; 130-1, at 58-60; 138-1, at 82-83). Devin responded to the petition by detailing his connection to farming including through his relatives, though he mentioned neither NuStar Farms nor that his family operated a farm in Sibley. (Docs. 118-2, at 29; 130-1, at 60; 138-1, at 83-84). Here, NuStar plaintiffs produced no discovery related to any public statement by them about Devin, stated there were no documents, and did not answer an

24

interrogatory to identify every public statement or communication NuStar plaintiffs made relating to Devin, because they objected to the interrogatory. (Docs. 118-2, at 30; 130-1, at 60-61; 138-1, at 84-85). In 2009, a regional dairy publication wrote an article about NuStar plaintiffs; NuStar plaintiffs conditioned their participation in the article on the agreement that there would be no mention of Devin, as he had nothing to do with the Sibley dairy. (Docs. 118-2, at 30-31; 130-1, at 61-62; 138-1, at 85). Later, NuStar plaintiffs asked the publication to remove the article out of concern for Devin and because they did not want publicity for the dairy and regretted the interview. (Docs. 118-2, at 30-31; 130-1, at 61-62; 138-1, at 85-86).

### 7. *Allegations of Federal Immigration Violations*

Defendants state that their expert, Philip Martin, explained that United States agricultural workers are primarily Hispanic and foreign-born, and 70 percent of foreign-born workers are unauthorized; plaintiffs dispute defendants' statement. (Docs. 118-2, at 42; 130-1, at 85; 138-1, at 117-18). When asked, "What do you think of people here—who are here illegally, just putting in work and making money for their family? Do you think there's anything wrong with that?" Anthony Jr. expressed a positive opinion of those people and stated positive sentiment toward the Bracero program[12] or one like it in which the government would legalize immigrants working in agriculture. (Docs. 118-2, at 42-43; 130-1, at 85-86; 138-1, at 118-19).

Under federal law, employers must use a Form I-9 to verify the identity and employment authorization of individuals hired by employers in the United States. (Docs. 118-2, at 31; 130-1, at 62; 138-1, at 86). Section 2 of the Form I-9 requires the

---

[12] On August 4, 1942, the Bracero program commenced with the goal of easing labor shortages by allowing millions of Mexican nationals to legally enter the United States to work on short-term contracts, often in the field of agriculture, though the program ended on December 31, 1964. LIBRARY OF CONGRESS, *1942: Bracero Program*, https://guides.loc.gov/latinx-civil-rights/bracero-program; (Docs. 118-2, at 69; 130-1, at 125; 138-1, at 177).

employer's signature and date attesting that they (1) "have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of [the employer's] knowledge the employee is authorized to work in the United States." (Docs. 118-2, at 31; 130-1, at 62; 138-1, at 86). For at least 289 Form I-9s—based on the 309 NuStar plaintiffs provided in discovery—NuStar Farms did not complete Section 2 on time, which is a substantive IRCA violation. (Docs. 118-2, at 31; 130-1, at 62-69; 138-1, at 86-96).

In October 2018, NuStar Farms was advised by its immigration attorney, Amanda Bahena, who was performing an internal I-9 compliance audit, that Section 2 must be filled out for all employees and that NuStar Farms could accept a document that "looks correct on its face" without further inquiry. (Docs. 118-2, at 31-32; 130-1, at 69-70; 138-1, at 96-98). On at least 208 Form I-9s, NuStar Farms never signed and dated Section 2, which is, as plaintiffs' expert testified, a substantive IRCA violation. (Docs. 118-2, at 32-33; 130-1, at 71; 138-1, at 99-100). Defendants state that for at least 68 Form I-9s, NuStar Farms did not fill out any portion of the forms on time—another substantive violation—and waited months or years to do so despite the law requiring the forms be filled out in within three days of the hire. (Docs. 118-2, at 32-33; 138-1, at 100-02). Plaintiffs dispute this, saying they completed all documentation at the commencement of each employee's work. (Doc. 130-1, at 72-73).

### a.    *NuStar Farms' Onboarding Process*

Dian Nunes, who trained the current bookkeeper, Lori Nunes, testified at her deposition that "it is 'a known fact' that it is 'against the law' to inspect employee documents." (Docs. 118-2, at 33; 130-1, at 73; 138-1, at 102). During Anthony III's deposition, he testified he believes he is not legally allowed to ask about expirations or question document validity and that he thought asking would constitute discrimination.

(Docs. 118-2, at 33-34; 130-1, at 73-74; 138-1, at 102-103). Anthony Jr. testified "it might be illegal for me to ask [workers] about their [SSNs]" submitted with the I-9 even when the SSA has alerted NuStar Farms of a no-match. (Docs. 118-2, at 33; 130-1, at 74; 138-1, at 103). Defendants state, to plaintiffs' denial, that Dian never verified employee documentation at NuStar Farms[13] because she thought it was against the law to try, which plaintiffs say is false because she verified documentation, just not immigration status. (Docs. 118-2, at 34; 130-1, at 74; 138-1, at 104).

Upon moving to Iowa, Anthony Jr., who has never taken responsibility for verifying documents at the Sibley farm, informed Anthony III that Anthony III was in charge of "the labor" and "the problems" because Anthony Jr. did not want to deal with labor or related problems. (Docs. 118-2, at 34; 130-1, at 74-75; 138-1, at 104).

Anthony III's wife, Lori, enters the onboarding paperwork and is tasked with ensuring all the entries are correct by checking the Form I-9s, which she has done at NuStar Farms since 2010. (Docs. 118-2, at 34; 130-1, at 75; 138-1, at 104-105). Lori has never reviewed a NuStar Farms' employee's identification for correctness, however, and does not believe it is her responsibility to look at Form I-9s and check them for correctness after an employee returns the Form I-9—though she has before. (Docs. 118-2, at 35; 130-1, at 75; 138-1, at 105). In Lori's deposition testimony, she stated the October 2018 self-audit was how she learned the dairy had to complete Section 2 of the Form I-9. (Docs. 118-2, at 35; 130-1, at 76; 138-1, at 106). Lori's practice, which she learned from Dian, is to enter the name and submitted SSN into QuickBooks to process payroll. (Docs. 118-2, at 35; 130-1, at 76; 138-1, at 106). Having learned all her bookkeeping skills from Dian, Lori followed Dian, Anthony Jr., and Anthony III's

---

[13] Defendants' claimed fact uses the label "Nunes Farms," not "NuStar Farms." (Doc. 118-2, at 34). Neither party comments on this distinction. Given that this is the only mention of "Nunes Farms," the Court interprets this as a typographical error and that defendants intended to say NuStar Farms.

27

direction relating to employment documents because she believed they knew and followed those laws. (Docs. 118-2, at 35; 130-1, at 76; 138-1, at 107).

Though Dian knew a Form I-9 was required for each employee and read the instructions, she never discussed the Form I-9 requirements with Lori or others at NuStar Farms; instead, she told Lori to make copies of the papers, attach them to the other paperwork, and file the documents. (Docs. 118-2, at 35-36; 130-1, at 77; 138-1, at 107-108). When Lori was asked during her deposition whether she wanted to know of her employees' statuses, Lori stated she did not know and has a lot of feelings on the matter. (Docs. 118-2, at 36; 130-1, at 75; 138-1, at 108-09). Plaintiffs' expert, Clete Samson, testified in his deposition that an employer "generally has the duty to confirm that their employees are authorized for work." (Docs. 118-2, at 36; 130-1, at 78; 138-1, at 109). Claude Arnold, defendants' expert, and Samson agree that at a minimum, the number and type of substantive Form I-9 violations is indicia of NuStar plaintiffs' constructive knowledge of hiring undocumented persons. (Docs. 118-2, at 36-37; 130-1, at 78; 138-1, at 109). Defendants expand this conclusion, however, and say, which plaintiffs deny, the number and type of violations are sufficient to conclude NuStar plaintiffs had constructive knowledge but were in willful disregard of laborers' eligibility to work in the United States. (Docs. 118-2, at 33-37; 130-1, at 78; 138-1, at 109).

On April 1, 2021, NuStar plaintiffs provided a document listing all its employees and former employees, which included their names, proffered SSNs, dates of birth, and dates of employment. (Docs. 118-2, at 37; 130-1, at 78; 138-1, at 109). This Court ordered the SSA to verify the SSNs of all disclosed NuStar Farms employees by populating a chart containing all NuStar Farms' current and former employees' names, proffered dates of birth, and SSNs in the rows and including a "Match?" column to state "Yes" if the name and SSN in that row matched the SSA records and "No" if not; on April 16, 2021, the SSA produced such a chart ("the Chart"). (Docs. 118-2, at 37; 130-

1, at 78-79; 138-1, at 109-10).  Of those employees who NuStar plaintiffs employed on or before September 30, 2018, 243 of 319 employees' names, dates of birth, and SSNs did not match SSA records.  (Docs. 118-2, at 37; 130-1, at 79; 138-1, at 110).

### b.    NuStar Farms' History of No-Match Issues

In October 2019, NuStar Farms received a letter from the SSA ("2018 No-Match Letter") stating that 20 of 27 W-2s submitted to the Internal Revenue Service ("IRS") for 2018 reported SSNs that did not match the SSA's records.  (Docs. 118-2, at 38; 130-1, at 79; 138-1, at 111).  Lori thought the 2018 No-Match Letter was a joke but still informed Anthony III and Anthony Jr., who said to do nothing but file it.  (Docs. 118-2, at 38; 130-1, at 80; 138-1, at 111).  In December 2020, NuStar Farms received another letter from the SSA ("2019 No-Match Letter") stating that 14 of 19 W-2s for tax year 2019 provided SSNs that did not match SSA records, which Lori believed was "bogus." (Docs. 118-2, at 38; 130-1, at 80; 138-1, at 111-12).

The no-match letters are what the SSA calls "EDCOR" letters or "Educational Correspondence," which the SSA began to send in 2019 after a decade-long hiatus from the practice.  (Docs. 118-2, at 39; 130-1, at 80-81; 138-1, at 112).  Both no-match letters state that NuStar plaintiffs could log into a government portal to find out which employees' information did not match, so as to ensure there were no errors with their identification documents.  (Docs. 118-2, at 39; 130-1, at 81; 138-1, at 112-13).  Both letters informed NuStar plaintiffs that when information does not match, the SSA cannot credit the earnings to the employee's Social Security records, which impacts whether the employee is "entitled to Social Security retirement, disability, and survivors' benefits, and how much he or she can receive."  (Docs. 118-2, at 39; 130-1, at 81; 138-1, at 113). Both letters provided information about free online wage reporting tools and how to view and correct name and SSN mismatches, in addition to indication that mismatches can be

the result of bookkeeping errors, which NuStar plaintiffs ruled out. (Docs. 118-2, at 39-40; 130-1, at 82; 138-1, at 113).

On the SSA website, there is information about what employers can do should they have questions about their EDCOR letters. (Docs. 118-2, at 40; 130-1, at 82; 138-1, at 114). That website states that an employer is responsible for investigating a name and SSN mismatch error. (Docs. 118-2, at 40; 130-1, at 82; 138-1, at 114). After receiving the letters, Lori, Anthony III, and Anthony Jr. did not visit the SSA website to determine which of their employees had records that did not match. (Docs. 118-2, at 40; 130-1, at 82; 138-1, at 113-14). After receiving the 2018 No-Match Letter, none of NuStar Farms' owners or managers advised employees to contact the SSA to correct the discrepancy, nor did the owners or managers seek legal advice. (Docs. 118-2, at 40; 130-1, at 82-83; 138-1, at 115). When NuStar plaintiffs received the 2019 No-Match Letter, Anthony III, Anthony Jr., and Lori did not visit the SSA website to determine which employees had information that did not match. (Docs. 118-2, at 41; 130-1, at 83; 138-1, at 115). In response, none of NuStar Farms' owners or managers asked any employees to check the accuracy of their SSNs, nor did they advise their employees to contact the SSA to correct the issues. (Docs. 118-2, at 41; 130-1, at 83; 138-1, at 115). Further, none of the owners or managers sought legal advice upon receiving the 2019 No-Match Letter. (Docs. 118-2, at 41; 130-1, at 83; 138-1, at 116).

Defendants state, and plaintiffs deny and dispute based on Arnold's methodology and conclusions, that Arnold concluded 239 of the 319 persons NuStar employed on or before September 30, 2018, had provided "counterfeit Resident Alien, state identification or Social Security card documents or did not provide documentation that satisfies employee verification requirements." (Docs. 118-2, at 41-42; 130-1, at 84; 138-1, at 116). Defendants state, and plaintiffs again deny and dispute based on Arnold's methodology and conclusions, that when Arnold produced his July 30, 2021 report,

NuStar Farms still employed nine of the aforementioned undocumented workers. (Docs. 118-2, at 42; 130-1, at 84; 138-1, at 116-17). Samson testified that some of the NuStar Farms' employees' documents contained "indicia" that they were "fake," including that the documents used different fonts than genuine cards and some SSNs started with the number 9 despite the SSA not assigning SSNs starting with that number. (Docs. 118-2, at 42; 130-1, at 84-85; 138-1, at 117). Plaintiffs add, to defendants' protest, that Samson also agreed with Arnold that other indicia existed, such as misspellings. (Docs. 118-2, at 45; 130-1, at 91; 138-1, at 126).

### c. NuStar Farms' Employees with Problematic Documents

On December 11, 2006, NuStar Farms hired R.G. who presented a Resident Alien card that had expired June 3, 2006, and the SSA confirmed R.G.'s name and SSN did not match records. (Docs. 118-2, at 43; 130-1, at 86; 138-1, at 119-20). On February 21, 2007, NuStar Farms hired I.C.V. who presented a Resident Alien card that expired on December 30, 2005, and whose name and SSN did not match SSA records. (Docs. 118-2, at 43; 130-1, at 86-87; 138-1, at 120). On July 4, 2007, NuStar Farms hired F.C.V., whose Form I-9 is dated July 20, 2007, and who presented a Resident Alien card expiring November 30, 2006; F.C.V.'s name and SSN did not match SSA records. (Docs. 118-2, at 43; 130-1, at 87; 138-1, at 120-21). On May 18, 2011, NuStar Farms hired A.H. who presented a Resident Alien card bearing an expiration date of December 5, 2009. (Docs. 118-2, at 43-44; 130-1, at 87-88; 138-1, at 121). On May 23, 2011, Lori signed the Section 2 employer verification on A.H.'s Form I-9; A.H.'s name and SSN did not match SSA records. (Docs. 118-2, at 43-44; 130-1, at 87-88; 138-1, at 121).

Samson stated that accepting expired work authorization documents violates the IRCA and opined that, having viewed F.C.V.'s Form I-9, F.C.V. must not have been instructed in any way how to fill out his Form I-9. (Docs. 118-2, at 43; 130-1, at 88-90;

31

138-1, at 122-23). Samson further testified that verifying and recording the expiration date is an important record-keeping obligation of the employer. (Docs. 118-2, at 44; 130-1, at 89-90; 138-1, at 123-24). Lori testified that she did not see expiration dates on documents because she did not check them, while Anthony III did not know work authorizations had expiration dates. (Docs. 118-2, at 44; 130-1, at 90; 138-1, at 124). Having been advised by Bahena, Lori now knows that she cannot accept expired documents and how to correctly complete forms. (Docs. 118-2, at 45; 130-1, at 90; 138-1, at 124).

On May 10, 2012, NuStar Farms hired J.N. who presented NuStar Farms with a state identification card that expired April 22, 2012. (Docs. 118-2, at 45; 130-1, at 90; 138-1, at 124-25). On July 7, 2017, NuStar Farms hired A.G.M. who provided a state identification card that had expired on January 18, 2016. (Docs. 118-2, at 45; 130-1, at 91; 138-1, at 125). Bahena acknowledged the fact NuStar Farms should not accept expired state identification documents. (Docs. 118-2, at 45; 130-1, at 91; 138-1, at 126).

In February 2018, NuStar Farms hired M.M.O. whose original Form I-9 identified him as a citizen of the United States; his name and SSN, however, did not match SSA records. (Docs. 118-2, at 46; 130-1, at 91-92; 138-1, at 126-27). In May 2021, after subpoenaing M.M.O., defendants were told M.M.O. no longer worked for NuStar plaintiffs, and he could not be produced for deposition. (Docs. 118-2, at 46; 130-1, at 92; 138-1, at 127). In May 2022, NuStar Farms re-hired M.M.O., and accepted the same identification document as in February 2018, though it had expired in May 2021, and NuStar plaintiffs did not complete Section 2 of M.M.O.'s Form I-9. (Docs. 118-2, at 46; 130-1, at 92-93; 138-1, at 127-28 (citing Doc. 118-115)). The May 2022 Form I-9, however, did not list M.M.O. as a citizen but rather a lawful permanent resident, and M.M.O.'s Alien Registration number was not on the Form. (Docs. 118-2, at 46; 130-1, at 93; 138-1, at 129). Defendants state Samson acknowledges that it is a red flag

for an employer when a potential employee presents the employer with a name and SSN that the employer has already been told by the SSA does not match; plaintiffs dispute this, saying the Chart showing the mismatch would not show constructive knowledge, and instead only "indicia of a potential issue with fraudulent documents being used." (Docs. 118-2, at 46; 130-1, at 93-94; 138-1, at 129-30).

