**Defendants' Brief in Support of Their Resisted Motion for Summary Judgment Against Plaintiffs Devin G. Nunes, NuStar Farms, LLC, Anthony Nunes, Jr., and Anthony Nunes, III**

**(Redacted)**

| | |
|---|---|
| **Devin G. Nunes,** | **Case No. 5:19-cv-04064-CJW-MAR** |
| Plaintiff, | |
| v. | |
| **Ryan Lizza, Hearst Magazines, Inc.,** and **Hearst Magazine Media, Inc.,** | |
| Defendants. | |
| **NuStar Farms, LLC, Anthony Nunes, Jr.,** and **Anthony Nunes, III,** | **Case No. 5:20-cv-04003-CJW-MAR** |
| Plaintiffs, | **Defendants' Brief in Support of Their Resisted Motion for Summary Judgment Against Plaintiffs Devin G. Nunes, NuStar Farms, LLC, Anthony Nunes, Jr., and Anthony Nunes, III** |
| v. | |
| **Ryan Lizza** and **Hearst Magazine Media, Inc.,** | **(Oral Argument Requested)** |
| Defendants. | **\*Filed Under Seal\*** |

Defendants Ryan Lizza ("Lizza") and Hearst Magazine Media, Inc. ("Hearst") (collectively, "Defendants") respectfully submit this brief in support of their Resisted Motion for Summary Judgment against Plaintiffs Devin G. Nunes (the "Congressman"), NuStar Farms, LLC ("NuStar"), Anthony Nunes, Jr. ("Anthony Jr."), and Anthony Nunes, III ("Anthony III") (NuStar, Anthony Jr., and Anthony III are referred to herein collectively as "NuStar Plaintiffs," and the Congressman and NuStar Plaintiffs are referred to herein collectively as "Plaintiffs"), seeking dismissal of Plaintiffs' claims in their entirety and entry of final judgment for Defendants.

# Table of Contents

INTRODUCTION ................................................................................................ 1

UNDISPUTED MATERIAL FACTS ................................................................ 5

I.     Congressman Nunes, Like His Family, Has Deep Experience in Dairy Farming. ............. 5

II.    Defendants Carefully Reported a Story on the Congressman's Family's Dairy,
       NuStar, and the Use of Undocumented Workers on Dairy Farms. ................................... 7

III.   The Congressman Did Not Publicize His Family's Move to Iowa. ................................. 9

IV.    The NuStar Plaintiffs Habitually Violate Federal Immigration Law .............................. 10

       A.    NuStar, as a Rule, Does Not Verify Its Workers' Documents. .......................... 10

       B.    Because It Does Not Verify Its Workers, NuStar's Workforce
             Is Overwhelmingly Unauthorized. ......................................................... 13

       C.    NuStar Hired Employees Whose Documents Stated, on
             Their Face, that They Did Not Authorize Employment. ................................. 14

       D.    NuStar's Employees Invoked Their Fifth Amendment Right to
             Remain Silent About NuStar's Knowledge of Their Status. ............................ 15

V.     The Congressman Knows His Family Has Routinely Hired Without Verification,
       in an Industry Rife with Unauthorized Workers. ............................................ 16

       A.    The Congressman Knows His Family Has Regularly Hired
             Workers Without Verifying Documents. .................................................. 16

       B.    The Congressman Communicates with His Family Constantly. ........................ 17

       C.    The Congressman Co-Sponsored Eight Bills Addressing the Issues of
             Undocumented Dairy Workers, Including Verification Requirements. .............. 19

VI.    After the Article, the NuStar Plaintiffs Feared for Their Employees and
       Did an Audit that Showed Their Practices Were Illegal. ................................... 22

VII.   Despite Knowing Their Practices Broke the Law, the NuStar Plaintiffs Sued for
       Defamation Following the Congressman's Lead. ........................................... 23

VIII.  Plaintiffs Have Not Been Damaged. ...................................................... 25

       A.    The NuStar Plaintiffs Can Show No Harm from the Article. ........................... 25

i

B.    The Congressman Has Not Been Harmed by Lizza's November 2019
Link to the Article. ................................................................................. 26

LEGAL STANDARD ........................................................................................ 26

ARGUMENT ...................................................................................................... 27

I.     THE NUSTAR PLAINTIFFS PRESENT NO GENUINE ISSUE FOR TRIAL. ............ 27

    A.    The NuStar Plaintiffs Cannot Prove It Is False to Say They
Knowingly Hired Undocumented Labor as a Matter of Law. ............................. 27

        1.    Plaintiffs Bear the Burden to Prove Falsity. .............................................. 27

        2.    The NuStar Plaintiffs Flouted the Laws and Hired
Employees with Facially Invalid Documents. ........................................... 30

        3.    When Asked If NuStar Knew of Their Undocumented Status,
Its Current Employees Pled the Fifth. ....................................................... 35

        4.    The Alleged Implication that the NuStar Plaintiffs Conspired to
Hide Their Use of Undocumented Labor Is Substantially True. ............... 37

    B.    The NuStar Plaintiffs Cannot Prove the Requisite Fault. ................................... 39

        1.    Defendants Were Not Negligent. ............................................................... 39

        2.    The NuStar Plaintiffs Cannot Show Actual Malice. .................................. 41

    C.    The NuStar Plaintiffs Have Not Been Harmed by Defendants ............................ 43

II.    THE CONGRESSMAN'S CLAIM FAILS AS A MATTER OF LAW. ........................ 44

    A.    Under California Law, Which Applies to the Congressman's Claim, the
Link Did Not Republish the Article. ................................................................... 44

        1.    The Link Could Not Republish the Article as a Matter of Law ................ 44

        2.    Hearst Had No Role in Publishing the Link. ............................................. 46

    B.    The Congressman Cannot Prove Falsity as a Matter of Law ............................... 46

    C.    The Congressman Cannot Meet His Burden to Prove Actual Malice. ................. 51

        1.    The Congressman Must Present Clear and Convincing
Evidence to Meet His Burden. ................................................................... 52

2.     The Congressman Cannot Meet His Burden to Show
       Lizza Intended to Convey the Purported Implication. ............................ 54

3.     The Congressman Cannot Meet His Burden to Show Lizza Believed
       the Implication Was False or Seriously Doubted Its Accuracy. ............... 55

D.     The Congressman Has Not Been Damaged by the Link to the Article. ............... 58

CONCLUSION ............................................................................................................. 60

# Table of Authorities

**Cases**

*Anderson v. Hearst Publ'g Co.*,
    120 F. Supp. 850 (S.D. Cal. 1954) ........................................................................59

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..........................................................................26, 29, 54

*Anschutz Ent. Grp., Inc. v. Snepp*,
    171 Cal. App. 4th 598 (2009) .............................................................................59

*Bandstra v. Covenant Reform Church*,
    913 N.W.2d 19 (Iowa 2018) ...............................................................................29

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976) .............................................................................................36

*Behr v. Meredith Corp.*,
    414 N.W.2d 339 (Iowa 1987) .............................................................................38

*Berisha v. Lawson*,
    973 F.3d 1304 (11th Cir. 2020) ..........................................................................41

*Bertrand v. Mullin*,
    846 N.W.2d 884 (Iowa 2014) .............................................................................58

*Bierman v. Weier*,
    826 N.W.2d 436 (Iowa 2013) .............................................................................43

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013) ................................................................58

*Bose Corp. v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984) .....................................................................................52, 54

*Brink's Inc. v. City of N.Y.*,
    717 F.2d 700 (2d Cir. 1983) ...............................................................................35

*Brown v. Hearst Corp.*,
    54 F.3d 21 (1st Cir. 1995) ...................................................................................40

*Buffalo Transp., Inc. v. United States*,
    844 F.3d 381 (2d Cir. 2016) ...............................................................................32

*Compuware Corp. v. Moody's Invs. Servs., Inc.*,
499 F.3d 520 (6th Cir. 2007) .......................................................................53

*Condit v. Dunne*,
317 F. Supp. 2d 344 (S.D.N.Y. 2004)..........................................................45

*Contemp. Mission, Inc. v. N.Y. Times Co.*,
842 F.2d 612 (2d Cir. 1988).........................................................................54

*Crescenz v. Penguin Group (USA), Inc.*,
561 F. App'x 173 (3d Cir. 2014) ..................................................................40

*Dallas Morning News, Inc. v. Tatum*,
554 S.W.3d 614 (Tex. 2018).........................................................................54

*Dameron v. Wash. Mag., Inc.*,
779 F.2d 736 (D.C. Cir. 1985) .....................................................................42

*Deeds v. City of Marion*,
914 N.W.2d 330 (Iowa 2018) .......................................................................38

*DLS Precision Fab LLC v. U.S. Immigr. & Customs Enf't*,
867 F.3d 1079 (9th Cir. 2017) .....................................................................32

*Doe v. Hagar*,
765 F.3d 855 (8th Cir. 2014) .......................................................................29

*Fuchs v. Scripps Howard Broad. Co.*,
868 N.E.2d 1024 (Ohio Ct. App. 2006)........................................................41

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)................................................................................41, 43

*Gomes v. Fried*,
136 Cal. App. 3d 924 (1982) ........................................................................59

*Good Gov't Grp. of Seal Beach, Inc. v. Super. Ct.*,
22 Cal. 3d 672 (1978) ...................................................................................53

*Graham v. Bd. of Educ.*,
8 F.4th 625 (7th Cir. 2021) ..........................................................................51

*Hammel v. Eau Galle Cheese Factory*,
407 F.3d 852 (7th Cir. 2005) .......................................................................51

*Harris v. City of Seattle*,
152 F. App'x 565 (9th Cir. 2005) .................................................................58

v

*Harte-Hanks Commc'ns, Inc.*,
   491 U.S. 657 (1989).................................................................52, 54, 57

*Home Show Tours, Inc. v. Quad City Virtual, Inc.*,
   827 F. Supp. 2d 924 (S.D. Iowa 2011) .................................................44

*Horras v. Am. Cap. Strategies, Ltd.*,
   729 F.3d 798 (8th Cir. 2013) ...............................................................51

*Howard v. Antilla*,
   294 F.3d 244 (1st Cir. 2002)................................................................53

*Janklow v. Newsweek, Inc.*,
   788 F.2d 1300 (8th Cir. 1986) .............................................................29

*John Doe 2 v. Super. Ct.*,
   1 Cal. App. 5th 1300 (2016) ................................................................46

*Johnson v. Nickerson*,
   542 N.W.2d 506 (Iowa 1996) ........................................................40, 43

*Kapellas v. Kofman*,
   1 Cal. 3d 20 (1969) .............................................................................59

*Kendall v. Daily News Publ'g Co.*,
   716 F.3d 82 (3d Cir. 2013)...................................................................53

*Kendrick v. Fox Television*,
   659 A.2d 814 (D.C. 1995) ...................................................................40

*Ketchikan Drywall Servs., Inc. v. ICE*,
   725 F.3d 1103 (9th Cir. 2013) .......................................................32, 50

*Knudsen v. United States*,
   254 F.3d 747 (8th Cir. 2001) ...............................................................49

*L. Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*,
   844 F.2d 955 (2d Cir. 1988).................................................................29

*Lauderback v. Am. Broad. Cos.*,
   741 F.2d 193 (8th Cir. 1984) ...............................................................26

*Lewis v. NewsChannel 5 Network, L.P*,
   238 S.W.3d 270 (Tenn. Ct. App. 2007) ...............................................42

*Littlefield v. Fort Dodge Messenger*,
   614 F.2d 581 (8th Cir. 1980) ...............................................................40

Case 5:19-cv-04064-CJW-MAR   Document 156-1   Filed 06/02/23   Page 8 of 75

*Lohrenz v. Donnelly,*
  350 F.3d 1272 (D.C. Cir. 2003) ................................................................58

*Lyons v. Johnson,*
  415 F.2d 540 (9th Cir. 1969) ...................................................................36

*Lyons v. Midwest Glazing,*
  265 F. Supp. 2d 1061 (N.D. Iowa 2003) ...................................................44

*Marcone v. Penthouse Int'l Mag. for Men,*
  754 F.2d 1072 (3d Cir. 1985) ...................................................................42

*Martin v. Wells Fargo Bank,*
  No. 17-CV-03425, 2018 WL 6333688 (C.D. Cal. Jan. 18, 2018) .............59

*Masson v. New Yorker Mag., Inc.,*
  501 U.S. 496 (1991) ..................................................................................29

*Medure v. Vindicator Printing Co.,*
  273 F. Supp. 2d 588 (W.D. Pa. 2002) .......................................................29

*Mercer v. City of Cedar Rapids,*
  308 F.3d 840 (8th Cir. 2002) ..............................................................52, 54

*Milkovich v. Lorain Journal Co.,*
  497 U.S. 1 (1990) .........................................................................29, 34, 48

*Montgomery v. Risen,*
  875 F.3d 709 (D.C. Cir. 2017) ..................................................................46

*New York Times Co. v. Sullivan,*
  376 U.S. 254 (1964) ..................................................................28, 34, 52, 53

*Newton v. Nat'l Broad. Co.,*
  930 F.2d 662 (9th Cir. 1990) ...................................................................53

*Nunes v. Cable News Network, Inc.,*
  31 F.4th 135 (2d Cir. 2022) ......................................................................45

*Nunes v. Cable News Network, Inc.,*
  520 F. Supp. 3d 549 (S.D.N.Y. 2021) .......................................................59

*Nunes v. Lizza,*
  12 F.4th 890 (8th Cir. 2021) .......................................................... *passim*

*Nunes v. Lizza,*
  476 F. Supp. 3d 824 (N.D. Iowa 2020) ................................................27, 29

Case 5:19-cv-04064-CJW-MAR   Document 156-1   Filed 06/02/23   Page 9 of 75

*NuStar v. Lizza*,
   486 F. Supp. 3d 1267 (N.D. Iowa 2020).................................................................*passim*

*Parker v. Hennepin Cnty. Dist. Ct., Fourth Jud. Dist.*,
   285 N.W.2d 81 (Minn. 1979).........................................................................36

*Penrose Hill, Ltd. v. Mabray*,
   479 F. Supp. 3d 840 (N.D. Cal. 2020) ...........................................................45

*Perez v. CRST Int'l, Inc.*,
   355 F. Supp. 3d 765 (N.D. Iowa 2018)......................................................44, 45

*Phila. Newspapers, Inc. v. Hepps*,
   475 U.S. 767 (1986).................................................................................*passim*

*Price v. Viking Penguin, Inc.*,
   881 F.2d 1426 (8th Cir. 1989) .......................................................................52

*Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*,
   808 F.2d 271 (3d Cir. 1986)....................................................................35, 36

*Reed v. City of St. Charles, Mo.*,
   561 F.3d 788 (8th Cir. 2009) .......................................................................46

*Roberts v. McAfee, Inc.*,
   660 F.3d 1156 (9th Cir. 2011) .....................................................................45

*S.E.C. v. Brown*,
   579 F. Supp. 2d 1228 (D. Minn. 2008)............................................................34

*Saenz v. Playboy Enters., Inc.*,
   841 F.2d 1309 (7th Cir. 1988) .....................................................................53

*Sandmann v. N.Y. Times Co.*,
   No. 20-CV-23, 2022 WL 2960763 (E.D. Ky. July 26, 2022)...........................29, 34

*Schlegel v. Ottumwa Courier, Div. of Lee Enters. Inc.*,
   585 N.W.2d 217 (Iowa 1998) .......................................................................43

*Schuster v. U.S. News & World Report, Inc.*,
   602 F.2d 850 (8th Cir. 1979) .......................................................................26

*Secrist v. Harkin*,
   874 F.2d 1244 (8th Cir. 1989) .....................................................................52

*Spacecon Specialty Contractors, LLC v. Bensinger*,
   713 F.3d 1028 (10th Cir. 2013) ................................................................57, 58

Case 5:19-cv-04064-CJW-MAR   Document 156-1   Filed 06/02/23   Page 10 of 75

*Spacecon Specialty Contractors, LLC v. Bensinger*,
    782 F. Supp. 2d 1194 (D. Colo. 2011) .................................................................58

*Spacecon Specialty Contractors, LLC v. Bensinger*,
    No. 09-CV-02080, 2010 WL 3720166 (D. Colo. Sept. 15, 2010) ..........................58

*Split Rail Fence Co. v. United States*,
    852 F.3d 1228 (10th Cir. 2017) ......................................................................30, 31

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ..........................................................................................52

*Strick v. Super. Ct.*,
    143 Cal. App. 3d 916 (1983) .............................................................................45

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
    No. 02 CV 2258, 2007 WL 935703 (S.D. Cal. Mar. 7, 2007) .............................45

*Tah v. Glob. Witness Publ'g, Inc.*,
    991 F.3d 231 (D.C. Cir. 2021) ..........................................................................58

