# Exhibit D
# (Redacted)

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF IOWA
2                      WESTERN DIVISION
3        NuStar Farms, LLC,      )
         Anthony Nunes, Jr., and)
4        Anthony Nunes, III,    ) CASE NO.
                                ) 5:20-cv-04003-CJW-
5             Plaintiffs,        ) MAR
                                )
6             vs.               ) VIDEOTAPED
                                ) 30(b)(6)
7        Ryan Lizza and Hearst  ) DEPOSITION OF
         Magazine Media, Inc.,  ) ANTHONY NUNES, III
8                                )
              Defendants.        )
9        -----------------------)
10
11
12
13          CONFIDENTIAL - ATTORNEYS' EYES ONLY
14
15
16              THE VIDEOTAPED 30(b)(6)
         DEPOSITION OF ANTHONY NUNES, III, taken before
17       Chris A. Quinlin, Registered Professional
         Reporter and Notary Public of the State of Iowa,
18       commencing at 10:07 a.m., July 14, 2021, at
         801 Grand Avenue, 33rd Floor, Des Moines, Iowa.
19
20
21
22          Reported by:  Chris A. Quinlin, R.P.R.
23
24
25   Job No. CS4693408
```

**EXHIBIT D**
Case 5:19-cv-04064-CJW-MAR   Document 156-6   Filed 06/02/23   Page 2 of 105   **App. 123**

Page 2

```
 1        A P P E A R A N C E S
 2  Plaintiffs by: STEVEN S  BISS
             Attorney at Law
 3       LAW OFFICES OF STEVEN S  BISS
         300 West Main Street
 4       Suite 102
         Charlottesville, VA 22903
 5       (202) 318-4098
         stevenbiss@earthlink net
 6
    Defendants by: NATHANIEL S  BOYER
 7       KRISTEN HAUSER
             Attorney at Law
 8       THE HEARST CORPORATION
         Office of General Counsel
 9       300 West 57th Street
         New York, NY 10019
10       (212) 841-7000
         nathaniel boyer@hearst com
11       khauser@hearst com
12       NICHOLAS A  KLINEFELDT
         SUSAN P  ELGIN
13           Attorneys at Law
         FAEGRE DRINKER BIDDLE & REATH LLP
14       801 Grand Avenue
         33rd Floor
15       Des Moines, IA 50309
         (515) 248-9000
16       nick klinefeldt@faegredrinker com
         susan elgin@faegredrinker com
17
    Videographer:  ANDREA KREUTZ
18
    Also present:  ANTHONY NUNES, JR
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   Examination by:    Page
 3   Mr. Boyer        7
 4
 5   Exhibit        Marked
 6   Exhibit 7        5
 7   Exhibit 8       16
 8   Exhibit 9       23
 9   Exhibit 10      25
10   Exhibit 11      71
11   Exhibit 12     114
12   Exhibit 13     150
13   Exhibit 14     171
14   Exhibit 15     183
15   Exhibit 16     197
16   Exhibit 17     201
17   Exhibit 18     201
18   Exhibit 19     206
19   Exhibit 20     214
20   Exhibit 21     221
21   Exhibit 22     230
22   Exhibit 23     231
23   Exhibit 24     235
24   Exhibit 25     237
25   Exhibit 26     250
```

Page 4

```
 1      I N D E X - Continued
 2   Exhibit        Marked
 3   Exhibit 27     254
 4   Exhibit 28     257
 5   Exhibit 29     260
 6   Exhibit 30     264
 7   Exhibit 31     266
 8   Exhibit 32     267
 9   Exhibit 33     269
10   Exhibit 34     271
11   Exhibit 35     273
12   Exhibit 36     274
13   Exhibit 37     277
14   Exhibit 38     282
15   Exhibit 39     296
16   Exhibit 40     303
17   Exhibit 41     316
18   Exhibit 42     316
19   Exhibit 43     325
20   Exhibit 44     342
21   Exhibit 45     350
22   Exhibit 46     352
23   Exhibit 47     402
24
25
```

Page 5

```
 1           P R O C E E D I N G S
 2        (Exhibit 7 was marked for
 3   identification by the reporter.)
 4        THE VIDEOGRAPHER:  Good morning.
 5   We are going on the record at 10:07 a m. on
 6   Wednesday, July 14th, 2021.
 7        Please note that the microphones
 8   are sensitive and may pick up whispering,
 9   private conversations, and cellular
10   interference.  Please turn off all cell phones
11   or place them away from the microphones, as they
12   can interfere with the deposition audio.  Audio
13   and video recording will continue to take place
14   unless all parties agree to go off the record.
15        This is Media Unit 1 of the video
16   recorded 30(b)(6) deposition of Anthony Nunes,
17   III, taken by counsel for defendant in the
18   matter of NuStar Farms, LLC, Anthony Nunes, Jr.,
19   and Anthony Nunes, III, versus Ryan Lizza and
20   Hearst Magazine Media, Inc., filed in the U.S.
21   District Court, Northern District of Iowa,
22   Western Division, Case Number
23   5:20-cv-04003-CJW-MAR.
24        This deposition is being held at
25   Faegre Drinker Biddle & Reath located at
```

2 (Pages 2 - 5)

Page 6

1    801 Grand Avenue, 33rd Floor, Des Moines, Iowa
2          My name is Andrea Kreutz from the
3    firm Veritext Legal Solutions, and I am the
4    videographer.
5          The court reporter is Chris
6    Quinlin from the firm Veritext Legal Solutions.
7    I am not related to any party in
8    this action, nor am I financially interested in
9    the outcome.
10         Counsel and all present in the
11   room and everyone attending remotely will now
12   state their appearances and affiliations for the
13   record. If there are any objections to
14   proceeding, please state them at the time of
15   your appearance, beginning with the noticing
16   attorney, please.
17         MR. BOYER: Good morning.
18   Nathaniel Boyer from The Hearst Corporation on
19   behalf of the defendants. I'm joined in the
20   room at the moment by Kristen Hauser, my
21   colleague, also from The Hearst Corporation, and
22   Susan Elgin of the Faegre Drinker Biddle & Reath
23   firm.
24         MR. BISS: I'm Steve Biss. I
25   represent the plaintiffs.

Page 7

1          THE VIDEOGRAPHER: Thank you.
2          Will the court reporter please
3    swear in the witness.
4          ANTHONY NUNES, III,
5    called as a witness, having been first duly
6    sworn, testified as follows:
7          DIRECT EXAMINATION
8    BY MR. BOYER:
9    Q.  Good morning, Mr. Nunes.
10   A.  Morning.
11   Q.  Have you testified before?
12   A.  In this case, no.
13   Q.  Any case?
14   A.  Yes.
15   Q.  Where?
16   A.  In Rock Rapids.
17   Q.  Where is Rock Rapids? In Iowa?
18   A.  Yes.
19   Q.  Okay. What was that case about?
20   A.  Some cattle dealing we had when we
21   bought the dairy.
22   Q.  Got it. Is that -- Is that the lawsuit
23   with the -- I think it's the Dodens is the last
24   name? Is that lawsuit, or is it the
25   Zylstras?

Page 8

1    A.  Neither one.
2    Q.  Neither one? It was a different one?
3    Okay. And you were deposed in that case?
4    A.  Yes.
5    Q.  All right. So you probably remember a
6    little bit about sort of the basic rules of
7    depositions, is that right, in terms of the --
8    how to answer questions and all that?
9    A.  Yes.
10   Q.  Okay. Do you have any medical
11   condition that impairs your memory?
12   A.  No.
13   Q.  Do you have any medical conditions that
14   impair your ability to tell the truth here
15   today?
16   A.  No.
17   Q.  Are you taking any medication that
18   impairs your memory or ability to take the
19   truth?
20   A.  No.
21   Q.  Or tell the truth. Excuse me.
22         So although you have been deposed
23   before -- Oh, let me just close the loop. Have
24   you testified in any other settings before?
25   A.  No.

Page 9

1    Q.  So you've only testified once before,
2    and it was that deposition in Rock Rapids?
3    A.  Yep.
4    Q.  Just a brief refresher on the rules in
5    the deposition, in terms of how we should go
6    about this. We'll try not to speak over each
7    other so that the court reporter can get
8    everything down. I'll do my best to let you
9    finish your answers and just ask that you please
10   do the same, let me finish my questions. Sound
11   okay?
12   A.  Yes.
13   Q.  If you don't understand a question,
14   just let me know. All that I ask, if you answer
15   the question, I will assume you understood it,
16   so it's good to get clarity if you don't
17   understand it. Is that okay?
18   A.  Yes.
19   Q.  If you need a break at any time, just
20   let me know. All that I ask is that we don't
21   take a break while a question is pending. Sound
22   okay?
23   A.  Yes.
24   Q.  And you understand that you're here
25   under oath today just as if you were testifying

3 (Pages 6 - 9)

Page 10

1    before a judge or a jury; right?
2        A.   Yes.
3        Q.   And your answers will be truthful and
4    complete; correct?
5        A.   Yes again.
6            MR. BOYER:  So you can hand him
7    number 7.  I'll slide it.  I'm happy to report
8    the document slides seamlessly across the table.
9        Q.   Mr. Nunes, you've been handed a
10   document that's been marked as Defendants'
11   Exhibit 7.  Do you recognize this document?
12       A.   It looks like I do, yes.
13       Q.   Okay.  Well, have you seen it before --
14       A.   It appears -- Yes.
15       Q.   Do you know what it is?
16       A.   I think so.  It's the -- It's the
17   original filing of the lawsuit, I assume.
18       Q.   Okay.  Let me just make sure I handed
19   you the correct document.  Could you -- Could I
20   ask you to please slide that back to me?
21           Okay.  The document reads at the
22   top "Defendants' Amended Notice of Video
23   Recorded Deposition."  Do you see that?
24       A.   Okay.  Yep.
25       Q.   Yep.  So this is the -- do you

Page 11

1    understand that this is the notice of deposition
2    that brings you here today?
3        A.   Okay.
4        Q.   Okay.  Is this the first time you're
5    seeing this particular document?
6        A.   I see lots of documents.  I don't know.
7    I would say yes.  I don't -- I don't know.  I
8    haven't seen it.
9        Q.   Okay.  Just there was a little -- it
10   was a little unclear there.  It sounds like
11   you're saying you -- as you sit here, you don't
12   recall if you've seen it or not; is that right?
13       A.   I've seen lots of papers.  There's lots
14   of e-mails.  You guys seen them.  There's lots
15   of e-mails go back and forth.  I don't -- I
16   don't know if I seen this one or not.  I can't
17   say.
18       Q.   Okay.  Why don't we take a look at a
19   couple portions of it and see if it refreshes
20   your recollection.
21       A.   Okay.
22       Q.   Take a look at page -- starting on page
23   4 there's a list that starts with topics.
24       A.   Okay.
25       Q.   Do you see that?  Do you see page 4, it

Page 12

1    says "Topics" at the top?
2        A.   Yes, I do.
3        Q.   And then you see there's a list of a
4    number of topics going from 1 all the way to
5    Topic 25, which ends on page 8?
6        A.   Okay.
7        Q.   Okay.  Have you reviewed those topics?
8        A.   Nope.
9        Q.   Okay.  Do you understand that you've
10   been identified as the person with the most
11   knowledge on these topics on behalf of the
12   company?
13       A.   Yes.
14       Q.   Okay.  So although you haven't actually
15   reviewed the topics, you believe you are the
16   person who has the most knowledge concerning
17   them?
18       A.   Yes.
19       Q.   Okay.  And you understand that today
20   you're speaking on behalf of the company?
21       A.   Yes.
22       Q.   So -- And by the way, when I said
23   "topics" there, there were Topics 1 to 25.
24   You're the person with the most knowledge on
25   behalf of all 25 topics?

Page 13

1        A.   I don't know.  I didn't read them all.
2    I don't know if I'd be the -- exact one, but
3    yes, I should.
4        Q.   Okay.  You're -- You're most likely to
5    be the right person.  Is that what you're
6    saying?
7        A.   Yes.
8        Q.   Okay.  So in the course of this
9    deposition I may refer to you, but when I do so,
10   because you're representing the company, unless
11   I say otherwise, I'm referring to NuStar.  Okay?
12       A.   Okay.
13       Q.   Sound fair?
14       A.   Yes.
15       Q.   Okay.  So how did you prepare to
16   testify today?  What did you do?
17       A.   Talked to my attorney.
18       Q.   When?
19       A.   Yesterday.
20       Q.   For how long?
21       A.   A couple hours.
22       Q.   Okay.  And that was an in-person
23   meeting or by telephone?
24       A.   In person.
25       Q.   Okay.  And the attorney in question

4 (Pages 10 - 13)

Page 14

1 here is Mr. Biss, who is in the room with us
2 today?
3    A. That is correct.
4    Q. Anything else you did to -- to prepare?
5    A. No.
6    Q. Did you review any documents?
7    A. Yeah. I think we went over some I-9s.
8    Q. Okay. Do you remember which I-9s you
9 went over?
10    A. No, I don't recall. We were just going
11 through the paperwork.
12    Q. Okay. So you remember reviewing some
13 I-9s. Anything else you remember reviewing?
14    A. No.
15    Q. Okay. So -- And did you review any
16 documents at a time other than when you were
17 meeting with your lawyer to prepare for the
18 deposition today?
19    A. No.
20    Q. Okay. So the sum total of what you've
21 done to prepare for the deposition is meet with
22 your lawyer for a couple hours yesterday, during
23 which time you reviewed a handful of I-9s?
24    A. That's correct.
25    Q. Okay. Did you talk to anyone else at

Page 15

1 NuStar in order to prepare for this deposition?
2    A. My father.
3    Q. Okay. And were those conversations
4 that you had with your father with Mr. Biss as
5 well? Was he in the room at the time?
6    A. Yes.
7    Q. Okay. Did you talk to him in
8 conversations where Mr. Biss was not a part of
9 that conversation to prepare for this
10 deposition?
11    A. No.
12    Q. Okay. Okay. And just to be clear, the
13 document that's in front of you is Defendants'
14 Exhibit 7. That was not among the documents you
15 reviewed in order to prepare for today's
16 deposition?
17    A. That is correct. I did not look at
18 that. I did not look at that paper.
19    Q. Okay. So, Mr. Nunes, you produced a
20 document to us as Plaintiffs' Exhibit -- or
21 excuse me. It was Bates stamped PX001. I just
22 want to understand who the people are in this
23 photograph that -- that you guys produced to us.
24 Okay?
25       MR. BOYER: You can mark it as

Page 16

1 Defendants' 8.
2       (Exhibit 8 was marked for
3       identification by the reporter.)
4    Q. Mr. Nunes, you've been handed a
5 document that's been marked as Defendants'
6 Exhibit 8. I believe it bears Bates stamp
7 PX001.
8       THE WITNESS: Did we -- Did we
9 give that picture?
10    Q. I just want to know who they are in the
11 photo. I'm not concerned with the child, who I
12 assume is the daughter of one of the -- daughter
13 of one of the people in this, but who are the
14 adults in this photo?
15    A. Me, my wife Lori, and my deceased
16 mother-in-law.
17    Q. Okay. Well, I'm sorry -- was this
18 the -- the one who passed away somewhat
19 recently, the mother-in-law?
20    A. No. She passed away like six, seven
21 years ago.
22    Q. I apologize. I just received notice
23 that there was some deaths in the family
24 recently, and I just wanted to offer my
25 condolences in that regard.

Page 17

1       But okay. But just in terms of
2 the people on the left, it's yourself and then
3 your wife Lori; correct?
4    A. Correct.
5    Q. Okay. You can set that aside.
6       You live at ▮▮▮▮▮▮▮ Drive;
7 right?
8    A. That's correct.
9    Q. A three-bedroom house; correct?
10    A. Yes.
11    Q. Do you have anybody other than family
12 members living with you in that house?
13    A. No.
14    Q. Okay. You own some other residential
15 properties in Sibley too; correct?
16    A. No.
17    Q. How about ▮▮ --
18    A. When you say "you," you mean NuStar
19 Farms, LLC; correct?
20       MR. BISS: Yeah, because that's
21 what you said, Nate.
22    Q. Oh, no. That's a very good correction.
23 I appreciate it.
24       NuStar doesn't own any other
25 residential properties in Sibley?

5 (Pages 14 - 17)

Page 18

1  A. No. They only own that -- the
2  ████ Drive.
3  Q. Got it. But you, meaning Anthony III,
4  and Lori Nunes own a couple other residential
5  properties in Sibley; right?
6  A. Yeah, that's correct. So I just
7  want -- let me make sure I'm not confused here.
8  Are we talking -- Are we going to do me today,
9  or are we going to do the corporation today?
10  Because it's two different -- you know --
11  Q. Your -- Your --
12  A. Are we going to cross over?
13  Q. Your clarifying -- Your clarifying
14  point a moment ago was a good one. It's going
15  to be the corporation unless I say otherwise. I
16  failed to say otherwise in that question, and
17  you therefore corrected me appropriately.
18  A. Okay.
19  Q. Yes.
20  A. I just want to make sure I understand.
21  Q. Right. So now for the moment let's
22  talk about the other residential properties that
23  you, Anthony III, own. Okay? You own two other
24  residential properties?
25  A. With my wife, yes.

Page 19

1  Q. Gotcha. One is ████ Street
2  Northeast; right?
3  A. I don't remember the address exactly.
4  Q. It's the place where ████
5  lives; right?
6  A. Yeah, if you say so.
7  Q. Well, he lives in one of your houses;
8  right?
9  A. That's correct.
10  Q. Okay. One of the houses you own;
11  right?
12  A. That's correct.
13  Q. And his -- how long has he lived there?
14  A. Since we bought it.
15  Q. Okay. And you bought it -- Let me
16  check. Do you remember when you bought ████?
17  A. I don't recall.
18  Q. Okay. The records seem to indicate it
19  was from March -- March 2015 you bought it. Is
20  that right?
21  A. Okay. Yeah.
22  Q. That sounds about right?
23  A. Sounds similar.
24  Q. Okay. Great. And you bought -- And
25  ████ has lived there since you bought

Page 20

1  it?
2  A. Yes.
3  Q. Why did you buy the house?
4  A. So he could move closer, because he was
5  living in Worthington.
6  Q. Got it. And I've heard ████
7  sometimes referred to as ████ Are you
8  familiar with that nickname for him?
9  A. Maybe a nickname, yeah.
10  Q. Okay. But you've heard him -- I just
11  want to -- for clarify -- to clarify, the person
12  who has a nickname of ████ is the person you
13  understand to be ████; is that right?
14  A. That is correct.
15  Q. Okay. And we'll get back to this in a
16  bit. ████ has been with the -- Excuse me.
17  ████ has been with the farm for a long
18  time; correct?
19  A. That's correct.
20  Q. All right. Let's talk about the other
21  residential property that I believe Anthony
22  Nunes, III, owns. And that's -- that's
23  ████ Street; is that correct?
24  A. Okay.
25  Q. That's where ████ lives; right?

Page 21

1  A. That's correct.
2  Q. And by ████
3  ████ right?
4  A. That's correct.
5  Q. He's another longtime employee;
6  correct?
7  A. That is correct.
8  Q. Does ████ live with
9  him in that house?
10  A. Nope.
11  Q. No. Okay. Did he at some point in
12  time live there?
13  A. Nope.
14  Q. Okay. All right. What about ████
15  ████? Does he live in a house that
16  Anthony -- the Nunes -- that you, Anthony Nunes,
17  III, own?
18  A. No. You already stated the two
19  properties that I had.
20  Q. Okay.
21  A. So there is no other ones.
22  Q. Okay. Are you aware of anyone else
23  living in those houses other than -- Well, let's
24  take them one at a time. Starting with the
25  house in which ████ lives, is there

6 (Pages 18 - 21)

Page 22

1  anyone else living in the house?
2      A.  His wife.
3      Q.  Okay.
4      A.  He lives there with his wife.
5      Q.  Okay.  Any -- Anyone else?
6      A.  I don't know if his kids are -- I think
7  his son bought a house somewhere else.  I
8  don't -- I don't think he's living there
9  anymore.
10     Q.  And his son is ████?
11     A.  Yes.
12     Q.  Okay.  ████ worked for you for some
13 period of time; right?
14     A.  Yeah.  Yeah.  When he was in high
15 school.
16     Q.  Okay.  And ████ Let me actually close
17 the loop on ██.  Are you aware of anyone else
18 having lived in that house since you owned it?
19     A.  No.
20     Q.  And then ████ Street, the one
21 where ████ lives, who else lives there?
22     A.  Nobody.
23     Q.  Nobody else?  Just him?
24     A.  Yep.
25     Q.  Okay.  And at any point in time are you

Page 23

1  aware of anyone else living in that house since
2  you've owned it?
3      A.  No.
4      Q.  All right.
5          MR. BOYER:  Let's mark this as
6  number 9.
7          (Exhibit 9 was marked for
8          identification by the reporter.)
9      Q.  Do you recognize this document,
10 Mr. Nunes?  You can flip through it.
11     A.  No.
12     Q.  Okay.  Take a look at the last page of
13 the document.  This is a -- appears to be a
14 verification signed by Lori Nunes; correct?
15     A.  That's what it looks like.
16     Q.  So this document is a list of all
17 employees/workers of NuStar Farms since its
18 formation, along with various other information
19 relating to each of those workers.  Were you
20 involved in preparing this document?
21     A.  No.
22     Q.  Okay.  Would -- Who would be the person
23 with the most knowledge concerning this
24 particular document at NuStar?
25     A.  Lori Nunes.

Page 24

1      Q.  Okay.  So for documents -- questions
2  concerning this, I guess I should talk to Lori
3  Nunes, huh?
4      A.  Sure.
5      Q.  Do you have any reason to think that
6  there would be -- Well, strike that.
7          I may still refer to this over
8  the course of the day, just because, I mean,
9  this is NuStar's response to Interrogatory
10 Number 1, and you're here on behalf of NuStar in
11 its corporate capacity, but I appreciate what
12 you just said, that Lori Nunes was the one who
13 worked on it.
14         The one thing I just want to
15 point out, though, and I apologize, because
16 things might have printed upside down, on the
17 back of the first page, and these pages aren't
18 numbered, you see -- you see ████, and
19 I apologize in advance if my pronunciation is
20 off, first name ████  It's about the fifth
21 person down on that page.  Do you see that?
22     A.  Okay.
23     Q.  You see that spot; right?
24     A.  Yes.
25     Q.  Okay.  It says his address is ████

Page 25

1  Street; right?
2      A.  That's what it says.
3      Q.  Right.  So does he actually live at --
4      A.  No.
5      Q.  -- ████ house?
6      A.  No.  It must be a clerical error of
7  some sort.
8      Q.  Okay.  Do you know where ████
9  ████ lives?
10     A.  I don't know his address.  I know where
11 his house is, yes, but I don't know where he
12 lives.
13     Q.  Okay.  Got it.  All right.  So we'll
14 get back to those topics here in a bit.  Let
15 me -- You can set aside Defendants' 9, but keep
16 it handy, because we might refer to it from time
17 to time throughout the day.
18         (Exhibit 10 was marked for
19         identification by the reporter.)
20     Q.  Mr. Nunes, you've been handed a
21 document that's been marked as Defendants'
22 Exhibit 10.  I want to use this document just to
23 kind of talk about the beginnings of NuStar and
24 the move to Iowa.  Okay?  So first of all, do
25 you recognize this document?

7 (Pages 22 - 25)

1    A.  Yes.
2    Q.  What is it?
3    A.  It's an article done on us.
4    Q.  Okay.  In a publication called the
5  Dairy Star; correct?
6    A.  That's correct.
7    Q.  And you understand that to be an
8  industry publication in, I guess, the Iowa and
9  Minnesota area about the dairy industry; right?
10    A.  I don't know.  I don't know where its
11  exact locations are.
12    Q.  Got it.  Do you subscribe to the Dairy
13  Star?
14    A.  No.
15    Q.  Okay.  Do you read it from time to
16  time?
17    A.  No.
18    Q.  All right.  But you recall this
19  interview being done by you back in 2009; right?
20    A.  That's correct.
21    Q.  All right.  And the article talks about
22  how and when you and your family moved to --
23  you, meaning Anthony Nunes, III, and your --
24  some members of your family moved to Iowa and
25  formed NuStar; correct?

1    A.  Yes.
2    Q.  Now, the article does not mention Devin
3  Nunes; right?
4    A.  That's correct.  I do believe so.  I
5  don't -- I don't remember the story.  I don't
6  think it did.
7    Q.  All right.
8    A.  I highly doubt it would.
9    Q.  Right.  Do you remember asking the
10  reporter not to mention Devin Nunes in this
11  article?
12    A.  No.  They -- I do remember this.  They
13  came, and they said they wanted to do -- they
14  came and said, "Oh, we want to do an article
15  about you guys moving here."
16        I said, "That's fine."  I said,
17  "But just remember that we're not going to speak
18  anything about Devin because he has nothing to
19  do with this dairy.  Because if you want to come
20  here and talk about that, we don't want to have
21  an interview."
22    Q.  Got it.  And they agreed to that;
23  right?
24    A.  That is correct.
25    Q.  They said -- And then they ultimately

1  wrote an article that said nothing about Devin
2  in it; right?
3    A.  That's what they did, yes.
4    Q.  Okay.  Did there come a time when
5  somebody at NuStar asked that this article be
6  removed from the Dairy Star website?
7    A.  Yes.
8    Q.  When was that?
9    A.  When Ryan Lizza -- I don't recall
10  exactly when.  I think it's after -- after
11  the -- it was after the article came out.
12    Q.  Got it.  But it was around the time
13  that the article was being reported on and then
14  came out?
15    A.  It was -- No.  It was after it came
16  out.
17    Q.  Got it.
18    A.  I do believe so.
19    Q.  Okay.  So tell me about that.  Who made
20  the request to the Dairy Star to have it
21  removed?
22    A.  I did.
23    Q.  Okay.  And what did you say?
24    A.  I told them to take it down.
25    Q.  Why did you want it down?

1    A.  Because it was mentioned in the -- it
2  was mentioned in the article that Lizza wrote.
3    Q.  Okay.  What did they -- And who did you
4  speak to at the Dairy Star?
5    A.  I talked to the editor.  I don't know.
6  I don't remember his name.
7    Q.  Okay.  What did the editor say?
8    A.  He said he would.
9    Q.  Okay.  Do you -- I mean, why did you
10  want it taken down because it was mentioned in
11  the article that was written by Ryan Lizza?
12    A.  Because I don't want people to be
13  coming around the dairy and harassing us like
14  they do out in California on my uncle's dairy
15  and to my grandmother.
16    Q.  So in other words, it's generally
17  publicity about you, your family, the farm that
18  you just didn't want out there; right?
19    A.  I didn't want the publicity of the
20  dairy because Devin has nothing to do with it.
21  So he has nothing to do with the farm.  I don't
22  want people just randomly showing up at our
23  dairy and causing problems, because there's a
24  lot of people that want to cause harm, that want
25  to do nothing but damage to us because of Devin,

1   even though he has nothing to do with it.
2         So we try to keep it -- you know,
3   we don't need to sit there and talk about what
4   we have going on because of Devin.  It has
5   nothing to do with Devin.
6         Q.  Right.  And this article doesn't
7   mention Devin, though; right?  We already talked
8   about that.
9         A.  No.  You asked -- You asked why I asked
10  them to take it down.
11        Q.  Right.  I did.  But then --
12        A.  Because it was mentioned in the story.
13        Q.  I see.  It was mentioned in the story
14  that talked about both Devin and the farm?
15        A.  I do believe so.
16        Q.  And because of that, people would draw
17  the connection, and that's why you wanted it
18  taken down?
19        A.  I do believe so.  I think that's what
20  the -- I think so, yes.
21        Q.  Okay.  And you don't remember --
22  correct me if I'm wrong, you don't remember the
23  name of the editor that you spoke with at the
24  Dairy Star?
25        A.  No.  I talked to the editor, because I

1   wasn't going to talk to the guy that wrote the
2   article.
3         Q.  Okay.
4         A.  Because I do know that he wrote -- he
5   spoke with Lizza.
6         Q.  Gotcha.  And you didn't like that?
7         A.  Well, obviously -- obviously he's
8   not -- it's all a political hit piece, what was
9   written.  And that's all Lizza came for, was
10  just to do damage to my brother.
11        Q.  Okay.
12        A.  And not -- So obviously there was an
13  agenda there that -- that we want to stay away
14  from, because he has nothing to do with the
15  farm.  He has literally nothing to do with the
16  farm.  So we don't want him to have a political
17  agenda and start coming after us and having
18  people show up at our dairy for political
19  agendas.
20        Q.  Okay.  So what does that have to do
21  with your concerns with Jerry Nelson talking to
22  Ryan?
23        A.  Oh, is that his name?  Jerry?
24        Q.  I believe so, yeah.  According to the
25  article, Exhibit 10 that we're looking at right

1   here, it appears to be written by Jerry Nelson.
2         A.  Okay.
3         Q.  Yeah.  So, I mean, I understand your
4   point regarding Mr. Lizza's reporting or your
5   perception of it, but my simple question was
6   like did you -- did you disapprove of Jerry
7   Nelson speaking to Mr. Lizza?
8         A.  Oh, he has every right to talk to him.
9         Q.  Okay.  Now, when you moved to Sibley,
10  you purchased a pre-existing dairy farm;
11  correct?
12        A.  That's correct.
13        Q.  I think it was called Sibley Dairy
14  before you took over; right?
15        A.  It was called Sibley Dairy, LLP.
16        Q.  Okay.  How did you find out about
17  Sibley Dairy being available for sale?
18        A.  Through a broker.
19        Q.  Got it.  So walk me through the
20  transaction from, you know, you're -- from the
21  point when you became interested in moving to
22  then when you ultimately decided to move and --
23  and why you ultimately made the move.
24        A.  Can you be more specific what you mean?
25        Q.  Sure.  Why don't I break that down for

1   you.  I take it there came a time in which you
2   were looking to sell the property in California;
3   right?
4         MR. BISS:  Object to the form.
5         Q.  Let me take another step back.  At one
6   point in time you -- Strike that.
7         At one point in time some of the
8   family members who own or operate NuStar owned a
9   dairy farm in California; correct?
10        A.  Nope.
11        Q.  Nope?  So you -- your dad never owned a
12  dairy farm in California?  I'm sorry.  Anthony
13  Jr. never owned a dairy farm in California?
14        A.  As far as I know, he didn't.
15        Q.  Okay.  Anthony III, that is you in your
16  personal capacity, you never owned a dairy farm
17  in California?
18        A.  Nope.
19        Q.  All right.  There came a point in time
20  when you decided to move from California -- Take
21  another step back.  You, Anthony Nunes, III,
22  used to live in California; right?
23        A.  That's correct.
24        Q.  At some point in time you decided to
25  move to Iowa; right?

9 (Pages 30 - 33)

App. 131

Page 34

1    A.   That's correct.
2    Q.   Okay.  Why did you decide to move to
3    Iowa?
4    A.   Because I wanted a dairy here.
5    Q.   Got it.  And you -- it sounds like you
6    reached out to a broker; correct?
7    A.   That's correct.
8    Q.   And you therefore, through the -- you
9    through the broker located a dairy farm that was
10   for sale in Iowa; right?
11   A.   That's correct.
12   Q.   All right.  And then you entered into
13   the transaction -- excuse me.  And then you
14   negotiated and entered into the transaction to
15   buy the dairy farm; right?
16   A.   That's correct.
17   Q.   All right.  So tell me about the
18   workforce at Sibley Dairy.
19         Let me -- Let me ask it this way.
20   In the course of buying the dairy farm, did you
21   have any conversations with the sellers about
22   the workforce there?
23   A.   I don't recall that.
24   Q.   Okay.  There were employees who were
25   working at Sibley Dairy; right?

Page 35

1    A.   It was an existing facility, yes.
2    Q.   Right.  Do you know how many employees
3    were working at Sibley Dairy?
4    A.   I don't know.
5    Q.   All right.  Did some of them stay on
6    after -- and work at NuStar?
7    A.   There was a few.  There was a few guys
8    that stayed on, yeah.
9    Q.   Okay.
10   A.   I mean, it was just a transaction.  It
11   just went from -- one day it was Sibley Dairy,
12   the next day it was NuStar Farms.
13   Q.   Got it.  And new owners came in; right?
14   Just completing the thought, one day it went
15   from Sibley Dairy and became NuStar Farms.  It
16   wasn't just a name change.  It was an ownership
17   change; right?
18   A.   Correct.
19   Q.   Okay.  Did you have any conversations
20   with -- by "you," now I'm back to talking about
21   NuStar.  Okay?  So when I talk about you, I'm
22   referring to NuStar.
23   A.   Okay.
24   Q.   Did you have any conversations with
25   persons at Sibley Dairy about recruiting workers

Page 36

1    in Iowa?
2    A.   I don't -- I don't think so.
3    Q.   Okay.
4    A.   I don't recall that.
5    Q.   You mentioned that some people stayed
6    on from Sibley Dairy; right?
7    A.   Yes.
8    Q.   I think ████████ -- does that
9    sound -- does that name ring a bell?
10   A.   Yeah, I think he was there.  Yeah.  He
11   was there right at the end.  He was hired by --
12   He was hired right at the end from -- ████
13   ████.  He was -- He was hired like one or two
14   months before we bought the dairy.
15   Q.   Got it.  Okay.  And then I think
16   another one I saw on the list might have been
17   ████████?
18   A.   Yeah.  He was the previous manager, and
19   then we kept him on after he was -- he was
20   hired, yes.
21   Q.   Got it.  Why did you keep him on?
22   A.   He was -- worked with cows.
23   Q.   Did he have some institutional
24   knowledge about the specific dairy farm that
25   could be of use to you?

Page 37

1    A.   I don't know.  I don't remember that.
2    Q.   Okay.  Well, what did he do as the
3    manager?
4    A.   He -- He -- Of what?
5    Q.   Of the -- Of the dairy farm that you
6    purchased and then you kept him on.
7    A.   NuStar Farms?
8    Q.   Yes.
9    A.   His capacity, he worked with cows.
10   Q.   Got it.  Did he manage people?
11   A.   I don't -- I don't -- I don't think so.
12   Q.   Okay.  So when you say he was -- Well,
13   let me ask you this.  If I'm understanding you
14   correctly, when he was at Sibley Dairy, he was
15   the manager at that farm; right?
16   A.   I assume so.  I don't know --
17   Q.   Okay.
18   A.   -- fully.
19   Q.   Did his responsibilities change when he
20   became -- when NuStar took over ownership?
21   A.   He was -- He was just taking care of --
22   in the capacity of taking care of cows.
23   Q.   Okay.  But -- Well, I'm asking like
24   did -- did his role diminish in some way?  Like
25   was he previously a manager and then he was

10 (Pages 34 - 37)

Case 5:19-cv-04064-CJW-MAR   Document 156-6   Filed 06/02/23   Page 11 of 105   App. 132

Page 38

1 just --
2     A.  I don't know what he -- I don't
3 remember what he did before.  I really don't
4 remember.  I don't know if he was taking care of
5 people.  There were so many people involved
6 there, I don't -- I don't know what Sibley -- I
7 can't speak for Sibley Dairy.
8     Q.  Fine.  ████████████, I think,
9 is another name of somebody who stuck around?
10     A.  I don't -- I don't remember him.
11     Q.  ██████████?
12     A.  Okay.  Yeah.
13     Q.  Okay.  Was that somebody who stuck
14 around from Sibley Dairy?
15     A.  Yeah, he stayed.
16     Q.  Okay.  What about ████████  Was
17 he at Sibley Dairy?
18     A.  No.  He was hired later.
19     Q.  Hired later?  I think he was hired in
20 2008.  Does that sound about right?
21     A.  I don't recall.
22     Q.  Okay.  What about ████████
23 ████████
24     A.  No.  He was -- He was hired by me.
25     Q.  He was hired by you?

Page 39

1     A.  Yeah.
2     Q.  Got it.  Do you -- Well, let me -- What
3 about ████████████
4     A.  Yeah.  He was hired later too.
5     Q.  Okay.
6     A.  I don't remember the date exactly.
7     Q.  Got it.  You said ██████ was hired by
8 you, meaning you personally, Anthony III?
9     A.  Yeah.  Yes.
10     Q.  Got it.  How did you find ██████, or
11 how did he find you?
12     A.  There was a job application.
13     Q.  Oh, there was a job application, and he
14 completed the job application and submitted it
15 to you?
16     A.  That's correct.
17     Q.  Okay.  He -- Do you require -- When we
18 talk about job applications generally, do you
19 have a job application form at NuStar Farms --
20     A.  Yes.
21     Q.  -- that you ask people to fill out --
22     A.  Yes.
23     Q.  -- if they want a job?
24     A.  Yes.
25     Q.  Okay.  And ██████ was one of them;

Page 40

1 right?
2     A.  Yes.
3     Q.  And he filled -- filled out the form
4 and handed it to you; right?
5     A.  Yes.
6         MR. BISS:  And, Nate, just to be
7 clear, that's the document that I -- that I
8 produced for you today.
9         MR. BOYER:  Got it.
10         MR. BISS:  We found it, so I
11 wanted you to have that.  I thought you might
12 want to use it.
13         MR. BOYER:  Okay.  Okay.
14     A.  Yeah.  It was in the records, so we
15 decided that you might as well have it.
16     Q.  Okay.  Appreciate it.  Do you have --
17 anybody who wants a job has to fill out an
18 application?
19     A.  Yes.
20     Q.  Okay.
21     A.  They pretty -- Everybody has to --
22 pretty much that's the protocol, is everybody
23 has to fill out a job application before we even
24 consider them to work.
25     Q.  Got it.  Okay.

Page 41

1     A.  We don't reclaim -- We don't -- We
2 don't keep those documents, but -- we don't
3 generally keep them, but we have some.  They're
4 just in the file.
5     Q.  Okay.  You have others?
6     A.  I don't know.  You have everything that
7 we had.  You have everything.
8     Q.  Okay.  So you said there are some that
9 are in the file; right?  You obviously have
10 ████████
11     A.  Yeah.  His -- His had it.  I don't -- I
12 don't know why it was in there.
13     Q.  Okay.
14     A.  It was in his file.
15     Q.  Got it.  Do you have job
16 applications -- you still have in NuStar's
17 possession job applications for other
18 applicants?
19     A.  We have -- People fill them out all the
20 time.  I don't --
21     Q.  I know.  But you -- I believe -- if I
22 understand what you were just saying a moment
23 ago, you said that you don't always keep them,
24 sometimes you do --
25     A.  We gave you everything that we had.

11 (Pages 38 - 41)

1   Q.   Okay.  That's fine.  So you're saying
2   there are no other job applications in NuStar's
3   possession?
4       A.   I don't think so.  As far as I know,
5   no.
6       Q.   Why does NuStar only have the job
7   application for ▮▮▮▮ and nobody else?
8       A.   It's not required to -- by law to
9   retain those.
10      Q.   I understand.  But was there a decision
11  made to retain ▮▮▮▮ but not others?
12      A.   No.  It was just an early hire.  It was
13  in the -- it was in his documents.
14      Q.   Okay.  So just sort of by happenstance
15  you only have ▮▮▮▮ and nobody else's?
16      A.   Yeah.  It was just one of those deals,
17  yeah.
18      Q.   Okay.  When you -- Let's go back again
19  to the transition from Sibley Dairy to NuStar.
20  Did Sibley Dairy have any sort of employment
21  files that they transitioned over to NuStar?
22      A.   I don't recall that.
23      Q.   Like, you know, applications,
24  for example, or I-9s on file for any workers
25  that were sticking around?

1       A.   I don't -- I don't recall.
2       Q.   Okay.  Did you complete new I-9s for
3   people?
4       A.   Yeah.  I mean, you -- you would think
5   it was a new company -- it was a whole different
6   one, so you would have to have all new files for
7   everybody.
8       Q.   Right.  So you -- you probably would
9   have gone and done new I-9s for the people that
10  started?
11      A.   Everybody would have had it, yeah.  It
12  would have been all new paperwork because it's a
13  totally different company.
14      Q.   Got it.  Okay.  So you said something
15  I'm trying to understand.  So you had never
16  lived in Iowa prior to moving here in 2006 to
17  2007; right?
18      A.   Yeah.
19      Q.   Okay.  I'm sorry, yes, it is correct
20  that you had never lived in Iowa prior to that
21  moment; right?
22      A.   That's correct.
23      Q.   Sorry, sometimes when people say yes,
24  it gets confusing as to whether or not you're
25  saying yes to I did live there or yes, I didn't,

1   but I understand you're saying yes, you did not
2   live in Iowa prior to?
3       A.   That's correct.
4       Q.   Okay.
5           MR. BISS:  You're referring to
6   Anthony Nunes, III, now; right?
7           MR. BOYER:  Yes.  I'm referring
8   to Anthony Nunes, III, correct.
9       A.   Okay.
10      Q.   Did anybody from California come over
11  to help you get the -- get the farm started?
12      A.   My father was here.
13      Q.   Any of the employees -- Strike that.
14          Any other persons other than
15  Nunes family members come over from California
16  to help?
17      A.   Yes.
18      Q.   ▮▮▮▮▮▮, was he one of them?
19      A.   Nope.
20      Q.   Okay.  ▮▮▮▮▮?
21      A.   Yeah.
22      Q.   Okay.  Tell me about ▮▮▮▮▮.  Why
23  did you have him come over?
24      A.   Because he was a previous employee.  He
25  wanted to move, try to -- try to better

1   himself --
2       Q.   Okay.
3       A.   -- and his family.
4       Q.   Okay.  He was a previous employee of
5   who?
6       A.   He was a previous employee of Nunes
7   Farms.
8       Q.   Nunes Farms.  And that's the farm that
9   you had worked on before coming to Iowa?
10      A.   That's correct.
11      Q.   Okay.  And ▮▮▮▮▮▮▮, he
12  was not somebody who came from California?
13      A.   Yes.
14      Q.   Okay.  And I only ask because I thought
15  I saw -- Let me take a look at interrogatories.
16      A.   You said when we transitioned.  He
17  didn't transition with us.
18      Q.   I see.  He came over at some other
19  time?
20      A.   Yes.
21      Q.   Okay.  Why did he come over?
22      A.   We were doing construction.
23      Q.   Oh, I see.  So was he -- his specialty
24  was in construction, not necessarily, you know,
25  milking the cows and stuff?

12 (Pages 42 - 45)

1    A.   That's correct.
2    Q.   Got it. ▮▮▮▮▮▮▮▮ didn't
3   stick around for too long, did he?
4    A.   No.
5    Q.   Okay. Do you know why he left?
6    A.   Yes.
7    Q.   Why did he leave?
8    A.   His -- His family decided they didn't
9   want to move.
10   Q.   Okay. Fair enough. And then he went
11   back to California?
12    A.   That's correct.
13   Q.   Do you stay in touch?
14    A.   Yeah. He called me after your
15   investigators -- well, he didn't call me. He
16   called our -- some of our family and told them
17   your investigators showed up last week.
18   Q.   Oh, there we go. Great. And what did
19   he say to you?
20    A.   That some investigators were asking a
21   whole bunch of questions.
22   Q.   Okay. And -- And what did you say in
23   response to him?
24    A.   I didn't talk to him.
25   Q.   Oh.

1    A.   I talked to my cousin.
2   Q.   Oh.
3    A.   He called one of my cousins.
4   Q.   Got it. Got it. So this would be
5   somebody -- like a son of Uncle Gerald?
6    A.   Nope.
7   Q.   Okay. Different -- Okay. Anyway, who
8   he spoke to, he called a cousin of yours and
9   said that some investigators were asking a bunch
10   of questions; right?
11    A.   That's correct.
12   Q.   All right. Did he say what questions
13   the investigators asked?
14    A.   If we had illegals working for us.
15   Q.   Okay. What did ▮▮▮▮▮ say in
16   response?
17    A.   He said no.
18   Q.   Okay. He said that to you -- he told
19   your cousin, who told you that that's what he
20   said to the investigators?
21    A.   That's correct.
22   Q.   Okay.
23    A.   So it's all hearsay. I don't know. I
24   didn't hear it firsthand.
25   Q.   You may be right. Maybe that is

1   hearsay.
2     MR. BISS: It might be double
3   hearsay, actually.
4     MR. BOYER: It might be a triple
5   or quadruple at that point; right?
6   Q.   So what about ▮▮▮▮▮▮? Do you
7   stay in touch with him?
8    A.   Yeah.
9   Q.   Okay. Have you talked to him recently?
10    A.   Yeah. He called.
11   Q.   Okay. Tell me about that call.
12    A.   One of your investigators showed up at
13   his door.
14   Q.   And he was not happy.
15    A.   And he was not happy.
16   Q.   Oh, really? So tell me about it.
17   What -- So first of all, he spoke to you,
18   Anthony Nunes, III?
19    A.   No. He talked to my wife.
20   Q.   He spoke to Lori Nunes. Got it.
21    A.   Right.
22   Q.   Got it. Okay. What did he tell Lori
23   Nunes, if you know?
24    A.   That your investigator showed up last
25   week asking if we hired illegals.

1   Q.   And anything else he said?
2    A.   I don't know. I didn't talk to him.
3   Q.   Got it. So I'll talk to Lori Nunes,
4   and she'll remember what --
5    A.   Yeah.
6   Q.   -- what ▮▮▮▮ told her about the
7   conversation he had with the investigators?
8    A.   Yeah. I just know he was not happy you
9   guys were knocking on his door.
10   Q.   Well, okay. Let's talk a little bit
11   about hiring generally and what you do now at
12   NuStar. Okay? So now when I'm talking about
13   you, I'm talking about NuStar. Okay?
14    A.   Okay.
15     MR. BISS: Again, Nate, before we
16   get into that, we're going to -- we're going to
17   mark this entire deposition counsel's eyes only.
18     MR. BOYER: Okay. Well,
19   obviously --
20     MR. BISS: I just want to get
21   that on the record before we go further.
22     MR. BOYER: Duly noted. I
23   obviously reserve the right to take a look at
24   this and deal with it if we think it's been
25   overdesignated, but that's a fine designation to

1  start.
2          MR. BISS:  Okay.
3      Q.  So did you -- how does NuStar find
4  employees when it needs them?
5      A.  They just show up.
6      Q.  What do you mean they just show up?
7      A.  They come looking for jobs.
8      Q.  They come to the farm?
9      A.  Yeah.
10     Q.  Okay.  So people will just drive, go to
11 the farm and say, "I'm looking for a job"?
12     A.  That's correct.
13     Q.  Okay.  Does the newspaper place --
14 Strike that.
15         Does NuStar place newspaper
16 advertisements?
17     A.  No.
18     Q.  Does it advertise anywhere around town
19 that it's looking for work?
20     A.  No.
21     Q.  Okay.  How often do people just show up
22 at the farm -- Well, let me ask the question.
23 If they don't see advertisements, how do they
24 know that NuStar may be hiring?
25     A.  I don't know.

1      Q.  Okay.  You don't know how --
2      A.  They just come by.  They don't -- We're
3  not always looking for people.
4      Q.  Okay.  Got it.  How often do people
5  come by looking for jobs?
6      A.  I don't know.  Just random.
7      Q.  Is it something like once a year?  Once
8  a month?
9      A.  Yeah, I don't know.  It -- I don't -- I
10 don't recall.  People just come by.  They fill
11 out job applications.  Maybe one -- a couple a
12 month.  I don't know.
13     Q.  Okay.
14     A.  I really don't keep track of that.
15     Q.  Got it.  Do you have -- Do you keep the
16 applications on file?
17     A.  Generally not, no.
18     Q.  Okay.  So people fill out applications,
19 you just throw them in the trash?
20     A.  We might keep them for a little while.
21     Q.  All right.
22     A.  We probably retain them a little bit,
23 longer than maybe Hearst Corp. does with their
24 e-mails, but --
25     Q.  Okay.  So -- So you would -- Do you

1  like retain a file of applications of people
2  that might be looking for a job?
3      A.  No, we don't keep a file.  It's just on
4  my desk.
5      Q.  Okay.
6      A.  So if they're there, then we'll just
7  throw them away.
8      Q.  Okay.
9      A.  If they're getting old.
10     Q.  Okay.  How old is old?
11     A.  Just when you go through my stack of
12 papers.
13     Q.  Okay.  So you've got a stack of papers
14 on your desk, and in that stack of papers might
15 be some applications?
16     A.  That's correct.
17     Q.  Okay.  And then when you are going
18 through the applications, if something looks
19 particularly old -- if you're going through the
20 stack of papers just doing housecleaning, if
21 something looks particularly old, you might
22 throw it out?
23     A.  That's correct.
24     Q.  Okay.  But you can't say how old is
25 old, it's just kind of a feel based on your

1  needs at the time?
2      A.  I don't know.  I don't.
3      Q.  Okay.  Am I correct that your -- I want
4  to actually ask a couple of other questions.  Do
5  any of NuStar's employees help in recruiting
6  workers at the farm?
7      A.  Yeah.  Some of my guys, they go, "Oh,
8  I've got a friend that wants to work," if we're
9  looking for somebody.
10     Q.  Got it.  Okay.  So you'll get like
11 recommendations, essentially, from people that
12 work there?
13     A.  Yeah.  Yeah, I guess you could call it
14 recommendations.  Yeah.
15     Q.  Right.  And so this could be -- does
16 ███████████ sometimes say, "Hey, I've got a
17 friend who needs to work"?  Is he somebody that
18 has offered recommendations in the past?
19     A.  Yeah, he has.
20     Q.  Okay.
21     A.  Probably in the time that he's been
22 there, yeah.
23     Q.  ██████?
24     A.  Yeah, probably.
25     Q.  Okay.  And ███████ as well?

14 (Pages 50 - 53)

App. 136

1    A. Yeah.

2    Q. Okay. And then those -- And then after

3  they have that recommendation, those persons

4  might then come to the -- would -- Strike that.

5        After you get that

6  recommendation, they'll then have the person

7  come to the farm and fill out an application?

8    A. Generally, yes.

9    Q. Unless they've already filled one out;

10  right?

11    A. Correct.

12    Q. Okay. And then you obviously would

13  give more consideration to that person because

14  they were recommended by one of your longtime

15  employees; right?

16    A. Of course, yeah.

17    Q. Okay. All right. Am I correct that

18  Anthony Nunes, Jr., and Toni Dian Nunes are the

19  owners of NuStar Farms, LLC, at the moment?

20    A. Yeah.

21    Q. Okay. And I think I've heard that you,

22  meaning Anthony Nunes, III, run the day-to-day

23  operations; right?

24    A. Well, my wife and I are also owners as

25  well.

1    Q. Oh, you're owners now? Excellent.

2    A. We have been for -- for a little while.

3    Q. Oh, great. When -- When were you

4  owner -- When did you become an owner?

5    A. Like 2019 or '20 we became -- What was

6  it? '20? It was either 2019 -- I think it was

7  2019.

8    Q. Okay. Is that -- Was that kind of

9  always part of the plan, that eventually you

10  would take over ownership and then eventually

11  own the whole thing?

12        Sorry. Strike that.

13        And the "you" there, I'm

14  referring to Anthony Nunes, III, and your wife,

15  Lori Nunes. Is the idea that eventually this

16  place will -- that NuStar Farms, LLC, ownership

17  will transition entirely to you guys?

18    A. That I have no -- I can't answer that

19  question.

20    Q. Okay. What percentage do you own,

21  Anthony Nunes, III, at present?

22    A. 5 percent.

23    Q. Okay. And what percent does Lori Nunes

24  own at present?

25    A. 5 percent.

1    Q. Okay. And the other 90 percent are

2  still held by your parents, namely Anthony

3  Nunes, Jr., and Toni Dian Nunes; right?

4    A. I do believe so, yes.

5    Q. Okay. And are you aware of any plans

6  for you to increase your share of ownership over

7  time?

8    A. That's not up to me.

9    Q. Okay. So you just aren't -- you don't

10  know, it maybe happens, maybe it doesn't, it's

11  not up to you?

12    A. Not up to me.

13    Q. Very well. So now -- now talking about

14  sort of the operations of NuStar, to what extent

15  is Anthony Nunes, Jr., involved in running the

16  farm on a day-to-day basis?

17    A. He doesn't necessarily run it on a

18  day-to-day basis, no.

19    Q. Okay.

20    A. He's there every day, but I have to

21  take care of everything else.

22    Q. Got it. What is -- And I realize now

23  you're talking about Anthony Nunes, Jr., even

24  though he's right in the room here, but what

25  does Anthony Nunes, Jr., do on a daily basis at

1  the farm?

2    A. Whatever needs done. Whatever help is

3  needed.

4    Q. Okay. So does he have an office?

5    A. No.

6    Q. All right. So where does he like -- if

7  you're running the day to day and if Anthony

8  Nunes, Jr., is not necessarily running the day

9  to day, what's he spending his time doing over

10  the course of the day?

11    A. Well, we have a farm.

12    Q. Right. Got that.

13    A. We have a family farm that everybody

14  has to work on.

15    Q. Okay. So it's just various things may

16  come up and he'll help out?

17    A. Yeah. If it's between getting parts or

18  whatever needs to be done.

19    Q. Okay. Fine. Now let's talk about

20  Anthony Nunes, III, i.e., you in your personal

21  capacity. What do you do at the farm on a daily

22  basis?

23    A. Daily operations.

24    Q. Okay. What does that look like?

25    A. From purchasing feed to making sure

15 (Pages 54 - 57)

1 work is completed to checking cows. I do it
2 all.
3    Q. Got it. Okay. And you have a number
4 of employees who work there as well; right?
5    A. Yeah. Yeah.
6    Q. All right. And do they all -- they all
7 report to you?
8    A. Yes.
9    Q. Okay. So does NuStar Farms have like
10 an org chart or anything like that?
11    A. No.
12    Q. Okay.
13    A. What -- What is that?
14    Q. An organizational chart --
15    A. Oh, no.
16    Q. -- sort of showing who would report to
17 whom or anything like that.
18    A. No.
19    Q. Gotcha.
20    A. No. We're a small family farm.
21 There's -- We're not big. We don't have an HR
22 department. We don't have any of that.
23    Q. Okay. What does Lori Nunes do?
24    A. She does -- She takes care of calves
25 and -- and books.

1    Q. Calves and books?
2    A. Yep.
3    Q. Okay. Anything else that she does?
4    A. Takes care of the children.
5    Q. Your children; right?
6    A. Yeah.
7    Q. Gotcha. Okay. By "you," I mean
8 Anthony Nunes, III's children.
9    A. Yeah. She takes care of our -- our
10 children and -- and works on the farm.
11    Q. Okay. And then --
12    A. Whatever she needs -- Whatever capacity
13 she needs to do.
14    Q. And you referred to books. What kind
15 of books?
16    A. Oh, yes. I should have -- She does the
17 accounting. Entering bills, paying bills,
18 things like that.
19    Q. Got it. Okay. Who handles the
20 employment process at -- Strike that.
21       Who is in charge of hiring, we'll
22 start there, at NuStar Farms?
23    A. I guess I would be.
24    Q. Okay. Does Lori Nunes play a role in
25 hiring?

1    A. No.
2    Q. Okay. So you make all the hiring and
3 firing decisions?
4    A. Unfortunately there's sometimes you've
5 got to fire people, yes.
6    Q. Sure. And you have had to fire people
7 from time to time?
8    A. Sometimes you have to do that.
9 Unfortunately -- You don't want that to happen,
10 but unfortunately it does happen.
11    Q. Okay. And does Lori Nunes assist with
12 sort of onboarding paperwork for hiring? Does
13 she assist with the paperwork for hiring, Lori?
14    A. Once I -- Once I get it, then she --
15 she gets it and then makes sure that it's all
16 correct, enters it into QuickBooks.
17    Q. Got it. Okay. And then for the I-9
18 process, who -- who oversees that at NuStar
19 Farms?
20    A. Well, I receive that, yes. I get that
21 from the employee.
22    Q. Okay.
23    A. We give them a packet, and then they --
24 they give us the packet back completed.
25    Q. Got it. Okay.

1    A. And then we fill out our portion of it.
2    Q. Okay. And who is the "we" that's
3 filling out that portion of it? Like who at
4 NuStar fills it out?
5    A. Oh, I'm sorry. Like Nu -- well, I'm
6 saying "we" as in NuStar Farms.
7    Q. Right. Gotcha.
8    A. So my wife or I.
9    Q. Got it. Okay. Does your wife tend to
10 do it more often than you or you more often than
11 her?
12    A. Once again, she does -- she does the
13 entering of it. She looks at it for
14 correctness. I look at certain parts, I'll sign
15 my name to the bottom, and then she takes it
16 from there and makes sure that -- not the I-9s,
17 necessarily. She'll look at the I-9s, but I
18 finish that, complete it, then pass it to her,
19 and then she'll take it from there.
20    Q. Okay. All right. I'm sorry, so who
21 tends to complete the portion of the I-9s that
22 the employer is supposed to complete? Is it you
23 or Lori?
24    A. I do it most of the time.
25    Q. Okay.

Page 62

1    A. Yeah.
2    Q. Got it.
3    A. Unless there's something I skipped or
4  missed or something, then she'll -- she'll --
5    Q. Okay.
6    A. -- take care of that.
7    Q. All right. Are you -- Is NuStar -- So
8  now transitioning back to talking about NuStar,
9  to you as NuStar. Okay?
10   A. Okay.
11   Q. Is NuStar involved in any industry
12 groups or trade organizations?
13   A. NuStar Farms itself a trade
14 organization?
15   Q. Yeah.
16   A. Yeah. We have -- We have to be, I
17 mean, as part of the checkoff. I guess is that
18 what you mean?
19   Q. I -- Maybe that's what I mean. Let me
20 ask you this. What trade organizations or
21 industry groups does NuStar participate in?
22   A. I guess I -- I don't understand what
23 you mean by that.
24   Q. Sure. Have you heard of something
25 called WIDA or the Western Iowa Dairy Alliance?

Page 63

1    A. Oh, WIDA?
2    Q. Is it WIDA?
3    A. Yeah.
4    Q. Okay. Have you heard of that?
5    A. Yeah.
6    Q. Okay. Does NuStar participate in WIDA?
7    A. No, we do not.
8    Q. Okay. Is there a reason why you don't?
9    A. Because I feel that it should be
10 covered by -- it should be covered by the
11 checkoff dollars. We shouldn't have to have an
12 independent group. I shouldn't have to pay for
13 an independent group that we're already paying
14 for anyways through the checkoff dollars.
15   Q. Okay. What are checkoff dollars? I'm
16 sorry. You keep referring to checkoff dollars.
17   A. Yeah. That's correct.
18   Q. What are checkoff dollars?
19   A. Checkoff dollars are money that's taken
20 out of our milk check that has to be
21 proportioned -- that has to be given to the
22 dairy industry itself.
23   Q. Got it. Is -- Okay. Is -- The
24 checkoff, is that in some way related to the
25 Midwest Dairy Alliance?

Page 64

1    A. Midwest Dairy Alliance?
2    Q. Have you heard of the Midwest Dairy
3  Alliance?
4    A. No, I don't think so.
5    Q. Okay. So help me --
6    A. Oh, MD -- they use a lot of acronyms.
7  I don't -- I mean, we're part of Midwest Dairy.
8    Q. Got it.
9    A. But that's part of Iowa's -- that's --
10 Iowa's checkoff dollars go there, and then they
11 have to give it to the national. It's -- It's
12 no different than the corn industry, the beef.
13 It's -- It's all set up through the government.
14 It's -- The checkoff is automatically taken out.
15   Q. It's automatically taken out of the
16 revenue that you generate from the sale of milk?
17   A. That's correct.
18   Q. I see. Okay. I think I saw an Anthony
19 Nunes listed on the board of the Iowa division
20 of something called Midwest Dairy. Which --
21 First of all, am I correct that there is an
22 Anthony Nunes on the board of the Iowa division
23 of Midwest Dairy?
24   A. That's correct.
25   Q. Which Anthony Nunes is it?

Page 65

1    A. III.
2    Q. Okay. So you're on the board there;
3  right? You, Anthony Nunes, III, are on the
4  board?
5    A. Okay. Yes. Yes.
6    Q. Okay. Great. What do you do as a
7  board member of the Iowa division of Midwest
8  Dairy, "you" being Anthony Nunes, III?
9    A. We just talk about dairy issues,
10 whatever they're working on, just go through
11 that.
12   Q. Okay. Do you -- It sounds like you
13 have meetings from time to time?
14   A. Yeah. Finally.
15   Q. Right. So you haven't had --
16   A. I've only been on the board two years.
17   Q. I gotcha.
18   A. This is the second -- The first year
19 was COVID, so we just had some Zoom meetings,
20 which were -- you know how Zoom meetings are.
21 They're not real productive.
22   Q. Right. Do you ever address -- Do you
23 address issues concerning employment or the
24 labor pool with Midwest Dairy?
25   A. No.

17 (Pages 62 - 65)

Case 5:19-cv-04064-CJW-MAR   Document 156-6   Filed 06/02/23   Page 18 of 105   App. 139

Page 66

1    Q.   Okay.
2    A.   I've -- We've never did that, no,
3    because -- No.
4    Q.   Okay.  How did you get on the board?
5    A.   You're appointed.
6    Q.   I see.  Appointed by whom?
7    A.   Through -- Through the creamery.
8    Q.   What's the creamery?
9    A.   Who buys our milk.
10   Q.   Is that -- I think it's called Agropur?
11   Agropur?
12   A.   Agropur.
13   Q.   Agropur?
14   A.   Yeah.  That's correct.
15   Q.   And did -- And what was -- there was a
16   name -- is that the same company you more or
17   less always sold almost all of your milk too?
18   A.   No.
19   Q.   There was previously a different
20   company; right?
21   A.   Yes.
22   Q.   And what was the other one before that?
23   A.   Which one?
24   Q.   I'll check my notes.
25   A.   The one before Agropur?

Page 67

1    Q.   Yes.
2    A.   Was called Davisco.
3    Q.   Davisco.  Right.  So those are two
4    separate entities, Davisco and Agropur?
5    A.   That's correct.
6    Q.   Okay.  Why did you change from --
7    A.   We didn't.  They bought them out.
8    Q.   I see.  Agro -- Just to make it clear,
9    Agropur bought out Davisco; right?
10   A.   That's correct.
11   Q.   Got it.  So you continued -- you
12   continued more or less doing the same thing, but
13   it was just now a different company?
14   A.   Yeah.  We were a patron with Davisco
15   and just transferred over.
16   Q.   Got it.  Okay.  What about the Iowa
17   State Dairy Association?  Are you familiar with
18   that trade organization?
19   A.   I don't -- Yeah, I -- I heard of it, I
20   guess.  It's not all part of the same -- they
21   kind of all go together, so it's hard to -- I
22   don't remember.
23   Q.   Got it.
24   A.   I don't know which one that one is.
25   Q.   Right.  Right.  Have you ever worked

Page 68

1    with the Iowa State Dairy Association on
2    anything?
3    A.   No.
4    Q.   Okay.
5    A.   Not that I recall.
6    Q.   All right.
7    A.   Meaning NuStar Farms; right?
8    Q.   NuStar Farms.
9    A.   I guess I get confused some there.
10   NuStar Farms --
11   Q.   So I'm asking about NuStar Farms;
12   right?
13   A.   Yeah.  Okay.  Yeah.  No, we never have.
14   Q.   Okay.
15   A.   I mean, I may have in -- as personally
16   we're on the board of -- of Midwest Dairy, Iowa
17   division, I may have indirectly did, but I
18   don't -- I don't -- we don't directly work with
19   them, no, as NuStar Farms.
20   Q.   Got it.  So you are, of course, on --
21   Well, strike that.
22        So now speaking about what you
23   have done indirectly, "you" being Anthony Nunes,
24   III --
25   A.   Okay.

Page 69

1    Q.   -- indirectly with the Iowa State Dairy
2    Association, okay --
3    A.   No.  I've -- I don't recall doing
4    anything with them.
5    Q.   Directly or indirectly you don't recall
6    doing anything?
7    A.   Yeah, I don't recall doing anything
8    with them.
9    Q.   Okay.  Okay.
10   A.   Just to clarify --
11   Q.   Sure.
12   A.   -- I don't understand how -- some of
13   those groups, they all kind of tie together
14   because it's part of the checkoff.
15        I don't -- I don't recall how all
16   that works.
17   Q.   Got it.
18   A.   There's a lot of groups.  A lot of
19   groups.
20   Q.   Okay.  Let me ask briefly about Devin
21   Nunes.  So Devin is your brother; correct?
22   Anthony Nunes, III's brother; right?
23   A.   That's correct.
24   Q.   All right.  And he grew up working on
25   farms; right?  Devin.

18 (Pages 66 - 69)

1    A.  Well, he was -- he was on the family
2  farm, yes.
3    Q.  All right.  Out in California; right?
4    A.  Yes.
5    Q.  Do you stay in touch with Devin?
6    A.  Yes.
7    Q.  Do you talk about your farm or NuStar
8  Farms, LLC, with Devin?
9    A.  In what capacity?
10    Q.  I don't know.  Just anything.  Do you
11  talk about how things are going on the farm?
12    A.  We just talk.  We just talk, yeah.
13    Q.  As brothers would talk?
14    A.  He's my brother, yeah.
15    Q.  Sure.  Fair enough.  Do you think he's
16  aware of issues that affect the agricultural
17  industry?
18    A.  I would hope so.
19    Q.  All right.  Especially dairy farms?
20    A.  I would think -- He has a lot of
21  dairies in his district, so I would hope he
22  would.  That's part of his job, I would assume.
23    Q.  Right.  You think you -- well, not just
24  from assumptions, but you are his brother.  I
25  would take it just from having spoken to him

1  over a number of years you believe that he is
2  knowledgeable about the dairy industry and its
3  issues; right?
4    A.  I would say he is.
5    Q.  Okay.  That's fine.
6      MS. BOYER:  I'll mark this as
7  Defendants' 11.  Defendants' 11.
8      (Exhibit 11 was marked for
9      identification by the reporter.)
10    Q.  So now I'm going to ask you some
11  questions --
12    A.  Are we done with number 10?
13    Q.  Yeah, you can set that aside.  Let's
14  talk about Defendants' 11.  I've just handed you
15  a document that has been marked as Defendants'
16  11.
17      MR. BISS:  Nate, I note that this
18  document doesn't have any Bates stamp on it.
19  Where did it come from?
20      MR. BOYER:  Where did it come
21  from?  It came from the web -- from the internet
22  from the office of Representative Zoe Lofgren.
23      MR. BISS:  All right.  And -- And
24  why is it relevant to this case, and why hasn't
25  it been produced in discovery?

1      MR. BOYER:  Well, I'm going to
2  ask a couple of questions that may or may not
3  establish the relevance.  It hasn't been
4  produced because it's not a pre-existing company
5  document.  It was obtained by attorneys in the
6  course of our work and therefore was attorney
7  work product until the moment in which I wanted
8  to discuss it with the witness.  It was publicly
9  available, and if you thought it relevant, you
10  could discuss it with him, but I'm going to ask
11  some questions and we'll see.
12      MR. BISS:  Well, how would I --
13  how would I know it existed?
14      MR. BOYER:  What's that?
15      MR. BISS:  How would I know it
16  existed and to look for it?
17      MR. BOYER:  Why don't I ask some
18  questions and we can have further discussions
19  offline, if needed.
20      MR. BISS:  Okay.
21    Q.  So, Mr. Nunes, I've handed you a
22  document that at the top it says "Farm Workforce
23  Modernization Act."  Do you see the headline
24  there?
25    A.  Yes.

1    Q.  Are you aware of what the Farm
2  Workforce Modernization Act is?
3    A.  No.
4    Q.  Have you ever heard of it?
5    A.  No.
6    Q.  Have you ever discussed this with
7  Congressman Nunes?
8    A.  No.
9    Q.  You've never heard of it, so obviously
10  you didn't discuss it with him; right?  Fair
11  enough.
12      So the document I've shown you I
13  will represent appears to be a two-page summary
14  of this bill.  So this is a -- again, I will
15  further represent to you that this is a summary
16  of a bill that has been co-sponsored by Devin
17  Nunes in congress.  I take it you didn't know
18  that; right?
19    A.  That's correct.  I did not know that.
20    Q.  All right.  So if you look at page 1
21  here toward the top it says in the second
22  sentence "Due to the diminishing supply of U.S.
23  workers willing to perform migrant farm labor,
24  our nation's farmers are increasingly dependent
25  on foreign workers to meet labor demands."

1       Okay?  Do you agree with that
2  statement?
3     A.  I -- Not necessarily, no.
4     Q.  Okay.  Why don't you agree?
5     A.  There's -- I always have people showing
6  up to work.  So every time we need somebody to
7  fill, we can -- we fill the spot.  It may take
8  awhile, but we -- we always try to run a full
9  team at the farm.
10    Q.  Got it.  Okay.  But this isn't about
11 whether or not somebody will be there to do the
12 work; right?  This is a statement about that
13 there's a, quote, diminishing supply of U.S.
14 workers willing to perform migrant farm labor
15 and therefore farmers are increasingly dependent
16 on foreign workers to meet labor demands.  Do
17 you agree that farmers are --
18    A.  I can't answer that question.  I don't
19 know.
20    Q.  You don't know one way or another?
21    A.  That's correct.
22    Q.  Okay.  So a little bit further down,
23 right under where it says "Title I," it says
24 "This title -- This title establishes a program
25 for agricultural workers in the United States

1  (and their spouses and minor children) to earn
2  legal status through continued agricultural
3  employment."
4       Would NuStar consider that to be
5  a good thing, if its agricultural workers could
6  earn legal status through continued agricultural
7  employment?
8       MR. BISS:  Nate, could you
9  explain the concept of a good thing?
10      MR. BOYER:  Sure.
11    Q.  Would NuStar -- Would that be helpful
12 to NuStar's business?
13    A.  I -- I can't answer that.
14    Q.  Okay.  Would it be helpful to NuStar's
15 workers?
16    A.  I can't answer that either.
17    Q.  Okay.
18    A.  I don't -- I don't know nothing about
19 this.  This is the first time I'm seeing it.
20    Q.  Fair enough.  Have you heard of H-2A
21 visas?
22    A.  No.
23    Q.  If I -- So just -- I'll say
24 something and see if it refreshes your
25 recollection.  My understanding of an H-2A visa

1  is that the -- they are entirely -- or at least
2  the overwhelming majority of them are meant for
3  seasonal agricultural workers, and therefore
4  dairy workers can't get them.
5       Is that your -- What I just said
6  right there, does that refresh your recollection
7  as to what an H-2A visa is?
8     A.  No.
9     Q.  Okay.  You've never had any dealings
10 with H-2A visas?
11    A.  No.
12    Q.  All right.  No one has ever showed up
13 to work on the farm and said, "Hey, here's an
14 H-2A visa"?
15    A.  Yeah, I never -- I don't -- I don't
16 know nothing about it.
17    Q.  Okay.  Got it.  Why don't we set this
18 aside.
19      Are you familiar with some of the
20 other dairy farmers in northwest Iowa?
21    A.  Yeah.  It's not a very big community.
22 We all know each other.
23    Q.  Darin Dykstra is one of them; right?
24    A.  Darin Dykstra is down by Maurice.
25    Q.  Okay.  Do you -- Do you stay in touch

1  with him?
2     A.  I mean, I don't talk to him regularly,
3  no.
4     Q.  Okay.  How often do you talk to him?
5     A.  Just when I see him.
6     Q.  How often do you see him?
7     A.  Just -- I don't know.  A couple times a
8  year.
9     Q.  You're generally not going out of your
10 way to speak to him, but if you run into him at
11 something, you'll chat -- you'll chat with him.
12 Is that about right?
13    A.  Yeah.
14    Q.  Sounds good.  Did you ever speak with
15 him about this case?
16    A.  Yeah.  Because he called when you guys
17 showed up at his door.
18    Q.  Okay.  And what did he say to you?
19    A.  That -- He said that Ryan Lizza showed
20 up, wanted to talk to him about immigration
21 stuff.  I don't -- Talk about workers,
22 immigration stuff.  And then when Darin said he
23 didn't want to talk to him, then he directly
24 asked about us.
25    Q.  Um-hum.  Okay.  And when did this --

1     A.   And at that point Darin realized that
2 there was obviously an obvious issue, that it
3 was politically motivated.
4     Q.   Okay.  When did this conversation with
5 Darin happen?
6     A.   I don't -- I don't recall exactly when.
7 It was before the article came out.  Ryan Lizza
8 contacted him.
9     Q.   I see.  So while Ryan was doing his
10 reporting and talking with Darin, Darin called
11 you and said, "Hey, Ryan came and spoke with
12 me"; right?
13           MR. BISS:  Object to the form.
14     A.   I don't --
15     Q.   It was before the article came out;
16 right?
17     A.   That's correct.
18     Q.   Okay.
19     A.   As I recall.
20     Q.   That's fine.  It wasn't -- It wasn't in
21 the last month or two; right?
22     A.   No.
23     Q.   It was -- It was back in 2018?
24     A.   Yes.
25     Q.   Okay.  So just curious, what do you --

1 what do you, Anthony Nunes, III, think of Darin
2 Dykstra?  Do you like him?
3     A.   Yeah.  He's a nice guy.  Yeah.
4     Q.   Okay.  Has he ever lied to you about
5 anything?
6     A.   Has he ever lied to me about anything?
7     Q.   That's right.
8     A.   Not that I know of.
9     Q.   Okay.  Let's talk about Alan Feuerhelm.
10 Do you know him as well?
11     A.   He's on the board with me.
12     Q.   Oh, the board of --
13     A.   He's on the -- He's on the Midwest
14 Dairy, Iowa division, board.
15     Q.   Got it.  Okay.  Do you -- So I assume
16 you talk to him in connection with your role on
17 the board; right?
18     A.   Really it's the first time -- I might
19 have met him once before a long time ago, but
20 I've never -- just the other day -- last
21 Thursday I met him for the first time, pretty
22 much in the board capacity.
23     Q.   Got it.  And had you ever spoken with
24 him before then?
25     A.   No.

1     Q.   All right.
2     A.   Not that I recall.
3     Q.   All right.
4     A.   I mean, we might have said hi.  It's a
5 small community, the dairy stuff is.
6     Q.   Sure.  Let's talk a little bit about
7 the farm generally.  So how big is the farm in
8 terms of number of cows?
9     A.   2,000.
10     Q.   2,000.  Has that been relatively stable
11 over the years?
12     A.   We've -- We've grown a little bit,
13 yeah.
14     Q.   Okay.
15     A.   We've grown.
16     Q.   So what was sort of the low and what's
17 sort of the high over the years?
18     A.   Well, when we started, it was -- it was
19 1,200, I think.  1,150, 1,200.
20     Q.   And I think -- I think that Dairy Star
21 article we were looking at, it talked about how
22 one of the first things you did was you looked
23 to increase the size of the farm, right, after
24 purchasing it?
25     A.   Yeah.

1     Q.   Yeah.  Okay.  So did it go from 1,200
2 to close to 2,000 pretty quickly after you
3 purchased it?
4     A.   No.
5     Q.   Okay.  It's just progressed -- slowly
6 progressed over the years?
7     A.   No.  We just did some modernization on
8 the dairy.
9     Q.   Got it.  Okay.  How many acres of land
10 is NuStar Farms?
11     A.   Oh, it's -- I think we're a big
12 whopping 34 or something like that.
13     Q.   Okay.  And how many workers does it
14 take to run the farm?
15     A.   All of them.
16     Q.   Okay.  Is there a number for how many
17 you want to have employed at any given time?
18     A.   14.
19     Q.   That's your target, to have 14
20 employees?
21     A.   Yes.
22     Q.   All right.  And I assume that from time
23 to time you lose some people and you need to
24 replace them, so there might be times when
25 there's a little below that?

21 (Pages 78 - 81)

App. 143

Page 82

1    A.   Sometimes you -- you're over, sometimes
2  you're under.
3    Q.   Okay.  What might cause you to be over
4  14?
5    A.   Say we got a new person in through
6  their time -- so now between their trial period,
7  maybe they're just not working out, so you hire
8  somebody else in between just to try to train
9  them.
10   Q.   Got it.  Tell me about the trial
11  period.  What's that?  What is the trial period
12  you just referred to?
13   A.   Usually we -- we -- like now we updated
14  our protocol to where we wait six months and see
15  how they work out.
16   Q.   Okay.  Did you have -- Was the trial
17  period shorter in the past?
18   A.   A lot of times new people, we have to
19  train them fully on their job.  And after
20  awhile, they decided they don't want to do it or
21  it's just not for them.
22   Q.   Got it.  Okay.  And so have -- let me
23  just ask this question.  Has NuStar always had a
24  trial period for new hires?
25   A.   Yeah.  We have to train -- We have to

Page 83

1  train them into our protocols.
2    Q.   Got it.  And at present, that trial
3  period is six months; right?
4    A.   Generally, yes.
5    Q.   Okay.
6    A.   Because we start -- Yeah.
7    Q.   Did it used to be a different amount of
8  time?
9    A.   Yeah, probably.  We just -- A lot of
10  times you just work.  I mean, they're employees.
11  We're trying to -- You've just got to train
12  them.  Sometimes they just don't work out into
13  the -- into the system.  They either decide they
14  want to move on and go to another job somewhere
15  else or -- or they don't.
16   Q.   I take from what you're saying, but
17  maybe I'm not interpreting this correctly, that
18  it just kind of ultimately depends on the worker
19  and whether it's working out how long their
20  trial period will be, whether they stick around,
21  things like that?
22   A.   Yeah.  I mean, we just implemented a
23  different trial period here recently just to
24  make sure that we're trying to -- quality
25  employees.  Because the -- through meetings with

Page 84

1  our long-term employees and everything, to make
2  their job -- to make them happier at their job,
3  they like to have -- where if this guy is going
4  to work with me, this -- this person is going to
5  work with me or not.
6    Q.   Gotcha.
7    A.   It's more for the employees, to make
8  sure they're happy.
9    Q.   Right.  So you have long-term employees
10  like ███████████████, people like
11  that, you want to make sure that they are
12  working with people who they like working with?
13   A.   Well, not necessarily those guys, but
14  there's a lot of other guys too.  Yeah.
15   Q.   Sure.  Got it.  Okay.  And that --
16  Okay.  Fine.  Did the trial period used to be
17  shorter than six months?
18        It's not a trick question.  I'm
19  just --
20   A.   I mean --
21   Q.   You keep on talking about a trial
22  period, and you say it's six months.  I just
23  didn't know if it used to be shorter than that
24  or not.
25   A.   Yes.

Page 85

1    Q.   Yeah, it did?  Okay.  How long was it
2  before?
3    A.   I don't remember.  I don't recall.
4    Q.   Okay.  All right.  So among the
5  employees, other than you and Lori, of course,
6  do any of -- is there anybody reporting to other
7  people?  Like, for example, does -- let me ask
8  you -- let me ask you a more specific question.
9  Does ██████████ have anybody reporting to
10  him?
11   A.   No.
12   Q.   Okay.  Does ███████████████
13  have anybody reporting to him?
14   A.   No.
15   Q.   ███████████████
16   A.   No.
17   Q.   Are there any persons other than
18  Anthony Nunes, III, who work at the farm and
19  have people reporting to them?
20   A.   Not that I know of.
21   Q.   Essentially the lines of reporting are
22  that everybody reports directly to you, Anthony
23  Nunes, III?
24   A.   That's correct.
25   Q.   Okay.

22 (Pages 82 - 85)

1    A.  We're a small family farm.  There's not
2  an HR department.  There's not a whole lot of
3  managers.  It's just -- There's just a few of
4  us.
5    Q.  No.  I understand that there's -- as
6  you say, 14 people would be working with you.
7  That's the target number at any given time;
8  right?
9    A.  That's correct.
10    Q.  Right?
11    A.  Not at any given -- I mean, we -- we
12  run 24 hours a day, seven days a week, 365 days
13  a year.
14    Q.  I --
15    A.  Everybody has their times off, and
16  there's always -- we're always working.
17    Q.  No.  I've had to learn a little bit
18  about the dairy industry for this case, and I
19  know cows have got to be milked all around the
20  clock.  Well, not all around the clock, but
21  there's shifts in which they've got to be --
22    A.  Yeah, I can tell you really don't know
23  too much about it.
24    Q.  That's fine.  I'm here to learn.  So I
25  take it that the workers work in shifts;

1  correct?
2    A.  Yeah.
3    Q.  Okay.  How long is each shift?
4    A.  Their shifts are -- we work --
5  certain -- certain employees work four -- four
6  days on, two days off, four nights on.  60-hour
7  workweeks.
8    Q.  Okay.  Say that again.  It was four
9  days, two -- four --
10    A.  Four days on --
11    Q.  Yep.
12    A.  -- two days off, four nights on, two
13  days off.
14      It's a four and two schedule.
15    Q.  Got it.  Is that common in the dairy
16  industry?
17    A.  Yes.
18    Q.  All right.  Okay.  You said certain
19  employees work those shifts?
20    A.  Yep.
21    Q.  Okay.  Not all employees work those
22  shifts?
23    A.  The ones that have to work nights.
24    Q.  Got it.  There are some --
25    A.  We switch back and forth.

1    Q.  All right.
2    A.  Because we found that it makes the
3  employees happier.
4    Q.  Got it.
5    A.  They decided that they like that
6  shift -- that style better, so we do whatever
7  makes the employee happy.
8    Q.  Out of -- Are there some employees who
9  do not work this pattern of four, two, four,
10  two?
11    A.  Yeah.  Yeah.
12    Q.  Okay.  Who are those employees?
13    A.  Those guys, they're -- they're mostly
14  day shift people --
15    Q.  Okay.
16    A.  -- that don't have to work at night, so
17  they work six ten-hour days.
18    Q.  Six ten-hour days and then one day off?
19    A.  Yeah.
20    Q.  Okay.  Now I'm doing some math in my
21  head.  And who are the day shift people?
22    A.  There -- There will be a feeder --
23    Q.  Right.
24    A.  -- there will be a -- there's a feeder,
25  there's a maintenance guy that takes care of

1  sand bedding, there's a calf guy, there's a cow
2  guy that takes care of cows, and then there's a
3  maternity person.
4    Q.  Maternity person.  Okay.  Is there one
5  feeder on the farm at present?
6    A.  Well, the guy that does sand bedding,
7  they usually relief the -- relieve the feeder.
8    Q.  Okay.  So you said there's a -- you
9  said there's a cow guy and a calf guy; right?
10    A.  Yeah.
11    Q.  Okay.
12    A.  And they -- they cross over.  They all
13  help each other.
14    Q.  Fair enough.  Is there one cow guy?
15    A.  Well, there's more -- I mean, that's
16  basically his job, yes.
17    Q.  Okay.  And -- And I understand there's
18  some crossover and people help each other.
19    A.  Yeah.
20    Q.  But there's one guy who is the cow
21  guy and there's --
22    A.  Well, he wands -- wands animals, does
23  that stuff, does all the protocols, the
24  day-to-day protocols that are --
25    Q.  Okay.

23 (Pages 86 - 89)

1     A.  -- need to be, vaccinations, things
2  like that.
3     Q.  Got it.  And one calf guy?
4     A.  Yeah.  Yep.
5     Q.  And one maintenance person?
6     A.  Well, there's -- they cross over;
7  right?
8     Q.  Understood.  I'm just trying to
9  ultimately figure out how many people are -- out
10  of the 14 employees that you are looking at at
11  any given time, how many are on the day shift
12  and how many are on the four, two, four, two
13  pattern.  Can you give me the breakdown?
14     A.  Yeah.
15     Q.  Sure.
16     A.  There's -- There's nine on the four and
17  two.
18     Q.  Okay.  Nine on the four and two.  And
19  then the other five or so are the ones we just
20  talked about, maternity --
21     A.  Not the other five or so.  It's five.
22     Q.  Exactly five?
23     A.  Yeah.
24     Q.  They are --
25     A.  The ones that I told you.

1     Q.  Right.  And those exactly five other
2  people do not include you or Lori Nunes; right?
3     A.  That's correct.
4     Q.  Those are five people other than you
5  and Lori Nunes who are on the day shift; right?
6     A.  Well, I'm always on call.
7     Q.  Well, you're always on call.  Other
8  than you and Lori Nunes, there are five people
9  who are on the day shift we just talked about?
10     A.  That's correct.
11     Q.  Gotcha.  Okay.  How do you track time
12  of employees?  Do they've got to punch in and
13  punch out each day?
14     A.  Yes.
15     Q.  Okay.  Is there like an electronic time
16  clock?
17     A.  Yes.
18     Q.  And therefore -- Okay.  So the day
19  shift people are working 60-hour weeks.  If
20  you're on a four, two --
21     A.  It's still 60 hours.
22     Q.  It adds to 60 hours total?
23     A.  Yeah.
24     Q.  Okay.  Are there anybody -- anybody at
25  the farm who's working less than 60 hours a

1  week?
2     A.  No.
3     Q.  All -- Everybody --
4     A.  I mean, we have a high school kid right
5  now working.
6     Q.  Okay.  Got it.
7     A.  Trying to teach -- teach the younger
8  generation, because nobody seems to know too
9  much about a farm these days.
10     Q.  Got it.  So the high school kid is not
11  working 60 hours a week then?
12     A.  No.
13     Q.  Okay.  But everyone else other than the
14  high school kid --
15     A.  Yes.
16     Q.  -- who is on these shifts is working 60
17  hours a week?
18     A.  That's correct.
19     Q.  Got it.  Do different -- What's the
20  hourly rate that you pay the employees?
21     A.  Anywhere from 15 on up.
22     Q.  15 on up.  Is 15 sort of the
23  entry-level rate?
24     A.  Yep.
25     Q.  15 an hour.  And it's straight time;

1  right?  There's no overtime?
2     A.  That's 60 hours.
3     Q.  I know.  But there's no overtime rate;
4  right?  There's no -- They don't get paid
5  overtime after 40 in any given week; right?
6     A.  I don't understand your question.
7     Q.  Okay.  Am I correct that everybody gets
8  paid $15 an hour for 60 hours a week?  Right?
9     A.  Yeah.
10     Q.  Okay.  And you do not pay overtime if
11  people exceed 40 hours a week; right?
12     A.  What does 40 have to do with anything?
13     Q.  That may be my answer right there.  A
14  lot of employers will pay people overtime when
15  they exceed 40, but not necessarily --
16     A.  You do realize we're ag; right?
17     Q.  I understand you're ag.
18     A.  And we're on 60-hour -- we're 60-hour
19  workweeks.
20     Q.  I understand you are.  And there's lots
21  of people on 60-hour workweeks, but other
22  industries pay overtime.  I am just confirming
23  you don't pay overtime.  That's it.
24     A.  We're not required by law.
25     Q.  I know.  And you don't do it; right?

24 (Pages 90 - 93)

1    A.  We're -- We're not required by law over
2  60.
3    Q.  I know you're not required by law.
4    A.  Okay.
5    Q.  You're not required by law.
6    A.  All right.
7    Q.  And you don't do it.
8    A.  I just want to make sure we understood,
9  because it sounded like you weren't
10  understanding.
11    Q.  I understand.
12    A.  You were asking -- You're crossing over
13  on industries.
14    Q.  I understand that the ag industry has
15  various exemptions and labor laws and that
16  includes that they don't have to pay overtime.
17  I'm just confirming that you don't pay overtime.
18  Correct?
19    A.  We -- We -- Generally not, because of
20  60-hour weeks.
21    Q.  Okay.  And you said it's $15 an hour on
22  up.  What's the high end that you pay employees?
23    A.  They're getting 20-some dollars an
24  hour.
25    Q.  So somewhere in the 20s?

1    A.  I don't -- I don't recall exactly.
2    Q.  Okay.  Okay.
3        MR. BISS:  Nate, when you get to
4  a convenient stopping point, let's take a break.
5        THE WITNESS:  Yeah.  I need to
6  use the restroom.
7        MR. BOYER:  Yeah.  Actually, that
8  sounds -- we can do it now.
9        MR. BISS:  Whenever you're ready.
10        MR. BOYER:  No.  I appreciate it.
11  But I think now is a fine enough time to stop.
12  We've been going for almost 80 or 90 minutes, so
13  let's break.
14        THE VIDEOGRAPHER:  We are going
15  off the record.  This is the end of Media Unit
16  Number 1.  The time is 11:25.
17        (A recess was taken.)
18        THE VIDEOGRAPHER:  We are back on
19  the record.  This is the beginning of Media Unit
20  Number 2.  The time is 11:41.
21    Q.  So I think I've already asked a handful
22  of questions that no doubt strike you as
23  obvious.  And I'm probably going to do a lot
24  more of that, both because, one, I'm here to
25  learn and, two, part of it is just sort of

1  making a record to sort of understand what's
2  going on and get it all down.
3        Let me start off by asking you
4  another such obvious question, but let's do it
5  anyway.  Dairy work is not seasonal agricultural
6  labor; right?
7    A.  Certain times of the year there's
8  seasonal stuff, yes.
9    Q.  Oh, okay.  What's the seasonal stuff
10  that comes up?
11    A.  Harvest.
12    Q.  What gets harvested in dairy?
13    A.  Silage.
14    Q.  Okay.
15    A.  Silage, hay, things like that.  On
16  other dairies there's pumping manure, all that
17  stuff.
18    Q.  Manure happens year-round; right?
19    A.  Yeah, but not hauling.
20    Q.  Oh, gotcha.  Gotcha.  Okay.  So --
21    A.  Not application.
22    Q.  Got it.  So when it comes to things
23  like silage, hay, stuff like that, that's
24  seasonal.  You might have spot needs to increase
25  the labor at that -- Strike that.  You might

1  need more employees at that point in time?
2    A.  Help, yeah.  More help.
3    Q.  Gotcha.  And same thing with hauling
4  manure?
5    A.  Yeah.
6    Q.  Okay.  So some spikes over the year
7  where there might be an increase in labor?
8    A.  Yeah.
9    Q.  Gotcha.  But -- But otherwise, tell me
10  if I'm wrong, you know, cows have got to be
11  milked year-round, multiple times throughout the
12  day every day; right?
13    A.  That's correct.
14    Q.  Okay.  I also -- One thing I heard is
15  that cows -- and I genuinely just kind of want
16  to learn from you.  Cows don't like a lot of new
17  people milking them at any given time.  Like
18  they sort of -- like there's something to be
19  said for the relationship that can be developed
20  between the milkers and the cows.  Is that
21  accurate, or am I just totally off base?
22    A.  I don't know.
23    Q.  It's just totally irrelevant to the
24  cows whether -- who is milking them so long as
25  they're hands?

1    A.  What do you mean by "hands"?

2    Q.  Do -- My question is this.  Do cows

3  produce milk in any way that's better if you

4  have a stable workforce as compared to a lot of

5  new people coming in to milk the cows?

6    A.  I don't -- I don't know.  I never read

7  any studies or anything like that.  I don't

8  know.

9    Q.  Okay.  Does -- Does NuStar like have a

10  practice or preference for having the same

11  people milk the cows over and over?  Like is

12  this something that NuStar is concerned about --

13    A.  No.

14    Q.  -- or is it just -- just whoever is

15  there, milk them, and move -- go on?

16    A.  No.  There's employees that's just --

17  they're -- they're job specific.

18    Q.  Got it.  Got it.  Okay.  I think I

19  follow you at this point.

20    A.  Do you?

21    Q.  I don't know.  We'll move on anyway.

22  How does that sound?

23        When new people -- When people

24  start as new employees, is there a specific job

25  that they have?

1    A.  Yes.

2    Q.  Okay.  What's that?

3    A.  Well, whatever they were -- if they

4  were maybe previously trained in another job,

5  they could do that, if there's an opening, or --

6  usually most of the turnover comes in the milk

7  parlor itself.

8    Q.  Okay.  Gotcha.  Why is most of the

9  turnover in the milk parlor?

10    A.  It's probably the most -- it's the

11  hardest job there.

12    Q.  All right.  And for the record, what is

13  the milk parlor?

14    A.  It's where we harvest the milk.

15    Q.  Got it.  I've heard terms such as

16  "milkers," "pushers."  What's -- What is a

17  milker?  Is that the person that actually does

18  the milking in the milk parlor?

19    A.  Yep.

20    Q.  All right.  I'm on to it.  And a

21  pusher, what's a pusher?

22    A.  They push cows.

23    Q.  All right.

24    A.  Clean stalls.

25    Q.  Got it.  And if I take from your prior

1  answer -- Well, let me -- let me just ask the

2  question.  Are most new employees starting off

3  as milkers?

4    A.  Yes, because that's where you hit most

5  of the turnover from.  It's pretty repetitive.

6    Q.  Got it.  Okay.  We noticed a lot of

7  turnover in the workforce, looking at the list

8  of employees and the amount of time they've been

9  there.  There's been a lot of people that we saw

10  on the list that were only there for literally a

11  day, like there was a start date and an end

12  date.  Why is there so much turnover?

13    A.  Maybe it's not the job for them.

14    Q.  Okay.  Anything else?  Just people

15  start and then they say, "I'm done"?

16    A.  Yeah.

17    Q.  Okay.  They might -- You specifically

18  recall a lot of people only working one day and

19  then leaving?

20    A.  No.

21    Q.  Okay.  Do you recall that ever

22  happening?

23    A.  Yeah.

24    Q.  Okay.  According to the records, we had

25  something like 61 names of people that started

1  one day and left.

2    A.  Okay.

3    Q.  Does that seem right to you?

4    A.  If you say so.

5    Q.  I mean, I'm just looking at the

6  interrogatory responses.

7    A.  I don't know.  I never counted them,

8  no.

9    Q.  Okay.  That's fine.  And we saw a lot

10  of other people that were employed for only a

11  week or two or a month or something like that.

12  Does that sound right to you as well?

13    A.  Yeah.  It's possible, yeah.

14    Q.  Okay.  When people leave, does NuStar

15  ask them why they're leaving?

16    A.  I don't necessarily -- you know, you

17  want to know, because you want to try to

18  better -- you want to try to make a better work

19  environment.

20    Q.  Right.  Like an exit interview?  Does

21  NuStar do exit interviews?

22    A.  What's an exit interview?

23    Q.  It would be a meeting with the person

24  who's leaving so that you can make a better work

25  environment going forward.

App. 148

1    A.   Okay.  Yeah.
2    Q.   Is that -- Is that more or less what
3    you do sometimes?
4    A.   Well, you just want to know what
5    they're -- why -- why they're leaving.
6    Q.   Okay.  Got it.  And what do they say?
7    Well, I know it's a general question.
8    A.   A lot of times they just -- they just
9    don't -- don't want to -- they don't like that
10   job, they want to do a different job.  Maybe
11   they came from another trade, maybe they came
12   from, you know, construction and it's in their
13   off time.  I don't know.  It's a lot of things
14   like that.
15   Q.   Got it.  Any other reasons that people
16   provide that you can think of?
17   A.   Not offhand.
18   Q.   All right.  Is the hiring process
19   different for people who only end up staying for
20   short periods of time?
21   A.   No.
22   Q.   Same standard process we talked about
23   earlier; right?
24   A.   Yep.
25   Q.   For everybody who comes in; right?

1    A.   There's a --
2    Q.   Do you expect --
3    A.   -- strict protocol we stay -- stick
4    with.
5    Q.   Very well.  Do you expect some people
6    to only work for short periods of time?
7    A.   No.  Never.  Never.
8    Q.   You always -- You always hire people
9    expecting them to be long-term employees?
10   A.   I would love for them to be long-term
11   employees.  Always.
12   Q.   Got it.  Earlier we talked about how
13   sometimes there's spikes in -- over the course
14   of the year of additional --
15   A.   Okay.
16   Q.   -- labor needed.
17        Do you hire people at that point
18   in time, saying, "Hey, we're only going to need
19   you for -- you know, to help with silage for a
20   short period of time"?
21   A.   Yeah.  They --
22   Q.   Okay.
23   A.   People that want to work extra, they
24   have a job somewhere else and they want to work
25   extra, or they're retired or they're farmers or

1    something like that.  Yeah.
2    Q.   Got it.  So sometimes you do bring
3    people on board knowing that they'll only be
4    working for a short period of time with you
5    guys?
6    A.   Yeah.  Yeah.
7    Q.   All right.  Okay.  We were talking
8    earlier about the -- sort of the training period
9    that you have of six months, right, at the
10   beginning?
11   A.   Okay.
12   Q.   Right?  Are the workers paid less
13   during the training period?
14   A.   No.  They're paid $15 an hour.
15   Q.   15?
16   A.   And after six months they get $16 an
17   hour.
18   Q.   Got it.  Okay.
19   A.   And then after that they get a 25 cent
20   pay raise every year after that.
21   Q.   And is that the way NuStar has always
22   done it, the 25 cent pay raise year after year?
23   A.   No, not always.  Generally we have to
24   keep going up in price anyways.  Labor keeps
25   going up.  I think -- I think we started -- I

1    think we started at like 10 when we moved
2    from -- when NuStar started.
3    Q.   Okay.  So now -- it used to be $10 when
4    you started, now it's $15 when you started?
5    A.   Yeah.  That's entry level, so --
6    Q.   Gotcha.  Entry level.  And then it goes
7    up to 16 once they're done with their training
8    period?
9    A.   Six months, yeah.
10   Q.   After six months?
11   A.   Yeah.
12   Q.   Yep.  And then after that it's a
13   quarter raise every year thereafter?  At least
14   that's what NuStar is doing right now?
15   A.   25 cents, yes.
16   Q.   Yes.  Right.  25 cents.  Right.
17   A.   But generally it goes up faster than
18   that.
19   Q.   Is this -- Is this high level of
20   turnover that we're talking about -- now, do you
21   know, is that common in the dairy industry?
22   A.   You say it's a high -- a high -- You
23   say it's high turnover.  I don't know.
24   Q.   Okay.
25   A.   I've never seen a study done on how

800-567-8658                                                973-410-4098

App. 1149

1    much turnover one is supposed to have.
2    Q.  Gotcha.  The amount of turnover that
3    you have -- Forget my characterization of it as
4    high.  Okay?  The amount of turnover you have, I
5    take it you don't know one way or another
6    whether that's typical in the dairy industry or
7    not?
8    A.  I have no idea.
9    Q.  Okay.  Let's talk about the different
10    benefits that you provide to employees, "you"
11    being NuStar here, as it has been.
12    A.  Okay.
13    Q.  Do employees get health insurance?
14    A.  No.
15    Q.  Okay.  Do they get paid vacation and
16    holidays?
17    A.  Yes.
18    Q.  Okay.  How much paid vacation time do
19    they get?
20    A.  Generally it depends when they start.
21    When they first start, it's about -- it's a
22    week, and then after that it's two weeks.
23    Q.  Got it.  And I'm going to -- well,
24    look, I don't have that much experience with the
25    dairy industry, but my dad was a retired

1    firefighter -- is a retired firefighter, so I
2    know that there are some jobs where holidays
3    don't count and you've got to work anyway.  I
4    take it dairy industry people probably don't get
5    holidays off, do they?
6    A.  No.
7    Q.  No.
8    A.  If you're -- yeah, you do if it's your
9    day off.
10    Q.  If it's your day off, right, or you
11    could take vacation?
12    A.  Well, no.  Like this year -- this year
13    my children -- my two older daughters and I,
14    we -- we went on Christmas, because we have
15    another one that -- it wasn't his day off, but
16    we gave -- because he has small children at
17    home, they're 4 or 5 years old, we gave him the
18    day off and we went to work.  We made sure
19    that -- that he was taken care of so he could be
20    with his family.
21    Q.  Awesome.  Very good.
22    A.  So we make those -- we make -- we try
23    to make it best as possible, because everybody
24    has to work all the time, so you want to try to
25    help out wherever we can to make sure that

1    everybody can spend as much time with their
2    family as possible.  It's real critical to --
3    to -- for people to be happy, employees to be
4    happy, and so we try to accommodate as best as
5    possible those situations.
6          And sometimes they'll forgo and
7    say, "Hey, I don't want -- I don't want off, you
8    know.  Give so-and-so off."  We're a giant
9    family there.  Everybody tries to work together
10    to make it all work.
11    Q.  Well, that's good.  That's great.  Do
12    you offer paid family or -- family leave or
13    paid sick leave?
14    A.  Generally if somebody is ill we -- we
15    pay them.
16    Q.  Okay.
17    A.  You know, it's not -- no fault of
18    theirs.
19    Q.  Right.  Are there any sort of
20    retirement plans that people participate in,
21    like 401(k)s?
22    A.  No.
23    Q.  Or pensions or anything like that?
24    A.  No.
25    Q.  Free parking at the firm -- at the

1    farm; right?  That's a joke.
2    A.  Right.
3    Q.  I'm just kidding.  But in any event, I
4    take it all of the employees drive to work;
5    right?
6    A.  I -- I don't -- I don't know.  Some --
7    Some drive, some don't.
8    Q.  Some drive, some don't.  Do they walk
9    there?
10    A.  They just get rides.
11    Q.  What's that?
12    A.  They -- We're not that far from town,
13    so some like to exercise, so they do it -- I
14    don't know.
15    Q.  Oh, some -- some will ride bikes or
16    something?
17    A.  Oh, yeah.  Yeah.  Yeah.
18    Q.  Okay.  Great.  We talked a little bit
19    about housing earlier, right, and that you own a
20    couple of other residential properties that a
21    couple of your employees live in; right?
22    A.  NuStar Farms does -- only owns the 414.
23    Q.  Fine.  That's fine.  Anthony Nunes,
24    III, who now happens to be a 5 percent owner of
25    NuStar Farms, he owns two residential

28 (Pages 106 - 109)

App. 150

Page 110

1  properties?
2      A.  My wife and I do, yes.
3      Q.  Very good.  The -- Why do you own those
4  properties, Anthony Nunes, III?
5      A.  I -- I bought the houses to have extra
6  income for -- for me personally.
7      Q.  Okay.  Do you charge the people who
8  live there rent?
9      A.  The people there rent?
10     Q.  Yes.  Yes.
11     A.  No.  No.  The farm pays for that.
12     Q.  Okay.  So --
13     A.  NuStar Farms is renting it from Lori
14  and I.
15     Q.  I see.  Got you.  So just to break it
16  down, make sure I got it, as we already talked
17  about, you and Lori own those two houses; right?
18     A.  That's correct.
19     Q.  Okay.  NuStar Farms pays rent to you
20  and Lori for those two houses; right?
21     A.  That's correct.
22     Q.  Okay.  How much is the rent that they
23  pay for each of them?
24     A.  I don't recall.  It's like $400 and
25  $500, something like that.

Page 111

1      Q.  Gotcha.  Okay.
2      A.  One house is a little bit bigger than
3  the other, so something like that.  I don't
4  recall.
5      Q.  Okay.  So --
6      A.  I don't -- I don't think the rent has
7  changed since anybody has lived in -- since they
8  moved in.  We haven't upped the rent.
9      Q.  It's $500 for both houses combined?
10     A.  No.  It's 400 for one, I think 500 for
11  the other.  Something like that.
12     Q.  Okay.  So you're getting somewhere
13  around $900 a month --
14     A.  Yeah.
15     Q.  -- in rental income?
16     A.  Yeah.
17     Q.  Okay.  Got it.  And I take it do you
18  and Lori kind of manage those properties?  Like
19  in other words, if there's problems with any --
20  with the fixtures or anything like that, you
21  guys work to fix them?
22     A.  Yeah, I guess so.  Yeah.
23     Q.  Okay.  Because you're -- Okay.  Was
24  part of the reason that you got the house --
25  that you purchased the houses so that you could

Page 112

1  then rent them to -- Strike that.
2          Was part of the reason that you
3  purchased the houses so that you could then
4  provide housing to a couple of your employees?
5      A.  Well, we got them because like --
6  ▮▮▮▮  he was living in Worthington.
7      Q.  Right.
8      A.  And so we wanted him to be closer to
9  the farm, so we just did that.  And I -- he had
10  a house, and I don't know if his -- one of his
11  daughters or something moved into that house.
12  I'm not sure.  I don't remember.
13     Q.  Got it.  And what about the other house
14  or the one ▮▮▮▮ ives in?
15     A.  Yeah.
16     Q.  Was part of the reason you purchased
17  the house and then rented it to NuStar to
18  provide housing to ▮▮▮▮
19     A.  Yeah, because they -- well, not -- not
20  necessarily for him in general.  It's just -- It
21  was -- They were going to rent a house anyways.
22  There was going to be a rental anyways, so might
23  as well do it that way.
24     Q.  Got it.  Does -- Now -- Now I guess you
25  would wear your NuStar Farms hat in answering

Page 113

1  this question.
2      A.  Okay.
3      Q.  Does ▮▮▮▮ pay any rental -- pay rent
4  to NuStar Farms?
5      A.  No.
6      Q.  So it's offered free of charge to him?
7      A.  Yes.  It's part of his pay.
8      Q.  It's part of -- It's part of his
9  compensation; right?
10     A.  Yeah.
11     Q.  And the same thing with ▮▮▮▮.  It's
12  part of his compensation; right?
13     A.  Yeah.
14     Q.  Right?
15     A.  Yeah.
16     Q.  So why these two specific employees?
17  Why do they get this extra compensation?
18     A.  Because they've been there a long time.
19  That's how originally we just -- that's how it
20  was set up.
21     Q.  Got it.  ▮▮▮▮ has been there since, I
22  think, 2008.  Does that sound about right?
23     A.  I don't remember when he started.
24     Q.  Okay.  But he's been there a long time?
25     A.  He's been here a long time.

29 (Pages 110 - 113)

Page 114

1   Q.  And he's --
2   A.  I don't remember when he started, no.
3   Q.  And he's been putting in -- he's
4   probably been putting in 60-hour weeks ever
5   since he started; right?
6   A.  Well, yeah.  He's employed, yeah.
7   Q.  He's a full-time employee; right?
8   A.  Yeah.
9   Q.  Exactly.  Same thing with ███,
10  right?
11  A.  Yeah.
12  Q.  Okay.  Do you -- Does NuStar treat this
13  housing -- Actually, let me start -- let me do
14  it this way.
15       MR. BOYER:  What are we up to?
16  Mark this as number 12.  Number 12.
17       (Exhibit 12 was marked for
18       identification by the reporter.)
19  Q.  So, Mr. Nunes, you've been handed a
20  document that has been marked as Defendants'
21  Exhibit 12.
22  A.  Okay.
23  Q.  First of all, take a look at the bottom
24  of this first page.  You'll see it has a Bates
25  stamp that says "Genske_970"; right?

Page 115

1   A.  Okay.
2   Q.  Okay.  Do you know what Genske refers
3   to?
4   A.  No.  I assume it's Genske, Mulder.
5   Q.  Yes.  And those are your accountants;
6   right?
7   A.  That's correct.
8   Q.  Gotcha.  So we got these documents from
9   your accountants.  That's why it has these --
10  this stamp Genske; right?  We subpoenaed them
11  for documents concerning the farm, the farm's
12  operations; right?  So why don't we take a look
13  at -- I'm looking at 2015 now.  Why don't we go
14  to the page that says "Genske_982" at the
15  bottom.
16  A.  Okay.
17  Q.  Okay.  So Genske_982, we're now looking
18  at the notes to the financial statements.  And
19  I'll draw your attention to where it says "7.
20  Lease."  Do you see that toward the bottom of
21  the page?
22  A.  Okay.
23  Q.  It says "The Company leases employee
24  housing on a month-to-month basis for $500 per
25  month"; right?

Page 116

1   A.  Okay.
2   Q.  Is that -- Is this notation in the
3   company's audited financial statements what you
4   were just referring to, namely the lease
5   payments that the company pays to you and Lori
6   to lease the housing?
7   A.  I'm going to assume so, since there's
8   no other one.
9   Q.  Right.  Well, that's -- that's perhaps
10  the question; right?  Are you aware of NuStar
11  renting or leasing any other property for
12  housing for its employees?
13  A.  We generally not -- generally try not
14  to do that unless somebody is really in a pinch,
15  they have a problem, and they need a house.
16  Right?
17  Q.  Gotcha.
18  A.  Like they're out of their house -- they
19  got -- they need a house for some reason.  We
20  generally try not to be involved in housing.
21  Q.  Okay.
22  A.  It just -- It's -- There's no reason
23  for a middle person in there.  If they need a
24  house, they rent their house, and just
25  compensate them for -- just in pay.  Just pay

Page 117

1   them properly.
2   Q.  Got it.  Do you pay more to compensate
3   them if they have to rent elsewhere, or is it
4   just -- or are you saying, you know, they get
5   paid the same regardless?
6   A.  Well, I'm not following you.
7   Q.  Sure.
8   A.  I'm not tracking.
9   Q.  You were saying, if I understood you
10  just a moment ago, that you try not to get
11  involved in housing; right?
12  A.  That's correct.
13  Q.  Okay.  Which means --
14  A.  Me meaning NuStar Farms; right?
15  Q.  NuStar Farms, LLC.
16  A.  Okay.
17  Q.  You, NuStar Farms, does not -- tries
18  not to get involved in housing; right?
19  A.  That's correct.
20  Q.  Okay.  And therefore, the employees
21  generally find their own housing; right?
22  A.  That's correct.
23  Q.  Okay.  Do you pay the employees
24  additional amounts in order to cover their
25  housing?

30 (Pages 114 - 117)

Page 118

1    A.  No.  No.  They just get their hourly
2  rate.
3    Q.  Gotcha.  They get their hourly rate.
4  Okay.  Okay.  And you -- if I understood you
5  earlier too, you said that there have been some
6  instances where you have provided housing?
7    A.  Helped.  Helped --
8    Q.  Helped?
9    A.  -- get one, get it set up for them.
10       Short -- Short periods of time,
11  just to get -- just to get -- for whatever
12  reasons.  I don't recall exactly.
13    Q.  Okay.  How do you help in those
14  settings?
15    A.  Well, just because we know people that
16  own houses, so you go, okay, "Hey, do you have a
17  house for anything?"
18       They go "Yes."
19       "Okay.  So-and-so needs a house."
20       "Okay."
21    Q.  Got it.  Okay.
22    A.  We try not to do that, try not to rent
23  houses.  We try not to mess with any housing
24  whatsoever.
25    Q.  Okay.  And why -- why do you try to not

Page 119

1  mess with housing?
2    A.  It's just -- You don't want to get
3  involved in between renters and rentees.  You're
4  just a middle person, and it never works.
5  That's never a good spot to be in.
6    Q.  Okay.
7    A.  You know, because if the person is
8  dirty or the house is bad or whatever reason,
9  it's never good to be in the middle.
10    Q.  Got it.  So for the two houses that
11  Anthony Nunes, III, owns, I take it that there
12  was no like application process that either ███
13  ███████████ went to -- went through in
14  order to apply for housing with you?
15    A.  Vetting?
16    Q.  There was no vetting?
17    A.  No.
18    Q.  No.
19    A.  No.
20    Q.  The vetting was implicit in them having
21  worked for you for so long; right?  You trusted
22  them; right?
23    A.  Yeah.  They're good -- They're good
24  people.
25    Q.  Good people?

Page 120

1    A.  Really good people.
2    Q.  Okay.  There's no -- I know further
3  silly questions, but just to make sure the
4  record is clear, there's no like letters of
5  recommendations or credit checks or anything you
6  did for them; right?
7    A.  No.
8    Q.  Okay.
9    A.  We're not -- We're not a big
10  corporation.  We're a small family farm.  We
11  don't -- We don't do that stuff.
12    Q.  Understood.  Do you know, do
13  employees -- will employees travel during their
14  vacation time each year?
15    A.  I have no idea.
16    Q.  No idea what they do on vacation time?
17    A.  They're not at work.  It's not up to --
18  I don't --
19    Q.  Okay.  Do you have an -- Do you have an
20  understanding that some of the employees live
21  pretty far away from their family members?
22    A.  That's -- Yeah.
23    Q.  I think -- All right.  Okay.  So how
24  did you ultimately determine that ███████████
25  ████████ would be allowed to live in the

Page 121

1  houses that NuStar rents from Anthony Nunes,
2  III, and not other employees?
3    A.  Just -- I don't know.  Just -- They
4  must have -- at the time we got it, like I told
5  you before, we wanted ███████ to move --
6    Q.  Right.
7    A.  -- closer to -- to the dairy, the farm.
8       And then I don't recall why
9  ████████ maybe just out of default.  I don't
10  know.
11    Q.  Okay.  Well, I mean, was -- you don't
12  recall why ███████ was allowed to live there
13  versus any of the other longtime employees?
14    A.  Yeah, I don't -- I don't recall.
15    Q.  Okay.
16    A.  No.
17    Q.  Okay.  Do you know how long -- I can't
18  remember if I asked this before.
19    A.  He probably was maybe renting from
20  somebody else and he needed something.  I
21  don't -- I don't remember.
22    Q.  Got it.  Okay.  I take it you don't
23  post any -- Now I want to hop back over to sort
24  of the onboarding and the job application
25  process.  We already talked about you don't do

31 (Pages 118 - 121)

1  advertisements. You don't -- Do you post
2  anything with the Iowa Employment Service when
3  you have job openings?
4      A. I don't know what that is.
5      Q. So that's a no then; right?
6      A. I would have to say so.
7      Q. Okay. So do you know how many
8  currently pending applications you have?
9      A. I have no idea.
10     Q. No idea? We'll take a look -- We'll
11 probably -- I'll take a look during the break at
12 the one that you guys just provided me. And I
13 might have some questions about that, but we'll
14 table that for a moment.
15         Do you have -- Do you interview
16 candidates for jobs when they -- when they come
17 looking for a job?
18     A. Yeah. I mean, you talk to them, yeah.
19     Q. Do you have a typical script you
20 follow, or just sort of casual conversation
21 or --
22     A. No, no script. No. We don't have an
23 HR department.
24     Q. I understand. Do you typically just do
25 one interview with the employees?

1      A. I would say yes.
2      Q. Okay. And would you typically offer a
3  job on the spot if they check out and you like
4  them?
5      A. If they're looking for a job and if we
6  need somebody, yeah, I guess so.
7      Q. Okay. Have you, that is NuStar -- And
8  all these questions will be NuStar questions.
9  Okay?
10     A. Okay.
11     Q. Have you ever filed petitions or
12 applications or sponsored an employee for
13 immigration benefits in the U.S.?
14     A. No.
15     Q. Okay. So let's talk about I-9 forms.
16 When did you first become aware of your legal
17 obligation as an employer to verify employees'
18 eligibility to work in the U.S.?
19     A. Oh, it's been a long -- since the --
20 since NuStar Farms started.
21     Q. You've known about your -- these
22 obligations at least as long as NuStar Farms
23 started; right?
24     A. Yeah.
25     Q. Fair enough. How did you learn about

1  it?
2      A. It's the law.
3      Q. Okay. Well, how did you learn about
4  the legal requirements? Did you attend, for
5  example, an industry seminar on how to do it?
6      A. No.
7      Q. Okay. Did you -- Did you just -- Did
8  you have conversations with lawyers or something
9  like that?
10     A. No.
11     Q. Okay. How did NuStar learn the process
12 by which it needs to complete I-9 forms?
13     A. I guess it was passed down by my
14 family.
15     Q. Okay.
16     A. I mean, you always have to do that
17 stuff. It's all legal obligations. No
18 different than a W -- W-4 and all that stuff.
19     Q. Got it. And family members -- Nunes
20 family members have been employing people in the
21 dairy industry for a while; right?
22     A. I'm fourth generation.
23     Q. Fourth generation.
24     A. It's not --
25     Q. So there's lots of institutional

1  knowledge about hiring people?
2      A. I don't know about institutional
3  knowledge about hiring people, but I've been in
4  the dairy -- I'm the fourth generation dairy
5  person.
6      Q. Understood. It's passed down from
7  family members, as you said; right?
8      A. I -- It's a legal obligation. You have
9  to do it.
10     Q. Got it. So what is NuStar's process
11 for verifying employee eligibility to work in
12 the United States?
13     A. We -- You have to have two forms of ID.
14     Q. Okay. Go on.
15     A. You have to have a Social Security card
16 and -- and another photo ID, just like the form
17 says.
18     Q. Okay. And then what?
19     A. That's it.
20     Q. People present NuStar a Social Security
21 card and one or two photo IDs?
22     A. One -- Just a photo ID. That's all
23 that's required.
24     Q. Okay. So they present that to NuStar,
25 and that's it? Nothing else needs to be done?

32 (Pages 122 - 125)

1    A.   Nothing else needs to be done.
2    Q.   Okay.  What --
3    A.   I guess.  I don't -- I guess I don't
4  recall.  What do you -- What do you mean?  I
5  don't know what you mean, I guess is what I
6  mean.
7    Q.   Well, I mean, so they -- why don't we
8  talk about these cards.  Okay?
9    A.   Okay.
10   Q.   So an employee will present to you a
11 Social Security card and a photo ID; right?
12   A.   Yeah.  With their I-9.
13   Q.   Okay.  And that will be -- that will
14 accompany their I-9 form that they've completed
15 their portion; is that right?
16   A.   That's correct.
17   Q.   Gotcha.  Okay.  What does NuStar do
18 with those cards?
19   A.   Photocopies.
20   Q.   Makes photocopies and sticks them in a
21 file; right?
22   A.   That's correct.
23   Q.   Does it review the cards?
24   A.   Yes.
25   Q.   What does it review them for?

1    A.   We review for -- to make sure that
2  they're -- they're authentic.
3    Q.   Okay.  And how does it do that?
4    A.   Just looking at it.
5    Q.   Just looking at it?  Okay.  Why does --
6  Why does NuStar do this?
7    A.   It's a legal requirement.
8    Q.   Is NuStar trying to verify the legal
9  status of its employees or just doing paperwork?
10   A.   It's the paperwork that has to be done.
11 We have to look at it.  It says right on the I-9
12 that you have to make sure that it's -- it looks
13 authentic.  I do believe -- What does it say on
14 a -- Do you have an I-9 form?
15   Q.   Oh, we'll -- I promise you, we'll look
16 at a couple today.
17   A.   Okay.  Super.
18   Q.   Yes.
19   A.   Then that will answer your question.
20   Q.   All right.  What sort of -- When NuStar
21 is reviewing it to -- reviewing the documents as
22 to what they're -- whether or not they're --
23 Strike that.
24        When NuStar is reviewing the
25 documents to see if they are authentic, what is

1  NuStar looking for?
2    A.   Just make sure they have their cards.
3  They have a Social Security card, they have a
4  photo ID.
5    Q.   Just make sure they exist, basically?
6    A.   That's what we are supposed to do.
7  That's what we're required to do.
8    Q.   Anything else NuStar needs -- does when
9  it looks at the cards?  Does it scrutinize them
10 in any way?
11   A.   I look at them, yeah.
12   Q.   I know, but like do you review them,
13 for example, for like expiration dates?  Like
14 would you accept an expired card?
15   A.   On -- On what?  A Social Security card?
16   Q.   No.  Social Security cards don't have
17 expiration dates, but would you accept an
18 expired ID?
19   A.   No.
20   Q.   Because that wouldn't be a valid work
21 authorization; right?
22   A.   That's correct.
23   Q.   And therefore, if somebody presented
24 you with an expired ID, you would look for that
25 and wouldn't accept it; right?

1    A.   That's correct.
2    Q.   Okay.  And then what about indicia of
3  forgery, things like mismatched fonts on a
4  Social Security card?  Do you focus on that
5  stuff?
6    A.   Mismatched fonts?
7    Q.   Fonts, correct.
8    A.   On a -- they all look the same.
9    Q.   All the fonts on all Social Security
10 cards?
11   A.   I've never seen any that looked
12 different.
13   Q.   Okay.  Very well.  All Social Security
14 cards have the same font on them?
15   A.   I have no idea.
16   Q.   No idea?  You're not focusing on that?
17   A.   That's -- All of them?  I don't know
18 how they were when they first were -- come out
19 to now.  I don't know if they changed -- if the
20 government has changed it or not.  I don't --
21 I've never known that.
22   Q.   Gotcha.  What about do you -- do you at
23 least confirm whether or not the name on the I-9
24 matches the names on the cards?  Do you look for
25 that?

33 (Pages 126 - 129)

Page 130

1    A.  Yes.
2    Q.  Okay.  And if there's some -- And if
3  there's an inconsistency, if they don't match,
4  then you wouldn't hire the person?
5    A.  Yeah.  Because they fill out their --
6  their part, and then we have to make sure
7  everything matches up, which you've got to
8  make -- I mean, they can't just have, you
9  know -- they can't have John Smith and have --
10  have Frank Smith's IDs.  That doesn't work.
11    Q.  Sure.  Has anybody ever presented cards
12  to you like that which didn't match?
13    A.  No.
14    Q.  No?
15    A.  No.  I never seen that before.
16    Q.  Have you ever been presented with cards
17  that you looked at and you said, "Those are
18  fraudulent.  I'm not going to accept them"?
19    A.  I've never -- I -- No.
20    Q.  No?
21    A.  I've never seen any, no.
22    Q.  100 percent of the cards that people
23  have presented to you for --
24    A.  All the employees that we have --
25    Q.  Of the employees --

Page 131

1    A.  -- that we've had or had had the
2  correct -- the strict protocol information on
3  it, it had the Social Security and their cards.
4    Q.  Got it.
5    A.  The photo ID.
6    Q.  Have you rejected anybody who wanted to
7  be an employee?
8    A.  No.  I've never seen -- I never seen
9  that.
10    Q.  So -- So 100 percent of the applicants
11  who have presented documents to you showed you
12  cards that were, as far as you could tell,
13  authentic?
14    A.  Yeah.
15    Q.  Okay.  What about mismatched
16  signatures?  Would that be a flag for you, if
17  the signature on the I-9 wasn't the same on the
18  cards?
19    A.  Yeah, I -- is there -- I don't know.  I
20  guess as long as the names match up, I don't
21  know how they sign their information.  I don't
22  know.
23    Q.  Are you focusing on that at all?
24    A.  I mean, I just look at the card to make
25  sure that they look legit, that they're --

Page 132

1  they're proper, the proper documentation with
2  the proper -- with numbers, and that's all I can
3  do.
4    Q.  Got it.
5    A.  It says right on the I-9 form what I
6  can and cannot do.
7    Q.  Okay.  So my understanding is that a
8  lot of the employees on the farm are native
9  Spanish speakers; is that correct?
10    A.  Native Spanish speakers?  I don't --
11    Q.  Yes.  They speak Spanish; is that
12  correct?
13    A.  Yeah.
14    Q.  Okay.  Do a lot of them not speak
15  English?
16    A.  I don't know.
17    Q.  Okay.  Do you talk to these employees,
18  all of whom apparently report to you directly?
19    A.  Yeah.
20    Q.  Okay.  And how do you speak with them,
21  in English or in Spanish?
22    A.  Both.
23    Q.  Okay.  Oh, you speak Spanish?
24    A.  Yes.
25    Q.  Excellent.  Good.  Is that something

Page 133

1  you've kind of learned working on the dairy
2  farms, or is it something you've learned
3  elsewhere?
4    A.  No.  I'm self-taught.
5    Q.  All right.  Great.  Bueno.
6    A.  Yeah.
7    Q.  That's all I know.  That's the extent
8  my knowledge.
9    A.  Very, very fluent.
10    Q.  Okay.  So my -- is it correct that a
11  lot of the workers don't read English?
12    A.  That I don't know.
13    Q.  Okay.  Do you present the I-9 forms to
14  the employees in the English version of the form
15  or the Spanish version of the form?
16    A.  They used to have a Spanish version.
17  At one time they did.  I think they did have a
18  Spanish version, but I don't know if they have
19  it or not.  It's -- It's all in -- I know it's
20  in English now.  I know there was a period of
21  time where they did have some.  The government
22  changes those forms constantly, so it's
23  really -- I don't remember.
24    Q.  Got it.  Who -- Who at the farm
25  presents the I-9 forms to the employees?

34 (Pages 130 - 133)

1    A. It's in a packet. We have a packet
2 with their information that they keep with the
3 form that they have to turn in.
4    Q. Their information they keep, what's
5 that that you're referring to?
6    A. It's just the government printed --
7 it's stuff that goes with the -- the packet.
8 When you get the I-9s, it prints off. I'm not
9 really sure what it is. You'd have to ask Lori
10 on that.
11    Q. Gotcha.
12    A. I don't -- I don't really read that.
13 It's just a packet that they need to fill out,
14 and that's what I hand off.
15    Q. When -- When you hand it to them, the
16 I-9 itself is blank; is that correct?
17    A. That's correct.
18    Q. All right. And we'll take a look at a
19 lot of these. A lot of these forms are in
20 English. Okay?
21    A. Okay.
22    Q. Is there somebody who is assisting them
23 with the translation of the forms?
24    A. On some of them it has that. It has
25 that right on there, if you helped them.

1    Q. Right.
2    A. If there was a translator or somebody
3 to help them, they have to mark that box there.
4    Q. Got it. Okay.
5    A. Once again, if you had the I-9 form, I
6 could look at it and show you where it's at,
7 but --
8    Q. I promise you, we will look at some
9 very shortly.
10    A. Okay.
11    Q. Have you ever read the -- Let me take
12 it this way. I take it from your answers that
13 you have not read a document that's called the
14 Handbook for Employers by -- that's issued by
15 the USCIS and its predecessor the INS for
16 completing I-9 forms and employment eligibility
17 verifications? Have you read that handbook?
18    A. No.
19    Q. Okay. I take it, as far as you know,
20 you probably don't have a copy of that handbook;
21 right?
22    A. I don't. I don't know what that is.
23    Q. Okay. Does somebody at NuStar ever
24 serve as the translator for completing
25 documents?

1    A. No.
2    Q. All right.
3    A. We can't. We can't.
4    Q. You can't?
5    A. We can't assist them.
6    Q. You can't assist them in completing it?
7    A. No.
8    Q. Okay. Got it. So let me be clear when
9 I say "someone at NuStar." I don't mean just
10 you, Anthony Nunes. I mean, obviously, the
11 employees as well. Do some of the other
12 employees sometimes assist these people?
13    A. I don't -- I don't think so, no, unless
14 they're friends and they -- they marked the
15 paper or something. I don't -- I don't recall.
16    Q. And if I recall, Lori is typically the
17 one who will give them the packet of documents;
18 right?
19    A. No, that's not what I said.
20    Q. Okay. See, that's why we double-check.
21 Are you the one that typically gives them the
22 packet?
23    A. I give them the packet.
24    Q. Gotcha. And do they tend to fill out
25 the I-9 forms on the spot?

1    A. Generally not, no.
2    Q. Okay.
3    A. Usually they're -- they just want to --
4 they always -- I say, "Do you want to fill it
5 out now, or would you like to take it home?" I
6 think they feel more comfortable doing it at
7 home, make sure they go through it correctly.
8        It's very important that they
9 understand what they're -- they're doing on the
10 I-9s and the W-4s and all that. We need to make
11 sure that they understand it fully. Sometimes,
12 you know, they feel more comfortable doing it at
13 home when they have their time. That's fine.
14    Q. Got it. Okay. Does -- By when does
15 NuStar require the employees to complete and
16 return the I-9 form?
17    A. The I-9 form is generally -- we want it
18 right away, but we will not issue checks unless
19 it's -- they have all the proper documentation.
20 They will not allow us to send a check out
21 without the proper documentation.
22    Q. Got it.
23    A. But we do require on the first day of
24 work that they have their -- their Social
25 Security card and their photo ID.

Page 138

1  Q. Got it.
2  A. The paperwork they could do on their
3  time so they understand it fully and do that,
4  but we do take the -- the Social Security card
5  and the photo ID right away --
6  Q. Got it. So --
7  A. -- and make copies of that, because we
8  don't -- we can't -- you can't hire illegal
9  people.
10  Q. Right. So -- So this is helpful to
11  kind of set the scene. Somebody shows up at the
12  farm looking for a job. Okay?
13  A. Okay.
14  Q. And then they -- you may hire them on
15  the spot if you have a need and it works out?
16  A. Very rarely.
17  Q. Oh, very rarely? Okay.
18  A. Very rarely does somebody get hired on
19  the spot.
20  Q. Okay. So --
21  A. We don't do fly-by-night stuff. That
22  doesn't work.
23  Q. Okay. So you have -- you might talk to
24  them on the spot and have sort of an interview
25  there?

Page 139

1  A. You can talk to them, yeah. Yeah.
2  Q. Gotcha.
3  A. They come in looking for a job, you
4  want to do a job interview, you know, say, "Hey,
5  where are you working? Where are you at right
6  now? What are you doing? Why are you looking
7  for a job?"
8  Q. Right.
9  A. Because you don't want somebody that's
10  bouncing around all over, you know.
11  Q. Sure. Okay. But then you'll take some
12  time to think about whether to hire them and get
13  back to them if you want them?
14  A. Yeah. You just don't want to hire just
15  some random people. That doesn't -- That
16  doesn't do us any good.
17  Q. Sure.
18  A. They're skilled -- All those people --
19  Everybody that -- All of our employees are very
20  skilled laborers.
21  Q. Okay.
22  A. They're all very skilled.
23  Q. Very good. Excellent. So then they
24  will come -- So then if you do offer them a job
25  and they want to work, I take it they come in

Page 140

1  the first day with their Social Security card
2  and ID?
3  A. Yes.
4  Q. Got it. They say, "Here it is," you
5  make a scan; right?
6  A. Yes.
7  Q. Okay. And then on that first day you
8  give them the packet we were just talking about?
9  A. That's correct. They get the packet,
10  they give me the cards, we verify that it
11  looks -- you know, that it's correct, make
12  photocopies front and back. And very rarely do
13  they ever -- does anybody ever fill out the
14  paperwork right then. They usually go, "Oh, I
15  just want to take it home." Fair enough.
16  Q. Fine. Okay. And -- But then as I
17  understand it, you will not issue them paychecks
18  until they return the completed I-9 forms?
19  A. Yeah. We have to. We have to.
20  Because they have the tax forms and everything.
21  I can't write a check without taxes and
22  everything on it.
23  Q. I see. Because the packet is not just
24  the I-9. It has like the tax forms and stuff
25  like that too?

Page 141

1  A. Yes. Yeah.
2  Q. They've got to give you all the
3  paperwork back?
4  A. It's all the -- It's all the starting
5  stuff.
6  Q. Gotcha. All the typical onboarding
7  things?
8  A. You can't just write a check for
9  nothing. I have to have taxes taken out.
10  Q. Yeah, indeed. Indeed. So has -- has
11  the farm's obligations as to what it needs to do
12  with regard to I-9 verifications changed over
13  time at all?
14  A. No.
15  Q. Okay. So --
16  A. No. We've been pretty strict on that
17  the whole time. As you can see, you have 14
18  years' worth of records, which we're not
19  required to have that at all, but we kept them.
20  Q. Okay. Yeah. Got it. So -- So the
21  understanding --
22  A. I mean, that's pretty impressive to
23  have that much paperwork all together.
24  Q. Okay. So NuStar understood its
25  obligations in 2007 when it started; right?

36 (Pages 138 - 141)

800-567-8658                                                    973-410-4098

1    A.  Yeah.

2    Q.  And understood it in 2010; right?

3    A.  That's correct.

4    Q.  2014?

5    A.  That's correct.

6    Q.  2018?  Yes?

7    A.  Yes.

8    Q.  And all the way through to today in

9  2021; right?

10    A.  That's correct.

11    Q.  Okay.  So then after the employee

12  returns the completed I-9 form, NuStar needs to

13  complete its portion; right?

14    A.  That's correct.

15    Q.  Okay.  And how long does NuStar have to

16  do that?  How long?  Like by when does NuStar

17  need to complete --

18    A.  You have to do it then.

19    Q.  You've got to do it right at that

20  moment in time?

21    A.  Yeah.  You've got to -- You've got to

22  get it done, because you can't -- you can't just

23  randomly do it whenever you want.

24    Q.  Right.  Got it.

25    A.  If you ever get audited, you can't --

1  you can't -- I mean, you never know when you're

2  going to get audited.  So if they come in

3  and -- and something is not filled out properly,

4  then we could get fined.

5    Q.  Right.

6    A.  So you have to do -- I mean, this is

7  not no fly-by-night stuff, man.  We're --

8    Q.  And NuStar -- Same idea.  NuStar has

9  known ever since 2007 that it needs to complete

10  its portion immediately; right?

11    A.  There was some spots that we weren't

12  fully aware of what we had to do until we did a

13  personal audit.

14    Q.  Okay.

15    A.  We did a self-audit.  And that's when

16  we realized that we were miss -- we missed some

17  spots that were very important to fill out,

18  which it was just clerical, so we would have got

19  told "If you didn't sign here, you would have

20  got fined for that."

21    Q.  Gotcha.  Okay.

22    A.  It would have been the fines.

23    Q.  What was this personal audit you were

24  talking about?  When was it?

25    A.  2018, I do believe.

1    Q.  All right.  Why did you do a personal

2  audit in 2018?

3    A.  Because after the political hit piece

4  that was done on my brother and my farm, we

5  decided that, well, you know what?  We'd better

6  make sure that all of our stuff is together,

7  because you send out your minions, and all of a

8  sudden there's some -- some political operative

9  inside the government that goes, "Hey, we'd

10  better go check these guys" all the sudden.  So

11  we wanted to make sure that we were fully and

12  100 percent covered, that all the paperwork was

13  right.

14    Q.  Got it.  Okay.  And so then you -- this

15  is the audit -- and we'll come back to this in a

16  little bit, but I just -- to kind of get my

17  bearings, this is the audit in which you worked

18  with Woods Fuller?

19    A.  That's correct.

20    Q.  And Amanda Bahena; right?

21    A.  Yeah.  Yes.

22    Q.  Got it.  Okay.  And as a result -- it

23  was after the audit that you filed this lawsuit;

24  right?

25    A.  I don't remember the dates exactly.

1    Q.  Okay.

2    A.  It would have had to have been, yeah.

3    Q.  Yeah.  It was -- It was as a result of

4  the audit that you felt your files were in order

5  and you were comfortable filing the lawsuit?

6    A.  No.

7    Q.  No?

8    A.  I was comfortable with our files

9  before.

10    Q.  Got it.  Okay.  But did your practices

11  change as a result of the audit?

12    A.  Nope.  No.

13    Q.  So you do everything the same as you

14  did before; is that correct?

15    A.  Yeah.  It was just some clerical --

16  maybe some -- some stuff was signed, some stuff

17  wasn't.  It just was inconsistent.  But

18  now we're just more -- more consistent and make

19  sure the clerical part is more correct.

20        And I'll refer you to Lori on

21  that, because she wants to double-check and make

22  sure everything is proper and correct.

23    Q.  Okay.

24    A.  I mean, you have all the records for 14

25  years.  You should -- It's all there.

37 (Pages 142 - 145)

Page 146

1   Q.  With the cards that come in, the Social
2   Security -- Strike that.
3           Remind me, did you say that you
4   typically make a copy of the Social Security
5   card and the ID?
6   A.  Front and back.
7   Q.  Front and back.  Copy front and back?
8   A.  Yes.
9   Q.  Gotcha.  Do you make a scan, like a
10  digital scan as well, or just --
11  A.  No.  No.
12  Q.  Okay.  Gotcha.  Where do you store the
13  I-9 files with the supporting documents?
14  A.  They're generally on the farm, unless
15  they're old ones and they get removed.
16  Q.  Okay.
17  A.  Because they just go into storage.
18  Q.  Got it.  Okay.  And where is the
19  storage on the farm?
20  A.  There is no storage.  We don't have --
21  They're not on the farm.
22  Q.  Got it.  Which ones do you keep on the
23  farm?
24  A.  The ones of current employees, the ones
25  that we have -- that we're required by law to

Page 147

1   keep.
2   Q.  Okay.  And what is your understanding
3   of the ones you are required by law to keep on
4   the farm?
5   A.  Three years or one year -- or one year
6   after termination, I do believe is what it is
7   after the three years.  Minimum of three, and
8   then after it's three I think it's like one
9   year.
10  Q.  Yeah, I think that's right.
11  A.  I'm pretty sure that's what it is.  I'd
12  have to refer to Lori on that one.  She would
13  know better.
14  Q.  Got it.  No.  I think you -- I think
15  you hit the nail on the head.  It's the later of
16  three years after the start of employment or one
17  year after the termination of employment.
18  A.  Yeah.
19  Q.  Whichever one is later.
20  A.  Yeah.  But we kept all -- all the
21  years.
22  Q.  Right.
23  A.  We had them -- for one is we didn't --
24  we just keep all the information just in case of
25  things like this popping up with -- with Ryan

Page 148

1   Lizza saying all this random stuff.  So we make
2   sure we keep all of our records just knowing
3   that political hit pieces may come out and just
4   try to destroy me personally.
5   Q.  And back to the audit again, you -- if
6   I understood you correctly, you said you were
7   concerned about -- you conducted the personal
8   audit because you were concerned about an ICE
9   audit; is that right?
10  A.  Well, we just wanted to make sure all
11  of our ducks were in a row, yeah.
12  Q.  Yeah.
13  A.  Because it's a political hit piece, so
14  you never know who is going to come out of the
15  woodwork and all of a sudden go, "Oh, we're
16  going to come out, and we're going to
17  investigate these people."
18  Q.  Got it.  Was NuStar afraid of an ICE
19  raid at that time?
20  A.  Oh, they -- I'm never afraid of one.
21  They can come right now.  I'm good.
22  Q.  Okay.
23  A.  I'm not worried about that.
24  Q.  All right.  You've never had --
25  A.  I just want to make sure that all of

Page 149

1   our paperwork was in order, because you can get
2   really big fines if you don't have that right.
3   Q.  Okay.
4   A.  You could send them out right now if
5   you want.
6   Q.  That's definitely not up to me.
7           So did you have a process -- does
8   NuStar have a process for updating or
9   reverifying employment authorizations if the
10  documents that are presented are near
11  expiration?
12  A.  I -- I don't think so.
13  Q.  Okay.
14  A.  I don't -- There's -- What do you mean?
15  What -- What expires?
16  Q.  Sure.
17  A.  Like a driver's license or something?
18  Q.  Work authorizations, like legal
19  permanent resident cards or green cards, those
20  have expiration dates.
21  A.  They do?
22  Q.  They do.
23  A.  Did not know that.
24  Q.  Okay.  So NuStar doesn't do anything --
25  Since you didn't know that, NuStar doesn't do

38 (Pages 146 - 149)

Page 150

1    anything --
2        A.  I'd have to -- I'd have to refer you to
3    Lori.  I don't -- I didn't know they had -- I
4    didn't know they had expiration dates.
5        Q.  Okay.
6        A.  We do -- we milk cows.  We don't -- We
7    don't necessarily do -- only do paperwork.
8        Q.  Got it.
9            MR. BOYER:  What are we up to?
10   13?  Lucky 13.
11       Q.  I told you I'd show you an I-9, and I'm
12   a man of my word.
13       A.  Excellent.
14       Q.  One coming your way.
15           (Exhibit 13 was marked for
16           identification by the reporter.)
17       A.  Am I done with number 12?
18       Q.  You can set 12 aside, yes.
19       A.  Okay.
20       Q.  Mr. Nunes, you have been handed a
21   document that has been marked as Defendants'
22   Exhibit 13.  So I think this is an example of --
23   First of all, this is a Form I-9; right?  State
24   the obvious.
25       A.  It's a version of it.

Page 151

1        Q.  Gotcha.  Give me just one moment,
2    please.
3            Okay.  So this is the -- this
4    appears to be the Form I-9 for a gentleman named
5    ████████████     correct?
6        A.  That's what it says at the top.
7        Q.  Do you remember ████████████
8        A.  No.
9        Q.  Okay.  But here -- I mean, I think this
10   is basically all done correctly, but tell me if
11   I'm wrong.  If you take a look here, it says --
12   the box is checked for him being a lawful
13   permanent resident; right?  Do you see that at
14   the top?
15       A.  Okay.
16       Q.  Okay.  You see that box is checked;
17   right?
18       A.  Yeah.
19       Q.  And then you look over here on the
20   supporting card, and he has a permanent resident
21   card; right?
22       A.  Okay.
23       Q.  Gotcha.  And although he signed in the
24   wrong spot -- So go back to the Form I-9 on the
25   front.

Page 152

1        A.  Okay.
2        Q.  You see he signed -- it appears that he
3    signed at the bottom; right?  At the very
4    bottom, bottom left-hand corner, but I see an
5    arrow pointing up there that the -- that was
6    meant to be an employee signature up on the
7    employee's signature line; right?
8        A.  Okay.
9        Q.  Do you see that?  So --
10       A.  I -- Yeah, I -- there's something on
11   the side there, yes.
12       Q.  Gotcha.
13       A.  A photocopy of some sort.
14       Q.  Gotcha.  And he was, according to the
15   records -- your response to Interrogatory Number
16   1, he was an employee starting on June 4th,
17   2010.  Okay?
18       A.  Okay.
19       Q.  Okay.  And you have here the form was
20   signed by him actually before he actually even
21   started his first day, on 5-20-2010; right?  So
22   that's definitely -- he signed it timely; right?
23       A.  Okay.
24       Q.  Okay?  Do you see that?  And then down
25   below, it seems that you guys filled it out

Page 153

1    correctly here in Section 2; right?  Not a trick
2    question.  I think you filled it out correctly.
3    Does that look correct to you?
4        A.  Okay.
5        Q.  Well, does -- does this look like you
6    filled out Section 2 correctly?
7        A.  I mean, the paper doesn't look correct
8    to me, because it has, you know, his signature
9    down here.  It belongs up there.  You know, it
10   looks like mostly a clerical error, where maybe
11   he didn't understand what he was filling out
12   properly.
13       Q.  Fine.  Fair enough.  The one thing we
14   have identified here is that he signed in the
15   wrong spot; correct?
16       A.  Yeah.
17       Q.  But other than him signing in the wrong
18   spot, this form looks to be filled out
19   correctly; right?
20       A.  Lawful permanent resident.  I don't
21   know.  You'd have to ask Lori.  I don't -- I
22   don't know.
23       Q.  Well, I mean, earlier you were talking
24   about how you were scrupulous in making sure
25   that everything was --

39 (Pages 150 - 153)

1    A.  No, that's not what I said.
2    Q.  Okay.
3    A.  I said make sure that like their Social
4  Security numbers -- they should be matching up
5  with their Social Security number, I look at the
6  cards.
7    Q.  Okay.  So you check and make sure the
8  Social Security number matches the card?
9    A.  That's correct.
10    Q.  Got it.  And you check -- you
11  probably -- I think we talked about you want to
12  make sure that the names match; right?
13    A.  I don't recall this one, you know.
14  Exactly I don't recall it.
15    Q.  Understood.  Gotcha.  But do you see
16  down here in Section 2?  Somebody filled out
17  correctly, I will note, the List A.  Do you see
18  where it says "List A" in Section 2?
19    A.  Okay.
20    Q.  Yeah.  And you list the types of
21  documents; right?
22        Strike that.
23        You list the details for the
24  document -- the List A document that they
25  provided; right?

1    A.  Okay.
2    Q.  Okay.  Do you understand what a List A
3  document is?
4    A.  Not exactly.  It's a -- What it -- What
5  is it exactly?
6    Q.  Well, I'm fundamentally asking you as
7  NuStar's corporate representative.
8    A.  We don't -- We require two things.  We
9  require a Social Security card and a photo ID.
10    Q.  Yeah.
11    A.  That's what we require.
12    Q.  Gotcha.  Okay.  Down here in the
13  certification, this one was signed -- this one
14  in particular was signed by, I think, your mom,
15  Toni Dian Nunes; right?
16    A.  That's what it says.
17    Q.  Hold on a second.  Sorry about that.
18        And she seems to have signed it
19  in -- on June 1st, 2010, if I'm reading that
20  correctly.  Is that what it says?
21    A.  That's what it says.
22    Q.  All right.  So again, she completed her
23  portion -- Strike that.
24        NuStar completed its portion of
25  this Form I-9 prior to ███████ starting

1  work on June 4th; right?
2    A.  When did he start work?
3    Q.  June 4th, 2010.
4    A.  He started -- Where is that?  What --
5  What are you looking at to know that?
6    Q.  Absolutely.  I'm looking at Defendants'
7  Exhibit 9.
8    A.  Okay.  Do you know what page?
9    Q.  Yep.  Well, the pages aren't numbered,
10  unfortunately.
11    A.  Okay.
12    Q.  But it's in alphabetical order.
13    A.  Okay.
14    Q.  And this one is under ███████.
15    A.  That would make sense.
16    Q.  There are a few ███████
17    A.  Very common.  Very common name.
18    Q.  Yes.  This one is toward the end of the
19  ███████  And it appears at the top of the
20  page.
21    A.  Okay.  It's not in this -- Okay.
22    Q.  Yeah.  So I think you found him now.
23  He's right above ███████.
24    A.  Okay.
25    Q.  Yep.  And you see it has the dates of

1  his employment in the fourth column, and it says
2  6-4-2010 to 5-02-2011; right?
3    A.  Okay.
4    Q.  Okay.  So my point is nothing more than
5  it seems that this form was filled out with the
6  exception -- Strike that.
7        With the exception of ███████
8  ███████ signing in the wrong spot but then an
9  arrow signifying where it should be, this form
10  was filled out correctly; right?
11    A.  Yeah.  I don't -- I don't know why it
12  would be so -- so many days difference.  That
13  doesn't necessarily make sense, like he would
14  start work, you know, two weeks.  But it's
15  possible.  Who knows?  He might have had --
16  worked somewhere else and gave two weeks' notice
17  and he already filled out his paperwork.  I
18  don't know.
19    Q.  Okay.  Fair enough.  But the point is
20  that NuStar knows how to fill out I-9 forms
21  correctly; right?
22    A.  I would say we do, yes.
23    Q.  Yes?  And, in fact, it did it here in
24  Exhibit -- Defendants' 13; correct?
25    A.  What did you say?

40 (Pages 154 - 157)

Page 158

1    Q.   Forgive me.  And it filled out the I-9
2  form correctly here in Defendants' Exhibit 13;
3  right?
4    A.   I'd have to ask Lori if it's filled out
5  correctly.  I don't know 100 percent.
6    Q.   Okay.  All right.
7    Q.   Are you done with 13?
8    A.   Yeah.  You can set 13 aside.
9    A.   Okay.
10   Q.   I'm going to show you a document that
11 has been previously marked as Defendants'
12 Number -- that one is mine, I believe.  Yes.
13 Defendants' Number 6.  Can you reach that?
14   A.   Oh, that's an old one.
15   Q.   It is.  This is -- Strike that.
16        Defendants' Exhibit 6 is
17 ███████████████        I-9 form; correct?
18   A.   Looks like it.
19   Q.   Is this one of the I-9s you reviewed in
20 preparing for this deposition?
21   A.   I don't think so.
22   Q.   Okay.  I want to draw your attention to
23 ████████████████      permanent resident card,
24 which is on page PX689.  So first of all,
25 this -- let me just be clear.  This is the

Page 159

1  permanent resident card and Social --
2    A.   Are you looking at the front?
3    Q.   I'm looking at the front, correct.
4    A.   Okay.
5    Q.   This is the permanent resident card and
6  Social Security card that ██████████████████
7  presented when he applied for employment with
8  you back in 2007; correct?
9    A.   It appears to be.
10   Q.   Right.  It's the one that he submitted
11 at the time the I-9 form was complete?
12   A.   That's our copy, yep.
13   Q.   Gotcha.  If you look at his permanent
14 resident card, it says the card expired in 2009;
15 correct?
16   A.   Where does it say that at?
17   Q.   There's a spot -- Do you see where
18 ████████  signature is on the card?
19   A.   Okay.
20   Q.   Do you see right above it these little
21 words that say "Card Expired"?
22   A.   Okay.
23   Q.   Right above that is a date.  Do you see
24 the date?
25   A.   Okay.

Page 160

1    Q.   It says 12-22-09; right?
2    A.   Okay.
3    Q.   Okay.  ████████████████████   resident
4  card appears to have expired on December 22nd,
5  2009; right?
6    A.   That's what it says, yes.
7    Q.   Okay.  And NuStar didn't do anything to
8  confirm whether ██████████        still has
9  work authorization at present; right?
10   A.   I don't think legally we could ask
11 anything about expirations.
12   Q.   Why -- I'm sorry, you said you can't
13 ask anything about expirations?
14   A.   I'm pretty sure.  You might have to ask
15 Lori, but I don't think we -- we can't legally
16 ask about that.
17   Q.   Right.  So you understand that this
18 legal permanent resident card is a work
19 authorization card; right?
20   A.   Right.
21   Q.   Okay.  It's -- It basically says that
22 he's authorized -- according to this card, he's
23 authorized to reside in and work in the United
24 States until December of 2009; right?
25   A.   Okay.

Page 161

1    Q.   Okay.  Have you taken any steps to
2  confirm whether or not ████████████  --
3    A.   I'm not -- I can't legally do that.
4    Q.   You can never again confirm that --
5    A.   I don't think I can legally ask.  We've
6  never had -- I assume everything is right and
7  proper, because the government has never sent us
8  anything saying, "Hey, there's a problem here."
9  I mean, '09?  You're talking, what, 12 years?  I
10 don't -- I don't think we could legally ask
11 about expiration dates.
12   Q.   Okay.  What's prohibiting you?  What's
13 the law that prohibits you from asking about
14 expiration dates?
15   A.   It says right on it, doesn't it?
16   Q.   Okay.  Let's take a look.
17   A.   It says on the I-9 somewhere.  Do you
18 have a different -- Maybe it's on the other
19 forms, about discrimination.
20   Q.   What -- What would be discriminatory
21 about asking ████████████  if he has a
22 new permanent resident card?
23   A.   We're not -- You'd have to ask Lori.  I
24 don't know.
25   Q.   Okay.  You understand you're testifying

41 (Pages 158 - 161)

Page 162

1  on behalf of NuStar. You said you're the
2  corporate representative; right? So does NuStar
3  know?
4      A. Yeah, you'd have to refer to Lori.
5      Q. Okay. All right. So I'll mention as
6  well that during his testimony ▆▆▆, if I
7  recall correctly, he said --
8      A. Can I -- Can I finish here?
9      Q. Yeah, please.
10     A. Yeah. Because it says -- it does say
11  future expiration dates -- we can't ask anything
12  about cards, future expiration dates, any of
13  that. It says right on the I-9 form.
14     Q. Okay. Where are you looking at?
15     A. The top, about the last sentence.
16     Q. The refusal because of a future
17  expiration date may also constitute -- that's
18  right. "The refusal to hire an individual
19  because of a future expiration date may also
20  constitute illegal discrimination"; right?
21  That's what it says?
22     A. That's what it says.
23     Q. So if ▆▆▆▆▆▆ had
24  presented a document to you -- Strike that.
25         It would have been -- You would

Page 163

1  not have been permitted at the time you hired
2  ▆▆▆▆▆▆▆ to say, "Your document
3  expires in two years, and therefore I'm not
4  going to hire you" in 2007; right? You couldn't
5  have done that?
6      A. That's correct.
7      Q. That would have been discrimination;
8  right?
9      A. Um-hum.
10     Q. Okay. I'm not asking about that. I'm
11  asking about whether after 2009 you took any
12  steps to confirm --
13     A. Am I legally obligated to do that?
14     Q. It's up -- I'm asking about NuStar's
15  knowledge as to what it's legally obligated to
16  do.
17     A. I'm going to have to refer to Lori.
18     Q. Okay.
19     A. I don't -- I don't know.
20     Q. Okay.
21     A. I don't think we can legally do that.
22     Q. All right.
23     A. You're starting to get in gray areas
24  where you've got to be careful, because, I mean,
25  we're not fly by night. I mean, I don't want to

Page 164

1  get in trouble by the government by no means. I
2  mean, we're a family farm. We don't have HR
3  people. We just want to make sure that it's
4  proper and correct.
5      Q. Right.
6      A. As far as I know, he's 100 percent
7  legal to work.
8      Q. Got it. Are you -- You're aware of the
9  fact that ▆▆▆▆▆▆▆▆ began his
10  testimony at a deposition in this case a couple
11  months ago; right?
12     A. Okay.
13     Q. Do you remember that?
14     A. I remember, yes, that there was that,
15  yes.
16     Q. There was a deposition?
17     A. Yeah.
18     Q. And he testified; right? Did you -- Do
19  you know what he said in his testimony?
20     A. I have no idea.
21     Q. Okay. You didn't read a transcript?
22     A. No.
23     Q. Okay. Did you talk to him afterwards
24  about what was said during the deposition?
25     A. No.

Page 165

1      Q. Talk to anybody about what he said
2  during the deposition?
3      A. No.
4         MR. BISS: Except -- Except for
5  me; right?
6         MR. BOYER: Yes. I'm sorry.
7      Q. Just to be clear, I'm not asking at all
8  about conversations you might have had with
9  Mr. Biss. Okay? So other than the
10  conversations with Mr. Biss, have you talked to
11  anybody about --
12     A. Yeah, Mr. Biss. But other than that,
13  nobody.
14     Q. Okay.
15         MR. BISS: Nate, apologies for
16  interrupting. Are you at a convenient stopping
17  point on this subject? I need to take a very
18  short break.
19         MR. BOYER: I am -- No. I --
20         MR. BISS: I don't mean to
21  interrupt, I know we've had one break, but I --
22         MS. HAUSER: And lunch has
23  arrived and is available for everyone, if that's
24  a --
25         MR. BOYER: You know, I was going

42 (Pages 162 - 165)

to turn you down, Steve, but now that lunch is here, I think now is the perfect time.
MR. BISS: She saved me.
MR. BOYER: Saved by lunch as always.
MR. BISS: Well, it's 12:44. It's probably a good time -- a good time to stop.
MR. BOYER: Yeah. Absolutely.
MR. BISS: What do you think we should do? 45 minutes?
MR. BOYER: 45 minutes sounds just about right.
MR. BISS: Come back at 1:30?
MR. BOYER: 1:30 it is. Let's shoot for 1:30. You know where to find us.
MR. BISS: We're going to go to our -- We're going to go to our breakout/lunchroom.
MR. BOYER: Excellent. Great.
THE VIDEOGRAPHER: We are going off the record. This is the end of Media Unit Number 2. The time is 12:45.
(A recess was taken.)
THE VIDEOGRAPHER: We are back on

the record. This is the beginning of Media Unit Number 3. The time is 1:34.
Q. Welcome back, Mr. Nunes. I hope lunch was good.
When we left off, we were talking about [redacted] document. We'll get back to that in a second, but first I just wanted to ask -- pick up on something else we talked about earlier, namely Spanish. You said you speak Spanish; right?
A. Yep.
Q. Yeah. Do you consider yourself fluent in Spanish?
A. No.
Q. Okay. How would you describe your --
A. Spanglish.
Q. Spanglish? Okay. Fair enough. Does Lori speak Spanish?
A. No.
Q. Okay. None at all?
A. None.
Q. Your mother, Toni Dian, does she --
A. No.
Q. No? What about your father, Anthony Jr.?

A. No.
Q. You speak Spanglish, and that's the best -- that's what we've got going in terms of the Nunes family members?
A. That's all we have.
Q. Okay. Fair enough. And I was also struck by -- you commented a couple times that the workforce there is sort of one -- you know, one large family and it's a good rapport among all the workers. Is that fair to say?
A. I would like to think so.
Q. Okay. So taking, for example, [redacted], do you ever just talk with him about his personal life?
A. Not necessarily his personal life, no.
Q. Like do you ever take vacations and stuff like that?
A. No.
Q. Do you ever say, "Where did you go? How was that vacation?" Anything like that?
A. Generally not. Just ask, "Hey, did you have a good vacation?"
"Yeah."
That's it.
Q. Okay. Not like "Where did you go?" or

anything like that?
A. No. No.
Q. All right. Okay. And I think you also mentioned that -- well, does -- [redacted] does he drive to the farm?
A. I think he does.
Q. You think he does? Okay. I mean, how many cars are coming into the farm each day in terms of, you know, workers coming in to do work?
A. It all -- It all depends, you know, who is working.
Q. Um-hum. Well, what's sort of the high end and what's the low end?
A. I don't know. There might be five, six cars there. I guess I never counted.
Q. Okay.
A. I don't keep track of cars.
Q. That's fair enough. But at any given time -- at any given time how many workers are there on the farm?
A. The minimum is three.
Q. Minimum is three. Got it. Okay. And what's the maximum?
A. All the rest, whoever else is there.

1    Q.  There would be times when all --
2    A.  There would be guys where -- there
3 would be -- five -- eight. I'd say eight.
4    Q.  Okay. All right. Let's go back to
5 ██████████ I-9, the document
6 previously marked as Defendants' 6. The thing I
7 wanted to ask you about is -- let's take a look
8 at the back of his alien registration card,
9 which I think is PX689. Do you see that?
10    A.  Okay.
11    Q.  Okay. Do you see where it says on that
12 card "W16"?
13    A.  Okay.
14    Q.  Do you see that?
15    A.  Yeah. The second line?
16    Q.  Yeah. Exactly.
17    A.  Okay.
18    Q.  Do you know what that signifies?
19    A.  I have no idea.
20    Q.  Okay. I'll represent to you that that
21 signifies the class of admission. Okay? So
22 these cards have various information on them,
23 and that's the class of admission for
24 ██████████ alien registration card.
25    A.  Okay.

1    Q.  Do you know what a class of admission
2 is?
3    A.  Nope.
4    Q.  Okay. You understand that people can
5 only become legal permanent residents under
6 certain circumstances?
7    A.  I have no idea.
8    Q.  No idea how or why people become legal
9 permanent residents?
10    A.  Nope.
11    Q.  Okay. Don't know why green cards get
12 issued?
13    A.  I -- I don't know.
14    Q.  Don't know the different classes of
15 admission?
16    A.  I have no idea.
17    Q.  Okay. Well, we'll talk about one of
18 them here.
19         MR. BOYER: Number 14.
20       (Exhibit 14 was marked for
21       identification by the reporter.)
22    Q.  You've just been handed a document
23 that's been marked as Defendants' Exhibit 14.
24 First of all, I want to say what this document
25 is. It's a two-page -- well, a three-page

1 document, excuse me, which is itself excerpts
2 from a document that I pulled called the
3 Adjudicator's Field Manual produced by the
4 USCIS. I take it you've never seen this before
5 in your life; correct?
6    A.  Never seen it before.
7    Q.  Okay. A portion of this document talks
8 about what the classes of admission are. Take a
9 look at the last page, where I have excerpts
10 from that section of this document. Not the
11 back. You're looking at the last page right
12 there. Correct.
13    A.  Okay.
14    Q.  About three or four lines down on the
15 left-hand side do you see something that says
16 "W16"?
17    A.  Okay.
18    Q.  Okay. And you go all the way across,
19 and it describes who -- what the W16 class of
20 admission is; right?
21    A.  Okay.
22    Q.  So again, this is a document by the
23 U.S. government describing what W16 means.
24 Okay. And at the end it says W16 class of
25 admissions for, quote, an alien previously

1 granted temporary resident status (legalization)
2 who legally -- who illegally entered the
3 country-region place United States without
4 inspection prior to January 1, 1982.
5       I take it you have no idea -- you
6 had no idea that W16 meant that particular class
7 of admission until I told you that right there;
8 right?
9    A.  That's correct. I have no idea.
10    Q.  Okay. Gotcha. ██████████
11 was -- according to his identifications and his
12 I-9, was born on ██████████ correct?
13 You can take a look. It's Defendants' 6.
14    A.  Okay.
15    Q.  Okay. So that's yes, he represented to
16 you that he was born on ██████████;
17 correct?
18    A.  That's what it says.
19    Q.  Okay. But the W16 class of admission,
20 according to the U.S. government, is limited to
21 persons who illegally entered the country
22 without inspection prior to January 1st, 1982;
23 right?
24    A.  That's what it says.
25    Q.  Okay. So if W16 is limited to those

Case 5:19-cv-04064-CJW-MAR   Document 156-6   Filed 06/02/23   Page 45 of 105   App. 166

Page 174

1  people, then it is literally impossible for
2  ███████████████ to be part of the W16
3  class of admission; right?
4      A.  I have no idea.
5          MR. BISS:  Object to the form.
6      Q.  You have no idea.  Well, do you doubt
7  that the -- that this class of admission, W16,
8  is designated as people who entered the United
9  States before January 1st, 1982?
10         MR. BISS:  Object to the form.
11     A.  That's --
12     Q.  You can answer.
13     A.  That's what your paper says.
14     Q.  Okay.
15     A.  I don't know.  I have no idea.
16     Q.  Okay.  You're not going to check after
17  this whether or not it is -- Actually, strike
18  that.  Don't worry about it.
19         I talked earlier about the fact
20  that ████████████ had his deposition --
21  his deposition started in this case a couple
22  months ago; right?
23     A.  Okay.
24     Q.  You remember that; right?
25     A.  Yes.

Page 175

1      Q.  Okay.  Do you recall that that
2  deposition was interrupted or stopped short, I
3  should say?
4      A.  Okay.
5      Q.  Do you recall that?
6      A.  Yes.
7      Q.  Do you -- You know -- let me put it
8  this way.  Let me ask a better question, just to
9  try to understand if there's anything that I can
10  discuss that's not privileged.  Okay?  Were you
11  involved in any conversations on that day of his
12  deposition, May 12th, 2015, about ████████
13  ████████ deposition?  Did you talk about it
14  with anybody on that day?
15     A.  About his --
16         MR. BISS:  Well, that would
17  require him to disclose attorney-client
18  communications.
19     Q.  I guess if it's just about general --
20  Did you discuss it with anybody other than
21  Mr. Biss?  Let me ask that.
22     A.  No.
23     Q.  Okay.  Did you talk to ██████
24  ████████ before his deposition?  We'll start
25  there.

Page 176

1      A.  No.
2      Q.  Okay.  Did you tell him he's got to go
3  to the deposition at least?
4      A.  I don't know if -- I don't know if I --
5  Actually, honestly, I don't know.  I don't know
6  if I told him that or if Lori told him.  I'm not
7  sure.
8      Q.  Okay.  Either -- It would have been
9  either you or Lori would have said, ████████
10  ███████ you've got to go to your deposition"?
11     A.  Yeah.
12     Q.  Okay.  And that's the first time
13  anybody had said anything to him about his
14  deposition, as far as you know?
15     A.  I mean, you'd have to notify him.  I
16  don't -- I don't remember when.
17     Q.  Okay.
18     A.  But, I mean, obviously there was
19  probably prior communication.
20     Q.  Got it.
21     A.  You're just not going to go, "Oh, by
22  the way, you're going to go over here."  There
23  had to have been some point in time.  I just
24  don't remember.
25     Q.  Okay.  Okay.  Did you have any other

Page 177

1  conversations with ████████████ later
2  in that day, May 12th, about his deposition?
3      A.  I just asked him how it went, and he
4  said they just stopped.  He said they stopped.
5      Q.  Okay.  That was after he came back to
6  the farm?
7      A.  Yeah.
8      Q.  Gotcha.  Anything else he said?
9      A.  Nope.  I didn't -- I can't ask him, can
10  I?
11     Q.  Well, did you -- Well, did you -- that
12  was the only question you asked, that was the
13  only answer he provided, and that was --
14     A.  Yeah.  I just said, you know, "How did
15  it go?"
16     Q.  And you spoke to █████ in Spanish or
17  English?
18     A.  English.
19     Q.  English.  Okay.  Does he speak English?
20     A.  Yes.
21     Q.  Okay.  Pretty well?
22     A.  I think so.
23     Q.  Okay.
24     A.  To me he does, but I understand
25  Spanglish.

45 (Pages 174 - 177)

Page 178

1    Q.   Gotcha.  Gotcha.  And [redacted]
2    [redacted], does he generally speak English with
3    you on the farm?
4    A.   I think so.
5    Q.   And with -- And obviously with Lori,
6    because she only speaks English; right?
7    A.   Yeah.
8    Q.   Okay.  Do you recall when Mr. -- you
9    recall, obviously, that Mr. Lizza was in Sibley
10   in August of 2018 doing his reporting; right?
11   A.   Yes.
12   Q.   Asking questions about the Nunes family
13   farm; right?
14   A.   Yes.
15   Q.   Okay.  Did you discuss that matter with
16   any of the employees on the farm at that time?
17   A.   Yeah, because I told them -- we seen
18   cars driving around.
19   Q.   Okay.
20   A.   Some random car.  So you always be
21   leery of random cars going down roads that
22   random cars don't go down.  So I said, "Hey, be
23   aware that -- that there's some random person
24   driving around.  We don't know who it is."
25   Because you don't know if they're animal rights

Page 179

1    people.  You don't know what they are.  You
2    don't know who they are.
3    Q.   Got it.  So you think --
4    A.   You know, it could be somebody wanting
5    to steal something.  You don't know.  It's just
6    normal -- normal everyday stuff.  We go, "Hey,
7    there's a random car."
8    Q.   Okay.  So you told -- you told the
9    workers to avoid the random car, basically?
10   A.   That's not what I said.
11   Q.   Okay.  I'm sorry, say it again.  What
12   exactly did you tell them?
13   A.   I told them just to be -- if you see
14   some random car coming on the dairy, we're going
15   to have to -- don't let them just drive around.
16   Q.   Got it.  Okay.  Were you aware of
17   anyone else Mr. Lizza was just talking to in
18   Sibley at that time?
19   A.   Well, yeah.  I know Hoyers.
20   Q.   You know Hoyers.  Right.  Okay.
21   A.   Yeah.
22   Q.   Who else?
23   A.   After -- What is your question again?
24   Q.   Yeah.  Who else was Mr. Lizza talking
25   to in Sibley that you're aware of?

Page 180

1    A.   He talked to everybody.
2    Q.   Everybody?
3    A.   He talked to all kinds of people.
4    Q.   Okay.
5    A.   Because they all contacted us.  The
6    business owners that he went to, they told us,
7    "Hey, there's some guy here asking about your
8    brother and you guys and about illegal
9    immigrants."
10   Q.   Okay.
11   A.   I mean, he told everybody -- he said he
12   was from LA.  Some guy -- Some random guy comes
13   into town, not like a normal Midwesterner,
14   pretty arrogant, asking if he's -- he's from LA,
15   he's from New York, he's from Washington, D.C.,
16   he's from CNN, he's from Esquire, he's from all
17   kinds of different places.  So everybody is like
18   "What is going on?"  You're talking about rural
19   Iowa.  Everybody is going to be all "What's
20   going on here?"
21   Q.   Okay.  Who -- Who are the -- Who is the
22   everybody who was reaching out to you at that
23   time?
24   A.   All kinds of people.
25   Q.   Okay.  Just help me -- Just provide the

Page 181

1    names, best as you can recall.
2    A.   He was at Hoyers, he was at The
3    Lantern, he went to -- he went up and down the
4    streets there.  He went over to -- there's a
5    store there.  He went to there and was asking
6    about us there.  He parked in front of my dad's
7    house.  My neighbors seen him.  Then he moved
8    down and parked down at the other street and was
9    just hanging out there until my dad goes "What
10   is going on?"  I seen this vehicle -- the couple
11   days -- the day before driving by the dairy when
12   we're chopping silage, and it's like, "Hey,
13   what's this random car doing here?"
14   Q.   You mentioned a store there.  What was
15   the store you were referring to?
16   A.   The clothing store or something,
17   knickknack store.
18        ANTHONY NUNES, JR.:  Porch on
19   Main.
20   Q.   Porch on Main.
21   Q.   Oh, Porch on Main?
22   A.   Yeah.
23   Q.   Okay.  Just to be clear, I think -- if
24   I'm not mistaken, I think Anthony Jr. just
25   mentioned Porch on Main and that refreshed your

46 (Pages 178 - 181)

Page 182

1  recollection?
2      A.  Yeah.  That's correct.
3      Q.  Okay.  Gotcha.  Any other stores that
4  you're aware that he was stopping in?
5      A.  No.
6      Q.  Okay.
7      A.  I just know he was going up and down
8  there.  I don't know.
9      Q.  Okay.  Did you say anything else to
10  your employees about Mr. Lizza?
11      A.  No, because they -- I mean, they don't
12  know who he is.  I just told them "There's some
13  random black car driving around with Nebraska
14  plates.  Be -- Be on the lookout."
15      Q.  Okay.
16      A.  Because like once again, we don't know
17  if they're animal rights people.  We don't know
18  who they are.
19          I mean, my brother gets death
20  threats.  Can these people be coming over to our
21  place?  You never know.  You always watch out
22  for those things.  You've got to be really
23  careful.  There's a lot of crazy people out
24  there trying to, you know, do bad things.
25      Q.  Okay.  You ultimately learned that he's

Page 183

1  a reporter; right?
2      A.  Yeah, once my dad confronted him.  So
3  are you asking me personal questions, or are you
4  asking me about the farm?  I want to make sure
5  we don't -- we don't --
6      Q.  That's actually a fair point.  This
7  last sequence of questions which I've been
8  talking about Ryan Lizza's reporting --
9      A.  Yeah.
10      Q.  -- I think I've been talking to you in
11  your personal capacity.
12      A.  Okay.
13      Q.  So I appreciate you were not
14  speaking -- you were not speaking in --
15      A.  Well, that's what I'm -- I didn't --
16      Q.  Sorry.
17      A.  I'm not speaking on behalf of the farm,
18  no.
19      Q.  Gotcha.  Sorry about that.
20          MR. BOYER:  We're up to 15.
21          (Exhibit 15 was marked for
22          identification by the reporter.)
23      A.  Are we done -- Are we done with this
24  one?
25      Q.  Yes.  You can set this one aside.

Page 184

1      A.  Are we done with Exhibit 7 as well?
2      Q.  I believe so, yes.
3          Mr. Nunes, you've been handed a
4  document that has been marked as Defendants'
5  Exhibit 15.  It appears it is a document
6  produced by Plaintiffs bearing Bates stamp PX675
7  to 76.  And appended to it is another document
8  produced by Plaintiffs bearing Bates stamp
9  PX2781.  So first of all, we were talking
10  earlier about ███████; right?
11      A.  You mentioned him, yes.
12      Q.  Yes.  And you can double-check if you
13  want on Exhibit 9, but I believe he's worked for
14  the farm since 2008.  Does that sound right?
15      A.  I don't know.  He's been there a long
16  time.
17          Okay.
18      Q.  Okay.  Yeah, you see that.  2008;
19  right?
20      A.  Yeah.
21      Q.  Okay.  Have you gotten to know him on a
22  personal level over the years?
23      A.  I went to his daughter's wedding.
24      Q.  So that's a reasonably personal level.
25  Okay.  That's fine.  Do you know where he's from

Page 185

1  originally?
2      A.  Mexico.
3      Q.  Mexico?
4      A.  I guess.  I -- Actually, I don't -- I
5  don't know.
6      Q.  Okay.  All right.  Do you know like
7  where he's -- what he did before he worked on
8  the farm?
9      A.  No.
10      Q.  Do you know where he lived before he
11  worked on the farm?
12      A.  No.
13      Q.  Okay.  So let's talk about this
14  document that's marked as Plaintiffs' Exhibit
15.  So start at the top in Section Number 1.
16  Am I correct that this is Ms. Lori Nunes's
17  handwriting here at the top in Section 1?
18      A.  I -- I have no idea.  I can't answer
19  that.
20      Q.  All right.  I can ask her, and she'll
21  probably be able to tell; right?
22      A.  Usually that's -- that's filled out by
23  employees, so I doubt she filled that out, but
24  it's hard to say.  I have no idea.
25      Q.  Okay.

47 (Pages 182 - 185)

Page 186

1    A.  I cannot answer that.
2    Q.  Okay.  So a couple of other things
3 about this form as you go down it.  You see
4 ████████ attests here -- do you see a box
5 checked under "A noncitizen national of the
6 United States"?  Do you see that?
7    A.  Okay.
8    Q.  Do you know what that is?
9    A.  Nope.
10    Q.  Okay.  Do you know if that's not -- a
11 noncitizen national is somebody who's from like
12 the Swain Islands or some very discrete places
13 that happen to be U.S. property but nationals.
14    A.  Okay.
15    Q.  Do you believe ████████ is from the
16 Swain Islands?
17    A.  Not that I know of.
18    Q.  Which I believe is in the South Pacific
19 or something like that.
20    A.  I have no idea.
21    Q.  Okay.  If you keep scrolling down here,
22 this is signed by ████████, and it's
23 dated January 20th, 2016.  Do you see that?
24    A.  Okay.
25    Q.  Okay.  Now go to the next page, which

Page 187

1 is the back of the I-9 form.  And you see toward
2 the bottom there's the certification; right?  Do
3 you see --
4    A.  Okay.
5    Q.  -- the section that says
6 "Certification"?
7    Do you see that?
8    A.  Where -- Where is -- No, I don't.
9 Where is it?
10    Q.  About two-thirds of the way down the
11 page it says "Certification."
12    A.  Okay.
13    Q.  Okay.  And it says here the employee's
14 first day of employment was April of 2008;
15 right?
16    A.  Okay.
17    Q.  What -- So just to be clear, the --
18 this form was not signed -- Actually, let me --
19 Let me actually keep on going down.  You see
20 also -- I believe that's your signature right
21 below it; correct?
22    A.  Yes.
23    Q.  And you dated it July 20th, 2016;
24 right?
25    A.  That's what it says.

Page 188

1    Q.  Okay.  So although ████████ started
2 his employment in April of 2008, he didn't sign
3 this form until January of 2016; is that
4 correct?
5    A.  I don't know why that would be.  I
6 don't know.  I don't know if it was a
7 correction, if they updated something.  I don't
8 know.
9    Q.  You think maybe there was a prior form
10 on file?
11    A.  Is this the only form you have?
12    Q.  That's the only one we have.
13    A.  Then that's the only one on file.
14    Q.  Okay.  Would you have kept the older
15 form if he had filed and signed a new one?
16    A.  You're going to have to ask Lori.  I
17 don't know.  I don't -- I don't know why there's
18 a discrepancy, if -- I have no idea.
19    Q.  Okay.  And then you go down even --
20 down a little further still.  And you see
21 there's a reverification and rehire section?  Do
22 you see it says "Section 3.  Reverification and
23 Rehires"?  Right?
24    A.  Okay.
25    Q.  And then down there toward the bottom

Page 189

1 you have what appears to be your name, your
2 signature, with a date of October 5th, 2018.
3    A.  Okay.
4    Q.  Do you see it?  Do you recall signing
5 this in October of 2018?
6    A.  It could have been --
7    Q.  Or excuse me.
8    A.  It could have been -- It could have
9 been a correction.
10    Q.  Strike that.  November of 2018.  Excuse
11 me.
12    A.  Okay.
13    Q.  Okay.
14    A.  It could have been a correction.
15    Q.  Okay.  Was it --
16    A.  Because you've got to remember, Amanda
17 came out and went through all this stuff.  So
18 maybe we signed it there and then it was wrong
19 and then we re-signed it over -- then this could
20 have been a correction down here.  Because
21 Amanda went through every single
22 communication -- Amanda went through every
23 single employee at that time and everything was
24 fine.  Every single one of them.  ████████ this
25 one, everybody's.  She went through them all.

48 (Pages 186 - 189)

1    Q.  Okay.  And she said they were fine?
2    A.  Everything was good.  She said we
3  actually had pretty remarkable records, because
4  a lot of farms don't carry IDs, do -- do both.
5  They don't do that.  We do.
6    Q.  Got it.  So she was impressed that your
7  records were actually pretty well kept?
8    A.  That's what she said.  So she went --
9  everything you're asking, you've got to
10  remember, like even ████████, she seen that.
11  She seen all this.  There was an immigration
12  attorney that looked at everything.  So if
13  there's something -- if there's an issue here,
14  we weren't aware of it.  And I'm still not aware
15  of it.
16    Q.  Okay.  Well, let's take a look at the
17  next page that's appended here, which is PX2781.
18  Okay?
19    A.  Okay.
20    Q.  So first, as a -- as a preliminary
21  matter, take a look at the picture of this guy.
22  This is ████████ here, right, in the ID?
23    A.  It looks like him.
24    Q.  Okay.  As an initial matter, these --
25  this page was produced separately to us from the

1  I-9.  I just want to know if you know why that's
2  the case.  Like was it stored separately or
3  something?
4    A.  I don't know.  I don't understand your
5  question.
6    Q.  Okay.  You see the Bates stamp at the
7  bottom of this one we're looking at says
8  "PX2781"?
9    A.  Okay.
10    Q.  Did you see it is my question.
11    A.  Yes.
12    Q.  Yes.  And you see that the I-9 form
13  itself was PX675, 76.
14    A.  Okay.
15    Q.  Okay.  So I'm just saying this document
16  was produced thousands of pages later.  And I'm
17  asking if you know why.
18    A.  I can't 100 percent say, but I'm
19  assuming that there was a -- a paperwork error
20  somewhere and it was found later on.
21    Q.  Okay.
22    A.  There isn't -- There's nothing to it.
23  It was on file.  It was just maybe put in a
24  different spot.  Maybe it wasn't stapled
25  together, maybe it come apart.  It's hard to

1  say.
2    Q.  Okay.
3    A.  I don't know.  You'd have to ask Lori.
4  But you have all the information.  There's not
5  like there's some kind of conspiracy of some
6  sort.  It just -- It was all here.
7    Q.  I'm not assuming there's a conspiracy
8  of some sort or anything.  I just want to kind
9  of make sure I understand.  These would have
10  been the documents that ████████ would have
11  presented at the time of hire?
12    A.  Of course.
13    Q.  Right?  And you therefore would have
14  made a scan and put a copy in; right?
15    A.  Of course.
16    Q.  And the fact that it happens -- if I'm
17  understanding you correctly, the fact that it
18  happens to have been produced later in the
19  production to us could be any number of reasons,
20  but the point is it was part of your file for
21  him; right?
22    A.  We still stick to the strict protocol
23  nobody can be hired without a Social Security
24  card and a photo ID.
25    Q.  Got it.

1    A.  Always.
2    Q.  Okay.
3    A.  There's never ever a point that you
4  could hire somebody without that.
5    Q.  Um-hum.
6    A.  Because if not, we don't know.  We
7  don't know if they're -- you know, you can't run
8  the risk of hiring somebody that's illegal.  I'm
9  not going to go to jail for them, I can tell you
10  that, or pay a fine.
11    Q.  Right.  Give me one second.  I lost my
12  train of thought.
13      So why don't we take a look at
14  his ID card that's on page 2781.  Okay?
15    A.  Okay.
16    Q.  So look at the bottom right-hand corner
17  of this card.
18    A.  Okay.
19    Q.  It says it was issued on January 8th,
20  2018.  Do you see that?
21    A.  Yes.
22    Q.  It says ISS, and then right below
23  January 8th, 2018; right?
24    A.  Okay.
25    Q.  So to be clear, by the point in time

49 (Pages 190 - 193)

Page 194

1  when this document -- when this card was issued,
2  right, ██████ had already been an employee
3  of the farm for ten years; right?
4      A.  Okay.
5      Q.  Right?  Is that correct?
6      A.  Whatever date he started.
7      Q.  He started in April of 2008; right?
8      A.  Okay.
9      Q.  Right.  So this card was issued over
10  ten -- issued almost ten years after he had
11  started his employment; right?
12      A.  Okay.
13      Q.  And ██████, by the way, had been
14  living in a house in Sibley for a number of
15  years; right?
16      A.  Okay.
17      Q.  No.  Yes?  The answer is yes, he'd been
18  living in a house for a number of years;
19  correct?
20      A.  Yes, he's been living there.  Yes.
21      Q.  In fact, he's been living in a house
22  that you own; correct?
23      A.  Yes.
24      Q.  Okay.  And so to be specific, you and
25  Lori Nunes are the owners; correct?

Page 195

1      A.  Yes.
2      Q.  And he had been living there since at
3  least the time you bought it, which I believe we
4  saw was 2015; right?
5      A.  That's what we said, yes.
6      Q.  Okay.  But ██████ then at some
7  point, it seems, no sooner than 2018, presents
8  to the farm an identification card stating that
9  he lives in the state of California; right?
10      A.  That's what it says.
11      Q.  Okay.  But you knew he lived in Sibley;
12  correct?
13      A.  Yes.
14      Q.  Okay.  So although you knew this
15  document could not possibly be an identification
16  card with his actual address, you accepted it
17  anyway?
18      A.  Well, he has family that lives out
19  there.  I don't know.  I don't know.
20      Q.  You know, this doesn't say his family
21  lives in California; right?  It says he does.
22      A.  No.  I can't -- I can't answer your
23  question.  I don't know, because it just says
24  "Identification Card."  He updated it.  I don't
25  know if he was planning on leaving.  You don't

Page 196

1  know.  He just said, "Here, here's the new ID."
2      Q.  Okay.  So you recall him coming and
3  saying, "Here's a new ID"?
4      A.  He had to get -- deliver a new ID.
5      Q.  Okay.  Do you recall the old ID?
6      A.  No, I don't.
7      Q.  Okay.  Do you -- Do you recall a point
8  in time at which he said, "I have a new ID," and
9  presented it to you?
10      A.  I don't recall, no.
11      Q.  You're just looking -- You're saying
12  that must have happened based on the date, but
13  you don't recall it?
14      A.  It has to be.  I don't recall what
15  happened there.
16      Q.  Okay.
17      A.  Because it doesn't -- I mean, it
18  doesn't correspond with anything, so I really
19  don't know.
20      Q.  Right.  Did you ask him when he
21  presented this card, "Hey, why do you have a
22  California license plate?"  Or strike that.
23  "Hey, why do you have a California
24  identification card?"
25      A.  I can't ask that question.

Page 197

1      Q.  You don't think you can ask like why
2  the card states from California when you know he
3  lives in Iowa?
4      A.  I can't ask -- I can't ask questions
5  like that.
6      Q.  Okay.
7      A.  It -- I can't legally ask those
8  questions.
9      Q.  Let's go with 16.
10          (Exhibit 16 was marked for
11          identification by the reporter.)
12      Q.  Mr. Nunes, you've been handed a
13  document that's been marked as Defendants'
14  Exhibit 16.  I'll tell you what this is because
15  I'm sure you don't know it, and I'm sure you
16  haven't seen it before.  Is that correct?
17      A.  I've never seen it before.
18      Q.  All right.  I took a look at the
19  address that was provided by ██████
20      A.  Okay.
21      Q.  -- on the parcel map in the city of
22  Bell, California.
23      A.  Yeah.
24      Q.  All right.  And if you look here and
25  you look at Walker Avenue, right, ██████

50 (Pages 194 - 197)

1  says that his address -- according to his
2  identification card he presents, he has an
3  address of ███ Walker Avenue; right?  In short,
4  when you look at the parcel map, there's no such
5  address; right?
6      A.  Okay.
7      Q.  It jumps from ███ Walker Avenue -- do
8  you see that sort of in the middle of the page?
9      A.  What was it supposed -- What is it?
10  What does this document say?
11      Q.  He says -- His identification card has
12  an address of ███ Walker Avenue.
13      A.  Yeah.  I don't know.  I didn't prepare
14  this document, so I don't -- I don't know.  I
15  don't see it on this document.
16      Q.  Right.  It jumps -- Do you see where it
17  says "███ Walker Avenue"?
18      A.  Okay.
19      Q.  And you see it jumps to ███ Walker
20  Avenue right below it?
21      A.  No.
22      Q.  Okay.  Do you see -- let's -- about
23  middle of the map, I guess it would be,
24  there's --
25      A.  █ --

1      Q.  You said you saw ███ Walker Avenue?
2      A.  Oh, yeah.  Right there.  Yep.
3      Q.  Yep.  Exactly.
4      A.  I was looking at ███ I'm sorry.
5      Q.  So it skips over ███ Walker Avenue?
6      A.  Okay.
7      Q.  There is no ███ Walker Avenue; right?
8      A.  According to your paper.
9      Q.  Right.  So it can't possibly be the
10  case that this is a genuine or authentic
11  identification card; right?
12          MR. BISS:  Object to the form.
13      Q.  Correct?
14      A.  I have no idea.
15      Q.  Okay.  Well, I mean, the address
16  doesn't exist.  We just saw that; right?
17          MR. BISS:  Object to the form.
18  Assumes facts not in evidence.
19      Q.  You can answer.
20      A.  I have no idea.
21      Q.  Okay.  So when you say you -- you said
22  earlier that you can't ask him about his
23  California identification; right?
24      A.  I can't ask about IDs.  I can't ask too
25  much about them, if they're legal or not legal.

1      Q.  Okay.  Are you referring to the
2  instructions that appear at the top of the I-9
3  form as to what you can and can't do?
4      A.  There's -- There's sections that -- in
5  there.  I don't -- I don't recall exactly.  I
6  mean, it's just part of it.  You just can't do
7  certain things.
8      Q.  Okay.
9      A.  Now, I don't know why he would -- I
10  really don't know why he has a different card.
11  I -- I don't know if I received that card or
12  not, but I can tell you this, on his -- on his
13  date of employment, he had the correct cards and
14  everything was right.  Now, why this is, I have
15  no idea.
16      Q.  Okay.
17      A.  I really can't answer your question.
18      Q.  Got it.
19      A.  And I'm assuming there's a valid
20  answer, but I cannot answer that.
21      Q.  Okay.  Let's take a look at another
22  one.
23      A.  Are you done with this one?
24      A.  Yep.  You can set that one aside.
25          MR. BOYER:  Here's 17.  Oh,

1  actually, mark 18 as well.  We'll do them
2  together.
3          (Exhibits 17 and 18 were marked
4      for identification by the reporter.)
5          MR. BISS:  Nate, what number are
6  we on?
7          MR. BOYER:  17.  And Kristen is
8  about to hand you number 18.
9      Q.  So you've been handed Documents 17 and
10  18.  This is the I-9 form for ███████████;
11  correct?
12      A.  That's what it says.
13      Q.  Sorry.  To be specific, Defendants' 17
14  is the I-9 form for ███████████; correct?
15      A.  That's what it says.
16      Q.  Okay.  And you can ignore what's on the
17  back of Defendants' 17.  Those are some W-4
18  forms.  We won't talk about those.
19          So we haven't -- we have not
20  received any identification to be produced for
21  ███████████  Are you aware of the fact
22  that you didn't produce any identification for
23  ███████████?
24      A.  You have his Social Security card.
25  Obviously we're missing some kind of other piece

1   of paper. There must have been something lost.
2      Q. Got it. Did you -- Have you recently
3   made any efforts to try to locate his
4   identification?
5      A. Me?
6      Q. Yes, you. Let me -- Has NuStar, as far
7   as you know, made any efforts?
8      A. No.
9      Q. Okay. And have you personally made any
10  such efforts?
11     A. No.
12     Q. Okay. So I'll represent that I
13  recently asked through Counsel if there is an
14  identification, and it hasn't been produced,
15  so --
16     A. Yeah. There's a lot of stuff that
17  never gets produced from you guys too.
18     Q. Okay. Well, on this particular issue
19  here with regard to the identification, does
20  that mean that there is no identification on
21  file for ██████████?
22     A. I don't have another one. Like I said,
23  I gave you everything we had for 14 years. This
24  one here, I don't know. There must have been
25  something lost somewhere. I don't know.

1      Q. Got it. So take a look at the card --
2      A. I can tell you this, it's still the
3   same thing. When we hire somebody, they have to
4   have a Social Security card and a photo ID.
5   It's always the same no matter what.
6      Q. Okay. Take a look at the first page.
7   It says -- under Section 1 where ██████████
8   attests to him being a lawful permanent
9   resident. Do you see that box checked?
10     A. Okay.
11     Q. All right. There's no alien
12  registration number written there; correct?
13     A. There's nothing marked there, no.
14     Q. Right. But also, if I'm not mistaken
15  too, we don't have a copy of his card on file
16  either; right?
17     A. I don't have a copy of that. It must
18  have been lost somewhere, because you cannot be
19  hired without two forms.
20     Q. Right.
21     A. Social Security card and a photo ID.
22     Q. Now, go down to Section 2, where it
23  says "Employer Review and Verification"; right?
24     A. Correct.
25     Q. And you see it says a List C document

1   of a Social Security card and it lists that
2   there. Do you see that?
3      A. Okay.
4      Q. Okay. What you're talking about there
5   with regards to the photo identification would
6   be a List B card, but there's nothing listed
7   under List B; right?
8      A. Right.
9      Q. Okay. Does that mean he didn't present
10  a card at the time of hire?
11     A. We don't have to fill out A, B, or C if
12  we have copies.
13     Q. Got it. So your position is you don't
14  have to fill it out at all if you have copies?
15     A. That's correct.
16     Q. Okay. So the fact that you put -- the
17  fact that you chose to fill out List C but not
18  List B is just --
19         MR. BISS: Object to the form.
20     Q. I mean, was there a reason that you
21  only filled out the Social Security card?
22         MR. BISS: Object to the form.
23     Q. Was there?
24     A. I have no -- I didn't -- I don't know.
25     Q. Okay. Down --

1      A. I did not do it. You'd have to ask
2   Lori.
3      Q. Okay. Well, down here it appears that
4   you signed it; correct? You signed the
5   certification?
6      A. Yep.
7      Q. Right. And then --
8      A. And once again, you have to have two
9   forms of ID. We have a strict protocol that we
10  have a Social Security card and an ID -- and a
11  photo ID. We have to have those. We don't have
12  to list them A, B, or C on the paper. I seen
13  them, I acknowledged that they were correct, and
14  I signed it.
15     Q. Okay. Do you know why, similar
16  question before, ██████████ Social
17  Security card was produced thousands of pages
18  later? Was it stored somewhere else?
19     A. No, but they probably were in the same
20  spot, I would assume that, as the other one.
21  They must have been in a file somewhere else
22  that was different for some reason.
23     Q. Okay.
24     A. But it's still a thousand more
25  documents than Hearst Corp. has ever produced.

52 (Pages 202 - 205)

Page 206

```
1    Q.  Okay.  So we talked about ████
2    ████████████ a little bit now.
3         MR. BOYER:  Let's mark this
4    number 19.
5         (Exhibit 19 was marked for
6         identification by the reporter.)
7    A.  Are we done with 17 --
8    Q.  Yes.
9    A.  -- or are we going to keep that?
10   Q.  Yeah, we're done with that one.
11   A.  Are you done with 18 also?
12   Q.  I believe so, yes.
13   A.  Okay.
14   Q.  Yep.  So I've handed you a document
15   marked as Defendants' 19, produced by Plaintiffs
16   in this case.  It appears -- It is the Iowa
17   Workforce Development reports and appended
18   payroll summaries for four quarters -- all four
19   quarters in 2018.  Okay?
20   A.  Okay.
21   Q.  Are you familiar with these documents?
22   A.  No.
23   Q.  Okay.  Is this something Lori handles?
24   A.  Yes.
25   Q.  All right.  It's more of a bookkeeping
```

Page 207

```
1    thing; right?
2    A.  That's correct.
3    Q.  Gotcha.  Why don't you jump to page
4    488.  There's text running through it, so it
5    might be difficult to read, but --
6    A.  Okay.
7    Q.  Are you there?
8    A.  Yep.
9    Q.  Okay.  One of the things we saw in
10   these is that quarter after quarter ████
11   ████████████████████████████████████
12   are -- are meaningfully higher paid than all
13   other employees.  So take a look here.  See line
14   14 for ████████████████████? Right?
15   A.  Yes.
16   Q.  He's paid a little more than $15,000,
17   right, for that quarter?
18   A.  Okay.
19   Q.  And 15 ████████████ is also paid
20   a little more than $15,000 for that quarter;
21   right?
22   A.  Okay.
23   Q.  And ████████ was paid a little
24   more than $16,000 for the quarter; right?
25   A.  Okay.
```

Page 208

```
1    Q.  And nobody else, including other
2    longtime employees, like ████ or others,
3    make more than 13,000 in a given quarter; right?
4    A.  Okay.
5    Q.  Or 13,130.88, to be specific.  Okay?
6    That's right; right?
7    A.  Yes.
8    Q.  Okay.  In fact, in this particular
9    quarter, all three of them made more than you,
10   as I recall.  I think you made $15,000; right?
11   A.  That's what it says.
12   Q.  So my question is, I'm just curious,
13   why are these three individuals paid
14   significantly more than their peers?
15   A.  What peers?
16   Q.  Well, let's take -- is there a reason
17   that they're paid more than -- we'll start with
18   ████ who I think has been there for a
19   while; right?
20   A.  Okay.
21   Q.  Like why are they paid a few thousand
22   dollars more in a quarter than he is?
23   A.  Why is a secretary paid less than an
24   attorney?
25   Q.  I ask that question --
```

Page 209

```
1    A.  Just because they're women, or why is
2    it?
3    Q.  Well, I'm sorry, I don't follow the
4    analogy I think you're trying to draw.  Like
5    what --
6    A.  Well, there's no analogy.  It's just
7    they're an employee, okay, so they get paid
8    less.  What does that have to do with anything?
9    Q.  Well, I'm just wondering if there's a
10   reason why they are paid more than -- than
11   others, like --
12   A.  Skill set, probably.
13   Q.  Skill set?  Okay.
14   A.  That's what I would say.
15   Q.  All right.  Well, is there a -- has
16   there been like evaluations where they've gotten
17   greater bonuses or something over time?  Because
18   you talked earlier, right, about how every year
19   there's a set amount in which everybody
20   increases?  Right?
21   A.  Yes.
22   Q.  And it's pretty -- And it's a quarter a
23   year per hour; right?
24   A.  Right.
25   Q.  Okay.  And they would have started at
```

53 (Pages 206 - 209)

Page 210

1    whatever it was?
2        A.  If you recall, I said that was
3    started -- this year we started doing that, but
4    we always go up more and more and more.
5        Q.  Okay.  Are they -- Is there any cash
6    that they receive that they then pass along to
7    other workers at the farm to pay them?
8        A.  Cash?
9        Q.  That's right.
10       A.  Are you trying to accuse us of -- of
11   doing a crime now?  Are you accusing me of doing
12   a crime of cash?
13       Q.  I'm asking -- I'm asking a question.
14   Let's start off with just the question.  Do you
15   pay them any more so that they can then pass
16   that payment along to --
17       A.  Absolutely not.
18       Q.  -- to any other workers?
19       A.  Absolutely not.  You think I'm going to
20   go to jail or I'm going to do something like
21   that?  Are you crazy?  Don't accuse me of a
22   crime.
23       Q.  I'm asking questions, sir.  And it's
24   fine if the answer is no, but I just need to
25   explore this.

Page 211

1        A.  Yeah.
2        Q.  You are aware that you brought a
3    defamation suit alleged -- demanding $20 million
4    in damages for harm to your reputation; right?
5            MR. BISS:  What does that have to
6    do with anything?
7            MR. BOYER:  Well, I think it's
8    fair -- the point is that it's fair to ask these
9    questions about their employment practices
10   because it's been put at issue.
11           MR. BISS:  And it's -- And it's
12   fair for him to respond and ask you to ask
13   questions and not make false accusations.
14           MR. BOYER:  Yeah.
15       A.  That's the whole reason this whole
16   thing came up.  It was false all the way along.
17       Q.  I see.
18       A.  Lizza comes out and writes all this
19   stuff, all these falsehoods, and then you're --
20   now you're trying to defend this?  That's --
21   That's not ethical.
22       Q.  Very well.  Have you ever heard of any
23   supervisors in the agriculture industry selling
24   IDs or Social Security cards to workers so that
25   they can satisfy I-9 requirements?

Page 212

1        A.  Absolutely not.
2        Q.  Okay.  So just to be clear, are there
3    specific reasons these persons were paid more
4    over time --
5        A.  Just like I said.
6        Q.  -- compared to others?
7        A.  Just skill set.
8        Q.  Just skill set?  What's the specific
9    skill set that ███ brings to the table that
10   others don't?  We'll start there.
11       A.  He can weld.
12       Q.  Okay.  Good.  What about -- Anything
13   else for ███?
14       A.  All kinds of things.
15       Q.  Okay.  What else?
16       A.  He can -- He can do just about
17   anything.
18       Q.  Okay.  What about ██████?
19       A.  Same thing.  He was -- He's -- He's a
20   very skilled employee.  He has lots of
21   knowledge.  They grew up knowing dairy.  They
22   know cows.  They have a very specific skill set.
23           Even though corporations and
24   people like you think that we're not skilled and
25   that these people that -- that just because they

Page 213

1    don't speak English, that they're -- they're
2    some kind of lesser people, they're not.
3    They're very skilled people and very smart
4    individuals.  Maybe that's why they get paid
5    more.  There's always some reason why somebody
6    gets paid more than somebody else.
7        Q.  Okay.  You know, that's a perfectly
8    fine answer.
9        A.  But to come up and say that we pay cash
10   for something illegal is absolutely asinine.
11       Q.  Okay.  What about Mr. --
12       A.  I'm a standup individual.
13       Q.  I would --
14       A.  We do everything honest and
15   straightforward.  I have to -- if I do
16   something -- if I do something wrong, I have to
17   respond to God.  And God will take care of me.
18   I don't -- I don't do nothing wrong.
19           MR. BOYER:  Okay.  What was my
20   last question?  I'm sorry.
21           (Requested portion of the record
22       was read.)
23       Q.  What about ██████?
24       A.  Very skilled employee.
25       Q.  Okay.  Anything in particular that he

54 (Pages 210 - 213)

Page 214

1  does for the farm?
2    A.  Yeah.  He knows how to heat detect and
3  artificial insemination.
4    Q.  Okay.
5          MR. BISS:  You would agree that's
6  a particularly interesting skill set.
7          MR. BOYER:  Well, it's certainly
8  important to be done, no doubt about it.
9          Let's mark this as number 20.
10         (Exhibit 20 was marked for
11         identification by the reporter.)
12   A.  Am I done with number 19?
13   Q.  You can move 19 aside.
14   A.  Thank you.
15   Q.  So you've been handed a document that
16  has been marked as Defendants' Exhibit 20.
17  Let's start with the I-9 form here.  This is the
18  I-9 form for ███████████████; right?
19   A.  That's what it says.
20   Q.  All right.  First of all, up near the
21  top I see his Social Security -- there's a
22  Social Security number that's written and then
23  crossed out there.  Do you see that?
24   A.  Yes.
25   Q.  Do you know why that happened?

Page 215

1    A.  I have no idea.
2    Q.  Okay.  Do you know who crossed it out?
3    A.  Nope.
4    Q.  Over by the side on the left there's a
5  little initial there that says -- it appears to
6  be LN with an underline on that.  Do you see
7  that?
8    A.  Yes.
9    Q.  All right.  Is that Lori's initials?
10   A.  It appears to be.
11   Q.  Okay.  Would that indicate that she was
12  the one who actually filled this out?
13         MR. BISS:  Object to the form.
14   Q.  Do you know why she initialed it?
15   A.  Maybe there was a correction done.
16   Q.  Okay.
17   A.  You have to initial the -- if there's a
18  correction, you've got to initial it.
19   Q.  Okay.
20   A.  There could have been an issue with the
21  paperwork, a clerical error or something.
22   Q.  All right.  But you don't -- you don't
23  personally know why she did it.  I'd have to
24  talk to Lori?
25   A.  No.  You'd have to ask Lori.  I don't

Page 216

1  know.
2    Q.  Down right below it says "A noncitizen
3  national of the United States."  Do you see that
4  checked?
5    A.  Okay.
6    Q.  We talked about this before.  And
7  that's a very limited set of people from places
8  like the Swain Islands.  Do you recall me
9  mentioning that?
10   A.  Yeah.
11   Q.  Take a look at ████████████
12  identification card on PX681.  This is an alien
13  registration card; right?
14   A.  A permanent resident card?
15   Q.  It's a permanent resident card; right?
16   A.  Okay.
17   Q.  And it says he's from Mexico; correct?
18   A.  I don't know.  Where does it say that?
19   Q.  It says "Country of Birth:  Mexico."
20   A.  Oh, yeah.  Right there.  Okay.
21   Q.  Okay.  So he's not a noncitizen
22  national of the United States; right?
23   A.  Okay.  He's not a -- whatever you said
24  he's not, yeah.
25   Q.  Okay.  You -- Got it.  Also, I noticed

Page 217

1  that he signed this.  You'll see in the top in
2  Section 1 he signed it in February of 2013; is
3  that correct?
4    A.  That's what it says.
5    Q.  And below it certifies that he started
6  his employment in August of 2008.  Do you see
7  down where it says "Certification" and the start
8  employee began employment?
9    A.  Say that again.  Where -- Where at?
10   Q.  Right.  So down where -- do you see
11  where it says "Certification"?  We'll start
12  there.
13   A.  Okay.  Yeah.
14   Q.  And then there's a line there where it
15  says "The employee began employment on" and then
16  it has a date.  Do you see that?
17   A.  Okay.
18   Q.  And the date is August 4th, 2008;
19  right?
20   A.  Okay.
21   Q.  Is that correct?  That's what it says;
22  right?
23   A.  That's what it says.
24   Q.  Okay.  So ██████████ started his
25  employment in August of 2008, but he didn't sign

55 (Pages 214 - 217)

1  or fill out this -- he didn't sign this form
2  until February 28th of 2013; right?
3      A.  I don't know.  Maybe -- Maybe there's
4  something lost.  Maybe -- I don't know.  I'm not
5  sure.  I can't answer that question.  It looks
6  like Lori would probably know better than I
7  would because it's on there, her initial.
8      Q.  Okay.  So you don't -- you can't
9  explain why?
10     A.  I can't explain why, no.
11     Q.  Okay.  And then down below, you sign
12  this as the manager -- you certify this as the
13  manager of NuStar Farms, but not until November
14  of 2018.
15     A.  Right.  After -- See that?  That
16  section wasn't filled out until after the
17  attorney looked -- looked at it.
18     Q.  Got it.  Over in the IDs -- I want you
19  to turn to the ID page.  So a couple of things
20  to note.  First of all, I have a question.  It
21  says up at the top start August 6th, 2008, at
22  $80; is that right?
23     A.  Okay.
24     Q.  What's that a reference to?
25     A.  It says he started at $80.

1      Q.  $80 for what?
2      A.  For a shift.
3      Q.  Oh, he was paid per shift or per hour?
4      A.  This is by the -- It's -- The way we
5  pay is -- there's -- it's by the hour, but it's
6  shifts.
7      Q.  Okay.
8      A.  So there's -- it still goes to shifts.
9  It was all set up originally.  They were on a
10  different pay period -- different pay, so --
11  Sibley Dairy was to NuStar Farms.  So what we
12  did, instead of having confusion, we just took
13  whatever they had and went over, and then we
14  just never adopted over to -- everybody still
15  gets paid by the hour, but you just divide the
16  hours by the shift, which are eight-hour shifts.
17     Q.  I see.
18     A.  Which they -- they put down.
19     Q.  Got it.  Okay.
20     A.  That's originally from the other dairy.
21  It was just something so there was a transition
22  period where there was no issues.  Because you
23  don't want -- you don't want somebody going "Oh,
24  well, I'm getting paid different.  I don't know
25  what I'm" -- you don't want to have to deal with

1  that when you just took something over like
2  that.
3      Q.  Got it.  Okay.  Take a look as well at
4  a couple things of ██████████ card.  So
5  first of all, the card expired on January 8th,
6  2018; right?
7      A.  That's what it says.
8      Q.  All right.  So his work authorization,
9  as far as NuStar's records are concerned,
10  expired in November of -- excuse me -- expired
11  in January of 2018; right?
12     A.  I -- I didn't know nothing about
13  expiration dates until you said something about
14  it.  I didn't know there was any expirations on
15  here, but I do know that the immigration
16  attorney looked at all this paperwork and never
17  said nothing about it.  So that's the second one
18  that she's seen and still never said nothing
19  about it.
20     Q.  Got it.  And that's what gives you
21  confidence that your records are well kept;
22  correct?
23     A.  Absolutely.  I mean, after she -- she
24  looked at it and she said that, yeah, that's --
25  she never said that there was an issue, like,

1  "Oh, you need to update that."  I mean, I would
2  hope that an immigration attorney would go,
3  "Hey, his card is expired.  We've got a problem
4  here."
5      Q.  Right.
6      A.  I would assume she's competent.
7      Q.  Let's take a look at another one.
8          (Exhibit 21 was marked for
9          identification by the reporter.)
10     Q.  Mr. Nunes, you're being handed a
11  document that has been marked as Defendants'
12  Exhibit 21.  So, Mr. Nunes, this is the -- this
13  appears to be the I-9 form plus supporting
14  documentation for ██████████████████
15  ██████ correct?
16     A.  That's what it says.
17     Q.  All right.  So let's take a look at
18  this one here.  So first of all, taking a look
19  at the I-9, he selects that he's a lawful
20  permanent resident; correct?
21     A.  Okay.
22     Q.  All right.  And he writes an
23  eight-digit number that starts with 108.  Do you
24  see that?
25     A.  Yes.

Page 222

1    Q.  If you look at the card that he
2   presented at the time of his hire -- because
3   just to be clear, these cards that are on PX692,
4   these are, as always, the cards he presents at
5   the time of hire; right?
6    A.  Say that again.
7    Q.  This is a scan of the cards he presents
8   at the time he was hired; right?
9    A.  Yep.
10    Q.  Yep. It says that the alien
11   registration number is a nine-digit number
12   ending in ███.  Do you see that?
13    A.  Okay.
14    Q.  Okay.  So just to be clear, ██████
15   ██████ completed the I-9 form writing a
16   different alien registration number than the one
17   that is on the card he submitted; correct?
18    A.  It appears to be that way.
19    Q.  And NuStar accepted that; correct?
20    A.  I can't ask them too many questions
21   about cards.
22    Q.  Got it.  You can't -- Even if you were
23   to -- your position is even --
24    A.  I didn't fill that out.  I didn't fill
25   that out. I can't ask too many questions.

Page 223

1    Q.  But you reviewed it; right?
2    A.  And also so did -- And on top of that,
3   so did the immigration attorney.
4    Q.  Got it.  And she was perfectly fine
5   with it?
6    A.  Obviously there was something right
7   about it. I don't know.
8    Q.  Okay.  Also, take a look at his
9   permanent resident card again, while we're --
10   while we're focused on it.  So you'll notice
11   that it says on the card he has been a resident
12   since January of 2004; right?
13    A.  Okay.
14    Q.  All right. So ████████████,
15   this card -- this card obviously was therefore
16   issued after -- on or after January of 2004;
17   right?
18    A.  I don't know.
19    Q.  Well, you don't get a permanent
20   resident card before you're a permanent
21   resident; right?
22       MR. BISS:  Object to the form.
23    A.  I don't know.
24    Q.  It's possible to get a permanent
25   resident card and you're actually not a

Page 224

1   permanent resident?
2       MR. BISS:  Object to the form.
3   Argumentative.
4    A.  I don't know.  I don't know how they
5   get cards.  I never had to get one.
6    Q.  Okay.  So just to be clear, you have no
7   idea -- do you understand that the permanent
8   resident card is -- Let me strike that.
9       Have you heard of the permanent
10   resident cards referred to as green cards?
11    A.  There's an old term -- they used to be
12   green, and they look like a Social Security
13   card.
14    Q.  Right.  And are you -- are you aware
15   that you are given a permanent resident card
16   after being granted legal permanent resident
17   status?
18    A.  You know, I don't know how -- once
19   again, I don't know how they get cards.  I've
20   never had to do it.
21    Q.  All right.  Okay.
22    A.  I'm not -- I milk cows.  I'm not -- I'm
23   not an immigration attorney.  I don't understand
24   that stuff.  But I did have an immigration
25   attorney look at it, because I am smart enough

Page 225

1   to do that.
2    Q.  Got it.  And she was perfectly fine
3   with this; right?
4    A.  Apparently.  Because she looked at
5   them.
6    Q.  By the way, this card expired in 2015;
7   correct?
8    A.  Where is it at?
9    Q.  It says card expires December --
10    A.  That's what it says.
11    Q.  Yeah.  We already talked about this,
12   that you haven't gone and asked for a new one.
13    A.  Once again --
14    Q.  Right?
15    A.  -- an immigration attorney looked at
16   it, and she verified it.
17       That's all I could do.  I'm
18   not -- I'm not an immigration attorney.
19    Q.  Gotcha.  While we're looking at these,
20   take a look at the Social Security card too
21   right above.
22    A.  Okay.
23    Q.  Does anything look odd about it to you?
24    A.  No.
25    Q.  Do you notice that the USA is off

57 (Pages 222 - 225)

Page 226

1 center on that Social Security card?
2 　　　　MR. BISS:  Object to the form.
3 　　A.  Okay.  If you say so.
4 　　Q.  Well, it's not -- I mean, normally it's
5 centered.  I mean, you've -- you've reviewed
6 hundreds of these Social Security cards before;
7 right?
8 　　A.  Okay.  Yeah.
9 　　Q.  Well, have you?
10 　　A.  I looked at these, yes.
11 　　Q.  Right.  And it's -- And the USA in the
12 logo is not pushed to the right relative to
13 point center as this one is; right?
14 　　A.  I don't see it, man.
15 　　Q.  It looks totally --
16 　　A.  I don't know what you're -- you're
17 getting real technical on something that I
18 don't -- I don't see it.
19 　　Q.  Okay.
20 　　A.  I mean, I'm not an artist by no means,
21 and I don't do that.  I milk cows for a living.
22 I don't -- I don't do artist stuff.  I don't --
23 I don't know the --
24 　　Q.  Got it.  So we -- we just talked about
25 five current employees, all of whom have been --

Page 227

1 or five of the six persons who have been noticed
2 for their depositions in this case.  Have you
3 spoken to -- Well, strike that.
4 　　　　We talked earlier about how you
5 had a brief conversation with ███ before his
6 deposition saying "You've got to go to the
7 deposition"; right?
8 　　A.  There's going to be depositions.
9 　　Q.  Yes.  And then after his deposition you
10 had a conversation with --
11 　　A.  I said, "How did it go?"
12 　　Q.  Right.
13 　　A.  And he said -- I think he said they --
14 they stopped.
15 　　Q.  Have you talked about their depositions
16 with any of the other persons who have been
17 deposed?
18 　　A.  I never have talked -- I've never
19 talked -- Say that again.
20 　　Q.  Sure.  Let's do them one --
21 　　A.  I had to explain -- I had to tell them
22 there was a date.
23 　　Q.  Got it.  Okay.  So like ███████,
24 what have you said to ███████ about it?
25 　　A.  That they had to have a date that they

Page 228

1 were going to go to court.
2 　　Q.  Okay.  That's how you framed it to him,
3 a date he's got to go to court?
4 　　A.  Yeah.
5 　　Q.  Okay.  What did he say?
6 　　A.  He asked, he goes, "Well, what do I --
7 what do we have to do this for?"
8 　　　　I said, "Well, they wrote an
9 article."
10 　　　　He said, "Oh, the ones that said
11 we're all bad people?"
12 　　　　And I said, "Yeah, that's the
13 one."
14 　　Q.  Got it.  Anything else happen in that
15 conversation?
16 　　A.  (Shaking head.)
17 　　Q.  ███████████, what did you
18 say to --
19 　　A.  I don't recall.
20 　　Q.  Okay.  ███████?
21 　　A.  Yeah, same thing.  "You've got to go to
22 court."
23 　　　　He said the same thing.  He's
24 like, "Oh, you've got to -- Oh, about the
25 article?"

Page 229

1 "Yeah."
2 　　Q.  Got it.  ███████  Did they -- Did
3 they read the article, by the way?
4 　　A.  I have no idea.
5 　　Q.  ███████████, did you have a
6 conversation with him about his deposition?
7 　　A.  I don't know if I talked to him or not.
8 　　Q.  Okay.
9 　　A.  I don't recall.
10 　　Q.  ███████████  I believe it is?
11 　　A.  Yep.
12 　　Q.  Did you talk to him?
13 　　A.  Yep.  I told him there was a date and
14 he's going to go to court.
15 　　Q.  Okay.  And what did he say?
16 　　A.  He didn't say anything, really.  He
17 just said, "Okay."
18 　　Q.  Okay.  And that was the end of the
19 conversation?
20 　　A.  That's what he said, yeah.  It was
21 pretty cut and dry.
22 　　Q.  All right.  So I want to ask briefly
23 about Hermelinda Montez.  Do you know who that
24 person is?
25 　　　　MR. BOYER:  You can mark this.

58 (Pages 226 - 229)

Page 230

1    (Exhibit 22 was marked for
2    identification by the reporter.)
3    Q.  I've handed you a document that's been
4    marked as Defendants' 24.
5    A.  Say that again.
6    Q.  I've handed you a document that has
7    been marked as Defendants' Exhibit 24.  My --
8    A.  22.
9    Q.  Oh, my goodness.  You're right.  Thank
10   you.  Apologies.
11       I have handed you a document that
12   has been marked as Defendants' Exhibit 22.  So
13   Defendants' 22, the preparer or the translator
14   at the bottom is somebody named Hermelinda
15   Montez; right?
16   A.  That's what it says.
17   Q.  All right.  Do you know who she is?
18   A.  No.
19   Q.  Okay.  Does she have any affiliation to
20   NuStar, as far as you know?
21   A.  I don't think so.
22   Q.  You've never heard of the name before,
23   or have you?
24   A.  Hermelinda?  No, I don't -- I don't
25   recall.

Page 231

1    Q.  Okay.  Okay.  Let's take a look at the
2    IDs on -- while we're taking a look at this
3    gentleman's I-9.
4    A.  ID or I-9?
5    Q.  Take a look at the ID, which starts on
6    PX3004.  I take it -- Take a look at the font on
7    the Social Security card.  Does that strike you
8    as odd in any way, unusual font?
9    A.  Not necessarily.
10   Q.  Does it somewhat strike you as an
11   unusual font to see on a Social Security card?
12       MR. BISS:  Asked and answered.
13   Q.  Well, you said "not necessarily."  Does
14   it in any way strike you as unusual?
15   A.  I don't -- I don't see anything.
16   Q.  Okay.  Have you ever seen a Social
17   Security card with that font before?
18   A.  I can't say that.
19   Q.  Okay.
20   A.  I don't know.
21   Q.  All right.  You can set that aside.
22   Let's talk about a gentleman named ███████
23   ████
24       (Exhibit 23 was marked for
25       identification by the reporter.)

Page 232

1    Q.  Do you remember ███████████?
2    A.  I can't say that I do.
3    Q.  Okay.  So why don't you take -- Just to
4    kind of focus a little bit, why don't you take a
5    look at the photograph of ████████ on
6    his ID on page -- on PX3196.  Do you see that?
7    A.  Okay.
8    Q.  Do you recognize him?
9    A.  No.
10   Q.  Okay.  He worked for you for a few
11   years; right?
12   A.  I have no idea.  I still don't
13   recognize him.  I don't know.
14   Q.  You still don't know?  Okay.
15       One second.  Give me -- Give me
16   just ten seconds here.  Okay?
17       Would somebody -- I'll put this
18   back on.  Would someone else perhaps know ████
19   ████ on the farm?  Like would Lori know
20   him -- know him?
21       MR. BISS:  Object to the form.
22   A.  Don't know.
23   Q.  Don't know?  I mean, who deals with --
24   who among the Nuneses ends up interacting with
25   the workers most frequently?

Page 233

1    A.  I do.
2    Q.  You do?  So is it fair to say if
3    anybody knew him it would probably be you?
4    A.  That's correct.
5    Q.  Okay.  Why don't we then focus on this.
6    So taking a look at his I-9, it states here in
7    the certification part of the I-9 -- so go back
8    to the I-9 itself, it says that he started in
9    November of 2014; correct?
10   A.  Okay.
11   Q.  Right.  You see that down there.
12   That's when he started; right?
13   A.  Where it says employee's signature and
14   it says 11-4-2014; is that correct?
15   Q.  That is not where I'm pointing at, but
16   that's also a good point.  He signed this I-9 on
17   11-4-2014; right?
18   A.  Okay.
19   Q.  And I'm looking down where it says
20   "Certification."
21   A.  Okay.
22   Q.  And there's a date there for the date
23   he began employment.  And it's that same day,
24   11-4-2014; right?
25   A.  Okay.

59 (Pages 230 - 233)

Page 234

1  Q.  Okay.  And again, he selects -- do you
2  see above he selects that he's a lawful
3  permanent resident?  Correct?
4  A.  That's what he marked.
5  Q.  And as you always do, when he presented
6  you with a card, you made a copy and a scan of
7  his cards; right?
8  A.  That's correct.
9  Q.  There we go.  Now, take a look at his
10  lawful permanent resident card on page 3196.
11  A.  Okay.
12  Q.  It says his birth date is ████████
13  ███ right?
14  A.  That's what it says.
15  Q.  Yeah.  It says his country of birth is
16  Mexico; right?
17  A.  Okay.
18  Q.  A resident -- And it says he's a
19  resident since January 27th of 2014; right?
20  It's on the card.
21  A.  Okay.
22  Q.  Yep.  And it says -- And if you look at
23  his Social Security card, he has a Social
24  Security card that ends in ███; right?
25  A.  That's what it says.

Page 235

1  Q.  Okay.  And why don't you take a look
2  at -- Actually, hold on a second.
3      And if I were to tell you that he
4  worked for you until 2017, would -- I guess it
5  doesn't ring any bells because you don't
6  remember him at all; is that right?
7  A.  That's correct.
8  Q.  Okay.  All right.  So now keep that one
9  handy, actually.  Let me show you another one.
10  We'll mark it as Defendants' 24.
11      (Exhibit 24 was marked for
12      identification by the reporter.)
13  Q.  All right.  You have been handed a
14  document that has been marked as Defendants'
15  Exhibit 24.  Okay.  So this appears to be
16  another I-9 form filled out by ████████
17  ████; right?
18  A.  That's the name, yes.
19  Q.  All right.  And go and take a look at
20  the -- go ahead and take a look at the photo of
21  ████████.  Right?
22  A.  Okay.
23  Q.  And it looks like the photo of
24  the same person on the other one; right?
25  A.  No.

Page 236

1  Q.  You think -- Oh, you think they look
2  different?
3  A.  I do, yeah.
4  Q.  Okay.  Take a look at the date of
5  birth.  They have the same date of birth,
6  ████████.
7  A.  Okay.
8  Q.  Okay.  So we have two different --
9  you're saying we have two different ████████
10  ████████ that happen to have been born on the
11  same day?  You were never aware of the fact that
12  your farm employed two different people with the
13  same exact name with the same exact birthday?
14  A.  No.  Why would I?
15  Q.  Okay.  If we were to check the payroll
16  records, would we find two different ████████
17  ████████ or do you think we could only
18  find one?
19  A.  You have the -- You have -- You have
20  all the information.  You have workforce
21  development.  Do you have that?
22  Q.  Yeah.  We'll pull up the --
23  A.  So did it answer your question?
24  Q.  Yeah.  We'll pull up the 2015 records
25  when we get a chance just to check this out.  So

Page 237

1  how about this?  How about we table this.  We'll
2  take it out -- We'll take a look at it and --
3  A.  All right.
4  Q.  Because you're saying it's possible
5  there might have been two ████████
6  ████████.
7  A.  I don't know.  I mean, obviously
8  they're different ones.  I mean, those two
9  people aren't the same to me.  I have no idea.
10  I mean, it's very possible.
11  Q.  All right.  Tell you what, let's set
12  aside 24 and 25.
13  A.  23 and 24?
14  Q.  Excuse me.  23 and 24.  Thank you.
15  A.  Okay.
16  Q.  Okay.
17      MR. BOYER:  This is 25.
18      (Exhibit 25 was marked for
19      identification by the reporter.)
20  Q.  Mr. Nunes, you've been handed a
21  document that's been marked as Defendants'
22  Exhibit 25.  Do you recall a person who worked
23  for you by the name of ████████████?
24  A.  Nope.
25  Q.  Okay.

60 (Pages 234 - 237)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 238

1   A.  How long was he employed for us?
2        MR. BISS:  Nate, do you have a
3   copy of that for me?
4        MR. BOYER:  Oh, sorry.  Of
5   course.
6   A.  Do you know how long he was employed?
7   Q.  Well, we can -- we can check.  I don't
8   know off the top of my head.  One thing I want
9   to -- I want to just ask a question, a fairly
10  discrete question about these documents.  Take a
11  look -- Well, first of all, as an initial
12  matter, look at the I-9.  And the certification
13  is just not completed at all; correct?
14  A.  Okay.
15  Q.  All right.  Well, it's correct?  It
16  hasn't been completed; right?
17  A.  I'll agree with that.
18  Q.  All right.  So NuStar did not certify
19  the authenticity of the documents that were
20  presented; right?
21  A.  That's not necessarily true.
22  Q.  Well, it didn't complete the
23  certification regarding their authenticity;
24  right?
25  A.  The paperwork just wasn't finished.

Page 239

1   Q.  Okay.  So this was just a paperwork
2   problem?  You just didn't finish the paperwork?
3   A.  It looks like a clerical error to me,
4   that there was something not there.  You have
5   copies of his IDs.
6   Q.  How long -- How often did that clerical
7   error happen, where you didn't complete the
8   certification?
9   A.  The -- The section here?
10  Q.  Yes.  The employer's section.
11  A.  There was some of them, because I
12  didn't realize we had to -- we had to do that.
13  I thought it was just an employee form, just
14  like the W-4, you just -- you just turn it in.
15  Q.  Okay.
16  A.  There could have been -- after -- I
17  think after Amanda came, then we -- we did it.
18  You know, you did some, you didn't do some.  I
19  don't know how that -- I don't recall how that
20  worked, but I do know everything now is exactly
21  right.
22  Q.  Got it.
23  A.  Because if we -- you know, with this
24  not being signed, we'd get fined for that.
25  Q.  Yeah, so early --

Page 240

1   A.  But we do have copies of all of his
2   cards.  That -- That protocol never changed.
3   Q.  Got it.  So earlier we talked about
4   whether your protocol with regards to I-9s has
5   changed over the years.  Remember we had -- I
6   asked you what about in 2007, 2010 --
7   A.  No.  No.  They still have never
8   changed.  We still always -- Like I said before,
9   we still always get both forms of ID no matter
10  what.  Now, if there was a clerical error where
11  something got not printed, that's -- that is --
12  that's a clerical error, but that has nothing to
13  do with receiving these cards.  We still had it,
14  and that's what we're required to do.
15  Q.  Got it.  But -- And you certainly --
16  you definitely reviewed the cards when he
17  presented them to you; right?
18  A.  You have the cards, you review them.
19  Q.  You review them and you -- to make sure
20  they're authentic; right?
21  A.  That's what we're supposed to do.
22  Q.  Okay.  Take a look at ████████
23  ████████ identification card and in particular
24  what it says at the top.  Do you see it?
25  A.  What, Texas?

Page 241

1   Q.  Texas and then right below it.  Can you
2   read the line right below it?
3   A.  "Department of Public Safery."
4   Q.  Safery.
5   A.  Okay.
6   Q.  Do you know what -- Do you know what
7   the Department of Public Safery is?
8   A.  I have no idea.
9   Q.  All right.  This is obviously a
10  typographical error.  It was meant to be the
11  Department of Public Safety; correct?
12  A.  I have no idea.
13  Q.  All right.  Well, you have -- many of
14  your IDs on file are issued by the Texas
15  Department of Public Safety; right?
16  A.  There's a lot of them that are from
17  Texas.
18  Q.  Right.  And that's the Texas -- and
19  those IDs say the Texas Department of Safety;
20  right?
21  A.  Okay.  So --
22  Q.  So somebody presents you with a
23  document that says it's from the Texas
24  Department of Public Safery, and you accept it?
25       MR. BISS:  Object to the form.

61 (Pages 238 - 241)

Veritext Legal Solutions

800-567-8658                                   973-410-4098

Case 5:19-cv-04064-CJW-MAR   Document 156-6   Filed 06/02/23   Page 62 of 105
App. 183

1    A.  How do you -- I looked at that ID, his
2  photo matched up with his Social Security card.
3  Did I read every little bit of that?  No.  I --
4  you know, you -- you scoured over this.  You're
5  looking at this.  There's things that you may
6  not see.  I'm not a -- you know, I may have read
7  it proper, maybe.  Is it correct?  No, it's not
8  correct.  I'll agree with you.  But did I read
9  it properly when -- when I seen it?  Maybe I
10  read it that it was correct.  Sometimes you just
11  do that.
12    Q.  Okay.
13    A.  But to know that it's a false idea, I
14  would have never -- I would have never guessed
15  that when I probably looked at it.  There was
16  never -- never any clue.
17    Q.  So just to break it down, do you recall
18  seeing -- when you reviewed this --
19    A.  Never, until you just pointed it out.
20    Q.  Okay.  So I'm -- So this is the first
21  time you're realizing that the ID says "Texas
22  Department of Public Safety"?  Is that what
23  you're saying?
24    A.  That's what I'm saying.
25    Q.  Okay.  Well, now you would agree with

1  me that it is obviously a forgery; right?
2        MR. BISS:  Object to the form.
3    A.  I -- At the time it looked correct.
4    Q.  I know.  But as you're looking at it
5  now, you would agree with me that if somebody
6  were to --
7    A.  There's a -- There's a -- I can't say
8  that.  There's an error on there.  I don't know.
9    Q.  Right.
10    A.  I don't know where -- I don't know how
11  Texas or where it does.  I can't answer that.
12    Q.  So if it says "Department of Public
13  Safety," you very well may have accepted it
14  anyway; right?
15    A.  There's --
16        MR. BISS:  Object to the form.
17    A.  Don't -- Don't accuse me again of
18  being -- doing illegal things, because we don't
19  do that.  We're honest people.
20    Q.  Okay.
21    A.  Now, if there was some little minor
22  error that we didn't notice, that I didn't
23  notice, that's very possible.  To me, the card
24  looked right.  And that's what I'm required to
25  do.

1    Q.  Okay.
2    A.  Now, if you want to nitpick and look at
3  it going, "Oh, well, this," and say, "Oh, well,
4  you guys didn't read that right," that's not --
5  don't -- don't accuse us of being frauds and --
6  and hateful individuals, that we're doing
7  something wrong.  Unlike Mr. Lizza and the
8  Hearst Corp. that -- that goes out and spews bad
9  things towards us and everybody in the community
10  about us.
11        MR. BOYER:  I'm sorry, what was
12  my question?
13        (Requested portion of the record
14        was read.)
15    A.  I never seen that.
16    Q.  You did -- You did not see that at the
17  time it was presented?
18    A.  Until -- Until just now.
19    Q.  Okay.  So now I'm asking a question of
20  what would NuStar's practice be if it was
21  presented with a document that it saw said
22  "Texas Department of Public Safety"?
23    A.  Well, they would -- You can't -- If
24  it's a fake ID, you can't take it.
25    Q.  Okay.  Would NuStar have identified

1  this as a fake ID?
2    A.  Obviously I did not notice it.  Yes.
3    Q.  I know you didn't, but now I'm
4  saying -- now -- now I want you -- now I want to
5  say NuStar's practices.  Okay?  If NuStar --
6  Wearing your NuStar hat; right?
7    A.  Okay.
8    Q.  If it is presented with a document that
9  says "Texas Department of Public Safety" and it
10  realizes it, but when you --
11    A.  Yeah, you would have to call --
12        (Court reporter interruption.)
13    Q.  If NuStar is presented with a document
14  that says "Texas Department of Public Safety"
15  and it recognizes that on the document at the
16  time it's presented, what would NuStar do?
17        MR. BISS:  You're asking him a
18  hypothetical; right?
19        MR. BOYER:  I'm asking him about
20  NuStar's practices.  I don't think it's
21  hypothetical.
22        MR. BISS:  Okay.  He's asking a
23  hypothetical.
24        MR. BOYER:  You can object to
25  form.

1      MR. BISS:  Do you understand
2  that?
3      THE WITNESS:  What if?
4      MR. BISS:  Yeah.  What if?
5      A.  Yeah.  I don't -- What if?  I've never
6  had one before.  I've never had one before
7  where -- Okay.  So this one says it, but I
8  didn't catch it.  I'm not the police.  I
9  don't -- I don't get four-year degrees in trying
10 to find out a forgery.  We're not the FBI.  I
11 milk cows.  I looked at the ID, I thought it was
12 correct, and that's what I went with.
13     Q.  Okay.  So how much time do you spend
14 looking at IDs when they come in?
15     A.  I just look at them.
16     Q.  I mean, I know, but for how long do you
17 look at them?
18     A.  I look at them and go "Yep, this is
19 it."  You look at the Social Security number,
20 does it match with what they wrote down, and
21 that's what we do.
22     Q.  How long does that process take?
23     A.  Not very long.
24     Q.  A matter of seconds?
25     A.  You look at the card, yes.  So --

1      Q.  Okay.
2      A.  It would be seconds.
3      Q.  Five seconds?
4      A.  I'm not going to sit there for an hour
5  and look at it, no.
6      Q.  I understand you're not sitting there
7  for an hour.  Are you sitting there for a minute
8  looking at the card, taking 60 seconds and
9  analyzing it?
10     A.  I look at the card.
11     Q.  I'm asking you for the amount of
12 time you spend --
13     A.  I don't know.  I don't know.  I can't
14 answer your question.
15     Q.  Okay.  Well, give me just some sense,
16 because I just want to understand the extent to
17 which you're evaluating this for the
18 authenticity and trying to -- trying to
19 scrutinize it.  Okay?  Are you scrutinizing it
20 at all?  We'll start there.
21     A.  So once again, you're saying that I --
22 I illegally hire people?
23     MR. BOYER:  I'm sorry, what was
24 my question?
25     (Requested portion of the record

1  was read.)
2      Q.  That's a question.  Are you
3  scrutinizing it at all?
4      A.  Yes.
5      Q.  Okay.  And when you scrutinize it, what
6  are you looking for?
7      A.  You just look to make sure it's -- it's
8  a correct ID.  I can't ask him if it was -- if
9  it said that, I -- legally I don't think I could
10 even ask him if that's -- if it's a legal card
11 or not.
12     Q.  Got it.  You just have to accept it.
13 You couldn't actually say, "Hey, this looks
14 wrong"?  You couldn't -- You couldn't say that
15 to him.  Is that your understanding?
16     A.  I'm pretty sure, yes.
17     Q.  Okay.
18     A.  Now, if I legitimately think that it's
19 a bad card, yeah, I could say, "Hey, that's" --
20 if I would have seen that, there's probably a
21 good chance it was like, "Hey, that's not --
22 that's not something that's" -- that's
23 ridiculous; right?
24     Q.  Okay.
25     A.  But I didn't read it as that.

1      Q.  So -- So again, I'm sorry, just to come
2  back to this, because I -- I want to get sort of
3  a -- it doesn't sound like you're spending too
4  much time with the cards, but I just honestly
5  want to know how much time you, on average, sort
6  of spend looking at a card to analyze it for
7  authenticity.
8      A.  I look at the card.  I don't -- I don't
9  understand your question.
10     Q.  How long?  It's not that complicated.
11 Just how long are you spending?  That's all I
12 want to know.
13     A.  I look at the card.  Whatever that time
14 takes.  You look at it here, and you flip it
15 over, you look at it, and you make photocopies.
16     Q.  Okay.  Are you looking at it for about
17 ten seconds?  Is that fair?
18     MR. BISS:  What card are we
19 talking about?
20     Q.  Let's start with the ID.  Not the
21 Social Security card.
22     A.  Sure, ten seconds.
23     Q.  Social Security card, are you looking
24 at it for ten seconds?
25     A.  Sure.

63 (Pages 246 - 249)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 250

1    Q.  Okay.
2        MR. BOYER:  Fair enough time to
3    take a break.  We've got ten minutes left on the
4    tape.  I've got to pull up something to go back
5    to other questions.  Do you want to take a quick
6    break?
7        MR. BISS:  Sure.
8        MR. BOYER:  All right.
9        THE VIDEOGRAPHER:  We are going
10   off the record.  This is the end of Media Unit
11   Number 3.  The time is 2:55.
12       (A recess was taken.)
13       THE VIDEOGRAPHER:  We are back on
14   the record.  This is the beginning of Media Unit
15   Number 4.  The time is 3:07.
16       (Exhibit 26 was marked for
17   identification by the reporter.)
18   Q.  Mr. Nunes, you've been handed a
19   document that's been marked as Defendants' --
20   A.  We're done with 25?
21   Q.  We're done with 25.  You can set it
22   aside.  Yep.
23       You've been handed a document
24   that's been marked as Defendants' Exhibit 26.
25   Do you remember ████████?

Page 251

1    A.  Nope.
2    Q.  Okay.  So let's take a look at this
3    particular one.  So this document was -- on this
4    document ████████ signs it and dates it
5    May 10th, 2012.  Do you see that?
6    A.  Okay.
7    Q.  And, of course, I think it's --
8    Lori Nunes is the one who signed the
9    certification at the bottom of the page;
10   correct?
11   A.  That's what it says.
12   Q.  Right.  And why don't we actually
13   double-check before we go any further, pull up
14   Plaintiffs' -- sorry -- Defendants' Exhibit 9
15   again, please.  Defendants' 9, the one we were
16   looking at earlier with the list of all
17   employees.
18   A.  Oh, yeah.  Right.  Okay.
19   Q.  It has the start and end dates.  What
20   is the start date of ████████ employment?
21       Do you see it?  It's May 21st of
22   2012; correct?
23   A.  Okay.
24   Q.  All right.  No.  That -- That was his
25   start date; right?  May 21st of 2012; right?

Page 252

1    A.  I didn't prepare this paper.  I don't
2    know what those dates mean.
3    Q.  Okay.
4    A.  I don't know what the -- that date
5    means.
6    Q.  Okay.  Well, I mean, you are --
7    A.  It says dates, positions with NuStar.
8    It could be a pay period or something.
9    Q.  Okay.  I'm sorry, just to be clear,
10   this is a certified interrogatory response on
11   behalf of NuStar in which you're certifying that
12   that's where he -- when he started and ended.  I
13   mean, do you have any --
14   A.  I didn't -- I didn't prepare the paper.
15   Q.  You personally did not prepare the
16   paperwork; right?
17   A.  No.
18   Q.  You're NuStar's corporate
19   representative; right?  You're testifying on
20   behalf of NuStar; right?
21   A.  Again, you're going to have to ask
22   Lori.  She prepared the paper, like you asked
23   before.
24   Q.  All right.  So let me ask you this
25   then.  Certainly -- As we've talked about

Page 253

1    before, you make sure that people return this
2    paperwork as soon as possible, and you don't
3    issue a paycheck until they do; right?
4    A.  That's correct.
5    Q.  All right.  He signed this form and
6    returned it on 5-10-2012.  Do you see that?
7    A.  Yeah.
8    Q.  Or he signed it on 5-10-2012.  Do you
9    see that?
10   A.  Yeah.
11   Q.  Okay.  Now, go to his ID, the Minnesota
12   identification card.  Do you see it?
13   A.  Okay.
14   Q.  Do you see it expired on April 22nd,
15   2012?
16   A.  Yeah.
17   Q.  Okay.  So just to be clear, then,
18   you've certified that he had a valid work
19   authorization even though the work authorization
20   document was expired?
21   A.  Yeah, I guess so.  It's something that
22   was missed, I guess.
23   Q.  Let's take a look at another one.
24   A.  I mean, it's -- I mean, that's pretty
25   close.  I mean, who knows?  I don't recall.  I

64 (Pages 250 - 253)

Veritext Legal Solutions

800-567-8658                                                                    973-410-4098

Case 5:19-cv-04064-CJW-MAR   Document 156-6   Filed 06/02/23   Page 66 of 105   App. 186

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 254

1 mean, could he have said, "Oh, I'm getting
2 another one" or something, you know? I don't
3 know. I mean, it's really close dates.
4 Q. Okay.
5 A. Only a couple days.
6 Q. And NuStar is okay with hiring them if
7 it's a close date?
8 A. Maybe it was missed. I don't know. It
9 could be a clerical deal. It just got missed.
10 MR. BOYER: Okay. You can mark
11 27.
12 A. I don't recall.
13 (Exhibit 27 was marked for
14 identification by the reporter.)
15 Q. You've been handed a document that's
16 been marked as Defendants' Exhibit 27. It
17 appears to be an I-9 form for somebody named
18 ██████████████. Do you see that?
19 A. Yes.
20 Q. Okay. Do you remember ██████████?
21 A. No.
22 Q. All right. He completes the I-9 form
23 on May 2nd, 2012; correct?
24 A. That's what it says.
25 Q. All right. And it was done through an

Page 255

1 interpreter, this woman Hermelinda Montez;
2 correct?
3 A. That's what it says.
4 Q. All right. NuStar didn't certify the
5 I-9 form or the documents; right?
6 A. It's just not written down there.
7 Q. Okay. NuStar did not complete the
8 certification portion of the I-9 form?
9 A. I could answer that question. Give me
10 a second here.
11 So according to this sheet,
12 what's his name, ████████████████
13 ██ -- well, I can -- I can answer why this
14 doesn't -- why it's not even finished.
15 Q. Why is that?
16 A. It should have been destroyed.
17 Q. Why should it have been destroyed?
18 A. Because it was already after the date.
19 He should have been -- He would have already --
20 The paperwork would have been destroyed by 2018.
21 Q. I see.
22 A. We kept every -- We kept all the
23 information.
24 Q. Got it. It wasn't among the files that
25 Ms. Bahena reviewed; right?

Page 256

1 A. That's correct.
2 Q. Okay.
3 A. It wasn't needed. The government would
4 have never looked at these files.
5 Q. That's right. Because it was --
6 A. They don't -- It's after the dates.
7 Q. That's right. It was more --
8 A. I mean, they may have looked at it. I
9 don't know. They may have looked at it, but --
10 but -- we -- we kept it, but that's why it's not
11 filled out.
12 Q. Got it. So now take a look at his
13 identification card, which is PX3223. This one
14 is also expired; right? On -- Strike that.
15 This identification card expired
16 on June 17th, 2013; right?
17 A. Where is that? Oh, right there. Okay.
18 Q. Yeah. So again -- So again, NuStar --
19 A. Not willingly. I didn't willingly -- I
20 wouldn't willingly realize this was expired. I
21 didn't do it knowingly, I should say. Because
22 when did he start? Where was that at again?
23 When was ████████. Yeah. It was expired what,
24 ten months, eleven months? Yeah. Just -- Must
25 have just missed the expiration.

Page 257

1 Q. Okay.
2 A. Once again, it's an ID card, right, I
3 missed the expiration. His picture went with
4 him and his Social Security.
5 Q. And that's what you were just looking
6 at, that the Social Security numbers matched?
7 A. It must have been, you know, once
8 again, a clerical error. Just they didn't --
9 they didn't realize the card was expired. It
10 was nothing -- but I did have his Social
11 Security card.
12 (Exhibit 28 was marked for
13 identification by the reporter.)
14 Q. Mr. Nunes, you have been handed a
15 document that has been marked as Defendants'
16 Exhibit 28. This is -- We actually talked about
17 this young man before. This is ████████
18 ████████ right?
19 A. Yeah.
20 Q ████████ son; right?
21 A. Yes.
22 Q. Okay. You employed ████████████
23 for four and a half years; right?
24 A. Yeah. He worked -- He worked there on
25 and off.

65 (Pages 254 - 257)

Veritext Legal Solutions
800-567-8658                                      973-410-4098

Case 5:19-cv-04064-CJW-MAR   Document 156-6   Filed 06/02/23   Page 66 of 105
App. 187

Page 258

1    Q.  I mean, around school, presumably, and
2 everything?
3    A.  Yeah.
4    Q.  Okay.
5    A.  Yeah.  Because he was going to go to
6 college, things like that, and then he ended up
7 going to work somewhere else.  I think he's a
8 welder or a painter or something now.
9    Q.  Okay.  So first of all, again, Section
10 2 is not completed; right?
11    A.  Okay.
12    Q.  No, not okay.  It's correct; right?
13 Section 2 is not completed on this form?
14    A.  Yeah.  Yes.
15    Q.  All right.  Take a look at his
16 identifications.  That's PX4090.
17    A.  Okay.
18    Q.  And so what we have for him is a school
19 ID; right?
20    A.  Yeah.  You know, some of those high
21 school kids I didn't -- you may not have got it.
22 I don't -- I don't remember.  I know some of
23 those high school kids, it's just -- you try to
24 give them work, and then we wouldn't -- they're
25 just -- yeah.  I don't know.  I can't answer why

Page 259

1 you wouldn't have it for -- they're just
2 those -- he started working part time, just in
3 and out, trying to teach him something.
4    Q.  Look, I sympathize and understand.  You
5 have a high school kid, you're just trying to
6 get him some work and teach him some stuff?
7    A.  He wasn't a full time -- when we hired
8 him, he wasn't full time or nothing.
9    Q.  Right.  Because you didn't -- And
10 that's essentially why you didn't ask him for
11 his Social Security card?
12    A.  I -- I don't know why -- why there's
13 not a Social Security card.  I couldn't
14 answer -- I can't answer -- I guess I should say
15 I can't answer that.
16    Q.  Okay.
17    A.  You'd have to ask Lori.
18    Q.  Okay.  Lori might know why you
19 accepted --
20    A.  Yeah.  I know some of -- like his ID, I
21 mean, it's just a high school card; right?  It's
22 not -- I mean, that's not a really valid ID;
23 right?  Is it?
24    Q.  I don't know.
25    A.  I don't know.

Page 260

1    Q.  Let's take a look at another one.
2       (Exhibit 29 was marked for
3       identification by the reporter.)
4    Q.  So this is a gentleman that I think --
5 Oh, I'm sorry.  Let me pass this over.
6       I've handed you a document that
7 has been marked as Defendants' Exhibit 29.  And
8 this is for a gentleman that I think worked for
9 you for a handful of years in the early days of
10 NuStar.  Do you remember ████?
11    A.  I can't say if I do or I don't.
12    Q.  Okay.  So let's walk through this one
13 here.  So -- I'm sorry, when you said "I can't
14 say if I do or I don't," that's --
15    A.  I don't recall.
16    Q.  Okay.  So he signs the form you see
17 here in July of 2007; right?
18    A.  Okay.
19    Q.  So he started in July of 2007.  Does
20 that sound right?
21    A.  I don't know.
22    Q.  Okay.  Who was responsible for
23 reviewing and completing I-9s in 2007 at NuStar?
24    A.  I assume I would have.
25    Q.  All right.

Page 261

1    A.  I don't -- I don't -- Yeah.  I don't
2 know.  Honestly, in 2007, I don't -- I don't
3 remember.  That's a long time ago, man.
4    Q.  Okay.  So let's just kind of move down
5 here a little bit.  So he -- it seems that he
6 completed Section 1 in a sense here.  He
7 didn't -- He didn't check, it seems, whether he
8 was a lawful purpose -- a lawful permanent
9 resident or a citizen or anything; right?  He
10 didn't check that box?
11    A.  It looks like it.  I don't know.  I
12 can't tell.  It's a copy.  It's not real good.
13    Q.  Okay.  But it seems like he completed
14 Section 1.  But let's go down to Section 2.
15    A.  Okay.
16    Q.  And this is where I'm just a little
17 confused as to what's going on in this document.
18 So first of all, the List A parts are completed;
19 right?  And you see the document title is Mexico
20 and the issuing authority is Omaha.  Do you know
21 what those mean?
22    A.  I have no idea.
23    Q.  As you go down to the certification, it
24 seems that the signature of the employer who
25 is -- who is certifying this and saying that he

66 (Pages 258 - 261)

Page 262

1  started on July 20th is ███ himself.  Do you
2  see that?
3      A.  Okay.
4      Q.  And he prints his name and he signs his
5  name; right?
6      A.  Yeah.
7      Q.  And one of my -- I see this here, he
8  lists under business and organization name cows;
9  is that right?
10      A.  That's what it says.
11      Q.  Okay.  Look, ███ shouldn't have been
12  filling out these forms in 2007; right?
13          Strike that.
14          MR. BISS:  Objection to form.
15      Q.  ███ shouldn't have been filling out
16  Section 2 of these forms in 2007; right?
17          MR. BISS:  Object to the form.
18      A.  He would have never -- They would have
19  never -- They just -- They just filled it out.
20      Q.  Right.  He didn't really know what he
21  was doing?
22      A.  He probably didn't know what he was
23  doing.
24          MR. BISS:  Object to the form.
25      Q.  All right.  But you didn't -- But you

Page 263

1  accepted this form anyway; right?
2      A.  Does he have both cards?
3      Q.  Let's take a look.  Let's take a look
4  at the resident alien card.  So one thing that I
5  noticed about the resident alien card is that it
6  expires, right, on November 30th, 2006?
7  Correct?
8      A.  Okay.
9      Q.  All right.  But as we saw before, he's
10  completing this form and representing that his
11  first day is on July 20th of 2007; right?
12      A.  That's what it says.
13      Q.  So the resident alien card had expired
14  seven months before it was presented to NuStar?
15      A.  I didn't know they had -- Once again, I
16  didn't know they had expiration dates.
17      Q.  Right.  Even though it says "Card
18  Expires" on the document?
19      A.  I don't -- I'm not -- I'm not a
20  forensic examiner on these cards.  I don't know.
21  I don't know what that -- I didn't know they had
22  that on there.
23      Q.  Okay.
24      A.  Once again, we produced documents that
25  we didn't need to produce, but we have all of

Page 264

1  our documents.  Did we knowingly do it?  No.
2  It's still better than Lizza and -- and Hearst
3  Corp. that has nothing.
4          MR. BOYER:  I'm -- Just remind me
5  again what my question was.  I'm sorry.
6          (Requested portion of the record
7  was read.)
8          MR. BOYER:  That's fine.  You can
9  leave it there.  We're up to 30?
10          (Exhibit 30 was marked for
11  identification by the reporter.)
12      Q.  Mr. Nunes, you've been handed a
13  document that has been marked as Defendants'
14  Exhibit 30.  And to cut to the chase here, this
15  document -- in this document -- Strike that.
16          To cut to the chase here,
17  ███ signed this document on May 18th,
18  2011; right?
19      A.  I guess that's what it says.
20      Q.  And down below it's certified and then
21  signed by Lori Nunes on May 23rd, 2011; right?
22      A.  Okay.
23      Q.  All right.  But then again, we look at
24  the resident alien card, and it expired in
25  December of 2009; correct?

Page 265

1      A.  Yep.  That's all new to me, those -- I
2  never seen those before.
3      Q.  Got it.  So once again, NuStar accepted
4  an identification that had expired?
5      A.  Lori -- That's what it says.  I don't
6  know if we, you know -- Knowingly?  No.
7      Q.  You just wouldn't have paid attention
8  to the expiration date?
9      A.  That's not what I said.
10      Q.  You didn't know it had an expiration
11  date?
12      A.  I still didn't realize that they
13  expired like that.  You look at the photo ID.
14      Q.  You were just kind of looking at the
15  photograph?
16      A.  I'm not -- I'm not the government.  We
17  have to look at the cards.
18      Q.  I understand that.  But the expiration
19  date is on the front of the card right above his
20  signature; right?
21      A.  Uh-huh.
22      Q.  Right?
23      A.  Does that make him illegal?
24      Q.  Well, it means -- Well --
25      A.  Exactly.

67 (Pages 262 - 265)

Page 266

1  (Exhibit 31 was marked for
2  identification by the reporter.)
3  Q.  Mr. Nunes, you've been handed a
4  document that has been marked as Defendants'
5  Exhibit 31.  So let's take a look at the
6  documents that were presented to you by
7  ▮▮▮▮▮, I believe.
8  Okay.  So ▮▮▮▮▮ presented
9  to NuStar a consular ID card from the Guatemalan
10  consular; right?
11  A.  That's what it shows.
12  Q.  So you knew he was a Guatemalan
13  citizen; right?
14  A.  I can't answer that.
15  Q.  All right.  Well, you know that a
16  foreign consular card is not --
17  A.  I would assume that's -- that that
18  would be it, but I -- yes.
19  Q.  Okay.  So you assume he's a citizen,
20  but you don't know for sure?
21  Strike that?
22  You assume he's a citizen of
23  Guatemala, but you wouldn't know for sure?
24  A.  He has a Social Security card.
25  Q.  Right.  I see he presented a Social

Page 267

1  Security card.  Right.  But you know the foreign
2  consular card is not a U.S. or state-issued ID
3  and therefore not an acceptable ID for
4  eligibility and verification; right?
5  MR. BISS:  Object to the form.
6  A.  That I don't know.
7  Q.  You don't know?  You thought that a --
8  A.  Don't -- I didn't think anything.  Once
9  again, these are papers, right, that should have
10  been destroyed, but we still presented them to
11  you.  We're not -- have nothing to hide.  We did
12  nothing wrong.  We didn't knowingly do anything.
13  Still, once again, we still produced way more
14  papers than Ryan Lizza or Hearst Corporation
15  can.
16  Q.  Okay.  Well, in any event, one more.
17  (Exhibit 32 was marked for
18  identification by the reporter.)
19  Q.  I'll hand you a document that's been
20  marked as Defendants' 32.  If you go straight to
21  the IDs, it appears that ▮▮▮▮▮ is it
22  ▮▮▮▮▮ also presented a Guatemalan
23  consular ID card; right?
24  A.  It looks like it.
25  Q.  And you made a scan of it; right?

Page 268

1  Strike that.
2  You made a copy of it; right?
3  A.  That's correct.
4  Q.  Stuck it in the file; right?
5  A.  That's correct.
6  Q.  And didn't scrutinize it any beyond
7  that; right?
8  A.  I cannot say that.
9  Q.  Okay.  Well, you accepted a Guatemalan
10  consular identification card as an acceptable ID
11  for employment eligibility verification; right?
12  A.  It says right here on the back of the
13  card that he's -- he's -- he's in the U.S.
14  Q.  Right.  It says he's in the U.S.;
15  right?
16  A.  So how do you know that he's here --
17  Are you trying to say that this is invalid?  I
18  mean, it says that he's here, so they
19  knowingly -- it should be a decent ID if it's --
20  if he's in the U.S.  Obviously the U.S. accepted
21  that.
22  Q.  Do you believe --
23  A.  Is that not true?
24  Q.  Well -- Well, let me just ask the
25  question.  To your understanding, are people

Page 269

1  allowed to present a foreign consular card as a
2  valid photo identification?
3  A.  I honestly can't say that I've actually
4  ever seen one, so -- and it's not signed, so I
5  can't honestly say that I -- I did this one or
6  that one.  I don't remember seeing one of those,
7  but I still go back to the same thing, that
8  if -- if he has this on here, how can he be --
9  you know, how -- how is that possible?
10  Q.  I'm going to hand you another one.
11  This one is marked as Defendants' 33.
12  (Exhibit 33 was marked for
13  identification by the reporter.)
14  A.  Boy, you're getting all the ones that
15  were supposed to be destroyed.
16  Q.  Do you wish they were destroyed?
17  A.  No.  That's what we -- If I did, they
18  wouldn't be here.  But they're here.  Once
19  again, we still produced all of our information.
20  We have nothing to hide, unlike Ryan Lizza and
21  Hearst Corp.
22  Q.  Okay.  So let's just take a look at the
23  documents that were presented by ▮▮▮▮▮
24  ▮▮▮▮▮  So take a look at his Social
25  Security card.  Do you see that?  It's on page

68 (Pages 266 - 269)

Page 270

1  PX3544.
2      A.  Okay.
3      Q.  And could you read the words that are
4  in print on the Social Security card right below
5  the Social Security logo?
6      A.  "Valid for work only with DHS
7  authorization."
8      Q.  Do you know what that means?
9      A.  I have no idea.
10     Q.  All right.  So you don't understand
11 that this means it actually is not in and of
12 itself a valid work authorization document?
13     A.  It's a Social Security card.
14     MR. BISS:  Object to the form.
15     A.  I can't -- I can't confirm.  I mean, I
16 don't -- I don't know if they get -- Do they
17 give out different ones?  Do they actually give
18 those out?
19     Q.  Well, I kind of want to know NuStar's
20 knowledge.  Is NuStar aware of the fact that
21 Social Security cards will sometimes have this
22 ledger at the top?
23     A.  I can't answer that.
24     Q.  You don't know?
25     A.  I don't know.  I don't know if they

Page 271

1  have -- I mean, obviously this one shows it, so
2  is that -- does that make it illegal?
3      Q.  All right.
4      A.  Is that fraudulent?
5      Q.  Do you recall seeing documents with
6  that ledger at the top in the past?
7      A.  I can't say.
8      Q.  Okay.  All right.
9      A.  He does have a valid driver's license.
10 How did he get a driver's license?
11     (Exhibit 34 was marked for
12     identification by the reporter.)
13     Q.  So -- So I think we might have touched
14 on this before, but remind me again, what's
15 NuStar's practice if the signature on the I-9
16 appears different than the signature on IDs that
17 are presented by the worker?
18     A.  There is no -- I don't know how people
19 sign cards.  I don't know how they do --
20     Q.  You don't scrutinize --
21     A.  Everybody has -- I have different
22 signatures.  You can't scrutinize that.
23     Q.  All right.  So it wouldn't matter
24 how -- it could look very different, and it
25 wouldn't matter to NuStar; right?

Page 272

1      A.  I can't scrutinize somebody's
2  signature.
3      Q.  Okay.  Well, take a look at the I-9,
4  for example, on the front.  It says "PX3629."
5  This is the I-9 for ████████████.
6      A.  Okay.
7      Q.  All right.  And the -- the signature --
8  you would at least agree with me that the
9  signature on the I-9, where it says "Employee's
10 Signature," is different than the signature on
11 ████████ Social Security card; right?
12     A.  It appears to be different.  One is --
13 One is a -- One is a print, and one is a
14 signature.
15     Q.  You didn't ask ████████ about that,
16 did you?
17     A.  No.
18     Q.  All right.  You didn't --
19     A.  Why would I?
20     Q.  You didn't say, "Is this really your
21 signature or" --
22     A.  I can't question that.
23     Q.  You just can't question it?
24     A.  You can't question the authenticity of
25 cards to the employee.

Page 273

1      (Exhibit 35 was marked for
2      identification by the reporter.)
3      Q.  Actually -- So I handed you a document
4  that's been marked as Defendants' Exhibit 38,
5  but I think we've made this point enough
6  already, so I'll just -- 35.
7      MR. BOYER:  My goodness, excuse
8  me.  Thank you for that correction.
9      Q.  I've handed you a document that's been
10 marked as Defendants' Exhibit 35, but I'll
11 actually skip over it because I think we've
12 already established, right, that NuStar does not
13 ask for updated employment work -- IDs or work
14 authorization cards when they expire in the
15 middle of somebody's employment; right?
16     A.  I don't --
17     Q.  Okay.
18     A.  I don't think legally we can.
19     MR. BOYER:  All right.  Give
20 me -- Let's go off the record for just 30
21 seconds.  I've just got to grab a stack of other
22 stuff.  I'll be right back.
23     THE VIDEOGRAPHER:  We are going
24 off the record.  The time is 3:36.
25     (A recess was taken.)

69 (Pages 270 - 273)

Page 274

1    THE VIDEOGRAPHER: We are back on
2 the record. The time is 3:37.
3    (Exhibit 36 was marked for
4    identification by the reporter.)
5    Q. Mr. Nunes, you've been handed a
6 document that has been marked as Defendants'
7 Exhibit 36. Do you remember ████████████
8    A. Nope.
9    Q. Well, let's take a look at his I-9
10 first. So first of all, you see the name in
11 Section 1 that he provides is ████████████
12 ████████ spelled ████████ right?
13    A. It appears to be that.
14    Q. Now go to his card.
15    A. Okay.
16    Q. Take a look at his Social Security
17 card.
18    A. Okay.
19    Q. All right. And you see it says
20 ████████████████████?
21    A. That's what it says.
22    Q. All right. Did you consider that to be
23 an indication that the document is not genuine?
24    MR. BISS: Object to the form.
25    A. I can't ask that question.

Page 275

1    Q. You've just got to accept it; right?
2    A. Legally we can't ask them.
3    Q. So you just say -- you could look at
4 it, you could say, look, it's spelled
5 differently on the form than on the -- on the
6 I-9 form than the Social Security card, and hire
7 them anyway?
8    A. Say that again.
9    Q. Right.
10    A. Because you -- Talk to me directly.
11    Q. Sure. So even if you saw that the card
12 was -- the name on the Social Security card was
13 spelled differently than on the I-9, you would
14 hire them anyway?
15    A. It's hard to say if I -- if I actually
16 seen the thing wrong. Once again, there was
17 another one on another one. Would you ever
18 have seen it? I don't know.
19    Q. All right.
20    A. I mean, you look at it, you read it. I
21 don't know. I can't say that.
22    Q. And the employers didn't --
23    A. So don't -- don't put words in my mouth
24 that I just automatically assumed that. No. I
25 just may not have read it properly.

Page 276

1    Q. Okay. Whose responsibility at NuStar
2 is it to confirm the accuracy of the names on
3 the I-9 versus on the cards that are offered?
4    A. Whoever is verifying the card.
5    Q. Right. But who is -- who is
6 responsible at NuStar for doing it, you or
7 Ms. -- or Ms. Lori Nunes?
8    A. One of us have to look at it.
9    Q. All right.
10    A. But once again, these are old documents
11 that maybe something was not right on it. Maybe
12 it was wrong, should have been destroyed, but
13 once again, we kept it. Ryan Lizza has no
14 notes, no nothing. Either does Hearst Corp.
15 They have nothing. We -- We supplied everything
16 that we have.
17    Q. And you didn't -- if I'm not mistaken
18 on the I-9, the employer did not certify the I-9
19 either; right?
20    A. Right. Because we didn't have to
21 because it's old.
22    Q. Gotcha.
23    A. It's an old deal. We -- We obviously
24 didn't finish completing the form, once again,
25 but the employee did fill it out.

Page 277

1    (Exhibit 37 was marked for
2    identification by the reporter.)
3    Q. I'm sorry, so if -- who exactly is the
4 one who has the practice of reviewing the cards
5 when they present it? Is it you or Lori?
6    A. On these old ones?
7    Q. Yeah.
8    A. I -- I assume it would have been me. I
9 don't -- I don't think Lori was looking at
10 those. I don't know.
11    Q. Okay. Did there come a time when Lori
12 started looking at the cards?
13    A. She had her name on some of those,
14 so --
15    Q. Okay. If she's filling out the
16 certification, she's the one looking at the
17 cards?
18    A. You would assume so.
19    Q. Okay. But if it's -- if the
20 certification isn't completed, then you were the
21 one who was looking at the cards on these old
22 ones?
23    A. I would assume so.
24    Q. Okay. And then if somebody else filled
25 out the certification, then whoever filled out

70 (Pages 274 - 277)

Page 278

1 that certification is the one who looked at the
2 cards?
3     A.  Nobody else signed anything.
4     Q.  Okay.  It was either you or Lori?
5     A.  Pretty much; right?  Was there another
6 one?
7     Q.  I think it's just -- I think there was
8 one with Toni Dian, if I recall, that we saw
9 earlier.  So she might have looked at the cards
10 there?
11     A.  It's hard to say.
12     Q.  You've been handed a document that has
13 been marked as Defendants' 37.  So -- All right.
14 This is for ████████████; is that right?
15     A.  That's what it says.
16     Q.  All right.  And that's what he writes
17 on the I-9, and that's the name he signs; right?
18 ████ spelled ████████ right?
19     A.  Okay.
20     Q.  Now take a look at his IDs.  So you
21 see --
22     A.  No, I don't see.
23     Q.  You don't -- They're on the very last
24 page.
25     A.  Oh, right there.

Page 279

1     Q.  Yep.  So first of all, take a look at
2 his signatures on these cards.  Now, his
3 signature is spelled ████████████ on
4 both his Social Security card and the resident
5 alien card; right?
6     A.  Okay.
7     Q.  Yeah.  But the name that's printed by
8 the government agency on each of the cards or
9 appears to be by the government is ████████ on
10 both cards.  Do you see that?
11     A.  I see that.
12     Q.  Did you ask him about that?
13     A.  I don't recall.
14     Q.  You don't recall?  Did you -- Do you
15 recall seeing this on the cards?
16     A.  I don't recall this.  I don't recall
17 this.  This is a long time ago.
18     Q.  Right.  Would you have -- If you had
19 seen that the cards were spelled wrong --
20     A.  I can't -- If I had seen it -- I don't
21 recall.
22     Q.  Right.  But what -- what would NuStar's
23 practice be if it's presented with cards where
24 the printed name on the IDs is different than
25 the name that's signed and proffered on the I-9?

Page 280

1     A.  I don't -- I don't recall this at all.
2 I don't -- I mean, you're asking a hypothetical
3 on that again.  I don't -- I don't ever recall
4 seeing anything like this.
5     Q.  Right.  So does NuStar have a practice
6 or policy as to how to handle situations where
7 the names don't match?
8     A.  Once again, like I told you before,
9 I've never seen it.
10     Q.  Have you had -- One second.
11         You say you've never seen these
12 mismatches between names and IDs and the I-9
13 before?
14     A.  I never recall ever seeing them, no.
15     Q.  Got it.  And you're speaking on behalf
16 of NuStar when you say that; right?
17     A.  Yeah.
18     Q.  All right.
19     A.  If you ask me if I -- if I -- if I
20 looked at those, I don't ever remember ever
21 seeing a card that was mismatched by no means.
22     Q.  Okay.  Do you have -- Have you had
23 conversations with other, say, farmers in the
24 area about the labor market?
25     A.  I don't recall.  What do you mean?

Page 281

1     Q.  Have you ever talked to them about
2 difficulty in finding employees or ease with
3 which you can find employees or anything like
4 that?
5     A.  No, not -- No.  I don't recall.
6     Q.  Do you discuss issues of undocumented
7 labor in the labor pool for agriculture
8 generally?
9     A.  Never.
10     Q.  Never talked about that with anybody?
11     A.  No.
12     Q.  Okay.  Have you ever heard that it's
13 pretty common for various agricultural
14 industries to have a labor pool that's saturated
15 with undocumented workers?
16     A.  No, but I know like Hearst Corp. and
17 Ryan Lizza spew out things like that as they
18 think it's factual and then can't verify that.
19 I have no idea.  But I do know there's stories
20 out there that like to beat up good honest
21 people.
22     Q.  What are some of those stories?
23     A.  What's that?
24     Q.  You said there's stories out there,
25 plural.

71 (Pages 278 - 281)

1      A.  Oh, there's all kinds of stories.
2      Q.  So what are some of the other stories?
3      A.  Just like you just mentioned, you said
4    all these other stories out there.  Well, I
5    don't -- you said stories.  Yep, there's stories
6    out there.
7      Q.  Okay.  Well, what are you talking about
8    when you say other stories out there?
9      A.  It's -- You hear -- You hear it in the
10   news.  They go, "Oh, all these undocumented
11   workers."
12     Q.  Right.  And you think it's just totally
13   false?
14     A.  I have no idea.
15     Q.  You just have no idea?
16     A.  I've never seen any.
17     Q.  Okay.
18     A.  It's not like we're going down to Home
19   Depot and picking up people.
20          (Exhibit 38 was marked for
21          identification by the reporter.)
22     Q.  Mr. Nunes, you are being handed a
23   document that has been marked as Defendants'
24   Exhibit 38.  So actually, before we get talking
25   about this specific document, let me just sort

1    of ask a couple general questions, now that
2    we've taken a look at a lot of I-9s.  Is it true
3    that NuStar tries to avoid hiring undocumented
4    workers?
5      A.  We don't hire undocumented workers.
6      Q.  I'm asking does it -- does it try to
7    avoid hiring undocumented workers?
8      A.  We never -- We don't hire undocumented
9    workers.  Everybody is documented.
10     Q.  All right.  Does it want to -- Does it
11   want to avoid hiring undocumented workers?
12     A.  We don't --
13     Q.  Okay.
14     A.  We don't hire undocumented workers.
15     Q.  How do you define undocumented workers?
16     A.  They're all documented.
17     Q.  How do you define -- What's your
18   definition of somebody who is documented?  Let
19   me start there.
20     A.  That they have legal forms of ID.
21     Q.  Okay.  That those --
22     A.  That's what we're required to get by
23   the government.
24     Q.  Let me just back up.  When you say
25   "documented," is it something -- is it they have

1    presented documents to you, or is it that their
2    documents are, in fact, genuine?  Which -- What
3    do you mean by "documented"?  When you say all
4    of your workers are documented, do you mean just
5    they have presented me documents?
6      A.  No.
7      Q.  Okay.  What do you mean?
8      A.  They look valid to -- They look valid
9    and correct, to my best of my ability.
10     Q.  Got it.  So they present to you
11   documents that you review, and they look valid
12   and correct, to the best of your ability?
13     A.  Social Security card and a photo ID.
14     Q.  Okay.  And -- But you are -- When we
15   talk about undocumented workers, you don't know
16   whether they are, in fact, in the country
17   illegally; right?
18     A.  I -- I -- I don't know any.
19     Q.  No.  Look, I'm just saying --
20     A.  I guess I don't understand what you're
21   asking.  You're saying, well, the people that
22   you know that are undocumented.  I don't -- I
23   don't know any.
24     Q.  Okay.  So you're confident that your
25   workers -- not a single one of them are in the

1    country --
2      A.  Absolutely.
3      Q.  Let me finish my question.
4      A.  Oh, I'm sorry.
5      Q.  You are confident that not a single one
6    of your workers, present or past, is in this
7    country illegally?
8      A.  Not that I know of.  I don't have
9    any -- I have no indication that they are.
10     Q.  Got it.  Would -- If there's a process
11   NuStar could use to keep it from -- to prevent
12   it from hiring people who are in the country
13   illegally --
14     A.  We do do that.
15     Q.  What's that?
16     A.  We do do that.
17     Q.  Okay.  What's that process?
18     A.  We look at the card just like we
19   legally are supposed to do.  We do exactly what
20   we're legally supposed to do.
21     Q.  Okay.  Well, if there's a process you
22   could use in order to confirm that the cards are
23   authentic, would NuStar want to use it?
24          MR. BISS:  Object to the form.
25     A.  I answered your question already.

1    Q.  I don't think you have.  I'm not asking
2  whether you look at it, say it's fine, stick it
3  in a file.  I'm asking --
4    A.  We do what we're supposed to do.
5    Q.  I am asking -- Please let me finish the
6  question.  I am asking whether NuStar would want
7  to take additional steps to not hire people who
8  are in the country illegally even if they have
9  fake IDs.  Is that -- Would you want to do that?
10    A.  What -- What steps are those?
11    Q.  Well, have you ever heard of E-Verify?
12    A.  We don't have to E-Verify.  We're --
13  don't have an HR department.  We can't -- We
14  can't take -- We don't have to legally do that.
15    Q.  What is E-Verify?
16    A.  I don't really know.
17    Q.  Okay.  All right.  Well, you've heard
18  of it before?
19    A.  Yes.
20    Q.  You obviously just talked about it.
21    A.  I've heard of it.
22    Q.  Right.  And you know you don't have to
23  do it as a matter of law; right?
24    A.  That I do know.
25    Q.  Okay.  So what is your understanding of

1  what it is?
2    A.  It's a -- some kind of verification for
3  big corporations.
4    Q.  Only big corporations need to do it?
5        MR. BISS:  Object to the form.
6    A.  As far as I know.
7    Q.  Okay.  Well, you understand what -- the
8  idea is that you input information about the
9  employer and then it will verify whether or not
10  their documents are --
11    A.  But I don't legally have to.
12    Q.  Again, please stop interrupting me.
13    A.  Oh, I'm sorry.
14    Q.  All I'm asking -- like you -- I know
15  you don't legally have to.  I'm just asking that
16  you understand that -- what it is.  And namely
17  that you would input the information and you
18  would get a confirmation from the government
19  that the person is here legally or not -- is
20  authorized to work or is not; right?
21        MR. BISS:  You're asking him to
22  accept those representations?
23        MR. BOYER:  I'm asking him if
24  that's his understanding.
25        MR. BISS:  He said he didn't

1  understand, he didn't know what it was.
2        MR. BOYER:  Okay.  Well, to the
3  witness.
4    A.  That's what I said.
5    Q.  Okay.  You have no idea what E-Verify
6  is?
7    A.  I have no idea.  We don't have to use
8  it.  Never have used it.  I don't know what it
9  is.  We don't legally have to use it.
10    Q.  Okay.  Does the -- Do folks in -- Do
11  persons in the agriculture industry tend to use
12  E-Verify?  Do you know?
13    A.  I have no idea.
14    Q.  No idea?
15    A.  I assume if they're of certain size
16  they would have to be required to do it by law.
17    Q.  Okay.  Now, why don't we take a look at
18  Defendants' Exhibit twenty -- excuse me -- 38.
19  Have you seen this before?
20    A.  I don't recall if I seen this one.
21    Q.  Okay.  I'm asking -- Just to be clear,
22  I'm asking NuStar, has NuStar seen this before?
23    A.  I don't -- I don't know what it is.
24  Lori might know what it is.
25    Q.  Okay.  You think Lori would be the one

1  who would be able to talk about this particular
2  document?
3    A.  When did we -- What date did we receive
4  this?  Oh, yeah.  This is the one that we got
5  after you guys did the story on us.  All of a
6  sudden we just get this letter out of nowhere.
7  I do recall this letter.
8    Q.  Okay.  So --
9    A.  After you -- After that story was ran,
10  all of a sudden we got a letter.  Never got one
11  that I recall ever, and then all of a sudden
12  we -- it shows that we have all these -- that --
13  you can't even do anything with it.  It's --
14  It's a worthless document.
15    Q.  Okay.  Well, let's break this down and
16  let's take it step by step.  So you do recall
17  receiving this document?
18    A.  I do recall this, yes, because I
19  remember receiving it after you ran the story.
20    Q.  Okay.  In 2019; right?
21    A.  When -- When -- It says it was -- Where
22  did I see that at?  Well, it says "Receipt Year:
23  2019."
24    Q.  Right.  And right above it it says for
25  the tax year 2018; correct?

73 (Pages 286 - 289)

Page 290

1    A.  Yeah.  That's what it says.
2    Q.  All right.  Okay.  Who -- Who at NuStar
3  received it?  Like who got it first?
4    A.  The business.  I don't --
5    Q.  Well, it was addressed to Anthony L.
6  Nunes, Jr., but also a P.O. Box.
7    A.  NuStar Farms.
8    Q.  At a P.O. Box; right?
9    A.  Yes.
10    Q.  Okay.  So I just want to take -- walk
11  me through the scene.  Like who got the
12  envelope, who opened it, et cetera?  Do you
13  remember?
14    A.  Lori probably did.
15    Q.  Is Lori typically the one who opens the
16  mail?
17    A.  That's correct.
18    Q.  Okay.
19    A.  So do you want to ask her about that?
20  Because I don't really know.  All I know is that
21  I remember getting this document.  And if you
22  read through it, we can't -- there's nothing to
23  do.  We can't respond to any -- there's nothing
24  to do.  We can't do anything.  And it came after
25  you guys ran the story, hence the reason why --

Page 291

1  after you guys wrote the story, Lizza and Hearst
2  Corp. accepted that story, and then all of a
3  sudden the government sends us something.
4    Q.  Okay.  You think the two are connected?
5    A.  Sent out the minions, and now all of a
6  sudden there's some -- some kind of problem --
7    Q.  You think those --
8    A.  -- that we've never had before.
9    Q.  You think those two are connected?
10    A.  Absolutely.
11    Q.  Okay.
12    A.  Because it's all political.  It's a hit
13  piece on my -- on Devin Nunes.  My brother has
14  nothing to do with NuStar Farms.
15    Q.  Okay.
16    A.  It's an exact hit piece.  And then all
17  of a sudden there's government stuff popping up
18  that we've never received before?  If that was
19  the case, why didn't we see this before?  If
20  there was a problem.
21    Q.  Okay.  So tell me all the facts that
22  support your statement here that --
23    A.  You wrote a hit piece on -- on my
24  brother saying that we -- we hire illegal
25  immigrants, which we don't.  Knowingly hired

Page 292

1  them.  We've never knowingly hired anybody that
2  was illegal.  And then all of a sudden we get
3  this letter.  It's all political.
4    Q.  Okay.
5    A.  If there was an issue, why didn't we
6  see anything before?
7    Q.  Well, did you have any communications
8  with the Social Security Administration about
9  this letter?
10    A.  Did you -- Did you read the letter?
11    Q.  I've read it, yes.
12    A.  There's nothing that -- There's nothing
13  to do.  I can't do anything.  There's nothing to
14  do.
15    Q.  Okay.  And you -- you read it all the
16  way through; right?
17    A.  Lori knows more about it than I do.
18  I'm just telling you what I know.  You asked
19  what I know, and that's what I know.
20    Q.  Did you discuss the letter with other
21  people at the farm?
22    A.  I -- I didn't.
23    Q.  Okay.  So you didn't discuss it with
24  Anthony Nunes, Jr., and you didn't discuss it
25  with Toni Dian Nunes?

Page 293

1    A.  I wouldn't discuss -- I don't --
2        THE WITNESS:  Did you read it?
3    A.  I guess I can't ask him that.
4    Q.  I'll talk to him.
5    A.  I don't know.  I don't recall.
6    Q.  Okay.  So Lori opens the mail, and then
7  she probably hands you the copy of the letter to
8  read; right?
9    A.  Okay.
10    Q.  Is that -- I'm just trying --
11    A.  I don't know.  I don't remember how the
12  sequence went.
13    Q.  Okay.  Did you discuss it with Lori?
14    A.  Yeah, because I think she said that
15  there's nothing we could do.  There's nothing to
16  do.  You can't -- I don't recall.
17    Q.  Okay.  So did you take -- did you do
18  anything after -- in response to this letter?
19    A.  I didn't do anything.
20    Q.  Okay.
21    A.  I don't recall doing anything.
22    Q.  Did NuStar do anything in response to
23  this letter?
24    A.  I don't know if Lori -- I don't know
25  what Lori did.

74 (Pages 290 - 293)

1    Q.   Okay.  Why don't we take a look at a
2  couple portions of this letter here.  And we'll
3  start with the very first page, which is PX2768.
4  So first let me make sure I understand what's
5  going on here.  At the top do you see where it
6  says "Processed W2 Count:  27"?
7    A.   Okay.
8    Q.   Do you see that there?
9    A.   Yes.
10    Q.   Okay.  You understand that means that
11  there were 22 W-2s that were processed for tax
12  year 2018 for NuStar?
13    A.   No, I don't know that.
14    Q.   You have no idea what that is?
15    A.   No.  22?  No.
16    Q.   Sorry.  Excuse me.  27.  I misspoke.
17    A.   Is that -- Is that what that means?  I
18  don't know what that means.
19    Q.   Okay.  So you don't know -- you don't
20  know what it means when it says --
21    A.   I don't know.  I don't know what that
22  means, no.
23    Q.   Okay.  So then if you go down, it
24  says -- in the very first sentence of the
25  paragraph of text it says "You reported 20

1  employee names and Social Security numbers on
2  the Wage and Tax Statements for tax year 2018
3  that did not match our records"; right?
4    A.   Okay.
5    Q.   So is -- is it your understanding --
6  and by "you," I mean NuStar, okay, does NuStar
7  understand that this means that of the 27 W-2s
8  that were processed for 2018 for NuStar, 20 of
9  them did not match the Social Security's
10  records?
11        MR. BISS:  Object to the form.
12    Q.   Is that NuStar's understanding?
13    A.   I don't know.  I can't answer that.
14    Q.   Why can't you answer it?
15        MR. BISS:  He's already said why.
16  He's never -- He can't answer what's -- He
17  doesn't know what this letter means.  He's
18  already answered all that.  How would he do
19  that?
20    Q.   All right.  Well, does NuStar not
21  understand what it means or does Anthony Nunes,
22  III, not understand what it means?  Who doesn't
23  understand -- like are you --
24    A.   I already told you; right?  You're
25  going to have to ask Lori, because I don't -- I

1  don't know.
2    Q.   Okay.  Is Lori the person with the most
3  knowledge about these documents at NuStar?
4    A.   This Exhibit 38, I would say yes.
5        MR. BOYER:  Okay.  Can we mark
6  this one too?
7        (Exhibit 39 was marked for
8        identification by the reporter.)
9    Q.   And I've handed you a document that has
10  been marked as Defendants' Exhibit 39.  And
11  based on your prior answers, I assume that Lori
12  is the person with the most knowledge about
13  Defendants' Exhibit 39 as well; correct?
14    A.   I would say yes.
15    Q.   Well, let me just explore your
16  knowledge then, Anthony Nunes, III.  Do you
17  recall receiving this letter in the mail in
18  2010 -- or excuse me -- 2020?
19    A.   I would have -- I can't recall if I --
20  I remember getting one -- maybe both of them.  I
21  don't remember.
22    Q.   Okay.  Do you remember --
23    A.   What am I supposed to do with it?  It
24  says right here -- what am I supposed to do?
25  Right here, "Important," right there, I can't do

1  anything about it.  So I don't know why that is.
2  Social Security Administration sends out this
3  letter after the story was written.  Never seen
4  one before, and now we get these, but we can't
5  do anything with it.  It says right there do not
6  take adverse actions against any employees.
7  What -- Okay.  So what are you trying to say?
8  What is there?
9        MR. BOYER:  I'm sorry, what was
10  my question?
11        (Requested portion of the record
12        was read.)
13    Q.   Yeah.  That was just my basic question,
14  is do you remember receiving this letter in
15  2020, Anthony Nunes, III?
16    A.   Once again, I don't recall exactly this
17  one, but what I still don't understand is the
18  Social Security Administration sends this out
19  after you -- after Ryan Lizza and Hearst Corp.
20  accepted the story, the hit piece on my brother,
21  saying we did all this, and all of a sudden we
22  start receiving this, but we can't do anything
23  with it.  It says right there, "Important,"
24  right there at the bottom of the page.  What am
25  I supposed to do with it?  I can't do anything.

75 (Pages 294 - 297)

App.197

1      MR. BOYER:  Okay.  I'm going to
2  move to strike the answer after "Once again, I
3  don't recall exactly this one" as being
4  nonresponsive thereafter.
5      MR. BISS:  What's the point?  Are
6  you flexing your muscles over there?  What's the
7  point of moving to strike it?
8      Q.  So, Mr. Nunes, do you recall any
9  conversations with anyone at NuStar about
10  receiving this letter in 2020?
11     A.  The one -- I talked to Lori.  I don't
12  recall years.  I remember talking to Lori about
13  it.
14     Q.  Okay.  What do you recall discussing
15  with Lori?
16     A.  That there's nothing to do.  It says
17  right here in the letter we can't do anything.
18     Q.  Got it.
19     A.  There's nothing to do.
20     Q.  But again, Lori is the person --
21     A.  As long as I -- That's what I remember.
22  That's what my recollection is.
23     Q.  Did you call Ms. Bahena after receiving
24  either of these letters?
25     A.  I don't recall if Lori did or not.  I

1  don't know.
2      Q.  Lori would have been the one to call
3  her?
4      A.  Yeah.
5      Q.  Okay.  Does Lori sort of maintain the
6  relationship with Ms. Bahena?
7      A.  Yes.
8      Q.  Okay.
9      A.  Because more clerical stuff, not
10  necessarily operations.
11     Q.  Got it.
12     A.  But if you're asking me, Anthony Nunes,
13  III, is I still don't understand how we got --
14  received these after the story was written.
15  We've never seen one before, then all of a
16  sudden we're starting to receive this after a
17  story is written.
18     Q.  Mr. Nunes --
19     A.  It's a total hit piece on my brother,
20  and then all of a sudden you start receiving
21  some crazy stuff that you can't do anything
22  with.
23     Q.  Mr. Nunes, why don't you hop back to
24  Defendants' 38, which is one of the ones in
25  front of you.

1      A.  Okay.
2      Q.  Take a look at PX2772.  Let me know
3  when you're at that page.
4      A.  Okay.
5      Q.  Again, I'll explore this more with Lori
6  at her deposition, because she seems to be the
7  one with the most knowledge.
8      A.  Okay.  You should ask her.
9      Q.  But to your -- to your knowledge,
10  Anthony Nunes, III, do you know -- well, let me
11  draw your attention to the relevant portion
12  here.  Do you see where it says "Helpful Tips
13  About Resolving Name/SSN Mismatches" right in
14  the middle of the page?
15     A.  Okay.
16     Q.  Okay.  And then you see where it says
17  "Resolving a mismatch"?  Do you see that?  It's
18  directly below where it says "Helpful Tips About
19  Resolving Names and SSN Mismatches."
20     A.  Helpful tips.
21     Q.  Helpful tips.
22     A.  It doesn't say require -- It doesn't
23  say that we're required to do anything.  I don't
24  know why there's mismatch.  Once again, you're
25  going to have to ask Lori, but I didn't --

1      Q.  Okay.
2      A.  You know, is there -- Did somebody else
3  have their ID?  I don't know.  But it's helpful
4  tips.  There's not -- nothing that we're
5  supposed to -- that we're required by law to do.
6  And we can't do it.  It just says right there.
7  It's -- It's a total bogus letter.  We've never
8  received one ever before, until after the story
9  was written.
10     Q.  Mr. Nunes, I appreciate that you feel
11  passionately about this matter, but please just
12  answer my questions.
13     A.  I did.  I said you're going to have to
14  ask Lori.  I went out on a statement.
15     Q.  Right.  That's what I would appreciate
16  if we could just cut out some --
17     A.  I answered your question.  I said
18  you're going to have to speak to Lori, and then
19  I went ahead and made a statement.
20     Q.  I understand what you did.
21     A.  Thank you.
22     Q.  Thank you.
23        So now drawing your attention to
24  the portion of the letter that says "Resolving a
25  mismatch," to your knowledge, Anthony Nunes,

76 (Pages 298 - 301)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  III, are you aware of NuStar having done
2  anything to resolve the mismatches?
3      MR. BISS: Object to the form.
4      Q.  Are you aware of anything?
5      A.  I already answered your question.  I
6  said you'll have to ask Lori.
7      Q.  I understand --
8      A.  I am not aware of what she did.  You'll
9  have to ask her.
10     Q.  Right.  You would not have done it, and
11 you are not aware of it, so ask Lori.  Is that
12 fair?  Is that a fair summary?
13     A.  That's the third time.  Yes.  It's
14 still amazing that you get -- never have
15 anything, and then all of a sudden this hit
16 piece was written -- written by a total
17 political hit job, and then all of a sudden you
18 receive some bogus letters.
19     Q.  Did you ever try to figure out -- Did
20 you ever conduct any research to find out why
21 that happened, like why the letters were issued
22 in 2019 and 2020?
23     A.  Because of the Ryan Lizza story and his
24 total hit piece on political.
25     Q.  Did you conduct any research?

1      A.  It's the same -- It's the same research
2  Ryan Lizza used.
3          MR. BOYER:  Would you mark that
4  as Defendants' 40?
5      A.  To answer your question, it's the same
6  research as Ryan Lizza used.
7      Q.  Okay.
8          (Exhibit 40 was marked for
9          identification by the reporter.)
10     Q.  So I've marked --
11         MR. BISS:  Nate, do you have a
12 copy of that for me?
13         MR. BOYER:  Oh, my goodness, of
14 course.  Sorry about that.
15         MR. BISS:  No problem.  Thank
16 you.
17     Q.  Mr. Nunes, I've handed you a document
18 that's been marked as Defendants' Exhibit 40.
19 Have you seen this document before?
20     A.  Nope.
21     Q.  Okay.  And by -- let me ask you this.
22 Has NuStar seen this document before?
23     A.  Nope.
24     Q.  Okay.  You're saying that on behalf of
25 the company; right?

1      A.  I've never seen this.
2      Q.  I'm not asking --
3      A.  I don't recall seeing this.
4      Q.  Okay.  When you say "I" --
5      A.  I still can't -- It's the same as.
6      Q.  Same what?
7      A.  If -- You're getting real nitpicky
8  here, so you need to make sure you specify,
9  because earlier in the day you'd say me, not the
10 company, this and that, or am I speaking now as
11 the company?  So when I do speak, that means I
12 have never seen that.
13     Q.  That is my question.  Has the
14 company --
15     A.  Still never seen it.
16     Q.  Okay.  Please let me ask the question.
17         Has the company ever seen this?
18 And your answer is?
19     A.  No.
20     Q.  Okay.  So why don't we take a look at
21 some of the names here on the list.
22     A.  What is this document?
23     Q.  What is this document?  Are you
24 aware -- Are you aware that in this case the
25 Social Security Administration was ordered to

1  populate this list with whether names and Social
2  Security numbers proffered by the company in its
3  interrogatories matched their records?
4      A.  No.
5      Q.  Okay.  Is the company -- Just to be
6  clear we're talking about the company, is the
7  company aware of the fact that the Social
8  Security Administration did this?
9          THE WITNESS:  What does he mean?
10     Q.  I'm asking you to testify on behalf of
11 the company.  Was anybody aware of this?
12         THE WITNESS:  I don't -- I don't
13 understand what he's saying.
14     A.  I don't understand what you're saying.
15 I said no.
16     Q.  I know you said no.  I'm just making
17 sure you're testifying on behalf of the company.
18 Does the company -- anybody, which I think would
19 be your dad, your mom, you or Lori; right?  Any
20 of them --
21     A.  To my recollection, no.
22     Q.  Okay.
23     A.  That's -- Does that answer?  Because I
24 don't know.  I've never seen it, no.
25     Q.  You personally --

77 (Pages 302 - 305)

Page 306

1    A.   To my recollection, I have never seen
2  it.
3    Q.   You've never seen it, and nobody at
4  NuStar is aware of the fact that the Social
5  Security Administration was ordered to populate
6  this list with either a yes match or a no match?
7    A.   Never heard -- Never knew they could
8  even do such a thing.
9    Q.   Okay.  I mean, take a look at some of
10 the names here.  Like you have -- right here in
11 row 8 you see █████████.  He's a
12 current employee; right?
13   A.   Okay.
14   Q.   He is; right?
15   A.   Yes.
16   Q.   And you see he came back as a no match
17 from the Social Security Administration?
18   A.   Okay.
19   Q.   All right.  And you understand that
20 this means the Social Security Administration
21 said that for this name, number, and date of
22 birth they don't have a match in their records?
23   A.   That -- I -- I don't know.  That's what
24 this document says.
25   Q.   Yeah.  Okay.

Page 307

1    A.   But the fact of the matter is, did we
2  do anything illegal?  No.  We collected
3  everything that we were supposed to do.  We're
4  not the police.  We don't -- We can't ask these
5  questions.  If they're somehow -- You -- You
6  could ask the government, and they give you
7  everything that you want, which obviously that
8  happens.  I have nothing to hide.  We did
9  everything we were supposed to do.
10   Q.   As you sort of scroll down this list,
11 and just -- you don't have to study it that
12 closely, but if you look at it, there's a lot of
13 names here that come back with no matches;
14 right?
15   A.   What does that have to do with NuStar
16 Farms?
17   Q.   I just want you to take a look at it.
18 Like do you see that a lot of the names of
19 NuStar's current and former employees came back
20 as no matches?
21   A.   That's what this document says.  I
22 don't know where it was generated from.
23   Q.   Okay.  And I take it because NuStar --
24 because NuStar has never even seen this document
25 before, NuStar has taken no actions to try to

Page 308

1  correct mismatches with the Social Security
2  Administration?
3    A.   What are you talking about?
4        MR. BISS:  Hold on.  Hold on.
5  Object to the form.
6        Go ahead.
7    Q.   Because NuStar has never seen this
8  document before, NuStar has taken no actions as
9  a result of it; right?
10   A.   We're not legally required -- I can't
11 do that.
12   Q.   Okay.  We'll explore --
13   A.   What the -- What the fact of the matter
14 is is that you said that we knowingly hired
15 undocumented workers.  We did not.  We did
16 exactly what the U.S. government told us what to
17 do.
18        Now, if you want to go out and
19 generate something that -- that I have no clue
20 of or -- or how it's even done, right, because
21 we milk cows, we do exactly what the government
22 said to do to a T for 14 years, we have nothing
23 to hide.  We gave you every single document that
24 we have.  Every single one of them.
25        You, on the other hand, Ryan

Page 309

1  Lizza and Hearst Corp., has never ever produced
2  anything except for, "Oh, well, we only have a
3  60-day retention policy."  So you have no
4  information.  I give you everything that we have
5  knowingly and honestly, saying that we have
6  nothing to hide.  And that's what we did.
7        Now, if you produce something
8  that says there's no match, I don't know.  All I
9  know is legally we did everything we were
10 supposed to do, to the best of our ability, with
11 nothing to hide.
12   Q.   Okay.  Well, now that you have seen
13 Defendants' Exhibit 40, are you going to do
14 anything with it?
15   A.   What is there to do?
16   Q.   Are you going to try to resolve the
17 mismatches?
18   A.   You're not the government.
19        MR. BISS:  Object to the form.
20   A.   I don't know what this is.
21   Q.   Okay.  Are you going to take any steps
22 to try to address the mismatches --
23        MR. BISS:  Object to the form.
24   A.   I'm not going to get bullied by -- by a
25 bunch of political BS.

78 (Pages 306 - 309)

1    Q.   Okay.

2    A.   So you want to ruin -- So let me

3    understand this.  Ryan Lizza comes to my

4    hometown, he wants to destroy -- destroy my

5    brother and my farm; right?  Is that correct?

6    And then saying how much he cares about people

7    and how he wants -- everybody wants kumbaya, we

8    love everybody, but all they want to do is

9    destroy people.  They're hatred.  Hateful, vile

10   people.

11          MR. BOYER:  What was my question?

12   A.   Very vile people --

13   Q.   I'm sorry.

14   A.   -- that don't want to help anybody.

15          We're out here producing

16   something, being productive citizens, producing

17   a good wholesome product so people can survive,

18   producing with -- that milk we give

19   families money so they can survive and live.

20          What does Ryan Lizza do?  He

21   doesn't do anything productive.  Or the Hearst

22   Corp.  All they're doing is sending out a whole

23   bunch of stuff and throwing it at the wall for

24   political organizations to try to beat the crap

25   out of us for no reason.

1    Q.   Anything else?

2          MR. BISS:  What's your next

3    question?

4          MR. BOYER:  What was my last

5    question, is actually what I want to know right

6    now.

7    A.   What was I going to do?  I'm legally

8    not bound to do anything.  I did legally what I

9    was supposed to do.  That was your question.

10          MR. BOYER:  What was it?  I can't

11   remember.

12          (Requested portion of the record

13          was read.)

14          MR. BISS:  Object to the form.

15          MR. BOYER:  What was the answer?

16   I'm sorry.

17          (Requested portion of the record

18          was read.)

19   Q.   Okay.  So I'll just repeat the

20   question.  Are you going to take any steps to

21   address the mismatches?

22          MR. BISS:  Object to the form.

23   Q.   It's a yes or no question.

24          MR. BISS:  Not really.

25   Q.   Are you going to answer?

1    A.   I did answer.

2    Q.   Are you going to take any steps to

3    address the mismatches?  You did not answer.

4    A.   I'm not going to get bullied by a bunch

5    of -- a bunch of people that have a political

6    agenda.

7    Q.   Is the answer no, you're not --

8    A.   Is the answer no?  I don't know what

9    this paper is.

10          MR. BISS:  I mean, Nate, what

11   mismatches?  What are you talking about?

12   Q.   Mr. Nunes, are you going to do anything

13   with the information that is contained in

14   Defendants' 40?

15   A.   What is there to do?  What can I do?

16   Q.   What --

17   A.   You're asking me what I'm going to do.

18   What can I do?

19   Q.   Well, let me ask you this.  Are you

20   going to go ask the employees who have been --

21   who are your current employees who came back as

22   noes, "Hey, the Social Security

23   Administration" --

24   A.   So I do believe --

25   Q.   Stop.  Stop.

1    A.   Oh, I'm sorry.

2    Q.   Let me ask my question.

3    A.   I'm sorry.

4    Q.   That the Social Security Administration

5    came back with a no match, you know, "Is there a

6    problem?"  Are you going to check your records,

7    how about that, to say is there a typographical

8    error in our records?  Are you going to do that?

9    A.   So let me -- let me understand this.

10   So you produced this.

11   Q.   No.  The Social Security Administration

12   produced the document.

13   A.   You had this produced.  This was also

14   produced by you guys.

15   Q.   No.  The Social Security Administration

16   produced that.

17   A.   Oh, they did that too?  Never seen

18   nothing before, prior to this event of -- of the

19   story written.  Right here it says I cannot do

20   anything.

21   Q.   Okay.

22   A.   So you're asking me to do something

23   that's illegal once again?

24   Q.   No.  I am asking -- Well, I'm not, but

25   put that aside, whether you think it's illegal

App. 201

Page 314

1  or not, please just answer my question. Please.
2  Start off --
3      A.  I'm not going to do anything illegal.
4      Q.  Are you going to check NuStar's records
5  to see if there's any typographical errors,
6  let's start there, that might have caused the
7  mismatches?  Are you going to check the records?
8      A.  Are you going to retract your story so
9  then we quit getting stuff like this?
10         MR. BOYER:  Move to strike.
11     Q.  Please answer my question.
12     A.  I can't answer your question.  I don't
13  know how to answer your question.
14     Q.  Are you just not going to answer my
15  question?
16     A.  I answered your question.  You don't
17  like my answer.
18     Q.  Your answer was not an answer.  Are you
19  going to check NuStar's records to see if there
20  were any typographical errors that might have
21  caused the mismatches?
22     A.  Yeah.  I think we already have.  But I
23  can't answer that question.  You're going to
24  have to ask Lori.
25     Q.  Okay.  So you think Lori has done --

Page 315

1  taken actions in response to Defendants' 40?
2      A.  I assume she looked at whatever she
3  needed to look at.
4      Q.  Okay.  You're pointing --
5      A.  I'm not in charge of that.
6      Q.  You're pointing at Defendants' 39 or 38
7  right now?
8      A.  Does it matter?
9      Q.  It well, it does, actually.
10     A.  Okay.
11     Q.  You assume -- You think she did take
12  some actions in response to Defendants' --
13     A.  You'll have to ask Lori.
14     Q.  Okay.
15     A.  I can't say.
16     Q.  Fine.
17         MR. BISS:  Nate, are you at a
18  good point where we can take a break?
19         MR. BOYER:  Yeah, why don't we
20  take a break now.
21         MR. BISS:  All right.  Thank you.
22         THE VIDEOGRAPHER:  This is the
23  end of Media Unit Number 4.  The time is 4:20.
24  We are off the record.
25         (A recess was taken.)

Page 316

1         (Exhibits 41 and 42 were marked
2  for identification by the reporter.)
3         THE VIDEOGRAPHER:  We are back on
4  the record.  This is the beginning of Media Unit
5  Number 5.  The time is 4:40.
6      Q.  Mr. Nunes, you've been handed a couple
7  documents marked as Defendants' 41 and
8  Defendants' 42.  My first question is who has
9  the e-mail address nustarfarms@mtcnet net?
10     A.  NuStar Farms does.
11     Q.  Okay.  Is that managed by you or your
12  father or both?
13     A.  It's all -- It's all -- It's just one
14  group e-mail.
15     Q.  Okay.  So there were a handful of
16  e-mails now that we've received, communications
17  with folks at Brown Winick, particularly in May
18  of 2021, and then some in June of 2021 as well.
19     A.  Okay.
20     Q.  Who was communicating with Brown Winick
21  through this e-mail account?
22     A.  I was.
23     Q.  You were?  This was you?
24     A.  Yeah.
25     Q.  Okay.  Let's take a look at -- In fact,

Page 317

1  let's start with number 42.  Okay?  So it starts
2  off -- if you look at number -- if you look at
3  e-mail 42 and you go to the end, sort of the
4  bottom of the chain for the oldest e-mail, and
5  it starts off by saying -- from what I could
6  tell, it seems like you were writing to Michael
7  Blaser.  You write "Can you call me tonight?  At
8  a loss here."  It appears on the top of page 3.
9      A.  Oh, okay.
10     Q.  Do you see that?
11     A.  Oh, okay.
12     Q.  Yeah.
13     A.  Um-hum.
14     Q.  And did you talk with Michael Blaser
15  that night?
16     A.  I don't know if I talked to him that
17  night or the next day.  I don't know.
18     Q.  What did you talk to him about?
19     A.  It must have been the deposition, to
20  get somebody to do that.
21     Q.  All right.  Because this was after
22  Justin Allen was no longer representing ██████,
23  right?
24     A.  Yeah.
25     Q.  And what's your -- well, what's your

80 (Pages 314 - 317)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 318

1  understanding of why Justin Allen no longer
2  represented any of the employees?
3      A.  I don't -- I don't know.  I don't know
4  if he was representing NuStar Farms or if he was
5  representing the employees.  There was some -- I
6  don't know what he was doing there.
7      Q.  Okay.  Was there confusion as to the
8  role that he had?
9      A.  Yeah.
10     Q.  Okay.
11     A.  Yeah.
12     Q.  Okay.  And was the confusion that your
13 expectation was that he would represent NuStar
14 Farms but he was --
15     A.  I don't -- I don't know.  I don't know
16 how that works.
17     Q.  Okay.
18     A.  That's why I talked to Michael Blaser,
19 because he's our -- he's our attorney.
20     Q.  Got it.  Okay.  And it goes on a couple
21 e-mails up -- well, why don't we take them one
22 at a time.  The next e-mail up Michael Blaser
23 says "Understood that he left already unless
24 your counselor wanted one deposition completed?"
25          And then you responded "No, I

Page 319

1  just need an attorney to help us tomorrow.  Just
2  wanted to know if you could help.  Try to
3  rectify the problem."
4          What is the problem you're
5  referring to there?
6      A.  Well, they had to -- Mr. Biss shut down
7  the meeting.
8      Q.  Right.  Okay.  So what -- what was the
9  problem that had arisen that you needed
10 rectified?
11     A.  That Mr. Biss wanted to stop it
12 because --
13     Q.  Okay.  And he wanted to stop it with
14 Justin Allen as the lawyer?
15     A.  I don't know what role he was playing
16 and what he was supposed to be doing.  There was
17 a big miscommunication there.  Blaser wasn't
18 available to talk to because he had depositions.
19 I really don't know what -- what was going on
20 there.
21     Q.  Got it.
22     A.  So was he representing NuStar Farms?
23 Was he representing the employees?  We don't
24 know.
25     Q.  So let's move up a little bit here.

Page 320

1  The next e-mail is about suggesting somebody
2  named Jen Lindberg.  He says it's a four-hour
3  drive.  "Can your attorney who brought the case
4  find someone closer to Sibley?"
5          And then you say "That's the
6  problem.  We can't find anybody that will do it
7  locally."
8          So at that point in time NuStar
9  was trying to contact other counsel to --
10     A.  Oh, we've been trying, but every time
11 we do something that somebody says yeah, it's
12 like these little minions go out there because
13 it's all political and they tell them, "Oh" --
14 and then all of a sudden they're like, "Oh, I
15 don't want to do it."  They say yes, and then
16 they go, "Oh, I don't want to do it."
17     Q.  Right.  And this -- And you mean this
18 was happening prior to May 13th; right?  That's
19 what --
20     A.  Right.  Because I didn't want to use --
21 we were just trying to find somebody local.  I
22 didn't want anybody.  All I needed was -- I
23 didn't want those guys going in there and
24 getting steamrolled because Mr. Biss could not
25 be here.  So I didn't want them going in there

Page 321

1  by themselves alone.
2          I can't tell them what to say.
3  As an employer, I didn't want to be in there.  I
4  wanted them to be truthful and tell them what
5  they needed to say.  And I didn't want them to
6  go in there by themselves.  But since it's all
7  political, I can't find anybody to do it because
8  most -- like 85 percent of -- of attorneys
9  are -- are not Republican.  And that's all this
10 is.  It's a total hit piece.
11          And so they sent out their
12 minions.  Somebody will say yes, and then all of
13 a sudden you guys find out, and then all of a
14 sudden they want to quit.  They go, "Oh, we
15 don't want to do it."
16     Q.  So just to be clear, your understanding
17 is that attorneys were unwilling to represent
18 the employees because they were Democrats or at
19 least not Republicans?
20     A.  Yeah.  It's a hit piece.  That whole
21 thing -- this whole thing is all political.
22 There's nothing about it that's -- that's legit.
23 Everybody that looks at it goes "This is all --
24 This is crazy."  It's like "Yeah, I know."
25     Q.  Is that what was communicated to you by

81 (Pages 318 - 321)

1 some of these attorneys you reached out to?
2     A. Um-hum.
3     Q. Is that what -- they said, "I'm not
4 going to do it because I'm not a Republican"?
5     A. They don't have to.
6     Q. Okay. Well, what were the reasons they
7 provided for not doing it?
8     A. They go, "Oh, well" -- they say they
9 want to do it, and then they don't.
10     Q. Okay. So I'm aware of this -- what
11 you're talking about, saying they'll do it,
12 happening with the Brown Winick firm. I'm aware
13 of it happening with a guy named Dan Shuck.
14     A. There was some other ones in between.
15     Q. And there's some other ones in between?
16     A. Yep. Because we tried everything. But
17 I didn't want the employees to go in there by
18 themselves. There was -- That's asinine. You
19 don't -- They don't need to go in there by
20 themselves without any representation, just to
21 be covered. And then you guys take and run with
22 it and like, "Oh, they need something." All of
23 a sudden you guys care about them. You guys
24 don't give two shits about my employees.
25            I love those guys. I want those

1 guys taken care of. They're awesome. They're
2 great human beings. Hard workers. All I ever
3 wanted to do -- All I ever got since 2018 is
4 everybody -- you guys are trying to destroy
5 them.
6     Q. Okay. So let's take a look at
7 Defendants' Exhibit 41. I just want to go with
8 the very top e-mail on the first page. This is
9 where I believe you are writing to Blaser "It
10 starts at noon today," meaning the deposition
11 that was set to start that day. "We just want
12 somebody by their side. Biss will do all the
13 work."
14           I take it that's what you were
15 saying earlier, that what you were looking for
16 was sort of a company lawyer to sort of be there
17 to accompany the employees?
18     A. I don't understand how it is, because
19 they start talking about something else, and I
20 don't understand it. All I know is Biss -- or
21 Blaser is our guy, and -- and I know he's good
22 and -- and a reputable person. They sent
23 somebody else out because Blaser was busy, and
24 the whole thing just totally went AWOL. I don't
25 even understand.

1     Q. Okay.
2     A. Because I don't know what happened
3 inside there. All I know is Mr. Biss shut it
4 down, and it wasn't right. And after that, we
5 couldn't -- they couldn't do any -- we
6 couldn't -- nothing.
7     Q. And nobody --
8     A. It's like you guys sent out your
9 minions, and everybody is like -- they're like
10 cockroaches fleeing.
11     Q. Who are our minions?
12     A. That's a good question.
13     Q. Well, you were referring to that.
14     A. Because all your -- it's attorneys talk
15 amongst each other --
16     Q. I'm in --
17     A. -- just like the dairy people all talk.
18     Q. I'm very interested to find out who my
19 minions are. I mean, do you know
20 specifically -- are you thinking about specific
21 people, quote, unquote?
22     A. No.
23     Q. Okay. You're just assuming that we
24 have minions?
25     A. Obviously.

1     Q. Okay. Very well.
2           MR. BOYER: Let's mark the next
3 one.
4          (Exhibit 43 was marked for
5          identification by the reporter.)
6           MR. BOYER: So first of all, just
7 to acknowledge for the record, Mr. Biss, this
8 document which was just marked as Defendants' 43
9 you designated as counsel's eyes only. So I
10 think you might have mentioned that off the
11 record. I just wanted to mention that on the
12 record for you right there.
13           MR. BISS: Thank you. I
14 appreciate that.
15     Q. You've been handed a document that's
16 been marked as Defendants' Exhibit 43. This was
17 produced to us this morning. I don't really
18 feel the need to go over it in detail, but I
19 just want to talk generally. Is this -- Is this
20 the application that you have employees fill
21 out -- or strike that.
22           Is this the application that you
23 have prospective employees fill out?
24     A. This is a really old one, when we first
25 started. They were already there.

82 (Pages 322 - 325)

Page 326

1  Q. Gotcha.
2  A. We just utilized what was there.
3  Q. And I think it says "Sibley Dairy LLP"
4  at the top.
5  A. Yeah. That's correct.
6  Q. Right. So this was probably a form
7  that was used by the prior dairy?
8  A. Yeah.
9  Q. Got it. And you've made changes to the
10 form over the years?
11 A. Yes.
12 Q. Okay. So it looks a lot different than
13 it does here today?
14 A. Yes.
15 Q. Okay.
16 A. There's questions on here we can't
17 answer -- we can't -- we can't ask.
18 Q. Gotcha. What are some of the questions
19 on here that you can't ask?
20 A. We legally can't ask them if they're
21 legal resident citizens of the United States.
22 Q. Got it.
23 A. And I don't think we could ask them if
24 they have felonies either, I don't think.
25 Q. How did you learn that you can't ask

Page 327

1  those questions?
2  A. Because we showed Amanda.
3  Q. Okay. Is Amanda sort of your -- your
4  go-to on issues of sort of compliance?
5  A. She's an immigration attorney.
6  Q. Immigration lawyer. Right. Yeah.
7  Speaking of compliance -- You can set that aside
8  now. We don't need to talk about it anymore.
9        Speaking of compliance, I can
10 only just make sure I understand the division of
11 labor between you and Lori when it comes to sort
12 of the intake of documents and applications;
13 right? I remember you talking about you were
14 the -- you, Anthony Nunes, III, are the one who
15 will review those documents?
16 A. Um-hum.
17 Q. Or review the IDs that are presented;
18 right?
19 A. Um-hum.
20 Q. Is that correct?
21 A. Yeah.
22 Q. Okay. Is Lori Nunes sort of more
23 responsible for the compliance with the
24 paperwork, the I-9 paperwork itself?
25 A. I would say yes.

Page 328

1  Q. Okay. Gotcha. So she's the one who is
2  focusing more on that, and she's the one more
3  knowledgeable about those --
4  A. Entering the data in, yes.
5  Q. Got it. Because she'll take the
6  information on the I-9 and then enter it into
7  the systems; right?
8  A. That's correct.
9  Q. Gotcha. Does she -- Oh, who actually
10 makes the copies of the IDs?
11 A. I would.
12 Q. You do? Okay. And then you hand that
13 copy off to Lori?
14 A. Um-hum.
15 Q. Because it's part of the I-9 package?
16 A. It's all part of the package.
17 Q. Gotcha. And I'm sorry, you said
18 "Um-hum" in response to two questions.
19 A. Yes.
20 Q. Yes. Thank you. I know it's annoying,
21 but we've got to do it for the court reporter.
22      Okay. And does she look at the
23 IDs as well, or is that not what she does?
24 A. I don't know what she -- I don't know
25 if she looks at the IDs or not. I assume she --

Page 329

1  she probably looks to make sure that the numbers
2  are right, that everything matches up.
3  Q. Okay. Got it. We've -- You've said it
4  repeatedly, you have produced all the records
5  that you have, all the I-9 records and
6  supporting documents; right?
7  A. 100 percent of all the records that we
8  have we produced.
9  Q. And if you didn't produce it, you don't
10 have it; right?
11 A. We don't have it.
12 Q. Gotcha. Okay. So if there's workers
13 who appeared on the interrogatory responses who
14 are listed there as having been employees but we
15 did not receive the I-9s and supporting
16 documents for them, then for those people, they
17 were employees, but you just don't have the
18 records for them?
19 A. Yeah. There's -- For some reason, the
20 information is missing.
21 Q. Okay. Got it.
22 A. It's still pretty impressive we have
23 14 -- we have that many employees and have all
24 that information.
25 Q. So let's talk -- we talked a little bit

83 (Pages 326 - 329)

1 about the audit earlier that was conducted in
2 2018 with Ms. Bahena; right?
3      A.   Okay.
4      Q.   I'm actually going to cross off some
5 questions we've addressed already.  Let's move
6 quickly through this.
7           Tell me about what that process
8 was for the audit.  Did Ms. Bahena -- Did
9 Ms. Bahena review the documents in hard copy or
10 electronically?
11     A.   Hard copies.
12     Q.   Okay.  Where did she review them?
13     A.   Our office.
14     Q.   So she came to the farm, went to the
15 office and reviewed them?
16     A.   I do believe she came with -- with an
17 assistant.
18     Q.   Got it.  Okay.  So you kind of just
19 pulled the files, gave them to her, gave them
20 the conference room, and she did her thing;
21 right?
22     A.   Yep.
23     Q.   Got it.  And the files that I was just
24 referring to would have been exactly the sorts
25 of I-9s with supporting documents --

1      A.   Everything that we had.
2      Q.   -- we were looking at; right?
3           Okay.  Do you -- Did Ms. Bahena
4 conduct any interviews of anybody?
5      A.   No.
6      Q.   Okay.  Did --
7      A.   I don't think -- I don't -- I don't
8 think so.
9      Q.   Okay.
10     A.   Let me rephrase.
11     Q.   Okay.  Sure.
12     A.   I don't recall.
13     Q.   That's fine.  All right.  Well, did she
14 interview you?  We'll start there.  You would
15 know that.
16     A.   I just talked to her for a few minutes.
17 Lori -- Lori worked on most of that because it's
18 all paper stuff.  I wasn't -- I wasn't really
19 involved a lot with that.  I was mostly working
20 outside, cows.
21     Q.   Okay.  And what did you discuss with
22 her?
23     A.   I think they just went over -- it was
24 just general -- I don't recall exactly.  There's
25 just general what you're going to go over, what

1 they want to -- you know, I don't recall
2 exactly.
3      Q.   Okay.  This is sort of, you know,
4 the -- I guess you could say sort of what the
5 process would be; right?  You kind of talked
6 about --
7      A.   Yeah.  I just wanted a generalization
8 of what was -- we were going through.  I do
9 remember talking about certain things that we
10 can and can't do.  We had a little brief deal --
11 well, I come in -- I think we had a brief
12 conversation about dos and don'ts.  I do
13 remember applications.  She asked for an
14 application.  I got that for her.  But I
15 don't -- I don't recall exactly.
16     Q.   Okay.  So she asked for an application
17 She asked for an application to review that;
18 right?
19     A.   Yeah.  Yeah.
20     Q.   Okay.
21     A.   Because we can't ask the -- we can't
22 ask certain things.  And I don't want to do
23 anything illegal.
24     Q.   Did she ask you for an employee roster
25 or a list of employees?

1      A.   Yeah.  Yeah.  She went through all
2 the -- all the current employees and the ones --
3 all the way up to the one -- I think she went
4 through most of them.  I don't know if she went
5 through all the older ones, but I know she went
6 at least a year -- the ones that are super
7 critical.
8      Q.   Okay.
9      A.   I do believe they reviewed all those,
10 but you would have to ask Lori.
11     Q.   Got it.  Okay.  So -- So first of all,
12 big picture, it sounds like the person with the
13 most knowledge about this would -- at NuStar
14 would be Lori; right?
15     A.   That's correct.
16     Q.   Okay.  So now let me just make sure,
17 all these -- this conversation we've been having
18 basically would have been about Anthony Nunes,
19 III, and his knowledge; right?
20     A.   Um-hum.
21     Q.   Okay.  Good.  So let's just make sure I
22 understand all of your knowledge on this.
23 How -- How often -- For how long did you meet
24 with Ms. Bahena?
25     A.   Me personally?

1    Q.   You personally.  Yep.
2    A.   It was a very short time.  20 minutes,
3  30 minutes.  I don't -- I don't recall.
4    Q.   Okay.  And there was some dos and some
5  don'ts she talked about during those 20 or 30
6  minutes?
7    A.   Yes.
8    Q.   Okay.  Do you remember what they were?
9        MR. BISS:  Are you asking him to
10 tell you what the attorney told them?
11       MR. BOYER:  Yes.
12       MR. BISS:  Okay.  I'm going to
13 instruct him not to answer that question.
14       MR. BOYER:  Okay.  Mr. Biss, I
15 think at this point we've squarely put the
16 matters at issue, but -- I mean, through his
17 testimony so far today, but I understand your
18 instruction.
19   Q.   Mr. Nunes --
20   A.   You'd have to refer to Lori --
21   Q.   Okay.
22   A.   -- on all that stuff.
23       She knows best.
24   Q.   Okay.  So just to be clear, I think the
25 last question --

1        MR. BOYER:  And I understand you
2  may instruct your witness, and we'll go from
3  there, Mr. Biss, but I'll just get it on the
4  record to make sure it's clean.
5    Q.   The last question was what did you
6  discuss with Ms. Bahena during that 20- to
7  30-minute meeting that you had.
8        MR. BOYER:  And, Mr. Biss?
9        MR. BISS:  Yeah.  And I think
10 you're asking him to disclose what legal advice
11 the lawyer gave to the client, so --
12       THE WITNESS:  That's what I
13 understand.
14       MR. BISS:  Hold on.  So I'm
15 instructing him not to answer that question.
16       MR. BOYER:  Okay.
17   Q.   And, Mr. Nunes, am I correct that
18 you're going to follow your lawyer's
19 instruction?
20   A.   100 percent correct.
21       MR. BOYER:  Okay.  And, you know,
22 we can obviously talk about it offline, and
23 we've got more depositions coming up, but I
24 think there might be a point here, Mr. Biss,
25 that at least a lot of what happened in this was

1  probably waived by now.
2    Q.   In any event -- Okay.  So were you in
3  the room while Ms. Bahena was doing her work
4  with the documents?
5    A.   Just a few minutes, like I told you.
6    Q.   Okay.  Got it.  And what, if anything,
7  did you do in response to Ms. Bahena's audit?
8    A.   I didn't do -- I personally didn't do
9  anything.  Lori -- Lori made changes.
10   Q.   Okay.
11   A.   It was mostly -- It was just paperwork.
12   Q.   Okay.
13   A.   I think there was a lot of -- there was
14 clerical errors, where we're supposed to fill
15 in, where we're not.
16   Q.   Got it.  I saw -- I see on a lot of
17 documents there's notations that say per audit
18 in 2018 or something like that.
19   A.   Right.
20   Q.   Right.
21   A.   And they -- the -- we already sent all
22 that stuff over to the court, and they said that
23 you can't -- it was all attorney-client
24 privileges.
25   Q.   Okay.  Got it.  I think in a lot of

1  those documents there might be notations that
2  say per audit 2018, but then you were the one
3  who would ultimately sign at the bottom in
4  November of 2018 the employer certification?
5    A.   Okay.
6    Q.   Is that -- Do you remember signing a
7  lot of things in November 2018?
8    A.   Yes.  Because I had -- we had to fix
9  it.  Because I was the one that verified the
10 documents.
11   Q.   Got it.
12   A.   Lori can't just sign it, because she
13 didn't do it.
14   Q.   And at that point what you were
15 doing -- Did you -- Let me ask -- Strike that.
16       Let me ask this.  What you were
17 verifying at that time was the copies of the
18 documents that you had on file; right?
19   A.   The legal requirement we're supposed to
20 take.  And we have the strict protocol of
21 getting Social Security -- a Social Security
22 card and a photo ID.
23   Q.   Okay.  Got it.  Did you go back to the
24 employees and say, "I want to look at the
25 original," or did you just look at the copy?

85 (Pages 334 - 337)

1    A.  I didn't have to.  I already -- I
2 already verified it.  I know that I looked at
3 it.
4    Q.  Okay.  Let me just break -- I'm sorry.
5 Let me just make sure I got that.  So you recall
6 having looked at the documents when they were
7 presented to you when they first applied to be
8 hired?
9    A.  I looked at them.
10    Q.  Gotcha.  So then --
11    A.  There's no other way to get around it.
12 This is strict protocol.  We always do the same
13 thing.
14    Q.  Understood.  Then you get to the audit
15 and changes need to be made to the forms; right?
16 And Lori makes those corrections; right?
17    A.  I had to sign some.
18    Q.  And then you had to sign them; right?
19    A.  There was no other corrections.
20    Q.  Got it.
21    A.  I mean, I don't -- I don't know what
22 other corrections there may be.  I had to sign
23 some papers that -- we just didn't do the
24 signatures on our end.  Every -- They -- The
25 paperwork was already filled out --

1    Q.  Yeah.
2    A.  -- by the employee.
3        We just didn't sign it.  Well, we
4 know what we did, because we do the same thing
5 every time.  I get the cards, I verify the
6 cards, I copy the cards, we put the cards in the
7 file.
8    Q.  Okay.
9    A.  Or the copies.
10    Q.  Gotcha.  And Ms. Bahena, when she was
11 doing her review, she was putting sticky notes
12 or something on the documents; is that right?
13    A.  Yeah.  That's correct.
14    Q.  Okay.  Got it.  And that's what you're
15 referring to, that the court took a look at
16 those sticky notes; right?
17    A.  (Nodding head.)
18    Q.  Okay.  And there was also -- there was
19 a letter that was delivered by Ms. Bahena on
20 August 12th.  Do you recall that letter?
21    A.  No.
22    Q.  Okay.  Do you remember -- I think it
23 was addressed to Lori Nunes.  Do you remember
24 reviewing it?
25    A.  No.

1    Q.  Okay.  Do you remember her discussing
2 with you the letter from Ms. Bahena at all?
3    A.  I don't recall.
4    Q.  Okay.  Did Ms. Bahena do any other work
5 on this 2018 audit other than what we just
6 described?
7    A.  I -- I don't think so.
8    Q.  Lori would know best, though; right?
9    A.  Yeah.  I don't know.
10    Q.  Okay.  Any other work that Ms. Bahena
11 has done in connection with immigration stuff
12 since then?
13    A.  I know we -- we talked to her about
14 questions.
15    Q.  Okay.  Got it.  Have you ever had any
16 conversations with Devin Nunes about the 2018
17 audit?
18    A.  No.
19    Q.  Okay.  Not the fact that you were going
20 to conduct it or the results?  You never talked
21 about that with him?
22    A.  No.  Why would I?
23    Q.  I don't know.
24    A.  It's internal business.  I don't -- I
25 don't try to air out my -- what we're doing --

1    Q.  Okay.
2    A.  -- to random people.
3    Q.  You didn't discuss it with him before
4 he filed his lawsuit, right, against Hearst?
5    A.  Well --
6    Q.  He didn't -- Let me ask this.  Let me
7 ask you this question.  Did he have any
8 conversations with you about your labor
9 practices before September of 2019?
10    A.  Devin has nothing to do with the dairy.
11 I don't talk to him about operational --
12 internal operations.  I don't talk with anybody
13 about internal operations.
14    Q.  Gotcha.  So that means you did not talk
15 with him at any point about NuStar's employment
16 and hiring practices?
17    A.  That's -- That's not something that --
18 that we talk about.
19    Q.  Okay.
20    A.  Once again, he has nothing to do with
21 the farm.  I'm not going to talk to somebody
22 that has nothing to do with the farm about
23 internal practices --
24    Q.  Okay.
25    A.  -- or issues.

86 (Pages 338 - 341)

Page 342

1    (Exhibit 44 was marked for
2    identification by the reporter.)
3    Q.  I'm handing you a document that has
4  been marked as Defendants' 44.  So, Mr. Nunes,
5  this is an I-9 form for somebody named ███████
6  ███████ right?
7    A.  That's what it says.
8    Q.  Do you remember ███████████?
9    A.  No, I don't.
10    Q.  Okay.
11    A.  How long did he work for us?
12    Q.  I actually don't know off the top of my
13  head.  You can look it up if you want.
14    A.  Yeah, I'll look it up.
15      Okay.
16    Q.  Okay.
17    A.  He worked for us for a really short
18  time.
19    Q.  Gotcha.  So that's why -- that's why
20  you don't remember ███████████.  It was very
21  short; right?
22    A.  He didn't work very long.
23    Q.  So --
24    A.  If I remember right, he was kind of a
25  big guy, if I do recall.

Page 343

1    Q.  Well, unfortunately we don't have a
2  photo ID so that we can see what he looks like.
3  There were no documents produced with this I-9
4  to us for ███████████ at least from our
5  review of the production.
6    A.  Okay.
7    Q.  Which kind of leads to a question I
8  have.  So if you go to the second page where it
9  says "PX3079," and if you go down to the
10  certification area, right --
11    A.  Okay.
12    Q.  First of all, you see the star, "Per
13  audit 11-5-2018" that presumably Lori Nunes
14  wrote right there; right?
15    A.  Okay.
16    Q.  Do you see that there?
17    A.  I see it.
18    Q.  Okay.  And then below you sign and date
19  and write your name and your title in the
20  certification box; right?
21    A.  That's correct.
22    Q.  Gotcha.  And you do that on
23  November 5th, 2018; right?  Correct?
24    A.  That's correct.
25    Q.  Okay.  What were you certifying on

Page 344

1  November 5th, 2018, if ███████████ documents
2  were not in NuStar's files?
3    A.  You can't -- I don't know -- They could
4  have been in this file.
5    Q.  You said it might have been in this
6  file at the time but then --
7    A.  Could have been.
8    Q.  Okay.  But then they -- So would you
9  have looked at ███████████?
10    A.  We still do the -- oh, sorry.
11    Q.  Sorry.
12      Would you have looked at
13  ███████████ documents at the time you
14  certified this in 2018?
15    A.  No.  But we don't hire anybody without
16  two forms -- you've got to have a Social
17  Security card and a photo ID.
18    Q.  Got it.
19    A.  Always.
20    Q.  Understood.  So you're confident that
21  they would have been presented by ███████████
22  at the time he was hired.  I understand that.
23    A.  Unless this is the one guy that didn't,
24  this is the one person that never produced an
25  ID.

Page 345

1    Q.  There was one person.
2    A.  There was one person.
3    Q.  Tell me about that.  What do you
4  remember about that?
5    A.  That's what I remember.
6    Q.  Got it.  And you hired the person?
7    A.  We needed the cards. I don't know how
8  long they worked, like a day they were there.
9    Q.  Oh, got it.  So -- So bottom line,
10  there was somebody -- you needed a person for
11  very short-term work?
12    A.  No.  No.  That's not true.  I needed a
13  full-time employee.
14    Q.  I see.  You needed a full-time
15  employee.  Got it.  But you needed it pretty
16  badly.  You needed the full-time employee pretty
17  badly, it sounded like, at that moment in time?
18    A.  No, I never said that.
19    Q.  Okay.  So in any event, you did hire
20  one person without documents for full-time
21  employment?
22    A.  I think they just worked for a short
23  period of time.  I have their check still.
24    Q.  Okay.  Has NuStar performed any other
25  audits of its I-9s and related files other than

87 (Pages 342 - 345)

Page 346

1  the one that was performed by Ms. Bahena in the
2  fall of 2018?
3      A.  No.
4      Q.  That's the only time NuStar has ever
5  done it?
6      A.  Yes.
7      Q.  Has NuStar -- Other than this process
8  we've talked a lot about today of maintaining
9  the I-9s and checking the IDs that come in, has
10  NuStar made any other attempts to confirm if
11  their employees are, in fact, authorized to work
12  in the United States?
13          MR. BISS:  Object to the form.
14      A.  We do what we're legally supposed to
15  do.  We get -- We go over and above what we're
16  supposed to do.  We get two forms of
17  identification.
18      Q.  Got it.  But I'm just saying is there
19  anything else that NuStar does that we haven't
20  talked about here today in order to confirm that
21  its workers are authorized to work in the United
22  States?
23      A.  We do legally what we're supposed to
24  do.
25      Q.  I understand that's your understanding

Page 347

1  of the legal requirements, you believe you have
2  followed them.  Fair enough.  I'm asking if you
3  do anything other --
4      A.  There is nothing else.
5      Q.  Okay.  Fine.  Have you ever received
6  reports, either formal or informal, of workers
7  on your farm being illegally present in the
8  U.S.?
9      A.  Never.
10      Q.  Never?  Does NuStar have a -- Actually,
11  hold on a second, before I get to that, has
12  NuStar ever been audited by ICE?
13      A.  We've never been audited.
14      Q.  Or INS?  Well, NuStar post-dated INS,
15  so forget that.
16          Has NuStar ever been the subject,
17  as far as you know, of a government
18  investigation?
19      A.  Not that I know of.
20      Q.  Okay.  Has NuStar ever interacted with
21  anyone from ICE?
22      A.  Nope.
23      Q.  Or the Department of Homeland Security?
24      A.  Nope.
25      Q.  Does NuStar have a policy for no show,

Page 348

1  no call when workers don't show up?
2      A.  No.
3      Q.  Does it happen sometimes?
4      A.  What do you -- What does that mean?
5      Q.  Does it have like a -- you know, if
6  this happens so many times, then you're fired or
7  something like that?
8      A.  Usually people just never show back up.
9      Q.  So that's actually -- So sometimes
10  workers will just not show up on one day and
11  then never show up again?
12      A.  That's correct.
13      Q.  How often does that happen?
14      A.  Quite a few times.
15      Q.  Okay.
16      A.  They show up for their check.
17      Q.  They'll show up for their check?
18      A.  Yeah.
19      Q.  And then -- And then they'll leave?
20  Okay.  That's -- That's fine.
21          Have you ever had employees sort
22  of miss a period of a few days of work and --
23  but then come back and want to work thereafter?
24      A.  I don't recall.
25      Q.  Okay.  So are you aware of any current

Page 349

1  or former employees who have ever missed work
2  because they've been in jail, for example?
3      A.  Yeah.
4      Q.  Okay.
5      A.  Yeah.
6      Q.  Tell me about that.
7      A.  I do.  I do.
8      Q.  Okay.  Tell me about that.  Like how
9  often -- Go ahead.
10      A.  One of the employees, he was -- yeah,
11  he got in trouble with a domestic.  I do know
12  that.
13      Q.  Okay.  Which employee was that?
14      A.  His name is ███████
15      Q.  ███████
16      A.  Um-hum.
17      Q.  Okay.  And then ███████ missed work
18  as a result of that?
19      A.  Yeah.  Yeah.
20      Q.  Okay.
21      A.  He contacted us and said, "Hey, I've
22  been in jail."
23      Q.  Got it.  Anybody miss work for a couple
24  days and just not tell you why they missed work?
25      A.  Generally they don't come back.

88 (Pages 346 - 349)

1    Q.   Generally they don't come back.  Okay.
2    You don't -- It sounds like you don't recall any
3    situations where somebody was just gone for a
4    few days and then --
5         A.   I don't recall that.
6         Q.   Okay.
7         A.   I mean, usually everybody -- anybody
8    that's been with us a long time tells us that
9    something happened.
10        Q.   Gotcha.  Okay.
11             (Exhibit 45 was marked for
12        identification by the reporter.)
13        Q.   Mr. Nunes, you're being handed a
14   document that's been marked as Defendants'
15   Exhibit 45.  Do you recall a gentleman named
16   ███████████████?
17        A.   No, I don't.
18        Q.   Okay.  If I were to tell you that your
19   records indicate that he was an employee at
20   NuStar at one point in time, would -- would
21   that -- well, I'll tell you what, I'll just
22   represent your records indicate that he was an
23   employee at NuStar at one point in time.
24        A.   Okay.
25        Q.   Okay?  So we found this docket on the

1    clerk of Osceola County's website.  And you look
2    down here, and it says in paragraph 2 of this
3    motion for a bench warrant "That on
4    September 6, 2018, ICE picked up the Defendant
5    from the Osceola County Jail to initiate removal
6    proceedings against the Defendant."  Do you see
7    that?
8         A.   That's what it says.
9         Q.   Okay.  So it seems like a then former
10   employee of NuStar was not in the country
11   legally because that person would be deported;
12   right?
13             MR. BISS:  Object to the form.
14        A.   I'm going to go with no, because he was
15   picked up by ICE.  Did he violate his residency
16   by doing a felony?  I don't know.  I don't know
17   what that means.
18        Q.   Gotcha.  So it could have been some
19   other reason, like maybe he was allowed to be in
20   the country but then something happened and he
21   had to be removed?
22        A.   Yeah, because -- Well, we should have
23   the records; right?  Do we have the records
24   here?
25        Q.   What, for --

1    A.   Do you have the records for this
2    gentleman?  You said he was employed here.
3         Q.   Yeah.  We have it somewhere, his I-9.
4         A.   Yeah.  Do you have that?
5         Q.   I think so.
6         A.   Let me see who this is.  How long was
7    he employed for?
8              (Exhibit 46 was marked for
9         identification by the reporter.)
10        A.   Yeah, so we have his ID ███████.
11        Q.   Okay.  Are you looking for where he is
12   on --
13        A.   Yeah.  Where -- When he was employed.
14   Am I missing him somewhere on this sheet?
15   Anyways --
16        Q.   Anyways --
17        A.   I guess it really doesn't matter
18   because, you know, you asked if I knew that he
19   was illegal and he was picked up there.  I have
20   his -- both his Social Security card and his
21   permanent resident card.  And from what this
22   says, he was picked up by ICE.  He could have
23   violated; right?
24        Q.   Gotcha.
25        A.   I don't know.

1    Q.   Sure.  Makes sense.  But while we're
2    looking at his Social Security card and
3    permanent resident card, I noticed on his Social
4    Security card the printing of ██████ is
5    spelled ████████  Do you see that?
6         A.   Okay.
7         Q.   And you see that same spelling at the
8    top of his permanent resident card, spelled
9    ██████████████ right?
10        A.   Okay.
11        Q.   But then he signed it ██████████
12   And that's the name he wrote on his I-9 form
13   too; right?
14        A.   I would assume he knows his name best.
15        Q.   All right.  So this is another instance
16   in which the printed name --
17        A.   I don't -- I don't think that's --
18   Sorry.  Go ahead.
19        Q.   Okay.  This is another instance in
20   which the printed name on the documents that
21   were presented by the prospective employee did
22   not match the name that that employee wrote and
23   signed; correct?
24        A.   That's not necessarily true.
25        Q.   Okay.

Page 354

1    A. I wouldn't say that.
2    Q. How is it --
3    A. I mean, you're -- you're assuming that
4  these -- that he -- he's signing his name
5  incorrectly. Once again, he -- he filled this
6  out. We did not. We have his cards. His
7  numbers verified. Everything matches.
8    Q. Yeah. I'm not assuming --
9    A. We legally did what we were supposed to
10  do.
11    Q. I'm not assuming he signed his name
12  incorrectly. I'm just pointing out that his
13  name as printed on these purportedly
14  government-issued cards doesn't match the way he
15  spells his name; right? You see that; right?
16  He spells it differently than the way it's
17  printed on the Social Security card.
18    A. Yeah, it's --
19    Q. Right? I take it you didn't see that
20  when you were looking at the documents?
21    A. I didn't see it.
22    Q. Okay.
23    A. Nor do I think I legally could ask
24  questions like that.
25    Q. You wouldn't -- So in other words, even

Page 355

1  if you had seen it, you wouldn't have been able
2  to follow up and say --
3    A. I can't do -- My hands are tied.
4    Q. Got it.
5    A. I'm not going to go to jail.
6    Q. We talked -- mentioned briefly earlier
7  Devin Nunes having filed a lawsuit against
8  Hearst as well. I want to pick up on that. You
9  know that Devin filed a lawsuit against Hearst
10  and Lizza before NuStar did; correct?
11    A. No, I don't know that.
12    Q. You don't know that? Okay. Do you --
13  Do you know --
14    A. He -- He files lawsuits. I don't
15  follow it.
16    Q. Okay.
17    A. I don't watch that stuff. I'm not
18  political. I don't watch any of that stuff.
19  I've got so many other things to do, I don't
20  have time to follow everything that goes on.
21    Q. Gotcha. Well, did you ever talk with
22  him --
23    A. We've never -- I've never politically
24  donated to anything. I've never did any sort of
25  that. I'm not part of any Republican club or

Page 356

1  Democrat club or any organization of the sort.
2    Q. Got it.
3    A. Never donated money. I don't pay
4  attention to it. I don't know.
5    Q. Got it. Well, the idea to file this
6  lawsuit, your lawsuit, that is, against Hearst
7  and Mr. Lizza, am I correct that that idea came
8  from Devin Nunes? Right?
9      MR. BISS: Object to the form.
10  Asked and answered.
11    A. No.
12    Q. No? Okay. Well, I mean, you're
13  obviously using the same defamation lawyer that
14  Devin Nunes uses in his defamation suits, namely
15  Mr. Biss right here; right?
16      MR. BISS: If it's obvious, why
17  do you need to ask him?
18    Q. Well, did you know Mr. Biss before --
19  How did you get introduced to Mr. Biss? Let me
20  start there.
21    A. I don't know.
22    Q. You don't know?
23    A. I don't know. Honestly, I don't know.
24    Q. Okay. How long --
25    A. I don't know if you contacted me -- I

Page 357

1  don't know if he contacted us or -- I'm not
2  sure.
3    Q. For how long have you known Mr. Biss?
4    A. I don't recall.
5    Q. You don't recall?
6    A. I don't know.
7    Q. Okay.
8    A. For a while.
9    Q. For a while? Okay.
10    A. Yeah. I don't know.
11    Q. Did you --
12    A. A year.
13    Q. Did you learn --
14    A. Two years.
15    Q. Did you learn of -- it was after the
16  article ran in Esquire that you met Mr. Biss;
17  right?
18    A. That's correct.
19    Q. Okay. Have you spoken with Devin about
20  your parallel lawsuits against Hearst?
21    A. Parallel lawsuits?
22    Q. Both of you have sued Hearst over the
23  same article; right?
24    A. That's what you're telling me.
25    Q. Right. You have no --

90 (Pages 354 - 357)

Page 358

1    A.  I don't really -- I don't know what he
2  does.  I don't know what that is.
3    Q.  Okay.  Okay.  Well, have you spoken to
4  him about your lawsuit?  Let's start there.
5    A.  No.
6    Q.  Never?
7    A.  I don't -- I -- I don't recall talking
8  to him about this lawsuit.
9    Q.  Okay.  Do you ever text him or write to
10  him about it?
11    A.  No.
12    Q.  Never?  Okay.  So set aside
13  conversations with Mr. Biss, which I don't want
14  to know about.  Prior to filing this lawsuit did
15  you talk to anybody else about filing the
16  lawsuit?
17    A.  My father.
18    Q.  Okay.  Great.  So --
19    A.  And Lori.
20    Q.  All right.  Great.  And tell me about
21  those conversations.  What did you discuss?
22    A.  That -- That we're tired of getting
23  beat up by -- for -- for political reasons.
24  We're tired of getting beat up in -- just
25  bad-mouthed every direction we turn.  We get

Page 359

1  crazy phone calls.  People want to, you know --
2  it's just crazy what happens, and I'm tired of
3  it.  I don't want to deal with this.
4         You know, if you guys want to
5  play political games, go play it, but don't play
6  with us.  I don't want to have no part of it.  I
7  milk cows, and that's what I do.  I work every
8  day all day.
9    Q.  Okay.
10    A.  And that's all I want to do, is do my
11  job, do my part, be a productive person.
12    Q.  Okay.  So then the three of you talked
13  about filing a lawsuit as a result of it?
14    A.  That's correct.
15    Q.  And what are you hoping to get out of
16  this lawsuit?
17    A.  I'm hoping that this never happens to
18  anybody else.  I can't believe that he would go
19  to Hoyer, that they would write about -- Ryan
20  Lizza would write about Hoyer -- his wife just
21  come back -- their son died, killed himself.  He
22  was mentally -- he was already mentally
23  challenged, a little bit slow, and then they go
24  and write about this.  Why?  Why would you do
25  that to somebody?

Page 360

1         Why would you come to somebody's
2  community and just -- just bad-mouth everything
3  that goes on just because you want to be
4  political?  It has nothing to do with Devin.
5  Devin has nothing to do with the farm.  He
6  doesn't have -- he -- he doesn't even hardly
7  come and see us.  So why would somebody come and
8  say that about these poor people?
9    Q.  Okay.
10    A.  Why would somebody be able -- why --
11  how can somebody with -- with no involvement get
12  totally brutalized and -- and beat up and have
13  people call and call and call and call, saying,
14  "Oh, you're in the news.  Oh, you're in the
15  news."  Oh, I have to explain myself.  I've got
16  to explain myself to everybody.  "Oh, you're
17  so-and-so.  I heard about you."
18         It's -- It's -- Totally get
19  demolished.  And against our peers and
20  everything else.  I go to a meeting, and it
21  comes up constantly.
22    Q.  Okay.
23    A.  I don't ever want this to happen to
24  anybody else ever.  I don't care about money.  I
25  really care less about money, about anything.

Page 361

1  What I care about is doing right, be the light,
2  be the good, and God will take care of me.  I
3  love God.  First I take care of what I'm
4  supposed to do, God will take care of me.
5    Q.  Tell me about the meeting you just
6  mentioned.  What's the meeting that it came up
7  at?
8    A.  It -- We were at -- Where was it?  I
9  don't know if it was at the Midwest Dairy
10  meeting that that come up.  I don't know if
11  Mr. Feuerhelm mentioned that.  I don't recall
12  exactly.  I think that was the meeting.
13    Q.  Okay.  Tell me everything you remember
14  about the -- this conversation at that meeting.
15    A.  I told you.  They bring it up.
16    Q.  Well, who brought it up?
17    A.  "Oh, you're Devin" -- oh, then, you
18  know, they say, "Oh, yeah, the hit piece."
19  Everybody brings it up.
20    Q.  Okay.  What -- So who brought it up
21  first?  It sounds like you don't recall who
22  brought it up.
23    A.  I think -- I do believe Mr. Feuerhelm
24  may have brought it up.  I don't recall.
25    Q.  Feuerhelm is the guy that's spelled

91 (Pages 358 - 361)

1   F-U-E-R --
2       A.  I don't know how to spell his name.
3       Q.  Okay.  Got it.  What did Mr. Feuerhelm
4   say?
5       A.  You know, that -- that Devin is doing a
6   great job and tell him to keep it up.
7       Q.  Okay.  What else did he say?
8       A.  That's it.
9       Q.  That is the total of what Mr. Feuerhelm
10  said to you about this issue?
11      A.  I just told you that he says -- I do
12  believe he said it, so do you want me to recall
13  every instance that somebody brought this up and
14  said, "Oh, hey, I heard you were in the news"?
15  Oh, it just keeps popping up over and over and
16  over again.  Do you want all these instances?
17  Because I could probably pull them up since we
18  have 14 years' worth of documents and you guys
19  have nothing.  I could probably pull up more
20  stuff, if you want, but --
21      Q.  Well, what would you be pulling up?
22      A.  Well, just -- You want me to get people
23  to come in and testify?
24      Q.  Well, put that aside.  Let's take it
25  bit by bit.  Okay?  Let's start with this

1   conversation with Mr. Feuerhelm in which
2   Mr. Feuerhelm says --
3       A.  He said he was doing a great job, you
4   know, keep up the good work, he gets the crap
5   beat out of him, you know, everything that
6   happens is -- is all political, they try to beat
7   everybody up.
8       Q.  Right.  Okay.  So what did he think of
9   the article?  Did he say anything about the
10  article?
11      A.  I don't recall exactly that.
12      Q.  Okay.  So you don't recall what he said
13  about the article itself?
14      A.  I just know it comes up.  I -- I tune
15  it out anymore.  I can't handle it.  It just --
16  It stresses us out.  We can't handle --
17  everybody comes towards us and just constantly
18  brings it up.
19      Q.  Okay.  So while we're on the topic, why
20  don't we continue exploring this, instances in
21  which this has been brought up to you.  Okay?
22  Who else has discussed with you the article?
23  Start there.  Start broad.
24      A.  We've had a lot of phone calls.
25      Q.  Okay.  A lot of phone calls.  Tell me

1   what you remember.
2       A.  Peers.  Peers, just other people -- we
3   go to volleyball games or games like that,
4   people will bring it up.
5       Q.  Okay.  Let's start with peers.  Who are
6   the peers?
7       A.  Other dairymen.
8       Q.  Which other dairymen?
9       A.  A lot of them.
10      Q.  Okay.  Can you provide me with names of
11  any other dairymen who brought this up?
12      A.  There is a lot.
13      Q.  Do you recall the names of other
14  dairymen who have brought this up?
15          THE WITNESS:  I've got a
16  question.  Do I have to answer all of -- say
17  every single one that's ever did -- said
18  something?  I mean, it's just peers.
19          MR. BISS:  Just do your best to
20  answer his question.
21      A.  Mr. Dykstra said something about it.
22  Van Ess has said something about it.  There
23  was -- Westra said something about it.
24  Ysselstein said something about it.  There was
25  the guys in Michigan said stuff about it.

1   Higgins, they called and they said something
2   about it.  There was Colorado, they called.
3   Wilgenburg, they called and they said something
4   about it.  Friends from California called and said
5   something about it.  Our heifer yard said
6   something about it.  Those guys that run the
7   heifer yard, Tulses.  There was -- Let's see.
8   Who else?
9           A guy down in Florida said
10  something about it, runs North Florida
11  Holsteins.  He said something about it.  I don't
12  remember if the guys from New York said anything
13  about it.  I think Wag said something about it.
14  The creamery said something about it.  The
15  hay -- The guy that runs the hay auction said
16  something about it.  The people at church said
17  stuff about it.  The guys I have coffee with
18  talked about it.
19      Q.  Okay.
20      A.  Do you want me to go on more?
21      Q.  Well, look, it is relevant to just know
22  anything that's out there in terms of people
23  raising concerns or points with you about this
24  in the community.  So yeah, if there's anybody
25  else you remember, I'd love to hear it.  Anybody

Page 366

1 else?
2    A. There's a lot. I don't even know where
3 to --
4    Q. Okay.
5    A. You could ask me in my personal one
6 more.
7    Q. Ask -- I'm sorry, say that again.
8    A. You can ask when I have to do a
9 personal deposition more.
10    Q. Okay. You might remember more at that
11 point in time.
12    A. There's a good possibility.
13    Q. Okay. Let's talk about what we've got
14 so far here. There's Dykstra. What did Dykstra
15 say to you about it?
16    A. That it was a political hit piece. But
17 we already talked about that.
18    Q. Got it. Anything else you recall about
19 that conversation?
20    A. Nope.
21    Q. What about Van Ess? What did he say?
22    A. Same thing. He come and help us,
23 because he knew that it was all BS.
24    Q. Help you how?
25    A. Help put up signs to make sure nobody

Page 367

1 comes on the dairy. Because after it was ran
2 there was -- all kinds of people started showing
3 up at the dairy. People driving on the dairy.
4 You could see it on the cameras.
5    Q. Got it. Okay. And did he -- did he go
6 help put up signs for you?
7    A. Who?
8    Q. Van Ess.
9    A. That's what I said.
10    Q. Okay. Well, yeah, you said he offered
11 it. Did he do it as well?
12    A. Yeah. He was there.
13    Q. Okay. Okay.
14    A. Because he knew it was -- it's all bad
15 news.
16    Q. Okay. Did he say -- Do you recall
17 anything else that he said?
18    A. I don't recall at this point.
19    Q. What about Wes --
20    A. Johnny Westra.
21    Q. Say it again.
22    A. Westra.
23    Q. Westra. Okay. Yep.
24    A. He said he read it.
25    Q. Okay. What did he say?

Page 368

1    A. That -- That he supports us. It's all
2 political.
3    Q. Okay. I think Ysselstein. Is that the
4 next one?
5    A. Shep Ysselstein.
6    Q. Yep.
7    A. Yeah, he read it.
8    Q. And?
9    A. He just said he read it.
10    Q. Did he say anything else?
11    A. I don't recall.
12    Q. Okay. You said guys in Michigan, and
13 then I think you said Higgins. Are those the
14 same --
15    A. Yeah. Yeah. Jeremy Higgins.
16    Q. Got it.
17    A. He read it.
18    Q. What did Jeremy Higgins say?
19    A. Supported us.
20    Q. Said it was a hit piece?
21    A. Yes.
22    Q. Anything else?
23    A. Not that I recall.
24    Q. Okay. Colorado. You said something
25 about Colorado.

Page 369

1    A. Wilgenburg.
2    Q. Rosenberg in Colorado?
3    A. Wilgenburg.
4    Q. I'm sorry, say it again.
5    A. Wilgenburg.
6    Q. Wilgenburg. Okay. What did Wilgenburg
7 say?
8    A. Just it was a political hit piece.
9    Q. Got it. I think you said friends from
10 California was the next one; right?
11    A. Yeah.
12    Q. Okay. Which friends?
13    A. There's just -- There's all the farmers
14 that we've always been friends with forever.
15    Q. Got it. And is there sort of a way to
16 sum up what they were saying about it?
17    A. Same thing. Political hit piece.
18    Q. Okay. The heifer yard?
19    A. Yep. Tulses.
20    Q. Tulses?
21    A. Yep.
22    Q. What did they say?
23    A. Just a hit piece, political hit piece.
24    Q. Anything else they said?
25    A. Nope.

93 (Pages 366 - 369)

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 370

1  Q.  Guys down in Florida I have next.
2  A.  Western -- Yep.  Steve.  Geez, you're
3  putting me on the spot.  I can't remember names
4  like that.
5  Q.  Okay.  What did -- What did this person
6  in Florida say?
7  A.  Same.  Said it was a political hit
8  piece.
9  Q.  Same thing.  And the holsteins, did
10  they say the same thing?
11  A.  That's the same thing.  That's the same
12  thing.  It's the same -- He runs the facility.
13  Q.  Got it.  Got it.  Okay.  So you recall
14  him saying political hit piece and supports you.
15  Do you recall anything else?
16  A.  No.
17  Q.  Guys from New York, what do you recall
18  about --
19  A.  No.  I said I don't think any of those
20  guys called me, I said.
21  Q.  Gotcha.  So we'll cross them out.
22      Then the last one I think I have
23  is Wag?
24  A.  Yeah.  Wag is north of us.
25  Q.  Got it.

Page 371

1  A.  Neighbors.
2  Q.  And what did they say?
3  A.  Same thing.  Political hit piece.
4  Q.  Kristen pointed out one or two that I
5  might have -- oh, by the way, just to close the
6  loop with Wags, do you remember anything else
7  they say?
8  A.  No, I don't remember.
9  Q.  Okay.
10  A.  I just --
11  Q.  Hay auction.  People at the hay
12  auction?
13  A.  Um-hum.
14  Q.  What did they say?
15  A.  Yeah, just said he -- he heard about
16  the -- about it and said it's just a political
17  hit piece.  He said don't worry about it, they
18  support us.
19  Q.  Got it.  The creamery.
20  A.  Yep.  Somebody at the creamery.
21  Political hit piece.  Supported us.
22  Q.  People at church.  Okay.  So first of
23  all, how many people at church were making this
24  point to you?
25      Strike that.

Page 372

1      How many people at church were
2  discussing this with you?
3  A.  All the farmers.
4  Q.  All the farmers at church?
5  A.  Yeah.  Other people.  Business people,
6  bankers.
7  Q.  Business people, bankers?
8  A.  Um-hum.
9  Q.  Okay.  Tell me everything you remember
10  about those conversations.
11  A.  Just -- It's always been positive.
12  They always said -- said it's a political hit
13  piece, we support you.  Everybody has been
14  really positive.  It was always positive towards
15  us.
16  Q.  So guys you have coffee with.  My first
17  question, is this coffee at The Lantern?
18  A.  No.
19  Q.  Oh, no?  You don't do The Lantern?  It
20  has good coffee.  I went there, you know, once
21  before.  But in any event, regardless of where
22  you have coffee, what about the guys you have
23  coffee with?  What was their reaction?
24  A.  They supported me.
25  Q.  It sounds like you had a lot of

Page 373

1  positive reactions from members of the
2  community.  Is that about right?
3  A.  They surrounded us, knowing it was a
4  political hit piece.
5  Q.  And they supported you; right?
6  A.  That's correct.
7  Q.  Gotcha.  They didn't think less of you
8  because the article came out; right?
9      MR. BISS:  Object to the form.
10  A.  So if all those people know, how many
11  other people didn't say anything?  There's a lot
12  of other people.  So if they all know and go
13  "Don't worry, we support you," how about all the
14  other people that are "Oh, my gosh, I don't
15  really know them, but how bad -- what are they
16  doing there?"
17  Q.  Gotcha.  Okay.
18  A.  So if I'm going to take all those
19  people that surrounded us and said, "Hey" --
20  friends of ours, said, "Hey, don't worry, we
21  support you, you're good," how many other people
22  were negative towards us --
23  Q.  Okay.
24  A.  -- in our -- in my dairy industry?
25  Q.  Tell me that.  Tell me about that.

94 (Pages 370 - 373)

Veritext Legal Solutions

800-567-8658                                973-410-4098

Case 5:19-cv-04064-CJW-MAR   Document 156-6   Filed 06/02/23   Page 95 of 105  App. 216

Page 374

1    A.   And my neighbors, you know.
2    Q.   Okay.  So tell me about that.  What
3  about people who were, as you said, negative
4  towards you?
5    A.   I'm just saying, I don't -- nobody ever
6  confronted me.  Nobody has -- Nobody will come
7  up and confront you usually negatively besides
8  crazies calling on the phone all the time, where
9  we had to do away with the phone.  They
10  called -- called my house, my 6-year-old answers
11  the phone, and they go all crazy on them and
12  they hang up.  I mean, that's unacceptable
13  behavior.  You can't have that.
14    Q.   Who called you?
15    A.   I don't know.
16    Q.   It was just some crazies; right?
17    A.   They called and they knew -- after that
18  article came out they would call us constantly.
19    Q.   Yeah.  Okay.  And I think we've had a
20  handful of voicemails or answering machine
21  messages that have been produced to us.  I take
22  it you got a handful of calls; right?
23    A.   A handful?
24    Q.   A lot of them?
25    A.   I would call it more than a handful.

Page 375

1    Q.   Okay.  So do you know who called?
2    A.   We got cards saying, you know, that --
3  about Devin and -- what does Devin have to do
4  with us?
5    Q.   Do you know who made the calls?
6    A.   Absolutely not.
7    Q.   Do you know if they -- Do you know
8  where they're from?
9    A.   I don't know.  Capitol police might.
10    Q.   I'm sorry, capitol police?
11    A.   Yeah.
12    Q.   Okay.  Explain that to me.
13    A.   Well, when you start getting threats
14  like that, the capitol police have to know.
15    Q.   Got it.  So it's ultimately been
16  reported to --
17    A.   Yeah.  We got a death threat here not
18  too long ago.
19    Q.   You got a death threat?
20    A.   Yes.
21    Q.   And how long was --
22    A.   My father did.
23    Q.   Okay.  Tell me about that death threat.
24  Like how -- was it by phone or was it by e-mail,
25  or what?

Page 376

1    A.   They called and left a message --
2    Q.   Okay.
3    A.   -- at my brother's office saying, "I
4  know where your family is."
5         And they specifically -- I do
6  believe they specifically said my dad.
7    Q.   Okay.
8    A.   So then the county sheriff was
9  notified.
10    Q.   Do you know -- I take it you don't know
11  who left that death threat at your brother's
12  office; right?
13    A.   No, I don't -- I don't know.
14    Q.   Okay.  I'm sorry, just going back, I
15  think I missed -- you said you -- perhaps this
16  is in the positive bucket, but I don't know, you
17  tell me.  You said people were talking about it
18  with you at volleyball games too; right?
19    A.   Yeah.
20    Q.   Okay.  So tell me --
21    A.   They're just random people that we know
22  that go, "Hey, it was a political hit piece.  We
23  support you."
24    Q.   Okay.  Anything else you remember about
25  those conversations?

Page 377

1    A.   No.
2    Q.   Have you made any attempts -- So now
3  we're talking about the phone calls that you
4  received or were received at your brother's
5  office.  Have you made any attempts to contact
6  any of those persons?
7    A.   Why would I?
8    Q.   I'm not saying you probably would.
9    A.   That's unhealthy.
10    Q.   I wouldn't expect you to, but I just
11  wanted to check.
12    A.   But I can tell you one thing, that --
13  that they better not show up at our place.
14    Q.   Or what?
15    A.   The sheriff will have them, just like
16  the people that showed up with all their signs
17  and the sheriff caught them.
18    Q.   What were those signs?
19    A.   They're signs of the guy running
20  against my brother.  They showed up over at
21  my -- at our dairy this year.  This year?  Last
22  year?  When was that?  When did they run?
23    Q.   It would have been 2020.
24    A.   Yeah.
25    Q.   So they put political signs up for the

95 (Pages 374 - 377)

1　candidate who was running against your brother
2　for congress?
3　　A.　Yeah.
4　　Q.　Okay.
5　　A.　There were signs.
6　　Q.　And then they were ultimately arrested;
7　right?
8　　A.　Well, yeah.  Because my neighbor seen
9　them.
10　　Q.　All right.  So any other -- any other
11　evidence of harm to NuStar's reputation that you
12　are aware of other than everything we've talked
13　about right now?
14　　A.　Just they defamed our name.  And we
15　can't do that amongst peers.
16　　Q.　Got it.  Okay.  Let's circle back, go
17　to something a little different, circle back to
18　something we were talking about earlier, just to
19　make sure I understand it.  Am I correct that
20　NuStar sells almost all of its milk to a
21　cooperative which currently is called --
22　　A.　It's not a cooperative.
23　　Q.　Oh, I'm sorry, what is it?  It's a --
24　Agropur is the name of it; right?
25　　A.　That's correct.

1　　Q.　Okay.  What -- What do you call
2　Agropur?  It's not a cooperative.  What is it?
3　　A.　No.  It's just a creamery.  A milk
4　company.
5　　Q.　Just a creamery.  Oh, is that the
6　creamery you were talking about earlier?
7　　A.　I -- I don't know.  Refresh my memory.
8　　Q.　I'm sorry.  A few minutes ago we were
9　talking about the various conversations you had
10　with people in the community; right?
11　　A.　Yeah.  Yes.
12　　Q.　You mentioned creamery; right?
13　　A.　That's correct.
14　　Q.　That was Agropur; right?
15　　A.　That's correct.
16　　Q.　Gotcha.  So you had conversation with
17　somebody at Agropur?
18　　A.　Yes.
19　　Q.　Okay.  And if I recall correctly, they
20　support you and it was a hit piece; right?
21　　A.　That's correct.
22　　Q.　And you continue to do business with
23　Agropur to this day; right?
24　　A.　That's correct.
25　　Q.　You sell all your milk to them; right?

1　　A.　That's correct.
2　　Q.　And there's been no deviation in your
3　sale of milk.  Like in other words, they haven't
4　stopped taking milk as a result of the hit -- as
5　a result of the, as you call it, hit piece;
6　right?
7　　A.　That's correct.
8　　Q.　And NuStar's revenue, am I correct that
9　the main driver -- actually, I want to look at
10　this.  Give me a second.  I can ask a better
11　question.  I'm trying to cut through some stuff.
12　　　　Okay.  NuStar, what -- what other
13　effects have there -- Let me strike -- Let me
14　ask it again.  I'm sorry.  I'm stumbling.  Give
15　me a second.
16　　　　I think I have in my notes here
17　that NuStar derives approximately 98 percent of
18　its milk income from sales to previously
19　Davisco, now Agropur; right?  Is that correct?
20　　A.　98 percent of our sales come from milk.
21　　Q.　Right.
22　　A.　That's correct.
23　　Q.　Which -- Okay.  Got it.
24　　A.　I do -- I mean, most of it.  I mean,
25　the only thing is -- would be beef, so there

1　would be a small percentage.
2　　Q.　NuStar's profits haven't suffered after
3　the article; right?
4　　A.　That -- but we're on a federal --
5　we're -- that goes off of -- yeah, that -- that
6　doesn't affect our profits because it goes off
7　of the federal order.
8　　Q.　Tell me, what do you mean by that, the
9　federal order?
10　　A.　The federal order is designed --
11　government designed to -- it -- there's --
12　there's a bunch of orders.  I don't know
13　exactly.  It's very complicated.  We get paid
14　how we get paid.
15　　Q.　Got it.  It's --
16　　A.　It goes off the board.  Utilizations of
17　Class 1, 2, 3, and 4 milk.  There's -- There's
18　utilization, and it depends on your -- your
19　location.  And there's a whole bunch that goes
20　into it.
21　　Q.　Got it.
22　　A.　You want to get into milk marketing?
23　　Q.　I think -- I think we're about to right
24　now.
25　　A.　If you want to, let's do it.

1  Q. Let's -- All right.
2  A. It's pretty complicated.
3  Q. I don't --
4  A. We're going to be here for days.
5  Q. All right. We're going to do the very
6  brief synopsis. Let me make sure I -- Let me
7  get the high-level point, and then you can fill
8  me in. Okay? It sounds like there's a lot of
9  factors that are basically dictated by the
10 government as to what the price of milk may be
11 or --
12 A. It goes off the board.
13 Q. It goes off the board. Now, tell me
14 what it means by "it goes off the board."
15 A. CME.
16 Q. CME. Okay. Now tell me what CME is.
17 A. Chicago Mercantile Exchange.
18 Q. Yes. There we go. So when you say
19 "the board," you mean the Chicago Mercantile
20 Exchange?
21 A. Yes.
22 Q. I follow you now. I've heard an
23 acronym CWT. What's CWT?
24 A. I don't know.
25 Q. It's like the measure of the weight of

1  milk or something.
2  A. Okay. Yeah. 100 weight.
3  Q. 100 weight, yeah, there you go.
4  A. That's also other stuff that says CWT.
5  Like there's organizations, there's other stuff.
6  Q. Sure.
7  A. Anyways, so yes, it's the measurement
8  of milk. Yes. Everything is sold in 100 pounds
9  of milk.
10 Q. Got it. Got it. Give me one second,
11 because I may be able to cut through even more
12 things.
13     I think I saw in your -- in your
14 income statements that NuStar's revenue from the
15 sale of market -- from the sale of milk, excuse
16 me, has increased over the last couple years; is
17 that right?
18 A. That just has to do with the federal
19 order -- or with the CME.
20 Q. Oh, gotcha. It's all dictated by those
21 factors, basically?
22 A. Right.
23 Q. Okay.
24 A. It's not independent. It's not -- I
25 don't -- you don't sell like -- I don't -- you

1  don't sell, "Oh, okay, well, how much do you
2  want to give me?" I'm not selling a pig.
3  Q. Got it. Give me a second.
4     MR. BOYER: Actually, what might
5  be efficient is we might be -- we might be
6  getting close to being able to wrap, but I just
7  want to check my notes and see what else I may
8  be missing, what else we need to cover. Do you
9  want to take a very brief break and see where we
10 go from there?
11    MR. BISS: It's up to you.
12    THE WITNESS: It's up to you,
13 man.
14    MR. BISS: I mean, if you need
15 five, ten minutes, we'll -- for you to figure
16 that out, we'll sit in the other room and just
17 somebody come in and get us when you're ready.
18    MR. BOYER: That sounds fine. So
19 let's go off the record.
20    THE VIDEOGRAPHER: We are going
21 off the record. This is the end of Media Number
22 5. The time is 5:48.
23    (A recess was taken.)
24    THE VIDEOGRAPHER: We are back on
25 the record. This is the beginning of Media Unit

1  Number 6. The time is 6:04.
2  Q. Mr. Nunes -- Mr. Nunes, do you have a
3  Twitter account?
4  A. I did.
5  Q. You did? Okay. When did you have a
6  Twitter account?
7  A. I don't recall. For a short period of
8  time.
9  Q. Okay. When -- Like do you recall
10 approximately when you would have had the
11 account?
12 A. 2016, maybe.
13 Q. Okay. And then you dropped it?
14 A. After they kept -- After -- I just
15 never used it.
16 Q. Gotcha. Okay. You never used it, so
17 then you canceled your account; right?
18 A. Yeah.
19 Q. Okay. Did you cancel it in 2016 or
20 2017?
21 A. No. It would have been in '19, maybe.
22 '18, '19.
23 Q. Oh, okay. And was it --
24 A. '19.
25 Q. Was it an anonymous account, or were

Page 386

1   you sort of out there as, you know, saying,
2   "Hey, I'm Anthony Nunes"?
3       A.  I don't remember my name.  I don't
4   know.  I try not to put my name out there.
5       Q.  Got it.  Okay.
6       A.  Because if we do, then they're -- they
7   just get bombarded with stuff.
8       Q.  Got it.  But you weren't putting your
9   name out there at any point that you had a
10  Twitter account?
11      A.  I don't know if that -- I don't
12  remember if my Twitter account name -- I don't
13  remember if it was Anthony Nunes.  I think -- I
14  think it was, but after -- after the article
15  ran, I couldn't have my name on hardly anything.
16  Like I have a Facebook account, but I have to
17  lock it down like I'm an 8-year-old because
18  people started -- after that people started
19  getting on and saying stuff.
20      Q.  Okay.  So let's talk about that
21  Facebook account first.  You said people started
22  getting on and saying stuff.  You mean they
23  would comment on your -- on your Facebook page?
24      A.  Yeah.
25      Q.  Okay.  Who would comment?

Page 387

1       A.  I don't know who they are.  I don't
2   know who they are.  They'd get on and say
3   negative things towards Devin.  They said, "Oh,
4   that's a nice picture," or something.
5       Q.  Oh, got it.  Okay.  So they would be
6   commenting on Devin on your Twitter account;
7   right?
8       A.  Not on Twitter.
9       Q.  Excuse me.  I'm sorry.  On your
10  Facebook account?
11      A.  That's correct.
12      Q.  Okay.  Back to Twitter, we've had a lot
13  of links to and screenshots of tweets that have
14  been produced to us in this case.
15      A.  Okay.
16      Q.  Okay?  First of all, are you aware of
17  those tweets that have been produced to us?
18      A.  In this case?
19      Q.  In this case, yeah.
20      A.  They're -- I don't -- I don't know.
21  They're from us?
22      Q.  Yeah.
23      A.  They're from us?
24      Q.  They're from -- It wouldn't surprise me
25  if Mr. Biss gathered them, but put that aside.

Page 388

1   Yes, it was produced by Plaintiffs in this case.
2       A.  They come from our account, or what?
3       Q.  No.  I'm sorry.  Let me be clear.
4   These are third-party tweets --
5       A.  Okay.
6       Q.  -- which seem to somehow relate to the
7   issues in the article or yourselves that have
8   been produced to us.
9       A.  That's correct.
10      Q.  Okay.  Are you -- Have you seen those
11  tweets?
12      A.  Yeah.  I try not to look at that stuff.
13  I don't want them to -- I don't need to help in
14  any way, shape, or means to encourage any more
15  usage by people looking at it; right?
16      Q.  Gotcha.  Okay.
17      A.  But what was interesting when I did
18  delete my account was I had only two retweets.
19  I don't have hardly any friends.  I only
20  follow -- followed a small group and -- like
21  four or five people, I think.  I don't remember.
22  But one of them, the retweet, was that story.
23  And I don't even know how to -- I would never do
24  that.  So how does that even happen?
25      Q.  I'm sorry, so --

Page 389

1       A.  I wish I took the screenshot of it when
2   I deleted the account, but I didn't.
3       Q.  Interesting.  So you're thinking
4   somebody else must have gone onto your account
5   to retweet that article?
6       A.  I wouldn't have retweeted it.  I don't
7   necessarily know how to retweet.
8       Q.  Got it.  There was a retweet from your
9   Twitter account.  You have no idea how it
10  appeared there, and you certainly wouldn't have
11  done it?
12      A.  That's correct.
13      Q.  Gotcha.  Okay.  Are you aware of who
14  was -- Let me strike that.
15          Let's go back to the third-party
16  tweets about the farm or Devin Nunes or whatever
17  after the article was published.  I take it
18  you're aware of those tweets; right?
19      A.  Yeah.  I did -- I did read some of the
20  comments.
21      Q.  Okay.  Do you know any of the people
22  that were tweeting?
23      A.  I don't know any of those people.
24      Q.  Gotcha.
25      A.  I know it's not very nice.

98 (Pages 386 - 389)

1    Q.   And you never tried -- I'm not saying
2  you should, but just to make -- make sure I have
3  a clear record, you never tried to contact any
4  of these people who tweeted?
5    A.   Absolutely not.
6    Q.   Okay.
7    A.   No advantage of trying to contact
8  people like that.
9    Q.   Got it.  Okay.
10    A.   There was a -- There was a train wreck
11  here recently in Sibley.
12    Q.   I saw the news on that.  Was everyone
13  okay?
14    A.   Yeah.
15    Q.   Okay.
16    A.   Except for they go, "Oh, I hope it's
17  next to Devin Nunes's family's dairy."
18    Q.   Who said that?
19    A.   It was comments.
20    Q.   On where?
21    A.   I don't know if it was -- I don't know
22  if it was on a local page or -- or what or if it
23  was on a Facebook or something.  The comment was
24  made.  I think one of my friends screenshotted
25  it.

1    Q.   Got it.
2    A.   It might have been on Twitter.
3    Q.   Okay.  But you -- again, you don't know
4  who posted that?
5    A.   No, I don't know who it is, but they
6  did -- they know that we're there and they're --
7  you know, wish ill upon us.  That's crazy.
8    Q.   Yeah.  Okay.  How much -- How much are
9  you going to ask a jury to award you in this
10  case?
11         MR. BISS:  Object to the form.
12    Q.   Okay.  You know you requested a jury
13  trial in this case; right?
14    A.   Yes.
15    Q.   You want to try this case to a jury;
16  right?
17    A.   That's correct.
18    Q.   What are you going to ask the jury to
19  give you?
20    A.   I don't care about money.
21    Q.   Okay.
22    A.   It's principal.
23    Q.   Okay.
24    A.   I don't want this to ever happen to
25  anybody ever.  Just because some -- maybe one of

1  their relatives is -- thinks a certain way or
2  does a certain thing doesn't mean that we are.
3  I don't want that to happen to us or anybody
4  else.  I don't care who it is.  It's horrible.
5    Q.   Okay.  Okay.  So that's the message --
6  you're not going to ask for money from the jury,
7  but you just want to prevent this from happening
8  in the future?
9         MR. BISS:  Object.
10    A.   As far as I'm --
11         MR. BISS:  Object to the form.
12  It's work product.  I'm not going to ask him --
13  I'm going to ask him not to answer that.
14    Q.   Okay.  Your attorney has instructed you
15  not to answer the question.
16         MR. BISS:  Yeah.  I mean, it
17  really -- it's really unfair.  I mean, how would
18  he know what we're going to ask the jury, you
19  know?  I don't think it's a fair question.
20    A.   I could --
21    Q.   Okay.  So your attorney --
22         MR. BISS:  Obviously we're going
23  to be asking for money damages.  We're not going
24  to be asking for any kind of injunctive relief,
25  that type of thing.  I don't think it's a proper

1  question.
2    Q.   Okay.  How does --
3    A.   As far as -- As far as I'm concerned,
4  it's principal.
5    Q.   Okay.  Fair enough.
6    A.   So however that needs to be that it
7  never happens again --
8    Q.   Okay.
9    A.   -- to anybody.
10    Q.   Has NuStar conducted any calculation of
11  its damages?
12    A.   I -- I don't -- I haven't, no.
13    Q.   Okay.  We touched briefly on the --
14  NuStar's search for documents in response to
15  document requests; right?
16    A.   Um-hum.
17    Q.   Obviously you produced thousands of
18  documents -- thousands of pages of documents,
19  which is great.  Thank you.  Just help me
20  understand like where you searched.  Okay?  Like
21  did you -- obviously you searched lots of hard
22  copy piles; right?
23    A.   That's what we have, yes.
24    Q.   Gotcha.  Did you search any e-mail
25  accounts for responsive documents?

99 (Pages 390 - 393)

App. 221

Page 394

1    A.  There shouldn't be any on -- there's
2  nothing e-mail.
3    Q.  Gotcha.
4    A.  We don't -- We don't do that.  We're
5  just a small farm.  We don't have a big
6  electronic office.  It's just paper files.  We
7  have file cabinets, and you put it in.
8    Q.  Well, as you can see, I'm a paper guy
9  too, so I respect that.  But just to kind of
10  make sure I understand, there's -- we saw one
11  e-mail account that you were e-mailing from
12  before, the NuStar Farms e-mail account; right?
13    A.  The MTC?
14    Q.  MTC, correct.
15    A.  Yes.
16    Q.  Okay.
17    A.  That's just our one account that we
18  have.
19    Q.  Any other e-mail accounts used by
20  persons at the farm?
21    A.  For -- For the farm?
22    Q.  Yes.
23    A.  No.
24    Q.  Okay.
25    A.  Nothing like that.  Just -- Just I have

Page 395

1  a gmail account that -- it's just for like
2  buying -- you know, I use my PayPal to buy
3  things so we don't get a bunch of junk e-mails
4  on the main e-mail.
5    Q.  Got it.  So in terms -- if I understand
6  what you're saying, in terms of farm business on
7  the gmail, you really just use it to buy stuff
8  so that you --
9    A.  Yeah.  It's -- It's nothing used for
10  communications whatsoever.
11    Q.  Got it.  Okay.
12    A.  I don't use it for communications with
13  business.  It's just to purchase.
14    Q.  Got it.  And then in terms of company
15  e-mail -- company e-mail accounts, NuStar
16  accounts, the only one is the one that we were
17  talking about earlier, the MTC account?
18    A.  That is correct.  Yep.  There is no
19  others.
20    Q.  And it's shared among the four of you?
21    A.  Everybody has it.
22    Q.  Gotcha.
23    A.  All -- All four of us.
24    Q.  All four of you.  Gotcha.  Okay.  And
25  then -- But you didn't search that account

Page 396

1  because you didn't think responsive documents
2  would be there; right?
3    A.  There shouldn't -- There shouldn't --
4  There's nothing on there.  We don't -- We don't
5  have anything e-mail.  We don't e-mail back and
6  forth anything.  We don't -- Everything is just
7  on paper.  It's in an office.
8    Q.  Okay.
9    A.  This is way bigger than our office is.
10    Q.  Yeah.  Bigger than ours too.
11       Okay.  So then what about text
12  messages?  Do you text about business matters
13  with your family?
14    A.  Not a whole lot.
15    Q.  Okay.
16    A.  I mean, it would just be -- if
17  anything, it would just be real basic stuff.
18    Q.  Okay.
19    A.  Just -- Just Lori.  You know, oh, we
20  need to do this or we need to do that.  Just
21  day-to-day stuff.
22    Q.  Got it.
23    A.  We're phone people.  We're not really
24  technology people.  It's real easy to call on
25  the phone.

Page 397

1    Q.  Yep.  Well, I get that.  My brother
2  cold calls me sometimes now too and I -- you
3  know, I'm now -- I'm now fully on you've got to
4  do the text in advance.  I don't appreciate the
5  cold calls.
6    A.  Yeah, no, we don't -- I don't like the
7  text messages.
8    Q.  Fair enough.  Fair enough.  Okay.  Any
9  other ways by which you guys communicate to do
10  company business?  Like do you -- do you have
11  like WhatsApp or anything like that?
12    A.  I don't know what that is.
13    Q.  Okay.  Fair enough.  Telegram?  Do you
14  guys --
15    A.  No, no telegrams.
16    Q.  No telegrams?
17    A.  Deet, deet, deet, deet, deet, no.
18    Q.  No.  Oh, my goodness.  I was actually
19  thinking of an app called Telegram.
20    A.  Oh, yeah, I have no idea.
21    Q.  Okay.  Very good.
22    A.  No -- either -- we don't do pony
23  express either.
24    Q.  No pony express?
25    A.  No.

100 (Pages 394 - 397)

1    Q.  No telegram?

2    A.  No.

3    Q.  Old-fashioned or new-fashioned?

4    A.  Right.  Just telephone mostly.

5    Q.  Telephone.  Okay.  Got it.

6         Let me ask about -- Oh, one thing

7  we were looking at when we were looking at the

8  general -- so your accountants, Genske, Mulder,

9  produced the company's general ledger to us.

10  Okay?

11    A.  Okay.

12    Q.  In the general ledger we didn't see any

13  payments to lawyers in connection with this

14  lawsuit.  Are you paying lawyers?  Is NuStar

15  Farms paying for its legal counsel in connection

16  with this lawsuit?

17         MR. BISS:  Objection.  We've

18  already gone over this.  We're not answering

19  these questions.

20         MR. BOYER:  Okay.

21         MR. BISS:  We've already

22  addressed it with the judge, so --

23         MR. BOYER:  I'm sorry, you're

24  instructing the witness not to answer?

25         MR. BISS:  Yep.

1         MR. BOYER:  Okay.  On what basis?

2         MR. BISS:  On the basis that it's

3  harassment.  It's just pure harassment.  It has

4  no bearing whatsoever on this case at all.

5         MR. BOYER:  Well --

6         MR. BISS:  None.

7         MR. BOYER:  Well, actually, on the

8  contrary, I'll explain the relevance of it.  At

9  a minimum it's relevant because my understanding

10  is that there may be somebody else who is going

11  to be testifying whose deposition we're taking

12  who has been identified as a witness in this

13  case, and I want to understand, if nothing else,

14  his connection or what the -- what's going on in

15  terms of his involvement in this case and

16  interest in it.

17         So I want to ask questions of

18  Mr. Anthony Nunes to know a little bit about the

19  connections there and what he may have to the

20  case.  Okay?  So that's the relevance.

21         Is that the only basis you're

22  instructing the witness not to answer, is you

23  believe it's harassment?

24         MR. BISS:  Yeah.  And it's not

25  relevant at all.  What you've just asked is not

1  relevant at all.

2    Q.  Okay.  Let me ask this again just to

3  make -- just to make sure we have a clear

4  record.  Let me ask -- Let me ask it very

5  bluntly to make sure we have a clear record.

6         MR. BOYER:  And if you want to

7  make your objection, so be it.  Okay?

8    Q.  Mr. Nunes, who is funding the lawyers

9  for this lawsuit?

10    A.  I have no idea.

11         MR. BISS:  Objection.  Objection.

12  And I'm instructing him not to answer.  If you

13  want to go back to the judge on this, we can do

14  it.  I'm not going to let you engage in these

15  stunts at all.

16    Q.  Got it.  All right.  I saw one general

17  ledger payment for Joe Feller for $500.  Okay?

18  So I guess Mr. Feller got paid $500, but we saw

19  no general ledger payments to Mr. Biss.  Does

20  NuStar -- Let me ask this.  Does NuStar

21  typically pay its attorneys for their counsel?

22  Like it pays them whatever their hourly rates

23  are; right?

24    A.  It depends on the situation.

25    Q.  Sometimes you take things on a

1  contingency fee basis?

2    A.  It depends on the situation.

3    Q.  Okay.  So sometimes NuStar has paid

4  outside counsel; right?

5    A.  Yes.

6    Q.  I imagine Blaser at the Brown Winick

7  firm has an hourly rate that he charges.

8    A.  I'm pretty sure this building isn't

9  free.

10    Q.  Absolutely.  That coffee costs

11  something.  And big conference rooms cost

12  something.  I can attest to the fact as in-house

13  counsel that outside counsel will charge you for

14  sure.

15         But the point is that NuStar has

16  paid for counsel in other situations, but NuStar

17  is not paying for the -- its counsel in this

18  case; right?

19         MR. BISS:  Object to the form.

20  I'm going to instruct him not to answer.

21    Q.  Okay.  Who is paying for NuStar's

22  counsel in this case?

23         MR. BISS:  I instruct him not to

24  answer.

25    Q.  And you're going to follow your

101 (Pages 398 - 401)

Page 402

1  attorney's instructions; is that right?
2      A.  That's correct.
3          MR. BOYER:  Okay.  And to be
4  absolutely crystal clear, your instruction on
5  this basis -- at this moment is on the same
6  basis as just a few questions ago, namely
7  harassment and irrelevance?
8          MR. BISS:  Absolutely.  Yep.
9          MR. BOYER:  Okay.
10          MR. BISS:  And we've already
11  addressed it with the judge, and the judge has
12  already given you his -- his free look.
13          MR. BOYER:  We've got the crystal
14  ball reading?
15          MR. BISS:  Yep.
16          (Exhibit 47 was marked for
17          identification by the reporter.)
18          MR. BISS:  Nate, do you have a
19  copy of that for me?
20          MR. BOYER:  Oh, I'm sorry.
21          MR. BISS:  Not a problem.
22      Q.  I want to talk a little bit about
23  communications that NuStar may have had with
24  members of the media over the years.  We already
25  talked earlier about NuStar giving an interview

Page 403

1  to the Dairy Star a number of years ago; right?
2      A.  That's correct.
3      Q.  That's correct.  Shortly after Ryan
4  Lizza's article came out this piece ran in The
5  Federalist.  Have you heard of The Federalist
6  before?
7      A.  I've heard of it.  I don't -- I've
8  never read any of it, I don't think.
9      Q.  Okay.  Okay.  And did you read this
10  particular article?
11      A.  I don't recall that.
12      Q.  Okay.
13      A.  I don't read a lot of any stuff that
14  deals with Devin.
15      Q.  Fair enough.  Do you know who Mollie
16  Hemingway is?
17      A.  I -- She's some kind of reporter.
18      Q.  Okay.  How do you know her, if you know
19  her?
20      A.  I just know -- just she's a reporter.
21  I don't even know who she's with.
22      Q.  Okay.  Has anyone with NuStar ever
23  spoken with her?
24      A.  NuStar?
25      Q.  Yes.

Page 404

1      A.  But who is -- who is Mollie?
2      Q.  Who is Mollie?  Well, I believe --
3          MR. BISS:  Just answer his
4  question.  Has anyone at NuStar talked to Mollie
5  Hemingway?
6      A.  No, nobody -- nobody at NuStar has.
7  No.  Sorry.
8          MR. BISS:  Okay.  There we go.
9      Q.  There you go.  Okay.  Why don't we go
10  down to -- Actually, you know what?  I'll hold
11  this.  All right.  You can actually set this
12  aside.  We don't need to go any further with
13  this one.
14          Let me ask -- Let me ask if you,
15  meaning NuStar, has spoken with any other
16  reporters.
17      A.  NuStar has not.
18      Q.  Okay.  So what about North -- I think
19  it's NWIowa.com is a local publication up there.
20  Have you spoken with anyone there?
21      A.  Absolutely not.
22      Q.  You sounded adamant.  Was that --
23      A.  Right.  Because they reran that article
24  in -- and then I had people calling me then.
25      Q.  Oh, gotcha, because they --

Page 405

1      A.  They -- They ran it in their newspaper.
2      Q.  Got it.  Okay.  How about the
3  Des Moines Register?  Did you ever speak to any
4  reporters with the Des Moines Register?
5      A.  If they actually were, I don't know.
6  They claimed they were.  They came onto our
7  facility.
8      Q.  Oh.
9      A.  And they refused to leave.  And then
10  they sent out some tweet -- somebody else showed
11  us that they sent out a tweet saying that we
12  tried to have them arrested.  Well, they
13  wouldn't leave our property.
14      Q.  Okay.  So --
15      A.  After the story ran.  The day that the
16  story ran, they were on the dairy.
17      Q.  Okay.  So let me make sure I
18  understand.  So after the article on -- after
19  the story ran in Esquire.com --
20      A.  Before the -- and all the tweets.
21      Q.  Right.  And then after that reporters
22  from the Des Moines Register showed up at the
23  farm?
24      A.  Yes.
25      Q.  Okay.  So you had not contacted the

102 (Pages 402 - 405)

1    Des Moines Register before then?
2       A.   Absolutely not.
3       Q.   Okay.   Did you have any particular
4    animosity toward the Des Moines Register before
5    then?
6       A.   Well, they're a rag.   There's no reason
7    to even -- it's a junk paper.
8       Q.   Junk paper.   Okay.   Any other reasons
9    other than just you believe it to be a junk
10   paper?
11      A.   I would never contact -- NuStar Farms
12   would never contact anybody from the Des Moines
13   Register.
14      Q.   Okay.
15      A.   Or pretty much any news media.
16      Q.   Gotcha.   Has Devin Nunes ever arranged
17   for conversations with members of the media with
18   persons with NuStar Farms?
19           MR. BISS:   Object to the form.
20      A.   No.
21      Q.   No?
22      A.   No.
23      Q.   No.   Any -- NuStar Farms ever given any
24   other interviews to anyone else in the media, as
25   far as you know?

1       A.   No.   We don't do that.
2       Q.   Okay.   So local television stations?
3    Anything?
4       A.   We regret the one that we did do.
5       Q.   Oh, from Dairy Star?
6       A.   Yes.
7       Q.   Okay.
8       A.   There might have been something in the
9    Northwest, but they just took a picture.   I
10   don't think they ever talked to us.   I remember
11   there was a picture ran.   And, of course, they
12   reran that when they ran the Devin Nunes
13   story --
14      Q.   Got it.
15      A.   -- if I recall, now that you ask.
16      Q.   That's why we ask.   Sometimes the
17   questions refresh recollections.   That's fine.
18      A.   But no, we don't actively go out and
19   search any reporter.
20      Q.   Got it.
21      A.   NuStar Farms does not go seek anybody.
22      Q.   The one you were just talking about
23   where there was a photograph taken, what do you
24   remember -- or you had a --
25      A.   It was for dairy month or something.

1    There was the local person goes out -- comes out
2    and wanted to take a picture.   I don't -- It was
3    for -- I don't -- I don't know why.
4       Q.   You don't remember what the --
5       A.   They were local.   They just come by.
6    The lady was dating a guy we have coffee with,
7    and she knew that we were chopping silage.   They
8    just came and took a picture.
9       Q.   Got it.
10      A.   At the -- From the road.
11      Q.   Got it.   Okay.
12           MR. BOYER:   Give me one second.
13           Okay.   Sorry.   Give me just one
14   moment.   We can stay on the record.
15           All right.   Thank you, Mr. Nunes.
16   We have no further questions at this time.
17           Mr. Biss, over to you.
18           MR. BISS:   No questions.   He'll
19   read.
20           MR. BOYER:   Okay.   Very good.
21           THE VIDEOGRAPHER:   We are off the
22   record at 6:27 p.m., and this concludes today's
23   30(b)(6) testimony given by Anthony Nunes, III.
24   The total number of media units used was six and
25   will be retained by Veritext Legal Solutions.

1              (Deposition concluded at
2         6:27 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

103 (Pages 406 - 409)

**Page 410**

1          SIGNATURE PAGE
2      I, ANTHONY NUNES, III, the
witness in the foregoing deposition, do hereby
3  certify that I have read the foregoing 409 pages
of typewritten material and that the same is,
4  with the corrections noted on the attached page,
if any, a true and correct transcription of my
5  deposition upon oral examination given at the
time and place herein stated.
6
7      _____
      ANTHONY NUNES, III
8
9
10      Subscribed and sworn to before me
11  this ____ day of _____, 2021.
12
13
14
15
16
17      Notary Public
18
19
20
21
22
23
24
25  Job No. CS4693408

**Page 411**

1      CORRECTION/CHANGE SHEET
2      I have read the entire transcript
of my deposition taken on the 14th day of July,
3  2021, or the same has been read to me. I
request that the following changes be entered
4  upon the record for the reasons indicated. I
have signed my name to the signature page and
5  authorize you to attach the same to the original
transcript.
6
   Page  Line  Correction or change and reason
7       therefor
8
9  ____ ____ _____
10 ____ ____ _____
11 ____ ____ _____
12 ____ ____ _____
13 ____ ____ _____
14 ____ ____ _____
15 ____ ____ _____
16 ____ ____ _____
17 ____ ____ _____
18 ____ ____ _____
19 ____ ____ _____
20 ____ ____ _____
21 ____ ____ _____
22 ____ ____ _____
23 ____ ____ _____
24 ____ ____ _____
25 Date _____ Signature _____

**Page 412**

1      C E R T I F I C A T E
2
3      I, the undersigned, a Registered
Professional Reporter and Notary Public of the
4  State of Iowa, do hereby certify that I acted as
the Registered Professional Reporter in the
5  foregoing matter at the time and place indicated
herein; that I took in shorthand the proceedings
6  had at said time and place; that said shorthand
notes were reduced to typewriting under my
7  supervision and direction, and that the
foregoing pages are a full and correct
8  transcript of the shorthand notes so taken; that
said deposition was submitted to the witness for
9  signature as requested
10      I further certify that I am
neither attorney nor counsel for, or related to
11  or employed by any of the parties in the
foregoing matter, and further that I am not a
12  relative or employee of any attorney or counsel
employed by the parties hereto, or financially
13  interested in the action
14      IN WITNESS WHEREOF, I have
hereunto set my hand and seal this 16th day of
15  July, 2021
16
17
18  REGISTERED PROFESSIONAL REPORTER
   AND NOTARY PUBLIC
19
20
21
22
23
24
25

**Page 413**

1  Steven Biss, Esq.
2  stevenbiss@earthlink net
3      July 16, 2021
4  RE: Nustar Farms, LLC Et Al v. Ryan Lizza, Hearst Magazine
5  7/14/2021, Anthony Nunes , III (#4693408)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  erratas-cs@veritext com
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19     If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22     Yours,
23     Veritext Legal Solutions
24
25

104 (Pages 410 - 413)

Veritext Legal Solutions

800-567-8658      973-410-4098