**Exhibit P**

**(Redacted)**

```
 1        IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF IOWA
 2                  WESTERN DIVISION
 3   NuStar Farms, LLC,      )
     Anthony Nunes, Jr.,     )
 4   and Anthony Nunes, III,) Case No.
                            ) 5:20-cv-04003-CJW-MAR
 5        Plaintiffs,        )
                            )
 6   vs.                     ) VIDEOTAPED DEPOSITION
                            )           OF
 7   Ryan Lizza and Hearst   )    CLETE SAMSON
     Magazine Media, Inc.,   )
 8                           )
          Defendants.        )
 9   -----------------------)
10
11
             CONFIDENTIAL - ATTORNEYS' EYES ONLY
12
13
14            THE VIDEOTAPED DEPOSITION OF
15   CLETE SAMSON, taken before Janice M. Doud,
16   Registered Professional Reporter and Notary
17   Public of the State of Iowa, commencing at 9:02
18   a.m., September 8, 2021, at 801 Grand Avenue,
19   33rd Floor, Des Moines, Iowa.
20
21
22
23      Reported by:  Janice M. Doud, R.P.R.
24
25   Job No. CS4790654
```

Page 2

```
1        A P P E A R A N C E S
2 Plaintiffs by:   STEVEN S  BISS
3               Attorney at Law
                (Via Zoom)
                LAW OFFICES OF STEVEN S  BISS
4               300 West Main Street
                Suite 102
5               Charlottesville, VA 22903
                (202) 318-4098
6               stevenbiss@earthlink net
7 Defendants by:   NICHOLAS A  KLINEFELDT
                Attorney at Law
8               FAEGRE DRINKER BIDDLE & REATH LLP
                801 Grand Avenue
9               33rd Floor
                Des Moines, IA 50309
10              (515) 248-9000
                nick klinefeldt@faegredrinker com
11
                SCOTT W  WRIGHT
12              Attorney at Law
                FAEGRE DRINKER BIDDLE & REATH LLP
13              90 South Seventh Street
                Unit 2200
14              Minneapolis, MN 55402
                (612) 766-7000
15              scott wright@faegredrinker com
16  NATHANIEL S  BOYER
                Attorney at Law
17              (Via Zoom)
                THE HEARST CORPORATION
18              Office of General Counsel
                300 West 57th Street
19              New York, NY 10019
                (212) 841-7000
20              nathaniel boyer@hearst com
21 Videographer:   Andrea Kreutz
22
23
24
25
```

Page 3

```
1            I N D E X
2 Examination by:               Page
3 Mr. Klinefeldt                  6
4 Mr. Biss                      313
5
6
7
8 Exhibit            Marked
9 (All exhibits were marked prior to the commencement
   of the deposition.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Good morning.
3 We are going on the record at 9:02 a m. on
4 Wednesday, September 8th, 2021.
5          Please note that the microphones
6 are sensitive and may pick up whispering, private
7 conversations, and cellular interference.
8          Please turn off all cell phones or
9 place them away from the microphones, as they can
10 interfere with the deposition audio.
11          Audio and video recording will
12 continue to take place unless all parties agree
13 to go off the record.
14          This is Media Unit 1 of the
15 video-recorded deposition of Clete Samson, taken
16 by counsel for defendant in the matter of NuStar
17 Farms, LLC, Anthony Nunes, Jr., and Anthony Nunes,
18 III, versus Ryan Lizza and Hearst Magazine Media,
19 Inc., filed in the U.S. District Court, Northern
20 District of Iowa, Western Division, Case Number
21 5:20-cv-04003-CJW-MAR.
22          This deposition is being held at
23 Faegre Drinker Biddle & Reath, located at 801
24 Grand Avenue, 33rd Floor, Des Moines, Iowa.
25          My name is Andrea Kreutz from the
```

Page 5

```
1 firm Veritext Legal Solutions, and I am the
2 videographer.  The court reporter is Janice Doud
3 from the firm Veritext Legal Solutions.
4          I am not related to any party in
5 this action nor am I financially interested in
6 the outcome.
7          Counsel and all present in the
8 room and everyone attending remotely will now
9 state their appearances and affiliations for
10 the record.
11          If there are any objections to
12 proceeding, please state them at the time of
13 your appearance, beginning with the noticing
14 attorney, please.
15          MR. KLINEFELDT:  Nick Klinefeldt
16 and Scott Wright from Faegre Drinker on behalf of
17 the defendants.
18          MR. BISS:  I'm Steve Biss.  I
19 represent the plaintiffs.
20          MR. BOYER:  Nate Boyer for the
21 defendants, joining remotely.
22          THE VIDEOGRAPHER:  Thank you.
23          Will the court reporter please
24 swear in the witness.
25
```

2 (Pages 2 - 5)

1          CLETE SAMSON
2 called as a witness, having been first duly
3 sworn, testified as follows:
4          DIRECT EXAMINATION
5 BY MR. KLINEFELDT:
6    Q.  Mr. Samson, could you please --
7          MR. BISS:  Hey, Nick?
8          MR. KLINEFELDT:  Yes.
9          MR. BISS:  Nick, just before you
10 begin, I'm getting a -- I'm getting garbley.
11 I'm getting garble.  Can you guys hear me okay?
12          MR. KLINEFELDT:  Yeah, we can
13 hear you loud and clear.
14          MR. BISS:  Okay.  Because when I
15 hear you, it's a little bit garbled, and I just --
16 if it's a problem that we can fix right now, I'd
17 like to try to do that.
18          I don't want to interrupt the
19 deposition, but I just -- I want to be able to
20 hear every -- every word that -- you know,
21 that's said, and I just don't want to have any
22 issues with -- with not being able to hear, so --
23          MR. KLINEFELDT:  Can you hear me
24 okay now or is it still garbley?
25          MR. BISS:  It's a little bit --

1 that's a little better.  I don't know what you
2 did.  You probably moved something, but --
3          MR. KLINEFELDT:  Okay.  Well, try
4 it out; and if you can't hear okay, just stop.
5 Just let us know and we'll fix it.
6          MR. BISS:  Yeah, I'll do that.  I
7 just wanted to see if there was something that
8 we could do beforehand, but we'll get through
9 it.  Thank you.
10          MR. KLINEFELDT:  All right.  Yep.
11    Q.  Mr. Samson, could you please state and
12 spell your name for the record?
13    A.  Clete Samson, C-l-e-t-e S-a-m-s-o-n.
14    Q.  Okay.  Mr. Samson, what's your role in
15 this case?
16    A.  I was retained to serve as a rebuttal
17 expert in relation to two reports that were
18 filed.
19    Q.  Okay.  And who hired you to do that?
20    A.  I was retained by plaintiffs' counsel.
21    Q.  Okay.  You weren't -- Do you have a
22 client in this matter?
23    A.  I do not.
24    Q.  Okay.  And so you were retained by
25 plaintiffs' counsel and not plaintiff?

1    A.  Well, I was retained through plaintiffs'
2 counsel, I should say.
3    Q.  Okay.  And so you've been hired by
4 NuStar; is that right?
5    A.  That's correct.
6    Q.  Okay.  And is NuStar the one who is
7 paying your fees?
8    A.  I -- My invoices would go to
9 plaintiffs' counsel.  I'm not sure exactly how
10 the fees are being covered.
11    Q.  Okay.  You don't know who is paying you?
12    A.  No.
13    Q.  How much time do you think you've spent
14 on this report that you've produced?
15    A.  I probably spent somewhere between --
16 somewhere between 20 and 25 hours, perhaps.
17    Q.  Okay.  And you produced a report in
18 this case; is that correct?
19    A.  That's correct.
20    Q.  Okay.  I'm going to show you what I've
21 marked as Exhibit 86, and just if you can -- if
22 you can, take your time to look at that; and, if
23 you can, confirm that that's the report that you
24 produced in this case.
25    A.  Yes, it is.

1    Q.  Okay.  And then keep that with you the
2 whole time.  I want to make sure that you have
3 access to it whenever you need it.  Okay?
4    A.  Thank you.
5    Q.  And so have you ever been engaged as an
6 expert witness before?
7    A.  I have not.
8    Q.  And so I know as a lawyer you're very
9 familiar with depositions, but I'll go ahead and
10 go over the ground rules just to be safe.
11          You've taken depositions before;
12 correct?
13    A.  Yes, hundreds.
14    Q.  Have you ever been deposed?
15    A.  I have not.
16    Q.  And so as I'm sure you tell all the
17 deponents that you have, you know, just ask that
18 you please let me finish asking my question and
19 that we try not to interrupt each other for the
20 benefit of the court reporter.  Is that fair?
21    A.  Yes.
22    Q.  And then, likewise, if you don't hear
23 or understand my question, please let me know
24 and I can repeat it or rephrase it.  Okay?
25    A.  Will do.

3 (Pages 6 - 9)

1    Q.  And then -- And so if you answer my
2  question, I'll assume that you heard it and
3  understood it.  Is that fair?
4    A.  Yes.
5    Q.  And then at any time you need to take a
6  break, just let us know and we'll take a break.
7  Okay?
8    A.  Yes.
9    Q.  So can you kind of tell us about your
10  educational background, maybe starting when you
11  graduated from high school?
12    A.  Graduated from high school in 1999,
13  attended Drake University and then transferred
14  to a smaller liberal arts college called Doane
15  College located in Nebraska, graduated from
16  Doane College in 2003 and went to law school at
17  Arizona State University's College of Law and
18  graduated from Arizona State University in 2006.
19    Q.  Okay.  Why did you transfer out of
20  Drake?  Just curious.
21    A.  I played football at Drake, and I
22  transferred to Doane to play football and
23  basketball.  I wanted to play both sports, and
24  it's harder to do that at a Division I school,
25  obviously, so --

1    Q.  Oh, that's awesome.
2         And so you graduate law school in
3  2006; right?
4    A.  Correct.
5    Q.  Any education past law school?
6    A.  No.
7    Q.  Any formal education?
8    A.  No.
9    Q.  Okay.  And so what is your -- did you
10  have any legal jobs during law school?
11    A.  I did.  I worked for various law firms
12  in law school, primarily Greenberg Traurig
13  during my second year and my third year; and
14  then after I graduated, that was my first
15  employer as a practicing attorney from 2006 to
16  2009.
17    Q.  Okay.  And were you an associate there?
18    A.  I was an associate, practicing in
19  complex commercial litigation, essentially, and,
20  you know, some employment law and things of
21  those natures.
22    Q.  Any immigration?
23    A.  You know, I think I handled a few
24  immigration-related cases but really didn't get
25  involved in immigration until around the early

1  part of 2009 when I -- when I took employment at
2  the United State Department of Homeland Security.
3    Q.  Okay.  So tell us about that.  How did
4  that come to pass?
5    A.  Well, they had a trial attorney -- you
6  know, they call it -- ICE or Homeland Security
7  calls it various different, but I'll just refer
8  to it as a federal trial attorney position
9  located in Omaha, Nebraska, which was my
10  hometown, decided to pursue that based on my
11  education credentials and my experience as a
12  litigator at Greenberg Traurig.
13         I was hired by Homeland Security,
14  and I think I was hired in '08, but by the time
15  background and stuff cleared, I started in the
16  early part of -- May of '09.
17    Q.  Okay.  And so that brought you back home
18  to Omaha?
19    A.  Correct.
20    Q.  Okay.  And then so what was your kind
21  of title and role when you first started with
22  Homeland Security?
23    A.  It would be assistant chief counsel.
24  Essentially, my role was to handle a docket of
25  removal hearings for -- for OPLA, which is the

1  legal -- legal agency that works for ICE and
2  services ICE.
3         The -- The other part of my job
4  was -- was to handle work site enforcement cases
5  for Nebraska and Iowa, primarily tailored to I-9
6  investigations and audits and, you know, document
7  audits, things of those nature.
8         And then after about my first
9  year at Homeland Security, I was given the
10  responsibility to oversee the field and serve as
11  a liaison for all the field attorneys and work
12  site enforcement, so I had a lot more connection
13  to Washington, D.C., and the ICE OPLA offices in
14  Washington, D.C., beginning -- I believe that
15  was about 2010.
16    Q.  Okay.  And did your title change?
17    A.  Title did not change and, you know,
18  just something I took on as kind of a collateral
19  duty.  We started having -- one of the services
20  that I provided for the agency was to regularly --
21  regularly distribute summaries of OCAHO decisions,
22  which is the Office of Chief Administrative Hearing
23  Officer, and then to have basically quarterly calls
24  with the 90 or so attorneys throughout the country
25  that -- that handled work site enforcement cases in

4 (Pages 10 - 13)

1 their AOR, their region.
2    Q.   And how long did you do that?
3    A.   All the way through for seven years.  You
4 know, we had those -- we had quarterly calls.  I
5 also presented on work site enforcement to the
6 agency and to our -- the affiliated enforcement
7 side, HSI.
8         Probably three to four times a
9 year for seven -- for seven years, I regularly
10 traveled to D.C. to present at the ICE OPLA
11 conferences and things of that nature and, you
12 know, essentially became the agency's expert on
13 work site enforcement, which consists of Form
14 I-9 audits and, you know, knowing hires, knowing
15 continued employment, those things, you know,
16 violations of those natures.
17    Q.   And so did you -- you kind of have
18 that title and duties until you left Homeland
19 Security?
20    A.   That's correct.  I left -- I also
21 continued to handle somewhere between -- probably
22 during that time frame somewhere between 100 and
23 150 active document cases in my AOR, which was
24 Nebraska and Iowa, and held those -- held those
25 roles all the way through 2016.  I left Homeland

1 Security in November of 2016 to go into private
2 practice.
3    Q.   Okay.  And why did you make that change?
4    A.   Primarily, just wanted to -- wanted to
5 always really enjoyed working with Kutak Rock,
6 even -- even as a -- as a government attorney
7 and just wanted to join.  I didn't look anywhere
8 but Kutak Rock, which is, you know, the biggest
9 law firm in Nebraska, and I just wanted to work
10 for them.
11    Q.   Okay.  Did the election have anything
12 to do with it?
13    A.   No, not -- not -- you know, I had --
14 when I had started for Homeland Security, there
15 had just been a change in administration from
16 President Bush, George W. Bush's administration,
17 and President Obama had just taken office, and
18 then there was -- there was another change,
19 obviously, in the administration in November of
20 '16, but it was totally unrelated.  I had already
21 kind of begun the process of transitioning over
22 to Kutak Rock in the like September, October time
23 frame.
24    Q.   Okay.  And so when you started at
25 Homeland Security, what kind of training did you

1 receive?
2    A.   Well, so, you know, there's general --
3 there's general training on removability,
4 inadmissibility, the INA.  There's training on
5 the INA that they do for new attorneys.
6         I was brought in -- one of the
7 reasons I was brought in was because the work
8 site enforcement program had been dormant for
9 the entirety of President George W. Bush's
10 administration, and ICE was effectively
11 relaunching that in that November '08, May '09
12 time frame.
13         And so I recall that early on
14 when I started, I spent a lot of time in D.C. on
15 the work site enforcement part of it because
16 they were relaunching it.
17         ICE was working with their --
18 their internal manual on how they were going to
19 approach work site enforcement, and so it was --
20 it was kind of a nice time to start with the
21 agency in that -- in that area because most of
22 the attorneys that had ever done work site
23 enforcement were Reagan -- Reagan attorneys.
24         And that's obviously when this
25 whole thing started, was in 1986 under President

1 Reagan, so there was kind of a new wave of work
2 site enforcement attorneys coming into the
3 agency.
4    Q.   And so did they have like formal
5 classes or trainings that you went to to start
6 off to kind of get you up to speed on
7 immigration?
8    A.   They did.  I also recall, you know,
9 taking probably between 15 to 20 hours of CLE
10 when I was still at Greenberg Traurig on
11 immigration in preparation for transitioning
12 over to the government, you know, on the basics
13 of removability and admissibility.
14         But, you know, the amount of
15 cases that you handle on the removal side is so
16 large that it is a very quick learning curve in
17 the immigration sense because you'll be handling
18 anywhere from forty -- 45 to 60 cases on a
19 docket on a given day, and so you're having to
20 very quickly identify the immigration issues.
21 So, you know, it's a quick curve.  It really is.
22    Q.   Okay.  A lot of kind of learning on the
23 job?
24    A.   Yeah, early on.  Early on, yep.
25    Q.   Did they have -- Because I remember the

1 Department of Justice had the NAC in Columbia,
2 South Carolina. You go there and do some
3 trainings.
4          Did you guys have like that? Did
5 you have a place where you went for training?
6    A.  Yes. It was in Dallas, and they had --
7 I think it was a -- it was either a one-week or
8 a two-week new attorney training in Dallas, and
9 I -- so I would have attended that in -- sometime
10 in the summer of 2009, probably.
11    Q.  Okay. And then you were always based
12 in Omaha; right?
13    A.  I was based in Omaha the entirety of my
14 time at Homeland Security, correct.
15    Q.  Okay.
16    A.  And Omaha was in a -- was a field
17 office, which is part -- but it was part of a
18 five-state AOR, which would have included the
19 two Dakotas, Minneapolis, and then Nebraska and
20 Iowa.
21    Q.  Okay.
22    A.  So at that time there was like 12 or 13
23 AORs, so we handled -- we handled the Nebraska
24 and Iowa part of the AOR.
25    Q.  Okay. And then I think you said that

1 they were kind of relaunching work site
2 enforcement when you started; is that right?
3    A.  That's correct.
4    Q.  What did that mean? What were they
5 going to start doing?
6    A.  Well, they updated their -- they updated
7 their manual on how they were going to approach
8 I-9 audits and things.
9          To my recollection, there was --
10 you know, there was -- IRCA, the Immigration
11 and Control Reform Act was in '86, and then from
12 that period of time they -- the INA obviously ran
13 the sanctions program. They called it employer
14 sanctions.
15          And so they -- After 9/11 the
16 program essentially went dormant, and there was
17 no activity in that program from about 2001 until
18 2008; and then when President Obama took office,
19 I believe one of the enforcement priorities of
20 his office was to make sure employers were hiring
21 properly and complying with -- with both the
22 Immigration Reform and Control Act as well as
23 IIRIRA, which was -- IIRIRA was passed during
24 President Clinton -- Clinton's administration.
25          And essentially what IIRIRA did

1 was expanded the amount of documents that could
2 be presented by employees at the time of hire to
3 establish work authorization.
4          So there was just -- you know, it
5 had been dormant, and then they were -- basically
6 they revamped their manual, and then there was
7 no -- there was no push to go out and be real
8 enforcement-oriented; but it was more of let's
9 get this program going again, you know, to
10 achieve some level of deterrence, I believe.
11    Q.  Okay. And so then kind of generally I
12 think you had mentioned that you did work site
13 enforcement, removal proceedings; is that right?
14    A.  Removal proceedings. You know, we --
15 That was the majority of what we did, yeah.
16    Q.  What about, like, audits? Did you go
17 out and do employer audits, or is that part of
18 work site enforcement?
19    A.  That -- That's part of work site
20 enforcement. When I say "work site enforcement,"
21 I'm talking about primarily I-9 audits. And
22 President Obama -- So during President Obama's
23 administration, there really were not the,
24 quote, unquote, raids that had occurred during
25 prior administrations that, you know, you saw

1 big enforcement actions take place on work
2 sites.
3          So that had went away, and they
4 really focused on I-9 auditing, which was you go
5 in, you serve an employer with a Notice of
6 Inspection, the employer provides their I-9
7 forms.
8          And then ICE employed auditors,
9 which were basically, you know, forensic
10 auditors, and they would go through each I-9,
11 and then they would levy fines based on any
12 verification violations that they -- that they
13 located during their audit.
14          Our job was -- Once that auditing
15 process was over, my job was to essentially
16 litigate that issue. Because when an employer
17 would retain counsel, then you would essentially
18 litigate that issue with the Office of Chief
19 Administrative Hearing Officer, which is the
20 agency tasked with overseeing work site
21 enforcement.
22    Q.  Okay.
23    A.  And, you know, it's an ALJ, essentially,
24 a chief administrative hearing judge, that
25 oversees that litigation aspect.

1    Q.   And how did -- how did Homeland Security
2   decide, you know, who to audit, who to initiate
3   a work site enforcement action against?
4      A.   I mean, you know, to my recollection,
5   it was typically random; and a lot of times it --
6   you know, it was the result of a lot of different
7   sources.
8          That was beyond -- typically, the
9   decision as to who -- as to which companies to
10  audit was made on the law enforcement side before
11  it got to the -- to the lawyers, and that was --
12  you know, a lot of it was probably pushed down
13  from D.C. to really try to achieve a deterrent
14  perspective.
15         The -- The -- It was sometimes
16  industry-specific.  You know, there were trends
17  in industry-specific, you know, construction,
18  hospitality, restaurants, you know, agriculture,
19  things of those natures.
20         So a lot of times it was
21  industry-specific; but, you know, there were
22  also the -- there were also ways in which companies
23  could become on the radar of the -- of the HSI side,
24  which Homeland Security investigations would have
25  been the ones that prompted the investigation.

1   That's who the auditors worked for, was HSI.
2      Q.   Okay.  And so they weren't -- the
3   auditors weren't under your supervision;
4   correct?
5      A.   They were -- They -- No, they weren't
6   under our direct supervision.  They were under
7   HSI's direct supervision; but, you know, we
8   essentially reviewed and signed off on audit
9   results and things like that.
10     Q.   Were you -- Were you ever a part of the
11  decision of what employer to audit?
12     A.   Never.
13     Q.   Okay.  And during your time at Homeland
14  Security, you had responsibility for Nebraska
15  and Iowa; is that right?
16     A.   As well as I was the liaison for all of
17  the 90 field attorneys.  They would filter their
18  questions through me, and then I would directly
19  work with the ICE attorneys in Washington, D.C.,
20  to respond to those inquiries and things.
21         So I had a -- I had a national
22  role.  In fact, I think it was in 2014 I
23  received an award from ICE OPLA National for my
24  training that I had done for all the field
25  offices in this area.

1      Q.   Okay.  And what was that training on?
2      A.   This.
3      Q.   Work site enforcement?
4      A.   Work site enforcement, Form I-9 audits,
5   you know, this specific area that we're
6   discussing today.
7      Q.   So other attorneys that were in a
8   different OR would call you with questions?
9      A.   Right.  They were -- They were
10  essentially instructed to filter all questions
11  through me; and if I could not handle them,
12  you know, based on, you know, my review of the
13  question, then we would -- I'd filter them up
14  to Washington, D.C., if it was more kind of
15  policy-oriented.  If it was more legally-oriented,
16  I would just answer those questions.
17         And I probably would receive
18  between 10 and 20 inquiries a week from field
19  attorneys with questions about, you know, what --
20  you know, an example would be, would this be
21  considered a technical violation or a substantive
22  violation on an I-9, would this be a finable
23  violation, would this -- do you think this -- this
24  rises to the level of constructive knowledge or
25  actual knowledge of a -- of a hiring violation,

1   things of that nature.
2          I would handle those locally; and
3   then, you know, more policy stuff about how to
4   handle certain cases would go to Washington.
5      Q.   Okay.  So you had -- in addition to
6   having firsthand responsibility for Iowa and
7   Nebraska, you had visibility on what was going
8   on elsewhere around the country?
9      A.   Absolutely.
10     Q.   Okay.  And you had mentioned that
11  sometimes the decision on what employers to
12  audit would be industry-based; is that right?
13     A.   It seemed like that.  Again, I think
14  what I said was that I didn't really have any
15  input into that; but you saw waves of
16  industry-specific audits that occurred, which,
17  you know, was probably the result of some policy
18  decision that was made in Washington that
19  filtered out to the field offices; but, you
20  know, again, that was an -- that was an HSI
21  decision.
22     Q.   Okay.  During the seven years that you
23  were there, do you ever recall any enforcement
24  actions against dairies?
25     A.   Yes.  Well, I mean, I recall generally

7 (Pages 22 - 25)

1 agriculture enforcement actions. You know,
2 specifically dairies, I don't -- I mean, there
3 was -- I handled hundreds and hundreds of cases,
4 so -- but, in general, I recall quite a few ag,
5 ag-related.
6    Q.  Do you -- Could you sit here and say
7 whether you were involved in a dairy work site
8 enforcement action during that seven years?
9    A.  I don't -- I don't recall. I really
10 just don't recall.
11    Q.  Do you recall ever -- someone ever
12 asking you a question from, you know, outside of
13 your OR about enforcement actions against
14 dairies?
15    A.  I mean, again, specific to dairies, no.
16 Farms and ag, you know, I recall pork, you know,
17 some pork -- pork farms, chicken farms, things
18 of that nature. I don't -- I don't know specific
19 to dairy.
20    Q.  And so can you kind of walk me through
21 typically what would happen in a work site
22 enforcement action, you know, how it would
23 start, how you would get involved and what would
24 happen from there?
25    A.  Yeah. The general -- The general

1 procedure was HSI's auditor would serve a
2 document called a Notice of Inspection on an
3 entity. That entity would then have three
4 business days to produce their I-9s to the
5 auditor.
6        The auditor would then take --
7 You know, they had large caseloads. They would
8 then take two to three months to review the
9 I-9s. They would then write up -- I mean, if
10 there was perfect compliance, we never saw it on
11 my end; but if there was going to be a fine
12 levied or proposed, they would issue what's
13 called a Notice of Intent to Fine, and it was at
14 that point in time when we would review that
15 because then that needed to be legally
16 substantiated.
17        So there was what was called a
18 Notice of Intent to Fine. The reason it's
19 called a Notice of Intent to Fine is because
20 ultimately ICE can't just levy the fine.
21 They're not the judge and the jury. Ultimately
22 it must be sustained by the Office of the Chief
23 Administrative Hearing Officer.
24        So they would issue the NIF.
25 We'll call it a NIF, a Notice of Intent to Fine,

1 and then the company would have 30 days to
2 request a hearing on those alleged violations.
3 And then once the company requested a hearing,
4 it would, you know, typically then turn into
5 regular litigation, where you would have
6 discovery, a prehearing conference, you know,
7 all those things. There was, you know,
8 settlement authority, settlement negotiations.
9        If they didn't request a hearing,
10 which means they waive their right to a hearing
11 or to challenge the alleged violations, then ICE
12 would issue what's called a final order, and it
13 would be essentially a collectible fine or a
14 collectible judgment against that entity. So
15 that was the -- that was the typical procedure.
16    Q.  And then so did you -- did you ever
17 have occasion to actually be at the employer's
18 office when the auditors were there looking at
19 documents?
20    A.  No. Typically they wouldn't look --
21 look at the documents on site. They would get --
22 They would get the original I-9s, and they would
23 take it back to the HSI headquarters and review
24 them there.
25    Q.  Okay. So they would -- they would --

1 they'd issue them a notice, and then they'd show
2 up three days later?
3    A.  To pick them up.
4    Q.  To pick them up?
5    A.  Correct.
6    Q.  And I'm assuming they'd get copies?
7    A.  No.
8    Q.  Or they take the originals?
9    A.  No, they take the originals because
10 that's -- you know, when you're looking at
11 backdating and there was an analysis about the
12 veracity of the forms, they wanted originals.
13        I -- You know, in my current
14 practice, which we haven't got to, I always
15 advise companies, in the event of an audit, to
16 make sure they make a corresponding copy so
17 that in the event ICE loses their originals they
18 have that backup; but, no, ICE would take the
19 originals.
20    Q.  Okay. And then -- And they wouldn't
21 review them on site. They would just come, pick
22 them up, and they'd review them off site?
23    A.  For months on end.
24    Q.  Okay.
25    A.  Yeah, I mean, depending on how large

8 (Pages 26 - 29)

1 the scope of the audit was.
2    Q.   And then you would get involved if they
3 were going to fine somebody?
4    A.   Right, or if the auditor had a question
5 during the auditing, like is this a violation,
6 is this a technical, is this a substantive, you
7 know, I would be involved just by phone, but I
8 didn't get involved from an advocacy standpoint
9 for the agency until that NIF was served.
10   Q.   Okay.  Prior to that you're just --
11 you're kind of advising the auditor?
12   A.   Exactly.
13   Q.   Answering questions, that kind of
14 thing?
15   A.   Exactly.
16   Q.   And would the auditor have the
17 authority to decide whether to fine them --
18   A.   There would be a --
19   Q.   -- without talking to you?
20   A.   There would be -- From my recollection,
21 there was a legal sufficiency review, so they
22 would -- any NIFs had to be approved through
23 counsel, you know, similar to an indictment or --
24   Q.   Okay.
25   A.   -- you know, that you would do in DOJ.

1 I mean, they had authority to write it up and
2 things, but there was a legal sufficiency
3 review.
4    Q.   Okay.  Were there ever administrative
5 subpoenas issued with I-9 Notices of Inspection?
6    A.   Yes.  Administrative subpoenas were
7 typically attached to the Notice of Inspection,
8 and those would ask for corroborating or
9 collateral documents.  You know, if the company
10 participated in E-Verify, it would ask for
11 E-Verify printouts, just collateral.  It asked
12 for payroll records.
13       Now, statutorily, ICE only had
14 the authority to request the I-9s.  The subpoena
15 was just attached, you know, in hope that the
16 company would comply.  They had the authority to
17 issue the subpoena; but, statutorily, under the
18 regs they only had the right to the I-9s.
19       So, you know, there were
20 employees -- or, I'm sorry, employers that would
21 not comply or would not produce those documents;
22 but, yeah, that was part of the standard procedures,
23 that an administrative subpoena would be attached.
24   Q.   Okay.  And then the auditor would have
25 to get permission from the lawyers to actually

1 notice -- file a Notice of Intent to Fine; right?
2    A.   Yeah.  And I think I spoke to that.
3 There's a legal sufficiency review before the
4 NIF was served on the -- on the entity.  So,
5 yeah, it passed through the law office, yeah.
6    Q.   Okay.  And that -- And you dealt with
7 those?
8    A.   That's -- Yes.
9    Q.   And how would it get -- would there be
10 like a memo, or how would that get presented to
11 you?
12   A.   Yeah, there was -- there was a file.
13   Q.   Okay.
14   A.   There was a file with the write-up, and
15 the I-9s were actually in the file, and then I'd
16 go -- you know, when I'm doing that sufficiency,
17 I would typically go through -- go through the
18 I-9s and then try -- you know, basically perform
19 a legal sufficiency review that, yeah, I think
20 that's sustainable if we get -- if they contest
21 that, we can likely sustain that with the ALJ.
22   Q.   Because you've got to be the one that --
23   A.   Yeah.  Right.
24   Q.   -- defends it; right?
25   A.   Right.  I mean, it's -- it's really no

1 different than -- than, you know, an indictment
2 and things like that.
3    Q.   And then in addition to the I-9 forms,
4 what else would you get, you know, in terms of
5 documents from the employer?
6    A.   From what I recall, articles of
7 incorporation, payroll records, you know, just
8 because, you know, it's ICE's burden of proof
9 on any -- any -- any of these violations.
10       So ICE would have the burden to
11 show not only that the entity associated -- or
12 the individual associated with the I-9 was an
13 employee and had received remuneration so there
14 was an employee -- so you had to -- you had to
15 establish that first; and then you had to
16 establish, you know, whether the I-9 contained a
17 violation that was finable.
18       And then you also -- you know,
19 depending on the alleged -- on the alleged
20 violations, particularly if you were going to --
21 if ICE was trying to establish a knowing hire or
22 a knowing continued employment violation, you
23 would also have to establish that the individual
24 themselves, the underlying employee, was indeed
25 an unauthorized individual.

9 (Pages 30 - 33)

1         So you would have to -- you would
2 need that evidence in the form of what's called
3 an I-213, which is -- or a sworn statement where
4 the employee admits to their alienage and their
5 manner of entry. So that essentially is what
6 you're doing on a legal sufficiency review.
7     Q. Okay. And how would you get that I-213?
8     A. That would be produced by an immigration
9 officer, an HSI agent, an agent or an officer.
10     Q. And how would they go about producing
11 that?
12     A. Well, they would typically meet with
13 the -- meet with the individual, the foreign-born
14 individual, and then conduct an interview; and
15 then they would write up the I-213 based on the
16 statements made during that interview.
17          And, see, that was the big --
18 that's the -- from what I recall when I was on
19 that -- when I was kind of on that side of things,
20 that was the biggest hurdle to any knowing hire
21 or knowing continued employment violations is
22 you have to establish that the person is indeed
23 unauthorized. That's an element of the burden
24 of proof, and that was always a very difficult
25 burden to show.

1          And the I-213 or a sworn statement
2 would be the manner in which you would do that
3 because otherwise everything is purely speculative.
4 Right? Until you have a sworn statement that
5 you've taken from the individual themselves about
6 their manner of entry to the United States or their
7 alienage, you don't really know whether or not
8 they are lawful.
9     Q. What if they didn't talk to you? What
10 if they didn't talk to the agent when the agent
11 tried to interview them for that?
12     A. That would be -- You know, I mean, the
13 agents typically -- There were not a lot of
14 situations where the individuals would not
15 provide that information because a lot of times
16 they're in custody, okay, and they're being
17 asked -- they're being asked on where -- you
18 know, where they're from. They're going to
19 provide some of that basic information.
20          So, you know, it's always --
21 it was always a challenge for our -- for our
22 immigration officers to establish alienage
23 and manner of entry.
24     Q. And so why were they in custody?
25     A. Because they were deportable at that --

1 at that point in time.
2     Q. How did you know they were deportable?
3     A. Through the I-213, through the
4 statements that they provided to the immigration
5 officer.
6     Q. And maybe I got wrapped around the axle
7 here, but I thought you said that they did the
8 interview for the I-213 while they were in
9 custody.
10     A. Typically that's the case.
11     Q. And how would they be in custody before
12 they did the I-213?
13     A. That has been challenged all over the
14 country for many, many years. Okay? That's
15 probably an area you don't want to go into, but
16 that -- the pre -- ICE's authority to detain
17 individuals is a constant source of challenge in
18 federal court.
19     Q. But they had to have some basis; right?
20     A. Absolutely.
21     Q. And --
22     A. Some probable cause or -- Yeah. Right.
23 Right.
24     Q. They had to have -- And I'm certainly
25 not asking you to defend any legal position on

1 that, but they had to have some basis to put
2 them in custody; right?
3     A. Typically, yes. Yeah.
4     Q. And probable cause, something like
5 that?
6     A. Right. And we're talking about --
7 we're kind of wading into removability issues;
8 but to bring us back to where we were, that
9 aspect was only relevant to knowing continued
10 employment violations as part of an I-9 audit.
11          If they were going to -- If ICE
12 wanted to establish a knowing continued
13 employment charge, they would need to establish
14 the person was actually deportable or removable,
15 unauthorized.
16     Q. Okay. And when you're going through
17 the administrative aspect of this or when you're
18 reviewing a work site enforcement audit, how
19 do you make the decision of whether to remove
20 somebody?
21     A. That is -- I mean, that was a decision
22 that was typically made by law enforcement.
23 And, you know, again, my role was always legal
24 sufficiency, were there grounds to remove,
25 and that comes out of INA Section 237 and INA

10 (Pages 34 - 37)

1 Section 212.
2         So, you know, I don't know how
3 much you want to get into the weeds, but
4 essentially there's two sources of removability.
5 There's a -- There's inadmissibility, which
6 means the individual was inadmissible at the
7 time of their entry.  Okay?  Then there's what's
8 called removability or deportability, which is
9 under INA Section 237, which relates to the
10 person made a lawful entry to the United States
11 but something happened to their status while
12 they were here that made them removable.  That
13 would be a visa overstay, you know, a lawful
14 permanent resident that has certain criminal
15 grounds of removability.
16         So, you know, that was a -- that
17 was all part of the enforcement side, and they
18 would -- so they would present that, and then
19 those individuals have the right to a hearing in
20 front of an immigration judge, and that's the
21 removal side of the aspect.
22         Work site enforcement is
23 different because it's tailored -- it's -- the
24 deterrent is -- the deterrent is tailored toward
25 the employer, not the employee, typically.

1    Q.  And so when you're doing the reviewing
2 for legal sufficiency and then handling the case
3 thereafter, you're primarily determining what
4 sort of administrative fine should be issued
5 against the employer?
6    A.  The fine -- The fine is to fall within
7 a range that are published, and ICE has its --
8 had its own calculation for how to determine the
9 amount of the fine based on a violation percentage,
10 and those -- that fine range varied; but, you
11 know, there was a separate range for paperwork
12 violations and a separate range for knowing hire
13 violations.
14    Q.  Okay.  And then were the paperwork
15 violations further broken down into different
16 types of paperwork violations?
17    A.  They were.
18    Q.  And how was that broken down?
19    A.  So, and ICE is public -- this is --
20 this is, you know, in the public domain.  ICE,
21 essentially, within its own -- you know, ICE is
22 the agency tasked with enforcing the CFR, the
23 regulations and the I-9 regulation, so they
24 essentially determined that there were certain
25 violations that were technical in nature and

1 certain violations that were substantive.  If
2 they were substantive, that meant that they were
3 finable.
4    Q.  Okay.  And can you give us examples of
5 what would be technical versus what would be
6 substantive?
7    A.  For example, in Section 1, if the
8 employee fails to put their date of birth,
9 that's probably a technical violation.  If the
10 employee fails to attest to a status, you know,
11 there's four boxes they can choose from, that
12 would be considered a substantive.
13         I always -- When I train on this,
14 I usually say substantive equates to seriousness
15 and goes to the heart of the I-9 itself.
16         And so Section 1 requires
17 employees to attest as to what their status is.
18 Okay?  The employer has no control over what
19 they attest to, but they have to ensure it's
20 done.  And then, you know, failure to sign and
21 date is typically a substantive violation, which
22 means it's finable.
23         Section 2, failure -- you know,
24 failure of the employer to sign and date,
25 Section 2 would be a substantive violation.  If

1 they only get a List B document instead of a
2 List B and C, that would be a missing -- a
3 missing document.  That would be a substantive
4 violation.
5         Technical violations would be,
6 you know, failure to -- failure to, you know,
7 write the correct abbreviation for the issuing
8 authority, things -- you know, there's just lots
9 of different ways you can mess up the I-9.  So
10 technical are -- basically, they don't go to the
11 heart of the reason we have the I-9.
12    Q.  And so what's the heart of the reason
13 you have an I-9?
14    A.  To establish identity and work
15 authorization.
16    Q.  And so a substantive violation would go
17 to that?
18    A.  A substantive violation would be
19 something that would prohibit ICE from
20 determining whether that person is authorized
21 for employment.
22    Q.  And so if an employer was committing a
23 substantive violation, would that also mean that
24 the employer is not adequately determining whether
25 they are authorized to work?

