**Exhibit Q**

**(Redacted)**

UNITED STATES DISTRICT COURT

for the

Northern District of Iowa

* * * * * * * * * * * * * * * * * * * * * * * * * *
NUSTAR FARMS, LLC,
et al.,

      Plaintiff,

    vs.      Civil Action No. 5:20-cv-04003-CJW-MAR

RYAN LIZZA, et al.,    **(COUNSELS' EYES ONLY)**

      Defendant.
* * * * * * * * * * * * * * * * * * * * * * * * * *

VIDEOTAPED DEPOSITION

OF

AMANDA J. BAHENA

Taken at
WOODS, FULLER, SHULTZ & SMITH, P.C.
300 South Phillips Avenue, Suite 300
Sioux Falls, South Dakota
February 22, 2022

---

| 1 | | WITNESSES | |
|---|---|---|---|
| 2 | AMANDA J. BAHENA | | Page |
| 3 | Examination by Ms. Hauser | | 5, 174 |
| | Examination by Mr. Biss | | 171 |
| 4 | | | |
| 5 | | EXHIBITS | |
| 6 | No. | Description | Page |
| 7 | 120 | Email dated 10-2-18 from Lori Nunes to | 10 |
| | | Amanda J. Bahena | |
| 8 | | | |
| | 121 | Letter dated 10-12-18 from Amanda J. | 56 |
| 9 | | Bahena to NuStar Farms, LLC | |
| 10 | 122 | Form I-9, with Attachment | 81 |
| 11 | 123 | Form I-9, with Attachment | 84 |
| 12 | 124 | Form I-9 | 85 |
| 13 | 125 | Form I-9, with Attachment | 99 |
| 14 | 126 | Form I-9, with Attachments | 106 |
| 15 | 127 | Form I-9 | 106 |
| 16 | 128 | Form I-9 | 110 |
| 17 | 129 | Form I-9, with Attachment | 114 |
| 18 | 130 | Form I-9 | 114 |
| 19 | 131 | Form I-9, with Attachment | 122 |
| 20 | 132 | Form I-9 | 122 |
| 21 | 133 | Form I-9, with Attachments | 132 |
| 22 | 134 | Form I-9 | 132 |
| 23 | 135 | Copies of Invoices | 155 |
| 24 | | | |
| 25 | | | |

---

1      A P P E A R A N C E S

2  KRISTEN HAUSER, ESQ.
   NATHANIEL S. BOYER, ESQ.
3     THE HEARST CORPORATION
      300 West 57th Street
4     New York, New York  10019

5     APPEARING ON BEHALF OF THE DEFENDANT.

6  SCOTT WRIGHT, ESQ.
      FAEGRE, DRINKER, BIDDLE & REATH, LLP
7     801 Grand Avenue
      33rd Floor
8     Des Monies, Iowa  50309

9     APPEARING ON BEHALF OF THE DEFENDANT.

10  STEVEN K. HUFF, ESQ.
      MARLOW, WOODWARD & HUFF, PLLC
11     200 West 3rd Street
      Yankton, South Dakota  57078
12
     APPEARING ON BEHALF OF THE DEPONENT.
13
14  STEVEN S. BISS, ESQ.
      LAW OFFICES OF STEVEN S. BISS
      300 West Main Street
15     Suite 102
      Charlottesville, Virginia  22903
16
     APPEARING REMOTELY ON BEHALF OF THE PLAINTIFF.
17
18
  Also Present: Anthony Nunes, Jr. (Appearing Remotely)
19           Lori Nunes     (Appearing Remotely)
           Cody Henderson  (Videographer)
20                     (Appearing Remotely)

---

1     (Deposition of AMANDA J. BAHENA, taken before

2  me, Cindy K. Pfingston, a Registered Professional

3  Reporter and a Notary Public in and for the County

4  of Pennington, State of South Dakota, at 9:30 a.m.

5  Central Time, on the 22nd day of February, 2022,

6  pursuant to Notice and/or Stipulation, at the Law

7  Offices of Woods, Fuller, Shultz & Smith, P.C., in

8  the City of Sioux Falls, County of Minnehaha, State

9  of South Dakota, counsel appearing on behalf of the

10  respective parties as hereinbefore indicated.)

11         * * * * *

12     THE VIDEOGRAPHER:  Good morning.  The time is

13  9:30 a.m. Central Time on Tuesday, February 22nd,

14  2022.

15     This begins Media Unit Number 1 of the video

16  recorded Zoom deposition of Amanda --

17     Is it Bathena?

18     THE DEPONENT:  Bahena.

19     THE VIDEOGRAPHER:  Bahena.  On one piece of

20  paper it's "Bathena."

21     -- Amanda Bahena, to be heard in the matter of

22  NuStar Farms, LLC, et al. versus Ryan Lizza, et al.,

23  to be heard in the United States District Court for

24  the Northern District of Iowa, Case Number

25  5:20-cv-04003-CJW-MAR.

1    My name is Cody Henderson.  I'm the
2 videographer.  Cindy Pfingston is the court
3 reporter.
4    Would Counsel please state their appearance for
5 the record.
6    MR. BISS:  I'm Steve Biss.  I represent the
7 plaintiffs, and in the combined action I represent
8 Devin Nunes.
9    MS. HAUSER:  Kristen Hauser.  I represent the
10 defendants in both actions.  With me are Nathaniel
11 Boyer, also from the Hearst Office of General
12 Counsel, and Scott Wright from the Faegre firm.
13    THE VIDEOGRAPHER:  Beautiful.
14    And we'll turn it over to the court reporter to
15 swear the witness.
16    MR. HUFF:  Sure.  Also Steve Huff here on
17 Ms. Bahena's behalf.
18    THE VIDEOGRAPHER:  Thank you.
19    MR. HUFF:  You're welcome.
20        AMANDA J. BAHENA,
21 a witness being first duly sworn, was examined and
22 testified on her oath as follows:
23        E X A M I N A T I O N
24 BY MS. HAUSER:
25 Q   Good morning, Ms. Bahena.

1 appeal.
2    So I just wanted to get those on the record
3 before you begin.  Sorry for interrupting.
4    MS. HAUSER:  No, no, understood.  And by your
5 objection, I understand you're not going to object
6 question by question.
7    MR. BISS:  Yeah, that's a good -- that's a
8 pretty good point.
9    The other thing that -- that I'm concerned
10 about, um, is the -- is -- is any attempt to elicit,
11 um, opinion testimony from -- from this witness.
12 Um, can you and I agree, so that -- that I don't
13 have to keep objecting, can you and I agree that any
14 objections as to, um, opinion testimony are, I don't
15 need to object every time, that they're all
16 preserved for the record?  Or do you want me just to
17 object every time I -- I find -- I find a question
18 objectionable?
19    MS. HAUSER:  I think you should make your
20 objections on the record as to questions, as to
21 particular questions.  I was just understanding your
22 global objection to the -- to the Court's order as
23 something you were not going to object to going
24 through.
25    Does that make sense?

1 A   Good morning.
2 Q   Would you please state your full name for the
3 record?
4 A   My full legal name is Amanda Joy Bahena Arteaga.
5 Q   Thank you.  And are you currently employed?
6 A   Yes.
7 Q   And where are you employed?
8 A   Woods, Fuller, Shultz & Smith, PC, law firm.
9 Q   And are you --
10    MR. BISS:  Kristen, just -- Kristen, just
11 before you go any further, I just want to put on the
12 record two matters.
13    Number one is I'm going to mark this entire
14 deposition "Counsels' Eyes Only" pursuant to the
15 protective order that has been entered in the NuStar
16 case.  I'm not sure it's been entered in the Devin
17 Nunes case, but regardless, I'm going to mark the
18 deposition as "Counsels' Eyes Only".  That's number
19 one.
20    Number two, I'm going to renew our objection to
21 the taking of the deposition, to the asking of any
22 questions on the grounds of attorney/client
23 privilege.  However, I recognize that the judge has
24 overruled that objection, so I'm merely stating that
25 objection to preserve it in the event we need to

1    MR. BISS:  It does.  I'll just object as I see
2 fit.  Thank you.
3    MS. HAUSER:  Thanks.
4 Q   (By Ms. Hauser)  Ms. Bahena, are you a shareholder in
5 the Woods Fuller firm?
6 A   Yes, I am.
7 Q   And when -- how long have you been a shareholder,
8 approximately?
9 A   That's a good question.  I don't know.  Um, let's
10 see, I would say approximately three years, maybe
11 four.
12 Q   Have you ever been deposed before?
13 A   No.
14 Q   Have you taken depositions before?
15 A   Yes.
16 Q   Um, you understand that it will help the court
17 reporter if you and I don't speak over each other
18 today and you wait for my question to be finished
19 before you answer?
20 A   Yes.
21 Q   Is there anything, any reason you believe you can't
22 testify truthfully today?
23 A   No.
24 Q   And today you're appearing pursuant to a subpoena?
25 A   Correct.

1  Q    And do you have -- what is your understanding of the
2       lawsuit pursuant -- excuse me, what is your
3       understanding of the lawsuit that you're giving
4       testimony in today?
5            MR. BISS:  Object to the form.
6  A    Um --
7            THE DEPONENT:  Should I answer?
8            MR. HUFF:  Yeah, yeah.
9  A    I'm not very familiar with the lawsuit.  I've seen
10      some of the pleadings, mostly related to whether or
11      not privilege was an issue, but I have not been
12      following it closely at all.  My understanding is
13      there was an article published by your clients that
14      now the Nunes family is suing your clients for libel
15      or related issues there.  Um --
16  Q    Have you -- so you've looked at some of the
17      pleadings; is that correct?
18  A    Some, not very many.
19  Q    Um, and you're -- and you said you're aware of the
20      Court's order permitting this deposition to happen?
21  A    Yes.
22  Q    And did you sign the protective order at some point?
23  A    I did.
24  Q    And have you read any of the Eighth Circuit's
25      opinions in the related matter concerning

1       congressman, former congressman Devin Nunes' libel
2       case?
3  A    Not that I recall.
4  Q    Did you read the esquire article that is the subject
5       of this lawsuit?
6  A    I -- yes.  I -- if it's the article that I'm
7       thinking of, um, Lori Nunes or someone had initially
8       sent that to me shortly after the publication, and I
9       read it at that time.  Yes.
10           MS. HAUSER:  So I've -- and for Mr. Biss, we've
11      handed the witness what has been previously marked
12      as plaintiff's exhibit 1.
13  A    Yes, I read this article.
14  Q    (By Ms. Hauser)  And do you recall that Mrs. Nunes
15      sent you this article?
16  A    I believe she e-mailed it to me, if I recall
17      correctly.  It may have been that she told me about
18      it and I found it myself.
19           MS. HAUSER:  I'm waiting on a number.
20           MR. BOYER:  Yeah.
21           MS. HAUSER:  Exhibit 120?
22           MR. BOYER:  Exhibit 120, okay.
23           Let's mark this as Defendants' Exhibit 120.
24           (Exhibit 120 marked for identification.)
25           MS. HAUSER:  Um, and for the record, this is a

1       document produced by Plaintiffs bearing the Bates
2       number PX4139 through PX4148.
3            And, Steve, I've marked it as 120 because I
4       believe that gives us a gap from the last
5       deposition.  It makes looking up the exact number --
6            MR. BOYER:  Yeah, let's go with 120.  I'm
7       almost positive that's fine.
8            MR. BISS:  So we're going to call it 120?
9            MS. HAUSER:  I think so, yeah.
10           MR. BOYER:  Yes, let's do that.
11           MR. BISS:  Okay.
12  Q    (By Ms. Hauser)  And, Ms. Bahena, the court reporter
13      just handed you a document, Exhibit 120.  Does this
14      refresh your recollection that Mrs. Lori Nunes sent
15      you a different article by e-mail?
16  A    Yes.  I think we, over the phone call she mentioned
17      the first e-mail, the esquire, or, sorry, she
18      mentioned the first esquire article, and I was able
19      to easily find that online.  And then she e-mailed
20      me a follow-up piece from a different -- from the
21      Federalist later.
22  Q    And do you recall when Mrs. Nunes first called you
23      about the article -- the Esquire article?
24  A    I don't recall the date.
25  Q    Was it -- do you know whether it was before or after

1       the article was published?
2  A    After.  I found it online.
3  Q    And if I represented to you that the article was
4       published on or around September 30th, 2018 online,
5       um, do you recall whether Mrs. Nunes called you that
6       day or the subsequent day or --
7  A    I don't remember.  It would have been after it was
8       available online because I would have found it
9       online.
10  Q    Have you read any other news articles -- have you
11      read any news articles about this lawsuit?
12  A    I couldn't say with certainty.  When they were
13      talking about taking my deposition, I assume I --
14      I -- yes, I Googled something, and I don't remember
15      if anything came up about the lawsuit or not.
16      Nothing in depth.
17  Q    Have you discussed this lawsuit with anyone other
18      than your lawyers?
19  A    I -- just my husband that I had to get my deposition
20      taken.
21  Q    Have you reviewed any social media posts about this
22      lawsuit or the article?
23  A    Not that I remember.  I don't have Twitter or
24      Facebook, so ...
25           MR. BISS:  Good for you.  Good for you.

1  Q  (By Ms. Hauser)  Have you discussed this lawsuit or
2     any of the claims with any of the Nunes?
3  A  No.  And I should correct, I -- I have Facebook.  My
4     account is deactivated, if that becomes a thing.
5     MR. HUFF:  My Space?
6     THE DEPONENT:  Maybe I have an account
7     somewhere.  Um...
8  Q  (By Ms. Hauser)  Generally, are you able -- would you
9     please describe your law practice at Woods Fuller?
10 A  Yes.  I have a combination of principally
11    immigration law and estate planning.  Depending on
12    the political environment and the time of the year
13    impacts how much time I spend on each.
14       Being in a small town, I also do some corporate
15    work, um, and a little bit of this and that, but
16    generally it's estate planning and immigration law.
17 Q  And, um, when you mentioned, um, the political
18    environment -- when you mentioned that the political
19    environment affects how much of, you devote to your
20    practice to one area or the other, what did you mean
21    by that?
22 A  Um, when there's proposed legislation changes or new
23    legislation in either immigration law or estate tax,
24    client demands swing, so the practice works out well
25    to have both because when it's quieter in

1     immigration because there's no changes or no -- no
2     court going on, um, often it's busier in estate
3     planning.  So they balance each other well.
4  Q  And what's the nature of your immigration practice?
5  A  It's evolved over the years.  Currently I do a lot
6     of work with, um, businesses looking to, um, sponsor
7     employees for permanent residency.
8        I also locally focus on working with
9     unaccompanied minors.  I just get a lot of
10    satisfaction with that.  And there's good options
11    for them and they're not able to go to larger cities
12    where there's more immigration lawyers.
13       I do a little bit of family petitions but less
14    and less of that because as I get busier, I am able
15    to refer those out to Omaha or Minneapolis or Des
16    Moines.
17       And I do very little, um, in immigration court
18    anymore just because with my family and the
19    scheduling, um, that requires, it became too
20    stressful, so I refer those out as well to the
21    cities.
22 Q  Do you advise on the rights of immigrant -- do you
23    advise immigrants on the rights of immigrants?
24 A  I will do initial -- I do initial consultations
25    where immigrants want to know their options, but I

1     don't go out and do anymore, um, like, legal rights
2     clinics or anything like that.
3  Q  And, um, do you advise employers on the rights of
4     immigrants?
5  A  I --
6  Q  Maybe that's a bad question.
7  A  Yeah, I'm not following the question.
8  Q  Um, do you advise employers concerning their
9     employees' immigration status?
10 A  Not really.  If an employee -- if an employer calls
11    me, sometimes this happens, and says, "I have an
12    employee who I think is undocumented," I say, "If
13    you're aware that he's, he or she is undocumented,
14    you need to terminate that employee."  And then the
15    call usually ends there.  And I say, "You should --
16    you know, you can terminate them and you can advise
17    them to go talk to an immigration lawyer."  But
18    that's as far as that goes.
19 Q  And so as between, you know, you said you represent
20    unaccompanied minors and businesses.  About how much
21    of your immigration work would you say is advising
22    businesses versus advising immigrants?
23 A  Um, right now I would say it's probably 60 percent
24    working with businesses on bringing in employees,
25    but a lot of times those are joint representations

1     where I represent both the business and the
2     employees that we are bringing in.
3  Q  And what -- in general, you know, what types of
4     businesses do you advise in that capacity?
5  A  Oh, all over, universities, hospitals, agricultural
6     businesses, um, manufacturing.
7  Q  Um, are there any other aspects of your immigration
8     practice that you haven't already explained?
9  A  Occasionally I do citizenship applications.
10 Q  Is there any part of your immigration practice
11    that's considered, that you would consider pro bono?
12 A  I do some for, um, domestic violence victims and
13    occasionally for some of the unaccompanied minors,
14    but we generally do that more low bono so we're able
15    to spread out our services to more people who need
16    them.
17 Q  When we were talking earlier about the political
18    environment and how that balances out your practice,
19    um, how do political concerns affect your
20    immigration practice?
21 A  Any time there's proposed legislation, legislative
22    changes or a new program, um, or actual changes, it
23    drives -- first of all, it's in the news so people
24    are thinking about it.  There may be new options for
25    people where there weren't options before, or people

1    may be concerned that enforcement is stepping up and
2    they want to review where they're at and if their
3    options have changed, or sometimes they want to
4    quickly move on something because they're concerned
5    it won't be available later.
6  Q    Were any specific concerns at issue affecting your
7    immigration practice in 2018?
8  A    There were concerns that enforcement would be
9    higher, certainly, and that, um, it -- that review
10    of petitions may become stricter, that review of
11    petitions may take longer, um, a lot of just general
12    questions with the new administration of what would
13    this look like. And there was, um, among both
14    employers and immigrants, just concerns about not
15    knowing how the new administration would handle
16    things just because of news clips and what was said
17    by people in the administration.
18  Q    And just to clarify, by the new administration, are
19    you speaking of the presidential change --
20  A    Yes.
21  Q    -- in 2016?
22  A    Yes.
23  Q    Um --
24  A    Immigration law is federal, so any time there's a
25    change at the federal level, or lots of talk about

1    immigration at the federal level, then that can turn
2    into changes pretty quickly.
3  Q    And do you recall any -- you said enforcement might
4    be higher. Do you recall any specific employer
5    concerns in that regard generally?
6  A    I think I just had maybe comments from current
7    clients of whether things would still be an option,
8    if the path they were on would still work, um, if
9    there would be more, um, workplace raids, things
10    like that. I live in a small town, so people
11    generally work side by side with their employees.
12    So when employees, immigrant employees are nervous,
13    it makes employers reach out to me sometimes.
14  Q    Any other concerns, general concerns from employers
15    at that time?
16  A    Not that I recall specifically or could share about
17    specific employers.
18  Q    Understood. And when you said there was concern
19    about enforcement, enforcement by whom?
20  A    ICE.
21  Q    And do you mean more frequent ICE enforcement
22    actions or --
23  A    Honestly a lot of the people who I talk to don't
24    know the -- they don't know how immigration works.
25    So they just hear things in the news, so they would

1    talk to me about clarification, "What does this
2    mean? Are all immigrants going to get deported?"
3    It's things like that. So sometimes they would just
4    come to me to ask, "I heard this in the news." What
5    does that mean?" And it would be me explaining the
6    system and how it works.
7  Q    And -- and generally how does the system work?
8  A    The immigration system?
9  Q    Well, in general, how would it work at the point of
10    enforcement?
11  A    Um, well, it depends on the situation. Do you mean
12    for employers or --
13  Q    For employers, yes.
14  A    Okay, for employers, okay. Um, for employers, if
15    someone in Immigration Customs Enforcement, ICE, has
16    reason to believe that an employer may be knowingly
17    employing undocumented workers or have a large,
18    knowing or unknowingly have a large percentage of
19    their workers who are undocumented, in our area they
20    may start looking into the matter. And they can
21    come and ask for your I-9 forms. If it's a serious,
22    if they have serious, serious concerns, they can get
23    authorization to immediately come onto the property
24    and interview workers, inspect documents and
25    determine if there's not -- if there's not only

1    undocumented employees but if the employer is
2    knowingly hiring them. So they're the enforcement
3    arm of the portion of the immigration code that
4    requires workers -- or, sorry, employers to ensure
5    through the I-9 form process essentially that their
6    employees are authorized to work in the United
7    States.
8  Q    So it sounded like you described. I'm going to
9    summarize it as two tiers. You have a tier of where
10    ICE would just ask for I-9 forms, and then you have
11    a tier where there's a more serious concern and that
12    leads to a deeper investigation; is that fair?
13  A    Yes.
14  Q    Um, does ICE -- when ICE, excuse me, asks for, in
15    the -- in the, I'll call it the lower tier, what are
16    the criteria that would lead ICE to ask for I-9
17    forms?
18        MR. BISS: Object to the form, speculation,
19    opinion testimony.
20  A    I -- I can't say with legal certainty. And I'm not
21    a trained ICE officer, but the way I explain to
22    people is it could be, um, repeated detention of
23    unauthorized workers who say, "I work at this and
24    that place," you know, and they're seeing the same
25    workers over and over.

1           Um, it could be criminal -- law enforcement
2    contact, so an officer could say, "We keep seeing
3    undocumented workers at this location" and suggest
4    that they look into it.
5           Um, it can be tips from the public; although, I
6    don't know if that's true, if they would follow up
7    on any tip.
8           And it could be, yeah, news articles and things
9    in the media that would draw ICE's attention and
10   make them question if they should go there and ask
11   to review their I-9s.
12 Q   (By Ms. Hauser)  And in -- in -- in such a situation,
13   you said ICE would look at their I-9s.  Would they
14   also look at copies of supporting documents if they
15   existed?
16 A   They can --
17         MR. BISS:  Objection, speculation.
18 A   They can require certain supporting documentation,
19   but, um, under the statute what needs to be
20   immediately provided are copies of I-9s for all
21   current employees and the ones that need to be
22   retained under the statute for terminated and former
23   employees.
24 Q   (By Ms. Hauser)  And if there were blanks on
25   section 2 of an I-9 form, would ICE then look to

1   supporting documents?
2 A   They can do that.
3         MR. BISS:  Objection, speculation, inadmissible
4   opinion.
5 A   If -- if the supporting documents are included with
6   the I-9 form, especially, yes, that has been my
7   experience.  More I would have to research I guess
8   if it came up.
9 Q   (By Ms. Hauser)  And in your second tier where you
10   talked about ICE entering the property, interviewing
11   workers, inspecting documents, what, in your
12   experience, are the serious concerns that would lead
13   to that type of ICE intervention?
14 A   I can't speak to that with confidence because I
15   haven't ever been involved in an ICE raid at that
16   level.
17 Q   And just asking generally, not asking about any
18   specific clients, have you been involved advising
19   employers when ICE has come in and asked to look at
20   their I-9 forms on a general level?
21 A   Yes.  To a limited extent, yes.
22 Q   Have you done so in the last five years?
23 A   I don't know the exact time frame.  It's been awhile
24   because they haven't done them during COVID.
25 Q   Um, and would it be fair to describe your, the

1   concepts you were describing as something called ICE
2   work site enforcement?
3 A   Yes.
4 Q   And can those I-9 -- would it be an I-9 audit when
5   they come in on that first tier and look at your
6   documents?
7 A   Yeah.
8         MR. BISS:  Objection, inadmissible opinion.
9 Q   (By Ms. Hauser)  And can those I-9 audits, in your
10   experience, lead to civil and even criminal
11   penalties?
12 A   Yes.
13        MR. BISS:  Objection, inadmissible opinion.
14 Q   (By Ms. Hauser)  And is one result of an I-9 audit
15   that it can lead to the identification of workers
16   who are unauthorized to work in the United States?
17        MR. BISS:  Objection, inadmissible opinion.
18 A   My understanding is ICE will run the information on
19   the I-9s through their database and they come with a
20   list to say, "These are the workers whose names and
21   Social Security numbers either do not match or
22   showed -- did not show up as an authorized worker."
23   And then there's follow-up after that.
24 Q   (By Ms. Hauser)  Is one of the points of follow-up
25   that the employer could lose those workers?