The Form I-9's instructions state that a Social Security card is not valid to establish employment authorization if it states, "VALID FOR WORK ONLY WITH [DHS OR INS] AUTHORIZATION." (Docs. 118-2, at 47; 130-1, at 94; 138-1, at 130). But NuStar Farms hired two known employees who presented Social Security cards bearing "VALID FOR WORK ONLY WITH [DHS OR INS] AUTHORIZATION," and one employee, H.F., presented a name and SSN that did not match SSA records. (Docs. 118-2, at 47; 130-1, at 94; 138-1, at 130-31). When Lori was asked about the notation as to one employee's card, she stated she did not recall the specific card but that there is most likely an authorization form that goes with the card, as is required. (Docs. 118-2, at 47; 130-1, at 95; 138-1, at 131-32).

In October 2018, Bahena informed Lori that when NuStar Farms reviews Form I-9s, identification documents, and work authorization documents, NuStar Farms should inspect the documents for discrepancies and inconsistencies. (Docs. 118-2, at 47-48; 130-1, at 95-96; 138-1, at 132). On August 20, 2007, NuStar Farms hired R.V.B. whose date of birth on his Form I-9 was "10-12-1975," though it was listed as "12/10/75" on his permanent resident card. (Docs. 118-2, at 49; 130-1, at 98-99; 138-1, at 135-36). Further, the SSA had no match to someone with his name, SSN, or either date in combination. (Docs. 118-2, at 49; 130-1, at 98-99; 138-1, at 135-36). On June 19, 2013, NuStar Farms hired someone listed on their Form I-9—which a translator helped him with—as "Criserio P.V.," as "Cricerio" on his W-4, and "Criceiro" on his identification document. (Docs. 118-2, at 48; 130-1, at 97; 138-1, at 133-34). The W-

4 lists this employee as having been born "11-12-86," but on his permanent resident card, his date of birth is "01/12/1986." (Docs. 118-2, at 48; 130-1, at 97; 138-1, at 133-34). On September 24, 2013, NuStar Farms hired A.V.G., whose Form I-9 lists his date of birth as "10-08-1990," though his permanent resident card states he was born on "10/18/90." (Docs. 118-2, at 49; 130-1, at 99; 138-1, at 136). The SSA had no match to an individual by his name, SSN, and either date of birth in combination. (Docs. 118-2, at 49; 130-1, at 99; 138-1, at 136). On January 1, 2016, NuStar Farms hired D.T.M., who, according to his Form I-9, was born on "10-6-1996." (Docs. 118-2, at 48-49; 130-1, at 98; 138-1, at 134-35). But D.T.M.'s permanent resident card—which was submitted with his Form I-9—lists his date of birth as "10 Jan. 1996," and there was no match within SSA records for someone with his name, SSN, and birthdate combination using either date. (Docs. 118-2, at 48-49; 130-1, at 98; 138-1, at 134-35).

Plaintiffs also hired C.L., whose identification card misspelled his last name as "Lpez." (Docs. 118-2, at 49; 130-1, at 99-100; 138-1, at 136-37). Plaintiffs hired J.A.G., the back of whose identification card defendants assert misspelled his middle name as "Afuirre." (Docs. 118-2, at 49; 130-1, at 99-100; 138-1, at 136-37). Also, Samson admits NuStar plaintiffs committed a substantive violation when they hired I.C.V., whose identification and social security cards both misspelled his first name as "Irael," because his identification card was expired. (Docs. 118-2, at 49-50; 130-1, at 100-01; 138-1, at 137-38). NuStar Farms also hired I.S., who presented identification and social security cards in which his first name was misspelled as "Israel." (Docs. 118-2, at 50; 130-1, at 101; 138-1, at 138-39). Bahena testified at her deposition that had NuStar plaintiffs "noticed the mismatch of the name, it would raise questions that [she] would advise them to follow up on." (Docs. 118-2, at 50; 130-1, at 101-02; 138-1, at 139). NuStar Farms hired T.F., who plaintiffs refer to as "J.F.," whose name is written as "T.F." in both Sections 1 and 2 of the Form I-9, but as "J.F.F." in the Section 1

34

Case 5:19-cv-04064-CJW-MAR    Document 149    Filed 04/25/23    Page 34 of 101

signature block and on his identification card. (Docs. 118-2, at 50; 130-1, at 102; 138-1, at 139-40). Had T.F. been a current employee when Bahena began her representation, Bahena stated she would have advised NuStar plaintiffs to follow up and terminate the worker if he was undocumented. (Docs. 118-2, at 50; 130-1, at 102-03; 138-1, at 140).

Last, NuStar Farms hired P.C.M., who presented an identification document purportedly issued by the Texas Department of Public Safety, though the document misspelled the word "Safety" as "Safery."[14] (Docs. 118-2, at 50; 130-1, at 103; 138-1, at 140-41). Bahena advised NuStar plaintiffs to question employees about their documents if they noticed obvious typos in the identification cards. (Docs. 118-2, at 51; 130-1, at 103; 138-1, at 141).

### d.     NuStar Farms Employees' Invocation of the Fifth Amendment

Defendants served deposition subpoenas on six of NuStar Farms' current employees who have worked for NuStar Farms for 5-14 years and were all hired before the Article's publication; each employee was asked to produce their original identification and authorization documents. (Docs. 118-2, at 51; 130-1, at 104; 138-1, at 141-42). F.S.D., J.T.G., and L.P.P. are paid significantly higher salaries than other workers and sometimes more than Anthony III. (Docs. 118-2, at 51; 130-1, at 104; 138-1, at 142). J.T.G. served in a supervisory position, according to Source 1's testimony. (Docs. 118-2, at 51; 130-1, at 104; 138-1, at 142). When F.S.D. sat for his March 12, 2021 deposition, his counsel—who NuStar Farms retained—stated he advised his client to "plead the Fifth" concerning his Form I-9 and associated documents. (Docs. 118-2, at 51-52; 130-1, at 104; 138-1, at 142-43). Further, when F.S.D.'s counsel so advised him to assert his Fifth Amendment rights, NuStar Farms' counsel interrupted to speak to

---

[14] Though not referenced by the parties, the word "department" is also misspelled "deparment." (Doc. 118-41, at 2).

F.S.D.'s counsel, after which F.S.D.'s counsel withdrew representation, and NuStar Farms' counsel said none of their employees were invoking their Fifth Amendment rights. (Docs. 118-2, at 52; 130-1, at 104-105; 138-1, at 143-44).

After counsel withdrew, the Court appointed new counsel for the employees who, thereafter, each invoked their Fifth Amendment rights and did not testify as to: (1) their proffered identification documents; (2) whether they are legally in the United States; (3) whether they are authorized to work in the United States; (4) whether they have been issued a valid social security card; (5) whether the United States has given them permission to live or work here; and (6) whether the federal or a state government has ever issued them identification cards. (Docs. 118-2, at 52-53; 130-1, at 105; 138-1, at 144-45). Also, none of the six workers produced the documents defendants subpoenaed, instead invoking the Fifth Amendment. (Docs. 118-2, at 53; 130-1, at 105; 138-1, at 145). All six workers invoked the Fifth Amendment and refused to answer when asked whether NuStar plaintiffs ever asked the employees for identification cards or documents and when asked whether they had spoken to NuStar plaintiffs about their authorization to work or reside in the United States and whether NuStar plaintiffs knew of the employees' respective authorization status. (Docs. 118-2, at 53; 130-1, at 105-06; 138-1, at 145-46). The six workers also invoked the Fifth Amendment and refused to answer when asked whether they filled out any forms or provided NuStar plaintiffs with documents regarding their authorization to work in the United States. (Docs. 118-2, at 54; 130-1, at 106; 138-1, at 146-47). When plaintiffs' counsel asked whether they had ever seen anyone bring workers to the Sibley dairy, both N.A.C. and A.K.S. invoked the Fifth Amendment, as did J.T.G. when asked whether NuStar Farms ever provided him housing, whether he lived in NuStar Farms-owned or Nunes-owned housing, or if he ever recruited workers for the dairy. (Docs. 118-2, at 54; 130-1, at 106-107; 138-1, at 147-48).

36

Also, all six subpoenaed employees had incomplete Form I-9s, as each Section 2 was incomplete, and the documents supplied to establish their identity and authorization to work were not listed on the Forms. (Docs. 118-2, at 54-55; 130-1, at 107; 138-1, at 148-49). The SSA confirmed none of the six subpoenaed employees' names, SSNs, and dates of birth in combination matched their records. (Docs. 118-2, at 55; 130-1, at 107-108; 138-1, at 149). Arnold testified, and Samson agreed—in defendants' telling— that to the extent there were paperwork and font issues and certain indicia of fraudulent documents, all six employees presented NuStar plaintiffs counterfeit documents containing the wrong fonts and various irregularities. (Docs. 118-2, at 55; 130-1, at 108-109; 138-1, at 149-51). According to defendants but contested by plaintiffs, there is no record of L.P.P. ever presenting NuStar plaintiffs with identification documents. (Docs. 118-2, at 55-56; 130-1, at 109; 138-1, at 151).

In October 2018, Bahena informed NuStar plaintiffs that at least some of its then-employed workers required follow-ups and "hard conversations" regarding their proffered work authorization documents, and she attached notes to at least one worker's documents and Form I-9, testifying that NuStar plaintiffs would have needed a valid work authorization document beyond his Social Security Card to maintain employment after Bahena's review. (Docs. 118-2, at 56; 130-1, at 109-10; 138-1, at 151-52). Plaintiffs deny and dispute defendants' assertion that Anthony III testified J.T.G.'s son, M.M., was hired despite not presenting valid work authorization, working on and off for four-and-a-half years. (Docs. 118-2, at 56; 130-1, at 110; 138-1, at 152). Defendants also state, to plaintiffs' denial, that Samson testified that A.K.S.—one of the six employees who pled the Fifth Amendment—presented a Social Security card that was discombobulated on its face and that, viewed with the Form I-9 that listed an "A Number" different from that of his permanent resident card, a reasonable employer should have

asked questions about the documents. (Docs. 118-2, at 56; 130-1, at 110-11; 138-1, at 153).

L.P.P., one of the six subpoenaed employees, has been convicted four times for failure to present a valid license. (Docs. 118-2, at 57; 130-1, at 111; 138-1, at 153-54). In 2018, another of the six subpoenaed employees, J.T.G., presented an updated California driver's license with a nonexistent address, despite living in Sibley since 2008 and in free, NuStar Farms-provided housing since 2015; plaintiffs deny these facts. (Docs. 118-2, at 57; 130-1, at 111; 138-1, at 154). F.S.D. also lives in rent-free, NuStar Farms-provided housing, which plaintiffs deny. (Docs. 118-2, at 57; 130-1, at 111; 138-1, at 154). Also, Samson stated J.T.G.'s documents would "cause a reasonable employer to have a duty of care to investigate." (Docs. 118-2, at 57; 130-1, at 111; 138-1, at 154-55). Further, Samson testified that NuStar Farms committed substantive IRCA violations upon hiring several of the six subpoenaed employees. (Docs. 118-2, at 57; 130-1, at 111-12; 138-1, at 155). On August 26, 2022, NuStar plaintiffs confirmed that they continue to employ all six employees. (Docs. 118-2, at 57-58; 130-1, at 112; 138-1, at 156). NuStar plaintiffs have not supplied additional or supplemental work authorization, identification, or Form I-9 documents for the six subpoenaed employees, though they state that is because they have already provided the documents they could find. (Docs. 118-2, at 58; 130-1, at 112; 138-1, at 156).

Further, as part of the employees' pay, NuStar Farms houses several of its employees, including J.T.G., F.S.D., and N.A.C., in homes owned by the Nunes family. (Docs. 118-2, at 58; 130-1, at 112; 138-1, at 156-57). According to Arnold, free housing is common among agricultural employees who might struggle to secure housing, should those employees be undocumented. (Docs. 118-2, at 58; 130-1, at 112-13; 138-1, at 157-58). Also, NuStar Farms provides health insurance to Nunes' family members in its employ, but it provides only worker's compensation insurance—not health insurance—to

38

non-Nunes' family employees; Arnold states, and plaintiffs deny, this is common for employers who know their employees are undocumented. (Docs. 118-2, at 58; 130-1, at 113; 138-1, at 158).

e. *Congressman Devin Nunes' Alleged Knowledge of NuStar Farms' Practices*

Devin stated that because of his time at the Tulare farm, he understands how hiring was done at the Tulare farm, and he cannot believe the practices would have changed when his family moved to Iowa. (Docs. 118-2, at 59; 130-1, at 113-14; 138-1, at 159). Devin also stated his belief that NuStar plaintiffs would not have hired anyone undocumented and that because of his familiarity with the hiring process in Tulare, he is sure NuStar plaintiffs are following the same procedure and regulations so as to not hire undocumented persons in Iowa. (Docs. 118-2, at 59; 130-1, at 114; 138-1, at 159-60). Specifically, Devin stated that NuStar plaintiffs' hiring practices "wouldn't have changed from the way that my grandmother did it and the way that we did it in the past." (Docs. 118-2, at 59; 130-1, at 114; 138-1, at 160). In stating he lacked knowledge about NuStar Farms' employment practices, Devin reiterated that he cannot imagine the practices have changed since when he worked with his family in California. (Docs. 118-2, at 59; 130-1, at 114; 138-1, at 160). Dian, Devin's mother, stated that the hiring procedure at the Sibley farm is "pretty much the same" as what the family did in California, and they "did not change their requirements" for Form I-9s when they moved to Iowa. (Docs. 118-2, at 60; 130-1, at 115; 138-1, at 160-61).

Dian's mother—Devin's grandmother—trained Devin how to hire. (Docs. 118-2, at 60; 130-1, at 115; 138-1, at 161). When Devin worked with family on their farms in California, the employee would fill out the Form I-9, and Devin would "get usually a social security . . . card, and a form or two of photo I.D." (Docs. 118-2, at 60; 130-1,

39

at 115; 138-1, at 161). Devin was asked whether he would review these cards to see whether they were genuine and responded:

> Yeah, I mean you had to—well, not if they're genuine, you have to accept them. I mean, I guess if you looked at a card and it had a picture of Ryan Lizza on it, and it wasn't of whoever's applying for the job, then—then, you know, you could challenge it at that point.

> But I don't know, I don't ever remember that happening. Somebody gives you a card, and it's their picture, you have to accept that as—as real, 'cause it's what they're giving you. And it would be illegal otherwise, discriminate against those people. Anybody that you're hiring, you can't challenge their—their identification that they give you.

(Docs. 118-2, at 60; 130-1, at 115; 138-1, at 161-62). Devin added that if an employer wanted to verify the documents, it would be impossible because it is impermissible to ask an applicant, so "nobody knows who's in this country illegally or not, and . . . you have no way to find out." (Docs. 118-2, at 60-61; 130-1, at 116; 138-1, at 162). Also, Devin stated that as someone who hires people "all the time," an employer must "accept their documentation as real, whatever they provide you." (Docs. 118-2, at 61; 130-1, at 116; 138-1, at 162). Last, when asked how one would enforce immigration laws if one cannot question an individual on the matter, Devin stated, "Well, they can't be questioned by the employer, that's for sure," and that accepting the provided documentation is "the way that I've always operated." (Docs. 118-2, at 61; 130-1, at 116; 138-1, at 162).

### f. Congressman Devin Nunes' Family Relationships

Before his election to the House of Representatives in 2002, Devin worked closely with his family on various farm ventures. (Docs. 118-2, at 61; 130-1, at 116; 138-1, at 163). Upon Devin's venture into politics, in support of her son on a volunteer basis, Dian became treasurer of the Devin Nunes Campaign Committee ("Devin's Campaign Committee"), a role she held at the time of her deposition along with being treasurer of three of Devin's political action committees. (Docs. 118-2, at 61-62; 130-1, at 116-17;

40

138-1, at 163). Devin is also involved with some of Anthony Jr.'s investment wineries in California. (Docs. 118-2, at 62; 130-1, at 117; 138-1, at 163). What is more, Devin often communicates with Anthony Jr. and Anthony III—to the tune of 860 calls, some calling one another back moments later after needing to hang up, over 18 months. (Docs. 118-2, at 62; 130-1, at 117; 138-1, at 163-64). Many conversations were about farming and how things were going at NuStar Farms, including water issues at the farm. (Docs. 118-2, at 62; 130-1, at 117-18; 138-1, at 163-64).

Devin has, in the past, arranged for his family to visit the White House and meet President George W. Bush. (Docs. 118-2, at 62; 130-1, at 118; 138-1, at 165). Anthony Jr., through Devin, met Senator John Hoeven when Hoeven was Governor of North Dakota, and they spoke about NuStar Farms. (Docs. 118-2, at 62-63; 130-1, at 118; 138-1, at 165-66). Anthony III and Anthony Jr., through Devin, have also met former Representative George Holding and met separately with Representative Billy Long, speaking with Long about farming. (Docs. 118-2, at 63; 130-1, at 118; 138-1, at 165-66).

Devin reported knowing that one NuStar Farms' employee is somehow related to Lori and knowing or knowing of—the parties contest which—some former NuStar Farms' employees. (Docs. 118-2, at 63; 130-1, at 118-19; 138-1, at 166). Devin and Anthony Jr. discussed NuStar Farms' employment records at some point—plaintiffs state during the litigation—because Devin was aware, he testified, that NuStar plaintiffs had to produce records going back "for the whole time" and learned from the conversation that "everybody was documented." (Docs. 118-2, at 63; 130-1, at 119; 138-1, at 166-67). In the Second Amended Complaint, Devin alleged that NuStar Farms' records show how NuStar plaintiffs documented workers. (Docs. 118-2, at 63; 130-1, at 119; 138-1, at 167). In the Third Amended Complaint—the complaint at issue here, Devin alleges that "documents establishing both employment authorization and ID as well as Forms I-9–

Employment Eligibility Verifications, are kept and maintained by NuStar [Farms] in the ordinary course of its business." (Docs. 118-2, at 63; 130-1, at 119; 138-1, at 167).