*In re United Press Int'l*,
    106 B.R. 323 (D.D.C. 1989) ..............................................................................29

*United States v. Carter*,
    7 OCAHO 931, 1997 WL 1051432 (May 9, 1997) ...............................32, 33, 50

*United States v. Foothill Packing, Inc.*,
    11 OCAHO 1240, 2015 WL 329579 (Jan. 13, 2015) ...........................................31

*United States v. Lomas*,
    826 F.3d 1097 (8th Cir. 2016) ...........................................................................49

*United States v. New El Rey Sausage Co.*,
    1 OCAHO 66, 1989 WL 433853 (July 7, 1989) .................................................30

*United States v. Noel Plastering & Stucco*,
    2 OCAHO 377, 1991 WL 717532 (Sept. 23, 1991) ......................................30, 34

*United States v. Occupational Res. Mgmt. Staffing, Inc.*,
    10 OCAHO 1166, 2013 WL 1918850 (Jan. 23, 2013) ...............................30, 31, 34

*United States v. Reyes*,
    4 OCAHO 592, 1994 WL 269183 (Jan. 6, 1994) ...............................32, 49, 50

*United States v. Sunshine Bldg. Maint.*,
    7 OCAHO 997, 1998 WL 746015 (May 4, 1998) ...............................31, 32, 33

Case 5:19-cv-04064-CJW-MAR   Document 156-1   Filed 06/02/23   Page 11 of 75

*Valentine v. C.B.S., Inc.*,
    698 F.2d 430 (11th Cir. 1983) ...........................................................................40

*Van v. City of Oakland*,
    No. 13-CV-992, 2015 WL 995127 (N.D. Cal. Mar. 4, 2015)..................................46

*Vojak v. Jensen*,
    161 N.W.2d 100 (Iowa 1968) ..............................................................................44

*Wade v. Kay Jewelers, Inc.*,
    No. 17-CV-990, 2019 WL 1385089 (D. Conn. Mar. 27, 2019) .............................41

*Woods v. Evansville Press Co.*,
    791 F.2d 480 (7th Cir. 1986) ...............................................................................54

*Wright v. Brooke Grp. Ltd.*,
    652 N.W.2d 159 (Iowa 2002) ..............................................................................38

*Yates v. Iowa W. Racing Ass'n*,
    721 N.W.2d 762 (Iowa 2006) ..............................................................................29

**Statutes**

8 U.S.C. § 1188(a)(1)(A) ...........................................................................................20

8 U.S.C. § 1324a ........................................................................................................10

Cal. Civ. Code § 48a ..................................................................................................59

Cal. Civ. Code § 3425.3 .............................................................................................45

Iowa Code § 706.1 .....................................................................................................38

**Other Authorities**

8 C.F.R. § 274a.1(l)(1)......................................................................................30, 31, 33

8 C.F.R. § 274a.2(a)(3) ..............................................................................................10

28 C.F.R. § 68.56 .......................................................................................................11

4 Jonathan Elliot, *Debates on the Federal Constitution* (1876) ................................28

Fed. R. Civ. P. 56(a) ..................................................................................................26

Fed. R. Evid. 801(d)(2)(A) .........................................................................................49

Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems*
    § 5:5.1[B] (5th ed. 2020)....................................................................................52

Restatement (Second) of Conflict of Laws § 150(2) ...................................................45

Robert Heidt, *The Conjurer's Circle: The Fifth Amendment Privilege in Civil Cases*, Yale L.J. 1062 (1982) ................................................36

# INTRODUCTION

Congressman Devin Nunes constructed a political identity as a California farmer, from a long line of Nuneses who have run the same dairy farm in Tulare, California for over a century.

Veteran reporter Ryan Lizza's September 2018 article ("Article") in *Esquire* magazine told how the Congressman was strangely silent about the fact that—at odds with his political persona—his father, brother, and other family members no longer farmed in California but had moved to Sibley, Iowa as long ago as 2007 to run a dairy farm called NuStar. Lizza could not tell that the Congressman had ever mentioned NuStar in public and determined to find out why.

After compiling over 1,100 pages of research and notes, spending several days in Sibley, conducting dozens of interviews with at least 24 sources, and sending Plaintiffs repeated requests for comment that were denied or ignored, Lizza published his Article.

Running 6,812 words, the Article is in the transparent tradition of New Journalism, pioneered at *Esquire* in the 1960s and 1970s by the likes of Truman Capote and Norman Mailer. It explains in Lizza's first-person narrative what he learned, how he learned it, what happened along the way, and what he left unanswered, leaving readers to form their own opinions. What he learned is that Midwest dairies often rely on unauthorized labor because a worker shortage leaves them little choice. Counterfeit documents are rampant, and farmers turn a blind eye. His sources said NuStar too hired undocumented labor, including one source who brought unauthorized workers to NuStar and said the "farm was aware of their status," and another who had worked at NuStar and was unauthorized. These facts are set against a political tension— what Lizza calls "hypocrisy"—that Iowa farmers overwhelmingly support politicians known for their anti-immigrant rhetoric, even if tough immigration enforcement "would destroy their livelihoods." Though the Congressman "ha[s] no financial interest" in NuStar, he embodies this contradiction, having "long supported moderate immigration reform," but more recently

1

supporting "ICE's raids and deportations" in line with his party. Lizza asks: "Is it possible the Nuneses have nothing to be seriously concerned about? Of course, but I never got the chance to ask because Anthony Jr. and Representative Nunes did not respond to numerous requests for interviews." His concluding sentiment, though, is unequivocal: "The immigration system that powers Iowa's dairies is undoubtedly broken."

The Congressman has a "policy" of suing the press over coverage he dislikes. *Esquire* is but one of his many targets. He is also close to his family and speaks to his father or brother on average multiple times a day, including about their farm. He and his family discussed what to do when Lizza first appeared in Sibley seeking information. When Lizza reached out for comment, he and his family coordinated their decision not to respond. After the Article came out, he and his family engaged the same lawyer and sued Defendants for defamation.

Not a single statement has been proven false in this lengthy and complex Article. The only claims to survive the pleading stage concern the purported suggestion that the NuStar Plaintiffs knowingly hired unauthorized workers, and an alleged implication that Plaintiffs "conspired" to hide the family's move to Iowa because of NuStar's use of undocumented labor. Now discovery is complete, Plaintiffs have no evidence to meet their burden to prove either contention is false. The undisputed evidence, rather, points toward their truth.

It has been the long-standing practice of the Nuneses, the Congressman included, to accept employees' identification ("ID") or work authorization documents without verifying, or examining, them. Though verification is required by law, their position is that it is unlawful "discrimination" to do it—that it is illegal to follow the law. Even faced with documents that were expired or stated they did not authorize the holder to work, NuStar did nothing (but hired the employees anyway). Even after the Social Security Administration ("SSA") informed them

three times that over 70% of their workforce's Social Security numbers ("SSNs") did not match government records, NuStar did nothing (but called SSA letters "bogus" and a "joke"). Even when their lawyer told them their practices violated the law, NuStar did nothing (but continued their practices unchanged).

As NuStar's expert concedes, failure to verify is a serious violation it committed hundreds of times, and its records show employees routinely submitted fake documents. Per established authority, its employees' facially invalid documents—those stating on their face they did not authorize work or were expired—charged NuStar with knowledge that it hired unauthorized workers, which can suffice to prove "knowing hire" violations under federal law. Six NuStar employees invoked their Fifth Amendment right against self-incrimination rather than answer questions regarding their employment, their documents, or whether NuStar knew if they were authorized, further giving rise to an adverse inference NuStar cannot overcome.

The Congressman admits he knows his family's hiring practices, including that they do not verify work authorization, because this has been their policy for decades since he worked with them. He does not deny knowing that failing to verify work authorization leads to the potential hire of unauthorized workers—this is the very purpose of the verification requirement. He has publicly acknowledged this reality, including by co-sponsoring several bills in Congress dealing with the dairy worker shortage and the concerns of unauthorized dairy workers. It is not genuinely disputed that he "knew about the farm's hiring practices, including the potential use of undocumented labor," which the Eighth Circuit held would be a "verifiable fact" proving that the implication he challenges is in fact true. *Nunes v. Lizza*, 12 F.4th 890, 898 (8th Cir. 2021).

But this is not a prosecution under the immigration laws, and it is not Defendants' burden to prove NuStar broke them, or to prove what the Congressman definitively knew or hid about

his family's farm.  It is *Plaintiffs' burden* to prove material falsity, under the First Amendment and state constitutions.  This they cannot do, as they have no evidence the Article was false—let alone materially so—against the mountain of undisputed evidence of substantial truth.

Nor can Plaintiffs meet their burden to prove the requisite fault.  Lizza's copious research, notes, and interview records have all been produced.  Even under a negligence standard, Plaintiffs cannot identify a single thing Lizza could or should have done differently that could amount to professional malpractice.  Certainly under an actual malice standard, which applies to the Congressman's case (and should apply to the family's), Plaintiffs come up empty-handed.  Nothing in all the information Lizza amassed would alert him to the falsity of the Article or the implications they allege.  Plaintiffs' conclusory assertions did not and do not shake his belief in the truth of his reporting, and such assertions alone do not now warrant a trial.

The Congressman's case, which the Eighth Circuit limited to Lizza's November 20, 2019, tweet of a link to the Article ("Link") after the Congressman's suit was filed, moreover fails because California law, which discovery has established applies, forbids a defamation claim over the content of the Article based on the mere post of a hyperlink to the Article.

 Nor can any Plaintiff prove they were harmed by Defendants.  They have no evidence whatsoever with which to meet their burden on that essential element of their claims.

At his deposition, Anthony Jr. let the mask slip.  His immediate reaction to the Article was "fear" for his employees, who he said were "scared of the government."  ¶ 323.[1]  He said, it is "the government's fault for not taking care of this problem" by "mak[ing] these people legal," reminiscing about the "Bracero program that let these guys come in," complaining "they did

---

[1]      All "¶ _" citations refer to Defs.' Statement of Undisputed Facts ("SUF"), unless otherwise noted.

away with it, and this is what we ended up with." ¶ 175.[2]  His nostalgia for the Bracero program, echoing his son's past public statements, is comprehensible.  Plaintiffs' insistence on maintaining this suit in the face of the undisputed record is far less so.  Whatever their reasons, they have not been defamed.  For the reasons discussed herein, this case should be dismissed.

## UNDISPUTED MATERIAL FACTS[3]

**I.    Congressman Nunes, Like His Family, Has Deep Experience in Dairy Farming.**

For over a century, members of the Nunes family have owned and operated a dairy on Oakdale Avenue in Tulare, California.  ¶ 1.  Anthony Jr. began working on the Tulare farm in 1959, at six years old.  ¶ 2.  The Congressman, Anthony Jr.'s son, also grew up working alongside his father on the farm in Tulare starting when he was "a small boy" in the 1970s.  ¶ 3. Anthony III, the Congressman's brother, likewise started working on the dairy with his father, brother, and other family members when he was a young boy—"[s]ince he could walk."  ¶ 4.

Anthony Jr. worked on the Tulare farm with his sons until the late 1980s, when he and his wife Toni Dian Nunes ("Dian") spent a few years managing Dian's father's farm near Tulare, then began a custom farming operation in California called Nunes Farms, which did "a lot of dairy farm management for other dairies" in "the largest dairy region in the nation."  ¶ 5.

Anthony III "worked closely together" with Anthony Jr. to help manage Nunes Farms, ¶ 6, and the Congressman also farmed throughout his youth.  Farming was a family affair:

> [M]y brother and I were partners, but it all worked—we were all together.  The family kind of operated all together . . . .  [W]e worked with the farm here [in California].  . . . [T]here's four or five different operations, including my own, that we all, like, shared and worked with . . . .  ¶ 7.

---

[2]      Until 1964, the "Bracero Program" allowed Mexican nationals to work in the United States on short-term contracts, including in agriculture.  ¶ 297.

[3]      While the SUF states the undisputed material facts supporting summary judgment and, with the appendix exhibits, comprises the summary judgment record, certain key undisputed facts are recapped here as context for the arguments that follow.

Farming was the Congressman's "educational focus from boyhood through completion of a university master's degree program, and much of his working history from age 14 to the present." ¶ 8. It was at age fourteen, in the late 1980s, that he first purchased, raised, and sold dairy cows himself. ¶ 9. As a teenager, following in his father's footsteps, he started his own custom farming business with Anthony III, which continued until he went to Congress. ¶ 10.

The Congressman "began managing [his] family's dairy farm" on Oakdale Avenue in Tulare in 1996, after getting his Master's in Agricultural Science from California Polytechnic University (he also has a Bachelor of Science in Agribusiness from that school). ¶ 11. At that time, according to his uncle Gerald Nunes who became the Tulare farm's half-owner in 1994, the Congressman was working on the farm seven days a week, doing everything from milking to feeding cows. ¶ 12. As of 1994, the farm's dairy herd had 900 cows, and its gross income was $1.4 million—already a sizeable operation when he worked there full-time. ¶ 13. Consistent with "shar[ing] and work[ing]" with his family as "partners," the Congressman bought another farm in the 1990s, but "can't remember" if he bought it alone or with Anthony III. ¶ 14.

The Congressman continued working at the Tulare farm until he was appointed by then-President George W. Bush in 2001 as the U.S. Department of Agriculture California State Director of Rural Development. ¶¶ 15–16. In 2003, he was elected to Congress, "stay[ing] on top of the issues" facing his constituent farmers. ¶ 17. His "life, education, work, public honors, and public offices all have been focused on farming and agriculture." ¶ 18. He represented the same area in California throughout his Congressional career and still lives there. ¶¶ 17, 19.

In the mid-2000s, Anthony Jr. and Dian sold their California property and were "looking for anything else to do," when a friend alerted them to an opportunity to purchase a dairy in Sibley, Iowa. ¶ 20. Anthony III wished to run the dairy in Sibley. ¶ 21. Anthony Jr. told his

son that was "fine," but Anthony III had to "deal with the labor" and "the problems":

> [T]hat's fine, you guys are going to run the dairy. . . . ***I don't want to deal with labor. You deal with the labor. You deal with the problems.*** Of course, if you have a problem, I want to know about the problems[.] ¶ 22 (emphasis added).

Anthony Jr. and Anthony III asked the Congressman to visit Sibley to give his opinion on the farm before completing the purchase. ¶ 23. The Congressman spent two nights there, "looked at the farm" and "gave . . . [his] advice" after "evaluating the facilities [and] the animals." ¶ 24. He claims that over those two days, he never discussed the farm's work force with his family—when asked if he had, his response was, "No, . . . nice try on the labor[.]" ¶ 25.

Anthony Jr. and Dian formed NuStar in 2006 and purchased the Sibley dairy that became Plaintiff NuStar. ¶ 26. Initially, Anthony Jr. and Dian were co-owners, and Anthony Jr. became 100% owner in 2011. ¶ 27. Recently, Anthony Jr. transferred 5% to Anthony III and 5% to Anthony III's wife, Lori Nunes ("Lori"), on the expectation that Anthony III and Lori will become full owners. ¶ 28.

## II.    Defendants Carefully Reported a Story on the Congressman's Family's Dairy, NuStar, and the Use of Undocumented Workers on Dairy Farms.

Hearst publishes *Esquire* as a magazine and at Esquire.com. ¶ 29. Between June 1, 2018, and June 1, 2019, Ryan Lizza was an experienced freelance political reporter with *Esquire*. ¶ 35. He has published hundreds of times in publications like *The New Republic*, *GQ*, *The Atlantic*, *The New York Times*, and *The New Yorker*. ¶¶ 36–50. In his 25-year career, none of his other work has been subject to a defamation claim. ¶ 51. *Esquire* assigned Lizza to investigate the Nunes farm in Tulare, core to the Congressman's political identity. ¶¶ 53, 105–06. Lizza had reason to believe the Congressman's father and brother moved over a decade before to Iowa, where dairies often rely on undocumented labor. ¶ 54. In forming the belief that Midwest dairies rely on undocumented workers, he reviewed a case involving the prosecution of

an Iowa dairy farmer for knowingly hiring unauthorized workers; statements from dairy groups on the authorized worker shortage and stating "our immigration policies must provide a sensible path forward for immigrants who are here without legal status"; newspaper articles on the pervasive use of undocumented workers at dairies, and numerous other sources. ¶¶ 61, 63–65, 75, 88. His reporting file is over 1,100 pages and was produced in discovery, along with dozens of interviews of at least 24 sources. ¶ 61.

The Article was published on Esquire.com on September 30, 2018 and in the magazine's November 2018 edition. ¶ 55. Lizza tweeted a link to it on September 30, 2018. ¶ 56.