11 (Pages 38 - 41)

1   A.   No, not necessarily.  It just means
2  that they have not completed the Form I-9
3  correctly.  There's a distinction there, and
4  it's important to talk about in this -- in this
5  realm.
6          Substantive violations can relate
7  to any type of employee, U.S. citizens, lawful
8  permanent residents.  It's you didn't do the
9  form right.  That's what a substantive violation
10 is.
11         It doesn't go to the underlying
12 analysis of whether that person is indeed
13 authorized.  It's just you didn't -- you didn't
14 do the form right.  It's really no different
15 than any other federal form in the sense that --
16 does that --
17   Q.   But there's still a distinction between
18 a technical violation and a substantive violation;
19 right?
20   A.   Which is why it's finable, right, which
21 is why the sub -- the substantive violation
22 relates directly to the -- to the CFR, and it
23 would essentially say that you haven't complied
24 with the CFR for completing the Form I-9, the
25 employment verification.

1   Q.   Right.  But it sounds like what you
2  were saying before is that the purpose of work
3  site enforcement is to make sure that employers
4  are not hiring unauthorized workers; right?
5   A.   That would be the general policy, yeah,
6  the general reason that you have that.
7   Q.   And the most serious type of
8  administrative fine would be a substantive
9  violation?
10   A.   Of an administrative fine, it would
11 be -- in my mind the most serious would be a
12 knowing hire or knowing continued employment
13 because that's fined at an even higher level,
14 and it requires a greater burden of proof on
15 ICE's part, which we talked about a little bit.
16   Q.   And you can -- And so that could be
17 either a criminal violation or the -- or an
18 administrative violation; is that right?
19   A.   Yeah.  Your question was what was --
20 what's the highest level of an administrative
21 violation.  There is a -- There are criminal
22 violations that can attach to this for pattern
23 and practice and, you know, various -- there's
24 various criminal sanctions that can attach.  It's
25 pretty rare that ICE would go criminal.  It has

1  to be very widespread.  You know, typically there
2  would be like a willful aspect to it.
3          You know, I've handled -- I've
4  represented companies in private practice that
5  have been criminally indicted for, you know,
6  verification issues or authorization issues.  So
7  there is a criminal aspect, but it's very rare.
8   Q.   The -- Let's go back to the I-213 for a
9  second.  You know, aren't there other ways that an
10 employer can learn if someone is not authorized to
11 work in the United States?
12   A.   There are essentially two aspects to
13 whether an employer would obtain awareness or
14 knowledge of whether someone is not.
15          There's an actual knowledge
16 component, which the best example of that is
17 the employee just flat out tells you I'm not
18 authorized.  And, you know, when I do trainings
19 and things, if the employee tells you they're
20 not authorized or, you know, you learn through
21 some firsthand knowledge that an employee -- that
22 an employee is not authorized for employment,
23 that would be actual knowledge.
24          Constructive knowledge is a much
25 different animal.  It's very restricted, but it's

1  basically -- it's restricted by federal case law,
2  and it's -- you know, it's indicia of situations
3  that occur that may put a reasonable employer
4  on notice that the -- that the person is not
5  authorized for employment.
6          It's that aspect of knowing
7  employment is constantly balanced against
8  discriminatory hiring acts because employers --
9  and we can talk about that as we get into this,
10 but employers have to constantly find that
11 balancing between what knowledge is being
12 imputed to them and then what is speculation and
13 what is discriminatory speculation and unlawful
14 hiring acts and things of that nature.
15          So it's -- And I -- You know,
16 there's a -- there's a decision out there.  I
17 think it's -- I think I put it in my report,
18 actually, the Aramark decision, that really
19 talks about the limits of that construction
20 knowledge aspect because, you know, employers
21 are not required to be federal agents.  They're
22 not required to figure out who -- they're just
23 required to make a reasonable inquiry at the
24 time of hire.
25   Q.   And we'll talk about actual knowledge

12 (Pages 42 - 45)

1 and the forms and everything a little bit more.
2 I was kind of focused on your government
3 experience.
4     A.  Sure.
5     Q.  But in terms of actual knowledge, I did
6 want to ask you one question.
7         So actual knowledge would
8 obviously include if they told you, you know,
9 Mr. Samson, I'm not authorized to work in the
10 United States; right?
11    A.  That's correct.
12    Q.  Could it also include if you asked
13 them, hey, are you authorized to work in the
14 United States and they said I'm not answering
15 your question?
16    A.  That would be -- You know, that's more
17 of a gray area, if they said I'm not answering
18 the question.  If -- It is a permissible inquiry
19 to ask where someone is authorized.  That's
20 what you're doing at the time of hire.  If --
21 And it is on the employee to establish that work
22 authorization.
23        So, yeah, that would be -- that
24 would likely fall under actual knowledge more
25 than constructive knowledge, but you're kind

1 of -- there's kind of an overlap there in the
2 hypothetical that you raised.
3     Q.  What if they asserted their Fifth
4 Amendment privilege to any questions about, you
5 know, whether they're here legally or authorized
6 to work in the United States?
7     A.  At the time of hire?
8     Q.  Yeah.
9     A.  To an employer?
10    Q.  Even afterwards.
11    A.  I mean, I'm not aware -- I suppose if
12 an employee said I'm not going to answer that,
13 then they wouldn't be able to establish work
14 authorization.  They would not be able to begin
15 employment then.
16    Q.  Okay.
17    A.  Right.  I mean, in your hypothetical.
18    Q.  What if they were already employed?
19    A.  If they were already employed?
20    Q.  Yeah.
21    A.  In the context of a conversation with
22 an employer they asserted --
23    Q.  Yes.
24    A.  -- their Fifth Amendment right?
25    Q.  Yes.

1     A.  If they were already employed, they would
2 have already established work authorization,
3 typically.  Right?
4     Q.  You know --
5     A.  So now you're wading into constructive
6 knowledge.  You're not -- You're out of actual
7 knowledge, and now you're wading into constructive
8 knowledge.
9         So that would be something that
10 might put the employer on constructive notice that
11 there's an issue with the work authorization if a
12 comment like that is made within their -- within
13 their -- within their awareness.
14    Q.  Right.  What law enforcement might
15 describe as a clue; right?
16    A.  Right.  Yeah.
17    Q.  Okay.  So getting back to the process
18 and the work site enforcement, so even if you
19 establish maybe a knowing hire of an
20 unauthorized worker, that could still be either
21 administrative or criminal; right?
22    A.  Correct.
23    Q.  And I think you said if it's criminal,
24 you apply a little bit different standard or a
25 higher burden?

1     A.  No.  Well, yeah.  I mean, if it's
2 criminal, there's a -- there's the obvious
3 criminal burdens of proof.  If it's an
4 administrative violation, it's a little bit --
5 it's a little bit lower.  You know, ICE always --
6 I believe that ICE typically needed to establish
7 by clear and convincing evidence for an
8 administrative knowing violation.
9     Q.  Okay.  You're proving the same thing
10 but under a lower burden?
11    A.  Right.  It's an administrative
12 violation.
13    Q.  Okay.
14    A.  So it's a lower burden of proof.
15    Q.  And then you mentioned that an I-213 is
16 one way to establish that the employee is not
17 authorized to work in the United States; right?
18    A.  Correct.
19    Q.  Aren't there other ways, though, to
20 establish that same thing?
21    A.  Again, is your question tailored to how
22 you would establish it with the court, with a
23 judicial tribunal or an ALJ?
24    Q.  How an employer would determine if
25 somebody is here -- is not authorized to work in

1 the United States, right, because an employer is
2 never going to get an I-213; correct?
3    A.  Yeah, and I think -- I think we're
4 talking about two different things.  When I
5 say -- I'm talking about, yeah, there's --
6 there's an aspect of establishing knowledge for
7 purposes of the violation; but as far as ICE's
8 burden of proof to actually establish that an
9 individual is unauthorized, that would be
10 through an I-213 or a sworn statement or some
11 admission of the employee as to their manner of
12 entry and their alienage.  Okay?
13    Q.  Right.  I get what you're saying.  And
14 so kind of setting aside for a second whether
15 the person actually is unauthorized to work in
16 the United States, how would you go about
17 showing that an employer is knowingly hiring
18 somebody who is unauthorized to work in the
19 United States?
20    A.  So you're talking about at the time of
21 hire or during the course of employment?  Because
22 there's two different knowing violations.
23    Q.  Well, right.  Go back to as you're
24 making the legal sufficiency determination, do
25 you typically have an I-213 in the file?

1    A.  For knowings?
2    Q.  Yeah.
3    A.  To my recollection, that became a part
4 of the requirement because ICE had lost a lot of
5 cases on that issue and with -- you know, in
6 front of the tribunal, which was OCAHO, because
7 they were -- you know, they were making
8 arguments that the employer knew or should have
9 known that the individual was unauthorized; but
10 that final piece of the puzzle, the actual
11 knowledge or the actual establishment that the
12 person was unauthorized was missing, and OCAHO
13 issued some decisions on that.
14        So I believe that toward the end,
15 whenever they wanted to do a knowing violation,
16 there was typically either a sworn statement or
17 an I-213 or some direct evidence of unauthorized
18 status.
19    Q.  Okay.  And but ICE had also won cases
20 without the I-213; is that correct?
21    A.  Without establishing that in front of
22 a --
23    Q.  In other words, they had won cases in
24 front of the ALJ establishing that an employer
25 had knowingly hired an unauthorized worker even

1 without presenting an I-213.
2    A.  There is some -- There is some
3 authority for that.  I believe there's some
4 authority for that in federal courts, you know,
5 where the -- I don't want to use the word
6 "negligence," but the circumstances were so
7 obvious to the employer that the court found
8 that the individual -- you know, that the burden
9 of proof had been met that they knowingly hired
10 an unauthorized person.
11        A perfect example -- And there's
12 case law out there.  A perfect example is where
13 there's employers who provide identity documents
14 to employees.  You know, there's some real bad,
15 bad employers out there that have done that and
16 have been caught doing that.
17        There's evidence out there where
18 employers have utilized E-Verify and received a
19 rejection notice, or what's called a
20 nonconfirmation, and then the employer has sent
21 that person to a staffing agency and hired them
22 through the staffing agency so there was no
23 direct employment relationship.
24        There's case law that -- where
25 they -- where courts have found that the employer

1 had knowledge of unauthorized status by virtue
2 of the E-Verify nonconfirmation.  So, yes, there
3 are cases where that's been established, but it
4 is -- the best piece of evidence you can have is
5 a Form I-213.
6    Q.  If you can get it, get it, if you're a
7 government attorney; right?
8    A.  Right.
9    Q.  But the employer would never receive
10 that; correct?
11    A.  No, but the employer would be the one
12 defending against that allegation.
13    Q.  And the I-213 is something that would
14 be generated after you had done a work site
15 enforcement, already started a work site
16 enforcement action; correct?
17    A.  If you just -- Typically, if you decide --
18 If ICE decides to not only do an enforcement action
19 against the employer but also the employee, you
20 know, if they want to move to deport the employee,
21 then -- then they would do an I-213.
22    Q.  Where does removal proceedings relate?
23 How does that happen?
24    A.  Lots of different ways.  I mean, removal
25 proceedings are initiated through a notice to

1 appear, where an ICE agent has made either an
2 arrest or a determination, you know, that the
3 person is removable, and then they put them into
4 removal proceeding.
5        They have an opportunity to
6 challenge their removability in front of an
7 immigration judge and also to file for certain
8 applications that allow them to avoid
9 removability.
10   Q.  And so a removal proceeding could take
11 place independent of a work site enforcement
12 action?
13   A.  Oh, absolutely.  There's -- There's far
14 more removal proceedings, removal cases than
15 there are work site enforcement cases.
16   Q.  But could a removal proceeding also
17 occur or arise out of a work site enforcement
18 action?
19   A.  Yes.
20   Q.  Okay.  How would that happen?
21   A.  Well, that's -- I mean, you saw that
22 happen a lot under President Trump's
23 administration, where they would go on -- on
24 site, they would arrest the employees and put
25 them in removal proceedings, and then they would

1 also initiate an audit or levy criminal sanctions
2 against the employer for knowing hire, knowing
3 continue to employ and I-9 audit.
4        So it can happen in two ways,
5 depending on how aggressive the enforcement
6 agency is being, which you saw a lot more of
7 that during -- from 2016 to 2020 than you ever
8 did prior.
9   Q.  On either a removal proceeding or a
10 work site enforcement action, what would happen
11 if the agent goes out to complete an I-213,
12 tries to talk to the individual, the employee,
13 and they refuse to talk to them, refuse to
14 answer their questions?
15   A.  They would typically -- From my
16 recollection, they would typically put in the
17 I-213 that manner and place of entry is unknown.
18 You know, typically the individual would tell
19 them their alienage, which is where they're
20 from, where they're born.
21        So, you know, in the event that
22 they didn't, they would typically just send the
23 213, say, you know, refuse to answer, and they
24 would just put it in the 213; but, again, that's
25 pretty rare.

1   Q.  But there's more to the I-213 than just
2 where they were born; right?
3   A.  Oh, yeah.  No, they run criminal
4 history, they run -- it's all in that record of
5 admiss -- record of inadmissible alien I think
6 is what it's called.
7   Q.  But what else do they ask the employee
8 besides where were you born?
9   A.  Well, sometimes they ask where did you --
10 where do you work, how long have you worked
11 there.  So there's employment info in there.
12 There's criminal history in there.  There's --
13   Q.  Do they ask them if they're here legally?
14   A.  Right.  I mean, that's what I'm -- I
15 mean, that's what I'm -- When I say "here
16 legally," you're talking about manner of entry.
17 You're talking about alienage, manner of entry,
18 and status.
19        So manner of entry is what
20 establishes your lawful ability to be here.  If
21 I'm here -- If I'm here legally, you know, which
22 is a term that is thrown around a lot; but if
23 I'm here legally, that means I entered in a
24 lawful status.  I entered with a visa or I
25 entered as a, you know, immediate family

1 relative.  So that's when I say -- when I say
2 "manner of entry," that's what I'm reflecting.
3   Q.  And did you ever do cases where in the
4 I-213 the employer -- or, I'm sorry, the
5 employee wouldn't answer all of the agent's
6 questions?
7   A.  There were -- There were -- I do recall
8 some situations where -- not in the context of
9 work site enforcement, but in the context of
10 removability, which you also need an I-213 for
11 removability, there were situations where they,
12 you know, refused to answer, and then we --
13 we just tried to establish it through other
14 evidence --
15   Q.  Like what?
16   A.  -- to the judge.
17        Cross-examination a lot of times.
18 But, again, you're talking about a very -- you're
19 talking about less than probably 1 percent.
20 Most respondents or foreign-born individuals
21 that are placed in the removal proceedings will
22 openly admit where they're from and how they
23 entered.
24   Q.  Okay.
25   A.  So, yeah, we would -- we would have to

15 (Pages 54 - 57)

1 establish it through testimony. You know,
2 sometimes if there were criminal hits, it will --
3 it would have been established through other
4 documents that you could produce, you know, so --
5 there's cameras on the border, and there were --
6 there were databases that reflected entries,
7 and there's fingerprints that would match the
8 individual to that entry point, which -- so we
9 would use that as evidence sometimes.
10        And I'm -- And, again, I'm
11 talking about the manner of entry would be
12 what's called without inspection or parole. It
13 means they entered illegally through the --
14 through the desert, you know, across the border.
15 So there's other ways that the Homeland Security
16 could establish.
17    Q.  And so would you still have -- When you
18 said, hey, look, you know, typically we would
19 have an I-213, if the employee refused to answer
20 the agent's questions, would the agent still
21 issue the I-213 based on other information?
22    A.  Yes.
23    Q.  Okay.  So you could still have an I-213 --
24    A.  If they had --
25    Q.  -- even if the employee didn't talk to

1 you?
2    A.  Yeah.  If they had -- If they had
3 probable cause to make a determination that the
4 person -- that the individual was removable or
5 inadmissible, yes.
6    Q.  Is the -- On the knowing hire violations,
7 is that established by the same statute under
8 criminal law, the 8 U.S.C. 1324a?
9    A.  Yes.
10    Q.  Okay.  Same elements?
11    A.  Right.
12    Q.  How would you decide whether to take
13 the case criminally versus administratively?
14    A.  That wasn't a decision that we made or
15 that I made on ICE's behalf.  That was -- You
16 know, that was between HSI and the DOJ.  Because
17 if you're taking it criminally, it has to be
18 brought by DOJ.  Removal proceedings are
19 instituted by Homeland Security.
20        So, yeah, that was -- if it was
21 going to go criminal, we didn't really have a
22 lot of say in that, other than just, you know,
23 we would work with our U.S. attorneys and
24 things; but, in general, that wasn't our --
25    Q.  Were you ever involved in the referral

1 of a matter for criminal prosecution?
2    A.  Yes.  I was involved in -- When I was
3 with ICE?
4    Q.  Yeah.
5    A.  Yes.  I was involved in, I recall, I
6 think, two or three different cases where there
7 was widespread knowing, and it was -- it was
8 those cases that I kind of described where the
9 employer was either recruiting at the border,
10 going down and bringing up, you know, vanloads
11 of individuals from -- from Mexico to work, so
12 there was just direct actual knowledge, or they
13 were supplying identity documents, so there was
14 like wide-scale identity theft or, you know,
15 there were conspiracy elements where they would
16 use staffing agencies.  I recall a few of those
17 where I was involved in the decision to go
18 criminal.
19    Q.  And what would be your involvement in
20 those?
21    A.  Just basically to be an expert resource
22 on things for the U.S. attorney.  You know,
23 they would call and they'd say -- we would talk
24 through the evidence.
25        You know, a lot of times those

1 document fraud cases and things would, you know,
2 settle out right away or plea out right away,
3 but we would just always -- I mean, I probably
4 talked to the U.S. attorney or the AUSAs on a
5 weekly basis about -- because they did a lot of
6 1546, false claim to U.S. citizenship, and they
7 would use I-9s to establish that because of that
8 Section 1 attestation.
9    Q.  It's a felony to falsely claim you're a
10 United States citizen on an I-9; right?
11    A.  It is, and it also bars the individual
12 from any relief to stay in the United States.  So
13 it's -- it's a felony.  There's a lot of those
14 prosecutions.  AUSAs get those, like, regularly.
15    Q.  Were you ever involved personally in
16 the criminal prosecutions?
17    A.  You know, always on -- always in the
18 background.
19    Q.  Okay.
20    A.  You know, in the sense that I would be
21 there with the AUSA at some hearings.  I
22 remember we had some in-chambers hearings and
23 things, but -- so, yeah, I was involved, but
24 not --
25    Q.  Okay.

16 (Pages 58 - 61)

1    A.   But not -- I was never the listed
2  attorney in that regard.
3    Q.   Okay.  You never had an appearance on
4  file in a criminal case?
5    A.   Not when I was with ICE, no.
6    Q.   Okay.  This may be -- Well, I'm going
7  to -- Let me ask you about your private
8  practice, and then we can take a break because I
9  think we've got about 24 minutes on the video.
10         So can you kind of describe for
11  us your private practice since leaving the
12  government?
13    A.   Yeah.  When I left the government in
14  November of '16, I joined Kutak Rock in Omaha,
15  in their Omaha office.  Kutak Rock is a national
16  law firm that has 16 offices.  Omaha is its
17  biggest office.
18         The -- I was -- immediately
19  joined the employment group as of counsel and,
20  did a variety of employment law litigation and,
21  you know, did some commercial litigation; but
22  always at least 50 percent or more of my practice
23  has been representing employers in this area of
24  Form I-9 compliance.
25         A lot of it was proactive.  I

1  would go out and do internal audits of their
2  I-9s, of their existing I-9s, would do a lot of
3  training of HR professionals.  You know, if
4  there was a Notice of Inspection served on an
5  employer, I would -- I would file a G-28 and
6  liaison with the -- with the agency to work
7  through those issues and, you know, settle
8  fines, do any -- you know, just basically
9  represent employers.
10         So that's what I've done since
11  2016.  I've had some larger -- well, one in
12  particular I was -- which was a criminal
13  indictment in Nebraska of a -- of a tomato farm
14  that I represented the entity that was actually
15  criminally indicted on some employment violations.
16         So I continue to do that.  I do
17  employ -- you know, employment litigation and
18  immigration litigation, essentially.
19    Q.   Can you kind of walk us through what
20  you tell employers with respect to filling out
21  I-9s?
22    A.   Well, there's a lot of things I tell
23  employers; but, one, that they should do it, you
24  know, that they should do it for every direct
25  hire that they make, that Section 1 needs to be

1  completed on the first date of employment by
2  the employee, that they need to ensure it's
3  completed properly by the employee, including
4  signed and dated, that Section 2 needs to be
5  done within three business days, and that includes
6  a review of identity and authorization documents,
7  and I tell them that if they don't do it, you
8  know, within compliance, that they're subjecting
9  themselves to fines in the event of an ICE audit,
10  you know, and I tell them to regularly conduct
11  internal audits of their I-9s to make sure they're
12  catching paperwork errors or -- I mean, it's
13  just -- you know, it's -- an I-9 is -- in
14  reality, an I-9 is typically part of a -- of an
15  onboarding packet, and it's one of 15 forms
16  that's getting filled out by an employee when
17  they start their employment.
18         And so there's just lots of ways
19  to mess it up, and so I usually tell employers
20  that the best way to catch those errors is to
21  review -- you know, assign somebody to review
22  them internally and make the corrections.  That's
23  what CI -- USCIS advises that, and so that's
24  generally my advice.
25    Q.   What do you tell them to do with respect

1  to internal audits?
2    A.   So USCIS has a guidance out there, best
3  practices for internal audits.  I always advise
4  them that it cannot be done discriminatorily.
5  So they can't just pick and choose who they want
6  to audit.  If they're going to do an audit,
7  it needs to be of their entire workforce or a
8  logical segment of their workforce that's
9  nondiscriminatory.
10         That's a real concern, is that
11  you've got employers that are only looking at
12  foreign-born individuals' I-9s or somebody who
13  looks a certain way or talks a certain way and
14  making discriminatory judgments based on that.
15         So there's just as much litigation
16  where employers are fined for discriminatory acts
17  as there is where they're fined for not doing,
18  you know, Form I-9s correctly.
19         So I always warn and advise on
20  that aspect of it.  My philosophy is that you
21  should -- an employer should treat every
22  employee in a robotic fashion, where they do the
23  same process for every employee and that they
24  engage and use the same level of scrutiny and
25  diligence for every employee.

1 Because you don't want an
2 employer pulling out a black light to look at a
3 document for somebody based on the way they look
4 and then, you know, a Caucasian male comes in
5 from Omaha, Nebraska, and they just take the
6 card and make a copy and put it in a drawer.
7 That's discriminatory. That's a discriminatory
8 act.
9 So those are issues that I advise
10 on; but with regard to internal audits, I always
11 provide them with CIS's best practices and just
12 coach them on that.
13 Q. And I think you said that sometimes
14 what you'll do for an employer is go through and
15 actually audit yourself their I-9s; is that right?
16 A. I will -- I will go through and review
17 them and prepare an audit report. I do not
18 touch the I-9s myself. I always instruct them
19 how to fix them. I don't -- I don't audit the
20 form myself, but I'll prepare an audit for them.
21 Typically there's a spreadsheet
22 that says you've got an improper List B document,
23 you know, you need to do XYZ to correct that, you
24 know, that lists out the errors and then instructs
25 them on how to correct that, but I don't -- I

1 don't like touching an original Form I-9, even
2 though I -- you can legally as long as you attach
3 a memo. I just -- I don't do that.
4 Q. But do they -- How do you actually review
5 the I-9s? Do they send you copies or how does that
6 work?
7 A. Yeah, or I go on site and sit in a dark
8 cave for three days and look through 10,000 I-9s
9 or what -- you know, it's scrupulous work, but
10 I -- you know, I enjoy it, so --
11 Q. And so when you're doing it on site,
12 you're not looking at the original. You ask
13 them to make a copy or how does that work?
14 A. Well, I always -- the corrections need
15 to be made on an original for it to be a valid
16 correction. So I confirm that they have the
17 original in their possession; but if I do it off
18 site, typically they'll send me a copy.
19 Q. And how long does it take you to go
20 through I-9s?
21 A. I mean, I'm pretty fast. And I've done
22 this, you know, for 15 years, or however long,
23 and so I can get through them and I can spot
24 them. They jump off the page at me. But, you
25 know, I do probably 5- to 7,000 I-9s a year on

1 an audit standpoint.
2 So, you know, it doesn't take me
3 long, but if -- a lot of times HR departments
4 don't have the budget to have outside counsel do
5 it, so I'll -- you know, their HR people will do
6 it, and I'll just serve as a resource as they do
7 it, and that takes longer; but, you know, for
8 me, I can probably go through 500 I-9s in a day.
9 Q. And then you'd typically produce a
10 spreadsheet or some sort of memo that tells the
11 employer what mistakes they have?
12 A. I do an audit report, which is obviously
13 attorney-client privilege and attorney work
14 product, but it tells them how to fix those I-9s
15 in compliance with CIS's best practices.
16 CIS openly -- USCIS, I should
17 say, is another sub agency. It's like a sister
18 agency of ICE that actually creates the form,
19 creates that M-274, the instructions.
20 So CIS puts all the -- you know,
21 all the instructions out there for employers,
22 and so that's -- you know, they openly advocate
23 that employers do regular internal audits.
24 Q. Okay. And then I think you said you
25 also will defend employers in work site

1 enforcement actions once they actually are
2 contested proceedings; right?
3 A. Correct.
4 Q. Anything else that we haven't talked
5 about that you do in your private practice?
6 A. I mean, I do commercial litigation, and
7 I do a lot of -- I do a lot of commercial
8 litigation. It's probably half of my practice.
9 Q. So about half of your practice is
10 immigration, half of it is commercial litigation?
11 A. That's correct. There seems to always
12 be some tie to immigration or at least employment,
13 you know, employment regs and things, but I do a
14 lot of -- one other thing I should probably tell
15 you is I do a lot of affirmative visa filings
16 for companies, meaning if they want to bring in
17 an H-1B visa worker, you know, I do those filings.
18 I do entertainment visas. I do
19 O visas for athletes. I do -- You know, I
20 represent companies that are being investigated
21 by the Department of Labor for -- for various
22 H-1B or H-2B visa violations.
23 So, you know, I'm very familiar
24 with that aspect of it, too, what I call the
25 benefit side or the -- you know, so both sides,

18 (Pages 66 - 69)

1 compliance and benefit side.

2    Q.  I noticed on your firm website that you
3 have an agricultural practice at the firm.  What
4 is your involvement with that?

5    A.  Just -- You know, I -- I usually speak --
6 We have an ag seminar every year, so I usually
7 speak, and that brings in a lot of our ag clients.

8          I mean, Kutak primarily does a lot
9 of, like, banking and finance for ag clients;
10 but, you know, compliance and things is always
11 of interest to agriculture clients, so I usually
12 try to make myself a part of their annual seminar,
13 even if I only get ten minutes, to just talk about
14 the importance of I-9 compliance and things, so I
15 do that every year.

16    Q.  Do you have or have you had immigration
17 clients in the agricultural industry?

18    A.  Yes.  Oh, yeah, on both the benefit side
19 and the compliance side.

20    Q.  On the compliance side how much a part
21 of that is your immigration practice?

22    A.  Specifically ag?  I mean, I consider ag
23 pretty broad-ranging, so basically the production
24 of food I would consider to be somewhat ag.  I'd
25 say it's 20 to 30 percent of my immigration clients

1 are somewhat connected to agriculture.

2    Q.  Is that somewhat of a specialty that
3 people seek out or may advise you -- or ask you
4 on because you have experience in the agriculture
5 industry?

6    A.  No.  It's more of a -- Agriculture is a
7 critical infrastructure sector within Homeland
8 Security's enforcement priorities.  Okay?  And
9 so, you know, as you know, we have to network,
10 and we have to market our services, so you -- I
11 always try to focus on critical infrastructure
12 sectors.

13          So that would include -- the tech
14 industry is big for me because tech relies on a
15 lot of H-1B visas.  The ag industry is big for
16 me because there's lots of ag visas that are
17 available, H -- H-2As and J-1 trainings.  I do a
18 lot of that stuff that, you know, basically -- so
19 I kind of market to those critical infrastructure
20 sectors.

21    Q.  Fair to say that the agriculture
22 industry may have more immigration challenges
23 than other industries?

24    A.  You know, I think -- I've seen various
25 studies that would show that, and I think that

1 that's probably accurate, that there's -- as in
2 any -- as in any industry that relies on manual
3 labor, and the same way -- I would say the same
4 thing for construction, the construction industry.
5 I think that there's a higher ratio of fake and
6 fraudulent documents used in those industries.
7 I would -- I would agree with that.

8    Q.  Okay.

9          MR. KLINEFELDT:  Okay to take a
10 break now?

11          THE WITNESS:  Yep.

12          MR. KLINEFELDT:  I think we're --
13 we've got about ten minutes left on the video.
14 So can we go off record?

15          THE VIDEOGRAPHER:  We are going
16 off the record.  This is the end of Media Unit
17 Number 1.  The time is 10:21.

18          (A recess was taken.)

19          THE VIDEOGRAPHER:  We are back on
20 the record.  This is the beginning of Media Unit
21 Number 2.  The time is 10:40.

22    Q.  Mr. Samson, before we talk about the
23 specifics of this case, I want to ask you a
24 little bit more about an employer's duties with
25 respect to immigration law.

1          Generally, how would you describe
2 an employer's duties with respect to immigration?

3    A.  When you say "immigration," I assume --
4 I assume that you mean with respect to employee
5 verification.  That would be the -- an employer's
6 responsibility is to comply with the federal
7 requirement that they complete a Form I-9 for
8 each employee that they hire at the time of hire
9 and also to exercise reasonable diligence to
10 confirm the identity and the work authorization
11 of the employee.

12    Q.  And an employer generally has the duty
13 to avoid hiring unauthorized workers.  Is that
14 fair to say?

15    A.  I would -- I would say the opposite.  I
16 think an employer generally has the duty to
17 confirm that their employees are authorized for
18 work.  We're probably saying the same thing, but
19 I would say it more affirmatively.

20    Q.  So you're familiar that the U.S.
21 Citizenship and Immigration Services has a
22 handbook for employers; right?

23    A.  Yes.  It's called an M-274.  It's
24 published -- The versions of it change from time
25 to time.  It's updated and amended.  They also

1 regularly keep guidance online for employers.
2 They have -- They have a good website called I-9
3 Central that USCIS kind of manages, so they are
4 the resource for employers.
5     Q.   And so the -- they have a handbook
6 available online for employers; is that right?
7     A.   Yes.  It's called an M-274.
8     Q.   And that's there to help employers
9 comply with their legal requirements.  Is that
10 fair?
11     A.   That's -- That's correct.  It contains
12 a lot of information for employers, including,
13 you know, we talked about the discrimination
14 aspect, including ways to avoid discriminatory
15 hiring.
16          There's a section on unfair
17 discrimination practices in that.  There's a
18 list of the documents that are acceptable to
19 accept.  So there's -- I believe it's like 13
20 chapters on it.  It's a thick document, and it's
21 a good resource.  I review it regularly.
22     Q.   Okay.  And I think this comports with
23 what you're saying.  I'll just show you what I
24 marked as Exhibit 91, which I will tell you is
25 Section 1 of the handbook for employers.

1     A.   Yeah.  This is -- This is like the
2 first chapter out of the M-274.  They now have
3 it completely available and broken down by -- by
4 section and chapter online.
5     Q.   Yeah.  So you can go on the website and
6 just get a particular section.
7     A.   Exactly.
8     Q.   Yeah.  And that's exactly what I did
9 there.
10          And I just want to kind of affirm
11 a couple of things there.  It looks like in the
12 second paragraph it says, you know, "Employment
13 is often the magnet that attracts people to
14 reside in the United States illegally.  The
15 purpose of the employer sanctions law is to
16 remove this magnet by requiring employers to
17 hire only individuals who may legally work
18 here."
19          Is that a fair description of
20 employer duties?
21     A.   That is a fair description of the
22 underlying basis for the Form I-9 requirement.
23 That was passed through a bipartisan effort in
24 1986.  So that language actually comes out of
25 from 1986, which was the language that supported

1 that requirement.
2     Q.   And so the purpose of the law is to get
3 employers to only hire individuals who may legally
4 work here; right?
5     A.   Right, to create a disincentive for the
6 admission into the country without inspection or
7 parole.
8     Q.   And then it says, look, there's -- to
9 comply with the law, employers must do, you
10 know, at least three things.  One is verify the
11 identity and employment authorization of each
12 person they hire; right?  That's one.  Is that
13 fair to say?
14     A.   Correct.  And that's through the Form
15 I-9 process.
16     Q.   And then --
17     A.   That's how they do that.
18     Q.   And then the second one is to complete
19 and retain a Form I-9, Employment Eligibility
20 Verification, for each employee, and that's the
21 second requirement of the employer; right?
22     A.   That is the -- It is listed as the
23 second bullet point, but that is actually the
24 way in which you comply with the first bullet
25 point, if that makes sense.

1          The Form I-9 is the -- is the
2 animal that was created to help employers verify
3 the identity and employment authorization.  They
4 have no duties beyond creating the -- the Form
5 I-9s unless they're put on notice of a change
6 during the course of employment, if that makes
7 sense.
8     Q.   But what I'm driving at here is that
9 an employer doesn't just have a duty to fill
10 out a form.  An employer has a duty not to hire
11 somebody who is unauthorized to work in the
12 United States.  Isn't that fair to say?
13     A.   An employer has the duty to complete a
14 Form I-9 using reasonable diligence to confirm
15 that the documents that are presented appear
16 genuine on their face, okay, and relate to the
17 individual in front of them.  That's their duty,
18 and that's what they attest to in Section 2 of
19 the form.  That's their -- That's their legal
20 obligation.  Okay?  There's no legal obligation
21 beyond that.
22          Now, employers -- if something
23 happens during the course of an employee's
24 employment that puts an employer on notice that
25 that person is no longer authorized for work or

1  never was, then an employer has certain duties
2  at that point as well, but at the time of hire
3  the Form I-9 is the main legal obligation of the
4  employee -- of the employer.
5     Q.  You could fill out the form and still
6  violate the law, though, couldn't you?
7     A.  If you had actual knowledge that you
8  were falsifying the form.  If you were falsifying
9  the form, yeah.  I mean, obviously --
10    Q.  Right.
11    A.  -- you could fill the form out and
12 falsify it and violate some other obligation,
13 yes.
14    Q.  Right.  Well, you could violate Section
15 1324a and still fill out the form, couldn't you?
16    A.  If you had -- Yes, if you had actual
17 knowledge at that time that you completed the
18 form that the person was not authorized for
19 employment, yes.
20    Q.  And so the obligation not to hire
21 unauthorized workers is bigger than just filling
22 out the I-9 form.  Isn't that fair?
23    A.  The obligation is -- is to act as a
24 reasonable employer would act.  That's a bigger
25 obligation than just the Form I-9.  I agree with

1  you there, but I'm pushing back on you a little
2  bit on your question because the -- the I-9
3  itself is the shield.  It's what you -- It's what
4  employers use to comply with the requirement; but
5  they can't do so unreasonably in order to avoid,
6  you know, violating 1324 for knowing hire.
7     Q.  Right.  They can't just go through the
8  motions of filling out the form even though they
9  may know that they're hiring somebody who is
10 unauthorized?
11    A.  The key part of your question there is
12 the knowledge aspect.  They can't -- They -- If
13 they have knowledge, yeah, you're correct,
14 there's -- the obligation is larger.  If they
15 don't have knowledge, then their job is to fill
16 out the form in a robotic fashion to avoid
17 discriminating against certain applicants.
18        So that's why when I -- I mean,
19 you have to understand that employers are in a
20 position where, if you look at the third bullet
21 point, "refrain from discriminating against
22 individuals on the basis of national origin or
23 citizenship," they're constantly balancing that
24 third bullet point against the first bullet
25 point, right, and that's what the Form I-9 is

1  designed to do, is designed to be that level of
2  protection.
3        Now, some employers go above and
4  beyond and sign up for E-Verify to help them
5  with that process.  Okay?  That's not required
6  in Iowa.  It's not required in many states.
7  But, in general, the Form I-9 is the obligation.
8  Obviously you have to complete it reasonably,
9  though.
10    Q.  And so is it your testimony, then, when
11 the USCIS says in the handbook that the purpose
12 of the employer sanctions law is to remove the
13 magnet by requiring employers to hire only
14 individuals who may legally work here, that that
15 requirement is limited to just filling out the
16 I-9 form?
17    A.  The I-9 form is the vehicle by which you
18 confirm the person is authorized for employment.
19 It's the vehicle you use.
20    Q.  And so when the USCIS lists out as a
21 separate bullet point the obligation of an
22 employer to verify the identity and employment
23 authorization of each person they hire separate
24 from completing and retaining an I-9 form,
25 what's your understanding of that?