1         MR. BISS:  Objection, inadmissible opinion.
2 A   It's possible if it ends up in further investigation
3   or admissions from the workers that they are not
4   authorized, then they would need to terminate those
5   workers.  And typically they work out with the
6   government a schedule for doing so, if the workers
7   are willing to stay.
8 Q   (By Ms. Hauser)  Um, and even without, you know, a
9   raid, um, an employer can lose workers if it's
10   determined or realized that the worker was using
11   invalid documents?
12 A   I --
13        MR. BISS:  Objection, speculation.
14 A   I guess I don't --
15        MR. BISS:  Inadmissible opinion.
16 A   I don't understand the question.
17 Q   (By Ms. Hauser)  Sure.  Is it possible for an
18   employer to lose workers if those workers had
19   presented invalid documents?
20        MR. BISS:  Same objections.
21 A   In what situation?
22 Q   (By Ms. Hauser)  In the context of an ICE work site
23   enforcement.
24 A   Um, I mean, the workers, if -- if the workers know
25   that they're unauthorized, they may get nervous and

1   just leave.  I mean, I suppose so.
2 Q  And have -- and the employer could learn that the
3   workers are unauthorized and have to terminate them;
4   is that correct?
5 A  Either through --
6   MR. BISS:  Objection, calls for speculation.
7 A  Either through, um, information coming from ICE
8   based on review or if the employee -- if the
9   employee -- employer -- employee admissions is
10   usually how that turns -- comes out.
11   THE COURT REPORTER:  Excuse me.  Can you just
12   please let him get his objection out before you
13   starting answering?
14   THE DEPONENT:  Uh-huh.
15   THE COURT REPORTER:  Thank you.
16 Q  (By Ms. Hauser)  Are there any other circumstances
17   besides employee admissions or obtaining information
18   from ICE in which an employer would learn that its
19   employees are not authorized to work in the United
20   States?
21   MR. BISS:  Objection, inadmissible opinion,
22   speculation.
23 A  In the context of ICE coming in?
24 Q  (By Ms. Hauser)  Yes.
25 A  Um, I don't know.

1 Q  Um, did you present at a conference to agriculture
2   and farmers in October of 2021 -- or November of
3   2021?
4 A  Yes, by Zoom.
5 Q  And what was the subject of your discussion?
6 A  Immigration options and issues for agriculture
7   employers, or something like that.  I was asked by
8   the, um, like the Agriculture Outreach Office or, of
9   Iowa state or the 4H, something similar, someone had
10   asked me to present on that, so I did that.
11 Q  And were other -- you presented -- were there other
12   presenters at that conference?
13 A  Yeah.  The only one I remember is Brett Stanley from
14   the Sioux City ICE office.  I just appeared for my
15   presentation by Zoom.
16 Q  And did you attend Mr. Stanley's presentation?
17 A  No.
18 Q  And what was the nature of your presentation?
19 A  We ran through, um, temporary and -- like temporary
20   visas that agriculture employers may be able to use
21   to sponsor workers to meet needs that they can't
22   fill with the current low unemployment situation,
23   and then also ways to sponsor immigrants for green
24   cards to meet those -- to fill gaps, was the main
25   thing.  That's what I was asked, that they said that

1   employers are -- that -- I don't even remember who
2   asked me to speak, but they said that ag employers
3   want to hear about ways of looking for more
4   employees, I guess, because it's a struggle to find
5   workers for everyone.
6   Um, and I said, "Should I speak much" -- I
7   think I asked, "Do you need a lot of I-9 type talk?"
8   And they said, "Well, Brent Stanley from ICE will be
9   there."  And I said, "He'll probably cover that
10   then."  I don't remember, there may have been a
11   slide or two, because I probably say -- and I
12   always -- I always have a slide on it, "Employers,
13   you have to know that also.  You need to be filling
14   out I-9s."  But I knew that Brett Stanley was
15   already speaking on that, so I wouldn't have gone
16   into much depth.  Um --
17 Q  What did you mean by low employment (sic) situation?
18 A  Oh, I -- just nationwide, um, with, um, during and
19   after COVID, just employers in all sectors have been
20   contacting me about ways to fill needs because
21   there's just a lot of demand from employers in all
22   sectors right now.  Um...
23 Q  Um, do you know -- and this was a discussion for --
24   the audience were dairy farmers; is that right?
25 A  I don't know if it was -- yeah, I think it was a

1   dairy alliance, yeah.  Um, I would have basically
2   reused one that I use for all agricultural employers
3   though because it's a lot of line -- it's a lot in
4   line.  So it was kind of -- it wasn't WIDA.  It may
5   have been the Iowa State Dairy Extension or
6   something that asked me to do it.  I didn't charge
7   for it and I just did it by Zoom, so I said, "Okay,
8   I'll do that.  If I can appear by Zoom, no problem."
9 Q  Do you know if it was recorded?
10 A  Um, I don't know.
11 Q  Um, and, again, just asking briefly:  You said there
12   were temporary visas options.  What are those
13   options for employers?
14 A  How in depth do you want me to go?
15 Q  Super general.
16 A  Um, TN visas, H-2A seasonal ag visas, and for some,
17   but probably -- I don't know, in dairies it's rare,
18   would be an H-1 B.
19 Q  And all of these are available to dairy farms?
20 A  Dairy -- dairy farms in our area generally use TN
21   visas.  Um, it's -- H-2As don't work for milkers
22   typically but if they have crop farming.  So we just
23   went into the different scenarios.  So it depends on
24   the employer and their operation.  I've had one
25   H-1 B at a dairy farm.

1  Q  Is it fair to say, you know, decades ago there used
2     to be a more robust visa program for immigrant
3     workers to work in agricultural, something called
4     the Bracero's program?
5  A  I have almost no familiarity of that because I
6     didn't practice then.  And most people who could get
7     through that, there was a SAW; there was a
8     Bracero's, however you want to call it.  Um, some
9     people -- yeah, so very rarely will it come with
10    someone who's eligible for that who hasn't already
11    taken advantage of that come across my practice, so
12    my knowledge of those programs are quite limited.
13  Q  And what's the -- what are the contours of the TN
14    visa?  Again speaking super generally.
15  A  So the TN visa -- I actually, myself, don't do a lot
16    of TNs because there is someone in Minneapolis who
17    does a lot of TNs for the dairies in that area.  Um,
18    it seems to work well for them, so often I will say,
19    "This may be an option for you," and I'll refer them
20    to him.
21        But on a dairy, TNs typically do animal science
22    type work.  The job has to require a bachelor's
23    degree in the field, and there's certain job
24    categories you can bring someone in on.  Um, so
25    typically you're looking at the animal breeder,

1     animal science type jobs if you're talking dairies,
2     and the worker needs to be from Mexico or Canada.
3  Q  Um, and I think you said the H-2A seasonal visas,
4     they're for crop farming?
5  A  They're for seasonal work, so the work must -- the
6     job must be seasonal.  It's a little more nuanced
7     than that.  I don't do H-2As.  I refer those out as
8     well because -- so this was more to alert people to
9     options.  And a lot of times if they say, "I'm
10    looking at a TN or I'm looking at an H-2A," I
11    have -- I will refer them to the appropriate...
12  Q  And you said the H- -- and what are the parameters
13    of the H-1 B?
14  A  The H-1 B is also, the job needs to require a
15    bachelor's degree.  And it has to be a specialty
16    occupation.  I guess that's what that is called.
17    And for the H-1 B there's a lottery, so it's less
18    likely, even if you qualify, that you'll get it.  So
19    TNs in our area are more popular.
20  Q  Um, and then you also said there's a -- you talked
21    about permanent visa sponsorships; is that correct?
22  A  Yes.
23  Q  And what would those parameters be as applied to --
24    or what did you talk about those parameters as
25    applied to dairy farmers?

1  A  So you can sponsor someone straight for permanent
2     residency if you determine what wage you need to pay
3     them and you advertise the positions and there's not
4     enough workers.  And that can be almost any
5     position, not enough U.S. workers.
6        Um, I do alert dairies, they struggle with one
7     of the -- one of the, um, hurdles to that is these
8     would likely be workers you've never employed
9     before, so you don't get to test them out.  It's a
10    two-and-a-half to three-and-a-half to four or longer
11    year process.  Um, and at some -- towards the end of
12    the process there's an ability-to-pay requirement,
13    which, depending on the dairy market at the time and
14    how the dairy does their tax returns, they may not
15    be able to meet, because if you haven't employed the
16    worker before, it's very dependent on tax filings,
17    which with dairies that can be a struggle because
18    they have accelerated depreciation, so some dairies
19    just may not be able to use that program.  For --
20    technically -- it gets in the weeds, but yeah, it's
21    not an option for everyone.
22  Q  When you were contacted by Lori Nunes in the fall of
23    2018, was any part of -- were you asked any
24    questions about any of these visa programs?
25  A  I don't remember.

1        MR. BISS:  Object to the form.
2  Q  (By Ms. Hauser)  Um, and just going back to the --
3     the previous discussion about the permanent
4     option -- or permanent resident option, why would
5     the dairies have -- you suggested that the dairies
6     would have to hire new workers; is that right?
7  A  Correct.  If someone is here undocumented, um, then
8     you wouldn't -- they wouldn't be able to go through
9     this process in, I mean, 99 percent of cases because
10    you can't go from undocumented status to permanent
11    resident status in the U.S. through an employer
12    petition.  You would have to go outside the U.S. for
13    your interview.  And at that point if the individual
14    had been in the U.S. for more than a year under
15    unlawful status, they would have most likely a
16    ten-year inadmissibility bar to come back.
17  Q  And I think you said -- and so how does that -- have
18    you seen that program applied to dairies before?
19    Have you seen dairy --
20        MR. BISS:  Objection, inadmissible opinion.
21  A  Um, I've -- I've worked with dairies to petition
22    employees for green cards who were on TNs or H-1 Bs
23    previously and, um, to try to employ people as
24    milkers who have never worked for them but that
25    we've hit roadblocks typically in that situation,

1 largely on ability to pay problems or because the
2 worker has never been in the U.S. and, um, and, um,
3 the connection and inability to make sure that, you
4 know, interviewing them and making sure they'd be a
5 fit is -- is not there.
6 Q (By Ms. Hauser) So would it be fair in your
7 experience that not many dairies take, use this
8 opportunity?
9     MR. BISS: Objection, inadmissible opinion.
10 A I can't say to all dairies. We've had success
11 moving people from TNs and H-1 Bs to green cards.
12 Um, I can't say if other dairies have had success
13 using the green card program to bring in milkers.
14 Um, the ones that we've tried have not panned out
15 unfortunately.
16 Q (By Ms. Hauser) Do you have a general understanding
17 that agriculture in -- northwest Iowa has
18 undocumented workers, have undocumented workers in
19 the workforce generally?
20     MR. BISS: Objection, relevance, inadmissible
21 opinion.
22 A There is a percentage of undocumented workers in the
23 workforce in agriculture in northwest Iowa.
24 Q (By Ms. Hauser) Have you --
25     THE COURT REPORTER: I'm sorry.

1 Q (By Ms. Hauser) Is there any --
2     MR. HUFF: Hold on. She lost her microphone.
3     THE COURT REPORTER: Thank you.
4 Q (By Ms. Hauser) Do you have an understanding of what
5 that percentage may be?
6 A No.
7     MR. BISS: Objection, inadmissible opinion.
8 Q (By Ms. Hauser) Have you ever read any news or
9 studies suggesting what the percentage of
10 undocumented workers is in the agriculture?
11 A Not that I remember, a percentage or actual study,
12 no.
13 Q Are you aware that that subject does get studied
14 from time to time by -- by universities or -- or --
15 or the U.S. Government?
16 A I would imagine. I'm not involved in the studies
17 and I haven't seen them.
18 Q In your experience -- excuse me, does your
19 experience give you any basis to estimate what that
20 percentage might be?
21 A No. That would be impossible.
22 Q Do you have a general understanding that the
23 workforce in agriculture in northwest Iowa is
24 comprised primarily of foreign born workers?
25     MR. BISS: Objection, inadmissible opinion,

1 speculation.
2 A It depends on the sector.
3 Q (By Ms. Hauser) How about in dairy farms?
4     MR. BISS: Same objections.
5 A I -- I -- I couldn't speak to all to -- to dairy
6 farms. I mean, the ones that I've been on, there's
7 a lot of Latinos. I don't know where they were
8 born.
9 Q (By Ms. Hauser) Are you aware of any recent
10 legislative proposals to allow undocumented workers
11 in agriculture to obtain some kind of status to
12 allow them to remain and work in the U.S.?
13 A Yes. I haven't even looked into them that closely
14 because experience tells me not to get your hopes up
15 or plan anything or anything like that until the
16 President signs it.
17     THE COURT REPORTER: Until what?
18     THE DEPONENT: The President signs it.
19 A Um...
20 Q (By Ms. Hauser) And would it be fair to say that a
21 part of the problem in this area is that federal law
22 hasn't been updated in the last several decades to
23 provide a path for farms and dairies to get work
24 visas for their workers?
25     MR. BISS: Objection, speculation, inadmissible

1 opinion.
2 A Could you ask the question again?
3     MS. HAUSER: Can you read it back?
4 Q (By Ms. Hauser) If you still can't understand it,
5 I'll restate it.
6     (Testimony read back as follows: Q. "And
7 would it be fair to say that a part of the problem
8 in this area is that federal law hasn't been updated
9 in the last several decades to provide a path for
10 farms and dairies to get work visas for their
11 workers?")
12 A Well, you're asking my opinion here. I would like
13 to see some forms.
14 Q (By Ms. Hauser) And is that consistent with your you
15 don't want to get your hopes up comment earlier?
16 A Yes.
17 Q So if many of these workers cannot get valid visas
18 to work on farms and in the dairy industry, are they
19 simply allowed to work without proper documentation?
20     MR. BISS: Object to the form, speculation,
21 inadmissible opinion.
22 A It depends on the employer.
23 Q (By Ms. Hauser) Um, so in your experience, again,
24 without delving into your relationship, specific
25 client relationships, um, what is your understanding

1  of how workers fill out I-9s if they are

2  undocumented?

3      MR. BISS: Objection, speculation, inadmissible

4  opinion.

5 A  If they're undocumented? They may refuse to fill

6  out the I-9 or be unable to because they don't have

7  the correct documentation. If an employer would

8  call me with that question, I would say, "You can't

9  employ that person until they bring in the correct

10  documentation." They may provide fraudulent

11  documentation, either someone else's identification

12  or, um, like, um, fake documents that they purchased

13  to show the employer and use those to fill out the

14  I-9.

15 Q  In your experience advising employers, have you ever

16  been asked to review identification documents

17  provided by employees --

18      MR. BISS: Objection, inadmissible opinion.

19 A  I've never been asked to review the originals.

20 Q  (By Ms. Hauser) So you've reviewed copies?

21 A  Copies, photocopies. But I'll hedge this with: Um,

22  at that point -- how do I say this -- the -- the

23  employee has either been terminated, so the

24  document -- the photocopy is what it is, or they've

25  already gone through the I-9 process, and there's

1  limitations on what you can do at that point in

2  asking for originals and things because you can get

3  into discrimination area.

4      So generally what I do is rather than focusing

5  on the old documents provided, I advise them how to

6  use best practices going forward. But if there's

7  blatant obvious documents from the photocopies, it

8  depends on the audit, if they've asked me to review

9  them or not, but I may suggest that this one is not

10  correct, more likely than not it's -- it's, um, like

11  not the correct document, like it's not an A, B or C

12  document on an I-9 form, which I would say, "Follow

13  up with this. It's not the right type of document

14  that they provided to you."

15 Q  And assuming that the employee has not provided a

16  type A document, um, there needs to be both then a

17  type B or a type C document presented, correct?

18 A  Correct.

19      MR. BISS: Objection, speculation, inadmissible

20  opinion.

21 Q  (By Ms. Hauser) And that's right on the form I-9 and

22  its instructions, correct?

23 A  Correct.

24      MR. BISS: Same objections.

25 Q  (By Ms. Hauser) If you -- can you take a peek back

1  at Plaintiffs' Exhibit 1, which is the Esquire

2  article, and if you could turn at the page on the

3  bottom it says "Lizza," I think it says 00525. Um,

4  are you at that page?

5 A  Yes.

6 Q  Um, if you look at the first full paragraph, it

7  says, quote, "Eighty percent of the Latino

8  population out here in northwest Iowa is

9  undocumented."

10      Do you see that sentence?

11 A  Yes.

12 Q  Um, is that consistent with your experience in

13  practicing immigration law?

14      MR. BISS: Objection, inadmissible opinion.

15 A  To me that would be an overestimate and

16  exaggeration.

17 Q  (By Ms. Hauser) And if you go down a little, the end

18  of the next line, it said -- sorry, the third line

19  down, at the end it says -- sorry, the fourth line

20  down, "We have a very tight labor pool around here."

21  is that what you were referring to earlier when you

22  said, you know: We had low unemployment?

23 A  Yeah. We live in --

24      MR. BISS: Objection, inadmissible --

25  objection, inadmissible opinion.

1 A  We live in a rural area with a lot of industry, so

2  that would be for every employer in our area.

3 Q  (By Ms. Hauser) The previous page, 524, um, the very

4  bottom of the page says, quote: In every

5  conversation I had with dairy farmers and industry

6  insiders in northwest Iowa, it was taken as a fact

7  that the local dairies were wholly dependent on

8  undocumented labor. The low unemployment rate (it's

9  2 percent in this county), and et cetera, et cetera,

10  making hiring outside of the readily available pool of

11  immigrants from Mexican and Guatemala unthinkable.

12      Is that consistent with your experience in

13  northwest Iowa practicing immigration law?

14      MR. BISS: Objection, speculation, inadmissible

15  opinion.

16 A  I -- I think that's an exaggeration.

17 Q  (By Ms. Hauser) But you'll agree that at least some,

18  there is some percentage of undocumented workers

19  working on dairy farms in northwest Iowa?

20 A  There is some percentage.

21      MR. BISS: Objection, speculation, inadmissible

22  opinion.

23 Q  (By Ms. Hauser) Based on your experience?

24 A  Yes.

25 Q  Um, on Page 525 again, in the second full paragraph,

1    um, it says, quote, "The farmer explained that all
2    the dairies require their workers to provide
3    evidence of their legal status and pay the required
4    state and federal taxes. But it's an open secret
5    that the system is built on easily obtained
6    fraudulent documents."
7        Is that statement consistent with your
8    experience in northwest Iowa practicing immigration
9    law?
10  A    **I haven't had --**
11        MR. BISS: Objection, inadmissible opinion.
12  A    **I haven't had those exact conversations with dairy**
13    **farmers, so, um, I would say my experience is that**
14    **they do request documents. What -- the rest I would**
15    **not be able to say.**
16  Q    (By Ms. Hauser) And we talked earlier and you said
17    one way that undocumented workers may provide forms
18    to their employer is to provide fake documents; is
19    that fair to say?
20  A    **Yes.**
21        MR. BISS: Objection, inadmissible opinion.
22  Q    (By Ms. Hauser) And that's, again, based on your
23    experience in practicing immigration law in
24    northwest Iowa?
25        MR. BISS: Same objections.