When Lizza arrived in Sibley for reporting but prior to the Nunes' awareness of which reporter was there, Anthony Jr. called Devin multiple times, and at least three times over two days once he learned it was Lizza, to inform Devin of a car driving around. (Docs. 118-2, at 64; 130-1, at 120; 138-1, at 167). Lizza sent Devin messages explaining he was writing an article about the "the dairy industry and immigration" a few days after Anthony Jr. informed Devin of Lizza's presence in Sibley. (Docs. 118-2, at 64; 130-1, at 120; 138-1, at 167-68). Devin never responded to Lizza and told his father not to either. (Docs. 118-2, at 64; 130-1, at 120; 138-1, at 168). The resulting Article was "exactly what [plaintiffs] thought" it would be. (Docs. 118-2, at 64; 130-1, at 120; 138-1, at 168).

### g. Congressman Devin Nunes' Time in Congress, Sponsorship, and Donations

Devin testified in his deposition that were there a mechanism for employers to "find out whether somebody's here illegally," it would be discriminatory and illegal. (Docs. 118-2, at 64; 130-1, at 120; 138-1, at 168). The federal government, however, offers a free online system called "E-Verify" that allows enrolled employers to verify their employees' ability to work in the United States. (Docs. 118-2, at 64; 130-1, at 121; 138-1, at 168). Employers can verify their employees' employment eligibility and identities by matching the Employment Eligibility Verification information on the Form I-9s against SSA and Department of Homeland Security ("DHS") records; the site has been used by millions in the United States since it became available in 1997. (Docs. 118-2, at 64-65; 130-1, at 121; 138-1, at 168-69). When Devin was asked about E-Verify and whether it may be used lawfully, he stated he believed it is unlawful to use it to target people, and the program is a failed program, does not work, and is discriminatory.

(Docs. 118-2, at 65; 130-1, at 121; 138-1, at 169). NuStar Farms does not and has never used E-Verify. (Docs. 118-2, at 65; 130-1, at 121-22; 138-1, at 169-70). An employer establishes a rebuttable presumption that it has not knowingly hired unauthorized employees when it confirms the identity and eligibility of a worker using E-Verify, giving legal protection and a definitive answer as to authorization. (Docs. 118-2, at 65-66; 130-1, at 122; 138-1, at 170). Lori and Anthony III stated NuStar plaintiffs do not use E-Verify because it is not legally required. (Docs. 118-2, at 66; 130-1, at 122 (citing Doc. 118-17, at 73); 138-1, at 170).

Having stated there is no way for someone to know another person's work authorization status, Devin also stated he has never known an undocumented worker because "no one person ever came up to him and said, oh, I'm illegal. Not one." (Docs. 118-2, at 66; 130-1, at 122; 138-1, at 170-71). Devin also testified that it is "practically impossible" to hire unauthorized workers, and "nobody's hiring unauthorized workers." (Docs. 118-2, at 66; 130-1, at 122; 138-1, at 171). In 2014, however, a Texas A&M survey found more than 70 percent of dairy respondents had low to medium confidence in workers' documents, and 58 percent of respondents stated they had high concern about enforcement of immigration laws. (Docs. 118-2, at 73; 130-1, at 131; 138-1, at 188).

On June 23, 2019, while on *Sunday Morning Futures*, host Maria Bartiromo, asked Devin about issues regarding undocumented or illegal immigration to which he responded:

> So, the easiest way, in my opinion, to fix all of this is that you put in a permit system. So you put in a system where, if somebody is employing you, you have to—you have to actually file with the government what's called E-Verify.

> It's a voluntary program now. It's worked really, really well. And that means, if everybody was certified by the government that everybody working for you is, in fact, here on a legal permit, that in the long run is great.

43

Now, you can't is have [sic] that without a permit system, because everyone knows that, in this country, we have got millions of people that are here on either expired permits, or they never had a permit in the first place. . . . we have already proven that this E-Verify system works with people who have voluntarily been taking part in it.

(Docs. 118-2, at 66-67; 130-1, at 123; 138-1, at 171-72). On a similar note, Devin co-sponsored four versions of the Agricultural Job Opportunity, Benefits, and Security Act ("AgJOBS bill") in 2003, 2005, 2007, and 2009. (Docs. 118-2, at 67; 130-1, at 123; 138-1, at 172). All four versions of the AgJOBS bill would have extended the H-2A program to agricultural workers, giving them a path to permanent residency and allowing their employ upon certification that "there are not sufficient workers who are able, willing, and qualified" to work in the United States. (Docs. 118-2, at 67; 130-1, at 123-24; 138-1, at 172-73). All four versions of the AgJOBS bill would have: (1) allowed workers to correct SSA records and voided penalties for using counterfeit numbers; (2) required employers to provide free housing and transportation; and (3) required employers to ensure that anyone driving workers has a valid driver's license. (Docs. 118-2, at 67; 130-1, at 123-24; 138-1, at 172-73). The 2007 and 2009 AgJOBS bills also included a provision that would grant dairy workers legal residence for up to three years and a path toward permanent citizenship. (Docs. 118-2, at 68; 130-1, at 124; 138-1, at 174).

In 2008 and 2009, Devin also co-sponsored versions of the Dairy and Sheep H-2A Visa Enhancement Act, which both included provisions to provide dairy workers legal residency for three years with extensions and provisions on housing. (Docs. 118-2, at 68; 130-1, at 124; 138-1, at 174-75). In the 2008 bill's opening remarks, Representative John McHugh stated the bill's purpose was "to ensure that American dairy farmers . . . can legally hire the employees they need," because "increasingly, the U.S. dairy workforce is relying upon those born outside of the United States, with some estimates

indicating that at least 50 percent of all current labor is now foreign-born."[15] (Docs. 118-2, at 68; 130-1, at 125; 138-1, at 175-76). In 2016, when asked whether a wall at the United States' southern border could be built while the United States maintains a Bracero program, Devin responded, "Yeah. I mean, it's always been the solution. It's security along with a permit system of some kind, and then a verification system." (Docs. 118-2, at 69; 130-1, at 125; 138-1, at 176-77).

In July 2018, Devin co-sponsored a bill, the Agricultural Guestworker and Legal Workforce Act ("AG Act") that would create a new H-2C visa for agricultural workers. (Docs. 118-2, at 69; 130-1, at 126; 138-1, at 177-78). The AG Act's new H-2C would require employers to attest that they were "unsuccessful in locating sufficient members of willing and qualified United States workers for the job." (Docs. 118-2, at 69; 130-1, at 126; 138-1, at 178-79). The AG Act would create a mandatory verification system modeled after E-Verify and include provisions to verify SSNs suspected of fraudulent use and to provide free housing to H-2C workers. (Docs. 118-2, at 69; 130-1, at 126; 138-1, at 179-80).

In 2019, Devin was an original co-sponsor of the Farm Workforce Modernization Act ("FWMA"), which provided a permanent residence path for unauthorized agricultural workers already in the United States. (Docs. 118-2, at 70; 130-1, at 126-27; 138-1, at 180). FWMA included provisions to eliminate penalties for workers using fake SSNs, verified SSNs suspected of fraudulent usage, expanded the H-2A with 50 percent reserved for dairy and agricultural workers, appropriated funds for housing farm workers and amended housing laws, created a mandatory verification system modeled after E-Verify, and required employers to provide free transport between jobs for workers. (Docs. 118-2, at 70; 130-1, at 127; 138-1, at 181). On March 18, 2021, Devin voted to

---

[15] Martin found similarly, estimating 51 percent of the dairy workforce is undocumented, though plaintiffs deny and dispute this finding. (Docs. 118-2, at 69; 130-1, at 125; 138-1, at 176).

pass the 2021 version of the FWMA, which contained similar provisions to the 2019 FWMA. (Docs. 118-2, at 70; 130-1, at 128; 138-1, at 182).

During the deposition, Devin could not recall any of the aforementioned bills that he either voted for or co-sponsored, stating that he did not recall the 2021 FWMA or his vote on it, nor the 2019 FWMA. (Docs. 118-2, at 70-71; 130-1, at 128; 138-1, at 183). When asked whether he supported the verification system within the FWMA, Devin did not say, as he has "voted on a lot of different immigration issues over the years," which he testified is a complex issue. (Docs. 118-2, at 71; 130-1, at 129; 138-1, at 183-84). Then, when asked if unauthorized workers were being hired because of labor shortages, Devin stated he does not know anyone "who is employing illegals," but also that no one "knows who's illegal or legal" in the United States. (Docs. 118-2, at 71; 130-1, at 129; 138-1, at 184).

Devin's Campaign Committee has received various donations from agriculture-related companies and food producers. For example, Blue Diamond Growers donated $41,000 to Devin's Campaign Committee, and has spent more than $1,000,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 72; 130-1, at 129; 138-1, at 184). Western Growers donated $30,000 to Devin's Campaign Committee and has spent over $2,000,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 72; 130-1, at 129; 138-1, at 185). Dairy Farmers of America donated $38,000 to Devin's Campaign Committee and has spent over $6,000,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 72; 130-1, at 130; 138-1, at 185-86). National Milk Producers Federation donated $23,000 to Devin's Campaign Committee and has spent over $4,500,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 72; 130-1, at 130; 138-1, at 186). Land O'Lakes, Inc. donated $54,000 to Devin's Campaign Committee and has spent $2,000,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 73; 130-1, at 130; 138-1, at 186-87). Last, Western Union

46

Dairymen donated $34,500 to Devin's Campaign Committee and has spent over $130,000 on lobbying, including for bills Devin sponsored. (Docs. 118-2, at 73; 130-1, at 131; 138-1, at 187-88).

### 8. The Nunes' Reaction Post-Publication

The day after the Article's publication, Devin spoke to his family, having many conversations that day and continued discussions thereafter. (Docs. 118-2, at 73; 130-1, at 131; 138-1, at 188-89). At his deposition, Anthony Jr. stated his reaction to the Article was "fear" and that his employees are "scared of the government." (Docs. 118-2, at 74; 130-1, at 131-32; 138-1, at 189). Devin believes that, based on discussions with undisclosed persons, he knows the identity of one of Lizza's sources for the Article; but Devin could not recall the alleged source's name. (Docs. 118-2, at 74; 130-1, at 132; 138-1, at 189-90). Devin also believes Lizza went to Sibley looking for any "brown Spanish-speaking person" he could find. (Docs. 118-2, at 74-75; 130-1, at 132; 138-1, at 190).

Defendants state that in October 2018—shortly after the Article was published, Lori contacted Bahena for a self-audit of NuStar plaintiffs' hiring protocol, which led to NuStar plaintiffs' discovery that their hiring protocol included errors; plaintiffs state the audit only showed NuStar plaintiffs that there were paperwork issues requiring correction. (Docs. 118-2, at 75; 130-1, at 133; 138-1, at 190-91). NuStar plaintiffs also claim they learned they must complete Section 2 on all Form I-9s or sign and attach the verification documents; defendants claim what NuStar plaintiffs actually learned was that one of their errors was lacking an employer signature in Section 2. (Docs. 118-2, at 75; 130-1, at 133; 138-1, at 191-92). Defendants state that NuStar plaintiffs learned they had been accepting facially defective documents, including expired cards; plaintiffs deny this and state the audit instead taught them they should not accept expired cards. (Docs. 118-2, at 75-76; 130-1, at 133; 138-1, at 192). Defendants state that after the audit,

47

Anthony III retroactively signed Section 2 on the Form I-9s of 59 employees; plaintiffs dispute this, stating Anthony III instead corrected unintended paperwork omissions and signed Section 2 on certain Form I-9s. (Docs. 118-2, at 76; 130-1, at 133-34; 138-1, at 192). Defendants further claim, to plaintiffs' denial, that when Anthony III retroactively signed Section 2 on the 59 employees' Form I-9s, he had not reviewed the original employee identification documents. (Docs. 118-2, at 76; 130-1, at 134; 138-1, at 192-93).

On September 30, 2019, Devin filed suit against defendants seeking $77,500,000 in damages but seeking no injunctive relief. (Docs. 118-2, at 76, 77; 130-1, at 134-35; 138-1, at 193, 195). Devin and Anthony Jr. discussed Anthony Jr.'s goal to get the Article retracted, and Devin sought counsel. (Docs. 118-2, at 76-77; 130-1, at 134; 138-1, at 193-94). On October 2, 2018, *The Federalist* published a counter-piece to the Article using Lori, who stated she talked to a reporter claiming to be associated with Breitbart, as a source. (Docs. 118-2, at 77; 130-1, at 134-35; 138-1, at 194). Then, on November 14, 2019, NuStar plaintiffs sent Hearst a retraction demand. (Docs. 118-2, at 77; 130-1, at 135; 138-1, at 194). On January 16, 2020, NuStar plaintiffs filed suit seeking $25,000,000 in damages but seeking no injunctive relief. (Docs. 118-2, at 77; 130-1, at 135; 138-1, at 195).

On February 3, 2020, Devin filed his First Amended Complaint containing allegations related to the Tweet and social media. (Docs. 118-2, at 78; 130-1, at 135-36; 138-1, at 195-96). Since filing suit, Devin and Anthony Jr. have had multiple conversations to discuss the suits, and Devin has spoken with an expert witness, Chris Buskirk, about working for both NuStar plaintiffs and himself. (Docs. 118-2, at 78; 130-1, at 136; 138-1, at 196). Despite engagement by plaintiffs, Buskirk later withdrew during the discovery process. (Docs. 118-2, at 78; 130-1, at 136; 138-1, at 196-97).

### 9. Damages

Various people in and around the Sibley community became aware of the Article; defendants state that none are identified as having thought less of NuStar plaintiffs after the Article, though plaintiffs state many did. (Docs. 118-2, at 78-79; 130-1, at 136-37; 138-1, at 197-99). Despite this, NuStar plaintiffs also received support from people in the community after the Article's publication. (Docs. 118-2, at 79; 130-1, at 137; 138-1, at 199).

It is unclear whether, before the Article, people believed NuStar Farms did not employ undocumented persons but now, after the Article, believe NuStar Farms employs undocumented persons. Source 1 testified that agricultural employers commonly have difficulty hiring because authorized people are less willing to work on farms, so farm employees are often undocumented persons. (Docs. 118-2, at 79; 130-1, at 137; 138-1, at 199-200). Another source, Father James Callahan, stated his belief, based on the composition of his parish and experience in his community in Minnesota, that dairy farms would be "screwed" absent undocumented and immigrant workers because these workers staff local farms. (Docs. 118-2, at 79; 130-1, at 137; 138-1, at 200-201). Fr. Callahan testified he does not think less of those who use undocumented labor because it is commonly known that local farms rely on undocumented workers who have invalid documentation. (Docs. 118-2, at 79; 130-1, at 137-38; 138-1, at 201-022). Source 1 also testified that the Sibley economy is commonly known to use undocumented labor, though plaintiffs deny and dispute this fact. (Docs. 118-2, at 79; 130-1, at 138; 138-1, at 202-03).

Defendants say NuStar Farms lost no business from the Article; plaintiffs state this is false, as evidenced by the fact Jesse Van de Stroet[16] and others would no longer do

---

[16] Plaintiffs have not stated who Mr. Van de Stroet is or what his business with NuStar Farms was, despite relying on Mr. Van de Stroet's severance of their business relationship as an actual

business with NuStar Farms after the Article, among other reasons.  (Docs. 118-2, at 80; 130-1, at 138; 138-1, at 203-204).  Although the parties agree NuStar Farms' revenue has increased since publication of the Article, plaintiffs state that is only because of increased prices on the Chicago Mercantile Exchange.  (Docs. 118-2, at 80; 130-1, at 138; 138-1, at 204-205).  NuStar Farms makes nearly all its revenue by selling milk to a local creamery, and the creamery's owner called to offer support to NuStar plaintiffs after the Article was published.  (Docs. 118-2, at 80; 130-1, at 139; 138-1, at 205).  Defendants claim and plaintiffs deny that NuStar plaintiffs have not identified any economic injuries caused by the Article.  (Docs. 118-2, at 80; 130-1, at 139; 138-1, at 205).

Defendants' expert, Mark J. Hosfield, examined NuStar plaintiffs' business and accounting records, which suggested to him that NuStar Farms has not suffered quantifiable damages through lost profits or loss in business value.  (Docs. 118-2, at 80; 130-1, at 139; 138-1, at 206).  When asked what he would like a jury to award, Anthony III stated he does not care about money because "[i]t's principal [sic]," and NuStar Farms' corporate representative did not make an effort to calculate NuStar Farms' damages by the date of its deposition.  (Docs. 118-2, at 81; 130-1, at 140; 138-1, at 206-207).  Nor did Anthony Jr. make efforts to calculate his damages by the date of the corporate deposition.  (Docs. 118-2, at 81; 130-1, at 140; 138-1, at 207).  Finally, Anthony Jr. has not required any medical or mental health care, including medications, as a result of the Article.  (Docs. 118-2, at 81; 130-1, at 140; 138-1, at 208).