"The article begins with the words: 'Devin Nunes has a secret,'" "namely, that '[t]he Nunes family dairy of political lore . . . isn't in California. It's in Iowa.'" *Nunes*, 12 F.4th at 896. The Article observes, "[a]s far as [Lizza] could tell . . . neither [Devin] Nunes nor the local California press that covers him had ever publicly mentioned that his family dairy is no longer in Tulare." ¶ 58. Lizza "went to Sibley" to see why. ¶ 59.

The Article describes his time reporting in Sibley, which overwhelmingly supported Donald Trump in 2016 and was represented by Steven King, "the most anti-immigrant member of Congress." ¶ 60. Many interviewees supported Trump but were uneasy about his hardline positions on immigration. ¶ 62. Lizza learned why that may be: "Midwestern dairies tend to run on undocumented labor," and farmers claimed "the system is built on easily obtained fraudulent documents." ¶¶ 63–64. He noted the "hypocrisy" that "Trump's and King's rural-farm supporters embrace anti-immigrant politicians while employing undocumented immigrants." ¶ 66.

In this context, in the Article's 54th paragraph, Lizza reports the following:

> According to two sources with firsthand knowledge, NuStar did indeed rely, at least in part, on undocumented labor. One source, who was deeply connected in the local

Hispanic community, had personally sent undocumented workers to Anthony Nunes Jr.'s farm for jobs. "I've been there and bring illegal people," the source said, asserting that the farm was aware of their status. "People come here and ask for work, so I send them over there." When I asked how many people working at dairies in the area are documented citizens, the source laughed. "To be honest? None. One percent, maybe." ¶ 67.

The Article quotes a second source, who used to work at NuStar and admitted to Lizza he is "illegal." ¶ 71. (The SSA has no record of someone with his name and SSN. ¶ 72.) A third source, like others, said nearly all employees on area dairy farms like NuStar are undocumented. ¶ 73. The Article asks: "Is it possible the Nuneses have nothing to be seriously concerned about? Of course . . . ." ¶ 77. Anthony Jr., on his son's advice, "did not respond to numerous requests for interviews," and Lizza was rebuffed at Anthony Jr.'s house. ¶¶ 82–84, 273. Calls to NuStar went unreturned. ¶ 83. The Congressman did not respond to requests for comment. ¶ 84.

Discovery in this case has shown that the Article's reporting was true.

## III. The Congressman Did Not Publicize His Family's Move to Iowa.

The Congressman admitted he never made any documented public statements about NuStar or his family's move to Iowa. ¶¶ 101–03. When asked for documents relating to any such statements, he said there were "[n]one." ¶ 102. When asked by interrogatory, he said he recalled no such statements, though acknowledging in the same responses that he attended events in Iowa after his family's move, including for Representative King, confirming the Article's report that that event's press release mentioned the Tulare farm but not NuStar. ¶¶ 103–04.

For the Congressman's political career, the Tulare farm—not NuStar—was "central to [his] identity." ¶¶ 105–08. He gave tours at the Tulare farm to "ambassadors, diplomats, government officials, [and] people in the media." ¶ 106. In August 2018, a Petition claimed he was "misleading" voters by calling himself a "Farmer" on the November 2018 ballot because he had not farmed since at least 2007. ¶ 107. He responded by detailing his extensive connections

9

to farming including through family in Tulare, yet failed to mention NuStar. ¶ 108.

The NuStar Plaintiffs identified no public statement by them about the Congressman in discovery. ¶¶ 109–11. When the *Dairy Star* wrote an article about the NuStar Plaintiffs, they conditioned their participation on a promise the Congressman would not be mentioned. Anthony III told the *Dairy Star*, "[J]ust remember that we're not going to speak anything about Devin because he has nothing to do with this dairy. Because if you want to come here and talk about that, we don't want to have an interview." ¶ 112. The family now "regret[s]" having done the *Dairy Star* interview at all. ¶ 113.

## IV. The NuStar Plaintiffs Habitually Violate Federal Immigration Law.

NuStar must verify every employee's ID and work authorization at the time of hire, pursuant to the Immigration Reform and Control Act, 8 U.S.C. § 1324a ("IRCA"). ¶ 145. The employer "must attest, under penalty of perjury . . . that it has verified" the employee is not unauthorized by "examining" their ID and work authorization documents, which "reasonably appear[] on [their] face to be genuine." 8 U.S.C. § 1324a(b)(1)(A); 8 C.F.R. § 274a.2(a)(3). This verification is documented in Section 2 of the Form I-9, in a signed employer certification:

> I attest, under penalty of perjury, that (1) I have examined the document(s) presented by the above-named employee, (2) the above-listed document(s) appear to be genuine and to relate to the employee named, and (3) to the best of my knowledge the employee is authorized to work in the United States.[4]

### A. NuStar, as a Rule, Does Not Verify Its Workers' Documents.

Both sides' experts agree, and it is thus undisputed, that NuStar almost uniformly failed to follow the I-9 verification requirements, committing hundreds of substantive IRCA violations.

For at least **289** Form I-9s (or **94%** of 309 Form I-9s produced by NuStar), NuStar did

---

[4]    ¶¶ 114–15. "Undocumented" or "unauthorized" means lacking sufficient authorizing documentation to work in the United States, comporting with the definition under federal law. 8 U.S.C. § 1324a(h)(3).

not complete Section 2 as required. ¶ 116. Clete Samson, NuStar's purported immigration expert, and Defendants' expert Claude Arnold, former Special Agent in Charge with ICE, agree this is the case and that it is a serious substantive violation. *Id.*

For at least **208** Form I-9s, NuStar did not sign and date Section 2, another substantive violation. ¶¶ 119–20. NuStar's expert Samson agrees ("Yeah. Failure to sign and date Section 2 . . . has been deemed to be a serious violation by OCAHO.").[5]

For at least **68** Form I-9s, NuStar did not fill out *any* part of the I-9 on time, sometimes waiting months or years after hire; the law requires completion within three days of hire. NuStar's expert Samson agrees that this is another substantive violation. ¶¶ 121–22.

These numbers follow from the NuStar Plaintiffs' policy of not verifying documents because, they claim, doing so is discriminatory and illegal. As the one originally responsible for bookkeeping at NuStar, who trained the current bookkeeper Lori, Dian testified it is "a known fact" that it is "against the law" to inspect employee documents. ¶¶ 123, 127. Anthony III echoed it would be "discrimination" to verify or question documents, even if expired—"I don't think legally we could ask anything about expirations." ¶¶ 124, 126. Anthony Jr. said it is "illegal" to investigate a SSN, even one the SSA has flagged as not matching its records. ¶ 125.

By design, then, no one at NuStar verifies documents for genuineness.

Anthony Jr. has never taken responsibility for verifying employee documents at NuStar, despite being a long-time owner and acknowledging "the buck stops with him." ¶¶ 128, 130. When the family moved to Iowa, Anthony Jr. made clear that as a condition of the move, Anthony III had to be in charge of "the labor" and "the problems" because Anthony Jr. "[didn't] want to deal with" them. ¶ 22. Thus, Anthony III is in charge of hiring at NuStar. ¶ 129.

---

[5]     ¶ 120. Prosecutions of the IRCA occur before the Department of Justice's Office of the Chief Administrative Hearing Officer ("OCAHO"). *See* 28 C.F.R. § 68.56.

But Anthony III, in turn, disclaims responsibility over verifying documents.  He said it is his wife Lori who "makes sure that [the onboarding paperwork is] all correct"—"she does the entering of it.  She looks at it for correctness. . . . She'll look at the I-9s[.]"  ¶¶ 131–33.

But Lori, in turn, said she never verifies employee documents for "correctness" either: "Q: In the time that you've been at NuStar, you've never reviewed an employee's identification and checked them for correctness? A: That's correct."  ¶¶ 134–35 ("Q. Is it part of your responsibility to look at the I-9s and check them for correctness after an employee returns them? A. No.").  At the time the Article was published, she did not know the employer was supposed to sign Section 2.  ¶ 136.  Lori's practice has been to enter the name and submitted SSN into QuickBooks to process payroll, and expressly not to review the documents for any other purpose. ¶ 137.  Lori learned "all bookkeeping skills and what was required" from Dian, the original NuStar bookkeeper who was also bookkeeper at Nunes Farms.  ¶¶ 138–39.  Lori followed Anthony Jr., Anthony III, and Dian's lead because she believed they "knew the laws."  ¶ 140.

But Dian, in turn, never verified employee documents because she claimed the farm was "not required to verify status," and it is "against the law" to try.  ¶ 127.  Though she knew the I-9 was obligatory, she never once discussed the I-9 requirements with Lori or anyone else at NuStar.  ¶¶ 141–43.  She told Lori just to accept papers and file them.  ¶ 143.

NuStar's professed belief that verifying documentation is "against the law" has resulted in hundreds of undisputed violations of law.  Lori all but admitted NuStar avoids verification. When asked if she "wanted to learn" if employees were authorized, she said she "[didn't] know":

> Q. Do you want to learn if the employees are authorized to work in the
> United States?
> MR. BISS: Object to the form.
> Q. You can answer.
> A. I don't—I don't know at this point right now.

Q. You don't know one way or another?

A. I just—I don't know right now.

Q. No feelings about that?

MR. BISS: Object to the form.

A. I have lots of feelings. I just don't know about that right now. ¶ 144.

**B. Because It Does Not Verify Its Workers, NuStar's Workforce Is Overwhelmingly Unauthorized.**

NuStar produced a verified employee roster with their names, proffered SSNs, dates of employment, and dates of birth. ¶ 147. In response to the Court's order, the SSA reported that data for **76%**, or 243 of 319, of NuStar employees listed did not match its records. ¶¶ 148–49. NuStar's expert admitted this was "a red flag" the workers are unauthorized. ¶¶ 150, 194.

This data is consistent with two so-called "no-match" letters the SSA sent NuStar in November 2019 and December 2020. ¶¶ 151–55. The letters state that, for tax year 2018, 20 of 27 NuStar employees (**74%**) did not match SSA records, and for tax year 2019, 14 of 19 employees (**74%**) did not match. ¶¶ 151, 153. The letters informed NuStar it could log into a government portal to find out which employees were affected, but NuStar did not do this or anything else in response. ¶¶ 155–69. Lori thought the letters were "a joke" and "bogus," and she raised the first no-match letter with Anthony III and Anthony Jr., who said to do "nothing" but "[f]ile it." ¶¶ 152, 154.

Defendants' expert Arnold explains why NuStar likely received so many mis-matches: its records showed 239 of 319 employees (**75%**) "provided counterfeit [Resident Alien, state ID, or Social Security card] documents or did not provide documentation that satisfies employee verification requirements," which Samson does not dispute. ¶¶ 170, 172. At the time of Arnold's report, NuStar "still employ[ed] . . . nine (9) of those undocumented workers." ¶ 171.

This accords with the opinion of Philip Martin, Professor of Agricultural and Resource

Economics at UC Davis, who explains U.S. farm workers are primarily foreign-born, like NuStar's workforce. ¶¶ 173, 175. Among foreign-born farm workers, studies show around **70%** are unauthorized. ¶ 174. Plaintiffs' expert does not dispute this. *Id.*

C. **NuStar Hired Employees Whose Documents Stated, on Their Face, that They Did Not Authorize Employment.**

NuStar repeatedly hired people whose documents were expired and could not authorize employment on their face. NuStar did this as early as 2006, its first year of operation, and still does so in 2022—years *after* this suit started, and after NuStar was informed by its attorney and its expert Samson that this practice carried significant legal risk. ¶¶ 176–84. Samson agrees that accepting expired authorization is a clear "violation" and stated the "employee that was asked to fill out [the] form" must have been "given no instruction whatsoever as to how to do it." ¶ 181.

Lori, who shared responsibility for the form with Anthony III, gave the straightforward explanation she did not see expired dates because she did not check: "A. . . . I did not see an expiration date on that card. Q. Did you look? A. I did not." ¶ 183. Anthony III, in turn, claimed an employer cannot "legally ask" about an expired document. ¶ 126. Lori claimed that since being advised by NuStar's immigration lawyer after the Article was published, she no longer accepts expired documents. ¶¶ 184, 187, 326–29. But NuStar hired an employee in January 2022 with an authorization document that expired in February 2019, disregarding this warning. ¶ 180.

In addition to expired work authorization, over the years NuStar has accepted expired IDs, which its immigration attorney acknowledged should not have been accepted. ¶¶ 184–87. NuStar's expert Samson agrees the expired IDs it accepted were likely "fake" based on improper fonts, misspellings, and other indicia. ¶ 188. As recently as May 2022, NuStar re-hired M█O. with an ID that had expired the year before in May 2021. ¶¶ 189–93. But it was not only the

14

expiration that should have alerted it to a problem. M█O. was a former employee on the SSA's list of non-matching NuStar employees. ¶ 190. In other words, his original I-9 from February 2018—in which he identified himself as "citizen"—attached an ID and SSN card that the SSA told NuStar did not match its files. ¶¶ 189–90. When M█O. was re-hired in May 2022, the same ID (now expired) and same SSN card (non-matching) were attached to his new Form I-9, which now claimed he was a "lawful permanent resident" (with no green card number). ¶¶ 192–93. NuStar hired him anyway.

NuStar also hired at least two more employees who presented SSN cards stating they were "VALID FOR WORK ONLY WITH [DHS OR INS] AUTHORIZATION," meaning the cards did not authorize their holders to work. ¶¶ 195–96. Lori said when these employees were hired, she did not understand what that notation meant and never followed up. ¶ 197. At her deposition, she conceded it meant additional authorization was required, though none was provided. *Id.*

### D. NuStar's Employees Invoked Their Fifth Amendment Right to Remain Silent About NuStar's Knowledge of Their Status.

Defendants served deposition subpoenas on six of NuStar's current long-time employees, who all had incomplete I-9s, calling for production of their original ID and authorization documents. ¶ 213. None of the six produced the documents called for by subpoena. ¶¶ 220–21.

When asked about their status and whether NuStar knew if they were authorized, all six employees invoked their Fifth Amendment rights and refused to testify, on advice of counsel. ¶¶ 218–28. When the first employee was deposed, his counsel announced he had advised the employee to plead the Fifth. ¶ 216. NuStar's counsel interrupted to speak to the employee's counsel, and after a break, the employee's counsel returned to say he no longer represented the employee. ¶ 217. The Court appointed new counsel for the employees, who all pled the Fifth,

refusing to testify about their authorization or NuStar's knowledge of it. ¶¶ 218–28.

NuStar's expert Samson does not dispute that all six employees presented counterfeit documents, and its immigration lawyer advised that at least some then-current employees required "follow up" and "hard conversations" about their documents. ¶¶ 231, 233. Plus, one presented no ID at all. ¶ 232. Samson called one SSN card "very discombobulated . . . on its face." ¶ 235. One employee was convicted four times for failure to present a valid driver's license, suggesting he did not have one. ¶ 236. Another presented an "updated" California license with a nonexistent address, though he had been living in Sibley for years in free NuStar housing. ¶ 237. NuStar has also provided free housing to other employees, a known practice where employees struggle to find housing due to a lack of genuine documents. ¶¶ 242–43. The SSA confirmed the numbers for each did not match its records. ¶ 230.

In August 2022, the NuStar Plaintiffs confirmed that all six employees are still at NuStar. ¶ 240. NuStar produced no additional work authorization or ID for those employees, or any evidence of investigation since their depositions over a year before. ¶ 241.

## V. The Congressman Knows His Family Has Routinely Hired Without Verification, in an Industry Rife with Unauthorized Workers.

### A. The Congressman Knows His Family Has Regularly Hired Workers Without Verifying Documents.

The Congressman testified that he has "firsthand knowledge" of how his family hires farm workers, from when he worked with them in California on ventures they "all . . . shared":

> I mean, *I do have obviously firsthand knowledge* . . . about when I did it way back in the day, the way that we did it. I was trained by my mother and my grandmother [Anthony Jr.'s mother] on what to do. . . . I can't imagine that they changed when they went there.[6]

---

[6] ¶¶ 7, 245–48 (emphasis added) ("I told you, I am familiar with the process that—because, of course, I used to work with my family many years ago, so I'm quite sure that it wouldn't have changed"; his knowledge of his family's hiring practices comes from "the practices from when—you know, when we all were—you know, operated together," and he "can't imagine that they changed").

Dian confirmed the Congressman is right, and the procedures NuStar follows are "[p]retty much the same thing" as what the family did in California—the family "did not change [their Form I-9] requirements with the move to" Iowa.[7]  When the Congressman was "trained by [Dian]" to hire people, like Lori was, he learned the process NuStar follows to this day.  ¶¶ 138–139, 250.