1     A.  The Form I-9 is the vehicle by which
2  they're verifying.  Okay?  So -- And that second
3  bullet point goes to another obligation, which
4  is, you can't complete the Form I-9 and then
5  throw it away.  You have to complete it and
6  retain it during the scope -- during the -- so
7  that's the retention aspect.  Okay?  That's
8  why that second bullet point is laid out there.
9  Okay?
10    Q.  Well, doesn't it --
11    A.  Because you see where it says "complete
12 and retain."  I mean, there's -- that's a --
13 that's -- that's a recordkeeping obligation.  You
14 can't just complete it, throw it away, and then
15 tell the federal government you did it.  You have
16 to retain and be able to produce it on three
17 business days' notice.
18    Q.  Right.  It says complete and retain the
19 I-9; correct?
20    A.  For each employee.
21    Q.  For each employee.
22    A.  Within a certain retention period, yes.
23    Q.  And that's the second bullet point;
24 right?
25    A.  Right.

21 (Pages 78 - 81)

1    Q.   And so are you saying, then, that the
2  first bullet point is a nullity; that so long as
3  you're doing the second bullet point, that first
4  one doesn't matter?
5    A.   No.  I'm saying the first bullet point
6  is read in conjunction with the second bullet
7  point because the Form I-9 is the vehicle by
8  which the employer verifies the identity and
9  employment authorization.  That's what they're
10  doing in Section 2 of the Form I-9.  Under
11  penalty of perjury, they're attesting that they
12  verified identity and employment authorization.
13    Q.   Okay.
14    A.   There's no -- There's no separate
15  obligation, but I agree with you that the
16  employer cannot falsify the form or unreasonably
17  fill out the form and just, you know, meet their
18  obligation.  They have to do it reasonably.  And
19  that's what they're attesting to.
20    Q.   Right.
21    A.   Yeah.
22    Q.   An employer can't knowingly hire somebody
23  who is unauthorized to work in the United States;
24  right?
25    A.   Right.  And a good example --

1    Q.   And that's not just limited to filling
2  out an I-9 form; correct?
3    A.   Well, a good example of that is the
4  employ -- the employer who provides the documents
5  to the employee and then turns around and fills
6  out the Form I-9 with the -- with the fraudulent
7  documents.
8         That's perfect example of, well,
9  they filled out the Form I-9, but they also
10  knowingly hired an unauthorized person.  That's
11  a -- That's -- That's your perfect example of
12  what you're saying.
13    Q.   Right.  And so I'll just ask you one
14  last time.  Would you agree with me, then, that
15  an employer's duty is to verify the identity and
16  employment authorization of each person they
17  hire and that while filling out the I-9 form is
18  part of that, it's not limited to filling out an
19  I-9 form?
20    A.   I agree.  I agree that the overarching
21  obligation and reason for the Form I-9 requirement
22  is the employer's obligation to verify identity
23  and employment authorization.
24    Q.   Okay.  And so before we talk about I-9s,
25  you mentioned E-Verify, and I want to ask you

1  about that.  What is E-Verify?
2    A.   E-Verify is essentially a service that
3  an employer can utilize that is associated and I
4  believe provided by USCIS.  The -- It's -- It's
5  a voluntary service.  Some states require it.
6  The federal government requires it if you're
7  doing -- the use of it if you're doing federal
8  contracting work, but it's not -- states can
9  make their own decision as to whether they
10  require it.
11         And then essentially what happens
12  is, at the time of hire, the employee -- the
13  employer, excuse me, receives the documents from
14  the employees, and then they create a case
15  within E-Verify.  They input the information on
16  the documents, and then E-Verify spits out --
17  E-Verify runs a check against Homeland Security's
18  databases and spits out a result that tells you
19  whether employment is authorized or whether it
20  can't be confirmed that it's authorized.
21         If it's not confirmed that it's
22  authorized, if it's -- it's called a TNC.  The
23  employee then has to take an affirmative action
24  to confirm and work with Homeland Security to
25  verify that.  And so they're given like eight

1  working business days to do that, and that's --
2  so it's just a -- it's another resource that
3  employers can use to meet that first bullet
4  point obligation that we talked about.
5         Here's the issue with E-Verify.
6  Okay?  E-Verify will not catch fraudulent cards.
7  Okay?  So E-Verify is not a perfect system in
8  the sense that -- the best way I can explain
9  this is that there's a difference between a fake
10  document and a fraudulent document.
11         A fake document is one that has
12  been manipulated.  Okay?  E-Verify will catch
13  that; and that is if the Social Security number
14  doesn't match the name or, you know, things of
15  that nature.  It's not going to catch if you're
16  using your brother's ID and the identity is all
17  legitimate and matches up to the date of birth
18  and the Social Security number.
19         So E-Verify is not a perfect system,
20  by any way.  It will only catch fake cards, it
21  won't catch fraudulent cards, if that -- Does that
22  make sense?
23    Q.   Is there any way that it matches pictures,
24  or is there any sort of identification it does of
25  your image?

22 (Pages 82 - 85)

1   A.  Not that I'm aware of.  It's -- It's a
2   cross section.  They may have added a digital --
3   a digital photo part of it more recently, but
4   that's -- that would be a new addition.
5           You do -- You do need to retain
6   an identity document which bears a digital
7   image, and so there is a component to that, but
8   a lot of times if you look at an E-Verify
9   printout, that image locator is going to be
10  blank because there wasn't -- they didn't do
11  that part of it.
12  Q.  And so let's start out, so do you know
13  what states do require E-Verify or how many?
14  A.  You know, I haven't -- I haven't looked,
15  but I think 33 do not, so I would say 17 do.
16  You know, I'm familiar with this AOR, so I think
17  Nebraska and Iowa do not; but, yeah, so I think
18  it's 17 require it, 33 don't.  I might have that
19  flip-flopped, though.
20  Q.  And do you know why they require it?
21  A.  Just as an extra layer of protection
22  against hiring unauthorized workers.
23  Q.  And can you kind of walk us through
24  how an employer would go about utilizing it?
25  A.  Yeah.  I mean, I think I just did that;

1   but, essentially, at the time of hire they get
2   the documents, right, that are -- that are also
3   listed in the Form I-9.  They then go into a --
4   It's a software-based system.
5           They go in, they input the
6   documents, and then the E-Verify system spits
7   out a result; and it either says a positive
8   result, employment authorized, or it says
9   tentative nonconfirmation, which says for
10  whatever reason we can't confirm authorization.
11          The employer then within the
12  system prints out what's called a Further Action
13  Notice, and they provide that to the employee,
14  and they say you can keep working here for the
15  next eight days, but you have to go to Homeland
16  Security and fix this or else, you know, we're --
17  we can terminate you because we had -- and so it
18  gives the employee a period of time because
19  there can be -- there can be TNCs that are
20  issued not as a result of the -- of a fraudulent
21  or, I'm sorry, of a -- of a fake document.  They
22  can be because, you know, the Social Security
23  number doesn't match perfectly to the name
24  because of the use of a middle initial.  There's
25  just a lot of reasons a TNC can generate.

1           So that's -- and then you go in
2   and -- basically the employer would go in and
3   resolve that case in the system, and then it
4   prints out a result.  You typically would attach
5   that to your Form I-9.
6           So it's just a -- it's a system
7   that -- it's not a perfect system, but it's a --
8   just an extra layer.  It's like the -- Right now
9   it would be what I would call the gold standard
10  of if an employ -- if an employer is an E-Verify
11  employer, if ICE were to come in and do an
12  audit, ICE would consider that a positive factor
13  or a good -- a good-faith indicator.
14  Q.  Would it be a best practice?
15  A.  I don't think USCIS has went as far --
16  as far as to say it's a best practice.  I think,
17  again, where there's real value to it is in the
18  event of an audit, ICE considers it a good-faith
19  factor.
20          So, you know, I -- I mean, if --
21  It's also burdensome to do it, and so a lot of
22  employers don't.  I mean, you know, I would say
23  in Nebraska and Iowa you're probably less than
24  half of the employers that use E-Verify just
25  because it's burdensome.  It's an extra part of

1   the onboarding process, and a lot of employers
2   don't want to do it.
3   Q.  If you get a tentative nonconfirmation
4   and the employee doesn't do anything to resolve
5   it, as an employer are you required to terminate
6   them?
7   A.  I mean, that's what I advise.  It's --
8   I don't know that it's a legal requirement under
9   the law, but you're required to resolve that
10  case within E-verify; and if you don't resolve
11  it, E-Verify will terminate your account, and
12  then you can't use E-Verify; but it's not
13  associated with an enforcement mechanism.
14          For example, like, E-Verify is a
15  completely separate system.  If an employer
16  doesn't handle that correctly, it doesn't mean
17  ICE is going to come the next day and arrest --
18  and charge you with knowing -- you know, knowing
19  hire or knowing continued employment; but, you
20  know, you're going to lose your ability to use
21  E-Verify, and that's -- and then when we talk
22  about that administrative subpoena, when ICE
23  comes in, that's going to be something ICE tries
24  to get, so if it's out there that you lost your
25  E-Verify account, ICE will use that as a -- as

23 (Pages 86 - 89)

1 a -- as indicia of noncompliance.

2    Q.  If you are accurately using E-Verify,
3 is there any protections under the law for that
4 action?  In other words -- That's a bad question.

5         If ICE comes in and does a work
6 site enforcement action and that employer is
7 using E-Verify correctly, does that give the
8 employer any protection under the law?

9    A.  Yes, in the sense that it's typically
10 used as a good-faith factor for purposes of fine
11 mitigation.  It can also be used -- There's --
12 I'm sure you've heard about the good-faith
13 defense to 1324.  It would also be a factor that
14 would help an employer establish that good-faith
15 defense.  It's not the factor, but it would be a
16 positive factor that would go a long way in
17 establishing that.

18         But, again, it's not a perfect
19 system, and there's a ton of case law out there
20 that talks about that not being a perfect system
21 and that you can't -- you know, the nonuse of
22 E-Verify does not equate to a lack of good faith.
23 And that's well-established.  I mean, the nonuse --
24 I want to make that clear.  The nonuse of E-Verify
25 does not equate to lack of good faith.

1    Q.  But if you've accurately used it,
2 you're getting a benefit as an employer; right?

3    A.  It's twofold.  Not only are you
4 operating at that gold standard of compliance in
5 hitting Bullet Point 1, but you're also -- it's
6 a shield to liability for knowing -- for knowing
7 hires.  So it's a -- yeah, it's a positive -- it's
8 a positive factor.

9    Q.  But if you use it and don't do so
10 accurately, for example, continue to employ
11 somebody who hasn't resolved a tentative
12 nonconfirmation or not resolved the tentative
13 nonconfirmation, then it sounds like you've kind
14 of bought yourself a problem.

15    A.  That's -- To me, that's -- that's a bad
16 situation to be in, and there's a very -- there's
17 a memorandum of understanding when you -- when
18 you agree to use it, like you're -- there's --
19 you're agreeing to use it correctly and things.

20         So not only is it a problem
21 because you're going to lose your access to that
22 account, but in the event of an ICE audit, that
23 would be something they would seek as part of
24 the administrative subpoena.

25    Q.  And then what -- where is E-Verify, the

1 system, getting information from to kind of
2 verify your employees' documents?

3    A.  Yeah.  I -- They are, to my knowledge --
4 And, again, obviously I didn't create the system,
5 but to my knowledge it's running a cross-check with
6 a couple different federal agencies, including
7 Social Security and Homeland Security's databases.

8         So it's running -- it's running
9 like a data check against a couple different
10 other databases, but I don't know exactly which
11 federal agencies supply that information.  And,
12 you know, data -- data in, data out.  Data is
13 only as good as the data in, so that's why it's
14 not a perfect system as well.

15    Q.  Is that why some employers don't use
16 E-Verify?  I mean, in your experience, why do
17 some employers not use E-Verify?

18    A.  I spoke about that a little bit.  I
19 mean, I have clients that are very sophisticated,
20 hospitals, tech companies, that don't use E-Verify
21 because it's just a burdensome thing to do at the
22 time of onboarding.  I mean, there's -- there's
23 very sophisticated clients out there that don't
24 E-Verify, enormous, enormous companies.

25         So it's -- it would be entirely

1 too speculative to say that an employer is not
2 using E-Verify because they're trying to --
3 they're trying to circumvent the employment
4 verification laws.

5         There's just -- To say that for
6 one employer, you would have to say that for
7 thousands and thousands and thousands of
8 employers that do it for completely different
9 reasons, and so that's why it's entirely too
10 speculative to appoint one singular reason to
11 it.

12    Q.  Do you think it's fair to say that some
13 employers don't use it because they want to avoid
14 getting negative results?

15         MR. BISS:  Objection to form.

16    A.  Yeah, I mean, I'll answer it to the
17 extent I can without speculating.

18         I think that it's probably
19 plausible that there are lots of employers in
20 the United States that choose not to do it
21 because it could create problems in their
22 ability to hire and recruit employees.  You
23 know, it could be an impediment to their ability
24 to recruit and hire.

25         I don't -- I haven't experienced

24 (Pages 90 - 93)

1 a lot of employers that purposely don't use it
2 for that reason; but, you know, it's probably
3 part of the analysis for, you know, many, many
4 employers.
5    Q.   Right.  Well, even as their lawyer,
6 they couldn't tell you that they purposefully
7 don't use it so they can hire unauthorized
8 workers; right?
9    A.   Right.  I mean, I would hope not, yeah.
10    Q.   And so -- And you mentioned some clients
11 don't use it that are very sophisticated; right?
12    A.   Yeah.  I'm generally aware of a lot
13 of entities, sophisticated entities that have
14 sophisticated HR departments, that just don't
15 want to do it because of the burden of doing it
16 and having to close out cases and all that.
17    Q.   Do they typically have a more
18 sophisticated system for making sure that the
19 I-9 forms are completed correctly and that the
20 people reviewing IDs know what they're looking
21 at?
22    A.   As opposed to who?  You're asking me to
23 make a comparison, and I don't know --
24    Q.   Well, you mentioned that they were
25 sophisticated clients, and I'm wondering what

1 about their sophistication might cause them to
2 not use it.
3    A.   I would say larger HR departments.
4 More sophisticated HR aren't onboarding, you
5 know, more help, essentially, you know, a
6 corporate structure.  You know, it just --
7 that's what you, you know, that's -- when I attach
8 the label of sophisticated, I just mean a better
9 corporate structure.
10    Q.   And, typically, without naming clients,
11 what do they do to, for example, examine IDs and
12 verify identity?
13    A.   Exactly what every employer should do,
14 review the documents, determine whether they
15 reasonably appear genuine on their face and
16 relate to the individual in front of them.  I
17 would strongly advise any company to do any more
18 than that.  I mean, you're just walking yourself
19 into a discrimination lawsuit if you're doing
20 more diligence.  So they're just doing I-9.  The
21 I-9 requirement is very simple and should be
22 methodically employed.
23    Q.   And so but E-Verify is helpful; correct?
24    A.   E-Verify is helpful to determine or to --
25 or to confirm work authorization.

1    Q.   You mentioned the burden of it.  How
2 long does it take to use?
3    A.   It's -- You know, it's a couple minutes.
4 I think there's some scanning involved now.  So,
5 you know, it probably -- where it gets burdensome
6 is if you don't close cases out if they get
7 nonconfirmation because, like I said, you can
8 get a tentative nonconfirmation for a lot of
9 reasons, not just because the person is
10 unauthorized, so -- and then you start -- you
11 know, it's burdensome because then you start
12 getting -- if you don't close cases out -- and
13 there -- you know, there's entities that hire
14 hundreds of employees on a single day.
15        So if you're adding 10, 15
16 minutes to your onboarding process for each
17 employee, that bogs companies down.  And you
18 have to do it within a certain time frame too.
19 So there's a lot of companies that don't do it
20 because of that.  You're bogging -- You're
21 bogging their hiring process down.
22    Q.   And so if you only hired like 20 employees
23 a year, it wouldn't be that burdensome?
24    A.   It would be less burdensome for sure, I
25 mean, than -- than a -- obviously than a company

1 that hires 100 in a month or --
2    Q.   So it sounds like it takes a few
3 minutes to do the initial check; right?
4    A.   I mean, yeah, I'd say five minutes,
5 five to ten minutes.
6    Q.   And then how long does it take to
7 handle the tentative nonconfirmation if you get
8 it?
9    A.   Well, then you would have to print
10 out -- I think it's called a Further Action
11 Notice, and you would have to then meet with the
12 employee.  You'd have to read through it with
13 them.  You know, you'd want to have it
14 interpreted if the employee doesn't speak
15 English.  And then you would give them eight
16 working days.
17        So then on the eighth or ninth
18 day, you have to go back into the system and
19 close the case out or put some other notes in
20 there if there's some reason more time is
21 needed.  So it's just a system that you have to
22 manipulate.
23    Q.   And if it comes back as a positive
24 result, is there any more you have to do as an
25 employer?

1   A.  No, other than print out the result and
2   attach it to your I-9.  I mean, I always advise
3   clients to attach it to their I-9s.
4   Q.  Is it free to use?
5   A.  Yes.
6   Q.  Do you have clients that use it?
7   A.  Yes, I do.
8   Q.  Have you had a lot of clients that used
9   it?
10  A.  I would say, I mean, if you're talking
11  about -- I mean, that's really hard to say, but
12  I would say probably about 50 percent use it and
13  50 percent don't.
14  Q.  In your --
15  A.  In all different industries.  I don't --
16  It's not really tied -- I mean, I have -- I have
17  clients, and immigration is filtering through
18  about every industry right now.
19  Q.  And in your experience how accurate is
20  it?
21  A.  Like I said, there's errors but it's
22  generally pretty accurate.  It's not going to --
23  If your -- If your goal in using it is to help
24  deter the use of fraudulent documents or fake
25  documents, then I think it's pretty -- pretty

1   helpful in that regard.  I think it's pretty
2   effective, not necessarily because of the
3   system, but because when you use E-Verify, they
4   send you, like, stickers and things to put on
5   your window.  Right?
6           So if you're -- in some of these
7   industries that are dealing with fraudulent
8   and fake documents, you're deterring a lot of
9   people from even applying.  Okay?  Because, you
10  know, usually if you walk into an industry
11  warehouse, it will say right on the door, we're
12  an E-Verify employer.
13          So there -- You know, I think
14  it's somewhat effective as a deterrent to that.
15  I think it's effective in the -- The system is
16  effective, but it's far from perfect.  And, you
17  know, again, there's lots of employers that
18  don't use it.
19  Q.  In your experience, how often do
20  employers get tentative nonconfirmations that
21  are then resolved successfully; in other words,
22  that it would be kind of a negative -- a false
23  negative?
24  A.  I mean, I would say less than -- less
25  than 10 percent of the time are those resolved

1   to the point where the employee can continue
2   their employment.  90 percent of the time the
3   employee will self-terminate, will voluntarily
4   leave their employ and not come back the next
5   day.
6           When the employer has that
7   conversation with the employee and says you've
8   got eight working days to resolve this, in my
9   experience, in representing a lot of companies,
10  you know, those employees just don't come back,
11  you know, because it's a deterrent.  They don't
12  have an explanation for it other than the fact
13  they presented a fake document.  So, yeah, I
14  would say I'd place it at 10 percent that are
15  successfully resolved.
16  Q.  So how are those 10 percent successfully
17  resolved, in your experience?
18  A.  Usually Social Security or Homeland
19  Security will confirm that the person is
20  authorized.  Social Security will not do that,
21  but Homeland Security -- So the Further Action
22  Notice that you give the employee has contact
23  information on it, so they reach out to Homeland
24  Security.  Homeland Security will -- If it's a
25  glitch on their end, they'll send some sort of

1   communication, provide some sort of communication
2   to the employee that says no, and then you can
3   go in -- and then the employee presents that to
4   the employer, and then it's resolved.  I think
5   the functionality has gotten better, too, more
6   recently.  I think Homeland Security can even
7   resolve them themselves sometimes.
8   Q.  How often is it a problem with Homeland
9   Security versus Social Security?
10  A.  Well, Social Security -- Social Security
11  doesn't have near -- near the amount of data that
12  Homeland Security would have.  That would be, for
13  example, immigration statuses.
14          You know, they're -- So Social
15  Security can do one thing.  They can match a
16  name to a Social Security number.  Homeland
17  Security has broader tools that would allow it
18  to confirm that -- that Clete Samson is a lawful
19  permanent resident, you know, that was issued a
20  green card, legitimately issued a green card.
21  So they have broader tools than Social Security
22  has.
23  Q.  How often, in your experience, do
24  people get tentative nonconfirmations based on
25  information from Social Security saying that the

26 (Pages 98 - 101)

1 name doesn't match the Social Security number?

2    A.   It's typically more so -- Social

3 Security Administration's data is typically --

4 well, kind of has a reputation for being

5 nonaccurate or overly -- overly -- you see this

6 with no-match letters.  You see it a lot with

7 employer correction notices, which you may be

8 familiar with.

9         But their -- their data is so

10 confined that, like, if a middle initial is off

11 or missing, it won't match it.  It will show it

12 as a no match.  So they have -- Social Security

13 has more of a reputation for incorrectly

14 generating a no match, more so than Homeland

15 Security does.

16    Q.   And if a Social Security card is valid

17 and the employer puts on E-Verify the name

18 exactly as it is on the Social Security card

19 and the number exactly as it is on the Social

20 Security card, then Social Security would not

21 come back with a no match; correct?

22    A.   I mean, I can't -- I can't answer that

23 because I've seen -- it kind of depends on where

24 the -- it depends on the Social Security's

25 system and if -- if a middle initial was used

1 instead of a full name, middle name.

2         I mean, you see it in the W-2 C's;

3 but, you know, in general, we're talking about a

4 10 -- I would say a 10 percent margin of error.

5 It may be a little bit higher than that.

6    Q.   But have you ever seen a tentative

7 nonconfirmation or a no-match notice go to an

8 employer where the employer accurately put in

9 both the Social Security number and the person's

10 name as it appears on the Social Security card?

11    A.   Yes, I've seen that.

12    Q.   How often?

13    A.   I mean, it's hard to tell because --

14 but it happens, and it's -- a lot of the reason

15 is the middle initial component is problematic.

16 Okay?

17         And that's why there is -- there is

18 a whole host of articles, data on how inaccurate

19 Social Security's no-match letters are, to the

20 point where there was about a ten-year period of

21 time where they stopped issuing no-match letters.

22 Okay?

23         It was subject to a ton of

24 litigation in the '90s because employers were

25 being fined for not properly responding to

1 no-match letters.  Okay?

2         So then there was a bunch of

3 litigation over -- over this issue with -- with

4 Social Security, and then they came up what was

5 called a safe harbor provision.

6         So they said if an employer

7 does XYZ when they get a no-match letter, then

8 they're -- then they -- they cannot be deemed

9 to have knowingly continued to employ an

10 unauthorized worker.  Well, then that, that safe

11 harbor, got challenged; and eventually they wiped

12 the whole thing off.

13         Then in 2019 a much more

14 aggressive administration on the enforcement

15 side was in office, and President Trump's

16 administration relaunched employer correction

17 notices in 2019, after like a ten-year hiatus

18 from doing it.

19         And immediately it was challenged

20 by a ton of employers because they got 200,

21 you know, employer correction notices that had

22 generated -- that were generated as a result of

23 errors.

24         Now, I don't know what percentage

25 of those were accurate no matches versus -- but

1 it's higher than you would -- it's higher than

2 you would think, and that's why there's this

3 whole body of case law in that no-match area.

4         And, in fact, Social Security has

5 even had to on its website openly say a mismatch --

6 a no-match letter or a -- does not equate to

7 constructive knowledge.  They've had to openly

8 say that as a result of the litigation because

9 there's just no accuracy, so it's --

10    Q.   There's no accuracy?

11    A.   Well, I shouldn't say there's no accuracy,

12 but what I will say is that there's -- there is

13 accuracy dilemmas that have caused them to be very

14 careful because employers -- and it even says

15 employers may not take adverse action based solely

16 on an employer correction notice.

17    Q.   And I'm going to -- I'm going to ask

18 you about the Social Security no-match letters

19 here later on; but before we go any further, I

20 just want to make sure that I don't screw up

21 terminology here.

22         And I know oftentimes we use the

23 term "unauthorized worker" or "undocumented

24 worker," and what I'm trying to convey is

25 somebody who is not authorized to work in the

27 (Pages 102 - 105)

1 United States legally. Is that fair? I mean,
2 is that --
3    A.  So --
4    Q.  Am I getting the terminology right
5 there?
6    A.  I mean, you have to be somewhat careful
7 because there are people who are legally in the
8 country that do not have authorization to work,
9 so if you're referring to somebody -- if you're
10 correlating an unauthorized worker with an
11 illegal or a legal person, that's not a direct
12 correlation because there's -- a perfect example
13 is an H visa.
14       A dependent can come over and
15 live with their H worker, their H visa worker,
16 but that person cannot get work authorization.
17 Okay?  So they're here legally, and they're H-4
18 status, but they can't -- they can't work in
19 that status, so that's why it's not a direct
20 correlation, but I mean --
21    Q.  In other words, somebody could be here
22 legally in the United States, but they may not
23 be legally authorized to work --
24    A.  To work --
25    Q.  -- in the United States; correct?

1    A.  Exactly.
2    Q.  But if you're illegally in the United
3 States, then there's no way you could be legally
4 authorized to work in the United States; right?
5    A.  And that's -- that's -- no, that's
6 not -- not accurate.  So in the way that term is
7 used, that's not completely accurate because
8 there are statuses where you are illegally in
9 the United States, but you can get a work card
10 while you're -- while certain applications are
11 pending.
12       For example, there's something
13 called a U visa.  A U visa is somebody who is
14 available -- somebody who has entered illegally,
15 so they're illegally in the United States, but
16 they've been the victim of a crime at the hands
17 of a United States citizen or at the actions
18 of a United States citizen.  They file a U visa.
19 They can now -- They can now get work authorization.
20       So that's why, you know, to
21 immigration lawyers it's like nails on a
22 chalkboard when you hear people say things like
23 undocumented, unauthorized, and illegal all in
24 the same breath, so it's --
25    Q.  It's more complicated than that.

1    A.  It is.
2    Q.  Right.
3    A.  And there's -- there's about 53 different
4 statuses you can get work authorization through,
5 noncitizen statuses, so you cannot -- and this
6 is what I tell employers because my big concern
7 for employers is discrimination.  You cannot
8 look at an individual and tell whether they're
9 authorized for work.
10    Q.  Right.
11    A.  Okay.  You just can't, not based on
12 language, not based on education, not based on
13 anything.
14    Q.  And so when I'm talking -- when I use the
15 term "unauthorized to work in the United States"
16 or "undocumented worker," I'm just trying to convey
17 that they're not legally authorized to work in the
18 United States.  Is that fair?
19    A.  For purposes of today, yes.
20    Q.  For purposes of today.  And so --
21    A.  And that's how I'll take it to be
22 understood.
23    Q.  Yeah.  And if it becomes -- if there's
24 an important distinction, please let me know.
25 Okay?

1    A.  I will.
2    Q.  So let's talk about I-9 requirements.
3 An employer must complete an I-9 form for every
4 employee; right?
5    A.  Correct.
6    Q.  Okay.  And so a Form I-9 is available
7 online; right?
8    A.  Online is the best way to get it because
9 that's the most accurate version.  The version
10 changes about every 18 months.
11    Q.  And then there's also instructions for
12 Form I-9 employment eligibility verification
13 that's available online too; is that right?
14    A.  That's correct.
15    Q.  Okay.  Let me show you what I've marked
16 as Exhibits 89 and 90, which we just downloaded
17 off the Internet.  Take your time to see if that
18 looks right and let me know when you're able.
19    A.  These are -- These are accurate.  This
20 is the current version.
21    Q.  Of both the form and the instructions?
22    A.  Yes.  And I know that based on the
23 "Expires" date up at the top right corner.
24    Q.  Okay.  And so, you know, you can -- I
25 know you're probably extremely familiar with

28 (Pages 106 - 109)

1 them, but you can just have them in front of you
2 throughout the deposition. Okay?
3        So I guess the first thing that --
4 I want to kind of walk through what employers'
5 obligations are with respect to completing these
6 forms. Okay?
7    A. Okay.
8    Q. And I guess the first obligation would
9 probably be that you have the current form. Is
10 that fair?
11    A. Yeah. And that would be, from a
12 compliance perspective, you want to make sure
13 you've got the right form at the time of hire.
14    Q. Okay.
15    A. But that's a technical violation, by
16 the way. Using the wrong version of the form is
17 a technical violation.
18    Q. And so let's start with Section 1, and
19 can you walk me through what an -- what's supposed
20 to happen in Section 1?
21    A. So Section 1 is the part of the document
22 that the employee fills out or uses a preparer to
23 fill out. It needs to be done on or before the
24 first date of employment, and -- Would you like
25 me to keep going?

1    Q. Yeah. So let's -- So it's got to be
2 done the first date of employment; correct?
3    A. Or before they start. It needs to be
4 done on or before their first day.
5    Q. And the employee is the one filling out
6 Section 1; is that correct?
7    A. That's correct, or they can have a
8 preparer fill out Section 1. If they have a
9 preparer do it, then they need to fill -- the
10 preparer needs to complete the box at the
11 bottom.
12    Q. And so the very first part, the
13 employer -- employee, excuse me, is filling out
14 kind of biographical information, name, address,
15 things like that; right?
16    A. That's correct.
17    Q. And then -- And are they required to
18 put a Social Security number?
19    A. No, but that's a -- that's an optional.
20 They can -- If the employer E-Verifies, that's
21 typically required, but it's not -- it's not
22 required.
23    Q. And right under that first box it says,
24 "I am aware that federal law prohibits" -- I'm
25 sorry. It says, "I am aware that federal law

1 provides for imprisonment and/or fines for false
2 statements or use of false documents in
3 connection with the completion of this form"; is
4 that right?
5    A. That's correct. That's what it says.
6    Q. And that's because it's actually a felony
7 under federal law to make false statements or use
8 false documents in connection with this form; is
9 that correct?
10    A. That's correct. And this is the -- this
11 is the employee who is attesting to this.
12    Q. And why -- why -- you know, I'm asking
13 you to kind of put your government hat on again.
14 Why is that important to have on there?
15    A. It establishes knowledge on the part of
16 the employee. It establishes an awareness that
17 the employee knows what they're doing when they
18 make this attestation because, you know, a lot of
19 times the Department of Justice will prosecute
20 individuals for making false claims to U.S.
21 citizenship by virtue of this form, and one of
22 the defenses to that is that they didn't know
23 what they were signing, so that's why they put
24 that in bold.
25    Q. And so the employee has to swear under

1 the penalty of a felony offense that the
2 information they're providing and the documents
3 they're providing is accurate; right?
4    A. That's correct.
5    Q. And then below that it says, "I attest,
6 under penalty of perjury, that I am checking one
7 of the following boxes," or "that I am," and
8 then in parentheses it says "checking one of the
9 following boxes"; is that right?
10    A. That's accurate. They have four choices.
11    Q. And what is the purpose of that statement?
12    A. To establish work authorization, they
13 would have to fall within one of those four boxes.
14    Q. And, again, that would be also a felony.
15 It would be perjury to knowingly check the
16 incorrect box; right?
17    A. On the part of the employee, yes.
18    Q. Correct. Right.
19    A. Yes.
20    Q. We're just talking about the employee.
21        And so an employee would be
22 committing a felony if that employee knowingly
23 checked the wrong box. Is that accurate?
24    A. Yeah. The most common -- That's
25 accurate. The most common example you see are

29 (Pages 110 - 113)

Page 114

1  employees that falsely attest to being citizens
2  of the United States.
3      Q.  Right.  And that's even a separate law,
4  right, that it's --
5      A.  Right.
6      Q.  It's against federal law.  In fact,
7  it's a felony to falsely claim United States
8  citizenship on a form such as this; right?
9      A.  For an employee to do so, yes.
10     Q.  For an employee to do so, is that
11 right, and so -- but it would also be a felony
12 to knowingly falsely claim to be a noncitizen
13 national of the United States; is that right?
14     A.  No, I don't think that's accurate,
15 because I think that the law itself requires you
16 to falsely attest to be a U.S. citizen.
17         If -- For example, if under what
18 I believe is 42.408, is the part of the criminal
19 code on this, I think the only prosecutions I've
20 seen are the false attestation to citizenship
21 because, for example, if you -- if you check 4,
22 "alien authorized to work," and you're actually
23 a lawful permanent resident --
24         MR. BISS:  Hold on one sec.  Hold
25 on one sec.  Nick, can you hear me?

Page 115

1          MR. KLINEFELDT:  Yes.
2          MR. BISS:  So my video just went
3  blank for about four or five seconds.  I wasn't
4  able to hear the witness for about four or five
5  seconds.  I just want to let you guys know that,
6  put that on the record.
7          I don't know if I missed anything
8  important or I didn't, if I missed a question
9  that you asked, but everything froze up there
10 for about four or five seconds, so I just want
11 to let you know.  You may want to reask your
12 last question.
13         MR. KLINEFELDT:  Okay.  Yeah,
14 absolutely.  Happy to do that.
15     Q.  And so what we were talking about is
16 kind of the second statement under that first
17 box where it says, "I attest, under penalty of
18 perjury, that I am," and then in parentheses it
19 says "check one of the following boxes"; right?
20     A.  Correct.
21     Q.  And we've established that falsely
22 claiming that you're a United States citizen is
23 a felony; right?
24     A.  Correct.  It can be a misdemeanor as
25 well, but it depends on what it's charged as,

Page 116

1  but it can be a -- it can be a felony, and it
2  would go -- it would be the same thing for a
3  perjury charge, depending on if it was brought
4  as a misdemeanor or a felony.  It could
5  potentially --
6      Q.  Right, but --
7      A.  -- be a felony.
8      Q.  You're talking about a matter of
9  discretion for a prosecutor.  What I'm saying
10 is, is that under law, whether it's prosecuted
11 or not, it is a felony to falsely claim that you
12 are a United States citizen on a form such as a
13 Form I-9; is that right?
14     A.  That's correct.
15     Q.  And separate and apart from claiming
16 that you are a United States citizen, it is
17 also a violation of federal law, in fact, it's
18 a felony, to claim that you are a noncitizen
19 national of the United States; is that correct?
20     A.  I'm just going to say potentially
21 that's correct.  It's -- If you're saying that
22 that's going to be a felony under a perjury
23 basis, potentially, yes, it could be.  It could
24 be a felony for --
25     Q.  Well, it --

Page 117

1      A.  -- knowingly checking one of the other
2  three boxes incorrectly.  That could be subject
3  to penalty of perjury.
4      Q.  Right.  And so that's what the
5  statement says; right?  Hey, look, you're
6  subject to the penalty of perjury for checking --
7  falsely -- knowingly falsely checking any one of
8  these four boxes; right?
9      A.  That's what the statement says, yes.
10     Q.  And that would be a violation of 18
11 U.S.C. 1001.  Fair?
12     A.  Correct.
13     Q.  And so, likewise, it would be a violation
14 to falsely claim that you're a lawful permanent
15 resident; right?
16     A.  Correct.
17     Q.  That would be perjury; is that right?
18     A.  That is -- That's correct.
19     Q.  And then -- And what -- Based on your
20 government experience, what -- why is that
21 important to have that attestation on there?
22     A.  Well, it's important for two reasons.
23 One, it's important to the form because it's
24 another element of establishing work authorization
25 because you're only going to be authorized to

30 (Pages 114 - 117)

1 work in the United States if you can accurately
2 attest to one of those four boxes.
3          The second part is, it's important
4 that -- the government often uses this form for
5 prosecutions, so they use that attestation as
6 evidence in criminal cases.
7     Q.   It's important to the government that
8 you are accurately identifying your status.  Is
9 that fair to say?
10    A.   Yes.
11    Q.   And so you have to check one of those
12 four boxes if you're the employee; right?
13    A.   That's correct.  If you fail to do so,
14 it would be considered a substantive paperwork
15 violation.
16    Q.   Okay.  And if you were, for example,
17 not authorized to work in the United States,
18 then you wouldn't be able to accurately check
19 one of those boxes; right?
20    A.   Right.  You would not have an option.
21    Q.   And so a citizen of the United States,
22 fair to say people generally know if they're a
23 citizen or not?
24          MR. BISS:  Object to the form.
25    A.   Yeah, I'm going to say I can't speculate.

1 Actually, in my experience, a lot of people don't
2 know what their status is.  They don't.  They don't
3 understand the difference between the various
4 statuses.
5          I think U.S.-born individuals will
6 know if they're a citizen, but those that have
7 immigrated to that status through naturalization
8 often don't understand the difference between
9 being a green card holder and a citizen, so --
10 but, in general, I'll agree with you to the extent
11 you're talking about U.S.-born individuals.
12    Q.   Now, let me ask you about the second
13 box.  What is a noncitizen national of the
14 United States?
15    A.   It's a very unique status that relates
16 to certain treaties and islands, where they have
17 basically all of the rights of a citizen, you
18 know, minus a few, such as the right to vote.
19          It's a very -- You know, I'd have
20 to look.  I'd have to go back and look, but the
21 Samoan Islands would probably qualify under that.
22 There's a -- It's in the instruction, too, but --
23    Q.   Yeah.  So that's what I was going to
24 direct you to.  So, actually, that's the only
25 box where it says "See instructions"; right?