1  A    **Yes.**
2        MS. HAUSER: Let's go off the record for five
3    minutes, ten minutes.
4        MR. BISS: No problem. Do you want to take
5    a -- do you want to take a break until, let's say,
6    10:45?
7        MS. HAUSER: That's fine with me, Steve.
8        MR. BISS: Okay.
9        MR. BOYER: That's fine.
10        MS. HAUSER: That's great. Thank you.
11        THE VIDEOGRAPHER: This ends Media Unit
12    No. 1 of the video recorded deposition of Amanda
13    Bahena, to be continued on Media Unit No. 2.
14        Going off the record at 10:34 Central Time.
15        (Recess taken.)
16        THE VIDEOGRAPHER: This begins Media Unit No. 2
17    in the video recorded Zoom deposition of Amanda
18    Bahena.
19        We are back on the record at 10:54 Central
20    Time.
21  Q    (By Ms. Hauser) Ms. Bahena, when did you first
22    communicate with anyone at NuStar Farms?
23  A    **I don't remember the exact date, but it would have**
24    **been after the article was published, because they**
25    **called me, Lori called me, I believe, to tell me**

1    about this article, and then I was able to find it
2    when she was telling me about it.
3  Q    And what did she say on that phone call?
4  A    **I don't remember, other than, um, I think who she**
5    **was and that -- I mean, what detail I don't know,**
6    **and, um, that she, not using exact words, but got my**
7    **name from another dairy family she knows who I'd**
8    **helped. Um, I had come and done, like reviewed**
9    **their paperwork or something. I don't know what**
10    **term she used.**
11  Q    Anything else you remember about the phone call?
12  A    **I remember Lori being upset and more so just how she**
13    **was portrayed in the article. And then I read the**
14    **article. Um, I don't remember more than that.**
15  Q    What did you say on the initial phone call?
16  A    **I don't remember. I don't remember if she'd asked**
17    **me at that time to come out to review her paperwork**
18    **or if she had asked if there was anything that I**
19    **could help her with to make sure she was doing**
20    **things right.**
21        **At some point -- there was a couple of calls, I**
22    **think. And at some point, either -- I offered to**
23    **come out and see if there was anything I could do to**
24    **put her at ease. She just seemed really anxious**
25    **about the whole article, um, and -- um, it just**

1    kind of developed over the phone from there.
2  Q    Do you recall how long that first phone call was?
3  A    **I don't recall. Not extremely long. It was not --**
4    **to my recollection, it wasn't a scheduled consult.**
5    **She called and happened to get to me, which**
6    **typically then it would be a shorter conversation**
7    **because I would have to make sure we didn't have**
8    **conflicts of interest or anything in representing**
9    **them before I could give them legal advice.**
10  Q    So I take it you did not dole out any legal advice
11    on that initial phone call?
12  A    **No, not to my -- no, I wouldn't have done that.**
13  Q    And you said there were a couple of phone calls.
14    When was the next phone call?
15  A    **I don't remember. It wasn't -- with the article and**
16    **everything and her being anxious, I feel the calls**
17    **were more her being upset of how she was portrayed**
18    **in the article, um, and I don't remember exactly how**
19    **it developed that I was there at their dairy later,**
20    **um, reviewing I-9 forms with them. The exact number**
21    **of calls or anything, I don't remember. The first**
22    **time -- I just know the first time I met her and**
23    **really started talking with her about things was**
24    **when we were physically at the dairy, and that was**
25    **only one time.**

1  Q   And do you have any understanding of why she called
2      you, an immigration lawyer, if she was just anxious
3      about how she was portrayed in the article?
4  A   She said, not in these exact words, but she's been
5      trying to do things right but wasn't -- just wanted
6      to make sure she wasn't messing things up. Not in
7      those words, but...
8  Q   That was the sum and substance of your conversation?
9  A   Yes, yes, that she was trying to do things right but
10     she wanted to make sure she wasn't getting into
11     trouble or messing any things up, anything up.
12 Q   And getting into trouble concerning documenting
13     workers?
14 A   I -- reviewing the article, just making sure that
15     she wasn't missing anything or doing things wrong as
16     opposed -- I mean, when -- in her role in helping at
17     the dairy.
18 Q   But concerning employment practices at the dairy?
19 A   Yeah. I mean, she said: This article says we're --
20     I mean, in not so many words, or maybe more: The
21     article says we're employing undocumented workers.
22     I'm trying to do things -- I've been trying to do
23     things right, but I want to make sure there's not
24     anything that I've missed or I'm doing wrong. And
25     she didn't want to cause problems for herself or

1      her -- her family.
2  Q   And she was speaking -- um, was she speaking
3      about -- you said she didn't want to do anything
4      wrong. Was it your understanding that she was
5      performing tasks required to comply with immigration
6      laws at the farm?
7  A   Over the phone I didn't ask all of the details. And
8      a lot of times I'll get those calls and people think
9      they're doing things right and you get to the site
10     and things are not being done right. I don't --
11     I -- I didn't get into details. I just -- at some
12     point I would have said, "Well, let's look through
13     the documents that you -- that you guys are doing."
14        Um, based on those conversations on the call, I
15     wasn't even sure who was preparing I-9s at the
16     dairy. Um, I essentially reserved that for when we
17     got there. And I said, you know, "Get your I-9s
18     ready so that it's efficient when I come, and we'll
19     just see what kind of state they're in when I get
20     there."
21 Q   When she said she didn't want to cause problems, the
22     article says we're employing -- and I appreciate you
23     were summarizing, but: The article says we're
24     employing undocumented workers. I don't want to
25     cause any problems, did you have an understanding of

1      what problems she was referring to?
2         MR. BISS: Object to the form.
3  A   Like I said, I don't know if she used those words.
4      That was the impression that I got, she was anxious,
5      um, because of the news story that was national
6      news. Um, she -- I think she wanted to make sure
7      that she wasn't missing anything or doing anything,
8      when she thought she was doing things right, that
9      she wasn't missing anything. So I -- I didn't ask
10     for specifics. I just -- I think they were really
11     short phone calls. I read the articles, and then we
12     arranged for me to come out there.
13 Q   (By Ms. Hauser) And by "missing anything," did you
14     have an understanding she meant missing anything in
15     terms of complying with immigration laws?
16 A   At that point I didn't know -- when I went out to
17     the dairy, I didn't know what situation I'd be
18     walking into, if they had an I-9 form for anyone or
19     almost no one. Um, I've been in situations where
20     it's a family-run business and no one is trained in
21     Human Resources, and, um, they don't know what an
22     I-9 form is. So in my experience it's best to just
23     say, "Prepare what you have and we'll -- we won't
24     hash it over right now. We'll get there and we'll
25     just see what kind of state everything is in."

1  Q   Did she express to you on either phone call that she
2      was concerned about government enforcement?
3  A   Not that I recall.
4  Q   Did she mention ICE on the phone call?
5  A   Not that I remember.
6  Q   And just to -- when you say not that you remember,
7      you don't remember one way or another or you don't
8      think it came up?
9  A   I don't remember one way or the other. It was -- it
10     was -- I'm sure it was in the back of my head, but I
11     don't want to say it's because she said. I don't
12     know if she said it. I -- in my head I said: Oh,
13     this story could alert, um, ICE, so -- but I don't
14     know if she was even aware of that or said that.
15 Q   Um, when you -- either from your phone calls or from
16     your visit, was Mrs. Nunes' concern about I-9s or
17     was she also referring to other things like W-2s or
18     wage and hour laws?
19 A   I --
20        MR. BISS: Object to the form.
21 A   I don't know. I only offered her the I-9s because I
22     don't review other types of documents.
23 Q   (By Ms. Hauser) So it's fair -- is it fair to say
24     that the nature of your engagement was an
25     immigration consult?

1 A    Yes. Even more narrowly, an I-9 review. She wanted
2      to look through her I-9s to make sure she was doing
3      things right. And I said, "Well, if we're going to
4      do this, you're under a microscope, why don't I come
5      and help you with that because you can make things
6      worse through a badly done internal I-9 review."
7 Q    Is there such a thing as an internal I-9 review?
8 A    Oh, yes. Many companies do them without the
9      assistance of a lawyer.
10 Q   And so that's what you meant by internal?
11 A   Yes, that she -- basically someone in the company,
12     an employee of the company, looks through, like any
13     documentation, and says:  Do we have one for
14     everyone? Are these filled out correctly? But as
15     she wasn't HR trained, I had concerns that she may
16     have created more problems in doing an I-9 review
17     incorrectly, and I offered to come and help her with
18     that.
19 Q   Did you send an engagement letter to the farm?
20 A   Not that I recall.
21 Q   Is it part of your practice to send an engagement
22     letter to your clients?
23 A   We generally do, but unfortunately I am not very
24     good about remembering to send engagement letters,
25     so I try to, but it does not always happen.

1 Q    And your firm got a subpoena for documents at some
2      point?
3 A    Yes.
4 Q    Related to the plaintiffs?
5 A    Yes.
6 Q    And did you look for responsive documents?
7 A    Yes.
8 Q    And did you not find an engagement letter?
9 A    I -- if it wasn't provided, I didn't find an
10     engagement letter. I sent everything. I remember
11     there weren't very many documents.
12 Q   And when you said you sent everything, did you send
13     everything to Mr. Biss?
14 A   Well, my partner, Sander Morehead, was helping, um,
15     gathering some of those. I don't think I was the
16     one to send them. But we have everything in
17     physical or electronic files under that person. So,
18     um, they would have gone into the file for -- I
19     guess I don't know exactly how they gathered all of
20     the documents, but they asked me if I thought there
21     was anything else. And, no, I -- they showed me
22     what they were going to send. But that's been
23     awhile.
24 Q   Did you -- do you recall taking any notes of your
25     telephone calls with Mrs. Nunes?

1 A    I may have hand written some notes, like contact
2      information, but I did not keep them, just chicken
3      scratch.
4 Q    Did you make any handwritten notes when you visited
5      the farm?
6 A    I don't remember. I may have and then changed it
7      into the letter that I sent out. Um, but anything
8      in the notes I would have put in the letter I sent
9      out. And I -- I don't -- I couldn't find any notes
10     that I had retained.
11 Q   If you look back at what we marked as Exhibit 120,
12     which is an e-mail from Mrs. Nunes --
13 A   Uh-huh.
14 Q   -- um, do you know -- did you have any conversations
15     with Mrs. Nunes about this article, which is a
16     different article?
17 A   Yeah, I don't believe so, because I think at this
18     point I figured it was just kind of back and forth
19     between media people.
20 Q   In response to the documents subpoena, what
21     specifically do you remember gathering and giving to
22     your partner?
23 A   They ran with it. I think they said, "Is there
24     anything else that there would be out there?" So I
25     think I looked for "Nunes" in my -- in my e-mail

1      chain. Um, so there was this e-mail, the letter I
2      sent to them after the audit. And I don't remember
3      anything else.
4 Q    Did your firm retain or make any copies of forms
5      I-9?
6 A    No. Everything is -- all the documents stayed on
7      site and I didn't copy anything. On site being at
8      the Nunes dairy.
9 Q    Is that consistent with your practice?
10 A   Yes. My practice, I don't make copies of I-9s. I'm
11     not actually doing I-9 audits anymore because I
12     wasn't asked to do that many in the start because we
13     only have so many local businesses. Um, so it was
14     picking up at that point. But yeah, I've never
15     made -- well, maybe one time someone brought me
16     their I-9s and I said, "No, I'd rather do them at
17     your place." But they brought them to me anyway.
18     And I may have scanned them and given them back
19     because I said, "I don't want your original I-9s
20     here." But in all other occasions I'd go to them.
21 Q   And picking up on something you said, you said it
22     was picking up at that point. What -- what did you
23     mean by that?
24 A   We had, um, a dairy in our area, or two, had been
25     audited on their I-9s. And I couldn't tell you the

1    dates. I was then contacted by a dairy association
2    representative, or maybe -- do you know what, I
3    think it was just a nutritionist that went to all of
4    these dairies to say: People are really concerned.
5    This was, um, new for them, this -- this type of
6    enforcement. And they hadn't been trained in I-9s,
7    um, so could I do kind of an emergency meeting. To
8    my knowledge this may have even -- I don't know how
9    long Nunes has been in the area, but this was awhile
10    ago.

11        Um, and so I gave a training on, just basics of
12    I-9s at that meeting, um, to some dairy families.
13    And after that, some asked me to come on site and
14    help them with their internal I-9 audits. So that's
15    kind of how that practice for me developed. So I
16    would say -- does that answer your question?

17  Q    Yes. And if we can pinpoint the point in time, do
18    you know if this was before or after the change in
19    presidential administration in 2016?

20  A    Before, I think. I think before.

21  Q    And did it relate to a very public case regarding a
22    farmer named Mr. Millenkamp?

23  A    No.

24  Q    Or after that?

25  A    It was -- I'm not familiar -- yeah, no, it was not

---

1    Mr. Millenkamp. I don't know if it was before or
2    after because I'm not really familiar with that one.

3  Q    I think that may have been in eastern Iowa, which --

4  A    Uh-huh.

5  Q    -- is probably outside of your practice, geography
6    anyway.

7  A    I think I'm placing that case. I think this was
8    slightly before or around the same time.

9  Q    Um, had you ever, prior to being contacted by
10    Mrs. Nunes, conducted an I-9 audit in the context of
11    any media reporting?

12  A    No.

13  Q    Um, do you know about how soon after visiting or
14    hearing -- talking to Mrs. Nunes and receiving the
15    e-mail that's Exhibit 120 that you visited the farm?

16  A    I don't remember. Did -- did you get -- I did mean
17    to ask: Did you get our invoice, the bill that we
18    sent for them? The date of the visit would be on
19    that. It was part of the document production.

20  Q    I don't have that invoice.

21        MR. BOYER: Maybe we can see if we --

22  Q    (By Ms. Hauser) We can talk about it at a break.

23  A    Yeah. If you have that, it's -- if not, we can get
24    that to you. But that would be one other document,
25    like the invoice that we sent for them for --

---

1        MR. HUFF: Could I go off the record for a
2    second and just say to everybody: I understood from
3    Sander that that had been provided, but I don't
4    know, I haven't seen --

5        THE COURT REPORTER: Excuse me. Are we off the
6    record?

7        MR. HUFF: I -- I just was trying --

8        THE COURT REPORTER: You said "off the record."
9    If we're going off the record --

10        MR. HUFF: I can keep it off.

11        THE COURT REPORTER: -- the videographer --

12        MR. HUFF: Do you want to go off the record for
13    a moment?

14        MS. HAUSER: Let's go off the record for a
15    moment, sure.

16        MR. HUFF: Okay.

17        THE VIDEOGRAPHER: Okay, no problem.

18        Going -- going off the record at 11:15.

19        (Discussion off the record.)

20        THE VIDEOGRAPHER: And we're back on the record
21    at 11:16 a.m. Central Time.

22  Q    (By Ms. Hauser) I'm going to hand the court reporter
23    an exhibit that we're going to mark as Exhibit 121.
24    It bears the Bates stamp PX 4137 to 4138.

25        MR. BISS: Kristen, could you just identify it?

---

1    What is it?

2        MS. HAUSER: Oh, it's the October 12th letter
3    from Woods Fuller to NuStar Farms. Nate should have
4    sent it to you or he is now.

5        MR. BOYER: No, I did.

6        (Exhibit 121 marked for identification.)

7  Q    (By Ms. Hauser) Ms. Bahena, would you take a look at
8    what's been marked as Exhibit --

9        MR. BISS: Just -- just hold on one -- one
10    second. I'm just trying to make sure I've got the
11    right document here. You said 4137 to 4138?

12        MS. HAUSER: Correct.

13        MR. BISS: Okay. All right, I've got it now.
14    Thank you.

15        MS. HAUSER: Thanks.

16  Q    (By Ms. Hauser) Ms. Bahena, would you take a look at
17    Exhibit 121?

18  A    Yes.

19  Q    Do you have that in front of you?

20  A    Yes.

21  Q    The date on this letter, is this the follow-up
22    letter you sent to Lori Nunes?

23  A    Yes.

24  Q    The date on this letter is October 12th, 2018. Do
25    you see that?

1   A   Yes.

2   Q   Is it fair to conclude from this document and

3       Exhibit 120 that you visited the farm sometime

4       between October 2, 2018 and October 12th, 2018?

5   A   Yes.  When was the article published?

6   Q   The article was September 30th and then your e-mail

7       from Lori is October 2nd.

8   A   Yeah, that's fair to say.

9   Q   Um, and I think earlier you said you only went to

10      the farm one time; is that correct?

11  A   Right.

12  Q   Did anyone accompany you to the farm?

13  A   Yes.

14  Q   Who accompanied you?

15  A   My associate at the time, Julie Allen.  She no

16      longer works here.

17  Q   Did anyone else go with you?

18  A   No.

19  Q   Um, what was the purpose of your visit?

20  A   I asked Lori to organize her I-9 forms into current

21      and former employees and prepare a list of current

22      employees and a list, I think, of former employees,

23      and I would sit down with her and go through them

24      and discuss best practices for I-9 preparation.

25  Q   Anything else?

1   A   No, not that I remember.

2   Q   And is this the purpose that you communicated to

3       Mrs. Nunes or that Mrs. Nunes communicated to you?

4   A   I don't remember.

5   Q   Did Mrs. Nunes express to you any concern about a

6       possible ICE audit as a result of the news article?

7   A   I don't remember.

8   Q   Did Mrs. Nunes express to you that NuStar Farms was

9       considering filing a lawsuit over the Esquire

10      article?

11  A   I don't think she had expressed that because I

12      probably would have stayed out of it if I had known.

13  Q   Um, did you ask Mrs. Nunes to organize any

14      supporting documentation that was part of the

15      employees' files?

16  A   Not that I recall.  I would have -- I would have

17      wanted to see I-9s as they were at that point

18      without her trying to modify or change anything

19      because that can cause problems, so I would have

20      just said, "Organize -- get the list of employees

21      and organize the I-9s that you have based on that

22      list into current and former employees."

23  Q   And did she provide you with a list of employees?

24  A   When I arrived, yes.

25  Q   Was that a handwritten list or a typed-up list?

1   A   I don't remember.  I think it was typed.  I don't

2       remember.

3   Q   And do you recall approximately how many -- was it a

4       list on paper or digitally?

5   A   Everything was on paper.

6   Q   And did she, um -- you didn't take a copy of the

7       list with you?

8   A   I did not.

9   Q   Um, and was there one list of current employees and

10      one list of former employees, or was it just one

11      list?

12  A   I don't remember.  And I -- I assume there was a

13      list because there must have been a list because I

14      always ask for a list, but I don't --

15          MR. BISS:  Objection, move to strike.

16      Speculation.

17      Yeah, I can't say with certainty about the list of

18      employees if she -- I don't want to put something in

19      my memory that may not have happened, so --

20  Q   (By Ms. Hauser)  Did she provide you with a list, a

21      printout from QuickBooks or something?

22  A   I don't remember.

23  Q   How long was the list?

24  A   I don't -- I don't remember the list itself.  I just

25      know we would have checked to make sure each person

1       on the list had an I-9.

2   Q   Okay.  And do you recall what info, information

3       about the employees were on the list?

4   A   I don't remember.  What I request, and I don't

5       remember if this was done exactly, is, um, a list of

6       employees with their start dates, and if they're

7       terminated, their termination dates, because that

8       helps us determine, um, um, like how long I-9s need

9       to be retained.  But I don't know if that's how the

10      list was prepared.  I don't remember.

11  Q   Do you -- looking back at Exhibit 121, do you recall

12      if there were any attachments to the letter or was

13      it just the letter as is?

14  A   Just the letter as is.  If there was attachments, I

15      would have put "ATTE".  I always do.

16  Q   How long -- when you visited the farm, how long did

17      you stay?

18  A   I don't remember exactly.  I should have looked at

19      that invoice.  I -- I think maybe two hours, two to

20      three.  It was shorter than I expected to need to be

21      there.

22  Q   And when you arrived, had Mrs. Nunes prepared the

23      current and former employee I-9s for you to look at?

24  A   Yes.  We met in the office that I think is connected

25      to the parlor.  Mrs. Nunes and I sat at a desk and

1  she had them in piles in front of us. And Julie
2  Allen sat there, too.
3  Q  What did you discuss first with Mrs. Nunes when you
4     arrived?
5  A  We first just talked a little bit about the article
6     and what she does at the dairy. Um, I got the
7     impression she just needed to talk a little bit
8     about the article to start. And, um, I wanted to
9     know how involved she was on the dairy, um, and just
10    kind of to put her at ease. I think I was curious.
11 Q  What did she tell you?
12 A  Um, she was embarrassed about the article, how she
13    was portrayed like physically, um, that she -- she
14    expressed that she enjoys life on a dairy but it's
15    not easy. Um, I remember she said she helps with
16    the calving and a lot of the dairy chores, which,
17    um, I appreciated. And outside of that, I don't
18    remember more of like the initial conversation. We
19    kind of talked about that through the whole audit.
20 Q  Um, were the -- about how many I-9s were in the --
21    were there two piles?
22 A  I don't remember.
23 Q  About how many I-9s do you recall looking at?
24 A  I don't remember. I mean, I can say -- I can't
25    speak to how many for terminated employees, but to

1  my recollection there was an I-9 for every, or
2  nearly every employee. I think every.
3  Q  And when you say there was an I-9 for every
4     employee, you mean physically there was a piece of
5     paper for each employee?
6  A  Correct.
7  Q  And that corresponded to the list she provided?
8  A  Yes, yes.
9  Q  Um, did you offer to do anything for NuStar that
10    NuStar rejected?
11 A  Not that I remember.
12       MR. BISS: Object to the form.
13 Q  (By Ms. Hauser) Were there any other pieces of paper
14    other than the Form I-9s that you looked at?
15 A  I'm trying to remember if there were copies of ID
16    documents, but I can't say with certainty. It's
17    been awhile.
18 Q  What happened after your initial conversation with
19    Mrs. Nunes when you visited the farm?
20 A  She sat next to me, and I have sticky notes and like
21    flags. And first we talked about general I-9
22    regulations, storage of, you know, retention
23    periods, making sure the right person is filling it
24    out, um, you know, if an interpreter is helping, how
25    to deal with that, and just learning more about

1  their I-9 practice, um, putting in safeties to make
2  sure I-9s get fully completed, even though it's busy
3  on the dairy, and suggesting there be a dedicated
4  person to I-9s, because if different people are
5  filling them out, it's just more likely that someone
6  will not fill it out correctly.
7       Then we started going through the I-9s
8  themselves, one by one. And I just take a pen and,
9  without the point and touch each spot in the I-9.
10 And if it looks like there's something that could be
11 corrected, we'll mark that, either with a flag or a
12 sticky note.
13      If it can't be corrected, some things can't,
14 um, it is what it is, so we just say, "Look, this --
15 this was an issue. And going forward, make sure,
16 you know, you have safeties in place that it's not a
17 recurring issue."
18      And then I talk about how to make the
19 corrections. Um, some things she's able to correct
20 while we go through them, if it's a missing,
21 something on page 2 or an address of the employer,
22 things that the employer can correct. And then
23 we -- I say, "Make sure you indicate what the
24 correction is so it doesn't look like you are
25 backdating things or, you know -- yeah, committing

1  some sort of fraud or something." So, you know, you
2  want to initial what you corrected, put an arrow to
3  it or circle it or something and make your initial
4  and say it's part of a, the date and -- the date
5  that you made the correction and that it's part of
6  an internal audit, which is the main reason, I mean,
7  one of the main reasons I wanted to be there to show
8  her how to make those corrections so she wasn't
9  trying to correct things on her own, um, and not
10 dating and initialing those corrections.
11 Q  Did you indicate to her to use a different color ink
12    in making any corrections?
13 A  I can't remember. I normally do say that, but if
14    we're there and there's corrections that she can
15    make under my guidance, then we will use the pen
16    that's there, as long as it's clear what you
17    corrected and what you didn't is the importance.
18 Q  Um, if you look at Exhibit 121, the third
19    paragraph --
20 A  Uh-huh.
21 Q  -- down, I note in your letter it says, "As a
22    reminder, for any corrections you make, use a
23    different color pen and write 'per internal audit,'
24    and date and initial the notation."
25      Does that summarize the advice you gave when

1      you were at the farm?

2  A    Yes. I would have said, "Make it as clear as you

3      can." I mean, I don't know if I used those exact

4      words, but, "Make it as clear as you can. Date and

5      show what you corrected so it doesn't look later, if

6      someone is looking through them, that you changed

7      this whole I-9 or, you know, things like that."

8      So -- so if I said to use a different color pen at

9      that time, I don't remember, but, um, yeah, my

10     letter says that.

11  Q    So you said you spoke with her about general I-9

12      regulations. What do you recall speaking to her

13      about that?

14  A    Um, the days that you have to -- the date limits

15      that you have to complete the I-9. Um, the first

16      page of the I-9 the employee completes on or before

17      the first day and then page 2 by day three the

18      employer completes. Um --

19          THE COURT REPORTER: What was that? And then

20      what?

21          THE DEPONENT: By -- by day three the employer

22      needs to complete page 2.

23  A    Um, making sure that every box is completed. It's a

24      surprisingly, um, easy form to miss things. We see

25      that all the time. There's just a lot of boxes

1      and -- um, crammed into two pages, so making --

2      going down and taking the time to make sure

3      everything is done. Um, explaining how fines work.

4      Um, a lot of employers miss the same box by accident

5      over and over and fines get higher based on the

6      percentage of I-9s that have errors, so making sure

7      you're not making recurring errors. And, um,

8      retention, appropriate documents for List A and then

9      List B and C.

10      And a lot of it we talked through as we went

11     through the forms. Because the forms were there, so

12     I could say, you know, um, "Make sure this document

13     is written in this way" or just generally -- and

14     then if she had questions, I'd answer them as best

15     as I could. But I don't remember exactly the

16     questions. So it was very conversational.

17  Q    What did you discuss about storage?

18  A    Um, I recommended they stick with paper storage just

19     because they're busy on a dairy and there's a lot of

20     requirements with electronic storage. And that's

21     what they'd been doing at the time anyways is paper.