In 2020, Devin was re-elected to the United States House of Representatives; to date, he has never lost an election.  (Docs. 118-2, at 81; 130-1, at 140-41; 138-1, at 208).  Having been elected to Congress ten times, Devin has served on many

---

injury caused by defendants.  (Docs. 130-1, at 138; 132, at 21; 132-11, at 3 (plaintiffs' disclosures)).

congressional committees, and chaired the House Permanent Select Committee on Intelligence ("Intelligence Committee") from 2015 until January 2019 as its ranking Republican until his resignation from the Intelligence Committee.  (Docs. 118-2, at 81-82; 130-1, at 141; 138-1, at 208-209).  Devin's position on the Intelligence Committee showed he had a stellar reputation and the support of his colleagues, though plaintiffs qualify that Devin's reputation and support suffered as he faced scrutiny after the Article's publication.  (Docs. 118-2, at 82; 130-1, at 141-42; 138-1, at 209-10).  In addition to his prestigious assignment on the Intelligence Committee, Devin also had a prestigious position on the House Ways and Means Committee from 2015 until his resignation and was the ranking Republican on its Subcommittee on Health from 2019 until he resigned.  (Docs. 118-2, at 82; 130-1, at 141; 138-1, at 209).  Devin did not lose any congressional committee positions since the Article or Tweet and, in January 2021, was awarded the Presidential Medal of Freedom by President Trump—one of the highest civilian honors in the United States.  (Docs. 118-2, at 82; 130-1, at 142-43; 138-1, at 210).  Devin stated he was awarded the Presidential Medal of Freedom partially because of the "attacks" Lizza and Hearst performed on Devin and the Nunes family.  (Docs. 118-2, at 83; 130-1, at 143; 138-1, at 211).

From 2018–2020, Devin's congressional salary was effectively unchanged after the Article and the Tweet, according to his tax returns; Devin earned $213,945 in 2018, $216,833 in 2019, and $220,048 in 2020.  (Docs. 118-2, at 83; 130-1, at 143; 138-1, at 211).  For information about campaign fundraising, defense counsel was directed to view Devin's Federal Election Commission filings.  (Docs. 118-2, at 83; 130-1, at 143-44; 138-1, at 211-12).  For the two years ending December 31, 2016, Nunes' campaign received $2,460,000 in donations; $12,690,000 for the two years ending December 31, 2018—one of the top five Congressional campaign fundraising amounts; and $26,800,000 for the two years ending December 31, 2020, ranking in the top four in Congressional

campaign fundraising dollars. (Docs. 118-2, at 83-84; 130-1, at 144-45; 138-1, at 212-14). Nevertheless, plaintiffs qualify that "probably three dozen companies" stopped supporting Devin after the Article and the Tweet; defendants, however, deny plaintiffs have proven this. (Docs. 130-1, at 144-45; 138-1, at 212-14).

In December 2021, Devin announced he was resigning[17] from Congress to serve as Chief Executive Officer of Trump Media & Technology Group, Inc. ("Trump Media"), the principal product of which is a social media platform called Truth Social. (Docs. 118-2, at 84; 130-1, at 145; 138-1, at 214). Devin was offered the position of CEO by the Chairman of Trump Media's Board, President Trump, based on Devin's reputation; Devin never had to apply or submit a résumé or negotiate a salary before being offered the position and was offered a salary of $750,000 annually to increase to $1,000,000 annually after two years. (Docs. 118-2, at 84-85; 130-1, at 145-46; 138-1, at 215). Devin also is entitled to 145,000 restricted shares in Trump Media to vest within the first two years of his employment there, and he receives an annual bonus determined by the Board. (Docs. 118-2, at 85; 130-1, at 146; 138-1, at 215-16). Devin stated that he accepted the job to give the American people their voices back via Truth Social and to fight defamation, end censorship, allow freedom of ideas and expression, and "provide a platform that encouraged global conversation without any discrimination." (Docs. 118-2, at 85; 130-1, at 146-47; 138-1, at 216).

According to defendants and denied by plaintiffs, Hosfield testified Devin has not suffered economic damages as a result of defendants' actions. (Docs. 118-2, at 85; 130-1, at 147; 138-1, at 216-17). Devin's September 30, 2019 complaint claimed defamation based on the Article and sought $75,000,000 in compensatory damages and $2,500,000 in punitive damages. (Docs. 118-2, at 86; 130-1, at 147; 138-1, at 217). These damages

---

[17] Devin resigned effective January 1, 2022. (Docs. 118-2, at 84; 130-1, at 145; 138-1, at 215).

were computed, according to defendants, by the aggregate damages from all the statements in the initial complaint concerning the Article as published on September 30, 2018; plaintiffs state these damages were instead calculated by the harm caused by defendants' continuing publication with intent and actual malice after Devin's retraction demand. (Docs. 118-2, at 86; 130-1, at 147; 138-1, at 217-18). Regarding Devin's case, defendants claim that the Eighth Circuit determined the publication at issue is the Tweet, and the case concerns only defamatory implication—not defamation; plaintiffs dispute and deny this. (Docs. 118-2, at 86; 130-1, at 147-48; 138-1, at 218). Devin's Third Amended Complaint also seeks $75,000,000 in compensatory damages and $2,500,000 in punitive damages attributed to the Tweet, though the attribution and computations have changed. (Docs. 118-2, at 86; 130-1, at 148; 138-1, at 218-19). Devin testified that his damages are based on "how much information's out there" and the "number of views," though plaintiffs qualify these are some factors the jury can consider. (Docs. 118-2, at 86; 130-1, at 148; 138-1, at 219). Further, Devin testified his damages increase daily and that the number of views have "ballooned beyond belief"; defendants assert Devin estimated the number of views as between 10 and 20 million. (Docs. 118-2, at 86-87; 130-1, at 148-49; 138-1, at 220-21). Discussing how he calculated the post's value in damages, Devin asked what a view or post is worth: "[Y]ou know, dollar, two dollars, three dollars? I don't know." (Docs. 118-2, at 87; 130-1, at 149; 138-1, at 221-22).

In March 2019, Devin sued Elizabeth Mair, Twitter, and two Twitter aliases for defamation, seeking $250,000,000 in compensatory damages, which he testified can be calculated by counting "all the tweets that went out." (Docs. 118-2, at 87; 130-1, at 149-50; 138-1, at 222). According to Fox News, Devin stated the lawsuit against Mair and Twitter was the "first of many," as he would be challenging "all these fake new stories" about "this [Russia hoax] investigation." (Docs. 118-2, at 87-88; 130-1, at 150; 138-1, at 223) (alteration in original). Devin's personal policy as of 2019 is that he will take

you to court "if you defame and slander" him, and the Article was "one of the big ones" that caused him to create this policy. (Docs. 118-2, at 88; 130-1, at 150; 138-1, at 223).

In April 2019, Devin also sued McClatchy—the parent company of *The Fresno Bee*—Mair, and Mair Strategies for defamation based on a story accusing Devin of crimes, dishonesty, unethical acts, lack of fitness for office or employment for profit, and lack of integrity. (Docs. 118-2, at 88; 130-1, at 150; 138-1, at 223). Alleging harm to reputation, insult, pain, embarrassment, humiliation, and mental suffering, Devin sought $150,000,000 in damages for the McClatchy article. (Docs. 118-2, at 88; 130-1, at 151; 138-1, at 223). Devin testified this damage calculation was computed by evaluating the number of times the article was published or "used," and that the article there was very similar to the Article accessible through the Tweet in that it accused him of crimes and that it was published before an election. (Docs. 118-2, at 88-89; 130-1, at 151; 138-1, at 223-24).

In December 2019, Devin sued Cable News Network ("CNN") for defamation related to a report involving a Ukrainian former-prosecutor and himself. (Docs. 118-2, at 90; 130-1, at 152-53; 138-1, at 226). Devin sought $435,000,000 in damages arising from allegations imputing onto Devin "commission of felonies and crimes involving moral turpitude," "an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of duties of such office or employment, including dishonesty, lack of candor, fraud and concealment, lack of ethics, self-dealing and conflicts of interest." (Docs. 118-2, at 90; 130-1, at 153; 138-1, at 226). During Devin's deposition, he stated damages were calculated in a similar way there as here. (Docs. 118-2, at 90; 130-1, at 153; 138-1, at 226).

In March 2020, Devin sued *The Washington Post* over allegations that he had informed President Trump that an intelligence official was giving a briefing to Adam Schiff; Devin sought $250,000,000 in damages for defamation causing him insult, pain,

embarrassment, humiliation, mental suffering, reputational injury, and special damages. (Docs. 118-2, at 89; 130-1, at 151; 138-1, at 224). Devin alleged the article's gist was that he lied to President Trump, causing Trump to become angry with the Acting Director of National Intelligence, and that such criminal conduct, dishonesty, deceit, and "sharp and unethical practices" made Devin unfit to perform duties of office or employment for profit, all of which Devin alleged harmed his reputation. (Docs. 118-2, at 89; 130-1, at 152; 138-1, at 225). Defendants assert that in November 2020, Devin again sued *The Washington Post* over statements in an article based on the so-called midnight run to the White House;[18] plaintiffs dispute and deny this fact. (Docs. 118-2, at 89; 130-1, at 152; 138-1, at 225). In the second *Washington Post* suit, Devin seeks $125,000,000 in compensatory damages and $50,000,000 in presumed damages, which he calculated in part by looking at the number of republications. (Docs. 118-2, at 89-90; 130-1, at 152; 138-1, at 225-26).

Then, in August 2021, Devin sued NBC Universal for defamation based on a Rachel Maddow segment on MSNBC alleging that there are published statements that accuse Devin of obstruction of justice and treason, severe breaches of the Code of Conduct and protocols in handling information from foreign sources in the Intelligence Committee, concealment, lack of integrity, and ethical impropriety. (Docs. 118-2, at 90; 130-1, at 153; 138-1, at 226-27). In this suit, Devin seeks $200,000,000 or more in damages; yet again, damages were calculated in a method similar to the method here and in every other defamation suit described. (Docs. 118-2, at 91; 130-1, at 154; 138-1, at 226-27).

---

[18] Plaintiffs deny that this was about the alleged midnight run. (Docs. 118-2, at 89 (citing Doc. 118-22), 130-1 at 152; 138-1, at 225). But Devin's testimony directly refers to that article as the one about the so-called midnight run. (Doc. 118-22, at 53).

In his deposition testimony, Devin states he has not tried to distinguish between damages caused by the various publications at issue in these lawsuits and has not compared them; plaintiffs add that Devin's suit here is based on its own facts, publications and republications, and damages. (Docs. 118-2, at 91; 130-1, at 154; 138-1, at 227). On Devin's website, he has publicized his lawsuits against various media outlets and personalities on a page called "Media Attacks and Lawsuits." (Docs. 118-2, at 91; 130-1, at 154; 138-1, at 227-28). The website discusses the instant suit, describing Hearst as a target of the lawsuit for the Article "falsely claiming that [Devin] conspired to hide a business venture operated by his family members in Iowa." (Docs. 118-2, at 91; 130-1, at 154; 138-1, at 228). Devin has received much "negative and false press" during recent years, even being called a "Putin stooge" and being asked whether he is a Russian agent. (Docs. 118-2, at 91; 130-1, at 155; 138-1, at 228-29). According to Devin, McClatchy published several negative stories accusing him of various improprieties, and large, corporate-owned media companies have launched large, full-scale attacks to ruin his reputation, with Democrat politicians defaming him by recounting claims within those stories. (Docs. 118-2, at 91-92; 130-1, at 155; 138-1, at 229-30). The mainstream media, "leftwing activist groups," and research operatives have all vehemently attacked Devin. (Docs. 118-2, at 92; 130-1, at 155; 138-1, at 230).

Devin has testified about his emotional distress in the hours after publication of the Article and of the humiliation he has experienced having to tell people he was being deposed for this case and, plaintiffs add, the humiliation he experienced interacting with people he worked with in Congress after the Article was published. (Docs. 118-2, at 92; 130-1, at 156; 138-1, at 230-31). Devin also testified as to his embarrassment at being unable to give tours on the Tulare farm after the Article, given his uncle's perceived need to distance himself from Devin. (Docs. 118-2, at 92; 130-1, at 156-57; 138-1, at 231-32). Further, Devin testified he has experienced anxiety when learning Lizza went to

Sibley before defendants published the Article, though he never sought treatment for the mental anguish or distress he claims resulted from the Article and Tweet. (Docs. 118-2, at 92; 130-1, at 157; 138-1, at 232). Last, Devin states he has no medical conditions that resulted from publication of the Article or Tweet. (Docs. 118-2, at 93; 130-1, at 157; 138-1, at 233).

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party can show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of material fact is genuine if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992). It is also genuine "when a reasonable jury could return a verdict for the nonmoving party on the question." *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not

57

significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that "require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.*, at 249 (internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395. A plaintiff may not then simply point to allegations made in her complaint but must identify and provide evidence of "specific facts creating a triable controversy." *See Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) (quotation marks omitted). When considering a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). Even so, the moving party does not meet its burden by "[s]imply providing a massive record," and the Court "will not sort through a voluminous record in an effort to find support for the plaintiff's allegations." *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004).

The moving party's burden of production turns on its burden of persuasion at trial. If the moving party bears the burden of persuasion on the relevant issue at trial, it must support its motion with credible evidence available under Rule 56(c) that would entitle it to a directed verdict if not challenged at trial. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting); *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993). But, if the moving party does not bear the burden of persuasion at trial, it has two options to satisfy its Rule 56 burden of production. First, it may submit affirmative evidence that negates an essential element of the nonmoving party's claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting); *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018). Second, it may show that the nonmoving party's evidence is insufficient to establish an

essential element of the nonmoving party's claim. *Celotex Corp.*, 477 at U.S. at 331 (Brennan, J., dissenting); *Bedford*, 880 F.3d at 996.

Once the moving party meets its burden of production, the nonmoving party must go beyond the pleadings and show by depositions, affidavits, or other evidence "specific facts which create a genuine issue for trial." *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quotation marks omitted). In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88; *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather, a "court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

## III. DISCUSSION

Plaintiffs sued defendants in two separate complaints. (Doc. 103; Case No. 20-CV-4003-CJW-MAR, Doc. 188). In Count I, NuStar plaintiffs allege that defendants committed defamation because defendants published false and defamatory statements to third parties about NuStar plaintiffs that defendants knew or should have known would cause NuStar plaintiffs injury. (Case No. 20-CV-4003-CJW-MAR, Doc. 188, at 26-28). In Count II, NuStar plaintiffs allege defamation by implication because the Article defendants allegedly republished implies, by use of juxtaposed facts, that NuStar plaintiffs, Nunes, and Steve King conspired to conceal a "politically explosive secret," namely alleged knowing-employment of undocumented laborers. (*Id.*, at 28-30).

In Count I of Nunes' complaint, he alleges defamation by implication. (Doc. 103, at 19-21). More specifically, plaintiff Nunes alleges that the Article defendants allegedly

59

republished, through use of juxtaposed facts, implies that Nunes conspired with Steve King and NuStar plaintiffs to conceal plaintiffs' alleged knowing-employment of undocumented laborers—a "politically explosive secret." (*Id.*).

For the following reasons, the Court **grants** defendants' motion for summary judgment on Count I of NuStar plaintiffs' complaint, **grants** summary judgment on Count II of NuStar plaintiffs' complaint, and **grants** defendants' motion for summary judgment on Count I of Nunes' complaint. NuStar plaintiffs have not shown a genuine dispute of material fact on multiple elements of Count I, nor have they shown genuine disputes of material fact on several elements of Count II. As for Count I of Nunes' complaint, Nunes has failed to show a genuine dispute of material fact on multiple elements of his defamation by implication claim. The Court will address defendants' arguments for summary judgment on each count.

The parties' arguments in support and in resistance to defendants' motion, both in their written briefing and at oral argument, are fact-intensive. The Court's discussion of facts in this section is not intended to be exhaustive. The Court analyzes the undisputed facts or disputed facts, as appropriate, to determine the claims on which a reasonable jury could find in favor of Nunes or NuStar plaintiffs. As such, the Court does not discuss or reach all of plaintiffs' arguments or evidence in support thereof.

### A. *NuStar Plaintiffs' Claim of Defamation*

NuStar plaintiffs allege that defendants are liable for defamation because of their alleged publication of false statements of fact concerning NuStar plaintiffs. (Case No. 20-CV-4003, Doc. 188, at 26-28). Defendants argue NuStar plaintiffs' defamation claim fails because NuStar plaintiffs have not shown that it is false to state that NuStar plaintiffs knowingly employed undocumented laborers. (Doc. 118-1, at 39-51). Further, defendants assert that NuStar plaintiffs—all of whom are private figures in this matter of

public concern[19]—cannot prove requisite fault of negligence or actual malice. (*Id.*, at 51-54). Finally, defendants argue that NuStar plaintiffs have not been harmed in any way by the alleged publication and have produced no evidence of damages to them, such as economic or reputational injury. (*Id.*, at 55-56).

NuStar plaintiffs assert defendants defamed them by publishing false statements about NuStar plaintiffs, causing them harm, and are thus liable in defamation. (Doc. 130). They argue defendants published the Article about plaintiffs, which contained alleged falsehoods, such as the narrative that any plaintiff attempted to hide NuStar plaintiffs' move to Iowa. (*Id.*, at 11-13). NuStar plaintiffs also argue defendants published the defamatory Article negligently, citing many reasons including republication after the lawsuit commenced and the use of "fabricated statements" in the Article. (*Id.*, at 13-18). Further, NuStar plaintiffs argue they have suffered injury because of the Article, particularly to their reputation within their local farming community. (*Id.*, at 18-33).

For the following reasons, the Court finds that NuStar plaintiffs have not shown genuine issues of material fact on all elements of defamation, making a grant of summary judgment appropriate on their claim of defamation (Count I).