That is, when the Congressman worked with his family on farms in California, he *purposefully did not verify documents because—he testified—to do so would be "illegal" discrimination*.  ¶¶ 252–54, 275.  His testimony that "you can't challenge . . . identification" matches his brother's and father's testimony that they cannot even ask about documents that are expired or known to be invalid.  ¶¶ 123–27, 252–54.  The Congressman claimed even if the employer wanted to verify, it would be "impossible" because "you cannot ask"—"nobody knows who's in this country illegally . . . you have no way to find out."[8]  He claims this is how he has "always" hired:

> Q. So, if somebody who is in the country without authorization obtains counterfeit documents, how is one to enforce the immigration laws if they can't be questioned about it?
>
> A. Well, they can't be questioned by the employer, that's for sure.
>
> *Q. So, employers are obligated to accept whatever documents are put in front of them?*
>
> *A. That's the way that I—that's the way that I have been—that's the way that I've always operated.*  ¶ 255 (emphasis added).

### B.    The Congressman Communicates with His Family Constantly.

The Congressman's family connections did not diminish when he went into politics.

---

[7]      ¶ 249 ("paperwork" associated with hiring "did not change" from Nunes Farms to NuStar).

[8]      ¶¶ 252–54 (The Congressman claimed: "It's practically impossible that you could ever even hire somebody illegal because you would never know," and "[a]nybody that you're hiring, you can't challenge their—their identification that they give you.").

Overlapping her role as co-owner and bookkeeper for Nunes Farms and NuStar, his mother Dian was his campaign treasurer for twenty years, and treasurer of three of his Political Action Committees. ¶¶ 257–58. She did these roles on a volunteer basis, to support her son. ¶ 259.

Though his career path diverged from that of his father and brother, the Congressman remains close to them, by any standard. Plaintiffs' phone records show more than 860 calls over a representative 18-month period between the Congressman and either his father or brother— averaging multiple times a day—not counting calls with his mother or other family members. ¶ 261. Among his calls, the Congressman had "lots of conversations about farming" and "how things are going" at NuStar. ¶ 262. He listed NuStar's address as his home in filings with the S.E.C. ¶ 263. He arranged family visits to the White House, including to meet the President. ¶¶ 264–65.

Asked what he knows about NuStar employees, the Congressman said he has known of some former employees, including one "related somehow to [his] sister-in-law," Lori. ¶ 266. He has discussed NuStar's employment records with Anthony Jr.:

> I know [NuStar] provided you documents for everyone. . . . That's probably when I talked to my dad that they provided documents that went back for the whole time. . . . *[E]verybody was documented, as I would expect* . . . . ¶ 267 (emphasis added).

The Congressman alleges facts based on his knowledge of NuStar records. *Nunes* [ECF No. 92][9] ¶ 31; *Nunes* [ECF No. 104] ¶ 10 ("documents establishing both employment authorization and [ID] as well as Forms I-9–Employment Eligibility Verifications, are kept and maintained by NuStar in the ordinary course of its business . . . .").

The Congressman discussed the Article and Lizza's reporting with his family. The Congressman had at least three conversations with his father over two days when they first

---

[9]     ¶¶ 268–69. References to the docket in *Nunes v. Lizza*, No. 19-cv-4064 are denoted as "*Nunes* [ECF No. __]." References to the docket in *NuStar v. Lizza*, No. 20-cv-4003 are denoted as "*NuStar* [ECF No. __]."

became aware Lizza was in Sibley, starting before they knew it was Lizza, with many more conversations thereafter. ¶¶ 270–72, 321–25, 343. A "few days" after the Congressman learned Lizza was in Sibley, Lizza sent him messages explaining he was writing an article "on the dairy industry and immigration." ¶¶ 270–72. The Congressman never responded and told his father not to either: "obviously that was the right advice." ¶ 273. When the Article came out, he said, "of course, *it was exactly what we thought . . . .*" ¶ 274 (emphasis added).

### C. The Congressman Co-Sponsored Eight Bills Addressing the Issues of Undocumented Dairy Workers, Including Verification Requirements.

The Congressman's position in this case is that any employer verification to "find out whether somebody's here illegally" is "discriminatory and illegal." ¶ 275 ("Even if the [verification] tool existed, [employers] can't use it."). His reasoning extends to the government's tool E-Verify, which is authorized by statute, allows instant comparison of the I-9 to government records, and is used by over a million employers. ¶¶ 276–80. When asked if E-Verify may be used lawfully, he would not answer directly, citing its "discriminatory nature" and saying "it is unlawful to use E-Verify to target people . . . ." ¶ 280 ("Q. Would it surprise you to learn that the United States government uses it? A. That's your opinion."). NuStar does not use E-Verify. ¶ 281. Because "there is no way" to verify someone's status, he claims the only way one could know a worker is undocumented is if the worker admits it—he has never known an "illegal" worker because although he has "worked with people in agriculture . . . [his] whole life[,] [n]ot one person ever came up to [him] and said, oh, I'm illegal. Not one." ¶¶ 284–86, 313.

The above testimony is at odds with the Congressman's 19-year career as a legislator, when he continually tried to pass laws that addressed I-9 verification requirements for dairy workers and confronted the reality that unauthorized workers are ubiquitous on dairy farms.

Between 2003 and 2019, the Congressman co-sponsored eight bills (voting for a ninth)

on the shortage of authorized farm workers, particularly in dairies. ¶¶ 288–308. The bills sought to amend a visa (H-2A) that applies only where "there are not sufficient workers who are able, willing, and qualified" in the U.S.—*i.e.*, only where there is a labor shortage—to cover farm and dairy workers. 8 U.S.C. § 1188(a)(1)(A); ¶¶ 288–308. These efforts mirror his public statements where, like his father, he approvingly cited the "Bracero Program," which until 1964 allowed Mexican nationals to work in the United States on short contracts in agriculture. ¶¶ 175, 287, 296–97. The Congressman has said in interviews that "security along with a permit system of some kind, and then a verification system" has "always been the solution." ¶¶ 287, 296.

The Congressman's legislative record and public statements belie his testimony that verifying work eligibility is "illegal," and "there is no way . . . to know" authorization status. ¶ 284. As a lawmaker, far from treating E-Verify as "illegal," he tried three times to make an electronic verification "system modeled after . . . E-Verify" mandatory, publicly lauding it. ¶¶ 287, 296, 298–308 (saying on Fox News, E-Verify has "worked really, really well" and should be mandatory).

The Congressman's bills also contradict his testimony that "nobody's hiring unauthorized workers." ¶ 286. The Farm Workforce Modernization Act ("FWMA") of 2019 (which he co-sponsored) and 2021 (which he voted for) would give status to unauthorized workers *already working in* the U.S. yet who are "inadmissible or deportable from the United States," *i.e.*, unauthorized. ¶¶ 303–08. This would make little sense if "nobody" hired unauthorized workers because it is "impossible," as the Congressman claimed at his deposition. ¶¶ 286–87 (in Fox News interview, saying, "[E]veryone knows that, in this country, we have got millions of people that are here on either expired permits, or they never had a permit in the first place.").

His legislative efforts also addressed other common concerns of undocumented dairy

workers.  Six times, the Congressman tried to eliminate penalties for farm workers who falsified SSNs.  ¶¶ 289, 305, 308.  Nine times, he tried to address housing and/or transportation needs of farm workers, who may lack the documentation for such services.  ¶¶ 289, 293, 302, 305, 308.

These efforts, reinforcing the Congressman's intimate familiarity with the issues of undocumented workers, mirror the needs of NuStar.  Over 70% of NuStar workers require correction to their SSN records and could well benefit from a law allowing such correction without penalties for having used counterfeit numbers.  ¶¶ 149, 151, 153.  For NuStar workers with state IDs, nearly 90% of the IDs did not authorize the holder to drive, while others presented licenses with clear indicia of being counterfeit.  ¶¶ 170, 237, 290.  NuStar houses workers for free.  ¶¶ 237, 242.  The Congressman's legislation would directly address these acute needs among NuStar's unauthorized employees.

The Congressman does not, and cannot, dispute the fact of his own legislative efforts. Rather, he claimed at his depositions not to recall any of these nine bills:

> Q. . . . Are there any bills that you can recall as you sit here today that you co-sponsored that relate to labor in the agriculture industry?
>
> A. No.
>
> Q. Are there any bills that you voted for or against that you can recall as you sit here today related to labor in the agriculture industry?
>
> A. Not that I can recall and speak factually on without doing the research.  ¶ 309.

Though he had voted for the FWMA only a few months before, he claimed at his deposition not to remember it.  ¶¶ 310–11 ("I have no idea what [that] is.").  When asked if he supported mandatory electronic verification as proposed in the FWMA, he would not answer, giving responses like, "I've co-sponsored, God knows how many bills, voted on a lot of different immigration issues over the years," and immigration is "very, very complex."  ¶ 312.  When asked if the labor shortage led to unauthorized hires, he repeated, "nobody knows who's illegal .

. . I don't know anyone in agriculture who is employing illegals." ¶ 313.

The Congressman's failure to recollect any bills he supported on farm worker issues is contrasted with his receipt of hundreds of thousands of dollars in campaign donations from dairy groups, which spent millions lobbying for the nine bills described herein. ¶¶ 314–19.

## VI.    After the Article, the NuStar Plaintiffs Feared for Their Employees and Did an Audit that Showed Their Practices Were Illegal.

The Congressman spoke to his family the day after the Article was published. ¶ 322. "[A] lot of conversations . . . took place that day," and family discussions of the Article continued on "on several occasions." *Id.* Anthony Jr.'s immediate reaction was "fear" for his employees, who he repeatedly said were "scared of the government":

> Q. If your guys are all here legally, why are they scared of the government?
> MR. BISS: Object to the form.
> A. You would have to ask my guys. . . .
> Q. But you know they're scared of the government; right?
> A. Yes, I know they're scared of the government. ¶ 323.

The Congressman also had discussions—he would not say with whom—about the identity of a potential "source" for the Article who spoke to Lizza:

> A. . . . I know the family, but I can't think of his name right now, but I think he was interviewed. And I heard that from one of his family members or something. . . .
> Q. And was this a family member of one of the workers or one of the farmers or somebody else?
> A. I just remember somebody that knew him said that Lizza had talked to him. . . . I don't remember who. *I just remember hearing it at the time, he was potentially a source.* ¶ 324 (emphasis added).

The Congressman could not say where he heard this information, which could have come from his family. ¶¶ 324–25 ("I know that, you know, just in passing conversations with—with, you know, surrounding this court case, that's the best that we can . . . tell, that [Lizza] just went to Sibley to find any brown Spanish-speaking person . . . .").

"[J]ust after the article" came out, in October 2018, Lori contacted immigration lawyer Amanda Bahena to help NuStar conduct a "self-audit." ¶ 326. Bahena identified several shortcomings, among the most critical that NuStar was not completing and signing Section 2 and was accepting facially invalid documents such as expired cards. ¶¶ 117, 187, 198, 212, 326–29.

NuStar's attempts to resolve these deficiencies were incomplete. When Anthony III retroactively signed Section 2 for 59 employees, he did not review the original documents despite attesting he had under penalty of perjury. ¶ 331. NuStar did not, and still does not, fill out Section 2 for current employees. ¶¶ 116, 118–20, 192, 199. There is no evidence NuStar investigated the employees Bahena flagged, yet they remained employed. ¶¶ 233, 240–41.

## VII. Despite Knowing Their Practices Broke the Law, the NuStar Plaintiffs Sued for Defamation Following the Congressman's Lead.

"At some point" after the Article was published on September 30, 2018 on Esquire.com (and linked through a post on Lizza's personal Twitter account the same day, ¶¶ 55–56), the Congressman spoke with his family about filing a lawsuit. ¶ 332.

On September 25, 2019, nearly a year after the Article's publication, the Congressman sent a retraction demand. ¶ 92. He commenced suit five days later on September 30, 2019, seeking $77.5 million in compensatory and punitive damages. ¶ 333.

The Congressman also discussed trying to get the Article retracted with Anthony Jr., who engaged the Congressman's lawyer. ¶¶ 334–35. NuStar demanded the *Dairy Star* take down its article about NuStar to avoid "publicity" out of concern for the Congressman. ¶ 112. Despite confirming by the October 2018 audit that their practices were illegal, and despite receiving an October 2019 SSA letter stating over 70% of their employees' data did not match its records, the NuStar Plaintiffs sent Hearst a retraction demand on November 14, 2019. ¶ 151, 326–29, 337.

On November 20, 2019, noting the Congressman's reappearance in the news of the day,

Lizza posted the Link to the Article through his account. ¶ 100. Lizza had stopped reporting for *Esquire* months before and had no relationship with Hearst at the time, as his freelance agreement with Hearst expired on June 1, 2019. ¶¶ 35, 100.

The NuStar Plaintiffs filed their suit on January 16, 2020, seeking $25 million and alleging they were not aware of any wrongdoing. ¶ 338. They sued to "make sure this never happens again"—meaning, no one writes a "political hit piece" about them again. ¶ 339.

The Congressman filed his First Amended Complaint ("FAC") on February 3, 2020, continuing to allege defamation by the Article and adding allegations about the November 2019 Link and other social media posts. *Nunes* [ECF No. 23].

The two suits, now consolidated, have since been through several iterations of pleadings. Relevant to this motion, at a time when he benefited from the liberal standard of Rule 8(a), the Court dismissed the Congressman's entire FAC with prejudice. *Nunes* [ECF No. 53]. The Eighth Circuit affirmed except for allowing his claim to proceed on a single alleged defamatory implication. The Article says he "had no financial interest in his parents' Iowa dairy operation," and it does not expressly say he knows the nature of their workforce. ¶ 79; *Nunes*, 12 F.4th at 894. Still, the appeals court held a reasonable reader could conclude he knew about his family's "use of undocumented labor," and this is why he "tried to 'hide' the family's move to Iowa," based on the Article's "series of facts about the supposed conspiracy to hide the farm's move, the use of undocumented labor at Midwestern dairy farms, the Nunes family farm's alleged use of undocumented labor, and the Congressman's position on immigration enforcement, in a way that reasonably implies a connection among those asserted facts." 12 F.4th at 894, 897–98.

While the Eighth Circuit affirmed this Court's conclusion that the Congressman could not claim the Article was published with actual malice, it recognized a claim limited to the Link

reasoning that (a) it could have republished the Article under Iowa law, (b) the Article plausibly could convey the aforementioned implication, and (c) by then the Congressman had filed his Complaint denying involvement in NuStar's "operations," a "'secret' involving [NuStar's] move," and his "aware[ness] of criminal wrongdoing," which taken together could suffice at the pleading stage to plausibly allege Lizza had actual malice as to the Link. *Id.* at 899–901.

This Court also narrowed the NuStar Plaintiffs' case on a motion to dismiss to an alleged defamatory claim that they knowingly hired undocumented workers (Count I). Though the Article was "careful to say that [Lizza's] sources only sent undocumented workers to" NuStar without saying NuStar hired any, the Court held the "gist or sting . . . is that people sent undocumented workers to [the NuStar] plaintiffs, [who] knew the status of those workers, and hired them." *NuStar v. Lizza*, 486 F. Supp. 3d 1267, 1290 (N.D. Iowa 2020). The NuStar Plaintiffs have since added a claim that Defendants implied they "conspired" to hide their use of undocumented labor (Count II), and alleged Lizza published the Link with actual malice.[10]

The Congressman has had multiple conversations with his father about these suits. ¶ 343. He referred the family to his lawyer and spoke to an expert witness about working on his and his family's cases. ¶¶ 335, 344. (That witness was engaged by all Plaintiffs but has withdrawn.) ¶ 345. The Congressman has discussed with his family the substance of their productions in this case, including their phone records and employment records. ¶¶ 261, 267, 343.

## VIII. Plaintiffs Have Not Been Damaged.

### A. The NuStar Plaintiffs Can Show No Harm from the Article.

The NuStar Plaintiffs cannot identify a single person who thought less of them because of any purported falsity at issue in the Article. ¶¶ 347–53. NuStar did not lose any business, its

---

[10] *See NuStar* [ECF No. 189] ¶¶ 45–56.

profits increased, and the customer responsible for nearly all its revenue called to offer support. ¶¶ 352–60. The NuStar Plaintiffs have not otherwise produced any evidence of damage to them.

### B. The Congressman Has Not Been Harmed by Lizza's November 2019 Link to the Article.

After the Link, the Congressman never lost an election, held on to prestigious positions including as the highest-ranking Republican on the House Intelligence Committee, and even received the Presidential Medal of Freedom "because of the attacks like Lizza and Hearst did on [himself], [his] family . . . ." ¶¶ 366–77. He has no proof of economic loss. ¶ 399. He continued receiving his Congressional salary after the Link, then more than tripled it in January 2022 when he left to be CEO of the social media platform Truth Social. ¶¶ 378–80, 387–96.