1     A.   Yeah, and it -- Yeah, it is the American
2 Samoa and then the Trust Territory of the Pacific
3 Islands.  So, yeah, it's a -- there's very few --
4 very few noncitizen nationals in the United
5 States.
6     Q.   And so that's -- And so if you were an
7 employer and somebody checked that and it said
8 "See instructions," you could go to page 3 of
9 the instructions and find the definition of a
10 noncitizen national of the United States; is
11 that correct?
12    A.   That's correct, but the employee is the
13 one making the attestation; but, yeah, the employer
14 could look as well.
15    Q.   And the instructions identify noncitizen
16 national of the United States in a single sentence;
17 is that right?
18    A.   Yes.
19    Q.   And it says, "An individual born in
20 American Samoa, certain former citizens of the
21 former Trust Territory of the Pacific Islands,
22 and certain children of noncitizen nationals
23 born abroad"; is that right?
24    A.   That's correct.  That's how that's
25 defined.

1     Q.   And so you'd either have to be born an
2 American Samoan or a Pacific Islander or a children
3 of somebody who was -- child of somebody who was
4 to qualify, generally?
5     A.   To accurately check that box, yes.  I
6 will just tell you, in my experience of looking
7 at thousands and thousands of these I-9s, that
8 box is often checked by noncitizens that are
9 authorized to work because they see the
10 "noncitizen" and they check it and they're
11 not -- you know, they're not -- so that box is
12 flagged very often by employees.  It's a very
13 typical mistake that's made by employees.
14    Q.   It's a -- And if you were advising an
15 employer and they said, hey, Mr. Samson, I've
16 got a person here who just checked the box
17 noncitizen national of the United States, and so
18 I go to my instructions, page 3, and it spells
19 out who is a noncitizen national of the United
20 States, and can I ask this person if they are
21 from American Samoa or the Pacific Islands?
22    A.   I do not typically advise employers to
23 try to control what the employee checks in
24 Section 1 because to do so -- if you look at the
25 top of the Form I-9, this Antidiscrimination

31 (Pages 118 - 121)

1 Notice, if you start having these conversations --
2 Section 1 is the employee's information. It's
3 their attestation.
4      And here's why. Okay? If the
5 employer starts trying to control the box that
6 the employee checks, it no longer becomes the
7 employee's attestation, okay, and it becomes the
8 employer's attestation, and it's problematic,
9 and it -- and it is -- and so I don't typically
10 advise clients to assist because then -- you
11 know, then you get into a situation where now
12 are you going to have them fill out the preparer
13 box?
14      Q.   No.  And maybe I asked a bad question,
15 but what I'm asking is not assisting them in
16 filling out the form.  I'm saying they've already
17 filled out the form; and now I'm calling you, as
18 my lawyer, saying they've already filled out the
19 form, but I understand I have a legal duty not
20 to hire unauthorized workers, and I don't think
21 this person is a noncitizen national of the
22 United States because, boy, it seems like that
23 would be very few people, that would be a
24 rarity, can I ask them if they're -- they have
25 any connection to America Samoa or the Pacific

1 Islands?
2      A.   An employer, I think, could do that and
3 be okay.  They could exercise that level of
4 diligence.  I don't know that that would be
5 required.  In fact, I don't think that that
6 level of diligence is required.  But if I had a
7 client call me and say -- and there's other
8 indicia, you know, that wouldn't match up with
9 that attestation, sure, I would tell that
10 employer you have the right to do that.  The law
11 does not require that, though.
12      Q.   What if you know they're from Mexico?
13      A.   If the employer knew they were from
14 Mexico and they --
15      Q.   Yeah.
16      A.   -- checked that box, then, I mean,
17 you're talking about indicia.  Right?  You're
18 talking about fact-based, so you're talking
19 about a variety of facts that start to tip the
20 scale toward knowledge, but it's -- it's a
21 fact-based inquiry on each time because you
22 can't just generally say, hold up, they checked
23 noncitizen, I'm going to do an extra level of
24 scrutiny here because to do that is now you're
25 discriminating.  Right?  You're committing a

1 discriminatory act.
2      So what I'm saying is each case,
3 if you have other indicia that you know the
4 person is from Mexico because of something that
5 substantiates that, you know, then -- then,
6 yeah, that scale starts to tip toward we need to
7 do some more diligence.
8      Q.   And in the years that you've done
9 immigration law, have you ever seen an I-9 where
10 somebody accurately checked the noncitizen
11 national of the United States box?
12      A.   Yes, I have.  I have.  We used to see
13 them quite a bit in certain regions.
14      Q.   What regions were those?
15      A.   Like, California.  California had --
16 California employers actually have quite a few
17 noncitizen nationals, because I think probably
18 just geographically located.  So, yeah, I mean,
19 I -- I always get a little excited when I see
20 it, you know, because it's -- it is a little bit
21 rare.
22      Q.   I also noticed about the noncitizen
23 national box is that it seems to be the only
24 status you can check, other than claiming you're
25 a United States citizen, where you don't have to

1 enter another number.  Is that right?
2      A.   In the sense of -- Yeah.  I mean, yeah,
3 right.  That would be accurate.  There's not a
4 requirement for you to enter like an alien
5 registration number or a -- or a lawful permanent
6 resident number or, you know, anything like that,
7 that's correct.
8      Q.   And so isn't it possible that if
9 somebody who was not authorized to work in the
10 United States is looking at this box, they could
11 easily make the determination that, look, I know
12 I'm not a citizen, but Box 2 is the only one I
13 can check where I don't have to provide an A
14 number or some other number, and so I'm going to
15 check that one?  Have you seen that occur?
16      MR. BISS:  Object to the form.
17      A.   Yeah, it's hard to speak for -- for
18 what would be in the employee's mind, so I
19 wouldn't be able to connect that, but I can tell
20 you that what you're talking about is why there's
21 a Section 2, okay, and why the top of the form
22 says, "Employers cannot specify which documents
23 an employee may present to establish employment
24 authorization and identity."
25      So someone can check noncitizen

Page 126

1 national of the United States and then present
2 an ID card and a Social Security card that
3 appears reasonably genuine on its face and
4 they've met -- they've complied with the I-9
5 requirement.
6          So, I mean, I understand your
7 point, that you think anybody who checks Box
8 Number 2, that it's some sort of a red flag, but
9 employers cannot discriminate on the basis of
10 what box is checked.
11    Q.   But they have an obligation to make sure
12 it's accurate; right?
13    A.   Reasonably.  Their obligation appears in
14 Section 2 under their attestation, their penalty
15 of perjury.
16    Q.   I mean, doesn't an employer have some
17 duty to make sure that that box is not inaccurately
18 checked?
19    A.   No.
20    Q.   Even if presented with information that
21 indicates that it may not be accurate?
22    A.   Perhaps then, but it's a fact-based
23 inquiry.  Perhaps then, but on its face at the
24 time of hire, if the employee checks it, the
25 employer's obligation is to confirm that it's --

Page 127

1 that it's completed.  Okay?  It's not -- It's --
2 You know, I have not seen any case law or
3 regulatory law that says an employer has the
4 duty to control what the employee attests to.
5          I have not -- I've just not seen
6 or I haven't even seen law or regulatory law
7 that says -- or regulatory decisions that say
8 the checking of the noncitizen national in and
9 of itself is somehow a red flag.
10          Now, if there's other indicia
11 that is, you know, corroborating evidence, like
12 the employer, you know, has some knowledge that
13 the person is actually from Mexico or Guatemala
14 or wherever, then you're in a different realm.
15    Q.   And so -- but are you telling me that
16 when you were with the government, that the fact
17 that somebody is checking noncitizen national of
18 the United States might not be a clue?
19    A.   No.  I mean, it may be a clue, but it's
20 not a piece of evidence that could be used to
21 support a knowing -- a knowing hire violation.
22    Q.   Under any circumstances?
23    A.   No.  It's not in and of itself, the
24 checking of the box, of that box is not in and
25 of itself, but if there's other indicia that a

Page 128

1 reasonable employer would be put on notice and
2 make that connection, then maybe.
3          But, again, I can't -- I'm pretty
4 familiar with all the regulatory decisions; and
5 I just cannot, sitting here today, think of a
6 case where an ALJ said the fact that someone
7 checked that box and there was some other
8 indicia, that established some sort of
9 knowledge on the part of the employer.  I just --
10 I have not seen that.
11    Q.   Right.  And let's put aside for now
12 whether any one single factor by itself
13 establishes a knowingly hire violation.  Okay?
14 All I'm asking is, is it a clue?  Could it be a
15 factor?
16    A.   I'll use the word "indicia."
17    Q.   Okay.
18    A.   Perhaps it could be, in combination
19 with other indicia.
20    Q.   And it would be, in fact, a substantive
21 violation if the employee presents a document for
22 Section 2 that contradicts the status checked in
23 Section 1; correct?
24    A.   Probably that would be a technical.  So
25 what you're saying is if the employee presents a

Page 129

1 lawful permanent resident card, okay, that tells
2 you the employee is a lawful permanent resident
3 but they check noncitizen.  That might get flagged
4 on an ICE audit, but it's not a violation.  It's
5 not a -- So it might be considered a technical
6 violation, and then -- but I don't believe that
7 would be a substantive, finable violation.
8    Q.   It would be indicia?
9    A.   It would likely be shown as a technical,
10 and then what would happen is it would be -- ICE
11 would return the I-9 to the employer and would
12 say this is a technical violation that needs to
13 be corrected within ten days.
14    Q.   But it could be a factor in determining
15 whether an employer hired somebody who they knew
16 to be unauthorized; right?
17    A.   Now, that -- Okay.  Now, that's a
18 different question because you asked whether it
19 was a substantive violation.  Now you're talking
20 about knowledge-based violations, so that's a
21 separate question.  It could be a factor used by
22 ICE to try to support a knowing violation
23 allegation.
24    Q.   What about a lawful permanent resident?
25 What does that mean?

33 (Pages 126 - 129)

1    A.   A lawful permanent resident is, by
2  slang, referred to as a green card holder
3  because in the old days those cards were green.
4  And it's basically someone who has established
5  the right to be here permanently, and they carry
6  with them all the rights that a citizen does,
7  minus certain things like the right to vote and
8  hold certain offices and things.
9         It also -- A lawful permanent
10 resident has the ability after a certain period
11 of time to naturalize, to become a citizen,
12 so it's -- it's a high -- it's high up on the
13 hierarchy of statuses.
14    Q.   Is it hard to get?
15    A.   It depends.  It's hard to get through --
16 The U.S. immigration system allows two paths.
17 One is an employer-based path, and one is a
18 family-based path.  It's not hard to get them on
19 a family-based path.  And there's also a path
20 for asylees and refugees, but the -- it takes
21 time to get that status.
22    Q.   Is it -- Do they typically have to hire
23 a lawyer to do it?
24    A.   No.  No.  In fact, if you're married to
25 a United States citizen, it's one or two forms

1  you fill out, an I-130 and an I-45.  I mean, I
2  do them for people, but a lot of -- I would say
3  more than half of lawful permanent resident
4  holders have got that status by filing documents
5  themselves.
6     Q.   But if you are not married to a United
7  States citizen or have other family members who
8  are a citizen, is it hard to get?
9     A.   It takes more time.  Like, if it's an
10 employee -- an employment-sponsored petition,
11 yeah, it takes more time.
12    Q.   In your experience, is it -- is it a
13 significant enough process that somebody would
14 remember going through it?
15    A.   Which type people?
16    Q.   Somebody who became a lawful permanent
17 resident.
18    A.   From what country and what dialect and
19 what educational background?
20    Q.   Let's say Mexico.
21    A.   Then, no, because a lot of times a work
22 card to them -- a lot of times a work card to
23 people from Central America that have immigrated
24 to the United States, a work card -- they don't
25 understand the difference between a work card, a

1  green card, a visa.  They just know they're here
2  lawfully, right, so -- and then you start -- you
3  start asking them, well, how, and then they
4  present a lawful permanent resident card.
5         And so I don't think most people
6  from Central America would demarcate a green
7  card process versus some other process.  I think
8  from other parts of the world, yes, you would
9  remember you went through that process because
10 there's typically an interview and there's other --
11 other obligations.
12    Q.   What about, what is a -- And I know
13 we're -- we're just about out of video here, so
14 we'll take a break after this, but what is an
15 alien authorized to work, that Box 4?
16    A.   So when I -- when I spoke about there
17 being like 50 other codes of statuses that you
18 can have, that would be there.
19         So that would be somebody who is
20 here on a -- on a visa, somebody who has what's
21 called an employment authorization document as a
22 result of a visa program or, you know, if they're
23 an asylee, a refugee.
24         There's just -- There's lots of --
25 There's like 50 different codes that would require

1  you to check that box, and those typically have
2  expiration dates.
3     Q.   Okay.  And if somebody is a lawful
4  permanent resident, would they always have an
5  alien registration number?
6     A.   Yes, that would be typical.  Now, there
7  is some regulatory case law that says if they
8  check that box and the permanent resident card
9  is used as a List A document in Section 2, they
10 do not need to fill in that blank.
11    Q.   And then it has a space where the
12 employee signs it and dates it; right?
13    A.   Right.
14    Q.   And then below that there's a box
15 called Preparer and/or Translator Certification;
16 is that right?
17    A.   Yes, and that -- that needs to be
18 filled out in the event the form is translated
19 for the employee or somebody assists the
20 employee with actually filling out Section 1.
21    Q.   And why is that?
22    A.   Because of that attestation issue
23 because in -- one defense to a false claim for
24 U.S. citizenship is that, oh, I didn't fill the
25 form out, I had somebody help me, okay, and now

34 (Pages 130 - 133)

1 you can establish that.
2          So they added this box in more
3 recent versions; and I think it was probably
4 HSI's, you know, idea to add it because it helps
5 you. And then you say, well, okay, well, who
6 filled it out for you?
7          Okay. Now you've got that
8 information, and then you would go to that --
9 you know, if you're -- if you're an enforcement
10 agency, you'd go to that person and you'd say
11 did you fill this box out for this employee and,
12 you know, on what basis did you check number 1,
13 and that's how -- that's why that's there.
14    Q. And the employee actually has to check
15 whether or not they used a translator?
16    A. That's -- That's a recent addition to
17 the form. That wasn't on former versions. I
18 think that that part came in in, like, 2018.
19 But, yeah, and that's a technical violation if
20 you don't, but you're supposed to check whether
21 you used one or whether you didn't. You are
22 supposed to check that box; but, again --
23    Q. And even prior to 2018, if you did use a
24 preparer or translator, then you had to identify
25 that you did so; correct?

1    A. That's correct.
2    Q. And the preparer or translator has to
3 also attest under the penalty of perjury that
4 they have assisted in the completion of Section 1
5 of the form and that to the best of their
6 knowledge the information is true and correct;
7 is that right?
8    A. That is correct.
9    Q. And why is that important?
10    A. It's important for the reason I just
11 articulated. When you're talking about using
12 this form as evidence to support a prosecution
13 for false claim, the government would like to
14 be able to say that there was full knowledge of
15 what was being done, of what attestation was
16 being made by the employee.
17    Q. And because they want the employee to
18 actually be accurate; right?
19    A. Correct.
20          MR. KLINEFELDT: Okay. We've got
21 about 12 minutes left on tape. When we come
22 back, I'll ask you about Section 2, but okay
23 time to take a break, Steve?
24          MR. BISS: Yeah. What's your plan,
25 Nick, on taking a short lunch break? What's

1 your -- What's your game plan there?
2          MR. KLINEFELDT: Yeah. Can we go
3 off the record and then we'll talk?
4          MR. BISS: Sure. Yeah. Absolutely.
5          THE VIDEOGRAPHER: We are going off
6 the record. This is the end of Media Unit Number
7 2. The time is 11:57.
8          (A recess was taken.)
9          THE VIDEOGRAPHER: We are back on
10 the record. This is the beginning of Media Unit
11 Number 3. The time is 12:35.
12    Q. Okay. Mr. Samson, when we left off, we
13 had just stopped talking about Section 1 of
14 the I-9, and we're going to move to Section 2. Okay?
15    A. Yes.
16    Q. And you've still got the I-9 and the
17 instructions in front of you?
18    A. I do.
19    Q. So who fills out Section 2?
20    A. Section 2 is filled out -- filled out
21 by the employer or an authorized representative
22 on behalf of the employer.
23    Q. Okay. And they have to fill it out
24 within three business days of the employee's
25 first day of employment; is that right?

1    A. That's correct. So if the employee
2 starts on a Monday, this -- they need to review
3 the documents no later than -- than a Thursday,
4 Thursday that week.
5    Q. And then right at the top, at the page
6 2 there, it says, "You must physically examine
7 one document from List A or combination of one
8 document from List B and one document from
9 List C as listed on the 'Lists of Acceptable
10 Documents.'" Is that what it says?
11    A. That's accurate.
12    Q. And what does that mean?
13    A. So List -- List A documents are those
14 documents that -- that satisfy both the identity
15 and the employment authorization component of
16 the confirmation.
17          That would be like a U.S. passport,
18 a lawful permanent resident card, employment
19 authorization document. It's documents that have
20 both identity elements as well as authorization
21 elements.
22          If the employee does not present
23 a List A, then they must present a List B and a
24 List C. List B documents are those documents
25 that establish identity. This is your typical

35 (Pages 134 - 137)

Page 138

1 identification card, driver's license, you know,
2 school ID, things of that nature.
3         And then the List C document is
4 the document that establishes employment
5 authorization, which is -- you know, List C is
6 quite typically a Social Security card, but it
7 can be -- there are other List C documents.
8         And then the -- the other aspect
9 of Section 2 is the physical examination of the
10 documents, and there's a certification that
11 requires the employer to attest that they've
12 examined the documents presented and that the
13 documents appear to be genuine and to relate to
14 the employee named and that to the best of their
15 knowledge the employee is authorized to work in
16 the United States. So there's an attestation
17 component to Section 2 as well.
18    Q.  And I notice at the top of Section 2 it
19 asks the employer to verify the last name, first
20 name, and middle initial of the employee; is
21 that right?
22    A.  This section is new to the form in the
23 last two or three years. It's basically just a
24 carryover from Section 1 and just asks the
25 employer to write the last name, the first name,

Page 139

1 and then also the number of the box that the
2 employee checked.
3    Q.  Right.  So it asks the employer to
4 identify the citizenship or immigration status
5 of the employee; is that correct?
6    A.  It asks the employer to carry over the
7 data from Section 1. That's why it says
8 "Employee Info from Section 1."
9         The employer itself isn't --
10 isn't verifying that, but they're just basically
11 carrying the data over from Section 1, if that
12 makes sense.
13    Q.  I'm sorry, where does it say that?
14    A.  In the left -- left side in bold it
15 says "Employee" --
16    Q.  Okay.
17    A.  -- "Info from Section 1."  All the --
18 All the employer is required to do is just to
19 transfer that data over so that -- I think it's
20 for ease of reference for review purposes.
21    Q.  And, then, but the employer would know,
22 hey, look, this is what box the employee checked
23 and here's what their name is; right?
24    A.  If they complete that portion, yes.
25 The -- In reality, this information at the top

Page 140

1 of Section 2 is quite often left blank by
2 employers.  It's one of the most -- It's a
3 technical violation, and it's one of the most
4 common lately that I've seen, but they would
5 have -- employers would have, you know, notice
6 of what the -- of what box was checked anyway
7 because they have access to Section 1.
8    Q.  And so -- And then it looks like, you
9 know, at least half of Section 2 is room for
10 the employer to actually describe the identity
11 and employment authorization documents; is that
12 correct?
13    A.  That's correct.  They are required to
14 list the document title, the issuing authority,
15 the document number and the expiration date
16 and --
17    Q.  Why is that important?
18    A.  Well, it's important because there's no
19 obligation that the employer retain copies of
20 the documents themselves.  That's always been an
21 optional obligation.  So a lot of employers will
22 just fill in the data, give the documents back
23 to the employee.
24         I personally advise my clients to
25 always keep copies of the documents, and the

Page 141

1 reason why is because it's -- it's a shield
2 from liability in the sense that it shows ICE
3 exactly what you reviewed when you filled in
4 the information.
5         The other thing is that there is
6 some regulatory law, some OCAHO decisions that say
7 if you attach a copy of the document, you don't
8 have to fill in this information perfectly, so it's
9 like an extra layer of liability -- a shield of
10 liability for the employer.
11    Q.  But you actually do still have to fill
12 out this section and describe the documents even
13 if you take photocopies.  Isn't that true?
14    A.  I disagree on that point.  The -- The --
15 There's OCAHO case law that says that if you
16 retain the document, you don't necessarily have
17 to fill in these columns.
18         Now, that was three or four years
19 ago, and I've seen it go both ways, so I would --
20 I would characterize that as a little bit of a
21 gray area as to --
22    Q.  What do you advise your clients to do?
23    A.  Both, because it's a -- it's a -- just an
24 extra layer of protection.  I mean, if you've --
25 And it works both ways.  If for some reason you

36 (Pages 138 - 141)

1 put in the wrong document number, then -- or you
2 leave the issuing authority blank, ICE has a
3 copy of the document attached, and ICE will not
4 typically fine for that or treat it as a -- as a
5 violation. That's why I always advise to do
6 both, because it's like you have -- you know,
7 you have two bites at the apple to get it right.
8    Q. Right. And so is it your testimony
9 that it's not a substantive violation to not
10 fill out this section on identity and employment
11 authorization even if you've retained photocopies
12 of the IDs?
13    A. It's a gray area. It may be from ICE's
14 perspective a substantive violation, but there
15 is OCAHO case law where they have found it not
16 to be a violation when the document -- when copies
17 of the documents are attached.
18    Q. And part of the reason why that's
19 important is because, even if you take photocopies
20 of the IDs, there's no way to attach the I-9 form
21 to the IDs; isn't that true?
22    A. Well, I mean, typically employers will
23 attach the photocopy to the I-9.
24    Q. But you're not making any attestation.
25 You know, you would have wiggle room there to

1 say, well, wait a minute, that's not the IDs I
2 reviewed.
3    A. Right, which is why I think it's a best
4 practice to do both. I really do. But what I'm
5 saying is -- And the reason why it's a best
6 practice is because if you have the document
7 attached and you either leave one of the blanks
8 blank or you, you know, transpose a number and
9 you don't have it right, then the document is
10 your backup.
11    Q. Right. It's still important to fill
12 that out. Fair?
13    A. Right. I just -- I would disagree that
14 it's -- it's a substantive violation.
15    Q. And then below that there's a
16 certification for the employer; is that correct?
17    A. That's correct.
18    Q. And what does that say?
19    A. And this is -- this is a required
20 component of Section 2. This is the -- essentially
21 the standard of review for employers. They're
22 certifying that they physically examined the
23 documents presented, that they appear genuine and
24 relate to the employee named and that to the best
25 of their knowledge the employee is authorized to

1 work best -- based on that review.
2    Q. Well, it doesn't say based on that
3 review, does it?
4    A. It says, "I attest, under penalty of
5 perjury, that I have examined the documents
6 presented by the above-named employee, the
7 above-listed documents appear to be genuine and
8 to relate to the employee named, and (3) to the
9 best of my knowledge the employee is authorized
10 to work."
11       So, arguably, that could be
12 considered separate, that part of the attestation,
13 but it's in relation to the review of the
14 documents.
15    Q. And they're actually -- they're
16 separated out by numbers, right? They list
17 three separate requirements; is that correct?
18    A. Three -- There are -- That's correct,
19 that there's three separate components of the
20 attestation.
21    Q. And kind of, you know, apropos of our
22 conversation at the top of the deposition, one
23 of those requirements is stating, under the
24 penalty of perjury, that to the best of my
25 knowledge the employee is authorized to work in

1 the United States; right?
2    A. Right. The only -- The only way an
3 employer could make that attestation would be
4 based on its review of the documents, which is
5 why that appears under Section 2.
6    Q. Well, that's not true, is it, because
7 you could -- you could, conversely, not be able
8 to make it even if somebody showed you documents
9 that look great, they were great fake documents,
10 but you know that person is not here legally
11 because they told you?
12    A. Right. That would be -- that would be
13 the rare hypothetical where -- which we talked
14 about when we were going through the bullet
15 points earlier and when we were looking at the
16 instructions.
17       That would be a situation where,
18 if you have knowledge separate and apart from
19 your review of the documents, then, yes, that --
20 that -- you would, you know, not want to attest
21 to this.
22    Q. But it's not your testimony that it's
23 rare for people in the agriculture industry to
24 present fake documents and work here illegally,
25 is it?

37 (Pages 142 - 145)

1    A.   No.
2         MR. BISS:  Object to the form.
3    A.   I don't think it's rare.  I don't think
4  it's rare that individuals would present fake
5  documents.  I think it's rare that employers
6  would have actual knowledge that they're fake or
7  fraudulent.
8    Q.   And the second requirement is actually
9  you're saying -- you know, the first requirement
10  is saying, hey, I've reviewed -- examined the
11  documents and then the above-listed documents,
12  so part of the attestation is the description of
13  the documents.
14    A.   Right.
15    Q.   Right.  It doesn't say, you know,
16  attached photocopy documents or the documents I
17  reviewed.  It actually says the above documents,
18  I'm attesting that the above documents appear to
19  be genuine and relate to the employee named;
20  right?
21    A.   Right.  That's that reasonableness
22  standard.  The case law is developed around that
23  part of the attestation, that a reasonable
24  employer, so they appear to be genuine and
25  relate to the employee named under a reasonable

1  employer review.
2    Q.   And so that's another reason why it's
3  important to list out those documents, because
4  it's part of your attestation; right?
5    A.   It's -- Yeah.  I mean, I always advise
6  that they do that, but I'm just telling you that
7  there's -- there's regulatory decisions out
8  there that say if you've attached copies of the
9  documents, it's -- you are not required to fill
10  in the information.
11         But, again, I would characterize
12  that as a gray area; but, I mean, the form
13  itself supports the idea that you are to fill in
14  the information in those blanks.  I agree with
15  you.
16    Q.   And then -- And you're really attesting
17  to two things.  You're attesting to that you've
18  examined the documents and they appear to be
19  genuine and relate to the employee; correct?
20    A.   Correct, because they can appear to be
21  genuine and not relate to the employee.
22    Q.   Right.  If I used your ID, for
23  example --
24    A.   Right.  It's a genuine document.
25    Q.   -- it looks genuine, but it ain't me.

1    A.   Correct.
2    Q.   But -- But -- And then, separately,
3  that to the best of my knowledge the employee is
4  authorized to work in the United States; right?
5    A.   Correct.
6    Q.   And then -- And so let's -- And then I
7  want to ask you about this, this standard, so --
8  but before I do, the certification requires the
9  employee -- or, I'm sorry, the employer who
10  reviewed it to then sign it; right?
11    A.   Yeah, the individual who reviewed the
12  documents, correct.
13    Q.   And they're attesting to that under the
14  penalty of perjury, which is a felony; right?
15    A.   Right.
16    Q.   And so what is -- in your experience
17  and opinion, what does an employer have to do
18  to satisfy this attestation with respect to a
19  review of the documents?
20    A.   Well, it's not necessarily my opinion.
21  It's the opinion of -- it's the opinion of the
22  judicial tribunal or the ALJ that -- you know,
23  Office of the Chief Administrative Hearing
24  Officer and the federal law that's kind of
25  developed around it, but basically the employer

1  is held to a reasonableness standard, and so
2  they're to conduct a reasonable inspection of
3  the documents.
4    Q.   And so what do they have to look for?
5  Like, what does that include?  When you're
6  looking at a document, what are you looking for?
7    A.   Well, it's fact-based.  It's a
8  fact-based inquiry, and that's what the case
9  law has kind of developed.
10         Aramark, that Aramark decision
11  out of the Ninth Circuit, is kind of the seminal
12  decision on that.  It gives a bunch of different
13  examples of where, you know, the court found
14  a reasonable employer isn't expected to have
15  identified that versus they would have identified
16  that.
17         So it's really fact-intensive,
18  the law is, and that -- you know, that's what
19  I'm giving an opinion on.  The law is, in
20  general, a reasonable employer, so would a
21  reasonable employer have determined that the
22  document was genuine and related to the employee
23  named.
24         I give the example of the employee
25  who presents -- you know, when I give seminars,

1 I give the example of the employee who presents
2 a driver's license, the male employee who
3 presents a driver's license of a -- of a female
4 employee.
5          Now, a reasonable employer would
6 feel comfortable not being discriminatory in
7 identifying that didn't relate to the
8 employee named. Of course, that's changed now a
9 little bit, too, but the issue is, it's a
10 reasonableness standard.
11    Q.   And so checking dates, would that be
12 part of it?
13    A.   Checking what types of dates?
14    Q.   Expiration dates.
15    A.   Well, that's part of the physical
16 review. I mean, that's part of the filling in.
17    Q.   Right, birth dates, issue dates?
18    A.   Reviewing, cross-checking is probably
19 not required of an employer as far as, like,
20 cross-checking documents across --
21    Q.   I'm just saying --
22    A.   -- throughout the form.
23    Q.   -- if I gave you an ID --
24    A.   Yeah.
25    Q.   -- that said I was 18 years old, that

1 would be a clue, right, that this document is
2 probably not legitimate?
3    A.   It could be; but, I mean, again, that
4 is a very slippery slope for an employer, to try
5 to make an age-based analysis or to try to --
6 you know, to do a name-based analysis.
7          You know, I have -- When I advise
8 on this exact issue -- These are the questions I
9 get the most, and it is very dangerous to
10 overscrutinize documents.
11    Q.   What about names and spellings of names?
12    A.   Aramark -- The Aramark case actually
13 discusses that; and, you know, if -- I believe
14 the court in that case found that, you know,
15 like a missing consonant or things of that
16 nature, that a reasonable employer may not have
17 caught that, and so they did not find that that
18 somehow put them on constructive knowledge, but --
19    Q.   Right. And that --
20    A.   I mean, that's the inquiry. The
21 inquiry is what would a reasonable employer have
22 identified.
23    Q.   Right. And so I could probably save us
24 a lot of time, since I understand that a lot of
25 what I'm asking about by itself doesn't establish

1 constructive knowledge, and my questions are
2 more about is it a factor that can contribute to
3 constructive knowledge; right? Does that make
4 sense?
5    A.   Yeah, I would agree with you that those
6 are -- that those are factors and that it's a
7 fact-based inquiry, you know.
8    Q.   And so -- And, likewise, typos. That
9 could be a factor; right?
10    A.   Blatant typos, I think. I don't
11 think -- Well, I know because the case law
12 supports that an employer is not necessarily
13 required to read the fine print on the back of a
14 Social Security card to make sure every word is
15 spelled correctly.
16          An employer is not required to --
17 but, you know, blatant typos that are legible
18 from the document, that would be a -- that would
19 be indicia, I would say.
20    Q.   What other sort of indicia or indications
21 of possible fake documents have you seen?
22    A.   Would a -- Have I seen been found --
23    Q.   Either in your personal experience or
24 in the case law or anywhere else.
25    A.   Well, you know, I always analyze things

1 under the backdrop of a reasonable employer
2 exercising the appropriate level of review
3 because you don't want them exercising one level
4 of review for a certain applicant versus another.
5          So I've seen, you know, driver's
6 license cards where the state is misspelled, you
7 know, or where it's real blatant, like a blatant
8 error like that. I've seen some very blatantly
9 bad where the -- you know, but, again, my review
10 is not -- my level of review is not the level
11 that an employer is required to undertake. I
12 was trained on this. I was -- I went to various
13 seminars as, you know --
14    Q.   And I get that, and so --
15    A.   And so, I mean, I can spot a fake a
16 lot -- a lot faster than an employer would be
17 able or would even be required to spot, so it's --
18 but as far as what the case law says, yeah, I
19 think the words that I've seen are blatant.
20    Q.   Well, any -- any typos could be a
21 factor; right? I'm not saying by itself
22 contribute to constructive knowledge, but a
23 small typo in somebody's name or anything else
24 could be something that enters into the analysis
25 of whether somebody is unauthorized; right?

39 (Pages 150 - 153)

Page 154

1    A.   It would enter into the analysis if
2  it's -- if it's spotted by the employer; but,
3  again, I've seen case law where the misspelling
4  of a word -- because there's a bunch of -- on a
5  Social Security card, there's like a paragraph
6  of fine print, and I've seen ICE try to use that
7  to establish, and it's typically not upheld or
8  sustained.
9    Q.   Is the -- Is it true that there are
10  several OCAHO cases that refer to filling out
11  all of Section 2 is the heart and most important
12  part of the I-9 process?
13    A.   That's accurate.  And that's why I
14  advise on that.  Judge -- Judge Ellen Thomas has
15  some decisions where she's -- she's said that,
16  but she also -- she said it in the context of,
17  for example, if the issuing authority is missing
18  but the document is attached, that's like an extra
19  layer of protection, so that's not necessarily
20  going to be a violation, but --
21    Q.   And so --
22    A.   Go ahead.
23    Q.   And so let's move on now to the legal
24  standard, so the -- we've been talking about
25  employers violating immigration law and

Page 155

1  specifically about, you know, wrongfully hiring
2  unauthorized workers.
3         What is the statute that governs
4  that?
5    A.   So I think what you're asking me is
6  what -- what statute controls the review aspect?
7    Q.   Well, what statute makes it illegal for
8  an employer to hire an unauthorized worker?
9    A.   1324a, I believe.
10    Q.   Okay.  Yeah.
11    A.   Off the top of my head.
12    Q.   And that's what --
13    A.   Off the top of my head.
14    Q.   Yeah, so 8 U.S.C. 1324a.
15    A.   That's right.
16    Q.   Okay.  And then let me do this.  Because
17  I thought about this the other day.  Let me give
18  you an exhibit that -- Okay.  What I've done is --
19  Let me show you what I've marked as Exhibit 92.
20    A.   Okay.
21    Q.   And, you know, you can review it; and
22  I'm not asking you to, you know, validate it or
23  verify that, you know, this is a complete and
24  accurate copy of the U.S. Code; but what it is,
25  is a printout of 8 U.S.C. Section 1324a.

Page 156

1         You're familiar with that statute;
2  is that right?
3    A.   Yes.
4    Q.   Okay.  And what I wanted to do is I
5  just wanted to have it available to you as a
6  reference because I think it's unfair to be
7  asking you about statutory language without
8  putting the statute in front of you.
9    A.   Yeah.  No, definitely.
10    Q.   Okay.  Okay.  And so what are the ways --
11  And so what, generally, does 8 U.S.C. 1324a make
12  illegal?
13    A.   Well, there's -- there's basically two
14  components to it.  So it's (a)(2) -- (a)(2) is
15  the one I think you're asking me about, and
16  that's continuing employment.  It basically
17  makes it illegal to hire an alien, so that's a
18  knowing hire, and to continue to employ the
19  alien in the U.S. knowing the alien is
20  unauthorized with respect to such employment.
21         So it essentially prohibits the
22  knowing hire or knowing continued employment of
23  an alien knowing the alien is unauthorized for
24  work.
25    Q.   And so the title of 8 U.S.C. 1324a is

Page 157

1  the "Unlawful employment of aliens"; right?
2    A.   That's correct.
3    Q.   And Subsection (a) is titled "Making
4  Employment of Unauthorized Aliens Unlawful";
5  right?
6    A.   Correct.
7    Q.   And it identifies three ways to violate
8  the statute.  Is that fair?  And maybe let me
9  break it down, and we can save some time here.
10         So it says there's three ways to
11  violate Subsection (a), Making Employment of
12  Unauthorized Aliens Unlawful.
13         One way is to, essentially, hire
14  for employment in the United States an alien
15  knowing the alien is unauthorized to work in the
16  United States; right?
17    A.   Right.  That's accurate.
18    Q.   And then a second way would be to --
19  And I'm jumping down.  That would be (a)(1)(A).
20  I'm jumping down to (a)(2).
21         A second way would be to continue
22  to employ an individual after learning that they
23  are unauthorized to work in the United States;
24  right?
25    A.   That's accurate.  That's -- That's

40 (Pages 154 - 157)

Page 158

1  what's referred to as a knowing continued
2  employment versus a knowing hire.  And then the
3  third -- the third way to violate this statute
4  is found at (B) -- (B)(i) and (i)(2).  But
5  basically it's without complying with the
6  requirements.  This is what -- This is where --
7  This section, Section (B) here, is what ICE
8  uses for its paperwork violations.
9      Q.  Okay.
10     A.  But it's unrelated to knowledge, that
11  component.  Do you see what I'm saying?  Because
12  this is just -- You can violate 1324a, (a)(B)
13  there, you can violate that with regard to U.S.
14  citizen workers.  That's the paperwork element.
15  Okay?  So this statute can actually be violated,
16  and that's what they use as their basis to lodge
17  the civil monetary fines.
18     Q.  And what that third way to violate the
19  statute is, is it's basically failing to comply
20  with the employment verification process that is
21  set out in the chapter; right?
22     A.  Without regard to knowledge of whether
23  the person is unauthorized or not.  That is --
24  This is the paperwork element.  This is the we,
25  you know, only got a List B document, I didn't

Page 159

1  get a List C.  So that -- This part of the
2  statute is what ICE uses to lodge substantive
3  violations.
4      Q.  And the employment verification process
5  that it refers to, that's generally the I-9;
6  right?
7      A.  Right.
8      Q.  And so, however, for purposes of the
9  criminal statute at least, it says just making,
10  you know, a clerical error or something like that
11  isn't going to cause you to violate the criminal
12  statute; right?
13     A.  That's correct.  I mean, yeah.
14     Q.  But if you fail to comply with it in
15  good faith, then you have violated the criminal
16  statute; right?
17     A.  That's not -- That's not my understanding
18  of what it says.  I think it's actually the
19  reverse.  The good faith -- If you comply in good
20  faith, it's a defense.
21     Q.  Right.  And so I think we're saying the
22  same thing, but you've stated it much more
23  eloquently than I have.
24         It's essentially that, hey, you
25  violated (a)(1)(B) if you failed to comply with

Page 160

1  the employment verification process; and as you
2  rightfully indicated, there's no, like,
3  knowledge component of that, but -- and so the
4  way the statute deals with that, it says, look,
5  if you comply in good faith with it, even if
6  you've made some mistakes, then you have a
7  defense, you haven't violated the statute;
8  right?
9      A.  With regard to Subsection (B), yes.
10     Q.  Right.  Right.
11         And so, conversely, if somebody
12  is not complying with the I-9 process in good
13  faith, then you have violated that subsection;
14  correct?
15     A.  Well, I mean, ICE would still have to
16  prove that, you know, meet their burden of
17  proof, but you don't have the safe harbor of the
18  good-faith defense.  You would lose the safe
19  harbor of the good-faith defense.
20     Q.  Right, and you would violate the
21  statute.
22     A.  If ICE is able to establish its burden
23  of proof, yes.
24     Q.  Right.
25     A.  And if a judicial tribunal finds that

Page 161

1  ICE established its burden of proof.  I mean --
2      Q.  Regardless is somebody can prove --
3      A.  ICE is not the judge --
4      Q.  Right.
5      A.  ICE is not the judge and jury here.
6  Right?  I mean, they can bring whatever
7  allegations they want as the enforcement agency,
8  but ultimately there's an analysis that would
9  need to be done by a judicial tribunal to find
10  that there was an actual violation of the
11  statute, but you're right --
12     Q.  Right.
13     A.  -- in the way you're saying the statute
14  reads.
15     Q.  And let's kind of divorce for a second
16  how somebody is proven guilty of that, but it
17  would be if -- if the government proved that the
18  employer hired for employment an individual in
19  the United States without complying with the I-9
20  requirements, then --
21     A.  We're talking -- Go ahead.
22     Q.  -- then you have violated the statute
23  unless you can show that you have complied in
24  good faith with those requirements; right?
25     A.  You would be subject to a violation of

41 (Pages 158 - 161)

1 1324a, Subsection (B,) for that, for that, and
2 that for -- for substantive violations, and
3 that's -- that's where -- when ICE created its
4 guidance on this point, that's where they drew
5 the line, is that is there certain violations
6 that are considered technical that would not
7 fall within the ambit of this statute; but,
8 ultimately, ultimately, any allegation by ICE
9 that you're in proper compliance would be
10 subject to review. I just -- I just --
11    Q. I get that.
12    A. I can't emphasize that enough.
13    Q. And I know, and I think you've done a
14 good job.
15    A. Okay.
16    Q. I understand that there's got to be
17 some sort of due process to proving somebody
18 violated a statute, whether it's the, you know,
19 administrative process or the criminal process.
20 I get that, and I also understand that a lot of
21 these can be administrative violations, some
22 technical, some substantive, but I know we're --
23 we're burning a lot of time here, and I want to
24 make sure that we can try to get you out of here
25 by 4:00.