22     Um, we -- I showed them how to calculate how

23     long an I-9 needs to be retained, as long as the

24     person is working, and then if they're terminated or

25     quit, there's a calculation on, as to how long you

1      retain that I-9, which I ran through with them.

2  Q    And what are those limits?

3  A    It is a year after the employment is terminated or

4      three years after the start date, whichever occurs

5      last.

6  Q    And that's for former employees?

7  A    Yes. You retain them as long as someone is employed

8      with you, and then you can destroy them after those

9      dates once they're terminated.

10  Q    Um, you mentioned that you talked with her about the

11      right person filling out the forms. What does

12      that -- what did that refer to?

13  A    I think, if I remember correctly, when we were

14      reviewing them, there were different -- I mean,

15      various people -- various people had completed the

16      employer portion. And I said, "Best practice would

17      be a point person does the I-9s so that that person

18      can get more familiar with the practice." And it

19      seemed that point person was going to be Lori rather

20      than several people dabbling in completing I-9s just

21      to get it done.

22  Q    Um, did you communicate to her that the person,

23      right person to fill out the form is the person who

24      looks at whatever identification documents the

25      employee presents?

1  A    Yes. Because I think it was, if I remember

2      correctly, it was a bit of a group effort at that

3      time, um, so whoever looked at the physical actual

4      documents I told, said should be the one to sign

5      them. Because I think there was some copying of

6      physical documents and then someone would get a copy

7      because they weren't available at the time, to, you

8      know, for the employer side portion, and then sign

9      based on photocopies. I do remember having

10     conversations about that maybe one person was

11     looking at the actual physical documents and taking

12     photocopies and then another person, I don't know

13     how widespread that was, but was completing the

14     employer portion of the I-9. If I remember

15     correctly, they thought at some point that it had to

16     be like an owner or something of the dairy doing it.

17     And I said, "You can appoint an agent to just do the

18     whole thing for you so that there's no gaps."

19  Q    And do you recall whether you learned that Anthony

20      Nunes the third was one of the people who had been

21      filling out the forms?

22  A    I remember --

23          MR. BISS: Objection, form.

24  A    I don't remember --

25          THE DEPONENT: Sorry.

```
1          THE COURT REPORTER:  I didn't get the
2     objection.
3          THE DEPONENT:  Could you repeat the objection?
4          MR. BISS:  Object to the form.
5   A   I don't remember if it was Anthony Nunes, Junior or
6       Anthony Nunes the Third, but I remember seeing an
7       Anthony Nunes on some of the forms.  And I think
8       that's how that conversation came up that Lori
9       can -- Lori can sign them herself if she is the one
10      looking at the actual physical documents and that
11      will make things easier and cleaner.
12  Q   (By Ms. Hauser)  Um, you said you learned more about
13      their practices?  What did you learn about their
14      practices?
15  A   I think it was -- um, based on what I saw, they were
16      getting the first page completed.  And then the
17      second page was getting completed, but I wasn't sure
18      if the person actually looking at the physical
19      document was the person signing the forms or if it
20      was based on photocopies.  I remember that being one
21      of the key takeaways to say Lori can fill out these
22      I-9s herself.  She doesn't have to, like, run
23      somebody down to do that, um, and that maybe she
24      just wants to be the person going forward so she's
25      not trying to track someone down on the dairy who's
```

```
1       not available to get it done.
2   Q   So was it communicated to you that Lori is the one
3       who physically looks at original documents?
4   A   I don't remember the extent.  I remember that being
5       a conversation, though, to say, "Lori, you can just
6       fill them out yourself.  You don't need to run
7       someone down to do it.  But that just needs to be
8       your -- you need to decide on a practice, like who
9       is the person going to be."
10  Q   And did she communicate to you what the practice was
11      before?
12  A   I don't remember exactly.  But I -- I do remember
13      having that conversation that -- I mean, I think she
14      was saying, "Well, sometimes it's hard to find them
15      to sign," or something like that.  Like, it was not
16      the cleanest most efficient way to get these I-9s
17      filled out, and, um, that's why I just said, "Hey,
18      Lori, if you're the one learning about this and
19      doing this, you can be the point person," I just
20      remember talking about that, "if that's what you
21      guys decide to do."
22  Q   Um, did she communicate to you that their practice
23      was for Anthony Nunes the Third to inspect forms,
24      I- -- excuse me, inspect identification documents,
25      um, and make the photocopy and then give that to
```

```
1       Lori?
2          MR. BISS:  Asked and answered.  She said she
3       didn't remember.
4   A   Yeah, I don't remember.  I don't remember.
5   Q   (By Ms. Hauser)  Was there anything else you learned
6       about their practices?
7   A   Not that I remember.
8   Q   Did you learn that NuStar Farms did not fill out
9       parts of Section 2 on Form I-9 as part of --
10         MR. BISS:  Asked and answered.  Said she didn't
11      remember.
12  A   If there were any that I reviewed that weren't
13      filled out, I would have put a note on to follow up
14      and get them completed.
15  Q   (By Ms. Hauser)  Are there any sections on Form I-9
16      that don't need to be filled out?
17  A   Yes.
18  Q   What sections?
19  A   Um, I should have an I-9 in front of me.  For
20      example, on page 1 -- and it depends on the version.
21      That's the other issue, they're always changing the
22      layout.
23         I mean, one that comes to mind is if a
24      translator or interpreter wasn't used, you don't
25      fill out the translator interpreter section.  And
```

```
1       then you only have to do either a List A or a List B
2       and C.  But it would be, I think looking at the
3       form, clear which ones aren't always required.
4       There's a reverification section that only gets
5       filled out if you reverify the person, so ...
6   Q   And did you advise anyone at NuStar Farms to fill
7       out the reverification section as part of the
8       corrections?
9   A   I don't remember if it was part of the corrections.
10      But if someone had had an I-9 filled out with a,
11      what was then, like, upon audit review an expired
12      work permit, I would have flagged that to go and get
13      a new work permit for the person to reverify them.
14      Um, and then we would have talked about the
15      reverification section saying -- because I always
16      warn people, "You don't reverify green cards, but
17      work permits you reverify."  And that's important
18      that they know the difference because if you ask to
19      reverify a green card, you can actually land into
20      discrimination issues, so ...
21  Q   And so just to complete that, a work permit is a
22      photo identification card that's not a green card;
23      is that fair, in general?
24  A   No.  A work permit is an employment authorization
25      document issued by the USCIS.
```

1  Q   And so which ones would be expired versus a green
2      card?
3  A   An employment authorization document is typically
4      valid from one to three years, sometimes four. And
5      those need -- those are temporary work
6      authorizations. So when they expire, the employer
7      needs to request a new unexpired either work permit
8      or other type of authorization document to continue
9      to lawfully employ that individual.
10 Q   Did you see any such photocopies of those documents
11     when you visited NuStar Farms?
12 A   I don't remember.
13 Q   Um, we've handed you what's previously been marked
14     as Defendants' Exhibit 89, which is a blank I-9
15     form.
16         Do you see that --
17 A   Yes.
18 Q   -- form? Taking a look at section 1, is section 1
19     the portion of the form that should be filled out by
20     the employee?
21 A   Yes, section --
22         MR. BISS: Objection, in- -- I'm sorry, I
23     interrupted. I'm sorry.
24         THE DEPONENT: You can do your objection now.
25     Go forward.

1          MR. BISS: Objection, inadmissible opinion.
2  A   Yeah, section 1 through signature of employee gets
3      filled out, the applicable portions.
4  Q   (By Ms. Hauser) Right. And what -- um, is there --
5      are there any blanks or boxes in section 1 that do
6      not need to be filled in?
7          MR. BISS: Same objection.
8  A   Um, e-mail address, in some cases telephone number,
9      other last names used, if any, um, and then you
10     select boxes 1 through 4 and you only fill out the,
11     below that and you only fill out the applicable
12     information for that box. And then you sign -- then
13     the employee signs and dates.
14 Q   (By Ms. Hauser) And section -- may the employer fill
15     out any portions of section 1?
16 A   No.
17         MR. BISS: Objection, inadmissible opinion.
18 A   No.
19 Q   (By Ms. Hauser) Did you advise --
20 A   Oh, wait. Unless they fill out the preparer. If
21     they're helping as the preparer, they can fill it
22     out.
23 Q   Oh, yes. May the employer fill in, for example, the
24     date of birth in section 1?
25         MR. BISS: Objection, inadmissible opinion.

1  A   I don't believe so.
2  Q   (By Ms. Hauser) Did you advise anyone at NuStar
3      Farms that they should correct the date of birth
4      section if it was blank?
5  A   I would have said: Go ask the employee to fill out
6      the date of birth, initial and date that correction.
7  Q   You didn't advise Mrs. Nunes to fill that out and
8      initial it herself?
9  A   No.
10 Q   And I believe what you were alluding to before is
11     there's a section in section 1 called "Preparer
12     and/or Translator Certification." That section does
13     not need to be filled out if no preparer or
14     translator assisted; is that correct?
15 A   Correct.
16 Q   If you turn the page to section, page 2 of 3,
17     there's a section called "Employer or Authorized
18     Representative Review and Verification" as part of
19     section 2. Are there any boxes in section 2 that do
20     not need to be filled out?
21         MR. BISS: Objection, inadmissible opinion.
22 A   I mean, if it's a List A document you don't fill out
23     B and C. If it's a B and C document, you don't fill
24     out List A. But everything else gets filled out,
25     um, through section 2.

1  Q   (By Ms. Hauser) And did you advise anyone at NuStar
2      Farms that they did not need to fill out the List B
3      or List C section and instead they could maintain
4      photocopies of identification cards?
5  A   So I don't remember if I said this or not, but if
6      that question came up, like if List B and C is not
7      filled out, in my experience if there's an ICE audit
8      and there's a photocopy attached, then they will
9      allow you -- like, they won't count it as what we
10     call a substantive error. They will say that
11     corrects the lack of completion of B and C. It's
12     not ideal practice. Ideal practice is to have B and
13     C completed. But if there's a photocopy attached to
14     the I-9, then in my experience they will not count
15     that as a substantive error and they will allow that
16     to be corrected and you will not be fined on that.
17     But you still need to fill out the rest of the
18     attestation. But that's not -- like I said, I
19     wouldn't advise to do that practice, but a blank B
20     and C with a photocopy attached of the documents is
21     better than a blank B and C with no photocopy
22     attached.
23 Q   And did you advise NuStar that going forward they
24     should continue to retain photocopies and not fill
25     in section 2?

1 A No. And if that's what they were doing, I'm afraid
2 they misunderstood me if that's what they think I
3 said. I have not talked to them since the audit.
4 Um, I would have said: If you keep photocopies, you
5 have to do it for all of your employees and be
6 consistent. You don't have to complete -- keep
7 photocopies.
8 And, yeah, like, in my experience, if B and C
9 isn't completed and there's an audit, photocopies
10 can help you reduce your fines that way, but I
11 wouldn't have advised them to leave B and C blank on
12 the form.
13 Q Was filling in the A, B or C section something you
14 advised NuStar Farms to correct after your visit?
15 A Can you rephrase that?
16 Q Sure. If you encountered blanks in section 2 in the
17 A, B or C document section, did you advise NuStar to
18 make corrections in that section?
19 A Yes, but that gets complicated because the person
20 who inspected the document should then, in my mind,
21 make that correction ideally. So I would have said:
22 Ideally the person who inspected the document make
23 that correction, initial and date it. Um, but
24 another person could use the copy, fill in List B
25 and C, initial and date it. That may have come up.

1 And because of -- it sounded like in some I-9s one
2 person inspected the document, photocopied and then
3 another person filled out the verification at the
4 end, so that was -- I don't recall the exact
5 conversation, but it -- it was a little more nuance
6 in that situation if someone, if one person had
7 inspected a physical document and then another
8 person filled out the attestation.
9 Q Do you recall approximately how many I-9s you looked
10 at?
11 A I don't remember.
12 Q Was it more than 50?
13 MR. BISS: Objection, asked and answered. Said
14 she didn't remember.
15 MS. HAUSER: Steve, you know I'm allowed to try
16 to refresh the witness's recollection.
17 MR. BISS: No, you're not.
18 MS. HAUSER: And asked and answered isn't a
19 proper --
20 MR. BISS: She said she doesn't have a
21 recollection.
22 MS. HAUSER: -- objection.
23 MR. BISS: She doesn't have a recollection.
24 She said, "I don't remember," and you're just trying
25 to suggest an answer. That's all you're doing.

1 MS. HAUSER: No, not at all.
2 MR. BISS: That's what you're doing, you're
3 trying to suggest an answer and get her to bite on
4 one number. You go one, two, three, for all day, up
5 to infinity.
6 MS. HAUSER: When it's your turn to ask her
7 questions, you can ask her if you want to know one,
8 two, three, four, five, six. That's not what I'm
9 asking.
10 MR. BISS: I'm satisfied -- when someone tells
11 me, "I don't remember," I'm satisfied that she
12 doesn't remember. So I wouldn't do what you're
13 doing. But, you know...
14 MS. HAUSER: Thanks for the advice.
15 MR. BISS: You're welcome.
16 A If -- if we're current employees, I would say -- I
17 mean, it's a very rough estimate, but I would say
18 somewhere between like, oh, my goodness, 40 to 60
19 current.
20 Terminated employees, I do not remember. It
21 would -- we would have slowly dredged through them
22 over the course of two to three hours. And it took
23 some time.
24 Q (By Ms. Hauser) Um, did you advise NuStar that they
25 are not allowed to ask any questions whatsoever

1 about identification documents presented by the
2 employee?
3 A No, but I did -- I would have told them -- I did not
4 advise them that, but I would have told them:
5 You're anxious. Be cautious. And don't be
6 discriminatory. If a document looks correct on its
7 face, you may accept that document. If there's a
8 reason to believe, a valid reason, something looks
9 very wrong in this document, um, then -- then you
10 should -- you can ask further. And -- and if it
11 looks like a fake document, then you have a duty to
12 look into that. But if a document looks good on its
13 face, um, you can accept that document without
14 further inquiry, unless you have reason to believe
15 that the worker is presenting you with a false
16 document.
17 Q Um, did you --
18 A Sorry, and I would say -- and I warn them that
19 reason can't be because they have an accent or, you
20 know, the color of their skin. You have to be
21 careful.
22 Q Um, did you advise them that they could accept an
23 identification document that had a name on it that
24 was different from the name the employee entered on
25 Form I-9?

```
1   A    A completely different name or a misspelling?
2   Q    I'll give you an example.
3             MR. BOYER:  What are we up to?
4             MS. HAUSER:  122.  Can I have one for the court
5        reporter?
6             MR. BOYER:  Sure.
7             MR. HUFF:  Thanks.
8             MS. HAUSER:  Will you mark this?
9             The court reporter is going to mark
10       Exhibit 122, which is a document bearing the Bates
11       numbers PX 3164 through 3167.
12            MR. BISS:  Kristen, do I have that document?
13            MR. BISS:  Nate is sending you it right now.
14       Sorry, I skipped around in my outline.
15            MR. BISS:  No worries.  No worries.
16            MR. HUFF:  Exhibit 122.
17  Q    (By Ms. Hauser)  Ms. Bahena, have --
18            THE COURT REPORTER:  Excuse me.
19            MS. HAUSER:  Oh, sorry, you're not done.  Nope,
20       no worries.
21            (Exhibit 122 marked for identification.)
22  Q    (By Ms. Hauser)  Ms. Bahena, the court reporter has
23       handed you exhibit, Defendants' Exhibit 122.  I'll
24       refer you to section 1.  Do you see that the
25       employee has entered the name ███████████
```

```
1        ████████    Do you see that?
2   A    Yes.
3   Q    And if you flip to page 3166, do you note that the
4        name on both the Minnesota identification card and
5        the Social Security card is ███████████████████████.
6        █████████
7   A    I do see that.
8   Q    And do you see that on page 3165 NuStar Farms made
9        some corrections to this Form I-9 in section 2?
10  A    Yes.
11  Q    And that the name that Mrs. Nunes added at the top
12       of section 2 matches the name on the front of the
13       I-9?
14  A    Yes.
15  Q    Is this an identification or a Form I-9 with
16       supporting identification that you recall reviewing
17       at the time of your audit?
18  A    I don't recall reviewing this specific one or any of
19       the names, but given the date, I would assume it
20       would have been in the pile of reviewed documents
21       that we would have noted for correction.
22  Q    And do you recall whether you or your associate
23       noticed that the names didn't match?
24  A    I don't recall if we noticed that the names didn't
25       match.  I may have missed the mismatch.
```

```
1   Q    Um, looking at it today, um, would an employer be
2        obligated to ask an employee a question about these
3        identification forms if they don't match the name
4        the employee himself entered in section 1?
5   A    I would say --
6             MR. BISS:  Objection, speculation, inadmissible
7        opinion.
8   A    If they noticed the mismatch of the name, it would
9        raise questions that I would advise them to follow
10       up on:  Why is -- you know, is this a nickname or is
11       this not actually the documents and ask them to
12       correct the I-9 with their true legal name.  I may
13       have missed the mismatch.
14  Q    Is -- is matching names something that you advise
15       employers to look out for when accepting documents?
16  A    I do --
17            MR. BISS:  Objection, inadmissible opinion.
18  A    I do advise them to watch how the employees fill out
19       the first section because there are a lot of low
20       literacy employees, um, and I've seen employees
21       barely be able to spell their own names right or
22       leave out a second last name, so I do advise, "Make
23       sure that, you know, the employee seems to have
24       filled out section 1 correctly as well."
25            Um, but specifically comparing the name -- I
```

```
1        mean, more for accuracy purposes.  I guess I haven't
2        run across it myself in like where it showed a
3        fraud.
4   Q    But looking at it today, it's certainly one you
5        would advise a client to ask some more questions?
6   A    Yes, yes.  And --
7             MR. BISS:  Objection, inadmissible opinion.
8   A    And I may have missed a mismatch.
9   Q    (By Ms. Hauser)  Um, does seeing this document or any
10       of your earlier testimony refresh your recollection
11       that you did review identification forms photocopies
12       when you visited NuStar Farms?
13  A    I still don't remember.  I just don't remember the
14       exact, if they were attached or not.  But given that
15       List B and C were blank here, I would have either
16       flagged them -- I mean, I would have flagged them to
17       fill out List B and C but -- hmm, I -- sorry, I just
18       don't remember if some had photos, none or all had
19       photocopy documents.  Where is my letter?
20            MS. HAUSER:  I'm going to hand the court
21       reporter two documents.  Exhibit 123 is a document
22       bearing Bates number 3108 to 3111.
23            (Exhibit 123 marked for identification.)
24            MS. HAUSER:  And Exhibit 124 is a document
25       bearing Bates numbers PX 4187 to PX 4188.
```

```
1              (Exhibit 124 marked for identification.)
2         MR. BISS:  Kristen, are these documents that
3    are on their way?
4         MS. HAUSER:  Yep.
5         THE VIDEOGRAPHER:  This is the videographer.
6    In about five minutes we have to change the tape.
7         MS. HAUSER:  Steve, let me know when you've got
8    it.
9         MR. BISS:  Yeah, I just -- I just got it.
10 Q  (By Ms. Hauser)  Ms. Bahena, would you take a look at
11    Exhibit 123?
12 A  Uh-huh.
13 Q  Um, do you note that in section 1, the employee
14    listed his name as ████████, and that his
15    signature is ████████?
16 A  Yes.
17 Q  And do you notice on page 3110 the name appears to
18    match the signature but not, um, the name in
19    section 1?
20 A  Yes.
21 Q  Do you recall seeing this employee's I-9 and
22    supporting documents when you visited NuStar Farms?
23 A  I do not recall seeing this specific I-9, but given
24    the dates and the note, I -- it's -- it was probably
25    in the pile of I-9s we reviewed.
```

```
1    guess my advice would be different if it's a
2    terminated employee and you want to provide ICE with
3    the information they need to be able to verify
4    someone.
5         Um, so, yeah, I -- I should have couched that
6    in:  Have the -- have the term-- the employee fill
7    it out, um, and initial and date.  Any changes the
8    employer -- the employer makes to -- to -- to
9    section 1 should be highly notated.
10       Um, is it illegal for the employer to fill out
11    section 1?  No.  So in a terminated employee case
12    like this where the employee is not going to
13    complete it, I feel it's appropriate that she filled
14    in this in a different color ink and initialed it.
15 Q  And does it raise any concerns for you that the
16    employee signed one name and wrote his name in
17    section 1 and in section 2 with a name that doesn't
18    match his identification form?
19 A  Yes.
20       MR. BISS:  Objection, inadmissible opinion.
21 A  Yes.  If this had been a current employee, I would
22    have advised them to follow up.  And if necessary --
23    if it turns out that they're undocumented, terminate
24    them.  But this was a terminated employee, so, um,
25    at that point it was a nonissue.  Um, and I...
```

```
1 Q  And if you look at Exhibit 124 --
2 A  Uh-huh.
3 Q  -- um, do you see this is the Form I-9 for that same
4    employee?
5 A  Yes.
6 Q  And do you see it has some red pen in section 1 with
7    an initial?
8 A  Yes.
9 Q  Did you -- but you're sure you didn't advise
10    Mrs. Nunes to correct section 1?
11 A  Well, this looks like it was for a terminated
12    employee potentially.  I don't know for sure.
13    There's a sticky note on it.  So it looks like I'm
14    seeing "S," like start date, "June 16."
15    Terminate -- "T" would likely be termination,
16    "September 16.  Shred July 2019."  So I'm thinking
17    this is in the pile of terminated employees, in
18    which case we would have said, "You're not going to
19    get this employee to fill this out.  If you make
20    corrections to finish it, make sure you initial it."
21       So if the employee is willing to, you fill out
22    the first page.  Um, but if you're going to fill out
23    the first page, initial it.  And here it's a
24    terminated employee.  So ICE is going to come back
25    and ask for this information if they audit.  So I
```

```
1 Q  (By Ms. Hauser)  Meaning it was a nonissue --
2         THE VIDEOGRAPHER:  I --
3 Q  (By Ms. Hauser) -- because they couldn't do anything
4    about it anymore?
5 A  Right.  The employee was no longer there, so they
6    wouldn't have -- they would have no right at that
7    point to go and ask them anyway, so what was done
8    was done.
9         MS. HAUSER:  Let's go off the record to change
10    the tape.
11       THE VIDEOGRAPHER:  Thank you.
12       This ends media unit number 2 of the video
13    recorded Zoom deposition of Amanda Bahena.
14       We are going off the record at 12:11 p.m.
15    Central Time.
16       (Lunch recess.)
17       THE VIDEOGRAPHER:  This begins media unit
18    number 3 in the video recorded Zoom deposition of
19    Amanda Bahena.
20       We are back on the record at 1:13 p.m. Central
21    Time.
22 Q  (By Ms. Hauser)  Good afternoon, Ms. Bahena.  Um, I'm
23    going to hand you what the court reporter has
24    previously, in earlier depositions, marked as
25    Deposition Exhibit 23.
```

1    Ms. Bahena, first, do you recall whether this
2  is an I-9 and supporting documents you reviewed as
3  part of your I-9 audit at NuStar?
4  A   I don't remember.
5  Q   And if I can direct your attention to page 3197,
6  which is the third -- sorry, excuse me, 3196, which
7  is the second page, do you note that on the
8  photocopy of United States of America Permanent
9  Resident Card the employee's surname is spelled
10  ████████ and on the photocopy of the Social
11  Security card the employee's last name is spelled
12  ████████   Do you see that?
13  A   I do see that.
14  Q   And before the break we were talking about
15  identification cards that may have not matched the
16  name on form -- in in -- in part 1 on Form I-9.
17    Do you see that the employee on page 1 of this
18  document spelled the last name with ████████,
19  I can't tell, can you?
20  A   I can't tell what the letter is.  There's --
21  there's -- I mean, I would normally read ████████
22  with an ███ so that's what I would have read it as,
23  an ███
24  Q   And would this be -- looking at the photocopies of
25  the identification cards, is having mismatched

1  surnames on the two forms of ID presented by the
2  employee something that should cause an employer to
3  ask more questions of the employee about his
4  identification documents?
5  A   I would --
6    MR. BISS:  Objection, speculation, inadmissible
7  opinion.
8  A   If I -- if I noticed the misspelling, I would
9  have -- I would advise them to follow up on that and
10  ask if, which is the correct spelling or -- or ask
11  for more information.
12  Q   (By Ms. Hauser)  And if you -- as part of the
13  certification section on the Form I-9 by the
14  employer, that's important because one thing the
15  employer is certifying is that the documents relate
16  to the employee, is that correct?
17    MR. BISS:  Objection, inadmissible opinion.
18  A   I would say the certification states that the
19  above-listed documents appear to be genuine and to
20  relate to the employee named.
21  Q   (By Ms. Hauser)  Right.
22  A   So yes.
23  Q   And do both of these -- how do we know if, which of
24  these documents relates to the employee named here?
25    MR. BISS:  Objection, speculation.