As a preliminary matter, defendants challenge this Court's previous finding that NuStar plaintiffs are private figures. Defendants assert discovery has brought to light facts indicating NuStar plaintiffs are limited-purpose public figures deserving of less

---

[19] This Court previously found NuStar plaintiffs, unlike Nunes, are neither public figures nor involuntary or limited-purpose public figures. (Case No. 20-CV-4003-CJW-MAR, Doc. 50, at 32-36). The parties did not challenge this finding on appeal to the Eighth Circuit Court of Appeals, and thus, the finding that NuStar plaintiffs are private figures remains the law of the case. *See Nunes v. Lizza*, 12 F.4th 890 (8th Cir. 2021); *CRST Expedited, Inc. v. TransAm Trucking, Inc.*, 505 F. Supp. 3d 832, 837-38 (N.D. Iowa 2020) (discussing law of the case doctrine). This Court has, however, previously referred to the matter as one of public concern. (Doc. 53, at 9 n.3).

protection than private persons. (Doc. 118-1, at 54). Plaintiffs assert the Court's finding that NuStar plaintiffs are private figures is correct because defendants failed to carry their burden of providing facts or evidence showing plaintiffs are limited-purpose public figures. (Doc. 130, at 13 n.7). The Court's finding that NuStar plaintiffs are private figures remains accurate, and it adopts its previous findings and analysis on this matter. The Court briefly addresses defendants' additional facts.

Defendants have not alleged any facts that change the outcome of the Court's analysis here. This Court previously found NuStar plaintiffs, unlike Nunes, are neither public figures, nor involuntary or limited-purpose public figures. (Case No. 20-CV-4003-CJW-MAR, Doc. 50, at 32-36). The parties did not challenge this finding on appeal. *See Nunes v. Lizza*, 12 F.4th 890 (8th Cir. 2021).

Here, defendants offer no additional material, relevant facts related to whether NuStar plaintiffs "voluntarily injected" themselves or were "drawn into" the public controversy. In arguing that NuStar plaintiffs are limited-purpose public figures, defendants cite various other sections of their brief, which themselves cite to various facts in the appendices. (Doc. 118-1, at 53-54 & 53 n.17 (citing Doc. 118-1, at 29-31, 34-37)). These cited pages discuss many facts defendants claim "show[ ] far greater voluntariness" in NuStar plaintiffs' coordination with Nunes, including that: Nunes' mother, Dian, was his volunteer campaign treasurer; Nunes talks to his family often about many things including farming and how general things are going; Nunes arranged a family meeting with President Trump at the White House; Nunes knew a handful of former NuStar employees and an employee's relation to his brother's wife; Nunes believed workers were documented, having talked to his father; Nunes and his father discussed not talking to Lizza who was writing about the dairy industry and immigration and that Nunes ignored Lizza's direct messages; and Nunes believes checking the status of an immigrant is illegal. (*Id.*, at 53-54 & n.17, 29-31).

In further support, defendants cite to facts (Doc. 118-1, at 53-54 & n.17 (citing Doc. 118-1, at 29-31, 34-37)), relating to: Anthony Nunes Jr.'s belief his employees fear the government; Nunes' recollection of a member in a certain family being a source; that an immigration attorney internally audited NuStar Farms in attempts to follow proper employment procedures; that defendants believe NuStar Farms still does not fill out a section of the proper forms; defendants' allegation that NuStar Farms never investigated flagged employees; that Nunes had discussions with his brother about getting the Article retracted; that Nunes had discussions with his father about the lawsuits; and that Nunes recommended his attorney to his family and talked to an expert for all plaintiffs.

None of these facts, even aggregated, voluntarily place NuStar plaintiffs into the public controversy, and the Court does not find NuStar plaintiffs were drawn into the controversy as required by the test for limited-purpose public figures nor the reasoning behind the test. A visit to the White House arranged by a relative or working a volunteer, out-of-sight position on a campaign does not cast one into the position of a limited-purpose public figure. Nor does sharing the same attorney; if an individual employs the same attorney as a public-figure employs in a case where both are sued, that does not render the individual a public personality. The choice to share an attorney as civil plaintiffs in a case based on similar facts and claims is a reasonable approach for purposes of efficiency and cost-savings by eliminating duplicative work. Further, NuStar plaintiffs are entitled to defend themselves against claims they believe are defamatory; their choice of attorneys to represent them in such a lawsuit does not voluntarily thrust them into the spotlight or drag them into it. The question of why one plaintiff spoke to an expert for several plaintiffs on the same facts and issues could be answered similarly. If anything, some of these facts indicate NuStar plaintiffs' inability to personally reach the press or lack of understanding how to deal with the press; they asked Nunes what to do when a

63

reporter asked questions that would impact Nunes, who has dealt with the press because NuStar plaintiffs have not.

Finally, defendants argue NuStar plaintiffs are limited-purpose public figures because one family member was quoted in a response article. (Doc. 118-1, at 53). That the family member, Lori Nunes—who is not individually a plaintiff to this litigation—was sought out by another reporter, after the family was initially sought out by Lizza, does not mean plaintiffs had ready access to the media generally, could have sought the media out independently of Nunes, or would have even been approached or acknowledged absent the Article that involved their public figure family member. (*Id.*; 118-2, at 77). The fact that one news source approached one family member who is involved with NuStar Farms does not mean NuStar plaintiffs have ready access or are transformed into public figures here.

Here, a public figure has himself been dragged into a matter by two media defendants' decision to investigate the public figure's private life and the lives of his family members, dragging the non-public family members into the issue and exposing private facts the public normally has no right to. Even were all allegations in the Article true as to the NuStar plaintiffs, these parties would likely never have received this disruption absent their relation to a public figure. A finding that NuStar plaintiffs, or other private persons on these specific facts, are public figures of any caliber would open the floodgates and unleash destruction on the lives of those whose loved ones have chosen a public life, simply because of familial relation. This could expose numerous people to reduced protection when they are allegedly defamed just because they are related to a public figure. For these reasons, the Court finds NuStar plaintiffs are private individuals, and a negligence standard applies. Alleged tortfeasors must take their alleged victims how they find them; whether greater protections apply is of no consequence.

### 1.    Applicable Law

Under Iowa law,[20] a claim of defamation may be brought for certain written statements—libel—tarnishing the name or reputation of the plaintiff. *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996). Statements that cannot reasonably be interpreted as stating actual facts about a particular person are not actionable in defamation, though whether a statement is capable of having a defamatory meaning is a question for the court to determine. *Bauer v. Brinkman*, 958 N.W.2d 194, 198 (Iowa 2021). To establish a prima facie case of defamation for libel as a public figure or limited-purpose public figure, a plaintiff suing a media defendant must show that the defendant "(1) published a statement that (2) was defamatory (3) of and concerning the plaintiff, and (4) resulted in injury to the plaintiff," but if plaintiff is a public figure, he must also show (5) the statement is false and (6) "was made with actual malice." *Nunes*, 12 F.4th at 895; *Cockram v. Genesco, Inc.*, 680 F.3d 1046, 1050-52 (8th Cir. 2012)[21]; *Nickerson*, 542 N.W.2d at 510-11 & n.3; *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 282 (1964). When the plaintiff is a private figure, however, alleged defamation related to matters of public concern require the plaintiff to prove (1) falsity and (2) a negligent breach of the professional standard of care. *Bierman v. Weier*, 826 N.W.2d 436, 447 (Iowa 2013); *Cockram*, 680 F.3d at 1053; *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 770, 777 (1986).

Speech involves matters of public concern when "it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' or when it

---

[20] This Court previously found that Iowa and California laws on defamation are not in conflict, and thus, it applied Iowa substantive law to NuStar's defamation claim, which the parties did not challenge. *See Nunes*, 12 F.4th at 895.

[21] For purposes of applicable law, the Court references several cases interpreting defamation law in other states, such as Missouri, as none conflict with Iowa's defamation laws.

'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citing *City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004)) (internal citation omitted). In other words, a public concern or controversy is one whose ramifications will affect "persons who are not direct participants" in the controversy. *Stepnes v. Ritschel*, 663 F.3d 952, 963 (8th Cir. 2011) (quotation omitted).

As the prima facie elements show, courts must determine whether an individual is a public figure, limited-purpose public figure, or private figure to apply the correct analysis to a defamation claim. A person is a public figure "for all purposes and in all contexts" when the person achieves "pervasive fame or notoriety." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). A person is a limited-purpose public figure when the person voluntarily injects themself or is drawn into a particular public controversy, becoming a public figure "for a limited range of issues." *Id.*; *Stepnes*, 663 F.3d at 963. Limited-purpose public figures are more common than public figures. *Gertz*, 418 U.S. at 351. Regardless of whether a figure is public for all purposes or a limited purpose, all public figures "assume special prominence in the resolution of public questions." *Id.* Absent a finding that a person is a public figure or limited-purpose public figure, the person is a private figure. *See id.*

To establish publication, a plaintiff must show that the allegedly defamatory statement was communicated to one or more third persons and understood to be defamatory. *Bierman*, 826 N.W.2d at 464; *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221-22 (Iowa 1996). That a defamatory statement is communicated to the defamed person alone is insufficient. *Huegerich*, 547 N.W.2d at 221. It is equally insufficient to establish publication when the defamed person alone is the disseminator of the statement unless the defamed is "under a strong compulsion to communicate the defamatory statement[ ]." *Id.* at 221-22.

To establish that a statement is defamatory, a plaintiff must show "it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Accent Media, Inc. v. Young*, 12-CV-07-LRR, 2013 WL 12140468, at *9 (N.D. Iowa Sept. 11, 2013) (quoting RESTATEMENT (SECOND) OF TORTS § 559 (AM. L. INST. 1997)) (applying Iowa law). In evaluating whether a statement was understood to be defamatory, the statement is viewed within the context of the circumstances surrounding the statement and the entire communication. *See Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 47 (Iowa 2018); *Huegerich*, 547 N.W.2d at 221. A court can determine as a matter of law whether a challenged statement is capable of a defamatory meaning. *See Stevens v. Iowa Newspapers, Inc.*, 728 N.W.2d 823, 830 (Iowa 2007). Courts examine the entire communication and the totality of the circumstances to determine whether an average and reasonable reader could understand the statement as having the purported defamatory meaning. *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 769, 772 (Iowa 2006) (citation omitted).

Though a court can find a statement is defamatory by looking at the larger context, a statement can be defamatory in its very nature, meaning it is defamatory per se. A court can properly find a statement defamatory per se because the statement is so naturally likely to expose the defamed to "public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse." *Bandstra*, 913 N.W.2d at 46 (quotation omitted). The Iowa Supreme Court has found defamation per se in several instances, such as when the defamed is accused of being a liar or of committing an indictable crime that would subject the defamed to a sentence of incarceration, including

illegal drug possession.[22]  *See Huegerich*, 547 N.W.2d at 221.  Statements requiring extrinsic evidence to show their defamatory meaning are not defamatory per se.  *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 116 (Iowa 1984).  If a statement is defamatory per se, the defamed plaintiff need not prove the statement was false or made with malice or show damages.  *Roskens v. Graham*, 435 F.Supp.3d 955, 988 (N.D. Iowa 2020) (applying Iowa law); *Huegerich*, 547 N.W.2d at 221; *Vinson*, 360 N.W.2d at 115. But when, as here, defendants are members of the media, there is no presumption that the allegedly libelous statements are false or caused injury.  In other words, libel per se is not available against members of the media.  *See Bierman*, 826 N.W.2d at 448 ("[L]ibel per se is available only when a private figure plaintiff sues a nonmedia defendant for certain kinds of defamatory statements that do not concern a matter of public importance[.]").

To establish that a statement is "of and concerning" a plaintiff, a plaintiff need only "establish a connection between [the statement] and himself [or herself]" so as to show the statement refers to plaintiff.  *New York Times*, 376 U.S. at 289-92.

To establish that a statement injured a plaintiff, the plaintiff must show injury resulting directly from the statement, whether in the form of "lost wages, emotional and mental anguish, humiliation, embarrassment," reputational, loss of enjoyment of life, or another cognizable injury.  *Goodman v. Performance Contractors, Inc.*, 308 F. Supp. 3d 1002, 1010 (N.D. Iowa 2018); *Schaetzel v. Mercy Health Servs-Iowa, Corp.*, No. 17-CV-1007-LRR, 2018 WL 3132610, at *5 (N.D. Iowa June 26, 2018).

To establish that a statement is false, a public-figure plaintiff—or a plaintiff in a matter of public concern—must show that "the alleged defamatory statement can

_____

[22] The Court notes here it is alleged plaintiffs have engaged in repeat violations of laws regulating employment of undocumented laborers, which can result in imprisonment.  *See* 8 U.S.C. § 1324a.

68

reasonably be interpreted as stating actual facts" and "those facts are capable of being proven true or false." *Yates*, 721 N.W.2d at 771. A plaintiff need not prove the literal falsity of every detail of a statement; rather, a plaintiff must prove that the "gist" or "sting" of the challenged statements are substantially false. *See Doe v. Hagar*, 765 F.3d 855, 863 (8th Cir. 2014) (applying Iowa law). "The gist or sting of a defamatory charge is the heart of the matter in question—the hurtfulness of the utterance." *Id.* (internal quotation marks omitted). Under this framing, opinions might be actionable "if they imply a provable false fact, or rely upon stated facts that are provably false," though the statement to be proven false is "not the literal wording of the statement but what a reasonable reader . . . would have understood" the defaming defendant to have said. *Yates*, 721 N.W.2d at 771. Further, statements "that are not sufficiently factual to be capable of being proven true or false and statements that cannot reasonably be interpreted as stating actual facts are absolutely protected under the Constitution." *Id.* Whether a statement implies a provably false factual assertion is an issue of law for the court to decide. *Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 891 (Iowa 1989), *overruled on other grounds by Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 224 (1998).

The Iowa Supreme Court adopted the following four-factor test to assess whether a statement is false:

> The first factor is whether the alleged defamatory statement has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous. The second factor is the degree to which the alleged defamatory statements are objectively capable of proof or disproof. The third factor is the context in which the alleged defamatory statement occurs. The final factor . . . is the broader social context into which the alleged defamatory statement fits.

*Bandstra*, 913 N.W.2d at 47 (cleaned up). In construing the context of the statement, Iowa courts consider whether the author disclosed the factual basis for the statement and whether the statement implies the existence of other, undisclosed defamatory facts. *See*

69

*Yates*, 721 N.W.2d at 771 ("[S]tatements of opinion can be actionable if they imply a provable false fact, or rely upon stated facts that are provably false.") (quoting *Moldea v. N.Y. Times Co.,* 22 F.3d 310, 313 (D.C. Cir. 1994)). Thus, Iowa courts consider the language of the challenged statement in the context of the entire communication to determine if it implies a statement of fact. *See id.* at 770 (discussing *Bandstra* factors). If a statement does not imply the existence of an objectively provable fact, then the statement is not actionable in defamation. *Bandstra*, 913 N.W.2d at 47, 49.

Last, to establish actual malice, a public-figure plaintiff must show the defendant acted with "knowing or reckless disregard of the truth of the statement." *Barreca v. Nickolas*, 683 N.W.2d 111, 121 (Iowa 2004). In other words, actual malice is shown when the defamer knows the statement to be false or makes the statement with reckless disregard of whether it was false. *New York Times*, 376 U.S. at 279-80.

### 2. Elements

#### a. Publication

Defendants make no argument as to the element of publication for defamation purposes and, thus, do not meet their initial burden as to this element. (*See generally* Doc. 118-1, at 39-56); *see Hartnagel*, 953 F.2d at 395.

#### b. Defamatory Statement

Next, defendants make no argument regarding whether the Article contained statements considered defamatory as to NuStar plaintiffs, and thus, do not meet their initial burden as to this element. (*See generally* Doc. 118-1, at 39-56); *see Hartnagel*, 953 F.2d at 395.

#### c. Of and Concerning Plaintiff

Defendants make no argument as to whether the publication was of and concerning NuStar plaintiffs and, thus, do not meet their initial burden as to this element. (*See generally* Doc. 118-1, at 39-56); *see Hartnagel*, 953 F.2d at 395.

70

### d.  *Injury to Plaintiff*

Next, the Court finds a genuine issue of material fact as to whether NuStar plaintiffs were injured by the alleged defamatory statements in the Article.

Defendants assert there is no genuine issue as to injury, and thus, plaintiffs' claim for defamation should be dismissed.  (Doc. 118-1, at 55-56).  In support of this assertion, defendants state plaintiffs have not provided any evidence of damages.  (*Id.*, at 55).  Under Iowa law, they argue, plaintiffs must show reputational harm, such as economic loss, before they can recover any parasitic damages, such as mental anguish.  (*Id.*).  Here, defendants argue, the evidence actually shows plaintiffs were supported by their community after publication of the Article.  (*Id.*, at 55-56).  For instance, in defendants' telling, NuStar Farms' main customer stated post-publication of the Article that it backed NuStar Farms, a witness stated the Sibley community would think no less of NuStar plaintiffs post-publication due to local reliance on undocumented laborers, and NuStar plaintiffs saw a profit increase post-publication instead of profit loss.  (*Id.*).  Thus, defendants state the defamation claim must be dismissed for lack of damages.  (*Id.*, at 56).