### LEGAL STANDARD

Summary judgment is warranted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Evidence that is "merely colorable" or "not significantly probative," *id.* at 249–50, does not create a genuine dispute. "[S]ummary judgment may be 'particularly appropriate' in an action for defamation." *Lauderback v. Am. Broad. Cos.*, 741 F.2d 193, 198 (8th Cir. 1984); *see also Schuster v. U.S. News & World Report, Inc.*, 602 F.2d 850, 855 (8th Cir. 1979).

The Court is familiar with the elements of a defamation claim. *See NuStar*, 486 F. Supp. 3d at 1279. A defamation plaintiff must prove: (1) publication (2) of a false and defamatory statement (3) concerning the plaintiff (4) made with the requisite level of fault (5) that resulted in demonstrable injury to plaintiff's reputation through its falsity. *See id.*

**I.    THE NUSTAR PLAINTIFFS PRESENT NO GENUINE ISSUE FOR TRIAL.**

### A.    The NuStar Plaintiffs Cannot Prove It Is False to Say They Knowingly Hired Undocumented Labor as a Matter of Law.

The record reflects that, as a matter of law, NuStar cannot prove that a suggestion that it knowingly hired undocumented workers is false.  The contrary undisputed evidence, on the other hand, is so plain it may well establish "knowing hire" violations under the IRCA even though it is *not* Defendants' burden to prove NuStar violated federal immigration laws.  The fact that the NuStar Plaintiffs would lack even a credible defense under the IRCA shows how wrong their attempt is to claim they were defamed, where *they* bear the burden.  Their acceptance of documents that did not authorize employment on their face strongly supports a showing they knowingly hired unauthorized workers as a matter of immigration law, particularly given their persistent refusal to follow I-9 requirements.  Defendants are moreover entitled to an adverse inference from NuStar employees' refusal to testify about their authorization status or NuStar's knowledge of it, making NuStar's burden that much more insurmountable.  Given the substantial truth that they knowingly hired unauthorized workers (and lack of any evidence of falsity), Count II must be dismissed for lack of falsity as well.

#### 1.    Plaintiffs Bear the Burden to Prove Falsity.

It is Plaintiffs' burden to prove the Article false.  The First Amendment requires libel plaintiffs to prove falsity where the challenged publication involves a matter of public concern, which the Court already held the Article does.  *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776–77 (1986); *Nunes v. Lizza*, 476 F. Supp. 3d 824, 839 n.3 (N.D. Iowa 2020).

Recognition that it is critical for the plaintiff to bear the burden of proving falsity in cases involving matters of public concern (especially those involving public officials and those in their

orbit) is as old as the First Amendment itself and is a core tenet of speech protection. Madison himself—architect of the Constitution and author of the First Amendment—noted in the context of explaining the First Amendment's protection of political speech that providing a defense of truth is wholly inadequate because of how difficult it may be to prove in a court of law.[11]

The Supreme Court echoed this view in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964),[12] and directly addressed it in *Hepps*, where it expressly directed that the burden of proof for falsity must be borne by plaintiff in cases involving matters of public concern. Where it is difficult or impossible to prove the speech true or false, "the burden of proof is dispositive," and plaintiff's claim fails. *Hepps*, 475 U.S. at 776–77. This rule of constitutional law is just as important to the protection of political expression as the ruling in *Sullivan*, and entirely consistent with it. For it necessarily follows from *Sullivan*, which held that the First Amendment protects even provably false statements made without knowledge of falsity, that the First Amendment protects statements that are not provably false in the first place.

Madison saw the particular importance of placing the burden on plaintiffs who challenge an implication, since "opinions and inferences, and conjectural observations[] cannot be subjects of that kind of proof which appertains to facts, before a court of law."[13] And where the

---

[11]     4 Jonathan Elliot, *Debates on the Federal Constitution* 574–75 (1876).

[12]     The Court in *Sullivan*, on the inadequacy of a truth defense placing the burden on defendant:

A rule compelling the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a . . . self-censorship. Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars. . . . Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so. . . . The rule thus dampens the vigor and limits the variety of public debate. It is inconsistent with the First and Fourteenth Amendments.

376 U.S. at 279 (citations and quotation marks omitted).

[13]     Elliot, *supra*, at 575.

challenged statements are not just implications, but "inferences" about a plaintiff's state of mind—which inherently elude exacting proof—the wisdom of the plaintiff bearing the burden has yet more force. *See Sandmann v. N.Y. Times Co.*, No. 20-CV-23, 2022 WL 2960763, at *7 (E.D. Ky. July 26, 2022), *appeal docketed*, No. 22-5734 (6th Cir. Aug. 24, 2022) ("It has long been established that someone's state of mind is not capable of being proven true or false.").[14]

As a corollary to their burden, then, the Constitution only permits plaintiffs to challenge "*verifiabl[y]*" false statements, and to meet their burden with "*objective* evidence." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) (emphases added). The burden is not met by showing the literal falsity of any "detail of the Article," but *material* falsity. *Nunes*, 476 F. Supp. 3d at 839. The "'gist' or 'sting'" of the challenged statements must go to "the heart of the matter" and have a material impact on a reader as compared to the literal truth. *Id.* (quoting *Doe v. Hagar*, 765 F.3d 855, 863 (8th Cir. 2014)); *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 516 (1991) (libel law "overlooks minor inaccuracies and concentrates upon substantial truth").

Plaintiffs' burden is not limited to trial but informs this motion as well; on summary judgment, "the determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255. Courts routinely apply *Hepps* at summary judgment to dismiss claims where the record would not reasonably permit a finding of falsity under the plaintiff's burden of proof. *See In re United Press Int'l*, 106 B.R. 323, 327–28 (D.D.C. 1989) (granting summary judgment where "no reasonable juror" could find statements proven false, under *Hepps*); *L. Firm of Daniel P. Foster, P.C. v. Turner Broad. Sys., Inc.*, 844 F.2d 955, 960 (2d Cir. 1988) (similar); *Medure v.*

---

[14]     *See also Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 770 (Iowa 2006); *Bandstra v. Covenant Reform Church*, 913 N.W.2d 19, 47 (Iowa 2018); *Nunes*, 476 F. Supp. 3d at 839–40 ("statements that are not sufficiently factual to be capable of being proven true or false . . . are absolutely protected") (citations and quotation marks omitted); *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302, 1304 (8th Cir. 1986).

*Vindicator Printing Co.*, 273 F. Supp. 2d 588, 601 & 612–13 (W.D. Pa. 2002) (similar).

2. **The NuStar Plaintiffs Flouted the Laws and Hired Employees with Facially Invalid Documents.**

The objective, verifiable evidence all points away from falsity and toward the conclusion that NuStar's conduct is consistent with knowingly hiring unauthorized workers, in violation of federal immigration law. *See Split Rail Fence Co. v. United States*, 852 F.3d 1228, 1233 (10th Cir. 2017) (describing violations of "knowing hire" and knowing continued employment of unauthorized workers). While immigration law does not provide a rule of decision here, it may serve as a useful guide in examining substantial truth, at least of NuStar's allegations. *See NuStar* [ECF No. 189] ¶ 9 (alleging Article claims "NuStar knowingly employed illegal workers in violation of Federal law"); *NuStar*, 486 F. Supp. 3d at 1290 ("Falsely accusing someone of knowingly employing undocumented workers is accusing someone of committing a crime.").

The IRCA does not require proof of an employer's knowledge by their admission; the government may prove knowledge through objective, external evidence, by a preponderance of the evidence. *See United States v. Occupational Res. Mgmt. Staffing, Inc.*, 10 OCAHO 1166, 2013 WL 1918850, at *8–9 (Jan. 23, 2013) ("*ORM*"). Thus, under the IRCA, "[t]he term knowing includes . . . knowledge which may fairly be inferred through notice of certain facts and circumstances which would lead a person, through the exercise of reasonable care, to know" the worker is unauthorized. 8 C.F.R. § 274a.1(l)(1); *United States v. New El Rey Sausage Co.*, 1 OCAHO 66, 1989 WL 433853, at *17 (July 7, 1989), *aff'd*, 925 F.2d 1153 (9th Cir. 1991). This is "modeled after the criminal law concept of 'imputed-knowledge' which holds that a deliberate failure to investigate suspicious circumstances imputes knowledge." *United States v. Noel Plastering & Stucco*, 2 OCAHO 377, 1991 WL 717532, at *3 (Sept. 23, 1991).

When employee authorization documents are facially invalid—for example, because they

are expired or state they do not authorize employment, as has repeatedly been the case during NuStar's years of operation (¶¶ 176–82, 189–97)—the employer may be charged with knowing the employee is unauthorized to work. *See ORM*, 2013 WL 1918850, at *8–9 (expired authorization imputed knowledge to employer that worker was unauthorized); *United States v. Foothill Packing, Inc.*, 11 OCAHO 1240, 2015 WL 329579, at *10 (Jan. 13, 2015) (expired authorization was "sufficient in itself" to put employer on "clear notice" of unauthorized status, establishing "constructive if not actual knowledge" for knowing hire violation); *United States v. Sunshine Bldg. Maint.*, 7 OCAHO 997, 1998 WL 746015, at *26 (May 4, 1998) (accepting SSN stamped "Not Valid for Employment" was knowing hire violation).

Because "knowing hire" violations are based on constructive as well as actual knowledge, an employer cannot rely on claimed subjective ignorance when confronted with facially invalid documents, for example by saying he did not read or understand them. *See Split Rail*, 852 F.3d at 1243 ("[T]he employer is not entitled to cultivate deliberate ignorance . . . ." (quoting *Foothill Packing*, 2015 WL 329579, at *7)). The fact that Lori may not have checked expiration dates by choice and practice, or that Anthony III "[d]id not know" work authorizations have expiration dates (¶ 183), would not inoculate NuStar from knowing hire violations, which are judged by an objective standard of what an employer would learn through "reasonable care." 8 C.F.R. § 274a.1(l)(1). This is not to mention the many other red flags in the documents they received such as mismatched birth dates, obvious misspellings,[15] or an employee presenting an "updated" California license with a nonexistent address, even though NuStar knew he had been living in Sibley for years in its free housing. ¶ 237. The omnipresence of these red flags tends to

---

[15]    ¶¶ 198–212. As just one example of many, a NuStar employee presented an ID in which the word "Safety" in "Texas Department of Public Safety" was misspelled "Safery." ¶ 211. Another employee who did not present valid authorization was hired because he was an employee's son. ¶ 234.

further evince its knowledge it hired unauthorized workers. *See Sunshine Bldg.*, 1998 WL 746015, at *20 (I-9 violations "coupled with circumstantial evidence of a conscious avoidance of acquiring knowledge as to the identification and status of one's employees" can show knowing hire).

This is particularly true in the context of NuStar's steadfast refusal to do I-9 verification as the law requires. *See Ketchikan Drywall Servs., Inc. v. ICE*, 725 F.3d 1103, 1111 (9th Cir. 2013) ("The I-9 Form . . . provides concrete evidence" the employer "actually review[ed] the verification documents closely enough to ascertain that they are facially valid . . . ."). The NuStar Plaintiffs refused to do the verification because, as Lori put it, she was not sure she "want[ed] to learn" the truth. ¶ 144. Neither did Anthony Jr. ("I don't want to deal with labor"), nor Anthony III (Lori "looks at it"), nor Dian (she was "not required to verify status"). ¶¶ 22, 127–35. Dian, Anthony Jr., and Anthony III all hid behind the puzzling excuse that complying with the law would paradoxically be "illegal," while Lori deferred to their judgment. ¶¶ 123–27, 140. Regardless of their avowed reasoning, that they did not comply admits of no dispute.

NuStar failed to complete Section 2 of the Form I-9 at least 289 times (94% of the time), failed to sign and date Section 2 at least 208 times, and failed to timely fill out the I-9 at all at least 68 times. ¶¶ 116, 119, 121. And no one, including NuStar's expert, disputes that these are serious violations of law. ¶¶ 116, 120, 122; *United States v. Carter*, 7 OCAHO 931, 1997 WL 1051432, at *31 (May 9, 1997) ("Failure to sign a certification renders it worthless . . . and . . . is a serious violation."); *accord United States v. Reyes*, 4 OCAHO 592, 1994 WL 269183, at *7 (Jan. 6, 1994); *DLS Precision Fab LLC v. U.S. Immigr. & Customs Enf't*, 867 F.3d 1079, 1084 (9th Cir. 2017); *Buffalo Transp., Inc. v. United States*, 844 F.3d 381, 385–86 (2d Cir. 2016).

The breadth and regularity of NuStar's non-compliance would also favor a knowing hire

violation under federal law. *See Sunshine Bldg.*, 1998 WL 746015, at *20. As would its abdication of responsibility for I-9 review to Lori, who was never instructed how to do it. *See* ¶¶ 139–43; *Sunshine Bldg.*, 1998 WL 746015, at *20 ("inadequate training of personnel to whom hiring authority was delegated" supported knowing hire); *Carter*, 1997 WL 1051432, at *14 (same).

While the NuStar Plaintiffs' conduct before the Article establishes the reporting was true, their conduct afterward serves to underscore how deeply their refusal to employ the required "reasonable care" is (and always has been) ingrained in their ways. 8 C.F.R. § 274a.1(l)(1).

By 2022, NuStar was warned by its attorney and expert not to accept expired documents, and to complete Section 2. ¶¶ 117, 181–87. Anthony III and Lori were shown expired documents and substantive violations at their depositions. ¶¶ 124, 183. Their expert opined that NuStar documents he saw at his deposition were likely "fake." ¶¶ 172, 188. The SSA informed NuStar *three times* over 70% of its workers' SSNs do not match. ¶¶ 148–58. The no-match list included employees with expired authorizations and at least one whose card outright said it did not authorize him to work. ¶¶ 176–79, 196. All six deposed employees pled the Fifth when asked about their work authorization status. ¶¶ 213–28.

Yet in 2022, NuStar still accepts expired documents and refuses to fill out Section 2. ¶¶ 180, 192. It appears no degree of knowledge about its workers will make NuStar change its habits. That this is how the NuStar Plaintiffs operate *today* is strongly probative that this is how they *always* operated, exactly as Dian and the Congressman testified. ¶¶ 123, 138, 245–55.

Perhaps, like the Congressman, the NuStar Plaintiffs will persist in claiming ignorance until an employee has said out loud that they are unauthorized. But that is not even the standard the government must meet to prosecute knowing hire violations under federal immigration law.

In *ORM*, an employee's authorization was expired, and his A-number and SSN did not match government records or were invalid. 2013 WL 1918850, at *7–8. While the employer argued this was "not conclusive" of unauthorized status because of possible discrepancies in records, the court held the government did not need "conclusive evidence," only a preponderance of it, and since the employer "fail[ed] to provide any evidence to the contrary," the government's burden for a knowing hire was met. *Id.* at *8–9; *see also Noel Plastering*, 1991 WL 717532, at *3 (in face of expired document, "an employer cannot avoid IRCA liability by claiming [the government] should have offered irrefutable proof of its workers' unauthorized status").

Defendants, of course, need not match the government's showing in a knowing hire prosecution because they do not bear the burden of proof. *Sullivan*, *Hepps*, and their progeny are incompatible with requiring a libel *defendant*, who does not bear the burden, to show more to avoid defamation liability than the government must show to prosecute immigration cases. It is the NuStar Plaintiffs' burden to prove falsity at trial. They cannot meet it solely with what they say was a purely subjective state of ignorance from failing to read documents they were legally required to review. Such cultivated ignorance merits no weight under the immigration laws, *supra* at 31, or on summary judgment. *See S.E.C. v. Brown*, 579 F. Supp. 2d 1228, 1235 (D. Minn. 2008) (stating it "would be inappropriate to allow [Plaintiffs] to rely on" self-serving statements and testimony "in opposing summary judgment"), *aff'd*, 658 F.3d 858 (8th Cir. 2011). And, as noted above, a state of mind reduced to such chimerical matter is not verifiably false or actionable and cannot be the basis of a defamation claim. *See Milkovich*, 497 U.S. at 21–22; *Sandmann*, 2022 WL 2960763, at *7; *supra* at 28–29. The *verifiable* evidence of the NuStar Plaintiffs' state of mind shows they knowingly hired unauthorized workers. ¶¶ 22, 175, 323 (Anthony Jr.: his employees are "scared of the government"; it is "the government's fault for not

. . . mak[ing] these people legal"; "I don't want to deal with labor" and "the problems").

In sum, all the evidence tends to show it is substantially true to say the NuStar Plaintiffs knowingly hired undocumented workers, and they cannot sustain their burden to show otherwise. The evidence is of such formidable weight that one could not reasonably expect to find more, short of their admissions. Not even the immigration laws require such proof. Remarkably however, as shown below, the record does contain the equivalent of an admission—NuStar's workers pled the Fifth, further extinguishing its ability to prove its claim.