1    A. Sure.
2    Q. And so let me move on.
3       The -- With respect to good faith,
4 one of the -- one of the ways the government
5 could prove that you do not -- you did not go
6 through the I-9 requirements of good faith is if
7 you have a pattern and practice of violations;
8 correct?
9    A. That's a different analysis, the pattern
10 and practice. I believe that's a completely
11 different analysis. I know what you're referring
12 to. That is an element. If you show like -- The
13 good-faith defense is not going to be available to
14 you if you have -- if you have, just in general,
15 a pattern and practice of poor compliance. I
16 agree with that aspect. I don't know that that
17 comes out of the statute, though.
18    Q. And then with respect to knowledge that
19 the statute talks about, that knowledge can be
20 either actual or constructive; correct?
21    A. The case law around -- around the
22 terminology of, yeah, 1324a(1)(A) and (A)(2) has
23 said it can be actual knowledge or constructive
24 knowledge. The constructive knowledge element
25 was significantly restricted, though, by -- by

1 case law.
2    Q. And your report cites 8 CFR 274a and
3 states that knowledge includes not only actual
4 knowledge but also knowledge which may fairly be
5 inferred through notice of certain facts and
6 circumstances which lead a person through the
7 exercise of reasonable care to know about a
8 certain condition. Is that fair?
9    A. That's right. That's accurate.
10    Q. And so what is the exercise of reasonable
11 care?
12    A. Well, that's developed. I mean, that's
13 a -- that's a great question because that's
14 what's litigated, you know, on these cases. And
15 I would point you to Aramark because that's --
16 that's the case that really digs into that, that
17 standard and provides good analysis and cites to
18 other cases that have addressed it and things.
19       So, I mean, that's the -- that's
20 the million dollar question, is what is
21 reasonable care. Right? And that's what ICE --
22 whenever ICE is bringing, you know, charges or
23 administrative fines on the basis, that's what
24 they're having to try to meet for their burden
25 of proof.

1    Q. And so it can be -- it can include the
2 duty to look further into something. Is that
3 fair?
4    A. That is fair. I mean, yeah, that would
5 be an aspect of it, if the facts supported that,
6 right.
7    Q. So fair to say it is very fact-based?
8    A. Oh, as I think I've said ten times
9 today, it's a fact-based inquiry.
10    Q. And that can be -- you know, it could
11 be one single fact that establishes knowledge or
12 it could be multiple facts. Is that fair?
13    A. That's fair. There are certain factors
14 that should not be considered, though. And then
15 you have to remember that it's not just what a
16 reasonable person, it's what a reasonable
17 employer would have discovered and against the
18 backdrop of that antidiscrimination clause and
19 provision.
20    Q. And so let me ask you about your base
21 of knowledge for this case in particular.
22       First, I've got to ask you, have
23 you already been paid for this case?
24    A. No, I have not.
25    Q. And so --

42 (Pages 162 - 165)

1   A.  When you say "this case," you're

2 talking about your underlying litigation?

3   Q.  Yeah.

4   A.  No, I have not.

5   Q.  And so your report I think on page 5

6 spells out what you reviewed for this case; is

7 that right?

8   A.  That's correct.

9   Q.  And --

10      MR. BISS:  Hey, Nick?

11      MR. KLINEFELDT:  Yep.

12      MR. BISS:  Nick, before we get

13 into that, before we get into the substance of

14 what he reviewed, I'm going to designate the

15 entire deposition transcript as counsels' eyes

16 only.  Do you understand that, that I've made

17 that designation?

18      MR. KLINEFELDT:  Yep.  The --

19      MR. BISS:  Okay.  Thank you.

20   Q.  And so on page 5 of your report, you

21 identify what you reviewed for this case; is

22 that correct?

23   A.  That's correct.

24   Q.  Do you have -- Is your knowledge of

25 this case based on anything besides those

1 documents?

2   A.  No.  It would be limited to this, these

3 documents.  And, you know, I primarily focused

4 on the expert reports of Arnold and Martin.  I

5 did review the deposition transcripts, paid

6 particular attention to the -- to the I-9s that

7 were focused on by Mr. Arnold and, you know, also

8 listened to the audiotapes of the interviews,

9 and my knowledge of the case would be limited to

10 that.

11   Q.  Did -- Have you ever talked to anyone

12 at NuStar?

13   A.  No, I have not, other -- only their

14 counsel.

15   Q.  Typically when you're doing an audit

16 for a client, would you talk to them?

17   A.  Oh, absolutely.  I would be -- I would --

18 Yes, I would have to.

19   Q.  And why is that?

20   A.  In order to obtain the I-9s, I would have

21 to speak to the -- to the client.

22   Q.  And aside from actually just getting

23 the documents, would it be important to talk to

24 the client?

25   A.  Yeah.  I mean, it depends on what type

1 of audit you're doing.  If you're auditing their

2 business practice surrounding I-9, then, yeah,

3 it would be important to have that dialogue.  If

4 you're just doing a paperwork audit, all you

5 need is the I-9s, and then you -- you know, but

6 in general, yeah, you would.

7   Q.  What -- I noticed that you mentioned

8 some miscellaneous exhibits introduced during

9 depositions.

10      Do you remember what those were?

11   A.  Not specifically, but I think it was

12 the -- I think I -- I think it was the -- like,

13 the ▮▮▮▮ -- I think the ▮▮▮▮ deposition

14 may have included some citations to statements

15 that she made or some -- something like that.

16 That might have been why I included that.

17   Q.  How were the documents that you reviewed

18 selected?

19   A.  They were provided to me by Mr. Biss.

20   Q.  Did you ask in particular to review any

21 certain documents?

22   A.  No.  I was primarily focused on the

23 expert reports of Arnold and Martin, so I wanted

24 to see what they looked at, you know, so that I

25 could -- I mean, because the nature of my -- of

1 my retention was essentially -- I mean, it wasn't

2 to do an I-9 audit.  It was to, you know, express

3 some opinion on as to what the standards are

4 that are relevant to your case and to basically

5 analyze statements that were made by Mr. Arnold

6 and Mr. Martin in their reports, you know, against

7 what the law actually says.

8   Q.  Did you ask to review any specific

9 documents?

10   A.  Not that I recall.  I felt like what I

11 received was sufficient for me to, you know,

12 perform the analysis.

13   Q.  Did you review the SSN no-match letters

14 that NuStar received?

15   A.  I did review some of those.  I believe

16 that was in there.  And, I mean, I'm generally

17 aware of what no-match letters are.  I also saw --

18 saw the references to those in the Arnold report.

19   Q.  And were you aware that NuStar received

20 a letter dated in December 2019 stating that 20

21 out of 27 of its employees for tax year 2018 did

22 not match?

23   A.  That is referenced in the Arnold report,

24 to my recollection.

25   Q.  And were you also aware that NuStar

Page 170

1  then again received a letter the next year,
2  December 2020, that 14 out of 19 employees, of
3  its employees for tax year 2019, did not match?
4      A.  Yes, I recall that being stated in the
5  Arnold report.
6      Q.  Were you aware of what NuStar's response
7  was to those letters?
8      A.  My under -- My understanding from
9  reviewing the Arnold report -- and, again, I
10  didn't make -- I didn't make a lot of inquiry
11  into that because my -- I'm very aware of what
12  an employer's obligations are in response to a
13  no match, so -- but I did see in the -- at least
14  the Arnold report seemed to indicate that there
15  was not -- that there was either little or no
16  action taken in response.
17      Q.  In fact, there was -- there was no action.
18  They did not follow up with any employees.  Were
19  you aware of that?
20      A.  I was aware that that was stated.  The --
21  You know, in general, the no match or employer
22  correction notices, there is a significant part
23  of the AILA bar that actually advises not to take
24  action in response to Social Security no-match
25  letters, and that's because it's so -- you know,

Page 171

1  so I just did not consider that really too much
2  of a relevant factor because --
3      Q.  Isn't it something that ICE considers?
4      A.  Right, and it's been -- as I've said
5  earlier, it's been subject to significant
6  challenge that they should consider that; and,
7  in fact, you know, there's been years and years
8  of litigation on that exact issue.
9      Q.  And isn't one of the purposes of the
10  SSA no-match letter to let the employer know
11  that the Social Security tax that the employer
12  is withholding from that employee's paycheck
13  isn't getting attributed for the benefit of the
14  employee?
15      A.  That is the sole -- That's the sole
16  purpose.  It doesn't have anything to do with
17  employment verification.  It's solely to alert
18  the employer that the W-2 -- the W-2 C, I
19  believe, is not -- it does not match and so
20  therefore withholdings may not be properly
21  accounted to the -- to that Social Security
22  account number or whatever.
23      Q.  So, in other words, Social Security is
24  telling you, whether you believe if I have this
25  right or wrong, Employer, I'm telling you that

Page 172

1  the Social Security benefits and money that's
2  supposed to go to your employee may not be going
3  to your employee?
4      A.  That -- Right.
5          MR. BISS:  Object to the form.
6      A.  I mean, that's -- that, to my knowledge,
7  is the reason for the employer correction notice,
8  is so that the employer can, you know, check the
9  W-2 to make sure that it adequately reflects what
10  the employee gave them.
11          If they do that, if they check
12  the W-2, you know, the inquiry is -- if there's
13  some sort of an error on that W-2, then that can
14  be corrected, but you're dead on to what the
15  purpose of that employer correction notice is.
16  It's to alert the --
17      Q.  And aren't you supposed to tell the
18  employee?
19      A.  I don't -- I don't know that that's in
20  the -- that that's in their -- their FAQs.  I
21  think it's more of a you need to check your
22  records type of an instruction.
23      Q.  And so if you --
24      A.  You have to go -- The reality is, you
25  have to go access something called like the SBO

Page 173

1  business portal to actually even see the names,
2  and then you have to establish an account.  A
3  lot of employers don't do that.
4      Q.  But fair to say if you cared about your
5  employees, you'd follow up and to make sure that
6  they were getting their Social Security benefits;
7  right?
8          MR. BISS:  Object to the form.
9      A.  You're asking me personally if I cared?
10      Q.  Yeah.
11      A.  I mean -- Right.  I mean, I would say
12  that there would be -- And this is separate and
13  apart from the immigration issue.  There would
14  be -- Yeah, I mean, I would say you would want
15  to alert your employee that potentially there's
16  an error to their Social Security number.
17      Q.  And that they're not getting -- they
18  might not be getting the Social Security benefits
19  they're entitled to; correct?
20      A.  Right.  And the same thing holds true --
21  This is the big misconception in the United States,
22  right, is that unauthorized workforces are -- are
23  getting paid without paying taxes.  It's actually
24  the inverse.
25      Q.  Right.

44 (Pages 170 - 173)

1    A.   Most -- Most unauthorized workers are
2  paying taxes and not getting returns.
3    Q.   And so --
4    A.   So it's --
5    Q.   -- one reason --
6    A.   That's one reason that they do that.
7    Q.   One reason you wouldn't follow up with
8  the employee is that if you knew that there's no
9  way to resolve that; isn't that fair?
10        MR. BISS:   Object to the form.
11   A.   In your -- In your hypothetical, one
12 reason an employer may not follow up would be --
13 Yeah, I mean, that's a plausible reason that
14 they would not follow up, would be that there
15 would be concern the employee would not be able
16 to resolve the no match.
17   Q.   Is there any other reason why you
18 wouldn't?
19        MR. BISS:   Object to the form.
20   A.   There's probably many reasons, but the --
21 you know, I think -- I think, in general, most of
22 those W-2 C's are corrected.  And those no-match
23 letters can relate to a lot of different errors.
24 And so, you know, I'm not sure.  I'm not sure if
25 there's other reasons.

1    Q.   Do you -- Are you aware that there was
2  a process in the course of this litigation
3  where through court order and discovery we, the
4  defendants, had plaintiffs identify their
5  employees and the information on their W-4s and
6  then had Social Security Administration verify
7  whether the names matched the Social Security
8  numbers?
9    A.   Yeah, I did see a reference to that in --
10 in one of the reports, I believe, saw a reference
11 to that, and I recall that there was a significant
12 percentage that did not match.
13        You know, my report focuses on what
14 impact that has on the analysis of constructive
15 knowledge, and that's why I'm saying it does not.
16   Q.   You're saying it wouldn't be a factor at
17 all?
18   A.   That -- Well, first of all, that
19 information, my understanding, and correct me if
20 I'm wrong, but my understanding is that that
21 information was done after the litigation had
22 been filed.  Is that accurate?  So the employer
23 was not on notice of that issue during the
24 pendency of employment; correct?
25   Q.   You're correct in that that process was

1  done after the date of the article, after the
2  date that the lawsuit was filed.
3    A.   So that may be indicia.  That would be
4  indicia of a potential issue with fraudulent
5  documents being used by employees, but what it
6  is not equated to is knowledge of that issue.
7  Do you see what I'm -- There's a difference.
8    Q.   They would know it now, though, wouldn't
9  they?
10   A.   Currently, after that information was
11 provided?
12   Q.   Yeah.
13   A.   That would -- That would be -- That
14 would be a red flag, yes.
15   Q.   And then were you aware that there were
16 six employees who were employed at the time of
17 the article and are still employed at NuStar?
18   A.   At the time of the article?
19   Q.   Yeah.  In other words, they were --
20   A.   In what reference?
21   Q.   They were hired before the article was
22 published in September of '18 and are still
23 employees there.  Were you aware of that?
24   A.   I think I did see a reference to that.
25   Q.   Did you know that they've been deposed?

1    A.   I have not reviewed their depositions,
2  so --
3    Q.   Did you know that they were deposed?
4    A.   I think I did.  I think I was informed
5  that there may have -- there may have been
6  depositions of them, but I don't know if that --
7  I did not -- did not review their transcripts
8  or -- no, I did not review their transcripts.
9    Q.   Were you aware that the court in this
10 case, the civil case, actually took the step of
11 appointing them criminal defense counsel?  Did
12 you know that?
13        MR. BISS:   Object to the form.
14   A.   I did not know that, but that is very --
15 that's very typical in civil litigation that
16 involves things like this because a lot of --
17 because you're asking individuals to potentially
18 make statements against their own interest in
19 relation to alienage, manner of entry.
20        And so, I mean, I've represented
21 companies where -- and that's just -- that's
22 fairly standard when you're going to be asking
23 employees about potentially incriminating
24 information.
25   Q.   And so were you aware that all six of

45 (Pages 174 - 177)

Page 178

1 those employees asserted their Fifth Amendment
2 privilege with respect to any questions regarding
3 where they work or their documents or filling out
4 I-9s?
5    A. On advice of their counsel?
6    Q. Correct.
7    A. I wasn't aware of that; but, again, I'm
8 aware generally that's a pretty common
9 practice.
10   Q. What does that mean to you when somebody
11 asserts the Fifth Amendment through the advice of
12 their counsel?
13   A. I really don't draw any inference from
14 it other than they're acting on the advice of
15 counsel. I mean, I don't know that you can draw
16 a negative inference from that, but there's a
17 lot of -- there are a lot of potential reasons
18 that a foreign-born worker would want to assert
19 that in that type of a -- in that context.
20   Q. What do you --
21   A. Including protection of family members,
22 including protection of -- I mean, there's just
23 a lot of reasons why workers in that context
24 would not want to speak much.
25   Q. Are you aware that you can only assert

Page 179

1 the Fifth Amendment privilege to protect
2 yourself?
3    A. Oh, absolutely, but what I'm just
4 saying, in general, there's a real -- in this --
5 in the population that works in, you know, ag,
6 construction, there's a real -- anytime there's a
7 legal proceeding there's a real, real sense of
8 insecurity.
9    Q. And are you aware that you can only
10 assert the Fifth Amendment privilege if you
11 believe the answer to the question would tend to
12 incriminate you?
13   A. I'm aware of that.
14   Q. And do you think it would be ethical
15 for a lawyer, especially a criminal defense
16 lawyer, who presumably knows what they're doing,
17 to advise their client to assert the Fifth
18 Amendment privilege for any other reason?
19       MR. BISS: Object to the form.
20   A. You know, I would obviously be
21 speculating; but I would just say, in general, I
22 think Padilla versus Kentucky advises criminal
23 defense attorneys to be real careful with making
24 sure they advise clients on immigration
25 consequences.

Page 180

1 So I think that's very typical
2 that that advice would be given because here's
3 the other thing: Information that is elicited
4 from people in those circumstances can impact
5 their ability to obtain benefits based on the
6 date of their entry and things.
7       That necessarily wouldn't fall
8 under Fifth Amendment, but there's just a lot of
9 reasons why there's a real protection of that
10 information. Because, for example, cancellation
11 of removal, okay, cancellation of removal requires
12 ten years of presence in the United States.
13       So there's -- there's timing
14 elements to a lot of benefits that are available
15 to workers; and so manner of entry, time of
16 entry, and alienage in the immigration world are
17 very much protected pieces of information, if
18 that makes sense.
19   Q. Right, but not protected by the Fifth
20 Amendment.
21   A. Not necessarily, unless there was some --
22   Q. Not at all.
23   A. Right.
24   Q. Right?
25   A. Right. Right.

Page 181

1    Q. And so to advise a client to assert his
2 Fifth Amendment privilege, you have to believe
3 that that client -- client's answer would tend
4 to expose them to a violation of criminal law.
5 Isn't that fair?
6    A. I think --
7       MR. BISS: Object to the form.
8    A. I think that would be fair.
9    Q. And so I'm going to show you what's
10 been marked as Exhibit 102, and this is the
11 transcript of the deposition of ██████████
12 ██████████
13       And I know, sir, that this is the
14 first time you've seen this, so I want to --
15 take your time, as much time as you need and
16 review it. Okay?
17   A. I've reviewed it. It's pretty short.
18   Q. And ████████████████ is represented
19 by an attorney named J.P. Greer here. Is that
20 fair?
21   A. I see that.
22   Q. And he is asserting his Fifth Amendment
23 privilege with respect to pretty much every
24 question that relates to his employment. Is
25 that fair?

46 (Pages 178 - 181)

Page 182

1    A.  It appears that way, yes.
2    Q.  For example, I asked him, "Do you have
3  any identification?"  He invokes his right to
4  remain silent.  "Where do you work?"  He invokes
5  his right to remain silent.  I asked him if he's
6  a citizen, and he invokes his right to remain
7  silent.
8          Likewise, "Are you legally
9  authorized to work in the United States?"
10          "I invoke my right to remain
11  silent."
12          "Have you ever had a Social
13  Security card?"  He invokes.  Same for a green
14  card.
15          What could this possibly mean
16  other than ███████████████, is not legally
17  authorized to work in the United States?
18    A.  I'm just --
19      MR. BISS:  Object to the form.
20    A.  Yeah, I'm not sure -- I'm not sure what
21  the inference would be.  It definitely means that
22  he felt like the answers could be incriminating.
23    Q.  And are you aware of any situation where,
24  for example, the question, "Are you legally
25  authorized to work in the United States?" and he

Page 183

1  asserts his Fifth Amendment privilege on the
2  advice of counsel, is there anything that can
3  mean other than he is not authorized to work in
4  the United States and cannot answer that
5  question?
6    A.  I'm -- I'm --
7      MR. BISS:  Object to the form.
8    A.  Yeah, I'm not sure what the inference
9  would be legally, other than, you know, he did
10  not want to answer that question on advice of
11  counsel.  I mean, that --
12    Q.  Right.
13    A.  You know, I mean, I think the -- the --
14    Q.  Can you think of anything?
15      MR. BISS:  Object to the form.
16    A.  That --
17    Q.  Can you think of anything other than
18  knowing what we know, what we've established
19  about what the Fifth Amendment protects and what
20  it doesn't protect and an attorney's obligation
21  to advise his client, especially one who knows
22  what they're doing, can you think of any reason
23  other than the answer to that question would
24  have been, "No, I'm not authorized to work in
25  the United States"?  Can you think of any --

Page 184

1      MR. BISS:  Object to --
2    Q.  -- other reason besides that --
3      MR. BISS:  Object to the form,
4  asked and answered.
5    Q.  -- that he could be asserting his Fifth
6  Amendment privilege?
7    A.  No.  I mean, I'm not comfortable
8  speculating as to why he invoked it, and he was
9  operating under advice of counsel.
10    Q.  And I can show you -- I will just give
11  to you for your reference, if you want to see
12  them, but I'll represent to you that the other
13  five all had the same answers.
14    A.  Okay.
15    Q.  And I'll give you copies in case on a
16  break or something you want to see it.  Okay?
17  And they're going to be Exhibits 103, 104, 105,
18  106, and 107.
19    A.  I have those.  Thank you.
20    Q.  Okay.  Would knowing what these
21  transcripts say have affected your opinions in
22  your report?
23    A.  You know, not -- not likely in the -- and
24  here's -- here's essentially why:  I understand
25  that these were statements or depositions that

Page 185

1  were taken in the context of the litigation.  I
2  mean, I would have needed -- for it to impact
3  any -- you know, any of my opinions -- and if
4  you look at my opinions, they're in relation to
5  standards and, you know, some of the statements
6  that were relied upon or data or documents that
7  were relied upon by Mr. Arnold and Mr. Martin.
8          This, to me, statements by an
9  employee under oath taking The Fifth and in the
10  context of a deposition, I would have needed to
11  know whether and when the employer, if at all,
12  became aware of those statements in order to
13  give an opinion as to whether that would raise
14  to the level of constructive knowledge.
15          My -- You know, those are
16  elements of that, of that inquiry, right, is --
17  is when and how and if there was knowledge on
18  the part of the employer about those statements,
19  and that was not -- you know, that wasn't part
20  of my report.
21    Q.  And I'll represent to you, and it's
22  apparent on each transcript, Steve Biss was
23  present at all those depositions, and you know
24  Mr. Biss to represent NuStar in this case; is
25  that correct?

47 (Pages 182 - 185)

1  A.  That's my understanding, yes.
2  Q.  In addition to Mr. Biss being present,
3 NuStar hired a separate translator to be there
4 and was present for all those depositions, and
5 she makes an appearance or identifies herself
6 for the record in each of those transcripts.
7 So, again, when we take a break, you can review
8 them.
9        And so -- And I'll come back and
10 ask you later, but one of the things I want to
11 ask you about is, could that have impacted the
12 opinions in your report?
13  A.  I mean, not likely, because I'm
14 analyzing what -- you know, from an I-9
15 perspective what the employer had at the time.
16        Now, where you're -- where that
17 could potentially become relevant to some of my
18 opinions is in relation to how deposition
19 testimony in the context of a litigation could
20 somehow be imputed to be constructive knowledge
21 to the employer.
22        That's how it would have impacted,
23 you know, and likely I would have -- you know,
24 my opinion with regard to that would be that this
25 would be further -- further indicia of some of

1 those factors that would be considered.
2  Q.  Did you review all of the I-9s and
3 employee documents in this case?
4  A.  I reviewed most of them quickly.  I
5 looked at -- You know, I paid particular attention
6 to the ones that were highlighted in the -- in the
7 defendants' experts' reports.
8  Q.  And so did you look at each of them?  I
9 mean, did you actually review each of the I-9s?
10  A.  I did review them.  I didn't review the
11 entirety of them.  I reviewed the ones that were
12 particularly relied upon by Mr. Arnold.
13  Q.  Okay.  So you reviewed a subset of them.
14 Is that fair?
15  A.  Well, yeah, I quickly looked at
16 everything that I had as far as the I-9s go; but
17 those I looked at, you know, because I wanted to
18 see exactly why Mr. Arnold was drawing certain
19 conclusions and things, so I -- but, in general,
20 I reviewed enough to understand what the company's
21 compliance protocol was with regard to I-9s.
22  Q.  So you didn't do the same procedure,
23 for example, if you were doing an audit for an
24 employer.  You didn't do the same --
25  A.  No, I did not do an I-9 audit here.

1  Q.  Okay.  So switch gears a little bit.
2 How are you doing?  Do you need a break or --
3  A.  No, I'm fine.
4  Q.  Okay.  We'll keep going.  We've got
5 about 25 minutes left of video here.  We'll use
6 as much of that as we can and keep plugging along
7 here.
8        So the -- I want to talk to you
9 about NuStar in particular now.  First, we already
10 talked about you reviewed Claude Arnold's report;
11 is that correct?
12  A.  I did.
13  Q.  Did you review our expert report,
14 Martin's report?
15  A.  I did, though I focused, you know,
16 mainly on Mr. Arnold's report.  Mr. Martin's
17 report seemed to rely on a lot of data, on
18 studies and was kind of industry-oriented, but I
19 did review both of them.
20  Q.  Okay.  What I want to do is, I'll put
21 in front of you, to be fair, both of those,
22 okay, just so you have them.
23  A.  Sure.
24  Q.  And so let me show you what's been
25 marked as Exhibit 98, which is the defense

1 expert report of Philip Martin, and Exhibit 99,
2 which is defense expert report of Claude Arnold.
3 And then here's 98.
4        And so first I want to ask you
5 about the agriculture industry.  We talked about
6 this, but I think both Mr. Arnold and Martin
7 reference that there's a -- you know, I think
8 the way Arnold describes it is a significant
9 percentage of employees in the agriculture
10 industry are not authorized to work in the
11 United States.
12        Would you agree with that?
13  A.  Can you repeat that?
14  Q.  And this may be Martin, too, but would
15 you agree that a significant percentage of
16 employees in the agricultural industry are not
17 authorized to work in the United States?
18  A.  I mean, I don't know how you --
19        MR. BISS:  Object to the form.
20  A.  I don't know how you would define
21 significant percentage.  I'd probably disagree
22 with it to the extent you define it beyond 10
23 percent.
24        The studies that I've seen
25 indicate that, you know, there's somewhere

48 (Pages 186 - 189)

1  between 10 and 13 percent of -- of the workforce,
2  you know, may have presented fraudulent documents
3  to obtain employment in agriculture or farming or
4  food or forestry.
5        So, you know, I don't know what
6  significant would mean, but I would say -- I
7  will just say that in the reports that I've
8  reviewed on that, ag, farming, food, forestry
9  are typically at the higher end of the industry
10  spectrum.
11    Q.  So ag would be similar to crop farms
12  and things of that nature and that issue?
13    A.  Right.
14    Q.  And so I believe it's on page 5 of
15  Martin's report.  Top of page 5, paragraph 2,
16  he states that the United States Department of
17  Labor's National Agricultural Worker Survey
18  finds that most of the hired workers on U.S.
19  crop farms were born abroad, usually in Mexico,
20  and that most foreign-born farm workers are not
21  authorized to work in the U.S.  The share of
22  foreign-born workers on U.S. crop farms averaged
23  70 percent over the past decade, and 70 percent
24  of these foreign-born workers were unauthorized,
25  making 49 percent of all U.S. crop workers

1  unauthorized.  The survey covers only workers
2  employed on crop farms, but the characteristics
3  of workers employed on livestock farms are
4  similar.
5        Would you have any reason to
6  disagree with Martin's statement there?
7    MR. BISS:  Object to the form.
8    A.  As to a recitation of what -- what that
9  survey says, I wouldn't have any -- any reason
10  to think that he misstated what the survey says.
11  I'm -- Just having practiced in this area for,
12  you know, 15 years, the -- the data -- the data
13  is only worth the veracity of what you're getting.
14        And so there's -- I've seen -- I
15  mean, I've literally seen studies that have said
16  that it's 7 percent and -- you know, or 11 percent.
17  I've seen 13 percent.
18        In general, I will agree that the
19  agriculture industry is usually at the highest end
20  of the spectrum when it comes to unauthorized
21  workers, or more so the use of fraudulent documents
22  to obtain employment.
23    Q.  It's an issue to be aware of; right?
24    A.  Oh, absolutely.
25    Q.  And you're aware -- And, of course,

1  NuStar is in the agriculture industry; right?
2  It's a dairy farm?
3    A.  That is correct.
4    Q.  And you're aware that NuStar did not
5  use E-Verify; is that correct?
6    A.  I am.
7    Q.  Did you review the deposition of Anthony
8  Nunes, III?
9    A.  I did briefly review that.
10    Q.  Were you able to, you know, review every
11  page of it and read all of it?
12    A.  I mean, I don't have it memorized, but
13  I did -- I did actually get through it.  I think
14  it was, you know, 423 pages or something, but I
15  did -- I did review it.
16    Q.  And so I will -- I'll show you that
17  deposition, just so you have it, because I'm
18  going to ask you about certain pages.
19        And so let me show you what's
20  been marked as Defense Exhibit 96, which is the
21  30(b)(6) deposition of NuStar, specifically,
22  Anthony Nunes, III.
23        And so are you -- and are you
24  aware that in his deposition Mr. Nunes described
25  the protocol for what NuStar does with respect

1  to filling out I-9 forms?
2    A.  Yeah, I recall reviewing that.
3    Q.  And that he, Mr. Nunes, was the one who
4  reviewed the IDs?
5    A.  I do recall that.
6    Q.  Do you recall what -- how he described
7  his -- what NuStar's protocol was for reviewing
8  IDs and filling out I-9 forms?
9    A.  I recall that -- And you can point me
10  to it in here if you'd like, but I recall that
11  he essentially said that he reviewed documents
12  and would either think to himself or say, yep,
13  that's what I -- that's what I needed or that's
14  what we need; and then that information would be
15  passed, I believe, on to Lori, Lori Nunes.
16        And, you know, as noted in -- as
17  noted in my report, there are -- there are I-9
18  compliance issues with that protocol, so -- and
19  as I also cited, poor I-9 compliance does not
20  equate to knowledge.
21        So, you know, in general, I think
22  that there were significant I-9 compliance issues,
23  and I -- and that was kind of what I gathered from
24  reading this deposition transcript.
25    Q.  And so fair to say, then, that he,

1 Mr. Nunes, does not have an adequate protocol
2 for filling out the I-9 forms or reviewing IDs.
3 Is that fair?
4    A.  Well, no, the --
5       MR. BISS:  Object to the form.
6    A.  I mean, the actual review part didn't --
7 didn't necessarily concern me. It was more the --
8 I was concerned that Ms. Nunes, I believe, was
9 signing Section 2 and without indicating she was
10 signing on his behalf or something like that.
11       The individual who reviews the
12 documents should be the individual that is
13 signing the certification in Section 2, so that
14 was the concern.
15       The level of review was typical
16 of what the level of review is in employers all
17 over the United States, so that part -- his
18 testimony kind of concerning that part didn't --
19 didn't necessarily concern me.
20       The review of the documents and
21 the -- you know, that part was, I think, pretty
22 typical. I mean, I think if you deposed 100 HR
23 professionals, they would probably say we look
24 at it, it's a driver's license, it's a Social
25 Security card, we input the information, and

1 we're done with the I-9. That's -- That's the
2 review.
3    Q.  Right, but that doesn't mean that that
4 makes it compliant; correct?
5    A.  No, I think it does. As long as you --
6 as long as you -- as long as you make the
7 determination that the documents are genuine and
8 reasonably appear to relate to the employee named
9 in front of you, then -- then the review segment
10 of that I think is compliant. Now, the actual
11 completion of the I-9 they had real issues with.
12    Q.  Right. But I just want to be clear
13 because I think we talked about two different
14 things.
15       Just looking at the document to
16 say, yeah, that's the driver's license, that's
17 the Social Security number and writing it down,
18 that does not constitute the review that is
19 required; is that correct?
20    A.  It does. No, I disagree. It does.
21    Q.  You don't have to see if it appears to
22 be genuine?
23    A.  In what way? Are you -- Are you saying
24 that employers should be bending it, getting
25 black lights out, doing Google research, doing

1 PACER research?
2       That's just not the requirement.
3 The requirement is you look at the document. If
4 it appears on its face to be genuine and relate
5 to the employee, you fill in the information and
6 you move on. That's what employers do all
7 through the -- all throughout the United States.
8       I just -- I guess what I'm not
9 getting is -- what I'm not understanding is if
10 you're asking -- if you're asking that there
11 should be additional steps taken as part of the
12 review, I don't think there is.
13    Q.  What do you think the chances are that a
14 dairy farm in northwest Iowa over the last dozen
15 or more years has never ever been presented with
16 a fake ID?
17    A.  Oh, I think --
18       MR. BISS:  Object to the form.
19    A.  I mean, if I was to speculate, I would
20 say there's minimal chances, if not zero, that
21 they wouldn't have at least at some point been
22 presented with that.
23       Now, whether the employer would
24 know that it was fraudulent or fake, that's a
25 completely different inquiry. Whether --

1 Whether it happened and they were indeed
2 presented that, that I would say is --
3    Q.  What do you think the chances are that
4 over the last dozen years NuStar was never
5 presented with a fake ID that they should have
6 known was fake?
7    A.  The only --
8       MR. BISS:  Object to the form.
9       THE WITNESS:  Sorry.
10    A.  The only way I can answer that question
11 is to look at the documents that Mr. Arnold, in
12 his report, seemed to think stood out as -- as
13 the brightest examples of fake documents.
14       And I don't think -- I don't
15 think he -- I think he is failing to understand
16 the inquiry that employers are required to make,
17 and it's a reasonable employer in the situation
18 of a dairy farmer. They're not -- They're not
19 federal agents.
20       And so, you know, it's just --
21 that's a very tough question to answer. I
22 think -- Because it's so fact-based. The I-9s
23 that I saw that Mr. Arnold relied on, particularly
24 where he called out the fonts and things of that
25 nature, that to me is not an inquiry that employers

Veritext Legal Solutions

800-567-8658                    973-410-4098

1  are required to make as far as a judging fonts
2  against other fonts and things of that nature.
3  I think that's a dangerous slope for employers
4  to go down.
5      Q.  Let me -- Let me ask a question.
6      A.  Sure.
7      Q.  Were you aware that Mr. Nunes testified
8  that he has never rejected an applicant based on
9  a review of their ID?
10     A.  I think -- I did see that, and I saw
11 that in something else, I think, maybe
12 Mr. Arnold's report.
13         I would like to tell you that's
14 atypical, but in this area it's just not atypical
15 because employers are so frightened of coming
16 afoul or running afoul of that antidiscrimination
17 standpoint, that unless they're rejecting based
18 on E-Verify, most employers do not reject.
19     Q.  And you think that's all they're
20 concerned with?  I mean, come on, you've been a
21 government attorney.  You think that's all
22 they're concerned with?
23     A.  Oh, no, I think --
24         MR. BISS:  Object to the form.
25     A.  I absolutely think there's different

1  elements, including the ability to find workers.
2  I think that's -- And this isn't specific to
3  NuStar.  This is specific to all employers.  I
4  think there's an incentive to be able to hire
5  for sure because of, you know, labor shortages
6  and things of that nature.  So, yeah, I think --
7      Q.  Right.
8      A.  -- there's other factors.
9      Q.  I know, but, I mean, you've mentioned a
10 few times that, well, you know, other employers
11 do this, other employers do that.
12         Fair to say that there's employers
13 out there who knowingly hire undocumented workers?
14     A.  Oh, yeah.  I mean, I think those -- those
15 charges have been established against a lot of
16 employers.
17     Q.  Right.  And so that is one factor for
18 some employers, that they don't scrutinize IDs
19 because they want to be able to hire somebody
20 who is undocumented.
21     A.  That's a factor.  Absolutely.
22     Q.  And doesn't it seem a little odd that
23 Mr. Nunes has been reviewing IDs for 12 years and
24 has never come across one that he thought was
25 fake?