1  A   I can't say that if, that they noticed the
2  misspelling on that that it's a ███ and not an ███
3  I don't know if I caught the misspelling that it's a
4  ███ and not an ███ " um, so I can't speak to when
5  they saw the document at the time, their state of
6  mind or anything like that.  But if they noticed,
7  then I would advise them, if they asked me, to
8  follow up with the employee, because, yeah, there's
9  an error or issue with the name on the card, that it
10  doesn't match the name on the ID.
11    Um, this is -- this employee presented a
12  permanent resident card as well, so technically the
13  Social Security card wasn't required for the I-9, if
14  that matters, but I would have still said, you know:
15  Follow up with the Social Security card, um, if I
16  noticed a misspelling.
17  Q   (By Ms. Hauser)  And would this have raised -- if you
18  had -- you don't recall whether you noticed or not
19  at the audit?
20  A   I don't remember.  And, frankly, I may have saw that
21  the -- I mean, looking at it now, as I would have
22  looked, I would have said:  Oh, you didn't fill out
23  List A.  This is how I would have handled it, most
24  likely:  The green card -- a copy of the green card
25  is attached, um, so you may -- you should go back,

1  you know, whoever looked at the card and fill out
2  List A, initial and date it as a correction.
3    But I don't know if I would have actually gone
4  down to the Social Security card because the List A
5  document would have been a green card.  So my big
6  comment on this one would be the List A document,
7  space is blank.
8  Q   And it looks like this has a "per audit" notation on
9  page 1.
10    Do you see that?
11  A   Yes.
12  Q   And it appears as if -- and would you have expected
13  that to be in the different color pen or -- that you
14  advised in your letter?
15  A   Without -- without seeing it, I don't know what
16  color they would have used.  I mean, that's not a
17  legal requirement.  I just like --
18  Q   Right.
19  A   -- it to be clear what changes they're making.
20  Q   Um, and it appears they did not correct it by
21  filling in anything on List A.  Do you see that?
22  A   Correct.
23  Q   And you can put that one aside.
24  A   Okay.
25  Q   Um, going back to the logistics of your visit to

```
1          NuStar, um, do you recall if you asked to see copies
2          of other documents like W-4s or payroll reports?
3    A     No --
4    Q     Um --
5    A     -- I would not have asked to see those.
6    Q     Do you recall if there was anything you asked to see
7          that they didn't have available?
8    A     No.  I only asked to see the I-9s.  And we reviewed
9          the I-9s that they provided.
10   Q     What advice did you give to NuStar, if any, about
11         what it means to inspect the, excuse me,
12         authorization documents presented by the employee?
13   A     So in my binder that I take to I-9s, because it has
14         some guidance that I sometimes refer to if I'm not
15         sure how to, you know, if a new situation comes up,
16         it has my sticky notes, there is from ICE, I think
17         Brent Stanley gave it to me, um, a pamphlet.  I
18         didn't leave it with them because I only have one.
19         I should get more.  But there's a pamphlet on
20         reviewing documents.  Um, it's pretty brief.  And
21         there's some online things.  Um, so I said, "To be
22         prudent and to make -- you know, um, you can
23         familiarize yourself with, um, some documents, but
24         you're not required to be an expert on them.  Um,
25         like there's pamphlets like, you know, like this.
```

```
1          There's online stuff.  And -- and ICE, as far as I'm
2          aware, will come in and do trainings," but, um,
3          that's about as far as that went.  I didn't go into
4          training on recognizing documents, um, with them.
5          I -- I saw the -- the review as like a point in time
6          in giving some advice to practices going forward.
7          Um, and we didn't do any in-depth training on
8          recognizing fake documents from valid ones.
9    Q     Did you discuss whether or not the birth date on the
10         employee's identification document should match the
11         birth date that the employee puts in Form I-9,
12         section 1?
13   A     I don't remember discussing that.
14   Q     Do you recall reviewing any I-9 forms with, at
15         NuStar where the birth date on the ID did not match
16         the birth date the employee filled out on Form I-9?
17   A     I don't remember discussing or seeing those.
18         Sometimes employees from different countries will
19         flip the month and the date.  That's the most common
20         issue.  Um, but other than that, no, I don't
21         remember -- well, I don't remember anything specific
22         to this audit.
23   Q     Um, you said you didn't do any training with NuStar
24         about how to recognize fake work authorization
25         documents.  Did anyone at NuStar ask you about that?
```

```
1    A     I don't remember.  I would have just said, you know,
2          they need to -- if -- "If something doesn't look
3          right on its face, you need to follow up.  And
4          that's a common sense type thing.  But you can
5          certainly do more training because you may -- you
6          may be able to recognize some documents if you do
7          further training, but it's not required."
8    Q     Did you describe to them any examples of documents
9          that look fraudulent on their face?
10   A     Not that I remember.
11   Q     Did you come across any documents in your review,
12         copies of which did not look genuine on their face?
13   A     I don't remember, but if I had I probably would have
14         set them aside if they popped out at me, but I don't
15         remember.  If they were terminated employees, I may
16         have said:  This one looks off.  But we wouldn't
17         have done anything about it because they were
18         terminated employees.
19   Q     Did you review any documents, um, where, um, NuStar
20         had accepted Social Security cards that said they
21         were valid for work only with DHS or INS
22         authorization?
23   A     I don't remember if I had seen those.  And it was
24         used as a List C document with a List B, then I
25         would have marked that for follow-up.  If it was
```

```
1          used -- if they had presented a List A document, I
2          would not have marked that for follow-up.
3    Q     Sorry, I jumped out of order.
4    A     Also if it was a terminated employee, I would not
5          have marked for follow-up because you can't at that
6          point.
7              MS. HAUSER:  Steve, this next one is coming.
8          It's already marked.  I've just handed the witness a
9          exhibit that's previously been marked as Defendants'
10         Exhibit 33.
11   Q     (By Ms. Hauser)  And, Ms. Bahena, I'll refer you to
12         the third page Bates stamped PX 3544 where there's a
13         photocopy of an ID that says, "Valid for Work Only
14         with DHS Authorization."
15             Do you see that?
16   A     Yes.
17   Q     Do you recall reviewing this as part of your audit?
18   A     I don't recall this specific I-9.
19   Q     And you'll note that it was presented with a
20         Minnesota driver's license.  Do you see that?
21   A     Yes.
22   Q     And are these acceptable documents together to show
23         that the employee is authorized to work in the
24         United States?
25   A     For this --
```

```
1           MR. BISS:  Objection, inadmissible opinion.
2  A    For this one, if this is -- if this were the
3       documents he showed for the I-9, I don't know,
4       because there's a W-4 here as well, but if these
5       were the documents that were shown for the I-9, um,
6       the List C Social Security card would only be valid
7       for a List C document if it had -- didn't have the
8       "Valid for Work Only with IHS Authorization,"
9       unless -- well, yeah, unless they presented a List A
10      document.
11  Q   (By Ms. Hauser)  And do you note also that the
12      employee filled out his name on page 1 with a █████
13      and the name on the identification document starts
14      with a █████ um, would these circumstances have
15      caused, should have caused the employer to ask more
16      questions about this employee's documents?
17          MR. BISS:  Objection, speculation, inadmissible
18      opinion.
19  A   Yeah, if I'd noticed -- if I noticed, and I don't
20      remember if I reviewed this I-9 or set it aside,
21      but, um, that it was, █████ with a █████ and █████
22      with a █████ I would have flagged it to ask them to
23      correct the legal name or follow up with them, but
24      also to ask for either a List A document or an
25      unrestricted Social Security card.
```

```
1       worked there, it appears NuStar improperly accepted
2       a restricted Social Security card as proof of work
3       authorization based on the documents produced to us
4       in the litigation.
5           MR. BISS:  Objection, inadmissible opinion and
6       just egregiously leading questions.  They're not
7       even questions; they're just statements by Counsel.
8  A    I would note that the attestation doesn't appear
9       completed either, so I can't attest to what
10      documents were reviewed when this I-9 was completed,
11      so ...
12          MS. HAUSER:  What number are we up to?
13          THE COURT REPORTER:  125.
14          MS. HAUSER:  Steve, this one is on its way.
15          I'm going to ask the court reporter to mark as
16      Exhibit 125 a document bearing PX 4046 to 4049.
17          (Exhibit 125 marked for identification.)
18  Q   (By Ms. Hauser)  Ms. Bahena, would you take a look at
19      Exhibit 125?
20  A   Yes.
21  Q   Um, and if you -- if I can direct you to page 4048,
22      do you see that the documents attached or produced
23      to us with this Form I-9 also contain a Social
24      Security card that says it's valid for work only
25      with INS authorization, do you see that?
```

```
1  Q   (By Ms. Hauser)  And if this was a former employee,
2       do you recall if this is one you set aside and said
3       was problematic?
4  A   If it was --
5           MR. BISS:  Asked and answered.
6  A   If it was a terminated employee, I wouldn't have set
7       those aside because there was nothing you can do at
8       that point.  They're not going to -- I mean, you --
9       you just retain them and the employee is gone, so
10      you can't make employees add corrections at that
11      point.
12  Q   (By Ms. Hauser)  Sorry, let me reask.  Did you -- is
13      this one of the documents that you told NuStar was
14      problematic?
15  A   I don't remember.
16  Q   Looking at it today, does it appear to be
17      problematic to you right now?
18          MR. BISS:  Objection, inadmissible opinion.
19  A   With the difference between the █████ and the
20      █████ um, and the restriction on the social, if
21      that's what was presented for the I-9, um, then
22      they -- I would have advised them to follow up with
23      the employee.
24  Q   (By Ms. Hauser)  But if we -- if -- if we know that
25      this employee worked at NuStar, um, and no longer
```

```
1  A   Yes.
2  Q   And that there's also a copy of an Iowa
3       identification card.  Do you see that as well?
4  A   Yes.
5  Q   Are those two documents together sufficient to
6       authorize an employee to work in the United States?
7  A   No.
8           MR. BISS:  Objection, lack of foundation,
9       inadmissible opinion.
10  A   The Social Security card has a restriction, so
11      they'd either have to show a different List C
12      document or a List A document.
13  Q   (By Ms. Hauser)  And do you recall whether you
14      reviewed this Form I-9 and supporting documents in
15      your audit at NuStar?
16  A   I do not remember.
17  Q   And do you see on page 1 the employee did not check
18      any of the boxes under the section, "I attest, under
19      penalty of perjury, that I am (check one of the
20      following)"?
21  A   I see that.
22  Q   Um, and does ICE consider that failure a serious I-9
23      violation?
24  A   That would be a --
25          MR. BISS:  Objection, speculation, inadmissible
```

1    opinion.

2  A   That would be a substantive, um, error.

3  Q   (By Ms. Hauser)  And, again, this one also has no

4      certification or signature from the employer and

5      nothing filled out in section 2, do you see that?

6  A   I see that.

7  Q   Would that also be a serious or substantive

8      violation?

9  A   Um --

10      MR. BISS:  Objection, inadmissible opinion,

11      speculation.

12  A   Assuming this employee was hired, that would be a

13      substantive violation.  In that situation they would

14      have until day three of employment to complete that.

15      I don't know if they got that far.

16  Q   (By Ms. Hauser)  Do you recall, and Steve will let me

17      know if I already asked this, but do you recall

18      whether you reviewed any Forms I-9 and supporting

19      documents at your audit that had restricted Social

20      Security cards?

21  A   I don't remember offhand.

22  Q   Um, are you aware of whether there were I-9s in

23      NuStar's possession that you did not review?

24  A   I don't know.  I reviewed what they provided to me.

25  Q   And did you have occasion to ask:  Is this

1      everything?

2  A   Yeah, I asked if -- I -- well, I told them, "Provide

3      all of your I-9s."

4  Q   Ahead of the audit you didn't say:  Provide only

5      those that are one year and three years in the

6      non-purge stage?

7  A   No.  I said, "Provide all of your I-9s," because I

8      would have been concerned they might purge ones that

9      aren't supposed to be.  The math isn't that easy to

10      figure out.

11  Q   Did you advise that going forward NuStar should fill

12      in section 2 completely and in terms of filling out

13      List B or List C or List A?

14  A   Yes.  Um, if Lori understood it that way, I don't

15      know, um, but my advice is to complete every part of

16      the I-9.

17  Q   Did you encounter any circumstances in your audit

18      where NuStar had not received from the employee both

19      a List B and a List C document?

20  A   I don't remember.

21  Q   Um, and sitting here today, you don't remember

22      specifically what I-9s you reviewed and which ones

23      you didn't?

24  A   I don't remember.

25  Q   Um, but you at least saw a list of employees,

1      correct?

2  A   I asked them to provide a list of employees.  If my

3      memory serves me correct, there was a list of

4      employees here and then a file next to it and a file

5      next to it and we went down with the list of

6      employees in the I-9s.  And I typically check them

7      off.  I can't picture doing an I-9 audit any other

8      way.

9  Q   Um, and so to the best of your recollection, you

10      reviewed the ones on the list, correct?

11  A   Yes.

12  Q   Um, so if you had the list, it would help us

13      understand and help you refresh your recollection as

14      to whether you reviewed an I-9 or not, correct?

15  A   Yes, um, assuming the I-9 was there, but I don't

16      remember being concerned that any were missing.

17  Q   I'm going to show you two exhibits that have

18      previously been marked as Exhibits 17 and 18.

19      MR. BOYER:  Here's 17.  And here's 18.

20      MR. HUFF:  Okay.

21  Q   (By Ms. Hauser)  Ms. Babena, the court reporter has

22      just -- well, I handed you documents

23      previously marked as Defendants' Exhibit 17 and 18.

24      And I will represent to you that we have learned

25      through discovery that this employee was employed at

1      the time of your audit.  Um, do you -- looking at

2      these two documents, do you recall whether you

3      looked at this employee's I-9 at the time of your

4      audit?

5  A   I don't remember.

6  Q   Um, what's been produced to us in litigation is a

7      photocopy of a Social Security card on -- in

8      Exhibit 18.  Do you see that?

9  A   Yes.

10  Q   And on Exhibit 17 there is a notation under List C.

11      Do you see that?

12  A   Yes.

13  Q   For a Social Security card?

14  A   Yes.

15  Q   Would these two documents together be sufficient to

16      authorize this worker to be employed in the United

17      States?

18      MR. BISS:  Objection, inadmissible opinion.

19  A   No.  They're missing either a List B document or a

20      List A document.

21  Q   (By Ms. Hauser)  And I note that there's no "per

22      audit" notations or post-its on this.  Do you -- and

23      you don't -- I think you said you don't recall

24      whether you saw this one --

25  A   I don't remember.

1 Q  -- or not?

2  Um, did you give any advice to NuStar, um, that

3  a single Social Security card is not sufficient I-9

4  documentation procedures?

5 A  Well, we would have gone through List A, B and C

6  documents and, um, its filing instructions, so, um,

7  I don't remember having an exact conversation about

8  a single Social Security card.

9 Q  Um, if you look at Exhibit 18, do you see that the

10  Social Security card starts with the number 9?

11 A  Yes.

12 Q  Do you know whether the Social Security

13  Administration has ever issued valid Social Security

14  numbers in a 900 series?

15 A  I can't speak to ever.  My understanding is often

16  those are ITIN numbers.

17 Q  Um, what would you advise an employer about this I-9

18  and supporting document that appears to have been

19  filled out in 2010?

20 A  I would have advised them that they need to request

21  a List B or a List A document.  I don't know if it

22  would have occurred to me to advise about the Social

23  Security number starting with a 9.

24 Q  What is an ITIN number?

25 A  Individual Taxpayer ID Number.  They are -- I don't

1  know all of the laws around -- ITIN numbers, I

2  probably shouldn't talk about them too much, but

3  they stand for Individual Taxpayer ID Numbers.

4  MS. HAUSER:  I've asked the court reporter to

5  mark two new exhibits.  P- -- Defendants'

6  Exhibit 126 bears the Bates numbers PX 3198, 3199

7  and 4086.  And Exhibit 127 bears the Bates numbers

8  PX 4166 and 4167.

9  (Exhibit 126 marked for identification.)

10  (Exhibit 127 marked for identification.)

11 Q  (By Ms. Hauser)  Ms. Bahena, would you take a look at

12  Exhibit 126, please?

13 A  Yes.

14 Q  Do you recall whether this is an I-9 and supporting

15  document that you reviewed as part of your audit at

16  NuStar?

17 A  I do not remember.

18 Q  If you take a look at PX 127 -- if you refer to

19  page 2 at PX 4167, do you see that there's -- on

20  appears to be a photocopy of a post-it on the -- on

21  the back?

22 A  Yes.

23 Q  Does that refresh your recollection as to whether

24  this is an I-9 you reviewed as part of your audit?

25 A  Yes.  I -- that would have been a notation that I

1  would typically make.

2 Q  And can you read for me what the post-it on

3  Exhibit 127 says?

4 A  Add document information or attach -- "Add document

5  information or attach documents used in RED."

6 Q  Do you recall what that note was intended to convey?

7 A  Here there's no documents listed in A, B or C, so we

8  would have wanted them to make -- to correct the

9  I-9, list valid documents in the appropriate places

10  that they used.

11 Q  And you'll see they've made, someone at NuStar has

12  made some corrections in red there --

13 A  Yes.

14 Q  -- on Exhibit 127.

15  And if you flip back to Exhibit 126, do you see

16  that there's a photocopy of a Social Security card

17  but no additional documents?

18 A  Correct.

19 Q  And does this refresh your recollection that you

20  encountered I-9s at NuStar where NuStar did not have

21  all of the documents required to authorize a worker

22  to work in the United States?

23 A  Um --

24  MR. BISS:  Objection to form.

25 A  -- it would appear, for ███████████  um, the

1  documents were not listed on the I-9.  I don't know

2  the order of these exhibits, if when I reviewed it,

3  the Social Security card was, there's a copy here,

4  was added -- was already existing when I reviewed or

5  if they added it later.  I -- I guess I don't know

6  which document came first.

7 Q  Um, and if this employee continued to be employed by

8  NuStar after the audit, did they require additional

9  identification documents to continue to employ him?

10 A  Yes.

11  MR. BISS:  Objection, inadmissible opinion.

12 A  Um, to be in compliance with the, um, regulations,

13  they would have had to complete the I-9 with --

14  and -- and see -- and he presented the appropriate

15  documents to show he's authorized to work.

16 Q  (By Ms. Hauser)  And do you have an understanding

17  that if this I- -- do you recall -- sorry.

18  You recall that earlier today you testified

19  that some corrections may have been made to the

20  Forms I-9 while you were present at NuStar?  Did you

21  say that?

22 A  I imagine -- I mean, if there were corrections that

23  Lori could make, we would have shown her how to make

24  those and helped her so that she knew how to initial

25  and date things.  There's no sense in waiting until

1  later to make those corrections. The corrections
2  that she could not make at the time or that needed
3  employee corrections, we would have flagged or set
4  aside for her to do later.
5  Q  (By Ms. Hauser) And it appears on Exhibit 127, does
6  the post-it, presence of the post-it help you
7  determine whether this is one you corrected on site
8  or asked where she was directed to correct after?
9  A  Well, it's stated that the correction was
10  November 4, 2018, um, so -- I think my audit was
11  before that, so that would have been after.
12  Q  So even though it was audited, there's still no
13  information suggesting that NuStar had a List B and
14  List C document; is that correct?
15  A  Based on --
16      MR. BISS:  Objection, speculation.
17  A  Based on the exhibits in front of me, no.
18  Q  (By Ms. Hauser) And that's because both Exhibits 126
19  and 127 are blank in the List A, B and C section of
20  Form I-9?
21  A  Correct. And there's also no additional A, B or C
22  documents -- well, the Social Security card would be
23  a C, but no A or B documents attached to the exhibit
24  that I have.
25  Q  Did you encounter in your audit any situations or

1  I-9s where NuStar had not collected or noted
2  inspecting any identification documents for
3  employees?
4  A  Not that I remember. If I had, I would have set
5  them aside and noted for follow-up.
6      MS. HAUSER:  I'm going to ask the court
7  reporter to mark as Exhibit 128 a document bearing
8  Bates Nos. PX 4247 to PX 4248.
9      THE COURT REPORTER:  And just for the record, I
10  need to say that while there's still talking, I
11  can't mark exhibits. So that's why they're not
12  getting marked quickly.
13      MS. HAUSER:  I'm good.  Thanks.
14      THE COURT REPORTER:  Okay.
15      (Exhibit 128 marked for identification.)
16  Q  (By Ms. Hauser) Ms. Bahena, we've handed you a
17  document previously marked as Defendants'
18  Exhibit 44 and also a new exhibit, Defendants'
19  Exhibit 128. Do you have those in front of you?
20  A  Yes.
21  Q  And I'll refer you to Exhibit 127. Um -- or, excuse
22  me -- yeah -- I'm not going to refer you to 127
23  because we're done with that.
24      Looking at Exhibit 128, are you able to tell me
25  whether this is an I-9 you reviewed as part of your

1  audit?
2  A  It appears so because we put notations on sticky
3  notes and there were corrections per internal audit.
4  Q  And, um, do you see on page PX 4248 there's a
5  post-it next to the List A, B and C section that
6  says, "Need copies of docs." Do you see that?
7  A  Yes.
8  Q  Does that refresh your recollection as to whether
9  you encountered any situations at NuStar where there
10  were no identification documents for the employees?
11  A  Yes.
12      MR. BISS:  Object to the form.
13  Mischaracterizes her testimony.
14  A  Yes.
15      So here, a couple of things on this one. Um,
16  my comment goes to a few things. The B and -- the
17  A, B and C should be completed. If that was
18  possible, I don't know, because it looks like this
19  was a terminated I-9, a terminated employee. Um,
20  but also we would have discussed with them, "If
21  you're going to attach copies, photocopies of
22  documents to I-9s, it can't be some yes, some no.
23  It should be consistent," so to have a consistent
24  practice. So this sticky note to me is both noting,
25  and there's a flag, too, we need A, B or C documents

1  and also let's be consistent and get photocopies of
2  documents with every I-9 for best practice.
3  Q  (By Ms. Hauser) And if this employee was employed in
4  2017, is this an I-9 that should have still existed
5  in full form in October of 2018 when you audited?
6  A  Depends on the start date and the termination date.
7  So if the start date here is correct, which is
8  July 5 of 2017, then this needs to be retained until
9  July -- I mean, here we wrote I think August 2020,
10  to be safe, but it should be retained three years
11  from the start date, so yes, even though it's a
12  terminated employee.
13  Q  Do you recall whether Mrs. Nunes or anyone at NuStar
14  told you whether or not they had supporting
15  documents for this employee?
16  A  I don't remember.
17  Q  Did you have any -- do you recall giving any
18  additional advice about the situation reflected here
19  where there is, are no identification documents
20  referenced or copied?
21  A  I don't remember. It was a terminated employee, so,
22  um, we would have said, you know, "Do what you can,
23  but your options are limited at this point."
24  Q  Um, and so what are -- what is the effect of the
25  corrections that are made on page 2 of Exhibit 128?