NuStar plaintiffs argue that the alleged defamation led to much suffering, including, "public shame, ridicule, insult, humiliation, embarrassment, emotional distress and mental anguish, anxiety, insecurity, fear for safety," fear about who heard the implication, fear of additional defamation from other actors based on information in the Article, "permanent loss of standing and credibility in the community," fear their names will not be cleared, and reputational injury.  (Doc. 130, at 19-20).  In support, NuStar plaintiffs state a local farmer read the Article then, upset and in disbelief, contacted them to ask: "[W]hat's going on here?  This is crazy."  (Docs. 118-8, at 16; 130, at 20; 130-1, at 136-37).  This fact does not, however, aid NuStar plaintiffs in meeting their burden, as it does not show damage but rather support from a local

71

individual. NuStar plaintiffs also state that multiple people called and threatened NuStar plaintiffs, including a phone call by a "Carrie" who threatened to call ICE and commented negatively on her perception of plaintiffs, using expletives. (Doc. 130, at 20; 131-4, at 7-8). Other people called NuStar plaintiffs to relay their negative beliefs about them after the Article—some of whom threatened the family—and multiple people attempted to get into the dairy building after the Article. (Docs. 118-8, at 16-18; 130, at 20; 130-1, at 136-37). NuStar plaintiffs cite to many other facts, including negative Facebook ratings of their business in response to the Article (Docs. 118-8, at 18-19; 131-4, at 8), that Lizza interviewed a priest—after the interview but before the Article was published—who was left with the belief NuStar plaintiffs were involved in corruption (Docs. 118-4, at 12; 130, at 20; 130-1, at 137-38),[23] and that a customer, Jesse Van de Stroet,[24] stopped doing business with plaintiffs because of the Article (Docs. 130, at 21; 130-1, at 138; 132-11, at 3).

The Court finds plaintiffs have shown a genuine issue of material fact as to the question of damages. First, people began leaving negative reviews of NuStar Farms after the Article was published, called expressing negative opinions of NuStar plaintiffs referencing allegations in the Article, and some people even showed up on farm property (though whether they went to the dairy farm to voice negative opinions is unclear). Also, there is evidence that brings into question the accuracy of defendants' statement that

---

[23] The Court finds the fact that Fr. Callahan formed this opinion of NuStar plaintiffs is irrelevant to the question of damages caused by the publication of defamatory statements within the Article, as he formed that opinion independently of the Article or statements therein. (*See* Docs. 118-2, at 79 (citing Doc. 118-4, at 20-23); 130-1, at 138; 138, at 12-13). The statements made or published to Fr. Callahan might overlap with those in the Article but are not statements he learned as a result of the Article's publication. Fr. Callahan's opinion as to plaintiffs' reputation is not relevant as to whether plaintiffs were injured as a result of the Article's publication.

[24] *Supra* note 16.

72

plaintiffs' profits increased after the Article because of increased business or transactions. Plaintiffs cite to market changes on the Chicago Mercantile Exchange as the reason for increased profits, (Doc. 130-1, at 138); defendants provide no evidence to the contrary or to show increased clientele, transactions, or anything that indicates that increased economic performance occurred. This change in profits could realistically, as plaintiffs claim, be caused by the agriculture market, which itself could be impacted by factors like inflation, labor, or shortages, not just better performance or increased business. Further, defendants' offered fact that NuStar plaintiffs' profits increased does not show what factors, if any, could have also impacted profits, which is necessary to show that no genuine issue exists as to economic harm. The Court notes, however, that the fact Van de Stroet stopped buying from NuStar plaintiffs is insufficient under the circumstances. The Court has seen no evidence in support of the claim Van de Stroet ended his business relationship with NuStar plaintiffs, nor that one existed prior to the Article. *See Matsushita*, 475 U.S. at 586; *Anderson*, 477 U.S. at 249–50. Thus, the Court does not consider this fact in its analysis.

The facts here create a genuine question as to whether NuStar plaintiffs faced economic and reputational harms because of the Article, so as to satisfy the element of damages. Also, there are additional facts indicating plaintiffs might have suffered anxiety and other parasitic damages after being threatened and having unknown persons enter their property after having received such threats.

In sum, there is a genuine issue of material fact as to whether NuStar plaintiffs suffered damages. *See Mosley*, 415 F.3d at 910. Thus, a reasonable jury could find for plaintiffs on this element.

### e.    Falsity

The Court finds no genuine issue of material fact as to whether the alleged defamatory statements were false.

73

Defendants assert that the statements in the Article are objectively, provably true and, thus, that summary judgment is appropriate. (Doc. 118-1, at 39-51). The statements at issue in NuStar plaintiffs' defamation claim are statements in the Article asserting that NuStar plaintiffs knowingly hired undocumented laborers. (*See* Case No. 20-CV-4003-CJW-MAR, Doc. 50, at 25-26). Defendants argue these statements are supported by NuStar Farms' acceptance of facially invalid documents from workers, such as expired documents. (*Id.,* at 42-47). Further, defendants argue NuStar plaintiffs are not protected because they did not read or understand certain documents, or their limits or expirations. (*Id.*, at 43). Instead, defendants argue NuStar plaintiffs might have constructive knowledge because employers must check documents with objectively reasonable care. (*Id.*, at 43); *see United States v. Cobo-Cobo*, 873 F.3d 613, 615 (8th Cir. 2017) ("Federal law requires employers to verify the identity of their employees by checking certain documents to ensure [a worker] is eligible to work in the United States, which the employer, in an I–9 form, must attest to having done."); *Split Rail Fence Co. v. United States*, 852 F.3d 1228, 1243 (10th Cir. 2017) (stating that "deliberate failure to investigate suspicious circumstances imputes knowledge" and deliberate ignorance or avoiding acquiring knowledge triggers constructive knowledge). Defendants next point to the fact that NuStar plaintiffs failed to complete Section 2 of the required I-9 Form at least 289 times and failed to sign and date the Form at least 208 times, despite attestation and completion of that section being required. (Doc. 118-1, at 44). In at least 68 instances, NuStar plaintiffs did not timely fill out the I-9s. (Doc. 118-1, at 44; 130-1, at 62-69). Defendants also point to the fact that NuStar plaintiffs have been notified that a majority of their workers' SSNs do not match to those individuals, including persons hired before the Article was created. (Doc. 118-1, at 45; 130-1, at 78-82). Finally, defendants point to NuStar employees' exercise of their Fifth Amendment rights, stating that rather than solely serving as protection against feared immigration proceedings, the

workers are invoking the right so as to insulate their employer, who provides many of them housing and livable wages. (Doc. 118-1, at 47-49). In their reply, defendants argue none of the facts plaintiffs cite create a genuine issue, particularly because the statements from their expert do not explain why or how NuStar plaintiffs did not knowingly hire unauthorized laborers but instead, the statements conclude that NuStar plaintiffs did not violate the law. (Doc. 138, at 6-9).

Plaintiffs assert the statement that NuStar plaintiffs knowingly employed undocumented laborers is false. Relevant here, NuStar plaintiffs cite to the fact that the sources Lizza used had no firsthand knowledge of whether NuStar Farms relied on undocumented labor. (Doc. 130, at 12). NuStar plaintiffs also reference that those sources never made the exact statements the Article states they made, such as the statement that NuStar knowingly employed undocumented persons, and Source 2 was fully documented despite the Article saying otherwise. (*Id.*, at 13). Finally, they cite to 65 of their undisputed facts, including their expert's statements, to support their assertion that NuStar Farms did not knowingly employ undocumented laborers. (*Id.*) (citing Doc. 130-1, at ¶¶ 116, 117, 118, 119, 120, 121, 122, 140, 146, 150, 155, 170, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 185, 186, 188, 190, 192, 193, 194, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 231, 232, 234, 235, 237, 238, 239, 240, 241, 242, 243, 246, 283, 327, 328, 329, 330, and 331). After reading all 65 of these cited paragraphs, few of them provide facts addressing the question of falsity and whether a genuine issue of material fact exists on the element. Rather, many of them only provide plaintiffs' expert's legal conclusions without giving the Court any facts with which to evaluate whether NuStar plaintiffs have met their burden of showing a genuine issue as to falsity of defendants' statements accusing plaintiffs of knowing-hire violations under any part of the IRCA. *See* 8 U.S.C. § 1324a. Plaintiffs do cite, however, to some facts related to their failure to complete I-9s, which plaintiffs

assert is simply a "paperwork issue[ ]" that does not include knowledge.  (Doc. 130-1, at 71); *see also Split Rail*, 852 F.3d at 1233.  They also cite to facts in some cases confirming and, in some cases, refuting defendants' assertions that NuStar plaintiffs did not question expired documents or were unaware of expiration at times before the Article was created.  (Doc. 130-1, at 74, 90- 92).  Further, many facts refer to instances where employees presented documents for work authorization that contained different birth dates from one another, contained misspellings of agencies, contained incorrect name spellings, incorrect names in total, or names that were spelled inconsistently from one another.  (Doc. 130-1, at 93-103, 110, 111).

The Court finds plaintiffs have not met their burden of showing a genuine issue exists.  Despite the fact that NuStar plaintiffs legally needed to obtain verification from prospective employees through unexpired documents, they accepted expired cards, at least some of which explicitly stated when they expired.[25]  For instance, the state identification card one worker presented to them had an expiration date on it, as did some of the resident cards and permanent resident cards.  Further, there were numerous problems and inconsistencies within documents provided by certain NuStar Farms' employees, such as documents referring to one employee by different names and the document provided by another employee which was purportedly issued by a government office whose name was spelled incorrectly.  These facts support defendants' position, not plaintiffs'—the facts plaintiffs cite simply reference the fact NuStar plaintiffs could not or did not question documents that appeared genuine as opposed to showing that NuStar

---

[25] U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Replace Your Green Card: When to Replace Your Green Card*, https://www.uscis.gov/green-card/after-we-grant-your-green-card/replace-your-green-card (discussing expiration of permanent resident cards, also called green cards); U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *Redesigned Green Card 2023*, https://www.uscis.gov/sites/default/files/document/guides/GreenCard_Comparison_EN.PDF.p df (showing expiration dates on permanent resident cards both before and after a 2023 card redesign).

plaintiffs can prove they lacked knowledge of their employees' documentation status. In all, NuStar plaintiffs reference no evidence showing statements that they knowingly hired undocumented laborers were false; accordingly, plaintiffs fail to show a genuine issue of material fact as to falsity.

In sum, NuStar plaintiffs do not show a genuine issue of material fact as to falsity. The assertion that NuStar knowingly used undocumented labor is substantially, objectively true. Thus, a reasonable jury could not find in favor of plaintiffs on this element. *See Mosley*, 415 F.3d at 910.

### f. Negligence

Last, the Court finds no genuine issue of material fact as to negligence.

Defendants argue Lizza's reporting and Hearst's publishing were far from negligent. (Doc. 118-1, at 51; 138, at 10-11). In support, defendants established that Lizza went to Sibley, performed dozens of interviews, gathered hundreds of pages of research before writing the Article, and made reasonable efforts to interview the relevant Nunes' family members who did not wish to speak to Lizza. (Doc. 118-1, at 51). Further, defendants conducted multiple rounds of editing on the Article, including fact-checking, over a two-week period. (*Id.*). Finally, plaintiffs cannot point to any other actions defendants could have taken in reporting and publishing to perform within the professional standard of care; defendants argue the evidence supporting the level of professional care taken in creating the Article is overwhelming, and evidence of negligence does not exist. (*Id.*, at 52-53). Defendants do not cite to any expert deposition, opinion, or other evidence stating what the professional standard is for the Court to apply at this stage, but at this stage in the litigation it is not defendants' burden unless and until plaintiffs point to a professional standard and indicate how defendants violated that standard. *See Jaurequi*, 173 F.3d at 1085. Defendants cite *Crescenz v. Penguin Group (USA), Inc.*, 561 F. App'x 173 (3d Cir. 2014), discussing the court's

decision affirming a grant of summary judgment on the element of negligence in a defamation suit against an author and publisher. (Doc. 118-1, at 52). In that discussion, defendants still do not point to a standard the Court might use to evaluate negligence, only to "overwhelming" evidence that defendants were not negligent, similar to the defendants in *Crescenz*. (*Id.*).

Plaintiffs assert defendants negligently created and published the Article's defamatory statements based on numerous facts. First, they point to Hearst's code of ethics, saying defendants violated the code. (Docs. 130, at 16; 130-1, at 13-14). NuStar plaintiffs do not, however, say how this code was violated. They provide no evidence as to what the professional standard is or how defendants' conduct breached the professional standard of care. Plaintiffs do, however, claim defendants "destroyed notes, emails, text messages and transcripts." (Doc. 130, at 16). In support, they cite to facts related to defendants' singular fact-checker who did not recall whether he listened to full recordings of interviews, and though he stated he reviewed all transcripts to fact-check the Article, defendants never produced the transcript of Lizza's interview with a woman who ran a grocery store. (Doc. 130-1, at 14-15). They also point to facts surrounding Lizza's research and interview process, including alleged lies Lizza told to interviewees, such as: NuStar relied 100 percent on undocumented labor; the Nunes family's move to Iowa was a secret; the Nunes family told a reporter to use Devin Nunes' middle name so no one would connect him to the story; Anthony Nunes Jr. did not want sources speaking to Lizza because of his son's connections to President Trump; and facts involving destruction or disappearance of various communications and notes Lizza used to write the Article but never produced. (Docs. 130, at 16; 130-1, at 25-32, 34-35). Further, NuStar plaintiffs state Lizza lied about what the Article was about because he told people he interviewed that the Article was about immigration, NuStar Farms, and the dairy industry. (Docs. 130, at 16; 130-1, at 27-28). None of these facts create a genuine issue

of material fact on this element. Plaintiffs have failed to show that the failure to retain notes or transcripts was intentional or violated a standard of care. The alleged misstatements made by Lizza during interviews are more opinions or hunches than false assertions of fact. Last, the Article was, in large part, about immigration, dairy farming, and NuStar Farms, so that was not a material misstatement.

Plaintiffs also cite, however, to facts that indicate information provided by various sources was not fact-checked, including a statement that a woman sent "illegal" workers to NuStar Farms during 2003-2004—years before NuStar plaintiffs purchased the farm in 2007. (Docs. 130, at 17; 130-1, at 28-32). That source also was unsure whether the workers were "legal," but Lizza wrote the plaintiffs were aware of the "illegal" workers' undocumented status based on the source's statements and did not include the source's lack of knowledge as to worker status in the Article. (Docs. 130, at 17; 130-1, at 28-32). Lizza also did not ask the source when the workers were sent to what is now NuStar Farms or who had requested the workers. (Docs. 130, at 17; 130-1, at 28-32). Further, plaintiffs state because the Article was subject to several edits using the audiotapes and transcripts, defendants would have known some statements, such as those from the source who sent labor to the farm before plaintiffs owned it, were not accurate or misrepresented the interviewee's statements. (Docs. 130, at 17; 130-1, at 41-44).

The Court finds that the facts here do not create a genuine issue of material fact as to negligence. Defendants cite facts showing they sought to investigate what they believed to be an important story involving NuStar plaintiffs and Nunes, their farm, and immigration. The facts support that defendants sought to discover the true facts through an investigation. Despite arguing negligence under a professional standard, neither party cited any facts, evidence, or cases that tell the Court the exact standard that is applied in evaluating negligence of a professional journalist. Once defendants have put on facts in support of its claimed lack of negligence, it is for plaintiffs to respond by arguing

negligence, stating and describing the standard for the Court to apply, and then show how the professional standard was violated so as to constitute professional negligence. Alas, NuStar plaintiffs have not done this. NuStar plaintiffs have only stated negligence occurred and cited a handful of facts without any reference to what those facts mean in relation to a standard of care. At most, plaintiffs have shown defendants may have made some mistakes, but like every other profession, journalism is not held to a standard of perfection. Pointing to isolated instances of errors does not satisfy plaintiffs' burden of showing a genuine issue of material fact as to negligence. Again, if presented with the actual standard, the Court might have found differently; but that standard is not available here. Thus, there is no genuine issue of material fact, and no reasonable jury could find for plaintiffs on this element.

In total, the Court finds that because two elements of NuStar plaintiffs' defamation claim do not present genuine issues of material fact, a reasonable jury could not find in their favor. Thus, the Court grants defendants' motion for summary judgment as to Count I of NuStar plaintiffs' third amended complaint.

### B.    *Defamation by Implication*

As to NuStar plaintiffs, defendants argue NuStar plaintiffs cannot show a genuine issue of material fact on several elements of their implication claim, and NuStar plaintiffs failed to identify a gist or sting different from that of Count I, and thus, Count II must be dismissed. In support, defendants argue NuStar plaintiffs cannot show a genuine issue of material fact as to falsity because the implication that NuStar plaintiffs conspired to hide their employment and use of undocumented labor is substantially, objectively true. (Doc. 118-1, at 49-51). Also, defendants argue NuStar plaintiffs cannot show defendants were negligent in their reporting and publication because defendants adhered to the professional standards of journalism. (*Id.*, at 51-52). Finally, defendants assert NuStar

plaintiffs have not been damaged by the implication because there is no evidence of reputational harm. (*Id.*, at 55-56).

NuStar plaintiffs assert they have shown a genuine issue on all elements of defamation by implication. They assert defendants published the Article again on November 20, 2019, via the Tweet.[26] (*See generally* Doc. 130). Also, NuStar plaintiffs argue defendants negligently published the Tweet for many reasons, including the use of "fabricated statements" in the Article. (*Id.*, at 13-18). Further, NuStar plaintiffs argue they have suffered actual injury, particularly to their reputation within their local farming community. (*Id.*, at 18-33). Finally, NuStar plaintiffs argue the implication is false, as Nunes was not connected to the business operations or benefits of the Iowa farm, and NuStar plaintiffs never concealed their move to Iowa. (*Id.*, at 11-13).