### 3. When Asked If NuStar Knew of Their Undocumented Status, Its Current Employees Pled the Fifth.

When Defendants asked six of NuStar's current long-time employees to testify under oath about their status and *whether NuStar knew if they were authorized to work*, all of them invoked their Fifth Amendment right to remain silent. ¶¶ 213–23. This fact creates an adverse inference the NuStar Plaintiffs cannot overcome, independently requiring dismissal of their case.

An adverse inference against a party to a civil suit is warranted when its employees invoke the Fifth Amendment and refuse to testify about matters within the employment relationship. *See Rad Servs., Inc. v. Aetna Cas. & Sur. Co.*, 808 F.2d 271, 275 (3d Cir. 1986) ("[N]othing forbids imputing to a corporation the silence of its personnel. . . . The bases for admitting [Federal Rule of Evidence 801(d)(2)(D)] vicarious admissions against the corporation also justify informing the factfinder when the corporation's agent invokes the Fifth Amendment privilege."); *Brink's Inc. v. City of N.Y.*, 717 F.2d 700 (2d Cir. 1983) (adverse inference may be drawn against Brink's based on Fifth Amendment invocation by former employees).

This rule applies with extra force when a civil *plaintiff* or its employees plead the Fifth; courts do not hesitate to grant adverse inferences, or more severe sanctions. *See Brink's*, 717 F.2d at 709 ("ample sanctions against *plaintiffs* who exercise their privilege have always been

granted") (citing Robert Heidt, *The Conjurer's Circle: The Fifth Amendment Privilege in Civil Cases*, 91 Yale L.J. 1062, 1087–88 (1982) ("[W]hen the person invoking the privilege in a civil case is the plaintiff or the plaintiff's employee[,] [t]he most common judicial response is to dismiss the plaintiff's action.")); *see also Lyons v. Johnson*, 415 F.2d 540, 541 (9th Cir. 1969) (plaintiff may not plead Fifth "then demand that he nevertheless be permitted to continue with the legal pursuit of his claim . . . ."); *Parker v. Hennepin Cnty. Dist. Ct., Fourth Jud. Dist.*, 285 N.W.2d 81, 83 (Minn. 1979) ("This court will not permit a plaintiff to use the judicial forum to make allegations only to later insulate himself by invoking the Fifth Amendment . . . .").

Here, Defendants could not obtain information from central employee witnesses—over whom NuStar asserts ample control even now—with direct knowledge of NuStar's hiring practices. They did not produce their ID or work authorization in response to Defendants' subpoena on Fifth Amendment grounds. ¶¶ 213, 219–20. When asked about their authorization and NuStar's knowledge of it, they refused to testify. ¶¶ 219, 222. Because Defendants were thus frustrated in seeking evidence from key witnesses within the NuStar Plaintiffs' control, their claims cannot survive summary judgment. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

The *Rad Services* court noted the ample policy reasons for an adverse inference against an employer whose employees invoke the Fifth:

> An employee's self-interest would counsel him to exculpate his employer, if possible. The witness, as well, would know the facts about which he is called to testify since they relate to the scope of his employment. The employer, moreover, could rebut any adverse inference that might attend the employee's silence, by producing contrary testimonial or documentary evidence.

808 F.2d at 275.

These policy reasons in favor of an adverse inference are all present here. These six employees are "long-term, loyal employees" of NuStar, according to Plaintiffs' counsel, having

worked there for anywhere from five to fourteen years.  ¶ 213.  At least two live in free NuStar

housing.  ¶¶ 226–27, 237, 242–43.  Three are paid substantially more than other employees,

including even Anthony III at times, and one served in a supervisory role.  ¶¶ 214–15.  Since

their livelihood and even, in some cases, shelter depend on NuStar, it is in their interest to

exculpate NuStar.  They had every reason to say they showed valid documents to NuStar, if that

were true.  Their refusal to testify strongly suggests it is not.  Nor is there any dispute they know

their own work authorization status, and how they represented that status to NuStar.

Finally, while NuStar had every opportunity to rebut the inference, its evidence only

corroborates it.  Its expert agreed the employees' I-9s had substantive violations, plus

irregularities suggesting the documents are counterfeit.  ¶¶ 120, 229, 231–39.  One employee

was convicted four times for failure to present a valid driver's license, suggesting he lacked one.

¶ 236.  All six did not match SSA records.  ¶¶ 230, 241.  All six are still at NuStar.  ¶ 240.

There is every reason to presume these employees' truthful testimony would only

reinforce that they lack work authorization, and NuStar knew it.  This adverse inference alone

thwarts the NuStar Plaintiffs from meeting their burden and requires judgment for Defendants.

### 4. The Alleged Implication that the NuStar Plaintiffs Conspired to Hide Their Use of Undocumented Labor Is Substantially True.

The NuStar Plaintiffs' Count II claims an added "defamatory gist and false implication

from the Article is that [they] conspired with others (including Devin and Rep. King) to hide and

conceal a 'politically explosive secret'—that NuStar knowingly employs undocumented labor on

its dairy farm."  *NuStar* [ECF No. 189] ¶ 53.  Because Count II alleges no independent

defamatory "gist or sting" apart from that in Count I, this supplemental claim must be dismissed.

*See NuStar*, 486 F. Supp. 3d at 1285 ("[T]he assertion that plaintiffs conspired with others to do

anything is a conclusion or characterization based on facts but is not a fact itself.").

When determining whether a defamatory charge is substantially true, "the test, for summary judgment purposes, is whether the plaintiff would have been exposed to any more opprobrium had the publication been free of error." *Behr v. Meredith Corp.*, 414 N.W.2d 339, 342–44 (Iowa 1987) (favorably citing "a number of cases in which substantial truth has been successfully asserted as a matter of law by a libel defendant who misstated a plaintiff's involvement in the criminal justice system"). The NuStar Plaintiffs knowingly use undocumented labor. Saying they "conspired" to employ undocumented labor "expose[s]" them to no "more opprobrium" and hence is also substantially true as a matter of law; reasonable minds could not differ that the defamatory "gist or sting" is the same. *Id.*

A "conspiracy" element adds no defamatory "sting" because conspiring, in and of itself, is not wrong. A conspiracy is only made wrongful by an independent wrongful act. *See NuStar*, 486 F. Supp. 3d at 1286 (where the "object of the 'conspiracy'" is not defamatory, the assertion of "conspiracy" cannot be defamatory as a matter of law); *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 172, 174 (Iowa 2002) ("Civil conspiracy is not in itself actionable . . . . [it] is merely an avenue for imposing vicarious liability on a party for the wrongful conduct of another with whom the party has acted in concert." (citations and quotation marks omitted)); *Deeds v. City of Marion*, 914 N.W.2d 330, 350 (Iowa 2018) (same); Iowa Code § 706.1 (criminal conspiracy requires "intent to promote or facilitate the commission of" separate crime).

Even if Defendants had accused the NuStar Plaintiffs of a formal conspiracy, hiring undocumented workers would be the "actionable underlying act" conferring the defamatory sting, not the act of conspiring to do so. *Deeds*, 914 N.W.2d at 350. But here, Defendants did not come close to making a formal allegation of "conspiracy." At most, the Eighth Circuit found the Article "as a whole" implies a "connection among [] asserted facts" through a "connect[] the

38

dots" exercise—namely, "the supposed conspiracy to hide the farm's move, the use of undocumented labor at Midwestern dairy farms, the Nunes family farm's alleged use of undocumented labor, and the Congressman's position on immigration enforcement . . . ." *Nunes*, 12 F.4th at 897. As to the NuStar Plaintiffs, none of these "dots," alone or connected, adds any sting to the substantial truth of NuStar's knowing employment of undocumented labor. (And in any event, the facts making up the so-called "conspiracy" are substantially true, *infra* at 47–51.)

For these reasons, the NuStar Plaintiffs' Count II fails as a matter of law.

### B. The NuStar Plaintiffs Cannot Prove the Requisite Fault.

Even if the NuStar Plaintiffs could raise a genuine issue as to material falsity, another reason to grant summary judgment is that they cannot show Defendants were at fault.

#### 1. Defendants Were Not Negligent.

Discovery has shown Lizza's reporting, and Hearst's publication process, were meticulous. There is nothing more they could have reasonably done to ensure the Article was accurate and fair. In a time of increasingly straitened newsrooms, the Article evokes a time when resource-intensive investigative reporting was more common. Lizza went to see Sibley himself, do dozens of interviews, compile hundreds of pages of research, and make every reasonable effort to speak to the subjects of the Article including Plaintiffs, who repeatedly turned him down. ¶¶ 59–65, 82–84. Lizza did this to get the story right. The Article was reviewed at Hearst by multiple layers of editors and a fact-checker who spent two weeks fact-checking the Article. ¶ 85. Remarkably, discovery has not proven a single fact inaccurate.

By contrast, the NuStar Plaintiffs have no evidence of negligence and cannot point to anything more or different Defendants ought to have done. Their testimony is clear that Plaintiffs' true quarrel is not with Lizza's diligence, but with his focus on a small community unaccustomed to the scrutiny, and on the family of a powerful Congressman who has a "policy"

of suing the press over unfavorable coverage.  ¶¶ 412–13.  No reasonable juror could find Lizza or Hearst negligent in failing to adhere to professional journalism standards.  *See Johnson v. Nickerson*, 542 N.W.2d 506, 511 (Iowa 1996).  This is a higher test to meet than mere negligence, and it cannot be met here, given Lizza's strict adherence to professional standards he knows well based on his education, work, and academic experience (including teaching at some of the world's most prestigious universities), against Plaintiffs' lack of any contrary evidence.

Courts routinely grant summary judgment in defamation cases under a negligence standard, including on records far less compelling than the one here.  In *Crescenz v. Penguin Group (USA), Inc*., 561 F. App'x 173 (3d Cir. 2014), the court affirmed summary judgment dismissing a private figure's case against an author and publisher who published a book suggesting plaintiff had an affair (which she denied), pointing to the "overwhelming evidence" supporting the writing, including interviews, documents, and even a report in *Esquire*.  *Id.* at 175, 177–79; *see also Valentine v. C.B.S., Inc.*, 698 F.2d 430, 432 (11th Cir. 1983) (affirming summary judgment that defamation defendants were not negligent where "the facts indicate there is no triable issue as to whether the defendants took reasonable precautions to ensure . . . accuracy," and "[s]everal individuals . . . repeatedly reviewed" the content).[16]

The same outcome should hold here, as the evidence supporting the Article is similarly "overwhelming," and there is no evidence of negligence (or falsity).  *See Brown v. Hearst Corp.*, 54 F.3d 21, 26 (1st Cir. 1995) (affirming summary judgment that station was not negligent where plaintiff identified "no significant inaccuracies" or "any counterbalancing exculpatory evidence . . . it would have discovered by diligent research"); *Kendrick v. Fox Television*, 659 A.2d 814,

---

[16]  *Cf. Littlefield v. Fort Dodge Messenger*, 614 F.2d 581, 584 n.4 (8th Cir. 1980) (in *dicta*, stating trial record showed lack of negligence where "the defendant reporter . . . checked his story . . . with a variety of sources including [plaintiff]," exercising due care).

823–24 (D.C. 1995) (affirming summary judgment that station was not negligent in failing to obtain plaintiff's side of the story, when station "made good faith attempts to reach" him before broadcast); *Fuchs v. Scripps Howard Broad. Co.*, 868 N.E.2d 1024, 1039–40 (Ohio Ct. App. 2006) (affirming summary judgment that broadcaster was not negligent where reporter spoke to multiple sources and "repeatedly tried to interview" plaintiff but was "stonewalled"). Given that NuStar's employees refused to testify in response to a subpoena, it is hard to imagine what more Lizza could have done. *See Fuchs*, 868 N.E.2d at 1039–40 (plaintiff could not complain of failure to investigate when plaintiff "himself prevented just such an investigation . . . .").

In the end, the NuStar Plaintiffs have nothing to meet their burden to prove negligence, if that standard governs their claims. *See Wade v. Kay Jewelers, Inc.*, No. 17-CV-990, 2019 WL 1385089, at *10 (D. Conn. Mar. 27, 2019) (granting summary judgment on negligence where plaintiff did "nothing to rebut or cast doubt on the reasonableness or diligence" of the speaker).

## 2. The NuStar Plaintiffs Cannot Show Actual Malice.

Though the NuStar Plaintiffs cannot even show negligence, discovery has confirmed the appropriate standard is actual malice, as they are limited-purpose public figures. While this Court found at the pleading stage that the complaint did not show NuStar's ready access to means to respond to the Article or that the Congressman had thrust himself into a controversy that touched his family, *NuStar*, 486 F. Supp. 3d at 1296, discovery has shown both to be true.[17]

Immediately after the Article came out, a counter-story was published by *The Federalist*, quoting a family member. ¶ 336. The Congressman—himself a national figure and head of a

---

[17] The record upon completion of discovery shows far greater voluntariness in the NuStar Plaintiffs' coordination with the Congressman than they admitted in their pleading. *See supra* at 17–19, 22–25. Defendants respectfully submit that even if their public figure status were involuntary, the category is well-established, even if rare, and its existence is a matter of federal constitutional law. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974); *Berisha v. Lawson*, 973 F.3d 1304, 1311 (11th Cir. 2020) (finding person in "close proximity to those in power" to be involuntary public figure), *cert. denied*, 210 L. Ed. 2d 991 (2021).

media platform—was relied upon by his family for "advice" on their response to Lizza's reporting and the Article, and on seeking counsel and a connection to the publisher of a conservative media outlet, who appeared as an expert before withdrawing. ¶¶ 270–74, 343–45. The Congressman introduced his family to other members of Congress, and even the President at the White House. ¶¶ 264–65. He also inserted himself into controversy, establishing a decades-long history of supporting laws addressing undocumented farm labor, and engaging with his family in flawed employment practices that occasioned the need for such laws. *Supra* at 16–17, 19–21.

Given this record, the NuStar Plaintiffs are limited purpose public figures who are both "relatives of famous people," *Marcone v. Penthouse Int'l Mag. for Men*, 754 F.2d 1072, 1084 n.9 (3d Cir. 1985) (citing cases), and necessarily part of a story about public officials and public business, *see, e.g.*, *Dameron v. Wash. Mag., Inc.*, 779 F.2d 736, 742 (D.C. Cir. 1985); *Lewis v. NewsChannel 5 Network, L.P*, 238 S.W.3d 270, 300 (Tenn. Ct. App. 2007). The record also supports a finding that the Congressman is directing his family's suit, and neither he nor his family should gain the benefit of a more favorable standard for private individuals. For the limited purpose of this case—about a farm he advised on and about which he admittedly has knowledge (*Nunes* [ECF No. 104] ¶ 10)—the NuStar Plaintiffs are public figures.

They cannot possibly meet the demanding clear and convincing standard to prove actual malice, not only because they cannot prove Lizza intended the challenged implication with clear and convincing evidence (*infra* at 54–55), but also because there is no evidence Lizza knew it was false the family used undocumented workers or hid that fact. His comprehensive reporting gave him every reason to believe this was true, and they have no evidence to the contrary.

**C.      The NuStar Plaintiffs Have Not Been Harmed by Defendants.**

The NuStar Plaintiffs produced no evidence of damages, essential to their claim. "[T]o prevail in a defamation action against a media defendant, a plaintiff must 'prove some sort of cognizable injury, such as injury to reputation.'" *Bierman v. Weier*, 826 N.W.2d 436, 447 (Iowa 2013) (quoting *Johnson*, 542 N.W.2d at 513) ("[U]nder *Gertz*, a private party must establish . . . actual damages—to bring a case against a media defendant.").

The Iowa Supreme Court has limited what damages can be recovered for defamation. *See Schlegel v. Ottumwa Courier, Div. of Lee Enters. Inc.*, 585 N.W.2d 217, 224 (Iowa 1998). A plaintiff must prove reputational harm, such as economic loss, before "parasitic" damages can be claimed—such as humiliation, mental anguish, or suffering. *Id.* at 224–26. Summary judgment is warranted when plaintiffs lack evidence of reputational harm. *See id.*; *Bierman*, 826 N.W.2d at 463 (finding no evidence anyone "believed the allegations about [plaintiffs] . . . and consequently thought less of [them]," and mental anguish did not show reputational harm); *Johnson*, 542 N.W.2d at 509, 513 (allegations of harm insufficient on summary judgment).

The record is barren of evidence that the NuStar Plaintiffs suffered injury to their reputation from the Article's alleged falsity. Rather, the community supported them, and their main customer called after the Article was published to say they backed NuStar. ¶¶ 347–58. A witness deposed by Plaintiffs confirmed no one in the community would think less of NuStar because of the Article, since the local economy runs on undocumented workers. ¶¶ 351–52.