1         MR. BISS:  Object to the form.
2      A.  I answered that, and I said I don't
3  think it is odd nor do I think it's atypical of
4  business owners or HR departments to reject IDs.
5         They're looking for two things.
6  Is this a -- Is this on the list of acceptable
7  documents?  Yes.  Is there anything about it
8  that is glaringly or blatant -- blatantly not
9  genuine?  If they can -- If they cross that
10 threshold, then they're not going to reject.
11     Q.  And so the attestation actually says
12 examination; right?  You're supposed to examine
13 the ID?
14     A.  It is an examination, which --
15     Q.  Right.
16     A.  And that's actually --
17     Q.  And what does that constitute, though?
18     A.  A physical examination is what the law
19 says on that.
20     Q.  Right.
21     A.  Because what you can't do is you can't
22 look at them via Skype or FaceTime.  The
23 examination component relates to a physical,
24 tactile review of the document.
25     Q.  For --

1      A.  Now, that's --
2      Q.  For what purpose?
3      A.  To determine the authenticity, the
4  authenticity, the genuine nature of it, the --
5  and that's actually -- just so we're clear, that's
6  changed a little bit.  In the post-COVID rule,
7  they're -- they are allowing some electronic
8  review of I-9s now.
9      Q.  You can ask somebody if you're authorized
10 to work in the United States; correct?
11     A.  Yes, that's a permissible inquiry.
12 I mean, by presenting them the I-9, you're
13 effectively asking them that.
14     Q.  Right.
15     A.  By making them complete the I-9, that's
16 the inquiry.
17     Q.  Right.  And then -- And you saw I also
18 asked all the -- all the six employees, anyway,
19 if they were authorized to work in the United
20 States, right, and they asserted their Fifth
21 Amendment privilege?
22     A.  I saw that.  I saw that question outside
23 the context of their application for employment.
24 I saw it in the context of a deposition, correct.
25         MR. KLINEFELDT:  Okay.  So let's --

51 (Pages 198 - 201)

1 Well, we've got about eight minutes here. I'm
2 going to move to asking you about Claude Arnold's
3 report.
4          THE WITNESS:  Okay.
5          MR. KLINEFELDT:  But why don't we
6 take a break here because we've got eight
7 minutes of video, and we'll take five minutes.
8 Is that okay?
9          THE WITNESS:  That's fine.
10         MR. KLINEFELDT:  Okay.
11         THE VIDEOGRAPHER:  We are going
12 off the record.  This is the end of Media Unit 3.
13 The time is 1:57.
14         (A recess was taken.)
15         THE VIDEOGRAPHER:  We are back on
16 the record.  This is the beginning of Media Unit
17 Number 4.  The time is 2:05.
18    Q.  Mr. Samson, I think when we left off,
19 we were talking about NuStar's protocol for
20 reviewing IDs and filling out I-9s, and I believe
21 you said that you've clearly reviewed our expert's
22 report, Claude Arnold's report; is that correct?
23    A.  I have, yes.
24    Q.  And I want to draw your attention to
25 Mr. Arnold's review of some of the documents in

1 this case.
2          So in his report he states that
3 he has reviewed the I-9s and that he determined
4 that out of 309 I-9 forms provided by NuStar,
5 that NuStar did not complete Section 2 on 289 of
6 them.
7          Do you agree with that assessment?
8    A.  I think the issue isn't that they didn't
9 complete Section 2.  They didn't fully complete
10 Section 2.  And, also, I think there was an issue
11 with timeliness.
12         So in that regard I believe
13 Section 2 was -- was completed at a later date.
14 Is that -- That was my -- my understanding, so
15 you would be looking at -- so the company would
16 be -- you know, essentially, if there was an
17 untimely completion of Section 2, that would be
18 a substantive violation.
19    Q.  And --
20    A.  Or a partial completion, that would be
21 a substantive violation.
22    Q.  So I'm at page 17 of --
23    A.  Okay.
24    Q.  -- Mr. Arnold's report.  And so fair to
25 say, then, that that would be -- out of 309 forms,

1 that would be substantive violations on 289 of
2 them?
3    A.  Well, again, potentially.  I mean,
4 you're -- what you're -- what you're wading into
5 is retention period and breadth or scope of audit.
6          So, in general, failure to properly
7 or timely complete Section 2 is a substantive
8 violation.
9    Q.  And so -- And I understand there may be
10 an issue with -- I'm assuming when ICE goes to
11 conduct an audit, they don't go back to every
12 record you ever kept; right?
13    A.  They can't.  There's a retention period.
14    Q.  And so I understand that there's
15 probably a difference between what ICE would
16 actually do in terms of assessing fines and what
17 a substantive violation may be.
18          In other words, you can commit a
19 substantive violation but not be held responsible
20 for it because it's outside of the period of
21 review.  Is that fair?
22    A.  That's fair.  And -- That's fair.
23    Q.  And so aside from the retention period
24 and that we're looking back -- further back than
25 ICE would actually look, but 289 out of the 309

1 I-9 forms provided by NuStar did not fully and
2 timely complete Section 2 and therefore would
3 have committed substantive violations with
4 respect to all of those?
5    A.  That's -- I mean, yeah, that's accurate,
6 that those would be substantive violations, and
7 that's -- where you see the same mistake being
8 made over and over on I-9s, we see that a lot in
9 this -- in this area because employee -- employers
10 are not going to correct a compliance issue until
11 it's been brought to their attention that it's a
12 compliance issue.
13          And so, you know, ICE sees that a
14 lot, I see it a lot in my practice where the same
15 mistake.  So at some point, you know, NuStar was
16 under the impression that all they had to do was
17 collect the documents.  And so, yeah, I mean,
18 that error that Mr. Arnold notes is a substantive
19 violation that repeated itself, it appears, for
20 many employees.
21    Q.  And Mr. Arnold also notes that 208 out
22 of these 309 I-9 forms provided by NuStar are
23 I-9s where NuStar also did not sign and/or date
24 the certification in Section 2.
25          Do you agree with that?

1    A.  Yeah.  Failure to sign and date
2  Section 2 is a substantive violation that has
3  been deemed to be a serious violation by OCAHO.
4         Again, we're in the context of
5  that paperwork violation realm by -- which is
6  what, you know, Mr. -- Mr. Arnold is identifying
7  paperwork violations, substantive paperwork
8  violations.
9    Q.  But you would agree with his conclusion
10 that 208 of those I-9s NuStar did not sign and/or
11 date the certification in Section 2?
12   A.  What page are you looking at?
13   Q.  Still page 17.  It's kind of the --
14   A.  Yeah, and I don't have any reason to
15 dispute that.
16   Q.  Okay.
17   A.  That he did that math.  I just want to --
18   Q.  But do you agree with his math?
19   A.  Yeah, I don't have any reason to disagree
20 with his number calculation.
21   Q.  And based on your review, how many of the
22 309 I-9s were completed timely and correctly?
23   A.  Well, again, I didn't complete a full
24 I-9 audit on it.  What I did was I looked at the
25 I-9s to get a feeling or a sense of their general

1  compliance protocol, which I have noted in my
2  report had, you know, serious flaws in the sense
3  that they weren't -- they were not -- like many
4  employers, they were, in spirit, attempting to
5  comply with the verification requirement.  In
6  reality, they were not fully completing the I-9s.
7    Q.  How many -- Of the 309 I-9s, any idea
8  how many were correct?
9    A.  Were perfect?
10   Q.  Well, I'm not saying -- they were
11 accurate and timely as the law requires.
12   A.  I -- I mean, I didn't -- like, again, I
13 didn't do a full I-9 audit, but I -- from
14 Mr. Arnold's report and from the I-9s that I
15 specifically looked at, a very small percentage
16 were perfect or completely compliant.
17         So in the reality, if ICE were to
18 have initiated an audit, which it didn't, okay,
19 but had it issued an audit, ICE would have likely
20 noted these protocol failures and served them with
21 a -- with a NIF that would have said, you know,
22 these are your substantive paperwork violations,
23 and then -- and so that's -- quite obviously that's
24 a completely different animal from a knowing hire
25 or knowing -- knowing -- we're in the paperwork

1  realm here.
2    Q.  Would you have any reason to dispute
3  that only four out of 309 were accurate and
4  timely?
5    A.  Were perfectly completed on time?
6    Q.  I'm not even saying perfectly.  I'm
7  just saying that were -- that complied with the
8  regulations.
9    A.  No.  And, again, I know -- I understand
10 those numbers seem atypical to you.  They're
11 just -- they're not in this world.  In the world
12 of I-9 compliance, most employers have significant
13 errors, including basic oversight, missing I-9s.
14   Q.  And so as a former federal prosecutor,
15 I'll tell you something that I noticed and I
16 want to ask you about.
17         If you can kind of get your I-9
18 out again, you've told me multiple times that,
19 look, failing to sign this as an employer is an
20 administrative violation.
21   A.  It's a serious substantive violation.
22   Q.  But administrative violation.  It could
23 result in a fine; right?
24   A.  Yes.
25   Q.  Signing it, what I know not to be true,

1  is a felony; right?
2    A.  Right.  Signing it -- Signing it when
3  you know it not to be true would be -- would
4  probably carry with it greater consequence.
5    Q.  And so if you knew that what you were
6  doing was hiring unauthorized workers, wouldn't
7  it make sense that you take the risk of an
8  administrative fine over a felony conviction?
9    A.  I -- I mean, I --
10        MR. BISS:  Object to the form.
11   A.  I have -- I mean, I can't speculate as
12 to how you would ever know that motivation
13 because all I can tell you is that the thousands
14 and thousands of I-9s that I've reviewed and
15 audited, the failure to sign is one of the most
16 prevalent.
17        It's a serious violation, but I
18 can't tell you that just because an employer
19 fails to sign Section 2, they're intentionally
20 committing immigration fraud or paperwork fraud
21 or hiring fraud.
22   Q.  But it's a factor.  It's a factor.
23   A.  I don't think it is.
24   Q.  Really?
25   A.  Not for purposes of knowledge.  I don't

Page 210

1 think poor I-9 compliance is a factor when it
2 comes to establishing knowledge of an unauthorized
3 worker.
4       It may be a factor in the totality
5 of what you're -- what you're describing, but when
6 you're tasked with supporting a single violation
7 of knowingly continued employment, it is not
8 part of the inquiry as to what their violation
9 percentage is. That's a completely different
10 animal as ICE considers it.
11    Q. Right. And I think maybe we're
12 conflating multiple things. All I'm talking
13 about is, as you're looking for clues, factors,
14 indicia of whether somebody is knowingly hiring
15 unauthorized workers, are you really telling me
16 it wouldn't be relevant to you that they, as a
17 pattern and practice, did not sign the attestation?
18    A. I'm really telling you that.
19       MR. BISS: Object to the form.
20    A. I'm telling you it's -- it's -- it's --
21    Q. Wouldn't be relevant at all?
22    A. For -- For -- No, I didn't say it wouldn't
23 be relevant, but it's not a -- it's not part of the
24 indicia that would establish a knowledge.
25       It's part of an indicia that

Page 211

1 would establish a very poor compliance violation
2 percentage; but is a court going to say because
3 a company committed the same paperwork violation
4 over and over and over, that it had knowledge
5 that the corresponding individual associated
6 with that I-9 was unauthorized, no.
7       And that's entirely speculative
8 because there are probably a large percentage of
9 I-9s that have not been signed in the country
10 that relate to completely authorized work, so I
11 don't think you can make that connection
12 logically.
13    Q. Right. And I think -- I think, again,
14 we've gotten out of step with one another.
15       I'm not saying that by itself it
16 establishes anything. What I'm saying is, it
17 would have to be something that you would take
18 into your analysis in terms of whether an
19 employee -- an employer is hiring undocumented
20 employees, wouldn't it?
21    A. Knowingly?
22       MR. BISS: Asked and answered.
23    A. Knowingly hiring?
24    Q. Correct.
25    A. And I'm answering your question again.

Page 212

1 The failure to sign Section 2 to me is not
2 evidence of a knowing hire in any way.
3    Q. It doesn't help -- It's completely
4 irrelevant, wouldn't be admissible in court
5 because it's not relevant and it doesn't help to
6 establish in any way a material fact?
7    A. It may be --
8       MR. BISS: Asked and answered.
9    A. It may be considered by a court in the
10 totality of a -- of a picture, you know, of
11 evidence, including I-213s that show all of that
12 stuff that would actually be relevant, the fact --
13 that might be like a small factor that would be
14 considered; but, in general, there's just no
15 correlation between a failure to sign Section 2
16 and a knowing -- a knowing hire.
17       There's just -- There's no
18 correlation to it that's ever been established.
19 You couldn't do that. If you would do that,
20 you would be imputing knowledge of unauthorized
21 status to every employer in America because if
22 you went into the drawer of every employer in
23 America and went through their I-9s, I guarantee
24 you you're going to find some unsigned I-9s.
25    Q. Right.

Page 213

1    A. So I don't think you can make that
2 logical leap to say that just because it's an
3 unsigned I-9 that employer has knowledge.
4    Q. Right. And there again I think we're
5 talking past each other. I am in no way saying
6 that just because they didn't sign that
7 attestation, that therefore they have knowledge.
8       What I'm saying is, it's got to
9 be one of the factors you would consider in
10 establishing whether they had knowledge or not,
11 whether they knowingly and intentionally hired
12 undocumented workers.
13    A. I'll give you that it may be --
14       MR. BISS: Asked and answered.
15    A. It may be part of the totality of the
16 analysis. I'll give you that.
17    Q. Okay. And we've talked about Claude
18 Arnold's analysis. Let's go over now some of the
19 examples that he looked at NuStar prevented --
20 or presented and we looked at. And so what I'm
21 going to do is, I'm going to show you a series
22 of examples and talk about those.
23    A. Okay.
24    Q. And give me one minute here.
25       Okay. The first example I'm

54 (Pages 210 - 213)

1 going to show you is what's been marked as
2 Defendants' Exhibit 20, and this is I-9
3 information that was presented to us for a
4 ████████████. Take your time to
5 look at it.
6    A.  Okay.  I've looked at it.
7    Q.  Okay.  Have you seen this I-9 before?
8    A.  I looked -- I did look at this one.
9    Q.  And so what do you -- And I'm not -- I'm
10 not trying to play gotcha, but what to you appears
11 inaccurate about this, if anything?
12    A.  Well, there's various paperwork errors
13 on this.  First of all, it appears to have been
14 untimely prepared, okay, based on the date of
15 hire listed in the Section 2 certification.
16       The employee -- I'm sorry, the
17 employer did not fill in List A.  He's got a
18 List A document attached, which is the permanent
19 resident card.  So, again, it's kind of a gray
20 area as to if you attach the card, whether you
21 actually have to complete the -- filling in the
22 information, but I know ICE would prefer that
23 you do.
24       The documents that are attached
25 are both acceptable.  It's a List A, and then

1 it's a List C, but you wouldn't need the Social
2 Security card because you've got a List A
3 document.  So a permanent resident card is a
4 List A document.
5       And then you obviously have the
6 employee who checked the noncitizen national
7 box.  You know, I mean, the check mark is
8 somewhere near the lawful permanent resident
9 box.  There's -- There's a whole breadth of
10 regulatory law on the ambiguous attestations.
11 So, you know, I don't --
12    Q.  You think that's ambiguous?
13    A.  I mean, personally, the majority of the
14 check mark is within the box; but these are
15 things that auditors -- that ICE auditors are
16 tasked with doing.
17       When they decide whether they're
18 going to bring a violation or treat it as a --
19 as a substantive violation, they have to make
20 sure that there's not an argument to the counter
21 that that's -- that that's within the third --
22 you know, intended to be within the third box.
23 You know, these -- this is just part of the
24 analysis.  The --
25    Q.  He marks the noncitizen national of the

1 United States box; right?
2    A.  I mean, it definitely appears like that
3 was what he intended to do; but, again --
4    Q.  And then he presents a permanent
5 resident card.
6    A.  Right.
7    Q.  Saying that he was -- he was born in
8 Mexico.
9    A.  He's a permanent resident.
10    Q.  Right?
11    A.  Right.
12    Q.  And so that's --
13    A.  So there's some ambiguity.
14    Q.  That's internally inconsistent; right?
15    A.  There's some ambiguity between the
16 attestation and the documents that are attached.
17 That's not atypical because a lot of -- a lot
18 of employees do not know the difference between
19 a noncitizen national and a lawful permanent
20 resident.  They don't know the difference
21 between --
22    Q.  But it says permanent resident card,
23 and the box he could have checked was lawful
24 permanent resident.
25    A.  Right.  These are -- These are issues

1 that appear clear to you and me; but if this
2 form is in English and, you know, you're being
3 presented with this form on your first date of
4 employment and --
5    Q.  Well --
6    A.  You know, there's just -- there's lots
7 of things that go into completing these.  I
8 don't see -- I don't make any connection between
9 the noncitizen box.  It's -- It's -- It's indicia.
10 It's indicia of a potential issue with that
11 List A document; but when you look at it from a
12 reasonable employer, he was -- the employer was
13 presented with a List A document, which satisfies
14 both identity and work authorization.
15    Q.  And --
16    A.  But there's -- there's --
17    Q.  Did you see --
18    A.  -- paperwork errors.
19    Q.  -- that he initially gets his Social
20 Security number wrong by eight digits --
21    A.  Yeah.  So any --
22    Q.  -- and crosses it out?
23    A.  Anytime there's corrections made on the
24 face of the I-9, I always recommend that employees
25 or employers initial and date that correction so

55 (Pages 214 - 217)

Page 218

1 that you can tell when it was made.
2    Q.   Do they issue Social Security numbers
3 that begin in 9?
4    A.   I don't know that a -- that an employer
5 is required to know that.
6    Q.   Do you know it?
7    A.   I believe they've went up to 8.  I
8 don't know it off the top of my head.
9    Q.   And so there are no Social --
10   A.   An employer definitely is not required
11 to know.
12   Q.   Right.  And I'm just asking you what
13 you know.
14            That would not be a correct
15 Social Security number that appears to be
16 initially written down; is that correct?
17            MR. BISS:  Object to the form.
18   A.   That -- To me, the Social Security
19 number and the digitized -- the digits that are
20 used for that, that's -- employers are not
21 required to know that, nor are they required to
22 keep up to that.  They're just required to
23 accept documents that appear genuine on their
24 face.
25            Now, in reality, this is one that

Page 219

1 if ICE came in and did an audit and the employer
2 handed this over and then ICE went back to their
3 headquarters and ran the data through, ICE would
4 then probably list this individual on what's
5 called a Notice of Suspect doc letter and say
6 we were unable to verify the authorization of
7 this employee based on the documents that were
8 provided.
9            That's how it would typically
10 play out by the time you get to the conclusion
11 that the person is not authorized.
12   Q.   And you had mentioned before, and I'm
13 asking what you know and not what an employer
14 would know --
15   A.   Sure.
16   Q.   -- that you can, based on your
17 experience, pretty easily spot fake IDs.
18            Mr. Arnold says that these IDs
19 are fake.  What's your opinion?
20            MR. BISS:  Object to the form.
21   A.   There's indicia of that, but it's just
22 really impossible to know.  I mean, there's
23 issues that, to me, having reviewed a lot of
24 these for ICE, these would -- these would stand
25 out as potentially modified documents that would

Page 220

1 like -- like I said earlier, that would likely
2 result in a Notice of Suspect doc letter, but
3 it's just --
4    Q.   Well, Mr. Arnold says that both
5 █████████ permanent resident card and his
6 Social Security cards had a font that's
7 different than genuine cards.
8            Do you agree with that?
9    A.   I agree.  I agree, but I can only agree
10 with that based on my own knowledge.  It's not
11 the standard that --
12   Q.   And, again, I understand.
13   A.   It's not the standard that an employer
14 would have the ability to know.  I mean, I
15 think there's issues with the font on the Social
16 Security card, but the -- you know, it's -- I
17 mean, Mr. Arnold also went on PACER for this --
18 for this individual and did a search on PACER.
19 That's not what employers are required to do.
20   Q.   And again --
21   A.   That's a true --
22   Q.   -- I want to be clear.  I want to be
23 clear.  I'm asking you what you know.
24   A.   Sure.
25   Q.   Let's shelve what an employer should

Page 221

1 know, and we'll get back to that.  Okay?  I'm
2 asking you your opinion; and, in your opinion,
3 do you believe that these two documents are
4 genuine?
5    A.   I have significant questions with regard
6 to the Social Security card based -- based on the
7 font, but there's only -- I mean, I can't sit here
8 and say that with 100 percent certainty because I
9 don't have access to Homeland Security's databases
10 and things.
11   Q.   And so what about the permanent resident
12 card?  What about that to you appears suspect?
13   A.   Potentially the category for adjustment
14 that led to his green card.  I'm not sure of a
15 W26 category.
16            It's just difficult because it's
17 a photocopy as well, but the "Card Expires" font
18 might be different from the resident card, you
19 know, a typical resident card.
20   Q.   And so --
21   A.   I mean, as they come, as I've seen
22 them, this permanent resident card is actually,
23 you know, even difficult for me to --
24   Q.   And, again, I'm just asking what you
25 know.

56 (Pages 218 - 221)

1   A.   But here's the other thing:  The back
2   of that permanent resident card is very much
3   consistent with a -- with a permanent resident
4   card, so if you look at the back of it.  So that
5   one is -- That one is closer.  I think the Social
6   Security card --
7   Q.   Let me -- Let me ask you --
8   A.   You know, based on my -- based on --
9   Q.   We're getting far afoot here.  Let me --
10  A.   Yeah.  Sure.
11  Q.   Let me interrupt you here.
12          The back of that card says United
13  States Department of Justice.  Do permanent
14  resident cards say Department of Justice?
15  A.   No, they don't, but what I'm saying is,
16  like, in reality, when you're looking at the
17  card itself, it's -- it's pretty consistent with
18  what the back of a permanent resident card looks
19  like.  I don't -- I'm not aware of anything that
20  would require an employer to know what actual
21  sub agency issues the cards, but --
22  Q.   Right.  And, again, we keep -- I know
23  we're going to go way past 4 o'clock now.
24  A.   Well, no, let's stay here.  Let's stay
25  here because you asked me about it, so --

1   Q.   Right.
2   A.   You know, INS was actually part of DOJ
3   before 9/11, so Homeland Security was created --
4   This card was issued in about '99.  Okay?
5   That's when it says.  It says a resident since
6   '99.  So INS was a different part -- There was
7   no Homeland Security until post-9/11.  Homeland
8   Security was created as a result of 9/11, so --
9   Q.   But it says it expires in 2018.
10  A.   Right, but you see it says resident
11  since --
12  Q.   Right.
13  A.   -- '99.
14  Q.   Does that make any sense to you that it
15  had been issued in '99 and expired in '18?
16  A.   Well, they're typically -- the "Resident
17  Since," okay, that is when you became a lawful
18  permanent resident.  Okay?  The length of time a
19  green card is -- is -- varies.  You can get
20  ten-year ones.  You can get -- I think there's
21  two-year ones.
22          So it depends on how much -- So
23  they -- They reissue, but if -- If -- Even in
24  2020, if I get a permanent resident card, it's
25  going to show "Resident Since."

1   Q.   But this expires in '18, so it would
2   have been -- had to have been issued -- if it
3   was legitimate and it really expired in '18, it
4   would have been issued in 2008; right?
5   A.   You know, that's an issue that -- I see
6   that a lot.  I believe that there may have used
7   to be 20-year cards, but I don't know that for a
8   fact, but I believe that generally they're
9   ten-year cards.
10          The fact of the matter is, the
11  analysis, the inquiry we're having right now is
12  far above --
13  Q.   Right.  I know.
14  A.   -- what an employer would ever have to
15  delve into, so I don't know how it's relevant.
16  Q.   Right.
17  A.   But I'm --
18  Q.   And so let's shelve what an employer
19  would know --
20  A.   No, I got that.
21  Q.   -- and just talk about what you, as an
22  expert, know.  Okay?
23  A.   Sure.
24  Q.   And so --
25  A.   I would say, in general, there's a high

1   probability that -- that these cards would be
2   flagged by ICE, in the event of an audit, as
3   fraudulent.
4   Q.   And that's because this card would have
5   had to have been issued in 2008, and there was
6   no INS in 2008, was there?
7   A.   Unless there were 20-year cards back in
8   '99.  I don't know that for fact; but, I mean, I
9   think the font on the "Card Expires" to me looks --
10  looks off.  So, yeah, I don't -- and I don't think
11  that that would -- you know, I think it's -- it's
12  suspect.  It would be listed as a Notice of Suspect.
13  It would be listed in a Notice of Suspect document
14  letter.
15  Q.   Would you have any reason to dispute if
16  we told you that there were never any 20-year
17  cards?
18  A.   No.  You know, I may have -- I wouldn't
19  dispute that.  I'd have to look at that.  The
20  cards go back, you know, to the 1930s and things,
21  so I don't know that for a fact that there were
22  20-year cards.
23  Q.   And so --
24  A.   That would be something that I would
25  notice, if there was a 20-year gap between a --

57 (Pages 222 - 225)

1 but, again --
2    Q.  Can you think of any reason why
3 somebody who was legally authorized to work in
4 the United States would present to his employer
5 fake documents?
6          MR. BISS:  Object to the form.
7    A.  The -- No.  No.  What I think -- No, I
8 can't, really.
9    Q.  And so if these are fake, then isn't the
10 only conclusion that could reasonably be drawn is
11 that ███████████ is not authorized to work
12 in the United States?
13          MR. BISS:  Object to the form.
14    A.  I mean, unless his status has changed
15 since the time of this.  I mean, if -- if --
16 which is a possibility.  I mean, people's
17 statuses can change at any time, and that's --
18 you know, so it's hard to really answer that.
19    Q.  And are you aware that I deposed
20 ███████████?
21    A.  I did -- I think I did make that
22 connection.
23    Q.  And I asked him if he was authorized to
24 work in the United States, and he asserted his
25 Fifth Amendment privilege.

1          Do you remember seeing that?
2    A.  I saw that was one of the transcripts
3 you handed me.
4    Q.  And so based on all of that, what is
5 your opinion about whether ███████████ is
6 authorized to work in the United States?
7    A.  You're just asking --
8          MR. BISS:  Object to the form.
9    Q.  I'm just asking --
10          MR. BISS:  Object to the form.
11    A.  You're just asking me whether I think
12 he's authorized based on the totality of what
13 I've reviewed.
14          I think it's very likely he's
15 not, other than the fact his status could have
16 changed and he may actually be authorized, which
17 is why you would need a 213 to really do that.
18 You'd have to run checks on him to see if he's got
19 pending applications in CIS or claims databases.
20          So I'm not being difficult, but it's
21 hard for me to say with 100 percent certainty he's
22 unauthorized.
23    Q.  Now let's talk about the next one.  I'm
24 going to show you what's been marked as Defense
25 Exhibit 15, which is the I-9 for ███████████.

1 Take your time to look at that.
2          Is this one you had reviewed
3 before?
4    A.  Yeah, I've seen this one.
5    Q.  What strikes you as being problematic
6 with this one?
7    A.  And you're just -- you're asking me for
8 my -- for my -- based on my knowledge.  I would
9 say the font.  If we're just looking at the
10 documents, I'd say the font on the Social
11 Security card is -- is atypical and doesn't --
12 doesn't match the fonts that I've typically
13 seen.
14    Q.  And now from an employer perspective,
15 if the employer is, like NuStar, keeping copies
16 of everyone's Social Security card, that's
17 something that they could easily identify; is
18 that correct?
19    A.  Yeah, but --
20          MR. BISS:  Object to the form.
21    A.  -- they're not required to do that.
22 They're not required to go cross-check fonts
23 among other employees' cards.  I mean, that --
24 would they do that if you were -- if you were --
25 would you expect an employer to do that if you

1 presented them with a card?  No.  Right?
2 Because that would be discriminatory in the
3 sense if they -- if -- if -- an employer is not
4 required to go dig into their drawer of I-9s and
5 do a font comparison.  It's just -- There's
6 nothing that requires them to do that in the
7 law, you know.
8    Q.  Well, let's go through this one, and
9 then we'll come back to that.
10    A.  Sure.
11    Q.  Okay?
12    A.  Sure.
13    Q.  And so ███████████, this -- he signed it
14 in 2016; right?
15    A.  Yeah.  It's untimely, untimely completed
16 because it looks like his employment began in '08.
17 So it's untimely completed, which is a substantive
18 violation.
19    Q.  And then we have another noncitizen
20 national of the United States; right?
21    A.  Which that's -- Right.  That wouldn't
22 characterize that as a violation because the
23 violation would be had there not been an
24 attestation, so there's actual -- I mean, the
25 employer has no control over what the employee

1 attests to, so that wouldn't be a violation.
2 The main issue is the timeliness here. And then
3 you've got a List B and a List C, which --
4    Q. But they didn't -- they didn't fill out
5 the information --
6    A. It comports --
7    Q. -- fill it out; right?
8    A. Right. And we've talked about how that's
9 a gray area when the documents are attached; but,
10 yeah. No, that would be an issue. And then you've
11 got, you know, potentially this individual would
12 also show up on a Notice of Suspect doc, you know,
13 based on the -- based on the font in the Social
14 Security card.
15    Q. You've got a Social Security number that
16 ends in the 900s; right?
17    A. Uh-huh.
18    Q. Is that right? That's not -- I'm sorry,
19 begins with a 9, and those don't exist; right?
20    A. Yeah, not that I'm aware of. I'm not
21 sure what those have went up to. I actually
22 researched that issue recently in another matter.
23    Q. How long do you think it would take you
24 on Google to figure that out?
25    A. Well, one, I would --

1          MR. BISS: Object to the form.
2    A. I would never advise an employer to do
3 that, to start Google-referencing because, again,
4 would you do that for every employee? Would you
5 do that for your -- for your employee that, you
6 know, speaks perfect English and went to, you
7 know, the local school down -- you just -- once
8 you go down that path as an employer, it's a --
9 you're committing discrimination. So, no, I
10 would not.
11          A Google search of the Social
12 Security numbers would probably take you about
13 ten minutes, though, to answer your question.
14    Q. You think it would take ten minutes to
15 figure out that Social Security numbers don't
16 start with a 9?
17    A. Yeah. There's a --
18          MR. BISS: Object to the form.
19    A. There's a site on it that talks about
20 the history of Social Security numbers and where
21 they've used it. So, I don't know, maybe less.
22    Q. And so I think we talked about before
23 that you can't view anything in isolation;
24 right? Everything has got to be fact-based,
25 and you have a reasonable duty of care as an

1 employer to look into something if facts warrant
2 it; right?
3    A. Right, if facts warrant it, yes.
4    Q. And so --
5    A. And if you're comfortable as an employer
6 that doing so, that you would also do so for
7 someone of a different national origin or --
8    Q. Absolutely.
9          And so this says that ███████
10 started working at NuStar in 2016; is that correct?
11    A. No. It says he started working there --
12    Q. I'm sorry.
13    A. -- in 2008.
14    Q. 2008. And that, you know, 2016 is when
15 he signed it, right, and so he had been working
16 there at least since 2016, but it looks like
17 probably since 2008; is that correct?
18    A. That's -- That's what Section 2 says.
19    Q. Okay. And, then, were you aware of
20 where ██████ lives?
21    A. I mean, I recall in the report and, I
22 mean, he even says it in the Section 1 here,
23 that he lives in Sibley, Iowa, and I recall in
24 the report that this individual may have been
25 living in some employee-provided housing. Is

1 that --
2    Q. Yeah.
3    A. Is that consistent?
4    Q. Housing owned by a member of the Nunes
5 family and/or NuStar. And the reason why I
6 point that out is, he's providing a California
7 ID that was issued 2018.
8          And so wouldn't it a reasonable for
9 that to cause an employer to say, wait a minute,
10 you're providing me an ID issued in 2018, right,
11 that, you know, I reviewed in 2016, which is kind
12 of a trick, and then on top of that --
13          MR. BISS: Nick, is there a
14 question coming up?
15    Q. -- you're saying you live in California,
16 but you actually live in my house? I mean,
17 don't you think that would put an employer on
18 reasonable notice that you need to follow up?
19          MR. BISS: Object to the form.
20    A. You know, that -- that one gets really
21 close, and I -- and I agree with you that that
22 issue caused me a lot of pause.
23          I looked at the Aramark case on
24 that; and Aramark, I think, actually addresses a
25 situation where an employer knew the person lived

1  in the -- in the town or whatever and presented
2  a card, an ID card, from a different state.  And
3  I believe Aramark said that did not impute to
4  constructive knowledge.
5          But I agree with you that that's
6  the type of inquiry -- inquiry and that's the
7  type of situation that ICE would likely levy --
8  you know, in the event of an audit, ICE would
9  perhaps levy, you know, some sort of violation,
10 and then that would be hammered out in litigation,
11 with an ALJ making the ultimate determination as
12 to whether there's constructive knowledge.
13    Q.  Right.  And let's put aside what ICE
14 would do for now.  I'm asking what an employer
15 had a duty to do.
16          And how did this employer review
17 ▬▬▬▬▬▬ ID?  I mean, it looks like maybe
18 a reverification, but there's no original --
19    A.  No, I --
20    Q.  -- ID.
21    A.  I --
22    Q.  But do you see there's like a
23 reverification, 2018?
24    A.  Yeah, but I noticed that in quite a few
25 of the I-9s.  I think Mr. Nunes signed in the

1  wrong line on a lot of them, where he was
2  signing the Section 3 line.  So there was no
3  reverification done here.
4     Q.  So he's saying he reviewed -- he's
5  attesting under the penalty of perjury that he
6  reviewed the IDs in --
7     A.  Right.  He does that --
8     Q.  -- in 2016.
9     A.  Right.  He does that on --
10    Q.  And this ID --
11    A.  -- January 20.
12    Q.  -- was issued in 2018, so how is that --
13    A.  Yeah, this looks like -- this looks like
14 there may have been -- yeah, I mean, this I-9 is
15 replete with errors.
16    Q.  And so -- And then if you had a reasonable
17 duty of care to say, hey, wait a minute, that
18 doesn't make sense, right, and I'm not saying that
19 that alone amounts to constructive knowledge, you
20 know, I think it does, but put aside that for now,
21 doesn't it at least cause a reasonable employer to
22 have a duty of care to investigate a little bit
23 further?
24    A.  I would agree with that.
25    Q.  And that's when you could say, well,

1  you know, maybe let me look at the font of that
2  Social Security number.  I've got other I-9s
3  right here.  Geez, you know, let me see if
4  Social Security numbers actually start with 9.
5  You know what, let me Google that address that
6  he says he lives in at California and --
7     A.  I would --
8     Q.  -- find out that that address doesn't
9  exist.
10    A.  Yeah, I would never advise an employer
11 to Google.  I think -- I think that's dangerous.
12 But what I would advise is for them to have a --
13 in this situation, if I got called on this one
14 and they said this is what -- this is what we
15 see, I would advise them to do a person-to-person
16 inquiry with the employee and say -- and have them
17 explain to me, as the employer, you know, about
18 the ID card, and then I would advise that they
19 attach a memo that includes the explanation.
20          So I would never ever advise
21 that you go to outside sources to investigate
22 document -- documents that are presented by
23 employees.
24    Q.  And I'm glad you say that because I
25 did.  I deposed ▬▬▬▬▬.  He's a very, very

1  nice gentleman.  But when I asked him if he was
2  authorized to work in the United States, he
3  asserted his Fifth Amendment privilege.
4     A.  Yeah, I saw that.
5     Q.  Based on all of that, and let me first
6  start with you, aside from what an employer
7  should or shouldn't know --
8     A.  Sure.
9     Q.  -- do you really think ▬▬▬▬▬▬ is
10 authorized to work in the United States?
11          MR. BISS:  Object to the form.
12    A.  Same answer as the last one.  Unless his
13 status for some reason has changed, you know,
14 there's a high percentage of likelihood that --
15 that he is not authorized.
16    Q.  And wouldn't you think that an employer
17 should know that ▬▬▬▬▬ is not authorized
18 to work in the United States --
19    A.  I wouldn't go as --
20    Q.  -- based on this?
21          MR. BISS:  Object to the form.
22    A.  I wouldn't go as --
23          MR. BISS:  Object to the form.
24    A.  -- go as far as saying that.  I would
25 say this would put them on -- that, you know,

60 (Pages 234 - 237)

800-567-8658                                              973-410-4098

Page 238

1 based on what we've looked at, I would advise
2 that employer to -- follow up with the employer
3 to -- to inquire about all these issues that
4 you've -- that you've brought up.
5     Q.  Same question for ██████████
6 that we talked about before.  Shouldn't an
7 employer have known that he's not authorized to
8 work in the United States?
9         MR. BISS:  Object to the form.
10    A.  I don't believe that an employer would
11 be held to that level for purposes of employment
12 verification.  And I say that against the backdrop
13 of case law and, you know, regulatory decisions
14 and things of that nature.
15    Q.  Let me show you what's been marked as
16 Defendants' Exhibit 21, which is the I-9 for
17 ████████████████████.  Take your time
18 to review that.
19    A.  Okay.
20    Q.  What jumps out at you from this one as
21 being problematic?
22    A.  It appears to me that the alien
23 registration number in Section 1 does not match
24 the lawful permanent resident card.  I'm not
25 sure where he pulled -- I'm not sure where the

Page 239

1 employee pulled that number from.  It's another
2 untimely completed Section 2.  The Social Security
3 card, the digits on the Social Security card are
4 misplaced from where they would typically be.
5     Q.  What about the logo being off-center?
6     A.  Yeah, that -- Yeah, I mean, that whole
7 thing looks disjointed.  The font looks --
8     Q.  Even to a -- Even to an employer,
9 that's -- that's got to be suspect; right?
10        MR. BISS:  Object to the form.
11    A.  You want me to speak on behalf of all
12 employers in the United States or what do you --
13 you want me to -- I mean, to me --
14    Q.  You've been talking about the standard --
15    A.  Yeah.
16    Q.  -- for what a reasonable employer would
17 know, and so I'm asking you what you think a
18 reasonable employer should think about this
19 Social Security card.
20    A.  This card to me -- and it's hard -- it's
21 hard for me to -- to speak on behalf of employers,
22 but this card to me would raise -- raise question,
23 you know, based on a review of it.
24    Q.  Do you think there's any way that's
25 legitimate?