1  MR. BISS: Objection, inadmissible opinion.
2  Q  (By Ms. Hauser) Do you have an understanding of what
3     the client was correcting as of the time of the
4     audit?
5  A  If -- well, I don't know if they had copies of
6     documents. If they recall reviewing the documents,
7     it would have been, um, the documents that they
8     listed up there were examined, but there's no
9     examination. So because the copies of the documents
10    or -- or the documents themselves weren't listed,
11    um, they may have, you know, filling out the first
12    date of employment, they may have eliminated some
13    things they could be fined on because now the first
14    day of employment is filled out. Um, but the key to
15    this one will be, um, the missing verification
16    documents.
17 Q  And if no such verification documents exist or
18    existed that were reviewed, could this employee have
19    been legally authorized to work at NuStar?
20    MR. BISS: Objection, speculation, inadmissible
21    opinion.
22 A  All I can say is the I-9 was not completed, so I
23    wouldn't be able to testify beyond that. The reason
24    it's not completed, I don't know.
25 Q  (By Ms. Hauser) Did you advise NuStar that accepting

1     identification documents that were expired was not a
2     practice that would authorize a worker to work at
3     NuStar?
4  A  I don't recall the exact conversation, but, um, the
5     documents, the identity documents need to be
6     unexpired.
7     MS. HAUSER: I'm going to hand -- ask the court
8     reporter to mark two additional exhibits.
9     Exhibit 129 bears the Bates numbers PX 3010 to 3012.
10    Um, and if everyone will bear with me, there seems
11    to be additional pages attached here that aren't
12    related to this employee, so I'm going to -- that's
13    the extent of Exhibit 129. And if there are
14    additional pages, let's just rip them off and not
15    make them part of this exhibit.
16    Steve, do you have that?
17    MR. BISS: I do.
18    MS. HAUSER: Thanks.
19    (Exhibit 129 marked for identification.)
20    MS. HAUSER: And I'm going to ask the court
21    reporter also to mark Exhibit 130, which is a
22    document bearing Bates numbers PX 4172 and PX 4173.
23    (Exhibit 130 marked for identification.)
24 Q  (By Ms. Hauser) Ms. Bahena, taking a look at
25    Exhibit 4- -- excuse me, Exhibit 130, are you able

1     to determine whether this is an I-9 that you
2     reviewed as part of your audit?
3  A  It appears that it is. It has the, um, "per audit"
4     notations and sticky note saying that it could be
5     destroyed.
6  Q  And on the back of that document, it looks like
7     there also may have been a little tape flag and
8     another post-it. Do you see that?
9  A  Oh, yes.
10 Q  Um, and referring to Exhibit 129, if you look at
11    page 3, do you see that the Tennessee driver's
12    license says it expires on January 18th, 2016?
13 A  Yes.
14 Q  And do you see that on page 3011 the employee's
15    first date of employment is listed as 7-7-2017?
16 A  Yes.
17 Q  Do you recall discussing with Mrs. Nunes that
18    expired documents would not, in this particular case
19    would not have authorized this worker to work at
20    NuStar?
21 A  I don't remember, but we probably didn't spend much
22    time on it because it was a terminated employee.
23 Q  But this set of documents would not have been
24    acceptable when this employee was hired in July of
25    2017?

1  A  If --
2     MR. BISS: Objection, inadmissible --
3     objection, inadmissible opinion, speculation.
4  A  If these were the documents used, because the
5     driver's license is expired, that wouldn't have been
6     an acceptable List B document. They would have
7     needed an unexpired, um, document.
8  Q  (By Ms. Hauser) Um, do you know at the time of your
9     audit whether NuStar had a, previously had any
10    policy around accepting expired identification
11    documents?
12 A  I don't know of any policy.
13 Q  Do you recall encountering any -- any documents
14    where -- any -- do you recall reviewing any I-9s,
15    aside from this one, where NuStar had copies of
16    documents that were expired at the time of hire?
17 A  I don't remember.
18    MR. BISS: Object to the form.
19 A  I don't remember.
20 Q  (By Ms. Hauser) Do you have -- in your letter, which
21    we previously marked as Exhibit, I can't remember
22    which number, 124, I think --
23    MR. HUFF: 122?
24    MS. HAUSER: Oh, yeah, 122. 121.
25 Q  (By Ms. Hauser) Sorry. Taking a look back at

1    Exhibit 121, in your first -- second sentence it
2    says, "During the audit, we discussed various best
3    practices to ensure I-9 compliance." Was not
4    accepting expired IDs one of the best practices you
5    discussed?
6  A  I don't remember. I would have given the spill
7    about making sure it's a valid, unexpired List A, B,
8    or C document. We talk about restrictions on Social
9    Security cards because a lot of lay people don't
10   know what that means. They're to look. So exact
11   conversations, I don't know. If we had seen
12   recurring items, we would have mentioned them as
13   something to avoid going forward.
14 Q  I'm going to hand you what's previously been marked
15   as Defendants' Exhibit 26.
16     MR. HUFF: Thank you.
17     MR. BOYER: Uh-huh.
18 Q  (By Ms. Hauser) Ms. Bahena, taking a look at this
19   set of documents, do you recall whether this is an
20   I-9 you reviewed as part of your audit?
21 A  I don't recall.
22 Q  And do you see that, on page 1 the date that the
23   employee, month, day, year filled out the form is
24   5-10-2012? Do you see that?
25 A  Yes.

1    get my objections the first time?
2      THE COURT REPORTER: Yes, I did.
3      MR. BISS: Okay, thank you. I won't repeat
4    them.
5  A  Not that I recall.
6  Q  (By Ms. Hauser) Do you have any knowledge of the
7    factors that courts or ICE consider to be evidence
8    of a knowing hire of an unauthorized worker?
9  A  Yes.
10     MR. BISS: Objection, relevance.
11 Q  (By Ms. Hauser) What are those factors?
12 A  Hmm, well, first is admissions from the employer or
13   the employee would probably be the most common.
14     Second, not completing I-9s or leaving I-9, um,
15   documents blank.
16     Um, knowingly accept- -- or accepting ID
17   documents that appear on their face or that the
18   employer would clearly know were -- were fraudulent.
19   It becomes more of a practice question, to my
20   understanding, um, rather than an error or oversight
21   here and there. There needs to be a practice of it,
22   my understanding is, unless it was a clear admission
23   from one known employee or employer.
24 Q  And you've so advised clients generally or -- or --
25   of these factors --

1  Q  And then on page 3, the Minnesota identification
2    card says it expires 4-22-2012, do you see that?
3  A  Yes.
4  Q  At the time in 2012, would that have been an
5    acceptable List B document to accept?
6      MR. BISS: Objection, inadmissible opinion.
7  A  The expired ID card would not have been an
8    acceptable List B document because it was expired at
9    the time that the I-9 was completed.
10 Q  (By Ms. Hauser) Um, and have you read any decisions
11   or opinions saying that accepting expired IDs is
12   evidence of a knowing hire of an undocumented --
13     MR. BISS: Objection, relevance.
14 Q  (By Ms. Hauser) -- worker?
15     MR. BISS: Objection, relevance, inadmissible
16   opinion.
17     THE COURT REPORTER: His objection came right
18   at the end of your answer -- question.
19     MS. HAUSER: Sure.
20 Q  (By Ms. Hauser) Do you have any -- have you read any
21   decisions or opinions stating that an employer
22   accepting expired IDs is evidence of a knowing hire
23   of an unauthorized worker?
24 A  Not that I --
25     MR. BISS: Did you get my opinion -- did you

1  A  No, I --
2  Q  -- in your experience?
3      MR. BISS: Objection, inadmissible opinion.
4  A  No, I don't get into that part of it. I advise them
5    to, that they need to complete the I-9s with
6    appropriate documents, that there are penalties for
7    knowingly hiring an undocumented worker, including
8    criminal fines, um, but to get into the legalities
9    of the factors, I don't include that usually in my
10   training, um, with them.
11     Um, I educate them, as best as I know how, that
12   it's important to have an I-9 for every employee
13   with the correct documents, and if the documents
14   don't look correct on their face, to do follow-up.
15 Q  (By Ms. Hauser) And we've discussed today some of
16   those documents that don't look right on their face,
17   correct? Like where an employee's -- where the name
18   on an employee's Social Security card is spelled
19   differently than the name on their photo
20   identification card?
21 A  Correct.
22     MR. BISS: Object to the form.
23 A  Correct. Um, I should note, if we're -- if I'm in
24   an audit and I-9s for terminated employees are not
25   in good shape, we use that as a learning going

1    forward. So, um, I don't spend a lot of time on

2    those, other than if I see recurring errors, to

3    learn what not to do in the future and what to watch

4    out for.

5        Um, but current employees we -- we, um, look

6    much more carefully at those I-9s because it's an

7    ongoing issue then.

8  Q  I'm going to show you what's been previously marked

9    as Exhibit 30. And, Ms. Bahena, if you'll take a

10    look at Exhibit 30, you'll note at the bottom of the

11    first page it's signed by Lori Nunes on May 23rd,

12    2011. Do you see that?

13  A  Yes.

14  Q  And on page 3 the resident alien card presented

15    expired in 2009, do you see that?

16  A  Yes.

17  Q  Do you recall whether this was an I-9 and supporting

18    documentation you reviewed as part of your audit?

19  A  I do not recall.

20  Q  And if you had, would you have advised NuStar that

21    this expired resident alien card was not acceptable?

22        MR. BISS: Objection, speculation.

23  A  If it is a terminated employee, I would have noted

24    it and marked the date for how long you had to

25    retain this.

1        If it was a current employee, I would have

2    advised them to go and ask for, um, an unexpired

3    card to correct the I-9.

4        MS. HAUSER: I'm going to ask the court

5    reporter to mark as Exhibits 131 and 132. Exhibit

6    131 is going to bear the Bates numbers PX 3176 to

7    3178 and also PX 2231. And Exhibit 132 will bear

8    the Bates number PX 4165.

9        (Exhibit 131 marked for identification.)

10        (Exhibit 132 marked for identification.)

11  Q  (By Ms. Hauser) Ms. Bahena, did you encounter in

12    your audit any I-9s and supporting documents where

13    the employee entered one birth date in section 1 on

14    Form I-9 but did not match the birth date on the

15    employee's identification document?

16  A  Um, not that I recall.

17  Q  If you'll take a look at Exhibit 131, sorry,

18    Exhibit 131, on 131 do you see that the employee

19    entered a date of birth of ▇▇▇▇ on part 1 of

20    Form I-9 and on the next page you'll see that the

21    date of birth on the permanent resident card is ▇▇▇

22    ▇▇▇▇▇ Do you see that?

23  A  I do see that.

24  Q  Did you give any advice to NuStar that mismatched

25    birthdays were a sign that the employee -- or should

1    ask more questions about the employee's documents?

2  A  I would have just said, you know: Look at their

3    documents and make sure things are consistent. Um,

4    use common sense.

5        This looks like a terminated employee, at the

6    time we reviewed it, so probably just set it in with

7    the terminated employees because we can't do

8    anything at that point. He's not working there

9    anymore.

10        But, I mean, I would have just -- I just say,

11    "Make sure that the documents are all on the face,"

12    and that the employee, because there are a lot of --

13    I do know there are a lot of literacy issues and

14    things in -- for dairy worker crews, that they are

15    accurately filling out section 1, based on the

16    information on there, that it matches their ID.

17  Q  Um, and here it's obvious that it doesn't.

18  A  Right. The date of birth is different, um, on the

19    I-9 and the green card.

20  Q  And do you see on page 1 of the I-9 the employee

21    checked the box called "A noncitizen national of the

22    United States"?

23  A  Yes.

24  Q  Do you see that? Do you have an understanding that

25    that notation applies to a very small number of

1    individuals born in, say, American Samoa and others?

2  A  Yes, I -- I know that. Um, a lot of lay people

3    don't know that though.

4  Q  And did you discuss with anyone at NuStar that if an

5    employee checks "A noncitizen national of the United

6    States," that might -- that that only accounts -- or

7    only applies to certain identification documents?

8  A  I don't recall having that conversation, but we go

9    through the form and what the different check boxes

10    mean, so I would imagine that I said -- and I --

11    very few people are going to be able to check

12    noncitizen national.

13  Q  And looking at this employee's documents

14    identification documents, does it appear that this

15    employee satisfies the requirements to check a

16    "Noncitizen national of the United States"?

17  A  Based on the --

18        MR. BISS: Object to the form, speculation.

19  A  Based on the documents that are photocopied here,

20    no. I would expect this person would either do

21    lawful permanent resident or at this point they may

22    have -- may be a citizen, but, um, yeah, not -- not

23    a noncitizen national.

24  Q  (By Ms. Hauser) Um, going back to -- going to the

25    132, do you see the two post-its on the front of the

| | |
|---|---|
| 1 | Form I-9? |
| 2 | A   Yes. |
| 3 | Q   On the post-it with dates on it, is that your |
| 4 | handwriting? |
| 5 | A   Yes, it looks like how I write sometimes. |
| 6 | Q   What about the post-it that says "complete" |
| 7 | something "in"? |
| 8 | A   Oh, no, the "S" and "T," that does not look like my |
| 9 | handwriting. |
| 10 | The post-it that says:  Complete in red -- |
| 11 | complete, I think in red -- yes, red ink.  "Complete |
| 12 | red ink," that is my handwriting. |
| 13 | Q   And what about "Shred Jan 2019"? |
| 14 | A   That would be either my associate that was there, I |
| 15 | may have had her writing post-its for me as I |
| 16 | dictated them, or Lori. |
| 17 | Q   And the start and -- the "S" and "T," were those |
| 18 | start and termination dates based on the employee |
| 19 | list that you reviewed when you were there? |
| 20 | MR. BISS:  Object to the form. |
| 21 | A   I don't recall.  Um, I do ask for the list to have |
| 22 | start and termination dates, so that's the most -- |
| 23 | so that's the clearest.  That's the most likely that |
| 24 | there was an employee list with start and |
| 25 | termination dates, or Lori may have been looking at |

| | |
|---|---|
| 1 | another place, but I think it was the list. |
| 2 | Q   (By Ms. Hauser)  Um, do you recall whether your |
| 3 | associate took any notes during the audit? |
| 4 | A   No, she didn't.  I just had her helping with -- it |
| 5 | was her first audit ever, so I had her helping with, |
| 6 | like, writing the post-its that I told her to write, |
| 7 | and, yeah, it was -- she wouldn't have known what |
| 8 | notes to take, I don't think. |
| 9 | Q   And to the extent she left any files at the firm at |
| 10 | the time of our subpoena, did anyone review to see |
| 11 | if there were any notes from this file? |
| 12 | A   No.  She didn't work for us as an associate that |
| 13 | long, and everything that she left we've gone |
| 14 | through and sorted and, um -- at least a year ago, |
| 15 | and put in the appropriate files, or over. |
| 16 | Q   Um, going back to Exhibit, the one that I just asked |
| 17 | you about on 132, do you see at the bottom of the |
| 18 | page Anthony Nunes appears to have signed the |
| 19 | reverification section? |
| 20 | A   Yes. |
| 21 | Q   And, again, what would have had to happen for |
| 22 | someone to sign a reverification section? |
| 23 | A   I think he may have been trying to check all the |
| 24 | boxes at that point and just oversigned the form, so |
| 25 | I won't -- I don't -- the reverification would be |

| | |
|---|---|
| 1 | if -- I guess you could maybe fill it out or make an |
| 2 | argument if they presented an unexpired green card, |
| 3 | but you're really not supposed to -- you're not |
| 4 | supposed to reverify for green cards, so I think |
| 5 | that might have just been a misunderstanding and he |
| 6 | signed a blank he didn't need to.  He did not sign |
| 7 | anything while we were there, so... |
| 8 | Q   Did you meet with Anthony Nunes the Third while you |
| 9 | were there?  That's Lori's husband?  Just -- |
| 10 | A   Yes.  Um, he didn't sit down or look at any |
| 11 | documents, um, because he was working.  I |
| 12 | remember -- hmm, he came in and said hello and, |
| 13 | that -- you know, generally, "Thanks for coming. |
| 14 | Um, Lori has been upset."  He seemed very pleasant. |
| 15 | Um, he was not there very long and, um, mentioned |
| 16 | that -- yeah, I think -- I don't even remember.  We |
| 17 | mostly talked about -- we chatted briefly about him |
| 18 | moving from California to Iowa and what that was |
| 19 | like for him.  And I don't remember anything else |
| 20 | about the conversation.  I've been trying to |
| 21 | remember but I can't. |
| 22 | Q   Do you recall whether you gave any I-9 compliance or |
| 23 | other legal advice to Mr. Nunes? |
| 24 | A   I don't remember if he was present when I was |
| 25 | explaining that or if he came in after.  He was not |

| | |
|---|---|
| 1 | there the whole time. |
| 2 | THE VIDEOGRAPHER:  Sorry to interrupt, this is |
| 3 | the videographer.  In about five minutes we have to |
| 4 | change the tape. |
| 5 | MS. HAUSER:  We can go off the record right |
| 6 | now. |
| 7 | THE VIDEOGRAPHER:  Okay. |
| 8 | This ends media unit number 3 in the video |
| 9 | recorded Zoom deposition of Amanda Bahena.  And we |
| 10 | will continue with media unit number 4. |
| 11 | I'm sorry if I'm butchering that. |
| 12 | We're going off the record at 2:22 Central |
| 13 | Time. |
| 14 | (Recess taken.) |
| 15 | THE VIDEOGRAPHER:  This begins media unit |
| 16 | number 4 in the video recorded Zoom deposition of |
| 17 | Amanda Bahena. |
| 18 | We're back on the record at 2:46. |
| 19 | MR. BISS:  Kristen, just before you begin, I |
| 20 | just want to put something on the record. |
| 21 | During -- at some point in time before the last |
| 22 | break Nate sent me an e-mail that, which he |
| 23 | forwarded to me, which is an e-mail that contains a |
| 24 | copy of an invoice.  I think it's dated November 13, |
| 25 | 2018.  That e-mail was sent -- it looks like it was |

1    forwarded by Steve Huff directly to Nate, no copies.
2    That shouldn't have been done.  That e-mail
3    potentially contains privileged communications.  The
4    privilege belongs to the client in this case.  So I
5    just want to put that on the record that to the
6    extent that there is any privileged material in that
7    invoice, the production to Nate does not in any way
8    waive the attorney/client privilege.
9        Also, whether or not the privilege has been
10    overruled by the Court, whether or not this document
11    is part of the documents that -- that the Court has
12    already ruled on, um, regardless of that, I'm going
13    to mark the document Counsel's Eyes Only.  So, um, I
14    just want to put that on the record.  At some point
15    in time I'm going to put that big stamp on that
16    document.
17        Um, so with that said, I'll turn it back over
18    to you, Kristen.  Thank you.
19        MS. HAUSER:  Thanks, Steve.  I just wrote the
20    letters "CEO" on the piece of paper that you're
21    talking about that's sitting in front of me.
22        MR. BISS:  Okay.  Thank you.
23 Q   (By Ms. Hauser)  Ms. Bahena, I'm going to hand you
24    what's previously been marked as Defendants'
25    Exhibit 36.

1        Have you had a chance to look at Defendants'
2    Exhibit 36?
3 A   Yes.
4 Q   Do you recall whether you reviewed this I-9 and
5    supporting document as part of your audit?
6 A   I do not remember.
7 Q   If you'll take a look at page 1, the employee spells
8    his last name in section 1 as ████████ and on the
9    third page the resident alien card presented also
10    spends -- spells the last name ████████  And the
11    Social Security card says ████.
12        Do you see that?
13 A  Yes.
14 Q  Um, do you have an understanding as to whether these
15    documents would have authorized this employee to
16    work in the United States?
17        MR. BISS:  Objection, inadmissible opinion.
18 A  Well, the resident alien card, um, would be a List A
19    document.  Um, I don't know -- this -- the I-9 is
20    not complete so I don't know when this individual,
21    the first day of work.  Um, so I would -- the
22    resident alien card would be a List A document, if
23    that was what was presented.
24 Q  (By Ms. Hauser)  And looking at the resident alien
25    card, does this appear like valid resident alien

1    cards you've seen in your experience?
2 A   It looks like an older version.  Um, I'd have to
3    look at the, um, online to compare it to cards from
4    that time.  And I don't -- you don't see that many
5    cards like this.  Well, is there an expiration?  I
6    have to look.  They've gone through some different
7    versions, um, so I'd have to look online to compare
8    it to prior versions.  This was from before I
9    started practicing immigration law.
10 Q  And how about the Social Security card, do you see
11    that the last name is missing a letter?
12 A  Yes.
13 Q  Does that strike you as a valid Social Security
14    card?
15        MR. BISS:  Objection, inadmissible opinion.
16 A  Um, I would -- well, it wouldn't have been required
17    for the I-9, but it could raise questions.  Um, in
18    any case, um, I would have had the employer ask more
19    to, I would think, and I'm no W-4 expert, but, um,
20    making sure that the -- the W-4 is correct as well.
21        Um, there are sometimes misspellings on Social
22    Security cards.  If this was a current employee and
23    they'd asked me about it, I would have suggested
24    that they follow up with the employee to make sure
25    that his name and Social Security number are

1    correct.  If ICE would try to verify this employee,
2    it wouldn't come up as a mismatch even if he's work
3    authorized.
4 Q   (By Ms. Hauser)  And did -- did you, as part of your
5    audit, review I-9 and supporting documents where the
6    employee checked the U.S. citizen box in section 1
7    but did not present a valid document to establish
8    that they were a citizen of the United States?
9 A   I don't remember.
10       MS. HAUSER:  I'm going to ask the court
11    reporter to mark as exhibits --
12       What are the next -- where did we leave off?
13       -- as Exhibits 133 and 134.  133 is a document
14    bearing the Bates numbers PX 3128 to 3131 and also
15    2262.  And the next exhibit is bearing Bates numbers
16    PX 4182 to 4183.
17       (Exhibit 133 marked for identification.)
18       (Exhibit 134 marked for identification.)
19 Q  (By Ms. Hauser)  Ms. Bahena, would you take a look at
20    Exhibit 134, please?
21 A  Yes.
22 Q  Do you recall whether you reviewed this I-9 as part
23    of your audit?
24 A  It appears I did.  I don't remember the time, but
25    looking at the notes, it appears I did.