Next, as to Nunes, defendants assert Nunes cannot prove five essential elements of his defamation by implication claim. First, defendants state Nunes cannot show republication of the Article, which is necessary for Nunes to prove publication, given the Twitter post of the Article is at issue, not the original Article. (Doc. 181-1, at 56-58). Further, even if the Article were republished via the Twitter post, defendants argue Hearst is not liable because Hearst no longer employed Lizza at the time of the Twitter post; accordingly, defendants assert Hearst is an improper defendant to the implication claim. (*Id.*, at 58). Second, defendants argue Nunes cannot show the implication is false, and substantial evidence refutes Nunes' claim that he did not conspire with his family to cover the alleged hiring practices and their move to Iowa because Nunes allegedly knew nothing of the hiring practices. (*Id.*, at 58-63). Third, defendants argue Nunes cannot prove actual malice, as required of a public figure, because no evidence exists to show Lizza knew the implication was false. (*Id.*, at 63-66). Fourth, defendants

---

[26] On appeal, the Eighth Circuit limited Nunes' claim of defamation by implication to the alleged republication of the Article through the Tweet. *Nunes*, 12 F.4th at 900-01.

assert Nunes cannot show Lizza intended the implication, which they claim is logically required in implication cases on the element of actual malice. (*Id.*, at 66-70). Finally, defendants claim that Nunes cannot show actual injury because he did not properly follow California's retraction laws, does not plead special or pecuniary or economic losses suffered, and does not present evidence of special damages. (*Id.*, at 70-72).

Nunes argues there exist genuine issues of material fact on every element of his defamation claim. He asserts defendants republished the Article through the Tweet. (*See generally* Doc. 130). Also, Nunes argues he was injured because of the implication's impact on his reputation among other members of Congress, companies, and donors, impacting his ability to raise campaign funds. (*Id.*, 18-22). Further, Nunes argues the implication is false, as Nunes was not connected to the business operations or benefits of the Iowa farm, and he never conspired or acted to conceal his family members' move. (*Id.*, at 11-12). Finally, Nunes asserts there is a genuine issue as to actual malice, particularly in view of the Tweet after Nunes demanded retraction. (*Id.*, at 16-18).

For the following reasons, because the Court does not find a genuine issue of material fact as to each element of NuStar plaintiffs' defamation by implication claim, the Court finds that a reasonable jury could not find in NuStar plaintiffs' favor on Count II. Thus, the Court grants defendants' motion for summary judgment as to NuStar plaintiffs' claim of defamation by implication.

Likewise, because the Court does not find a genuine issue of material fact as to each element of Nunes' defamation by implication claim, the Court finds that a reasonable jury could not find in Nunes' favor on Count I. Thus, the Court grants defendants' motion for summary judgment as to Nunes' claim of defamation by implication.

### 1.    *Applicable Law*

Both Iowa and California laws[27] allow a plaintiff—public figure or otherwise—to bring a claim of defamation by implication when they believe that defamation has occurred not because of what the defamer explicitly states but from what the defamer implies. *Stevens*, 728 N.W.2d at 829; *Price v. Stossel*, 620 F.3d 992, 1003 (9th Cir. 2010) (applying California law); *In re Hunter*, 610 B.R. 479, 498 (M.D.N.C. 2019) (examining California law); *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 889 (9th Cir. 2016) (applying California law).

There is a threshold element of defamation by implication that is dependent upon the way the alleged implication presents in the written piece. Defamation by implication occurs when the defamer "(1) juxtaposes a series of facts so as to imply a defamatory connection between them, or (2) creates a defamatory implication by omitting facts[.]" *Stevens*, 728 N.W.2d at 827 (quotation omitted); *see Price*, 620 F.3d at 1003. Even if the facts stated are true, the implication is a form of defamation unless the implication qualifies as an opinion. *Stevens*, 728 N.W.2d at 827; *Price*, 620 F.3d at 1003; *Weller v. Am. Broad. Cos., Inc.*, 283 Cal. Rptr. 3d 664, 652 n.10 (Cal. Ct. App. 1991). Defamation by implication claims must be evaluated by considering the entire written article or document, as the implication can arise from various facts and phrases scattered throughout the piece or placed consecutively. *Manzari*, 830 F.3d at 890; *Stevens*, 728 N.W.2d at 827-28; *see also Toney v. WCCO Television, Midwest Cable and Satellite,*

---

[27] Magistrate Judge Mark A. Roberts previously found a conflict between Iowa and California law on the issue of republication. (Doc. 90, at 14-15). The Court adopts Judge Roberts' analysis and findings on choice of law and finds California law applies to Nunes' claimed republication. Therefore, unlike NuStar plaintiffs' defamation and defamation by implication claims where no conflict of laws exists and thus the Court applies Iowa law, any discussion of defamation by implication as to Nunes will apply California law. (*See id.*, at 16-22).

83 83

*Inc.*, 85 F.3d 383, 396 (8th Cir. 1996).[28] "[T]he touchstone of implied defamation claims is an artificial juxtaposition of two true statements or the material omission of facts that would render the challenged statement(s) non-defamatory." *Toney*, 85 F.3d at 387; *see Price*, 620 F.3d at 1003; *Stevens*, 728 N.W.2d at 827. Thus, a defendant must "defend the juxtaposition of two statements or the omission of certain facts." *Toney*, 85 F.3d at 387. "When a reader, 'connecting the dots,' could reasonably arrive at the implication, the author may be accountable." *Nunes*, 12 F.4th at 897 (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 109 (2d Cir. 2017)); *Manzari*, 830 F.3d at 889-91. Thus, the court must determine that a reasonable person could understand the communication as bearing the allegedly defamatory implication. *Bertrand v. Mullin*, 846 N.W.2d 884, 896 n.3 (Iowa 2014); *GetFugu, Inc. v. Patton Boggs LLP*, 162 Cal. Rptr. 3d 831, 842 (Cal. Ct. App. 2013).

Once a court finds this threshold element satisfied, it must evaluate whether the juxtaposed, truthful statements or omitted facts satisfy other elements typical of traditional defamation claims. "A claim asserting defamation by implication requires proof of similar elements [as a claim asserting defamation], except that a plaintiff need not show that individual statements are defamatory." *Nunes*, 12 F.4th at 895. Thus, a plaintiff must show that the defendant (1) published statements—that is the statements or omissions within the document in its entirety—(2) of and concerning the plaintiff, which (3) resulted in injury to the plaintiff. *Id.* Further, though the facts and phrases presented in the statement might be true, "[t]he court must determine whether an objectively reasonable reader could draw the alleged false implication from the article as a whole," meaning the implication itself must be false. *Id.* at 896; *Manzari*, 830 F.3d at 889-90; *Stephens*, 728

---

[28] For purposes of applicable law, the Court references several cases interpreting defamation by implication laws in other states, such as Minnesota when no conflict exists between it and the applicable law here.

N.W.2d at 827-28; *Toney*, 85 F.3d at 394-96. As discussed previously, a plaintiff need not prove the literal falsity of every detail of a statement; rather, a plaintiff must prove that the "gist" or "sting" of the challenged statements are substantially false. *See Doe*, 765 F.3d at 863 (applying Iowa law). Further, statements "that are not sufficiently factual to be capable of being proven true or false and statements that cannot reasonably be interpreted as stating actual facts are absolutely protected under the Constitution." *Id.* Courts applying California law, but not Iowa law, have held that a plaintiff must also prove "that the defendant 'intended to convey the defamatory impression.'" *De Havilland v. FX Networks, LLC*, 230 Cal. Rptr. 3d 625, 646 (2018) (quoting *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063-64 (9th Cir. 1998)).

When the plaintiff alleging defamation by implication is a public figure or limited-purpose public figure, they must also prove by clear and convincing evidence that the implication was made with actual malice, just as a plaintiff claiming defamation. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511-12 (1984); *Nunes*, 12 F.4th at 899; *Nelson Auto Center, Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020); *Manzari*, 830 F.3d at 883-84. A defendant displays actual malice when an implication is made with knowledge of its falsity or reckless disregard as to the implication's truth. *See Stevens*, 728 N.W.2d 830-831 (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989)); *Manzari*, 830 F.3d at 891. "[T]he defendant must have made the false publication with a high degree of awareness of . . . probable falsity, or must have entertained serious doubts as to the truth of his publication." *Harte-Hanks Commc'ns*, 491 U.S. at 688 (internal citation and quotations omitted); *see Manzari*, 830 F.3d at 889. In the case of republication, actual malice can be shown when the defendant republishes the defamatory statement or implication after being notified that it is defamatory and false. RESTATEMENT (SECOND) OF TORTS § 580A cmt.-d 2022; *see also, e.g.*, *Stevens*, 728 N.W.2d at 828, 830 (relying on Restatement

(Second) of Torts when discussing defamation liability); *Kahn v. Bower*, 284 Cal. Rptr. 244, 248 (Cal. Ct. App. 1991) (same). Whether evidence in the record supports a finding of actual malice by clear and convincing evidence is a question of law for the court to decide. *Harte-Hanks Commc'ns*, 491 U.S. at 685-86.

Under California and Iowa law,[29] when a defamatory statement or implication is republished on social media, under some instances, the republication can constitute an additional instance of defamation or defamation by implication that resets the statute-of-limitation. "Republication occurs when the original defamer repeats or recirculates his or her original remarks to a new audience." *Penrose Hill, Ltd. v. Mabray*, 479 F.Supp.3d 840, 850 (N.D. Cal. 2020) (quoting *Shively v. Bozanich*, 80 P.3d 676, 683 (Cal. 2003)); *Nunes*, 12 F.4th at 899-900. Under California law, whether the statute-of-limitation is reset through a republication depends on whether the second or later publication is made via an "aggregate communication that reaches a large number of persons at the same time" and whether that publication is part of the same single integrated publication as the original publication. *Penrose*, 479 F.Supp.3d at 850-51. General reference to or linking to a defamatory article alone is not republication. *Id.* at 851. When a second or later publication steps beyond simply hyperlinking the defamatory material and adds to or alters the original substance, there might be republication. *Id.* at 852. Republication might occur when the text of a social media post linking to the defamatory piece contains statements about the plaintiff, repeats the contents of the defamatory statements, or realleges the original substance by providing additional information. *Id.* at 852-53. Under Iowa law, however, a plaintiff need only show repetition of the original statement that was reasonably foreseeable. *Huegerich*, 547

---

[29] Again, as to the issue of republication, NuStar plaintiffs' claims are subject to Iowa law, but Nunes' claim is subject to California law because of the conflict of law regarding republication, (*See* Doc. 90, at 14-15); accordingly, the Court references the law of both jurisdictions in its statement of applicable law.

N.W.2d at 222 ("Every repetition of a defamatory statement 'constitutes a claim which is separate and independent from any claims arising out of the original publication.'") (quoting *Kiner v. Reliance Ins. Co.*, 463 N.W.2d 9, 14 (Iowa 1990)).

### 2. *NuStar Plaintiffs' Claim*[30]

#### a. *Juxtaposition of Facts*

Defendants make no argument as to whether a juxtaposition exists. (*See* Doc. 118-1, at 59-60). Thus, defendants fail to meet their initial burden as to whether statements throughout the Article are sufficiently juxtaposed so as to produce the implication. *See Hartnagel*, 953 F.2d at 395.

#### b. *Republication Under Iowa Law*

The Court finds no genuine issue of material fact as to republication for purposes of the implication as to Hearst, though it finds a genuine issue of material fact as to Lizza under Iowa law. In relation to the Tweet's publication—the Article's republication— under Iowa publication laws, defendants make no argument. Applicable to both plaintiff groups, however, is defendants' argument that Hearst is an improper defendant to any claims arising from the Tweet because it no longer employed Lizza when he shared the Tweet. (Doc. 118-1, at 58).

In response, NuStar plaintiffs state only, throughout their briefing, that publication of the Article occurred for an additional time on November 20, 2019, when Lizza published the Tweet. (*See generally* Doc. 130). They do not state any factual or legal support for their conclusion, and they incorrectly state that the Eighth Circuit Court of Appeals held explicitly the Tweet was a republication of the Article. (Doc 130, at 7). The Eighth Circuit never said this; instead, it held that "the complaint sufficiently alleges

---

[30] NuStar plaintiffs allege defamation by implication under Iowa law as private figures and so must show, in sum: (1) juxtaposition or omission of facts thereby creating a defamatory implication; that defendant (2) published a statement(s); (3) of and concerning the plaintiff; (4) which resulted in injury to the plaintiff; (5) falsity of the implication; and (6) negligence.

that Lizza republished the article," *Nunes*, 12 F.4th at 901, meaning Nunes sufficiently alleged republication of the Article in his individual complaint—not that republication was shown or substantiated definitively. *See* FED. R. CIV. P. 12(b)(6). Importantly, the Eighth Circuit Court of Appeals said nothing about whether Lizza's publication of the Tweet constituted republication by Hearst when Lizza no longer worked for Hearst at the time. NuStar plaintiffs do not address defendants' argument that Hearst is an improper defendant on the implication claims. (Doc. 118-1, at 58). The two responses to defendants' two undisputed facts showing Lizza no longer worked for Hearst in November 2019 do not in any way controvert that Lizza no longer worked for Hearst when he posted the Tweet—plaintiffs instead use their response to discuss a prior conflict with Lizza from 2017 and to assert that Lizza had apparent authority to publish the Tweet for Hearst, though plaintiffs do not say how there would still be apparent authority under agency law. (Doc. 130-1, at 15-17, 55-56). Nor do plaintiffs cite any evidence or argue that the republication through the Tweet was foreseeable, as required under Iowa law.

The Court finds no genuine issue of material fact as to Hearst. Defendants have provided evidence showing Hearst was no longer affiliated with Lizza at the time of the Tweet. Plaintiffs have put on no evidence to rebut defendants' evidence, and they have cited no evidence or argument in support of their assertion that Lizza was acting with apparent authority when posting the Tweet. Thus, plaintiffs have not shown a genuine issue of material fact on this element as to Hearst.

Defendants make no argument as to whether, under Iowa law, Lizza republished the Article via the Tweet. Thus, defendants fail to meet their initial burden on this element as to Lizza. *See Hartnagel*, 953 F.2d at 395.

In sum, the Court finds no genuine issue of material fact exists on publication as to Hearst but that a genuine issue of material fact exists on the element as to Lizza. *See*

88

*Mosley*, 415 F.3d at 910.  Thus, the Court finds no reasonable jury could find for NuStar plaintiffs on this element in relation to Hearst.  *See Mosley*, 415 F.3d at 910.

### c.    *Of and Concerning Plaintiff*

Next, defendants make no argument as to whether the Article was of and concerning NuStar plaintiffs.  (*See generally* Doc. 118-1, at 39-56).  Thus, defendants fail to meet their initial burden on this element.  *See Hartnagel*, 953 F.2d at 395.

### d.    *Injury*

Here, defendants' injury argument is the same for both Counts I and II of NuStar plaintiffs' complaint, given the similarity in the claimed defamatory statement and claimed implication.  Accordingly, the Court adopts its findings and analysis of injury under NuStar plaintiffs' defamation claim.  Thus, the Court finds a genuine issue of material fact exists as to injury such that a reasonable jury could find for NuStar plaintiffs on this element.  *See Mosley*, 415 F.3d at 910.

### e.    *Falsity of the Implication*

The Court finds there exists no genuine issue of material fact on the issue of falsity of the implication.  Defendants argue that the defamatory gist plaintiffs allege is the same as that alleged in Count I—that all plaintiffs conspired with others to hide and conceal the "politically explosive secret" that NuStar plaintiffs knowingly employ undocumented laborers on their farm, which defendants say is no different than the alleged defamatory statement that NuStar plaintiffs knowingly hire undocumented laborers.  (Docs. 118-1, at 49; 138, at 9).  Defendants assert that the test on summary judgment for this element is whether NuStar plaintiffs "would have been exposed to any more opprobrium had the publication been free of error."  (Doc. 118-1, at 50).  Referencing Count I, defendants state the defamatory sting on both counts, being the same, could not possibly create more opprobrium.  (*Id.*).  Defendants also state that the alleged defamatory statements and implication are substantially true.  (*Id.*).  They argue further there is no additional sting

89

by stating plaintiffs conspired because conspiracy by itself is not wrong or defamatory—it is only defamatory when one conspires to commit a wrongful or illegal act, which differs from conspiring to hide an illegal act. (*Id.*). Further, even if defendants accused plaintiffs of actionable conspiracy, defendants assert that the underlying act resulting in the sting or gist was the knowing hiring of undocumented persons, which defendants argue is substantially true. (*Id.*, at 50-51). Finally, defendants argue none of the juxtaposed facts connected with the statement that plaintiffs used undocumented labor add to the sting of the Article. (*Id.*, at 51).

NuStar plaintiffs assert they did not knowingly employ undocumented laborers and conspire to cover it up. (*See generally* Doc. 130). They argue the farm in Sibley, Iowa is not the family farm—that farm has remained in Tulare, California. (*Id.*, at 12). Further, NuStar plaintiffs point to the fact plaintiffs never acted to conceal their move to Iowa in 2006. (Docs. 130, at 12; 130-1, at 22-23, 25-27, 39, 46-47). NuStar plaintiffs assert they opened a new dairy in Iowa, but the family farm in California is currently run by other family members, and there is no political secret about the farm as implied in the entire Article or from the individual fact that NuStar plaintiffs moved. (Docs. 130, at 12; 130-1, at 22-23, 25-27). Also, despite the Article implying that Devin Nunes had some interest in the Iowa farm, in NuStar plaintiffs' telling, he was never involved in the farm, its management, employment or hiring, never discussed labor issues with Anthony Jr., Anthony III, or Lori Nunes, and Devin Nunes and his wife never used the Iowa farm's address on any SEC filings and challenge the authenticity of the alleged filing produced in discovery. (Docs. 130, at 12; 130-1, at 39, 47-48, 118). Finally, they dispute that either Source 1 or 2 had any personal knowledge of NuStar Farms' labor practices, and state that (1) Sources 1 and 2 did not make the statements attributed to them in the Article given Lizza's notes, (2) Source 2 was not undocumented as claimed in the Article, and (3) at no time did NuStar Farms knowingly employ undocumented

laborers, as supported by their purported expert's opinions. (Docs. 130, at 12-13; 130-1, at 28-32, 34, 36).