The NuStar Plaintiffs did not allege lost profits and have not offered evidence of any; rather their profits *increased*.[18] Anthony III admitted they suffered no economic injury and do

---

[18]      In their pleading, the NuStar Plaintiffs sought over $20,000,000 based on "actual injury and damages, including, but not limited to, insult, public ridicule, humiliation, embarrassment, impairment, damage and injury to personal and professional reputations, [and] out-of-pocket expenses and costs," *see NuStar* [ECF No. 189] ¶ 56, but never alleged specific facts concerning lost profits or economic injury.

not seek monetary damages, thus preventing them from seeking "parasitic" damages. ¶¶ 361–63; *Vojak v. Jensen*, 161 N.W.2d 100, 106–08 (Iowa 1968) (plaintiffs must have "some basis upon which the amount thereof can be ascertained without resort to speculation and surmise"), *abrogated on other grounds by Barreca v. Nickolas*, 683 N.W.2d 111 (Iowa 2004). Because Plaintiffs show no damages, their claim should be dismissed for this independent reason. *Home Show Tours, Inc. v. Quad City Virtual, Inc.*, 827 F. Supp. 2d 924, 943–44 (S.D. Iowa 2011) (dismissing plaintiff's libel claim on summary judgment in the absence of damages).

## II. THE CONGRESSMAN'S CLAIM FAILS AS A MATTER OF LAW.

### A. Under California Law, Which Applies to the Congressman's Claim, the Link Did Not Republish the Article.

The Eighth Circuit held the Congressman could not sustain his claim over the Article and limited any possible claim to the Link alone, and only to the extent the Link republished the Article's content. *Supra* at 24–25. Because the Link did not republish the Article as a matter of California law, which governs the Congressman's claim, his case must be dismissed.

#### 1. The Link Could Not Republish the Article as a Matter of Law.

This Court on remand already has held California law applies to a claim the Congressman sought to assert. *Nunes* [ECF No. 90] ("June 1 Order") at 12–23. "A federal court must apply the choice of law rules of the forum state in which it sits," here, Iowa. *Lyons v. Midwest Glazing*, 265 F. Supp. 2d 1061, 1072 (N.D. Iowa 2003). The first step is to determine if there is a "true conflict" between "the different bodies of law that could govern." *Perez v. CRST Int'l, Inc.*, 355 F. Supp. 3d 765, 769 (N.D. Iowa 2018) (Williams, J.). There is a "true conflict" between Iowa and California law since: (1) unlike in Iowa (as interpreted by the Eighth Circuit), under California's "single publication rule," sharing a hyperlink to the Article does not republish it and cannot be the basis of a claim over the Article's content, June 1 Order at 22; *Nunes* [ECF

No. 60] at 4, 15; and (2) unlike in Iowa, in California the Congressman is limited to "special damages" (because he failed to abide by California's retraction statute, June 1 Order at 22).

Iowa applies the "most significant relationship" test of the Restatement (Second) Conflict of Laws to decide the conflict. *Perez*, 355 F. Supp. 3d at 769. For defamation claims arising from content published in multiple states (such as, *arguendo*, the Link), "the state of most significant relationship will usually be the state where the person was domiciled at the time . . . ." Restatement (Second) of Conflict of Laws § 150(2); *id.* comment e; June 1 Order at 15–17.

California law supplies the rule of decision here. California is where the Congressman lives and where he was elected from for nearly two decades. *See Condit v. Dunne*, 317 F. Supp. 2d 344, 354 (S.D.N.Y. 2004) (applying California law to defamation claims of Congressman from California); ¶¶ 17, 19, 366–67. His contacts with Iowa are minimal, "visit[ing] with his family" only "on a few occasions." ¶ 19. The Court reached the same conclusion. June 1 Order at 16–17; *see also Nunes v. Cable News Network, Inc.*, 31 F.4th 135, 148 (2d Cir. 2022).

California's Single Publication Act limits a plaintiff to "one cause of action for damages for libel" "founded upon any single publication," including internet publications. Cal. Civ. Code § 3425.3; *see also Strick v. Super. Ct.*, 143 Cal. App. 3d 916, 924 (1983) (Single Publication Act "reflected great deference to the First Amendment"); *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1166 (9th Cir. 2011). Courts applying California law consistently hold hyperlinks are not "republications" of the linked content, in accord with the great weight of authority across the country. June 1 Order at 15, 22; *see also Penrose Hill, Ltd. v. Mabray*, 479 F. Supp. 3d 840, 851–53 (N.D. Cal. 2020) (collecting and analyzing cases); *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02 CV 2258, 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007).

The Link therefore did not republish the Article, under the law governing the

Congressman's claim.  Because neither the Link nor the Article is an actionable publication with respect to the Congressman's defamation claim, it must be dismissed.

### 2.     Hearst Had No Role in Publishing the Link.

Separately, and additionally, Hearst played no role in posting the Link and is therefore not a proper Defendant for the Congressman's claim in any event.  By the time he posted the Link, Lizza was no longer affiliated with Hearst and could not publish the Link on Hearst's behalf.  ¶¶ 35, 100.  Because Hearst did not "publish" the Link under any applicable law, it must be dismissed for that reason alone.  *See John Doe 2 v. Super. Ct.*, 1 Cal. App. 5th 1300, 1312 (2016) ("publication" essential element of defamation claim).

### B.     The Congressman Cannot Prove Falsity as a Matter of Law.

Like his family, the Congressman cannot meet his burden—which *Hepps* places squarely on his shoulders—to prove the Article false.  *Supra* at 27–29.  Even if the record were ambiguous, which is not the case as the Congressman lacks any proof for his claim, the burden would decide this case for Defendants as a matter of law.  *See Hepps*, 475 U.S. at 776–77.

In case after case, courts applying *Hepps* have dismissed claims on summary judgment, where the only evidence offered by the plaintiff consisted of their conclusory assertions.  *See, e.g.*, *Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790–91 (8th Cir. 2009) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor . . . ."); *Montgomery v. Risen*, 875 F.3d 709, 712, 714–15 (D.C. Cir. 2017) (affirming summary judgment for failure to show falsity under *Hepps*, where only plaintiff's "conclusory" testimony supported claim).

Aside from his bald assertions, the Congressman presents no evidence of falsity.  On the other hand, the undisputed evidence including his specific testimony and pleadings directly refutes his claim and favors a showing that the Article is literally or substantially true.  *See Van*

46

*v. City of Oakland*, No. 13-CV-992, 2015 WL 995127, at *19–20 (N.D. Cal. Mar. 4, 2015) (granting summary judgment, applying *Hepps* where evidence showed substantial truth).

The Congressman claims the Article defames him by implying he "conspired or colluded with his family, Rep. King and with others to hide or cover-up that NuStar employs undocumented labor." *Nunes* [ECF No. 104] ¶ 27. Specifically, he alleges the Article "juxtaposes a series of facts" implying a connection—namely: **(a)** "the supposed conspiracy to hide the farm's move"; **(b)** "the use of undocumented labor at Midwestern dairy farms"; **(c)** "the Nunes family farm's alleged use of undocumented labor"; and **(d)** his "position on immigration enforcement . . . ." *Id.* ¶¶ 25–26; *Nunes*, 12 F.4th at 897–98. The claimed upshot is that the Article **(e)** falsely implies he had "knowledge that the farm employed undocumented labor," explaining his public silence about his family's move. *Nunes*, 12 F.4th at 894, 898.

The Article's reporting on each of these "juxtapose[d] . . . facts" has all been shown at least substantially true, with no countervailing evidence of falsity. As to **(a)**, insofar as the veracity of a "conspiracy" can have any material effect on Plaintiffs' claims, *NuStar*, 486 F. Supp. 3d at 1285, Plaintiffs "hid[] the farm's move" in precisely the sense Lizza reported—that prior to August 2018, "[a]s far as [Lizza] could tell," Lizza could not find any "public[] mention[]" by the Congressman that "his family dairy is no longer in Tulare," referring to his father and brother. ¶ 58. The Congressman admitted in discovery he had never made any such documented public statement, while admitting he attended a rally for Rep. Steve King in Iowa in 2010, confirming Lizza's reporting. ¶¶ 101–04. The NuStar Plaintiffs also identified no public statements they made about the Congressman. ¶¶ 109–11. They corroborated Lizza's report that they insisted the *Dairy Star* omit the Congressman in its story on NuStar, then demanded it take down the article to avoid "publicity" in response to Lizza's reporting. ¶ 112. Anthony Jr.

followed the Congressman's advice not to speak to Lizza, and they conferred how to get the Article retracted, with NuStar hiring the Congressman's attorney for that purpose. ¶¶ 273, 334–35. It is thus not only true the NuStar Plaintiffs did not publicize NuStar's connection to the Congressman, but that they tried—in harmony with him—to suppress that information.

With respect to the other "juxtapose[d] . . . facts," it is undisputed that **(b)** Midwestern dairies, and **(c)** NuStar specifically, rely on undocumented labor, and that **(d)** the Congressman "has long supported moderate immigration reform . . . including amnesty for many undocumented people," as the Article said. ¶¶ 273, 334–35; *supra* at 13–14, 19–21.

As to **(e)**, the Congressman admits he knows "firsthand" his family does not verify work authorization, supporting the substantial truth of the implication that he had "knowledge that the farm employed undocumented labor . . . ." *Nunes*, 12 F.4th at 898; ¶¶ 245–52. In a parallel to the objective, verifiable evidence proving an employer's knowledge under the IRCA, the Eighth Circuit similarly recognized that the "verifiable," "important facts can be confirmed or refuted" concerning the Congressman's knowledge of NuStar's unauthorized hiring. *Nunes*, 12 F.4th at 898. An "issue[] of verifiable fact" is "[w]hether Nunes *knew about the farm's hiring practices*, including the *potential use of undocumented labor* . . . ." *Id.* (emphases added). Such a showing could make the implication about his knowledge "sufficiently factual to be susceptible of being proved true or false," so as not to run afoul of the First Amendment's prohibition on defamation liability for unverifiable statements. *Id.* (quoting *Milkovich*, 497 U.S. at 21).

The undisputed evidence in the record shows the Congressman knows NuStar's "hiring practices," which lead necessarily to "the potential use of undocumented labor."

*The Congressman admitted under oath he knows his family does not verify work authorization.* He testified repeatedly that he used to work closely with his family, he knows

48

their hiring practices, and he knows their practices have not changed.  ¶ 245 ("I do have obviously firsthand knowledge . . . I was trained by my mother . . . . I can't imagine that they changed"); ¶ 246 ("I am familiar with the process . . . I'm quite sure that it wouldn't have changed"); ¶ 247.  He was unequivocal that when he worked with his family, their joint approach was that employees "can't be questioned by the employer"—it is thus "impossible" to verify documents.  ¶¶ 252–55 ("You'd have to accept their documentation as real, whatever they provide to you.").  His admissions under oath are compelling evidence of their truth.  *See* Fed. R. Evid. 801(d)(2)(A); *United States v. Lomas*, 826 F.3d 1097, 1105 (8th Cir. 2016).

   *The Congressman pleads specific facts based on his knowledge of NuStar's hiring practices.*  In his TAC, he alleges facts about NuStar's practices evincing his knowledge of them:

>   NuStar documents all labor and employment decisions.  Those records, including documents establishing both employment authorization and identity as well as Forms 1-9–Employment Eligibility Verifications, are kept and maintained by NuStar in the ordinary course of its business in accordance with Federal law.

*Nunes* [ECF No. 104] ¶ 10; *id.* at 21 (allegations are "based upon personal knowledge, public statements of others, and records in his possession").  His familiarity with NuStar's practices and conversations with his father about NuStar's records show the above allegations are based on his knowledge (though his legal conclusion that its hiring was "in accordance with Federal law" carries no weight).  *See Knudsen v. United States*, 254 F.3d 747, 752 (8th Cir. 2001) ("[F]actual statements in a party's pleadings are generally binding on that party . . . .").

   *The Congressman does not, and cannot, deny knowing that refusing to verify work authorization leads to "the potential use of undocumented labor."*  The "potential use of undocumented labor" is the natural consequence of failing to screen for them.  This is true as a matter of common sense and of law—the very purpose of I-9 verification is to prevent unauthorized hires through reasonable diligence.  *See Reyes*, 1994 WL 269183, at *7 (failure to

complete I-9 "frustrates the national policy by which employers and INS are intended to *assure that unauthorized aliens are excluded from the workplace*") (emphasis added); *Ketchikan*, 725 F.3d at 1111 (I-9 "provides concrete evidence" the employer "actually review[ed]" documents).

The Congressman's consistent legislative efforts to deal with the consequences of failing to screen unauthorized workers is strong evidence that he knows the most obvious consequence is their potential hire. For example, the FWMA he co-sponsored in 2019 would grant a path to legal residence for unauthorized dairy workers in the United States and forgive penalties for their use of a fake SSN, while at the same time instituting a new mandatory electronic verification system and expanding permits going forward. ¶¶ 303–08. The connection between failing to verify workers and the potential presence of unauthorized workers is so evident, he did not try to deny it. Rather, he claimed not to remember *any* of his legislative efforts and repeated "nobody knows who's legal": "Q. . . . Are there any bills that you can recall as you sit here today that you co-sponsored that relate to labor in the agriculture industry? A. No." ¶¶ 309–13 (regarding the FWMA, which he voted for a few months prior: "I have no idea what [that] is.").

If an employer refuses to verify documents, he will break the law in one of two ways: either he will commit perjury by signing the verification, or he will violate the law by failing to sign it, rendering the form "worthless." *Carter*, 1997 WL 1051432, at *31; *Reyes*, 1994 WL 269183, at *7 ("fail[ure] to attest in section 2, is a serious violation, implying avoidance of liability for perjury . . . ."). The Congressman cannot genuinely dispute his knowledge that failure to do I-9 verification is illegal and sanctions unauthorized hires. His family all but admits it. *See* ¶ 144 (Lori "[didn't] know" if she "wanted to learn" if her employees were authorized).

In short, though it is not Defendants' burden to prove the Congressman's knowledge of NuStar's practices and potential use of unauthorized workers, his admissions, pleadings, and

legislative acts only tend to prove it. The remainder of the record eviscerates any possibility he could carry his burden. His testimony that the Article "was exactly what we thought" despite Plaintiffs' refusal to engage with Lizza, strongly suggests he and his father spoke about NuStar's labor practices as reported in the Article (which is consistent with their habit of daily calls, on average). ¶¶ 261–62, 273–74, 334–35. His testimony that he identified a "potential[] source" for Lizza also tends to show he believes the Article's reporting is accurate. ¶ 324.

Opposite this evidence pointing to literal or substantial truth, the Congressman has nothing. That he never owned or managed NuStar is in the Article and does not disprove the above undisputed evidence, not least his testimony that he knows how his family operates. ¶¶ 245–52. Without evidence of falsity, and having rather admitted the opposite, his claim fails.

### C. The Congressman Cannot Meet His Burden to Prove Actual Malice.

On the motion to dismiss, the Eighth Circuit accepted as "plausible" that Lizza had actual malice as to the alleged implication. *Nunes*, 12 F.4th at 901. But plausibility is not enough to withstand summary judgment if discovery does not support the allegations. *See Horras v. Am. Cap. Strategies, Ltd.*, 729 F.3d 798, 807 (8th Cir. 2013) (Colloton, J., concurring in part). Lizza and Hearst produced every document they have relating to the reporting, Hearst was deposed, and Lizza was deposed twice. The Congressman must now "supply the specifics." *Graham v. Bd. of Educ.*, 8 F.4th 625, 627 (7th Cir. 2021); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (summary judgment "is the put up or shut up moment in a lawsuit").

This, he cannot do. The Congressman cannot put forth "clear and convincing" evidence that Lizza, subjectively, knew the implication was false. Indeed, the Congressman cannot even show, by a "clear and convincing" standard, that Lizza intended to convey the implication in the first place, a predicate showing of actual malice that logic and law require in implication cases.

51

### 1. The Congressman Must Present Clear and Convincing Evidence to Meet His Burden.

The First Amendment requires public official defamation plaintiffs to prove, by clear and convincing evidence, that challenged statements were made with actual malice. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984). This high bar furthers our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open . . . ." *Sullivan*, 376 U.S. at 270. Actual malice is "knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not." *Id.* at 280. "[R]eckless disregard" means the author "in fact entertained serious doubts as to the truth of their publication," with a "high degree of awareness of probable falsity." *Secrist v. Harkin*, 874 F.2d 1244, 1251–52 (8th Cir. 1989) (citations and alterations omitted). This entails extraordinary circumstances such as that "the story was fabricated" or "there were particular reasons to doubt sources." *Price v. Viking Penguin, Inc.*, 881 F.2d 1426, 1445 (8th Cir. 1989).

This inquiry turns on the defendant's subjective state of mind. *See Mercer v. City of Cedar Rapids*, 308 F.3d 840, 850 (8th Cir. 2002). Objective arguments that "a reasonably prudent man would [not] have published, or would have investigated," *St. Amant v. Thompson*, 390 U.S. 727, 730–31 (1968), or even that there was an "extreme departure from professional standards," *Harte-Hanks Commc'ns, Inc.*, 491 U.S. 657, 665 (1989), are insufficient.