Page 240

1         MR. BISS:  Object to the form.
2     A.  Me personally?
3     Q.  You personally.
4     A.  No, I don't think that's a legitimate
5 Social Security card.
6     Q.  And you have to have a Social Security
7 number to work in the United States; correct?
8     A.  No, that's not correct.
9     Q.  An employer doesn't have to have a
10 Social Security number for an employee to employ
11 them --
12    A.  I don't believe that's correct.
13    Q.  -- and pay them?
14    A.  I don't believe that's correct.
15    Q.  Would there be any reason you can think
16 of that ████████████████ would present a fake
17 Social Security card other than he is not legally
18 authorized to work in the United States?
19        MR. BISS:  Object to the form.
20        THE WITNESS:  Can you read that
21 question?
22        (Requested portion of the record
23         was read.)
24    A.  No.  I mean, I think he presented the
25 Social Security card in order to meet the

Page 241

1 requirement of producing a List C document.
2     Q.  Right.  Which if the permanent resident
3 card is real, he actually wouldn't have to do;
4 right?
5     A.  Right, because that --
6         MR. BISS:  Object to the form.
7     A.  That's a List A.  But you see that a
8 lot.  You see employees that just kind of dump --
9 you know, like, present everything they have in
10 their wallet.  And so, yeah, but you're correct
11 that the List A is there as well.
12    Q.  And so what do you think a reasonable
13 employer should have done when they saw that
14 Social Security card?
15    A.  It's -- I mean, I agree the Social
16 Security card is very discombobulated and is so
17 on its face, and so I'm not -- the issue is that
18 you've also got a List A document here that
19 corresponds to what the employee attested to.
20 Okay?  So --
21    Q.  Does it?
22    A.  Well, I mean, it corresponds to the
23 status.  He checked a lawful permanent resident,
24 and he presented a permanent resident card, so
25 there's some correlation there.

61 (Pages 238 - 241)

1    Q.   But the A numbers are wrong.
2    A.   Right, but what I'm saying is that --
3    I'm saying there's a correlation between the
4    status selected and the card presented.
5    Q.   And so --
6    A.   And so what I'm saying is, I -- you
7    know, would a reasonable employer reject a
8    Social Security card?  You know, perhaps.  I
9    mean, but it's pretty obvious to me, and I think
10   it would be to most HR departments and hiring
11   officials.
12          The permanent resident card would
13   give you further pause as an employer because,
14   you know, you're looking at it and you're like,
15   well, but that's a List A.  So, you know, it's
16   just --
17   Q.   What are the problems with the permanent
18   resident card?  I'll start by he's been a resident
19   since 2004; right?
20   A.   Uh-huh.
21   Q.   Why does it say INS A number then?
22   A.   Yeah, INS would not have existed as of
23   2004.  So, yeah, I mean, that's a discrepancy on
24   its face.
25          Do you know -- I mean, I don't

1    think employers are required to know when
2    agencies were established and abolished and
3    things of that nature.  I just don't -- You
4    know, again, I don't think -- We're talking
5    about a lot of things.
6           Mr. Arnold is a very experienced
7    law enforcement officer that -- that did a lot
8    of work in this.  He's -- He's pinpointed a lot
9    of issues that -- that I would also pinpoint if
10   I was doing, you know, an analysis; but, in
11   general, would a reasonable employer have hired
12   this person, probably, because he presented a
13   List A document.
14   Q.   But --
15   A.   He's established work authorization
16   through the List A document.  I mean, it's -- it's
17   really tough to draw that line where -- where an
18   employer is supposed to reject documents.
19   Q.   Well, and let's talk about this one a
20   little bit more because it seems to me --
21   A.   Okay.
22   Q.   -- this one goes way past it.
23   A.   Okay.
24   Q.   And so if we walk through the analysis
25   and say, okay, the social security card is

1    suspect, as an employer, wouldn't I be on notice
2    to say, hey, look, this guy is presenting me
3    with something that clearly appears to be a fake
4    ID, that's a red flag, and I have -- as a
5    reasonable employer, have a duty to look a
6    little further into this; right?  Is that fair?
7    A.   Based on the Social Security card, I --
8    Q.   Yeah.
9    A.   I would think a reasonable employer
10   would have asked more -- you know, perhaps asked
11   questions; but, again, the red herring here is
12   that permanent resident card.  I don't think a
13   reasonable employer would identify that permanent
14   resident card as being -- as being fake.
15   Q.   Right, but they've already seen that
16   you've presented one fake ID, so now it's different
17   than somebody just presenting a permanent resident
18   card; right?
19   A.   Agree.
20        MR. BISS:  Object.
21   A.   Agree.
22        MR. BISS:  Object to the -- Hold
23   on.  Object to the form.
24   A.   Agree.  All of those are fact-based;
25   right?

1    Q.   Yeah.
2    A.   Isn't that a fact-based --
3    Q.   And so -- And here's what I'm getting
4    at, is then you look at the permanent resident
5    card and then say, well, look, let me really look
6    at this, and the first thing you notice is that
7    the A number he provides is not the A number he
8    provides on the I-9; right?
9    A.   Yeah.  I mean, the -- the digits on the
10   Section 1 don't correspond to a typical A number.
11   Q.   And --
12   A.   But, I mean, again, I don't --
13   Q.   And so even any employer could say, hey,
14   look, man, I don't even know how many digits an
15   A number has, but I can tell you those two are
16   different numbers; right?  Is that fair?
17   A.   Right.
18   Q.   And then to say, well, wait a minute,
19   I'm not an immigration lawyer, but I do know
20   that at some point INS stopped existing, right,
21   and because I --
22        MR. BISS:  Object to the form.
23   Q.   You know, this employer is dealing with
24   multiple employees a year.  Okay?  Wouldn't it
25   be reasonable for them to then look at the

62 (Pages 242 - 245)

**App. 624**

1 "Resident Since" and wonder why the number
2 that's not correct on it is an INS number when
3 INS didn't exist in 2004?
4          MR. BISS: Object to the form.
5    A.  And, again, I think at this point
6 you're asking me to speak would it be reasonable
7 for an employer.
8          I don't think with regard to the
9 permanent resident card, no, because I don't
10 think an employer would be required to say when
11 INS went out of -- that's not the typical level
12 of review that would be required.
13    Q.  But you know, not an employer, but you
14 know that those cards are fake; right?
15    A.  I would -- I mean, I would have a strong
16 suspicion they are.  Even ICE doesn't flat out
17 come out and say that they know.  ICE issues
18 what's called a Notice of Suspect doc letter,
19 so -- and that's even running them against their
20 own databases, so --
21    Q.  And so --
22    A.  Yeah, I mean, I would say very likely.
23    Q.  And then you know he was one of the
24 people we deposed and asserted his Fifth
25 Amendment privilege when I asked him whether he

1 was authorized to work in the United States;
2 right?
3    A.  Yes, I saw he was in that list.
4    Q.  Let's quickly go through the next three
5 who are still there.
6          The next one was ████████,
7 which is Exhibit 17 and 18.  Here is 17, and here
8 is 18.  Review it when you have a chance.  Let me
9 know what strikes you as being problematic with
10 this one.
11    A.  I see a -- I see a -- This would be a
12 missing List B document, which would be a
13 substantive violation.
14    Q.  And so Mr. -- ████████, didn't even
15 bother submitting two fake cards.  He just
16 submitted one card.  Right?
17          MR. BISS: Object to the form.
18    A.  Yeah, based on this I-9 record, there's
19 no List B document attached.
20    Q.  And so what would a reasonable employer
21 do there?
22    A.  So --
23          MR. BISS: Object to the form.
24    A.  -- a missing List B or a List C
25 document would be a substantive violation.  I

1 don't know any of the background as to why a
2 List B document wasn't provided; but, you know,
3 if you -- if you don't -- if you don't get a
4 List B and a List C, then you'd be required to
5 ask the employee to present that.
6    Q.  And --
7    A.  Because this -- this -- this would be a
8 substantive violation for failure to provide a
9 List B document.
10    Q.  And, again, we see a Social Security
11 number here beginning in a 9; right?
12    A.  Yeah.  The Social Security card looks
13 suspect to me based on the fonts.
14    Q.  And that's what I was noticing.  I was
15 just looking -- Just the three we've been looking
16 at here, the last three, the Social Security
17 cards all have different fonts and different
18 logos in the center.
19          MR. BISS: Object to the form.
20    Q.  Is that fair to say?  When you look at
21 all these three, I mean --
22    A.  One I can't -- It's the copy.  You
23 can't see the logo.  One the logo is kind of
24 off-centered.  This, the logo looks fairly
25 accurate to what a regular Social Security

1 card's logo would be, but I think the font is --
2    Q.  And the font is different on all of
3 them; right?
4    A.  Correct.
5          MR. BISS: Object to the form.
6    Q.  Wouldn't that be kind of a clue to an
7 employer that maybe somebody is submitting false
8 Social Security cards to me?
9          MR. BISS: Object to the form.
10    A.  Do I think an employer would be able to
11 look at that document and know with certainty
12 that it should be rejected because it's not --
13    Q.  That's not my question at all, no.
14    A.  What's your question?
15    Q.  My question is, don't you think a
16 reasonable employer would be able to look at
17 these Social Security cards and understand that
18 somebody could be presenting him with fake Social
19 Security cards?
20    A.  I think if you --
21          MR. BISS: Object to the form.
22    A.  If you did a comparison, you would
23 think that somebody could be presenting fake
24 Social Security cards.
25    Q.  And, in fact, that would, under the

Page 250

1 standard, create a duty to investigate a little
2 bit further?
3         MR. BISS: Object to the form.
4     A. Perhaps if not viewed in isolation, but
5 if you're -- if you're viewing what the standard
6 is at the time of hire, when they're looking at
7 one presentation of documents from one employee,
8 it's a different -- again, an employer is not
9 required to go pull out its other I-9s and do a
10 side-by-side comparison. Employers aren't
11 required to do that.
12     Q. But employers can consider and, in
13 fact, should consider other factors that they're
14 aware of besides just the documents that have
15 been put in front of them; isn't that true?
16     A. Outside of the documents in front of
17 them?
18     Q. Correct.
19     A. Only if there's a -- the totality of
20 circumstances would require that level of
21 diligence.
22     Q. And so if, for example, you hired 20
23 people in a year and the first 19 all had a
24 Social Security card that looked exactly the
25 same and the twentieth person comes in and you

Page 251

1 look at it and say, boy, that's different than
2 the other 19?
3     A. I think in that hypothetical, if you
4 had a consistent -- and you had the same person
5 reviewing the documents and you -- and you had
6 19 that looked identical and one that looked
7 completely different, then I think that you
8 could do a follow-up inquiry with that employee
9 and say this seems suspect to me, can you,
10 you know, provide other indicia of your work
11 authorization.
12         Now, you'll recall that at the
13 top of the I-9 and the regs say that an employer
14 cannot specify which documents an employee must
15 present.
16     Q. Right, but --
17     A. So the employee gets to choose which
18 documents they present. If one is -- on its
19 face does not appear genuine, then, yeah, you
20 can go back to the employee and say we either
21 need another document or we're not going to be
22 able to employ you.
23     Q. Not only can you, but you're legally
24 required to; isn't that true?
25     A. If you think -- If you, as a reasonable

Page 252

1 employer, think that it crosses the threshold,
2 you would be required to -- you know, crosses
3 the threshold of not being genuine. Okay?
4     Q. And so NuStar was not supposed to --
5 based on the information it was presented from
6 ▮▮▮▮▮▮ they were not supposed to hire him;
7 is that correct?
8     A. They --
9         MR. BISS: Object to the form.
10     A. They have a paperwork error here. They
11 have a missing document. I don't know -- So,
12 yeah, I mean, you're correct that without a
13 List B and a List C, that person should not have
14 been hired. Okay? That's -- That's an accurate
15 statement. Without a List B and a List C, that
16 person should not have been allowed to begin in
17 their employ.
18     Q. And you're aware that I deposed ▮▮▮▮▮▮
19 and he asserted his Fifth Amendment privilege
20 with respect to the question whether he was
21 authorized to work in the United States; right?
22     A. I saw that he was one of the deposition
23 transcripts, yeah.
24         The -- Now, just to give some
25 context on missing documents, in every audit I've

Page 253

1 ever done for every company, there's missing
2 documents like this, so this wouldn't be -- this
3 is not evidence of a knowing violation. This is
4 just evidence of a missing List B document.
5     Q. Let me ask you about that.
6     A. Okay.
7     Q. Are you aware that ▮▮▮▮▮▮ still
8 works there?
9     A. I'm not.
10     Q. Are you aware that all these people
11 I've been asking you about still work there?
12     A. I believe you said that earlier today,
13 yeah.
14     Q. If NuStar was your client, what would
15 you tell them to do with respect to these
16 employees?
17         MR. BISS: Object to the form.
18     A. I would likely instruct them to meet with
19 the employees to inquire about their status based
20 on the totality of the information that has been
21 presented to me as the employer.
22         You don't jump out and automatically
23 terminate. You would give the employee a reasonable
24 opportunity to either explain the situation or
25 establish their work authorization. CSI allows

64 (Pages 250 - 253)

Page 254

1 an employee to present new documentation to
2 establish work authorization.
3      So that's -- that's what I would
4 advise, is that they have a sit-down with the
5 employees and that they say, you know, we have
6 reason to believe, based on the totality of
7 everything we've learned during the course of
8 this litigation, that you're -- you may not be
9 authorized for employment, we're going to give
10 you a reasonable period of time to present those
11 documents, you know, and that's -- that's what I
12 would advise.  I mean, I --
13      Q.  And what if the employer didn't provide
14 them?  I'm sorry, what if the employee didn't
15 provide them?
16      A.  Within a reasonable period of time, then,
17 you know, my advice would likely be to terminate
18 the employee at that point, after you've provided
19 a reasonable period of time.
20      Q.  And what would you say if we subpoenaed
21 all six of these individuals to present current
22 work authorization documents and none of them
23 did?
24          MR. BISS:  Object to the form.
25      A.  I would probably say I don't think that --

Page 255

1 I don't know if you want me to go into this, but
2 the -- I don't know that the subpoena would be
3 valid in the sense I don't know that you would
4 have a right to compel production of an identity
5 and an authorization document.  Perhaps you would
6 be, but I think there would be questions about
7 the enforceability of such a subpoena.  I'm not --
8 I'm not entirely --
9      Q.  Let me stop you there.
10      A.  Yeah.  Sure.
11      Q.  So I'll give you more information.
12      A.  Sure.
13      Q.  So we did go to the court, and the
14 judge did enforce that subpoena with respect to
15 all six, and they were subpoenaed to not only be
16 deposed to present -- but to present current work
17 authorization documents as well as any current
18 IDs they have, and none of them did, and so --
19          MR. BISS:  Object to the form.
20      Q.  -- with that information, I'm asking
21 you, what's the -- what should NuStar do with
22 respect to those employees?
23      A.  If -- If it was --
24          MR. BISS:  Object to the form.
25      A.  If I was -- If I was advising, I would

Page 256

1 likely advise the same thing I said earlier,
2 have the inquiry, give a reasonable period of
3 time, and advise to terminate if they do not
4 meet the requirement at that point.  Because I
5 think at that point you've crossed the -- you've
6 likely crossed the threshold to where you can
7 have that inquiry with the employee.
8      Q.  Let me show you what's been marked as
9 Defendants' Exhibit 6, which is the I-9 for
10 ███████████████.
11      A.  Okay.
12      Q.  What strikes you as being off about
13 this one?
14      A.  With regard to the cards?  Is that what
15 you would like me to look at?
16      Q.  The I-9.
17      A.  I believe this is a -- not the correct
18 version of the I-9 for '07.  Maybe it is, though.
19 You can't see the version.  The -- Beyond that,
20 the I-9 on its face is missing the description
21 of the documents.  The documents themselves is a
22 resident alien card, an older one.
23      Q.  Could it have been -- have a valid
24 expiration date of '09?
25      A.  The expiration date itself, yeah, I

Page 257

1 mean, that's suspect.  The --
2      Q.  Because that can't be right; right?  It
3 would have to expire by '07?
4      A.  Yeah, perhaps.  And I think, I mean,
5 there's another issue with the class of admission,
6 I think; but, again, these -- with the class of
7 admission.  Again, these are issues that I'm
8 aware of, of when these resident alien cards
9 were issued for this class.
10          The Social Security card font I
11 think looks different.  The number is higher
12 than it normally is on the logo.  So, yeah, I
13 mean, there's -- there's indicia of a fake card,
14 fake cards here.
15      Q.  And so ███████████ is somebody
16 who is still employed, and I deposed him last
17 month with the other individuals, and he asserted
18 his Fifth Amendment privilege with respect to any
19 questions about documents or work status.
20          Are you aware of that?
21      A.  Yes, I saw those transcripts.
22      Q.  Let me show you one last one, and we'll
23 take a break here.  It's ██████████████
24 ████████ which is Exhibit 109.
25      A.  Okay.  I've reviewed it.

65 (Pages 254 - 257)

1   Q.   In the first page we got another
2  noncitizen national of the United States; is
3  that right?
4          MR. BISS:  Object to the form.
5   A.   Yeah.  I don't know that that's relevant,
6  though, that they -- that he checked -- he checked
7  that box.  I mean, it's relevant because it's
8  likely incorrect, but it's not relevant as to the
9  employer's compliance.
10   Q.   And then the employer filled out the
11  certification, it looks like, two years after
12  the employee's first day of employment; is that
13  right?
14   A.   Yeah, it looks -- it looks to be about
15  two years untimely, which would be a substantive
16  violation.
17   Q.   And then didn't fill out the ID
18  information; is that right?
19   A.   Correct.
20   Q.   And you're going to love this one,
21  being a Cornhusker fan.  Take a look at that
22  Nebraska ID.
23          Do you notice anything about that
24  address?
25   A.   I reviewed it.

1          Well, I mean, I know that in
2  Lincoln it's Vine -- it's Vine Street that I'm
3  aware of, but is that what you're referencing?
4   Q.   Yeah.
5   A.   Yeah.  I mean, I don't -- Again, I
6  don't know that an employer is supposed to know
7  the difference between avenues and streets.  In
8  fact, I know they're not.
9          If there's anything questionable
10  about the documents here, it's likely the Social
11  Security card, based on the placement of the
12  number.
13   Q.   That's right by the Cornhusker football
14  stadium; right?
15   A.   Vine Street?
16   Q.   Yeah.
17   A.   It is very near there, yep.
18   Q.   And it looks like they're trying to say
19  on this ID that it's avenue instead of street;
20  right?
21          MR. BISS:  Object to the form.
22   A.   Yes, it appears that way.
23   Q.   And that's clearly a typo, right, because
24  avenue is not abbreviated AV; right?
25          MR. BISS:  Object to the form.

1   A.   Right.  Within the DMV system, I would
2  assume that it would be abbreviated Ave.; but,
3  again, these are not inquiries that an employer
4  would need to make.
5   Q.   And have you ever -- have you ever seen
6  an ID that abbreviated avenue as AV?
7   A.   I don't know that I have.
8   Q.   Are you familiar with a Vine AV in
9  Lincoln, Nebraska?
10   A.   No, I am not.
11   Q.   What about the Social Security card?
12   A.   I spoke to that already.  I said I
13  think that the number is -- is too high there.
14  I think the number and the name are reversed.
15  Maybe not, though.  It's --
16   Q.   It doesn't look right, does it?
17   A.   There's an issue with the font, I
18  think, you know, just based on seeing a lot of
19  Social Security cards.
20   Q.   And, again, these, like the other five,
21  ████████████ is still an employee there.  Are
22  you aware of that?
23   A.   I was not until today, but the -- you
24  did, I think -- was he one that was deposed?
25   Q.   And he was the sixth one that was --

1   A.   I thought so, yeah.
2   Q.   -- deposed and asserted his Fifth
3  Amendment privilege, like the others did, to all
4  questions relating to work authorization or
5  documents.
6          MR. KLINEFELDT:  And so why don't
7  we take a break right there and then do our best
8  to finish up.  Is that okay?
9          THE WITNESS:  Sure.
10          THE VIDEOGRAPHER:  We are going
11  off the record.  This is the end of Media Unit
12  Number 4.  The time is 3:22.
13          (A recess was taken.)
14          THE VIDEOGRAPHER:  We are back on
15  the record.  This is the beginning of Media Unit
16  Number 5.  The time is 3:36.
17   Q.   Okay.  Mr. Samson, when we left off, we
18  had just reviewed the I-9s of six employees who
19  were employed at the time the article in question
20  was published, and they're still employed at
21  NuStar.
22          Now I'm going to ask you just about
23  a few examples of employees who worked there prior
24  to the article but no longer work there.  Okay?
25   A.   Okay.

66 (Pages 258 - 261)

1 Q. And the first one I'm going to show you
2 is a gentleman by the name of ████████████
3 ████ which is Defense Exhibit 31.
4 When you get an opportunity, take
5 a look at that and tell me if you notice anything
6 wrong about that document.
7 A. Okay. I've looked at it.
8 Q. Do you notice any -- any errors or causes
9 for concern with this one?
10 A. Well, Section 2 on the I-9 is not
11 completed or signed, so that would be a substantive
12 violation.
13 Q. And so there's no certification that the
14 employer reviewed the documents at all; is that
15 correct?
16 A. That's correct. So a failure to -- to
17 sign and date and complete that would be a
18 substantive violation.
19 Q. And then he marks down a noncitizen
20 national; right?
21 A. I see that, yes.
22 Q. And probably not correct. Fair to say?
23 A. Probably an incorrect attestation. Well,
24 very likely an incorrect attestation by the
25 employee, given -- given the Guatemalan consular

1 ID seems to establish he's from Guatemala, so
2 Guatemalans are not -- would not be considered
3 noncitizen nationals. So, yeah, I would agree
4 that that's likely an incorrect attestation by
5 the employee.
6 Q. What about the Social Security card?
7 A. Yeah, I would -- I mean, based on my
8 experience in reviewing, you know, valid Social
9 Security cards, that -- the font appears different
10 from the typical Social Security card. The number
11 you can't see based on the logo, things of that
12 nature.
13 I'm not sure a consular ID is a
14 valid List B document. I'd actually have to
15 check the list for that, but the -- so, yeah,
16 there's -- there's paperwork violations and, you
17 know, potentially a fake -- you know, a fake
18 Social Security card or a manipulated Social
19 Security card that would get flagged in the
20 event of an ICE audit.
21 Q. And I'll refer you to the instructions
22 for Form I-9.
23 Does that list out what is a
24 valid -- and then also on the blank I-9 form I
25 handed you, it lists out acceptable List B

1 documents, and it appears to me that an ID card
2 from a foreign country like the one that was
3 presented is not an acceptable ID.
4 A. That's accurate. So that's an -- that's
5 a violation that's called an improper List B
6 document. I agree that the consular ID would not
7 be an acceptable List B document. So that I-9
8 would -- In the event of an ICE audit, that I-9
9 would have subjected the employer to a potential
10 fine.
11 Q. Let me show you a second one real quick.
12 It is Defense Exhibit 37, which is ████████████
13 ████████
14 So there's no employer review and
15 verification section filled out at all; correct?
16 A. That's correct. So you're missing
17 a Section 2 certification on this, which
18 we've discussed earlier that that would be a
19 substantive violation.
20 Q. And then what do you make of the fact
21 that his name is ██████, first name, spelled
22 ████████ and we know that because he filled
23 out Section 1, presumably, and then on his
24 resident alien card he puts forth, that's the
25 way he signs it, but the resident alien card has

1 the government misspelling his first name.
2 What do you make of that?
3 A. Yeah. I mean, it --
4 MR. BISS: Object to the form.
5 A. This -- This is a -- This is an -- This
6 is an example of where, you know, further --
7 further diligence may have been required of the
8 employer in light of the misspelling on the name
9 by the employee in Section 1 and then the name
10 as it appears on the -- on the cards.
11 You know, as the -- the leading --
12 the leading case on point is the Aramark. I
13 believe there was a similar situation in that
14 case; and the court analyzed whether, you know,
15 misspellings in names or missing -- missing
16 consonants in names and things or inconsistencies,
17 whether an employer is required to -- to catch
18 that.
19 And there's actually case law on
20 both sides of that issue that I'm aware of, so
21 it's indicia. It's indicia, and had they caught
22 it, it would have required them to do a follow-up
23 inquiry, I think, with the employee; but, you
24 know, clearly they didn't catch it.
25 You know, we don't know what

1 happened because this -- these -- the important
2 thing to remember is these Form I-9s are created
3 at the time of hire, so it's like a snapshot at
4 the time of hire, and it's usually a one- to
5 two-minute situation where the employee presents
6 the documents, the form is completed.
7          And so courts that have analyzed
8 whether -- whether there's, you know, constructive
9 knowledge of unauthorized employment or of a --
10 or of a nongenuine document have analyzed these
11 exact issues that we're going through.
12     Q.  And he actually -- We have -- Well, he
13 marks down a citizen or national of the United
14 States.  I thought for a second we had somebody
15 who didn't mark down a noncitizen national; but
16 it looks like this form, when you check the box,
17 it's either you're saying you're a citizen or
18 national --
19     A.  It used to be that --
20     Q.  -- of the U.S.; right?
21     A.  -- on these older forms.  On these
22 older forms, they used to put those together,
23 and then they separated it out on the newer
24 versions.
25     Q.  Okay.  Let me show you one last one here

1 real quick.  Oh, I forgot about that.  Let me go
2 back to that one.
3          So it looks like he starts in,
4 what, '06?  He signs it in '06, right, the I-9?
5     A.  I see that, yes.
6     Q.  And it's first day of employment earlier,
7 so he's starting no later than '06, and the card
8 expires in '05.
9     A.  Well, we can't -- we can't tell that.
10     Q.  Why not?
11     A.  I mean, the '05 is listed under alien
12 number.  Oh, I see where you're -- I see what
13 you're saying.  Okay.
14     Q.  Yeah.  Well, I mean, it's clearly a
15 fake.  I mean, it's -- Do you think that's a
16 real card?
17     A.  You're -- I mean, very, very --
18          MR. BISS:  Object to the form.
19     A.  Very unlikely.
20          MR. BISS:  Object to the form.
21     A.  Very unlikely.  The -- Correct.  The
22 card appears expired on its face; and that's a
23 violation, to accept an expired card.  That's a
24 substantive violation.
25     Q.  Right.  So even if you didn't catch,

1 hey, you know, maybe that resident alien card
2 doesn't look like what it's supposed to, on its
3 face do you see not only his first name is
4 misspelled but also it's expired.
5          MR. BISS:  Object to the form.
6     Q.  Right?
7     A.  Right.  I will -- you know, on that --
8 on that point, I -- and maybe we're going to get
9 to this, and I think I pointed it out in my
10 report, but there was -- Mr. Arnold, in his
11 report, toward the end, focused a lot on LPR
12 cards that expired during -- during the time of
13 employment and claimed that those were violations
14 for failure to reverify.
15          And just to be clear, lawful
16 permanent resident cards are not required to be
17 reverified in Section 3, even if they expire
18 during the course of employment.
19          Now, this situation, in the
20 ███████████████  I-9, the card was -- was
21 expired at the time of hire, so it should not
22 have been accepted, so it's an improper List A
23 document.
24     Q.  Right.  Another person who shouldn't
25 have been hired, based on what you see?

1          MR. BISS:  Object to the form.
2     A.  It's a situation -- It's a compliance
3 error in the sense that it should not have been
4 accepted.  The document should not have been
5 accepted.  It's a compliance error.
6          Is this coming to me?
7     Q.  This is Exhibit 29, which is ███████
8 ████████  He may be related to the other individual
9 I showed you, I don't know, but they have --
10          MR. BISS:  Object to the form.
11     Q.  -- a similar last name.
12          And so what I wanted to ask you
13 about on this one is, it appears that ████████████
14 fills out both Section 1 and 2 and certifies it.
15          Is that the way you read it?
16     A.  Yeah, that appears right.  I think this
17 is a situation where the employer failed to ensure
18 the employee properly completed Section 1 and
19 Section 2.  Section 2 does seem to contain the
20 same handwriting throughout the entire document,
21 so I think that's clearly an error.
22     Q.  And so he dates it 7-20-07, both Section 1
23 and 2; correct?  As it appears when he fills out
24 the form is 7-20-07?
25     A.  Correct.  I see that, yep.

68 (Pages 266 - 269)

Case 5:19-cv-04064-CJW-MAR   Document 156-16   Filed 06/02/23   Page 69 of 82

**App. 630**

1    Q.   And then his resident alien card would
2  have already been expired; right?
3    A.   Right.  This is another example of a
4  violation for an improper List A document.
5    Q.   Does that resident alien card appear to
6  be genuine to you?
7        MR. BISS:  Object to the form.
8    A.   Based on my experience, you know, and
9  not a reasonable employer's perspective, but
10  based on my experience, I would -- you know, I
11  would suspect that this is a fake document,
12  although it is very -- it very much looks like
13  the resident alien cards that existed at that --
14  during that time frame.
15        But, you know, there's -- there's
16  some indicia that, with regard to fonts and
17  things and placement of the picture, that would
18  put somebody with my background and knowledge or
19  would cause somebody with my background and
20  knowledge and Mr. Arnold's background to suspect
21  that's not likely a valid card, same with the
22  Social Security card on that one; but, again,
23  you know --
24    Q.   What about --
25    A.   -- different standard for employers.

1    Q.   Section 2, which he completes himself,
2  he lists the document title as Mexico, the
3  issuing authority as Omaha, and has a document
4  number there that, as near as I can tell, doesn't
5  relate to anything.
6    A.   I mean, I think this is an example of
7  an employee that was asked to fill out a form
8  and given no instruction whatsoever as to how to
9  do it.  And what you've seen here is, you know,
10  just a noncompliant Form I-9, which in the event
11  of an audit would have been flagged for these
12  substantive violations.
13        I don't believe that, based on
14  the review of the documents, that, you know, a
15  reasonable employer -- that constructive
16  knowledge of unauthorized status would be imputed
17  to a reasonable employer with regard to these,
18  but clearly the List A document was -- should not
19  have been accepted at the time of hire because it
20  was expired, so that would be -- that would be a
21  substantive violation.
22    Q.   And that I wanted to ask you.
23  With respect to -- I've shown you nine of these.
24  Are you -- Are you really telling me that if I
25  was in front of a jury with these and -- you're

1  saying you don't think a jury would say that
2  this employer knew that they were hiring an
3  undocumented worker?
4    A.   If the jury --
5        MR. BISS:  Object to the form.
6    A.   If the jury is properly instructed on
7  antidiscrimination statutes, on the case law
8  that exists with regard to what an employer is
9  required to do as far as diligence is concerned,
10  you know, I think they would have a difficult
11  time finding that a reasonable employer in the --
12  in the ag industry has knowledge that these are,
13  indeed, unauthorized.
14        I would also argue that there's
15  zero evidence that they are.  Indeed -- Well, I
16  shouldn't say zero evidence.  There's zero
17  conclusive evidence that they're unauthorized in
18  the sense we don't have I-213s, we don't have
19  any document from the federal government that
20  establishes that they're unauthorized.
21        I understand there's -- there's
22  significant indicia of it that you've raised;
23  but, you know, I can't -- I can't say with
24  certainty that a reasonable employer would have
25  rejected these documents, especially in my

1  background of doing audits and seeing -- and
2  seeing what employers do all throughout the
3  country.
4        These are very typical issues.
5  These are very typical I-9 compliance issues
6  that employers deal with throughout the country.
7  It's very difficult to equate compliance issues
8  with knowledge of unauthorized status.
9    Q.   Isn't that the purpose of the I-9 form,
10  is to make sure --
11        MR. BISS:  Objection.
12        MR. KLINEFELDT:  Hold on, Steve.
13    Q.   -- is to make sure that you are not
14  hiring unauthorized workers?
15    A.   That's -- That was the intended purpose
16  at the beginning, back --
17    Q.   That's not the purpose now?
18    A.   That's the intended purpose.  That's
19  not the -- the reality of where the -- how the
20  law has evolved in this area is that the use of
21  fraudulent documents and things of that nature
22  have got to the point where -- where they're
23  better, they're -- they're more prevalent.
24        And so as a result, you've got
25  the law has evolved to where -- and especially

1 on the antidiscrimination side, that you now have
2 a body of law that says exactly what a -- what
3 an employer should do at the time.
4         So the I-9 itself is still our
5 best shield for confirming authorization of
6 employment, but it's -- its purpose was to
7 do that, but it does not mean that an employer
8 is required to be a document expert.  Right?
9 They're not required to spot fake or fraudulent
10 documents.  They're just -- That's not what
11 they're required.  They can't bury their head in
12 the sand, obviously.
13    Q.  Right.
14    A.  But they can -- they definitely are not
15 required to be document forensic experts, so to
16 speak.
17    Q.  Let me ask you this way:  Do you think
18 any of the nine people that I've showed you
19 here today are authorized to work in the United
20 States?
21         MR. BISS:  Object to the form.
22    A.  The ones that we just went through?  I
23 mean, again, if I was looking at it in a -- in
24 a time warp, you know, I would say no, but I --
25 I can't speculate as to whether statuses have

1 changed or whether they're authorized for
2 employment now.  That happens quite often.  But,
3 yeah, I mean, they're high -- the documents are
4 highly suspect.  So is their authorization
5 status.
6    Q.  And so do you think -- is it fair to say,
7 then, that NuStar hired undocumented workers?
8         MR. BISS:  Object to the form.
9    A.  No.  And that's in my report.  They're
10 documented.  They're documented, and that's --
11    Q.  Here's what I mean.  Is -- Is -- I mean
12 unauthorized to work in the United States.  And
13 so what I'm asking you is, before we talk about
14 knowledge or whether they knew they did or not,
15 as you sit here today, do you think NuStar hired
16 individuals who are not authorized to work in the
17 United States?
18    A.  Setting aside the knowledge, setting
19 aside the knowledge component, I think it's very
20 highly likely that a portion of their workforce,
21 based on what I've reviewed, presented
22 fraudulent documents in order to establish work
23 authorization, which in the event of an ICE
24 audit or in the event of some other enforcement
25 action would have revealed that they were

1 unauthorized; but without that enforcement action,
2 we don't know that.
3         So I'm answering your question,
4 but I'm being careful in the speculation aspect
5 of it because I really think it's important that
6 setting aside the knowledge component and knowing
7 what we know about -- about the ag industry
8 and things of that nature, yes, I think it's --
9 I think it's likely that a portion of their
10 workforce presented fraudulent documents to
11 establish work authorization.
12    Q.  Do you think NuStar should have known
13 with respect to at least some of these individuals
14 that it was likely they were hiring an
15 unauthorized worker?
16    A.  I would --
17         MR. BISS:  Object to the form,
18 asked and answered.
19    A.  I would say that applying the standards
20 that have been established, there are certain
21 examples where there was -- there was indicia
22 that perhaps would have required the employer to
23 inquire further.
24         But, in general, I don't think
25 that, as you look at these I-9s in isolation,

1 that there's anything that establishes knowledge
2 or a should have knowledge on the part of the
3 employer.
4    Q.  And so you don't think, for example,
5 with respect to ██████████, who submitted
6 only a Social Security card that doesn't even
7 look right, you don't think that they should
8 have known that he was likely unauthorized to
9 work in the United States?
10    A.  I think --
11         MR. BISS:  Object to -- Object to
12 the form, mischaracterizes the evidence.
13    A.  I think that, to answer that question,
14 the missing List B document is a compliance error.
15 It's not a -- It doesn't establish a knowledge
16 component without --
17    Q.  Well, the paperwork here --
18    A.  Without --
19    Q.  Because we're just talking about paperwork;
20 right?
21    A.  Without further -- without further
22 indicia, right, that would -- that would -- that
23 would connect -- for example, if you had -- if
24 you had a sworn statement where the employee said,
25 yeah, I said I didn't have a List B document, and

1 the employer said, that's okay, we'll just take
2 your List C, if you had a sworn statement or
3 something to that sort, then now you've got a
4 knowing hire. Okay? Without those -- Without
5 that level of evidence, you just have a paperwork
6 violation.
7     Q. What about if they're advised by their
8 attorney to assert the Fifth Amendment privilege
9 and they do so?
10     A. We've -- We've talked about that. I
11 don't know --
12         MR. BISS: Object to the form.
13     A. I don't -- And now what you're asking --
14 Well, let me -- Why don't you finish your question
15 in that regard.
16     Q. Yeah. So my question is, are you telling
17 me that you'd be willing to say that you don't
18 believe NuStar knowingly hired even a single
19 unauthorized worker?
20     A. Knowingly hired. I have not reviewed
21 evidence that they knowingly hired an unauthorized
22 worker. I have not seen evidence that would say
23 they knowingly hired.
24         With regard to -- With regard to
25 the individuals that, you know, you produced the

1 deposition transcript and there was other indicia,
2 now what you're wading into is knowing continued
3 employment, and I believe I answered that and said
4 in those circumstances I would advise the employer
5 to give the employee a reasonable period of time
6 to produce documentation; and if they don't,
7 then I would advise termination on the basis that
8 you've likely crossed that threshold. That's in
9 the knowing continued employment arena. Okay?
10     Q. And so --
11     A. The knowing hire, I have -- I -- I can
12 affirmatively answer I do not think that there's
13 evidence of a knowing hire here.
14     Q. And that's because you don't think that
15 there is enough in any of these situations or
16 even reviewed all together that would cause an
17 employer to believe that the applicant was
18 unauthorized to work in the United States?
19     A. Correct. I think that a reasonable
20 employer may have missed a lot of the indicia
21 that we've went through and that Mr. Arnold
22 pointed out and that -- and so if you're talking
23 about knowing hires, I would not -- if I was
24 reviewing a sufficiency on whether to bring an
25 allegation or a violation for knowing hire, I'd

1 likely reject it and advise to only -- to only --
2 in the event of like an audit or something, I
3 would likely advise, you know, we should only
4 bring substantive violations or finable
5 violations for the paperwork errors because I
6 just don't think here that there's enough
7 evidence to cross into the knowing territory.
8     Q. Have you ever seen I-9s more ridiculous
9 than the nine I showed you here?
10     A. Oh, absolutely.
11         MR. BISS: Object to the form.
12     Q. And so do you think that this is filling
13 out the I-9 in good faith?
14     A. I think that it is compliant with the
15 regulations in the sense they're accepting the
16 right documents for the most part, with a few
17 limited examples.
18         I think that there is compliance
19 issues with this employer in the sense that they
20 should be, you know, completing the I-9s; but as
21 far as the presentation of documents and things,
22 I think you would be surprised at how regular
23 that this -- these type of documents are being
24 produced to employers throughout the entire
25 United States.