1   Q   Um, and if you look at Exhibit 133, do you see that
2       the employee checked the box called, "A citizen of
3       the United States"?
4   A   Yes.
5   Q   And if you look at page 3 of that document, the
6       employee presented a document entitled "Permanent
7       Resident Card".  Do you see that?
8   A   Yes.
9   Q   Is that document a valid document to show U.S.
10      citizenship?
11          MR. BISS:  Objection, inadmissible opinion.
12  A   I would have to look into that.  This is probably
13      one where I would have looked at my guidance, um,
14      this is one -- if they check "citizen," I don't come
15      across this much, and present a permanent resident
16      card, is that okay.  Because you can't pick and
17      choose.  Um, so I apologize, I wouldn't be able to
18      say offhand if that's sufficient.
19  Q   So you don't recall whether this is one you asked
20      Lori or Mrs. Nunes?
21  A   I don't recall.  That's a unique situation, so I
22      don't remember what I would have advised.  I would
23      have looked at, it's the M-274, um, to see how
24      to handle a situation like that.
25  Q   And the M-274 is the manual that's also available

1       should -- that they should question the employee.
2       If the document does not look valid on its face, ask
3       them if they have a different type of document they
4       can present.  And if that document also just raises
5       more questions, if it's a different name or
6       something, just, you don't proceed.
7   Q   I'm going to hand you what's previously been marked
8       as Defendants' Exhibit 25.  Do you recall whether
9       you reviewed this I-9 and supporting document as
10      part of your audit?
11  A   No, I don't remember.
12  Q   Um, and do you see on page 1 the employee checked
13      off "Noncitizen National of the United States"?
14  A   I do see that.
15  Q   Um, and do the attached documents suggest that that
16      employee checked the correct box?
17  A   I wouldn't know from the attached documents because
18      you could come in from, say, the Marshall Islands
19      and get a Texas ID, so I would not know.  And I -- I
20      don't know what a nonemploye (sic) national Social
21      Security card would look like.
22  Q   And do you see any typos on the Texas ID card?
23  A   Depart- -- Department is spelled "Deparmnt" of
24      Public "Safery".
25  Q   Is this the type of document that might, or that

1       online on the ICE website?
2   A   Correct.
3   Q   Did you advise anyone at NuStar to take a look at
4       the field guide M-274?
5   A   I typically say, as questions arise, "You can check
6       the M-274 first.  It may save you a phone call to
7       me, because that is the most up-to-date
8       instructions."
9   Q   And are there also available -- when an employer
10      goes to the CIS website to download Forms I-9,
11      there's also a document called:  Instructions on how
12      to fill out Form I-9; is that right?
13  A   Part of the form themselves, there are some, like,
14      limited instructions on the form itself, so part of
15      the I-9, which is actually -- I mean, depending on
16      the version.  But like a nine-page form is
17      instructions.  Um, I don't -- I'll have to look.  I
18      think the new one they don't do that anymore, but...
19  Q   Um, other than documents we've already looked at
20      today, did you give advice to NuStar that if they
21      noticed any obvious typos on identification
22      documents that that should cause them to question
23      the employee about, further about their documents?
24  A   Yes.  Like if on the face something doesn't look
25      right, typos, um, not like a doc- -- yeah, that they

1       should cause an employer to question the employee a
2       little more --
3   A   Yeah.
4   Q   -- about their documents?
5   A   Yes.
6           MR. BISS:  Objection, speculation, inadmissible
7       opinion.
8   A   This would be an example of a document that we would
9       say, "If you notice the typos, you should follow up
10      on that."
11  (By Ms. Hauser)  Um, and just to close the loop, none
12      of the section 2 is filled out for this employee on
13      Form I-9?
14  A   Right.
15  Q   And, again, that would be something that the
16      employer should fill out?
17  A   Yes.
18  Q   I'm going to hand you what's previously been marked
19      as Exhibit 15.
20          Have you had a chance to take a look at this
21      document, Ms. Bahena?
22  A   Yes.
23  Q   And do you recall reviewing this I-9 with NuStar?
24  A   I do not remember.
25  Q   And if this employee was a current employee at the

1    time, do you see anything on the form that would
2    cause you to have given additional advice?
3        MR. BISS:  Objection, inadmissible opinion.
4  A  Well, the List B and C are blank, so I would have
5    advised them to fill that in by the person who
6    inspected the document, if possible.
7        Um, and then they have -- a non-citizen
8    national of the U.S. is checked, um, on the front
9    page, but looking at the documents provided, I don't
10   know if I would have advised them to, um, to push
11   the employee if he's truly a non-citizen national,
12   because a non-citizen national could have, under --
13   based on my understanding, gotten these documents.
14   So if I'm incorrect, I -- if the Social Security
15   card would be different.
16 Q  What about the 900 series on the Social Security
17   card?
18 A  I -- I may have missed that, the 900 series, if it's
19   only ITINs can be 900s.  So I don't know if I --
20   don't know if I would have told them that they
21   should follow up on this one.
22 Q  You've said a few times today:  I might have missed
23   that.  Are you confident in your audit at NuStar?
24 A  Well, we do the best that we can.  Um, there's a lot
25   of forms and a lot of documents.  I don't know if I

1    reviewed this one specifically.
2        So I'm confident that we went there; we gave
3    them correct instructions on how to fill out I-9s.
4    And we marked the I-9s that needed follow-up.  Did I
5    catch every misspelling, like the ██████████ I
6    may have missed that.  We went through a lot of
7    documents.  So, um, is every I-9 I do, review I do
8    perfect?  I wish, but there may be things that I
9    miss.  Um, especially with terminated employees, we
10   don't get as far into those unless we're seeing
11   recurring errors because there's not much you can
12   do.
13       Um, so if this was a -- if this was a current
14   employee, um, I -- I think a lot of people wouldn't
15   know to -- I don't know, looking at this, if they
16   should be pushed on the noncitizen national issue.
17       The num-- -- the Social Security number starting
18   with a nine, I would have to look into if that's a
19   reason to go back and push on an employee.
20 Q  What about if the employee had lived in housing
21   provided by NuStar in Iowa for the last several
22   years but had a California driver's license?
23       MR. BISS:  Objection, speculation.
24 A  That wouldn't come up in my review of the document
25   on its face.

1  Q  (By Ms. Hauser)  So in your review, did you talk with
2    Mrs. Nunes or anyone at NuStar more in depth about
3    any particular employee other than what was on the
4    face of the documents you looked at?
5  A  We didn't talk in depth on particular employees, no.
6  Q  So it was not communicated to you during the audit
7    that this employee had lived on their -- in their --
8    in Nunes' family-owned property for several years?
9  A  No.
10 Q  And I'm going to hand you what's been previously
11   marked as Exhibit 20.  Do you recall reviewing this
12   I-9 and supporting document while you were at
13   NuStar?
14 A  I don't remember.
15 Q  Um, and did you -- um, do you see -- I'll represent
16   to you this employee was a current employee at the
17   time of the audit and thereafter.  Um, do you see on
18   page 1 of the I-9 the address is filled in with an
19   initial from Lori in part 1?
20 A  Yes.
21 Q  Um, did you expect that -- did you give advice to
22   NuStar that they should fill in section 1 if the
23   employee was still there?
24 A  No, I said the employee should, um, they should go
25   and ask the employee to finish section 1 if there

1    were open items.  Unless the employee wasn't there,
2    and then -- and then there's really no other option.
3  Q  And do you see that the employee checked the box
4    called "A noncitizen national of the United States"?
5  A  Yes.
6  Q  And do you see on the second page that the employee,
7    at least the copy here, is that of a permanent
8    resident card?
9  A  Uh-huh.
10 Q  Um, do those -- are those -- are that check box and
11   this card consistent?
12 A  No.  That would have caused me to, um, suggest that
13   they go talk to the employee to see if they filled
14   out section 1 correctly.
15 Q  And did you talk to them -- did you give that advice
16   with respect to this then current employee?
17 A  I can't say with a hundred percent certainty, but I
18   would assume that I said to check why did they check
19   noncitizen national if they presented a permanent
20   resident card.  Sometimes it's just a mistake by the
21   employee.
22 Q  And do you see on the permanent resident card that
23   it has the notation "INS"?
24 A  Oh, I see that now, yes.
25 Q  Is that a notation that appeared on permanent

1      resident cards at that time?

2  A  **No, I do not believe so.**

3  Q  That should at least say ICE or CIS? Or what should

4      it say?

5  A  **CIS, I believe, or just an "A" number, I think. I**

6      **would have to look at an example.**

7  Q  Do you recall discussing this discrepancy with

8      anyone at NuStar at the time?

9  A  **No.**

10      MR. BISS:  Objection to form.

11  A  **No, I don't recall that.**

12  Q  (By Ms. Hauser)  And do you see the, on the back of

13      the card, on the last page of the exhibit --

14  A  **Yes.**

15  Q  -- do you see there's a reference to the U.S.

16      Department of Justice?

17  A  **Yes.**

18  Q  Is that something that appeared on permanent

19      resident cards?

20  A  **I don't know.  I'd have to look at a card.  I**

21      **believe it would be U.S. Citizenship and Immigration**

22      **Services.**

23  Q  I'm going to hand you what's been previously marked

24      as Exhibit 21.  Um, Ms. Bahena, do you recall

25      reviewing this I-9 and supporting document as part

---

1      of your audit?

2  A  **I do not recall.**

3  Q  And I'll represent to you that this was a then

4      current employee at NuStar at the time.

5  A  **Uh-huh.**

6  Q  Um, if you'd look at the Social Security card on the

7      third page, does that Social Security card in your

8      experience look valid on its face?

9      MR. BISS:  Objection, inadmissible opinion.

10  A  **I -- I would say yes.  Nothing jumps out at me.**

11  Q  (By Ms. Hauser)  And the font being off center, that

12      doesn't strike you as odd?

13  A  **I guess I don't --**

14      MR. BISS:  Asked and answered.

15  A  **I don't see the --**

16      MR. HUFF:  The "USA".

17  Q  (By Ms. Hauser)  The "USA" right in the middle.

18      MR. BISS:  Asked and answered.

19  A  **It -- it didn't jump out at me.  And I --**

20  Q  (By Ms. Hauser)  And how about on the permanent

21      resident card, do you see that it says again "INS"?

22  A  **Yes.**

23  Q  Um, did you discuss that with anyone at NuStar

24      regarding this employee's ID?

25  A  **No.**

---

1      MR. BISS:  Asked and answered.

2  A  **I don't believe I would have.**

3  Q  (By Ms. Hauser)  And why is that?

4  A  **It probably didn't jump out at me that it said "INS"**

5      **rather than just a number.**

6  Q  And you don't recall any advice you gave with

7      respect to this employee?

8  A  **I don't recall.**

9  Q  Ms. Bahena, have you had a chance to take a look at

10      Exhibit 109?

11  A  **Yes.**

12  Q  On the second page, by section 2 there's a note

13      "Internal Audit, 10/18".  Do you see that?

14  A  **Yes.**

15  Q  Um, is this one of the I-9 forms that you corrected

16      with Mrs. Nunes?

17  A  **I think we -- in those I think there's a couple that**

18      **we added the employee's first -- the employee's**

19      **first date of employment.  Yes, that seems**

20      **consistent with what I remember.**

21  Q  And it appears the signature was filled in later by

22      Mr. Nunes?

23  A  **It appears so, yes.**

24  Q  And do you recall any specific discussion about this

25      Form I-9?

---

1  A  **I do not recall.**

2  Q  Um, do you recall knowing that section 2 was blank?

3  A  **I would have noted that, yes.  That would have been**

4      **an ongoing note of section 2 needs to be filled in,**

5      **on one said section two is not filled in.**

6  Q  And I think you said earlier, for the ones -- for a

7      current employee, did you advise NuStar to fill in

8      section 2?

9  A  **Yes.  My expectation was they were going to go and**

10      **complete section 2 but ideally by the person who**

11      **looked at the documents.  So, I don't know, I can't**

12      **speak to them, but it may not have been communicated**

13      **to Mr. Nunes to fill out section 2 himself.**

14  Q  And in your letter, in Exhibit 121 --

15  A  **Yes.**

16  Q  -- there's a reference to, um, educating or training

17      the employee who's going to fill out the forms on

18      how to properly inspect documents.

19      Do you see that?

20  A  **Yes.**

21  Q  What was your advice in that regard?

22  A  **Could you rephrase the question?**

23  Q  Sure.  Um, was filling out section 2 part of the

24      advice that is part of that section of the letter?

25      I'm going to take -- I withdraw it.  I'll ask a

1    better question.

2         At the bottom of your letter it says:  As we

3    discussed, the employer portion of the form should

4    be filled out by the staff member who actually

5    inspects the employees' identification documents.

6 A  Yes.

7 Q  Did you communicate that in person to Mrs. Nunes?

8 A  I did to Mrs. Nunes.  Um, I think that -- I recall

9    that being a large part of the conversation, um, was

10   one person was taking copies and the other person

11   was filling out the I-9, whether they had a

12   misunderstanding of the rules or what.  Um, and so

13   my understanding was whoever looked at these, um, or

14   whoever signed the bottom saying they looked at

15   those was going to be the person who finished

16   section 2, but I never followed up to see if that

17   had happened.

18 Q  Um, and where it says, "If that," in your letter,

19   "If that individual is not yourself, it is important

20   that you adequately train the inspecting staff

21   person."  Was it your expectation that Mrs. Nunes

22   was going to educate Mr. Nunes on that?

23 A  I don't remember exactly.  I just remember there

24   were more people involved than I felt needed to be

25   and it would be cleaner and they'd have more

1    accuracy if one person was involved.  And that was

2    more in line with the regulations as well.

3         (Discussion off the record between Ms. Hauser

4         and Mr. Boyer.)

5 Q  (By Ms. Hauser)  Um, looking at your letter, um, it

6    says in the beginning at the end of the third line,

7    "During our audit, we did find some blanks in

8    certain forms."

9         Um, were there any forms where section 2 was

10   filled out properly?

11      MR. BISS:  Object to the form.

12 A  I believe so.  Otherwise -- yeah, I don't remember,

13   but I would have -- yeah, I believe there was, but I

14   don't remember, and I couldn't say which ones.  It

15   seems different people, they had used different

16   practices over time.  For a while Lori did them, and

17   then they kind of switched the practice, um, so it

18   kind of depended on their practice, I think, in any

19   given year how -- how they were filled out.

20 Q  Did it -- did you express any -- aside from what's

21   in your letter, what did you communicate to NuStar

22   about any concerns you had about the blanks?  Is

23   there more that you discussed with them than what's

24   in your letter or what we already talked about today

25   concerning blanks that you found?

1 A  Completing, um, the I-9s, if -- if you don't have

2    the documents that look valid to fill it out, then

3    having the hard conversation and asking for those

4    documents, and if they can't produce them, then, um,

5    you have to terminate the employee.  But other than

6    that, no.  It's a requirement that the I-9 be filled

7    out completely.

8 Q  Did you advise them that any employee ought to be

9    terminated based on your audit?

10 A  No.  If there was concerns on any I-9, I would have

11   set them aside and told them to follow up with the

12   employee if there were questions.  But would I

13   terminate a employee simply based on an I-9?  No.

14 Q  How many did you set aside for them to follow up

15   with the employee?

16 A  I do not recall.

17 Q  There were some?

18 A  Yes, there would have been some.

19 Q  Current employees?

20 A  Yes, some.

21 Q  And that's not in your letter?

22 A  No, that's not in my letter.

23 Q  Why not?

24 A  It's -- we would have flagged them as blanks in the

25   form and said, "Only employees can fill out the

1    first page.  You have to do the second page."  But

2    that's part of completing the I-9.

3 Q  You say at the end of the first paragraph, "The

4    solution to this is for the employer to carefully

5    review the employee and employer portion of the form

6    to ensure that every required question is answered."

7         Do you see that?

8 A  Yes.

9 Q  Did you give any other advice about that other than

10   what we've already talked about today?

11 A  Other than what we've talked about today, I don't

12   believe so.

13 Q  The second paragraph of your letter you discussed

14   storage.  Did you express any concerns to NuStar

15   about how the I-9 forms were being stored at the

16   time?

17 A  I think they had questions about how to store I-9

18   forms and what the rules were, um, so that was just

19   a follow-up.  But I didn't think that electronic

20   storage for them would be the best just because

21   there's a lot of regulations and they're, yeah,

22   they're not Human Resources trained, so --

23      THE COURT REPORTER:  I'm sorry?  They're not?

24      THE DEPONENT:  Like trained in Human Resources

25   specifically.

1  A    So I had worries that maybe the electronic storage
2       would not be the best.
3  Q    (By Ms. Hauser) Um, and that's because there are
4       certain security requirements around electronic
5       storage, et cetera?
6  A    Right. That's actually why I don't copy the I-9s
7       that I review because I don't want to run afoul of
8       electronic storage of I-9s.
9  Q    Um, in the third paragraph, we already talked about
10      the different color pen. And then the next sentence
11      says, "It will show the government that you are
12      putting forth the best efforts to comply with I-9
13      requirements." What did you discuss with NuStar
14      about that?
15 A    Oh, I mean, as we reviewed these documents, we don't
16      want to try to fix errors without showing what
17      you're doing, because that could be fraud and it
18      will just raise more questions if there's an audit.
19      It's very -- I've seen people who have tried to do
20      their own internal audits, and, um, not clearly mark
21      which questions or what things they added and then
22      it calls all of the I-9s into question from the
23      beginning. Um, so, I mean, both to avoid looking
24      like you're committing fraud or something and to
25      show these were the only issues we needed to correct

1       on this I-9, not the whole I-9, I make sure that
2       they're indicating what corrections they're making.
3  Q    And so you had communicated to someone at NuStar
4       that as the documents existed at the time of your
5       review, they were not in compliance with I-9
6       requirements?
7            MR. BISS: Object to the form.
8  A    It's a bit of a loaded question, because it's rare
9       to go to any I-9 review, and I don't know if anyone
10      has, and find perfect I-9s. It's just the nature of
11      I-9s. Um, so were there things they needed to
12      correct, were there I-9s that were not in
13      compliance? Yes. Were there I-9s that, um, were
14      too late to correct? Yes. Um, were there I-9s that
15      had technical errors that could be corrected? Yes.
16      So I advised them to make the corrections they were
17      able to make.
18 Q    (By Ms. Hauser) At the time that NuStar was going to
19      fill in the certification section on section 2 after
20      the fact, after the audit --
21 A    Yes.
22 Q    -- did you advise NuStar that they should be taking
23      another look at the photocopies of the
24      identification documents?
25 A    To some extent. Um, I wanted to make sure the

1       person who viewed them the first time, if possible,
2       was the person, if the attestation wasn't complete,
3       that completed the attestation to be consistent.
4            I wanted the person who, if the line 2 was
5       blank and completed the attestation -- like if
6       Anthony had completed the attestation but not
7       completed part 2, I wanted Anthony to complete
8       part 2.
9            I wanted to avoid wide -- I counseled them not
10      to do a widespread reverification, um, of every
11      employee, even though they were nervous, because
12      that also is, you can run into discrimination, but
13      if there were employee documents that looked
14      invalid, to follow up on those. I didn't, in so
15      many -- yeah, I don't know exactly how I put that,
16      but that was my message at the time and -- and --
17      and my philosophy.
18 Q    (By Ms. Hauser) And on the ones you counseled them
19      to follow up on, did you counsel them to ask for
20      originals again or to review the photocopies?
21 A    If I -- if I saw an issue with a photocopy, it would
22      have been: This document doesn't look correct. You
23      should ask for an alternate document.
24 Q    And you did do that on this audit?
25 A    I don't remember specific employees or which

1       documents, but if I saw a document that looked
2       obviously false, I would have said: Follow up and
3       ask if they have another document or like an
4       expired (sic) one for a current employee, or do --
5       yeah, look into it.
6  Q    So, for example, when we looked at Defendants'
7       Exhibit 17 and 18, um, there's only a Social
8       Security card and no identification document. Did
9       you advise NuStar to ask that employee for
10      additional documentation?
11 A    I -- if I saw this, my practice would be to advise
12      them to ask for a List A or List B document. I
13      don't recall the exact conversation or the exact
14      reviewing this I-9.
15           THE COURT REPORTER: I'm sorry, reviewing?
16           THE DEPONENT: This exact I-9.
17 Q    (By Ms. Hauser) What did you mean in the last
18      paragraph, or the last full paragraph of your
19      letter, um, to inspect the employee documents?
20      What's -- what's part of an inspection? Sorry,
21      previous paragraph.
22 A    Okay. Well, an I-9 -- inspecting the employee
23      documents would be the person -- you're supposed to
24      handle the original document. So the person who's
25      handling the original document is supposed to be the

```
1       person that does the attestation.
2   Q   And they're attesting that they've checked the
3       document to make sure it appears valid on its face?
4   A   Yes.
5   Q   And that it relates to the person who filled out the
6       Form I-9 with their name?
7   A   Yes.
8   Q   And it says, "If that individual is not yourself, it
9       is important that you adequately train the
10      inspecting staff person."  What -- other than what
11      we've already talked about today, was there anything
12      else you discussed with NuStar about that training?
13  A   I remember Lori was mentioning that she felt she had
14      a lot on her plate and that she was actively
15      involved -- I mean, if I remember right, they have
16      kids, and she was helping with calves and -- and
17      talking about chores, and then the I-9s she felt I
18      think -- I don't want -- like there was a lot for
19      her to do.  Um, so we mentioned, "You could, you
20      know, hire someone.  But if you hire someone, then
21      you need to make sure they're trained," so ...
22      "Like an employee could do this.  It doesn't need to
23      be an owner or manager."
24  Q   Do you recall any specific indicia of invalidity
25      that you, regarding documents that you spoke to the,
```

```
1       had marked the document CEO?
2       MS. HAUSER:  Yes.
3       MR. BISS:  I take it that's Counsel's Eyes
4   Only?
5       MS. HAUSER:  Correct.
6       MR. BISS:  Okay.  Thanks.
7       (Exhibit 135 marked for identification.)
8   Q   (By Ms. Hauser)  And, Ms. Bahena, the court reporter
9       has just handed you Exhibit 135.
10      MS. HAUSER:  And I just want to state for the
11      record:  The handwritten letters "CEO" on the bottom
12      right corner are my handwriting and not part of the
13      original document.
14  Q   (By Ms. Hauser)  Ms. Bahena, what is the document
15      135?
16  A   This is a regenerated invoice from our billing
17      system for, um, the services to NuStar from 2018.
18  Q   And does this document refresh your recollection as
19      to when you visited the farm?
20  A   Yes.
21  Q   And when was that?
22  A   It was October 8th, 2018.
23  Q   Um, and does this invoice capture the sum and
24      substance of all the work that you did on NuStar's
25      I-9 audit?
```

```
1       NuStar about?
2   A   I don't remember.
3   Q   Did you have such a conversation?
4   A   I remember saying, "You need to make sure documents
5       look valid on their face.  Um, there's ways that you
6       can get trained up in that."  But, I mean, we didn't
7       have this lecture on seeing valid versus invalid
8       documents, no, we didn't get into the in-depth
9       training on that.
10  Q   Did anyone at NuStar ask you:  What can -- what
11      should I look for?
12  A   I don't remember.
13  Q   You don't remember one way or another or you didn't?
14  A   I don't remember.  I don't remember.  If they had
15      asked, I would have probably pointed them to online
16      resources where you can compare what a document
17      looked like at that date and time.
18  Q   I'm going to hand you --
19      MS. HAUSER:  -- hand the court reporter a new
20      document to mark as Exhibit --
21      THE COURT REPORTER:  135.
22      MS. HAUSER:  135.  This is a copy of
23      invoices dated November 13th of 2018 that were
24      produced during the deposition.
25      MR. BISS:  Kristen, you said earlier that you
```

```
1   A   Yes.
2   Q   What did you discuss with NuStar in terms of options
3       for sponsoring future employees?
4   A   I don't recall the exact conversation, but it would
5       have been similar to the H-2As, the TNs and the
6       green cards.  I get those questions a lot.
7   Q   That we discussed earlier today?
8   A   Yes.
9   Q   And there's a reference to additional I-9 training.
10      Um, did that comprise anything other than what we've
11      already talked about today?
12  A   No, I don't believe so.
13  Q   Um, did Mrs. Nunes ask about options for sponsoring
14      future employees?
15  A   I don't remember if she asked or if I offered some
16      ideas to fill some gaps.
17  Q   Did they express to you they had employee, excuse
18      me, staffing needs?
19  A   I don't remember.
20  Q   What gaps were you trying to fill?
21  A   Well, she felt that --
22      MR. BISS:  Object to the form.
23  A   She -- like the TNs, the ones I would have
24      suggested, for example, would have been a higher
25      level employee, and I remember she was talking about
```

1  how it's very busy and a lot of work, um, so I
2  mentioned other dairies can get an animal scientist
3  and breeders under these programs, and, um -- yeah,
4  I probably -- yeah, and if -- petitioning long term
5  for milkers, but I don't remember the exact
6  conversation. Those would be long-term planning.
7  Q  (By Ms. Hauser)  Um, did you advise NuStar that,
8  quote, everything was fine with their I-9 documents?
9  A  I wouldn't have used those exact words.
10 Q  Did you give them, in sum and substance, that
11 advice?
12 A  I do remember saying that I could -- I could -- to
13 this effect:  I could tell that she was trying to
14 comply.  She seemed very anxious about whether or
15 not she had done things correctly, and I assured her
16 that it seemed like she was trying to comply.
17 Q  Did you -- asked by -- were you asked by NuStar to
18 judge the validity of any underlying supporting
19 documents?
20 A  Aside from the I-9s?
21 Q  Correct.
22 A  No.
23 Q  So part of your audit wasn't to tell NuStar who
24 among the employees had provided valid versus
25 invalid documents?