The Court finds no genuine issue of material fact exists as to falsity. NuStar plaintiffs argue the alleged implication as to them is false. As to the juxtaposed fact that the family conspired to hide the farm's move, they cite facts supporting that they never concealed the move and that the family's farm did not move—instead, they claim, the family purchased a separate and additional farm unaffiliated with the family farm in California. NuStar plaintiffs also cite to facts rebutting the allegation Devin Nunes had any interest or affiliation with—and thus that he could conspire with—the Iowa farm or knew anything about their current, active hiring practices or history at the Iowa farm at the time of the Article or had any knowledge of undocumented labor usage. But, as discussed in NuStar plaintiffs' defamation claim, NuStar plaintiffs do not, however, cite to facts that properly rebut defendants' argument as to whether NuStar plaintiffs knowingly used undocumented labor. This is because NuStar plaintiffs cite mostly to conclusions by their expert, which the Court cannot evaluate as facts. NuStar plaintiffs also cite to many facts indicating that they accepted insufficient documents because they believed it was invidiously discriminatory to question the documents. But none of these facts support that NuStar plaintiffs did not knowingly use undocumented labor. In all, NuStar plaintiffs have not presented facts creating a genuine issue of material fact as to falsity of the implication. Each of the juxtaposed facts identified lend to the larger implication, and defendants need only show the sting or gist of the implication is substantially true. The fact of knowing employment of undocumented laborers is essential and central to the implication being defamatory—there would be no "politically explosive secret" absent knowing employment of undocumented workers. The scandal comes from the allegation that a politician who votes for laws in furtherance of his belief that illegal immigration is wrong turns his head away when his family employs

undocumented immigrants; the hypocrisy of knowing employment is the politically explosive secret. Here, the Court finds there is no genuine question as to whether the implication itself is substantially true or false; thus, the level of opprobrium is the only issue. *See Olson v. City of North Liberty*, 451 F.Supp.3d 1010, 1026 (S.D. Iowa 2020) (stating that the Court can only determine substantial truth as a matter of law when the only issue regarding falsity is the level of opprobrium, not when the truth of what was implied or said is also in issue). Plaintiffs have not met their burden to show a genuine issue of material fact as to falsity of the implication, despite defendants' recitation of facts which paint the implication as substantially true.

In sum, the Court finds no genuine issue of material fact exists on this element. *See Mosley*, 415 F.3d at 910. Thus, the Court finds no reasonable jury could find for NuStar plaintiffs as to falsity of implication.

### f.    Negligence

Defendants' argument about negligence under Count II of NuStar plaintiffs' complaint does not differ from their negligence argument under Count I. NuStar plaintiffs' argument and cited facts in support also do not differ. Accordingly, the Court adopts its analysis and findings on negligence under Count I. In sum, the Court finds no genuine issue of material fact exists on this element. Thus, the Court finds no reasonable jury could find for NuStar plaintiffs on negligence.

In total, the Court finds that because not all elements of NuStar plaintiffs' defamation by implication claim present genuine issues of material fact, a reasonable jury could not find in their favor. Thus, the Court grants defendants' motion for summary judgment as to Count II of NuStar plaintiffs' third amended complaint.

92

### C.     Nunes' Claim[31]

#### 1.     Juxtaposition of Facts

Defendants make no argument as to whether a juxtaposition exists. (*See* Doc. 118-1, at 59-60). Thus, defendants do not meet their initial burden as to this element. *See Hartnagel*, 953 F.2d at 395.

#### 2.     Republication Under California Law

The Court finds no genuine issue of material fact as to republication. Defendants assert that the Tweet was not an actionable republication. (Doc. 118-1, at 57). In support, they cite California law establishing that hyperlinks alone are not republication. (*Id.*). Even if the Court were to find republication, defendants argue, Hearst is not a proper defendant because Lizza no longer worked for Hearst when he created the Tweet. (*Id.*, at 58).

Plaintiff Nunes does not show a genuine issue of material fact on this element. Rather than arguing and citing facts to support the question of republication within the caselaw, Nunes states only, throughout his briefing, that republication of the Article occurred on November 20, 2019, when Lizza published the Tweet. (*See generally* Doc. 130). He states no factual or legal support for the conclusion that the Tweet constitutes a republication of the Article under California law and incorrectly states the Eighth Circuit Court of Appeals held that the Tweet was a republication of the Article. (*Id.*, at 7). Again, the Eighth Circuit never said this; instead, it held that "the complaint sufficiently alleges that Lizza republished the article," *Nunes*, 12 F.4th at 901, meaning

---

[31] Nunes alleges defamation by implication under California law as a public figure based on the alleged republication of the Article on Twitter, and thus must show: (1) a juxtaposition or omission of facts thereby creating a defamatory implication; (2) that the defendant published a statement(s); (3) the statement(s) was of and concerning the plaintiff; (4) the statement(s) resulted in injury to the plaintiff; (5) the implication was false; (6) the defendant intended to convey the defamatory impression; and (7) the defendant acted with actual malice.

the complaint *sufficiently alleged* republication for purposes of a motion to dismiss, not that republication was shown or substantiated definitively. *See* FED. R. CIV. P. 12(b)(6). Here, Nunes makes no showing as to whether, beyond simply pleading republication in the complaint, there is a genuine issue as to republication. Further, Nunes makes no argument that Hearst is a proper defendant.

In sum, the Court finds no genuine issue of material fact exists on this element. *See Mosley*, 415 F.3d at 910. Thus, the Court finds no reasonable jury could find for Nunes on republication.

### 3.    *Of and Concerning Plaintiff*

Defendants make no argument as to this element. (*See generally* Doc. 118-1, at 56-72). Thus, defendants fail to meet their initial burden as to whether statements throughout the Article were of and concerning Nunes. *See Hartnagel*, 953 F.2d at 395.

### 4.    *Injury*

The Court finds no genuine issue of material fact as to injury. Defendants argue Nunes can recover only special damages because he did not properly follow the California retraction statute. (Doc. 118-1, at 70-71 (citing Doc. 90, at 15 and *Anschutz Ent. Grp., Inc. v. Snepp*, 171 Cal. App. 4th 598, 640-41 (2009)). In support, defendants cite the statute which requires retraction demands be made three weeks before filing a lawsuit based on the same statements, assert Nunes failed to do, and state that Nunes did not request the Tweet be retracted, only the unspecified "publication." (*Id.*, at 71). Defendants also argue Nunes produces no evidence of his special damages, or pecuniary or economic losses. (*Id.*). Defendants point to his salary staying the same while he served in Congress and tripling when he began employment with Truth Social, and to his fundraising increasing substantially after the Article was published. (*Id.*).

Plaintiff Nunes argues he has suffered injury as a result of the Tweet. He cites the retweets, quotes, replies, and likes of the alleged republication as injury. (Doc. 130,

at 20). He additionally cites to reputational harm suffered in Congress because he was confronted by several other members of Congress and the House Intelligence Committee attorney about what was going on, some of whom were concerned he would be expelled from Congress due to accusations of federal crimes—that is, employing undocumented laborers—and some of whom wanted to know whether he had an undisclosed interest in NuStar Farms. (*Id.*, at 21). Further, Nunes states that many companies stopped donating to him as a result of the Article and its republication, that he experienced public shame and embarrassment because he was no longer able to give farm tours in California, and that at least one family member cut off—at least in part—his relationship with Nunes because of the Article and Tweet and not for any act by Nunes. (*Id.*, at 21-22).

The Court finds no genuine issue as to damages. As a preliminary matter, Nunes can recover only special damages because he did not properly follow the California retraction statute. *See Anschutz Ent. Grp.*, 171 Cal. App. 4th at 640-41 (discussing California Civil Code Section 48a(1)). Under California Civil Code Section 48a(d)(2), special damages under Section 48a are limited to evidenced damages suffered to a plaintiff's "property, business, trade, profession, or occupation, including the amounts of money the plaintiff alleges and proves he or she has expended as a result of the alleged libel, and no other." Nunes makes no accounting and provides no formula on which to base his damages. He does not show being confronted by various persons at work negatively impacted his occupation or ability to work, or that changes in campaign fundraising damaged his campaign and thus his occupation.

In sum, the Court finds no genuine issue of material fact exists as to recoverable damages and thus, injury. *See Mosley*, 415 F.3d at 910. Thus, the Court finds no reasonable jury could find for Nunes on this element.

## 5. *Falsity of the Implication*

Next, the Court finds a genuine issue of material fact exists on the issue of falsity as to Nunes. Defendants argue their reporting is substantially true, making summary judgment appropriate. They argue that Nunes never made public disclosures of his family's move, and he attended a Steve King rally in 2010, which shows he knows King—with whom defendants say Nunes conspired to hide the family move. (Doc. 118-1, at 59). Defendants point also to evidence Nunes told his family they should not speak to Lizza and his family's insistence that Nunes be left out of the *Dairy Star* article, in addition to the family hiring Nunes' lawyer and speaking with Nunes about retraction. (*Id.*, at 59-60). Further, defendants argue Nunes knows his family employs undocumented laborers—a verifiable fact—based on his statements about knowing what the hiring looks like from the California farm, his belief that employers cannot question the authenticity of worker documentation, and his conversations with his father and brother. (*Id.*, at 60-63). Defendants argue each of these facts show Nunes knew of the use or potential use of undocumented labor because of his family's refusal to question authorizing documents. (*Id.*, at 61).

Nunes asserts he did not cover up any politically explosive secret or conspire to do so, and he had no knowledge of NuStar Farms' business or its practices. He argues the farm in Sibley, Iowa is not the family farm—that farm has remained in Tulare, California. (Doc. 130, at 12). Further, Nunes points to the fact neither he nor NuStar plaintiffs ever acted to conceal NuStar plaintiffs' move to Iowa in 2006. (Doc. 130, at 12; 130-1, at 22-23, 25-27, 39, 46-47, 56). He asserts his relatives opened a new dairy in Iowa, but the family farm in California is currently run by other family members, and there is no political secret about the farm as implied in the entire Article or from the individual fact that NuStar plaintiffs moved. (Docs. 130, at 12; 130-1, at 22-23, 25-27, 39, 46-47, 56). To this point, Nunes once more states NuStar Farms has never been the

96

family farm because that farm has remained in California. (Doc. 130, at 12). Importantly, despite the Article implying that Nunes had some interest in the Iowa farm, in Nunes' telling, he was never involved in the farm, its management, employment, or hiring, never discussed labor issues with Anthony Jr., Anthony III, or Lori Nunes, and he and his wife never used the Iowa farm's address on any SEC filings and challenge the authenticity of the alleged filing produced in discovery. (Doc. 130, at 12; 130-1, at 48-49). He has no ownership or interest, disclosed or undisclosed, in the farm, he states. (Doc. 130, at 12; 130-1, at 48-49). Last, Nunes points to the fact that the family does not knowingly employ undocumented persons. (Doc. 130, at 12-13).

The Court finds that a reasonable jury could find for Nunes here. There are disputes on essential facts, including whether Nunes was aware of his family's alleged hiring practices. There is, however, no evidence to which Nunes cites that rebuts the allegation that his family farm employs undocumented persons. At the same time, defendants do not show evidence Nunes knew of any employment practices in California so that he would have reason to know of current employment practices in Iowa, assuming they are the same practices. Defendants do not show that Nunes knew of the employment practices in Iowa. They do not show that the employment practices are the same at the Iowa farm now as when Nunes worked at the California farm but instead assume so. Further, no facts suggest Nunes acted to conceal his family's move, and his association with King alone does not show conspiracy. Central to the implication as to Nunes is the fact that he was involved at all, and the evidence presented creates a question as to whether Nunes had knowledge or involvement in the (1) alleged knowing employment of undocumented laborers or (2) covering it up through a conspiracy. Whether Nunes' family employed undocumented persons has no bearing here if he is not connected to those actions. Though defendants might have shown substantial truth of the implication

as to NuStar plaintiffs, an implication cannot be said to be substantially true as to someone who has not been shown to have acted in the scheme at all.

In sum, the Court finds a genuine issue of material fact exists as to falsity of the implication. *See Mosley*, 415 F.3d at 910. Thus, a reasonable jury could find in favor of Nunes on this element.

### 6.    *Defendants' Intent to Convey Defamatory Impression*

Next, the Court finds no genuine issue of material fact as to intent to convey the defamatory impression. Defendants argue Lizza intended no implication and has not been shown to intend the implication. (Doc. 118-1, at 66-67). Defendants point to the Article's content, which includes the statement that Nunes has no financial interest in the Iowa farm and does not say he is involved with the farm. (Doc. 118-1, at 66). Defendants state Lizza never meant "conspire" in the formal, legal sense—which is shown, in defendants' telling, by "precise facts" Lizza includes and how they are "precisely laid out in the Article." (*Id.*, at 67).

Nunes does not argue on this element. He simply states in his brief, "[t]he intended and endorsed defamatory implication" once when outlining the implication, (Doc. 130, at 3), and discusses the Eighth Circuit Court of Appeals' mention that plaintiff plausibly pled that defendants intended the implication, not that Nunes had proven such intent. (*Id.*, at 7). This is insufficient to raise any material fact on which a genuine issue could exist.

In sum, the Court finds no genuine issue of material fact exists on defendants' intent to convey a defamatory statement. *See Mosley*, 415 F.3d at 910. Thus, the Court finds no reasonable jury could find for Nunes on this element.

### 7.    *Actual Malice*

Last, the Court finds a genuine issue of material fact as to actual malice. Defendants argue no actual malice exists because Lizza did not knowingly or recklessly

disregard the truth of the implication—an implication he did not know or intend to make. (Doc. 118-1, at 66-67). Further, defendants argue Nunes cannot show actual malice by clear and convincing evidence, as the law requires. (*Id.*, at 64-66).

Nunes argues Lizza harbors extreme bias toward Nunes and has previously made other false accusations regarding Nunes. (Doc. 130, at 16). Nunes also states Lizza lied about what he was reporting, Lizza made many misrepresentations to interviewees including the sources, and defendants fabricated statements including assertions that sources sent undocumented labor to NuStar Farms and that one source was undocumented. (*Id.*, at 17). He points out that Lizza did not ask important follow up questions such as when people were brought to the farm. (*Id.*). He cites further to publication via Twitter after the retraction demand and lawsuit filing, and what he believes was an October Surprise—the timing of the Article being tweeted evidences, in Nunes' telling, an intent to inflict harm on his career, as defendants knew he was a prominent member of Congress. (*Id.*, at 17-18). Also, Nunes states that Lizza knew the Article contained falsehoods when he made the Tweet because he had audiotapes of source interviews that did not contain what he claimed they did. (*Id.*, at 17).

Here, the Court finds by clear and convincing evidence that there is a question as to whether actual malice existed. It is insufficient for Nunes to say defendants desired to inflict damage on Nunes and his career without proper evidence to support such a blanket statement. It also is insufficient for Nunes to claim Lizza knew he was publishing falsehoods because of the content of the interview tapes when nothing Nunes cites evidences contradiction between what Lizza wrote and what interviewees stated, including interview tapes. Conversely, though Nunes did not argue republication as required, the Article was at least re-posted and a request for retraction—whether sufficient—occurred. In other words, Lizza was informed of its alleged falsity and then spoke the allegedly defamatory implication again—regardless of whether that additional

recitation of the implication legally qualifies as a republication for purposes of the statute-of-limitation. As discussed, there is a question as to the substantial truth of the implication as to Nunes, which Nunes demanded defendants retract because he alleges the implication is false as to him. Lizza renewed or ratified his previous statements when he shared the Tweet, despite being told the implication as to Nunes was false before tweeting. *See Dickinson v. Cosby*, 37 Cal. App. 5th 1138, 1159 (Cal. Ct. App. 2019) (discussing failure to retract a statement upon which doubt is cast after publication and ratification through that same failure to retract). Thus, the Court finds the evidence of the Tweet's publication after an attempted retraction demand creates a genuine issue as to Lizza's actual malice.

As to Hearst, defendants make no argument and put on no evidence in support of the assertion that Hearst did not act with actual malice. Under a clear and convincing evidence standard, the Court finds defendants have not met their initial burden as to Hearst's alleged actual malice. *Hartnagel*, 953 F.2d at 395.

In sum, the Court finds a genuine issue of material fact exists as to actual malice. *See Mosley*, 415 F.3d at 910.

In total, however, because Nunes does not show a genuine issue of material fact on all elements of his claim, a reasonable jury could not find in his favor. Thus, the Court grants defendants' motion for summary judgment as to Count I of Nunes' third amended complaint.

## IV.    CONCLUSION

For these reasons, defendants' motion for summary judgment (Docs. 118; 121) is **granted** as to NuStar plaintiffs' claim of defamation (Count I), **granted** as to NuStar plaintiffs' claim of defamation by implication (Count II), and **granted** as to Nunes' claim of defamation by implication (Count I).

Still pending before this Court is the disposition of the motion to unseal certain documents supporting the motion for summary judgment.  (Docs. 124; 125; 142).  The Court orders the motion to unseal be held in abeyance.  The Court directs the Clerk of Court to delay filing its judgment closing this matter until the Court issues its order on the motion to unseal.

**IT IS SO ORDERED** this 25th day of April, 2023.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

101