A plaintiff alleging defamation by implication must necessarily show the defendant knew he was communicating the implication, to be able to "*realize[]* that his statement was false or that he subjectively entertained serious doubt as to [its] truth . . . ." *Bose*, 466 U.S. at 511 n.30 (emphasis added); Hon. Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* § 5:5.1[B] (5th ed. 2020) ("A person who believes and intends to say one thing is . . .

not guilty of 'actual malice,' merely . . . because those who hear the statement reasonably believe it to mean something different.").

Thus, a plaintiff must first "show with clear and convincing evidence that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material." *Saenz v. Playboy Enters., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988); *see also Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002) (same, quoting *Saenz*); *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 528 (6th Cir. 2007) (same). It is not enough to know "the defamatory meaning was . . . possible"; defendants must have known it was "likely, and [then] still made the statement despite their knowledge of that likelihood." *Kendall v. Daily News Publ'g Co.*, 716 F.3d 82, 90–92 (3d Cir. 2013). This has been described as the defendant's "communicative intent," and the plaintiff must also show actual malice toward the "falsity" of the meaning of the implication. *Id.* at 90; *Saenz*, 841 F.2d at 1318.

Even where a court finds the implication "clear and inescapable," that does not answer the question of whether the defendant harbored actual malice toward that meaning. *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 681–82 (9th Cir. 1990) (reversing verdict where evidence lacked "convincing clarity" that the defendant intended to convey the implication). To hold a defendant liable for implications she did not realize she was imparting "would create precisely the chilling effect on speech which the New York Times rule was designed to avoid." *Good Gov't Grp. of Seal Beach, Inc. v. Super. Ct.*, 22 Cal. 3d 672, 683–84 (1978).

This approach is consistent with the First Amendment concern that animates *Sullivan*. If publishers must guarantee the truth of statements concerning public officials before publishing them, that will result in "self-censorship" and a "chilling effect" on the free exchange of ideas. *Sullivan*, 376 U.S. at 279, 300–01. It follows that "[a] publisher reporting on matters of general

or public interest cannot be charged with the intolerable burden of guessing what inferences a jury might draw from an article and ruling out all possible false and defamatory innuendoes that could be drawn from the article." *Woods v. Evansville Press Co.*, 791 F.2d 480, 487–88 (7th Cir. 1986); *see also Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 632–33 (Tex. 2018).

The Congressman's burden to prove actual malice clearly and convincingly governs this motion. *See Anderson*, 477 U.S. at 255–56. *Anderson* rejected the argument that summary judgment should be denied where the defendant's "state of mind is at issue and the jury might disbelieve him or his witnesses as to this issue," stressing that a plaintiff opposing a motion must offer "concrete evidence from which a reasonable juror could return a verdict in his favor . . . ." *Id.* at 256. "It is not enough for the plaintiff merely to assert that the jury might . . . disbelieve the defendant's denial of legal malice." *Contemp. Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621–22 (2d Cir. 1988) (citation, quotation marks, and alterations omitted).

"The . . . question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Mercer*, 308 F.3d at 849 (quoting *Harte-Hanks*, 491 U.S. at 685–86) (citing *Bose*, 466 U.S. at 510–11). Specifically, "judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Mercer*, 308 F.3d at 849 (quoting *Harte-Hanks*, 491 U.S. at 685–86) (alterations and quotation marks omitted).

## 2. The Congressman Cannot Meet His Burden to Show Lizza Intended to Convey the Purported Implication.

Lizza was exact in what he did, and did not, report. The Article states the Congressman has "no financial interest in his parents' Iowa dairy operation," and it does not report any facts to suggest he is involved in the farm's operations. ¶ 79. It explains what the "secret" is: "So here's

54

the secret: The Nunes family dairy of political lore—the one where his brother and parents work—isn't in California." ¶ 80. Lizza intended that line to convey exactly what it said—that the secret concerned the farm's location, not whether it hired undocumented workers. *Id.*

When Lizza asked, "Why would the Nuneses, Steve King, and an obscure dairy publication all conspire to hide the fact that the congressman's family sold its farm and moved to Iowa?," he did not mean a legal conspiracy or formal agreement; he meant it in a vernacular sense, consistent with its dictionary meaning to "act in harmony." ¶ 81. The precise facts showing what he meant by this "conspiracy"—including Plaintiffs' attempts to suppress information connecting the Congressman to NuStar—are expressly laid out in the Article. *Id.* Nothing in discovery suggests Lizza intended to convey an "agreement" among the Nuneses, Rep. King, and the *Dairy Star*, or that he understood the Article to convey that. *Id.* Such a reading of the Article would never have occurred to him, if not for this suit. *Id.*

Against this straightforward explanation of Lizza's intent, which corresponds with the plain terms of the Article, the Congressman has no evidence—let alone "clear and convincing" evidence—that Lizza intended to convey a conspiracy to hide the hiring of undocumented workers in a legal sense, or that such an implication was ever brought to his attention prior to his Link. Without such evidence, the Congressman cannot meet his burden to prove fault.

### 3. The Congressman Cannot Meet His Burden to Show Lizza Believed the Implication Was False or Seriously Doubted Its Accuracy.

There is also no evidence at all showing Lizza knew the purported implication was false. Rather, the evidence shows Lizza—with good reason—believed the Congressman knows NuStar hires undocumented workers, discouraging him from publicly discussing the farm.

Lizza's extensive reporting file, comprising over 1,100 pages and interview records, informed his educated belief that Midwestern dairy farms run on undocumented labor as a matter

of necessity. ¶¶ 61, 65, 87. Among other facts, his research uncovered a prosecution of an Iowa dairy farmer for violations in hiring unauthorized workers, statements from dairy industry groups, and other documents showing it is widely known dairies commonly employ undocumented workers but have little alternative given the nature of the market. ¶ 88.

He continues to believe dairy farms widely use undocumented labor, the truth of which is not genuinely disputed and finds ample support in his reporting file. The prevalence of undocumented labor led him to believe, as his multiple, credible sources told him, NuStar understood the nature of its workforce. ¶¶ 63–76, 87. It seemed unlikely that a dairy could remain ignorant of its workers' status, and he believed NuStar knowingly hired undocumented workers. *Id.* As shown herein, there is no evidence that could have informed him this is false.

Having also reported on the Congressman for years and being aware of his record of sponsoring bills addressing the concerns of unauthorized dairy workers, Lizza continues to believe the Congressman knows his family hires undocumented workers. ¶ 90. This seemed another possible explanation why he did not speak publicly about NuStar, given the Republican Party's approach to immigration. *Id.* As Lizza wrote in the Article, he understood from prior reporting that the Nuneses speak frequently with one another about the farm. *Id.* He expected that they would have discussed immigration and the dairy labor pool. *Id.*

Neither the Congressman's September 2019 demand letter, nor his original complaint the same month, induced any doubt in Lizza's mind as to the accuracy of the implication that the Congressman "conspired" to hide NuStar's reliance on undocumented labor. ¶¶ 92–100. Both documents alleged several specific defamatory statements, the implication not among them. ¶ 94. Struck by the Congressman's failure to challenge the substance of his reporting, Lizza

tweeted on November 21, 2019 (a day after the Link) that the Congressman "didn't dispute the core finding that his family's dairy used undocumented immigrants." ¶ 96.

Though the retraction demand and complaint allege the "strong defamatory gist and false implication" was a conspiracy to conceal "criminal wrongdoing," neither identifies the "criminal wrongdoing." ¶ 97. The complaint describes the "conspiracy" as "that Plaintiff 'conspired' with his own family, Congressman King, and an Iowa dairy publication to 'hide' his family's 'secret' move to Iowa." *Id.* This is how the Congressman described the "conspiracy" himself, on his website. ¶¶ 430–31 (devinnunes.com describing Article as "falsely claiming that Nunes conspired to hide a business venture operated by his family members in Iowa").

Now discovery has proven how wide-ranging Lizza's reporting activities were, ¶¶ 52–75, vague allegations alone could not meet the Congressman's burden to prove actual malice.

It is well established that a denial by plaintiff prior to publication is not "clear and convincing" evidence the defendant knew the publication was false or harbored serious doubts as to its truth. *Harte-Hanks*, 491 U.S. at 691 n.37 ("Of course, the press need not accept denials, however vehement; such denials are so commonplace . . . that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." (citation and quotation marks omitted)).

At summary judgment, courts routinely dismiss defamation claims where the plaintiff's evidence of actual malice is that they denied the reporting. *See, e.g.*, *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1043 (10th Cir. 2013) (affirming summary judgment and finding denial was not clear and convincing evidence of actual malice: "Bensinger was not required to accept Banks's denials of the film's allegations as conclusive, or prefer them

over apparently creditable accusations.");[19] *Harris v. City of Seattle*, 152 F. App'x 565, 569 (9th Cir. 2005) (affirming summary judgment and finding "[t]he fact that [plaintiff] issued such a generalized denial falls well short of demonstrating that [defendant] acted with malice."); *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285 (D.C. Cir. 2003) (affirming summary judgment for defendant; denial did not give defendant "obvious reasons to doubt the veracity of her publication"); *Bertrand v. Mullin*, 846 N.W.2d 884, 900 (Iowa 2014) ("[W]e reject the claim that actual malice was established by the evidence that Mullin continued to air the commercial after Bertrand publicly told him the implication was false.").[20] A denial "only 'serves to buttress a case for actual malice when there is something in the content of the denial or supporting evidence produced in conjunction with the denial that carries a doubt-inducing quality.'" *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281–82 (S.D.N.Y. 2013) (citation omitted) (granting Rule 12(b)(6) motion), *aff'd*, 807 F.3d 541 (2d Cir. 2015), and *aff'd*, 622 F. App'x 67 (2d Cir. 2015).

Here, the Congressman's demand and original complaint did not even specifically identify the defamatory meaning or inference he now challenges, let alone deny it. They gave Lizza no reason to doubt his thoroughly researched piece. *See Harris*, 152 F. App'x at 569; *Spacecon*, 713 F.3d at 1043 (denial does not require publisher to doubt his sources).

Put simply, the Congressman has no evidence that Lizza knew his reporting was false.

### D. The Congressman Has Not Been Damaged by the Link to the Article.

Because the Congressman failed to comply with California's retraction statute, he is

---

[19]     *Spacecon* is particularly instructive, granting summary judgment on the absence of actual malice having previously found the plaintiff's denial was enough to plead actual malice, illustrating the higher burden on a Rule 56 motion. *Spacecon Specialty Contractors, LLC v. Bensinger*, 782 F. Supp. 2d 1194, 1203 (D. Colo. 2011), *aff'd*, *Spacecon*, 713 F.3d at 1043; *Spacecon Specialty Contractors, LLC v. Bensinger*, No. 09-CV-02080, 2010 WL 3720166, at *2 (D. Colo. Sept. 15, 2010).

[20]     *See also Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 242 (D.C. Cir. 2021) (finding "no support in our First Amendment case law" for proposition that publisher must "credit" a plaintiff's "denials").

58

limited to special damages caused by the Link, which he cannot prove.  *See* June 1 Order at 15, 22; *Anschutz Ent. Grp., Inc. v. Snepp*, 171 Cal. App. 4th 598, 640–41 (2009).

His failures to comply with the retraction statute were manifold.  His demand was untimely, coming nearly a year after he was aware of the Article.  ¶¶ 55, 92, 321; Cal. Civ. Code § 48a(b).  His demand preceded his suit by only five days, not the required three weeks.  Cal. Civ. Code § 48a(b).  He sought no retraction of the Link, the only potentially actionable "publication."  He also failed to specify the implication at issue, which is especially important in "length[y] and complex[]" pieces, like the Article.  *Gomes v. Fried*, 136 Cal. App. 3d 924, 938 (1982) (statement must be "specif[ied]" with "particularity"); *Kapellas v. Kofman*, 1 Cal. 3d 20, 31 (1969) ("adequacy of the notice turns on whether the publisher should reasonably have comprehended which statements plaintiff . . . wished corrected"); *Anderson v. Hearst Publ'g Co.*, 120 F. Supp. 850, 853 (S.D. Cal. 1954) (demand to retract "certain statements" insufficient).

The Congressman does not even plead "special damages," or specific economic or pecuniary loss suffered.  Cal. Civ. Code § 48a (including damages to "property, business, trade, profession, or occupation"); *Martin v. Wells Fargo Bank*, No. 17-CV-03425, 2018 WL 6333688, at *2 (C.D. Cal. Jan. 18, 2018); *Nunes v. Cable News Network, Inc.*, 520 F. Supp. 3d 549, 561 (S.D.N.Y. 2021) (dismissing the Congressman's complaint making nearly identical generalized damages demands), *aff'd*, 31 F.4th 135 (2d Cir. 2022).

He also has produced no evidence of special damages.  After the Link he kept his Congressional salary, then more than tripled it as CEO of Truth Social; his fundraising also increased by multiples after the Article.  ¶¶ 378–99.  He alleges no quantifiable damage from the Link, as distinct from the Article—his first through fourth pleadings all seek the same amounts, even as the first preceded the Link, and the fourth is based entirely on the Link.  ¶¶ 400–03.

The Congressman's $77.5 million demand is not tethered to any methodology or calculation of loss. It is based on "how much information's out there," after "look[ing] at all the posts" and "overwhelming number of views," arriving at a "round number that [he] thought was appropriate." ¶ 404. He cannot remember the number of posts or views ("it was 10 or 15 or 20 million times") and does not know how they add up to $77.5 million, musing, "well, what's that [post or view] worth, you know, dollar, two dollars, three dollars? I don't know." ¶¶ 405–07.

The Congressman is a plaintiff in several other defamation suits, each seeking an eye-popping sum calculated a similar way.[21] He has not "ever tried to distinguish between the damages" caused by these different publications, though he says at least one article at issue in another suit is "very similar to" the Article linked in the Link. ¶¶ 417, 428–29.

The immense sum sought here has no connection with any special damages, which under California law is fatal to the Congressman's claim.

## CONCLUSION

Defendants respectfully request that the Court enter summary judgment for them.

[*signature block on next page*]

---

[21]    ¶¶ 408–27 ($250 million from *Washington Post*, $435 million from CNN, $250 million from Twitter, all calculated using a "similar" method).

Dated:  October 25, 2022.                    **Ryan Lizza and Hearst Magazine Media, Inc.,**
                                             **Defendants**

                                             /s/ Jonathan R. Donnellan
                                             Jonathan R. Donnellan, *Lead Counsel*\*
                                               jdonnellan@hearst.com
                                             Ravi R. Sitwala\*
                                               rsitwala@hearst.com
                                             Nathaniel S. Boyer\*
                                               nathaniel.boyer@hearst.com
                                             Sarah S. Park\*
                                               sarah.park@hearst.com
                                             Nina Shah\*
                                               nina.shah@hearst.com
                                             Kristen Hauser\*
                                               khauser@hearst.com
                                             The Hearst Corporation
                                             Office of General Counsel
                                             300 West 57th Street
                                             New York, New York 10019
                                             Telephone: (212) 841-7000
                                             Facsimile: (212) 554-7000
                                             *\*Admitted Pro Hac Vice*

                                             Michael A. Giudicessi
                                               michael.giudicessi@faegredrinker.com
                                             Nicholas A. Klinefeldt
                                               nick.klinefeldt@faegredrinker.com
                                             Susan P. Elgin
                                               susan.elgin@faegredrinker.com
                                             Faegre Drinker Biddle & Reath LLP
                                             801 Grand Avenue, 33rd Floor
                                             Des Moines, Iowa 50309-8003
                                             Telephone: (515) 248-9000
                                             Facsimile: (515) 248-9010

                                             Scott W. Wright\*
                                               scott.wright@faegredrinker.com
                                             Faegre Drinker Biddle & Reath LLP
                                             2200 Wells Fargo Center/90 S. 7th Street
                                             Minneapolis, Minnesota 55402
                                             Telephone: (612) 766-7000
                                             Facsimile: (612) 766-1600
                                             *\*Admitted Pro Hac Vice*

                                             **Attorneys for Defendants**

**Certificate of Service**

The undersigned certifies that a true copy of the foregoing **Defendants' Brief in Support of Their Resisted Motion for Summary Judgment Against Plaintiffs Devin G. Nunes, NuStar Farms, LLC, Anthony Nunes, Jr., and Anthony Nunes, III** was served upon the following parties through the Court's CM/ECF electronic filing system on October 25, 2022.

/s/  Jonathan R. Donnellan

Jonathan R. Donnellan

Copy to:

Bill McGinn
  *bmcginn@mcginnlawfirm.com*
Steven S. Biss
  *stevenbiss@earthlink.net*

*Attorneys for Plaintiffs*