1     Q. And there's a lot of employers who --
2 who hire undocumented or unauthorized workers.
3 Is that fair to say?
4     A. Right, but what we're --
5         MR. BISS: Object to the form.
6     A. What we're talking about is that
7 knowledge component. Okay?
8     Q. And that would be for a jury, right,
9 is --
10     A. It's a fact -- Exactly. It's a fact
11 inquiry.
12     Q. It's a fact question whether there's
13 enough for constructive knowledge; right?
14     A. I -- I completely believe that.
15     Q. And --
16     A. And I've said that throughout today's
17 deposition.
18     Q. You had stated on page 16 of your report,
19 second -- or first full paragraph, middle of that
20 paragraph, quote, "With some limited exception,
21 the documents that were presented by NuStar
22 employees reasonably appeared on their face to
23 be genuine."
24     A. What page? I'm sorry.
25     Q. It's page 16 of your report, first full

71 (Pages 278 - 281)

Case 5:19-cv-04064-CJW-MAR    Document 156-16    Filed 06/02/23    Page 72 of 82

App. 633

Page 282

1 paragraph, middle of the paragraph.
2     A.   And are you asking me a question about
3 that statement?
4     Q.   Yeah.  I just wanted to draw your
5 attention to it and ask you if you still believe
6 that's correct.
7     A.   Where are we at?  I'm sorry.  Can you
8 point me to it?
9     Q.   It's page 16, middle of the first
10 paragraph.
11     A.   The first full paragraph?
12     Q.   Yeah.
13     A.   Yeah.  And what I'm -- I'm comfortable
14 with that statement in the sense that what
15 I'm saying there or I'm -- that's as from the
16 perspective of a reasonable employer.
17           I think the limited exception,
18 when I reference the limited exception, I'm
19 referencing the I-9s that we just went through.
20       I think that there is some indicia
21 that those were not genuine cards that could have
22 been caught by the employer at the time of hire;
23 but, in general, having looked through, you know,
24 some of the other I-9s and things, it's very --
25 it's very difficult to say that an employer should

Page 283

1 have determined those were fake documents.
2     Q.   But --
3     A.   And fake is the opposite of genuine.
4 So that's what we're talking about, is what's an
5 employer required to determine.
6     Q.   But you still stand by the statement
7 that there are some documents that were presented
8 by NuStar employees that were -- that did not
9 reasonably appear on their face to be genuine;
10 correct?
11     A.   And I think we just went through those;
12 and, you know, I included that clause in -- that
13 opening clause in that sentence with relation
14 to some of these examples that we went through
15 where -- you know, for example, the misspelled
16 name and things of those -- that nature.
17           Those, as I said earlier, probably
18 should have required additional follow-up by
19 the employer, you know, but, again, it's a
20 reasonableness issue.  So that's really not for
21 me to determine.  That would be for a jury to
22 determine.
23     Q.   Right, but you make a statement about
24 it here, right, and --
25     A.   I say NuStar was required to accept

Page 284

1 reasonably genuine documents, which is completely
2 accurate, so --
3     Q.   Right, but with some limited exception,
4 the documents that were presented by NuStar
5 employees reasonably appeared on their face to
6 be genuine; right?
7     A.   Yeah.  And that introductory clause is
8 because there were a few examples, which I think
9 we went through, where I thought the employer
10 should have, you know, conducted at least a
11 follow-up inquiry with the employee or asked for
12 a different document or something like that in
13 the sense that, you know, that -- that's why I
14 included that introductory clause.
15     Q.   What does the law say about an employer
16 who doesn't take action to follow up with
17 documents in that instance?
18     A.   It's a reasonableness standard.  It's --
19 What we're talking about is whether a judge
20 or a jury would determine that the employer
21 has constructive knowledge and failed to act
22 reasonably.
23           So that's -- I mean, that's what
24 we're talking about.  So for the most part, you
25 know, from what I saw, most employers in the

Page 285

1 United States would have accepted the documents,
2 and that -- and so that reasonable -- what a
3 reasonable employer would have done in those
4 circumstances is the standard.
5     Q.   So let me ask you about a -- I'm going
6 to continue to ask you about your report, so if
7 you want to keep that out.
8           On page 14 of your report, you
9 state in the first full paragraph, second
10 sentence, "However, it is my opinion there is
11 nothing to suggest or establish that NuStar was
12 on constructive knowledge that any of its
13 employees were unauthorized for employment."
14           Do you still believe that?
15     A.   I do, as that term "constructive
16 knowledge" has evolved under the law.  And if
17 you read the follow-up sentence to that, I say
18 this is particularly true given the fact that
19 ICE would bear the burden to establish both
20 constructive knowledge and that the employees
21 were indeed unauthorized, so -- and then I say,
22 put differently, you do not even get to the --
23 to the knowledge component if there is not
24 some -- first some official confirmation of the
25 worker's alienage and manner of entry.

1 So if somebody is going to say
2 the employer was on constructive knowledge,
3 okay, and if ICE was -- if ICE decided they were
4 going to bring a charge for knowing continued
5 employment, they would have to first establish
6 the unauthorized status of the individual. They
7 would also then have to establish the constructive
8 knowledge component.
9 It's a difficult burden, it
10 really is, which is why you don't see a lot of
11 these cases.
12 Q. But juries deal with knowledge
13 requirements all the time, right, criminal
14 cases, civil cases? They have to distinguish
15 between knowledge, constructive knowledge,
16 actual knowledge all the time; right?
17 A. Agree. I agree with that.
18 Q. What I want to ask you about there is,
19 let's talk about the establishing actual alienage,
20 and if we can put that aside for a second. In
21 other words, if I were to ask you to assume that,
22 you know, somehow we knew definitively the nine
23 people we were -- we talked about this afternoon
24 were, in fact, not authorized, right, if they
25 were here and they said, Mr. Samson, I'm telling

1 you I'm not authorized to work here, okay, would
2 that change your opinion at all about the statement
3 you made in this paragraph?
4 MR. BISS: Object to the form.
5 A. And then -- then what we're left with --
6 if you take that element out, what we're left with
7 is was there indicia, was there enough indicia of
8 evidence to cross the threshold where you've got --
9 where you have constructive knowledge, and that's
10 the -- that's the fact-based inquiry.
11 So based on the law that I'm
12 aware of and what I've reviewed, although, you
13 know, to -- to, you know, lawyers and other
14 people that look at this in a vacuum and they're
15 looking at these nine I-9s as examples in a
16 vacuum, you may think this is so obvious these
17 are fake cards, you're not looking at it from
18 the context of a reasonable employer that's
19 reviewing these documents against the backdrop of
20 making sure they're not committing discriminatory
21 hiring practices, making sure that they're treating
22 employees consistently.
23 And I'm not talking specific to
24 NuStar. That's just the standard that's been
25 laid out. Aramark talks about it in great detail.

1 And here's an example. Because here's what's
2 missing, all right, because I think this would
3 be helpful. Here's what's missing. In a lot of
4 constructive knowledge cases, there is some
5 confirmation from the government that the
6 individuals are not authorized for work.
7 So your typical scenario is this:
8 ICE does an audit. ICE sends you a Notice of
9 Suspect doc letter. An employer gets that
10 letter from ICE and does nothing in response,
11 continues to employ.
12 That's your typical, you know,
13 slam-dunk constructive knowledge. You got --
14 You had confirmation from the government, and
15 you did nothing in response, from the -- from
16 the -- from ICE or INS. That's what the case
17 law says. So that's a slam-dunk constructive
18 knowledge case.
19 This is speculative. You know,
20 it's -- but there's significant indicia,
21 especially with the nine that we went through.
22 I agree with that. It's a closer call. It's
23 definitely a closer call.
24 Q. And so your opinion is not that there's
25 no evidence that would go towards constructive

1 knowledge. It's just that it doesn't meet the
2 burden of establishing constructive knowledge?
3 A. In my opinion, yes, that's accurate.
4 Q. And so, but there are ways to meet the
5 constructive knowledge element without getting
6 notice from the government, aren't there? In
7 other words, the law is not that the only way an
8 employer can be held liable under the constructive
9 knowledge standard is to first get confirmation
10 from the government that its employees are
11 unauthorized; right?
12 A. I agree with that, that there is -- there
13 is some law out there that -- where there's enough
14 blatant evidence that you can get there without
15 some sort of official confirmation. There is
16 some support for that in different circuits and
17 things.
18 It's tough. It's very -- It's a
19 very high threshold. That's why I said it's a
20 slam dunk if you have nonaction in response to
21 an ICE letter or an INS letter. That's what --
22 the cases support that; but when you start talking
23 about this area, it gets really fact-intensive.
24 Q. What about situations like this, where
25 you have an employer who is committing substantive

1 violations on their I-9s in almost all of them,
2 some of which ridiculously slow -- ridiculously
3 so in the sense that --
4             MR. BISS: Object to the -- Object
5 to the form.
6    Q. -- you have an employee filling out
7 Section 2, or in a lot of cases just not filling
8 it out at all, combined with documents that
9 either are missing or appear on their face to be
10 not accurate or at least cause the need for
11 further follow-up, and then you know that they
12 are unauthorized because they assert their Fifth
13 Amendment in the deposition? You're telling me
14 these cases, you don't think meet the constructive
15 knowledge standard?
16             MR. BISS: Object to the form,
17 asked and answered.
18    A. With regard to the ones that have been
19 continued to employ, I think it's a very close
20 call. I mean, with regard to that specific
21 subset that you went through, it's close. It's
22 a -- It wouldn't be up to us to decide that, but
23 it's close. And if you're asking my opinion as
24 to whether it meets it, I mean, I'm looking at --
25 Let me give you an example. Okay?

1             There's a case called Associated
2 Painters. It's an OCAHO decision. ICE sends a
3 letter to the employer that lists these three
4 employees out and says that they're not --
5 they're not authorized. There's a suspect
6 document. Employer terminates. Then employer
7 rehires them on the same documents a year later
8 or six months later. Okay?
9             The ALJ said that that was not --
10 that they did not have constructive notice of
11 that -- of unauthorized employment by virtue of
12 the prior letter they got from ICE.
13             That's what I'm telling you. The
14 standard and the law has evolved that constructive
15 knowledge is so dangerous that it's essentially
16 being pushed out of the law.
17             It's so dangerous to say that
18 employer had constructive knowledge of something,
19 of unauthorized employment, that -- and there's
20 so much emphasis on avoiding discriminatory acts
21 that that part of the law is being squeezed out,
22 if that makes sense.
23    Q. But wouldn't it at least be fair to say
24 with respect to the six employees who were
25 deposed, based on NuStar's repeated noncompliance

1 with I think what the case law calls the heart
2 of the I-9, Section 2, the noncompliance in
3 their specific cases, documents that appear to
4 be fake and then these guys asserting the Fifth
5 Amendment, couldn't a reasonable jury on a
6 preponderance of the evidence standard find that
7 NuStar had constructive knowledge that it was
8 hiring unauthorized workers?
9             MR. BISS: Object to the form,
10 asked and answered.
11    A. I mean, yes, I think -- I think a
12 reasonable jury could conclude that. It would
13 be -- It would be a close call; and it would,
14 you know, be up to the lawyers to make sure the
15 jurors are educated on the proper standards and
16 things; but, yeah, I mean, it's -- it's a fact
17 inquiry.
18    Q. In -- What about -- Well, we covered
19 that. I want to talk to you about good faith.
20             On page 14 of your exhibit -- of
21 your report, excuse me.
22    A. Page 14?
23    Q. Do I have that right? I believe --
24 Where is that? There we go. I'm sorry, page
25 16.

1             Based on the fact that I think
2 we've all agreed that 289 of the 309 I-9s that
3 NuStar submitted have substantive violations,
4 some of which, as we've talked about now, and we
5 could probably talk about until midnight, you
6 know, had instances where the employer is not
7 filling out the attestation at all, we saw one
8 where the employee did it, and things of that
9 nature, do you think that NuStar complied with
10 the I-9 requirements in good faith?
11    A. So that -- that statement is -- I want
12 us -- I want to read you because when I put that
13 in my report, I did it -- I did it carefully in
14 the sense that I'm not talking about whether --
15 I'm not saying that NuStar would be able to take
16 advantage of the affirmative defense of good
17 faith as that.
18             There's a whole separate idea of
19 good faith in this area. Okay? And there are --
20 when ICE comes in and levies a fine, they have --
21 they can enhance that fine based on a lack of
22 good faith.
23             There's a whole bunch of case
24 law, OCAHO decisions about what a lack of good
25 faith looks like, separate and apart from the

1 affirmative against in 1324. Okay?
2         When I say that they generally --
3 when they -- when I say they complied in good
4 faith with the requirements, they have real
5 compliance issues. I say NuStar displayed an
6 imperfect but regular and consistent attempt.
7         At the end of the day NuStar has
8 documents from the large majority of -- they
9 have List B and List C documents from a large
10 majority of their workforce. That cannot be
11 refuted. I mean, they received documents, and
12 that's the spirit of the I-9 requirement itself.
13         Do they have a whole host of
14 paperwork errors and compliance issues?
15 Absolutely. But in good faith they did request
16 documents and require documents from employees.
17         In the cases where I've seen bad
18 faith or culpable conduct found, that's where
19 there's a complete disregard for the I-9
20 requirement. There's missing documents. There's
21 missing I-9s. There's -- You know, we've got --
22 They would -- If ICE had done an audit, a
23 paperwork audit on NuStar, they likely would
24 have been hit with a pretty significant fine
25 because so many were untimely completed, and

1 that would have been a -- probably a large fine;
2 but when it comes to this good-faith analysis
3 for purposes of enhancement and mitigation of
4 fines, that's what I'm saying there in that
5 point. So I should clarify that here. That's
6 what I'm saying.
7         I don't know and, frankly, I
8 don't think they could take advantage of the
9 affirmative defense in 1324 for good faith; but,
10 in general, do I think in good faith they
11 complied with the -- with the requirement to --
12 to get documents that are, you know, acceptable
13 documents and things, I'm comfortable saying
14 that, yes.
15     Q. And then with respect to whether NuStar
16 continued to employ an individual that it became
17 aware of was unauthorized, right, and so we've
18 talked about that, where, you know, it's one
19 thing to hire somebody you know was unauthorized.
20 That's a violation of law.
21     A. At the time of hire, correct.
22     Q. But it's also a violation of the law
23 if -- even though you didn't know at the time
24 you hired the person, if you subsequently become
25 aware that they are unauthorized, you can't

1 continue to employ them; right?
2     A. Right. If something puts you on
3 constructive notice or actual notice during the
4 course of employment, that subjects you to a --
5 that's what we've been talking about, is it's
6 not necessarily -- the typical example of that
7 is, if you get a letter from ICE that says these
8 individuals are not authorized for employment or
9 they've presented you with suspect documents.
10 If you continue to employ after you receive that
11 letter from ICE, then you've committed a continued
12 employment.
13     Q. And so couldn't a reasonable jury conclude
14 under a preponderance of the evidence standard that
15 NuStar continued to employ at least these six
16 workers that we've talked about after obtaining
17 constructive knowledge that they were unauthorized
18 to work in the United States?
19     A. I think it's a very close --
20         MR. BISS: Object to the form.
21     A. I think I've answered that question a
22 few times, but I think it's a very close call,
23 and -- and I think I've already answered in the
24 affirmative that, yes, a jury could conclude,
25 but a jury could also conclude the opposite.

1         And so, you know, it's a very
2 high burden to establish that, particularly when
3 there's not evidence in the form of a confirmation
4 from ICE or DHS.
5     Q. And so I just want to quickly run
6 through the rest of your opinions, starting on
7 page 7.
8         The first one was that NuStar
9 had adequate protocols and Form I-9 procedures
10 in place between '07 and present to reasonably
11 conclude that its employees were legally
12 authorized for employment in the United States.
13         After all that we've gone through
14 today, do you still think that's the case?
15     A. I do, and what I'm saying is that they
16 had the adequate process in place. They were --
17 They were collecting documents from the employees.
18 They had adequate procedures in place.
19         The problem is, they were not
20 completing the I-9 correctly, but they had the
21 general idea and protocol that you collect
22 the documents at the time of hire to establish
23 identity and work authorization.
24         We don't have a large chunk of
25 missing documents or missing I-9s. I think

1 there was maybe three out of -- out of -- or
2 maybe there were 17 at one point but three
3 within the scope of retention period.
4        So you don't have a situation
5 where there was just a complete negligent
6 attempt at this. You did have protocols and
7 procedures in place.
8        Now, they would have benefited
9 from an immigration attorney, you know,
10 informing them about the proper way to complete
11 the I-9s, collect the documents and review the
12 documents; but, in general, I do think that they
13 had adequate protocols in place.
14    Q.   But there were a lot of instances where
15 they were not -- well, in almost all the instances
16 they were not filling out the heart of the I-9
17 form.
18    A.   I agree with that.
19    Q.   And in some cases not getting the correct
20 IDs; right?
21    A.   In limited cases.
22    Q.   And in many cases not attesting that
23 they had done any review whatsoever; right? In
24 209 out of 309 cases they don't even, you know,
25 sign and date the attestation that they had done

1 any review.
2    A.   Right, which is a substantive violation,
3 but what I'm saying when I say they have adequate
4 protocols in place, they were -- they were
5 collecting the documents at the time of hire.
6 That was established in the deposition testimony.
7 The compliance side of it, the filling out the
8 form part of it was poor.
9    Q.   They didn't do that right.
10    A.   No, but as far as protocols for collecting
11 the documents, yes.
12    Q.   And then the second opinion that you
13 have is that NuStar's business policies and
14 practices substantially complied with federal
15 law.
16    A.   Yeah. And if you look at the footnote --
17    Q.   What do you mean by that?
18    A.   The same thing we've just discussed.
19 What I'm saying is, poor compliance, extremely
20 poor compliance would be -- would be -- there's
21 a significant amount of companies out there that
22 are operating. They don't have I-9s for any
23 employees. Okay? ICE -- ICE sees that. They
24 go out. You know, that's not unheard of. In
25 fact, it's somewhat typical.

1        So what I'm saying is they had a
2 large -- they had a large percentage of documents
3 for their employees that were given to them at
4 the time of hire. All right? But what I say is
5 failure to prepare I-9s for employees are
6 considered serious substantive violations, but
7 missing I-9s alone are not sufficient to
8 establish knowledge of an unauthorized worker.
9        So they had compliance issues,
10 but were they substantially complying with the
11 regulation, yeah, because they were collecting
12 the documents. They were doing -- They were --
13 They were collecting the correct documents,
14 okay, but they were not filling out the form, so
15 it's -- to me, the OCAHO law says poor compliance
16 is not evidence of anything other than poor
17 compliance with --
18    Q.   Right.
19    A.   -- with the I-9 requirement.
20    Q.   And we're just talking about, you know,
21 their -- I think you put it their business
22 policies and practices substantially complied
23 with federal law, and I'm just asking how can
24 that possibly be the case when --
25    A.   And I -- Sure.

1    Q.   -- they are doing -- when they are in
2 almost all instances not filling out the heart
3 of the I-9 form? How could that still be
4 substantial compliance?
5    A.   You keep referencing that, and I'm
6 telling --
7        MR. BISS: Object to the form,
8 asked and answered.
9    A.   I'm telling you, the retention and
10 collection of the documents is the heart of the
11 I-9 requirement. Okay? The documents are
12 there. And that's what I'm saying.
13        They did not complete the I-9s
14 correctly on a lot of them, but they did the --
15 the heart of the work is getting the documents
16 from the employee.
17        So they had the evidence of
18 identity and work authorization for the large
19 majority of the employees, with the -- with the,
20 you know, limited exception of a few missing
21 I-9s.
22    Q.   So you can say, hey, look, you know, I
23 collected -- I made photocopies of documents
24 that are clearly not genuine; I avoided, some
25 might say purposefully, filling out an

Veritext Legal Solutions

800-567-8658                                                973-410-4098

Page 302

1 attestation; and that's still complying with
2 the, you know, heart of the requirement?
3    A.  That is not what I'm saying.
4         MR. BISS:  Object to the form,
5 argumentative, asked and answered.
6    A.  That's not what I'm saying, and I don't
7 agree with the first part of the question.  If
8 the first part of the question were -- were
9 accurate, then I would say they did not comply
10 with the requirement, but the first part of the
11 question is very much not accurate, and it's
12 very much subject to the standards that are laid
13 out by years and years of case law in this area
14 that cannot be ignored as to what an employer is
15 required to do.
16    Q.  But you would agree with me that many,
17 if not most, of the documents that you saw in
18 these I-9s do not appear to be genuine?  And I
19 mean from your perspective as an immigration
20 lawyer, not an employer's perspective.
21    A.  The ones that we've looked at today, I
22 would agree from my perspective, as somebody
23 who's looked at thousands and thousands of these
24 and had training at ICE facilities and things of
25 that nature, I would agree.

Page 303

1    Q.  And so -- And those are representative
2 of the other, you know, 300 some odd I-9s in
3 here; right?
4         MR. BISS:  Object to the form,
5 mischaracterizes testimony --
6    A.  They're --
7         MR. BISS:  -- and the documents.
8    A.  They're a segment.  You know, I looked
9 through the other ones.  Some of those -- Some
10 of these same issues are seen in other documents;
11 but, again, we're not talking about -- the
12 inquiry isn't what -- what I know.  It's what a
13 reasonable employer would know.
14    Q.  Right.  And what I'm getting at, though,
15 is how can we say that they have a sufficient
16 system set up and are substantially complying
17 with the law if they're collecting a bunch of
18 fake documents?
19    A.  Because they're doing -- They're --
20         MR. BISS:  Object to the form.
21    A.  We don't know that they're collecting a
22 bunch of fake documents until ICE or DHS tells
23 us that; but even assuming that's correct, the
24 employer is doing what the law requires, which
25 is collecting the documents from the employees,

Page 304

1 conducting a review at the time of hire and, you
2 know, now completing the I-9s.
3         So that's how we can say that, is
4 that they're doing what is required of employers.
5 Okay?  There's -- And what you're talking about,
6 again, is -- is wading into are they burying
7 their head in the sand on a -- on a document
8 fraud issue.  There's no evidence.  There's no
9 evidence that I reviewed that that is occurring.
10 Okay?
11    Q.  No evidence?
12    A.  There's -- That that -- That they're
13 knowingly burying their head in the sand on --
14 on fake documents, there's no corroborating
15 evidence that would say that they're doing that
16 intentionally or knowingly.
17         So what I'm saying is, the -- a
18 reasonable employer, reasonable employers all
19 throughout the United States, are doing the
20 exact same process.
21         And you know what, those
22 documents may look different in different
23 industries, but in general they're doing what
24 the law requires them to do.
25         This entity is doing what the law

Page 305

1 requires them to do, which is receive the
2 documents from the employees, conduct a review.
3 If they're genuine on their face and they appear
4 to relate to the employee in front of them,
5 they're moving -- they're moving on.  They're
6 hiring the individual.  That's what employers
7 are doing all throughout the United States.
8 That's what they're tasked to do.
9    Q.  It doesn't mean that that's all they're
10 required to do.  It means what they're doing;
11 right?
12    A.  No, that's what they're required to do.
13 Now, there's a -- there's a level of -- there's
14 a level of diligence that they -- they have to
15 conduct; and that's what we've been talking
16 about, this fact -- you take each one on a
17 case-by-case basis, the level of inquiry that's
18 required.
19    Q.  On page 8, kind of halfway down, you
20 state that the only truly way to establish
21 someone is illegal or unauthorized is through a
22 sworn statement from the individual or a Form
23 I-213.
24    A.  Yeah.  We talked about that early this
25 morning, that that's the way the government

77 (Pages 302 - 305)

Page 306

1 establishes that somebody is unauthorized or
2 unlawful -- unlawfully in the country is through
3 that document.
4    Q.  But isn't the case law clear that you
5 can do it without a sworn statement or a 213?
6    A.  You can do --
7    Q.  You can establish somebody is here
8 illegally without a 213 or a sworn statement
9 from that individual; is that right?
10    A.  By making a negative inference.  They're
11 very rare.  You'd have to have an insurmountable
12 amount of evidence.  You could not deport that
13 person on that basis.  That's what I'm saying.
14    Q.  Right.
15    A.  You cannot remove an individual from
16 this country without first establishing they're
17 here unlawfully.  The way you establish that is
18 through an I-213 or a sworn statement or some
19 finding of an immigration judge or ALJ that that
20 person is removable based on the evidence that
21 was presented at a hearing.  You cannot look at
22 a person and say that they're unauthorized.
23    Q.  Right.  And so what I'm talking about is
24 not a removal proceeding, but just establishing to
25 a reasonable jury that somebody is not authorized

Page 307

1 to work in the United States, and I'm saying that
2 there is nothing in the law that says I would have
3 to have a sworn statement from that individual
4 or a Form 213; is that correct?
5        MR. BISS:  Object to the form,
6 asked and answered.
7    A.  Again, I characterized -- said the only
8 way to truly establish it, right, is through an
9 I-213 or a sworn statement.
10        There is some support in some cases
11 out there that you can establish an individual
12 unauthorized for employment through other evidence,
13 right, and I'm not fighting you on that at all.
14    Q.  Okay.
15    A.  There is support for that.
16    Q.  It would be nice to have a 213 or a sworn
17 statement, though; right?
18    A.  It would be --
19    Q.  That's what you look for.
20    A.  That is what you would --
21    Q.  Yeah.
22    A.  That's where you would feel comfortable
23 moving forward with that.
24    Q.  I totally get that.  I totally get that.
25        The next page, page 9, kind

Page 308

1 of halfway through you make the point that,
2 you know, look, there's never been a legal
3 determination made by a court, ALJ, or
4 enforcement agency that NuStar knowingly hired
5 or continued to employ an unauthorized employee.
6        How do you know that?
7    A.  I mean, I know it through the absence
8 of any evidence that was shown to me that would
9 establish that.
10        If there was some evidence to the
11 contrary, then I presume that would have been
12 provided to me.  The -- And what I'm saying is
13 if someone is going to say that an employer has
14 relied -- knowingly relied on unauthorized
15 workers, someone is going to say that, an actual
16 determination through a final order or through a
17 court in which they were found guilty of doing
18 that or responsible for doing that would be
19 the only legitimate evidence to support such a
20 claim.
21        To my knowledge they've never
22 been subjected to an ICE enforcement action or
23 issued a final order or had any court or ALJ
24 deem them to have violated 1324.
25    Q.  And that doesn't mean that they aren't

Page 309

1 violating 1324.  That just means that it hasn't
2 been enforced against them; right?
3    A.  There has been no finding that they
4 are.  There's been no legitimate finding that
5 they have.
6    Q.  Right.  And what I'm saying is that
7 just because the statute hasn't been enforced
8 against them yet doesn't mean they haven't
9 violated it; correct?
10    A.  I mean, you'd have to get into that,
11 right?  You'd have to get into what the word
12 "violated" means in that sense, you know, but I
13 agree that you can -- you can -- you can commit
14 an act without being found guilty of the act or
15 there being a formal finding of an act.  Yes, I
16 agree with that.
17    Q.  Okay.  And so, put differently, there
18 are likely a lot of employers out there who have
19 violated 1324a and never had any enforcement
20 action against them.  Isn't that fair?
21    A.  That's fair.
22        MR. BISS:  Object to form.
23        MR. KLINEFELDT:  I think I am
24 just about done.  Can we have just two minutes
25 off the record?  I want to consult with my

78 (Pages 306 - 309)

1 colleague here, and then we'll jump right back
2 on. Okay, Steve?
3          MR. BISS: Thank you, Nick.
4          THE VIDEOGRAPHER: We are going
5 off the record. The time is 4:41.
6          (A recess was taken.)
7          THE VIDEOGRAPHER: We are on the
8 record. The time is 4:45.
9     Q. Mr. Samson, I just had a couple of
10 clarifications I wanted to ask you about.
11          One is, at one point we talked
12 about, and I think you agreed with me, that the
13 case law states that the heart of I-9 compliance
14 is the completion of Section 2.
15          Do you agree with me on that?
16     A. Yes, I do agree it is, in the sense that
17 that is the part of the process that includes the
18 collection of documents and the review of the
19 document.
20          The case law that's discussing
21 that involves that, and then it also discusses
22 why it's important that the employer certifies
23 or attests to that review. That is essentially
24 the heart of the I-9 requirement. I agree with
25 that. I agree that there's case law out there

1 that says that.
2     Q. And so it's not really the -- just the
3 collecting of documents that's the heart of the
4 I-9 compliance, it's really the completion of
5 Section 2 that's the heart of the I-9 compliance;
6 right?
7     A. In conjunction -- If you look at the --
8 If you look at the language from those decisions,
9 it's in conjunction with the receipt and review of
10 the documents.
11     Q. And I believe you had testified that
12 the reason that you concluded that NuStar was
13 substantially compliant with the law here was the
14 fact that it was at least properly collecting
15 the documents. Is that fair?
16     A. That was the basis for me making that
17 statement. That's what -- I find that to be the
18 most -- In my experience, that's the most
19 important element of the I-9 requirement, is
20 that the employees are -- or is that the
21 employer is requiring the employees to present
22 that, those documents, at the time of hire.
23          That's -- To me that is the meat
24 of the -- of the whole process. Without that
25 part of the process, you don't even -- you just

1 have words on a piece of paper.
2     Q. And I know you didn't have the
3 opportunity to do a full I-9 audit here, but if
4 it was the case that NuStar actually was not
5 collecting all the documents at the time of hire
6 in a significant number of cases, would that
7 change your opinion?
8     A. That would likely --
9          MR. BISS: Object to the form.
10     A. That would -- That would change my
11 opinion in the sense that if you told me there
12 was, you know, a large percentage of time where
13 they weren't or, you know, that the timeliness
14 was -- was a real, you know, issue and things of
15 that nature, then, yeah.
16          In those, then, yeah, that would
17 be a -- that would be a harder statement to
18 protect or to back up; but the fact of the
19 matter is, from the -- you know, I reviewed the
20 deposition testimony. I saw -- I reviewed, you
21 know, a significant amount of the I-9s; and, in
22 general, what I used as the basis for that is
23 that they were collecting the documents from the
24 employees, they had List B and List C documents
25 or List A documents, which is to me the meat of

1 the requirement.
2          They in no means, and not even
3 close, were they -- were they compliant on just
4 an I-9 sense; but with regard to the other
5 requirements of this area, you know, I found
6 that they were compliant and had protocols in
7 place that, had they been executed better, it
8 would -- you know, it would have been completely
9 compliant.
10          MR. KLINEFELDT: Okay. I have no
11 further questions.
12          Mr. Biss, do you have any questions?
13          MR. BISS: Sure.
14          CROSS-EXAMINATION
15 BY MR. BISS:
16     Q. Mr. Samson, I have just one question,
17 and it might be -- might morph into two.
18          We have been going for a number
19 of hours today, and counsel had asked you a
20 number of questions.
21          Have any of the questions that
22 counsel has asked you, in any way have they
23 changed -- have they caused you to change the
24 opinions stated in your expert report?
25          MR. KLINEFELDT: Objection, form.

Page 314

1   A.  No.  I think any -- any of the
2  statements I made in my report were properly
3  limited in their scope to -- in the sense of
4  what I was, you know, referring to.  So, no, I
5  would answer no.
6   Q.  All right, sir.  And as a result of any
7  of the questions that counsel asked you today,
8  in other words, in light of -- in light of or in
9  the face of the questions that you were asked
10 today, do you stand behind the opinions stated
11 in your report?
12   A.  I do.
13      MR. KLINEFELDT:  Objection, form.
14      MR. BISS:  All right.  I don't
15 have any other questions.
16      MR. KLINEFELDT:  All right.  I
17 think that's it.  We can go off the record.
18      MR. BISS:  Okay.  Hold on.  Before
19 we go off the record, I need to make sure of one
20 thing.  I don't know who is in the room there
21 other than Mr. Samson.  Nick, I know you're
22 there and the court reporter is there.
23      MR. KLINEFELDT:  Yep.  And we
24 have --
25      MR. BISS:  In light of -- In

Page 315

1  light of -- In light of the -- some of the
2  things that have happened recently in this case,
3  I want to make sure that I understand who is in
4  the room other than -- than counsel, and I want
5  to make sure that anybody in the room has signed
6  the witness assurance declaration that was
7  attached to the protective order.
8      I want to make sure that under no
9  circumstances are the contents of the deposition,
10 including the contents of any of the exhibits
11 that were referred to today, leaked to the press
12 or to the public.
13      So can we just do a roll call and
14 make sure that we identify on the record who is
15 present during the deposition?
16      MR. KLINEFELDT:  Yeah.  And it's
17 the --
18      MR. BISS:  Or can you just tell me,
19 Nick, put it on the record?
20      MR. KLINEFELDT:  It's the same as
21 been here all day and that we announced at the
22 beginning of the deposition.
23      It's been myself, Nick Klinefeldt,
24 and my partner, Scott Wright, both from the
25 Faegre Drinker Law Firm, and we've complied

Page 316

1  with the protective order attestations, and I
2  believe Mr. Wright has now, like me, entered an
3  appearance in this case.
4      MR. BISS:  Yeah.  I think I saw
5  the text order come in today he's been -- he's
6  been admitted.
7      And the court reporter signed a
8  witness assurance declaration?
9      MR. KLINEFELDT:  Yeah.  Both the
10 court reporter and the videographer were the
11 same as you -- that were here before when you
12 were here, Steve.  They've been in this case
13 before.
14      MR. BISS:  Okay.  I appreciate
15 it.  Just, once again, I'm going to mark and
16 designate the entire deposition counsels' eyes
17 only, so I just wanted to be extra cautious with
18 this, with this deposition.  Thank you, guys.
19      MR. KLINEFELDT:  Yep.  Thanks,
20 Steve.
21      THE VIDEOGRAPHER:  Ready to go
22 off the record?
23      MR. KLINEFELDT:  Yes.
24      THE VIDEOGRAPHER:  Okay.  We are
25 off the record at 4:52 p.m., and this concludes

Page 317

1  today's testimony given by Clete Samson.  The
2  total number of media units used was five and
3  will be retained by Veritext Legal Solutions.
4      (Deposition concluded at 4:52 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

80 (Pages 314 - 317)

Page 318

```
1        C E R T I F I C A T E
2        I, the undersigned, a Registered
   Professional Shorthand Reporter and Notary
3  Public, do hereby certify that I acted as the
   Registered Professional Reporter in the
4  foregoing matter at the time and place indicated
   herein; that I took in shorthand the proceedings
5  had at said time and place; that said shorthand
   notes were reduced to typewriting under my
6  supervision and direction, and that the
   foregoing pages are a full and correct
7  transcript of the shorthand notes so taken; that
   said transcript was not submitted for review
8
         I further certify that I am
9  neither attorney nor counsel for, or related to
   or employed by any of the parties in the
10 foregoing matter, and further that I am not a
   relative or employee of any attorney or counsel
11 employed by the parties hereto, or financially
   interested in the action
12
         IN WITNESS WHEREOF, I have
13 hereunto set my hand and seal this 10th day of
   September, 2021.
14
15
16 _____
   REGISTERED PROFESSIONAL REPORTER
   and NOTARY PUBLIC
17
18
19
20
21
22
23
24
25
```

81 (Page 318)