1  A  No.
2  Q  Did NuStar ask you to advise them who among their
3  employees were legal to work in the U.S.?
4  A  No.
5  Q  Did they ask you to let them know who you might have
6  suspected was not legal to work in the U.S.?
7  A  I don't remember that exact question.
8  Q  Was there a question like it?
9  A  Or like -- I don't remember them asking like looking
10 through these I-9s, is there, you know, other than
11 the I-9 review, beyond the I-9 review.  I guess we
12 looked through the I-9s and she wanted to make sure
13 she was doing the paperwork correctly.
14 Q  In your experience doing I-9 audits for clients
15 generally, um, do you provide services beyond just
16 seeing if the paperwork is done correctly?
17    MR. BISS:  Objection, inadmissible opinion.
18 A  No.  Do I go out and interview employees or
19 anything?  No, I do not do that.
20 Q  (By Ms. Hauser)  But if identification copies are
21 made available to you during an audit, you certainly
22 will take a look at them?
23 A  Yes.  If someone brought me an ID and asked me, an
24 original ID and asked me to look it over, I would be
25 open to doing that.

1  Q  And that didn't happen at NuStar?
2  A  No, I didn't see any original IDs.
3  Q  Did you advise anyone at NuStar that certain
4  employees may have provided fake documents?
5  A  I wouldn't be able to say with certainty at NuStar
6  at that audit if I had or not.  I -- I don't
7  remember.  I would have taken an I-9 at a time.
8  Q  And you have no recollection if at any time you said
9  to anyone that an employee may have provided a fake
10 document?
11 A  I don't recall.  But if I had seen one that jumped
12 out at me, I would say, you know:  Follow up on
13 this, if they were still a current employee, or:
14 Set it aside.
15 Q  Did you advise anyone at NuStar that employees may
16 be engaging in identity theft?
17 A  No.  Like using someone else's name and ID?  No, I
18 didn't advise that.
19 Q  Did you advise them on the risks that some workers
20 may be using false Social Security numbers or...?
21 A  Yes.
22 Q  Do you know how many?
23 A  No.
24 Q  Did you advise them that certain workers may not be
25 properly authorized to work in the U.S.?

1  A  Yes.  I explained that documents can look fine on
2  their face but that doesn't guarantee that it's --
3  it's an authorized worker.
4  Q  And did you reference any specific employees in that
5  conversation?
6  A  No.
7  Q  Did your I-9 audits speak to the issue of whether
8  NuStar had a legal workforce?
9  A  No.
10 Q  And NuStar didn't ask you about that?
11 A  No.  I mean, I wouldn't be able to opine that based
12 on the I-9 audit.  I would have had to do further
13 investigation.
14 Q  And you weren't asked to do any further
15 investigation?
16 A  No.
17 Q  And you didn't offer to do any?
18 A  I would have referred something like that out most
19 likely.
20 Q  Is it possible that some of the workers whose I-9s
21 you reviewed are, in fact, not properly authorized
22 to work in the U.S.?
23 A  Yes.
24    MR. BISS:  Objection, speculation, inadmissible
25 opinion.

1 Q    (By Ms. Hauser)  Do you agree that having a complete
2      I-9 on file for a worker is no guarantee that the
3      person is legal to work in the U.S.?
4 A    Yes.
5         MR. BISS:  Objection, inadmissible opinion.
6 Q    (By Ms. Hauser)  Did you give any advice to NuStar on
7      the government's offer of a program called E-Verify?
8 A    Yes.
9 Q    What did you discuss in that regard?
10 A   I tell them that there is an optional program
11     available, E-Verify, ran through a little bit how
12     that works, um, and that it can reduce the risk of
13     having employees, for example, that their documents
14     look fine but they're fraudulent.  Um, I don't know
15     if we went farther than -- I mean, I don't recall
16     the exact conversation, but I do bring up E-Verify
17     in I-9 audits.
18 Q   Um, did you give any specific advice to NuStar as to
19     whether they should or should not use it or consider
20     using it?
21 A   Kind of --
22        MR. BISS:  Asked and answered.
23 A   I mean, I don't remember the exact conversation, but
24     I just give them the pros and cons and leave that up
25     to the individual employer.  Um, yeah, I just --

1      yeah, I let them weigh it.  And I don't tell them to
2      do it or not to do it.
3 Q    Did Mrs. Nunes say anything in response to that
4      advice?
5 A    I don't remember.
6 Q    In giving advice on the risks that some workers may
7      be using false Social Security numbers, did
8      Mrs. Nunes say anything in response to that advice?
9 A    I don't remember.
10        MR. BISS:  Object to the form of the question.
11 Q   (By Ms. Hauser)  What are the pros and cons of
12     E-Verify?
13 A   Well, the pro is it's -- it allows you to check to
14     make sure the employee's, um, name matches their
15     Social Security number in the Social Security
16     database, so it can reduce the risk that you are
17     unknowingly employing undocumented workers going
18     forward.
19        Um, the cons, it's more paperwork that needs to
20     be done.  And you can't go back and verify existing
21     employees, so it's looking forward only.
22        Um, you need -- once you decide to do it, you
23     need -- it's -- essentially you need to do it
24     forever going forward.  So it's a commitment to do
25     that.

1 Q    If ICE was going to conduct a review of a business'
2      I-9s, they would review the photocopies of the IDs
3      if an employer had those on file?
4 A    Yes, if they were --
5         MR. BISS:  Object to the form, speculation,
6      inadmissible opinion.
7 Q    (By Ms. Hauser)  Based on your experience?
8 A    Based on my experience, if they're attached to the
9      I-9, they will review them as part of the I-9.
10 Q   Based on your experience, would ICE check the
11     employee's proffered names, birthdays and Social
12     Security numbers against databases to determine if
13     they match the government's records?
14 A   Based on my experience, yes.
15        MR. BISS:  Objection, inadmissible opinion.
16 Q   (By Ms. Hauser)  And if they didn't match, would they
17     notify the business?
18 A   Based on --
19        MR. BISS:  Objection, speculation, inadmissible
20     opinion.
21 A   Based on my experience, they will provide a list of
22     the names of employees who do not match.
23 Q   (By Ms. Hauser)  And if an employee -- employer
24     received a no-match letter from the government, can
25     an employer also access who, in its employee, among

1      its employees, came back as the no match?
2 A    From ICE?
3         MR. BISS:  Objection to form, speculation,
4      inadmissible opinion.
5 A    A no-match letter from ICE like in the context of
6      a --
7 Q    (By Ms. Hauser)  Sorry.  Do you have an understanding
8      that at some point the government revived a practice
9      of sending to employers a notice that employees for
10     whom they had submitted wage information did not
11     match the Social Security Administration's records?
12 A   Yes.
13 Q   If an employer receives such a letter, do you have
14     an understanding that the employer can follow up
15     online to find out which of its employees produced
16     the no-match results?
17        MR. BISS:  Objection, inadmissible opinion.
18 A   There's instructions, um, to employers, through the
19     Social Security Administration, on how to handle
20     those no-match letters.  When I get questions for
21     them, I direct them to that.  And there's a form
22     letter that you're supposed to give to every
23     employee that you get a no-match letter for to let
24     them know that you got a no-match letter.
25        Um, and then I -- it depends on the employer

1    situation and the no-match letter, so I wouldn't be
2    able to -- I don't feel comfortable just giving
3    general advice on how to handle no-match letters
4    because it depends on the employer.
5  Q   (By Ms. Hauser)  Is one other con of E-Verify that it
6    may prevent you from being able to hire someone?
7        MR. BISS:  Object to the form, inadmissible
8    opinion.
9  Q   (By Ms. Hauser)  Based on your experience?
10  A   If someone comes up as a tentative non-confirmation
11    in E-Verify, then before you hire them you need to
12    have them go -- like, you let them know -- there's
13    these specific notices that you get.  Um, and if the
14    situation isn't resolved in the statutory period of
15    time under the regulations, then you should not --
16    then you cannot hire that worker, yes.
17  Q   Did Mrs. Nunes ask you about visa sponsorship for
18    any specific current employees?
19  A   No.
20  Q   Did she ask if it was possible for NuStar to get
21    legal status for any existing employees?
22  A   I don't remember.
23  Q   And of the pros and cons of E-Verify that you
24    testified about in the last few minutes, did you
25    tell those to Mrs. Nunes?

1  A   I don't recall exactly, but I know -- that's
2    normally part of my I-9 review and -- and training.
3  Q   Um, going back to ICE, if ICE notifies an employer
4    that certain employees' information doesn't match
5    government's records, would the business have to
6    take action in response to that notice?
7        MR. BISS:  Objection, speculation, inadmissible
8    opinion.
9  Q   (By Ms. Hauser)  In your experience?
10  A   Can you ask the question again?
11        MR. BISS:  That doesn't -- that doesn't cure
12    it.
13  A   I'm getting a little tired.  Can you ask the
14    question one more time?
15  Q   (By Ms. Hauser)  Sure.  If a business receives notice
16    from, following an ICE audit that certain employees
17    did not match the government's records, does the
18    business have an obligation to take action in
19    response?
20        MR. BISS:  Same objections.
21  A   Yes, it has a certain amount of time to follow up
22    with those employees.  Some of them are just due to
23    misspellings, um, inaccuracies in the Social
24    Security Administration, um, but if the error can't
25    be corrected and they can't bring in documents that,

1    or corrected documents so that it does match Social
2    Security database, then you have a certain amount of
3    time to terminate that employee.  And in my
4    experience usually that time is, they give you a
5    time, and then you negotiate, um, with the
6    government if you can keep employees who are willing
7    to stay on a little longer, just for the business,
8    you know, depending on the extent of the situation.
9  Q   (By Ms. Hauser)  And did Mrs. Nunes ask you, in sum
10    or substance, if -- if NuStar would lose employees
11    if ICE did an audit?
12  A   I don't know if she asked me specifically, but I
13    would have warned her of the risk.
14  Q   What other risks of an ICE audit did you inform her
15    of?
16  A   Civil and -- civil monetary penalties, um, and if
17    ICE had any reason to believe that anyone was
18    knowingly employing an unauthorized worker, there
19    could be up to criminal penalties.
20  Q   And did you discuss any of the discrepancies in
21    their practices that could result in such penalties?
22  A   Civil penalties, yes.  I didn't see anything in my
23    discussions with her or review that would lead to
24    criminal level penalties.
25  Q   How -- based on your I-9 audit at NuStar, how high

1    was the risk that NuStar would lose workers if ICE
2    audited them?
3        MR. BISS:  Objection, inadmissible opinion.
4  A   I couldn't speculate as to that, but -- yeah, I
5    should not speculate.
6  Q   (By Ms. Hauser)  Did you express to them that there
7    was any such risk?
8  A   Yes.
9        MS. HAUSER:  Let's take a short break.  I'm
10    going to check my notes, but I think I might be very
11    close to done.  So I will go be efficient with my
12    colleagues, and we'll come back in like ten minutes.
13        THE VIDEOGRAPHER:  This ends media unit
14    number 4 in the video recorded Zoom deposition of
15    Amanda Bahena, to be continued on media unit
16    number 5.
17        We're going off the record at 3:52 Central
18    Time.
19        (Recess taken.)
20        THE VIDEOGRAPHER:  This is media unit number 5
21    in the video recorded Zoom deposition of Amanda
22    Bahena.
23        We're back on the record at 3:58 p.m. Central
24    Time.
25  Q   (By Ms. Hauser)  Ms. Bahena, after you completed the

1    I-9 audit for NuStar and sent them the letter, did
2    you continue to counsel them on immigration issues?
3  A  No.
4  Q  Did you hear from anyone at NuStar again after the
5    audit otherwise?
6  A  Not that I recall.
7  Q  Um, did you communicate with anyone at NuStar when
8    you received a subpoena for documents in this
9    lawsuit?
10 A  I don't think so.
11 Q  Did NuStar ever seek your advice concerning no-match
12   letters from the U.S. Social Security
13   Administration?
14 A  No.
15 Q  Did you speak to Anthony Nunes, Jr., who is
16   Mrs. Nunes' father-in-law, at all when you visited
17   NuStar?
18 A  I think about five minutes.  He was clearly working
19   on the dairy.  And he came in and said hello.  Um, I
20   don't -- I don't remember exactly what we talked
21   about, um, but he was more just friendly, "Thank you
22   for coming," um, and then left.  But I -- not very
23   much at all.
24 Q  Did you meet with Mrs. Toni Dian Nunes when you
25   visited the farm?

1  A  I don't even know who that is.
2  Q  That is Lori's mother-in-law.
3  A  No.
4  Q  Did you meet with anyone else at the farm while you
5    were there?
6  A  No.  It was just, um, Lori, and then her husband
7    came in, Anthony Nunes the Third, um, for a short
8    time, and we chatted.  And I think while I was
9    chatting with him, um, Mr. Anthony Nunes, Jr. came
10   in and said hello, and then I think -- was just in
11   the middle of doing some chores.
12 Q  Um, other than the testimony you've already given
13   today, do you recall any other conversations you had
14   with any of the Nunes's while you were at the farm?
15 A  No.  I mean, only what it was like to move to Iowa,
16   and, um, she told me maybe -- like they told me a
17   little bit about their kids and things, just
18   personal type, um, conversations.
19 Q  And other than what you've already testified about
20   today, did you give any other advice to NuStar about
21   immigration risk at the farm?
22 A  Other than what I talked about today, no, not that I
23   recall.
24 Q  Um, did NuStar ask any other questions of you other
25   than what we've already talked about today?

1  A  Not that I recall.
2  Q  I have no further questions.
3            EXAMINATION
4  BY MR. BISS:
5  Q  Amanda, I've just got a couple of questions.  Good
6    afternoon.  Or is it late evening now?  The sun has
7    gone down here in Charlottesville, Virginia.  I
8    didn't think that I had the energy to get through
9    this deposition, but I did, I found the energy and I
10   found the strength.  And I have just a couple of
11   questions.
12       Um, the conversations that you testified about
13   concerning the risks of an ICE audit, those were
14   general conversations about the risks of an ICE
15   audit; they didn't pertain to any particular
16   employee at NuStar, correct?
17 A  Correct.
18       MS. HAUSER:  Objection.
19 Q  (By Mr. Biss)  Okay.  And then -- and then my last
20   question -- there might be two or three, because
21   that's how it goes sometimes.  During today's
22   deposition you were shown, I'm going to say
23   hundreds; it probably wasn't hundreds but it was a
24   lot of documents, including the letter that you
25   authored dated October 12 and an invoice dated

1    November 13 that no doubt you authorized to be
2    delivered to your client.  But in not one of those
3    documents and in not one of the questions that my
4    colleague, Counsel for the Defendants, asked you
5    today, did the name Devin Nunes ever come up.  Do
6    you remember hearing the name Devin Nunes today?
7  A  No.
8  Q  Do you remember seeing his name on any document that
9    you were shown today?
10 A  No.
11 Q  And this is true, isn't it:  During the 2018 audit,
12   um, Devin Nunes' name never came up once, correct?
13 A  That is not correct.
14 Q  Okay.  So when did his name come up?
15 A  Hmm, I don't recall, but I -- I don't recall the
16   exact context.  It wasn't in the case of the dairy
17   and stuff.  It was more like family --
18 Q  Okay.
19 A  -- personal stuff.
20 Q  So it -- so it had nothing to do with the dairy?
21 A  No, it didn't, not with his involvement or the dairy
22   or the I-9s.  It was just -- I may have asked out of
23   curiosity.
24 Q  Okay.  Now, you know who Devin Nunes is, right?
25 A  Yes.

1  Q    And when you went to the dairy on October 8th, you
2       knew who Devin Nunes was, correct?
3  A    **Yes.**
4  Q    You knew that he was a congressman, correct?
5  A    **Yes.**
6  Q    Did you know that he was, um, Anthony -- did you
7       know that he was Lori's brother-in-law?
8  A    **Yes.**
9  Q    And how did you know that?
10 A    **From the article.**
11 Q    Is that the only source of information as to who
12      Devin Nunes was and how he was related to Lori and
13      the Nunes's in Sibley, Iowa?
14 A    **To my recollection, yes.**
15 Q    Other than, um, other than a casual mention of Devin
16      Nunes being related to Lori Nunes and Anthony,
17      Junior and Anthony the Third, this is true, isn't
18      it, Devin Nunes' name didn't come up at all?
19 A    **Correct.**
20 Q    Okay. Amanda, I don't have the energy to ask you a
21      single other question. So I thank you for your
22      time.
23           MS. HAUSER: I just have one, if you'll indulge
24      me, just to clarify the record.
25      * * * * *

1            We're going off the record at 4:06 p.m. Central
2       Time.
3            MR. BISS: No orders. Thank you.
4            THE COURT REPORTER: Would you like to order
5       the transcript.
6            MS. HAUSER: Yes, rough today or tomorrow.
7            MR. BOYER: Two weeks is fine on the final.
8            THE COURT REPORTER: Would you like her to read
9       the transcript?
10           MR. HUFF: I advise them to waive reading and
11      signing.
12           THE COURT REPORTER: And would you like to
13      order the transcript?
14           MR. HUFF: Yes.
15           * * * * *
16           (The deposition concluded at 4:06 p.m. Central
17           Time, February 22, 2022.)
18
19
20
21
22
23
24
25

1                 FURTHER EXAMINATION
2  BY MS. HAUSER:
3  Q    Mr. Biss asked you if Mr. Devin Nunes' name was on
4       any of the documents you were shown today, and I
5       just want to clarify that you did see a couple of
6       news articles as exhibits and was Mr. Devin Nunes'
7       name mentioned in those exhibits?
8  A    **Yes. Thank you. They were in the news articles**
9       **that were exhibits.**
10 Q    No further questions.
11           THE VIDEOGRAPHER: Okay.
12      Um, while we're on the record we've just got to
13      get orders, so I'll let Cindy go first.
14           MS. HAUSER: Ms. Bahena --
15           THE COURT REPORTER: Excuse me. I just --
16           MS. HAUSER: -- you are excused.
17      We are off the --
18           MR. BISS: Okay, so -- so --
19           THE COURT REPORTER: Excuse me. The
20      videographer has to go off the record first.
21           MR. BISS: All right, let's go off the record
22      then. We can do this off the record.
23           THE VIDEOGRAPHER: This ends media unit
24      number 5 and concludes today's video recorded Zoom
25      deposition of Amanda Bahena.

1      CERTIFICATE OF COURT REPORTER AND NOTARY PUBLIC
2  STATE OF SOUTH DAKOTA )
                          ) ss.
3  COUNTY OF PENNINGTON  )
4        I, Cindy K. Pfingston, a Registered
     Professional Reporter and Notary Public in and for
5    the County of Pennington, State of South Dakota,
        DO HEREBY CERTIFY that on the 22nd day of
6    February, 2022, there appeared before me pursuant to
     Notice and/or Stipulation
7
8                    AMANDA J. BAHENA
9        The deponent named herein, a witness in the
     above-entitled cause;
10       That the said deposition was then taken at the
     time and place indicated; that counsel appeared on
11   behalf of their respective parties as indicated;
        That the foregoing testimony was taken by me in
12   shorthand and thereafter reduced to typewriting
     under my supervision, and the foregoing typewritten
13   pages contain a full, true and correct transcription
     of all the testimony of said witness;
14       That the reading and signature of the witness
     to the deposition was expressly waived by the
15   witness and respective counsel;
        That I am not of kin or in anywise associated
16   with any of the parties to said cause of action, or
     their counsel, and that I am not interested in the
17   event thereof.
        IN WITNESS WHEREOF, I have hereunto set my hand
18   this 10th day of March, 2022.
19
20
21      _____
22      CINDY K. PFINGSTON
        Registered Professional Reporter
23          and Notary Public
        Pennington County, South Dakota
24      My Commission expires:   2-4-2028
25